## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JEOFFREY L. BURTCH, CHAPTER 7 TRUSTEE, FACTORY 2-U STORES, INC., et al., <br><br> Plaintiff, <br><br> v. <br><br> MILBERG FACTORS, INC., CAPITAL FACTORS, INC.  THE CIT GROUP/COMMERCIAL SERVICES, INC., GMAC COMMERCIAL FINANCE LLC, HSBC BUSINESS CREDIT (USA) INC., ROSENTHAL AND ROSENTHAL, INC., STERLING FACTORS CORPORATION, WELL FARGO CENTURY INC., <br><br> Defendants. | Civil Action No. |

## COMPLAINT
## (JURY TRIAL DEMANDED)

Jeoffrey L. Burtch, Chapter 7 Trustee (the "Trustee"), for Factory 2-U Stores, Inc.,

A/K/A Factory 2-U, F/A/K/A General Textiles, Inc., F/A/K/A General Textiles, F/A/K/A Family

Bargain Corporation, F/A/K/A Family Bargain Center (collectively "Factory 2-U"), as and for

his Complaint, states as follows:

## Introduction

1.      This is a complaint seeking damages for an illegal group boycott to deny credit and price fixing in violation of Section 1 of the Sherman Act, together with a related claim for unlawful restraint of trade under the New York State Donnelly Act, N.Y. Gen. Bus. L. § 340.

2.      Factory 2-U Stores, Inc. ("Factory 2-U"), prior to its closure and pending liquidation in bankruptcy, was a major discount clothing retailer, operating more than 200 stores in ten states.

### A. The Factoring Business

3.      Defendants are engaged in the business of "factoring." Factors are lenders who play a major role in financing purchase and sale transactions between garment manufacturers[1] and garment retailers, such as Factory 2-U. Factors extend credit to garment industry businesses in two distinct ways: (1) through written "factoring" agreements with clients (i.e. garment manufacturers), and (2) through oral "customer credit" agreements and relationships with their clients' customers (i.e. garment retailers). Factors function, in effect, as many garment manufacturers' credit departments by reviewing the creditworthiness of the retailers to whom those manufacturers sell, by extending credit for manufacturers' sales to particular retailers, and by purchasing manufacturers' receivables on a full, partial, or non-recourse basis. The factors collect the money from retailers through collection calls on past due or over limit accounts. Factors receive and clear checks from retailers, and apply the receipts.

4.      A "factoring agreement" is one by which a factor provides financing to a client by purchasing the client's accounts receivable at a small discount, usually between 0.5% and 0.9% of the face amount of the receivables. The factor and the client may agree that the factor will make advances to the client, at normal commercial interest rates, in amounts up to 70% to 90%

---

[1] In this Complaint, all references to garment manufacturers shall include garment wholesalers.

of the face amount of the receivables, which advances are repaid when the factor collects the receivable from the garment retailer.

5.     When a factor purchases a client's accounts receivable, it assumes the risk of collecting the accounts receivable.  The factor assumes that risk only as to those sales to customers that the factor approves (or "credit checks", in the parlance of the industry).   When a factor refuses to "credit check" a client's customer, the factor declines to approve orders placed by the customer with the factor's client.  Any sale by the client to that customer becomes a "client's risk" sale if the client elects to go forward with the transaction.  Since a garment manufacturer usually cannot afford to risk sales that are not acceptable to a factor, the factor's "credit check" decision usually determines whether a sale is made.

6.     Although factors advertise that they will assume their clients' credit risk, upon information and belief, factors almost always include in their factoring agreements a boilerplate provision stating that the factor has discretion to refuse to "credit check" a garment retailer for any reason at all.  This allows the factors to refuse to "credit check" a garment retailer for reasons that have nothing to do with the retailer's creditworthiness.

7.     Factors compete with each other to provide financing to garment manufacturers. This financing enables garment retailers such as Factory 2-U, to purchase the inventory that they sell to their customers.  If a factor's "credit check" decision is adverse to the garment retailer, not only is the garment manufacturer unable to sell its materials to the garment retailer due to its inability to quickly convert accounts receivable into cash, but the garment retailer is left with insufficient inventory to sell to its customers.

8.     Factors determine the terms and conditions on which they will deal with particular retailers and manufacturers, including the discount rate at which factors will purchase

receivables from manufacturers owed by retailers, payment terms required of retailers, and indeed, whether purchases by particular retailers from particular manufacturers will be financed at all. Because small to medium-sized garment manufacturers and retailers often lack access to other forms of financing, factor financing is essential to their ability to remain profitable, viable businesses. Because a factor's credit decision determines whether a sale is made between a garment retailer and a garment manufacturer, the factors exert significant control over the garment industry.

9.      Defendants are all factors that ostensibly competed with each other to provide credit to Factory 2-U, and financing for Factory 2-U's purchase of inventory from several garment manufacturers. In fact, they regularly discussed and agreed among themselves as to the terms and conditions on which they would finance Factory 2-U's purchases, the discount rate at which they would purchase Factory 2-U's receivables from Factory 2-U's garment manufacturers, or whether they would extend credit to Factory 2-U at all. These discussions and agreements constituted a conspiracy in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and agreements in restraint of trade under the New York State Donnelly Act, N.Y. Gen. Bus. L. § 340.

10.      As a result of Defendants' unlawful activities, Factory 2-U's access to credit was rendered more costly, was restricted, and sometimes was cut off altogether. Defendants' unlawful conduct increased Factory 2-U's credit costs, reduced its sales and profitability, and contributed materially to its bankruptcy and ultimate business failure.

