# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JEOFFREY L. BURTCH, CHAPTER 7
TRUSTEE, FACTORY 2-U STORES, INC., *et
al.*,

              Plaintiff,

          v.

MILBERG FACTORS, INC., CAPITAL
FACTORS, INC., THE CIT
GROUP/COMMERCIAL SERVICES, INC.,
GMAC COMMERCIAL FINANCE LLC,
HSBC BUSINESS CREDIT (USA) INC.,
ROSENTHAL AND ROSENTHAL, INC.,
STERLING FACTORS CORPORATION,
WELL FARGO CENTURY INC.,

              Defendants.

Civil Action No. 1:07-cv-00556-***-LPS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## THE CIT GROUP/COMMERCIAL SERVICES, INC.'S
## <u>MOTION TO DISMISS THE COMPLAINT</u>

BLANK ROME LLP
Michael DeBaecke (ID No 3186)
David K. Sheppard (ID. No. 4149)
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington, DE 19801
(302) 425-6400

and

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

Dated:  December 14, 2007

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES........................................................................................iii

SUMMARY OF ARGUMENT................................................................................ 1

BACKGROUND....................................................................................................... 3

The Parties and Factoring....................................................................................... 3

The Defendants' Alleged Sharing of Credit Information.................................... 4

The Allegations Against CIT .................................................................................. 6

Factory 2-U's Bankruptcy ....................................................................................... 6

Plaintiff's "Boycott" and "Price Fixing" Claims ................................................. 7

ARGUMENT ............................................................................................................. 9

I.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE
      SHERMAN ACT BECAUSE THE SHARING OF CREDIT
      INFORMATION DOES NOT VIOLATE SECTION 1 ........................................... 10

II.    THE COMPLAINT FAILS TO ALLEGE  THE FACTS NECESSARY TO
      SHOW AN AGREEMENT TO BOYCOTT OR DENY CREDIT.......................... 11

      A.     Plaintiff's Conclusory Allegations are Insufficient to Show an
             Agreement to Boycott ........................................................................... 12

      B.     An Agreement Cannot Be Inferred from the Exchange of Credit
             Information ........................................................................................... 14

      C.     An Agreement Cannot be Inferred from Parallel Conduct........................ 15

      D.     An Agreement Cannot Be Inferred Because It Makes No
             Economic Sense ................................................................................... 18

III.   THE COMPLAINT FAILS TO ALLEGE THE FACTS NECESSARY TO
      SHOW AN AGREEMENT TO FIX PRICES.......................................................... 20

IV.   THE COMPLAINT FAILS TO STATE AN ANTITRUST  CLAIM
      BECAUSE IT DOES NOT ALLEGE ANY HARM TO COMPETITION.............. 22

V.    THE COMPLAINT FAILS TO STATE  A CLAIM UNDER NEW YORK
      LAW......................................................................................................................... 25

i

## TABLE OF CONTENTS
### (Continued)

**Page**

VI.   THE COMPLAINT IS BARRED BY THE STATUTE OF LIMITATIONS .......... 26

CONCLUSION ............................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Atlantic Richfield Co.* v. *USA Petroleum Co.*,
  495 U.S. 328 (1990) ...................................................................................................... 22

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999)..................................................................................... 15, 20

*Bell Atlantic Corp.* v. *Twombly*,
  127 S. Ct. 1955 (2007) ............................................................................................*passim*

*Broadcast Music, Inc.* v. *CBS, Inc.*,
  441 U.S. 1 (1979) ........................................................................................................... 13

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ................................................................................................. 22, 23

*Capital Imaging Assoc.* v. *Mohawk Valley Med. Assoc., Inc.*,
  996 F.2d 537 (2d Cir. 1993) .......................................................................................... 14

*Catalano* v. *Target Sales, Inc.*,
  446 U.S. 643 (1980) ................................................................................................. 20, 21

*Cement Mfrs.' Protective Ass'n* v. *United States*, 268 U.S. 588 (1925) ...............................*passim*

*Dresses for Less, Inc.* v. *CIT Group/Commercial Services, Inc.*,
  No. 01 CIV. 2669 (WHP), 2002 WL 31164482 (S.D.N.Y. Sept. 30, 2002)............... 20, 21, 28

*Eichorn* v. *AT&T Corp.*,
  248 F.3d 131 (3d Cir. 2001) .......................................................................................... 22

*In re Factory 2-U Stores*,
  Case. No. 04-10111 (PJW), Bankr. D. Del. ................................................................ 6, 7, 19

*First Nat'l Bank of Arizona* v. *Cities Service Co.*,
  391 U.S. 253 (1968) ....................................................................................................... 18

*Federal Trade Comm'n* v. *Superior Court Trial Lawyers Ass'n*,
  493 U.S. 411 (1990) ....................................................................................................... 23

*Federal Trade Comm'n* v. *Indiana Fed'n of Dentists*,
  476 U.S. 447 (1986) ....................................................................................................... 19

*In re Flat Glass Antitrust Litig.*,
  385 F.3d 350 (3d Cir. 2004)........................................................................................... 15

iii

*Garshman* v. *Universal Resources Holding, Inc.*,
  824 F.2d 223 (3d Cir. 1987) ............................................................................ 12

*Granite Partners, L.P.* v. *Bear, Stearns & Co.*,
  17 F. Supp. 2d 275 (S.D.N.Y. 1998) ............................................................... 26

*Hamilton County Bd. of Comm'rs* v. *Nat'l Football League*,
  491 F.3d 310 (6th Cir. 2007) .......................................................................... 27

*Kalmanovitz* v. *G. Heileman Brewing Co.*,
  595 F. Supp. 1385 (D. Del. 1984) .................................................................. 12

*Kasada, Inc.* v. *Access Capital, Inc.*,
  No. 01 Civ. 8893 (GBD), 2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004) ...................... *passim*

*Klehr* v. *A. O. Smith Corp.*,
  521 U.S. 179 (1997) ........................................................................................ 28

*Larry K. Mucko, Inc.* v. *Southwestern Pa. Bldg. & Const. Trades Council*,
  670 F.2d 421 (3d Cir. 1982) ............................................................................ 19

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
  998 F.2d 1144 (3d Cir. 1993) .......................................................................... 27

*Malley-Duff & Assocs., Inc.* v. *Crown Life Ins. Co.*,
  734 F.2d 133 (3d. Cir. 1984) ........................................................................... 23

*Mariana* v. *Fisher*,
  338 F.3d 189 (3d Cir. 2003) ............................................................................ 23

*Masco Contractor Servs., Inc.* v. *Beals*,
  279 F. Supp. 2d 699 (E.D. Va. 2003) .............................................................. 27

*Mathias* v. *Daily News, L.P.*,
  152 F. Supp. 2d 465 (S.D.N.Y. 2001) ............................................................. 23

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................................. 18, 19

*Metro Video Dist., Inc.* v. *Vestron Video, Inc.*,
  Civ. No. 89-0640 PG, 1990 WL 58463 (D.P.R. Feb. 8, 1990) ...................... 10, 11

*Michelman* v. *Clark-Schwebel Fiber Glass Corp.*,
  534 F.2d 1036 (2d Cir. 1976) ................................................................... *passim*

*NCAA* v. *Board of Regents*,
  468 U.S. 85 (1984) ......................................................................................... 21

iv

*Northwest Wholesale Stationers, Inc.* v. *Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985) ................................................................................................ 19