**B. The Defendants' Control of the Factoring Industry**

11.    According to The Commercial Factor, Summer 2003 Edition, the eight

Defendants were in the top ten list of factors based on estimates of their annual factoring volume

in 2002-2003:

> (a)    CIT Group was ranked as the number one factor based on its annual
>
> factoring volume of $20 billion.
>
> (b)    GMAC was ranked as the number two factor based on its annual factoring
>
> volume of $10 billion.
>
> (c)    Wells Fargo Century Inc. was ranked as the number four factor based on
>
> its annual factoring volume of $5 billion.
>
> (d)    HSBC Business Credit was ranked as the number five factor based on its
>
> annual factoring volume of $4-5 billion.
>
> (e)    Capital Factors was ranked as the number six factor based on its annual
>
> factoring volume of $3 billion.
>
> (f)    Milberg Factors was ranked as the number eight factor based on its annual
>
> factoring volume of $2.5 billion.
>
> (g)    Rosenthal & Rosenthal was ranked as the number nine factor based on its
>
> annual factoring volume of $2.5 billion.
>
> (h)    Sterling Factors was ranked as the number ten factor based on its annual
>
> factoring volume of $750 million.

12.    Furthermore, upon information and belief, about 80% of garment manufacturers

relied on factors for their credit needs.  In recent years, at least one factor, Defendant CIT, has

factored approximately $16 billion for the domestic garment manufacturing industry, or at least

33% of the market. Because the Defendants comprised eight out of the top ten factors and most of the garment manufacturers relied on them for credit and financing, they exerted significant control over the garment industry.

13.    During the time period relevant to this Complaint, 305 of Factory 2-U's garment manufacturers were factored by the Defendants with the breakdown as follows:

      (a)    CIT – 169 manufacturers

      (b)    GMAC – 48 manufacturers

      (c)    Milberg Factors – 16 manufacturers

      (d)    Rosenthal & Rosenthal – 37 manufacturers

      (e)    Sterling Factors – 11 manufacturers

      (f)    Capital Factors – 24 manufacturers

14.    Because hundreds of Factory 2-U's garment manufacturers were factored by the Defendants, the impact of the Defendants' refusal to extend credit to Factory 2-U and decline garment manufacturers' Factory 2-U orders was financially devastating to Factory 2-U. Specifically, the Defendants' concerted activity caused a reduction of Factory 2-U's inventory, increased Factory 2-U's credit costs, reduced its sales and profitability, and contributed materially to its bankruptcy and ultimate business failure.

15.    The economic power which the Defendants exerted within the garment industry is magnified by the fact that many of the smaller factors refactored through the Defendants. This means that many of the smaller factors ran their receivable purchases through one or more of the Defendants. Thus, when the Defendants decreased or refused to extend credit to Factory 2-U, Factory 2-U could not go to any of the smaller factors for recourse because those smaller factors were essentially controlled by the Defendants.

**Jurisdiction and Venue**

16.    This Court has original subject matter jurisdiction over this action pursuant to 15

U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

17.    This Court has supplemental jurisdiction over the New York State Donnelly Act

claim pursuant to 28 U.S.C. § 1367.

18.    Defendants reside and transact business within this District and are therefore,

subject to personal jurisdiction in this District.  Venue is proper in the District of Delaware

pursuant to 15 U.S.C. §§ 15 and 22 as a district in which Defendants reside, are found, and/or

transact business; and 28 U.S.C. § 1391(b) and (c) as a district in which Defendants reside

because they are subject to personal jurisdiction in this District. Service may be effected in this

district pursuant to 15 U.S.C. § 22 as a district in which Defendants are found.

19.    The Trustee and Defendants are involved in interstate trade and commerce, and

the conduct of Defendants complained of herein occurred in and had a substantial adverse effect

on interstate trade and commerce.  In the conduct of their business, Defendants directly or

indirectly used the means and instrumentalities of interstate trade and commerce in furtherance

of the acts complained of herein.

**Parties**

20.    Plaintiff is the Chapter 7 Trustee for Factory 2-U, which is a clothing retailer

currently in Chapter 7 bankruptcy proceedings. On January 13, 2004, Factory 2-U Stores filed a

voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§

101, *et seq.,* as amended, in the United States Bankruptcy Court for the District of Delaware. The

bankruptcy case converted to a case under Chapter 7 on January 27, 2005.  Jeoffrey L. Burtch

was appointed as interim trustee on January 27, 2005 pursuant to Section 701, and is serving as

Trustee of this Estate pursuant to Section 702(d) of the Bankruptcy Code.   Factory 2-U Stores Inc. is a Delaware corporation whose principal office was located in San Diego, California.

21.     The defendant factors are Milberg Factors, Inc., Capital Factors, Inc., The CIT Group/Commercial Services, Inc., GMAC Commercial Finance LLC, HSBC Business Credit (USA) Inc., Rosenthal and Rosenthal, Inc.,  Sterling Factors Corporation, and Wells Fargo Century Inc. (collectively the "Defendants").

22.     Defendant Milberg Factors Inc. ("Milberg") is:

(a)      a corporation of the state of Delaware;

(b)     with its principal place of business located in New York, NY;

(c)     with a mailing address at 99 Park Avenue, New York, NY 10016; and

(d)     United States Corporation Company is the registered agent with a mailing address at 2711 Centerville Road Suite 400, Wilmington, DE 19808.