*Palmer* v. *BRG of Ga., Inc.*,
    498 U.S. 46 (1990) .................................................................................................. 21

*Pinney Dock & Transport Co.* v. *Penn Central Corp.*,
    838 F.2d 1445 (6th Cir. 1988) ............................................................................... 27

*Queen City, Inc.* v. *Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ................................................................................... 24

*Re-Alco Indus., Inc.* v. *Nat'l Center for Health Education, Inc.*,
    812 F.2d 387 (S.D.N.Y. 1993) ............................................................................... 25

*TV Communications Network, Inc.* v. *Turner Network Television, Inc.*,
    964 F.2d 1022 (10th Cir. 1992) ................................................................................ 9

*U.S. Horticultural Supply, Inc.* v. *The Scotts Co.*,
    No. 04-5182, 2006 WL 1531407 (E.D. Pa. June 1, 2006) ..................................... 19

*United States* v. *General Motors Corp.*,
    384 U.S. 127 (1966) ............................................................................................... 23

*Venture Technology, Inc.* v. *National Fuel Gas Co.*,
    685 F.2d 41 (2d Cir. 1980) ..................................................................................... 14

*Weit* v. *Continental Illinois Nat. Bank & Trust Co. of Chicago*,
    641 F.2d 457 (7th Cir. 1981) .................................................................................. 17

*Yellow Page Solutions, Inc.* v. *Bell Atlantic Yellow Pages Co.*,
    No. 00 Civ. 5663, 2001 WL 1468168 (S.D.N.Y. Nov. 19, 2001) .......................... 12

*Zenith Radio Corp.* v. *Hazeltine Research, Inc.*,
    401 U.S. 321 (1971) ............................................................................................... 26

*Zoslaw* v. *MCA Distrib. Corp.*,
    693 F.2d 870 (9th Cir. 1982) ............................................................................ 10, 11

## STATE CASES

*State of New York* v. *Mobil Oil Corp.*,
    38 N.Y.2d 460, 381 N.Y.S.2d 426, 344 N.E.2d 357 (1976) ................................. 25

## STATUTES

15 U.S.C. § 15b ............................................................................................................ 26

Donnelly Act, N.Y. Gen. Bus. L § 340 ................................................................. 25, 26

v

## Rules

Fed. R. Civ. P. 3 ................................................................................................. 26

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 1

## Other Authorities

ABA Section of Antitrust Law, *Antitrust Law Developments* (5th ed. 2002) ....................... *passim*

VI Areeda & Hovenkamp, *Antitrust Law* (2003) .......................................................... 10, 14, 17

Defendant The CIT Group/Commercial Services, Inc. ("CIT") respectfully submits this memorandum of law in support of its motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## SUMMARY OF ARGUMENT

This action seeks to blame the financial failure of one bankrupt clothing retailer (Factory 2-U) on an imagined antitrust conspiracy. Plaintiff, the trustee in bankruptcy, claims that eight providers of "factoring services," including CIT, made an agreement to cut off credit to Factory 2-U, a distressed and now bankrupt enterprise. Since the Complaint alleges no facts showing such an agreement, and alleges no facts showing any harm to the competition among the defendants, it should be dismissed.

The only concrete fact contained in the Complaint is that some of the defendants shared information about the creditworthiness of Factory 2-U before each of them, allegedly, decided to deny or limit further credit. Plaintiff labels that a "boycott" and "price fixing" in violation of Section 1 of the Sherman Act. The Supreme Court, however, has ruled that exchanging credit information is pro-competitive and thus perfectly legal. *Cement Mfrs.' Protective Ass'n* v. *United States*, 268 U.S. 588 (1925). The conduct alleged in the Complaint is not a violation of the Sherman Act.

The conclusory accusations of "agreements" and "conspiracies" peppered throughout the Complaint are not enough to prevent its dismissal. Neither CIT, nor any of the other defendants, is alleged to have actually proposed or made an agreement to deny credit. That each of the defendants may have concluded at the same time that Factory 2-U had become a bad credit risk is just the kind of parallel conduct that the Supreme Court held this year "will not suffice" to overcome a motion to dismiss. *Bell Atlantic Corp.* v. *Twombly,* 127 S. Ct. 1955, 1966 (2007). Since the simultaneous behavior alleged -- in this case, reducing credit

1

to a failing retail business -- "could just as well be independent action," the Supreme Court explained, "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway." *Id.* at 1971. Not even plaintiff claims that Factory 2-U was creditworthy.

Even if these Supreme Court precedents did not dispose of the pleading, it would have to be dismissed for another reason:  the plaintiff has failed to allege any harm to competition, the key to any viable antitrust claim.  It is not enough for plaintiff to complain that Factory 2-U was forced out of business because the defendants allegedly made the same credit decision, or made this decision together.  The loss to Factory 2-U must flow from a marketwide harm to the competitive process.  That is not what is alleged here.  No rivals of CIT or any of the defendants are alleged to have been foreclosed from competing in the market.  No other retail or manufacturing firms are alleged to have been hurt by any collusion.  What is alleged here, the loss of credit by one isolated business, does not come close to stating an antitrust claim.

Given that the Complaint fails to state a claim as a matter of law, CIT respectfully submits that the Complaint should be dismissed with prejudice.

# BACKGROUND

## The Parties and Factoring

Plaintiff Jeoffrey L. Burtch is the Chapter 7 Trustee for Factory 2-U Stores, Inc., A/K/A Factory 2-U, F/A/K/A General Textiles, Inc., F/A/K/A General Textiles, F/A/K/A Family Bargain Corporation, F/A/K/A Family Bargain Center (collectively "Factory 2-U"). (Cmplt. p.1.) Factory 2-U is a discount clothing retailer currently in Chapter 7 bankruptcy proceedings. (Cmplt. ¶¶ 2, 20.)

The eight defendants, including CIT, provide "factoring services" to, among others, domestic garment manufacturers. [1] (Cmplt. ¶ 3.) Some of those garment manufacturers were suppliers to Factory 2-U. (Cmplt ¶ 13.)

Factoring is a form of financing for garment manufacturers, who are referred to as the "client" of the factors. Factors extend credit by purchasing (at a discount) their clients' accounts receivable -- *e.g.*, the invoices reflecting a garment manufacturer's sale of goods to a retailer like Factory 2-U. (Cmplt. ¶ 4.) The factor may agree to make advances to the client in amounts up to 70% to 90% of the receivables. (Cmplt. ¶ 4.) These advances are repaid when the factor collects the receivable from the retailer. (Cmplt. ¶ 4.)

Before agreeing to accept (or "approve") a client's receivable from a retailer, the factor analyzes the creditworthiness of the retailer since the retailer is responsible for paying the factor. (Cmplt. ¶ 5.) That credit analysis is called "credit checking." If the factor decides not to approve the order -- *i.e.*, not to take the risk of non-payment of the receivable -- the garment manufacturer can still choose to make the sale to that retailer, but at its own

---

[1]    The other defendants are Milberg Factors, Inc., Capital Factors, Inc., GMAC Commercial Finance LLC, HSBC Business Credit (USA) Inc., Rosenthal and Rosenthal, Inc., Sterling Factors Corporation and Wells Fargo Century Inc.

106756.00601/40172643v.1

risk of non-payment. (Cmplt. ¶ 5.) By the terms of their client agreements, the Complaint alleges, factors have discretion to refuse to "credit check" a retailer like Factory 2-U for any reason at all. (Cmplt. ¶ 6.)