23.     Defendant Capital Factors, Inc (a/k/a Capital Business Credit, LLC) ("Capital") is:

(a)      a corporation of the state of Florida;

(b)     with its principal place of business located in New York, NY;

(c)     with a mailing address at 1700 Broadway, New York, NY; and

(d)     Corporation Service Company is the registered agent with a mailing address at 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

24.     Defendant, The CIT Group/Commercial Services, Inc. ("CIT") is:

(a)      a corporation of the state of Delaware;

(b)     with its principal place of business located in New York, New York;

(c)    with a mailing address at 1211 Avenue of the Americas, New York, N.Y. 10036 and

(d)    The Corporation Trust Company is the Registered Agent for The CIT Group /Commercial Services, Inc. with a mailing address at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

25.    Defendant GMAC Commercial Finance LLC ("GMAC") is:

(a)    a limited liability company of the state of Delaware;

(b)    with its principal place of business located in New York;

(c)    with a mailing address at 1290 Avenue of the Americas - 3rd Floor New York, NY 10104; and

(d)    The Corporation Trust Company is the registered agent with a mailing address at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

26.    Defendant HSBC Business Credit (USA) Inc. ("HSBC") is:

(a)    a corporation of the state of Delaware;

(b)    with its principal place of business located in New York, NY;

(c)    with a mailing address at 452 Fifth Avenue, 14th Floor, New York, NY 10018; and

(d)    The Corporation Trust Company is the registered agent with a mailing address at 1209 Orange Street, Wilmington, DE 19801.

27.    Defendant Rosenthal & Rosenthal Inc. ("Rosenthal") is:

(a)    a corporation of the state of New York;

(b)    with its principal place of business located in New York, NY;

(c)    with a mailing address at 1370 Broadway, New York, NY 10018;

(d)   Rosenthal, Inc. is the parent company of Rosenthal & Rosenthal Inc.; and

(e)   The Corporation Trust Company is the registered agent of Rosenthal, Inc. with a mailing address of 1209 Orange Street, Wilmington, DE 19801.

28.   Defendant Sterling Factors Corporation ("Sterling") is:

(a)   a corporation of the state of New York;

(b)   with its principal place of business located in New York, NY;

(c)   with a mailing address at 500 7th Avenue 10th Floor, New York, NY 10018;

(d)   Sterling Bancorporation, LLC is the parent company of Sterling Factors Corporation; and

(e)   The Wilmington Trust Special Services is the registered agent of Sterling Bancorporation LLC with a mailing address of 1105 N. Market Street, Suite 1300, Wilmington, DE 19801.

29.   Defendant Wells Fargo Century Inc. ("Wells Fargo") is:

(a)   a corporation of the state of New York;

(b)   with its principal place of business located in New York, New York;

(c)   with a mailing address at 119 West 40th Street, New York, NY 10018;

(d)   Wells Fargo & Company is the parent company of Wells Fargo Century Inc.; and

(e)   Corporation Trust Company is the registered agent of Wells Fargo & Company with a mailing address of Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

**Relevant Market**

30.    The relevant product market is the provision of "factoring services" in the

domestic garment industry to include retailers, wholesalers, and manufacturers.  Factoring

services include a complete financial package that consists of: (1) credit extension; (2) accounts

receivable purchasing and collection; and (3) financing.

31.    The relevant geographic market is the United States.

**Antitrust Standing/Antitrust Injury**

32.    Factory 2-U has standing to bring the claims because it has suffered an injury that

is causally related to the Defendants' illegal anti-competitive activity.   Specifically, Defendants'

violations of the antitrust laws have directly and proximately injured Factory 2-U in its business

and property and damaged it in an amount which will be proved at trial.  The unlawful conduct

alleged herein increased Factory 2-U's credit costs and deprived it of adequate inventory with

which to conduct business.  As a result, Factory 2-U's profits were reduced, its losses were

substantially increased, and its business was damaged so as to materially contribute to its

ultimate bankruptcy and business failure.

33.    Defendants' violations of the antitrust laws have directly and proximately

lessened competition generally.  Defendants were in the top ten list of factors based on their

annual factoring volume in 2002-2003 and thus, possessed market power sufficient to inhibit

competition on a market-wide basis.   Through illegal concerted activity, these dominant factors

sought to: (1) minimize their risks and costs of doing business with garment manufacturers and

their customers; (2) maintain and stabilize pricing structures for factoring services; and (3)

stabilize their respective market shares, all of which they could not accomplish if they operated

in a legal, competitive manner.  Additionally, because of their control of the smaller factors,

11

Defendants, through collusion, effectively dominated and controlled the factoring market and dictated terms to their clients and customers.

## Facts

34.     For years, prior to the filing of this Complaint, the largest factors in the domestic garment industry have engaged in cartel-like behavior. These factors, including many of the Defendants, regularly and unlawfully shared highly confidential information relating to factored customers and clients, and then reached illegal agreements regarding the terms and conditions of credit to be extended. The unlawful information exchanges and agreements occurred at highly-secretive weekly meetings of formal groups such as the Uptown Credit Group, Inc. and the Thursday Garment Group, and through less formal means of communication. Upon information and belief, when legal challenges exposed the activities of the formal groups, the factors continued their collusive behavior through informal communication methods, such as telephone calls.