**The Defendants' Alleged Sharing of Credit Information**

Plaintiff charges, in conclusory fashion, that all eight of the defendants "agreed upon the basis on which they would do business with Factory 2-U and its manufacturers" (Cmplt. ¶ 38), but never alleges any facts or specifics about the supposed agreement. The only facts alleged in the Complaint are about the defendants sharing credit information about Factory 2-U. (Cmplt. ¶ 35.)

Plaintiff alleges that the factors "shared highly confidential information relating to factored customers and clients" at "highly secretive weekly meetings of formal groups such as the Uptown Credit Group, Inc. and the Thursday Garment Group" and "through informal communications methods." (Cmplt. ¶ 34.) With regard to the "weekly meetings," the Complaint alleges no facts: not when or where they occurred, not who attended, and not even what was discussed (let alone agreed to). Indeed, there is no allegation that Factory 2-U was ever discussed at one of these meetings.

As for the "less formal means of communications," plaintiff alleges a series of conversations between representatives of various factors from February 2002 to September 2003. (Cmplt. ¶¶ 34-35.) None of the alleged conversations involved a discussion of an agreement. None involved all the defendants. Rather, the alleged conversations involved one-on-one exchanges of credit information about Factory 2-U: *e.g.*, the approval, reduction and expiration of Factory 2-U's credit lines; decisions by some factors to approve or decline orders from Factory 2-U to garment manufacturing clients; the

4

imposition of credit limits or surcharges by some factors; and the payment terms and deposit requirements of some factors.  (*See* Cmplt. ¶ 35 (a-aa).)

The Complaint does not allege that, in the course of these credit information exchanges, any of the defendants proposed or accepted an agreement about what each of them would do with that information.  The Complaint does not allege, for example, that any factor ever proposed that all the factors agree to decline orders from Factory 2-U.  It does not even allege that the two factors who received the information (Milberg and Rosenthal) made any credit decisions based on that information.

In fact, according to conversations alleged in the Complaint, the defendants did *not* act in accord or make the same credit decisions, but acted differently toward Factory 2-U at different times:

- A series of calls allegedly made by Milberg on March 13, 2003 revealed that Wells Fargo, Capital, and HSBC were *declining* orders for Factory 2-U, while Rosenthal was *approving* orders. (Cmplt. ¶ 35 (k-m).) HSBC had been reducing its line over the previous 6 months. (Cmplt. ¶ 35 (b, d, f, g, h).) Milberg is not alleged to have made any decision based on that information.

- A series of calls allegedly made by Milberg in April 2003 revealed that Capital (which had been declining orders) was now *approving* orders; that Sterling, Rosenthal, GMAC and CIT were also *approving* orders; and Wells Fargo and HSBC were *declining* orders. (Cmplt. ¶ 35 (n-t).) Again, Milberg is not alleged to have made any decision based on that information.

- A series of calls allegedly made by Milberg on September 15 and 17, 2003 revealed that Sterling was *approving* orders; GMAC had placed orders *on hold*; Rosenthal was now *declining*; and CIT had a credit limit in place. (Cmplt. ¶ 35 (x–aa).) Again, Milberg is not alleged to have made any decision based on the information.

Finally, the Complaint does not allege that any of the credit decisions made by any of the defendants relating to Factory 2-U were economically irrational -- *i.e.*, that Factory 2-U was truly creditworthy but was inexplicably denied credit.

**The Allegations Against CIT**

With respect to CIT specifically, the Complaint alleges only that a representative of Milberg twice contacted a representative of CIT, once on April 23, 2003 and again on September 17, 2003. (Cmplt. ¶ 35 (t, aa).) In the first conversation, representatives of CIT and Milberg allegedly discussed "the amount of credit that CIT was approving on orders from Factory 2-U, including a line of credit that Factory 2-U had established, the fact that CIT was imposing surcharges on all manufacturers whose orders from Factory 2-U CIT was financing, payment terms required by CIT from Factory 2-U and the fact that Sterling . . . was approving Factory 2-U orders up to a specified limit." (Cmplt. ¶ 35(t).) In the second conversation, CIT and Milberg allegedly "discussed the credit limit applied to Factory 2-U orders by CIT, and the future expiration date of that credit limit." (Cmplt. ¶ 35(aa).)

As alleged, these conversations involved nothing more than a sharing of credit information. There is no allegation that Milberg and CIT agreed to act in unison with respect to Factory 2-U, or made any such agreement with the other defendants. And while the Complaint vaguely alleges that "Defendants declined and limited credit to Factory 2-U at approximately the same time" (Cmplt. ¶ 37), the Complaint does not allege whether CIT "declined" all credit to Factory 2-U or simply "limited" the amount of credit.

**Factory 2-U's Bankruptcy**

Factory 2-U filed for bankruptcy protection on January 13, 2004. (*See In re Factory 2-U Stores*, Case. No. 04-10111 (PJW), Bankr. D. Del.) In a declaration filed that same day with the bankruptcy court, Factory 2-U's CEO Norman Plotkin stated that prior to the declaration of bankruptcy, Factory 2-U had suffered through a "sustained period of sub-par operating performance despite two rounds of out-of-court store closures during fiscal 2002 and fiscal 2003" and that it had experienced "declining sales volume" in both fiscal 2001 and

6

2002. (Declaration of Norman G. Plotkin in Support of First Day Motions and Applications Filed by Factory 2-U Stores, Inc., dated Jan. 13, 2004, filed in *In re Factory 2-U Stores*, Case. No. 04-10111, Bankr. D. Del., D.I. 5 (hereinafter, "Plotkin Decl.") at ¶¶ 7, 13.) Explaining Factory 2-U's poor performance, he noted that in the two years prior to Factory 2-U's bankruptcy filing, "the retail industry has experienced price deflation, primarily due to a weak economy and intense competition." (Plotkin Decl. at ¶ 11.) And specifically with respect to 2002, Plotkin attributed Factory 2-U's poor performance to "general economic malaise on the part of the consumer . . . extreme price competition within the retail industry . . . higher fuel and utility costs . . . the September 11 terrorists attacks . . . and the deployment of United States armed forces overseas." (Plotkin Decl. ¶ 13.)

### Plaintiff's "Boycott" and "Price Fixing" Claims

Plaintiff claims that the defendants violated Section 1 of the Sherman Act and the New York Donnelly Act by allegedly "boycotting" Factory 2-U and "fixing" Factory 2-U's terms and amount of credit. (Cmplt. ¶¶ 43–57.) The sole basis for these claims is the unsupported assertion that, after the exchanges of credit information, "the Defendants declined and limited credit to Factory 2-U at approximately the same time." (Cmplt. ¶ 37.) This parallel denial of credit, the Complaint alleges, "caused a reduction of Factory 2-U's inventory, increased Factory 2-U's credit costs, reduced its sales and profitability, and contributed materially to its bankruptcy and ultimate business failure." (Cmplt. ¶¶ 14, 32, 45, 52, 57.)

Though the Complaint is full of conclusory assertions of "illegal agreements," "unlawful discussions" and "an illegal group boycott," it contains no facts showing the proposal or creation of any agreement, other than perhaps an agreement to share credit information. It does not even allege that the defendants acted in unison. On the contrary,

7

according to the conversations alleged in the Complaint, different factors made different credit decisions at different times: *e.g.*, some factors allegedly declined credit while others limited credit and still others approved credit. (*See* Cmplt. ¶ 35 (k-m, n-t, x-aa).) On the facts alleged, there was not a single day when all eight defendants were doing the same thing.