35.     Consistent with the longstanding industry culture, beginning at least as early as 2002, the Defendants discussed and unlawfully agreed with each other on how they would do business with Factory 2-U and its garment manufacturers. The precise scope and duration of the Factory 2-U discussions and agreements are at present unknown to the Trustee, but they include, at a minimum, the discussions and agreements specifically alleged herein. Upon information and belief, these discussions and agreements began before the dates specifically alleged and continued after the dates specifically alleged. The conspiratorial communications among Defendants, include, but are not limited to the following:

> (a)     On February 27, 2002, a credit representative from Rosenthal & Rosenthal contacted "Hattie" from Wells Fargo, a competing factor, and was told

12

that Factory 2-U's $2 million credit line expired in February 2002 and that

$282 thousand in Factory 2-U orders were being held as of March 2002.

(b)     On June 13, 2002, a credit representative of Rosenthal & Rosenthal

contacted George Dazet at HSBC, a competing factor, and was told that Factory

2-U's $4 million credit line was due on June 30, 2002, that a $2

million credit line was approved for June and July 2002, and that $3 million

in Factory 2-U orders were being held.

(c)     On June 20, 2002, a credit representative from Rosenthal & Rosenthal

contacted "Efrin" at Capital, a competing factor, and was told that Capital had

approved $1 million on Factory 2-U's orders but were holding $1.5 million in

Factory 2-U orders.

(d)     On July 10, 2002, a credit representative from Rosenthal & Rosenthal

once again contacted George Dazet from HSBC and was told that Factory 2-U's

credit line clearance was submitted for $4 million, but was cut down to

$2.5 million.  The representative was also told that HSBC was holding $2.1

million in Factory 2-U orders and that Factory 2-U had to "pay down to get the

line free."

(e)     On August 30, 2002, a credit representative from Rosenthal & Rosenthal

contacted Steve Turkish and/or "Amy" at Sterling Factors and was informed that

$1 million was being held on Factory 2-U orders.

(f)     Also, on August 30, 2002, a credit representative from Rosenthal &

Rosenthal  once again contacted George Dazet at HSBC and was told that

13

Factory 2-U's $2.5 million line expired in September and that $3.7 million in December 2002 Factory 2-U orders were being held.

(g)     On October 15, 2002, a representative from Rosenthal & Rosenthal contacted George Dazet at HSBC and was told that Factory 2-U's credit line was $1.5 million through December 31, 2002, which was a $1 million cut from September 2002.  The Rosenthal representative was also told that GMAC was holding $3.2 million in Factory 2-U orders.

(h)     On December 18, 2002, a representative from Rosenthal & Rosenthal contacted George Dazet at HSBC and was told that Factory 2-U's credit line had decreased from $5 million to $1.5 million.  The Rosenthal representative was also told that HSBC was holding $460 thousand in Factory 2-U orders.

(i)     Also, on December 18, 2002, a representative from Rosenthal & Rosenthal contacted "Efrin" from Capital and was told that Factory 2-U's $1.5 million credit line was being pulled and that $1 million of Factory 2-U orders were being held.

(j)     Also, on December 18, 2002, a representative from Rosenthal & Rosenthal contacted a representative at Sterling Factors and was told that Sterling was holding Factory 2-U orders.

(k)     On March 13, 2003, Maurice Sabony, a vice president of Milberg, telephoned Roy Gringhaus of Wells Fargo, a competing factor, and discussed with Mr. Gringhaus the fact that Century was "continuing to decline all orders" that Factory 2-U was attempting to place with manufacturers.  Mr. Gringhaus also

14

told Mr. Sabony that another competing factor, Capital, was also not approving orders by Factory 2-U.

(l)    Also on March 13, 2003, Mr. Sabony telephoned George Dazet of HSBC, a competing factor, and discussed with him the fact that HSBC was declining orders that Factory 2-U was attempting to place with manufacturers.

(m)    Also on March 13, 2003, Mr. Sabony telephoned Orlando Morales of Rosenthal and Rosenthal, a competing factor, and discussed with him the amount of orders that Rosenthal and Rosenthal had approved for Factory 2-U, as well as the payment terms that Rosenthal and Rosenthal was requiring of Factory 2-U. Mr. Sabony and Mr. Morales also discussed whether Rosenthal and Rosenthal was requiring security deposits from Factory 2-U, and Mr. Morales told Mr. Sabony about the security deposit policy of CIT, another competing factor, with regard to Factory 2-U.

(n)    On or about April 9, 2003, Frank DeRita, Senior Vice President and Credit Manager at Milberg, who was Mr. Sabony's superior, telephoned Steve Turkish, a credit manager at Sterling Factors, a competing factor. Mr. DeRita and Mr. Turkish discussed the credit limit that Sterling was maintaining on orders by Factory 2-U, the payment terms that Sterling was requiring from Factory 2-U, and the fact that Sterling was getting surcharges[2] from manufacturers on all approved orders from Factory 2-U.

(o)    On April 21, 2003, Mr. Sabony telephoned Bill French at Capital Factors, a competing factor. Mr. Sabony discussed with Mr. French the fact that Capital

---

[2] A surcharge is an increase over the normal percentage of a garment manufacturer's receivable that a factor would ordinarily be paid.

Factors was approving only small orders from Factory 2-U for good clients, and was trying to resist "opening up" Factory 2-U's account for significant amounts of credit.

(p)     On April 23, 2003, Mr. Sabony again telephoned Mr. Morales at Rosenthal and Rosenthal. They discussed the amount of credit that Rosenthal was approving on orders by Factory 2-U, the payment terms that Rosenthal was requiring of Factory 2-U, and the fact that Rosenthal was "doing surcharges" with Factory 2-U's manufacturers.