Likewise, based on the same alleged conversations, plaintiff makes the conclusory assertion that the defendants "agreed on the amount of credit that would be extended to Factory 2-U," the terms of that credit, and whether "surcharges" would be imposed. (Cmplt. ¶ 44.) Again, no facts are alleged to show such an agreement. The Complaint does not even purport to identify the amount or terms of credit that supposedly were "fixed."

## ARGUMENT

The Complaint should be dismissed because it does not allege facts sufficient to establish the existence of any unlawful agreement or conspiracy. As demonstrated below, an agreement to share credit information not only is *not* a violation of the antitrust laws, it is pro-competitive and lawful. *See Cement Mfrs.' Protective Ass'n* v. *United States*, 268 U.S. 588 (1925); *Michelman* v. *Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036 (2d Cir. 1976). To start to state a viable claim, plaintiff would at least have to allege, with sufficient facts, that the defendants reached an eight-way agreement about the credit decisions they would make with that information.

Just last term, the Supreme Court clarified the standard for pleading a conspiracy claim under Section 1 of the Sherman Act. *See Bell Atlantic Corp.* v. *Twombly,* 127 S. Ct. 1955, 1965 (2007). It held that the law "requires more than labels and conclusions, and a formulaic recitation of the elements will not do." *Id.* at 1964-65. Plaintiff's use of antitrust buzz words like "boycott" and "collusion" will not suffice to state an antitrust conspiracy claim. *See Id.* at 1964-65, 1966; *TV Communications Network, Inc.* v. *Turner Network Television, Inc.*, 964 F.2d 1022, 1026 (10th Cir. 1992). Instead, the Court ruled that to survive a motion to dismiss, a Section 1 pleading must allege "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 127 S. Ct. at 1965.

Even where a plaintiff alleges parallel behavior, such as an allegedly simultaneous denial of credit (which this plaintiff fails to do), "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.* at 1966. As in *Twombly*, the Complaint here "does not set forth a single fact in a context that suggests an agreement" and "there is no reason to infer that the companies had agreed among themselves to do what was only natural

9

anyway" -- deny or limit credit to a troubled company heading into bankruptcy. *Id*. at 1968-69, 1970.

## I.

## THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE SHERMAN ACT BECAUSE THE SHARING OF <u>CREDIT INFORMATION DOES NOT VIOLATE SECTION 1</u>

Exchanging credit information among competitors "is clearly lawful." VI Areeda & Hovenkamp, *Antitrust Law* ¶ 1423b (2003). The U.S. Supreme Court and every other authority to address this issue have so held. *See Cement Mfrs.' Protective Ass'n* v. *United States*, 268 U.S. 588 (1925); *Michelman* v. *Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036 (2d Cir. 1976); *Zoslaw* v. *MCA Distrib. Corp.*, 693 F.2d 870 (9th Cir. 1982); *Metro Video Dist., Inc.* v. *Vestron Video, Inc.*, Civ. No. 89-0640 PG, 1990 WL 58463 (D.P.R. Feb. 8, 1990).

As the Second Circuit found, the exchange of information "concerning the credit-worthiness of customers has long been held not to violate the Sherman Act." *Michelman*, 534 F.2d at 1048. That rule was applied in dismissing a Section 1 claim that was virtually identical to this case -- *i.e.*, the exchange of credit information among factors allegedly resulting in a parallel denial of credit. *Kasada, Inc.* v. *Access Capital, Inc.*, No. 01 Civ. 8893 (GBD), 2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004).

The exchange of credit information is pro-competitive and legal because "allowing creditors to gather relevant information about borrowers" has an "obvious social utility." Areeda & Hovenkamp ¶ 1423b. The more credit information lenders have, the better they can assess and minimize their risks, thereby making more credit available at affordable prices. "[T]he dissemination to competitors of information concerning the credit-worthiness of customers" serves the "legitimate function" of aiding "sellers in gaining information

10

necessary to protect themselves against fraudulent or insolvent customers." *Michelman*, 534 F.2d at 1048. It is not an antitrust violation -- indeed, it is beneficial for consumers -- for lenders to exchange credit information that aids in "assessing [a customer's] future financial stability." *Id.*

Therefore, "[a]s long as the exchange of credit information is not accompanied by any agreements relating to the extension of credit, such as an agreement to deny credit to one or more of the competitors' customers, no violation of the antitrust laws has occurred." *Metro Video*, 1990 WL 58463, at *9 (citing *Zoslaw*, 693 F.2d at 886). "[I]t is not a violation of Section 1 to exchange [information concerning the creditworthiness of customers], provided that any action taken in reliance upon it is the result of each firm's independent judgment, and not of agreement." *Michelman*, 534 F.2d at 1048.

Even if the defendants' credit decisions were uniform and parallel -- and the Complaint actually alleges the contrary -- that would not imply any agreement. The Court need look no further than the bankruptcy proceeding to understand why lenders and credit analysts might have found Factory 2-U to be a bad credit risk. The Complaint certainly does not allege that CIT and the other defendants' credit determinations can only be explained by an agreement to deny credit. Absent those and many other facts, the Complaint fails to state a claim.

## II.

### THE COMPLAINT FAILS TO ALLEGE THE FACTS NECESSARY TO SHOW AN AGREEMENT TO BOYCOTT OR DENY CREDIT

To convert the alleged information sharing into an antitrust conspiracy claim, plaintiff would have to allege facts showing that all eight defendants made an agreement to deny credit to Factory 2-U -- in other words, that they abdicated their independent decision-

11

making ability. *See Twombly*, 127 S. Ct. at 1966; *Michelman*, 534 F.2d at 1042, 1048. Plaintiff has not satisfied that pleading burden. Neither the conclusory assertions of a conspiracy, nor the exchanges of credit information, nor the purported parallel conduct are adequate to avoid dismissal.

### A.     Plaintiff's Conclusory Allegations are Insufficient to Show an Agreement to Boycott

The Complaint alleges nothing but the naked conclusion that the defendants conspired and agreed. A viable Section 1 claim "requires more than labels and conclusions." *Twombly*, 127 S. Ct. at 1964-65. No specific agreement is alleged with any factual particularity -- *i.e.*, no details, no dates, no places, no participants, no purpose, no decisions, no terms, no actions. Since such conclusory allegations do not suffice to assert a conspiracy claim, courts routinely dismiss such poorly pled antitrust claims.[2]

The Complaint never alleges, for instance, that CIT and/or the other defendants discussed, let alone made, any agreements during their conversations about Factory 2-U. Plaintiff has simply applied a legal label to that conduct without alleging the facts necessary to show an agreement. *See Twombly*, 127 S. Ct. at 1964-65 ("a plaintiff's obligation to

---

[2]     *See Twombly*, at 1971 n.10 (stating that because "the pleadings mentioned no specific time, place or person involved in the alleged conspiracies" they would not have satisfied the notice required by F.R.C.P. 8); *Garshman* v. *Universal Resources Holding, Inc.*, 824 F.2d 223, 230 (3d Cir. 1987) ("The allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act"); *Kasada*, 2004 WL 2903776, at *6 (same); *Yellow Page Solutions, Inc.* v. *Bell Atlantic Yellow Pages Co.*, No. 00 Civ. 5663, 2001 WL 1468168, at *13 (S.D.N.Y. Nov. 19, 2001) (Mukasey, J.) (dismissing claims with prejudice where complaint is "devoid of factual support for the existence of any § 1" conspiracy); *Kalmanovitz* v. *G. Heileman Brewing Co.*, 595 F. Supp. 1385, 1401 (D. Del. 1984) ("Only allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose, will be deemed sufficient.").