(q)     Also on April 23, 2003, Mr. Sabony again telephoned Mr. Gringhaus at Wells Fargo, who told Mr. Sabony that Wells Fargo was continuing to decline all Factory 2-U orders.

(r)     Also on April 23, 2003, Mr. Sabony again telephoned Mr. Dazet at HSBC, who told Mr. Sabony that HSBC was continuing to decline all Factory 2-U orders.

(s)     Also on April 23, 2003, Mr. Sabony telephoned Bill Rose of GMAC, a competitor. Mr. Rose and Mr. Sabony discussed the amount of credit that GMAC was approving on orders by Factory 2-U, the payment terms that GMAC was requiring of Factory 2-U (including the fact that GMAC was insisting on "strict terms"), and GMAC's policy with regard to surcharges to Factory 2-U's manufacturers.

(t)     Also on April 23, 2003, a Milberg representative contacted a representative of CIT. They discussed the amount of credit that CIT was approving on orders from Factory 2-U, including a line of credit that Factory 2-U had established, the fact that CIT was imposing surcharges on all manufacturers

16

whose orders from Factory 2-U CIT was financing, payment terms required by CIT from Factory 2-U and the fact that Sterling, another competing factor, was approving Factory 2-U orders up to a specified limit.

(u)    On June 5, 2003, Mr. Sabony again telephoned Mr. Turkish at Sterling. They discussed Sterling's credit limit with regard to Factory 2-U, Sterling's willingness to increase Factory 2-U's credit limit, whether Sterling or the manufacturers bore the risk of nonpayment, and payment terms required by Sterling from Factory 2-U.

(v)    On July 22, 2003, Mr. Sabony again telephoned Mr. Frank at Capital Factors. They discussed the payment terms required of Factory 2-U by Capital, and the fact that Capital was declining orders from Factory 2-U except for small orders that were accepted as accommodations for Capital's best clients.

(w)    On July 28, 2003, Mr. DeRita again telephoned Mr. Turkish at Sterling. They discussed Sterling's intention to keep Factory 2-U's available credit limited to a specified amount.

(x)    On September 15, 2003, Mr. Sabony again telephoned Mr. Turkish at Sterling, who told Mr. Sabony that Sterling was approving orders up to a specified limit.

(y)    Also on September 15, 2003, Mr. Sabony again telephoned Mr. Rose at GMAC. Mr. Rose discussed with Mr. Sabony GMAC's payment terms to Factory 2-U, GMAC's placement of $1 million of Factory 2-U orders on hold, GMAC's withholding of approval for those orders, GMAC's credit limit to

Factory 2-U, and GMAC's possible increase of Factory 2-U's credit limit depending on Factory 2-U's financial plan.

(z)    Also on September 15, 2003, Mr. Sabony telephoned Steve Batkowsky of Rosenthal and Rosenthal, who told Mr. Sabony that Rosenthal and Rosenthal was still not approving Factory 2-U orders.

(aa)    On September 17, 2003, Mr. DeRita telephoned R. Louie of CIT. Mr. DeRita and Mr. Louie discussed the credit limit applied to Factory 2-U orders by CIT, and the future expiration date of that credit limit.

36.    Not only did Mr. Sabony contact various factors, but competing factors also telephoned Mr. Sabony to discuss with him Milberg's dealings with Factory 2-U and its manufacturers, including but not limited to Milberg's willingness to extend credit to Factory 2-U, Milberg's credit limits on Factory 2-U orders, and Milberg's payment terms to Factory 2-U.

37.    After their unlawful discussions and communications, the Defendants took concerted action which harmed Factory 2-U's ability to conduct business. Specifically, the Defendants declined and limited credit to Factory 2-U at approximately the same time. The Defendants based their future course of action on their previous unlawful communications and discussions. As a result of the Defendants taking adverse concerted action, Factory 2-U filed for bankruptcy in January 2004.

38.    Through their unlawful discussions and communications, the Defendants agreed upon the basis on which they would do business with Factory 2-U and its manufacturers. Those illegal agreements included, without limitation:

(a)    Agreements on whether credit would be extended by Defendants to Factory 2-U for its purchases from garment manufacturers;

     (b)     Agreements on the amount of credit that would be extended by Defendants to Factory 2-U for its purchases from garment manufacturers;

     (c)     Agreements on the terms on which credit would be extended by Defendants to Factory 2-U for its purchases from garment manufacturers, including without limitation time to pay (e.g., net 60, net 30, net 15, or other terms), the date on which the time to pay would commence (e.g., from receipt of goods or date of invoice), and whether a security deposit would be required from Factory 2-U; and

     (d)     Agreements on whether surcharges would be imposed by Defendants on garment manufacturers as a condition of financing Factory 2-U's purchases from those manufacturers.

39.     The Trustee did not discover the Defendants' unlawful conduct until April/May 2007 while reviewing documents reflecting Milberg's contacts and agreements with its competitors that Milberg produced in response to discovery requests in bankruptcy proceedings. Neither the Trustee nor Factory 2-U could have discovered the unlawful conduct earlier because the documents were the internal and confidential documents of Milberg to which the Plaintiff had no access.

40.     The Defendants fraudulently concealed their unlawful conduct from Factory 2-U. The conspiratorial communications among the competing factors were conducted secretly by telephone so as to leave no written record.