12

provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"); *see also Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 8 (1979) ("Easy labels [like price fixing] do not always supply ready answers.").

In *Kasada,* the court granted a motion to dismiss similar claims of boycotting (and price fixing) by factors who had allegedly agreed to stop credit-checking the plaintiff garment manufacturers. 2004 WL 2903776, at *1. The plaintiffs alleged that the defendant factors conspired to "boycott" plaintiffs by denying them credit by "routinely" communicating with each other and consulting each other on credit decisions, among other discussions. *Id.* at *5. The court held that the plaintiffs "fail[ed] to provide sufficient factual allegations to support" their boycott claim. *Id.* The complaint contained "no allegation that a particular plaintiff, once refused to be credit checked by one factor, was subsequently refused by each of the other factors," which might be indicative of a boycott rather than independent action by the factors. *Id.*

Here, not only is there "no allegation that a particular plaintiff, once refused to be credit checked by one factor, was subsequently refused by each of the other factors," but the opposite is alleged. Plaintiff alleges that certain factors (Wells Fargo and HSBC) had refused to credit check Factory 2-U, while CIT and other factors (Rosenthal, GMAC, Sterling and Capital) were continuing to extend credit. Like *Kasada*, "there is no allegation that [plaintiff] applied for and was refused to be credit checked by all of the defendants." *Id.*

**B.    An Agreement Cannot Be Inferred from
the Exchange of Credit Information**

The sharing of credit information does not allow the court to infer an illegal

agreement: "[N]o boycott conspiracy is inferable from the circulation of credit information."

Areeda & Hovenkamp ¶ 1423b (2003).  As Areeda explains:

> Circulating such information does not imply any agreement to use it in any
> particular way.  Furthermore, such information is generally useful to each
> possible creditor without regard to any competitor's granting or withholding
> credit; accordingly, the defendants would seldom have any motive to
> coordinate their credit-granting decisions. . . . Reinforcing the reluctance to
> see any conspiracy here is the obvious social utility of allowing creditors to
> gather relevant information about borrowers.

*Id.*  An agreement to share credit data, policies and developments does not establish that

"any cooperation resulted from the distribution of this information."  *Cement Mfrs. '*, 268

U.S. at 600.  Exchanging information does not equate to agreeing how to use it.

Nor do plaintiff's conclusory allegations of sharing information at industry meetings

(Cmplt. ¶ 34) create an inference of an agreement.  *See, e.g.*, *Capital Imaging Assoc.* v.

*Mohawk Valley Med. Assoc., Inc.*, 996 F.2d 537, 544-45 (2d Cir. 1993) (holding that, while

members of a physicians' practice association had the capacity to conspire among

themselves, "[t]he mere opportunity to conspire does not by itself support the inference that

such an illegal combination actually occurred").  Alleging "frequent meetings between the

alleged conspirators . . . will not sustain a plaintiff's burden absent evidence which would

permit the inference that those close ties led to an illegal agreement." *Venture Technology,*

*Inc.* v. *National Fuel Gas Co.*, 685 F.2d 41, 45 (2d Cir. 1980) (citations omitted).  Because

plaintiff has pled no facts about those meetings, he necessarily has failed to plead facts

sufficient to infer that those meetings led to an illegal agreement.

14

## C.    An Agreement Cannot be Inferred from Parallel Conduct

The Complaint does not actually allege parallel conduct, and even if it did, such allegations would be insufficient to state a claim.  Plaintiff offers the conclusion that the defendants "declined and limited credit to Factory 2-U at approximately the same time." (Cmplt. ¶¶ 35-37.)  The facts alleged, however, show independent and different conduct by each factor.  For example, on April 23, 2003, a representative of Milberg allegedly contacted five factors:  two reported that they were *declining* all Factory 2-U orders, while three said they were *approving* orders for Factory 2-U.  (Cmplt. ¶ 35(p–t).)  At no point in time, in fact, does the Complaint allege that the defendants were acting in the same manner towards Factory 2-U.

Thus, by plaintiff's own account of the alleged information sharing, the defendants were not acting in parallel.  "[C]ourts are concerned that they do not punish unilateral, independent conduct of competitors" in inferring an agreement through conscious parallelism.  *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999); *see also Twombly*, 127 S. Ct. at 1965-66 ("[L]awful parallel conduct fails to bespeak unlawful agreement").[3]

However, even if plaintiff had actually pled parallel conduct, that would not sustain his claims.  *Twombly* establishes the standard for pleading a Sherman Act Section 1 conspiracy claim based on parallel conduct.  It holds that parallel conduct alone is not

---

[3]    Moreover, the alleged communications cover a nearly two-year time period.  Actions spanning years are typically not found to be parallel conduct for purposes of inferring concerted action. *See, e.g., In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 355 (3d Cir. 2004) ("Within a twelve-day period in the summer of 1991, for example, [defendant] and its competitors all raised their list prices for flat glass by the same amounts"); *In re Baby Food Antitrust Litig.*, 166 F.3d at 131-32 (time lags of 3-6 months between defendants' pricing moves, *inter alia*, "refute rather than support" allegation of conscious parallelism).

enough to survive a motion to dismiss. *Id.* at 1966. A mere allegation of parallel conduct is "much like a naked assertion of conspiracy." *Id.* Additional facts must be alleged to support the "suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.*

To overcome a motion to dismiss, a complaint based on parallel conduct must allege "some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Id.* In *Twombly*, the Court upheld the dismissal of plaintiffs' complaint because none of the facts alleged were suggestive of a conspiracy -- plaintiffs did not "nudge their claims across the line from conceivable to plausible." *Id.* at 1970-74. The defendants, a group of former regional telephone service monopolies, were accused of an antitrust conspiracy based on their parallel conduct in their respective service areas which sought to inhibit the growth of competitive local exchange carriers after Congress withdrew the approval of their monopolies. *Id.* at 1961-63. All of the defendants were accused of inflating charges in their local service areas to inhibit the growth of upstart competitors, providing those new competitors with inferior service, and billing the new competitors in ways designed to sabotage the relations with their customers. *Id.* at 1962. The Court held that dismissal of the claim was proper, finding that "nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each of [the defendants] intent on keeping its regional dominance." *Id.* at 1971. The Court went on:

> there is no reason to infer that the companies had agreed to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1

16

violation against almost any group of competing businesses would be a sure thing.

*Id.* The same can be said here: if the Complaint is sustained based on parallel conduct of creditors that follows the exchange of credit information, every defunct business will be able to state an antitrust claim against its creditors.