41.     Milberg misdescribed its contacts with its competitors as credit "references," but it never informed Factory 2-U that it was in contact with other factors or requested the names of

credit "references" from Factory 2-U. Moreover, information on Factory 2-U's payment history and credit standing was readily available from a credit reporting agency through reports to which Defendants subscribed, making direct contact with competing factors for so-called "references" unnecessary.

42.    Mr. Sabony had frequent and regular telephone contacts with Factory 2-U executives, including its controller, in which Mr. Sabony asked about or discussed with the Factory 2-U representatives what other factors were doing with regard to Factory 2-U orders. Mr. Sabony concealed from Factory 2-U, however, the fact that the competing factors were discussing and agreeing upon what their actions would be with regard to Factory 2-U orders.

## Causes of Action

## Count I – Violation of 15 U.S.C. § 1 (Price-Fixing Conspiracy)

43.    The Trustee repeats and realleges the allegations in paragraphs 1-42 above with the same force and effect as if fully set forth herein.

44.    The Defendants conspired and agreed among themselves to fix, maintain, and stabilize Factory 2-U's terms and amount of credit, which is a *per se* illegal price-fixing agreement in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Specifically, the Defendants had numerous discussions in which they agreed on the amount of credit that would be extended to Factory 2-U, the terms on which credit would be extended to Factory 2-U, whether the Defendants would impose surcharges on garment manufacturers as a condition of financing Factory 2-U's purchases from those manufacturers, and whether security would be required from Factory 2-U. Based on these agreements, the Defendants acted in concert by declining or limiting Factory 2-U's credit at approximately the same time.

45.    Factory 2-U was injured as a proximate result of the conspiracy in that the Defendants' unlawful conduct increased Factory 2-U's credit costs and deprived it of adequate inventory with which to conduct business. As a result, Factory 2-U's profits were reduced, its losses substantially increased, and its business was damaged as to materially contribute to its ultimate bankruptcy and business failure.

WHEREFORE, the Trustee demands judgment in its favor and against all Defendants, jointly and severally, in an amount to be determined at trial trebled, plus costs of suit, attorneys' fees and interest, and other and further relief as the Court deems just and proper.

### Count II – Violation of 15 U.S.C. § 1 (Boycott)

46.    The Trustee repeats and realleges the allegations in paragraphs 1-45 above with the same force and effect as if fully set forth herein.

47.    The Defendants conspired and agreed among themselves to boycott Factory 2-U from the garment retailer business, which is a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Specifically, the Defendants had numerous discussions in which they agreed on the amount of credit that would be extended to Factory 2-U, the terms on which credit would be extended to Factory 2-U, whether the Defendants would impose surcharges on garment manufacturers as a condition of financing Factory 2 U's purchases from those manufacturers, and whether security would be required from Factory 2 U. Because the Defendants acted in concert when limiting or refusing to extend credit to Factory 2-U, the Defendants boycotted Factory 2-U from the garment retailer business.

48.    Factory 2-U was injured as a proximate result of the boycott in that the Defendants' unlawful conduct increased Factory 2-U's credit costs and deprived it of adequate inventory with which to conduct business. As a result, Factory 2-U's profits were reduced, its

losses substantially increased, and its business was damaged as to materially contribute to its ultimate bankruptcy and business failure.

WHEREFORE, the Trustee demands judgment in its favor and against all Defendants, jointly and severally, in an amount to be determined at trial trebled, plus costs of suit, attorneys' fees and interest, and other and further relief as the Court deems just and proper.

### Count III – Violation of 15 U.S.C. § 1 (Rule of Reason Claim)

49.     The Trustee repeats and realleges the allegations in paragraphs 1-48 above with the same force and effect as if fully set forth herein.

50.     The Defendants conspired and agreed among themselves to fix, maintain, and stabilize Factory 2-U's terms and amount of credit, and exchanged other competitive information with regard to Factory 2-U.   Specifically, the Defendants had numerous discussions in which they agreed on the amount of credit that would be extended to Factory 2-U, the terms on which credit would be extended to Factory 2-U, whether the Defendants would impose surcharges on garment manufacturers as a condition of financing Factory 2-U's purchases from those manufacturers, and whether security would be required from Factory 2-U.  Based on these agreements, the Defendants acted in concert by declining or limiting Factory 2-U's credit at approximately the same time.

51.     The Defendants' conspiracy produced adverse and anticompetitive effects within the relevant product and geographic markets because the Defendants possessed "market power" sufficient to inhibit competition on a market-wide basis.  Through illegal concerted activity, Defendants sought to: (1) minimize their risks and costs of doing business with garment manufacturers and their customers; (2) maintain and stabilize pricing structures for factoring services; and (3) stabilize their respective market shares, all of which they could not accomplish

if they operated in a legal, competitive manner. Additionally, because of their control of the smaller factors, Defendants, through collusion, effectively dominated and controlled the factoring market and dictated terms to their clients and customers. Defendants' agreements were not designed to, nor had the effect of, increasing economic efficiency or rendering the relevant market more competitive.

52.    Factory 2-U was injured as a proximate result of the conspiracy in that the Defendants' unlawful conduct increased Factory 2-U's credit costs and deprived it of adequate inventory with which to conduct business. As a result, Factory 2-U's profits were reduced, its losses substantially increased, and its business was damaged as to materially contribute to its ultimate bankruptcy and business failure.

WHEREFORE, the Trustee demands judgment in its favor and against all Defendants, jointly and severally, in an amount to be determined at trial trebled, plus costs of suit, attorneys' fees and interest, and other and further relief as the Court deems just and proper.