Indeed, long before *Twombly*, the courts rejected the inference of a conspiracy from parallel conduct following the sharing of credit information. *See Cement Mfrs. '*, 268 U.S. at 600, 604-05; *Michelman*, 534 F.2d at 1047. After the exchange of credit information, no boycott conspiracy can be inferred from "any subsequent parallelism in denying credit." Areeda & Hovenkamp ¶ 1423b. "[A]ny subsequent parallelism in denying credit is at least as likely to be attributable to the underlying facts about the plaintiff's creditworthiness than to any coordinated decision making by the defendants." *Id.* The Seventh Circuit, in a case about an alleged scheme to fix the price of credit, reached the same conclusion:

> The showing of parallel behavior under these circumstances, where each bank faced identical problems of fraud, credit losses, and large initial expense to which reasonable businessmen would react in the same fashion, does not provide a basis for the inference of the conspiracy which plaintiffs allege.

*Weit* v. *Continental Illinois Nat. Bank & Trust Co. of Chicago*, 641 F.2d 457, 463 (7th Cir. 1981). A parallel denial of credit following an exchange of credit information does not lead to the inference of an agreement:

> One seller or lender who considers the plaintiff a poor credit risk is usually indifferent to its competitor's willingness to take a greater credit risk. Because there would be no motive to coordinate the denials of the credit, parallel denials would not permit an inference of conspiracy or create any question to be submitted to a jury.

Areeda & Hovenkamp ¶ 1412c.

This point is critical. No matter how motivated a factor like CIT might be to share credit information, it is economically "indifferent" to what its competitors choose to do with

17

that information.  One factor's self-interest may be advanced by learning what its competitors know about mutual customers, but it is not advanced by its competitors all agreeing to put those customers out of business.[4]

Therefore, the Complaint cannot be sustained by alleging parallel conduct.

### D.    An Agreement Cannot Be Inferred Because It Makes No Economic Sense

Similarly, from the facts alleged, no agreement or conspiracy can be inferred because it would make no economic sense.  *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (whether conduct is consistent with defendants' own self-interest is a factor as to whether there is an inference of a conspiracy); *First Nat'l Bank of Arizona* v. *Cities Service Co.*, 391 U.S. 253, 278-79 (1968).  The purported purpose of defendants' alleged boycott -- to drive the customers of their clients out of business -- would be economically self-destructive.  (Cmplt. ¶¶ 10, 32, 37.)  Retailers generate demand for factoring services by CIT's clients and are thus a source of CIT's revenues.  Driving such customers out of business would only reduce demand and lower prices.  That is the very opposite effect of an antitrust violation.  It is not surprising, therefore, that no Section 1 case can be found in which there is a conspiracy to drive one's own customers out of business.

Plaintiff has alleged no facts to explain why the factors would make an agreement on how to act on the information exchanged and, in particular, agree to sabotage their own

---

[4]    The same considerations apply to allegations of the exchange of information with respect to price fixing claims.  *See Cement Mfrs.* ', 268 U.S. at 605-06 (finding that the Court "cannot regard the procuring and dissemination of information [as to credit and responsibility of buyers]...as an unlawful restraint of trade." and rejecting the government's argument that the exchange of information had an unlawful effect on the price of cement).

source of business and profits.[5]  Dismissal is "warranted when the alleged conspiracy was

illogical" or "made no economic sense."  *U.S. Horticultural Supply, Inc.* v. *The Scotts Co.*,

No. 04-5182, 2006 WL 1531407, at *5 (E.D. Pa. June 1, 2006); *see also Matsushita Elec.*

*Indus.*, 475 U.S. at 593 ("[C]ourts should not permit factfinders to infer conspiracies when

such inferences are implausible, because the effect of such practices is often to deter

procompetitive conduct.").

     The implausibility of the conspiracy demonstrates well why the Complaint fails to

state a cause of action for a *per se* violation of Section 1.  In particular, *per se* unlawful

boycotts are only those which "*disadvantage competitors.*"  *Northwest Wholesale Stationers,*

*Inc.* v. *Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985) (emphasis added); *see*

*Federal Trade Comm'n* v. *Indiana Fed'n of Dentists*, 476 U.S. 447, 458 (1986).  Therefore,

as a threshold matter, the supposed boycott here does not fit into this model of a group

boycott because the only alleged disadvantage is of a non-competing garment retailer, and

not another factor.  *See Larry K. Mucko, Inc.* v. *Southwestern Pa. Bldg. & Const. Trades*

*Council*, 670 F.2d 421, 429 (3d Cir. 1982).[6]

---

[5]     The conspiracy is particularly non-sensical for CIT.  Its affiliate, The CIT Group/ Business Credit, Inc. (not a defendant in this action), provided tens of millions of dollars of both pre-bankruptcy and post-bankruptcy lending to Factory 2-U.  (*See In re Factory 2-U Stores*, Case No. 04-10111 (PJW), Bankr. D. Del., Final Order (A) Authorizing Postpetition Financing . . . , dated February 2, 2004, D.I. 147.)  Thus, to sustain the Complaint, the Court must accept the proposition that CIT would conspire to drive out of business a company that not only was a source of revenue, but also was indebted to an affiliated company, and that following the antitrust conduct, that affiliated company stepped up to provide financing to the target of the conspiracy.

[6]     The claim also must fail under the rule of reason.  The Third Circuit has established "four steps of proof that a plaintiff must present" when alleging a Section 1 violation under the rule of reason: "(1) that defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and conduct pursuant to the contract or conspiracy

19

## III.

## THE COMPLAINT FAILS TO ALLEGE THE FACTS
## NECESSARY TO SHOW AN AGREEMENT TO FIX PRICES

Plaintiff's price fixing claim is even more scantily pled than his boycott claim.

Plaintiff fails to allege any details whatsoever about any agreement about price -- *e.g.*, no

prices, no credit terms, no dates, no locations, no participants, etc. All the Complaint alleges

is that various defendants discussed "payment terms," "surcharges" and "security deposits."

The Complaint does not allege that the defendants came to any agreement as to these prices.

Strikingly, the Complaint never alleges what these terms were and whether each of the

defendants charged the same amount to Factory 2-U, or to any others.

The *Kasada* case is again instructive. The court in *Kasada* dismissed the plaintiff

garment manufacturers' claims that the defendant factors had controlled the price and

interest rates for factoring because those allegations were conclusory and unsupported by any

facts. 2004 WL 2903776, at *6. The court concluded that:

> Plaintiffs' price fixing argument hinges on the allegation that by not
> extending credit to the plaintiffs, the defendants 'minimized their risks and
> costs of doing business' thereby controlling the price and interest rates for
> factoring. Plaintiffs, however, do not state how the denial of credit to
> specific garment manufacturers affected market prices.

*Id.* at *7 (citations omitted). *See also Dresses for Less, Inc.* v. *CIT Group/Commercial*

*Services, Inc.*, No. 01 CIV. 2669 (WHP), 2002 WL 31164482, at *10 (S.D.N.Y. Sept. 30,

2002) (dismissing claim for price fixing).[7]

---

were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy." *In re Baby Food*, 166 F.3d at 118. As demonstrated in this section, plaintiff has failed to satisfy steps 1 and 3, and as demonstrated *infra* Section IV, plaintiff has also failed to satisfy step 2.