### Count IV – Violation of the New York Donnelly Act (N.Y. Gen. Bus. L. § 340)

53.    The Trustee repeats and realleges the allegations in paragraphs 1-52 with the same force and effect as if fully set forth herein.

54.    The Defendants have restrained trade in the market for the provision of factoring services in the garment industry in the United States in violation of the law of the State of New York.

55.    The Defendants conspired and agreed among each other to fix, maintain, and stabilize Factory 2-U's terms and amount of credit, which constitutes unlawful restraint of trade in violation of N.Y. Gen. Bus. L. § 340. Specifically, the Defendants had numerous discussions in which they agreed on the amount of credit that would be extended to Factory 2-U, the terms

on which credit would be extended to Factory 2-U, whether the Defendants would impose surcharges on garment manufacturers as a condition of financing Factory 2-U's purchases from those manufacturers, and whether security would be required from Factory 2-U. Based on these agreements, the Defendants acted in concert by declining or limiting Factory 2-U's credit at approximately the same time.

56.    Each of the Defendants' unlawful information exchanges and agreements entered into was a combination in restraint of trade in violation of the Donnelly Act. Each such unlawful agreement violates the Donnelly Act *per se*, or violates the Donnelly Act, because its pro-competitive effects, if any, are outweighed by its anticompetitive effects. Specifically, the Defendants' conspiracy produced adverse and anticompetitive effects within the relevant product and geographic markets because the Defendants possessed "market power" sufficient to inhibit competition on a market-wide basis. Through illegal concerted activity, Defendants sought to: (1) minimize their risks and costs of doing business with garment manufacturers and their customers; (2) maintain and stabilize pricing structures for factoring services; and (3) stabilize their respective market shares, all of which they could not accomplish if they operated in a legal, competitive manner. Additionally, because of their control of the smaller factors, Defendants, through collusion, effectively dominated and controlled the factoring market and dictated terms to their clients and customers. Defendants' agreements were not designed to, nor had the effect of, increasing economic efficiency or rendering the relevant market more competitive.

57.    Factory 2-U was injured as a proximate result of the conspiracy in that the Defendants' unlawful conduct increased Factory 2-U's credit costs and deprived it of adequate inventory with which to conduct business. As a result, Factory 2-U's profits were reduced, its

losses substantially increased, and its business was damaged as to materially contribute to its ultimate bankruptcy and business failure.

WHEREFORE, the Trustee demands judgment in its favor and against all Defendants, jointly, and severally, in an amount to be determined at trial trebled, plus costs of suit, attorneys' fees and interest, and other and further relief as the Court deems just and proper.

### **Jury Demand:**

The Trustee demands trial by jury in this action.

Respectfully submitted,

| | |
|---|---|
| OF COUNSEL<br>Joseph D. Mancano, Esq.<br>Anthony J. Basinski, Esq.<br>Bryan S. Neft, Esq.<br>Divya Wallace, Esq.<br>PIETRAGALLO BOSICK & GORDON LLP<br>1255 Drummers Lane, Suite 105<br>Wayne, PA 19087<br>Phone: (610)-293-2222<br>Fax: (610)-293-2225<br><br>Attorneys for Plaintiff, Jeoffrey L. Burtch,<br>Chapter 7 Trustee<br><br>Dated: September 17, 2007 | /s/ Robert W. Pedigo          GRT  DE<br>                                             3911<br>Robert W. Pedigo, Esq.<br>ID#: 4047<br>COOCH & TAYLOR, P.A.<br>824 Market Street, 10th Floor<br>Wilmington, DE 19801<br>Phone: (302)-984-3832<br>Fax: (302)-652-5379<br><br>Attorneys for Plaintiff, Jeoffrey L. Burtch,<br>Chapter 7 Trustee<br><br>Dated: September 17, 2007 |