[7]  The denial of credit alleged here does not constitute price fixing, as it did in *Catalano* v. *Target Sales, Inc.*, 446 U.S. 643 (1980). In *Catalano*, competing beer wholesalers agreed among

20

Here, plaintiff makes the exact same allegation and it should be dismissed for the exact same reason. (Cmplt. ¶¶ 33, 51.) The Complaint contains no factual allegation that the defendants' alleged conduct had *any* adverse effect on competition, and certainly no allegations that the conduct is *per se* illegal because it has "no purpose except stifling of competition." *Palmer* v. *BRG of Ga., Inc.*, 498 U.S. 46, 49 (1990) (internal citations omitted). In setting forth plaintiff's price fixing claim, the Complaint alleges that defendants agreed to "fix, maintain, and stabilize *Factory 2-U's* terms and amount of credit." (Cmplt. ¶ 44 (emphasis added).) As in *Kasada*, the allegation that the terms and amount of credit extended to *one* garment retailer were fixed and that credit was not extended to this *one* retailer is wholly inadequate to support a claim that competition in the entire market was affected.

The Complaint boils down to the allegation that defendants shared information regarding whether credit would be extended and the terms of the credit extended to a single garment retailer, which does not amount to an antitrust violation, let alone a *per se* restraint of trade. *See NCAA* v. *Board of Regents*, 468 U.S. 85, 104 (1984) ("Under the Sherman Act

---

themselves to fix the credit terms on which they would sell beer to retailers. *Id.* at 644. Specifically, the wholesalers agreed to require the retailers to pay in advance or upon delivery, and discontinue the practice of accepting late payments without interest. *Id.* Since extending interest-free credit "is equivalent to giving a discount" off the purchase price, terminating that practice constituted "an agreement to eliminate discounts" -- i.e., fixing the price of beer. 446 U.S. at 648. The courts in *Kasada* and *Dresses for Less* rejected arguments by the plaintiff garment manufacturers based on *Catalano*. Both courts distinguished *Catalano* from the claims of the plaintiffs because the defendants in *Catalano* "specifically denied credit to the plaintiffs alone and not to all of their customers." *Kasada*, 2004 WL 2903776, at *7; *Dresses for Less*, 2002 WL 31164482, at *10. Likewise, the allegations here are that defendants denied credit and agreed on the terms of the credit extended to only Factory 2-U, and plaintiff does "not state how the denial of credit to specific garment [retailers] affected market prices." *Kasada*, 2004 WL 2903776, at *7.

21

the criterion to be used in judging the validity of a restraint on trade is its impact on competition"); *Kasada*, 2004 WL 2903776, at *7. Most importantly, the Complaint does not allege that any agreement was reached by CIT or any other defendant to make collective credit decisions or take any collective action to harm competition -- the *sine qua non* of an antitrust claim.

**IV.**

**THE COMPLAINT FAILS TO STATE AN
ANTITRUST CLAIM BECAUSE IT DOES NOT
ALLEGE ANY HARM TO COMPETITION**

Whatever financial misfortune may have befallen Factory 2-U, and whatever the defendants may have done to Factory 2-U, plaintiff has no antitrust claim because he has not alleged any marketwide harm to competition, only a loss to Factory 2-U.

"In order to assert a cause of action under Section 1, plaintiffs must prove they have suffered an antitrust injury that is causally related to the defendants' allegedly illegal anti-competitive activity." *Eichorn* v. *AT&T Corp.*, 248 F.3d 131, 138 (3d Cir. 2001) (citing *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Courts consistently hold that "an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market." *Id.* at 140 (citing cases). "While a plaintiff may have individually suffered an injury as a result of defendants' actions, the antitrust laws were designed to protect market-wide anticompetitive activities." *Id.* (citing *Atlantic Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 338 (1990)).

Here, the Section 1 claims should be dismissed because plaintiff fails to allege that the purported conduct has "a wider impact on the competitive market" beyond injury to Factory 2-U. *Id.*; *see Kasada*, 2004 WL 2903776, at *7 ("[P]laintiff bears the burden of

22

showing that the challenged action has an adverse effect on competition as a whole in the relevant market"); *Mathias* v. *Daily News, L.P.*, 152 F. Supp. 2d 465, 479 (S.D.N.Y. 2001) ("[P]rivate antitrust plaintiffs must allege harm to competition in the market rather than primarily harm to themselves").  The supposed grievance in the Complaint -- that Factory 2-U was denied credit -- does not signify or flow from any harm *to competition* in the alleged factoring market.  Even if it were true that all the factors agreed to cut off credit to the suppliers of one retailer like Factory 2-U, that is no indication of a marketwide impairment of competition among the factors.  There is no allegation, for example, that the factors drove up the cost of their factoring services to their customer base by, say, collectively restricting output (shrinking the availability of credit) or by reducing competition (driving out an efficient competitor).[8]  The defendants may have decided not to approve their clients' orders for Factory 2-U -- because it was poor credit risk, or because they did not like the retailer -- but that financial loss to one business did not arise from any marketwide absence of competition among the factors.

An antitrust plaintiff must allege an injury resulting from some specific conduct which the antitrust laws make unlawful.  *Brunswick Corp.*, 429 U.S. at 489.  Plaintiff has

---

[8]   *See Federal Trade Comm'n* v. *Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 423 (1990) (finding that agreement among members of a bar association to stop representing indigent criminal defendants unless the District of Columbia increased their compensation to be a restraint on price and output in violation of Section 1); *United States* v. *General Motors Corp.*, 384 U.S. 127, 140 (1966) (finding a "classic conspiracy in restraint of trade" where car dealers, their associations and General Motors agreed to "eliminate a class of competitors" of certain franchised dealers); *Mariana* v. *Fisher*, 338 F.3d 189, 196 (3d Cir. 2003) ("An agreement which has the purpose and effect of reducing output is illegal under § 1 of the Sherman Act" (citations omitted)); *Malley-Duff & Assocs., Inc.* v. *Crown Life Ins. Co.*, 734 F.2d 133, 141 (3d. Cir. 1984) (finding that there was sufficient evidence for jury on insurance agency's claim that competitors conspired among themselves to freeze agency out of the market for a Canadian insurance carrier).

done the very opposite: not one garment retailer (or any other entity in the garment industry) is identified, other than Factory 2-U, who has been hurt by the alleged exchange of information among the defendants or has been driven out of business. Only in the most conclusory terms does the Complaint state that defendants "possessed market power sufficient to inhibit competition on a market-wide basis." (Cmplt. ¶ 33.)

In *Kasada*, the court rejected similar allegations that garment manufacturers were "eliminated from the marketplace" by the defendant factors alleged boycotting and fixing of the price for factoring. 2004 WL 2903776, at *8. The court found it significant that the plaintiffs did not allege "what garment manufacturers, other than themselves, were affected by defendants' alleged actions. Indeed, plaintiffs' claims center on their injury alone and not on a broader injury to competition generally." *Id.* The *Kasada* plaintiffs' allegations of personal injury "failed to allege the requisite antitrust injury to competition resulting from defendants' actions" and were rejected. *Id.*

Further illuminating plaintiff's failure to plead harm to competition, and his improper focus only on injury to Factory 2-U, is plaintiff's failure to plead properly a relevant market in which competition was somehow thwarted. Plaintiff has defined the relevant market as the "provision of 'factoring services' in the domestic garment industry to include retailers, wholesalers, and manufacturers." (Cmplt. ¶ 30.) This definition fails to meet the basic requirement to defining a relevant market: it contains no factual allegations concerning product interchangeability or cross-elasticity of demand. *See Queen City, Inc.* v. *Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (affirming dismissal "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand"). Moreover, plaintiff essentially

24

concedes that factoring is not a market in and of itself. Plaintiff alleges that "about 80% of garment manufacturers relied on factors for their credit needs." (Cmplt. ¶ 12.) This obviously means that 20% rely on other sources of credit -- traditional asset backed financing, credit insurance, securitization etc. -- that are clearly interchangeable with factoring.