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| | |
|---|---|
| **I. (a)  PLAINTIFFS:** Jeoffery L. Burch, Chapter 7 Trustee, Factory 2-U Stores, Inc., et al. | **DEFENDANTS:** Milberg Factors Inc., Capital Factors Inc., The CIT Group Commercial Services Inc., GMAC Commercial Finance LLC, HSBC Business Credit (USA) Inc., Rosenthal & Rosenthal Inc., Sterling Factors Corporation, and Wells Fargo Century Inc. |
| **(b)**   County of Residence of First Listed Plaintiff : New Castle County, Delaware (EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant: New Castle County, Delaware (IN U.S. PLAINTIFF CASES ONLY) <br> NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |
| Attorneys (Firm Name, Address, and Telephone Number): <br> Robert W. Pedigo, Esq., Cooch and Taylor, P.A., 824 Market Street, Suite 1000, Wilmington, DE 19899; Telephone: (302) 984-3832; OF COUNSEL: <br> Joseph D. Mancano, Esq., Anthony J. Basinski, Esq., Bryan S. Neft, Esq., and Divya Wallace, Esq., PIETRAGALLO BOSICK & GORDON, LLP, Four Glenhardie Corporate Center, 1255 Drummers Lane, Suite 105, Wayne, PA 19087; Telephone: (610) 293-2222 | Attorneys (If Known): |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & Enforcement of Judgment <br> ☐ 151 Medicare Act <br> ☐ 152 Recovery of Defaulted Student Loans <br> ☐ 153 Recovery of Overpayment of Veteran's Benefits <br> ☐ 160 Stockholders' Suits <br> ☐ 190 Other Contract <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | **PERSONAL INJURY** <br> ☐ 310 Airplane <br> ☐ 315 Airplane Product Liability <br> ☐ 320 Assault, Libel & Slander <br> ☐ 330 Federal Employers' Liability <br> ☐ 340 Marine <br> ☐ 345 Marine Product Liability <br> ☐ 350 Motor Vehicle <br> ☐ 355 Motor Vehicle Product Liability <br> ☐ 360 Other Personal Injury | **PERSONAL INJURY** <br> ☐ 362 Personal Injury - Med. Malpractice <br> ☐ 365 Personal Injury - Product Liability <br> ☐ 368 Asbestos Personal Injury Product Liability <br> **PERSONAL PROPERTY** <br> ☐ 370 Other Fraud <br> ☐ 371 Truth in Lending <br> ☐ 380 Other Personal Property Damage <br> ☐ 385 Property Damage Product Liability | ☐ 610 Agriculture <br> ☐ 620 Other Food & Drug <br> ☐ 625 Drug Related Seizure of Property 21 USC 881 <br> ☐ 630 Liquor Laws <br> ☐ 640 R.R. & Truck <br> ☐ 650 Airline Regs. <br> ☐ 660 Occupational Safety/Health <br> ☐ 690 Other | ☐ 422 Appeal 28 USC 158 <br> ☐ 423 Withdrawal 28 USC 157 <br> **PROPERTY RIGHTS** <br> ☐ 820 Copyrights <br> ☐ 830 Patent <br> ☐ 840 Trademark | ☐ 400 State Reapportionment <br> ☒ 410 Antitrust <br> ☐ 430 Banks and Banking <br> ☐ 450 Commerce <br> ☐ 460 Deportation <br> ☐ 470 Racketeer Influenced and Corrupt Organizations <br> ☐ 480 Consumer Credit <br> ☐ 490 Cable/Sat TV <br> ☐ 810 Selective Service <br> ☐ 850 Securities/Commodities/ Exchange <br> ☐ 875 Customer Challenge 12 USC 3410 |
| **REAL PROPERTY** <br> ☐ 210 Land Condemnation <br> ☐ 220 Foreclosure <br> ☐ 230 Rent Lease & Ejectment <br> ☐ 240 Torts to Land <br> ☐ 245 Tort Product Liability <br> ☐ 290 All Other Real Property | **CIVIL RIGHTS** <br> ☐ 441 Voting <br> ☐ 442 Employment <br> ☐ 443 Housing/ Accommodations <br> ☐ 444 Welfare <br> ☐ 445 Amer. w/Disabilities - Employment <br> ☐ 446 Amer. w/Disabilities - Other <br> ☐ 440 Other Civil Rights | **PRISONER PETITIONS** <br> ☐ 510 Motions to Vacate Sentence Habeas Corpus <br> ☐ 530 General <br> ☐ 535 Death Penalty <br> ☐ 540 Mandamus & Other <br> ☐ 550 Civil Rights <br> ☐ 555 Prison Condition | **LABOR** <br> ☐ 710 Fair Labor Standards Act <br> ☐ 720 Labor/Mgmt. Relations <br> ☐ 730 Labor/Mgmt.Reporting & Disclosure Act <br> ☐ 740 Railway Labor Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Empl. Ret. Inc. Security Act | **SOCIAL SECURITY** <br> ☐ 861 HIA (1395ff) <br> ☐ 862 Black Lung (923) <br> ☐ 863 DIWC/DIWW (405(g)) <br> ☐ 864 SSID Title XVI <br> ☐ 865 RSI (405(g)) <br> **FEDERAL TAX SUITS** <br> ☐ 870 Taxes (U.S. Plaintiff or Defendant) <br> ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions <br> ☐ 891 Agricultural Acts <br> ☐ 892 Economic Stabilization Act <br> ☐ 893 Environmental Matters <br> ☐ 894 Energy Allocation Act <br> ☐ 895 Freedom of Information Act <br> ☐ 900 Appeal of Fee Determination Under Equal Access to Justice <br> ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1  Original Proceeding

☐ 2  Removed from State Court

☐ 3  Remanded from Appellate Court

☐ 4  Reinstated or Reopened

☐ 5  Transferred from Another District (Specify)

☐ 6  Multidistrict Litigation

☐ 7  Appeal to District Judge from Magistrate Judgment

| | |
|---|---|
| **VI. CAUSE OF ACTION** | Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity) <br> 15 U.S.C. § 1 (Sherman Act) <br> Brief description of cause: <br> Illegal group boycott to deny credit and price fixing violation |
| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND      CHECK YES only if demanded in complaint: <br> JURY DEMAND: ☒ Yes ☐ No |
| **VIII. RELATED CASE(S) IF ANY** | (See instructions):  JUDGE      DOCKET NUMBER |

| | |
|---|---|
| **DATE:** 9/17/07 | SIGNATURE OF ATTORNEY OF RECORD <br> GEORGE R. TSAKATARAS   FOR ROBERT W. PEDIGO <br> George R. for DE 3911 |
| **FOR OFFICE USE ONLY** | |

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 7 - 5 5 6 _____ __

## ACKNOWLEDGMENT
## OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF __ 8 ____ COPIES OF AO FORM 85.

9/17/07
(Date forms issued)

Chadd P. FFL
(Signature of Party or their Representative)

Chadd P. Fitzgerald
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action