Lastly, plaintiff's own allegations negate any claim of harm to competition. Plaintiff claims that one of defendants' purposes for the alleged conspiracy was to "minimize their risks and costs of doing business with garment manufacturers and their customers." (Cmplt. ¶¶ 33, 51.) These are pro-competitive effects. By reducing their risks and costs, factors can reduce prices and make affordable credit available to a larger universe of creditworthy customers. That is a result the antitrust laws seek to promote, not prohibit.

## V.

## THE COMPLAINT FAILS TO STATE
## A CLAIM UNDER NEW YORK LAW

If the Court dismisses plaintiff's Sherman Act claims, it must also dismiss his Donnelly Act claim.

In Count IV, the Complaint alleges a violation of the Donnelly Act, N.Y. Gen. Bus. L § 340, the New York corollary of the Sherman Act. *See Re-Alco Indus., Inc.* v. *Nat'l Center for Health Education, Inc.*, 812 F.2d 387, 393 (S.D.N.Y. 1993). The Donnelly Act "has been narrowly construed to encompass only those causes of action falling within the Sherman Act." *Kasada*, 2004 WL 2903776, at *13; *State of New York* v. *Mobil Oil Corp.*, 38 N.Y.2d 460, 463-64, 381 N.Y.S.2d 426, 427, 344 N.E.2d 357 (1976) (same). It should be dismissed for the reasons set forth in Sections I, II, III and IV above. *See, e.g., Kasada*, 2004 WL 2903776, at *13 (dismissing Donnelly Act claim where plaintiff failed to allege a federal

25

antitrust claim); *Granite Partners, L.P.* v. *Bear, Stearns & Co., Inc.*, 17 F. Supp. 2d 275, 297 (S.D.N.Y. 1998) (same).

**VI.**

**THE COMPLAINT IS BARRED**
**BY THE STATUTE OF LIMITATIONS**

This action was commenced on September 17, 2007. (Cmplt. at 26; Fed. R. Civ. P. 3.) The limitations periods in both the Sherman Act and the Donnelly Act bar claims accruing more than four years before the action is commenced. 15 U.S.C. § 15b; N.Y. Gen. Bus. L. § 340. Under the antitrust statutes, a cause of action accrues when the allegedly unlawful act takes place. *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). This is true even if the injury resulting from the act occurs after the act itself. *See id.* ("[E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and ... *the statute of limitations runs from the commission of the act.*") (Emphasis added). Claims arising from allegedly unlawful acts that occurred before September 17, 2003 are therefore time barred.

The unlawful acts alleged by the Complaint are "information exchanges and agreements" among defendants. (Cmplt. ¶ 56 ("Each of the Defendants' unlawful information exchanges and agreements entered into was a combination in restraint of trade").) The Complaint alleges that these information exchanges and alleged agreements took place "at least as early as 2002" and continued through September 17, 2003, a date that is precisely four years before this action was commenced. (Cmplt. ¶ 35; *see also* Cmplt. ¶¶ 9, 37-38, 56.) Plaintiff filed his Complaint nearly two years after the expiration of the limitations period for the first allegedly unlawful act and on the same day as the expiration of the limitations period for the last allegedly unlawful act. Accordingly, all the claims are time

26

barred (with the possible exception of any claim arising from an alleged discussion on one day, September 17, 2003).[9]

Recognizing that his claims fall outside the limitations period, plaintiff alleges that defendants "fraudulently concealed their unlawful conduct," with the result that the limitations period should be tolled. (Cmplt. ¶ 40.) Plaintiff's fraudulent concealment allegations fail in three ways. First, plaintiff must plead with particularity facts showing "affirmative acts of concealment." ABA Section of Antitrust Law, *Antitrust Law Developments* 901 (5th ed. 2002); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1178-79 (3d Cir. 1993); *Hamilton County Bd. of Comm'rs v. Nat'l Football League*, 491 F.3d 310, 319 (6th Cir. 2007). The Complaint does not allege such affirmative acts. It alleges only silence by defendants, that defendant Milberg "never informed Factory 2-U that it was in contact with other factors." (Cmplt. ¶¶ 41-42.) But it is hornbook law that "silence . . . is not enough" to plead fraudulent concealment. *Antitrust Law Developments*, at 901; *Pinney Dock & Transport Co. v. Penn Central Corp.*, 838 F.2d 1445, 1472 (6th Cir. 1988).

Second, to plead fraudulent concealment, plaintiff must also allege with particularity that plaintiff "exercise[d] … due diligence" or, as explained by the Supreme Court, "reasonable diligence" to discover his claims. *Antitrust Law Developments*, at 900; *Klehr* v.

---

[9] The complaint alleges no facts to suggest that any unlawful discussions or agreements took place after September 17, 2003. Although it asserts in wholly conclusory terms that "agreements" "continued after the dates specifically alleged" (Cmplt. ¶ 35), this conclusory assertion falls squarely within the assertions held insufficient to withstand a motion to dismiss by the Supreme Court in *Twombly*, 127 S. Ct. at 1964-65 (affirming dismissal of complaint which alleged "agreement" and "conspiracy" without supporting factual allegations); *see also Masco Contractor Servs., Inc. v. Beals*, 279 F. Supp. 2d 699, 703 (E.D. Va. 2003) ("The liberal pleading requirements of the Federal Rules do not . . . relieve claimants of the burden of properly pleading facts which, if proven, would establish all the elements that make up the theory for relief.").

27

*A. O. Smith Corp.*, 521 U.S. 179, 194 (1997).  The Complaint does not allege, with or without particularity, that Factory 2-U exercised any diligence to discover its claims.

Finally, to plead fraudulent concealment, a plaintiff must allege that he was not aware of the factual basis of his claims during the requested tolling period.  *Antirust Law Developments*, at 900.  Nowhere does the complaint allege that Factory 2-U was unaware in 2002 of the exchanges of information and reductions in credit that constitute the only facts alleged by the trustee.  Nor could plaintiff credibly make such an allegation.  By 2002, two lawsuits had been publicly filed against garment industry factors, including several defendants in this action, which challenged their exchanges of credit information as violations of the antitrust laws.  *See Dresses for Less*, 2002 WL 31164482, at *1; *Kasada*, 2004 WL 2903776, at *2 (deciding motion to dismiss filed in 2002 and holding that the information exchanges did not violate the antitrust laws).  Nor could plaintiff credibly allege that Factory 2-U did not know in 2002 that the defendants were exchanging credit information about Factory 2-U in particular.  The Complaint expressly alleges that Milberg told Factory 2-U that it was having contacts with the other defendants concerning Factory 2-U's credit.  (Cmplt. ¶ 41.)  Finally, Factory 2-U obviously would have been aware of any reductions in credit offered by defendants.

28

## CONCLUSION

For the reasons stated herein, CIT respectfully requests that this Court grant its motion to dismiss all the claims in the Complaint with prejudice.

Dated:    December 14, 2007

BLANK ROME LLP

*/s/ David K. Sheppard*

By: _____

Michael DeBaecke (ID No. 3186)
David K. Sheppard (ID No. 4149)
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 425-6400

and

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

Robert A. Atkins
Daniel H. Levi
Robin D. Fineman

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for Defendant The CIT
Group/Commercial Services Inc.*

Dated:  December 14, 2007

29