## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JEOFFREY L. BURTCH, CHAPTER 7 TRUSTEE, FACTORY 2-U STORES, INC., et al., | ) ) ) ) | |
| | ) | C.A. No. 07-556 *** |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| MILBERG FACTORS, INC., CAPITAL FACTORS, INC., THE CIT GROUP/COMMERCIAL SERVICES, INC., GMAC COMMERCIAL FINANCE LLC, HSBC BUSINESS CREDIT (USA) INC., ROSENTHAL AND ROSENTHAL, INC., STERLING FACTORS CORPORATION, WELL FARGO CENTURY, INC., | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

### OPENING BRIEF OF DEFENDANTS GMAC COMMERCIAL FINANCE LLC, STERLING FACTORS CORPORATION AND WELLS FARGO CENTURY, INC. IN SUPPORT OF THEIR MOTION TO DISMISS

EDWARDS ANGELL PALMER & DODGE LLP
Stuart M. Brown (#4050)
Denise Seastone Kraft (#2778)
Mark D. Olivere (#4291)
919 N. Market Street, Suite 1500
Wilmington, DE 19801
(302) 777-7770
smbrown@eapdlaw.com
dkraft@eapdlaw.com
molivere@eapdlaw.com
  *Counsel for Defendants*
  *GMAC Commercial Finance LLC,*
  *Sterling Factors Corporation and*
  *Wells Fargo Century, Inc.*

OF COUNSEL:

Daniel Wallen
Bernard Beitel
Lloyd M. Green
OTTERBOURG, STEINDLER, HOUSTON
 & ROSEN, P.C.
230 Park Avenue
New York, New York 101069
(212) 661-9100

December 17, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................... iii

I.    SUMMARY OF ARGUMENT ......................................................................1

    A.  Plaintiff Fails to Allege a Conspiracy .................................................3

    B.  Plaintiff Fails to Adequately Plead Antitrust Injury ...........................5

    C.  The Court May Take Judicial Notice of Factory 2-U's Public Filings..............5

    D.  The Complaint Should Be Dismissed .................................................8

II.   THE ALLEGATIONS OF THE COMPLAINT ...................................................8

    A.  The Parties to This Action ..................................................................8

    B.  Factoring ............................................................................................ 8

    C.  Plaintiff's Insufficient Antitrust Allegations ....................................9

    D.  The Allegations Fail to State a Claim.............................................. 12

III.  ARGUMENT ........................................................................................ 12

    A.  PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER
       SECTION I OF THE SHERMAN ACT......................................... 14

         (1)    Plaintiff Has Failed to Adequately Allege a Conspiracy.............. 15

         (2)    Plaintiff Has Failed to Adequately Allege Price-Fixing............... 16

         (3)    The Complaint Does Not Allege an Agreement to Boycott.......... 19

         (4)    Plaintiff Has Not Alleged Any Antitrust Injury ...........................23

         (5)    Plaintiff Has Failed to Allege a Relevant Market.........................25

B.  PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER
    NEW YORK LAW.............................................................................27

C.  THE COMPLAINT IS BARRED BY THE STATUTE
    OF LIMITATIONS .........................................................................28

IV.    CONCLUSION .......................................................................................30

# TABLE OF AUTHORITIES

Page

Cases

Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc., 801 F. Supp. 1450 (E.D. Pa. 1992) ....24

Am. Channel, LLC v. Time Warner Cable, Inc., 2007 U.S. Dist. LEXIS 47966
   (D. Minn. June 28, 2007)........................................................................................13

Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 110 S.Ct. 1884 (1990)......23

Bell Atlantic Corp. v. Twombly, __ U.S. __, 127 S.Ct. 1955 (2007) ........................passim

Ben Sheftall Distributing Co., Inc. v. Mirta de Perales, Inc., 791 F.Supp. 1575
   (S.D.Ga. 1992)........................................................................................................15

Brunson Communications, Inc. v. Arbitron, Inc., 239 F.Supp.2d 550
   (E. D. Pa. 2002) ................................................................................................19, 23

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690
   (1977)......................................................................................................................23

Cement Mfrs' Protective Assn. v. United States, 268 U.S. 588, 45 S.Ct. 586
   (1925)..................................................................................................................4, 17

Cohen v. General Motors Corp. (In re New Motor Vehicles Canadian Export
   Antitrust Litig.), 490 F.Supp.2d 13 (D. Me. 2007)................................................16

Continental Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499 (4th Cir. 2002).......23, 24

Delco LLC v. Giant of Maryland, LLC, 2007 U.S. Dist. LEXIS 82711
   (D. N.J. Nov. 8, 2007) .....................................................................................20, 22

Doron Precision Sys., Inc. v. FAAC Inc., 423 F.Supp.2d 173 (S.D.N.Y. 2006) .............28

Eichorn v. AT&T Corp., 248 F.3d 131 (3d Cir.), cert. denied,
   534 U.S. 1014, 122 S.Ct. 506 (2001) .............................................................21, 22, 23

First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S. Ct. 1575
   (1968)................................................................................................................22, 23

FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 106 S. Ct. 2009 (1986) ........................21

Garshman v. Universal Resources Holding, Inc., 824 F.2d 223 (3d Cir. 1987)..........15, 16

Gordon v. Lewistown Hosp., 272 F. Supp. 2d 393 (M.D. Pa. 2003), aff'd,
    423 F.3d 184 (3d Cir. 2005), *cert. denied*, 547 U.S. 1092, 126 S. Ct. 1777 (2006) ...25

Granite Partners, L.P. v. Bear, Stearns & Co., Inc., 17 F. Supp.2d 275
    (S.D.N.Y. 1998)......................................................................................24

Hackman v. Dickerson Realtors, Inc., 2007 U.S. Dist. LEXIS 64669
    (N.D. Ill. Aug. 31, 2007) .........................................................................20

Harrison Aire, Inc. v. Aerostar Intern., Inc., 423 F.3d 374 (3d Cir. 2005)........................26

IDT Corp. v. Building Owners & Managers Assn. Intl., 2005 U.S. Dist.
    LEXIS 33208 (D. N.J. Dec. 14, 2005) ...............................................21, 25

In re Baby Food Antitrust Litig., 166 F.3d 112 (3d Cir. 1999) ........................................18

In re Elevator Antitrust Litig., 502 F.3d 47 (2d Cir. 2007) .............................................13

In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055
    (D. N.J. Oct. 3, 2006) .............................................................................15

In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144 (3d Cir. 1993) .............29

In re NAHC, Inc. Securities Litig., 306 F.3d 1314 (3d Cir. 2002).......................................6

Indeck Energy Services, Inc. v. Consumers Energy Co., 250 F.3d 972 (6th 2000)..........24

Inter-City Tire and Auto Center, Inc. v. Uniroyal, Inc., 701 F.Supp. 1120
    (D. N.J. 1988), *aff'd without opinion*, 888 F.2d 1380 (3d Cir. 1989) ........................28

J.L. Terrel's & Terrel's Pro Finishes, Inc. v. Sherwin-Williams Automotive
    Finishes Corp., 2004 U.S. Dist. LEXIS 6411 (E.D. Pa. March 30, 2004) ...................14

Kasada, Inc. v. Access Capital, Inc., 2004 U.S. Dist. LEXIS 25257
    (S.D.N.Y. Dec. 10, 2004) ...................................................................passim

Klehr v. A.O. Smith Corp., 521 U.S. 179, 117 S.Ct. 1984 (1997) ...................................29

Lantec, Inc. v. Novell, Inc., 146 F.Supp.2d 1140 (D. Utah 2001),
    aff'd, 306 F.3d 1003 (10th Cir. 2002) .......................................................17

Larry V. Muko, Inc. v. Southwestern Pennsylvania Bldg. & Constr.,
    670 F.2d 421 (3d Cir.), *cert. denied*, 459 U.S. 916, 103 S. Ct. 229 (1982)...........21, 22

Lemelson v. Bendix Corp., 621 F.Supp. 1122 (D. Del. 1985) ..........................................19

Linzer Prods. Corp. v. Sekar, 499 F. Supp. 2d 540 (S.D.N.Y. 2007)..........................27 28

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348 (1986)................................................................................................................... 1, 2, 22

Metro Video Dist., Inc. v. Vestron Video, Inc., 1990 U.S. Dist. LEXIS 18739 (D. P.R. Feb. 8, 1990)................................................................................................ 17

Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036 (2d Cir.), cert. denied, 429 U.S. 885, 97 S.Ct. 236 (1976)............................................................. 4

Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S.Ct. 1464 (1984) ........ 1, 2

Mumford v. GNC Franchising LLC, 437 F.Supp.2d 344 (W.D. Pa. 2006) ...................... 26

Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 105 S. Ct. 2613 (1985) ......................................................................... 21

PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101 (2d Cir. 2002)........................................... 21

Perry v. Rado, 504 F. Supp. 2d 1043 (E.D. Wash. 2007)........................................... 19, 20

Queen City Pizza v. Domino's Pizza, 124 F.3d 430 (3d Cir. 1997)................................... 26

Schafer v. State Farm Fire & Cas. Co., 507 F.Supp.2d 587 (E.D. La. 2007)................... 18

Staehr v. Hartford Fin. Svcs. Group, Inc., 460 F.Supp.2d 329 (D. Conn. 2006) ............... 6

State Oil Co. v. Khan, 522 U.S. 3, 118 S. Ct. 275 (1997) ................................................. 17

Tal v. Hogan, 453 F.3d 1244 (10th Cir. 2006), cert. denied, __ U.S. ___, 127 S. Ct. 1334 (2007)............................................................................................. 14

Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, 127 S. Ct. 2499 (2007)............. 6

Trans World Technologies, Inc. v. Raytheon Co., 2007 U.S. Dist. LEXIS 82118 (D. N.J. Nov. 1, 2007) ......................................................................................... 13, 24

Tredennick v. Bone, 2007 U.S. Dist. LEXIS 87941 (W.D. Pa. Nov. 29, 2007) ................. 6

United Airlines, Inc. v. U.S. Bank N.A., 406 F.3d 918 (7th Cir. 2005)............................. 24

United Magazine Co. v. Murdoch Magazines Distribution, Inc., 146 F. Supp. 2d 385 (S.D.N.Y. 2001)................................................................................................... 23

United States v. Central State Bank, 621 F.Supp. 1276 (W.D. Mich. 1985), aff'd, 817 F.2d 22 (6th Cir. 1987)............................................................................. 27

Untracht v. Fikri, 454 F.Supp.2d 289 (W.D. Pa.2006), aff'd, 2007 U.S. App. LEXIS 23058 (3d Cir. Oct. 1, 2007) ......................................... 23

Venture Technology, Inc. v. National Fuel Gas Co., 685 F.2d 41 (2d Cir.),
    cert. denied, 459 U.S. 1007, 103 S.Ct. 362 (1982)................................................16, 17

Westerfield v. Quizno's Franchise Co., LLC, 2007 U.S. Dist. LEXIS 83883
    (E.D. Wis. Nov. 5, 2007) ....................................................................................14, 26

Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287 (11th Cir. 2003) ....................18

Worldwide Basketball and Sport Tours, Inc. v. National Collegiate Athletic Ass'n.,
    388 F.3d 955 (6th Cir. 2004) .................................................................................26, 27

Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co., 2001 U.S. Dist.
    LEXIS 18831 (S.D.N.Y. Nov. 14, 2001) ...................................................................15

Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795 (1971) ......28

Zoslaw v. MCA Distributing Corp., 693 F.2d 870 (9th Cir. 1982), cert. denied,
    460 U.S. 1085, 103 S. Ct. 1777 (1983) ......................................................................18

Statutes and Rules

15 U.S.C § 15b .................................................................................................................28

15 U.S.C. § 1 (Section 1 of the Sherman Act)..........................................................passim

Fed. R. Civ. P. 12(b)(6) ...............................................................................................1, 14

N.Y. Gen. Bus. L. § 340 (Donnelly Act)......................................................3, 8, 12, 27, 28

Treatises

6 Phillip E. Areeda, Antitrust Law an Analysis of Antitrust Principles and Their
    Application (2006)......................................................................................................21

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JEOFFREY L. BURTCH, CHAPTER 7 TRUSTEE, FACTORY 2-U STORES, INC., et al., <br><br> Plaintiff, <br><br> v. <br><br> MILBERG FACTORS, INC., CAPITAL FACTORS, INC., THE CIT GROUP/COMMERCIAL SERVICES, INC., GMAC COMMERCIAL FINANCE LLC, HSBC BUSINESS CREDIT (USA) INC., ROSENTHAL AND ROSENTHAL, INC., STERLING FACTORS CORPORATION, WELL FARGO CENTURY, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) Civil Action No. 1:07-cv-00556- *** ) ) ) ) ) ) ) ) ) ) ) ) |

**OPENING BRIEF OF DEFENDANTS GMAC COMMERCIAL FINANCE LLC, STERLING FACTORS CORPORATION AND WELLS FARGO CENTURY, INC. IN SUPPORT OF THEIR MOTION TO DISMISS**

Defendants GMAC Commercial Finance LLC ("GMAC"), Sterling Factors Corporation ("Sterling") and Wells Fargo Century, Inc. ("Century") respectfully submit this Memorandum of Law in support of their motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim and because it is time-barred.

## I. SUMMARY OF ARGUMENT

The recent Supreme Court decision, Bell Atlantic Corp. v. Twombly, ___ U.S. __, 127 S. Ct. 1955 (2007), coupled with prior Supreme Court precedent, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348 (1986) and Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764, 104 S.Ct. 1464 (1984), mandates that a plaintiff asserting a claim under section 1 of the Sherman Act must plead enough facts,

that if proven true, plausibly suggest that an agreement was reached. An allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Twombly, 1275 Ct. at 1966, 1971. The Supreme Court in Twombly noted that it had previously "hedged" against the risks of "false inferences from identical behavior" at a number of points in the trial sequence. Id. at 1964. It pointed to its holding in Monsanto that at the trial stage "proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action," and to its holding in Matsushita that at the summary judgment stage, plaintiff's "offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently." Id. Twombly has now extended that view to the pleading stage, holding that:

> Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action. Id. at 1966.

The Supreme Court further noted that antitrust actions can be very expensive, and that a District Court "must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." Id. at 1967.

This Complaint [D. I. 1] (Exhibit "A")[1] does not even come close to meeting the standards set by the Supreme Court, and should therefore be dismissed in its entirety for failing to state a cognizable claim under the federal or New York antitrust statutes.

---

[1] References to Exhibits refer to the exhibits to the accompanying Declaration of Stuart Brown.

Plaintiff is the Chapter 7 Trustee of Factory 2-U Stores, Inc. ("Factory 2-U"), a bankrupt clothing retailer. The Complaint alleges that Defendants violated 15 U.S.C. § 1 (Section 1 of the Sherman Act) by engaging in a price-fixing conspiracy (Count I), participating in an illegal boycott (Count II), and running afoul of the rule of reason (Count III). Count IV alleges a violation of a New York statute, the Donnelly Act, N.Y. Gen. Bus. L. § 340. While Plaintiff uses four different labels, it is all the same claim, which is predicated upon the alleged refusal by Defendants in 2002 and 2003 to assume the credit risk of non-payment (or "credit check" in industry parlance) of the receivables of Defendants' respective factored clients that would be generated by the clients' sales to Factory 2-U. Although the Complaint sets forth the Trustee's lament, it does not articulate a legally viable claim.

A.    Plaintiff Fails to Allege a Conspiracy

The Complaint lacks specific and particular allegations of the Defendants actually agreeing to deprive Factory 2-U of credit or to jointly fix the terms of credit ultimately extended to Factory 2-U. Accordingly, the Complaint cannot stand. That one or more Defendants may have concluded during the same period that they would not accept the credit risk on their factored clients' sales to Factory 2-U is just the kind of parallel conduct that Twombly held is insufficient to withstand a motion to dismiss, because it does not by itself reasonably infer an agreement. Defendants' credit decisions can just as well be independent action based upon a review of negative financial reports issued by Factory 2-U. Furthermore, even allegations of parallel conduct are lacking. The Complaint does not allege any facts showing: (a) that if one Defendant refused to accept the credit risk on its factored clients' sales to Factory 2-U, every other Defendant

- 3 -

subsequently also refused to accept the credit risk of sales to Factory 2-U; (b) that any or all of Factory 2-U's suppliers (Defendants' factored clients) failed or refused to ship to Factory 2-U at their own credit risk; or (c) that each of the Defendants offered uniform credit lines, imposed identical credit terms, or extracted uniform service charges.

The few factual allegations contained in the Complaint actually describe *independent* conduct, not a conspiracy and not an agreement. The Complaint narrates the exchange of credit information, but does not describe any agreement from which a conspiracy may be reasonably inferred. Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1048 (2d Cir.), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236 (1976). Exchanging credit information is pro-competitive and legal, and therefore allegations of credit information sharing, coupled with little else, do not give rise to a valid antitrust claim. Cement Mfrs' Protective Assn. v. United States, 268 U.S. 588, 604, 45 S. Ct. 586, 590 (1925). There are no "facts" alleged reflecting any agreement to fix and maintain a specific amount of credit or to deny credit to Factory 2-U. Instead, the Complaint simply describes the travails of a distressed business, and then seeks to lay the blame of a declining business leading to bankruptcy at the Defendants' feet. Simply stated, the Complaint is no more than a synthesis of conclusory allegations and legal jargon with no facts to support it.

Indeed, the only factual allegations contained in the Complaint, namely the various telephone conversations discussed in paragraph 35 of the Complaint, actually demonstrate the absence of *any* agreement among the factors. Paragraph 35 is replete with alleged instances of credit actually being *extended*, shows variations in the credit

lines established by some of the Defendants, and demonstrates that the factors were *not* acting in unison. This "allegation supports a finding that credit-checking decision[s] were made independently by each factor based on subjective criteria." Kasada, Inc. v. Access Capital, Inc., 2004 U.S. Dist. LEXIS 25257, at *18 (S.D.N.Y. Dec. 10, 2004).

B.    Plaintiff Fails to Adequately Plead Antitrust Injury

Although the Complaint purportedly sounds in Section 1 of the Sherman Act, it omits any specific allegations of an injury to the competitive market *as a whole* by reason of Defendants' alleged wrongdoings (so-called "antitrust injury"). Instead, Plaintiff has attempted to make Factory 2-U's own alleged injury synonymous with an injury to the market itself. The allegations in the Complaint are about the purported losses of Factory 2-U -- and not about injury to any purported relevant market as a whole.

Thus, the allegations of adverse and anticompetitive effects within "the relevant product and geographic markets" are self-serving. The Complaint alleges that the "relevant product market" is the "provision of 'factoring services' to the domestic garment industry." However, the Complaint offers no rationale as to why the product market is so narrowly drawn so as to exclude alternate forms of financing. Further, there is no allegation how the "factoring services" market was adversely affected by the Defendants' independent credit decisions relating to their factored clients' sales to Factory 2-U.

C.    The Court May Take Judicial Notice of Factory 2-U's Public Filings

Although motions to dismiss are generally restricted to the text of the pleadings, the Third Circuit has concluded that the Court may take judicial notice of public records,

including judicial proceedings and SEC filings. <u>Tellabs, Inc. v. Makor Issues & Rights,</u> <u>Ltd.,</u> __ U.S. __, 127 S. Ct. 2499, 2509 (2007) ("Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); <u>In re NAHC, Inc.</u> <u>Securities Litig.</u>, 306 F.3d 1314, 1331 (3d Cir. 2002) (judicial notice of SEC filings not attached to complaint); <u>Tredennick v. Bone</u>, 2007 U.S. Dist. LEXIS 87941, at *5 (W.D. Pa. Nov. 29, 2007); <u>Staehr v. Hartford Fin. Svcs. Group, Inc.</u>, 460 F.Supp.2d 329, 333 - 335 (D. Conn. 2006) (action dismissed as court takes judicial notice of regulatory filings and press releases).

Factory 2-U's filings with the Securities and Exchange Commission ("SEC") and with the United States Bankruptcy Court for the District of Delaware admit that the company's general and operational performance after September 11, 2001, was poor. They demonstrate that Factory 2-U sustained operating losses in the tens of millions of dollars in calendar years 2001, 2002 and 2003. According to Factory 2-U's amended 10-K for the fiscal year ended February 1, 2003, filed on August 4, 2003 with the SEC (Exhibit "B"), Factory 2-U had sustained over $10.8 million in losses in the fiscal year ended February 2, 2002 and over $28.5 million in losses for the fiscal year ended February 1, 2003.

Factory 2-U also reported that it went through two unsuccessful restructurings to ameliorate its deficiencies, and acknowledged that any tightening of credit arose from its own poor performance, the general weak economic environment and bankruptcy filings

of other large retail chains.  Factory 2-U's SEC filings also disclose that trade credit was not its only source of credit, and that in April 2003, Factory 2-U had "completed a $7.5 million debt financing transaction . . . secured primarily by inventory and accounts receivable and . . . equipment and other assets." (Exhibit B at p. 5.)  In that same filing, Factory 2-U also praised the very "credit community" it now reproaches:

> In April 2003, we . . . experienced an improved flow of merchandise product to our stores, a loosening of credit terms from the *credit community* and improved liquidity as a result of our capital raising efforts.  To a large extent, our ability to obtain merchandise in the future on credit terms consistent with those that we have received historically will depend upon our ability to improve future operating results as measured by comparable store sales growth and operating margins.  Id. (Emphasis added.)

Factory 2-U's September 16, 2003 quarterly SEC filing echoed this same theme and contained an acknowledgment that Factory 2-U controlled its own destiny, "While we have experienced an improvement in support from the credit community, any further improvement in credit will be contingent upon improved operating results and liquidity." (Exhibit "C" at p. 9.)

Thus, Plaintiffs' attempt to portray a scenario where Factory 2-U was allegedly victimized by an illegal agreement reached among the Defendants in this action cannot withstand a motion to dismiss.  Not only are no facts alleged in the Complaint upon which the Court can plausibly draw such an inference, Factory 2-U's admissions in its public filings belie any such inference.

D.     The Complaint Should Be Dismissed

Accordingly, the Complaint should be dismissed for failing to state a claim that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. §1, whether labeled as price-fixing, illegal boycott or running afoul of the rule of reason, or violated the Donnelly Act, N.Y. Gen. Bus. L. §340, a state law that mirrors the federal antitrust statutes.

## II. THE ALLEGATIONS OF THE COMPLAINT

A.     The Parties to this Action

Plaintiff Jeoffrey L. Burtch ("Plaintiff") is the Chapter 7 Trustee for Factory 2-U, a clothing retailer currently in Chapter 7 bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware. (Compl. ¶ 20.)

The eight defendants, GMAC, Sterling, Century,  Milberg Factors, Inc., Capital Factors, Inc., The CIT Group/Commercial Services, Inc., HSBC Business Credit (USA) Inc., and Rosenthal and Rosenthal, Inc. (collectively, the "Defendants") are alleged to have provided factoring and other financial services and accommodations to garment manufacturers and others, including companies that supplied Factory 2-U with merchandise for re-sale to the public. (Compl. ¶¶ 7, 14.)

B.     Factoring

The Complaint alleges that factoring is a form of commercial finance by which a lender purchases receivables at a discount and assumes the risk of collecting the receivables from the account debtor.  (Compl. ¶ 3-5.)  It is alleged that factoring is transacted pursuant to a written contract between the factor on the one hand, and the factored client on the other hand.  (Id.)  Factory 2-U acknowledges that it was not a

- 8 -

factored client of any of the Defendants in the within action, but was a customer of Defendants' factored clients. (Compl. ¶ 14.)

Prior to the factored client's sale to its factored customer, the client will request that the factor *bear the unsecured risk of collection* of the receivable that will be generated from such sale. (Compl. ¶ 5.) The factor analyzes the credit of the prospective customer to decide whether to accept the risk of non-payment by the customer. Within the factoring industry, this process is referred to as "credit checking." (Id.) The factor, in its discretion, may decline to approve or "credit check" the proposed sale. (Compl. ¶ 6.) Under those circumstances, if the factor declines the credit check, the factored client may nonetheless proceed with the sale to its customer, and in that event, it is the client, and not the factor, who bears the risk of the customer failing to pay, *i.e.*, the sale is at "Client's Risk." (Compl. ¶¶ 5, 6.)

Although Factory 2-U was not a factored client of any of the Defendants, according to the Complaint, Factory 2-U *indirectly* received credit accommodations from the Defendants. (Compl. ¶14.) Specifically, Plaintiff alleges that the Defendants factored Factory 2-U's suppliers, and by Defendants' determination whether or not to accept the credit risk on the receivables generated by sales to Factory 2-U by the Defendants' factored clients, the Defendants were essentially granting or denying the extension of credit to Factory 2-U. (Id.)

C.     Plaintiff's Insufficient Antitrust Allegations

According to the Complaint, the relevant product market is "the provision of factoring services in the domestic garment industry" and "[f]actoring services include a

- 9 -

complete financial package that consists of: (1) credit extension; (2) accounts receivable purchasing and collection; and (3) financing." (Compl. ¶ 30.)  Plaintiff also alleges that the United States is the relevant geographic market. (Compl. ¶ 31.)  This description of the pertinent product market is an unwarranted attempt by Factory 2-U to depict its own individual difficulties as systemic problems.

The Complaint offers no explanation why the relevant market should be limited to *factoring* for the garment industry.  Nor does Plaintiff explain why other credit sources cannot and do not compete with factors in financing the domestic garment industry or why banks or non-bank asset based lenders should not be considered as part of the relevant market.  Indeed, Factory 2-U's own SEC filings make clear that Factory 2-U relied upon other sources of credit.

In addition, without specifying "who," it is alleged that "many" of the Defendants shared and exchanged "highly confidential information relating to factored customers and clients" at "highly-secretive" formalized weekly trade group meetings. (Compl. ¶ 34.) The Complaint, however, fails to allege when those meetings occurred; what transpired at the alleged meetings; what information could not be openly discussed by and among creditors; whether or not Factory 2-U was a topic at any of these meetings; or <u>whether after any such alleged meeting Factory 2-U was deprived of credit based upon an illegal agreement reached at such meeting.</u>

Paragraph 35 is the crux of Plaintiff's Complaint, but all it does is allege that during the period February 2002 through September 2003, some Defendants discussed Factory 2-U's credit history with other Defendants. As discussed below, this is perfectly

- 10 -

legal.  Significantly, paragraph 35 lacks *any* allegation of an *actual agreement* between the Defendants to deny or restrict credit to Factory 2-U.  The Complaint never alleges that either GMAC, Sterling or Century made any agreement with any other Defendant during its alleged discussions.

Even if Plaintiff had pled identical conduct by each Defendant -- which it did not, it is well established that parallel conduct alone, without an agreement, is insufficient to withstand a motion to dismiss.  Twombly, 127 S.Ct. at 1966.  The Complaint does not even allege parallel conduct.  There is no allegation that once one factor Defendant refused to accept the credit risk of its factored client's sales to Factory 2-U, every other factor Defendant subsequently also refused to accept the credit risk of sales to Factory 2-U.  There is no allegation that any or all of Factory 2-U's suppliers (Defendants' factored clients) failed or refused to ship to Factory 2-U at "Client's Risk" -- *i.e.* to accept the credit risk themselves of Factory 2-U failing to pay.  Likewise, the Complaint does not allege the existence of uniform credit lines being offered by each of the Defendants, that Defendants imposed identical credit terms, or that Defendants extracted uniform service charges.

Paragraph 35 in fact makes clear that Defendants were *not* acting in tandem. Paragraph 35(a) through (f) describes how between February 2002 and August 2002 the factors did *not* even attempt to reach a unified credit policy toward Factory 2-U, and that some Defendants had different credit lines in place.  Indeed, one factor had renewed a credit line after it had expired.  Paragraph 35(g) through (j) illustrates that in late 2002, while two factor Defendants had "pulled" credit lines, some factor Defendants had not.

Paragraph 35(k) through (t) depicts how in March and April 2003, three factor Defendants were extending credit on sales to Factory 2-U and two factor Defendants had declined credit on sales to Factory 2-U.

Similarly, paragraph 35(u) through (aa) demonstrates how in the late spring and summer of 2003, three factor Defendants were extending credit, two factor Defendants were declining credit and one factor Defendant was even contemplating expanding credit. Nevertheless and notwithstanding the pled inconsistencies in the credit made available to Factory 2-U, each factor who allegedly participated in the described telephone conversations are accused of price fixing and boycott. This claim cannot stand.

D.      The Allegations Fail to State a Claim

Based on the foregoing, Plaintiff claims that all of the Defendants violated Section 1 of the Sherman Act and the Donnelly Act. Although the Complaint creates different Counts labeled as price-fixing, illegal boycott, and violating the rule of reason, it is simply one claim with different labels, and that claim is not viable. The Complaint is nothing more than conclusory allegations containing "buzz words" but no factual support. Accordingly, the Complaint should be dismissed.

## III. **ARGUMENT**

The Complaint should be dismissed because it does not allege facts stating a claim against the Defendants, and it is time-barred. This action is predicated upon an alleged "conspiracy," but there are no factual allegations to plausibly support any conclusion that a conspiracy was actually created. Plaintiff's Complaint does not plead enough facts, that if proven true, could survive a motion for summary judgment.

- 12 -

Accordingly, the Complaint should be dismissed.  As the Court of Appeals stated in In re

Elevator Antitrust Litig., 502 F.3d 47 (2d Cir. 2007):

> To survive a motion to dismiss under *Twombly*, it is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement; to be viable, a complaint must contain "enough factual matter (taken as true) to suggest that an agreement to engage in anticompetitive conduct was made." *Twombly*, 127 S.Ct. at 1965 [citation and internal quotation marks omitted]. While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to "nudge plaintiffs' claims across the line from conceivable to plausible."

502 F.3d at 50.  *See also* Am. Channel, LLC v. Time Warner Cable, Inc., 2007 U.S. Dist.

LEXIS 47966, at *11 (D. Minn. June 28, 2007) (In *pleading* such a conspiracy, a plaintiff

*must show evidence"* 'that reasonably tends to prove . . . a conscious commitment to a

common scheme designed to achieve an unlawful objective.") (Emphasis added.)

Here, Plaintiff "has not alleged any additional facts that, taken as true, would take

[its] claim across the line from possibility to plausibility of entitlement to relief." Id. at

*13.  A "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do . . . ." Twombly, 127 S. Ct. at 1964-1965.

The Complaint in this action contains "really nothing more than the ill-fated

'labels and conclusions' buried by the Supreme Court in *Twombly.*"  Trans World

Technologies, Inc. v. Raytheon Co., 2007 U.S. Dist. LEXIS 82118, at *15 (D. N.J. Nov.

1, 2007).  The use of antitrust "buzz words" does not supply the necessary factual

allegations. Tal v. Hogan, 453 F.3d 1244, 1261 (10th Cir. 2006), *cert. denied*, ___ U.S.
_____, 127 S. Ct. 1334 (2007).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), an antitrust
complaint "must set forth enough information to suggest that relief would be based on
some recognized legal theory." Kasada, *supra*, 2004 U.S. Dist. LEXIS 25257, at *11.
"*Twombly* . . . requires, *especially for antitrust claims*, that a complaint set forth
sufficient facts to show plausible grounds exist for believing a violation has occurred."
Westerfield v. Quizno's Franchise Co., LLC, 2007 U.S. Dist. LEXIS 83883, at *41 (E.D.
Wis. Nov. 5, 2007) (Emphasis added). *See* J.L. Terrel's & Terrel's Pro Finishes, Inc. v.
Sherwin-Williams Automotive Finishes Corp., 2004 U.S. Dist. LEXIS 6411, at *6 (E.D.
Pa. March 30, 2004), in which the complaint was dismissed for failure to "state
individual theories of antitrust liability" or to "assign particular facts to the different
statutory violations alleged." The Complaint herein completely fails to meet these
pleading standards and should therefore be dismissed in its entirety.

## A.    PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT

The Complaint alleges that the Defendants violated Section 1 of the Sherman Act
by entering into a "conspiracy" and "boycott" in which they allegedly agreed on the
amount of credit that would be extended to Factory 2-U, the credit terms and any
collateral requirements. (Compl. ¶¶ 44, 47, 50.) Whether denominated as a "price-fixing
conspiracy" and "per se" violation (Count I), a "boycott" and "per se" violation (Count
II) or a "rule of reason claim" (Count III), Plaintiff's Sherman Act claims should be
dismissed for failing to state a claim.

- 14 -

(1)    Plaintiff Has Failed to Adequately Allege a Conspiracy

Plaintiff's claim of conspiracy comes up short. Without pointing to any specific agreements or to the terms of any specific agreement, Plaintiff alleges that Defendants conspired, and thereby violated Section 1 of the Sherman Act. These allegations are insufficient to withstand a motion to dismiss. Plaintiff does not:

> "adequately allege the role that each Defendant played in the conspiracy . . . The existence of . . . agreements between the . . . Defendant and other[s] shows that the parties engaged in a business relationship; but is not, without more, an allegation that the Defendants conspired among each others [sic] in violation of the Sherman Act."

In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055, at *81 (D. N.J. Oct. 3, 2006).

Factory 2-U has not provided sufficient facts to substantiate concerted conduct among the purported co-conspirators. Plaintiff fails to allege any specific facts pertaining to credit availability, terms of sale, requisite collateral, the imposition of surcharges or the existence of a boycott. Under these circumstances, the "court is left to speculate as to its specific terms." Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co., 2001 U.S. Dist. LEXIS 18831, at *42 (S.D.N.Y. Nov. 14, 2001) (Mukasey, J.).

The requisites of pleading an antitrust claim are not met by a mere allegation that there was a combination, contract and conspiracy. To state a cause of action, "the plaintiff must allege the facts constituting the conspiracy, its object and accomplishment." Ben Sheftall Distributing Co., Inc. v. Mirta de Perales, Inc., 791 F.Supp. 1575 (S.D.Ga. 1992). See Garshman v. Universal Resources Holding, Inc., 824 F.2d 223, 230 (3d Cir. 1987) ("The allegation of unspecified contracts with unnamed

other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act."); Cohen v. General Motors Corp. (In re New Motor Vehicles Canadian Export Antitrust Litig.), 490 F.Supp.2d 13 (D. Me. 2007) (holding that, under Twombly a "naked" assertion of conspiracy is insufficient to state a claim under Section 1 of the Sherman Act).

> (2)     Plaintiff Has Failed to Adequately Allege Price-Fixing

Only in the most conclusory manner does Plaintiff allege that Defendants engaged in price-fixing: "Defendants conspired and agreed among themselves to fix, maintain, and stabilize Factory 2-U's terms and amount of credit, which is a *per se* illegal price-fixing agreement . ." (Compl. ¶ 44.)  The Complaint lacks specifics as to the prices, terms, conditions, or interest rates that were allegedly "fixed" by the Defendants.

Most important, the Complaint does not allege that a *specific* agreement was reached by the Defendants to make collective credit decisions or take any collective action to harm competition.  Plaintiff claims only that the alleged misbehavior was directed at hurting Factory 2-U, and Factory 2-U alone.  (Compl. ¶ 10.)  *See* Kasada, *supra*, 2004 U.S. Dist. LEXIS 25257 at *22 (Plaintiff does "not state how the denial of credit to specific garment manufacturers affected market prices . . . Plaintiff's claims of price fixing in the factoring industry are completely conclusory, unsupported by factual allegations and are, therefore, dismissed.")

Likewise, the allegation that Defendants engaged in group meetings to share "credit information" does not state an antitrust claim.  (Compl. ¶¶ 9, 34.)  Alleging "frequent meetings between the alleged conspirators ... will not sustain a plaintiff's

burden absent evidence which would permit the inference that those close ties led to an illegal agreement." Venture Technology, Inc. v. National Fuel Gas Co., 685 F.2d 41, 45-46 (2d Cir.), *cert. denied*, 459 U.S. 1007, 103 S.Ct. 362 (1982). *See* Lantec, Inc. v. Novell, Inc., 146 F.Supp.2d 1140, 1151 (D. Utah 2001), *aff'd*, 306 F.3d 1003 (10th Cir. 2002) ("The mere showing of close relations or frequent meetings between alleged conspirators to violate antitrust laws will not meet plaintiff's burden absent evidence which would permit the inference that those close ties led to an illegal agreement."). These allegations are also undercut by Plaintiff's omission from the Complaint as to when these meetings were conducted and when those meetings ceased.

At the outset, the alleged exchange of credit information among the Defendants does not constitute a "*per se*" violation of Section 1. Only agreements with "pernicious anti-competitive effect, and such limited potential for procompetitive benefit" are deemed unlawful *per se*. State Oil Co. v. Khan, 522 U.S. 3, 10, 118 S. Ct. 275, 276 (1997). Thus, courts will not impose liability under Section 1 of the Sherman Act for the mere dissemination of credit information. As the Supreme Court held in Cement Mfrs' Protective Assn., *supra*, 268 U.S. at 604, 45 S. Ct. at 599, an agreement to share credit data and developments does not establish that any cooperation resulted from the distribution of the information. *See also* Kasada, *supra*, 2004 U.S. Dist. LEXIS 25257, at *18 (The exchange of information between business firms concerning the credit-worthiness of customers has long been held not to violate the Sherman Act); Metro Video Dist., Inc. v. Vestron Video, Inc., 1990 U.S. Dist. LEXIS 18739, at *29 (D. P.R. Feb. 8, 1990) (The exchange of information between competitors regarding the creditworthiness of customers does not violate any provision of the federal antitrust laws.)

- 17 -

In <u>Schafer v. State Farm Fire & Cas. Co.</u>, 507 F.Supp.2d 587 (E.D. La. 2007), the District Court dismissed the Sherman Act claims brought by plaintiffs-insureds against an insurance company and a carrier for alleged price fixing. The Court in <u>Schaefer</u> found the Complaint to be insufficient because the plaintiffs had failed to demonstrate an agreement and <u>Twombly</u> "required that plaintiffs assert facts in the pleadings that plausibly demonstrate the existence of an illegal agreement." 507 F.Supp.2d at 595. In addition, <u>Schaefer</u> expressly noted and held that <u>Twombly</u> had changed the rules of the game. The Court expressed its view that <u>Twombly</u> superseded the Third Circuit's holding in <u>Nelson v. Pilkington PLC (In re Flat Glass Antitrust Litig.)</u>, 385 F.3d 350, 360 (3d Cir. 2004), and that it was no longer enough to infer collusion "through an accumulation of circumstantial facts" and that <u>Twombly</u> was "a clear and visible departure from the liberal federal pleading standards . . .that ultimately will render it difficult to withstand dismissal without direct evidence of an illegal agreement." 507 F.Supp.2d at 596, n.26.

Plaintiff has failed to allege with requisite detail the existence of an agreement violative of the Sherman Act that excludes independent conduct. Plaintiff's conclusory allegations, without factual support, are not enough. <u>Williamson Oil Co. v. Philip Morris USA</u>, 346 F.3d 1287 (11th Cir. 2003) (grant of summary judgment dismissing antitrust action affirmed as wholesalers failed to present evidence tending to exclude lawful synchronous behavior); <u>In re Baby Food Antitrust Litig.</u>, 166 F.3d 112 (3d Cir. 1999) (Third Circuit affirmed summary judgment for the defendant despite evidence of exchange of price information among rivals); <u>Zoslaw v. MCA Distributing Corp.</u>, 693 F.2d 870, 886 (9th Cir. 1982), <i>cert. denied</i>, 460 U.S. 1085, 103 S. Ct. 1777 (1983) (no

indication of any agreement to fix credit terms aside from appellants' observation that large retailers in fact received more favorable credit terms); Lemelson v. Bendix Corp., 621 F.Supp. 1122, 1133 (D. Del. 1985) ("Even if defendants' occasional sharing of settlement information was regarded as a form of conscious parallel business behavior, there would still be an insufficient basis for inferring the existence of concerted action").

Plaintiff's allegations of price-fixing can only be described as inadequate, and the Complaint should be dismissed, without leave to replead.

### (3)    The Complaint Does Not Allege an Agreement to Boycott

Plaintiff fares no better by changing the label of its claim from price-fixing to boycott. In a minor variation of the conclusory allegations of price-fixing (Compl. ¶44), the Complaint alleges in similar conclusory fashion that "Defendants conspired and agreed among themselves to boycott Factory 2-U from the garment retailer business, which is a *per se* violation of Section 1 of the Sherman Act . ." (Compl. ¶47.) What is missing are the requisite specifics of any such agreement to boycott. Brunson Communications, Inc. v. Arbitron, Inc., 239 F.Supp.2d 550, 561 (E.D. Pa. 2002) (Complaint dismissed because although Plaintiff alleged a group boycott, the conclusory allegation was devoid of details).

To adequately allege an agreement that unreasonably restrains trade, the plaintiff must allege with particularity "facts sufficient to show an agreement between the parties to inflict the alleged wrong." Kasada, *supra,* 2004 U.S. Dist. LEXIS 25257, at *16. Where there is "only a conclusory allegation of boycott without the pleading of any particular facts establishing a per se restriction on competition and a decrease of output,"

the Complaint must be dismissed. Perry v. Rado, 504 F.Supp. 2d 1043, 1048 (E.D. Wash. 2007). *See also* Delco LLC v. Giant of Maryland, LLC, 2007 U.S. Dist. LEXIS 82711, at *44-45 (D. N.J. Nov. 8, 2007) ("Given the conclusory nature of [plaintiff's] group boycott allegations, the Court finds that [plaintiff] has not shown a probability of success in proving a *per se* Sherman Act violation under the group boycott theory.")

In Hackman v. Dickerson Realtors, Inc., 2007 U.S. Dist. LEXIS 64669 (N.D. Ill. Aug. 31, 2007), the District Court dismissed the antitrust claims brought against defendant realtors for allegedly shutting plaintiff out of the real estate market. Citing Twombly, the Court found plaintiff's allegations to be inadequate against one group of defendants because plaintiff, at most, had alleged parallel conduct together with "bare assertions of conspiracy." Id. at *36. Dismissing a Sherman Act claim against a second group of defendants, the Court stressed that under Twombly "[e]ncouragement absent an agreement is not enough." 2007 U.S. Dist. LEXIS 64669, at *27.

Just as the exchange of credit information does not by itself give rise to a claim of price-fixing, the exchange of credit information does not give rise to a boycott claim. Rejecting plaintiffs' boycott claim, Kasada held that:

> [T]he exchange of information between business firms concerning the credit-worthiness of customers has long been held not to violate the *Sherman Act*. *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1048 (2d Cir. 1976); *see also Cement Mfrs. Protective Asso. v. United States*, 268 U.S. 588, 604, 69 L. Ed. 1104, 45 S. Ct. 586, 591 (1925). Furthermore, the dissemination to competitors of information concerning the credit-worthiness of customers aids sellers in gaining information necessary to protect themselves against fraudulent or ***insolvent*** customers. *Michelman*, 534 F.2d at 1048. Lastly, the Second Circuit has held that it is not a violation of

- 20 -

> Section 1 to exchange such information, provided that any
> action taken in reliance upon it is the result of each firm's
> independent judgment, and not of agreement.

Kasada, *supra*, 2004 U.S. Dist. LEXIS 25257, at *18-19. (Emphasis added.)

The black letter rule is similarly clear and unambiguous:

> *[N]o boycott conspiracy is inferable from the circulation of*
> *credit information. Circulating such information does not*
> *imply any agreement to use it in any particular way.*
> Furthermore, such information is generally useful to each
> possible creditor without regard to any competitor's
> granting or withholding credit ; accordingly, the defendants
> would seldom have any motive to coordinate their credit-
> granting decisions. … *Reinforcing the reluctance to see any*
> *conspiracy here is the obvious social utility of allowing*
> *creditors to gather relevant information about borrowers.*

VI Phillip E. Areeda, <u>Antitrust Law An Analysis of Antitrust Principles and Their</u>
<u>Application</u> at ¶ 1423b (2006) (Emphasis added.)

Nor does the boycott alleged here constitute a "*per se*" violation of Section 1.
The *per se* rule in boycott cases is limited to cases "*involving horizontal agreements*
*among direct competitors.*'" <u>PepsiCo, Inc. v. Coca-Cola Co.</u>, 315 F.3d 101, 110 (2d Cir.
2002). (Emphasis added.) The Third Circuit has echoed that narrow construction of the
*per se* rule for boycotts. <u>IDT Corp. v. Building Owners & Managers Assn. Intl.</u>, 2005
U.S. Dist. LEXIS 33208, at *36 (D. N.J. Dec. 14, 2005), *citing* <u>Eichorn v. AT&T Corp.</u>,
248 F.3d 131, 143 (3d Cir.), *cert. denied*, 534 U.S. 1014, 122 S.Ct. 506 (2001). In
particular, *per se* unlawful boycotts are only those which "*disadvantage competitors*."
<u>Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.</u>, 472 U.S. 284,
294, 105 S.Ct. 2613, 2619 (1985) (emphasis added). *See* <u>FTC v. Indiana Fed'n of</u>
<u>Dentists</u>, 476 U.S. 447, 458, 106 S.Ct. 2009, 2018 (1986); <u>Larry V. Muko, Inc. v.</u>

Southwestern Pennsylvania Bldg. & Constr., 670 F.2d 421, 429 (3d Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 229 (1982) ("The application of the per se rule has been limited to those 'classic' boycotts in which a group of business competitors seek to benefit economically by excluding other competitors from the marketplace").     Plaintiff's "conclusory allegations that Defendants have engaged in a group boycott . . . clearly [does] not fit the classic group boycott case to which the *per se* approach applies." Delco LLC, *supra*, 2007 U.S. Dist. LEXIS 82711, at *44.

Plaintiff's boycott claim also fails under the rule of reason.  To state a claim under the rule of reason, "plaintiffs have the burden of establishing that, under all the circumstances, the challenged acts are unreasonably restrictive of competitive conditions in the relevant market." Eichorn, *supra*, 248 F.3d at 138.  An analysis of the reasonableness of particular restraints includes "the consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption." Id.  Plaintiff has failed to plead a cognizable antitrust injury or relevant market.

Finally, the alleged conspiracy makes absolutely no economic sense.  The Complaint is predicated upon the notion that Defendants sought to drive Factory 2-U out of business.  However, if a factor forces its client's customers to leave the market, that reduces demand for its services.  That is the very opposite effect of an antitrust violation. *See* Matsushita, *supra*, 475 U.S. at 594, 106 S. Ct. at 1359 (Courts should not permit fact finders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct); First Nat'l Bank of Arizona v.

Cities Service Co., 391 U.S. 253, 278-79, 88 S.Ct. 1575, 1587 (1968); Brunson Communications, *supra*, 239 F.Supp.2d at 563 ("If the defendants had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy"). Thus, where the "facts alleged in a complaint demonstrate that an alleged . . . conspiracy makes no economic sense, the cause of action must be dismissed." United Magazine Co. v. Murdoch Magazines Distribution, Inc., 146 F.Supp. 2d 385, 401 (S.D.N.Y. 2001).

(4)    Plaintiff Has Not Alleged Any Antitrust Injury

Even in cases involving *per se* violations, the right of action is available only to those private plaintiffs who have suffered antitrust injury. Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344, 110 S.Ct. 1884, 1894 (1990). An antitrust injury is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. Id. An antitrust plaintiff must allege an injury resulting from some specific conduct which the antitrust laws make unlawful. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S. Ct. 690, 697 (1977).

In order to assert a cause of action under Section 1, plaintiffs must prove that "they have suffered an antitrust injury that is causally related to the defendants' allegedly illegal anti-competitive activity." Eichorn v. AT&T Corp., *supra*, 248 F.3d at 138. An antitrust plaintiff must show that "the challenged conduct affected the prices, quantity or quality of goods or services, *not just his own welfare*." Untracht v. Fikri, 454 F.Supp.2d 289, 308 (W.D. Pa. 2006), *aff'd*, 2007 U.S. App. LEXIS 23058 (3d Cir. Oct. 1, 2007). (Emphasis added.) *See* Continental Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499,

508 (4th Cir. 2002) ("A plaintiff must show that the net effect of a challenged restraint is harmful to competition"); Indeck Energy Services, Inc. v. Consumers Energy Co., 250 F.3d 972, 977 (6th 2000) (record "presents no indication that competition itself was harmed by any act of the defendants").

The Complaint should be dismissed because Plaintiff makes "no allegations from which the Court could infer that defendants' alleged actions had any anticompetitive effect beyond the injury to plaintiffs." Kasada, supra, 2004 U.S. Dist. LEXIS 25257, at * 25, citing Granite Partners, L.P. v. Bear, Stearns & Co., Inc., 17 F. Supp.2d 275, 297-98 (S.D.N.Y. 1998).    Under "the law of the Third Circuit, plaintiff must show an anticompetitive effect beyond injury to their particular business." Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc., 801 F.Supp. 1450, 1462 (E.D. Pa. 1992).

There is nothing in the Complaint to plausibly support injury to the competition. For example, the Complaint "does not describe the marketplace, other than itself, or even suggest the presence of other actual competitors." Trans World Technologies, supra, 2007 U.S. Dist. LEXIS 82118, at *15.  The supposed antitrust grievance -- that the Defendants failed to accept the credit risk of their factored clients' sales of garments to Factory 2-U -- does not identify any harm to competition in the alleged factoring market or in any other market.

Plaintiff's "antitrust claim is thin to the point of invisibility." United Airlines, Inc. v. U.S. Bank N.A., 406 F.3d 918, 924 (7th Cir. 2005).  Plaintiff has failed to discharge his pleading obligations.  While Plaintiff describes the relevant product market as "factoring services" (Complaint ¶ 30), there are no factual allegations depicting any

interference with competition in the "factoring services" market. The Complaint lacks any allegations with respect to harm to Factory 2-U's competitors, harm to Defendants' competitors, or harm to Defendants' factored clients and their competitors. The story depicted in the Complaint is all about Factory 2-U -- and no one else.

In fact, Plaintiff's own allegations negate any claim of harm to competition. Plaintiff claims that one of the effects of the alleged conspiracy was to "minimize [the Defendants'] risks and costs of doing business . . . ." (Compl. ¶ 33.) That is a decidedly pro-competitive effect. By reducing their risks and costs, factors can reduce prices and make affordable credit available to a larger universe of creditworthy customers. That is a result the antitrust laws seek to promote, not prohibit.

(5)    Plaintiff Has Failed to Allege a Relevant Market

Under the rule of reason, a complaint must allege both relevant product and geographic markets. "Pursuant to the traditional rule of reason test, the plaintiff bears an initial burden . . .of showing that the alleged combination or agreement produced adverse, anti-competitive effects within the relevant product and geographic markets." Gordon v. Lewistown Hosp., 272 F.Supp. 2d 393, 415-16 (M.D. Pa. 2003)(citations omitted), aff'd, 423 F.3d 184 (3d Cir. 2005), cert. denied, 547 U.S. 1092, 126 S.Ct. 1777 (2006).

Here, the Complaint describes an ill defined product market and alleges the "United States" to be the pertinent geographic market. These allegations are inadequate as a matter of law. IDT Corp. v. Building Owners & Managers Assn. Intl., supra, 2005 U.S. Dist. LEXIS 33208, at *31 (Plaintiff "failed to allege sufficient facts concerning the anticompetitive effects of Defendants' conduct in the relevant product and geographic

markets . . . this Court cannot conclude that [plaintiff] has stated a claim for a rule of reason violation").

In defining the relevant product market, the plaintiff must take into account the concept of reasonable interchangeability and cross-elasticity of demand, and must address any reasonably interchangeable substitutes for the product at issue. Mumford v. GNC Franchising LLC, 437 F.Supp.2d 344, 352 (W.D. Pa. 2006) ("Boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it"). As the Third Circuit has held:

> Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

Queen City Pizza v. Domino's Pizza, 124 F.3d 430, 436 (3d Cir. 1997), *cited by* Westerfield v. Quizno's Franchise, *supra*, 2007 U.S. Dist. LEXIS 83883, at *39.

The Complaint cannot simply allege a product market without alleging facts that demonstrate that no products are functionally substitutable for those in the market. *See* Harrison Aire, Inc. v. Aerostar Intern., Inc., 423 F.3d 374, 383 (3d Cir. 2005) ("Relevant market definition is a function of reasonably available product substitutes"); Worldwide Basketball and Sport Tours, Inc. v. National Collegiate Athletic Ass'n., 388 F.3d 955, 961 (6th Cir. 2004) ("In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that

commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade or commerce. . .").

The Complaint fails to allege whether there were any interchangeable substitutes for factoring.   Plaintiff alleges that the relevant product market is "the provision of factoring services in the domestic garment industry."  Factoring services are defined in the Complaint to include a complete financial package that consists of:   (1) credit extension;  (2) accounts receivable purchasing and collection;  and (3) financing." (Compl. ¶ 30.)  However, the Complaint offers no explanation why the relevant market should be limited to factoring for the garment industry.

Plaintiff does not explain why other credit sources cannot and do not compete with factors in financing the domestic garment industry or why non-factored apparel manufacturers, banks or non-bank asset based lenders should not be considered as part of the relevant market.   Indeed, Factory 2-U's filings with both the Bankruptcy Court and the SEC demonstrate that factoring was not Factory 2-U's direct nor sole source of credit. "The essential test for ascertaining the relevant product market involves the identification of those products or services that are either identical to or available substitutes for the defendants' product or service."  United States v. Central State Bank, 621 F.Supp. 1276, 1290-1291 (W.D. Mich. 1985), aff'd, 817 F.2d 22 (6th Cir. 1987).

**B.    PLAINTIFF HAS FAILED TO STATE**
**A CLAIM  UNDER NEW YORK LAW**

The Donnelly Act was modeled after the Sherman Act, and the same standard applies under both statutes to the issues that are relevant here.   Venture Technology, Inc. v. National Fuel Gas Co., *supra*, 685 F.2d at 42, n.1.  *See also* Linzer Prods. Corp. v.

Sekar, 499 F.Supp.2d 540, 557 (S.D.N.Y. 2007); Inter-City Tire and Auto Center, Inc. v. Uniroyal, Inc., 701 F.Supp. 1120, 1124 (D. N.J. 1988), *aff'd without opinion*, 888 F.2d 1380 (3d Cir. 1989).

Accordingly, Plaintiff's "failure to adequately allege antitrust injury, restraint on trade . . . through anticompetitive behavior is just as fatal to its Donnelly Act claim as it is to its Sherman Act claims." Doron Precision Sys., Inc. v. FAAC Inc., 423 F.Supp.2d 173, 193 (S.D.N.Y. 2006). *See* Linzer Prods., *supra*, 499 F.Supp.2d at 557, holding that since Plaintiff failed to adequately plead its Sherman Act claims, the Donnelly Act claims were also insufficiently pled and had to be dismissed.

**C.    THE COMPLAINT IS BARRED BY THE STATUTE OF LIMITATIONS**

The events described in the Complaint occurred outside the four (4) year statute of limitations contained in 15 U.S.C. § 15b and N.Y. Gen. Bus. L. §340. The Complaint was filed on September 17, 2007. A cause of action for antitrust violations accrues when the allegedly unlawful act took place. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338, 91 S.Ct. 795, 806 (1971). The Complaint alleges that the unlawful acts were the "information exchanges and agreements" among Defendants. (Compl. §56). It is alleged that these information exchanges and alleged agreements occurred "at least as early as 2002" and continued through September 17, 2003. (Compl.§35.) The Complaint was filed more than two years after the expiration of the limitations period for the earliest alleged unlawful acts, and on the same day the limitations period expired for the last alleged unlawful act. The Complaint is therefore time-barred.

- 28 -

In an effort to circumvent this problem, the Complaint alleges in a conclusory fashion that "agreements" "continued after the dates specifically alleged." (Compl. §35.) However, this kind of conclusory allegation has been held insufficient to withstand a motion to dismiss. Twombly, 127 S.Ct. at 1964-65.

In a further attempt to make an end run around the statute of limitations, Plaintiff alleges that Defendants fraudulently concealed their allegedly unlawful conduct so that the statute of limitations should be tolled. (Compl. §40.) Plaintiff's fraudulent concealment argument fails because the Complaint does not plead with particularity any affirmative act of concealment. In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F. 2d 1144, 1178-79 (3d Cir. 1993). It also fails because the Complaint does not allege that Plaintiff exercised due diligence to discover his claim. Klehr v. A.O. Smith Corp., 521 U.S. 179, 194, 117 S.Ct. 1984, 1993 (1997). Significantly, the Complaint does not allege that Factory 2-U was unaware in 2002 and 2003 of the exchanges of credit information that constitute the basis of the antitrust claim. To the contrary, we note that according to Factory 2-U's SEC form 10-K, for the fiscal year ended February 1, 2003 and filed with the SEC on May 2, 2003 (Exhibit "D"), Factory 2-U was aware, as of January 2003, of credit restrictions and diminished trade credit because of poor performance and continued losses. In addition, the Complaint concedes that Factory 2-U was aware of communications among Defendants concerning Factory 2-U's credit because it alleges that Defendant Milberg Factors told Factory 2-U about its contacts with other factors. (Compl. § 41.) Thus, the Complaint is time-barred on its face and must be dismissed.

## V. **CONCLUSION**

For the reasons stated above, and in the Memorandum of Law of Defendant The CIT Group/Commercial Services Inc.'s Motion to Dismiss, which is adopted and incorporated herein, Defendants GMAC Commercial Finance LLC, Sterling Factors Corporation and Wells Fargo Century, Inc. respectfully request that this Court grant their motion to dismiss the Complaint in its entirety, with prejudice.

EDWARDS ANGELL PALMER & DODGE LLP

*/s/ Denise Seastone Kraft*

Stuart M. Brown (#4050)
Denise Seastone Kraft (#2778)
Mark D. Olivere (#4291)
919 N. Market Street, Suite 1500
Wilmington, DE 19801
Tel: (302) 777-7770
Fax: (302) 777-7263
smbrown@eapdlaw.com
dkraft@eapdlaw.com
molivere@eapdlaw.com
  *Counsel for Defendants*
  *GMAC Commercial Finance LLC,*
  *Sterling Factors Corporation and*
  *Wells Fargo Century, Inc.*

OF COUNSEL:

Daniel Wallen
Bernard Beitel
Lloyd M. Green
OTTERBOURG, STEINDLER, HOUSTON
  & ROSEN, P.C.
230 Park Avenue
New York, New York 101069
(212) 661-9100

December 17, 2007

- 30 -

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 17, a copy of the attached was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following counsel of record:

Robert W. Pedigo, Esquire
Shelley A. Kinsella, Esquire
Cooch & Taylor

Jeffrey R. Waxman, Esquire
Cozen & O'Connor

David J. Baldwin, Esquire
Potter Anderson & Corroon LLP

David Kyle Sheppard, Esquire
Michael D. DeBaecke, Esquire
Blank Rome LLP

Stephen B. Brauerman, Esquire
The Bayard Firm

Monte Terrell Squire, Equire
Young, Conaway, Stargatt & Taylor LLP

In addition, the undersigned forwarded a copy of same in the manner indicated below to:

### BY HAND

Robert W. Pedigo, Esquire
Shelley A. Kinsella, Esquire
Cooch & Taylor
824 Market Street, Suite 1000
Wilmington, DE 19801

Jeffrey R. Waxman, Esquire
Cozen & O'Connor
1201 N. Market Street, Suite 1400
Wilmington, DE 19801

David J. Baldwin, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street, Hercules Plaza
Wilmington, DE  19801

David Kyle Sheppard, Esquire
Michael D. DeBaecke, Esquire
Blank Rome LLP
1201 N. Market Street, Suite 800
Wilmington, DE  19801

Stephen B. Brauerman, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE  19801

Monte Terrell Squire, Esquire
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

*/s/ Denise Seastone Kraft*
Denise Seastone Kraft (#2778)
Edwards Angell Palmer & Dodge LLP
Wilmington, DE  19801
(302) 777-7770
dkraft@eapdlaw.com

1

LEXSEE 2007 U.S. DIST LEXIS 47966



Caution
As of: Dec 13, 2007

**The America Channel, LLC, Plaintiff, v. Time Warner Cable, Inc.; Time Warner NY Cable, LLC; Time Warner, Inc.; and Comcast Corporation, Defendants.**

**Civil No. 06-2175 (DWF/SRN)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*2007 U.S. Dist. LEXIS 47966; 2007-2 Trade Cas. (CCH) P75,833*

**June 28, 2007, Decided**

**PRIOR HISTORY:** *Am. Channel, LLC v. Time Warner Cable, Inc., 2007 U.S. Dist. LEXIS 3484 (D. Minn., Jan. 17, 2007)*

**COUNSEL:** [*1] Daniel R. Shulman, Esq., Gray, Plant, Mooty, Mooty & Bennett, PA, and Joseph M. Alioto, Esq., Alioto Law Firm, counsel for Plaintiff.

Andrew G. Gorden, Esq., J. Adam Skaggs, Esq., and Jay Cohen, Esq., Paul, Weiss, Rifkind, Wharton & Garrison, LLP, and Peter J. Gleekel, Esq., Winthrop & Weinstine, PA, counsel for Defendants Time Warner Cable, Inc., Time Warner NY Cable, LLC, and Time Warner, Inc.

Arthur J. Burke, Esq., Kevin C. Wallace, Esq., and Michael P. Carroll, Esq., Davis, Polk, & Wardwell, and Robert E. Cattanach, Esq. and Sarah J. Kerbeshian, Esq., Dorsey & Whitney, LLP, counsel for Comcast Corporation.

**JUDGES:** DONOVAN W. FRANK, Judge of United States District Court.

**OPINION BY:** DONOVAN W. FRANK

**OPINION**

**MEMORANDUM OPINION AND ORDER**

**INTRODUCTION**

This matter is before the Court pursuant to a Motion to Dismiss brought by Defendants Time Warner Cable, Inc.; Time Warner NY Cable, LLC; and Time Warner, Inc. (collectively, "Time Warner") and Defendant Comcast Corporation ("Comcast") (collectively, "Defendants"). In an Order dated January 17, 2007, the Court granted Defendants' Motion to Dismiss with prejudice as to several counts of Plaintiff The American Channel's ("TAC") original Complaint and allowed TAC leave to [*2] amend its Complaint consistent with the Court's Order. TAC filed a First Amended Complaint on February 5, 2007. In its First Amended Complaint, TAC asserts four counts: (1) concerted refusal to deal in violation of Section 1 of the Sherman Act, *15 U.S.C. § 1*; (2) horizontal division of markets in violation of *Section 1 of the Sherman Act*; (3) conspiracy to monopolize in violation of *Section 2* of the Sherman Act, *15 U.S.C. § 2*; and (4) anticompetitive acquisition of Adelphia Cable Systems in violation of *Sections 1 and 2* of the Sherman Act and in violation of *Section 7* of the Clayton Act, *15 U.S.C. § 18*. For the reasons set forth below, the Court grants Defendants' motion.

**BACKGROUND**

The factual background and procedural history of this matter are fully set forth in the Court's Order dated January 17, 2007. In that Order, the Court first held that Counts One and Two of TAC's original Complaint were moot because TAC had not amended its pleadings to seek divestiture of the asset purchase or money damages flowing from the asset purchase of Adelphia Communications, Corp. ("Adelphia"). (Jan. 17, 2007 Order at 8.) Second, the Court found that to the extent that Counts Three and Four were based [*3] on alleged harm to cable subscribers, TAC lacked standing to raise such claims because there was no causal relationship between

the harm alleged to cable subscribers and TAC. (*Id.* at 10.) Third, the Court found that to the extent Counts Three and Four were based on alleged bid-rigging, TAC lacked standing to bring such claims. Specifically, the Court found that TAC had alleged no antitrust injury as a result of the alleged bid-rigging. (*Id.* at 11.) Moreover, even assuming there was an antitrust injury, the Court determined that TAC had not alleged any facts to establish how it suffered a direct injury as a result of the bid-rigging sufficient to confer standing or how the asset purchase impacted TAC's carriage on the cable systems of Time Warner, Comcast, or Adelphia, given that they had all denied carriage before the asset purchase. (*Id.* at 11-12) Fourth, the Court held that TAC had pleaded inconsistent allegations as to their Sherman Act conspiracy claim and that aside from these inconsistent allegations, only conclusory allegations of a conspiracy remained. (*Id.* at 16.) The Court held that such allegations failed to indicate a common schedule designed to achieve an unlawful motive [*4] and/or exclude the possibility of independent action. (*Id.*) As a result, the Court dismissed Count Five of the Complaint. Finally, the Court dismissed TAC's claims for monopolization and attempted monopolization brought pursuant to the Sherman Act. The Court further stated:

> [T]he Court grants TAC leave to amend its Complaint to correct the deficiencies discussed above and to seek divestiture with respect to Counts Three and Four (to the extent that they are not based on alleged harm to cable subscribers or alleged bid-rigging, they are not based on the cable network market, and the exclusionary conduct is not based on the essential facilities doctrine) and with respect to Count Five.

(*Id.* at 26.)

The First Amended Complaint varies in subtle ways from the original Complaint. Because the Court addressed the facts and procedural history of the case in the previous Motion to Dismiss, for purposes of this motion and to the extent possible for reasons of clarity, the Court will limit the factual and procedural history stated here to the relevant new allegations raised in the First Amended Complaint.

In the First Amended Complaint, TAC explains that it has redefined its niche market. In addition [*5] to a network that would tell the stories of Americans in the 21st Century, TAC has now entered into agreements with several collegiate athletic conferences to operate as a regional sports network. (First Am. Ct. P 3.) According

to the First Amended Complaint, TAC has still not launched its network or commenced broadcasting. (*Id.*)

TAC alleges, at least primarily, that the relevant market for purposes of this action consists of multichannel video programming distributors ("MVPDs") such as Time Warner and Comcast, who purchase carriage rights to distribute programming to their customers. (*Id.* at PP 11, 18-19.) TAC asserts that Time Warner and Comcast have market power, if not monopoly power, in these markets. (*Id.* at P 11.)

TAC asserts that Defendants have "simultaneously engaged in persistent and extensive discrimination against independent programming networks" in favor of their own affiliates. (*Id.* at P 28.) Without detail, TAC asserts that "Defendants have made known to independent networks that they cannot obtain carriage on defendants' cable systems if defendants do not have an equity ownership interest in such independent networks." (*Id.* at P 28.) Moreover, TAC details Defendants' [*6] carriage decisions as to independent networks, including the allegation that of 114 independent networks who sought national carriage on Time Warner and Comcast's systems between January 1, 2003, and May 15, 2005, Comcast only granted coverage to one--the NFL Network--and Time Warner only granted coverage to one--the Sportsman Channel. (*Id.* at P 29.) TAC asserts that during that same time period, Comcast granted coverage to 10 of 19 affiliated networks and Time Warner to 8 of those same 19 affiliated networks.

According to the First Amended Complaint, in April 2005, Time Warner and Comcast jointly submitted the highest bid to acquire the assets of Adelphia, a company that had been the fifth largest operator of cable systems. (*Id.* at P 15(d).) Adelphia had filed for bankruptcy protection in 2002 and announced that it would explore sale of the company as part of its Chapter 11 process. (*Id.* at P 33.) In January 2004, TAC commenced negotiations with Adelphia for carriage and allegedly received a favorable response at first. (*Id.*) At the same time, TAC was negotiating with Time Warner and Comcast for carriage on their cable systems, and both Time Warner and Comcast were made aware of TAC's [*7] negotiations with Adelphia. (*Id.*) However, TAC asserts that in May 2004, after Adelphia announced it was for sale, Adelphia broke off negotiations with TAC and told TAC that it would not carry TAC unless TAC had carriage agreements with Time Warner and Comcast. (*Id.*) TAC asserts "[u]pon information and belief, this abrupt change of position by Adelphia resulted from instructions from defendants, at the time potential bidders for Adelphia, that Adelphia should not deal with TAC." (*Id.*) The Adelphia transaction with Time Warner and Comcast closed on July 31, 2006.

Case 1:07-cv-00556-JJF-LPS    Document 31-2    Filed 12/17/2007    Page 4 of 57

Page 3

2007 U.S. Dist. LEXIS 47966, *; 2007-2 Trade Cas. (CCH) P75,833

As noted above, TAC's First Amended Complaint asserts four counts: (1) concerted refusal to deal in violation of Section 1 of the Sherman Act, *15 U.S.C. § 1*; (2) horizontal division of markets in violation of *Section 1 of the Sherman Act*; (3) conspiracy to monopolize in violation of *Section 2 of the Sherman Act, 15 U.S.C. § 2*; and (4) anticompetitive acquisition of Adelphia Cable Systems in violation of *Sections 1 and 2 of the Sherman Act* and in violation of *Section 7 of the Clayton Act, 15 U.S.C. § 18*.

Defendants contend that TAC's First Amended Complaint has not cured the deficiencies of the original Complaint.

## DISCUSSION

### I. [*8] Standard of Review

A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under *Rule 12(b)(6) of the Federal Rules of Civil Procedure. See Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999)*. In deciding a motion to dismiss, a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986)*. In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. School Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999)*, or legal conclusions drawn by the pleader from the facts alleged. *Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990)*.

The United States Supreme Court recently clarified the pleading standard for actions brought pursuant to *§ 1 of the Sherman Act*. In *Bell Atlantic Corp. v. Twombly*, the Supreme Court held that in order to state a claim pursuant to *§ 1*, the complaint must contain "enough factual matter (taken as true) to suggest that an agreement [*9] was made." *127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (May 21, 2007)*. The Court further stated that "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice" to state a *§ 1* claim. *Id. at 1966*. The Court held that "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* The Court stated, "[h]ence, when allegations of parallel conduct are set out in order to make a *§ 1* claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* Thus, the Court held:

A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a *§ 1* claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a *§ 1* complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops [*10] short of the line between possibility and plausibility of "entitle[ment] to relief."

*Id.*

### II. Refusal to Deal Claim

In Count I of the First Amended Complaint, TAC asserts that during the four years prior to the filing of the original Complaint, Defendants "agreed, combined, and conspired to engage in a concerted refusal to deal with independent programming networks, including specifically TAC, by denying and refusing them carriage on defendants' cable systems" in violation of *§ 1 of the Sherman Act*. (First Am. Compl. at P 27.) The First Amended Complaint further details the difficulty of the survival of independent networks in the absence of carriage on Defendants' cable systems. In addition, the First Amended Complaint provides statistics of Defendants' similar decisions with regard to not allowing carriage of independent networks and of Defendants' decisions regarding coverage of their own affiliated networks. (*Id.* at P 29-30.)

In their motion to dismiss, Defendants assert that TAC has failed to identify the roles each defendant played in the putative conspiracy, the means by which the conspiracy was effected, or any specific communications through which Defendants allegedly conspired. [*11] Defendants contend that, like the original Complaint, the First Amended Complaint contains conclusory and internally inconsistent conspiracy allegations.

As noted in the Court's January 17, 2007 Order, it is possible for the Court to infer the existence of a contract, combination, or conspiracy "from consciously parallel conduct if that parallelism is accompanied by substantial additional evidence--often referred to as the 'plus factors.'" *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp., 5 F. Supp. 2d 694, 704 (D. Minn. 1998)*. In pleading such a conspiracy, a plaintiff must show evidence "that reasonably tends to prove . . . a conscious commitment to a common scheme designed to achieve an unlawful objec-

Case 1:07-cv-00556-JJF-LPS    Document 31-2    Filed 12/17/2007    Page 5 of 57

Page 4

2007 U.S. Dist. LEXIS 47966, *; 2007-2 Trade Cas. (CCH) P75,833

tive." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984). "The elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal of the complaint on a defendant's *Rule 12(b)(6)* motion." *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 558 (8th Cir. 1998).

Here, TAC's allegations in the First Amended Complaint, like the allegations of the original Complaint, are insufficient to state a claim for refusal to [*12] deal. Many of TAC's allegations of communication between Time Warner and Comcast were rejected by this Court in the January 17, 2007 Order.

Other than those allegations, TAC alleges that Defendants conspired because both Defendants allegedly declined to carry 112 of the 114 networks that sought carriage from Comcast and Time Warner. However, even assuming these facts are true, they at best demonstrate parallel conduct, not an agreement or conspiracy. Like the allegations of the original Complaint, TAC's allegations in this regard do not exclude the possibility of independent action, especially considering TAC's concession on the face of the First Amended Complaint that it is in Comcast and Time Warner's economic interest to promote their own affiliated networks. (First Am. Compl. P 14 ("Cable systems, including specifically those owned by defendants, are able artificially to inflate the price of programming and prevent downward pricing pressure on their own affiliated networks, by excluding cheaper and more efficient independent cable networks like TAC."))

In addition, TAC alleges that Defendants conspired to thwart TAC's efforts to obtain carriage on Adelphia. The only substantive change [*13] in the allegations from those of the original Complaint is TAC's statement that "[o]n information and belief, this abrupt change of position by Adelphia resulted from instructions from defendants, at the time potential bidders for Adelphia, that Adelphia should not deal with TAC." (First Am. Cplt. P 33.) Similar to the conclusory allegations in the original Complaint, TAC offers nothing beyond conclusory allegations to support this statement. Such conclusory allegations are not sufficient to support a *§ 1* claim.

Finally, TAC asserts that Defendants' history of close cooperation and statements allegedly made at a public event in 2006 and opportunities to conspire, along with its allegations of parallel conduct, are sufficient to support a conspiracy. In this regard, the Court finds that TAC's allegations are not materially different from those raised in the original Complaint and are thus insufficient to state a claim.

In sum, TAC's factual allegations regarding Defendants' refusal to deal are insufficient to allege a claim of

conspiracy because, like the original Complaint, they fail to indicate a common schedule designed to achieve an unlawful motive and/or exclude the possibility of [*14] independent action. (Jan. 17, 2007 Order at 16.) TAC has not alleged any additional facts that, taken as true, would take TAC's claim across the line from possibility to plausibility of entitlement to relief. *See Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1966.* As such, TAC's refusal to deal claim is properly dismissed.

**III. Horizontal Division of Markets Claim**

Count II alleges that Defendants illegally divided markets by swapping and exchanging cable systems and agreeing not to compete with each other in areas where each company operates. (First Am. Compl. P 42.) The only specific references in the First Amended Complaint are the exchange of systems related to the Adelphia transaction (P 34(b)) and the allegedly illegal market division "in the Philadelphia and Chicago MVPD markets and elsewhere throughout the United States" (P 43). TAC asserts that it sustained antitrust injury as a result of being "denied access to the cable systems and other means of transmission available either from defendants or from their competitors, who have been excluded by defendants' division of markets." (*Id.* at P 45.)

Defendants contend that TAC's horizontal division claim fails because TAC fails to allege [*15] any cognizable injury. Specifically, Defendants assert that TAC cannot link any damages to the Adelphia transaction because TAC was already denied carriage well before the asset purchase. Thus, according to Defendants, TAC could not possibly suffer a direct injury as a result of the purchase and subsequent division of markets. (*See* January 17, 2007 Order at 12.)

The Court agrees that TAC still has not stated a claim upon which relief can be granted regarding horizontal division of markets. Similar to the original Complaint, TAC's only specific allegation in the First Amended Complaint regarding an illegal swap relates to the swaps and exchanges conducted related to the Adelphia transaction. Viewing the allegations in the light most favorable to TAC, TAC's allegations are insufficient to support a claim. As noted in the Court's previous Order, TAC could not have suffered a legally cognizable injury as a result of these swaps because TAC admits that Comcast, Time Warner, and Adelphia had each independently denied carriage before the asset purchase. (Jan. 17, 2007 Order at 12.) As a result, the subsequent division of markets could not have caused direct injury to TAC because that purported [*16] injury already existed at the time of the Adelphia transaction. TAC's assertion that, "on information and belief," Adelphia's refusal to carry TAC was a result of Defendants' instruction is not

Case 1:07-cv-00556-JJF-LPS    Document 31-2    Filed 12/17/2007    Page 6 of 57

Page 5

2007 U.S. Dist. LEXIS 47966, *; 2007-2 Trade Cas. (CCH) P75,833

sufficient to suggest that some kind of agreement or conspiracy was made.

What remains is TAC's allegation that illegal market division occurred "in the Philadelphia and Chicago MVPD markets and elsewhere throughout the United States." (First Am. Compl. P 43.) However, Defendants are correct in asserting that TAC lacks any specificity as to the nature and scope of these alleged agreements. Moreover, TAC does not provide any detail as to how other MVPDs were deterred or eliminated by swaps or division between Defendants. (*Id.* at P 44.) As pleaded, these allegations are insufficient to state a claim.

### IV. Conspiracy to Monopolize Claim

In Count III of the First Amended Complaint, TAC asserts a claim for Conspiracy to Monopolize in violation of the Sherman Act, § 2. Specifically, TAC alleges that the "overall course of conduct of defendants [described in the complaint], including defendants' concerted refusal to deal with TAC, defendants' horizontal division of markets and customers, and defendants' [*17] joint acquisition of the Adelphia and other cable systems," constitutes a conspiracy to monopolize. (First Am. Cplt. P 47.)

In order to state a claim for unlawful monopolization, Plaintiffs must establish that: (1) the defendant "possessed monopoly power in the relevant market" and that (2) the defendant "willfully acquired or maintained this monopoly power by anticompetitive conduct as opposed to gaining that power as a result 'of a superior product, business acumen, or historical accident.'" *Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1060 (8th Cir. 2000)* (quoting *United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966)*).

Defendants assert that TAC has failed to state a claim because TAC has failed to sufficiently identify the relevant market and because TAC has failed to allege any unlawful exclusionary conduct by Defendants. TAC, on the other hand, asserts that it has identified the relevant market, the MVPD market, and the specific geographic areas in which Defendants have implemented their alleged conspiracy. (*See* First Am. Compl. PP 34(b), 43.)

As a preliminary matter, the Court recognizes that TAC has based its § 2 claims on the same allegations used for its other [*18] claims for refusal to deal, market divisions, and the acquisition of Adelphia to support its claims. As the Court has deemed the allegations in the First Amended Complaint inadequate to state a claim upon which relief can be granted as to these claims, little remains to support TAC's § 2 claim. However, for purposes of clarity, the Court will address the § 2 claim in substance.

In order to state a claim under *§ 2 of the Sherman Act*, TAC must identify a relevant market, comprised of a product market and a geographic market. *Bathke v. Casey's Gen. Stores, Inc., 64 F.3d 340, 345 (8th Cir. 1995)*. The Court agrees with Defendants that TAC's allegations include contradictory and inconsistent geographic markets. Although TAC claims that the relevant market is MVPD in the United States (First Am. Compl. P 11), TAC then confuses the issue by pointing to different local and regional market segments as the basis for its claims. Specifically, TAC goes on to allege that Defendants engaged in illegal market division in the Philadelphia and Chicago markets (*id.* at P 43) and that they "created monopoly markets in affected DMAs [Designated Market Areas], but also regional clusters of such monopoly markets [*19] involving multiple DMAs" (*id.* at P 44). The Court is left with no cognizable geographic market and, as such, TAC's claim fails.

Moreover, TAC has not identified any geographic markets in which Comcast and Time Warner are competitors. Rather, TAC concedes that Comcast and Time Warner never compete in the same geographic markets. It is unclear to the Court how a horizontal division can occur in a geographic market where the two companies do not compete. *See, e.g., Overhead Door Corp v. Nordpal Corp., No. 4-75-Civ. 523, 1978 U.S. Dist. LEXIS 15737, 1978 WL 1479 at *3 (D. Minn. Sept. 1, 1978)* ("Under the antitrust laws, a horizontal conspiracy to divide markets by its very definition must be among competitors or potential competitors."). As such, TAC's § 2 claim fails to state a claim upon which relief can be granted.

### V. The Acquisition of Adelphia

Count IV of the First Amended Complaint asserts that in agreeing jointly to acquire Adelphia and then jointly acquiring the Adelphia cable systems in 2006, Defendants violated *Sections 1* and *2* of the Sherman Act and *Section 7* of the Clayton Act. Defendants contend that TAC sustained no injury-in-fact from the acquisition and that TAC has failed to define a proper geographic [*20] market.

Consistent with the Court's holdings above, the Court finds that TAC has not pled a coherent or consistent geographic market. Moreover, as noted above, because TAC admits that the Adelphia acquisition had no bearing on the carriage decision regarding TAC--i.e., TAC concedes that Time Warner, Comcast, and Adelphia had each decided not to carry TAC prior to the acquisition--TAC did not suffer a cognizable injury as a result of the Adelphia acquisition. [1] For these reasons,

2007 U.S. Dist. LEXIS 47966, *; 2007-2 Trade Cas. (CCH) P75,833

TAC's claim premised upon the Adelphia acquisition fails.

    1   The Court rejects TAC's purely speculative arguments, raised only in TAC's responsive brief, that Adelphia or some other unidentified future purchaser of Adelphia may have reversed the decision not to carry TAC.

Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss Complaint (Doc. No. 48) is **GRANTED.**

2. The First Amended Complaint (Doc. No. 46) is **DISMISSED WITHOUT PREJUDICE.**

**LET    JUDGMENT    BE    ENTERED ACCORDINGLY.**

Dated: June 28, 2007

s/ Donovan W. Frank

Judge of United States District Court

2

LEXSEE 2007 U.S. DIST LEXIS 82711

**DELCO LLC, and EDWARD DECKER, Plaintiffs, v. GIANT OF MARYLAND, LLC, WAKEFERN FOOD CORP., and STOP & SHOP SUPERMARKET COMPANY, LLC, Defendants.**

Civil No. 07-3522 (JBS), [re Docket Item 2]

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2007 U.S. Dist. LEXIS 82711*

**November 8, 2007, Decided**

**COUNSEL:** [*1] David L. Braverman, Esq., Julie I. Kaplan, Esq., BRAVERMAN KASKEY, P.C., Philadelphia, PA, Attorneys for Plaintiffs Delco, LLC et al.

Edward T. Kole, Esq., WILENTZ, GOLDMAN & SPITZER, PA, Woodbridge, NJ, Attorney for Defendant Wakefern Food Corp.

James J. Shrager, Esq., NORRIS, MCLAUGHLIN, MARCUS, Somerville, NJ, Attorney for Defendant Stop & Shop Supermarket Company, LLC.

**JUDGES:** Jerome B. Simandle, United States District Judge.

**OPINION BY:** Jerome B. Simandle

**OPINION**

***TABLE OF CONTENTS***

| |
|---|
| I. INTRODUCTION |
| II. BACKGROUND |
| A. Factual and Procedural History |
| B. Expert Testimony |
| 1. Plaintiffs' Expert - Dr. Cotterill |
| 2. Defendants' Expert - Dr. Ordover |
| III. DISCUSSION |
| A. Antitrust Standing |
| 1. Delco's Standing |
| 2. Decker's Standing |
| B. Preliminary Injunction Requirements |
| 1. Likelihood of Success |
| a. Per Se Antitrust Claims |
| b. Remaining Antitrust Claims |
| 2. Irreparable Harm |
| 3. Harm to the Nonmoving Party |
| 4. Public Interest |
| IV. CONCLUSION |

**SIMANDLE,** District Judge:

**I. INTRODUCTION**

In this action, Plaintiffs Delco, LLC ("Delco") and Edward Decker ("Decker") filed suit for various federal and state antitrust [*2] claims against Defendants Stop

Case 1:07-cv-00556-JJF-LPS    Document 31-2    Filed 12/17/2007    Page 10 of 57

Page 2
2007 U.S. Dist. LEXIS 82711, *

& Shop Supermarket Company, LLC ("Stop & Shop"), Giant of Maryland, LLC ("Giant"), and Wakefern Food Corporation ("Wakefern") alleging that a proposed transaction under which Wakefern would acquire and close a Stop & Shop supermarket located Delco's shopping center was an illegal antitrust violation. Stop & Shop sold all nine of its southern New Jersey supermarkets to Wakefern, which took over the leases and will operate the stores as ShopRite supermarkets, except for the store in Delco's shopping center, which it has closed because it already has a ShopRite operating about half a mile away. Along with their Complaint [Docket Item 1], Plaintiffs filed a motion for a preliminary injunction and a temporary restraining order [Docket Item 2] seeking to enjoin Defendants from subleasing the supermarket premises in question, closing the Stop & Shop supermarket, removing equipment from the supermarket, and enforcing a provision of the Delco-Giant lease that prevented other supermarkets from opening in the shopping center. In its August 1, 2007 Order [Docket Item 5], the Court denied Plaintiffs' motion for a temporary restraining order.

Subsequent to the Court's [*3] issuance of its August 1 Order, the plaintiffs altered their request for relief and filed an Amended Complaint. The Amended Complaint alleges violations of section 7 of the Clayton Act, *15 U.S.C. § 18*, and section 1 of the Sherman Act, *15 U.S.C. § 1*; breach of contract; tortious interference with economic advantage; and violations of New Jersey antitrust laws, *N.J. Stat. Ann. §§ 56:9-3, 9-4*. Plaintiffs' motion for a preliminary injunction now asks the Court to nullify the allegedly illegal sublease between the defendants, and to enjoin the defendants from enforcing provisions in the Delco-Giant lease that restrict the operation of other supermarkets in the shopping center. Presently before the Court is Plaintiffs' motion for a preliminary injunction [Docket Item 2]. For the reasons discussed herein, which constitute the findings of fact and conclusions of law pursuant to *Rule 52(a), Fed. R. Civ. P.*, the Court will deny Plaintiffs' request for preliminary injunctive relief.

## II. BACKGROUND

### A. Factual and Procedural History

The instant dispute centers around a supermarket in the Grande Center, a shopping center located in Rio Grande, Cape May County, New Jersey. (Am. Compl. PP 22-23.) Plaintiff Delco developed and owns the Grande Center. (*Id.* at P 22.) Plaintiff Decker works for Delco as its superintendent of construction, but he sues in his capacity as a consumer who shopped at the Stop & Shop before it was bought and closed by Wakefern. (*Id.* at P 17.) In September 2002, Delco and Giant signed a 20-year lease agreement (the "Delco-Giant lease") under which Delco leased space in the Grande Center to Giant for Giant to open a Stop & Shop [1] supermarket (*Id.* at P 25; Am. Compl. Ex. A § 1.3); the lease was subsequently amended in March 2004 and March 2005. [2] (Am. Compl. P 26.) Giant opened a Stop & Shop supermarket (the "Grande Center Stop & Shop") in the leased premises on October 6, 2005. (*Id.* at P 30.)

> 1  Stop & Shop and Giant are related companies. (Am. Compl. PP 18-19.)

> 2  Under the terms of the Delco-Giant lease, Giant was granted the exclusive right to operate a supermarket, supermarket-drugstore, or drugstore in the Grande Center during the period of the lease. (Am. Compl. Ex. A § 9.3(a)(1).) In addition, the lease provides that "[o]nce the Premises have been open for business for 1 day as a supermarket, Tenant shall not be required to operate continuously in all or any part [*5] of the Premises." (*Id.* at § 9.2(b)(1).) The lease further provides Delco with two forms of recourse if Giant fails to operate a supermarket in the premises. First, if Giant seeks to sublease the premises for a non-supermarket use, then Delco has a 30-day period within which to pay a lease termination fee and terminate the lease. (*Id.* at § 11.6(c).) Second, the lease provides that if after Giant opens for business "there is no business being operated in at least 25,000 square feet of the Premises for more than 270 consecutive days," then Delco can also pay the lease termination fee and terminate the lease. (*Id.* at § 9.2(b)(2).) The lease termination fee to be paid by Delco recognizes that Giant had contributed the construction funds to build the supermarket building, to avoid a windfall to Delco in the event of early termination of the lease.

In 2007, Stop & Shop and Wakefern completed a transaction regarding the sale from Stop & Shop to Wakefern of all nine Stop & Shop supermarkets in southern New Jersey. (Am. Compl. P 33; (Certification of Frank Rostan ("Rostan Cert.") P 2.) The implications of the Stop & Shop-Wakefern transaction for the Grande Center Stop & Shop precipitated the [*6] instant dispute, and the parties disagree about the circumstances that resulted in the sale. According to Plaintiffs' allegations, when Stop & Shop approached Wakefern about the possibility of selling supermarkets, Stop & Shop was not interested in selling the Grande Center Stop & Shop to Wakefern. (Am. Compl. P 34; Juliano Supp. Aff. P 4.) Instead, Plaintiffs allege that Wakefern insisted that the Grande Center Stop & Shop be included in the package of supermarkets being sold "because it wished to eliminate Giant and Stop & Shop . . . as a competitor and po-

tential competitor in the lower Cape May County geographic market." (Am. Compl. P 36.) Wakefern was interested in the Grande Center Stop & Shop, according to Plaintiffs, because Wakefern owned a ShopRite supermarket approximately one-half mile from the Grande Center Stop & Shop. (*Id.* at P 38.) As Plaintiffs allege, "Wakefern wanted Giant and Stop & Shop to get out of South Jersey." (Julian Supp. Aff. P 6) (quotations omitted).

Defendants offer a completely different account of the Stop & Shop-Wakefern transaction. According to Stop & Shop's former Senior Vice President of Real Estate, Anthony Colavolpe, Stop & Shop sought to "exit[] [*7] the southern New Jersey market" entirely because its stores in the region were losing money, and "[i]n exiting the southern New Jersey area, Stop & Shop did not want to have any store(s) remaining in the area in which they were leaving." (Certification of Anthony Colavolpe ("Colavolpe Cert.") PP 4-6.) Mr. Colavolpe explains the decision of Stop & Shop to include the Grande Center Stop & Shop in the sale to Wakefern by noting that "[t]o operate only one store at Grande Center in this market area would be extremely unprofitable." (*Id.* at P 7.) Moreover, according to Wakefern's Senior Vice President, Frank Rostan, Wakefern made clear during its negotiations with Stop & Shop that Wakefern "had no interest in purchasing the [Grande Center Stop & Shop] because the understanding was that the store consistently lost money." (Rostan Cert. P 4.) Despite Wakefern's disinterest in the Grande Center Stop & Shop, according to Mr. Rostan, "Stop & Shop insisted that Wakefern purchase all nine New Jersey locations or none at all - i.e., it was a take-it-or-leave-it offer requiring the purchase of all southern New Jersey Stop & Shop stores." (*Id.* at P 5.)

Plaintiffs allege that after the Stop & Shop-Wakefern [*8] transaction was completed, Wakefern informed Delco that it intended to close the Grande Center Stop & Shop and remove certain pieces of equipment from the premises. (Am. Compl. P 39.) In addition, Wakefern informed Delco that it would not "seek[] to escape or otherwise renegotiate its obligations as sublessee," which meant that Delco would remain subject to the lease provision prohibiting Delco from leasing retail space in the Grande Center to a supermarket or drugstore. (*Id.* at PP 9, 39.) Wakefern informed Delco that it intended to continue to meet its obligation under the lease to pay rent to Delco. (*Id.* at P 42.) Delco continues to receive full rental from Wakefern for the empty space where the Stop & Shop formerly operated.

In the wake of these events, Plaintiffs filed a Complaint with this Court, arguing that Wakefern's decision to acquire and subsequently shutter the Grande Center Stop & Shop would amount to an anticompetitive maneuver that was prohibited under federal and state antitrust law. (Compl. P 5.) With their Complaint, Plaintiffs filed a motion for preliminary injunction and a temporary restraining order seeking to enjoin Defendants from closing and removing equipment [*9] from the Grande Center Stop & Shop, and from enforcing the provision of the lease that granted the lessee the exclusive right to operate a supermarket in the Grande Center.

On July 31, 2007, the Court heard oral arguments on Plaintiffs' motion for a temporary restraining order. In its Order of that same date, the Court denied Plaintiffs' motion for a temporary restraining order on the grounds that Plaintiffs failed to demonstrate a probability of success or the likelihood of immediate and irreparable harm [Docket Item 5]. The Court observed that Plaintiff could not prevail in the absence of expert opinion testimony regarding anticompetitive effects in the relevant market, and directed the parties to submit expert's reports on the issues of what constituted the relevant product and geographic markets in the case and set an expedited discovery schedule in anticipation of convening a hearing to hear further arguments on Plaintiffs' motion for a preliminary injunction [*Id.*].

The parties subsequently submitted their respective experts' reports, with Dr. Robert W. Cotterill, Ph.D., submitting a report on behalf of Plaintiffs (the "Cotterill Report") and Dr. Janusz A. Ordover, Ph.D., writing [*10] on behalf of Defendants (the "Ordover Report"). In addition, Plaintiffs submitted a revised Proposed Order for injunctive relief that alters in part the nature of the relief sought in their preliminary injunction motion. Plaintiffs' motion now asks the Court (1) to declare null and void the allegedly illegal sublease of the Grande Center Stop & Shop from Giant to Wakefern, and (2) to enjoin Defendants from enforcing the lease and sublease provisions granting exclusive rights to the lessee to operate a supermarket in the Grande Center.

The Court conducted a hearing on Plaintiffs' preliminary injunction motion on October 1, 2007. At the hearing, Plaintiffs and Defendants cross-examined their opponents' experts on the contents of their respective reports, and the Court received various affidavits or certifications without cross-examination. The Court heard oral argument from both sides, permitted short supplemental briefs, and reserved decision.

**B. Expert Testimony**

**1. Plaintiffs' Expert - Dr. Cotterill**

Dr. Ronald W. Cotterill, Ph.D., submitted a report (Ex. P-1) and testified on behalf of the plaintiffs. [3] Dr. Cotterill defines the product and geographic markets in this case using the U.S. [*11] Department of Justice and Federal Trade Commission's Horizontal Merger Guide-

lines (the "Guidelines"). The Guidelines approach to market definition, as Dr. Cotterill explains, uses the concept of a hypothetical monopolist imposing a "small but significant nontransitory increase in price" (or "SSNIP") to define both the product and geographic markets in a particular case. (Cotterill Report 5-6.) With respect to the geographic market, Dr. Cotterill explains that the Guidelines direct the evaluator to "start[] with the geographic location(s) of the merging supermarkets" and assess whether, if a hypothetical monopolist in that geographic region were to institute a SSNIP, "consumers would accede to such price increase or instead would make such increase unprofitable by taking their business to supermarkets at more distant locations." (Id. at 5.) If instituting this SSNIP would be profitable, then the stores in question constitute the relevant geographic market; if it would not be profitable, then next-best stores are added and the exercise is repeated on a store-by-store basis until a hypothetical monopolist could profitably impose a SSNIP on the included stores, and this final group of [*12] included stores becomes the relevant geographic market. (Id. at 5-6.) Dr. Cotterill explains that the Guidelines adopt a similar approach to product market definition: "If one or more supermarkets raise prices by 5%, will shoppers defeat that price increase (i.e., make it unprofitable) by switching to other food stores . . .?" (Id. at 6.)

> 3    Dr. Cotterill is the Director of the Food Marketing Policy Center and a Professor of Agricultural Economics at the University of Connecticut. (Cotterill Report Attach. A.) Dr. Cotterill has a joint Ph.D. in economics and agricultural economics from the University of Wisconsin - Madison and has served as an economic expert in numerous supermarket antitrust and merger cases, working with the Attorneys General of Connecticut, Massachusetts, and Rhode Island and the Federal Trade Commission. (Cotterill Report 1-2.) He has 30 years of experience analyzing antitrust issues in food markets, including the New Jersey supermarket industry. (Id. at 1-3.)

According to Dr. Cotterill, the product market in this case is "supermarket sales." (Id. at 7.) While Dr. Cotterill acknowledges that his conclusion does not stem from a "precise numerical" calculation, he asserts [*13] that courts, the Federal Trade Commission, state Attorneys General, and the UK Competition Commission use supermarket sales product markets to assess antitrust questions in the supermarket industry. (Id. at 6-7.) In Dr. Cotterill's words, supermarkets are "one[-]stop' because of their broad product mix, typically 30,000 items (stock keeping units, or 'SKUs') or more," and convenience stores and "limited assortment 'bare bones' discount stores such as Save-A-Lot" meet fill-in needs and pro-

vide an "inadequate substitute" for supermarkets. (Id. at 7.)

With regard to the geographic market in this case, Dr. Cotterill concludes that the market is "lower Cape May County, from the southern tip of the peninsula to a northern border located at Route 147." (Id. at 19.) In drawing the boundaries of the geographic market, Dr. Cotterill acknowledges that performing an actual SSNIP experiment would be unfeasible, and instead employs "standard accepted proxies (such as geography and demographics)" to estimate the size of the market. (Id. at 8.) The geographic market that Dr. Cotterill uses to test whether a hypothetical monopolist could profitably institute a SSNIP includes five supermarkets to the [*14] south and west of the Grande Center Stop & Shop [4] and excludes two supermarkets to the north of the Grande Center in Cape May Court House. (Id. at 14.)

> 4    These supermarkets are: the ShopRite in Rio Grande, the Acme and Super Fresh on Wildwood Island to the east of the Grande Center, and two Acmes in Cape May to the south of the Grande Center. (Cotterill Report 14.)

Within this geographic market, Dr. Cotterill argues that a hypothetical monopolist could profitably institute a SSNIP of 5% because the detour costs to consumers in this market to defeat the price increase by shopping elsewhere would be too great. (Id. at 15.) Dr. Cotterill estimates that it would cost the average consumer $ 9.25 in gasoline, lost time, and other travel costs to drive outside of this hypothetically monopolized market to the closest competitor supermarket, which Dr. Cotterill identifies as being located in Cape May Court House. (Id.) For such a detour to be cost-effective in the face of a 5% SSNIP, Dr. Cotterill calculates that a consumer would have to have a minimum grocery basket size of $ 185 [5], which is significantly greater than the average weekly food basket for consumers at local supermarkets. (Id.)

> 5    The [*15] Cotterill Report presents the equation as follows: $ 9.25 (detour cost) divided by .05 (SSNIP) equals $ 185.00. (Id. at 15.)

Dr. Cotterill also performs a critical loss analysis [6] to determine the percentage of sales volume that a hypothetical monopolist could afford to lose in the wake of a SSNIP and still remain profitable. According to Dr. Cotterill's calculations, a hypothetical monopolist operating the ShopRite in the geographic market he identifies could afford to lose as much as 23% of its sales volume as a result of a 5% SSNIP and still remain profitable. [7] (Id. at 18.) Taking account of the population distribution of the region and detour costs, Dr. Cotterill concludes that a 5% SSNIP would result in between 8% and 22.45% in lost sales, leading him ultimately to conclude

that a 5% SSNIP would be profitable. (*Id.* at 19; Cotterill Errata, Ex. P-2.) In light of his conclusion that a 5% SSNIP in the market he has defined would be profitable, Dr. Cotterill argues that he properly defined the geographic market in this case as being lower Cape May County, south of Route 147. (Cotterill Report 19-20.) The upshot of this market boundary is that, in the absence of the Grande Center Stop [*16] & Shop, there are only three firms - ShopRite, A&P Superfresh, and Acme - operating five supermarkets in the geographic market. (*Id.*)

> 6  Dr. Cotterill does not label this section of his analysis "critical loss analysis," and, as Dr. Ordover notes, Dr. Cotterill uses a different formula than is typically performed in critical loss analysis. (Ordover Report P 47.) Nonetheless, for the sake of clarity, the Court uses the term to label this section of Dr. Cotterill's analysis.

> 7  In his initial report, Dr. Cotterill calculated this figure at 33.65%. In his *errata* he submitted revised calculations with the figure set between 21% and 23%. (Cotterill Errata, Ex. P-2.)

In addition to defining the product and geographic markets at issue in this case, Dr. Cotterill evaluates the market concentration following the closure of the Grande Center Stop & Shop, the effects of this concentration, and the likelihood that another competitor would enter the market. Dr. Cotterill follows the Guidelines in using the Herfindahl-Hirschman Index (HHI) to measure the effect of the Stop & Shop's closure on market concentration. In Dr. Cotterill's words, the HHI "is calculated by adding together the squares of the market [*17] shares (expressed as percentages) of all firms that compete in the market." (*Id.* at 20.) Because he did not have sales data for all of the supermarkets in the geographic market, Dr. Cotterill used store square footage as a proxy and determined that the post-merger HHI in this case is 3849, an increase of 980 over the pre-merger HHI of 2869. (*Id.*) This post-merger index, according to Dr. Cotterill, indicates that Wakefern's acquisition and closure of the Grande Center Stop & Shop presumptively carries anticompetitive effects. (*Id.*)

Dr. Cotterill opines that the closure of the Grande Center will give rise to coordinated and unilateral anticompetitive market effects. (*Id.* at 21, 23.) According to Dr. Cotterill, the geographic structure of lower Cape May supermarket sales market, the transportation grid, and the decrease in the number of supermarket firm competitors will facilitate coordinated effects, or "tacit collusion," between the remaining competitors, leading to higher consumer prices. (*Id.* at 22.) Additionally, Dr. Cotterill argues that the closure of the Grande Center

Stop & Shop will eliminate the "head-to-head competition" between that supermarket and its closest competitor, [*18] the Rio Grande ShopRite, which, according to unilateral effects analysis, would lead to higher prices in the entire geographic region. (*Id.* at 23.) As Dr. Cotterill argues, the closure of the Rio Grande ShopRite's head-to-head competitor will give "substantial pricing power to the ShopRite store in that trading area." (*Id.*)

Finally, Dr. Cotterill argues that "entry (the opening of a new supermarket within the geographic market as defined) would [not] be timely, likely, or sufficient to defeat ShopRite's ability to increase prices" in the absence of a supermarket in the Grande Center. (*Id.* at 25.) As Dr. Cotterill notes, under the Guidelines, entry must occur within two years of the initial decision to enter in order to be timely; and, given that the Grande Center Stop & Shop took more than three years to open after its initial lease was signed, timely entry of a competitor is unlikely. (*Id.* at 26.) Dr. Cotterill further opines, based on the representations of William Juliano (Delco's president), that "[t]he state of New Jersey, in effect, will not allow any new supermarkets to be built in Middle Township" and that the "only potential site for a new entrant to open a supermarket" is [*19] in the Grande Center. (*Id.*)

## 2. Defendants' Expert - Dr. Ordover

Dr. Janusz A. Ordover submitted an expert report (Ex. D-1) and testified on behalf of the defendants. [8] Dr. Ordover states in his report that he agrees with Dr. Cotterill that the Guidelines provide the "general approach for the determination of relevant markets and the analysis of competitive effects," but, according to Dr. Ordover, Dr. Cotterill applies the analysis improperly, relying too heavily on unsupported assumptions and ignoring potential competitive restraints in the market. (*Id.* at PP 5, 7.) As Dr. Ordover puts it, "[a]bsent rigorous analysis showing no competitive interaction, it would be incorrect (and not in accordance with the Guidelines) to presumptively exclude . . . competitors when analyzing the competitive effects of the disputed actions." (*Id.* at P 12.)

> 8  Dr. Ordover is a Professor of Economics and former Director of the Masters in Economics Program at New York University. (Ordover Report P 1.) He is also a former Deputy Assistant Attorney General for Economics at the Antitrust Division of the United States Department of Justice, where he was a co-drafter of the 1992 Horizontal Merger Guidelines. (*Id.*) [*20] Dr. Ordover has served as an antitrust consultant and expert in numerous governmental and adjudicative contexts, including consulting on supermarket mergers in the United States and New Zealand. (*Id.* at P 2.)

With regard to the product market in this case, Dr. Ordover takes issue with Dr. Cotterill's conclusion that the market is limited to supermarkets. (*Id.* at P 19.) Dr. Cotterill's observation that the FTC, courts, and other bodies have accepted "supermarket sales" as the relevant product market in various contexts misses the point, according to Dr. Ordover, because an evaluation of the product market is fact-and case-specific. (*Id.*) Dr. Ordover points to "a substantial amount of publicly available literature that argues that traditional supermarkets compete with other food and consumables retailers, such as club stores, mass merchants and smaller grocery stores." (*Id.* at P 25.) Dr. Ordover notes that supermarkets in southern New Jersey monitor prices at Wal-Mart and Target, suggesting that the industry participants regard non-supermarket businesses as competitors. (*Id.* at P 28.) In describing the impact of omitting non-supermarket competition from Dr. Cotterill's product market [*21] analysis, Dr. Ordover argues that "[n]o conclusion about the relevant product market can be reasonably proffered without examining evidence specific to the stores in the area, including the selection of products offered at the various stores, which stores perform price checks against which other stores, and whether consumer surveys in the area indicate substitution across different types of retailers." (*Id.* at P 27.)

With respect to the geographic market at issue here, Dr. Ordover disagrees with Dr. Cotterill's conclusion that the Acme and A&P Superfresh in Cape May Court House are not within the geographic market of the Grande Center Stop & Shop. (*Id.* at PP 36-37.) Dr. Ordover argues that because the Cape May Court House stores are closer to other supermarkets within the geographic market than is an Acme store at the southernmost tip of the peninsula, the Cape May Court House stores should be included within the geographic market analysis. (*Id.*)

At a more fundamental level, Dr. Ordover argues that Dr. Cotterill's reliance on travel costs to assess the impact of a SSNIP on potential consumer switching is economically unsound, because it ignores potentially outcome-affecting considerations [*22] like product quality, product selection, driving patterns, shopping frequency, and whether the consumer is marginal or committed to a particular store. (*Id.* at PP 39-40.) In addition, according to Dr. Ordover, the assumptions about supermarket trading areas in Dr. Cotterill's detour cost analysis is inconsistent with Dr. Cotterill's own data, which suggests that consumers do not shop at the closest available supermarket at levels necessary to sustain Dr. Cotterill's assumptions. (*Id.* at PP 53-54.) Dr. Ordover further argues that even if one accepts Dr. Cotterill's detour cost methodology, Dr. Cotterill's calculations are inaccurate because they overestimate travel costs and are

based on individual, rather than household, shopping patterns. (*Id.* at PP 38, 41.) As a result of these errors, according to Dr. Ordover, "Dr. Cotterill's analysis does not provide any reliable estimate of the amount of sales that would be lost in response to a SSNIP." (*Id.* at P 43.)

Dr. Ordover also critiques Dr. Cotterill's critical loss analysis, arguing that the formula Dr. Cotterill uses to find a critical loss of 33% is incorrect. (*Id.* at P 47.) The correct formula for critical loss [9], according to Dr. [*23] Ordover, yields a lower critical loss of 25%. [10] (*Id.*)

> 9   Dr. Ordover describes the accepted critical loss formula as follows: "for a price increase of X percent and a variable margin of M percent, the critical loss is $X/(X + M)$." (*Id.* at P 47.)

> 10   Dr. Ordover's figure of 25% is lower than the figure reported in Dr. Cotterill's original report. As noted above, in the *errata* to Dr. Cotterill's report, Dr. Cotterill determined that the figure should be between 21% and 23%. (Cotterill Errata 1.)

Dr. Ordover also challenges Dr. Cotterill's analysis of the competitive effects of Wakefern's acquisition and closure of the Grande Center Stop & Shop. First, with regard to Dr. Cotterill's conclusions about market concentration based on the HHI, Dr. Ordover argues that the HHI is used to "screen out transactions that are clearly not anticompetitive," but not as proof of market concentration. (*Id.* at P 60.) Additionally, Dr. Ordover notes that in cases of differentiated product markets (such as supermarkets), "[t]he antitrust authorities routinely allow mergers for which the HHI is well above the threshold, in part because the existence of product differentiation offsets concerns about potential competitive [*24] effects . . ." (*Id.* at P 61.) Moreover, Dr. Ordover criticizes the reliability of the data Dr. Cotterill uses to calculate the HHI, since Dr. Cotterill uses store square footage as a proxy for sales volume and there is "no evidence for the reliability of square footage estimates" in this case. (*Id.* at P 62.) Indeed, the confidential sales performance data in Dr. Cotterill's own report (Ex. P-1 at 30), suggests that relying upon square footage as a proxy for market share will produce misleading results. The annual sales for the ShopRite in Rio Grande per square foot was about 2 1/2 times greater than for the Stop & Shop. Dr. Cotterill's incorrect assumption thus overstates the expected market share of a supermarket in the Grande Center in light of Stop & Shop's actual experience. [11]

> 11   Further, Dr. Cotterill has seemingly ignored the historic data that shows that Stop & Shop's entry into the market has not been shown to depress the ShopRite's sales or profits. ShopRite's

annual sales per square foot grew approximately 18.3% between March 2004 and August 2006 (*see* Exs. 3, parts 1 & 2 to Ordover Report). Shop Rite's net income at the Rio Grande store also grew substantially during the period [*25] of Stop & Shop's operation for 2006 and 2007 (*see* Att. B-3 to Cotterill Report). Meanwhile, Stop & Shop unfortunately operated at a substantial, constant loss throughout its 20 months at the Grande Center, despite its brand name recognition, as Dr. Ordover testified, and as shown by the confidential data in Att. C-1 to the Cotterill Report. These financial results also support the decision of the Stop & Shop management to unload this supermarket as part of the nine-store deal with Wakefern for lawful business reasons.

Second, Dr. Ordover critiques Dr. Cotterill's coordinated effects analysis. Dr. Cotterill oversimplifies the possibilities for tacit coordination, according to Dr. Ordover, by overlooking the difficulties of coordinating across the thousands of products offered at supermarkets and by ignoring the competitive restraints that nonsupermarket stores would exercise to restrict such coordination. (*Id.* at PP 65-66.) Moreover, Dr. Ordover argues that under Dr. Cotterill's analysis, such coordination would have been possible in the three-firm market that existed before the Grande Center Stop & Shop opened, and there is no evidence of such coordinated effects during that time. [*26] (*Id.* at P 67.)

Finally, according to Dr. Ordover, Dr. Cotterill's discussion of unilateral anticompetitive effects is inconsistent with his market definition analysis. Specifically, Dr. Ordover argues that the contribution ratio of 15.03% Dr. Cotterill uses to calculate critical loss implies that supermarkets in the geographic market have a high demand elasticity of 6.65%. (*Id.* at PP 72-73.) According to Dr. Ordover, an elasticity of demand of 6.65% indicates that "even a small unilateral price increase by the [Rio Grande] ShopRite would drive away a large amount of sales volume, whether or not the Stop & Shop store was operating nearby." (*Id.* at P 73.) More generally, Dr. Ordover notes that the possibility of the ShopRite being able to profit from a unilateral price increase is inconsistent with the market Dr. Cotterill defines, since the market "extends beyond supermarket sales in Rio Grande alone." (*Id.* at P 75.)

The upshot of the failings he identifies in Dr. Cotterill's analysis, according to Dr. Ordover, is that "Professor Cotterill does not prove that the relevant market for this inquiry is sales at supermarkets on Cape May south of Route 147, or that the disputed activities are [*27] at all likely to give rise to competitive effects." (*Id.* at P 77.)

Dr. Ordover testified that the appropriate competitive market includes not only the supermarkets identified by Dr. Cotterill (the closed Rio Grande Stop & Shop, the Rio Grande ShopRite, the Wildwood Acme and A & P SuperFresh and the Cape May Acme) but also the two Cape May Court House supermarkets (the Acme and the A & P SuperFresh) and the Rio Grande Wal-Mart's grocery department and the Save-a-Lot Market.

**III. DISCUSSION**

**A. Antitrust Standing**

At the preliminary injunction stage, each element of the "irreducible constitutional minimum of standing" must be supported "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e. with the manner and degree of evidence required at the successive stages of litigation." *Doe v. National Bd. of Medical Examiners, 199 F.3d 146, 152-53 (3d Cir. 1999)* (quoting *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*). Accordingly, before assessing the merits of the plaintiffs' motion, the Court addresses the important threshold question of antitrust standing to determine whether Delco and Mr. Decker are appropriate plaintiffs to bring this action.

In [*28] *In re Lower Lake Erie Iron Ore Antitrust Litigation, 998 F.2d 1144 (3d Cir. 1993), cert. denied sub nom. Bessemer & L. E. R.R. v. Wheeling-Pittsburgh Steel Corp., 510 U.S. 1091, 114 S. Ct. 921, 127 L. Ed. 2d 215 (1994)*, the Court of Appeals for the Third Circuit described the elements that a plaintiff seeking monetary damages in an antitrust action brought pursuant to section 4 of the Clayton Act, *15 U.S.C. § 15*, must satisfy in order to have standing. In applying the test for antitrust standing, a court evaluates

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause the harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Id. at 1165-66.* The standing of a plaintiff seeking injunctive relief under section 16 of the Clayton [*29] Act, *15 U.S.C. § 26,* is evaluated under a less restrictive standard that requires the plaintiff to show "(1) threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust injury." *In re Warfarin Sodium Antitrust Litigation, 214 F.3d 395, 399 (3d Cir. 2000).* A plaintiff seeking relief under *section 16* must still show that the injury it alleges is "an injury of the type the antitrust laws were designed to prevent." *Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 107 S. Ct. 484, 490, 93 L. Ed. 2d 427 (1986).*

**1. Delco's Standing**

The Court first addresses Delco's standing to bring the instant action. Delco conceded at oral argument that it lacks standing to sue under *section 7* of the Clayton Act. Delco argues that it has standing to bring this antitrust suit under *§ 1* of the Sherman Act because "there is a direct causal connection between defendants['] anticompetitive and monopolistic actions" and the resulting harm to Delco's business. (Pls.' Br. 15-16.) According to Delco, the alleged scheme between Giant, Stop & Shop, and Wakefern to transfer ownership of the Grande Center Stop & Shop for the exclusive purpose of closing the supermarket was the direct and [*30] proximate cause of Delco's injury -- namely, its restricted capacity to "function[] as a landlord" resulting from "the loss of economic advantages to be gained from a continuing supermarket operation in the Grande Center, potential loss of tenants, loss of customers and loss of income (including rental income from neighboring tenants)." (Pls.' Br. 17; Am. Compl. P 66.) Delco argued at the October 1 hearing that the directness of the link between Delco's injury and the defendants' anticompetitive conduct finds support in *Blue Shield of Virginia v. McCready,* in which the Supreme Court held that a plaintiff need not be among the "competitors whom the conspirators hoped to eliminate from the market" in order to have antitrust standing. *457 U.S. 465, 479, 102 S. Ct. 2540, 73 L. Ed. 2d 149 (1982).* Delco argues that "[t]he antitrust laws were enacted precisely to curtail defendants' conduct" with victims like Delco in mind. (Pls.' Br. 16.)

Defendants dispute Delco's reasoning and argue that it lacks standing to bring this case. The defendants first note that Delco's injury is merely an "incidental by-product of the alleged anti-competitive conduct," not the direct result of the alleged scheme. (Defs.' Br. 14) (quoting *Acme Markets v. Wharton Hardware & Supply Corp., 890 F. Supp. 1230, 1237 (D.N.J. 1995)).* [*31] Moreover, according to Defendants, the injuries Delco identifies, including the predicted decrease in Grande Center revenues resulting from having no supermarket in the shopping center, are not antitrust injuries because

they have "nothing to do with harm to competition regarding supermarkets in the region." (Defs.' Br. 15.) Defendants further argue that the alleged anticompetitive scheme is not the cause of Delco's injuries, because the Delco-Giant lease permits non-supermarket uses of the Grande Center Stop & Shop after one day of operating as a supermarket. (*Id.* at 16, 18.)

The Court agrees with the defendants that Delco lacks antitrust standing. [12] With regard to "whether [Delco's] alleged injury is of the type for which the antitrust laws were intended to provide redress" and "the directness of the injury" alleged here, *Lower Lake Erie Iron Ore, 998 F.2d at 1165-66,* the Court first notes that Delco is "neither a consumer nor a competitor in the market in which trade was [allegedly] restrained," but is instead a supplier providing retail space to market participants. *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 539, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983).* As the Court of Appeals for the Third Circuit has noted, "although generally only competitors and consumers will suffer antitrust injury (an essential component of antitrust standing), such injury may in some circumstances inhere where the harm is 'inextricably intertwined with the defendant's wrongdoing.'" *Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62, 77 (3d Cir. 2000)* (quoting *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 926 n.8 (3d Cir. 1999)).* "The simple invocation of [the phrase 'inextricably intertwined'], however, will not allow a plaintiff to avoid the fundamental requirement for antitrust standing that he or she have suffered an injury of the type - almost exclusively suffered by consumers or competitors - that the antitrust laws were intended to prevent." *Steamfitters, 171 F.3d at 926 n.8.* [13]

> 12 Because Delco seeks both monetary and injunctive relief in this action, the Court addresses all five parts of the *Lower Lake Erie Iron Ore* test. However, the Court notes that the elements that the two tests have in common - antitrust injury, causation, and directness - are sufficient to show that Delco lacks standing under the less restrictive section 16 standard as well as under section 4.

> 13 The recent decision of the Court of Appeals for the Fourth Circuit in *Novell, Inc. v. Microsoft,* in which the court found that Novell had antitrust standing despite the fact that it did not compete in the same market as Microsoft, is distinguishable from the present case. *Nos. 06-1134, 06-1238, 2007 U.S. App. LEXIS 24101, 2007 WL 2984372, at *1 (4th Cir. Oct. 15, 2007)* . In *Novell,* the court took as true Novell's allegations

that although the plaintiff was not a competitor in the "PC operating-systems market," Microsoft "specifically targeted [Novell's] products for destruction." Id. at *10. such targeting was at least conceivable in Novell because while Novell did not compete with Microsoft in the PC operating-systems market, it did compete with Microsoft in the "office-productivity applications" market. Id. at *1. while acknowledging that "the defendant's specific intent to injure the plaintiff is not a panacea," the court placed great emphasis on the issue of "whether the harm was intended." Id. at *10 (internal quotations and citations omitted) In the instant case, Delco has not alleged that Defendants' activities were driven by a specific intent to injure Delco. Rather, Delco complains that "[t]he clear purpose and effect of wakefern's conduct . . . has been . . . the preclusion and suppression of legitimate competition between Wakefern's supermarkets and other supermarkets in lower Cape May County, including the (former) Stop & Shop supermarket in the Grande Center." (Am. Compl. ¶ 11.) While a non-consumer, non- competitor victim of such deliberate targeting as was alleged in Novell might "have suffered an injury of the type - almost exclusively suffered by consumers or competitors - that the antitrust laws were intended to prevent," Steamfitters, 171 F.3d at 926 n.8, this is not such a case.

Delco's alleged injuries are not of the sort that the antitrust laws were intended to prevent. The overwhelming weight of authority provides that "[s]uppliers to direct market participants typically cannot seek recovery under the antitrust laws because their injuries are too [*33] secondary and indirect to be considered 'antitrust injuries.'" Serfecz v. Jewel Food Stores, 67 F.3d 591, 597 (7th Cir. 1995). An "an owner-lessor of retail commercial space" is such a supplier and, consequently, lacks "the requisite direct injury to have standing to assert that [a defendant] has monopolized, or conspired with others to monopolize, the retail grocery market." Id. at 597, 599; see also R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 890 F.2d 139, 148 (9th Cir. 1989) (en banc); Southaven Land Co. v. Malone & Hyde, Inc., 715 F.2d 1079, 1087 (6th Cir. 1983); Acme, 890 F. Supp. at 1237; Sunny Isle Shopping Center, Inc. v. Xtra Super Food, 237 F. Supp. 2d 606, 611 (D.V.I. 2002); Rosenberg v. Cleary, Gottlieb, Steen & Hamilton, 598 F. Supp. 642, 645 (D.C.N.Y. 1984); cf. Melrose Realty Co. v. Loew's, Inc., 234 F.2d 518, 519 (3d Cir. 1956) (holding that a "lessor-owner of a motion picture theatre who is entitled to rental based on a percentage of receipts is nonetheless not a person injured in his business or property within the meaning of section 4 of the Clayton Act") (internal quotations and citations omitted).

Delco's reliance on McCready is unavailing. In McCready, the [*34] Supreme Court found that a consumer of mental health services from psychologists had standing to challenge an anticompetitive arrangement between her insurance provider and an organization of psychiatrists designed to dampen competition in the psychotherapy market. 457 U.S. at 483-84. The Court held that "[w]here the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations would be likely to cause." Id. at 479 (internal quotations and citations omitted). While the McCready Court found that the consumer's injuries in that case were a sufficiently "integral" result of an antitrust conspiracy to confer standing, the case does not stand for the proposition that any party claiming to be injured - no matter how indirectly - as a result of an allegedly anticompetitive conspiracy has standing. Rather, courts have consistently held that the alleged antitrust injuries of lessors of retail space to market participants are too peripheral to the aims of the antitrust laws to confer antitrust standing. See, e.g., Serfecz, 67 F.3d at 597 ("[Lessors] typically cannot seek recovery under [*35] the antitrust laws because their injuries are too secondary and indirect to be considered 'antitrust injuries.'").

The other elements of the antitrust standing inquiry also weigh against Delco's standing in this case. With regard to the "causal connection" between Delco's injury and the conspiracy it alleges, Lower Lake Erie Iron Ore, 998 F.2d at 1165-66, the Court agrees with Defendants that Delco's own voluntarily assumed contractual obligations are a more direct cause of the harm it has suffered than the defendants' allegedly anticompetitive conduct. In light of the fact that the Delco-Giant lease permitted the lessee to close the Grande Center Stop & Shop and enforce the lease provision preventing Delco from leasing shopping center space to other supermarkets whether or not Wakefern purchased the store in question, it would appear that Delco's own lease has a far greater and more direct causal tie to its injuries than do Defendants' allegedly anticompetitive actions. [14] (Am. Compl. Ex. A §§ 9.3(a)(1), 9.2(b)(1).)

> 14    The same is true of the injury Delco claims to have suffered as a result of the "loss of . . . rental income from neighboring tenants." (Am. Compl. ¶ 66.) If Delco's contracts with neighboring tenants provide for reduced payments in the absence of a supermarket at the Grande Center, as Plaintiffs' Amended Complaint suggests, and the Delco-Giant lease permits the lessee to cease operating a supermarket after being open for business for one day, then these contractual provisions would appear to be the primary cause of Delco's injuries. (Am. Compl. Ex. A § 9.2(b)(1).)

2007 U.S. Dist. LEXIS 82711, *

Finally, "the existence of more direct victims of the alleged antitrust violations" and "the potential for duplicative recovery," *Lower Lake Erie Iron Ore, 998 F.2d 1144 at 1165-66*, [*36] weigh against Delco's standing in this case. Because Delco is "neither a producer nor a consumer" in the market in question, "it is not the plaintiff best situated to challenge [Defendants'] allegedly unlawful conduct" in that market. *Int'l Raw Materials, Ltd. v. Stauffer Chemical Co., 978 F.2d 1318, 1329 (3d Cir. 1992)*. This is because, as a party with only indirect ties to the market at issue, Delco "cannot be depended upon to advance the strongest arguments identifying the anticompetitive effects in . . . [a market] in which it does not participate" and "may not be the best advocate for those who are participants in . . . [that] market, who would be more appropriate plaintiffs." *Id.* In short, then, Delco does not have antitrust standing in the instant dispute. [15]

> 15   The fact that Delco alleges that Defendants' conduct amounts to a se violation of the antitrust laws, of course, has no bearing on whether Delco has standing to bring this suit in the first place. *See Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344, 110 S. Ct. 1884, 109 L. Ed. 2d 333 (1990)* ("proof of a per se violation and of antitrust injury are distinct matters that must be shown independently") (citation omitted)

**2. Decker's Standing**

Plaintiffs maintain that Mr. Decker has standing to bring this action because he "shopped regularly at the Grande Center Stop & Shop" and, as a result of its closure, "Mr. Decker and similarly situated customers will be denied the benefits of robust competition in the lower Cape May County market and will be faced with higher prices and limited consumer choice." (Am. Compl. PP 17, [*37] 67.)

Defendants argue that Mr. Decker is tainted as an antitrust plaintiff by virtue of the fact that he is an employee of Delco, a business that lacks standing to sue. (Defs.' Br. 18-19.) Defendants analogize Mr. Decker's claim to *Shroder v. Suburban Coastal Corporation*, in which the court found that a law firm employee was an inappropriate representative of a class in an action in which his employer was class counsel. *729 F.2d 1371, 1375 (11th Cir. 1984)*. Defendants further argue that under the reasoning of *FTC v. Whole Foods Mkt., Inc., 502 F. Supp. 2d 1, 17 (D.D.C. 2007)*, Mr. Decker is an inappropriate antitrust plaintiff because he is such a "core" Grande Center Stop & Shop customer that his interests skew the anticompetitive analysis contemplated by the antitrust laws. (Defs.' Br. 20-21.)

The Court finds that Mr. Decker has standing to sue for injunctive relief under *section 16* of the Clayton Act, but lacks standing to sue for damages under *section 4*. Contrary to Defendants' arguments, the Court is aware of no case holding that a consumer is stripped of his standing to challenge allegedly anticompetitive activities by virtue of his status as an employee of one of the market participant's [*38] suppliers. While the *Shroder* court, in the context of evaluating the qualifications of a class representative whose employer was the law firm representing the class, noted that "a clear possibility remains that [the employee] is interested in maximizing the return to his employer," the court's concern pertained to the plaintiff's potential for divided loyalty as a class representative. *729 F.2d at 1375*. Here, Mr. Decker has stated in an affidavit that he has not received and does not expect to receive "any consideration from Delco in connection with [his] role as a plaintiff in this action." (Decker Aff. P 3.) Moreover, since, as is explained *infra*, Mr. Decker has standing to sue only for injunctive, rather than monetary, relief, the concerns in *Shroder* regarding divided class loyalties apply with less force here. *See Cargill, 479 U.S. at 111 n.6* ("the fact is that one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one") (citation omitted).

Defendants' reliance on *Whole Foods* is also misplaced. The discussion of "core" versus "marginal" customers in *Whole Foods* pertained to the court's analysis of the relevant product market at issue [*39] in that case. *502 F. Supp. 2d 1, 17*. The court did not hold that "core" customers lack standing to sue, and this Court is aware of no authority suggesting that the Court should so hold here.

Mr. Decker does not present the same problems that make Delco an inappropriate antitrust plaintiff. The injury Mr. Decker claims that he will suffer - increased prices and decreased competition in the market of Cape May County supermarkets - is a quintessential "antitrust injury," *Cargill, 479 U.S. at 121*, and consumers are within the class of acceptable antitrust plaintiffs. *See McCready, 457 U.S. at 483*. The injury is also of the sort that "proximately result[s]" from a violation of the antitrust laws as Plaintiffs allege in their Complaint. *Warfarin Sodium Antitrust Litigation, 214 F.3d at 399*; *see also Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969)* (a plaintiff suing under *section 16* of the Clayton Act "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws").

However, while the Court finds that Mr. Decker has standing to sue under *section 16* of the Clayton Act, he does not have standing to sue for treble damages under *section 4*. [*40] *Section 4* standing requires a showing of

"actual injury," whereas *section 16* "requires a showing only of 'threatened' loss or damage." *Cargill, 479 U.S. at 111* (quoting *15 U.S.C. § 26*). In this case, the injuries Mr. Decker has alleged are purely prospective - the plaintiffs allege that he "will be denied the benefits of robust competition in the lower Cape May County market and will be faced with higher prices and limited consumer choice." (Am. Compl. P 67.) In the case of the "threatened loss" Mr. Decker has identified, *section 16* standing is appropriate, but *section 4* standing is not. *Warfarin Sodium Antitrust Litigation, 214 F.3d at 399.* The Court finds accordingly that Mr. Decker has standing in this action under *section 16* of the Clayton Act, but that he lacks standing to sue for damages under *section 4.*

**B. Preliminary Injunction Requirements**

Having found that Mr. Decker has standing to bring the instant action, the Court proceeds to evaluate the merits of Plaintiffs' motion for preliminary injunctive relief. In order to obtain a preliminary injunction, the moving party must establish that "(1) it has a likelihood of success on the merits, (2) it will suffer irreparable harm if [*41] the injunction is denied, (3) granting preliminary relief will not result in even greater harm to the nonmoving party, and (4) the public interest favors such relief." *Rogers v. Corbett, 468 F.3d 188, 192 (3d Cir. 2006)* (internal quotations and citations omitted). The Court of Appeals for the Third Circuit has noted that "[p]reliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004)* (internal quotations and citations omitted).

**1. Likelihood of Success**

The Court first evaluates the likelihood that Mr. Decker will succeed on the merits of his antitrust actions. Mr. Decker's antitrust claims assert that Defendants have violated section 7 of the Clayton Act, *15 U.S.C. § 18*, and section 1 of the Sherman Act, *15 U.S.C. § 1.* Specifically, Mr. Decker alleges that the result of Wakefern's acquisition and closure of the Giant Center Stop & Shop and its enforcement of the lease provision prohibiting the operation of other supermarkets in the shopping center will be "substantially to lessen competition" in the relevant product and geographic market, in violation of *section 7* [*42] of the Clayton Act. (Am. Compl. PP 63-65.) Mr. Decker further alleges that the defendants illegally conspired to allocate markets and thereby restrict competition by entering into a sublease agreement for the sole purpose of closing the Grande Center Stop & Shop and preventing another supermarket from opening in the Grande Center, in violation of *section 1* of the Sherman Act. (*Id.* at PP 73-75.) Mr. Decker claims that this con-

duct is further violative of *section 1* of the Sherman Act because it amounts to an anticompetitive group boycott. [16] (*Id.* at PP 85-91.)

16    The fact that Delco alleges that Defendants' conduct amounts to a se violation of the antitrust laws, of course, has no bearing on whether Delco has standing to bring this suit in the first place. See Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990) ("proof of a per se violation and of antitrust injury are distinct matters that must be shown independently") (citation omitted)

**a. *Per Se* Antitrust Claims**

As a preliminary matter, it is clear that Mr. Decker has not established at this stage that he is likely to succeed on the two *per se* Sherman Act violations he alleges - namely, his group boycott and market allocation claims. To establish a claim for a violation of *section 1* of the Sherman Act, a plaintiff must prove: "(1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Mathews v. Lancaster General Hosp., 87 F.3d 624, 639 (3d Cir. 1996).* [*43] While generally a plaintiff bears the burden of proving the anticompetitive effects of the challenged business practice, *State Oil Co. v. Khan, 522 U.S. 3, 10, 118 S. Ct. 275, 139 L. Ed. 2d 199 (1997)*, certain inherently anticompetitive practices are considered *per se* Sherman Act violations that are "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958).* Two such practices are engaging in a concerted refusal to deal (or group boycott) and the allocation of markets. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 105 S. Ct. 2613, 86 L. Ed. 2d 202, (1985); Palmer v. BRG of Georgia, Inc., 498 U.S. 46, 49, 111 S. Ct. 401, 112 L. Ed. 2d 349 (1990).*

In explaining his group boycott allegation, the Amended Complaint states that "Defendants . . . have conspired and agreed amongst themselves to refuse to deal with Mr. Decker and other consumers similarly situated by agreeing that none of defendants will operate a supermarket at the Grande Center." (Am. Compl. P 87.) However, as the Court of Appeals for the Third Circuit has noted, "The classic example of a concerted refusal to [*44] deal is the situation in which businesses at one level of production or distribution, e.g., retailers, use the threat of a boycott to induce businesses at another level, e.g., manufacturers, not to deal with competitors of the

retailers." *Weiss v. York Hosp., 745 F.2d 786, 819 (3d Cir. 1984); see also Northwest Wholesale Stationers, 472 U.S. at 294 (1985)* ("Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.") (internal quotations and citations omitted). Mr. Decker's conclusory allegations that Defendants have engaged in a group boycott against him clearly do not fit the classic group boycott case to which the *per se* approach applies. Mr. Decker is neither in competition with Defendants, nor at a different level of production or distribution in Defendants' industry, and the closure of the Grande Center Stop & Shop does not evidence that Defendants have somehow boycotted Mr. Decker (and similarly situated customers). Given the conclusory nature of [*45] Mr. Decker's group boycott allegations, the Court finds that Mr. Decker has not shown a probability of success in proving a *per se* Sherman Act violation under the group boycott theory.

Mr. Decker's second *per se* Sherman Act claim alleges that the Stop & Shop-Wakefern transaction leading to the sale and ultimate closure of the Grande Center Stop & Shop constitutes a conspiracy "to allocate the relevant market and/or the market for retail sale of food and grocery products in supermarkets in Lower Cape May County, New Jersey." (Am. Compl. P 76.) It has long been held that a conspiracy between competitors to allocate customers or geographic territories for the purpose of reducing competition is a *per se* violation of *section 1* of the Sherman Act. *See Palmer, 498 U.S. at 49* ("One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition.") (citation omitted). To prove such a conspiracy, "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that [the defendants] had a conscious commitment to a common scheme designed [*46] to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984)* (internal quotations and citations omitted).

On the record before it at this stage of the litigation, the Court finds that Mr. Decker has not demonstrated a likelihood of success in proving the conspiratorial acts that would show a *per se section 1* violation in the absence of market analysis. Beyond the allegations in the Amended Complaint regarding Defendants' alleged conspiracy, Mr. Decker has offered only a hearsay statement alluding to an anticompetitive conspiracy in the affidavit of William T. Juliano, Delco's president. (Juliano Supp. Aff. PP 4-6.) By contrast, Defendants submitted affidavits of Wakefern and Stop & Shop executives that provide a benign, non-conspiratorial explanation for the terms of the Stop & Shop-Wakefern transaction. (Colavolpe Cert. PP 4-6; Rostan Cert. PP 2-5.) While "[a]t the preliminary injunction stage, a district court may rely on . . . hearsay materials," the "weight to which such materials are entitled may of course vary greatly depending on the facts and circumstances of a given case." *Kos Pharms., 369 F.3d at 718-19* (internal quotations [*47] and citations omitted). Weighing the hearsay statement in the Juliano affidavit against the Colavolpe and Rostan affidavits, it appears to the Court that rational, non-conspiratorial considerations fueled the Wakefern-Stop & Shop transaction. Specifically, the transaction took the form it did because Stop & Shop sought to exit the southern New Jersey market due to its steadily declining sales, and since it had no intention of selling all but one of its stores, it included the Grande Center Stop & Shop as part of a nine-store, take-it-or-leave-it offer to Wakefern. (Colavolpe Cert. PP 4-7; Rostan Cert. P 5.) Wakefern, in turn, despite its disinterest in the Grande Center Stop & Shop, agreed to purchase all nine New Jersey stores because of the all-or-nothing nature of the offer. (Rostan Cert. P 5.) The Court therefore finds that Mr. Decker has not shown a probability of success in proving a *per se* Sherman Act violation under a market allocation theory, and, accordingly, looks instead to the market analysis to assess whether Mr. Decker is entitled to the injunction he seeks.

### b. Remaining Antitrust Claims

Under *section 7* of the Clayton Act and *section 1* of the Sherman Act the plaintiff [*48] must succeed in defining the relevant market and showing the competitive effects of the defendant's conduct in order to prevail. *See Brown Shoe Co. v. United States, 370 U.S. 294, 324, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962)* (under *section 7* of the Clayton Act, "[s]ubstantiality can be determined only in terms of the market affected") (citation omitted); *Mathews, 87 F.3d at 639*. "A market has two components, product and geographic," and "the burden is on the plaintiff to define both components of the relevant market." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 513 (3d Cir. 1998)*.

As the Court of Appeals for the Third Circuit has stated, "defining a relevant product market is a process of describing those groups of producers which, because of the similarity of their products, have the ability actual or potential to take significant amounts of business away from each other." *SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1063 (3d Cir. 1978), cert. denied, 439 U.S. 838, 99 S. Ct. 123, 58 L. Ed. 2d 134 (1978)*. Put another way, "[t]he outer boundaries of a product market are determined by evaluating which products would be reasonably interchangeable by consumers for the same

purpose." *Brokerage Concepts, 140 F.3d at 513.* Courts [*49] frequently assess product interchangeability by examining whether there is "cross[-]elasticity of demand between the product itself and substitutes for it," because "[w]hen there is cross-elasticity of demand between products in a market, the rise in the price of a good within the relevant market would tend to create a greater demand for other like goods in that market." *Id. at 513-14* (internal quotations and citations omitted); *see also AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 227 (2d Cir. 1999)* ("Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product."). Also relevant to defining the product market are "practical indicia such as industry or public recognition of the market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors." *Whole Foods, 502 F. Supp. 2d at 7* (quoting *Brown Shoe Co., 370 U.S. at 325*).

Mr. Decker urges the Court to adopt Dr. Cotterill's definition of the product market in this case as supermarket sales. (Pls.' [*50] Supp. Br. 2.) While acknowledging that his definition of the product market is not based on numerical calculations, Dr. Cotterill focuses on the fact that supermarkets offer a one-stop shopping opportunity, typically stocking 30,000 distinct items, and are thus not interchangeable with the much smaller range of food offerings at mass merchants, like Wal-Mart and smaller grocery stores, such as Save-A-Lot, both of which are actually operating nearby. (Cotterill Report 7.) Mr. Decker also draws the Court's attention to multiple cases in which courts found the product market to be supermarket sales. *See Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90 (2d Cir. 1998); Ind. Groc'y Co. v. Super Valu Stores, Inc., 684 F. Supp. 561 (S.D.Ind. 1988); Cal. v. Am. Stores Co., 697 F. Supp. 1125 (C.D.Cal. 1988).*

Defendants argue that Dr. Cotterill's definition of the product market is unreliable because Dr. Cotterill offers an insufficient explanation for excluding from the product market businesses like Wal-Mart and Save-A-Lot that serve as a competitive constraint on supermarkets. (Defs.' Supp. Br. 6.) Defendants find fault in Dr. Cotterill's analysis in light of Dr. Ordover's observation that "a substantial [*51] amount of publicly available literature [] argues that traditional supermarkets compete with other food and consumables retailers, such as club stores, mass merchants and smaller grocery stores." (Ordover Report P 25.) Defendants note that these arguments about cross-shopping in the literature cited by Dr. Ordover are borne out in Dr. Ordover's visit to the Save-A-Lot in Lower Cape May, where he observed customers purchasing groceries in quantities comparable to an average supermarket visit. (Tr. 95.) The defendants also argue that because cases relied on by Mr. Decker offer minimal support to Dr. Cotterill's conclusions, since *Indiana Grocery* and *American Stores* were decided before the cross-shopping phenomenon identified by Dr. Ordover took place, and in *Tops Market* the parties stipulated to the issue of the relevant product market. *See Tops Mkts., Inc., 142 F.3d at 94.*

The Court agrees with the defendants that Mr. Decker has not satisfied his burden of limiting the relevant product market definition to supermarket sales. While defining the product market as such would offer a convenient shorthand in this case, defining the product market is not a search for such a conceptual shorthand, but [*52] instead requires an evaluation of "which products would be reasonably interchangeable by consumers for the same purpose." *Brokerage Concepts, 140 F.3d at 513.* In particular, the phenomenon of cross-shopping that Dr. Ordover explains in his report at minimum indicates a strong likelihood that stores like Save-A-Lot "have the ability actual or potential to take significant amounts of business away from" Lower Cape May supermarkets if those supermarkets were to raise their prices. *SmithKline, 575 F.2d at 1063.*

Apart from Dr. Cotterill's testimony that he drew inferences about cross-shopping in this market and determined that its influence was negligible, Mr. Decker has not offered a suitable explanation for excluding potentially competitive businesses like Wal-Mart and Save-A-Lot from the product market. (Tr. 28.) The Court finds that Dr. Cotterill's inferences about cross-shopping are alone an insufficient basis to exclude from the product market the potential competitors that Dr. Ordover has identified. Mr. Decker has not offered quantitative data or qualitative information such as customer views on product interchangeability to justify the exclusion of potential competitors like Save-A-Lot [*53] and Wal-Mart from the product market. *See Fineman v. Armstrong World Indus., 980 F.2d 171, 199 (3d Cir. 1992)* (taking account of consumer perspectives on interchangeability); *Whole Foods, 502 F. Supp. 2d at 26* (taking account of the shopping practices of customers to assess interchangeability). While a plaintiff is not required to put forth such data or information in order to define the relevant market, Mr. Decker's exclusive reliance on Dr. Cotterill's assumptions about cross-shopping is insufficient to sustain his burden in light of Dr. Ordover's competing conclusions.

Moreover, the impact that cross-shopping has on the product market in this case is supported by evidence in the record indicating that Lower Cape May supermarkets themselves consider non-supermarket businesses to be a source of competition. As Dr. Ordover notes, documents prepared by Wakefern in the ordinary course of business,

which Dr. Cotterill utilized in preparing his report, show that Wakefern accounted for the Save-A-Lot and Wal-Mart in the region in its list of "2007 Competition." (Cotterill Report Attach. B4.) While self-serving "conclusory statements" by market participants are of little value in [*54] defining the product market, *H.J., Inc. v. International Tel. & Tel. Corp., 867 F.2d 1531, 1540 (8th Cir. 1989),* courts regularly take account of industry participants' perspectives on who their competitors are in order to shed light on the interchangeability of the products they offer. *See, e.g., United States v. Continental Can Co., 378 U.S. 441, 453-55, 84 S. Ct. 1738, 12 L. Ed. 2d 953 (1964); Fineman, 980 F.2d at 199; Associated Press, 181 F.3d at 227-29.* Wakefern's inclusion of Save-A-Lot and Wal-Mart in its assessment of its competition, prepared before this litigation existed, undercuts Dr. Cotterill's conclusion that the product market in this case is limited to supermarket sales. Bearing in mind that it is the plaintiff's burden to define the outer bounds of the product market in an antitrust case, *Brokerage Concepts, 140 F.3d at 513,* the Court finds that Mr. Decker has not demonstrated a "reasonable probability of eventual success" in limiting the definition of the product market in question to include only supermarket sales. *Weiss, 745 F.2d at 829.*

The finding that Mr. Decker has failed to define the product market in this case means that he is not entitled to the injunctive relief he seeks. *Brokerage Concepts, 140 F.3d at 513* [*55] (plaintiff's burden is to prove both product and geographic markets). Even if Mr. Decker had sustained his burden with respect to the product market, however, the Court finds that he has failed to establish that the geographic market excludes the supermarkets located in Cape May Court House and is limited to the region south of Route 147. The parties agree that the means of assessing the geographic market, as explained in the Guidelines, is to (1) start with the geographic location of the merging supermarkets; (2) determine whether, if a hypothetical monopolist in that geographic region instituted a small but substantial nontransitory increase in price, "consumers would accede to such price increase or instead would make such increase unprofitable by taking their business to supermarkets at more distant locations"; and (3) if imposing a SSNIP would not be profitable, add next-best stores one by one until imposing a SSNIP within the resulting market would be profitable. (Cotterill Report 5; Ordover Report P 30.) The parties further agree that the key consideration for whether imposing a SSNIP would be profitable is the calculation of critical loss, which tests "at what point a purveyor's [*56] price increases lead to a sufficient amount of lost sales (and lost customers) that the economic loss exceeds the gain from having raised prices (the 'critical' loss)." *Whole Foods, 502 F. Supp. 2d at 17;* (Pls.' Supp. Br. 4; Ordover Report P 47.)

While the parties are in dispute about numerous elements of the geographic market analysis, including the correct formula with which to calculate the critical loss that would result from imposing a SSNIP, the Court need not explore these disagreements in detail. This is because, even under Dr. Cotterill's calculations, Mr. Decker has not established that a hypothetical monopolist could profitably impose a SSNIP on the geographic market Mr. Decker urges the Court to adopt. In his original report, Dr. Cotterill calculated that a hypothetical monopolist imposing a 5% SSNIP at a supermarket in the geographic market he proposes could afford to lose as much as 33.65% of sales volume and still be profitable. (Cotterill Report 18.) Dr. Cotterill estimated, based on the census tracts in the region, that the lost sales volume resulting from a 5% SSNIP would be between 8% and 22.45%, which, he noted, is "considerably less than the 33.65% of sales it would [*57] need to lose to make the price increase unprofitable." (*Id.* at 18-19.)

However, in the *errata* to Dr. Cotterill's report that Plaintiffs submitted, Dr. Cotterill adjusts his critical loss estimate from 33.65% to between 21.208% and 23.42%. (Cotterill Errata 1.) As Defendants correctly note, Dr. Cotterill's conclusion that a hypothetical monopolist could profitably impose a 5% SSNIP in the geographic market Mr. Decker proposes is no longer adequately supported by Dr. Cotterill's own data. If the upper range of Dr. Cotterill's lost sales volume and the lower range of his critical loss calculation are accurate, then a hypothetical monopolist who could afford to lose only 21% of sales volume in the wake of imposing a SSNIP would instead lose 22.45%. In this case, under the approach taken by the Guidelines, one or more additional supermarkets would have to be added to the geographic market. Using Dr. Cotterill's own figures, then, yields indeterminate results about the size of the geographic market. The impact of this data on the question at issue is that Mr. Decker has not sustained his burden of defining the geographic market in this case, and that "the area in which a potential buyer may [*58] rationally look for the goods [] he or she seeks" is not sufficiently clear for the Court to adhere to the precise geographic boundaries that Mr. Decker proposes. *Pennsylvania Dental Ass'n v. Medical Service Ass'n, 745 F.2d 248, 260 (3d Cir. 1984).* Finally, Dr. Cotterill's exclusion of the two supermarkets lying six miles north of Route 147, in Cape May Court House, was based upon an assumption that consumers tend to select the supermarket closest to their homes; this assumption disregards commuting patterns in the area, in which the Cape May Court House supermarkets are at the northern part of the peninsula most contiguous to the mainland, past which most peninsula traffic must flow on the Garden State Parkway and Route 9 arteries, rendering them to be good choices - and thus competitors - with the Grande Center store.

2007 U.S. Dist. LEXIS 82711, *

The Court accordingly finds that Mr. Decker has failed to define the relevant product and geographic market in this case. Because defining the relevant market is an essential requirement in order for Mr. Decker to prevail on his remaining antitrust claims, the Court determines that he has not demonstrated a likelihood of success on the merits.

## 2. Irreparable Harm

The Court [*59] further finds that there is no indication that irreparable harm will result from denying the motion for injunctive relief. For an injunction to issue, "a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994)* (internal quotations and citations omitted). As the Court of Appeals has explained,

> [t]he key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Id.* (quoting *Sampson v. Murray, 415 U.S. 61, 90, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974)*).

The injuries Plaintiffs claim they will suffer in the absence of an injunction are not "irreparable," but are instead subject to adequate post-trial redress. Mr. Decker predicts that he will have to pay more for groceries at the Rio Grande ShopRite if there is not a supermarket in the Grande Center or will have to travel "outside the relevant [*60] market" to do his grocery shopping. (Am. Compl. P 57.) Mr. Decker's anticipated injuries are tied exclusively to "money, time and energy," and are precisely the sort of injuries that can be satisfactorily compensated after trial. *Acierno, 40 F.3d at 653* (citation omitted).

Likewise, in addition to its lack of standing in this case, Delco has not alleged the type of irreparable injury for which preliminary injunctive relief is available. Delco claims that its interest in the "active operation of the supermarket [extends] far beyond the payment of fixed monthly rental," but in identifying such interests, it points only to monetary hardships like the "fall-off in revenues in the Grande Center" and the "loss of the economic advantages to be anticipated from a continuing supermarket operation in the Grande Center." (Juliano Aff. at PP 27-29.) Indeed, Plaintiffs appear to have no

difficulty quantifying the scope of the economic damages Delco claims to face, since Mr. Juliano's affidavit predicts with specificity that the "closure of the Stop & Shop would result in a twenty percent (20%) decrease of the rental income from [lessee] Ross alone." (*Id.* at P 30.) The quantifiable economic hardships [*61] that Delco predicts that it will suffer in the absence of an injunction do not satisfy the irreparable injury requirements that a plaintiff must prove in order to secure preliminary injunctive relief.

It further appears that the harm Delco claims -- that is, the loss of a supermarket tenant in the Grande Center -- was anticipated in its own contract with Giant pertaining to the Stop & Shop store. The Delco-Giant lease required Stop & Shop to operate as a supermarket for only one day, it permitted Stop & Shop to sublease the premises, it provided a leasehold guaranteeing that no other supermarket would be permitted in the Grande Center, and it provided for termination of the lease by Delco upon payment of a lease termination fee if the space is not occupied for 30 days and also after 270 days of vacancy. [17] Meanwhile, the tenant remains liable to pay full rent even during any period of non-use, until the lease is terminated. Indeed, Wakefern is paying full rent to Delco today pursuant to the terms of the Delco-Giant lease. Since it is more probable than not that the Stop & Shop was financially unsuccessful in the Grande Center, running up staggering losses throughout its twenty months [*62] of operation (October 2005 to July 2007), it is also more likely, as the case unfolds, that the closure of the Stop & Shop was destined to occur, and that its purchase by a rival supermarket as part of the nine-store deal, in which Wakefern was required to accept this store as part of the package, was bona fide. In any event, Delco negotiated and benefitted from a lease which anticipated that the Stop & Shop could be closed, or that the space could be subleased, and this is the cause in fact of the injury Delco complains of, and not any misconduct under the antitrust laws. Accordingly, the Court finds Plaintiff has not demonstrated irreparable harm caused by Defendants' alleged breach of the antitrust laws.

17  See n.2, supra.

## 3. Harm to the Nonmoving Party

The balance of hardships in this case does not favor Plaintiffs. *Corbett, 468 F.3d at 192* (citation omitted). Notwithstanding Plaintiffs' arguments regarding "the limited nature of the relief" that they have sought here, the Court finds that in the absence of a showing of an antitrust injury (to say nothing of an irreparable injury), it would be inequitable to nullify the sublease between Stop & Shop and Wakefern or to rewrite the [*63] terms of the Delco-Giant lease. (Tr. 6.)

2007 U.S. Dist. LEXIS 82711, *

**4. Public Interest**

The final factor that a court must consider when determining whether to issue a preliminary injunction is whether "the public interest favors such relief." *Corbett, 468 F.3d at 192* (citation omitted). This factor does not militate in Plaintiffs' favor. While the public certainly has a strong interest in the enforcement of the antitrust laws, it would not in any way serve those interests for the Court to enjoin activities that have not been shown to have anticompetitive tendencies.

**IV. CONCLUSION**

For the reasons discussed above, the Court will deny Plaintiffs' motion for a preliminary injunction.

The accompanying Order will be entered.

*November 8, 2007*

*Date*

**s/ Jerome B. Simandle**

JEROME B. SIMANDLE

United States District Judge

**ORDER**

This matter having come before the Court on the motion [Docket Item 2] of Plaintiffs for a preliminary injunction nullifying the sublease between Defendants Stop & [*64] Shop and Wakefern or modifying the terms of the Delco-Giant lease; the Court having considered the submissions of the parties in support thereof and opposition thereto; for the reasons explained in the Opinion of today's date; and for good cause shown;

IT IS this *8th* day of **November, 2007** hereby

ORDERED that the motion for preliminary injunctive relief shall be and hereby is *DENIED.*

**s/ Jerome B. Simandle**

JEROME B. SIMANDLE

United States District Judge

3

LEXSEE 2007 U.S. DIST LEXIS 64669


Positive
As of: Dec 13, 2007

**GREGORY HACKMAN d/b/a GREGORY HACKMAN RELATORS, and
GREGORY HACKMAN REALTORS, INC., an Illinois corporation, Plaintiffs, v.
DICKERSON REALTORS, INC., an Illinois corporation d/b/a DICKERSON-
NEIMAN REALTORS, WHITEHEAD, INC., an Illinois corporation d/b/a
WHITEHEAD REALTORS, PREMIER REAL ESTATE BROKERAGE
SERVICES, INC., an Illinois corporation d/b/a COLDWELL BANKER PREMIER,
CENTURY 21 COUNTRY NORTH, INC., an Illinois corporation d/b/a CENTURY
21 COUNTRY NORTH, R. CROSBY, INCORPORATED, an Illinois corporation
d/b/a PRUDENTIAL CROSBY REALTORS, McKISKI-LEWIS, INC., an Illinois
corporation d/b/a TOM McKISKI REALTORS, LORI REAVIS, RAY YOUNG,
MICHAEL DUNN, DONNA SHIPLER n/k/a DONNA KITZMAN, MELISSA
SMITH, JESSICA LICARY, DIANE PARVIN, ROCKFORD ASSOCIATION OF
REALTORS, and ILLINOIS ASSOCIATION OF REALTORS, Defendants.**

No. 06 C 50240

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

*2007 U.S. Dist. LEXIS 64669*

**August 31, 2007, Decided
August 31, 2007, Filed**

**COUNSEL:**  [*1] For Gregory Hackman, doing business as Gregory Hackman Realtors, Gregory Hackman Realtors Inc, an Illinois corporation, Plaintiffs: David G. Sigale, LEAD ATTORNEY, Law Firm of David G. Sigale, P.C., Bolingbrook, IL.

For Dickerson Realtors Inc, an Illinois corporation, doing business as Dickerson-Neiman Realtors, Ray Young, Michael Dunn, Defendants: Adam S Long, Jason H. Rock, Richard K. Van Evera, Barrick, Switzer, Long, Balsley & Van Evera, Rockford, IL; Robert C. Pottinger, Barrick Switzer et al, Rockford, IL.

For Whitehead Inc, an Illinois corporation, doing business as Whitehead Realtors, Defendant: Ian K Linnabary, Reno & Zahm LLP, Rockford, IL.

For Premier Real Estate Brokerage Services Inc, an Illinois corporation, doing business as Coldwell Banker Premier, Donna Shipler, now known as Donna Kitzman, Defendants:    Marc    Charles    Gravino,    LEAD

ATTORNEY, Brendan A. Maher, John James Holevas, Troy E. Haggestad, Williams & McCarthy, Rockford, IL; Scott Collins Sullivan, WilliamsMcCarthy LLP, Rockford, IL.

For R Crosby Incorporated, an Illinois corporation, doing business as Prudential Crosby Realtors, Jessica Licary, Defendants: Edward M. Maher, Lori E McGirk, Guyer & Enichen, P.C., Rockford, [*2] IL.

For McKiski-Lewis Inc, an Illinois corporation, doing business as Tom McKiski Realtors, Defendant: James E. Stevens, LEAD ATTORNEY, Tyler Alan Moore, Barrick, Switzer, Long, Balsley & Van Evera, Rockford, IL.

For Lori Reavis, Defendant: Amy Lynn Silvestri, LEAD ATTORNEY, Silvestri Law Office, Rockford, IL.

For Melissa Smith, Defendant: Adam S Long, Barrick, Switzer, Long, Balsley & Van Evera, Rockford, IL.

Case 1:07-cv-00556-JJF-LPS     Document 31-2     Filed 12/17/2007     Page 27 of 57

Page 2
2007 U.S. Dist. LEXIS 64669, *

For Diane Parvin, Defendant: Donald Quirk Manning, LEAD ATTORNEY, Jeffrey P Orduno, McGreevy Williams, P.C., Rockford, IL.

For Rockford Association of Realtors, Illinois Association of Realtors, Defendants: David M Schultz, LEAD ATTORNEY, Clifford E. Yuknis, Hinshaw & Culbertson, Chicago, IL; Thomas H Boswell, Hinshaw & Culbertson, Rockford, IL.

**JUDGES:** Elaine E. Bucklo, United States District Judge.

**OPINION BY:** Elaine E. Bucklo

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Gregory Hackman d/b/a Gregory Hackman Realtors and Gregory Hackman Realtors, Inc. (collectively "Hackman") [1] have brought this multi-count complaint against several defendants, generally alleging that these defendants who, like Hackman, are all involved in the real estate market in Rockford, Illinois, collectively shut Hackman out of the Rockford [*3] real estate market to retaliate against him for charging a lower commission rate than other realtors. Some of these defendants have answered Hackman's complaint, while others have brought motions to dismiss various counts of the complaint or for a more definite statement of certain counts. Defendants Diane Parvin ("Parvin") and Century 21 Country North, Inc. ("Century 21") have also brought motions to compel arbitration and stay the present proceedings. [2] These motions are resolved as discussed below.

> 1  Hackman alleges that Gregory Hackman is an individual person who did business as Gregory Hackman Realtors and Gregory Hackman Realtors, Inc. For ease of discussion this memorandum opinion and order refers to both plaintiffs collectively as "Hackman."

> 2  Since Century 21 has since settled with Hackman and Hackman has voluntarily dismissed it from this litigation, I do not consider its motion to compel arbitration; that motion is denied as moot.

**I.**

Hackman's complaint alleges that from 1991 to 2005, Gregory Hackman, a natural person, was the sole proprietor of Gregory Hackman Realtors. (Compl. P 5.) Since late 2005, Gregory Hackman has been the president and owner of Gregory Hackman Realtors, [*4] Inc. (*Id.*) Other defendants are residential realtor businesses or individual licensed real estate agents. (*Id.* at PP 6-18.) In addition, defendant Illinois Association of Relators ("IAR") is an organization headquartered in Springfield, Illinois, that "serves as the governing body to enforce the regulations in the code of ethics promulgated by the National Association of Realtors," "serves to resolve disputes between licensed Realtors over alleged violations of the NAR regulations," and, "in proper circumstances, accepts the transfer of local disputes and disciplinary actions." (*Id.* at P 20.) Similarly, defendant Rockford Association of Realtors ("RAAR") is an organization headquartered in Rockford, Illinois, that, in addition to engaging in education and other programs related to the real estate industry, "enforces the regulations in the code of ethics promulgated by the National Association of Realtors, and serves to resolve disputes between licensed Realtors over alleged violations of the NAR regulations." (*Id.* at P 19.)

Hackman's complaint alleges that his dispute with the defendants began in 2000, when he opened a new office and decided that he would charge a 5% brokerage fee/commission [*5] for new clients. (*Id.* at P 21.) This figure is significant because the Multiple Listings Service ("MLS") rules require the selling agent to share the commission equally with the buyer's agent so that other brokers in the Rockford area acting as buyer's agents in transactions in which Hackman was the seller would receive a commission lower than the normal commission of 6 to 7%. (*Id.* at PP 23-24.) For this reason, Hackman alleges, defendants Dickerson Realtors, Inc. ("Dickerson"), Whitehead, Inc. ("Whitehead"), Century 21, Premier Real Estate Brokerage Services, Inc., d/b/a Coldwell Banker Premier ("Coldwell"), R. Crosby, Inc. d/b/a Prudential Crosby Realtors ("Prudential"), and McKiski-Lewis, Inc. ("McKiski") entered into an agreement to "retaliate against [Hackman] in every facet of his business." (*Id.* at P 25.) Hackman alleges that their retaliatory actions included refusing to present offers on their own listings from potential purchasers represented by Hackman, and disparaging Hackman to discourage their seller clients from accepting offers from his purchasing clients. (*Id.*) He further alleges that Dickerson ordered all but one of its offices not to allow Hackman agents to set up [*6] showings of Dickerson-listed properties (*Id.* at P 27), and that Coldwell and Dickerson filed false ethics complaints against him. (*Id.* at P 30.) Hackman alleges that these activities caused him lost sales commissions and smeared his reputation, resulting in lost past business and future prospects. (*Id.* at P 36.) Hackman's claims include claims against Dickerson, Whitehead, Century 21, Coldwell, Prudential, McKiski and RAAR for violation of the Sherman Act, *15 U.S.C. § 1 & 2* and the Illinois Antitrust Act, *740 ILL. COMP. STAT.*

2007 U.S. Dist. LEXIS 64669, *

*10/1, et seq.* (Counts I and II); a claim for a temporary injunction against RAAR and IAR to prevent them from conducting an ethics hearing originally scheduled for December 5, 2006 (Count III); [3] a request for a declaration of rights and a permanent injunction against RAAR and IAR concerning the same ethics hearing (Count IV); a claim for defamation against Dickerson, Lori Reavis ("Reavis"), Ray Young ("Young"), Prudential, Jessica Licary ("Licary"), Whitehead, Coldwell, Century 21 and McKiski (Count V); and a claim for tortious interference with business expectancy against Dickerson, Michael Dunn ("Dunn"), Reavis, Melissa Smith ("Smith"), Young, Whitehead, Coldwell,    [*7] Donna Shipler ("Shipler"), Prudential, Licary, Century 21, Parvin and McKiski (Count VI).

> 3  Plaintiffs submitted a petition for a temporary restraining order on November 30, 2006, the same day that they filed the present complaint. However, on December 1, 2006, plaintiffs withdrew that petition, and it has not since been renewed.

## II. Parvin's Motion to Compel Arbitration

I first address Parvin's motion to compel arbitration under the FAA. Parvin contends that Hackman's claim against her for tortious interference with contract, Count VI of his complaint, is subject to an enforceable arbitration agreement Hackman made as a member of RAAR. While not denying that his membership in RAAR included an agreement to arbitrate, Hackman contends that Count VI is not subject to the arbitration agreement.

In her original motion for arbitration Parvin contended that I should order arbitration under the Federal Arbitration Act, *9 U.S.C. § 1 et seq.* ("FAA") (2007). However, after I ordered supplemental briefing on certain issues related to her motion, Parvin changed her position and now asserts that arbitration was mandated by the Illinois Arbitration Act. The FAA only applies to contracts that "evidenc[e]    [*8] a transaction involving commerce." *9 U.S.C. § 2.* The Supreme Court has interpreted the term "involving commerce" as "the functional equivalent of the more familiar term 'affecting commerce'-words of art that ordinarily signal the broadest permissible exercise of Congress' *Commerce Clause* power." *Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56, 123 S. Ct. 2037, 156 L. Ed. 2d 46 (2003)* (citing *Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 273-74, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995)).*

In *Cecala v. Moore, 982 F. Supp. 609 (N.D. Ill. 1997),* the district court concluded that because the arbitration agreement at issue was part of a contract between two Illinois parties entered into in Illinois, and because the contract concerned a local real estate transaction, it did not implicate interstate commerce and therefore did not trigger the FAA. *Id. at 611-12.* Relying on *Cecala,* Parvin contends that because Count VI concerns a single real estate transaction between local parties, it does not implicate interstate commerce and therefore does not trigger the FAA. I disagree. Count VI of Hackman's complaint contains an allegation that Parvin, an agent of Century 21, violated the MLS agreement with Hackman and interfered with his business expectancy with a  [*9] client by falsely telling Hackman that a property was not available for his client to see. The nature of the dispute is not the relevant question for purposes of the FAA, however, but rather the nature of the contract requiring arbitration. *See 9 U.S.C. § 2.* The arbitration agreement that Parvin wishes to invoke is contained in the bylaws of the RAAR, to which Hackman and Parvin both belong.

While neither party has presented much information concerning the RAAR and its bylaws, it appears that RAAR is a local Illinois real estate association. A local real estate association formed by realtors who participate in real estate transactions, even if local, does "affect commerce" under the meaning of the *Commerce Clause.* The Supreme Court has previously suggested that the activities of real estate brokers affect interstate commerce because the financing of real estate purchases involves multi-state lending institutions, mortgages are insured under federal programs involving interstate transfers of premiums and settlements, mortgage obligations are traded as financial instruments in an interstate secondary mortgage market, and required title insurance is furnished by interstate corporations.  [*10] *See McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 245, 100 S. Ct. 502, 62 L. Ed. 2d 441 (1980)* (finding a sufficient basis for petitioners to proceed to trial on claim that defendant real estate brokers had violated Sherman Act by engaging in price-fixing of brokerage commissions on sale of residential property). Other courts have also concluded that businesses "engaged in real estate markets" have at least a minimal effect in interstate commerce. *See United States v. Leslie, 103 F.3d 1093, 1102 (2d Cir. 1997).* Therefore, I conclude that the bylaws of the RAAR do affect commerce under the meaning of the *Commerce Clause,* and therefore are subject to the provisions of the FAA.

Applying the requirements of the FAA, I must determine whether Hackman had a duty to arbitrate his claims against Parvin. Under the FAA, a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." *9 U.S.C. § 4.* "[I]f the parties have an arbitration agreement and the asserted claims are within its scope," the district court must grant the motion  [*11] to

compel arbitration. *Sharif v. Wellness Int'l Network, Ltd., 376 F.3d 720, 726 (7th Cir. 2004)* (citing *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc., 174 F.3d 907, 909 (7th Cir. 1999)*). I must grant Parvin's request to arbitrate "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Kiefer, 174 F.3d at 909* (quoting *United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960)*).

Whether a particular issue is subject to arbitration is a matter of contract interpretation. *Kiefer, 174 F.3d at 909* (citation omitted). I must rely on state contract law governing the formation of contracts. *James v. McDonald's Corp., 417 F.3d 672, 677 (7th Cir. 2005)* (citing *First Options of Chicago Inc. v. Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)*). The parties contend that Illinois law should apply to interpret this contract, since all the parties to this case are residents of Illinois and the RAAR was entered into in Illinois. No matter the provenance of the other documents referred to in the relevant sections of the RAAR bylaws, including the "Code of Ethics and Arbitration Manual," because they [*12] are incorporated by reference into the RAAR bylaws I must also interpret them as part of this contract under Illinois law. *See T.H.E. Ins. Co. v. Chicago Fireworks Mfg. Co., 311 Ill. App. 3d 73, 78, 243 Ill. Dec. 879, 884, 724 N.E.2d 188, 193 (Ill. App. Ct. 1999).* [4]

> 4    The parties have not presented a complete copy of the Code of Ethics, but the portions I have reviewed do not show that the Code of Ethics has any choice of law provision or any other indication that the law of another state applies to interpret its requirements.

Interpreting the meaning of the RAAR bylaws and the incorporated documents (collectively the "contract") under Illinois law, I must first determine whether the language of the contract is ambiguous. *See Quake Constr., Inc. v. American Airlines, Inc., 141 Ill.2d 281, 288, 152 Ill. Dec. 308, 312, 565 N.E.2d 990, 994 (1990)* (citations omitted). If the language is not ambiguous I may determine the meaning of the contract solely from the writing itself. *Id.* If the language is ambiguous or capable of more than one interpretation, then I may examine parol evidence to ascertain the parties' intent. *See id.*

Here, the unambiguous language of the RAAR bylaws is [*13] clear that the parties have agreed to arbitrate; the parties do not dispute the existence of such an agreement. Section 2 of Article VII of the RAAR's bylaws provides:

> It shall be the duty and responsibility of every REALTOR(R) Member of this Association to . . . arbitrate controversies arising out of real estate transactions as specified by Article 17 of the Code of Ethics [of the NATIONAL ASSOCIATION OF REALTORS(R)], and as further defined and in accordance with the procedures set forth in the *Code of Ethics and Arbitration Manual* of this Association as from time to time amended.

(Parvin Mot. to Compel Arbitration Ex. A at 1.) Article 17 of the National Association of Realtors ("NAR") Code of Ethics ("Code of Ethics") provides:

> In the event of contractual disputes or specific non-contractual disputes as defined in Standard of Practice 17-4 between REALTORS(R) (principals) associated with different firms, arising out of their relationship as REALTORS(R), the REALTORS(R) shall submit the dispute to arbitration in accordance with the regulations of their Board or Boards rather than litigate the matter.

(Parvin Mot. to Compel Arbitration Ex. B, Art. 17.) These provisions make clear that [*14] the parties have agreed to arbitrate controversies as specified by the Code of Ethics and as further defined and in accordance with procedures in the "Code of Ethics and Arbitration Manual."

Second, I must determine whether the claims Hackman asserts against Parvin in Count VI are within the scope of the arbitration agreement. *Sharif, 376 F.3d at 726* (citation omitted). The unambiguous language of the Code of Ethics as incorporated into the RAAR bylaws is that the parties agreed to submit to arbitration "contractual disputes" and certain non-contractual disputes between realtors arising out of their relationship as realtors. None of the parties assert that any of the specific non-contractual disputes identified in the NAR Standards of Practice apply to Hackman's claims, and by the plain language of the Standards of Practice they do not, so I must only determine whether Hackman's claims against Parvin are "contractual disputes" under the meaning of Article 17. The plain language of the contract does not define "contractual dispute," and this term is ambiguous. One plausible interpretation is that the term refers to a dispute between realtors about a contract between those realtors. Another [*15] potential interpretation is that it

refers to a dispute between realtors about a contract between one of the realtors and a third party.

The RAAR bylaws indicate that the duty to arbitrate is limited and defined by the procedures set forth in the "Code of Ethics and Arbitration Manual." Parvin presents a section of that document entitled "Suggested Factors for Consideration by a Hearing Panel in Arbitration" (attached as Exhibit A to her supplemental reply) that she contends defines "contractual dispute" as referring to one of four types of contracts. [5] The "Suggested Factors" document to which Parvin refers lists four types of contracts that "come into play" in real estate transactions: (1) the listing contract between the seller and the listing broker; (2) the contract between the listing broker and cooperating brokers; (3) the purchase contract between the seller and the buyer; and (4) a buyer-broker agreement between the purchaser and a broker. (Def.'s Supp. Reply Ex. A at 2-3.) It then explains that there are "hazards in formation and afterward" to each of these contracts, certain difficulties may be arise, and states that "[t]here are several methods by which contractual questions [*16] (or 'issues' or 'disputes') are resolved," including arbitration. (Id. at 4.) Finally, the "Suggested Factors" document states:

> Boards and Associations of REALTORS(R) provide arbitration to resolve contractual issues and questions . . . that arise between members, between members and their clients, and, in some cases, between parties to a transaction brought about through the efforts of REALTORS(R). Disputes arising out of any of the four above-referenced contractual relationships may be arbitrated. . . .

(Id.) This language does not allow the conclusion that the term "contractual dispute" in Article 17 could refer to a dispute between realtors relating to a contract between one of those realtors and a third party; this document only contemplates disputes between parties to a contract about that contract. Because this language makes the contract unambiguous, I need not consider any parol evidence.

> 5   In his supplemental response Hackman does not dispute that the document to which Parvin refers is part of the document referenced in the RAAR bylaws, and is therefore incorporated as part of the contract I must interpret.

Based on this interpretation of the arbitration agreement, I need determine [*17] whether Count VI is a claim against Parvin concerning a dispute about a con-

tract between her and Hackman. In Count VI Hackman brings what he identifies as a tortious interference with business expectancy claim against Parvin and other defendants. In that count his only specific allegations against Parvin are:

> On August 10, 2006, PARVIN, an agent of CENTURY 21, misrepresented the status of a property (saying it was unavailable) in order to prevent HACKMAN from presenting an offer. The MLS computer system did not reflect that the property was unavailable. The sellers previously confirmed availability of the property with HACKMAN'S clients directly. PARVIN's actions violated MLS rules, and, although HACKMAN was eventually able to present the offer, PARVIN's actions resulted in HACKMAN's clients not making the purchase.

(Compl. at P 91.) Hackman also generally alleges that he "had valid business relationships, and the expectancy of the completion of those relationships" with clients and that defendants "intentionally interfered with said business relationships by ingratiating themselves with said clients, and making derogatory statements about HACKMAN and went [*18] to the Defendants' offices." (Id. at PP 91, 96.)

Hackman contends that Count VI is a tort claim and as such is not a contractual dispute subject to arbitration. Parvin responds that although Count VI is a self-described tort claim, it is really a contract claim between Hackman and Parvin for a violation of the rules of the Multiple Listing Service, which is connected to the parties' agreement as members of RAAR. I agree that, to the extent Hackman is bringing a claim against Parvin for a violation of the MLS rules, such a claim is governed by the arbitration agreement. Article XVIII of the RAAR bylaws provides that the RAAR shall maintain the MLS for the use of its members, and that the MLS is governed by the RAAR bylaws. (Parvin Mot. to Compel Arbitration Ex. A at 1.) No matter how Hackman defines his own claim, disputes between realtors concerning violations of the MLS rules are "contractual disputes" under Article XVII. Therefore, they are subject to arbitration.

However, Hackman's general allegations in paragraphs 91 and 96 of his complaint that defendants, including Parvin, interfered with his valid business relationships with potential clients by making derogatory statements about [*19] Hackman is not a claim concerning a contract between Hackman and defendants, but a tort claim that defendants intentionally interfered with

Hackman's prospective economic advantage. *See, e.g., Fellhauer v. City of Geneva, 142 Ill.2d 495, 512, 154 Ill. Dec. 649, 656-57, 568 N.E.2d 870, 877-78 (1991)* (citations omitted). This claim in no way falls under the arbitration agreement. Because it can be said with "positive assurance" that the parties' arbitration agreement is "not susceptible of an interpretation that covers" this aspect of Count VI, it is not subject to arbitration. *See Kiefer, 174 F.3d at 909* (citation omitted). [6]

> 6  As noted below in section IV.C. *supra*, I do not believe that Hackman has stated a claim with respect to these general allegations under the pleading standard articulated in *Bell Atlantic*. However, to the extent Hackman may later state those claims with the specificity required under the standard, they do not appear to be within the scope of the arbitration agreement.

Given that I find that one aspect of Hackman's claims against Parvin is subject to arbitration, but that I find other of his claims in this litigation are not, it is within my discretion to decide whether [*20] to stay the whole of the litigation or to allow the remainder of Hackman's claims to proceed. *Volkswagen of Am., Inc. v. SUD's of Peoria, Inc., 474 F.3d 966, 970-72 (7th Cir. 2007)* (citations omitted). The Seventh Circuit has explained that where one claim is arbitrable, the remaining claims should be stayed as well where the arbitration may shed light on remaining issues, or where allowing both the arbitration and the case to proceed simultaneously runs the risk of inconsistent verdicts. *Id. at 972* (citing *Morrie Mages & Shirlee Mages Found. v. Thrifty Corp., 916 F.2d 402 (7th Cir. 1996); AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 242 F.3d 777 (8th Cir. 2001)).* Here, the arbitrable claim, whether Parvin violated the MLS rules by misrepresenting the status of a property, is tangentially related to Hackman's allegations under the Sherman Act that defendants agreed to boycott Hackman, although this specific allegation is not a part of the Sherman Act claim and Parvin herself is not a defendant to that claim. Hackman's claim against Parvin for violating the MLS rules and tortiously interfering with his business expectancy is a discrete claim that involves no other [*21] parties, particularly since Century 21 is now dismissed from this litigation. Further, staying the entire matter would cause the "tail to wag the dog" and would not aid in the most effective resolution of the claims in this case. *See Volkswagen of Am., 474 F.3d at 971* (citing *Pryner v. Tractor Supply Co., 109 F.3d 354, 361 (7th Cir. 1997)).* For this reason, I grant Parvin's motion to compel arbitration of Hackman's claim concerning Parvin's purported violation of the MLS rules, but deny Parvin's motion to stay this proceeding. I deny Century 21's motion

to compel arbitration as moot. In all other respects, Parvin's motion to compel arbitration is denied.

## III. IAR and RAAR's Motion to Dismiss

IAR and RAAR have brought a joint motion under *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(6)* to dismiss Counts I, II, III and IV of Hackman's complaint. They argue that I should dismiss Counts I and II against RAAR for failure to state a claim, and that I should dismiss the claims against IAR and RAAR in Counts III and IV because they do not state a claim and because I lack supplemental jurisdiction under *28 U.S.C. § 1367(a)*. For the following reasons I grant RAAR and IAR's motion to dismiss [*22] Counts I and II for failure to state a claim, and consequently also dismiss Counts III and IV for lack of subject matter jurisdiction.

In resolving IAR and RAAR's motion to dismiss, I must accept all well-pled facts in Hackman's complaint as true. *Thompson v. Illinois Dep't of Prof'l Regulation, 300 F.3d 750, 753 (7th Cir. 2002).* [7] I must view the allegations in the light most favorable to Hackman. *Gomez v. Illinois State Bd. of Educ., 811 F.2d 1030, 1039 (7th Cir. 1987).* Dismissal of a claim is proper if Hackman has not, at minimum, made enough factual allegations to raise a right to relief above a "speculative level." *Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007)* (citations omitted). In addition to the allegations contained in Hackman's complaint, I may consider the attachments to the complaint. *See FED. R. CIV. P. 10(c); Help at Home, Inc. v. Med. Capital, LLC, 260 F.3d 748, 752 (7th Cir. 2001)* (citation omitted). Normally, if a district court, in ruling on a motion to dismiss, considers documents not incorporated into the complaint, the district court must convert the motion to dismiss to a motion for summary judgment under *Federal Rule of Civil Procedure 56. FED. R. CIV. P. 12(b);* [*23] *Tierney v. Vahle, 304 F.3d 734, 738 (7th Cir. 2002).* However, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [his] claim." *Venture Assoc. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993).*

> 7  In *United Phosphorus, Ltd. v. Angus Chem. Co., 322 F.3d 942 (7th Cir. 2003),* the Seventh Circuit explained that where subject matter jurisdiction is not evident on the face of the complaint, a motion to dismiss under *Rule 12(b)(1)* is analyzed "as any other motion to dismiss, by assuming for purposes of the motion that the allegations in the complaint are true." *Id. at 946* (citations omitted).

## A. Count I

2007 U.S. Dist. LEXIS 64669, *

Count I of Hackman's complaint is a claim against RAAR and other defendants for violation of the Sherman Act, *15 U.S.C. §§ 1 & 2*. Defendants contend that I should dismiss this claim because the Sherman Act does not apply to non-profit corporations lacking commercial objectives. They further argue that Hackman has failed to plead that RAAR engaged in competitive conduct, possessed monopoly power, did more than "encourage" anti-competitive activity, or that RAAR's [*24] purported conduct had an effect on interstate commerce. Because I find that Hackman has not properly alleged RAAR agreed with any other defendant to engage in anticompetitive activity, I grant RAAR and IAR's motion to dismiss this claim.

"A successful claim under *Section 1* of the Sherman Act requires proof of three elements: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Denny's Marina, Inc. v. Renfro Prods., Inc., 8 F.3d 1217, 1220 (7th Cir. 1993)* (citations omitted). A jurisdictional prerequisite to such a claim is that the defendants' activities affect interstate commerce; a plaintiff may conclusorily allege an effect on interstate commerce. *Hammes v. AAMCO Transmissions, Inc., 33 F.3d 774, 778-80 (7th Cir. 1994)*. To prove his claim that defendants conspired to monopolize the market Hackman must show

> 1) the existence of a combination or conspiracy, 2) overt acts in furtherance of the conspiracy, 3) an effect upon a substantial amount of interstate commerce and 4) the existence of specific intent to monopolize.

*Great Escape, Inc. v. Union City Body Co., Inc., 791 F.2d 532, 540-41 (7th Cir. 1986)* [*25] (citations omitted).

Hackman's claims against RAAR are not barred by RAAR's non-profit status. There is no bar to bringing Sherman Act claims against non-profit corporations where those corporations have engaged in anticompetitive activity. *See, e.g., Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma, 468 U.S. 85, 100 n.22, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984)* (citations omitted); *United States v. Rockford Mem'l Corp., 898 F.2d 1278, 1285 (7th Cir. 1990)*. Hackman alleges that RAAR "provides and promotes programs, products and services to enhance licensed Realtors' ability to conduct their individual businesses successfully, and that RAAR encouraged other defendants to boycott him. Setting aside whether encouragement is enough to qualify as anticompetitive activity under the Sherman Act, Hack-

man has sufficiently alleged that RAAR engaged in anti-competitive activity such that its non-profit status is irrelevant.

Second, RAAR and IAR contend that Hackman has failed to plead various requirements to establish his Sherman Act claims, including that RAAR engaged in competitive conduct, possessed monopoly power, or did more than encourage other defendants' anticompetitive activity. They argue that although [*26] Hackman alleges that the other defendants conspired to exclude Hackman from the market, there is no evidence that RAAR agreed to any conspiracy or did anything more than encourage the other defendants. Hackman's only allegation against RAAR in Count I is that, with RAAR's encouragement, other defendants "engaged in unfair anticompetitive behavior by agreeing to boycott HACKMAN, by refusing to offer the same commission as all other MLS members, and refusing to allow HACKMAN to show properties listed by the defendants." (*Id.* at P 43.) Hackman contends that defendants' collective actions "intentionally constitute an illegal conspiracy to conduct a group boycott of HACKMAN by the holders of a large share of the Rockford area real estate market." (*Id.* at P 45.) Hackman also alleges that the other defendants, "through their market share and influence within the RAAR" have the power to control commission rates and to exclude any realtor who attempts to charge a lower commission rate. (*Id.* at P 42.) Count I's only specific allegation about RAAR's participation in the purported conspiracy is that RAAR encouraged other defendants to boycott Hackman, and that RAAR contributed to the defendants' [*27] ability to monopolize the market.

As defendants contend, other courts have concluded that a defendant must do more than "encourage" other defendants in order to be liable under the Sherman Act. *See, e.g., Nichols Motorcycle Supply, Inc. v. Dunlop Tire Corp., 913 F. Supp. 1088, 1120 (N.D. Ill. 1995), vacated on other grounds by No. 95-C-617, Order at 1 (Sept. 18, 1995)* ("A defendant's actions become illegal only when its concerns and plans cross the line between encouragement and agreement."); *AD/SAT v. Assoc. Press, 181 F.3d 216, 242-43 (2d Cir. 1999)* (holding that although a trade association may have encouraged, assisted, and endorsed the development of a competitor's product, there was no evidence that the association agreed to boycott the plaintiff's product or participated in a refusal to deal with the plaintiff). The Supreme Court recently emphasized in *Bell Atlantic* that to survive a motion to dismiss a *§ 1* Sherman Act claim a plaintiff's complaint must include "enough factual matter (taken as true) to suggest than an agreement was made." *127 S. Ct. at 1966.* Encouragement absent an agreement is not enough. Here, Hackman has not met this standard. He

has not alleged that RAAR [*28] reached an agreement with other defendants, and has not alleged facts from which it could be inferred that RAAR reached an agreement. The same is true under § 2 of the Sherman Act; Hackman has not sufficiently alleged that RAAR agreed or conspired with other defendants to monopolize the market, only that other defendants used their position in RAAR to obtain a monopoly. Therefore, I need not consider IAR and RAAR's other arguments concerning Count I, and I grant their motion to dismiss Count I against RAAR.

B. Count II

Count II of Hackman's complaint is a claim against RAAR and other defendants for violation of the Illinois Antitrust Act, *740 ILL. COMP. STAT. 10/1, et seq.* Count II tracks the allegations of Count I, that defendants Dickerson, Whitehead, Century 21, Coldwell, Prudential and McKiski, at RAAR's encouragement, boycotted Hackman in violation of *Section 3(2)* of Illinois act. [8] RAAR and IAR argue that Hackman has no claims against RAAR under the Illinois Antitrust Act because that act does not apply to nonprofit corporations, and because the complaint does not properly allege the existence of a conspiracy or that RAAR reached any agreement or engaged in any anticompetitive [*29] conduct. I agree and grant RAAR and IAR's motion to dismiss Count II.

> [8]    Count II also alleges that Dickerson, Whitehead, Coldwell, Century 21, Prudential and McKiski violated *Section 3(3)* of the Illinois act, but I need not consider this allegation since Hackman has not brought it against RAAR.

First, RAAR and IAR argue that the Illinois Antitrust Act does not apply to nonprofit corporations. In *Int'l Test and Balance, Inc. v. Assoc. Air and Balance Council, No. 98 C 2553, 1998 U.S. Dist. LEXIS 22230, 1998 WL 957332 (N.D. Ill. Dec. 23, 1998)*, the district court dismissed a claim against the defendant because it was a non-profit corporation, and specifically held that nonprofit corporations are exempt from claims under the Illinois Antitrust Act. *1998 U.S. Dist. LEXIS 2230, [WL] at *8* (citing *O'Regan v. Arbitration Forums, Inc., 121 F.3d 1060, 1065 (7th Cir. 1997)*). In *O'Regan*, the Seventh Circuit affirmed the dismissal of Illinois Antitrust Act claims against a defendant nonprofit corporation. It noted that under *740 ILL. COMP. STAT. ANN. § 10/4*, the act only covers services "performed in whole or in part for the purposes of financial gain" and under *§ 10/2* is only intended to prohibit restraints of trade relating to for-profit enterprises. *Id. at 1066.* [*30] It therefore concluded that the defendant was "a non-profit corporation, not covered by the Illinois Antitrust Act." *Id.* The Sev-

enth Circuit did not hold that all non-profit entities are categorically excluded from the provisions of the act.

I agree with Hackman that the holdings of *O'Regan* and *Int'l Test and Balance* do not prevent Hackman from bringing an Illinois Antitrust Act claim against RAAR in this case. *Section 3(2)* of the Illinois Antitrust Act provides that a person violates the Illinois act through a "contract, combination, or conspiracy with one or more other persons" that unreasonably restrains trade or commerce, *740 ILL COMP. STAT. ANN. § 10/3(2)*; Hackman alleges that defendants violated this provision. Courts interpret the Illinois Antitrust Act in light of federal antitrust law upon which it is modeled; this section is modeled on *Section 1* of the Sherman Act. *Id.* at *§ 10/11*; *Laughlin v. Evanston Hosp., 133 Ill.2d 374, 383-84, 140 Ill. Dec. 861, 865, 550 N.E.2d 986, 990 (1990).* Given that under federal antitrust law claims may be brought against non-profits that engage in anticompetitive activity, there is no basis to conclude that the same is not true under *Section 3(2)*.

However, [*31] like Hackman's claims under the Sherman Act, his claims under the Illinois Antitrust Act fail for other reasons. The Illinois Supreme Court has applied Sherman Act precedent to conclude that to state a claim under *Section 3(2)* of the Illinois Antitrust Act, a complaint must allege that a conspiracy existed and that it unreasonably restrained trade. *People ex rel. Scott v. Coll. Hills Corp., 91 Ill.2d 138, 153-54, 61 Ill. Dec. 766, 774, 435 N.E.2d 463, 470-71 (1982)* (citations omitted). A conspiracy requires more than evidence of parallel conduct, but rather evidence of an agreement. *See McClure v. Owens Corning Fiberglas Corp., 188 Ill.2d 102, 140, 720 N.E.2d 242, 261, 241 Ill. Dec. 787, 806 (1999)* (adopting Sherman Act conspiracy standard requiring evidence of more than parallel conduct to civil conspiracy claims, and noting that Illinois courts have previously applied the Sherman Act standard to Illinois Antitrust Act claims). As discussed above in Section II.A. *supra*, an allegation of encouragement is not a sufficient allegation of fact that raises Hackman's right to relief above a speculative level. *Bell Atl., 127 S. Ct. at 1964.* I therefore grant RAAR and IAR's motion to dismiss [*32] Count II against RAAR.

C. Counts III and IV

Count III of Hackman's complaint is a request for a temporary injunction against RAAR and IAR to prevent them from conducting an ethics hearing against Hackman. Count IV is a request for a declaration of rights and a permanent injunction against RAAR and IAR concerning the same ethics hearing. This hearing was originally scheduled for December 5, 2006, and although Hackman originally filed a motion for a temporary injunction to prevent this hearing from taking place, he has since

2007 U.S. Dist. LEXIS 64669, *

withdrawn that motion. IAR and RAAR's motion to dismiss these counts contends that I lack supplemental jurisdiction over these claims and that, even assuming I do have jurisdiction, Hackman's agreements with RAAR and IAR prevent him from challenging the results of any ethics hearing.

Hackman's complaint alleges jurisdiction over Counts III and IV under *28 U.S.C. § 1367(a)*, which grants district courts supplemental jurisdiction over claims "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Federal courts have interpreted *§ 1367(a)* to require that [*33] the supplemental claims involve "a common nucleus of operative facts" with the federal claims. *See, e.g., Ammerman v. Sween, 54 F.3d 423, 424 (7th Cir. 1995)* (citations omitted). "A loose factual connection between the claims is generally sufficient." *Id.* Hackman alleges that his claims concerning the ethics complaint are connected to his antitrust claims because he contends that Coldwell and Dickerson filed a false ethics complaint against him as part of their anticompetitive scheme. (Compl. at P 30.) However, his claims against RAAR and IAR concerning the ethics complaint do not concern whether the ethics complaint was false, but rather whether RAAR and IAR improperly handled the complaint. There is no allegation that would connect RAAR and IAR's treatment of the complaint as part of an anticompetitive scheme against Hackman, and this is underscored by the fact that I am dismissing Hackman's antitrust claims against RAAR. Counts III and IV do not have the same nucleus of operative facts as Hackman's other claims, so I dismiss them for lack of subject matter jurisdiction.

D. Conclusion

For the above reasons, I grant RAAR and IAR's motion to dismiss Counts I and II against RAAR, and [*34] Counts III and IV against RAAR and IAR.

IV. Prudential and Licari Motion to Dismiss

Defendants Prudential and Licari have brought their own motion to dismiss Counts I, II, V and VI against them for failure to state a claim. I deny their motion as to Count V, but otherwise grant it.

A. Counts I and II

As discussed above with respect to RAAR and IAR's motion, Hackman alleges that certain defendants, including Prudential, violated the Sherman Act by boycotting Hackman, refusing to offer the same commission as other MLS members, and refusing to allow Hackman to show properties listed by defendants. (Compl. at P 43.)

Hackman brings his claim under *§ 1* (illegal restraint of trade) and *§ 2* (monopolization). Prudential and Licary argue that this claim is deficient because it does not allege damages caused by an antitrust injury, does not allege that defendants engaged in interstate commerce, does not establish that the complaint was filed within the applicable statute of limitations, and provides no facts supporting a conspiracy or the existence of a monopoly.

First, and most importantly, Prudential and Licary contend that Hackman has failed to allege facts suggesting the existence of a monopoly [*35] or a conspiracy. Hackman's complaint does allege that certain defendants entered into an agreement to retaliate against Hackman for undercutting the going commission rate, and he provides some specific allegations about retaliatory actions that certain defendants (not including Prudential) took against him as a result, including a "sustained and coordinated process" of defamation by Dickerson, Whitehead, Century 21 and Coldwell. He makes a specific allegation that on a certain date Dunn ordered nearly all Dickerson offices to boycott Hackman's agents. In *Bell Atlantic* the Supreme Court clearly held that, contrary to the old pleading standard recognized in *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80, (1957)*, and followed by numerous federal courts thereafter, federal pleading requires more than just a short and plain statement of the facts. *127 S. Ct. at 1969* ("The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."). In the antitrust context, the holding of *Bell Atlantic* requires that an antitrust plaintiff pleading the [*36] existence of a conspiracy or agreement to monopolize or restrain trade do more than conclusorily plead the existence of an agreement or conspiracy, but rather "a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *127 S. Ct. at 1965.* [9] As discussed above, in Section II.A. *supra*, an "allegation of parallel conduct and a bare assertion of conspiracy" is not enough because parallel conduct does not suggest conspiracy, and a "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id. at 1966.*

---

9   Although *Bell Atlantic* addresses a case in which claims were brought only under *§ 1* (restraint of trade) of the Sherman Act, its reasoning applies equally to claims brought under *§ 2* (monopolization) where the plaintiff alleges that the defendants had a monopoly through combination or conspiracy with one another, as Hackman alleges here.

Hackman's complaint is in the realm of insufficiency identified in *Bell Atlantic* because he conclusorily alleges an agreement, at an unspecified time, between certain defendants to boycott him, but presents no evidence of an agreement other than evidence of parallel [*37] conduct (defendants' refusal to do business with him and the defamatory comments some defendants allegedly made about him) as well as allegations that would create a motivation for defendants to boycott him (he was undercutting them on commissions and lowering their bottom line). These facts are not enough to adequately allege that defendants had an agreement to unreasonably restrain trade under *§ 1* or conspired to monopolize the market under *§ 2*. Therefore, I agree with Licary and Prudential that on this basis Hackman's complaint must be dismissed.

For the same reasons, the complaints against Licary and Prudential in Count II are dismissed. As discussed above, complaints under the Illinois Antitrust Act require factual allegations that an agreement was made. Since the pleading requirements of the Sherman Act inform the pleading requirements under the Illinois Antitrust Act, *740 Ill. Comp. Stat. § 10/11*; *Laughlin, 133 Ill.2d at 384, 140 Ill. Dec. at 865, 550 N.E.2d at 990*. Hackman's failure adequately to allege the existence of an agreement or a conspiracy also dooms his claims under Count II, so I grant Licary and Prudential's motion to dismiss this claim.

Because I grant Licary and [*38] Prudential's motion to dismiss Counts I and II on this ground, I need not consider their other arguments that these claims fail because Hackman has not alleged damages caused by an antitrust injury, has failed to appropriately allege interstate commerce, has not established that he filed his claims within the limitations period, and has not pled properly facts showing the existence of a monopoly. I note, however, that there is no obligation under the federal rules to negate affirmative defenses, so there is no cause to dismiss Hackman's claims based on the statute of limitations. [10] *See, e.g. Tregenza v. Great Am. Communications Co., 12 F.3d 717, 718-19 (7th Cir. 1993)*. I also note that it does appear that Hackman has not made the proper jurisdictional allegations concerning the effect of defendants' purported actions on interstate commerce, although this can be easily remedied given that the Supreme Court has previously concluded that even local real estate transactions have an effect on interstate commerce. *See McLain, 444 U.S. at 245*.

10  Hackman alleges that his dispute with the defendants began in 2000, but he does not allege any facts showing when their purported conspiracy to shut [*39] him out of the Rockford-area real estate market began.

**B. Count V**

Licary and Prudential have also moved to dismiss the claims brought against them in Count V of Hackman's complaint. Both are named as defendants in this claim, which generally alleges that the named defendants made derogatory and defamatory statements about Hackman to Hackman's clients, agents and other third parties, including statements relating to Hackman's personal and business integrity. (Compl. at P 80.) Specifically, the complaint alleges that on May 10, 2005, Hackman signed a listing contract with a particular client to sell the client's house, and subsequently signed a sales contract with a Prudential agent to sell the house to a Prudential client. (*Id.* at P 78.) When Hackman did not receive an expected request for extension on the offer, he called the Prudential agent and learned that Licary, a representative of Prudential, had told the Prudential agent that Hackman "was dishonest and not to go through with the deal." (*Id.*) The Prudential agent subsequently told his client this, and Hackman lost the sale and his client. (*Id.*) Hackman alleges that the defendants named in Count V made statements that constitute [*40] "slander *per se*." (*Id.* at P 81.) Licary and Prudential argue that Count V should be dismissed as to them because it does not specifically allege the statements made, to whom they were made, and their context, and that the alleged statements do not constitute defamation *per se*. I deny Licary and Prudential's motion to dismiss Count V.

First, I agree that the only plausible reading of the complaint is that Hackman alleges defamation against a corporate entity, since the complaint is brought only on behalf of the companies as which Hackman did business. A statement is defamatory under Illinois law if it "tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with him." *Kolegas v. Heftel Broad. Corp., 154 Ill.2d 1, 10, 180 Ill. Dec. 307, 312, 607 N.E.2d 201, 206 (Ill. 1992)* (citation omitted). Although normally a plaintiff alleging defamation must allege that he was damaged by the defendant's actions, certain categories of defamation considered defamation *per se* require no proof of actual damages. *Bryson v. News Am. Publ'ns, Inc., 174 Ill.2d 77, 87, 220 Ill. Dec. 195, 202, 672 N.E.2d 1207, 1214 (1996)* [*41] (citations omitted). Recognized categories of defamation *per se* under Illinois law relevant to this case include words implying "an inability to perform or want of integrity in the discharge of duties of office or employment" or "prejudice a party, or impute lack of ability, in his or her trade, profession or business." *Kolegas, 154 Ill.2d at 10, 180 Ill. Dec. at 312, 607 N.E.2d at 206* (citation omitted).

Given the specific allegations about Licary's statement to a Prudential agent that Hackman was dishonest, Licary and Prudential's argument that Hackman has not specifically alleged the defamatory statement at issue is without merit. Hackman fairly specifically alleges the statement made, the time it was made, and the context of the statement. Further, a statement that Hackman is "dishonest" falls into the realm of defamation *per se* because it suggests that Hackman as an individual or corporate entity lacks integrity. [11] Because Licary and Prudential's arguments in support of dismissal are without merit, I deny their motion to dismiss Count V.

> 11   Hackman's complaint lumps together defamation claims on behalf of Gregory Hackman Realtors and Hackman Realtors Inc., referring to both collectively [*42] as "Hackman." Defamation allegations on behalf of either entity are sufficient to state a claim. A certain line of Illinois appellate cases suggests that corporate plaintiffs bringing claims for defamation *per se* must allege that the defendant made a statement that "assail[s] a corporation's financial or business methods" or accuses the corporation of fraud or mismanagement. *See, e.g., Am. Int'l Hosp. v. Chicago Tribune Co., 136 Ill. App. 3d 1019, 1024, 91 Ill. Dec. 479, 483, 483 N.E.2d 965, 969 (Ill. App. Ct. 1985)* (citations omitted). Even under this stricter application of the *per se* rule Hackman's complaint states a claim because it alleges that Licary stated the collective "Hackman" was dishonest, which is akin to an accusation of fraud. Licary and Prudential have cited no cases that a false statement that a corporate entity was dishonest is not within the definition of *per se* defamation under Illinois law.

## C. Count VI

Count VI brings a claim for tortious interference with business expectancy against certain defendants including Prudential and Licary. Count VI makes specific allegations about certain actions taken by certain defendants to interfere with his business expectancy, [*43] but makes no specific allegations about actions Prudential and Licary took. Hackman generally alleges that he had valid business expectancy with his agents, and that defendants knew of that expectancy but interfered with his business relationships "by ingratiating themselves with said clients, and making derogatory statements about HACKMAN until the client left HACKMAN and went to the Defendants' offices." (Compl. at PP 94-96.) Hackman alleges that defendants also interfered with his business relationships by "making derogatory statements about HACKMAN to its agents, and refusing to do business with those agents as long as they continued to work

for HACKMAN, until the agents quit HACKMAN'S employ." (*Id.* at P 97.) Prudential and Licary argue this claim should be dismissed because Hackman has not properly alleged any specific wrongful conduct, that he had a legitimate expectation of entering into a relationship with an identifiable party, or that Prudential and Licary intentionally or maliciously interfered with that expectancy. I grant their motion to dismiss this claim.

Hackman identifies his claim in Count VI as a claim for tortious interference with business expectancy. Although Prudential [*44] and Licary contend that Count VI appears to include intermingled allegations of tortious interference with a contractual relationship and tortious interference with economic advantage, Hackman is clearly bringing a claim for tortious interference with prospective economic advantage. [12] Establishing this claim requires that Hackman show (1) his reasonable expectation of entering into a valid business relationship; (2) defendants' knowledge of his expectancy; (3) purposeful interference by the defendants preventing his expectancy from being fulfilled; and (4) damages resulting from such interference. *Burrell v. City of Mattoon, 378 F.3d 642, 652 (7th Cir. 2004)* (citations omitted). Hackman has alleged that he had a reasonable expectation of continuing business relationships with the agents who worked for him as well as the clients whom he represented. *See, e.g., Dorado v. Aargus Sec. Sys., Inc., No. 00 C 4002, 2002 U.S. Dist. LEXIS 2732, 2002 WL 230776, at *5 (N.D. Ill. Feb. 14, 2002)* (claim may be brought where plaintiff had a reasonable expectation of continuing a business relationship) (citation omitted). He has alleged that defendants knew of that expectation but intentionally interfered [*45] by making derogatory statements about him to his clients and agents and refusing to do business with his agents, causing them to go elsewhere. Hackman has therefore pled the bare bones element of his claim. He has not, however, specified any particular wrongful conduct that Licary or Prudential committed to interfere with his expectancy, other than generally alleging that they made derogatory statements about Hackman and refused to do business with his agents. To be actionable, defendants' conduct must be wrongful, such as fraudulent, deceitful, intimidating, or deliberately disparaging. *Am. Broad. Co. v. Maljack Prods., Inc., 34 F. Supp 2d. 665, 674 (N.D. Ill. 1998)* (citations omitted). The inference from Hackman's complaint might be that defendants' conduct is wrongful because it was in violation of the Sherman Act (refusing to do business with Hackman's agents) or defamatory (making false disparaging statements) but this is not clear from the complaint. I agree that without more detailed factual allegations it is not clear what Licary or Prudential did that was wrongful that interfered with Hackman's economic advantage. Hackman's allegations do not raise the right to relief above a speculative level. [*46] *Bell*

*Atl., 127 S. Ct. at 1964.* Therefore, I grant Licary and Prudential's motion to dismiss Hackman's claims against them in Count VI.

> 12 Illinois courts have variously designated this tort as interference with prospective economic advantage, *Fellhauer, 142 Ill.2d at 511, 154 Ill. Dec. at 656-57, 568 N.E.2d at 877-78,* interference with prospective economic relationships, *Kruger v. Menard Elec. Coop., 169 Ill. App. 3d 861, 864-65, 119 Ill. Dec. 952, 954, 523 N.E.2d 708, 710 (Ill. App. Ct. 1988),* and interference with prospective business expectancies, *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc., 190 Ill. App. 3d 524, 527, 137 Ill. Dec. 409, 412, 546 N.E.2d 33, 36 (Ill. App. Ct. 1989).* The Restatement uses the term interference with prospective contractual relation. *4 Restatement (Second) of Torts § 766B* (1979).

D. Conclusion

For the above reasons, I grant Licary and Prudential's motion to dismiss Counts I, II, and VI, and deny their motion to dismiss Count V.

V. Parvin's Motion to Dismiss

Parvin has also brought a motion to dismiss Hackman's claims against her in Count VI of the complaint. As discussed above in Section II *supra,* the portion of Count VI alleging that Parvin [*47] violated MLS rules by misrepresenting the status of a property to prevent Hackman from presenting an offer is subject to an arbitration agreement, and is therefore stayed. Because I have ruled this claim to be subject to arbitration I deny Parvin's motion to dismiss as moot. *See, e.g., Olson v. Jensen & Gilchrist, 461 F. Supp 2d. 710, 727-28 & n.11 (N.D. Ill. 2006)* (citing cases and explaining that when a court grants a motion for arbitration it should be careful not to rule on any issues going to the merits of the claim to be arbitrated). To the extent Count VI states other allegations of conduct against Parvin as part of the general allegations that all defendants tortiously interfered by defaming Hackman and shutting him out of the real estate market in Rockford, those portions of Count VI are dismissed as to Parvin for the same reasons articulated in Section IV.C. *supra.*

VI. Smith's Motion to Dismiss

Smith has also brought a motion to dismiss Count VI of Hackman's complaint. The complaint alleges that Smith acted as an agent of Dickerson. Count V, which is incorporated into Count VI, alleges that agents and employees of Dickerson made derogatory and defamatory statements about Hackman's [*48] personal and business

integrity, and that certain of these statements made by unnamed agents of Dickerson caused the sellers of a property identified as "7371 Countryshire" to refuse to re-list with Hackman. (Compl. at PP 79-80.) Count VI of Hackman's complaint specifically alleges that Smith's boycott of Hackman and refusal to set up a showing with a former Hackman realtor caused one of Hackman's realtors to quit. (*Id.* at P 84.) Count VI alleges that unnamed agents of Dickerson made derogatory statements about Hackman's business integrity and honesty in April of 2002, causing Vickie Stearns, a former Hackman agent, to lose a client. (*Id.* at P 83.) Smith argues that Count VI fails to state a claim because Hackman does not allege that Smith refused to deal with Hackman's agent without justification, and does not allege that he had a legally binding contract with his agent. I deny this motion.

Smith is incorrect that Hackman must have had a contract with his agent in order for an interference with their relationship to constitute a tortious interference with business expectancy. The case that Smith cites for this proposition, *Lusher v. Becker Bros., Inc., 155 Ill. App. 3d 866, 108 Ill. Dec. 748, 509 N.E.2d 444 (Ill. App. Ct. 1987)* [*49] held that the plaintiff, the employee of a subcontractor, did not have a cause of action against the contractor for conditioning its work with the subcontractor on the subcontractor's not using the plaintiff on any of its jobs. *Id. at 870, 108 Ill. Dec. at 750, 509 N.E.2d at 446.* The court concluded this was so because, although the plaintiff had a reasonable expectation of being hired by the subcontractor, the plaintiff had not shown that he had a reasonable expectation of further work on the contractor's jobs with the subcontractor. *Id.* In this case, however, Hackman has alleged that Smith's boycott of Hackman (which may be reasonably inferred to be in violation of the Sherman Act and therefore improper) caused Hackman's agent to quit, and that but for Smith's action Hackman had a reasonable expectation of a continuing business relationship with the agent. Nothing about the holding of *Lusher* specifically requires that an employer or employee have an employment contract in order for one of them to have a reasonable expectation of continuing to work with the other, but simply that the plaintiff be able to show that under the circumstances there was some reasonable expectation that [*50] their relationship would continue. Here Hackman has met that burden, so I deny Smith's motion to dismiss.

VII. Reavis's Motion to Dismiss

Reavis has also moved to dismiss Count VI of Hackman's complaint. Count V (incorporated into Count VI) alleges that in early 2005 Reavis, an agent of Dickerson, made "slanderous and derogatory statements about HACKMAN's business integrity" that caused Hackman to lose a showing of a client's property and to

lose the listing of the property; Reavis subsequently signed the clients in alleged violation of NAR rules. (Compl. at P 77.) Count VI alleges that Reavis stole a client of one of Hackman's agents, and that when a resulting commission dispute arose between Hackman and Dickerson, Reavis caused the client to write an ethics complaint against Hackman, causing Hackman's agent to quit Hackman's employ. (*Id.* at PP 87-88.) Reavis argues that Count VI fails to state a claim because Hackman has failed to allege that there was a legally binding contract that Reavis had knowledge of or that Reavis's actions were not privileged; that the filing of a quasi-judicial proceeding by any party is privileged; and that Hackman is attempting to bootstrap all asserted [*51] actions by all defendants into a claim against Reavis as an individual. I deny Reavis's motion.

First, as discussed in Section IV.C. *supra,* to establish a claim for tortious interference with business expectancy Hackman must show that he had a reasonable expectation of entering into a valid business relationship and that Reavis knew of his expectancy. *Burrell, 378 F.3d at 652* (citations omitted). Although Reavis attempts to argue, citing *Film and Tape Works, Inc. v. Junetwenty Films, Inc., 368 Ill. App. 3d 462, 305 Ill. Dec. 807, 856 N.E.2d 612 (2006),* that Hackman must allege there was a legally binding contract between himself and the client in order to satisfy that element of his claim, this is incorrect. Hackman's claim is for tortious interference with business expectancy, not tortious interference with contract, and although these torts "are closely related . . . the former requires a mere business expectancy while the latter applies only where there is a legally binding contract between the parties." *Film and Tape Works, Inc., 368 Ill. App. 3d at 468, 305 Ill. Dec. at 813, 856 N.E.2d at 618* (citation omitted). Hackman adequately alleges that he had "valid business relationships, [*52] and the expectancy of the completion of those relationships with [his] clients as described above by virtue of the respective Exclusive Listing Agreements." (Compl. at P 92.) As the Illinois appellate court concluded in the very case that Reavis cites, an existing relationship predicated upon an ongoing course of dealing, even if terminable at will, is sufficient to support a claim for tortious interference with business expectancy as long as it will presumptively continue if the parties are satisfied. *See Film and Tapes Works, Inc., 368 Ill. App. 3d at 469, 305 Ill. Dec. at 814, 856 N.E.2d at 619.* Hackman's allegations are sufficient to support this inference. In addition, although Reavis argues that Hackman has not alleged that Reavis knew of this expectancy, Hackman has specifically pled that defendants, "as individuals, knew Hackman had said relationships with the above-referenced clients." (Compl. at P 93.)

Second, Reavis urges that her actions were privileged as competition. As discussed above, to be tortious Reavis's actions must have somehow been improper, and lawful competition is normally not tortious unless it encompasses fraud, intimidation, or disparagement. *Belden Corp. v. Internorth, Inc., 90 Ill. App. 3d 547, 551-53, 45 Ill. Dec. 765, 768-770, 413 N.E.2d 98, 101-03 (Ill. App. Ct. 1980).* [*53] Hackman correctly notes in his response that raising the privilege of competition is an affirmative defense and cannot form the basis of a motion to dismiss. *See Zenith Electronics Corp. v. Exzec Inc., No. 93 C 5041, 1997 U.S. Dist. LEXIS 20762, 1997 WL 798907, at *14-15 (N.D. Ill. Dec. 24, 1997).* Regardless, as discussed in Section IV.C. *supra,* a reasonable inference from Hackman's allegations is that Reavis's actions in taking a client and causing the filing of an ethics complaint against Hackman's agent, as well as making false and derogatory statements about his integrity, were improper and not lawful competition. *See, e.g., Baloun v. Williams, No. 00 C 7584, 2002 U.S. Dist. LEXIS 20663, 2002 WL 31426647, at *16 (N.D. Ill. Oct. 25, 2002)* (holding that allegations of "ma[king] defamatory statements regarding [plaintiff's] integrity, honesty, and business practices" sufficiently stated a claim for tortious interference with business expectancy).

Third, Reavis urges that Hackman may not use the filing of an ethics complaint by any party as part of his claim because it is a quasi-judicial proceeding and therefore protected by absolute privilege. It is unnecessary to determine whether the filing of the complaint was a quasi-judicial proceeding [*54] and whether this can support a motion to dismiss because a reasonable reading of Hackman's complaint is that he is not alleging that the filing of the complaint itself was necessarily the tortious interference, but rather that Reavis's statements to the former client causing the complaint to be filed were tortious interference. *See Dowd & Dowd, Ltd. v. Gleason, 181 Ill.2d 460, 484, 230 Ill. Dec. 229, 242, 693 N.E.2d 358, 371 (1998)* ("[T]he focus here is not on the conduct of the client in terminating the relationship, but on the conduct of the party inducing the breach or interfering with the expectancy.").

Finally, Reavis contends that Hackman is attempting to "bootstrap" all of the Defendants' actions together to assert a claim. I agree that Count VI of Hackman's complaint is not always clear as to which allegations apply to which defendants. Regardless, Hackman's specific allegations that are clearly directed at Reavis sufficiently state a claim for tortious interference of business expectancy. Therefore, I deny Reavis's motion to dismiss.

## VIII. Young's Motion to Dismiss

Young has brought two motions to dismiss Counts V and VI of Hackman's complaint against him. Young's

name appears [*55] in the heading of Count V, Hackman's defamation claim, but there are no specific allegations in that claim against him. Hackman's response acknowledges that the inclusion of Young's name in the header of Count V is a typographical error and that he is not currently asserting any defamation claims against Young, so Young's motion to dismiss Count V is granted.

The only dispute between the parties, then, is Young's motion to dismiss Count VI. In addition to the general allegations against all defendants named in Count VI as discussed in Section IV.C. *supra*, Count VI specifically alleges that in May 2004, Young, an agent of Dickerson, made "false and derogatory statements" to a Hackman client, Don Sandell, that falsely impugned Hackman's "business integrity and honesty." (Compl. at P 89.) As a result, the client left Hackman and signed with Young, causing Young to receive an unearned commission. (*Id.*) As other defendants have argued, Young argues that Hackman's allegations fail to state a claim because Hackman does not allege that a legally binding contract existed between himself and the client, and does not allege that Young's alleged interference was more than privileged business competition. [*56] For the same reasons that Reavis's arguments to dismiss Count VI failed, Young's arguments fail as well. Hackman need not allege the existence of a contract, only the existence of a valid business expectancy, and as discussed in Section VII *supra*, the reasonable inference from his allegations is that Young's interference was improper and not mere competition. Therefore, Young's motion to dismiss Count VI is denied.

IX. Reavis Motion for a More Definite Statement

In addition to her motion to dismiss addressed above, Reavis has filed a motion for a more definite statement of Count V of Hackman's complaint, arguing that she is unable to reasonably frame a response to Hackman's claim for defamation because his allegations are too vague. In Count V, Hackman specifically alleges:

> On January 20, 2005, HACKMAN entered into a Listing Contract with Jeffrey and Kathleen Reimer, for the property commonly known as 10111 Joy Court in Roscoe. REAVIS had also tried to get the Reimers to sign up. Two days before the Listing Contract expired, the sellers refused to allow HACKMAN to set up a second showing for the agent of a potential buyer, saying HACKMAN would have to talk to REAVIS of DICKERSON. Due [*57] to slanderous and derogatory statements about HACKMAN'S business

> integrity made by REAVIS, HACKMAN was denied the second showing, and lost the listing after it expired. Instead, the Reimers signed with REAVIS, who violated NAR rules in contacting the Reimers.

(Compl. at P 77.)

Under *FED. R. CIV. P. 12(e)*, "[i]f a pleading to which a responsive pleading is permitted is so vague and ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." An allegation is considered specific enough to form a responsive pleading "if the statement permits the defendant to understand the specific nature of the claim and form a responsive pleading." *Giant Sreen Sports, LLC v. Sky High Entm't, No. 05 C 7184, 2007 U.S. Dist. LEXIS 13343, 2007 WL 627595, at *3 (N.D. Ill. February 27, 2007)* (citations omitted). Courts in this district have previously held that a complaint for defamation need not quote defamatory language verbatim, but have alternatively granted or denied motions for a more definite statement made on this basis. *See id.* (citations omitted); *Cozzi v. Pepsi-Cola Gen. Bottlers, Inc., No. 96 C 7228, 1997 U.S. Dist. LEXIS 7979, 1997 WL 312048, at **5-6 (N.D. Ill. June 6, 1997);* [*58] *Guy v. Illinois, 958 F. Supp. 1300, 1311-12 (N.D. Ill. 1997); Chisholm v. Foothill Capital Corp., 940 F. Supp. 1273, 1284-85 (N.D. Ill. 1996).* These decisions were all made under the *pre-Bell Atlantic* pleading standards, so it is possible that under *Bell Atlantic* a plaintiff must do more to specifically allege the content of a defamatory statement in order to raise the right to relief above a speculative level. *127 S. Ct. at 1964.*

Reavis acknowledges that under the precedent in this district Hackman need not plead the content of the statement verbatim, but nevertheless contends that she is unable to formulate a meaningful response to the allegations that she made "slanderous and derogatory statements," without more detail as to the content and context of the statements. Courts in this district have previously granted motions for more definite statement to require a claimant to more specifically plead facts surrounding the statement, including the content, context, speaker, recipient, and timing of the statement. *See, e.g., Wilton Partners III, LLC v. Gallagher, No. 03 C 1519, 2003 U.S. Dist. LEXIS 21899, 2003 WL 22880834, at *6 (N.D. Ill. Dec. 5, 2003)* (directing plaintiff to [*59] amend the complaint "to allege more precisely the content of the allegedly defamatory statements, the context in which those statements were made, as well as the identities of both the speakers and the individuals to whom the state-

ments were allegedly made."); *Cozzi, 1997 U.S. Dist. LEXIS 7979, 1997 WL 312049 at *6* ("Nevertheless, in fairness to defendant, the court orders plaintiff [to supplement allegations] to the extent of her current knowledge, with details as to the speaker, recipient, timing, words, and context in which the alleged statements were made.").

Here, Hackman has alleged the general timing of the statement (around January 20, 2005), the general content of the statement (that it was a slanderous and derogatory statement about his business integrity), the speaker (Reavis), and the context (that it was made to deny him a second showing and to encourage Hackman's client to leave him and sign with Reavis). The complaint is unclear about who the recipient of the statement was, but the reasonable inference to be drawn is that the statement was made to Hackman's clients. Other than requiring Hackman to specifically allege the content of the statement, Hackman's allegations are sufficiently detailed. [*60] Therefore, a motion for a more definite statement would serve no purpose, and any further information Reavis requires can be obtained through discovery. To the extent Reavis argues she needs more information in order to determine whether she should plead certain affirmative defenses such as innocent construction, Reavis is free to plead whatever affirmative defenses she believes might be applicable, but this should have no bearing on her ability to answer. I therefore deny this motion.

X. Young, Dunn, Smith and Dickerson Motion for a More Definite Statement

Defendants Young, Dunn, Smith and Dickerson have also filed a motion for a more definite statement as to Counts I, II, V and VI of Hackman's complaint. Defendants generally contend that these counts violate *Federal Rule of Civil Procedure 10*, which requires

> All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a [*61] separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

*FED. R. CIV. P. 10(b)*. Violation of this rule may be remedied by a motion under *Rule 12(e)* for a more definite statement. *See Fields v. Vill. of Skokie, 502 F. Supp.*

*456, 459-60 (N.D. Ill. 1980)*. I deny this motion as to Counts I and II, but grant it as to Counts V and VI.

Defendants argue that they cannot respond effectively to Count I, Hackman's Sherman Act claim, because it combines "Greg Hackman's pre-2005 actions" with "Gregory Hackman Realtor, Inc.'s claims for post-2005 actions." This is a frivolous argument. Although there are perhaps deficiencies with Hackman's claims in Count I as noted in response to other defendants' motions, defendants have identified nothing about the combination of these two entities' claims that prevents a clear presentation of the allegations. Hackman's claims seem to be that defendants treated both entities in a similar fashion, so there is nothing about the combination of their claims that would prevent defendants from responding. The same is true with respect to Count II, Hackman's claims under the Illinois Antitrust Act.

Defendants' arguments [*62] concerning Counts V and VI are colorable. Count V is a motion for defamation, and does combine into one count numerous allegations about separate instances of defamation by numerous defendants that constitute separate transactions or occurrences. Count VI is likewise a motion for tortious interference with business expectancy that combines allegations about separate instances of tortious interference by numerous defendants. I agree that Hackman's claims concerning these counts would be more clearly presented and would be more easily responded to were Hackman to separate then into separate counts. Therefore, Hackman is directed to file an amended complaint that separates the allegations of Count V and VI to more clearly state his separate claims against the relevant defendants.

XI.

For the above reasons, I grant Parvin's motion to compel arbitration [Docket No. 79] of Hackman's claim concerning Parvin's purported violation of the MLS rules and to stay that aspect of Hackman's claims against her, but I otherwise deny her motion. I deny her motion to dismiss [Docket No. 80] to the extent it pertains to the claim for which I granted her motion to arbitrate, but otherwise grant that motion. [*63] I deny Century 21's motion to compel arbitration [Docket No. 78] as moot given its dismissal from the litigation. I grant RAAR and IAR's motion to dismiss [Docket No. 70] Counts I and II for failure to state a claim, and consequently also dismiss Counts III and IV for lack of subject matter jurisdiction. I grant Licary and Prudential's motion to dismiss [Docket No. 90] as to Counts I, II, and VI, and deny their motion to dismiss as to Count V. I deny Smith and Reavis's motions to dismiss [Docket Nos. 63 and 35, respectively], and deny Reavis's motion for a more definite statement [Docket No. 34]. I grant Young's motion to dismiss

2007 U.S. Dist. LEXIS 64669, *

Count V [Docket No. 62], but deny its motion to dismiss Count VI [Docket No. 64]. I grant Young, Dunn, Smith and Dickerson's motion for a more definite statement [Docket No. 34] as to Counts V and VI, but deny it as to Counts I and II.

**Elaine E. Bucklo**

United States District Judge

Dated: August 31, 2007

4

LEXSEE 2005 US DIST LEXIS 33208



Cited
As of: Dec 13, 2007

**IDT CORPORATION, WINSTAR COMMUNICATIONS, L.L.C., and WINSTAR OF NEW JERSEY, L.L.C., Plaintiffs, v. BUILDING OWNERS AND MANAGERS ASSOCIATION INTERNATIONAL, BUILDING OWNERS AND MANAGERS ASSOCIATION OF NEW JERSEY, TRIZEC PROPERTIES, INC., TRIZECHAHN NEWPORT, L.L.C., and TRIZEC REALTY, INC., Defendants.**

**Civil Action No. 03-4113 (JAG)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2005 U.S. Dist. LEXIS 33208; 2006-1 Trade Cas. (CCH) P75,151*

**December 14, 2005, Decided**
**December 15, 2005, Filed**

**NOTICE:**    [*1] NOT FOR PUBLICATION

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff telecommunications company sued defendants, building associations, building owner-managers, and a real estate investment trust, for violations of 15 U.S.C.S. § 1 et seq., inter alia, based on the alleged use defendants' collective control of the commercial real estate market to deny the company access to their tenants and, when granted, to condition building access by the company on exclusionary and anticompetitive terms and conditions.

**OVERVIEW:** The company claimed that defendants conspired to fix the rental price of building access for the provision of telecommunications services to commercial office building tenants. The company asserted that these horizontal price-fixing agreements severely restrained and diminished competition in the relevant market. The problem with the company's antitrust allegations was that defendants did not compete in the market for provision of telecommunications services. Even if the court assumed the truth of the company's allegation that defendants conspired to impose discriminatory prices upon the company for building access, in order for the court to find that the company had alleged sufficiently a restraint on competition in the telecommunications services market, the court would have to assume further that, through this discriminatory pricing in the building access market, defendants aimed to restrain competition in the market for provision of telecommunications services--a market in which defendants did not compete. Thus, the company's market definitions were insufficient to state a valid claim for anticompetitive market power. This was fatal to the company's claims.

**OUTCOME:** Defendants' motion to dismiss was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] On a motion to dismiss for failure to state a claim, pursuant to *Fed. R. Civ. P. 12(b)(6)*, the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail.

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN2] While a court will accept well-pled allegations as true for the purposes of a motion dismiss, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. The pleader is required to set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist. It is not proper for a court to assume that the plaintiff can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.

*Antitrust & Trade Law > Clayton Act > Claims*
*Antitrust & Trade Law > Private Actions > Standing > Clayton Act*
[HN3] The burden of a plaintiff in a private antitrust action to demonstrate that it has antitrust standing arises from § 4 of the Clayton Act, *15 U.S.C.S. § 15*, which provides that any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may bring suit under the antitrust laws in the district courts for treble damages.

*Antitrust & Trade Law > Private Actions > Standing*
[HN4] The focus of antitrust standing is different from constitutional standing. In the constitutional context, standing is concerned with whether a party has sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy and, among other things, requires a plaintiff to show that it has suffered an "injury in fact." While harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact the doctrine of antitrust standing requires the court to make a further determination as to whether the plaintiff is a proper party to bring a private antitrust action.

*Antitrust & Trade Law > Clayton Act > Claims*
*Antitrust & Trade Law > Private Actions > Standing > Clayton Act*
[HN5] The mere fact that the claim is literally encompassed by the Clayton Act does not end the standing inquiry. A court must consider, along with a number of other factors, the nature of the plaintiff's alleged injury in order to determine whether it is of the type that the antitrust statute was intended to forestall.

*Antitrust & Trade Law > Private Actions > Injuries & Remedies*

[HN6] In defining antitrust injury, the United States Supreme Court has explained that conduct in violation of the antitrust laws may have three effects, often interwoven: In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.

*Antitrust & Trade Law > Private Actions > Injuries & Remedies*
[HN7] It is well established that an antitrust injury reflects an activity's anticompetitive effect on the competitive market. A plaintiff's personal grievance cannot be deemed an antitrust injury unless the activity has a wider impact on the competitive market.

*Antitrust & Trade Law > Private Actions > Injuries & Remedies*
*Antitrust & Trade Law > Private Actions > Standing > Requirements*
[HN8] The Third Circuit Court of Appeals has interpreted certain precedent to require a plaintiff to satisfy the antitrust injury requirement and also be the appropriate "person" to bring suit under the standing requirements. Antitrust injury is a threshold inquiry to be satisfied before the matter may proceed.

*Antitrust & Trade Law > Private Actions > Standing > Requirements*
[HN9] The Third Circuit Court of has Appeals has enumerated the factors to be considered in an antitrust standing analysis: (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Antitrust & Trade Law > Private Actions > Injuries & Remedies > Clayton Act*
[HN10] A § 4 of the Clayton Act, *15 U.S.C.S. § 15*, plaintiff need not prove an actual lessening of competi-

tion in order to recover. Competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened.

***Antitrust & Trade Law > Private Actions > Injuries & Remedies > Sherman Act***
[HN11] To establish a § 1 of the Sherman Act violation for unreasonable restraint of trade, a plaintiff must prove (1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason***
[HN12] For antitrust violations not within the per se category of invalidity, courts employ a rule of reason test.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > Sherman Act***
[HN13] Under a rule of reason analysis, a valid claim must allege facts which, if true, are sufficient to establish the four elements of the § 1 of the Sherman Act analysis. In order to establish the second element, that the defendants' actions have produced anticompetitive effects within the relevant product and geographic markets, the plaintiff must allege that particular, actual anticompetitive effects occurred within these markets, such as price increases or output reduction. Because such proof is often impossible to make due to the difficulty of isolating the market effects of challenged conduct, courts typically allow proof of the defendant's market power instead. Market power is the ability to raise prices above those that would prevail in a competitive market. As with actual anticompetitive effects, market power must be shown in the relevant product and geographic markets.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > Sherman Act***
[HN14] To state a valid claim under the rule of reason analysis under § 1 of the Sherman Act approach, a plaintiff must, inter alia, define the relevant product and geographic markets in which market power is alleged. The proper definition of the market is a "necessary predicate" to an examination of the competition that may be affected. A plaintiff may also define a sub-market as the area in which market power may be found. The boundaries of such a sub-market may be determined by examining such practical indicia as industry or public recogni-

tion of the sub-market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason***
[HN15] Although most restraints are analyzed under the traditional "rule of reason," there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable. Such practices are deemed to be "illegal per se." The per se rule of illegality, however, is based in large part on economic predictions that certain types of activity will more often than not unreasonably restrain competition.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > Boycotts***
[HN16] In certain instances, concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as per se violations of § 1 of the Sherman Act. Generally, the per se approach to boycotts is applied in cases where there are joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle. The United States Court of Appeals for the Third Circuit has echoed that narrow construction of the per se rule for boycotts.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason***
[HN17] As a general matter, the United States Supreme Court has been cautious in extending the per se approach to claims that fall outside certain previously enumerated categories of liability. Thus, claims not within established categories of antitrust liability are more appropriately analyzed under the rule of reason where courts can balance the effect of the alleged anticompetitive activity against its competitive purposes within the relevant product and geographic markets.

***Communications Law > Federal Acts > Communications Act > General Overview***
[HN18] The Communications Act of 1934, in particular *47 U.S.C.S. §§ 201(b), 202(a)*, makes it unlawful for any "common carrier" of telecommunications services to discriminate in prices or practices.

Case 1:07-cv-00556-JJF-LPS    Document 31-2    Filed 12/17/2007    Page 46 of 57

Page 4
2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

*Communications Law > Federal Acts > Communications Act > General Overview*
[HN19] See *47 U.S.C.S. § 201(b)*.

*Communications Law > Federal Acts > Communications Act > General Overview*
[HN20] See *47 U.S.C.S. § 202(a)*.

*Communications Law > Federal Acts > Communications Act > General Overview*
[HN21] The text of the Communications Act of 1934, specifically *47 U.S.C.S. § 153(44)*, defines and describes "common carrier" as an entity that is "engaged in providing telecommunications services." To determine whether an entity is a "common carrier," courts should examine: (1) whether the carrier "undertakes to carry for all people indifferently"; and (2) whether the system is such that customers transmit intelligence of their own design and choosing.

*Communications Law > Resale of Services*
[HN22] Resale is an activity wherein one entity subscribes to the communications services and facilities of another entity and then reoffers communications service and facilities to the public for profit.

*Communications Law > Federal Acts > Communications Act > General Overview*
[HN23] The Communications Act of 1934's prohibition against unjust or unreasonable practices expressly applies to "any common carrier."

**COUNSEL:** For IDT CORPORATION, Plaintiff: DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ; JOSEPH A. BOYLE, KELLEY DRYE & WARREN LLP, PARSIPPANY, NJ.

For WINSTAR COMMUNICATIONS, L.L.C., WINSTAR OF NEW JERSEY, L.L.C., Plaintiffs: DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ; JOSEPH A. BOYLE, PAUL L. KATTAS, KELLEY DRYE & WARREN LLP, PARSIPPANY, NJ.

For CARRAMERICA REALTY CORP., CARRAMERICA DEVELOPMENT, INC., Defendants: CLIFFORD BRIAN KORNBREK, GREENBAUM, ROWE, SMITH & DAVIS, ROSELAND, NJ.

For TRIZEC PROPERTIES, INC., TRIZECHAHN NEWPORT, L.L.C., TRIZEC REALTY, INC., Defendants: ARTHUR S. GOLDSTEIN, WOLFF & SAMSON, PC, WEST ORANGE, NJ; KEVIN N. AINSWORTH, MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO PC, NEW YORK, NY.

For CB RICHARD ELLIS, INC., Defendant: WILLIAM J. O'SHAUGHNESSY, MCCARTER & ENGLISH, ESQS., NEWARK, NJ.

For HINES CORPORATE PROPERTIES, L.L.C., HINES INTEREST, L.P., Defendants: GARY M. BUTTER, BAKER & BOTTS, L.L.P, New York, NY.

For SHORENSTEIN, L.L.C., Defendant: MICHAEL S. WATERS, MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP, NEWARK, NJ.

**JUDGES:** JOSEPH A. GREENAWAY, JR., U.S.D.J.

**OPINION BY:** JOSEPH A. GREENAWAY, JR.

**OPINION**

[*2] **GREENAWAY, JR., U.S.D.J.**

This matter comes before the Court on the reinstated motion of Defendants Trizec Properties, Inc., TrizecHahn Newport, L.L.C., and Trizec Realty, Inc. (collectively "Trizec") [1] to dismiss the Complaint, pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*. For the reasons set forth below, Defendants' motion is granted; the Complaint is dismissed without prejudice as to Counts 1, 2, 4, and 5, and dismissed with prejudice as to Count 3.

> 1    Defendants CarrAmerica Realty Corp., CarrAmerica Development, Inc., Trammel Crow Company, CB Richard Ellis, Inc., Hines Corporate Properties, L.L.C., and Hines Interest, L.P. originally joined in Trizec's motion to dismiss. Subsequently, these parties were terminated from the litigation.

**BACKGROUND**

Plaintiff IDT Corporation, and its wholly-owned subsidiaries Winstar Communications, L.L.C. and Winstar of New Jersey, L.L.C. (collectively "Winstar"), provide telecommunications services [*3] to residential and business customers, as well as other telecommunications carriers, throughout the United States. (Complaint ("Compl."), at PP13-14.)

Winstar's Complaint names two categories of defendants: trade associations Building Owners and Managers

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

Association International ("BOMA") and Building Owners and Managers Association of New Jersey ("BOMA-NJ"), and building owner-managers ("Building Defendants"), including Trizec.

Defendant BOMA is a non-profit trade association for the commercial real estate industry that provides advice, research, and legal and legislative advocacy for its members. BOMA's members own and manage roughly eighty percent of the commercial office space in the United States. (Compl. P3.) Defendant BOMA-NJ is a separate non-profit corporation that provides research, advisory, and advocacy services related to the New Jersey commercial real estate market. (BOMA Br. at 5.)

Defendant Trizec owns, manages or provides real estate services for commercial real estate properties throughout the United States. (Building Defs.' Br. in Supp. of Mot. to Dismiss ("Building Defs.' Br.") at 3.) Trizec Properties, Inc. is a real estate investment trust ("REIT") that owns [*4] and leases commercial real estate properties and is a member of BOMA. (Compl. P20.) TrizecHahn Newport, L.L.C. and Trizec Realty, Inc. are subsidiaries of Trizec Properties, Inc. (Compl. PP21-22.)

Parties like Winstar are relatively new. With the passage of the Telecommunications Act of 1996 ("the Act"), Congress enacted provisions designed to promote competition in the local telecommunications markets, which traditionally had been served by one incumbent local exchange carrier ("ILEC"). [2] (Compl. P36) (citing 47 U.S.C. § 151 et seq.). Pursuant to the Act, competitive local telecommunications providers like Winstar (also known as competitive local exchange carriers or "CLECs") began to enter local markets and offer the ILECs' customers a choice in telecommunications services. (Compl. P36.)

> 2  The parties use several different acronyms in their briefs: ILEC (incumbent local exchange carrier, such as Verizon); CLEC (competitive local exchange carrier, such as Winstar); MTE (multiple tenant environment, i.e., an office building accommodating both ILECs and CLECs); REIT (real estate investment trust); RBOC (regional bell operating company, such as Verizon or other ILECs that historically served local telecommunications markets before the 1996 amendments to the Communications Act opened such markets to competition from CLECs). (Compl. P36.)

[*5] Since the passage of the Act, the Federal Communications Commission ("FCC") has continued to monitor the development of competition in the market for the provision of telecommunications services. (BOMA Br. at 9.) In 2000, the FCC adopted a measure prohibiting telecommunications carriers from entering into contracts that restrict owners and managers of commercial buildings from granting access to competing carriers. (BOMA Br. at 9.) Without access to the building rooftops and to the internal ducts and conduits of these buildings, companies like Winstar cannot deliver telecommunications services to tenants in those buildings. (Compl. P3.) At the same time, however, the FCC declined to adopt a rule prohibiting owners and managers from entering into contracts with various telecommunications providers that may contain different terms and fees for building access. (BOMA Br. at 9.)

Winstar alleges that, beginning in 1997 and continuing through the present, the Building Defendants, through and with their trade associations (BOMA and BOMA-NJ), have used their "collective control of the commercial real estate market to deny Winstar access to their tenants and, when granted, to condition building [*6] access by Winstar on exclusionary and anticompetitive terms and conditions, including price." (Compl. P3.) Winstar claims that, as a result of Defendants' conduct, it has been:

> unable to serve many customers that have requested service, has been impeded in its entry into the telecommunications market, and has been harmed in its ability to compete with Verizon and other ILECs. Competition in the commercial telecommunications market has accordingly been eliminated or restrained, injuring Winstar in its business and harming commercial office building tenants by limiting their choices in communications services.

(Compl. P7.) On August 29, 2003, Winstar filed a five-count complaint, [3] seeking relief for: (1) violations of § 1 of the Sherman Act, 15 U.S.C. § 1 (2004), based on allegations of horizontal price fixing, concerted refusals to deal (group boycott), and conspiracy to impose discriminatory prices in violation of the rule of reason; (2) violation of the New Jersey Antitrust Act, N.J. STAT. ANN. §§ 56:9-1 to 56:9-18 (1970); (3) violation of §§ 201(b) and 202(a) of the 1934 Communications Act, as amended, 47 U.S.C. §§ 201 [*7] (b) and (202)(a); (4) tortious interference with prospective business relations; and (5) breach of duty of good faith and fair dealing. (Compl. PP50-89.) On April 12, 2004, both BOMA and the Building Defendants filed the instant motions to dismiss the complaint, pursuant to FED. R. CIV. P. 12(b)(6).

> 3  Counts 3 and 5 are against the Building Defendants only.

Case 1:07-cv-00556-JJF-LPS     Document 31-2     Filed 12/17/2007     Page 48 of 57

Page 6
2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

On April 23, 2004, Winstar filed a complaint in the District Court for the Southern District of New York ("New York"), naming as defendants several building owners and managers, together with their trade association, BOMA-NY, and alleging that the defendants conspired in violation of *§ 1* of the Sherman Act to disadvantage Winstar in favor of ILECs. (Defs.' Joint Supplemental Mem. of Law in Supp. of Their Mot. to Dismiss, dated Feb. 4, 2005 ("Defs.' Mem."), at 3); Winstar Communications, LLC v. Equity Office Properties Inc., No. 04-3139 (S.D.N.Y. Jan. 24, 2005) (order granting motion to dismiss, at 1) [hereinafter [*8] "J. Wood's order"]. The defendants in the New York action also filed a motion to dismiss.

On December 1, 2004, Judge Wood conducted oral argument regarding the motion to dismiss in the New York action. On December 21, 2004, oral argument was held before this Court regarding Defendants' Motions to Dismiss in the instant action. On January 24, 2005, the New York action was dismissed with prejudice, on the ground that Winstar did not have standing to bring the suit under the antitrust laws. (J. Wood's order at 3.)

In light of the dismissal of the New York action, Trizec, with other defendants, submitted a Joint Supplemental Memorandum of Law in Support of Their Motions to Dismiss. Trizec argued that Winstar's antitrust claims in this action are "substantially identical" to those dismissed by Judge Wood in the New York action, and that Winstar lacks standing to raise Sherman Act claims before this Court. More specifically, Trizec asserts that, as in the New York action, Winstar's Complaint is likewise deficient here because "Winstar has alleged no more than harm to *itself* and to *its* business, and not harm to competition." (Defs.' Mem. at 2.) Thus, Trizek seeks dismissal of the [*9] Complaint, or alternatively, a stay of all proceedings pending resolution of Winstar's appeal to the Second Circuit Court of Appeals. (Defs.' Mem. at 2.)

Winstar argues in opposition that Defendants' Motion to Dismiss, and alternative plea for a stay, should be denied because Judge Wood's opinion is irrelevant and not dispositive. (Pls.' Supplemental Mem. of Points and Authorities on Antitrust Injury, dated Feb. 22, 2005 ("Pls.' Mem."), at 2.) Winstar contends that: (1) the actions do not present substantially identical antitrust claims, as the instant action includes a group boycott claim in addition to price fixing; (2) "Judge Wood's opinion is mistaken and poorly reasoned"; (3) Judge Wood's opinion is not binding precedent and has no collateral estoppel effect; and (4) Judge Wood did not permit Winstar an opportunity to amend its complaint to cure the antitrust injury pleading deficiencies. (Pls.' Mem. at 2-6.)

On June 30, 2005, Trizec and Plaintiffs stipulated to the withdrawal without prejudice of Trizec's motion to dismiss, subject to the condition that Trizec could reinstate the motion at any time, to be then decided by this Court upon the record as it existed as of June 28, 2005. On [*10] October 20, 2005, Trizec filed a request that the motion to dismiss be reinstated.

### STANDARD OF REVIEW

[HN1] On a motion to dismiss for failure to state a claim, pursuant to *FED. R. CIV. P. 12(b)(6)*, the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. See *Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994)*. A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. See *In re Warfarin Sodium, 214 F.3d 395, 397-98 (3d Cir. 2000)*. The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. See *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*; *Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000)*.

[HN2] While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported [*11] conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. See *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)*. "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" *Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993)* (quoting 5A CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357). It is not proper for a court to "assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*.

### DISCUSSION

In its Complaint, Winstar makes no specific statements about any Trizec entity, beyond naming Trizec as a defendant. The Complaint includes Trizec when referring either to all defendants, or to the building owner-manager defendants (hereinafter, "Defendants").

**A. Standing -- Counts 1 & 2 -- Federal and State Antitrust Claims**

[*12]  As a preliminary matter, this Court must determine whether Winstar has standing to sue under the antitrust laws, which are, along with the alleged Communications Act violations, the basis for this Court's subject matter jurisdiction over this action. Trizec, largely relying on Judge Wood's dismissal of the New York action for lack of antitrust standing, argues that Winstar lacks standing to raise its antitrust claims because it has failed to allege antitrust injury. (Defs.' Mem. at 1.) More specifically, Trizec asserts that Plaintiffs cannot establish antitrust standing because "just as in [the] New York [action], Winstar has alleged no more than harm to *itself* and to *its* business, and not harm to competition; thus, here just as in New York, Winstar's antitrust complaint should be dismissed for failure to state a claim." (Defs.' Mem. at 2.)

Winstar disagrees in several respects. First, Winstar counters that Defendants' reliance on the New York action is misplaced because this action is not similar to the New York action. (Pls.' Mem. at 3.) For example, Winstar argues that, unlike the New York action, this case involves a per se group boycott claim in addition to [*13] a per se price fixing claim, whereas the New York action raised only price fixing claims. (Pls.' Mem. at 3.) Therefore, Winstar disputes Defendants' contention that the instant action presents antitrust claims that are "'substantially identical'" to those raised in the New York action. (Pls.' Mem. at 2) (quoting Defs.' Mem. at 1, 3). Winstar contends that it "has suffered antitrust injury for purposes of its group boycott claim without regard to Judge Wood's ruling on standing with respect to price fixing." (Pls.' Mem. at 3.) Winstar further maintains that Judge Wood's ruling is not controlling because it is "mistaken and poorly reasoned" in its conclusion that Winstar has only alleged injury to itself, and not harm to competition in the marketplace. (Pls.' Mem. at 3-5.) Finally, Winstar asserts that Judge Wood's ruling is not binding precedent upon this Court, and that Judge Wood erred by declining Winstar's express request for an opportunity to amend its complaint. (Pls.' Mem. at 5-7.)

### 1. Applicable Law

[HN3] The burden of a plaintiff in a private antitrust action to demonstrate that it has antitrust standing arises from *Section 4* of the Clayton Act, which provides that [*14] "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may bring suit under the antitrust laws in the district courts for treble damages. See *15 U.S.C. § 15 (1982)*.

It is an understatement to state that, "in many ways the standing question is the most difficult issue in [a] case." *Arroyo-Melecio v. Puerto Rican Am. Ins. Co., 398 F.3d 56, 72 (1st Cir. 2005)*. To begin with, the term

"standing" has "caused confusion when used in the antitrust context as opposed to the constitutional sense." *Alberta Gas Chem. Ltd. v. E.I. Du Pont De Nemours and Co., 826 F.2d 1235, 1239 (3d Cir. 1987)*.[HN4]  The focus of antitrust standing is different from constitutional standing. In the constitutional context, standing is concerned with whether "a party has sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy" and, among other things, requires a plaintiff to show that it has suffered an "injury in fact." See *Sierra Club v. Morton, 405 U.S. 727, 731, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972)*. While "harm to the antitrust plaintiff is sufficient to satisfy [*15] the constitutional standing requirement of injury in fact . . . [the doctrine of antitrust standing requires] the court [to] make a further determination [as to] whether the plaintiff is a proper party to bring a private antitrust action." *Alberta, 826 F.2d at 1239* (quoting *Associated Gen. Contractors, 459 U.S. at 535 n.31*).

In *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*, widely regarded as the leading case on antitrust standing, the Supreme Court observed that [HN5] "the mere fact that the claim is literally encompassed by the Clayton Act does not end the [standing] inquiry." *Id. at 537*. A court must consider, along with a number of other factors, "the nature of the plaintiff's alleged injury" in order to determine whether it is "of the type that the antitrust statute was intended to forestall." *Id. at 538, 540*.

[HN6]  In defining antitrust injury, the Supreme Court has explained that:

> Conduct in violation of the antitrust laws may have three effects, often interwoven: In some respects the conduct may reduce competition, in other [*16] respects it may increase competition, and in still other respects effects may be neutral as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.

*Id. at 543-44.*

The Third Circuit Court of Appeals echoed this notion in *Eichorn v. AT&T Corp., 248 F.3d 131 (3d Cir. 2001)*, where it stated that [HN7] "it is well established that an antitrust injury reflects an activity's anticompetitive effect on the competitive market." *Eichorn, 248 F.3d at 140* (citing *Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344, 110 S. Ct. 1884, 109 L. Ed. 2d 333*

*(1990))*. A plaintiff's personal grievance cannot be deemed an antitrust injury "unless the activity has a wider impact on the competitive market." Id. (citing *City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 266-67 (3d Cir. 1998))*.

[HN8] The Third Circuit Court of Appeals has interpreted Brunswick and Associated Gen. Contractors to require a plaintiff to satisfy the antitrust injury requirement and also be the appropriate "person" to bring suit under the standing requirements. [*17] Antitrust injury is a threshold inquiry to be satisfied before the matter may proceed. See *Alberta, 826 F.2d at 1240* (stating that "once antitrust injury has been demonstrated by a causal relationship between the harm and the challenged aspect of the alleged violation, standing analysis is employed to search for the most effective plaintiff from among those who have suffered loss"). In *Angelico v. Lehigh Valley Hospital, Inc., 184 F.3d 268, 274 (3d Cir. 1998)*, [HN9] the Third Circuit Court of Appeals enumerated the factors to be considered in an antitrust standing analysis:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex [*18] apportionment of damages.

*Id. at 274* (citations omitted).

## 2. Analysis

For the purposes of the instant motions, this Court assumes the truth of Winstar's factual allegations, although this Court does not accept as true any conclusory or legal assertions. See *Morse, 132 F.3d at 906*. For the reasons set forth below, this Court concludes that Winstar has established standing to bring suit under the antitrust laws.

Generally, Winstar claims that as a result of the unlawful conspiracy and agreements among Defendants to deny or restrict building access, it is being anticompetitively forced out of the market for the provision of telecommunications services. (Compl. P7.) Winstar also alleges that commercial office building tenants have been

harmed because their choice of telecommunications carriers has been limited. (Compl. P7.) Thus, Winstar alleges that "competition in the commercial telecommunications market has accordingly been eliminated or restrained." (Compl. P7.)

Specifically, Winstar claims that Defendants have conspired "to fix the rental price of building access for the provision of telecommunications services to commercial [*19] office building tenants." (Compl. P51.) Winstar asserts that these horizontal price-fixing agreements "have severely restrained and diminished competition in the relevant market." (Compl. P51.) Winstar also contends that Defendants have conspired not to deal with Winstar "by denying it access to the buildings they own or manage" - a horizontal agreement that constitutes an unlawful group boycott. (Compl. PP58, 63.) Finally, Winstar argues that Defendants have conspired to impose discriminatory prices, terms, and conditions on Winstar's building access, thereby "substantially restraining and impeding competition in the relevant market." (Compl. P64.)

The threshold issue in the Angelico analysis is one of antitrust injury. Trizec argues solely that Winstar has failed to establish standing because it has not articulated antitrust injury. [4] (Defs.' Mem. at 1-2.) This Court disagrees: Winstar has alleged an injury "of the type for which the antitrust laws were intended to provide redress." *Angelico, 184 F.3d at 274*. Assuming the truth of Winstar's allegations that Defendants have combined in a horizontal agreement to disadvantage Winstar intentionally and impede its [*20] competition in the market, as this Court must at the motion to dismiss stage, this Court finds that Winstar has sufficiently alleged, for standing purposes, that Defendants' purported agreement has a market-wide impact on the competitive market. *Eichorn, 248 F.3d at 140* (citing *West Penn Power Co., 147 F.3d at 266-67*).

> 4  In their joint supplemental memorandum, Defendants argue that Winstar lacks standing because it has not alleged a cognizable antitrust injury. (Defs.' Mem. at 4.) Defendants do not argue that Winstar has failed to establish any other factor of antitrust standing.

Mindful of Angelico's admonition not to confuse the issue of anticompetitive market effect with the antitrust injury requirement of the standing inquiry, *Angelico, 184 F.3d at 275 n.2*, but also noting Eichorn's requirement that "antitrust injury reflect[] an activity's anticompetitive effect on the competitive market," *Eichorn, 248 F.3d at 140*, it appears to this [*21] Court that Winstar has alleged, at a minimum, that Defendants conspired to restrict or deny access to Winstar, as part of a larger campaign against other similarly-situated CLECs, and that

this conduct resulted in a wide impact on the competitive telecommunications market. (Compl. PP2-7, 37, 41, 47-48.) Thus, this Court concludes that Winstar has standing to sue under the antitrust laws. [5]

> 5   In the New York action, Judge Wood concluded that Winstar had merely alleged harm to itself as an individual competitor, and had not "alleged how Defendants' conduct has reduced competition among telecommunication services providers." (J. Wood's order at 8.) Judge Wood's decision is governed by a Second Circuit case, *Balaklaw v. Lovell, 14 F.3d 793 (2d Cir. 1994).* In Balaklaw, the court concluded that the plaintiff anesthesiologist who competed for an exclusive contract, and lost it to another anesthesiology group, had not suffered an antitrust injury sufficient to confer standing upon him. *Balaklaw, 14 F.3d at 802.* The court noted that, since the market for anesthesiology services for hospitals was multi-state, if not national, the plaintiff had not provided any evidence to suggest that he was excluded from or substantially limited in the broader market for employment, and thus, had failed to demonstrate antitrust injury. *Id. at 799.* The court also relied in part on the lack of impact of the alleged unlawful restraint on the consumer, regardless of whether there had been an impact on the plaintiff competitor. *Id. at 798* (noting that "from the consumers' point of view, nothing about the market has changed"). Judge Wood was persuaded further by the notion that this type of exclusive contract actually might foster competition, rather than restrain it, in that the competing anesthesiology groups would have strong incentives to offer competitive and improved care and prices in order to obtain exclusive contracts. *Id. at 799.* Judge Wood's decision emphasizes the Balaklaw court's observation that Dr. Balaklaw had "only established harm as an individual competitor." (J. Wood's order at 9 n.8) (citing *Balaklaw, 14 F.3d at 797*). While Balaklaw may be persuasive, it is not binding in this Circuit.

[*22]   Furthermore, the Supreme Court has stated that [HN10] "a *§ 4* plaintiff need not 'prove an actual lessening of competition in order to recover. Competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened.'" *Blue Shield of Virginia v. McCready, 457 U.S. 465, 482, 102 S. Ct. 2540, 73 L. Ed. 2d 149 (1982).* To the extent that Winstar is claiming that Defendants have conspired to drive it (and other CLECs) from the market, thereby resulting in a future reduction in competition, this Court finds that Winstar has alleged successfully antitrust injury sufficient to obtain standing. Al-

though Winstar is not a direct competitor of Defendants, it appears that its alleged injury is sufficiently related to the injury Defendants allegedly sought to inflict on the market such that this Court may conclude that Winstar's alleged injury "flows from that which makes Defendants' acts unlawful" within the meaning of Brunswick. See *McCready, 457 U.S. at 483-84.*

Finally, this Court considers persuasive the notion that, assuming Defendants indeed have conspired to restrain trade in a manner in which the antitrust laws are designed to prevent, [*23] denying standing to Winstar might be "'likely to leave a significant antitrust violation undetected or unremedied.'" *Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp., 951 F.2d 1158, 1164 (9th Cir. 1991).* Winstar has alleged that it, along with other CLECs, is the specific target of Defendants' alleged anticompetitive conspiracy to disadvantage it within the market. (Compl. PP2-7, 37, 41, 47-48.) Thus, Winstar has established that, if an anticompetitive practice does in fact exist, Winstar is the most direct victim. Based on Winstar's allegations, this Court cannot speculate that there exists a more appropriate antitrust plaintiff in this context who is "better poised to vindicate the public interest in antitrust enforcement." *Yellow Pages, 951 F.2d at 1163.* Winstar has established sufficient antitrust injury to give it antitrust standing.

### B. Failure to State a Claim

#### 1. Counts 1 & 2 -- Federal and State Antitrust Claims [6]

> 6   Winstar admits in its Complaint that "the New Jersey Antitrust Act parallels the Sherman Act and is to 'be construed in harmony with judicial rulings' under the Sherman Act." (Compl., at P69 (citing *N.J. STAT. ANN. § 56:9-18*).) Thus, Winstar's federal and state antitrust claims shall be treated together and dismissed on the same grounds.

[*24]   [HN11] "To establish a *section 1* violation for unreasonable restraint of trade, a plaintiff must prove (1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action." *Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997).* Winstar has alleged three distinct violations of *§ 1* of the Sherman Act: (1) a discriminatory pricing scheme in violation of the rule of reason; (2) a per se price fixing violation; and (3) a per se group boycott. (Compl. PP51-67.)

##### a. Rule of Reason Violation (Price Discrimination)

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

Winstar claims that "Defendants have colluded, conspired and agreed, among themselves and with Verizon and other ILECs, to impose discriminatory and less favorable prices, terms and conditions on Winstar's access to their commercial properties than those applied to Verizon and other ILECs." (Compl. P64.)[HN12] For antitrust violations not within the per se category of invalidity, courts employ a rule of reason test. [7] *Eichorn, 248 F.3d at 138.* [*25] This Court finds that Winstar has failed to allege a rule of reason violation adequately.

> 7 "Under the per se test, agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality are found to be antitrust violations. . . Under [the rule of reason] test, plaintiffs have the burden of establishing that, under all the circumstances, the challenged acts are unreasonably restrictive of competitive conditions in the relevant market." *Eichorn, 248 F.3d at 138.*

[HN13] Under a rule of reason analysis, a valid claim must allege facts which, if true, are sufficient to establish the four elements of the § 1 analysis. In order to establish the second element, that the Defendants' actions produced anticompetitive effects within the relevant product and geographic markets, the plaintiff must allege that particular, actual anticompetitive effects occurred within these markets, such as price increases or output reduction. [*26] See *F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61, 106 S. Ct. 2009, 90 L. Ed. 2d 445 (1986).* Because "such proof is often impossible to make . . . due to the difficulty of isolating the market effects of challenged conduct . . ., courts typically allow proof of the defendant's 'market power' instead. Market power [is] the ability to raise prices above those that would prevail in a competitive market." *United States v. Brown Univ., 5 F.3d 658, 668 (3d Cir. 1993)* (internal citations omitted). As with actual anticompetitive effects, market power must be shown in the relevant product and geographic markets.

Here, Winstar has not alleged sufficiently that Trizec's conduct has been "unreasonably restrictive of competitive conditions" to state a § 1 claim under either the actual competitive effects or market power approaches. Actual anticompetitive effects are typically measured by price increase or output reduction, but Winstar has not alleged that these effects occurred in the market for provision of telecommunications services. Winstar does allege that Defendants increased the price of building access for Winstar, (Compl. P37), but to the extent Winstar is asserting [*27] that the increased prices in building access are evidence of actual anticompetitive effects, this effort fails for two reasons.

First, Winstar claims a restraint on competition in the telecommunications services market, but has not alleged an increase in the price of telecommunications services that could evidence actual anticompetitive effects in that market.

Second, and more importantly, Winstar is claiming that a restraint of trade has occurred in the market for the provision of telecommunications services, not in the market for building access. (Compl. P7) (emphasis added). Therefore, even if there has been a market-wide rise in price for building access, this Court cannot infer reasonably that price increases in building access have resulted in price increases for telecommunications services, evidencing actual anticompetitive effects.

Winstar also fails to state a claim for anticompetitive effects using the market power approach. [HN14] To state a valid claim under this approach, Winstar must, *inter alia,* define the relevant product and geographic markets in which market power is alleged. "The proper definition of the market is a 'necessary predicate' to an examination [*28] of the competition that may be affected." *Brown Shoe Co. v. United States, 370 U.S. 294, 335, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962).* A plaintiff may also define a sub-market as the area in which market power may be found. "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id. at 325.*

Winstar alleges that the relevant product market is "the provision of telecommunications services to tenants in commercial office buildings." (Compl. P28.) Winstar alleges that the relevant geographic market is "the United States and includes sub-markets, such as the State of New Jersey, because access for telecommunications purposes to commercial office buildings in one city or location is not a good substitute for access to commercial office buildings in other cities or locations." (Compl. P28) (emphasis added). Winstar's market definitions suffer from several fatal defects.

First, to the extent that [*29] Winstar defines the geographic market as the entire United States, it has not alleged facts sufficient for a conclusion that Defendants have market power over the national market for provision of telecommunications services. Second, to the extent that Winstar defines the relevant geographic market as "including sub-markets," this is simply too undefined to state a claim of anticompetitive power in a specific sub-market. Third, to the extent that Winstar defines the relevant geographic market as the sub-market of the

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

State of New Jersey, Winstar has not stated sufficient facts to support this sub-market definition.

Lastly, Winstar's market definition incorporates two different kinds of markets: "provision of telecommunications services" and "access for telecommunications purposes to commercial office buildings." (Compl. P28.) Winstar justifies its claim of market power in the sub-market of the State of New Jersey by connecting the two: "landlords enjoy locational market power in the sale of building access." (Compl. P30.) This, however, is the wrong market power: it is not power in the relevant product market, defined by Winstar as the provision of telecommunications services. (Compl. [*30] P28.) Winstar does not explain how power in the market for building access produces power in the market for telecommunications services, nor does it allege facts sufficient to support such an argument, had it made it.

Defendants do not compete in the market for provision of telecommunications services. Even if this Court assumes the truth of Winstar's allegation that Defendants have conspired to impose discriminatory prices upon Winstar for building access, in order for the Court to find that Winstar has alleged sufficiently a restraint on competition in the telecommunications services market, the Court would have to assume further that, through this discriminatory pricing in the building access market, Defendants aimed to restrain competition in the market for provision of telecommunications services -- a market in which Defendants do not compete.

Winstar has not alleged sufficient facts to permit this Court to find that a restraint in the market for building access has resulted in a restraint in the product market for telecommunications services. This Court is not required, nor would it be "proper to assume that [Winstar] can prove facts that it has not alleged or that Defendants [*31] have violated the antitrust laws in ways that have not been alleged." *Associated Gen. Contractors, 459 U.S. at 526.*

For all the reasons cited, Winstar's market definitions are insufficient to state a valid claim for anticompetitive market power. As dictated by the Supreme Court, "in a case of this magnitude, a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id. at 528 n.17.*

Because Winstar has failed to allege sufficient facts concerning the anticompetitive effects of Defendants' conduct in the relevant product and geographic markets in which Winstar alleges that trade has been restrained, under either the actual anticompetitive effects or market power approaches, this Court cannot conclude that Winstar has stated a claim for a rule of reason violation.

Thus, Winstar's rule of reason price discrimination claim will be dismissed.

**b. Price Fixing**

Winstar alleges in Counts 1 and 2 that Defendants "have colluded, conspired and agreed . . . to fix the rental price of building access for the provision of telecommunications services to commercial [*32] office building tenants. This horizontal conspiracy . . . constitutes a per se violation of *Section 1* of the Sherman Act." (Compl. PP51, 54.)

[HN15] Although most restraints are analyzed under the traditional "rule of reason," *Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49, 97 S. Ct. 2549, 53 L. Ed. 2d 568 (1977),* "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable." *N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958).* Such practices are deemed to be "illegal per se." *Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 692, 98 S. Ct. 1355, 55 L. Ed. 2d 637 (1978).* The per se rule of illegality, however, is "based in large part on economic predictions that certain types of activity will more often than not unreasonably restrain competition." *Brown Univ., 5 F.3d at 670;* see also *Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 344, 102 S. Ct. 2466, 73 L. Ed. 2d 48 (1982)* ("Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption [*33] that the restraint is unreasonable"); *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 289, 105 S. Ct. 2613, 86 L. Ed. 2d 202 (1985)* ("The per se approach permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive"); *NCAA v. Bd. of Regents of the Univ. of Oklahoma, 468 U.S. 85, 103-04, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984)* ("Per se rules are invoked when the surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct"). For the following reasons, this Court determines that Winstar's claim of price fixing, as currently alleged, should not be subject to the per se rule of illegality, and rather, should be subject to a rule of reason analysis.

Winstar's price fixing claim centers upon action allegedly taken by BOMA and BOMA-NJ to encourage their members "to offer uniform and less favorable terms to Winstar than to Verizon or other ILECs." (Compl. P52.) Winstar refers to model agreements, "best practices," and other related materials distributed to BOMA's members by their trade association. (Compl. P52.) Defendants [*34] argue, however, that "BOMA's develop-

Case 1:07-cv-00556-JJF-LPS    Document 31-2    Filed 12/17/2007    Page 54 of 57

Page 12

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

ment of model agreements and 'best practices' for building access was a lawful trade association activity that was specifically encouraged by the FCC." (BOMA Br. at 17.)

This Court cannot conclude with confidence that the price fixing conspiracy alleged in this case presents an unreasonable restraint on competition in the telecommunications service market such that it should be conclusively presumed per se illegal, and that further examination of the facts and circumstances would be unjustified. First, it is only very recently that Congress and the FCC have begun to scrutinize the issue of competition in the local telecommunications markets, and the issues arising out of the passage of the Telecommunications Act of 1996 are still being addressed. (BOMA Br. at 6.) In addition, the courts have not yet begun to publish consistent pronouncements on the issue. [8] Because this is not the type of circumstance where this Court can easily ascertain the great likelihood of anticompetitive effects, see *California Dental Ass'n v. FTC, 526 U.S. 756, 770, 119 S. Ct. 1604, 143 L. Ed. 2d 935 (1999)*, this Court holds that, as currently alleged, Winstar's claim of price fixing [*35] should not be analyzed under the per se rule, but rather under the full rule of reason. Because of Winstar's failure to state a claim for anticompetitive effects, delineated above (failing to specify particular adverse effects on competition in particular markets), Winstar's price fixing claim, analyzed under the rule of reason, also must fail. Therefore, this Court will dismiss Winstar's claim of price fixing.

8 Notably, the Third Circuit has stated that:

. . . concerted action does not exist every time a trade association member speaks or acts. Instead, in assessing whether a trade association (or any other group of competitors) has taken concerted action, a court must examine all the facts and circumstances to determine whether the action taken was the result of some agreement, tacit or otherwise, among members of the association.

*Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1007-08 (3d Cir. 1994).*

## C. Group Boycott

In Counts 1 and 2, Winstar claims that [*36] "Defendants have colluded, conspired and agreed not to deal with Winstar by denying it access to the buildings they own or manage," constituting "per se unlawful group boycotts in violation of *Section 1* of the Sherman Act." (Compl. PP58, 63.)

[HN16] In certain instances, concerted refusals to deal or group boycotts are "so likely to restrict competition without any offsetting efficiency gains that they should be condemned as per se violations of § 1 of the Sherman Act." *Northwest Wholesale, 472 U.S. at 290.* Generally, the per se approach to boycotts is applied in cases where there are "joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'" *Id. at 294* (quoting L. SULLIVAN, LAW OF ANTITRUST 261-62 (1977)). The Third Circuit has echoed that narrow construction of the per se rule for boycotts. See *Eichorn, 248 F.3d at 143* (citing *Northwest Wholesale, 472 U.S. at 289-90* (per se rule confined to limited types of anti-competitive practices); *Larry Muko, Inc. v. Southwestern Pa. Bldg. and Const. Trades Council, 670 F.2d 421, 429* [*37] *(3d Cir.)* ("Generally the application of the per se rule has been limited to those 'classic' boycotts in which a group of business competitors seek to benefit economically by excluding other competitors from the marketplace"), cert. denied, *459 U.S. 916, 103 S. Ct. 229, 74 L. Ed. 2d 182 (1982)).*

[HN17] As a general matter, "the Supreme Court has been cautious in extending the per se approach to claims that fall outside certain previously enumerated categories of liability." *Eichorn, 248 F.3d at 143* (citations omitted). Thus, "claims not within established categories of antitrust liability are more appropriately analyzed under the rule of reason where courts can balance the effect of the alleged anticompetitive activity against its competitive purposes within the relevant product and geographic markets." Id.

Based on the judicial reluctance to analyze boycott claims under the per se rule, as well as upon this Court's review of the Complaint, it appears that the circumstances of the alleged boycott in this case do not fall within the narrow scenario detailed by the Court in *Northwest Wholesale.* In this case, Winstar alleges that the Building Defendants conspired with each [*38] other and BOMA to engage in a group boycott of Winstar. (Compl. PP58, 63.) However, Winstar is not a competitor of either BOMA or the Building Defendants. Winstar is in competition with other CLECs, Verizon, and other ILECs. This case does not fall within the Northwest Wholesale per se rule, which applies only to boycotts by competitors against competitors. [9] Therefore, this Court holds that, as currently alleged, Winstar's group boycott claim should not be analyzed under the per se rule, but rather under the full rule of reason.

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

9  Winstar specifically alleges that:

> Through and with BOMA, the Owner-Manager Defendants, together with other coconspirator real estate owners and managers not parties to this action, have entered into exclusive arrangements for building access pursuant to which they receive equity and/or revenue-sharing compensation from their preferred telecommunications provider. In light of these exclusivity provisions, Defendants' [sic] have refused to execute building access arrangements with Winstar for certain of their commercial properties.

(Compl. P58.) Winstar has not implicated Verizon or other ILECs in the concerted refusal to deal beyond alleging that Defendants have chosen Verizon and other ILECs to be their exclusive "preferred providers." (Compl. P58, 61.) Winstar also has not alleged or intimated that Verizon or other ILECs are at all involved in the conspiracy to boycott Winstar.

[*39]  Because of Winstar's failure to state a claim for anticompetitive effects, Winstar's group boycott claim, analyzed under the rule of reason, must also fail. Therefore, this Court will dismiss Winstar's group boycott claim.

Because this Court has determined that Winstar has failed to state a claim upon which relief may be granted for violations of *section 1* of the Sherman Act, this Court dismisses Counts 1 and 2 of the Complaint, without prejudice, allowing Winstar to re-plead to address its present deficiencies.

**2. Count 3 -- The Communications Act of 1934, as amended**

Winstar asserts this claim against the Building Defendants only. [10] This claim arises from the Communications Act of 1934 ("the Act"). See *47 U.S.C. §§ 201(b)* and *202(a)*. [HN18] The Act makes it unlawful for any "common carrier" of telecommunications services to discriminate in prices or practices. See *47 U.S.C. §§ 201(b)* [11] and *202(a)*. [12]

10  Of the Building Defendants, Trizec is the only remaining defendant.

11  [HN19] *Section 201(b)* declares that, for "common carriers," "all charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." *47 U.S.C. § 201(b)*.

[*40]

12  *Section 202(a)* [HN20] makes it unlawful for any "common carrier":

> to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

*47 U.S.C. § 202(a)*.

Winstar alleges that the Building Defendants are "common carriers" subject to the Act because the Building Defendants have entered into arrangements with "preferred" telecommunications carriers wherein the carriers were given exclusive access to the properties in exchange for the Building Defendants' equity interests in the carriers or revenue-sharing with the carriers. (Compl. P73.) Winstar claims that, based upon the revenue-sharing agreements between the Building Defendants and the "preferred carriers," the [*41] Building Defendants are de facto "common carriers" of telecommunications services. (Compl. P74.) Winstar then claims that these exclusive agreements deny access to Winstar, and amount to discriminatory practices and pricing proscribed by the Act. (Compl. P77.)

The Building Defendants argue that this claim cannot survive because *§§ 201* and *202* only apply to "common carriers," which they are not. (Building Defs.' Br. at 38-46.) This Court agrees. Because Winstar has not alleged facts to support the theory that the Building Defendants are "common carriers" of telecommunications services, this Count is dismissed with prejudice.

[HN21] The text of the Act defines and describes "common carrier" as an entity that is "engaged in provid-

Case 1:07-cv-00556-JJF-LPS    Document 31-2    Filed 12/17/2007    Page 56 of 57

Page 14

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

ing telecommunications services." *47 U.S.C. § 153(44)*. To determine whether an entity is a "common carrier," see *FCC v. Midwest Video Corp., 440 U.S. 689, 700-01, 99 S. Ct. 1435, 59 L. Ed. 2d 692 (1979)*, courts should examine: (1) whether the carrier "undertakes to carry for all people indifferently," see *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC, 525 F.2d 630, 641, 173 U.S. App. D.C. 413 (D.C. Cir. 1976)* (internal quotation marks and citation omitted); and (2) [*42] whether the system is such that customers transmit intelligence of their own design and choosing, see *Nat'l Ass'n of Regulatory Util. Comm'rs, 533 F.2d 601, 609, 174 U.S. App. D.C. 374*. The Building Defendants are not "engaged in providing telecommunications services," *47 U.S.C. § 153(44)*, nor do the factual allegations support the finding that the Building Defendants satisfy the first prong of the test articulated above.

Winstar claims that the Building Defendants should be deemed "common carriers" because they are resellers of telecommunications services who are subject to "common carrier" duties under the Act. According to Winstar, "common carrier duties apply to any entity that: (1) independently or jointly through a resale or joint service provider arrangement, (Pls.' Br. in Opp'n to the Building Defs.' Mot. to Dismiss ("Pls.' Opp'n") at 36 (citations omitted)); (2) offers 'transmission, between or among points specified by the user, of information of the user's choosing.'" (Pls.' Opp'n at 36) (quoting *47 U.S.C. § 153(43)*).

Defendants argue that Winstar's characterization of them as "resellers" that are subject to *§§ 201(b)* and *202(a)* of [*43] the Act as "common carriers" is flawed, and thus, must fail. (Building Defs.' Br. at 44.) This Court agrees.

[HN22] Resale is "an activity wherein one entity subscribes to the communications services and facilities of another entity and then reoffers communications service and facilities to the public . . . for profit." *Resale and Shared Use Order, 60 F.C.C.2d 261, 261 P17 (1976)*. The Third Circuit Court of Appeals described the resale market as follows:

Resellers . . . subscribe to AT&T programs which provide large discounts for high volume purchases of AT&T telecommunications services. The resellers then sell the services to individual businesses that do not generate sufficient volume to qualify individually for the high-volume discounts. Thus, by providing the services to these end-users, resellers make a profit while end-users receive access to the AT&T network at a significantly lower cost than if they purchased services

from AT&T directly . . . in the resale business, only the reseller is a customer of AT&T; the end-users are customers of the reseller and not AT&T.

*AT&T v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1423 (3d Cir. 1994).* [*44]

The Building Defendants are not customers of the telecommunications providers, i.e., they do not purchase the telecommunications services from the providers. (Building Defs.' Br. at 23.) The end-users of the telecommunications services, the tenants, are direct customers of the telecommunications providers, not the Building Defendants. Winstar has not alleged facts to show that the Building Defendants act as the sort of intermediaries or intermediate providers of telecommunications services intended to be captured by the term "resellers" that are subject to "common carrier" duties under the Communications Act. Thus, its attempt to seek relief against the Building Defendants under this theory must fail.

Finally, Winstar attempts to argue that it has pled adequately a claim for relief under the Communications Act "regardless of whether the Defendants are common carriers," because Winstar claims that "Defendants violated *Sections 202(a)* and *201(b)* of the Act, which prohibit discrimination and unreasonable practices 'in connection with' telecommunications services." (Pls.' Opp'n at 47.) This basis for relief also fails.

In asserting this theory of relief, Winstar appears to have overlooked [*45] the fact that [HN23] the Act's prohibition against unjust or unreasonable practices expressly applies to "any common carrier." See *47 U.S.C. § 202(a)*. Indeed, the Act states: "It shall be unlawful for any common carrier to make any unjust or unreasonable determination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service." *47 U.S.C. § 202(a)* (emphasis added). Furthermore, *Section 201* expressly provides that the chapter applies to "common carriers." *47 U.S.C. §§ 201(a)* and *(b)*. In fact, the relevant subchapter of the statute containing both *§§ 201* and *202* is entitled "Common Carriers," and the relevant part is entitled "Common Carrier Regulation." Winstar cannot seek relief under *§§ 201* and *202* against parties who are not common carriers.

Winstar has not alleged facts to support its assertion that the Building Defendants are "common carriers," subject to liability under the Communications Act. Thus, Count 3 is dismissed with prejudice.

### 3. Counts 4 & 5 - State Common Law Claims

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

Count 4 asserts tortious interference with prospective [*46] business relations on the part of all Defendants, and Count 5 asserts breach of the duty of good faith and fair dealing on the part of the Building Defendants. These are claims under state law.

Based upon this Court's dismissal of all other counts of the Complaint, this Court declines to exercise supplemental jurisdiction over these state law claims, pursuant to *28 U.S.C. § 1367*. This Court dismisses these claims without prejudice because this Court cannot conclude that Winstar's amendment of its antitrust claims would be futile. Thus, if Winstar successfully re-pleads its Sherman Act claims, satisfying federal question jurisdiction under *28 U.S.C. § 1331*, this Court may exercise supplemental jurisdiction over any state or common law claims under *28 U.S.C. § 1367*.

## CONCLUSION

For the reasons set forth above, Trizec's motion to dismiss is granted. Accordingly, Counts 1, 2, 4, and 5 are dismissed without prejudice and Count 3 is dismissed with prejudice. Winstar, if it so chooses, may file an amended complaint within forty-five (45) days of the entry of this Court's order.

Dated: December 14, 2005

[*47] JOSEPH A. GREENAWAY, JR., U.S.D.J.

## ORDER

**GREENAWAY, JR., U.S.D.J.**

This matter having come before the Court on the reinstated motion of Defendants Trizec Properties, Inc., TrizecHahn Newport, L.L.C., and Trizec Realty, Inc. (collectively "Trizec") to dismiss the Complaint, pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, and Trizec's appeal of Magistrate Judge Haneke's discovery order dated May 10, 2005; and it appearing that resolution of the motion to dismiss renders the appeal moot; and it appearing that this Court reviewed the parties' submissions, and heard oral argument on the motion to dismiss; and for the reasons set forth in the accompanying Opinion, and good cause appearing,

IT IS on this 14th day of December, 2005,

ORDERED that Defendants' motion to dismiss (Docket Entry no. 47) is GRANTED, and Counts 1, 2, 4, and 5 of the Complaint are hereby DISMISSED without prejudice, and Count 3 of the Complaint is hereby DISMISSED with prejudice; and it is further

ORDERED that Defendants' Appeal of Magistrate Judge Haneke's Order dated May 10, 2005 (Docket Entry no. 91) is dismissed as moot; and it [*48] is further

ORDERED that a copy of this Order be served on the parties within seven (7) days of the entry of this Order.

JOSEPH A. GREENAWAY, JR., U.S.D.J.

5

LEXSEE



Positive
As of: Dec 14, 2007

**IN RE: INSURANCE BROKERAGE ANTITRUST LITIGATION, APPLIES TO ALL ACTIONS; IN RE: EMPLOYEE-BENEFIT INSURANCE BROKERAGE ANTITRUST LITIGATION, APPLIES TO ALL ACTIONS**

**MDL No. 1663, Civil Action No. 04-5184 (FSH), Civil Action No. 05-1079 (FSH)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2006 U.S. Dist. LEXIS 73055*

**October 3, 2006, Decided**

**NOTICE:** [*1] NOT FOR PUBLICATION

**SUBSEQUENT HISTORY:** Motion denied by, in part, Motion to strike denied by *In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73054 (D.N.J., Oct. 3, 2006)*

**PRIOR HISTORY:** *In re Ins. Brokerage Antitrust Litig., 2005 U.S. Dist. LEXIS 44909 (D.N.J., Aug. 8, 2005)*

**COUNSEL:** For EAGLE PRODUCTS, INC., Movant: HOWARD J. SEDRAN, LEVIN, FISHBEIN, SEDRAN & BERMAN, PHILADELPHIA, PA.

For STEPHEN LEWIS, Plaintiff: ADAM J LEVITT, FRED TAYLOR ISQUITH, WOLF HALDENSTEIN ADLER FREEMAN & HERTZ LLP, CHICAGO, IL; JAYNE ARNOLD GOLDSTEIN, MAGER & GOLDSTEIN LLP, CORAL SPRINGS, FL; , PHILADELPHIA, PA; MARK C. RIFKIN, WOLF, HALDENSTEIN, ADLER, FREEMAN & HERZ, LLP, NEW YORK, NY; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For DIANE PRUESS, Plaintiff: ADAM J LEVITT, FRED TAYLOR ISQUITH, MARY JANE EDELSTEIN FAIT, WOLF HALDENSTEIN ADLER FREEMAN & HERTZ LLP, CHICAGO, IL; JAYNE ARNOLD GOLDSTEIN, MAGER & GOLDSTEIN LLP, CORAL SPRINGS, FL; KENNETH I. TRUJILLO, PHILADELPHIA, PA; MARK C. RIFKIN, WOLF,

HALDENSTEIN, ADLER, FREEMAN & HERZ, LLP, NEW YORK, NY; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For OPTICARE HEALTH SYSTEMS INC, (CIVIL 05-1168), Plaintiff: EDITH M. KALLAS, MILBERG, WEISS, BERSHAD & SCHULMAN, LLP, NEW YORK, NY; JOE R. WHATLEY, CHARLENE P. FORD, OTHNI J. LATHRAM, RICHARD P. ROUCO, WHATLEY, DRAKE, LLC, BIRMINGHAM, AL; JOHN J. STOIA, MARY LYNNE CALKINS, [*2] RACHEL LYNN JENSEN, THEODORE JOSEPH PINTAR, LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS, LLP, SAN DIEGO, CA; JOSEPH P. GUGLIELMO, LILI R. SABO, WHATLEY DRAKE & KALLAS, NEW YORK, NY; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US; BONNY ELAINE SWEENEY, JAMES DANIEL MCNAMARA, LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, SAN DIEGO, CA; PETER S. PEARLMAN, COHN, LIFLAND, PEARLMAN, HERRMANN & KNOPF, LLP, SADDLE BROOK, NJ.

For MARYANN WAXMAN, (CIVIL 05-1079), Plaintiff: KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US; LILI R. SABO, WHATLEY DRAKE & KALLAS, NEW YORK, NY; PETER S. PEARLMAN, COHN,

2006 U.S. Dist. LEXIS 73055, *

LIFLAND, PEARLMAN, HERRMANN & KNOPF, LLP, SADDLE BROOK, NJ.

For SUNBURST HOSPITALITY CORPORATION, (CIVIL 04-5742), Plaintiff: ELLEN MERIWETHER, MELODY FORRESTER, MICHAEL STEVEN TARRINGER, TIMOTHY FRASER, BRYAN L. CLOBES, MILLER, FAUCHER & CAFFERTY, LLP, PHILADELPHIA, PA; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For GOLDEN GATE BRIDGE, HIGHWAY AND TRANSPORTATION DISTRICT, [*3] REDWOOD OIL CO, Plaintiffs: FREDERICK P. FURTH, MICHAEL P. LEHMANN, THOMAS P. DOVE, JON T. KING, THE FURTH FIRM LLP, SAN FRANCISCO, CA; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US; JULIO J. RAMOS, THE FURTH FIRM LLP, SAN FRANCISCO, NJ.

For SHELL VACATIONS LLC, Plaintiff: DOUGLAS A. MILLEN, STEVEN A. KANNER, WILLIAM HENRY LONDON, MUCH, SHELIST, FREED, DENENBERG, AMENT & RUBENSTEIN, PC, CHICAGO, IL; FREDERICK P. FURTH, MICHAEL P. LEHMANN, THOMAS P. DOVE, JON T. KING, THE FURTH FIRM LLP, SAN FRANCISCO, CA; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US; JULIO J. RAMOS, THE FURTH FIRM LLP, SAN FRANCISCO, NJ.

For BAYOU STEEL CORP, (CIVIL NO. 05-1800), Plaintiff: AUSTIN B COHEN, HOWARD J. SEDRAN, LEVIN, FISHBEIN, SEDRAN & BERMAN, PHILADELPHIA, PA; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For REDWOOD OIL COMPANY, (CIVIL NO. 05-1798), Plaintiff: JAMES S. SHEDDEN, LAWRENCE WILEY SCHAD, MICHAEL S HILICKI, TONY KIM, BEELER, SCHAD & DIAMOND, PC, CHICAGO, IL; KENNETH I. [*4] TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US; W. TIMOTHY NEEDHAM, JANSSEN MALLOY NEEDHAM MORRISON REINHOLTSEN & CROWLEY, EUREKA, CA.

For CLEAR LAM PACKAGING INC, (CIVIL 05-1797), Plaintiff: KATHLEEN CURRIE CHAVEZ, CHAVEZ LAW FIRM, GENEVA, IL; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT M. FOOTE, FOOTE, MEYERS, MIELKE & FLOWERS, GENEVA, IL; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For DR ROBERT H KIMBALL, (CIVIL 05-2374), Plaintiff: JAMES L REED, TRAVIS SCOTT CRABTREE, LOOPER REED & MCGRAW, HOUSTON, TX; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For DAVID BOROS, (CIVIL NO. 05-1793), Plaintiff: CADIO ZIRPOLI, GEOFFREY C. RUSHING, SAVERI & SAVERI, SAN FRANCISCO, CA; GUIDO SAVERI, RICHARD ALEXANDER SAVERI, SAVERI & SAVERI, INC., SAN FRANCISCO, CA; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For SHELDON LANGENDORF, (CIVIL 05-3284), ESTELLE LANGENDORF, (CIVIL 05-3284), Plaintiffs: KENNETH I. TRUJILLO, PHILADELPHIA, PA; LARRY R. DRURY, CHICAGO, IL; ROBERT ANDREW SANTILLO, [*5] TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For Cellect, LLC, City of Stamford, Gateway Club Apartments, Ltd., Michigan Multi-King Corp., GLENN SINGER, The Enclave, LLC, The Omni Group of Companies, Plaintiffs: KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For COMCAR INDUSTRIES, INC., Plaintiff: KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US; JOSEPH PRESTON STROM, STROM LAW FIRM LLC, COLUMBIA, SC US; MARIO ANTHONY PACELLA, STROM LAW FIRM LLP, COLUMBIA, SC US.

For ROBERT MULCAHY, Plaintiff: ELLEN MERIWETHER, MELODY FORRESTER, MICHAEL STEVEN TARRINGER, MILLER, FAUCHER & CAFFERTY, LLP, PHILADELPHIA, PA; ROBERT

ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For SIGNUM LLC, (CIVIL NO. 05-4047), Plaintiff: ARTHUR CAMDEN LEWIS, LEWIS, BABCOCK & HAWKINS, LLP, COLUMBIA, SC; JAMES M. GRIFFIN, JAMES M. GRIFFIN LAW OFFICE, COLUMBIA, SC; KENNETH I. TRUJILLO, PHILADELPHIA, PA; RICHARD A HARPOOTLIAN, COLUMBIA, SC; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For KLLM INC, (CIVIL [*6] NO. 05-4046), Plaintiff: ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US; ROY H. LIDDELL, THOMAS M. LOUIS, JULIE C. SKIPPER, WELLS, MARBLE & HURST, PLLC, JACKSON, MS.

For FORTUNE BRANDS INC, (CIVIL NO. 05-4137), Plaintiff: ERNEST SUMMERS, III, LISA COLLEEN SULLIVAN, HOWREY, SIMON, ARNOLD & WHITE, LLP, CHICAGO, IL US; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US; THOMAS LOUIS RUFFNER, HOWREY LLP, CHICAGO, IL US.

For SLAY INDUSTRIES, (CIVIL NUMBER 05-5698), Plaintiff: JEFFREY J. LOWE, ST. LOUIS, MO; KENNETH I. TRUJILLO, PHILADELPHIA, PA; MICHAEL J. FLANNERY, CAREY & DANIS, ST. LOUIS, MO; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For SLAY TRANSPORTATION CO INC, (CIVIL NUMBER 05-5698), Plaintiff: JEFFREY J. LOWE, ST. LOUIS, MO; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For PALM TREE COMPUTERS SYSTEMS INC, (CIVIL NO. 05-5238), DELTA RESEARCH INSTITUTE INC, (CIVIL NO. 05-5238), Plaintiffs: DAVID HUGHES HARRIS, GOLDSTEIN, BUCKLEY, CECHMAN, RICE & PURTZ, PA, FORT MYERS, [*7] FL; KENNETH G. GILMAN, GILMAN & PASTOR, LLP, BOSTON, MA; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For EMERSON ELECTRIC CO., (CIVIL NO. 05-5697), Plaintiff: DOROTHY L. WHITE-COLEMAN, WHITE, COLEMAN & ASOCIATES, LLC, ST. LOUIS, MO US; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For DELTA PRIDE CATFISH INC, (CIVIL NO. 05-5290), Plaintiff: JULIE C. SKIPPER, ROY H. LIDDELL, WELLS, MARBLE & HURST, PLLC, JACKSON, MS; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For CAMERON OFFSHORE BOATS INC, (CIVIL NO. 05-5696), Plaintiff: H. ALAN MCCALL, STOCKWELL SIEVERT, LAKE CHARLES, LA US; JOSEPH N. KRAVEC, SPECTER & SPECTER, PITTSBURG, PA US; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For Tri-State Container Corp., Plaintiff: NATALIE FINKELMAN BENNETT, SHEPHERD, FINKELMAN, MILLER & SHAH, LLC, COLLINGSWOOD, NJ.

For Connecticut Spring & Stamp Co., Plaintiff, Pro se.

For BELMONT HOLDINGS CORP., PLAINTIFF IN CIV. 05-5533, Plaintiff: [*8] CHRISTINA DONATO SALER, KOHN SWIFT & GRAF, PHILADELPHIA, PA US.

For AMERICAN STANDARD, INC., PLAINTIFF FROM DOCKET 05-4573, AMERICAN STANDARD COMPANIES, INC., PLAINTIFF IN DOCKET 05-4573, Plaintiffs: BARBARA T. SICALIDES, PEPPER, HAMILTON, PHILADELPHIA, PA; JOANNA J. CLINE, PEPPER HAMILTON LLP, CHERRY HILL, NJ.

For SINCLAIR OIL CORP, Plaintiff in 06-3844, Plaintiff: GEORGE M. HALEY, J. ANDREW SJOBLOM, E. BLAINE RAWSON, HOLME ROBERTS & OWEN, SALT LAKE CITY, UT US.

For AIR LIQUIDE AMERICA L.P., Plaintiff, Pro se.

For AIR LIQUIDE LARGE INDUSTRIES U.S. LP, Plaintiff, Pro se.

For AIR LIQUIDE USA LLC, Plaintiff, Pro se.

2006 U.S. Dist. LEXIS 73055, *

For AL America Holdings, LLC, Plaintiff, Pro se.

For American Air Liquide Holdings, Inc., Plaintiff, Pro se.

For American Air Liquide, Inc., Plaintiff, Pro se.

For American Plumbing and Mechanical, Inc., Plaintiff, Pro se.

For Huntsman Advance Materials LLC, Plaintiff, Pro se.

For HUNTSMAN CORPORATION, Plaintiff, Pro se.

For Huntsman Holdings, LLC, Plaintiff, Pro se.

For HUNTSMAN LLC, Plaintiff, Pro se.

For International Risk Insurance Company, Plaintiff, Pro se.

For John Baird, Plaintiff, Pro se.

[*9] For PLAINT CORPORATION, Plaintiff, Pro se.

For MARK TOBEY, KIM VAN WINKLE, Intervenor Plaintiffs: GREGG ABBOTT, AUSTIN, TX US.

For MARSH & MCLENNAN COMPANIES, INC., Defendant: ANDREW T. BERRY, GARY N. WILCOX, MCCARTER & ENGLISH, LLP, NEWARK, NJ; C. LARRY CORBO, III, CAROLE ELAINE HOWARD, JACKSON WALKER LLP, HOUSTON, TX; CHRISTOPHER J. ST. JEANOS, JOHN ROBERT OLLER, MITCHELL JAY AUSLANDER, WILLKIE FARR & GALLAGHER, NEW YORK, NY US; DANIEL P. JORDAN, P. RYAN BECKETT, BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC, JACKSON, MS US; FREDERICK BARTLETT WULFF, SR, JACKSON WALKER LLP, DALLAS, TX; GREGORY K. CONWAY, WILLKIE, FARR & GALLAGHER, WASHINGTON, DC US; KEVIN F HORMUTH, KEVIN F. O'MALLEY, GREENSFELDER & HEMKER, ST LOUIS, MO US; PHILIP RITCHEY SIMS, WILLIAM F. GRACE, CHAFFE MCCALL, NEW ORLEANS, LA US.

For MARSH INC., Defendant: ANDREW T. BERRY, GARY N. WILCOX, MCCARTER & ENGLISH, LLP, NEWARK, NJ; CAROLE ELAINE HOWARD, JACKSON WALKER LLP, HOUSTON, TX; CHRISTOPHER J. ST. JEANOS, JOHN ROBERT OLLER, MITCHELL JAY AUSLANDER, WILLKIE FARR & GALLAGHER, NEW YORK, NY US; DANIEL P. JORDAN, P. RYAN BECKETT, BUTLER,

SNOW, O'MARA, STEVENS & CANNADA, PLLC, JACKSON, MS US; DAVID C [*10] GUSTMAN, JILL CHRISTINE ANDERSON, FREEBORN & PETERS, CHICAGO, IL US; FREDERICK BARTLETT WULFF,SR., JACKSON WALKER LLP, DALLAS, TX; KEVIN F HORMUTH, KEVIN F. O'MALLEY, GREENSFELDER & HEMKER, ST LOUIS, MO US.

For MARSH USA INC., Defendant: ANDREW T. BERRY, GARY N. WILCOX, MCCARTER & ENGLISH, LLP, NEWARK, NJ; C. LARRY CORBO, III, CAROLE ELAINE HOWARD, JACKSON WALKER LLP, HOUSTON, TX; CHRISTOPHER J. ST. JEANOS, JOHN ROBERT OLLER, MITCHELL JAY AUSLANDER, WILLKIE FARR & GALLAGHER, NEW YORK, NY US; DANIEL P. JORDAN, P. RYAN BECKETT, BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC, JACKSON, MS US; FREDERICK BARTLETT WULFF, SR, JACKSON WALKER LLP, DALLAS, TX; GREGORY K. CONWAY, WILLKIE, FARR & GALLAGHER, WASHINGTON, DC US; KEVIN F HORMUTH, KEVIN F. O'MALLEY, GREENSFELDER & HEMKER, ST LOUIS, MO US; PHILIP RITCHEY SIMS, WILLIAM F. GRACE, CHAFFE MCCALL, NEW ORLEANS, LA US; CHRISTOPHER J. ST. JEANOS, WILLKIE FARR & GALLAGHER, NEW YORK, NY US; DANIEL P. JORDAN, BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC, JACKSON, MS US; DAVID C GUSTMAN, FREEBORN & PETERS, CHICAGO, IL US; GREGORY K. CONWAY, WILLKIE, FARR & GALLAGHER, WASHINGTON, DC US; JILL CHRISTINE ANDERSON, FREEBORN & PETERS, CHICAGO, IL [*11] US; JOHN ROBERT OLLER, MITCHELL JAY AUSLANDER, WILLKIE FARR & GALLAGHER, NEW YORK, NY US; KEVIN F HORMUTH, KEVIN F. O'MALLEY, GREENSFELDER & HEMKER, ST LOUIS, MO US; P. RYAN BECKETT, BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC, JACKSON, MS US; PHILIP RITCHEY SIMS, WILLIAM F. GRACE, CHAFFE MCCALL, NEW ORLEANS, LA US.

For SEABURY & SMITH, INC., DOING BUSINESS AS MARSH ASVANTAGE AMERICA, Defendant: MITCHELL JAY AUSLANDER, WILLKIE FARR & GALLAGHER, NEW YORK, NY US.

For B&T CORPORATION, (CIVIL 05-1168), BB&T INSURANCE SERVICES, INC., (CIVIL 05-1168), Defendants: ALAN L. BRIGGS, JAMES PAUL WEHNER, JR., AMY LYNN BROWN, HOLLY BROOKE JAMES, SQUIRE, SAMDERS & DEMPSEY, LLP, WASHINGTON, DC US; HOWARD J.C. NICOLS,

2006 U.S. Dist. LEXIS 73055, *

SQUIRE, SANDERS & DEMPSEY, LLP, NEW YORK, NY; JACK LOUIS WUERKER, SQUIRE SANDERS & DEMPSEY, VIENNA, VA US.

For BRANCH BANKING & TRUST COMPANY, (CIVIL 05-1168), Defendant: ALAN L. BRIGGS, JAMES PAUL WEHNER, JR., AMY LYNN BROWN, SQUIRE, SAMDERS & DEMPSEY, LLP, WASHINGTON, DC US; HOWARD J.C. NICOLS, SQUIRE, SANDERS & DEMPSEY, LLP, NEW YORK, NY.

For UNUMPROVIDENT CORPORATION, Defendant: DEBORAH E HYRB, PATRICK SHEA, PAUL HASTINGS, JANOFSKY & WALKER, LLP, STAMFORD, CT [*12] US; JENNIFER BATES MCINTYRE, ROSEANN OLIVER, PERKINS COIE LLC, CHICAGO, IL; RACHEL ROSS KRAUSE, OGDEN & SULLIVAN, PA, TAMPA, FL US; STEVEN PAUL DEL MAURO, RANDI F. KNEPPER, MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP, MORRISTOWN, NJ; TIMON V SULLIVAN, OGDEN & SULLIVAN, PA, TAMPA, FL US.

For ACE INA HOLDINGS, (CIVIL 05-1800, PUR. TO ORDER DATED 3/11/2005), Defendant: JEREMY J BRANDON, JOHNNY W. CARTER, SUSMAN GODFREY, LLP, DALLAS, TX US; LIZA M. WALSH, MARC D. HAEFNER, CONNELL FOLEY, LLP, ROSELAND, NJ; M. DUNCAN GRANT, PEPPER HAMILTON LLP, PHILADELPHIA, PA; DANIEL J. LEFFELL, NEW YORK, NY.

For ACE LIMITED, (PUR. TO ORDER DATED 3/11/2005, Defendant: ALAN N. SALPETER, CHICAGO, IL; H. LEE GODFREY , JEFFREY R. SEELY, JOHNNY W. CARTER, MICHAEL P. GEISER, NEAL S. MANNE, VINEET BHATIA, SUSMAN GODFREY, LLP, HOUSTON, TX; JEREMY J BRANDON, SUSMAN GODFREY, LLP, DALLAS, TX US; ROBERT J KRISS, MAYER, BROWN, ROWE & MAW, LLP, CHICAGO, IL; DANIEL J. LEFFELL, NEW YORK, NY; MARC D. HAEFNER, CONNELL FOLEY, LLP, ROSELAND, NJ.

For ACE USA, (PUR. TO ORDER DATED 3/11/2005), Defendant: ALAN N. SALPETER, CHICAGO, IL; FREDERIC STANLEY, JR, STANLEY, DEHLINGER & RASCHER, ALTAMONTE SPRINGS, FL US; [*13] GRETHCHEN S. SWEEN, JEREMY J BRANDON, JOHNNY W. CARTER, SUSMAN GODFREY, LLP, DALLAS, TX US; H. LEE GODFREY , JEFFREY R. SEELY, L. JANE RAY, MICHAEL P. GEISER, NEAL S. MANNE, VINEET BHATIA, SUSMAN GODFREY,

LLP, HOUSTON, TX; LIZA M. WALSH, CONNELL FOLEY, LLP, ROSELAND, NJ; M. DUNCAN GRANT, PEPPER HAMILTON LLP, PHILADELPHIA, PA; ROBERT J KRISS, MAYER, BROWN, ROWE & MAW, LLP, CHICAGO, IL; DANIEL J. LEFFELL, NEW YORK, NY; MARC D. HAEFNER, CONNELL FOLEY, LLP, ROSELAND, NJ.

For WILLIS GROUP HOLDINGS LIMITED, (CIVIL 05-1168), WILLIS GROUP LIMITED, (CIVIL 05-1168), WILLIS NORTH AMERICA INC., Defendants: ANASTASIA ANGELOVA, RICHARD C. PEPPERMAN, II, SULLIVAN & CROMWELL, LLP, NEW YORK, NY.

For AMERICAN INTERNATIONAL GROUP, INC., Defendant: CARL H POCDTKE, DLA PIPER RUDNICK GARY CARY US LLP, CHICAGO, IL; DANIEL J. LEFFELL, LAYALIZA KLEIN SOLOVEICHIK, MARTIN FLUMENBAUM, REBECCA CAREN SHORE, ROBERTA A. KAPLAN, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, NEW YORK, NY; KENNETH A. GALLO, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, WASHINGTON, DC; MARK A. ARONCHICK, HANGLEY ARONCHICK SEGAL & PUDLIN, PHILADELPHIA, PA; SAMUEL BAYARD ISAACSON, STEPHEN W SCHWAB, DLA PUPER RUDICK GRAY CARY US LLP, [*14] CHICAGO, IL.

For THE ST. PAUL TRAVELERS COMPANIES, INC., Defendant: DANIEL J. LEFFELL, NEW YORK, NY; MICHAEL J. GARVEY, SIMPSON THACHER & BARTLETT LLP, NEW YORK, NY.

For BROWN & BROWN, INC., Defendant: BARRY G. SHER, ALASTAIR WOOD, KEVIN C. LOGUE, SARAH EMILY HAGANS, VICTORIA ASHWORTH, PAUL HASTINGS JANOFSKY & WALKER, LLP, NEW YORK, NY US; THEODORE ALLAN KITTILA, PAUL, HASTINGS, HANOFSKY & WALKER, LLP, NEW YORK, NY.

For ACORDIA INC, WELLS FARGO, (CIVIL 05-1168), Defendants: ALAN L. KILDOW, DLA PIPER RUDNICK GRAY CARY US LLP, MINNEAPOLIS, MN; CARLOS F. ORTIZ, DLA, PIPER, RUDNICK, GRAY & CARY, LLP, NEW YORK, NY; SONYA RAE BRAUNSCHWEIG, DLA, PIPER, RUDNICK, GRAY, CARY & US, LLP, MINNEAPOLIS, MN.

For NATIONAL FINANCIAL PARTNERS CORP., Defendant: WILLIAM F. CLARKE, JR., SKADDEN

ARPS, SLATE, MEAGHER & FLOM. LLP, NEW YORK, NJ.

For PRUDENTIAL FINANCIAL, INC., (CIVIL 05-1064), Defendant: CHRISTOPHER C. GILBERT, MARTIN B. UNGER, UNGER LAW GROUP, PL, ORLANDO, FL US; DOUGLAS SCOTT EAKELEY, JOHN R. MIDDLETON, LOWENSTEIN SANDLER PC, ROSELAND, NJ.

For THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, INC., (CIVIL 05-1064), Defendant: JOHN R. MIDDLETON, LOWENSTEIN SANDLER [*15] PC, ROSELAND, NJ.

For U.S.I. HOLDINGS CORPORATION, Defendant: RACHEL L. GERSTEIN, ROBERT HARDY PEES, AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, NEW YORK, NY; RICHARD B. ZABEL, AKIN, GUMP, STRAUSS, HAVER & FELD, LLP, NEW YORK, NY.

For ACE INA, Defendant: FREDERIC STANLEY, JR, STANLEY, DEHLINGER & RASCHER, ALTAMONTE SPRINGS, FL US; GRETHCHEN S. SWEEN, JEREMY J BRANDON, ·SUSMAN GODFREY, LLP, DALLAS, TX US; H.· LEE GODFREY , JEFFREY R. SEELY, JOHNNY W. CARTER, L. JANE RAY, NEAL S. MANNE, SUSMAN GODFREY, LLP, HOUSTON, TX; MARC D. HAEFNER, CONNELL FOLEY, LLP, ROSELAND, NJ.

For ACE INA HOLDINGS INC, Defendant: ALAN N. SALPETER, CHICAGO, IL; H. LEE GODFREY , JEFFREY R. SEELY, MICHAEL P. GEISER, NEAL S. MANNE, VINEET BHATIA, SUSMAN GODFREY, LLP, HOUSTON, TX; JOHNNY W. CARTER, SUSMAN GODFREY, LLP, DALLAS, TX US; M. DUNCAN GRANT, PEPPER HAMILTON LLP, PHILADELPHIA, PA; ROBERT J KRISS, MAYER, BROWN, ROWE & MAW, LLP, CHICAGO, IL; MARC D. HAEFNER, CONNELL FOLEY, LLP, ROSELAND, NJ.

For ACE LTD, (CIVIL 05-1167), Defendant: M. DUNCAN GRANT, PEPPER HAMILTON LLP, PHILADELPHIA, PA; MARC D. HAEFNER, CONNELL FOLEY, LLP, ROSELAND, NJ.

For AON CORPORATION, Defendant: AMY D HARMON, MARGUERITE [*16] S. WILLIS, RUSSELL THOMAS BURKE, NEXSEN, PRUET, JACOBS & POLLARD, COLUMBIA, SC; BENJAMIN R. OSTAPUK, KIRKLAND & ELLIS LLP, SAN FRANCISCO, CA; DANIEL EDWARD LAYTIN, ELIZABETH A. LARSEN, KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP, CHICAGO, IL; DONALD A. ROBINSON, LEDA DUNN WETTRE, ROBINSON & LIVELLI, ESQS., NEWARK, NJ; JILL M. STEINBERG, BAKER DONELSON BEARMAN, CALDWELL & BERKOWITZ, MEMPHIS, TN; JOHN ARMANDO BOUDET, GREENBERG TRAURIG, PA, ORLANDO, FL US; LESLIE M. SMITH, RENEE WICKLUND, RICHARD C GODFREY, KIRKLAND & ELLIS LLP, CHICAGO, IL.

For AON CORP, (CIVIL 05-1801), Defendant: DONALD A. ROBINSON, LEDA DUNN WETTRE, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AON SERVICES GROUP, (CIVIL 05-1167), Defendant: LESLIE M. SMITH, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, LEDA DUNN WETTRE, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For MARSH USA INC., (CONNECTICUT) (CIVIL 05-1168), Defendant: ANDREW T. BERRY, MCCARTER & ENGLISH, LLP, NEWARK, NJ; MITCHELL JAY AUSLANDER, WILLKIE FARR & GALLAGHER, NEW YORK, NY US.

For HILB, ROGAL & HOBBS, (CIVIL 05-1168) FORMERLY KNOWN AS HILB, ROGAL, & HAMILTON COMPANY, Defendant: MICHAEL R. GRIFFINGER, WILLIAM P. DENI, JR., GIBBONS, [*17] DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, PC, NEWARK, NJ; SHAWN PATRICK REGAN, HUNTON & WILLIAMS, LLP, NEW YORK, NY; JONATHAN MICHAEL WILAN, NEIL KEITH GILMAN, HUNTON & WILLIAMS LLP, WASHINGTON, DC.

For ARTHUR J GALLAGHER & CO, Defendant: ANDREW KENNETH LEVINE, BROAD AND CASSEL, TALLAHASSEE, FL US; DANIELLE A. R. COFFMAN, WINSTON & STRAWN, LLP, CHICAGO, IL; DAVID EMILIO MOLLON, EDWIN MICHAEL LARKIN, LINA M. VIVIANO, WINSTON & STRAWN LLP, NEW YORK, NY; JAMES S. RICHTER, WINSTON & STRAWN LLP, NEWARK, NJ; KATHERINE E BORDEN, STEPHEN CHARLES SCHULTE, TERRY M. GRIMM, CHICAGO, IL.

For LEXINGTON INSURANCE COMPANY, Birmingham Fire Insurance Co. of PA, NEW HAMPSHIRE INSURANCE CO., Defendants: DANIEL J. LEFFELL, NEW YORK, NY; KENNETH A. GALLO, PAUL

2006 U.S. Dist. LEXIS 73055, *

WEISS RIFKIND, WHARTON & GARRISON LLP, WASHINGTON, DC.

For U.S.I HOLDINGS CORP, Defendant: PATRICK CHARLES SCHMITTER, ROBERT HARDY PEES, RICHARD B. ZABEL, AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, NEW YORK, NY.

For HARTFORD FINANCIAL SERVICES GROUP INC, Defendant: ANDREA ROBINSON, WILMER CUTLER PICKERING, HALE & DORR LLP, BOSTON, MA; GREGORY M. REISER, WILMER, CUTLER, PICKERING, HALE & DORR, LLP, PRINCETON, NJ; JAMES E. FOSTER, VIRGINIA [*18] B. TOWNES, AKERMAN SENTERFITT, ORLANDO, FL US; MARCI A EISENSTEIN, WILLIAM M HANNAY, SCHIFF HARDIN, LLP, CHICAGO, IL; PAUL ADAM ENGELMAYER, WILMER, BUTLER & PICKERING, ESQS., NEW YORK, NY; ROBERT W. TRENCHARD, ROBIN L. ALPERSTEIN, WILMER, CUTLER, PICKERING, HALE & DORR, LLP, NEW YORK, NY; DANIEL J. LEFFELL, NEW YORK, NY;MARY SUSAN HENIFIN, BUVHANAN INGERSOLL, PC, PRINCETON, NJ.

For HARTFORD FIRE INSURANCE COMPANY, Defendant: ANDREA ROBINSON, WILMER CUTLER PICKERING, HALE & DORR LLP, BOSTON, MA; JAMES E. FOSTER, VIRGINIA B. TOWNES, AKERMAN SENTERFITT, ORLANDO, FL US; ROBERT W. TRENCHARD, WILMER, CUTLER, PICKERING, HALE & DORR, LLP, NEW YORK, NY; DANIEL J. LEFFELL, NEW YORK, NY; MARY SUSAN HENIFIN, BUVHANAN INGERSOLL, PC, PRINCETON, NJ.

For PROPERTY & CASUALTY INSURANCE COMPANY OF HARTFORD, Defendant: MARCI A EISENSTEIN, WILLIAM M HANNAY, SCHIFF HARDIN, LLP, CHICAGO, IL; MARY SUSAN HENIFIN, BUVHANAN INGERSOLL, PC, PRINCETON, NJ.

For TWIN CITY FIRE INSURANCE COMPANY, Nutmeg Life Insurance Co., The Hartford Fidelity & Bonding, Defendants: DANIEL J. LEFFELL, NEW YORK, NY; MARY SUSAN HENIFIN, BUVHANAN INGERSOLL, PC, PRINCETON, NJ.

For AON GROUP INC, (CIVIL NO. 05-1801), [*19] Defendant: BENJAMIN R. OSTAPUK, KIRKLAND & ELLIS LLP, SAN FRANCISCO, CA; DANIEL EDWARD LAYTIN, KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP, CHICAGO, IL; JILL

M. STEINBERG, BAKER DONELSON BEARMAN, CALDWELL & BERKOWITZ, MEMPHIS, TN; JOHN ARMANDO BOUDET, GREENBERG TRAURIG, PA, ORLANDO, FL US; LESLIE M. SMITH, RICHARD C GODFREY, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AON DIRECT GROUP INC, (CIVIL NO. 05-1801), Defendant: DANIEL EDWARD LAYTIN, KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP, CHICAGO, IL; JILL M. STEINBERG, BAKER DONELSON BEARMAN, CALDWELL & BERKOWITZ, MEMPHIS, TN; LESLIE M. SMITH, RICHARD C GODFREY, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AFFINITY INSURANCE SERVICES INC, (CIVIL NO. 05-1801), Defendant: DANIEL EDWARD LAYTIN, KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP, CHICAGO, IL; JILL M. STEINBERG, BAKER DONELSON BEARMAN, CALDWELL & BERKOWITZ, MEMPHIS, TN; LESLIE M. SMITH, RICHARD C GODFREY, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For HEALTHCARE PROVIDERS SERVICE ORGANIZATION, (CIVIL [*20] NO. 05-1801), Defendant: DANIEL EDWARD LAYTIN, KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP, CHICAGO, IL; JILL M. STEINBERG, BAKER DONELSON BEARMAN, CALDWELL & BERKOWITZ, MEMPHIS, TN; LESLIE M. SMITH, RICHARD C GODFREY, KIRKLAND & ELLIS LLP, CHICAGO, IL.

For AMERICAN RE CORPORATION, Defendant: DAVID GRAIS, DEWEY BALLANTINE, LLP, NEW YORK, NY; DANIEL J. LEFFELL, NEW YORK, NY; MOLLY LEHR, DEWEY BALLANTINE, LLP, NEW YORK, NY.

For AMERICAN RE-INSURANCE COMPANY, Defendant: DAVID GRAIS, JOHN F. COLLINS, MOLLY LEHR, DEWEY BALLANTINE, LLP, NEW YORK, NY; EAMON O'KELLY, DEWEY BALLANTINE, NEW YORK, NY US; HOUSTON S. PARK, III, STEPHENS, LYNN, KLEIN, LA CAVA, HOFFMAN, WEST PALM BEACH, FL US; KRISTIN ANN MEISTER, DEWEY BALLANTINE, LLP, NEW

YORK CITY, NY US; DANIEL J. LEFFELL, NEW YORK, NY.

For MUNICH-AMERICAN RISK PARTNERS INC, Defendant: DAVID GRAIS, JEFFREY S. RUGG, MOLLY LEHR, DEWEY BALLANTINE, LLP, NEW YORK, NY; EAMON O'KELLY, DEWEY BALLANTINE, NEW YORK, NY US; DANIEL J. LEFFELL, NEW YORK, NY.

For AON RISK SERVICES COMPANIES INC, Defendant: BENJAMIN R. OSTAPUK, KIRKLAND & ELLIS LLP, SAN FRANCISCO, CA; DANIEL EDWARD LAYTIN, KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP, [*21] CHICAGO, IL; JOHN ARMANDO BOUDET, GREENBERG TRAURIG, PA, ORLANDO, FL US; LESLIE M. SMITH, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AON RISK SERVICES INC U.S., Defendant: BENJAMIN R. OSTAPUK, KIRKLAND & ELLIS LLP, SAN FRANCISCO, CA; DANIEL EDWARD LAYTIN, KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP, CHICAGO, IL; LESLIE M. SMITH, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AON SERVICES GROUP INC, Defendant: BENJAMIN R. OSTAPUK, KIRKLAND & ELLIS LLP, SAN FRANCISCO, CA; DANIEL EDWARD LAYTIN, KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP, CHICAGO, IL; JOHN ARMANDO BOUDET, GREENBERG TRAURIG, PA, ORLANDO, FL US; LESLIE M. SMITH, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For UNIVERSAL LIFE RESOURCES, DOING BUSINESS AS ULR, Defendant: DAVID A. GABIANELLI, HANCOCK ROTHERT & BUNSHOFT LLP, SAN FRANCISCO, CA; ERIC NEAL MACEY, STEPHEN J SIEGAL, NOVACK & MACEY, LLP, CHICAGO, IL; SCOTT L. METZGER, DUCKOR, SPRADLING, METZGER & WYNNE, SAN DIEGO, CA US; STEPHEN P. YOUNGER, PATTERSON, BELKNAP, WEBB & TYLER, NEW YORK, NY.

For [*22] UNIVERSAL LIFE RESOURCES INC, DOING BUSINESS AS ULR INSURANCE SERVICES INC, Defendant: ERIC NEAL MACEY, NOVACK & MACEY, LLP, CHICAGO, IL; NED GELHAAR,

HANCOCK, ROTHERT & BUNSHOFT, LLP, LOS ANGELES, CA US; SCOTT L. METZGER, DUCKOR, SPRADLING, METZGER & WYNNE, SAN DIEGO, CA US; STEPHEN P. YOUNGER, PATTERSON, BELKNAP, WEBB & TYLER, NEW YORK, NY.

For WILLIS GROUP HOLDINGS LTD., Defendant: ANASTASIA ANGELOVA, RICHARD C. PEPPERMAN, II, SULLIVAN & CROMWELL, LLP, NEW YORK, NY; FREDRICK H. MCCLURE, TAMPA, FL US; JOHN L. WARDEN, SULLIVAN & CROMWELL, NEW YORK, NY US; RICHARD C. PEPPERMAN, II, SULLIVAN & CROMWELL, LLP, NEW YORK, NY.

For WILLIS GROUP LTD., WILLIS NORTH AMERICAN INC, Defendants: ANASTASIA ANGELOVA, RICHARD C. PEPPERMAN, II, SULLIVAN & CROMWELL, LLP, NEW YORK, NY; FREDRICK H. MCCLURE, TAMPA, FL US; JOHN L. WARDEN, SULLIVAN & CROMWELL, NEW YORK, NY US.

For BENEFITS COMMERCE, Defendant: ERIC NEAL MACEY, NOVACK & MACEY, LLP, CHICAGO, IL; SCOTT L. METZGER, DUCKOR, SPRADLING, METZGER & WYNNE, SAN DIEGO, CA US; STEPHEN P. YOUNGER, PATTERSON, BELKNAP, WEBB & TYLER, NEW YORK, NY.

For DOUGLAS P. COX, Defendant: ERIC NEAL MACEY, NOVACK & MACEY, LLP, CHICAGO, IL; SCOTT L. [*23] METZGER, DUCKOR, SPRADLING, METZGER & WYNNE, SAN DIEGO, CA US; STEPHEN P. YOUNGER, PATTERSON, BELKNAP, WEBB & TYLER, NEW YORK, NY.

For METLIFE INC, Defendant: CHRISTOPHER C. GILBERT, MARTIN B. UNGER, UNGER LAW GROUP, PL, ORLANDO, FL US; JAMES W. CARBIN, DUANNE MORRIS, LLP; PAUL JEFFREY RIEHLE, SEDGWICK DETERT MORAN & ARNOLD, SAN FRANCISCO, CA; MARGARET MARY O'ROURKE, WOLFF SAMSON, PC, WEST ORANGE, NJ.

For ST PAUL TRAVELERS COS INC, Defendant: PAUL C. CURNIN, SIMPSON THACHER & BARTLETT, NEW YORK, NY.

For ZURICH AMERICAN INSURANCE CO., DOING BUSINESS AS ZURICH NORTH AMERICA, Defendant: ANN M. ASHTON, DAVID S. TURETSKY, GEORGE E. ANHANG, RALPH C. FERRARA, LEBOEUF, LAMB, GREENE & MACRAE, LLP,

WASHINGTON, DC; GIL M. SOFFER, MATTHEW J. CANNON, KATTEN MUCHIN ZAVIS ROSENMAN, CHICAGO, IL; JONATHAN E. RICHMAN, LEBOEUF, LAMB, GREENE & MACRAE, LLP, NEW YORK.

For NATIONAL FINANCIAL PARTNERS CORPORATION, Defendant: DONNA L. MCDEVITT, TIMOTHY ALAN NELSEN, SKADDEN ARPS SLATE, MEAGHER & FLOM & LLP, CHICAGO, IL.

For AMERICA RE-INSURANCE CO, Athena Assurance Co., Gulf Insurance Co., Indemnity Insurance Co. North America, ST. PAUL FIRE & MARINE INSURANCE CO., ST. PAUL MERCURY [*24] INSURANCE CO., Westchester Surplus Lines Insurance Co., AMER RE-INSURANCE CO, Illinois Union Insurance Co., THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, HARTFORD STEAM BOILER INSPECTION & INSURANCE COMPANY, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURG PA, Defendants: DANIEL J. LEFFELL, NEW YORK, NY.

For WELLS FARGO & CO, Defendant: CARLOS F. ORTIZ, DLA, PIPER, RUDNICK, GRAY & CARY, LLP, NEW YORK, NY; SONYA RAE BRAUNSCHWEIG, DLA, PIPER, RUDNICK, GRAY, CARY & US, LLP, MINNEAPOLIS, MN.

For HILB ROGAL & HAMILTON CO, Defendant: JONATHAN MICHAEL WILAN, NEIL KEITH GILMAN, HUNTON & WILLIAMS LLP, WASHINGTON, DC.

For BB&T CORP, Defendant: ALAN L. BRIGGS, JAMES PAUL WEHNER, JR., SQUIRE, SAMDERS & DEMPSEY, LLP, WASHINGTON, DC US; JACK LOUIS WUERKER, SQUIRE SANDERS & DEMPSEY, VIENNA, VA US.

For BRANCH BANKING & TRUST CO, Defendant: ALAN L. BRIGGS, JAMES PAUL WEHNER, JR., HOLLY BROOKE JAMES, SQUIRE, SAMDERS & DEMPSEY, LLP, WASHINGTON, DC US.

For HUB INTERNATIONAL LTD, Defendant: ALAN SETH RABINOWITZ, NEW YORK, NY.

For AMERICAN RE CORP, Defendant: EAMON O'KELLY, JEFFREY S. RUGG, DEWEY BALLANTINE, NEW YORK, NY US; DANIEL J. LEFFELL, NEW YORK, NY.

For [*25] MARSH USA INC., (ILLINOIS), MARSHA USA INC, MARSH & MCLENNAN INCORPORATED, Defendants: ANDREW T. BERRY, MCCARTER & ENGLISH, LLP, NEWARK, NJ.

For AMERICAN RE-INSURANCE COMPANY, Defendant: MOLLY LEHR, DEWEY BALLANTINE, LLP, NEW YORK, NY; DANIEL J. LEFFELL, NEW YORK, NY.

For AON BROKERS SERVICES INC, Defendant: BENJAMIN R. OSTAPUK, KIRKLAND & ELLIS LLP, SAN FRANCISCO, CA; JOHN ARMANDO BOUDET, GREENBERG TRAURIG, PA, ORLANDO, FL US; LESLIE M. SMITH, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, LEDA DUNN WETTRE, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AON GROUP INT, Defendant: DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AMERICAN RE INSURANCE CO, Defendant: JEFFREY S. RUGG, DEWEY BALLANTINE, LLP, NEW YORK, NY; DANIEL J. LEFFELL, NEW YORK, NY.

For MERCER HUMAN RESOURCE CONSULTING INC, Defendant: CAROLE ELAINE HOWARD, JACKSON WALKER LLP, HOUSTON, TX; FREDERICK BARTLETT WULFF, SR, JACKSON WALKER LLP, DALLAS, TX.

For MERCER HUMAN RESOURCE CONSULTING OF TEXAS INC, Defendant: CAROLE ELAINE HOWARD, JACKSON WALKER LLP, HOUSTON, TX; FREDERICK BARTLETT WULFF, SR, JACKSON WALKER LLP, DALLAS, TX; MITCHELL JAY AUSLANDER, NEW YORK, NY.

For [*26] ACE American Insurance Co., Defendant: DANIEL J. LEFFELL, NEW YORK, NY; MARC D. HAEFNER, CONNELL FOLEY, LLP, ROSELAND, NJ.

For AIU Insurance Co., National Union Fire Insurance Co. of Louisiana, Defendants: DANIEL J. LEFFELL, NEW YORK, NY; KENNETH A. GALLO, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, WASHINGTON, DC.

For American Alternative Insurance Co. Corp., Defendant: DAVID GRAIS, EAMON O'KELLY, DEWEY BALLANTINE, LLP, NEW YORK, NY.

2006 U.S. Dist. LEXIS 73055, *

For American Casualty Co. of Reading, CNA FINANCIAL CORP., Continental Casualty Co., Defendants: MICHAEL R. BLANKSHAIN, MICHAEL LEE MCCLUGGAGE, BETH L. FANCSALI, WILDMAN, HARROLD, ALLEN & DIXON, LLP, CHICAGO, IL US; DANIEL J. LEFFELL, NEW YORK, NY; JOHN MICHAEL AGNELLO, CARELLA BYRNE BAIN, GILFILLAN CECCHI STEWART & OLSTEIN, PC, ROSELAND, NJ; MATTHEW JOSEPH CACCAMO, WILDMAN, HARROLD, ALLEN & DIXON, CHICAGO, IL US; MELISSA E. FLAX, CARELLA, BYRNE, BAIN, GILFILLAN, ROSELAND, NJ.

For AMERICAN HOME ASSURANCE CO., AMERICAN INTERNATIONAL INSURANCE CO., Commerce and Industry Insurance Co., Defendants: DANIEL J. LEFFELL, NEW YORK, NY; KENNETH A. GALLO, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, WASHINGTON, DC.

For AON GROUP, INC., AON [*27] RE, INC., AON SERVICES GROUP, INC., Defendants: DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AON RISK SERVICES INC US, Defendant: JOHN ARMANDO BOUDET, GREENBERG TRAURIG, PA, ORLANDO, FL US; DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For Arthur J. Gallagher Risk Management Service, Defendant: JAMES S. RICHTER, WINSTON & STRAWN LLP, NEWARK, NJ.

For AXIS REINSURANCE CO., AXIS Specialty Insurance Co., AXIS Surplus Insurance Co., Defendants: WILLIAM F. CLARKE, JR., SKADDEN ARPS, SLATE, MEAGHER & FLOM. LLP, NEW YORK, NJ; DANIEL J. LEFFELL, NEW YORK, NY.

For Berkshire Hathaway, Inc., Defendant: CATHERINE FLORENCE AUGUST JOHNSON, MUNGER, TOLLES & OLSON, LLP; LOS ANGELES, CA US; CHRISTOPHER P. ANTON, BUDD LARNER PC, SHORT HILLS, NJ; DANIEL J. LEFFELL, NEW YORK, NY; JOSEPH J. SCHIAVONE, BUDD LARNER, PC, SHORT HILLS, NJ.

For Chicago Insurance Co., National Surety Corp., Defendants: STEVEN P. HANDLER, AMY GRAHAM DOEHRING, GEOFFREY A. VANCE, LAZAR P. RAYNAL, MCDERMOTT, WILL & EMERY, LLP, CHICAGO, IL US; DANIEL J. LEFFELL, NEW YORK, NY.

For Crum & Forster Holdings Corp, United States Fire Insurance Co., Defendants: LOUIS G. CORSI, LANDMAN, [*28] CORSI, BALLAINE & FORD, NEW YORK, NY US; CHRISTOPHER G. FRETEL, STEPHEN JACOBS, LANDMAN, CORSI, BALLAINE & FORD, NEW YORK, NY US; DANIEL J. LEFFELL, NEW YORK, NY; JOHN HERBERT NOORLANDER, LANDMAN, CORSI, BAILAINE & FORD, NEWARK, NJ.

For EXECUTIVE RISK INDEMNITY INC., FEDERAL INSURANCE CO., The Chubb Corp., VIGILANT INSURANCE CO., Defendants: PETER RICHARD BISIO, HOGAN & HARTSON, LLP, WASHINGTON, DC; DANIEL J. LEFFELL, NEW YORK, NY.

For FIREMAN'S FUND INSURANCE CO., Defendant: STEVEN P. HANDLER, AMY GRAHAM DOEHRING, GEOFFREY A. VANCE, LAZAR P. RAYNAL, MCDERMOTT, WILL & EMERY, LLP, CHICAGO, IL US.

For General Re Corporation, General Reinsurance Corp., Defendants: CHRISTOPHER P. ANTON, BUDD LARNER PC, SHORT HILLS, NJ; DANIEL J. LEFFELL, NEW YORK, NY; JOSEPH J. SCHIAVONE, BUDD LARNER, PC, SHORT HILLS, NJ.

For GREENWICH INSURANCE CO., Indian Harbor Insurance Co., Defendants: AMY E. BARABAS, ROBERT A. ALESSI, TAMMY L. ROY, CAHILL, GORDON & REINDELL, LLP, NEW YORK, NY US; DANIEL J. LEFFELL, NEW YORK, NY; JOHN L. THURMAN, FARRELL & THURMAN, PC, SKILLMAN, NJ.

For HARTFORD STEAM BOILER INSPECTION AND INSURANCE CO., National Union Fire Insurance Co. of Pittsburg, PA, [*29] Defendants: DANIEL J. LEFFELL, NEW YORK, NY; KENNETH A. GALLO, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, WASHINGTON, DC; MITCHELL JAY AUSLANDER, WILLKIE FARR & GALLAGHER, NEW YORK, NY US.

For Liberty Mutual Fire Insurance Co., Liberty Mutual Holding Co., LIBERTY MUTUAL INSURANCE CO., WAUSAU UNDERWRITERS INSURANCE COMPANY, Defendants: BRIAN E. ROBISON, VINSON & ELKINS, DALLAS, TX; DANIEL J. LEFFELL, NEW YORK, NY; KATHRINE MARLENE MORTENSEN, KORNSTEIN, VEISZ, WEXLER & POLLARD, NEW YORK, NY US.

For Mt. Hawley Insurance Co., RLI CORP, Defendants: AUGUSTA MORGAN RIDLEY, BRIAN ROBERT MEINERS, GRACIELA RODRIGUEZ, KEVIN RICHARD SULLIVAN, KING & SPALDING, LLP, WASHINGTON, DC; DANIEL J. LEFFELL, NEW YORK, NY.

For Pacific Insurance Co., Ltd, Defendant: MARY SUSAN HENIFIN, BUVHANAN INGERSOLL, PC, PRINCETON, NJ.

For RLI Insurance Corp, Defendant: AUGUSTA MORGAN RIDLEY, BRIAN ROBERT MEINERS, GRACIELA RODRIGUEZ, KEVIN RICHARD SULLIVAN, KING & SPALDING, LLP, WASHINGTON, DC.

For Summit Global Partners of Florida, Inc., USI Insurance Services of Florida, Inc., Defendants: ROBERT HARDY PEES, AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, NEW YORK, NY.

For The Continental Insurance [*30] Group, Defendant: MICHAEL R. BLANKSHAIN, MICHAEL LEE MCCLUGGAGE, BETH L. FANCSALI, WILDMAN, HARROLD, ALLEN & DIXON, LLP, CHICAGO, IL US; MATTHEW JOSEPH CACCAMO, WILDMAN, HARROLD, ALLEN & DIXON, CHICAGO, IL US.

For TRAVELERS INDEMNITY COMPANY, RLI INSURANCE COMPANY, Defendants: MITCHELL JAY AUSLANDER, WILLKIE FARR & GALLAGHER, NEW YORK, NY US; DANIEL J. LEFFELL, NEW YORK, NY.

For UNITED STATES FIRE INSURANCE COMPANY, Defendant: LOUIS G. CORSI, LANDMAN, CORSI, BALLAINE & FORD, NEW YORK, NY US; CHRISTOPHER G. FRETEL, STEPHEN JACOBS, LANDMAN, CORSI, BALLAINE & FORD, NEW YORK, NY US; JOHN HERBERT NOORLANDER, LANDMAN, CORSI, BAILAINE & FORD, NEWARK, NJ.

For XL Capital Ltd, Defendant: DANIEL J. LEFFELL, NEW YORK, NY; JOHN L. THURMAN, FARRELL & THURMAN, PC, SKILLMAN, NJ.

For AON RISK SERVICES OF THE CAROLINAS INC, Defendant: AMY D HARMON, MARGUERITE S. WILLIS, RUSSELL THOMAS BURKE, NEXSEN, PRUET, JACOBS & POLLARD, COLUMBIA, SC; DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For INSURANCE CO OF THE STATE OF PENNSYLVANIA, (CIVIL NO. 05-4046), Defendant: KENNETH A. GALLO, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, WASHINGTON, DC; DANIEL J. LEFFELL, NEW YORK, [*31] NY.

For MARSH & MCLENNAN INC, Defendant: ANDREW T. BERRY, MCCARTER & ENGLISH, LLP, NEWARK, NJ; DANIEL P. JORDAN, P. RYAN BECKETT, BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC, JACKSON, MS US.

For C. V. Starr & Co., Defendant: ROBERT A. MAGNANINI, BOIES, SCHILLER & FLEXNER, LLP, SHORT HILLS, NJ.

For FIRST MARKET INTERNATIONAL INC, Defendant: MAYANNE DOWNS, KIMBERLY DUNKEL HEALY, KING, BLACKWELL, DOWNS & ZEHNDER, PA, ORLANDO, FL.

For AMERICAN ALTERNATIVE INSURANCE CORPORATION, Defendant: JEFFREY S. RUGG, MOLLY LEHR, DEWEY BALLANTINE, LLP, NEW YORK, NY; DANIEL J. LEFFELL, NEW YORK, NY.

For Discover Re Managers, Inc., UNITED STATES FIDELITY AND GUARANTY SPECIALITY INSURANCE COMPANY, Defendants: EDWARD F. MALUF, MIRIAM THERESA DOWD, PHILIP L. BLUM, BINGHAM MCCUTCHEN, LLP, NEW YORK, NY.

For DISCOVER REINSURANCE COMPANY, DISCOVERY MANAGERS LTD, UNITED STATES FIDELITY & GUARANTY COMPANY, Defendants: BARRY HASSELL, COPELAND, COOK, TAYLOR & BUSH, RIDGELAND, MS; CHARLES GREG COPELAND, MICHAEL W. BAXTER, COPELAND, COOK, TAYLOR & BUSH, RIDGELAND, MS; EDWARD F. MALUF, MIRIAM THERESA DOWD, PHILIP L. BLUM, BINGHAM MCCUTCHEN, LLP, NEW YORK, NY.

For MARK A SMITH, [*32] (CIVIL NUMBER 05-5698), Defendant: KEVIN F HORMUTH, KEVIN F. O'MALLEY, GREENSFELDER & HEMKER, ST LOUIS, MO US.

For AMERICAN INTERNATIONAL GROUP, Defendant: CHRIS S. COUTROULIS, CARLTON FIELDS, PA, TAMPA, FL US; JAMES E. FOSTER, VIRGINIA B. TOWNES, AKERMAN SENTERFITT, ORLANDO, FL US; STEVEN J BRODIE, CARLTON FIELDS, PA,

MIAMI, FL US; DANIEL J. LEFFELL, NEW YORK, NY.

For CHUBB CORPORATION, THE, Defendant: DUSTIN E DEESE, MARVIN E. BARKIN, TRENAM, KEMKER, SCHRARF, BARKIN, FRYE, O'NEILL & MULLIS, TAMPA, FL US; DANIEL J. LEFFELL, NEW YORK, NY.

For HARTFORD INSURANCE CO OF THE SOUTHEAST, HARTFORD UNDERWRITER INS. CO., Defendant: ANDREA ROBINSON, WILMER CUTLER PICKERING, HALE & DORR LLP, BOSTON, MA; JAMES E. FOSTER, VIRGINIA B. TOWNES, AKERMAN SENTERFITT, ORLANDO, FL US; ROBERT W. TRENCHARD, WILMER, CUTLER, PICKERING, HALE & DORR, LLP, NEW YORK, NY.

For USI HOLDINGS INC, Defendant: DENIS L. DURKIN, BAKER & HOSTETLER, LLP, ORLANDO, FL; PATRICK CHARLES SCHMITTER, RACHEL L. GERSTEIN, RICHARD B. ZABEL, ROBERT HARDY PEES, AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, NEW YORK, NY.

For JOSEPH E LAMPEN, Defendant: KEVIN F HORMUTH, KEVIN F. O'MALLEY, GREENSFELDER & HEMKER, ST LOUIS, [*33] MO US.

For MARSH USA INC OF LOUISIANA, Defendant: DANIEL P. JORDAN, P. RYAN BECKETT, BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC, JACKSON, MS US.

For NAVIGATORS INSURANCE COMPANY, Defendant: ELLIOTT ABRUTYN, MORGAN, MELHUISH & ABRUTYN, LIVINGSTON, NJ.

For NAVIGATORS INSURANCE SERVICES OF TEXAS INC, Defendant: ELLIOTT ABRUTYN, MORGAN, MELHUISH & ABRUTYN, LIVINGSTON, NJ; ELTON F DUNCAN, JESSICA G ROUX, KELLEY SEVIN, THOMAS A. FRENCH, DUNCAN, COURINGTON & RYDBERG, NEW ORLEANS, LA US.

For THE CONTINENTAL INSURANCE COMPANY, Defendant: DANIEL J. LEFFELL, NEW YORK, NY; JOHN MICHAEL AGNELLO, CARELLA BYRNE BAIN, GILFILLAN CECCHI STEWART & OLSTEIN, PC, ROSELAND, NJ; MATTHEW JOSEPH CACCAMO, CHICAGO, IL US; MELISSA E. FLAX, CARELLA, BYRNE, BAIN, GILFILLAN, ROSELAND, NJ.

For UNITED STATES OF AMERICA, Defendant: SUSAN J. STEELE, UNITED STATES ATTORNEY'S OFFICE, NEWARK, NJ.

For Guy Carpenter & Company, Inc., MARSH & MCLENNAN COMPANIES, INC., Marsh Advantage America, Marsh Global Broking, Inc. (Missouri), Marsh Global Broking, Inc. (New Jersey), Marsh Global Placement, MARSH INC., MARSH USA INC. (Connecticut), MARSH USA INC., Seabury & Smith Inc., MARSH & MCLENNAN COMPANIES, [*34] INC., Marsh Advantage America, MARSH INC., Defendants: CHRISTOPHER J. ST. JEANOS, WILLKIE FARR & GALLAGHER, NEW YORK, NY US.

For MARSH & MCLENNEN, DEFENDANT IN 06-3844, Defendant: DARREN K NELSON, PARR WADDOUPS BROWN GEE & LOVELESS, SALT LAKE CITY, UT US.

For MARSH, DEFENDANT IN 06-3844, Defendant: DARREN K NELSON, PARR WADDOUPS BROWN GEE & LOVELESS, SALT LAKE CITY, UT.

For AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE CO., Consol Defendant: DANIEL J. LEFFELL, NEW YORK, NY; KENNETH A. GALLO, PATRICIA C. CROWLEY, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, WASHINGTON, DC.

For LEXINGTON INSURANCE CO., Consol Defendant: DANIEL J. LEFFELL, NEW YORK, NY; PATRICIA C. CROWLEY, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, WASHINGTON, DC.

For National Association of Professional Insurance Agents, National Association of Professional Insurance Agents, Amicus: WILLIAM F. MEGNA, MORRIS, MANNING & MARTIN, LLP, PRINCETON, NJ.

For Independent Insurance Agents & Brokers of America, Inc., Amicus: SHAFFIN ABDUL DATOO, VENABLE LLP, NEW YORK, NY US.

**JUDGES:** Hon. Faith S. Hochberg, U.S.D.J.

**OPINION BY:** Faith S. Hochberg

**OPINION**

**HOCHBERG, District Judge:**

In this Multidistrict [*35] Litigation, 38 cases brought throughout the country have been assigned to

this Court for all pretrial proceedings. The Plaintiffs claim a vast conspiracy between insurance brokers and carriers to rig bids and to allocate or "steer" customers to defeat competition in the insurance market in exchange for high brokerage commissions. This matter comes before the Court upon Defendants' Motion to Dismiss the First Consolidated Commercial Class Action Amended Complaint (the "Commercial Complaint") and the First Consolidated Employee Benefits Class Action Amended Complaint (the "Employee-Benefits Complaint") (together, "the Complaints") pursuant to *Fed. R. Civ. P. 12(b)(6)*. The Court has considered the written submissions of the parties, and heard oral arguments on July 26, 2006.[1]

> 1 The Defendants have submitted two omnibus briefs, one on behalf of a group of insurance brokers (the "Broker Defendants"), and one on behalf of a group of insurance carriers (the "Insurer Defendants") (collectively, "the Defendants"). Several Defendants have also filed supplemental briefs, in which they expressly adopted the Brokers and Insurers' arguments, and set forth additional arguments for dismissal. This Opinion addresses both the omnibus and the individual motions.

[*36] **I. Background.**

**A. The Parties**

The plaintiffs in the Commercial Case are businesses, individuals, and public entities who, between August 26, 1994 and the date of the class certification (the "Class Period"), have engaged the services of the Broker Defendants to obtain advice with respect to the procurement or renewal of commercial property and casualty insurance, and entered into or renewed a contract of insurance with one of the Insurer Defendants.

The plaintiffs in the Employee-Benefits Case purport to represent two distinct classes: (1) a class of employees (the "Employee-Plaintiffs") who obtained insurance from the Insurer Defendants through their employers' benefits plans, and purchased from them certain supplemental insurance coverages; and (2) a class of employers (the "Employers-Plaintiffs"), who, with the assistance of the Broker Defendants, contracted with the Insurer Defendants to provide group insurance coverage to their employees as part of their employee benefits plans.

The Complaints name two groups of defendants: a group of insurance brokers (the "Broker Defendants"), and a group of insurance carriers (the "Insurer Defendants"), described in [*37] the Complaints as the "nation's largest insurance brokers ... and insurance companies." Commercial Complaint ("Comm. Compl.") P 1.

The Broker Defendants, together with their affiliates, provide their clients with risk management and insurance brokerage services, including, *inter alia*, "analysis of risk and insurance options, procurement and renewal of insurance, interpretation of insurance policies, monitoring the insurance industry on the client's behalf, keeping clients informed as to developments in the insurance marketplace, and assisting clients with the filing and processing of claims against the policies they place." *Id.* at P 178. The Insurer Defendants and their subsidiaries develop, market and sell a variety of insurance and reinsurance products for individuals and business clients, in the United States and abroad.

**B. Procedural History**

On October 14, 2004, New York State Attorney General Eliot Spitzer ("NYAG") filed a civil complaint in New York State Supreme Court against Marsh & McLennan ("Marsh"), one of the Defendants in this action, alleging, among other things, that Marsh had solicited rigged bids for insurance contracts, and had received improper contingent [*38] commission payments in exchange for steering its clients to a select group of insurers. *See People of the State of New York v. Marsh & McLennan Cos., Inc.,* No. 04/403342 (N.Y. Sup. Ct., Oct. 14, 2004). The NYAG Complaint was followed by other governmental and regulatory investigations throughout the country, and prompted the filing of several federal actions based on allegations similar to those raised in the complaint against Marsh. *See Opticare Health Systems, Inc. v. Marsh & McLennan Companies, Inc., et al.,* C.A. No. 1:04-6954 (S.D.N.Y. 2004); *QLM Associates, Inc. v. Marsh & McLennan Companies, Inc., et al.,* C.A. No. 2:04-5184 (D.N.J. 2004); *Accent On Eyes Corp. v. Marsh & McLennan Companies, Inc., et al.,* C.A. No. 2:04-4535 (E.D.N.Y. 2004); *Eagle Creek, Inc. v. ACE INA Holdings, et al.,* C.A. No. 2:04-5255 (E.D. Pa. 2004).

On February 17, 2005, the Judicial Panel on Multidistrict Litigation transferred these cases to this Court for coordinated or consolidated pretrial proceedings pursuant to the multidistrict litigation ("MDL") procedures set forth in *28 U.S.C. § 1407. See In re Insurance Brokerage Antitrust Litig., 360 F.Supp. 2d 1371 (J.P.M.L. 2005)* [*39] (establishing MDL No. 1663). Since that time, additional "tag-along" actions have been conditionally transferred to this MDL.

By Order dated May 25, 2005, this Court directed Plaintiffs to sever their claims involving commercial property and casualty insurance from their claims involving insurance sold as part of an employee benefits plan, and on August 8, 2005, the Court consolidated the transferred actions into two consolidated dockets, *In re Insurance Brokerage Antitrust Litigation* (Civil No. 04-5184)

(the "Commercial Case") and *In re Employee-Benefit Insurance Brokerage Antitrust Litigation* (Civil No. 05-1079) (the "Employee-Benefits Case"). *See* Orders No. 3 and 6. Plaintiffs filed two Consolidated Amended Complaints on August 1, 2005, followed by a 153-page Corrected Employee-Benefits Complaint on August 15, 2005, and a 173-page Corrected Commercial Complaint on August 29, 2005. [2]

> 2   A group of Insurer Defendants has moved to strike the allegations of the Employee-Benefits Complaint concerning property and casualty insurance as immaterial and impertinent pursuant to *Fed. R. Civ. P. 12(f)*. This motion is denied. The Court will consider Defendants' arguments as they relate to the sufficiency of the Complaint.

[*40] **C. Factual Allegations**

> [3]

> 3   The following is a summary of Plaintiffs' allegations as set forth in the Commercial and the Employee-Benefits Complaints. The Court repeats these allegations for present purposes, but makes no findings of fact as to any of Plaintiffs' claims.

The thrust of Plaintiffs' Complaints is that Defendants have perpetrated a "massive scheme to manipulate the market for commercial insurance," and have conspired to "fraudulently market and sell insurance products and related services to and/or through employee benefits plans." Comm. Compl. P 1; Employee-Benefits Complaint ("EB Compl.") P 1. Plaintiffs allege that "the Broker Defendants and Insurer Defendants engaged in a combination and conspiracy to suppress and eliminate competition in the sale of insurance by coordinating and rigging bids for insurance policies, allocating insurance markets and customers and raising, or maintaining or stabilizing premium prices above competitive levels." Comm. Compl. P 1. Through such practices, according [*41] to the Complaints, the Brokers and the Insurers "have created the illusion of a competitive market for insurance" while "the selection, pricing, and placement of the insurance products at issue in this litigation are, in fact, the result of Defendants' collusion." *Id.* at P 2.

Plaintiffs claim that as a result of the conspiracy, "the prices paid by plaintiffs and class members were raised and maintained at artificially high, supra-competitive levels" and that Plaintiffs "were deprived of the benefits of free and open competition in the purchase of insurance." *Id.* at P 532. Plaintiffs allege that the Broker Defendants profited from the conspiracy through the receipt of "exorbitant contingent commissions" and "other undisclosed kickbacks," and that the Insurer Defendants have improperly increased their profits and revenues by raising and maintaining the premiums charged to Plaintiffs, without having to compete for insurance business.

The Complaints rest on the general theory that Defendants' conduct has created "an overwhelming conflict of interest and breach of duties" and has undermined the nature of the broker-client and the insurer-insured relationships. Plaintiffs allege [*42] that, despite the Brokers' representations "that they will provide unbiased brokering advice and assistance to their clients in the selection of insurance products," the Brokers allegedly conspired with the Insurer Defendants to steer their clients to purchase or renew coverage with the Insurers at inflated prices and/or reduced coverage and benefits, "at the expense of their clients' best interests and in contravention of their fiduciary obligations." *Id.* at P 181. Plaintiffs allege that the Brokers and the Insurer Defendants have misled their clients into thinking that they are receiving the most economical and appropriate insurance products, while in fact, the Brokers are steering them towards products that will maximize the profit of the Defendants.

Plaintiffs contend that the Defendants implemented the conspiracy through two main schemes: (1) the kickback and steering scheme and (2) the bid-rigging scheme.

**1. The Kickback and Steering Scheme**

The Complaints allege that the Broker Defendants have received undisclosed kickbacks from the Insurers in the form of contingent commissions (also known as "overrides"), and in return, have agreed to steer their clients to purchase [*43] insurance from certain "preferred" Insurers with whom the Brokers had the most profitable arrangements. As the Complaints explain, the payment and amount of contingent commissions are based on factors such as: (i) the volume of insurance that the Brokers place with a particular Insurer ("volume contingency"); (ii) the renewal of that business ("persistency contingency"); and (iii) the profitability of that business ("claims loss ratios contingency"). *Id.* at P 202. Contingent commissions are often memorialized in written agreements between brokers and insurers referred to as "placement service agreements" ("PSAs"), "override agreements," or "market service agreements." The Complaints describe several examples of contingent commission agreements. *Id.* at P 224-231.

Plaintiffs claim that the Defendants have fraudulently misrepresented and failed to adequately disclose these contingent commission agreements. In particular, Plaintiffs allege that the Defendants have failed to disclose (a) the existence, source, and amount of the contin-

gent commissions; (b) the material impact of contingent commissions on Defendants' profitability; (c) that Plaintiffs ultimately pay the cost of these [*44] undisclosed fees through higher premiums; and (d) that contingent commissions have created economic incentives for the Defendants to act contrary to their contractual and fiduciary duties to the Plaintiffs. While Plaintiffs acknowledge that some of the Defendants have begun to take steps to disclose the payment and receipt of contingent commissions, they assert that many Defendants continue to make inadequate disclosures of their contingent commission agreements.

Plaintiffs allege that the Broker Defendants improperly steer their clients to certain preferred insurers to maximize contingent commission revenues. In support of their allegations, Plaintiffs point to several statements allegedly made by some broker executives. *See, e.g.,* Comm. Compl. P 240 (alleging that a former managing director with Marsh stated that "some [contingent commission agreements] are better than others ... I will give you clear direction on who [we] are steering business to and who we are steering business from."); *Id.* at P 259 (alleging that a former Aon executive stated: "With our override agreements with Chubb and Fire Fund, we need to direct all new business exclusively to them for the next [*45] month and beyond."); *Id.* at P 271 (alleging that a Chief Marketing Officer at Willis wrote in an email: "Don't forget the advantages of placing as much business as possible with the carriers we have negotiated special deals with, as you look for ways to maximize revenues the last few months of this year and into 2000."); *Id.* at P 268 (alleging that a managing Director of Willis stated: "Special attention is being given to St. Paul, Chubb, Liberty Mutual, Hartford and Crum & Forster due to special [PSA] agreements."); *Id.* at P281 (stating that "a Gallagher executive instructed his managers to 'pump additional premium volume' to those carriers with whom it had contingent commissions agreements."); *Id.* at P 294 (alleging that "USI employees were told, at monthly department meetings, to 'stick with the higher commission carriers.'").

The Complaints further allege that the Brokers provided "financial incentives" to employees who maximized contingent commission revenues by steering clients to the preferred insurers, and "reprimanded" their employees for failing to steer business to those insurers. *See, e.g., id.* at P 246 (alleging that one Marsh employee was elevated [*46] to vice president in part because he had been able to renew a client's business by "moving" that client to an insurer with which Marsh had a PSA). Plaintiffs also claim that some Insurers agreed to pay the salaries of certain Brokers' employees, as well as "hiring subsidies," in exchange for the Brokers' promise to steer new business to the Insurers. *See, e.g., id.* at P 287 (alleg-

ing that Chubb, an insurance company, agreed to pay a hiring subsidy to a broker, Gallagher, and that an internal document stated that "in return for Chubb's contribution to individuals salary, [Gallagher's unit] was required to meet specific new business goals with Chubb.")

The Complaints assert that those insurers who refused to pay contingent commissions were "left out of the game." *See, e.g., id.* at P 249 (alleging that in 2003, Aon steered business away from Hartford in retaliation for Hartford's decision to use a different broker for its own directors and officers policies; Aon allegedly decided to examine all placements with Hartford and recommended that Aon keep clients with Hartford on the lines that paid contingent commissions); *Id.* at P 245 (describing a report from Marsh's Los Angeles [*47] office which directed the brokers to temporarily stop selling personal coverage lines from AIG because Marsh did not want to exceed an annual cap on policies with AIG in states with a high risk of earthquakes and hurricanes, since exceeding the limit could reduce contingent commissions to Marsh).

In addition to contingent commissions, Plaintiffs claim that the Brokers obtained undisclosed compensation from the Insurers through "unlawful tying arrangements" under which the Brokers steered primary insurance contracts to the Insurers on the condition that those Insurers use the Brokers' reinsurance subsidiaries for their reinsurance business. Plaintiffs allege that such arrangements allowed the Brokers "to reap additional improper revenue," and "had the effect of increasing the price of reinsurance," with the increased costs being passed on to the policyholders. *See, e.g., id.* at P 359 (quoting a letter from a Gallagher executive, in which he stated that he would "try and leverage the specific companies [AIG, Chubb and Hartford] for more of their reinsurance business."); *Id.* at P 363-67 (alleging that Aon promised to steer business to AIG, Liberty Mutual Group, and Chubb in [*48] return for their commitment to use Aon's reinsurance services); *Id.* at P 368-71 (describing Aon's alleged practice of entering into "clawback" agreements, under which Aon's reinsurance subsidiary would discount its reinsurance brokerage commissions, and in return, would steer retail insurance business to certain insurers).

Finally, Plaintiffs contend that the Brokers received additional income (known as "wholesale payments") by placing their clients' business with insurers through related wholesale entities "purport[ing] to act as intermediaries between the Broker Defendants and the Insurer Defendants." *Id.* at P 348. According to the Plaintiffs, wholesale payments create the same incentives as contingent commissions, and are part of the same scheme and conspiracy under which the Brokers mislead their clients into believing that they provide independent bro-

kerage advice. These allegations of the Complaint only focus on one Broker Defendant, Willis, *Id.* at P 349-53 (claiming that Willis placed its clients' business through its wholesaler, Stewart Smith, to generate additional commissions, and that between 2002 and 2004, Stewart Smith paid Willis over $ 62 million for brokering [*49] business originated by Willis through Stewart Smith.).

## 2. The Bid-Rigging Scheme

The Complaints allege that "the Defendants colluded in a bid-rigging scheme to allocate customers and to deceive Plaintiffs into believing that the Broker Defendants were obtaining competitive insurance bids from the Insurers on behalf of their clients." Comm. Compl. P 307. The bid-rigging allegations fall into two categories: (a) allegations against the Brokers; (b) allegations against the Insurers [4]

> 4    As clarified by Plaintiffs at oral argument, Plaintiffs "[do not] have bid-rigging allegations against each and every defendant in this case" and only purport to assert bid-rigging against Defendants Aon, Gallagher, HRH, Marsh, ULR, Willis, ACE, AIG, Chubb, CNA, Fireman's Fund, Hartford, Munich, St. Paul Travelers, and Unum-Provident. *See* July 26, 2006 Transcript of Oral Argument ("Tr.") at 54; Plaintiffs' August 4, 2006 Submission at 2. This does not preclude, however, other Defendants from being named as participants in bid-rigging if and when there is a good faith factual basis to support it.

As set forth in the Complaints and at oral argument, the gist of Plaintiffs' contention is that there were two primary schemes for suppressing competition in the insurance market – "bid-rigging" and "steering." In subsequent correspondence, Plaintiffs appear to restate their theory as a conspiracy to allocate customers using a variety of manipulative devices, including "bid-rigging." For current purposes, this is a distinction without importance.

## [*50] a. Allegations Against the Brokers

Plaintiff claim that the bid-rigging was "facilitated by the Broker Defendants, who solicited and obtained fictitious high quotes from the Insurer Defendants to guarantee that certain preferred insurers would win the bidding competition, and by determining the terms of the winning and losing bid." According to the Complaints, the Brokers arranged for fictitious quotes (referred to as "A quotes," "B quotes," and "C quotes") to be submitted to the client. "A quotes" refers to the quotes solicited by a broker when the broker had an incumbent carrier for one of its clients whose insurance policy was up for re-

newal; if the insurer agreed to make a quote at the targeted premium and policy terms demanded by the broker, the insurer was guaranteed the policy renewal. "B quotes" (also known as "backup quote" or "accommodation quote") refers to "phony" quotes solicited from non-incumbent insurers with the understanding that these insurers would not submit a competitive bid; "B quotes" were used to ensure that the incumbent carrier would get its policy renewed, and the "B quote" insurers allegedly knew that "their turn would come later." "C quotes" refers [*51] to the quote solicited from insurers when there was no insurance carrier "to protect."

In support of their bid-rigging allegations against the Brokers, Plaintiffs rely extensively on the guilty pleas of several executives from Marsh and other insurance and brokerage companies who acknowledged that they had submitted false quotes and participated in a bid-rigging scheme. *Id.* at P 311 (citing the guilty plea of an AIG executive, John Mohs, which states, in relevant part: "Marsh and AIG personnel periodically instructed Mohs to submit specific quotes for insurance rates that Mohs believed: (a) were higher than those of incumbent carriers; (b) were designed to ensure that the incumbent carriers would win certain business; and (c) resulted in clients being tricked and deceived by this deceptive bidding process."). Plaintiffs also explain how Aon allegedly used Zurich and other insurers to inflate bids, and assert that Aon ordered its brokers on several occasions to contact Insurer Defendants AIG, CNA and Zurich to inform them of a competitor's bid. *Id.* at P 337-42. They further describe: (a) HRH's alleged practice of providing a "last look" to the incumbent insurance company; [*52] *Id.* at P 343; (b) Gallagher's alleged practice of informing insurance companies "what price they had to beat" and that they could secure "whatever they wanted" from Gallagher; *Id.* at P 344; and (c) Willis' alleged practice of soliciting false bids from CNA and Zurich. *Id.* at P 345.

## b. Allegations Against the Insurers

Plaintiffs contend that the Insurer Defendants colluded with the Brokers in the bid-rigging scheme "because they were promised protection from competition in other bids when their business was up for renewal."*Id.* at P 307. Plaintiffs also maintain that "bid-rigging enables the Insurer Defendants to keep premium prices high," and allows them to recoup the cost of contingent commissions paid to the Brokers. **EB** Compl. P 266. Relying primarily on the NYAG Complaint against Marsh, Plaintiffs describe several instances where certain Insurers allegedly complied with a Broker's request to submit false bids. *See* Comm. Compl. P 310-36 (alleging that "Munich complied with Marsh's request to submit a B quote so that the incumbent, AIG, would get the business."); *Id.* at P 93 (quoting an ACE's executive as stating: "Marsh is constantly asking us [*53] to provide

what they refer to as 'B' quotes for a risk. They openly acknowledge we will not bind these 'B' quotes in the layers we are be [sic] to quote by that they 'will work us into the program' at another point.").

### D. Legal Claims

The Commercial Complaint asserts six causes of action: (1) Violation of the Racketeering Influence and Corrupt Organization Act ("RICO"), *18 U.S.C. §§ 1962(c)* and *(d)* (Counts I, II, and III); (2) Unlawful conspiracy to restrain trade in violation of Section 1 of the Sherman Act, *15 U.S.C. § 1* (Counts IV and V); (3) Violation of the antitrust laws of forty eight states and the District of Columbia (Count VI); (4) Breach of fiduciary duty (against the Broker Defendants only) (Count VII); (5) Aiding and abetting breach of fiduciary duty (against the Insurer Defendants only) (Count VIII); and (6) Unjust enrichment (Count IX). The Employee-Benefits Complaint alleges the same causes of action, with the exception of claims asserted against the Insurer Defendants on behalf of the Employee-Plaintiffs for breaches of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"), Section [*54] 502(a)(2), *29 U.S.C. § 1132(a)(2).* [5]

> 5   While the Employee-Benefits Complaint asserts ERISA claims on behalf of both the 'Employer-Plaintiffs and the Employee-Plaintiffs, Plaintiffs have expressly withdrawn the ERISA claims brought on behalf of the Employer-Plaintiffs. *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Employee-Benefits Complaint at 60 n.32.

Plaintiffs seek restitution, compensatory, punitive and treble damages, disgorgement, injunctive and declaratory relief, and attorneys' fees and costs. Defendants move to dismiss the Complaints on multiple grounds. Each ground will be discussed together with the law applicable to a motion to dismiss on such ground.

### II. Standard of Review.

A motion to dismiss under *Fed. R. Civ. P. 12(b)(6)* should be granted "if it appears to a certainty that no relief could be granted under any set offacts which could be proved." *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).* [*55] While a court need not credit a complaint's "bald assertions" or "legal conclusions," it is required to accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff. *Id.* (citing *Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989)); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997).* In evaluating a motion to dis-

miss pursuant to *Fed. R. Civ. P. 12(b)(6)*, the Court may consider only the Complaint, exhibits attached to the Complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based on those documents. *Pension Guaranty Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1992).*

### III. Analysis.

#### A. Motion to Dismiss Federal Antitrust Claims

Defendants argue that (1) Plaintiffs' federal antitrust claims are barred by the McCarran-Ferguson Act, *15 U.S.C. §§ 1011 et seq.*; and (2) the Complaints fail to allege facts sufficient to state a claim under [*56] *Section 1* of the Sherman Act.

#### 1. The McCarran-Ferguson Act

The McCarran-Ferguson Act ("the Act"), enacted in 1945, provides for a limited, conditional exemption from federal antitrust laws. *Section 1012(b)* of the Act states, in relevant part:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee of tax upon such business, unless such business is specifically relates to the business of insurance ....; *Provided* that... the Sherman Act shall be applicable to the business of insurance to the extent that such business is not regulated by State law, ...." *15 U.S.C. § 1012(b)* (emphasis in original).

*Section 1013(b)* provides that: "Nothing contained in this Chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." *15 U.S.C. § 1013(b).* Therefore, the McCarran-Ferguson exempts from federal antitrust liability conduct that (1) is part of the "business of insurance;" (2) is "regulated by state law;" and (3) does not constitute a "boycott, [*57] coercion or intimidation."

The Court first considers whether the challenged practices are "the business of insurance." "The process of deciding what is and what is not the business of insurance is inherently a case-by-case problem." *Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 252, 99 S. Ct. 1067, 59 L. Ed. 2d 261 (1979)* (Brennan, J., dissenting) ("Royal Drug"). While the Act does not define "business of insurance," the case law has developed a

series of guidelines and principles to consider in determining whether a particular practice falls within the reach of the McCarran-Ferguson exemption. Initially, the Supreme Court adopted a rather expansive interpretation of "business of insurance," addressing the issue in terms of "issuance of policies," "contracts," and payment of insurance claims. *See Prudential Insurance Co. v. Benjamin, 328 U.S. 408, 416-17 n. 15, 66 S. Ct. 1142, 90 L. Ed. 1342 (1946)*. The Court subsequently clarified its understanding of the "business of insurance" in National Securities, where it instructed that the focus is upon "the relationship between the insurance company and the policyholder." *Securities and Exchange Commission v. National Securities, Inc., 393 U.S. 453, 460, 89 S. Ct. 564, 21 L. Ed. 2d 668 (1969)* [*58] ("The relationship between the insurer and the insured, the type of policy which could be issued, its reliability, interpretation and enforcement - these were the core of the 'business of insurance.'").

Two later decisions further refined the *National Securities* definition of "business of insurance" in the antitrust context. First, in *Royal Drug,* the Court emphasized that the McCarran-Ferguson Act exempts insurance "activities", rather than insurance "companies", from federal antitrust laws. *Royal Drug, 440 U.S. at 210-11* (holding that "the statutory language in question here does not exempt the business of insurance companies from the scope of the antitrust laws. The exemption is for the "business of insurance," not the "business of insurers ...."); *Hartford Fire Ins. Co. v. California, 509 U.S. 764, 783, 113 S. Ct. 2891, 125 L. Ed. 2d 612 (1993)* (citing *Royal Drug, 440 U.S. at 232-33*) ("the McCarran-Ferguson Act immunizes activities rather than entities ...."). *Royal Drug* involved an alleged conspiracy to fix the price of prescription drugs. *Royal Drug, 440 U.S. at 207*. The plaintiffs, a group of independent pharmacies, claimed that the [*59] "Pharmacy agreements" between Blue Shield, an health insurer, and three participating pharmacies allowed the participating pharmacies to offer prescription drugs to customers at a lower price than the independent pharmacies could. *Id. at 207*. The Supreme Court held that the Pharmacy agreements were not part of the "business of insurance" and thus were not exempt from federal antitrust laws. *Id. at 214-34*. In so holding, the Court reasoned that these agreements did not concern the underwriting or spreading of risk because they were "legally indistinguishable from countless other business arrangements" between any two parties. *Id. at 215*. The Court also found that the Pharmacy agreements were "not between insurer and insured,'" but rather, "separate contractual arrangements" between Blue Shield and the participating pharmacies. *Id. at 216*. Noting that the Act did not create a "blanket exemption from the antitrust laws," the Court finally explained that the Act's legislative history demonstrated that such collateral agreements

were not intended to qualify as "business of insurance" as Congress was primarily concerned [*60] with the underwriting of risks and with permitting intra-industry cooperation for statistical and rate-making purpose. *Id. at 221-22*.

Reaffirming its holding in *Royal Drug,* the Supreme Court in *Pireno* enumerated three specific criteria for determining whether a particular conduct constitutes "the business of insurance:" "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." *Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129, 102 S. Ct. 3002, 73 L. Ed. 2d 647 (1982)* ("Pireno"); *United States Dep't of Treasury v. Fabe, 508 U.S. 491, 497, 113 S. Ct. 2202, 124 L. Ed. 2d 449 (1993)* (applying *Pireno's* "tripartite standard for divining what constitutes the 'business of insurance.'"). The Court cautioned, however, that none of the three factors is a litmus test, and that the practice at issue should be examined "with respect to all three criteria." *Pireno, 458 U.S. at 129* (stating that "[n]one of these criteria is necessarily determinative in itself. [*61] ").

Guided by these precedents, the Court's focus is not on the legality, but rather on the "quality of the practice." [6] *Hartford, 509 U.S. at 782*. The Court first defines the "practices" at issue. *Id.* (explaining that in *Pireno,* the Supreme Court "explicitly framed the question as whether a particular *practice* is part of the 'business of insurance' exempted from the antitrust laws ....") (emphasis in original) (internal citation and quotation marks omitted); *Id. at 781* ("the 'business of insurance' should be read to single out one activity from others ...."). [7] As clarified at oral argument, the Complaints involve two types of practices: "bid-rigging" and "steering." Bid-rigging is an agreement to manipulate bids for insurance contracts pursuant to which the Brokers solicit collusive, noncompetitive or inflated quotes from the insurers in order to ensure the placement or renewal of insurance policies with certain insurers. Assuming the truth of Plaintiffs' allegations for purposes of the instant matters, steering consists of implicit and explicit agreements to allocate premium volume to certain preferred insurers for the purpose of increasing [*62] the amount of contingent commissions paid to the brokers.

6    The mere fact that the alleged steering and bid-rigging practices may be anti-competitive or illegal does not remove them from the "business of insurance." As the Third Circuit noted in *Sabo v. Metropolitan Life Insurance Company,* "the language and purpose of the Act speak not of le-

gal insurance transactions, but instead seek to allow states to regulate and enforce the insurance business without fear of unintended federal interference ... if we were to construe the 'business of insurance' phrase by reference to federal legality, the statute would be read out of existence." *137 F.3d 185, 192 (3d Cir. 1998); see also Royal Drug, 440 U.S. at 210* ("Whether the Agreements are *illegal* under the antitrust laws is an entirely separate question, not now before us.") (emphasis in original); *Hartford, 509 U.S. at 782 n.10* ("The activities in question here, of course, are alleged to violate federal law, and it might be tempting to think that unlawful acts are implicitly excluded from the 'business of insurance.' Yet [the MFA]'s grant of immunity assumes that acts which, but for that grant, would violate the Sherman Act ... are part of the 'business of insurance.'").

[*63]

> 7   Defendants argue that contingent commission agreements are part of the business of insurance because they relate to the policy relationship between the insurer and the insured; that rate-fixing constitutes the business of insurance.

Plaintiffs concede that the activities involved in this case are limited to entities within the insurance industry, but dispute Defendants' contention that these practices have "the effect of transferring or spreading a risk" and that they are "an integral part of the policy relationship between the insurer and the insured." With respect to the first *Pireno* factor. Defendants explain that "transfer of risk occurs at a price, at a premium" and that under Plaintiffs' theory, Defendants' conduct causes "the risk [to be] transferred at a higher price than it would otherwise be transferred at." Tr. at 14. They also contend that the alleged practices involve the transfer or spread of policy holders' risk because, according to the Complaints, "the transfer of risk to the policyholder is happening ... as part of a fraudulent transaction." *Id.* Defendants argue [*64] that the bid-rigging and steering practices are, in essence, changing both "the terms and conditions of the transfer of the risk" and "the price at which risk is transferred." *Id.* at 16. Defendants further maintain that the second *Pireno* criterion is satisfied here because Plaintiffs' allegations "all relate directly to the policy relationship between the insurer and the insured," and more particularly, to "the pricing of insurance contracts between insurers and insureds, the methods for such pricing, and the system of compensation of brokers and its impact on insurance premiums."

While the alleged bid-rigging and steering practices indisputably take place within the insurance market, such practices do not transfer or spread risk. As one Court held, "defendants must show more than a mere relationship to risk spreading in order to meet the first [*Pireno*] criteria." *State of Md. v. Blue Cross and Blue Shield Ass'n, 620 F. Supp. 907, 916 (D.C. Md. 1985)*. The practices involved in this case are too remotely related to risk-allocation to satisfy the first prong of the *Pireno* test. To establish that a particular practice has a substantial connection to [*65] the spreading and the underwriting of risk, more than a mere impact on the price of premiums must be demonstrated. The concept of insurance involves three basic elements: (1) the undertaking of a "risk" by the insurer; (2) in exchange for the payment of a "premium;" (3) through a contract called the "policy." *Royal Drug, 440 U.S. 205, 212 n.7, 99 S. Ct. 1067, 59 L. Ed. 2d 261*. The premium is the cost of transferring the risk, the price paid in consideration of the insurer's promise to indemnify the insured upon the occurrence of a specified risk. That the activity complained of may affect premium levels is certainly relevant to antitrust issues, such as standing or damages. Yet, for purposes of applying the McCarran-Ferguson exemption, the effect on price is only part of the equation, and does not explain, in and of itself, whether a particular practice "has the effect of transferring or spreading a policyholder's risk." [8]

> 8   The fact that the transfer of risk allegedly occurs as part of a fraudulent scheme does not alter the analysis. *See Royal Drug, 440 U.S. at 214 n. 12* (distinguishing between "risk underwriting" and "risk reduction"). The court does note, however, that these practices are claimed to interfere with the operation of normal market forces, thereby reducing the probability of risk to the insurance carriers that is not integrally related to "risk underwriting."

[*66]   Secondly, the challenged practices are, at most, only tangentially related to the relationship between an insurer and insured. The practices are directly between the broker and the carrier. To the extent that Plaintiffs are policyholders, whose purported injury arose in connection with the sale of insurance, the allegations of the Complaints are certainly not indifferent to the contractual relationship with the brokers and the insurers. However, the practices at issue here are not an "*integral* part of the *policy* relationship between the insurer and the insured." *Pireno, 458 U.S. at 129* (emphasis added). Rather, accepting Plaintiffs' allegations as true solely for purposes of the instant motion, the alleged bid-rigging and steering arrangements involve interactions between brokers and insurers, and constitute independent agreements between entities operating within the insurance industry, but outside the sphere of the insurer/insured relationship.

As the Supreme Court made clear in *National Securities*, "[t]he [McCarran-Ferguson Act] did not purport to

make the States supreme in regulating all of the activities of insurance companies ... Insurance companies [*67] may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the statute apply." *393 U.S. 453, 459-60, 89 S. Ct. 564, 21 L. Ed. 2d 668 (1969).* Having examined the practices at issue in light of the three *Pireno* criteria, and mindful of the general principle that "exemptions from the antitrust laws are to be narrowly construed," *Royal Drug Co., 440 U.S. at 231,* the Court finds that the alleged bid-rigging and steering activities do not constitute the "business of insurance." [9] Therefore, the McCarran-Ferguson exemption does not apply.

> 9   Because the Court finds that the alleged practices are not "the business of insurance," and thus do not fit within the McCarran-Ferguson exemption, the Court need not consider whether the practices are "regulated by state law" and whether the Complaints adequately alleges conduct constituting an agreement to, or an act of "boycott, coercion or intimidation." *See 15 U.S.C. § 1012(b).*

### [*68] 2. Sherman Act Section 1

*Section 1* of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared illegal." *15 U.S.C. § 1.* To properly plead a violation of *Section 1*, a plaintiff must allege "(1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action." *Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997).* [10]

> 10   The Court finds that Plaintiffs have alleged, at this stage of the litigation, sufficient antitrust injury to establish standing under the Sherman Act. "Private plaintiffs pursuing claims under *§ 1* have standing when they suffer an antitrust injury that is causally related to the defendants' allegedly illegal anti-competitive activity." *Eichorn v. AT & T Corp., 248 F.3d 131, 140 (3d Cir. 2001)* (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)).* Plaintiffs must allege an injury "of the type for which the antitrust laws were intended to provide redress." *Angelico v. Lehigh Valley Hospital, Inc., 184 F.3d 268, 274 (3d Cir. 1998).*

Here, Plaintiffs allege that "the actions of the Defendants were all part of the same conspiracy

to increase revenues and to suppress or eliminate competition." Comm. Compl. P 407; EB Compl. P 325. They claim that as a result of the alleged conspiracy, the "prices paid by plaintiffs and Class members for insurance were raised, maintained or stabilized at artificially high, supracompetitive levels." Comm. Compl. P 532; EB Compl. P 451 (alleging that Defendants' conduct had "the effect of inflating premiums above competitive levels."). As the Third Circuit has stated, albeit in a different context, "[i]t is difficult to imagine a more formidable demonstration of antitrust injury" than supra-competitive overcharges. *In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 400 (3d Cir. 2000).* Assuming the truth of Plaintiffs' allegations for purposes of the instant motion. Plaintiffs have properly alleged, for standing purposes, that Defendants' conduct has "a wider impact on the competitive market." *Eichorn, 248 F.3d at 140.*

[*69]   The first element, concerted action, constitutes the "very essence of a *section 1* claim." *Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 998 (3d Cir. 1994)* (noting that "unilateral action, no matter what its motivation, cannot violate *[section] 1*") (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 110 (3d Cir. 1980)).* As the Third Circuit has stated, "[a] general allegation of conspiracy without a statement of the facts is an allegation of a legal conclusion and insufficient of itself to constitute a cause of action." *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 182 (3d Cir. 1988)* ("*Zimmerman*"). Only "allegations of conspiracy which are particularized ... will be deemed sufficient." *Id. at 181* (quoting *Garshman v. Universal Resources Holding, Inc., 641 F. Supp. 1359 (D.N.J. 1986); Id. at 182* (stating that plaintiffs must "present evidence 'that tends to exclude the possibility that the alleged conspirators acted independently.") (citations omitted). To adequately allege concerted activity, Plaintiffs are not required, at this stage of the proceedings, [*70] to provide all the details of the alleged conspiracies. *Id.* (quoting *Black & Yates, Inc. v. Mahogany Asso., 129 F.2d 227, 231-32 (3d Cir.1941)).* But they must, at a minimum, "plead the facts constituting the conspiracy, its object and accomplishment," such as "the date of the alleged conspiracy," or "its attendant circumstances." *Id.; see also Mowrer v. Armour Pharmaceutical Co., 1993 U.S. Dist. LEXIS 18367, Civ. A. No. 92-6905, 1993 WL 542541, at *3 (E.D. Pa. Dec. 30,1993)* (holding that plaintiffs must plead "the general composition of the conspiracy, some or all of its broad objectives, and [each defendant's] general role in the conspiracy.")

The requirement that conspiracy allegations be pled with adequate specificity is not a mere technicality, but

rather, is grounded in considerations of judicial economy and fairness to the defendants. *See Zimmerman, 836 F.2d at 182* ("It is simply not fair to the defendants, and it would be an onerous imposition on the judicial process, to permit litigation to go forward on the basis of [] conclusory and speculative allegations."); *see also Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law P 1409, at 55 (2003)* ("Conspiracy [*71] allegations frequently name one or two specific persons or firms and also sweep in other unnamed conspirators. The openness of the charge invites confusion where only a few of the possible conspirators have engaged in readily provable collaborative conduct."); *see finally Stanziale v. Nachtomi (In re Tower Air, Inc.), 416 F.3d 229, 237 (3d. Cir. 2005)* ("[e]ven at the pleading stage, a defendant deserves fair notice of the general factual background for the plaintiff's claims.").

This requirement is also particularly important where, as here, Plaintiffs' conspiracy claims are predicated on fraud, and thus, are subject to *Fed. R. Civ. P. 9(b)* ("Rule 9(b)"). [11] In *Lum v. Bank of America,* the Third Circuit held that antitrust and RICO claims based on theories of fraud are subject, like explicit fraud claims, to the heightened pleading requirement of *Rule 9(b). 361 F.3d 217, 228-29 (3d Cir. 2004)* ("Lum"). The Court noted that "generally, the pleading standard for *Section 1* claims is the short and concise statement standard of *Rule 8(a),*" but stated: "Because plaintiffs allege that the defendants accomplished the goal of their conspiracy through [*72] fraud, the Amended Complaint is subject to *Rule 9(b)." Id. at 228* (emphasizing that under *Rule 9(b),* "all averments of fraud ... shall be stated with particularity.") (emphasis in original).

> 11   *Rule 9(b)* provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

Plaintiffs argue that the particularity requirement of *Rule 9(b)* does not apply to their Sherman Act claims because these claims "do not sound in fraud." They also seek to distinguish *Lum* on the ground that in *Lum,* the antitrust conspiracy "was alleged to have been carried out by fraud," while here, in contrast, the Complaints allege that the acts of fraud were perpetrated merely "to conceal" the antitrust violation. Plaintiffs offer no legal support for such an interpretation. In *Lum,* the Court did not limit its holding to instances in which fraud is the necessary [*73] element of a claim, but stated more generally that Plaintiffs' claims were subject to *Rule 9(b)* because Plaintiffs were "alleging that the defendants carried out [the alleged] plan, scheme, and conspiracy *through fraud." Id.* (emphasis added); *Id. at 229* (de-

scribing plaintiffs' complaint as asserting an "antitrust claim predicated on fraud," and applying *Rule 9(b)* where plaintiffs had alleged fraud "as a basis for their antitrust cause of action."). Plaintiffs' contention that their Sherman Act claims "do not sound in fraud" is also belied by the specific allegations of the Complaints, which assert, in relevant part that: "Each Defendant and co-conspirator has committed *acts of fraud* in furtherance of this conspiratorial objective." (Comm. Compl. P 409) (emphasis added); "*In furtherance of the conspiracy,* Defendants and co-conspirators have agreed to implement and use the same or similar devices and *fraudulent tactics* against their clients ...." (*Id.* at P 410) (id.); "Each Defendant and member of each [broker-centered] conspiracy, with knowledge and intent, *has committed acts of fraud." (Id.* at P 433) (id.); "Through Defendants' fraudulent [*74] misrepresentations and failure to make adequate disclosure of the Contingent Commissions ... Defendants have knowingly misled and continue to mislead and deceive their clients ..." (*Id.* at P 306) (id.); "Defendants have affirmatively and *fraudulently concealed* their unlawful scheme, course of conduct and conspiracy from plaintiffs. In fact, *as part of the conspiracy,* Defendants went to great lengths to create the appearance of a competitive market for insurance coverage, where no such competitive market existed." (*Id.* at P 465) (id.); "Plaintiffs had no knowledge of Defendants' *fraudulent scheme* and could not have discovered that Defendants' representations were false or that Defendants had concealed information and materials until shortly before the filing of this Complaint." (*Id.* at P 466) (id.); *see also id.* at P 358 (alleging a "fraudulent scheme"); EB Compl. P 21. Contrary to Plaintiffs' assertion, these allegations demonstrate that Plaintiffs' claims are not merely allegations of fraudulent concealment, but rather allegations of a conspiracy to defraud. Accordingly, the Court examines the sufficiency of Plaintiffs' conspiracy allegations under [*75] *Rule 9(b).*

The Complaints allege the existence of a "global, single conspiracy" (the "Global Conspiracy") or alternatively, of six "broker-centered conspiracies" (the "Broker-Centered Conspiracies").

### a. The Global Conspiracy

Plaintiffs allege that the "Broker Defendants and the Insurer Defendants have engaged in a conspiracy and common course of conduct to restrain trade in the market for commercial insurance," and that they "conspired to rig bids, allocate customers and to maintain the price of insurance products in these markets at supra-competitive levels." Comm. Compl. P 405; EB Compl. P 323 ("[t]he common scheme and conspiracy involves all of the Broker Defendants and the Insurer Defendants, as well as other brokers and insurers who have undertaken the wrongful conduct set forth herein and other entities that

have facilitated the conspiracy."). The Complaints assert that "[t]he actions of the Defendants were all part of the same conspiracy to increase revenues and to suppress or eliminate competition," Comm. Compl. P 407, EB Compl. P 325, and that "[e]ach Defendant and co-conspirator has agreed to the overall objective of the conspiracy" and "has committed acts [*76] of fraud in furtherance of the conspiratorial objective." Comm. Compl. PP 408-409; see also EB Compl. P 326-327. In their Complaints, Plaintiffs further allege that "[t]he same pattern and cause of conduct and activity and similar facts, which evidence the existence of a conspiracy, exist among all Defendants and co-conspirators," including "similar agreements and policies among the Broker Defendants and the Insurer Defendants regarding concealment of their conflicts of interest and wrongful conduct," "similar agreements regarding Contingent Commissions," "similar practices regarding the reporting of their arrangements," "similar tactics for steering customers" and "for coercing submission of false bids, client steering, allocation of markets and customers, and stabilizing, raising or maintaining premium prices above competitive levels." Comm. Compl. P 411; EB Compl. P 329.

The Court finds that these allegations have insufficient particularity to demonstrate "concerted action" by all of the Defendants under the Sherman Act. The alleged conspiracy of bid-rigging does aver collusion between a limited subset of brokers and insurers, but this group is far fewer in number than the [*77] entire group of defendants. While the conduct of bid-rigging has been stated with particularity, the pleadings must identify the purported subset of conspirators in this conduct and the nature and scope of each alleged conspirator's role. With respect to the global "steering" conspiracy, Plaintiffs do not explain how such a large and diverse group of Defendants acted, combined or conspired as part of a single conspiracy. See In re Elec. Carbon Products Antitrust Litigation, 333 F. Supp. 2d 303, 312 (D.N.J. 2004) ("Simply using the 'global term 'defendants' to apply to numerous parties without any specific allegations" that would tie each particular defendant to the conspiracy is not sufficient."). Plaintiffs' broad allegations sweep together more than a hundred defendants, other unnamed brokers and insurers as well as "other entities" without alleging any facts to show that an implied or express agreement existed between the alleged conspirators. The Complaints merely aver that the Defendants "would not have undertaken the practices alleged [in the Complaints] absent and agreement among all Defendants" and that "[t]his parallel conduct would not have occurred absent [*78] either an explicit or tacit agreement among the Defendants," Comm. Compl. P 412-13; EB Compl. P 330, but plead no facts positively establishing collusion between the members of the purported conspiracy. The

only allegations of concerted activity are Plaintiffs' general assertions that the Defendants have communicated and shared information through various industry trade groups and conferences. Comm. Compl. P 414; EB Compl. P 331. Yet, while these allegations may demonstrate an "opportunity to conspire," they fall short of averring actual concert of action among the Defendants. See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1235 (3d Cir. 1993) (citing Tose v. First Pennsylvania Bank, N.A., 648 F.2d 879, 894 (3d Cir. 1981) ("Proof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place."); Areeda & Hovencamp, Antitrust Law, P 1417, at 105 ("Some conspiracy complaints make much of the defendants' opportunity to conspire ... Such proof satisfies the necessary precondition of any traditional conspiracy that the parties have the opportunity to conspire. But it remains [*79] the plaintiff's burden to prove that the defendant succumbed to temptation and conspired.").

Even at the dismissal stage, Plaintiffs must aver sufficient facts to make the existence of the pleaded conspiracy among so great a number of alleged co-conspirators plausible. See Twombly v. Bell Atlantic Corp., 425 F.3d 99, 114 (2d Cir. 2005) ("the pleaded factual predicate must include conspiracy among the realm of 'plausible' possibilities in order to survive a motion to dismiss.").

b. The Broker-Centered Conspiracies

"In the alternative," the Complaints allege the existence of a series of "separate but parallel" conspiracies, "each involving a Defendant Broker and the insurance companies with which each had Contingent Commission Agreements." Comm. Compl. P 429; EB Compl. P 338. In the Commercial Complaint, Plaintiffs allege that "a minimum of six broker-centered conspiracies exist:" (1) "A Marsh-centered conspiracy consisting of Marsh and the insurance companies with which Marsh had Contingent Commission Agreements;" (2) "An Aon-centered conspiracy consisting of Aon and the insurance companies with which Aon had Contingent Commission Agreements;" (3) "A Willis-centered [*80] conspiracy consisting of Willis and the insurance companies with which Willis had Contingent Commission Agreements;" (4) "A Gallagher-centered conspiracy consisting of Gallagher and the insurance companies with which Gallagher had Contingent Commission Agreements;" (5) "A Wells Fargo-centered conspiracy consisting of Wells Fargo and the insurance companies with which Wells Fargo had Contingent Commission Agreements;" (6) "A USI-centered conspiracy consisting of USI and the insurance companies with which USI had Contingent Commission Agreements." Comm. Compl. P 430. [12]

12    The Employee-Benefits Complaint alleges the existence of at least three broker-centered conspiracies: (1) "A ULR-centered conspiracy consisting of defendant ULR and the insurance companies with which it had Contingent Commission arrangements, including defendants UnumProvident, CIGNA, Prudential, MetLife and Hartford and others (the "ULR-centered Broker Conspiracy"); (2) "A Marsh-centered conspiracy consisting of Marsh and the insurance companies with which it had Contingent Commission arrangements, including defendant [sic] MetLife, Cigna, AIG, ACE, Hartford and others (the "Marsh-centered Broker Conspiracy"); (3) "A Aon-centered conspiracy consisting of Aon and the insurance companies with which it had Contingent Commission arrangements, including defendant [sic] MetLife, ACE, AIG, Cigna, Hartford, Metlife [sic], UnumProvident and others (the "Aon-centered Broker Conspiracy"). EB Compl. P 339.

[*81] Plaintiffs do not specifically identify the entities which allegedly conspired with each Broker Defendant, but vaguely refer to "the insurance companies with whom [the Broker Defendant] had Contingent Commission Agreements." *See Garshman v. Universal Resources Holding Inc., 824 F.2d 223, 230 (3d Cir. 1987)* (the "allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act."); Areeda & *Hovencamp, Antitrust Law,* P 1410, at 59 ( "The first step should always be to identify with maximum particularity the alleged conspirators and the subject matter of each conspiracy."). Nor do Plaintiffs adequately allege the role that each Defendant played in the conspiracy. Plaintiffs do not challenge the legality of contingent commissions. The existence of contingent commission agreements between the Broker Defendant and other insurers shows that the parties engaged in a business relationship; but is not, without more, an allegation that the Defendants conspired among each others in violation of the Sherman Act.

Therefore, the Court [*82] concludes that Plaintiffs have not pled sufficient facts to adequately allege a *Section 1* contract, combination or conspiracy. Rather than requiring Plaintiffs to file a Second Amended Complaint, the Court will instead devise and implement a new procedural framework in the form of a "supplemental statement of particularity." The Court believes that this device will promote efficiency by preserving judicial resources, reducing the expenses of the parties, and avoiding the delays associated with the filing of two voluminous amended complaints followed by a new round of motions to dismiss, in this large multidistrict litigation involving dozens of defendants. Such device will also provide fairness to both sides, by giving Plaintiffs an opportunity to cure the deficiencies in their Complaints, and by allowing Defendants to file the appropriate motions should Plaintiffs fail to substantiate their conspiracy allegations.

The supplemental statement of particularity shall set forth, with the degree of particularity required under *Rule 9(b)*, the identity of the conspirators and the role of each Defendant in the alleged conspiracies. While Plaintiffs need not present proof of Defendants' conduct [*83] at this juncture of the case, they shall aver sufficient facts to inform each Defendant of its alleged participation in the conspiracies. The supplemental statement of particularity must satisfy the requirements that apply to the filing of a complaint, and may be used by any Defendant as a pleading that may form the basis for (1) a subsequent Motion to Dismiss the Complaints with prejudice pursuant to *Fed. R. Civ. P. 12(b)(6)*; (2) a Motion for Judgment on the Pleadings pursuant to *Fed. R. Civ. P. 12(c)*; or (3) a Motion for Summary Judgment pursuant to *Fed. R. Civ. P. 56*, upon the completion of fact discovery.

**B. RICO Claims**

Plaintiffs allege violations of RICO, *18 U.S.C. § 1962(c)* and RICO conspiracy, *18 U.S.C. § 1962(d)*, against all defendants. The predicate acts alleged are wire and mail fraud in violation of *18 U.S.C. §§ 1341* and *1343*. Defendants seek dismissal of the RICO counts on the grounds that (1) Plaintiffs' RICO claims are barred by the McCarran-Ferguson [*84] Act; [13] (2) the Complaints fail to allege a substantive RICO violation under *18 U.S.C. § 1962(c)*; and (3) the Complaint fails to plead a RICO conspiracy under *18 U.S.C. § 1962(d)*.

13    Defendants argue that the McCarran-Ferguson Act precludes Plaintiffs' RICO claims under both the second, antitrust-specific sentence of *§ 1012(b)*, as well as the first clause of *§ 1012(b)*. The second clause of *§ 1012(b)* deals specifically with antitrust immunity, whereas the first clause applies to federal laws more generally. As the statute itself makes clear, the two clauses are two distinct provisions, which apply in different situations. Accordingly, Plaintiffs' RICO claims are properly analyzed under the first clause of *§ 1012(b)*.

The first clause of *§ 1012(b)* provides:

"No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating

the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." *15 U.S.C. § 1012(b).*

In determining whether Plaintiffs' RICO claims are barred under *§ 1012(b),* the "threshold question" is "whether the challenged conduct broadly constitutes the 'business of insurance' in the first place." *Sabo v. Metropolitan Life Ins. Co., 137 F.3d 185, 190 (3d Cir. 1998)* (quoting *National Securities, 393 U.S. at 459-60)* ("only when [insurance companies] are engaged in the business of insurance does the act apply.") (internal quotation marks omitted); *accord Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 166 (3d Cir. 2001)* (citing *Sabo, 137 F.3d at 190).* "If the Defendant's conduct does not constitute 'the business of insurance,' then there is no need to confront preclusion issues under *§ 1012(b)." Sabo, 137 F.3d at 190.* For the reasons discussed above, the Court finds that the practices at issue here are not "the business of insurance." The McCarran-Ferguson preemption analysis of the second clause of *§ 1012(b)* is therefore inapplicable to Plaintiffs' RICO claims.

#### [*85] 1. RICO Violation, § 1962(c)

*Section 1962(c)* of the RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ..." *18 U.S.C. § 1962(c).* To allege a violation of *Section 1962(c),* the plaintiffs must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985).* Defendants challenge the sufficiency of Plaintiffs' RICO pleadings as to each element required to state a claim under *Section 1962(c).*

The Court first determines whether Plaintiffs have adequately pled the existence of a RICO enterprise. The RICO statute defines an "enterprise" as "[i]ncluding any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961(4).* Here, Plaintiffs allege the existence of associated-in-fact [*86] enterprises. *See* Comm. Compl. PP 436, 443; EB Compl. PP 345, 354. An associated-in-fact

enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981).* To establish an "association-in-fact" enterprise, a plaintiff must demonstrate that (1) the enterprise is an "ongoing organization, formal or informal;" (2) the members of the enterprise function as a "continuing unit" with established duties; (3) the enterprise is "separate and apart from the pattern of activity in which it engages." *Id.* Elaborating on the first element, the Third Circuit held in *Riccobene* that the enterprise must have "some sort of structure ... within the group for the making of decisions, whether it be hierarchical or consensual." *United States v. Riccobene, 709 F.2d 214, 222 (3d Cir. 1983).* While Plaintiffs need not show that "every decision [is] made by the same person," the alleged structure should provide "some mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis." *Id.*

Plaintiffs allege the existence [*87] of two alternative enterprises: the "Commercial Insurance Enterprise" and, "at a minimum," six "Broker-centered Commercial Enterprises." [14] According to the Complaint, the Commercial Insurance Enterprise includes: "the Defendants;" wholesale entities that receive wholesale payments and transmit those payments to the Defendants; "other insurers that pay contingent commissions, wholesale payments and other kickbacks;" "other brokers, intermediaries, agents and other insurance entities that have received undisclosed compensation;" "other entities that engage in steering practices and/or bid-rigging;" "other insurance brokerage and industry groups ...." Comm. Compl PP 436; RICO Case Statement at 33. [15] The Complaint defines the six Broker-Centered Commercial Insurance Enterprises as:

> . "Marsh and the insurers, including the Insurer Defendants, with which Marsh has Contingent Commission Agreements;"

> . "Aon and the insurers, including the Insurer Defendants, with which Aon has Contingent Commission Agreements;"

> . "Willis and the insurers, including the Insurer Defendants, with which Willis has Contingent Commission Agreements;"

> . "Gallagher and the insurers, including [*88] the Insurer Defendants, with which Gallagher has Contingent Commission Agreements;"

> . "Wells Fargo and the insurers, including the Insurer Defendants, with

which Wells Fargo has Contingent Commission Agreements;"

. "USI and the insurers, including the Insurer Defendants, with which USI has Contingent Commission Agreements." Comm. Compl. P 443; RICO Statement at 33-34.

14  Likewise, the Employee-Benefits Complaint alleges the existence of an "Employee- Benefits Insurance Enterprise" and alternatively, of three "Broker-centered Employee Benefits Enterprises." EB Compl. PP 345, 354. To the extent that Plaintiffs' RICO allegations contained in the two complaints are similar, the Court's analysis with respect to the Commercial Insurance Enterprise and the Broker-centered Commercial Enterprises shall apply with equal force to the Employee-Benefits Insurance Enterprise and the Broker-centered Employee Benefits Enterprises.

15  When asked by the Court at oral argument to define the enterprise, Plaintiffs' Counsel stated: "The enterprise would be all the insurance companies who enter into contingent fee agreements, all the brokers who receive compensation using these types of agreements, all of the industry groups that have allowed facilitation of discussions and decision-making relating to those contingent fee agreements." Tr. at 83.

[*89]  With respect to the Commercial Insurance Enterprise, the Complaint does not adequately set forth what organizational structure connects the Defendants, or how the Defendants were related to each other. Except for the conclusory allegations that "the Commercial Insurance Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged," nothing in the Complaint or in the RICO Case Statement suggests that the members of the Commercial Insurance Enterprise formed a continuing unit, an ongoing organization with "some sort of structure." *See Riccobene v. 709 F.2d at 222.* While Plaintiffs need not allege in their Complaints facts sufficient to *prove* the existence of an enterprise, *see Seville Indus. Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 790 (3d Cir. 1984)*, they must, at a minimum, *identify* the enterprise and provide details about its structure. *See Elliott v. Foufas, 867 F.2d 877, 881 (5th Cir. 1989)* ("a plaintiff must plead specific facts, not mere conclusory allegations, which establish the existence of an enterprise."); *Segreti v. Lome, 747 F.*

*Supp. 484, 486 (N.D. Ill. 1990)* [*90]  (even at the pleading stage, "a plaintiff must *identify* the enterprise [and] such identification must necessarily include details about the structure of the enterprise.") (emphasis in original); *Begala v. PNC Bank, Ohio, N.A., 214 F.3d 776, 781-82 (6th Cir. 2000)* (holding that the "complaint must contain facts suggesting that the behavior of the listed entities is 'coordinated' in such a way that they function as a 'continuing unit'....").

Pleading a RICO enterprise is not a mix-and-match game. *See Glessner v. Kenny, 952 F.2d 702, 714 (3d Cir. 1991).* Here, the Complaint does not even identify the members of the Commercial Insurance Enterprise, but only refer in vague terms to "the Defendants," "other insurers that pay contingent commissions, wholesale payments and other kickbacks," "other brokers," "other entities," and "other insurance brokerage and industry groups." "Such a nebulous, open-ended description of the enterprise does not sufficiently identify this essential element of a RICO offense." *Richmond v. Nationwide Cassel, L.P., 52 F.3d 640, 645 (7th Cir. 1995)* ("naming of a string of entities does not allege adequately [*91]  an enterprise"); *International Paint Co., Inc. v. Grow Group, Inc., 648 F. Supp. 729, 731 (S.D.N.Y. 1986)* ("A general assertion that a group of defendants constituted an 'enterprise' does not suffice."); *Price v. Amerus Annuity Group Co. (In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.), 2006 U.S. Dist. LEXIS 35980, MDL No. 1712, 2006 WL 1531152, at *9 (E.D. Pa. June 2, 2006)* ("[w]hen it comes to associations in fact... there is a greater risk that the RICO statute 'might be improperly employed to string together predicate acts by unconnected defendants.'") (citation omitted).

The six Broker-Centered Commercial Enterprises suffer from the same flaw. The mere allegations that the Defendants did business with one another or contracted together does not suffice to establish the existence of an enterprise. *See, e.g., In re Mastercard Intern. Inc., Internet Gambling Litigation, 132 F. Supp. 2d 468, 490 (E.D. La. 2001)* (stating that "[a]llegations of a business relationship do not indicate that defendants took part in directing the enterprise's affairs."). In addition, Plaintiffs have not alleged, for each Broker-Centered Enterprise, that the members of [*92]  the enterprises have established any kind of decision-making structure, independent from their regular business practices; the Complaint only states in conclusory terms that "through each of Broker-Centered Commercial Insurance Enterprises, Defendants engage in consensual decision-making regarding the implementation of their fraudulent scheme ...." Comm. Compl. P 444. Plaintiffs' RICO Case Statement, filed pursuant to *L. Civ. R. 16.1(b)(4)*, is similarly deficient, and merely restates, verbatim, the same general enterprise allegations set forth in the Complaint. *Comp.,*

*e.g.,* Comm. Compl. P 444 and Comm. RICO Statement at 35.

The Complaints also fail to allege any facts beyond the conclusory allegation that the enterprise has "an existence separate and apart from the alleged pattern of racketeering activity." *United States v. Riccobene, 709 F.2d at 221* (citations omitted). "It is an essential element of the RICO cause of action that the 'enterprise' be apart from the underlying pattern of racketeering activity." *Seville, 742 F.2d 786, 790 n.5; United States v. Turkette, 452 U.S. at 583* ("[t]he 'enterprise' is not the 'pattern [*93] of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages.").

In the present case, the Complaints merely state, in a conclusory fashion, that "the Commercial Insurance Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged." Comm. Compl. P 442; EB Compl. P 353 ("The Employee-Benefits Insurance Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged."). [16]

> 16    Similarly, with respect to the Broker-Centered Enterprises, the Complaints states: "Broker-Centered Enterprises have an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged." Comm. Compl. P 448; EB Compl. P 359 ("The Broker-centered Employee-Benefits Enterprises have an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.").

[*94] In their RICO Case Statements, Plaintiffs explain that:

> The enterprises function by providing insurance consultation, advice, and related services as well as insurance products. Many of these services and products are legitimate and non-fraudulent. Normally the activities of the enterprises involve recommendations and the provision of insurance products which best meet the needs of the insured. However, Defendants, through the Commercial Insurance Enterprise and the Broker-Centered Enterprise have engaged in a pattern of racketeering activity which involves a fraudulent scheme to increase premium revenue for the insurers and commissions and other revenue for the brokers through steering of customers, bid-rigging, and

unlawful tying. Comm. RICO Case Statement at 37; EB RICO Case Statement at 33.

The RICO distinctiveness requirement cannot be met simply by alleging that the conduct of one aspect of Defendants' activities through fraud constitutes the racketeering activity. Rather, Plaintiffs must demonstrate that the enterprise, functioning as an independent, free-standing association-in-fact, engages in a pattern of activity which differs from the usual and daily activities [*95] of its members. Here, by alleging that the enterprise engages in the same business activities and provides the same services as the Defendants themselves, Plaintiffs have not sufficiently averred that the alleged enterprise has an existence of its own, and performs functions other than the perpetration of the predicate racketeering acts. *See Hollis-Arrington v. PHH Mortg. Corp., 2005 U.S. Dist. LEXIS 27, No. Civ.A. 05-2556FLW, 2005 WL 3077853, at *% (D.N.J. Nov. 15, 2005)* (finding no RICO enterprise where plaintiffs' allegations merely "refer to the functions of the individual members of the enterprise and not the functions of the enterprise as a whole" and where plaintiffs had failed to show that "the enterprise engaged in any activity as an enterprise"); *Parrino v. Swift, 2006 U.S. Dist. LEXIS 40361, Civil Action No. 06-0537 (DRD-SDW), 2006 WL 1722585, at *3 (D.N.J. June 19, 2006)* (dismissing RICO claims where Plaintiffs had "alleged that the conspiracy to defraud was the same thing as the enterprise"); *Reves v. Ernst & Young, 507 U.S. 170, 185, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993)* ("[RICO] liability depends on showing that the defendants conducted or participated in the conduct of the *enterprise's* affairs, [*96] " not just their *own* affairs.") (emphasis in original).

Plaintiff have thus failed to plead an enterprise distinct from the Defendants and separate from the alleged acts of racketeering, beyond simply stating that the distinctiveness requirement is met. The RICO case statement is intended to supplement the pleadings and enable Plaintiffs to set forth how this requirement is met. It has not done so. *See Seville, 742 F.2d at 790 n. 5* (by "limiting its allegations of conspiracy to the underlying offenses," plaintiff "affirmatively negated the existence of the third [*Riccobene*] factor: an enterprise separate and apart from the pattern of activity in which it engages."). The Court will reserve on this motion to dismiss the RICO counts and a short extension file an Amended RICO case statement that must explicitly set forth the facts which demonstrate the existence and function of the alleged enterprise. The Court will make a final ruling on the Motion to Dismiss with regard for Counts n and III of

the Complaints based on the sufficiency of that case statement. [17]

> 17   Although Plaintiffs' mail and wire fraud allegations fail to meet the strict and rigorous pleading requirements of Rule (9b), the Court does not reach that issue because of the deficiencies in their enterprise allegations.

[*97] **2. RICO Conspiracy, § 1962(d)**

Count I alleges that the Defendants engaged in a conspiracy to violate RICO as prohibited by *18 U.S.C. § 1962(d)*. *§ 1962(d)* states that it is "unlawful for any person to conspire to violate any of the provisions of subsection ... (c) of this section." *18 U.S.C. § 1962(d)*. "Any claim under *section 1962(d)* based on a conspiracy to violate the other subsections of *section 1962* necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1192 (3d Cir. 1993)*. As with Counts II and III of the Complaint, the Court will determine if Plaintiffs have alleged a substantive RICO violation under *§ 1962(c)* based on the sufficiency of the Amended RICO case statement that Plaintiffs must file, as detailed above.

**C. ERISA Claims**

The ERISA claims are brought against the Insurer Defendants on behalf of a purported subclass of employees who acquired insurance "as part of an employee benefit plan." Count IX of the Employee-Benefits Complaint asserts a claim for breach of fiduciary duty under ERISA § 502(a)(2), *29 U.S.C. § 1132(a)(2)* [*98]   . Plaintiffs allege that the Insurer Defendants breached their fiduciary duties by (1) "paying kickbacks and other non-disclosed or inadequately disclosed payments to the broker defendants;" (2) "knowing and falsely certifying the amount of compensation paid to a party in interest, such that the plan's Form 5500 filings ... did not accurately reflect the total compensation paid to parties in interest;" (3) "causing and/or allowing the plan to engage the services of a party of interest;" (4) "receiving consideration for its own personal account from a party in interest that dealt with the plan;"and (5) "acting contrary to the interests of plan participants about the plan." EB Compl. P 539. Plaintiffs seek monetary relief pursuant to *ERISA § 502(a)(2)* for damages equal to the losses allegedly sustained by various ERISA benefit plans and for restitution, disgorgement of illegal profits and imposition of a constructive trust pursuant to ERISA § 502(a)(3), *29 U.S.C. § 1132(a)(3)*. In Count X, Plaintiffs also seek "other appropriate equitable relief in the form of an injunction pursuant to *ERISA § 502(a)(3)*.

In determining whether the Insurer Defendants have breached [*99] any fiduciary duty under ERISA, the threshold question is whether the Defendants are fiduciaries within the meaning of the statute. [18] A person is an ERJSA fiduciary if he or she

> (i) [E]xercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii)... renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) ... has any discretionary authority or discretionary responsibility in the administration of such plan. *29 U.S.C. § 1002(21)(A)*.

> 18   Plaintiffs' ERISA claims are brought under ERISA's fiduciary duty provisions and predicated upon the finding of fiduciary status. *See generally* ERISA § 404, *29 U.S.C. § 1104* (specifying duties of a "fiduciary with respect to a plan"). At oral argument, Plaintiffs' Counsel also invoked ERISA § 406, *29 U.S.C. § 1106*, and maintained that even if the Court finds that the Insurer Defendants are not fiduciaries, the Defendants could still be liable under *ERISA § 406* as parties in interest. Tr. at 88-89. However, paragraph 539 of the Complaint references *§ 406* as a means of breach of fiduciary duty and not as an independent basis for ERISA liability. The Complaint nowhere alleges that the Defendants are "parties in interest." *See* EB Compl. PP 535-550.

[*100]   Defendants argue that the Insurer Defendants did not act as ERISA fiduciaries in selling insurance to the plans because the insurers have no control over the employee benefit plan sponsors, and did not exercise any discretionary authority on behalf of the plans with respect to the plans' purchase of insurance. Plaintiffs respond that the Complaint adequately alleges that the Defendants have breached their fiduciary obligations under ERISA "by engaging in a scheme to pay concealed kickbacks to brokers in exchange for securing business that resulted in plan assets that they would not otherwise have received."

Merely selling insurance to a plan does not confer fiduciary status. *See Fechter v. Connecticut General Life Ins. Co., 800 F. Supp. 182, 197 (E.D. Pa. 1992)* ("the courts have refused to impose fiduciary obligations on insurance companies who merely sell their products or

services to a pension plan unless, under the terms of such contracts, the insurer assumes decision-making control over the administration of the plan or the disposition of its assets."). In the present case, Plaintiffs allege that the Insurer Defendants are fiduciaries because they "retain and [*101] exercise authority to determine whether a participant is entitled to a benefit under the plans and the amount of the benefits payable to the participants." Plaintiffs further allege that the Defendants "pay the benefits owed to participants under the plans," and "assume duties associated with plan administration, such as providing notice and disclosure of information required under ERISA."

Viewing these allegations in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, as this Court must, we conclude that Plaintiffs have at this stage of the litigation pled fiduciary status. *See In re Polaroid ERISA Litigation, 362 F. Supp. 2d 461, 470 (S.D.N.Y. 2005)* (holding that an ERISA complaint need 'do little more than track the statutory definition' to establish a defendant's fiduciary status in compliance with *Rule 8*."). Although Plaintiffs have set forth very few facts to establish fiduciary status, the dismissal of Plaintiffs' ERISA claims is not warranted at this early juncture in the case. This issue will be more appropriately resolved upon motions for summary judgment. *See, e.g., In re Cardinal Health, Inc. ERISA Litigation, 424 F. Supp. 2d 1002, 1030 (S.D. Ohio 2006)* [*102] (stating that "fiduciary status is a fact-intensive inquiry, making the resolution of that issue inappropriate for a motion to dismiss.") (internal quotation marks omitted). As set forth more fully in the accompanying Order, the Court will set an expedited discovery schedule in order to finalize discovery as to this issue and to ascertain whether a factual basis exists for Plaintiffs' fiduciary claims.

**D. State Law Claims**

Plaintiffs allege that Defendants' activities violate the antitrust laws of forty eight states and the District of

Columbia. The Complaints also assert (a) claims for breach of fiduciary duty (against the Broker Defendants); (b) claims for aiding and abetting breach of fiduciary duty (against the Insurer Defendants); and (c) unjust enrichment (against all Defendants).

Because Plaintiffs have not alleged diversity jurisdiction, the sole basis for subject matter jurisdiction over these claims is supplemental jurisdiction pursuant to *28 U.S.C. § 1367.* Comm. Compl. P 14; EB Compl. P 22. In the interests on judicial economy, this Court will reserve its judgment as to whether federal courts should exercise supplemental jurisdiction over [*103] the state law claims until it is determined what, if any, federal claims will be tried. *See United Mine Workers of Amer. v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966).*

**IV. Conclusion.**

The Court will set an expedited discovery schedule in order to ascertain whether a factual basis exists for Plaintiffs' ERISA fiduciary claims, and allow Defendants to file an appropriate Motion for Summary Judgment on this issue pursuant to *Fed. R. Civ. P. 56.* The Court reserves on the motion to dismiss the RICO claims until after the supplemental RICO case statement is filed. The Court will also require Plaintiffs to amend their Sherman Act claims by filing a supplemental statement of particularity. The supplemental statement of particularity shall conform to the requirements of a pleading, and meet the particularity requirements of *Rule 9(b).* It may be used as a basis for either (1) a subsequent Motion to Dismiss the remaining counts of the Complaints pursuant to *Fed. R. Civ. 12(b)(6)*; (2) a Motion for Judgment on the Pleadings pursuant to *Fed. R. Civ. P. 12(c)*; [*104] or (3) a Motion for Summary Judgment pursuant to *Fed. R. Civ. P. 56,* as the Defendants deem appropriate. An appropriate order will issue.

/s/ Hon. Faith S. Hochberg, U.S.D.J.

6

LEXSEE



Cited
As of: Dec 14, 2007

### J.L. TERREL'S and TERREL'S PRO FINISHES, INC., Plaintiffs v. SHERWIN-WILLIAMS AUTOMOTIVE FINISHES CORPORATION, Defendant

#### CIVIL ACTION NO. 02-CV-2645

#### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

#### *2004 U.S. Dist. LEXIS 6411; 2004-1 Trade Cas. (CCH) P74,377*

#### March 30, 2004, Decided
#### March 30, 2004, Filed; March 31, 2004, Entered

**DISPOSITION:** [*1] Motion to dismiss granted in part. Case remanded to state court.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff paint distributor filed a complaint against defendant paint manufacturer in the Court of Common Pleas of Chester County, Pennsylvania, alleging violations of *15 U.S.C.S. §§ 1 and 2* of the Sherman Antitrust Act, *15 U.S.C.S. § 1 et seq.*, and *§ 3* of the Clayton Act, *15 U.S.C.S. § 14*, and state law claims including breach of a jobber contract. After removal, the manufacturer moved to dismiss under *Fed. R. Civ. P. 12(b)(6)*.

**OVERVIEW:** The complaint's allegations of unlawful activities in restraint of trade and commerce, and that the jobber agreement that the manufacturer attempted to enforce with the distributor was a violation in that it was an unlawful restraint of trade, did not state a claim under *15 U.S.C.S. § 1*, as there was no sufficient allegation of interdependent behavior. The allegations were conclusory statements of law. The only concerted action alleged was the jobber agreement which included no pricing provision. As to *15 U.S.C.S. § 2*, there was no allegation that the manufacturer had monopoly power over the supply of the paint in southeastern Pennsylvania and Delaware. In fact, the allegation showed sufficient competition in the market. There was no information as to the manufacturer's market share or ability to affect competition. The parties entered into a non-exclusive contract for

the distributor to serve as jobbers of the manufacturer's paints. The complaint did not allege an exclusive dealing contract. The distributor could not state a claim under *15 U.S.C.S. § 14*. The court declined to exercise supplemental jurisdiction over the state law claims under *28 U.S.C.S. § 1367(c)*.

**OUTCOME:** The manufacturer's motion to dismiss was granted. Declining to exercise supplemental jurisdiction over the remaining state law claims, the court remanded the case to the state court.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] When considering a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, courts allow the non-movant the benefit of all reasonable inferences drawn from the allegations contained in the complaint and accept these allegations as true. However, courts are not required to accept legal conclusions alleged or inferred in the complaint. A complaint will withstand an attack under *Rule 12(b)(6)* if the material facts as alleged, in addition to inferences drawn from those allegations, provide a basis for recovery.

*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Restraints > General Overview*

2004 U.S. Dist. LEXIS 6411, *; 2004-1 Trade Cas. (CCH) P74,377

*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview*
*Business & Corporate Law > Distributorships & Franchises > Causes of Action > Restraints of Trade*
[HN2] Horizontal agreements, for purposes of antitrust cases, are those among competitors on the same level of business, while vertical agreements are between entities operating on different levels, e.g., a manufacturer and a distributor.

*Antitrust & Trade Law > Sherman Act > General Overview*
[HN3] See *15 U.S.C.S. § 1.*

*Antitrust & Trade Law > Sherman Act > Claims*
*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
*International Trade Law > General Overview*
[HN4] Because *15 U.S.C.S. § 1* of the Sherman Antitrust Act, *15 U.S.C.S. § 1 et seq.*, prohibits joint plans to restrain trade, a plaintiff attempting to establish a *§ 1* violation must have proof of a conspiracy, or interdependent action used to restrain trade. In distinguishing the type of conduct that constitutes a violation of *§ 1*, the United States Supreme Court has drawn a distinction between independent action and action in concert with another. Independent action does not constitute a violation of *§ 1.*

*Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview*
*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*
[HN5] See *15 U.S.C.S. § 2.*

*Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview*
*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > General Overview*
*Antitrust & Trade Law > Sherman Act > Claims*
[HN6] Unlike proving a claim under *15 U.S.C.S. § 1* of the Sherman Antitrust Act, *15 U.S.C.S. § 1 et seq.*, a violation of *15 U.S.C.S. § 2* of the Act can be found based solely on independent action. To state a claim for monopolization, a plaintiff must allege (1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident. Alternatively, to state a claim for attempted mo-

nopolization under *§ 2*, one must prove (1) that the defendant has engaged in predatory or anti-competitive conduct, (2) with a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power.

*Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview*
*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*
[HN7] Alleging monopolization under *15 U.S.C.S. § 2* of the Sherman Antitrust Act, *15 U.S.C.S. § 1 et seq.*, requires alleging (1) the strength of competition, (2) probable development of the industry, (3) the barriers to entry, (4) the nature of the anticompetitive conduct, and (5) the elasticity of consumer demand.

*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > General Overview*
[HN8] To successfully state a claim of attempted monopolization, a plaintiff must allege: (1) that the defendant has engaged in predatory or anti-competitive conduct, (2) with a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power.

*Antitrust & Trade Law > Clayton Act > General Overview*
*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing*
*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Tying Arrangements > Clayton Act*
[HN9] *Section 3* of the Clayton Act, *15 U.S.C.S. § 14*, makes it unlawful for any person engaged in commerce, in the course of such commerce to make tie-in sales or enter exclusive-dealing arrangements, where the effect may be to substantially lessen competition or tend to create a monopoly in any line of commerce. To state a claim under *§ 14*, plaintiffs must first allege the existence of an exclusive dealing contract. An exclusive dealing arrangement exists where the seller deals with the buyer only on the condition that the buyer agrees to purchase all of its product requirements from the seller.

**COUNSEL:** For J.C.D., INC., TERREL'S PRO FINISHES, INC., Plaintiffs: JOHN G. BRAVACOS, LEAD ATTORNEY, PAOLI, PA.

For SHERWIN-WILLIAMS AUTOMOTIVE FINISHES CORP., Defendant: JAMES M. JONES,

2004 U.S. Dist. LEXIS 6411, *; 2004-1 Trade Cas. (CCH) P74,377

LEAD ATTORNEY, JONES DAY REAVIS & POGUE, PITTSBURGH, PA.

For SHERWIN-WILLIAMS AUTOMOTIVE FINISHES CORP., Defendant: JOHN J. O'DONNELL, LEAD ATTORNEY, LAVIN COLEMAN O'NEIL RICCI FINARELLI & GRAY, JOSHUA A. GELMAN, LEAD ATTORNEY, LAVIN COLEMAN O'NEIL RICCI, ET AL, PHILADELPHIA, PA.

**JUDGES:** R. Barclay Surrick, Judge.

**OPINION BY:** R. Barclay Surrick

**OPINION**

**MEMORANDUM & ORDER**

Presently before the Court is Defendant Sherwin-Williams Automotive Finishes Corporation's ("Sherwin-Williams") Motion to Dismiss Amended Complaint pursuant to *Fed. R. Civ. P. 12(b)(6)*, (Doc. No. 18). [*2] For the following reasons, Defendant's Motion will be granted with respect to Plaintiffs' federal claims.

**Background**

Plaintiffs, J.C.D., Inc. t/a J.L. Terrel's and Terrel's Pro Finishes, Inc. (collectively "Plaintiffs"),commenced this action after Defendant terminated the parties' Direct Jobber Agreement ("Agreement"), under which, Plaintiffs had agreed to distribute Defendant's paint to their customers in southeastern Pennsylvania and Delaware. Plaintiffs filed a Complaint in the Chester County Court of Common Pleas alleging various state law claims and federal antitrust claims against Defendant. The Defendant removed the matter to this Court, pursuant to *28 U.S.C. § 1331*, as Plaintiffs' antitrust claims provides us adequate subject matter jurisdiction. The Amended Complaint alleges violations of sections 1 and 2 of the Sherman Antitrust Act, *15 U.S.C. § 1, et seq.* ("Sherman Act"), and section 3 of the Clayton Act, *15 U.S.C. § 14.* [1] Plaintiffs are citizens of Pennsylvania and Delaware. Defendant is a Delaware corporation, headquartered in Ohio, with its principal place of business in Pennsylvania. In July [*3] of 2000, the parties entered into an agreement which appointed Plaintiffs as non-exclusive "jobbers" to distribute Defendant's paint to Plaintiffs' commercial customers. (Am. Compl. Ex. A Agreement P 1.) The Agreement specifically stated that Defendant was free to compete with Plaintiffs and to sell its own paint to whomever it wished including Plaintiffs' customers. (Id. P 4.2.) The Agreement also provided that Defendant could "appoint, license and/or otherwise contract with additional jobbers in any geographical area including the

same geographical area which is serviced by [Plaintiffs]." (Id. P 4.1.)

> 1 The Amended Complaint also alleges state law claims for breach of contract, fraud, intentional interference with contractual relations, misappropriation of trade secrets and unjust enrichment.

The parties verbally agreed that Defendant would provide Plaintiffs with a combination of rebates and price discounts to assist Plaintiffs with the purchase of new equipment which Plaintiffs needed to mix and [*4] apply Defendant's paint. (Am. Compl. P 14.) When Defendant failed to pay Plaintiffs these rebates as agreed, Plaintiffs were unable to pay for the paint purchased from Defendant. (Id. PP 24-25.) Upon Plaintiffs' failure to pay, Defendant refused to ship paint to Plaintiffs unless they paid cash on delivery, in lieu of paying for the paint on credit. (Id. P 26.) As a result of Defendant's failure to ship the paint, Plaintiffs began buying paint from another of Defendant's jobbers. (Id.) This was presumably in violation of the contract, as the Agreement stated that Plaintiffs "shall purchase the [paint] from [Defendant]." (Am. Compl. Ex. A Agreement P 2.2).

On March 6, 2002, Defendant contacted Plaintiffs both verbally and in writing to inform Plaintiffs that they were no longer authorized to distribute Defendant's paint. (Am. Compl. P 27.) Termination of the contract was to take effect upon Plaintiffs' execution of a response letter. Though Defendant asked that the Agreement be terminated, Plaintiffs refused to execute the response letter. (Id.) On April 3, 2002, Defendant sent a second letter to Plaintiffs terminating the Agreement as of May 3, 2002. This termination [*5] was executed pursuant to paragraph 5.1 of the Agreement. [2] (Id. P 28.)

> 2 Paragraph 5.1 of the Agreement reads: "This Agreement may be terminated without cause at any time by Jobber or [Defendant] by giving written notice to the other party at least thirty (30) days prior to the proposed termination date." (Am. Compl. Ex. A Agreement P 5.1.)

Plaintiffs also distributed the paint of Dupont, one of Defendant's competitors. During the course of their relationship, Defendant told Plaintiffs that if it could have certain information about Plaintiffs' pricing, inventory and customers, it would not compete for the business of Plaintiffs' Dupont customers in Pennsylvania. (Id. P 19.) Defendant also indicated that it would later purchase Plaintiffs' business, and convert the DuPont accounts to its own brand. (Id.)

In Count VI of the Amended Complaint, Plaintiffs allege violations of *sections 1* and *2* of the Sherman Act,

Case 1:07-cv-00556-JJF-LPS    Document 31-4    Filed 12/17/2007    Page 5 of 30

Page 4

2004 U.S. Dist. LEXIS 6411, *; 2004-1 Trade Cas. (CCH) P74,377

and *section 3 of the Clayton Act*. While Plaintiffs cite the proper federal statutes, [*6] the averments in the Amended Complaint do not state individual theories of antitrust liability or assign particular facts to the different statutory violations alleged. Rather, Plaintiffs make general conclusory statements regarding Defendant's actions. Plaintiffs allege that Defendant "attempted to monopolize through conspiracy the market for automotive finishes in Southeastern Pennsylvania and the State of Delaware," (Id. P 69), and that from August, 2001 through March, 2002, Defendant engaged in unlawful activities that restrained trade and commerce in violation of *sections 1*and*2* of the Sherman Act. (Id. P 70.) Plaintiffs contend that they were injured in violation of the antitrust laws when Defendant refused to sell any products to Plaintiffs and when Defendant, without compensation, used the competitive information which Plaintiff provided in expectation of being acquired. (Id. P 75.) The issue before the Court is whether these allegations properly state claims under the federal antitrust laws.

**Standard of Review**

[HN1] When considering a motion to dismiss pursuant to *Rule 12(b)(6)*, we "allow the non-movant the benefit of all reasonable inferences drawn from [*7] the allegations contained in the complaint and ... accept these allegations as true." *Breyer v. Meissner, 214 F.3d 416, 421 (3d Cir. 2000)* (citing *Lake v. Arnold, 112 F.3d 682, 684 (3d Cir. 1997))*. "However, we are not required to accept legal conclusions alleged or inferred in the complaint." Id. (citing *Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993))*. "A complaint will withstand an attack under *Federal Rule of Civil Procedure 12(b)(6)* if the material facts as alleged, in addition to inferences drawn from those allegations, provide a basis for recovery." Id. (citing *Menkowitz v. Pottstown Memorial Med. Ctr., 154 F.3d 113, 115 (3d Cir. 1998))*.

**Discussion**

*Section 1 of the Sherman Act*

Plaintiffs contends that Defendant has restrained trade in violation of *section 1 of the Sherman Act*. From the pleadings it appears that Plaintiffs believe that the agreement Defendant attempted to enforce was an "exclusive dealing agreement" that violates the Sherman Act. [3] *Section 1 of the Sherman Act* states in relevant part:

> 3 The Plaintiffs do not clearly state what theory of antitrust liability they have brought suit under. However, Plaintiffs' allege that Defendant attempted to "enforce an agreement with Plaintiff" and "allocate customers." (Am. Compl. PP 71, 75.) This language suggests that Plaintiffs believe

that the Agreement was an unlawful vertical or horizontal agreement/restraint. [HN2] Horizontal agreements are those among competitors on the same level of business, while vertical agreements are between entities operating on different levels, e.g., manufacturer and distributor. *Brunson Communications, Inc. v. Arbitron, Inc., 239 F. Supp. 2d 550, 567 (E.D. Pa. 2002)*.

[HN3] -

[HN4]

[*8]

> "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."

*15 U.S.C. § 1*. Because *section 1 of the Act* prohibits joint plans to restrain trade, a Plaintiff attempting to establish a *section 1* violation must have *proof* of a conspiracy, or interdependent action used to restrain trade. *Brooke Group, Ltd. v. Brown and Williamson Tobacco Corp., 509 U.S. 209, 251, 125 L. Ed. 2d 168, 113 S. Ct. 2578 (1993)* (emphasis added). In distinguishing the type of conduct that constitutes a violation of *section 1*, the Supreme Court has drawn a distinction between independent action and action in concert with another. See *Fisher v. Berkeley 475 U.S. 260, 266, 89 L. Ed. 2d 206, 106 S. Ct. 1045 (1986)* (citing *Montsanto Co. v. Spray-Rite Svc. Corp., 465 U.S. 752, 761, 79 L. Ed. 2d 775, 104 S. Ct. 1464 (1984))*. Independent action does not constitute a violation of *section 1*. *Fisher, 475 U.S. at 266*.

Plaintiffs allege here that Defendant's efforts to enforce this agreement constitutes an unreasonable [*9] restraint of trade. Under the Agreement, Plaintiffs served as jobbers for Defendant. The Agreement included no provision with respect to pricing. Rather, the Agreement only ensured that Plaintiffs would distribute Defendant's products. We infer from the allegations that Plaintiff contends that this Agreement somehow unreasonably restrained competition. [4]

> 4 Agreement of this type are called vertical non-price restraints. Vertical non-price restraints are typically analyzed under the "rule of reason.' *Nynex Corp. v. Discon, Inc., 525 U.S. 128, 133, 142 L. Ed. 2d 510, 119 S. Ct. 493 (1998)*. In the instant case we need not distinguish between a "per se" approach and a "rule of reason' approach as the allegations of illegal, anti-competitive behavior are so lacking.

Case 1:07-cv-00556-JJF-LPS    Document 31-4    Filed 12/17/2007    Page 6 of 30

Page 5

2004 U.S. Dist. LEXIS 6411, *; 2004-1 Trade Cas. (CCH) P74,377

The allegations in the Amended Complaint do not state a claim under *section 1 of the Sherman Act*, as there is no sufficient allegation of interdependent behavior. Plaintiff alleges that "beginning at the meeting of August, 2001 and continuing until [*10] March of 2002, Defendant, SWAF, engaged in unlawful activities in restraint of trade and commerce in violation of § 1 and § 2 of the Sherman Antitrust Act." (Am. Compl. P 70.) In addition, Plaintiff alleges that "the agreement that SWAF attempted to enforce with Plaintiffs is a violation of § of the Sherman Act in that it is an unlawful restraint of trade." (Id. P 71.) These allegations are conclusory statements of law rather than factual pleadings that constitute a cause of action. See *Brunson, 239 F. Supp. 2d at 559-60*. The only concerted action alleged between two actors in the Amended Complaint is the Agreement between Plaintiffs and Defendants. (Am. Compl. P 19.) We do not believe that the antitrust laws were enacted for the purpose of allowing a Plaintiff to bring suit where Plaintiff was complicit in the action which Plaintiff complains is illegal. If the Plaintiffs were unlawfully injured when Defendants cancelled the Agreement then they have a remedy in contract law, not under the antitrust laws.

### Section 2 of the Sherman Act

Plaintiffs have alleged that Defendant has violated *section 2* of the Sherman Act. *Section 2 of the Sherman Act* reads [*11] in relevant part:

> [HN5] "Every person who shall monopolize, or attempt to monopolize or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of felony ...'

*15 U.S.C. § 2*. In the Amended Complaint, Plaintiffs fail to distinguish a claim of monopolization from a claim of attempted monopolize. [HN6] Unlike proving a claim under *section 1 of the Sherman Act*, a violation of *section 2* can be found based solely on independent action. *Brooke Group, 509 U.S. at 251*. "To state a claim for monopolization, a plaintiff must allege (1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *Schuylkill Energy Res. v. Pa. Power & Light Co., 113 F.3d 405, 415 (3d Cir. 1997)* (citing *Fineman v. Armstrong World Indus., 980 F.2d 171, 197 (3d Cir. 1992)*). Alternatively, to state a claim for *attempted* monopolization [*12] under *section 2*, one must prove (1) that the defendant has engaged in predatory or

anti-competitive conduct with; (2) a specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power. *Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 512 (3d Cir. 1994)* (citing *Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 122 L. Ed. 2d 247, 113 S. Ct. 884 (1993)*).

Plaintiffs have not sufficiently alleged a violation of *section 2*. Turning first to a possible claim of monopolization, the Amended Complaint contains no allegation that the defendant had monopoly power over the supply of automotive refinishing paint in southeastern Pennsylvania and Delaware. Plaintiffs describe Defendant as "a manufacturer of high performance interior and exterior coatings .... It serves automotive jobbers, ... body builders and original equipment manufacturers by its sale through one hundred seventy four company owned branches ...." (Am. Compl. P 7.) With respect to Defendant's competition in the market, Plaintiffs' state that "in addition to [Sherwin-Williams], DuPont, and PPG are significant manufacturers in the industry, and compete with [Sherwin-Williams]." (Am. Compl. [*13] P 8.) Instead of showing that Defendant had monopoly power, these allegations show the opposite-that there was sufficient competition in the market. This conclusion is buttressed by the fact that when Sherwin-Williams began requiring Plaintiff to pay "cash on delivery," Plaintiff obtained refinishing paint through another source. (Id. P 26.)

The facts proffered do not support a conclusion that Plaintiffs have sufficiently averred monopoly power. [HN7] Alleging monopolization requires alleging "the strength of competition, probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct, and the elasticity of consumer demand." *Crossroads Cogeneration Corp. v. Orage & Rockland Util., Inc., 159 F.3d 129, 141 (3d Cir. 1998)* (quoting *Barr Lab., Inc. v. Abbott Lab., 978 F.2d 98, 112 (3d Cir. 1992)* (internal quotation omitted)). Because Plaintiffs have failed to allege monopoly power, the claim against Defendant for monopolization under *section 2* cannot be sustained. Plaintiffs also fail to allege a claim of attempted monopolization. [HN8] To successfully state a claim of attempted monopolization, a plaintiff must allege: (1) [*14] that the defendant has engaged in predatory or anti-competitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. *Crossroads, 159 F.3d at 141*. Nothing in the Amended Complaint alleges any facts that go towards the probability of achieving monopoly power. See*Brotech Corp. v. White Eagle Int'l Techs. Group, Inc, 2003 U.S. Dist. LEXIS 21073, No. Civ. A. 03-232, 2003 WL 22797730, at *4 (E.D. Pa. Nov. 18, 2003)* (citing *Spectrum Sports, 506 U.S. at 456*) (holding that in order to determine whether there is a dangerous

2004 U.S. Dist. LEXIS 6411, *; 2004-1 Trade Cas. (CCH) P74,377

probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market.). Plaintiffs provide no information with respect to Defendant's market share, and its ability to affect competition. See *Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997)* (holding that "where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market [*15] that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and motion to dismiss may be granted."). Since the Plaintiffs have failed to allege the third element of attempted monopolization there is no need to consider whether Plaintiffs sufficiently pled the first two elements of the claim.

### Section Three of the Clayton Act [5]

> 5  The Clayton Act is generally regarded as imposing tighter restraints on exclusive dealing agreements than *section 1 of the Sherman Act. Balaco, Inc. v. Upjohn Co., 1992 U.S. Dist. LEXIS 7538, Civ. A. No. 92-0113, 1992 WL 131150, at *2 (E.D. Pa. June 3, 1992)*

Plaintiff also alleges a violation of section 3 of the Clayton Act, *15 U.S.C. § 14.* [6] [HN9] *Section 3 of the Clayton Act* makes it unlawful "for any person engaged in commerce, in the course of such commerce to make tie-in sales or enter exclusive-dealing arrangements, where the effect may [*16] be to substantially lessen competition or tend to create a monopoly in any line of commerce." *Gulf Oil Corp. v. Copp Paving Co., Inc., 419 U.S. 186, 194 n.9, 42 L. Ed. 2d 378, 95 S. Ct. 392 (1974)* (quoting *15 U.S.C. § 14*) (internal quotations omitted). To state a claim under *section 3 of the Clayton Act*, Plaintiffs must first allege the existence of an exclusive dealing contract. *Balaco, Inc. v. Upjohn Co., 1992 U.S. Dist. LEXIS 7538, Civ. A. No. 92-0113, 1992 WL 131150, at * 3 (E.D. Pa. Jun. 3, 1992)*. An exclusive dealing arrangement exists where the seller deals with the buyer only on the condition that the buyer agrees to purchase all of its product requirements from seller.

> 6  Though Plaintiffs' Amended Complaint does not artculate its theory articulate its theory of liability under *section 3 of the Clayton Act*, we presume that based on the facts alleged, Plaintiffs are pursuing a claim of illegal exclusive dealing.

In the instant is is without question that Plaintiffs have not alleged the existence [*17] of an exclusive dealing contract. Plaintiff and Defendant entered into a *non-exclusive* contract such that Plaintiffs would serve as jobbers of Defendant's products. (Am. Compl. Ex. A P 1.1.) The Agreement specifically provided that Defendants were still free to hire other jobbers in the same region. (Id. PP 4.1, 4.2.). There was nothing in the Agreement that limited Plaintiffs' ability to distribute the products of Defendant's competitors. (See Id. P 1.1 ("[Defendant] hereby appoints [Plaintiff(s)] as a non-exclusive jobber of those automotive refinish products distributed by [Defendant] ....").) As there is no *exclusive* agreement there is no danger that competition was unreasonably foreclosed. In fact, in August 2001, over a year after signing the Agreement with Defendant, Plaintiffs were still buying and distributing DuPont products. (Am. Compl. PP 13, 19.) Plaintiffs cannot state a claim under *section 3 of the Clayton Act.*

Conclusion

Having disposed of Plaintiffs' federal claims there is no longer any independent basis for federal question jurisdiction. Nor is there any basis for diversity jurisdiction in this case. In situations such as this Congress [*18] has granted the courts discretion whether·or not to exercise supplemental jurisdiction under *28 U.S.C. § 1367(c)*. We decline to exercise supplemental jurisdiction over the state law claims.

An appropriate Order follows.

ORDER

AND NOW, this 30th day of March, 2004 upon consideration of the Defendant's Motion to Dismiss Amended Complaint (Doc. No. 18) and all papers filed in support thereof and in opposition thereto, it is ORDERED as follows:

> 1.  Defendant's Motion to Dismiss is GRANTED as to Count VI only;

> 2.  We decline to exercise supplemental jurisdiction over the remaining state law claims; and

> 3.  This case is remanded to the Court of Common Pleas of Chester County.

BY THE COURT:

R. Barclay Surrick, Judge



LEXSEE 2004 US DIST LEXIS 25257



Positive
As of: Dec 13, 2007

**KASADA, INC., JOHN MICHAELS, INC., GABBEY DESIGN GROUP, INC.
GARMENT MAKERS, INC., THEORDORE SADAKA, KAREN SADAKA AND
GLADYS SADAKA, Plaintiffs, -against- ACCESS CAPITAL, INC., WESTGATE
FINANCIAL CORP., FINOVA CAPITAL, INC., UCC ASSET MANAGEMENT
CORP., STAR FUNDING, INC., OMNI COMMERCIAL, L.L.C., COMMERCIAL
SERVICES, INC., d/b/a C.I.T. GROUP, ROSENTHAL & ROSENTHAL, MILES
M. STUCHIN and RICHARD I. SIMON, Defendants.**

**01 Civ. 8893 (GBD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2004 U.S. Dist. LEXIS 25257; 2005-1 Trade Cas. (CCH) P74,693*

**December 10, 2004, Decided
December 14, 2004, Filed**

**DISPOSITION:** [*1] Defendants' motions to dismiss granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, commercial credit "factors," filed motions to dismiss claims by plaintiff garment manufacturers alleging price fixing and monopoly claims under the Sherman Act, *15 U.S.C.S. §§ 1 and 2*, the Clayton Act, *15 U.S.C.S. § 4*, and the Donnelly Act, *N.Y. Gen. Bus. Law § 340*, and pendent common law claims.

**OVERVIEW:** The manufacturers argued, inter alia, that the factors' denial of credit constituted a group boycott and that the factors controlled the price and interest rates for factoring which constituted illegal price-fixing under *15 U.S.C.S. § 1* of the Sherman Act. The district court rejected the manufacturers' group boycott claim under the Sherman Act, as there was no allegation that a particular manufacturer, once denied credit, was subsequently refused by each of the other factors. Likewise, the district court dismissed the manufacturers' price fixing claim, as the manufacturers made no allegation that the price, terms, conditions, interest rates, or any other aspect of the factors' factoring services were fixed. How-

ever, the court found that the manufacturers had stated a claim against the factors under *15 U.S.C.S. § 2* of the Sherman Act, alleging that the factors acted with specific intent to archive or maintain monopoly power in the factoring market by merging with competitors and unlawfully utilizing the resulting economic leverage to fix piece goods prices and to drive out of business garment manufacturers that potentially enhanced the factors' overall credit risk exposure.

**OUTCOME:** Defendants' motions to dismiss plaintiffs' price fixing and group boycott claims and their Clayton Act claim were granted. Defendants' motions to dismiss plaintiffs' monopolization claims under the Sherman Act and the Donnelly Act were denied, and dismissal of the pendent common law claims was granted in part and denied in part.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Failures to State Claims*
[HN1] *Fed. R. Civ. P. 12(b)(6)* allows a party to move to dismiss a complaint where the complaint fails to state a claim upon which relief can be granted. *Fed. R. Civ. P.*

*12(b)(6)*. In reviewing a motion to dismiss, the court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party. A motion to dismiss will only be granted if the plaintiff can prove no set of facts in support of its claim that would entitle it to relief.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings > General Overview***
[HN2] In considering a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview***
***Criminal Law & Procedure > Accusatory Instruments > Informations***
[HN3] Although no heightened pleading requirements apply in antitrust cases, a plaintiff must do more than cite relevant antitrust language to state a claim for relief. A plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated those laws are insufficient. Furthermore, it is not proper to assume that the plaintiff can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been set forth in the complaint. The complaint must set forth enough information to suggest that relief would be based on some recognized legal theory. In practice, a complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.

***Antitrust & Trade Law > Sherman Act > General Overview***
***International Law > Authority to Regulate > Anticompetitive Activities***
[HN4] *15 U.S.C.S. § 1* of the Sherman Act prohibits every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > Boycotts***

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Restraints > Price Fixing***
***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Restraints > Sherman Act***
[HN5] The blanket prohibition against any restraint of trade under the Sherman Act, *15 U.S.C.S. § 1*, has been delineated into two separate doctrines. The first doctrine finds certain conduct illegal per se. In construing and applying the Sherman Act's ban against contracts, conspiracies, and combinations in restraint of trade, certain agreements or practices are so plainly anticompetitive, and so often lack any redeeming virtue, that they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases. Examples of per se illegal conduct include horizontal restraints, i.e. agreements between competitors at the same level of market structure, like agreements to fix prices and group boycotts. Conduct that does not fall within the per se rule is subject to the rule of reason analysis. Under the rule of reason, the anticompetitive consequences of a challenged practice are weighed against the business justifications upon which it is predicated and its putative procompetitive impact, and a judgment with respect to its reasonableness is made. For example, allegations of agreements between entities at different market levels that restrain trade i.e., vertical agreements, are analyzed under the rule of reason.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > Boycotts***
***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview***
[HN6] Courts have found that group boycotts, because of their anti-competitive nature, are unreasonable per se and therefore always illegal.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Restraints > Price Fixing***
***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview***
***Criminal Law & Procedure > Accusatory Instruments > Informations***
[HN7] Although "information exchange" has been found to be an example of a facilitating practice that a court could use to help support an inference of a price-fixing agreement, the exchange of information between business firms concerning the credit-worthiness of customers has long been held not to violate the Sherman Act. Furthermore, the dissemination to competitors of information concerning the credit-worthiness of customers aids

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

sellers in gaining information necessary to protect them-selves against fraudulent or insolvent customers. Lastly, the United States Court of Appeals for the Second Circuit has held that it is not a violation of *15 U.S.C.S. § 1* to exchange such information, provided that any action taken in reliance upon it is the result of each firm's independent judgment, and not of agreement.

*Antitrust & Trade Law > Private Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN8] A bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal.

*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview*
[HN9] Credit terms must be characterized as an inseparable part of price. An agreement to terminate the practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional per se rule against price fixing.

*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*
[HN10] In alleging a violation of *15 U.S.C.S. § 1* of the Sherman Act, under the rule of reason, a plaintiff bears the burden of showing that the challenged action has an actual adverse effect on competition as a whole in the relevant market. It is not sufficient for plaintiffs merely to show that they have suffered injury due to the alleged agreement; they must also demonstrate an actual adverse effect on competition market-wide. The injury to a relevant market requirement assures that the Sherman Act protected competition as a whole in the relevant market, and not the individual competitors within that market.

*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview*
[HN11] A plaintiff that fails to plead an actual injury to competition may nonetheless show antitrust injury by showing that the defendant possesses "market power" sufficient to inhibit competition on a market-wide basis. Market power is defined as the power to raise prices significantly above the competitive level without losing all of one's business.

*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > Sherman Act*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
[HN12] *15 U.S.C.S. § 2* of the Sherman Act provides that every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize, any part of the trade or commerce among the several states shall have committed an illegal act. In order to state a claim of conspiracy to monopolize under *§ 2*, a plaintiff must allege (1) a concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize. Intent alone is not sufficient, however; the defendant's power in the relevant market must be established, to establish whether the defendant is a monopolist or is threatening to become one. Furthermore, a short plain statement of a claim for relied which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules. Lastly, in antitrust cases in particular, the United States Supreme Court has stated that dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.

*Antitrust & Trade Law > Sherman Act > General Overview*
[HN13] *15 U.S.C.S. § 1* and *2* of the Sherman Act require proof of conspiracies which are reciprocally distinguishable from and independent of each other, although the objects of the conspiracies may partially overlap.

*Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > General Overview*
[HN14] Although the allegation of market share is not the same as one alleging monopoly power, the existence of monopoly power may be inferred from a predominant share of the market. The higher the market share, the stronger the inference of monopoly power.

*Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview*
*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > General Overview*
[HN15] Market share is not enough to allege a violation of *15 U.S.C.S. § 2* because monopoly power is not unlawful per se. Plaintiffs must allege an anticompetitive

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

effect harmful to competition or antitrust injury. An "antitrust injury" is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violations or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations would likely cause.

*Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview*
[HN16] To state an antitrust injury, a plaintiff must demonstrate that the defendants' conduct has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice. To this end, the antitrust laws were enacted for the protection of competition, not competitors.

*Antitrust & Trade Law > Market Definition > Product Market*
*Business & Corporate Law > Distributorships & Franchises > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN17] A complaint under the Sherman Act, *15 U.S.C.S. § 2*, must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed. However, because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market. To survive a *Fed. R. Civ. P. 12(b)(6)* motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes-- analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible. Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way.

*Antitrust & Trade Law > Joint Ventures, Mergers & Acquisitions > Clayton Act*
*Business & Corporate Law > Mergers & Acquisitions > Antitrust > Horizontal Mergers*
*Business & Corporate Law > Mergers & Acquisitions > Antitrust > Market Definition*
[HN18] Section 7 of the Clayton Act, *15 U.S.C.S. § 18*, forbids mergers in any line of commerce where the effect

may be substantially to lessen competition or tend to create a monopoly. The section proscribes many mergers between competitors in a market, it also bars certain acquisitions of a market competitor by a noncompetitor, such as a merger by an entrant who threatens to dominate the market or otherwise upset market conditions to the detriment of competition. Suspect also is the acquisition by a company not competing in the market but so situated as to be a potential competitor and likely to exercise substantial influence on market behavior. Entry through merger by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate § 7 because the entry eliminates a potential competitor exercising present influence on the market.

*Antitrust & Trade Law > Clayton Act > General Overview*
[HN19] See *15 U.S.C.S. § 18*.

*Antitrust & Trade Law > Monopolization > General Overview*
[HN20] See *N.Y. Gen. Bus. Law § 340(1)*.

*Antitrust & Trade Law > Monopolization > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*
[HN21] The Donnelly Act, *N.Y. Gen. Bus. Law § 340*, was patterned after the Sherman Act, *15 U.S.C.S. § 2*, and has been narrowly construed to encompass only those causes of action falling within the Sherman Act.

*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN22] Under New York law, a mere conspiracy to commit a tort is never of itself a cause of action. An independent tort must form the basis of a claim of civil conspiracy. A defendant may be held liable in tort for conspiracy to do an unlawful thing, or to do a lawful thing in an unlawful manner. The purpose of civil conspiracy is to establish joint liability by co-participants in a particular tortious conduct.

*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > Elements*

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

[HN23] A successful claim for civil conspiracy requires a plaintiff to show the primary tort plus the following four elements: (1) a corrupt agreement between two or more persons; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) the resulting damage or injury.

*Torts > Business Torts > Slander of Title > General Overview*
*Torts > Business Torts > Trade Libel > General Overview*
[HN24] The tort of trade libel or injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment. The utterance or furnishing of false and misleading information may be actionable if done maliciously or with the intention to harm another, or so recklessly and without regard to its consequences, that a reasonably prudent person should anticipate that damage to another will naturally follow.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Special Damages*
*Civil Procedure > Remedies > Damages > Special Damages*
*Torts > Business Torts > Trade Libel > Elements*
[HN25] The elements of a claim of injurious falsehood or trade libel are: (i) falsity of the alleged statements; (ii) publication to a third person; (iii) malice; and (iv) special damages. The requirement of pleading and proving special damages is applied strictly. Thus, a motion to dismiss a claim of injurious falsehood may be granted for failure to allege special damages with the requisite specificity. Under New York law, a plaintiff's special damages claim must be fully and accurately stated.

*Civil Procedure > Remedies > Damages > General Overview*
*Torts > Intentional Torts > Defamation > Defamation Per Se*
*Torts > Intentional Torts > Defamation > Remedies > General Overview*
[HN26] Under New York law, the elements of a defamation cause of action are: (i) a defamatory statement of fact concerning the plaintiff, (ii) publication to a third party by the defendant, (iii) falsity of the defamatory statement, (iv) some degree of fault, and (v) special damages or per se actionability (defamatory on its face). As a general rule, a statement is defamatory per se if it tends

to disparage a person in the way of his office, profession or trade. If a statement is defamatory per se, injury is assumed and the statement is actionable without proof of special damages. Special damages are those which flow directly from the injury to a plaintiff's reputation caused by the defamation and which involve the loss of something having economic or pecuniary value. Lastly, a plaintiff in a libel action must identify a plausible defamatory meaning of the challenged statement or publication. If the statement is susceptible of only one meaning, it becomes the court's responsibility to determine, as a matter of law, whether that one meaning is defamatory. On the other hand, if the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it becomes the trier of fact's responsibility to determine in what sense the words were used and understood.

*Real Property Law > Deeds > Enforceability*
*Torts > Intentional Torts > Defamation > Defamation Per Se*
*Torts > Intentional Torts > Defamation > Elements > Slander*
[HN27] Under New York law, there are four elements necessary to establish a prima facie case of slander: (1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff. The fourth element is presumed when the defamatory statement takes the form of slander per se.

*Torts > Intentional Torts > Defamation > Defamation Per Se*
[HN28] Defamation per se consists of statements (i) charging the plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that the plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman. The second type of defamation per se is limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities. Thus, charges against a clergyman of drunkenness and other moral misconduct affect his fitness for the performance of the duties of his profession, although the same charges against a business man or tradesman do not so affect him.

*Contracts Law > Breach > General Overview*
*Torts > Business Torts > Commercial Interference > Business Relationships > Elements*

Case 1:07-cv-00556-JJF-LPS    Document 31-4    Filed 12/17/2007    Page 14 of 30

Page 6

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

*Torts > Business Torts > Commercial Interference > Contracts > Elements*

[HN29] In order to state a claim for tortious interference with contractual relations under New York law, a plaintiff must allege (1) the existence of a valid contract between itself and a third party for a specific term; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of its breach; and (4) damages. The standard for demonstrating tortious interference with business relations is somewhat more stringent. A plaintiff must allege that the defendant interfered with business or economic relations between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by dishonest, unfair, or improper means. Indeed, the defendant must interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.

*Contracts Law > Breach > Causes of Action > General Overview*

[HN30] In order to state a claim for breach of contract, plaintiffs must allege: (1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of the contract provisions by the defendants; and (4) damages resulting from the breach.

**COUNSEL:** For Kasada, Inc., John Michaels, Inc., Gabbey Design Group, Inc., Garment Makers, Inc., Theodore Sadaka, Karen Sadaka, Gladys Sadaka, Plaintiffs: Laura M. Dilimetin, Dilimatin & Dilimetin, New York, NY.

For Access Capital, Inc., Miles M. Stuchin, Defendants: Clifford M. Solomon, Solomom & Tanenbaum, P.C., White Plains, NY.

For UCC Asset Management Corp., Star Funding, Inc., Defendants: Joseph J. Macchiarola, Ruskin, Moscou, Evans & Faltischek, P.C., Uniondale, NY.

For Omni Commercial, L.L.C., Defendant: Liviu Vogel, Salon, Marrow, Dyckman & Newman, L.L.P., New York, NY.

For Omni Commercial, L.L.C., Counter Claimant: Liviu Vogel, Salon Marrow Dyckman & Newman LLP, New York, NY.

For Omni Commercial, L.L.C., Cross Claimant: Liviu Vogel, Salon, Marrow, Dyckman & Newman, L.L.P., New York, NY.

For Access Capital, Inc., Miles M. Stuchin, Counter Claimants: Clifford M. Solomon, Solomom & Tanenbaum, P.C., White Plains, NY.

For UCC Asset Management Corp., Star Funding, Inc., Counter Claimants: Joseph J. Macchiarola, Ruskin, Moscou, Evans & Faltischek, P.C., Uniondale, NY.

For Kasada, [*2] Inc., John Michaels, Inc., Gabbey Design Group, Inc., Garment Makers, Inc., Theodore Sadaka, Karen Sadaka, Gladys Sadaka, Counter Defendants: Laura M. Dilimetin, Dilimatin & Dilimetin, New York, NY.

**JUDGES:** GEORGE B. DANIELS, United States District Judge.

**OPINION BY:** GEORGE B. DANIELS

**OPINION**

MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, DISTRICT JUDGE:

Plaintiffs bring suit alleging price fixing and monopoly claims in violation of the *Sherman Act §§ 1, 2*, the *Clayton Act § 4*, the *New York State Donnelly Act*, and pendant common law claims. Defendants filed motions to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. For the reasons below, defendants' motions to dismiss are granted in part and denied in part.

I. Background

Plaintiffs are garment manufacturers, their principals and related entities who bring suit against various credit institutions alleging price fixing and monopoly in violation of federal and state antitrust statutes and state common law. Plaintiffs Kasada, Inc., John Michaels, Inc., Gabbey Design Group, Inc. and Garment Makers, Inc. are corporations engaged in the business of domestic garment manufacturing. Complaint at 2-3, PP4-7. Plaintiff Theodore [*3] Sadaka is the principal officer of plaintiffs Garment Makers, Inc. and John Michaels, Inc.. Plaintiff Karen Sadaka is a principal officer of plaintiff Kasada, Inc. Plaintiff Gladys Sadaka is a principal officer of plaintiff Gabbey Design Group, Inc. Id. at 3, P8.

Plaintiffs' allegations revolve around the business of factoring, a form of commercial finance by which credit institutions provide financing to clients in exchange for the right to collect the client's accounts receivable. These credit institutions, commonly referred to as factors, advance up to 80% of the worth of a garment manufacturers' invoices in exchange for fees and interest. Complaint at 8, P20. The factor also assumes the risk of collecting

the client garment manufacturers' accounts receivable. Id. A factor assumes that credit risk, however, only after it has checked whether its client garment manufacturer is selling to a creditworthy purchaser. The garment manufacturer, in turn, uses that credit to purchase raw materials to produce their product. Id.

Plaintiffs allege that the defendants mutually agreed to stop credit-checking plaintiff garment manufacturers, denied them credit and/or withdrew their [*4] funding. The refusal by a factor to credit check a garment manufacturer results in "the garment manufacturer [being] unable to obtain virtually any fabric or other raw materials on credit." Id. at 10, P24. Specifically, plaintiffs allege that Westgate Financial Corp. and Finova Capital, Inc. allegedly discontinued their funding of plaintiff John Michaels, Inc. Id. at 4, P11. Finova Capital, Inc. also allegedly denied credit to John Michaels, Inc. Id. at 5, P12. Defendants Rosenthal & Rosenthal ("Rosenthal") and Star Funding, Inc. are alleged to have withdrawn funding from plaintiff Gabbey Design, Group, Inc. Id. at 3, 5, 6 PP6, 13, 16. Defendant Omni Commercial denied credit and refused to release monies to plaintiff Garment Makers, Inc. and caused defendant C.I.T. to deny credit to Garment Makers, Inc. as well. Id. at 3, 5, PP7, 14. The plaintiffs also allege that defendant Access Capital "published false accusations against plaintiffs, which caused plaintiffs to be group boycotted by defendants." Id. at 3, P7. Plaintiffs further claim that "Access Capital designed and orchestrated the group boycott of plaintiffs and caused defendants to deny credit . [*5] . . and caused plaintiffs to cease operations." Id. at 4, P10. Individual defendants Miles M. Stuchin and Richard I. Simon are alleged to be the presidents of Access Capital, Inc. and Westgate Financial Corp., respectively. Id. at 6, P17. Each are alleged to have "conspired with other defendants to conduct a group boycott against plaintiffs." Id. at 6-7 PP17-18.

Plaintiffs assert that defendants' actions precluded them from receiving the credit they needed to purchase fabric or other raw materials. This, in turn, caused some of them to lose money and "to cease operations." Complaint at 2-4, PP4-10. [1] Without specifically identifying which defendants were involved and which plaintiffs were affected, plaintiffs allege that the "factoring defendants, engaged in boycotting certain plaintiffs, denied credit to certain plaintiffs, fixed costs and interest rates, published letters to plaintiffs' customers, and agreed with other factors to fund certain manufacturers and to deny funding to other manufacturers, and to drive them out of business." Id. at 11, P25. Plaintiffs claim that the defendants communicated with each other, shared credit information, and agreed to make [*6] credit decisions together. Complaint at 12, P30. These communications allegedly occurred during meetings of the Uptown Credit Group and the Thursday Group. [2] Plaintiffs maintain that these groups "allowed defendants to conduct their secret meetings and made many of their collective credit decisions at these meetings and during telephone calls and other contacts." Id. at 12, P28. Plaintiffs argue that the defendants' denial of credit constitutes a group boycott in violation of *Section 1 of the Sherman Act.* In addition, plaintiffs allege that the defendants "controlled the price and interest rates for factoring" constituting illegal price-fixing in violation of *Section 1* of the Sherman Act. Id. at 18, P57. Plaintiffs also claim that defendants' actions constitute illegal price-fixing in the "piece goods" market, arguing that the "piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors." [3] Id. at 8, P20.

> 1 Without specifically identifying which manufacturers, plaintiffs allege that "numerous garment manufacturers have been driven out of business." Plaintiffs' complaint, however, is devoid of any allegation that any of the plaintiffs have gone out of business. To the contrary, plaintiffs complaint alleges that each corporate plaintiff "was and still is a domestic Corporation duly organized and licensed to do business within the State of New York." Complaint at 2-3, PP4-7.

[*7]

> 2 Uptown Credit Group and the Thursday Group are not parties to this litigation.

> 3 The piece goods market is the market for raw materials such as fabric, buttons, trim and other accessories.

Plaintiffs also claim that the defendants violated *Section 2 of the Sherman Act* by engaging "in an unlawful combination and conspiracy to unreasonably restrain and monopolize interstate commerce." Complaint at 12, P30. Plaintiffs allege that the defendants acted as "one," in that defendants "black listed certain customers and weeded out those that they targeted to drive out of business." Id. at 11, P27 (internal quotations omitted). Plaintiffs assert that through these actions, the defendants "have engaged in predatory and anti-competitive conduct, with a specific intent to monopolize, and have achieved monopoly power." Id. at 17, P53. This conspiracy to monopolize allegedly occurred in two markets: the factoring market for domestic garment manufacturers and the piece goods market. Plaintiffs claim that the defendants "factor 90% of the factored piece goods vendors in the United States." [*8] Id. at 10, P24. Plaintiffs also allege that all the defendants are members of the Uptown Credit Group and the Thursday Group, which plaintiffs maintain are designed "to maintain a monopoly over the industry, and they collectively agreed unlawfully to deny

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

plaintiffs credit." Id. at 9, P22. Plaintiffs allege that "collectively, defendants involved in these two groups control over 85% of [the] factoring market for garment manufacturing and virtually all of the piece goods manufacturing segment of that market." Id. [4]

> 4 Plaintiffs also assert claims under the *Clayton Act § 4*, the *Donnelly Act of the State of New York*, as well as the following common law claims: trade libel, defamation, injurious falsehood, interference with commercial relations, and breach of contract.

Defendants submitted motions to dismiss plaintiffs' claims, arguing that the plaintiffs failed to allege a violation of *Section 1 of the Sherman Act*. Specifically, defendants argue that plaintiffs failed to make sufficient allegations [*9] to establish that: the defendants entered into an agreement to boycott; the defendants engaged in price-fixing; and the defendants caused plaintiffs to suffer an antitrust injury rather than an injury specific to plaintiffs. Defendants also maintain that plaintiffs have failed to sufficiently allege a violation of *Section 2 of the Sherman Act*, arguing that plaintiffs' complaint fails to allege: a conspiracy by defendants to monopolize the market; an abuse of power by defendants; an antitrust injury; and a relevant market. [5] Defendants further argue that plaintiffs have failed to state a claim under the *Section 4 of the Clayton Act*, the Donnelly Act, or other state laws.

> 5 Defendants C.I.T. Group and Rosenthal & Rosenthal submitted a brief in support of their motion to dismiss. Their arguments to dismiss plaintiff's federal claims were adopted by Westgate Financial Corp., Richard I. Simon, and Omni Commercial. In lieu of filing a motion, defendants Star Funding, Inc. and UCC Asset Management submitted a letter dated March 12, 2002 stating that "counsel for plaintiff and [these defendants] have agreed that to the extent that portion of the decision of the Court regarding the federal claims (and the *Donnelly Act* claim) applies to all Moving Defendants, it shall also be deemed to apply to Star and UCC." Similarly, defendants Access Capital, Inc. and Miles M. Stuchin, in a letter dated February 7, 2002, informed the Court that "in lieu of filing a formal motion to dismiss the plaintiffs' complaint, [defendants] submit this letter to join and adopt the legal arguments made by counsel for [Finova], [C.I.T.], [Rosenthal & Rosenthal], [Omni], [Westgate], and [Simon] in connection with their respective motions to dismiss."

[*10] II. Discussion

[HN1] *Federal Rule of Civil Procedure 12(b)(6)* allows a party to move to dismiss a complaint where the complaint "fail[s] . . . to state a claim upon which relief can be granted[.]" *FED. R. CIV. P. 12(b)(6)*. In reviewing a motion to dismiss, this Court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party. See *Patel v. Searles, 305 F.3d 130, 134-35 (2d Cir. 2002)*. A motion to dismiss will only be granted if the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. See *Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1494 (2d Cir. 1992)*. [HN2] In considering a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference. *Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991)*; see also *Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998)*(in evaluating motions to dismiss, a court must limit its review to the allegations contained within [*11] the four corner's of the complaint).

[HN3] Although no heightened pleading requirements apply in antitrust cases, *Todd v. Exxon Corporation, 275 F.3d 191, 198 (2d Cir. 2001)*, a plaintiff must do more than cite relevant antitrust language to state a claim for relief. See *TV Communications Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1024 (10th Cir. 1992)*. "A plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated those laws are insufficient." Id. (citing *Klebanow v. New York Produce Exchange, 344 F.2d 294, 299 (2d Cir. 1965)*). Furthermore, "it is not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been" set forth in the complaint. *George Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 139 (2d Cir. 1998)*. The complaint must set forth enough information to suggest that relief would be based on some recognized legal theory. *Fort Wayne Telsat v. Entertainment and Sports Programming Network, 753 F.Supp 109, 111 (S.D.N.Y. 1990)*. [*12] "In practice, a complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Id. (quoting *District of Columbia v. Air Florida, Inc., 243 U.S. App. D.C. 1, 750 F.2d 1077, 1081-82 (D.C. Cir. 1984)*).

A. Section 1 of the Sherman Act

[HN4] *Section 1 of the Sherman Act* prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." *15 U.S.C. §*

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

1. [HN5] This blanket prohibition against any restraint of trade has been delineated into two separate doctrines. The first doctrine finds certain conduct illegal *per se*.

> In construing and applying the *Sherman Act*'s ban against contracts, conspiracies, and combinations in restraint of trade, the Court has held that certain agreements or practices are so plainly anticompetitive, and so lack any redeeming virtue, that they are conclusively presumed illegal without further examination under the rule of reason generally applied in *Sherman Act* cases.

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 7-8, 99 S. Ct. 1551, 1556, 60 L. Ed. 2d 1 (1979)* [*13] (internal quotations and citations omitted). Examples of *per se* illegal conduct include horizontal restraints, i.e. agreements between competitors at the same level of market structure, like agreements to fix prices and group boycotts. See, *Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212, 79 S. Ct. 705, 3 L. Ed. 2d 741 (1959)*(finding group boycotts unreasonable *per se*); *United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S. Ct. 811, 84 L. Ed. 1129 (1940)*(finding price fixing unreasonable *per se*); *Michelman v. Clark-Schwebel Fiber Glass Corporation, 534 F.2d 1036, 1043 (2d Cir. 1976)*(finding that a group boycott, because of its inherently anti-competitive nature, is unreasonable *per se* and thus always illegal).

Conduct that does not fall within the *per se* rule is subject to the rule of reason analysis. Under the rule of reason, the anticompetitive consequences of a challenged practice are weighed against the business justifications upon which it is predicated and its putative procompetitive impact, and a judgment with respect to its reasonableness is made. See KAYE SCHOLER, KAYE SCHOLER'S ANTITRUST [*14] DESKBOOK, 6 (3d ed. 2002). For example, allegations of agreements between entities at different market levels that restrain trade i.e., vertical agreements, are analyzed under the rule of reason. *Electronics Communications Corp. v. Toshiba America Consumer Prods. Inc., 129 F.3d 240, 243 (2d Cir. 1997)*("Absent price-fixing between a supplier and distributor, vertical restraints are generally subject to 'rule of reason' analysis.") Id.

a. *Per se* Illegal Conduct: Group Boycott and Price Fixing

Plaintiffs allege that the defendants violated *Section 1 of the Sherman Act* "by engaging in an unlawful group boycott and a concomitant price-fixing conspiracy" in which the defendants collectively refused to credit check

certain garment manufacturers. Complaint at 18, P56. Plaintiffs further claim that defendants colluded to fix the price and interest rates for factoring as well as the price of the piece goods purchased by the garment manufacturers.

Defendants argue that plaintiffs' complaint alleges no facts to support a finding that an agreement or conspiracy to boycott existed and that plaintiffs' complaint "alleges only the naked conclusion that the defendants [*15] conspired and agreed. No specific agreement is alleged with any factual particularity -- no dates, no details, no places, no participants, no purpose, no decisions, no terms, no actions." Defendant C.I.T.'s Memorandum of Law in Support of Its Motions to Dismiss the Complaint ("C.I.T. Brief") at 7. Defendants also argue that the plaintiffs have failed to state a claim to establish price fixing in either the factoring market or the piece goods market.

i. Group Boycott

[HN6] Courts have found that group boycotts, because of their anti-competitive nature, are unreasonable *per se* and therefore always illegal. See *Klor's, Inc., 359 U.S. at 212*; *Michelman v. Clark-Schwebel Fiber Glass Corporation, 534 F.2d at 1043*. Plaintiffs allege that the defendants conspired to conduct a group boycott against plaintiffs by denying them credit.

> Defendants routinely communicated with each other, had access to each others' databases and credit information, consulted with each other regarding credit decision, shared confidential information, and agreed together when making credit decisions concerning garment manufacturers.

Complaint at 12, P30. Plaintiffs, [*16] however, fail to provide sufficient factual allegations to support this claim. There is no allegation that a particular plaintiff, once refused to be credit checked by one factor, was subsequently refused by each of the other factors. Compare *Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., 2002 U.S. Dist. LEXIS 18338, 2002 WL 31164482, *9 (S.D.N.Y. 2002)*(in finding that plaintiff stated a claim for group boycott, the Court found that "the gravamen of plaintiffs' amended complaint is that C.I.T. and the other factors agreed that once C.I.T. refused to credit check a manufacturer, the other factors would refuse to check that manufacturer's credit as well"). Id. There is no allegation that a particular garment manufacturer applied for and was refused to be credit checked by all of the defendants.

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

Conversely, there is no allegation that a particular factor refused to credit check all of the plaintiffs. Plaintiffs' complaint specifically alleges that specific defendants denied credit to specific plaintiffs, withheld from a specific plaintiff credit or refused to release to a specific plaintiff monies allegedly owed. Complaint at 3-7, PP6-18. Plaintiffs [*17] allege that "after a group meeting of defendants," defendants Westgate Financial Corp. and Finova Capital, Inc. refused to continue funding plaintiff John Michaels and that Finova Capital, Inc. denied credit to John Michaels, Inc. Id. at 4, 5 PP11-12. "After a group meeting of defendants," defendants Rosenthal & Rosenthal and Star Funding, Inc. are alleged to have withdrawn funding to plaintiff Gabbey Design. Id. at 3, 5, 6 PP6, 13, 16. "After a group meeting of defendants," defendant Omni Corp. is alleged to have refused to release monies to plaintiff Garment Makers, Inc. Id. at 3, P7. "After a group meeting of defendants," defendant Omni Commercial is alleged to have denied credit to plaintiff Garment Makers, Inc. and caused defendant C.I.T. to deny credit to Garment Makers, Inc. There is, furthermore, no allegation that the plaintiffs are one organization, belong to the same association, or that they possess any contractual relationship. Lastly, plaintiffs allegation that defendants "used subjective criteria and denied credit based upon malice, ill will, a personal dislike of management, rumors with no bearing on the customer's creditworthiness, or simply due to negligence" [*18] belies their argument that a collective decision not to credit check certain plaintiffs was because of a conspiracy to boycott. Complaint at 10, P24. Rather, this allegation supports a finding that credit-checking decision were made independently by each factor based on subjective criteria.

Plaintiffs' also argue that the defendants "engaged in group meetings" to share "credit information" and "had access to each other's databases and credit information." Complaint at 11-12, PP27, 28, 30. [HN7] Although "information exchange" has been found to be an example of a facilitating practice that a court could use to help support an inference of a price-fixing agreement, [6] the exchange of information between business firms concerning the credit-worthiness of customers has long been held not to violate the *Sherman Act*." *Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1048 (2d Cir. 1976)*; see also *Cement Mfrs. Protective Asso. v. United States, 268 U.S. 588, 604, 69 L. Ed. 1104, 45 S. Ct. 586, 591 (1925)*. [7] Furthermore, "the dissemination to competitors of information concerning the creditworthiness of customers aids sellers in gaining information necessary to protect [*19] themselves against fraudulent or insolvent customers." *Michelman, 534 F.2d at 1048*. Lastly, the Second Circuit has held that "it is not a violation of *Section 1* to exchange such information, provided that any action taken in reliance upon it is the result of each firm's independent judgment, and not of agreement." Id.

> 6  See *Todd v. Exxon Corporation, 275 F.3d 191, 198 (2d Cir. 2001)*.
>
> 7  Although the Supreme Court has found that the exchange of information itself, as opposed to merely using the information exchanged as evidence upon which to infer a price-fixing agreement, violates *Section 1 of the Sherman Act* under a Rule of Reason analysis, plaintiffs in the present case have made no such argument and therefore, this type of violation will not be entertained by the Court.

In the absence of factual allegations to support their claim, plaintiffs claim of group boycott is dismissed. See *Fort Wayne Telsat v. Entertainment and Sports Programming Network, 753 F. Supp. at 115* [*20] (finding that local subscription company had to do more than merely allege existence of a conspiracy; company was required to prove factual basis for the allegation); see also *Garshman v. Universal Resources Holding Inc., 824 F.2d 223, 230 (3d Cir. 1987)*("The allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the *Sherman Act*." Id.); *Heart Disease Research Foundation v. General Motors Corp., 463 F.2d 98, 100 (2d Cir. 1972)*[HN8] ("a bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal"). Id.

ii. Price Fixing

Plaintiffs' claim of price fixing is equally conclusory. Plaintiffs allege that the defendants "have dominated the factoring market for domestic garment manufacturers for many years [and] used their control over [the] market to fix conditions," specifically by controlling "the price and interest rates for factoring." Id. at 18, PP56-57. Plaintiffs allege that by colluding and agreeing to drive their own clients out of business, [*21] the defendant factors have "enhanced their overall competitive position and [reduced] [their] collective credit risk exposure." Id. at 18, P57. Defendants argue that "plaintiffs do not allege, even in conclusory fashion, that defendants fixed the price of the product they provide: factoring and financial serves. There is no allegation that the price, terms, conditions, interest rates or any other aspect of defendants' factoring services were fixed." C.I.T. Brief at 11.

Similar to plaintiffs' arguments in *Dresses for Less, Inc. 2002 U.S. Dist. LEXIS 18338, 2002 WL 31164482*, plaintiffs' in the present case argue that the factor's denial

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

of credit is analogous to the facts of *Catalano v. Target Sales, Inc. 446 U.S. 643, 100 S. Ct. 1925, 64 L. Ed. 2d 580 (1980)*. In Catalano, competing beer wholesalers agreed to fix the credit terms on which they would sell beer to retailers. Specifically, the wholesalers agreed to require that the retailers pay in advance or upon delivery, and to discontinue the practice of accepting late payments without interest. *Id. at 644-45*. The Court held that [HN9] "credit terms must be characterized as an inseparable part of price. [*22] An agreement to terminate the practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional *per se* rule against price fixing." *Id. at 648*. Unlike *Catalano*, however, the present complaint alleges that the defendants specifically denied credit to the plaintiffs alone and not to all of their customers. Most importantly, there is no allegation that the defendants conspired or agreed to fix the price or terms of credit. Plaintiffs' price fixing argument hinges on the allegation that by not extending credit to the plaintiffs, the defendants "minimized their risks and costs of doing business" thereby controlling the price and interest rates for factoring. Complaint at 18, P57. Plaintiffs, however, do not state how the denial of credit to specific garment manufacturers affected market prices. *Dresses for Less, Inc. 2002 U.S. Dist. LEXIS 18338, 2002 WL 31164482 at *10*. Plaintiffs claims of price fixing in the factoring industry are completely conclusory, unsupported by factual allegations and are, therefore, dismissed.

Furthermore, plaintiffs appear to allege that defendants have also fixed the prices in the [*23] piece goods market. Plaintiffs argue that "when defendants conspire to withdraw funding, they are actually fixing the prices of the goods." Plaintiffs' Brief at 18. Plaintiffs apparent argument is that piece goods cost more to the plaintiffs as a result of defendants denial of credit. This allegation is insufficient to find that the defendants conspired or agreed to fix prices in the piece goods market. Plaintiffs claim that defendants fixed prices in the piece goods market, therefore, is also dismissed.

b. The Rule of Reason

[HN10] In alleging a violation of *Section 1 of the Sherman Act* under the rule of reason, a plaintiff bears the burden of showing that the challenged action has an actual adverse effect on competition as a whole in the relevant market. *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc., 996 F.2d 537, 543 (2d Cir. 1993)*. It is not sufficient for plaintiffs merely to show that they have suffered injury due to the alleged agreement; they must also demonstrate "an actual adverse effect on competition market-wide." *Electronics Communications Corp., v. Toshiba, 129 F.3d at 244*. "The injury to a relevant market requirement [*24] assures that the *Sherman Act* protected competition as a

whole in the relevant market, and not the individual competitors within that market." *Dresses for Less, Inc. 2002 U.S. Dist. LEXIS 18338, 2002 WL 31164482 *7 (S.D.N.Y. 2002)*(internal quotations omitted).

In support of their rule of reason claim, plaintiffs allege that

> each of the agreements entered into among the defendants was an agreement in restraint of trade in violation of *15 U.S.C. § 1*, intending to achieve anticompetitive effects. Each agreement violates the *Sherman Act* under the Rule of Reason because its pro-competitive effects are outweighed by its anti-competitive effects.

Complaint at 19, P65. Plaintiffs also claim that "as a result of defendants' conduct, plaintiffs have been damaged in an amount to be determined at trial in excess of $ 40,000,000.00 for which defendants are jointly liable." Id. at 19, P66. Plaintiffs also allege that the

> piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors. The domestic garment manufacturing market is adversely affected by the antitrust violations through [*25] the resulting increase in piece goods prices and the elimination of garment manufacturers from the marketplace.

Id. at 8, P20.

These allegations are insufficient to establish a violation under the rule of reason. Plaintiffs make no allegations from which the Court could infer that defendants' alleged actions had "any anticompetitive effect beyond the injury to plaintiffs." See *Granite Partners, L.P v. Bear, Stearns & Co., Inc. 17 F. Supp.2d 275, 297-98 (S.D.N.Y. 1998)*. As discussed *supra*, plaintiffs have not articulated with any particularity the effect of the defendants' alleged actions on the piece goods market. Alleging that the price they paid for piece goods increased as a result of their concomitant inability to receive credit to purchase those goods falls short of alleging an anticompetitive effect beyond personal injury to the plaintiffs. Furthermore, the allegation that client competition among the factors was reduced is conclusory and unsubstantiated. Lastly, plaintiffs' allegation of an anticompetitive effect on the domestic garment manufacturing marker is also conclusory. Plaintiffs claim that garment

Case 1:07-cv-00556-JJF-LPS    Document 31-4    Filed 12/17/2007    Page 20 of 30

Page 12

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

manufacturers were eliminated from [*26] the market-place. However, they do not allege what garment manu-facturers, other than themselves, were affected by defen-dants' alleged actions. Indeed, plaintiffs' claims center on their injury alone and not on a broader injury to competi-tion generally. Plaintiffs, therefore, have also failed to allege the requisite antitrust injury to competition result-ing from defendants' actions.

[HN11] A plaintiff that fails to plead an actual injury to competition may nonetheless show antitrust injury by showing that the defendant possesses "market power" sufficient to inhibit competition on a market-wide basis. *Dresses for Less, 2002 U.S. Dist. LEXIS 18338, 2002 WL 31164482 at \*7 (S.D.N.Y. 2002)*. Market power is de-fined as the power to raise prices significantly above the competitive level without losing all of one's business. See id.; see also *CDC Techs., Inc. v. IDEXX Lab., Inc., 186 F.3d 74, 81 (2d Cir. 1999)*(internal citations and quotations omitted). Plaintiffs do not allege with any specificity that defendants possess market power in the factoring market. Plaintiffs, furthermore, do not allege that the defendants sought to raise the price for credit market-wide in a manner that affected competition. Plaintiffs' [*27] Second Cause of Action alleging a vio-lation under the Rule of Reason is therefore dismissed.

B. Section 2 of the Sherman Act

Plaintiffs claim that the defendants have conspired to monopolize both the factoring market for domestic piece goods vendors and the factoring market for domes-tic garment manufacturers. [8] They allege that the defen-dants "engaged in an unlawful combination and conspir-acy to unreasonably restrain and monopolize interstate commerce." Complaint at 12, P30. Plaintiffs assert that the "defendants acted as "one" and that they "black listed certain customers and weeded out those that they tar-geted to drive out of business." Id. at 11, P27. Defendant C.I.T. argues that plaintiffs' complaint fails to allege a conspiracy to monopolize, an abuse of monopoly power, an antitrust injury or a relevant market. [9] Defendant Rosenthal similarly argues that plaintiffs have failed to allege an antitrust injury, an abuse of monopoly power or a relevant market. [10]

8    Although plaintiffs did not specify in their complaint that their third cause of action consti-tuted a conspiracy to monopolize claim as op-posed to a monopolization claim, in their Memo-randum of Law in Opposition to Defendants' Mo-tions to Dismiss the Complaint ("Plaintiffs' Brief"), plaintiffs argue that their complaint al-leges a conspiracy to monopolize. See Plaintiffs' Brief at 20.

[*28]

9    C.I.T. also asserts that they should not even be a defendant in this matter as they are not alleged to have had a factoring contract with the plaintiffs and were not a party to any of the alleged tortious conduct that C.I.T. claims is the gravamen of plaintiffs' complaint. C.I.T. argues that they are "named as a defendant solely because of [their] alleged market share and because [they] attended, along with other factors, weekly meetings of two industry credit groups. That is not enough to state a claim under any law, including the antitrust laws." C.I.T. Brief at 1.

10    Rosenthal likewise argues that "CIT was added to the Complaint simply to permit a *Sec-tion 2* claim to be asserted." Rosenthal Brief at 13.

[HN12] *Section 2 of the Sherman Act* provides that "every person who shall monopolize, or attempt to mo-nopolize, or combine or conspire with any other person or persons, to monopolize, any part of the trade or com-merce among the several States" shall have committed an illegal act. *15 U.S.C. § 2*. In order to state a claim of con-spiracy to monopolize under *Section 2*, [*29] a plaintiff must allege (1) a concerted action, (2) overt acts in fur-therance of the conspiracy, and (3) specific intent to mo-nopolize. *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc., 129 F.3d 240, 246 (2d Cir. 1997)*. "Intent alone is not sufficient, however; the defendant's power in the relevant market must be established, to establish whether the defendant is a mo-nopolist or is threatening to become one." Id. Further-more, "a short plain statement of a claim for relied which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules." *George A. Frey Ready-Mixed Concrete, inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 554 (2d Cir. 1977)*. Lastly, "in antitrust cases in particular, the Supreme Court has stated that dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *George Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 139 (2d Cir. 1998)*(internal quotations and citations omitted).

Plaintiffs' complaint presents colorable claims of a conspiracy to monopolize under *Section* [*30] *2*. The gravamen of plaintiffs' *Section 2* claims, and indeed of all of plaintiffs' federal claims, is that the defendants conspired to selectively choose which garment manufac-turers would receive credit and which would not. This choice, in effect, ultimately decided which manufacturers went out of business and which ones did not. Complaint at 20, P68. Whether through the defendants' alleged membership in both the Uptown Credit Group and the Thursday Group, or through other unspecified meetings,

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

plaintiffs maintain that the defendants "shared all credit information and in effect merged the companies." Id. at 11, P27. It is at these meetings and "during telephone calls and other contacts" that the alleged concerted action took place. Id. at 12, P28.

Similar to their arguments to dismiss plaintiffs' *Section 1* claims, defendants contend that the plaintiffs have failed to specify the conspiracy claims with any particularity, citing several cases where antitrust conspiracy actions were dismissed for failing to allege any supporting facts. See *Telectronics Proprietary, Ltd., v. Medtronic, Inc., 687 F.Supp 832, 839 (S.D.N.Y. 1988)*(quoting *Heart Disease Research Foundation v. General Motors Corp., 463 F.2d 98, 100 (2d Cir. 1972)).* [*31] " Unlike their *Section 1* claim, however, plaintiffs have alleged facts sufficient to support a preliminary finding of concerted action among the defendants. [12]

> 11  Unlike the plaintiff in *Telectronics,* who did not name the others who allegedly conspired with the defendants, plaintiffs in the instant case have alleged that all the defendants conspired with each other to monopolize the factoring markets for garment manufacturers and for piece goods vendors.

> 12  [HN13] *Sections 1* and *2* of the *Sherman Act* require proof of conspiracies which are reciprocally distinguishable from and independent of each other, although the objects of the conspiracies may partially overlap. See *American Tobacco Co. v. United States, 328 U.S. 781, 788, 66 S. Ct. 1125, 1129, 90 L. Ed. 1575 (1946).*

Plaintiffs, furthermore, allege several overt acts in furtherance of the alleged conspiracy. Plaintiffs claim that the defendants

> deliberately created a monopoly by merging their interests, eliminating competition, [*32] and working to together control the business, by agreeing and deciding to give Plaintiffs credit or not, setting the prices, controlling every credit decision relative to factored sales, issuing substantially the same unconscionable contract, and having the ability to drive manufacturers out of business, including plaintiffs.

Complaint at 13, P33. Plaintiffs further allege that the defendants

> have the power to drive manufacturers out of business by their agreements to-

> gether to control the market and in turn control the garment manufacturers by choosing which manufacturers they would withhold payments to and deny credit to, fixing costs of goods at artificially high prices, and charging exorbitant fees.

Complaint at 9, P21. These allegations are sufficient to allege overt acts in furtherance of the conspiracy.

Plaintiffs have also specifically alleged the defendants' intent to monopolize. Plaintiffs claim that the defendants "engaged in the acts and practice alleged herein with the specific intent to achieve or maintain monopoly power in the two affected markets." Complaint at 20, P69. Plaintiffs further allege that the defendants' merging of interests gave [*33] the defendants "a dominant share in the factored domestic manufacturing market" and in the piece goods market, as well as "the power to drive manufacturers out of business by their agreements together to control the market and in turn control the garment manufacturers." Id. at 9, P21. This alleged monopoly power came from the defendants' ability to "control 85% of factoring market for garment manufacturing" and "90% of the factored piece goods vendors in the United States." Id. at 9, 10 PP22, 24. [HN14] Although the allegation of market share is not the same as one alleging monopoly power, the existence of monopoly power may be inferred from a predominant share of the market. See *United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S. Ct. 1698, 1703-04, 16 L. Ed. 2d 778 (1966).* The higher the market share, the stronger the inference of monopoly power. See *Broadway Delivery Corp. v. United Parcel Serv. of America, Inc., 651 F.2d 122, 129 (2d Cir. 1981).*

Defendants further argue that plaintiffs' fail to allege an anticompetitive effect harmful to competition or antitrust injury. [HN15] "Market share is not enough to allege a violation of *Section 2* because [*34] monopoly power is not unlawful *per se.*" Defendant C.I.T. Brief at 14 (internal quotations and citations omitted). An "antitrust injury" is an

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violations or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations ... would likely cause.

Case 1:07-cv-00556-JJF-LPS    Document 31-4    Filed 12/17/2007    Page 22 of 30

Page 14

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)*; see also *Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial, Inc., 919 F.2d 1517, 1522 (11th Cir. 1990)*(finding that a "monopolist's refusal to deal becomes actionable under the antitrust laws only where the refusal is designed to have an anticompetitive effect, whether to gain greater market share, to drive up prices, or to obtain some other illegal goal").[HN16] To state an antitrust injury, a plaintiff must demonstrate that defendants' conduct "has had an actual adverse effect on competition as a whole in the relevant market; to [*35] prove it has been harmed as an individual competitor will not suffice." *Capital Imaging, 996 F.2d at 543*; see also *Brunswick Corp., 429 U.S. at 488* ("The antitrust laws ... were enacted for 'the protection of competition, not competitors.'")(quoting *Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962)*). Plaintiffs, however, have proffered sufficient allegations displaying harm to competition and antitrust injury. Plaintiffs allege that

> defendants have violated Section 2 of the Sherman Act, *15 U.S.C. § 2*, because they have acted with specific intent to archive (sic) or maintain monopoly power in the factoring market for domestic piece goods and garment manufacturers by merging with competitors and unlawfully utilizing its resulting economic leverage to fix piece goods prices and to drive out of business garment manufacturers that potentially enhance defendants' overall credit risk exposure.

Complaint at 20, P70. Plaintiffs also maintain that the defendants'

> actions have harmed consumers in that the manufacturer has to charge higher prices and the manufacturers [*36] that were forced out of business prevented consumers from having the freedom to choose from quality merchandise suppliers since there is a limited product.

Complaint at 16, P49. These allegations are sufficient to allege both the anticompetitive effect of, as well as the antitrust injury resulting from, defendants' actions.

Lastly, defendants argue that the plaintiffs have failed to adequately allege a relevant market. [HN17] "A complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." *Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co., 2001 U.S. Dist. LEXIS 18831,*

*2001 WL 1468168 (S.D.N.Y. 2001).* However, because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corporation, 275 F.3d 191, 199 (2d Cir. 2001).* "To survive a *Rule 12(b)(6)* motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes -- analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible. [*37] " *Id. at 199* (internal citations omitted). "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." Id.

Plaintiffs allege that the "relevant market is the factoring market for domestic garment manufacturers." Complaint at 8, P20. Plaintiffs further claim that factors are distinguishable from banks and other credit institutions in that factors are willing to grant credit without the borrower having to put up collateral outside of the borrower's invoices and incoming accounts receivable. Id. Plaintiffs also claim that the "piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors. The domestic garment manufacturing market is adversely affected by the antitrust violations through the resulting increase in piece goods prices and the elimination of garment manufacturers from the marketplace. [*38] " Id. Defendants' motions to dismiss plaintiffs' *Section 2* claims are denied.

### C. Clayton Act

Plaintiffs also assert claims under *Sections 4* and *7* of the Clayton Act. Complaint at 1, P1. [13] Plaintiffs make the same allegation they did under their *Section 1* and *Section 2* claims alleging that the

> defendants violated the *Clayton Act* because it has acted with specific intent to achieve or maintain its monopoly power in the factoring market for domestic piece goods and garment manufacturers by merging with competitors and unlawfully utilizing its resulting economic leverage to fix piece goods prices and to drive out of business garment manufacturers to enhance defendants' overall credit risk exposure. .

Complaint at 21, P76.

Case 1:07-cv-00556-JJF-LPS    Document 31-4    Filed 12/17/2007    Page 23 of 30

Page 15

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

13    The Fourth Cause of Action of plaintiffs' complaint does not specify which section of the *Clayton Act* was violated. In paragraph 1 of their complaint, plaintiffs allege a violation of *Section 4*. *Section 4*, however, does not provide a substantive claim for relief but rather enables plaintiffs who have been injured under the antitrust laws to sue for damages. See *Floors-N-More, Inc. v. Freight Liquidators, 142 F. Supp.2d 496, 499-500 (S.D.N.Y. 2001)*; see also *Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*. In contrast, plaintiffs argue in their Memorandum of Law in Opposition to Defendants' Motion to Dismiss that they have adequately alleged a claim under *Section 7 of the Clayton Act*. Plaintiffs do not reference any other section of the *Clayton Act*. The Court, therefore, will construe plaintiffs' *Clayton Act* claim as one being under *Section 4* and *Section 7* of that act.

[*39]    The Supreme Court summarized the purpose of *Section 7* of the Clayton Act in *United States v. Falstaff Brewing Corp., 410 U.S. 526, 531-32, 35 L. Ed. 2d 475, 93 S. Ct. 1096, 1099- 1100, (1973)*: [HN18] *Section 7 of the Clayton Act* forbids mergers in any line of commerce where the effect may be substantially to lessen competition or tend to create a monopoly. [14] The section proscribes many mergers between competitors in a market, *United States v. Continental Can Co., 378 U.S. 441 (84 S. Ct. 1738, 12 L. Ed. 2d 953) (1964)*; *Brown Shoe Co. v. United States, 370 U.S. 294 (82 S. Ct. 1502, 8 L. Ed. 2d 510) (1962)*; it also bars certain acquisitions of a market competitor by a noncompetitor, such as a merger by an entrant who threatens to dominate the market or otherwise upset market conditions to the detriment of competition, *FTC v. Procter & Gamble Co., 386 U.S. 568, 578- 580 , 18 L. Ed. 2d 303, 87 S. Ct. 1224 (1967)*. Suspect also is the acquisition by a company not competing in the market but so situated as to be a potential competitor and likely to exercise substantial influence on market behavior. Entry through merger [*40] by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate *§ 7* because the entry eliminates a potential competitor exercising present influence on the market. *Id., at 580-581 (87 S. Ct. at 1231-1232)*; *United States v. Penn-Olin Chemical Co., 378 U.S. 158, 173-174 (84 S. Ct. 1710-1718, 12 L. Ed. 2d 775) (1964)*.

14    *Section 7 of the Clayton Act* provides that[HN19]

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

*15 U.S.C. § 18.*

[*41]    None of the preceding situations exist in the present case. Plaintiffs allegations of a 'merger' are conclusory and unsupported by any factual allegations. Plaintiffs do not allege the existence of either a merger agreement or an acquisition agreement to support its *Section 7* claim. Plaintiffs' *Section 7* claim, therefore, is dismissed.

D. Donnelly Act

Plaintiffs also assert claims under the *Donnelly Act of the State of New York*. Specifically, plaintiffs allege that the defendants

entered into agreements with other factoring companies to engage in group boycotts where they refused to approve credits for New York based garment manufacturers, unlawfully fixed piece goods prices for those manufacturers, drove them out of business, and enabled the factors to maintain supra-competitive pricing structures and stable market shares, among other anti-competitive effects.

Complaint at 22, P79. Plaintiffs further assert that the unlawful reduction of the number of garment manufacturers competing in the market has resulted in artificially maintained and non-competitive levels of prices for factoring services throughout New York and has enabled the factors to stabilize [*42] their respective market

shares in a way that could not have been achieved or maintained had the factors operated in a genuinely competitive environment.

Complaint at 22, P80. Defendants move to dismiss plaintiffs' *Donnelly Act* claims on the same grounds that it moved to dismiss the *Sherman Act* claims.

The Donnelly Act, *N.Y. Gen. Bus. Law § 340*, states that [HN20] "every contract, agreement, arrangement or combination whereby a monopoly ... is or may be established or maintained, or whereby competition ... may be restrained" is illegal. *N.Y. Gen. Bus. Law § 340(1)*. [HN21] The Donnelly Act was patterned after the *Sherman Act* and has been narrowly construed to encompass only those causes of action falling within the *Sherman Act*. See *State v. Mobil Oil Corp., 38 N.Y.2d 460, 381 N.Y.S.2d 426, 427, 344 N.E.2d 357 (1976)*; accord *Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton, 997 F. Supp. 340 (E.D.N.Y.1998)* (finding *Donnelly Act* is modeled after the *Sherman Antitrust Act* and is generally interpreted in accordance with federal precedent); see also *Anheuser-Busch, Inc. v. Abrams, 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 820, 520 N.E.2d 535 (1988)* [*43] (*Donnelly Act* was modeled on the *Sherman Act* and is to be construed in accord with it). Accordingly, defendants' motion to dismiss plaintiffs' *Donnelly Act* claims is granted in part and denied in part. Plaintiffs' *Donnelly Act* claims of price-fixing and group boycott are therefore dismissed.

E. State Law Claims

In addition to plaintiffs' federal and state antitrust claims, plaintiffs also allege the following pendant state law claims: trade libel; defamation, libel and slander; injurious falsehood; interference with commercial relations; and breach of contract. Each of these claims, with the exception of plaintiffs' breach of contract claim, have been alleged as conspiracies to commit the alleged tortious acts. In presenting their claims in this manner, plaintiffs allege that all of the defendants are liable for the tortious conduct. Specifically, plaintiffs' Sixth, Seventh, Eighth and Ninth Causes of Action claim that all of the defendants "engaged in an unlawful combination and conspiracy" to commit trade libel; defamation, libel and slander; injurious falsehood; and interference with commercial relations.

[HN22] Under New York law, however, "a mere conspiracy to commit a [tort] [*44] is never of itself a cause of action." *Alexander & Alexander v. Fritzen, 68 N.Y.2d 968, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986)* (citations omitted). An independent tort must form the basis of a claim of civil conspiracy. See *Demalco v.*

*Feltner, 588 F. Supp. 1277, 1278 (S.D.N.Y.1984)*; *Smukler v. 12 Lofts Realty, 156 A.D.2d 161, 548 N.Y.S.2d 437, 439 (1st Dep't 1989)*, app. den., *76 N.Y.2d 701, 557 N.Y.S.2d 878, 557 N.E.2d 114 (1990)*. "[A] defendant may be held liable in tort for conspiracy to do an unlawful thing, or to do a lawful thing in an unlawful manner." *Arlinghaus v. Ritenour, 622 F.2d 629, 639 (2d Cir.1980)*(internal citations omitted); see *Banque Nationale de Paris v. Prudential Sec., Inc., 1997 U.S. Dist. LEXIS 15998, 1997 WL 639257, at *3 (S.D.N.Y. Oct. 16, 1997)*. The purpose of civil conspiracy is to "establish[] joint liability by co-participants in a particular tortious conduct." *Sackman v. Liggett Group, Inc., 965 F. Supp. 391, 395 (E.D.N.Y.1997)*. [HN23] A successful claim for civil conspiracy requires a plaintiff to show the primary tort plus the following four elements: "'([1]) a corrupt [*45] agreement between two or more persons[;] ([2]) an overt act in furtherance of the agreement[;] ([3]) the parties' intentional participation in the furtherance of a plan or purpose[;] and ([4]) the resulting damage or injury.'" *Andre Emmerich Gallery, Inc. v. Segre, 1997 U.S. Dist. LEXIS 16899, 1997 WL 672009, at *10 (S.D.N.Y. Oct. 29, 1997)* (quoting *Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1267 (S.D.N.Y.1991)*).

Plaintiffs provide no factual support for their conclusory allegations of a conspiracy to commit any of these torts. Plaintiffs claims of a conspiracy to commit these torts, therefore, is dismissed as to all plaintiffs. Furthermore, as will be seen, plaintiffs have also failed to allege facts sufficient to support their claims of the underlying torts.

a. Trade Libel and Injurious Falsehood

Plaintiffs Sixth and Eighth Causes of Action allege independent trade libel and injurious falsehood claims against all the defendants. In support of their trade libel claim, plaintiffs allege that the

> defendants have engaged in an unlawful combination and conspiracy to cause the publication of untruths disparaging plaintiffs, such as [*46] plaintiffs' actions are fraudulent, their products and services are of inferior quality, they misappropriated inventories and are poor risks. Such publications being accompanied by an intent to cause competitive injury, personal hostility, and bad faith. These untruths were published maliciously and without reasonable or probable cause to believe in the truth thereof. These publications of injurious falsehoods constituted, and continue to constitute, the tort of trade libel for

Case 1:07-cv-00556-JJF-LPS    Document 31-4    Filed 12/17/2007    Page 25 of 30

Page 17

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

which defendants are jointly and severally liable.

Complaint at 23, P87.

Similarly, in support of their injurious falsehood claim, plaintiffs restate many of the same conclusory allegations in their trade libel claim. Plaintiffs maintain that the

> defendants have engaged in an unlawful combination and conspiracy to cause the publication of untruths disparaging plaintiffs, such publication being accompanied by an intent to cause competitive injury, personal hostility, and bad faith. These untruths were published maliciously and without reasonable or probable cause to believe in the truth thereof. These publications of injurious falsehoods such as plaintiffs committed fraud, stole money, fraudulently [*47] conveyed assets, misrepresented themselves, and lied to their customers, and switched receivables constitute the tort of injurious falsehood. Defendants made these statements and published these statements knowing they were false and knowing and intending to cause harm to plaintiffs. These statements in fact caused harm to plaintiffs' in that plaintiffs' customers stopped doing business with plaintiffs and other factors withdrew funding from plaintiffs and factors refuse to factor plaintiffs.

Complaint at 25, P92.

These conclusory allegations are insufficient to support plaintiffs' claim of trade libel or injurious falsehood. The allegations fail to identify which specific defendants committed these torts. Furthermore, the allegations fail to identify the false statements made by any defendant. However, in their Seventh Cause of Action for defamation, slander and libel, plaintiffs make allegations from which the Court may infer false statements in support of their trade libel and injurious falsehood claims. Plaintiffs allege that Miles M. Stuchin "defamed and slandered Plaintiffs by writing and publishing false and libelous letters, including a letter dated November 3, 2000, and [*48] telephone calls, mainly during October 2000 and through and including December 2000, and oral communications to Plaintiffs' clients and to the industry." Complaint at 6, P17. Stuchin and defendant Access Capital, of which he is president, are alleged to have

defamed[,] libeled and slandered plaintiffs in that on many dates during the time between October 2000 and February 2001, defendant and his employees including Vincent Grillo called and wrote plaintiffs' customers and others in the industry stating that plaintiffs "committed fraud," "stole money," "fraudulently conveyed assets," "misrepresented themselves" and "lied" to their customers, and "switched receivables."

Complaint at 6, P17. Lastly, plaintiffs maintain that in a letter dated January 16, 2001, defendants Richard I. Simon and Westgate Financial, of which he is allegedly president, "accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey." Complaint at 7, 15, PP18, 43. These statements were published to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others. Id. at 15, P43. [*49] [15]

> 15 Plaintiffs have not pled their trade libel or injurious falsehood claim against all defendants with any specificity. The only defendants identified as having made false statements are Miles M. Stuchin, Access Capital, Richard I. Simon and Westgate Financial. The Court will therefore treat plaintiffs' claims of trade libel and injurious falsehood as against those defendants only. If indeed plaintiffs intended to allege these claims against all of the defendants, those claims are dismissed as conclusory and unsupported by specific allegations of published false statements.

Although pled separately, the torts of trade libel and injurious falsehood require the same allegations to be pled. The distinction between the two is slight; courts having articulated that statements disparaging another's product were called "trade libel," another's business "injurious falsehood," and another's title "slander of title." *Payrolls & Tabulating, Inc. v. Sperry Rand Corp.*, 22 A.D.2d 595, 257 N.Y.S.2d 884, 887 [*50] *(1st Dep't 1965).* [HN24] "The tort of trade libel or injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment." *Waste Distillation, 136 A.D.2d 633, 634, 523 N.Y.S.2d 875 (2nd Dep't 1988);* see also *Global Merch., Inc. v. Lombard & Co., 234 A.D.2d 98, 99, 650 N.Y.S.2d 724 (1st Dep't 1996)* ("trade libel ... requires 'knowing publication of false matter derogatory to the plaintiff's

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

business.'") (quoting *Waste Distillation, 136 A.D.2d at 634, 523 N.Y.S.2d 875*). "The utterance or furnishing of false and misleading information may be actionable if done maliciously or with the intention to harm another, or so recklessly and without regard to its consequences, that a reasonably prudent person should anticipate that damage to another will naturally follow." *Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co., 7 A.D.2d 441, 444, 184 N.Y.S.2d 58, 61 (App. Div. 1st Dep't 1959)*.

[HN25] The elements of a claim of injurious falsehood or trade libel are: [*51] (i) falsity of the alleged statements; (ii) publication to a third person; (iii) malice; and (iv) special damages. See *Drug Research Corp. v. Curtis Publishing Co., 7 N.Y.2d 435, 440, 199 N.Y.S.2d 33, 37, 166 N.E.2d 319 (1960)*; see also *Computech Int'l, Inc. v. Compaq Computer Corp., 2002 U.S. Dist. LEXIS 20307, No. 02 Civ. 2628, 2002 WL 31398933, at *5 (S.D.N.Y. Oct. 24, 2002)*. The requirement of pleading and proving special damages is applied strictly. See *id.WL at *6*. Thus, a motion to dismiss a claim of injurious falsehood may be granted for failure to allege special damages with the requisite specificity. See *id.*; see also *Drug Research Corp., 7 N.Y.2d at 440-41, 199 N.Y.S.2d at 37-38, 166 N.E.2d 319*.

Plaintiffs' claims of trade libel and injurious falsehood, like their defamation, slander and libel claims, are premised on two letters dated November 3, 2000 and January 16, 2001 as well as telephone calls made during October 2000 and through and including December 2000. Plaintiffs complaint, however, does not allege with particularity to whom the November 3, 2000 letter was written. [16] Plaintiffs' claim regarding the November 3, 2000 letter, therefore, [*52] is dismissed. Furthermore, all of plaintiffs' trade libel and injurious falsehood claims against all defendants must be dismissed because plaintiffs failed to allege special damages with sufficient particularity. Under New York law, plaintiffs' special damages claim, premised on their loss of business, must be "fully and accurately stated." *Drug Research Corp. v. Curtis Pub. Co., 7 N.Y.2d 435, 440-41, 199 N.Y.S.2d 33, 37-38, 166 N.E.2d 319 (N.Y. 1960)*(finding that special damages were not adequately alleged where the damage claim was a round figure [$ 5,000,000] with no attempt at itemization); see also *Rall v. Hellman, 284 A.D.2d 113, 114, 726 N.Y.S.2d 629, 632 (App. Div. 1st Dep't 2001)*(finding that complaint was deficient because it failed to identify special damages with sufficient particularity). Plaintiffs allege damages "in an amount to be determined at trial but not less than $ 40,000,000.00." Complaint at 23, 26, PP87, 93. This allegation is insufficient under New York law and cannot survive defendants' motion to dismiss.

16  Plaintiffs do, however, allege that "on December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance" Complaint at 15, P42. Plaintiffs also allege the third person to whom Westgate published false statements: "on or about January 16, 2001 Defendants, including Westgate Financial Corp., accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey. Defendants published these statements to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others." Complaint at 15, P43.

[*53] b. Defamation, Libel, Slander

In their Seventh Cause of Action, plaintiffs assert claims of defamation, libel and slander. Premised on the same set of allegations as their trade libel and injurious falsehood claims, plaintiffs' defamation, libel and slander claim is based on false statements allegedly made by defendants Stuchin, Access Capital, Simon and Westgate Financial in two letters dated November 3, 2000 and January 16, 2001, as well as oral statements made on the telephone from October 2000 through and including February 2001. Complaint at 6, 13, 14, 24, PP17, 36, 37, 89. As with plaintiffs trade libel and injurious falsehood claims, plaintiffs' claim regarding the November 3, 2000 letter fails to specify to whom the letter was published and is, therefore, dismissed.

Although defendants Westgate, Simon, Access and Stuchin argue that plaintiffs claim must be dismissed for failing to specify to whom all of the alleged defamatory statements were made, plaintiffs' complaint does allege that "on December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance. [*54] " Complaint at 15, P42. Plaintiffs further assert

> that on or about January 16, 2001 Defendants, including Westgate Financial Corp., accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey. Defendants published these statements to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others.

Complaint at 15, P43. [17]

Case 1:07-cv-00556-JJF-LPS    Document 31-4    Filed 12/17/2007    Page 27 of 30

Page 19

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

17    Additionally, plaintiffs maintain that Omni Corp. "slandered plaintiffs to many in the industry." Complaint at 3, P7. Although plaintiffs allege that Omni Corp. and not named defendant Omni Commercial, LLP slandered the plaintiffs, assuming *arguendo* that the plaintiffs allegation is directed towards defendant Omni Commercial, plaintiffs' claim would still be dismissed for failure to state a claim. Plaintiffs do not allege a specific defamatory statement; to whom these statements were made; nor any special damages to support their claim.

[HN26] Under New York law, [*55] the elements of a defamation cause of action are: (i) a defamatory statement of fact concerning the plaintiff, (ii) publication to a third party by the defendant, (iii) falsity of the defamatory statement, (iv) some degree of fault, and (v) special damages or per se actionability (defamatory on its face). See *Dillon v. City of New York, 261 A.D.2d 34, 37, 704 N.Y.S.2d 1- 38,* (App. Div. 1st Dep't 1999); *Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 176 (2d Cir.2000).* As a general rule, a statement is defamatory per se if it "tends to disparage a person in the way of his office, profession or trade." *Celle, 209 F.3d at 179* (emphasis in original); see also *Aronson v.. Wiersma, 65 N.Y.2d 592, 594, 493 N.Y.S.2d 1006, 1008, 483 N.E.2d 1138 (1985).* If a statement is defamatory *per se,* injury is assumed and the statement is actionable without proof of special damages. Special damages are those which flow directly from the injury to a plaintiff's reputation caused by the defamation and which involve the loss of something having economic or pecuniary value. See *Celle, 209 F.3d at 179* (citing [*56] *Matherson v. Marchello, 100 A.D.2d 233, 235, 473 N.Y.S.2d 998, 1000 (App. Div.2d Dep't 1984)).* Lastly, "a plaintiff in a libel action must identify a plausible defamatory meaning of the challenged statement or publication." *Celle 209 F.3d at 178.* If the statement is susceptible of only one meaning, it becomes the court's responsibility to determine, as a matter of law, whether that one meaning is defamatory. On the other hand, if the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it becomes the trier of fact's responsibility to determine in what sense the words were used and understood. See id.

Although plaintiffs allege that all of the defendants committed defamation, plaintiffs' complaint only supports claims against defendants Stuchin, Access Capital, Simon and Westgate Financial. Stuchin and Access Capital are alleged to be responsible for the November 3, 2000 letter as well as the oral communications between October 2000 and February 2001. Defendants Simon and Westgate are alleged to be responsible for the January

16, 2001 letter. As plaintiffs' complaint does not refer to any other communications, [*57] plaintiffs claims against all other defendants are dismissed.

Plaintiffs' claims against defendants Stuchin and Access Capital regarding the November 3, 2000 letter are dismissed for failing to allege with specificity the exact words contained in the November 3, 2000 letter that plaintiffs' claim are libelous. Plaintiffs' insufficient pleading of the allegedly defamatory statement goes hand in hand with their failure to identify a plausible defamatory meaning for that statement. Plaintiffs further fail to allege to whom that letter was published. Lastly, plaintiffs fail to allege special damages or that the defamatory words contained in the letter should be considered by the Court as defamatory *per se.* See *Church of Scientology Int'l v. Eli Lilly & Co., 778 F.Supp 661, 668 (S.D.N.Y. 1991)*(dismissing claim that failed "to provide both the context and the precise language of" the alleged statements).

Plaintiffs allegations concerning the January 16, 2001 letter allegedly written by defendants Simon and Westgate Financial suffer from the same deficiencies as their claims regarding the November 3, 2000 letter. Plaintiffs fail to articulate the libelous statement [*58] made in that letter and also fail to allege either special damages or that the libelous statement reaches *per se* liability. Although plaintiffs allege to whom that letter was sent, that allegation alone is insufficient to support plaintiffs' claims. Plaintiffs' libel claim regarding the January 16, 2001 letter is therefore dismissed.

Plaintiffs claims regarding telephone calls and other oral communications that occurred between October 2000 and February 2001 against Stuchin and Access Capital are dismissed except for one slander allegation: "on December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance." Complaint at 13, P42. [HN27] Under New York law, there are four elements necessary to establish a *prima facie* case of slander: (1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff. The fourth element is presumed when the defamatory statement takes the form of slander *per se. Weldy v. Piedmont Airlines, 985 F.2d 57, 61-62 (2d Cir. 1993)* [*59] (citations omitted). [HN28] Defamation *per se* "consist[s] of statements (i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman v. Gelstein, 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992).* The second type of defamation *per se* is "limited to defamation of a kind incompatible with the proper

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities". *Id.* Thus, "charges against a clergyman of drunkenness and other moral misconduct affect his fitness for the performance of the duties of his profession, although the same charges against a business man or tradesman do not so affect him". *Id. at 436, 590 N.Y.S.2d 857, 605 N.E.2d 344* (citations omitted). For the purposes of this motion, therefore, plaintiff has adequately pled a *prima facie* case of slander. Defendants' motion to dismiss plaintiffs' [*60] claim of slander based on this telephone call is denied.

c. Interference with Commercial Relations

In their Ninth Cause of Action, plaintiffs also allege a claim of interference with commercial relations. Plaintiffs maintain that the

> defendants have induced Plaintiffs' clients to refrain from purchasing from Plaintiffs by publishing disparaging and false statements about the products and services of Plaintiff, such publications being accompanied by an intent to cause competitive injury, personal hostility, bad faith, knowing the matter was false, by creating the impression and belief that to work with plaintiffs would jeopardize such customers' continued status, and by Defendants having purposely induced or otherwise caused third persons not to enter into or continue business relations with Plaintiffs.

Complaint at 13, P34. These allegations are insufficient to state a claim of tortious interference with business relations against all of the defendants. The only allegations which specify direct conduct by particular defendants are actions by defendants Access Capital and Stuchin against plaintiff John Michaels. Plaintiffs allege that Access Capital and Stuchin "interfered [*61] with an unrelated lawsuit plaintiffs were involved in, illegally diverted and opened plaintiffs' personal and business mail." Complaint at 6, P17. Plaintiffs assert that

> on or about and after October 27, 2000, Defendant Access intentionally and illegally diverted, opened and withheld Plaintiffs' mail, made illegal financial threats and demands upon Plaintiff John Michaels' accounts causing many of John Michael's accounts to withhold payments

and caused John Michaels to be unable to operate its business.

Complaint at 14, P40. Plaintiffs maintain that

> defendants' actions constitute interference of John Michaels' and other plaintiffs' contractual relationships with its customer accounts, and disrupted the normal operation of John Michaels' and plaintiffs' business, causing a great loss of booked orders plus future sales. Defendants acted intentionally with the knowledge that their actions would cause John Michaels' accounts to stop payments for shipments received and that the factors would refuse to do business with plaintiffs, and that plaintiffs' customers would refuse to do business with plaintiffs.

Complaint at 15, P41.

[HN29] In order to state a claim for tortious [*62] interference with contractual relations under New York law, a plaintiff must allege "(1) the existence of a valid contract between itself and a third party for a specific term; (2) defendant's knowledge of that contract; (3) defendant's intentional procuring of its breach; and (4) damages." *150 East 58th St. Partners, L.P. v. Wilkhahn Wilkening & Hahn GmbH & Co., 1998 U.S. Dist. LEXIS 1701, No. 97 CIV. 4262(SHS), 1998 WL 65992, at *1 (S.D.N.Y. Feb. 17, 1998)* (quoting *Riddell Sports Inc. v. Brooks, 872 F. Supp. 73, 77 (S.D.N.Y.1995)*); see *Jews for Jesus, Inc. v. Jewish Community Relations Council of N.Y., Inc., 968 F.2d 286, 292 (2d Cir.1992)*; *Union Carbide Corp. v. Montell N.V., 944 F. Supp. 1119, 1136 (S.D.N.Y.1996)*; *Foster v. Churchill, 87 N.Y.2d 744, 749-50, 665 N.E.2d 153, 156, 642 N.Y.S.2d 583, 586 (1996)*.

The standard for demonstrating tortious interference with business relations "is somewhat more stringent." *Campo v. 1st Nationwide Bank, 857 F. Supp. 264, 273 (E.D.N.Y.1994)*; see *International Minerals and Resources, Inc. v. Pappas, 761 F. Supp. 1068, 1075 (S.D.N.Y.1991)*. A plaintiff [*63] must allege that defendants interfered with business or economic relations between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by dishonest, unfair, or improper means. See *PPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266, 269 (2d Cir.1987)*; *Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F. Supp. 477, 482 (S.D.N.Y.)*, cert. denied, *522 U.S. 908, 118 S. Ct. 265, 139 L. Ed. 2d 191 (1997)*; *Houbigant, Inc. v. ACB Mercantile, 914 F. Supp. 964, 995 (S.D.N.Y.1995)*; *Campo, 857 F. Supp. at 273*. Indeed, the defendant "must

interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." *Fonar Corp., 957 F. Supp. at 482.*

Defendants Access and Stuchin argue that plaintiffs fail under both standards. First, defendants argue that plaintiffs fail to allege that they were "actually and wrongfully prevented from entering into or continuing in a specific business relationship." *Solar Travel Corp. v. Nachtomi, 2001 U.S. Dist. LEXIS 7549, 2001 WL 641151 (S.D.N.Y. 2001);* [*64] *Korn v. Princz, 226 A.D.2d 278, 641 N.Y.S.2d 283 (1st Dep't 1996).* Defendants further contend that plaintiffs have not alleged that a contract would have been entered into but for the alleged actions of Access and Stuchin. See, e.g., *Bankers Trust Co. v. Bernstein, 169 A.D.2d 400, 563 N.Y.S. 2d 821 (1st Dep't 1991).*

Plaintiffs' claims against defendants Stuchin and Access Capital must be dismissed. Plaintiffs do not allege with any specificity the contracts it claims were breached or the business relations it claims were prevented from going forward as a result of either Stuchin's or Access Capital's actions. Plaintiffs also fail to identify the third parties that plaintiffs had either a contractual or prospective business relationships with. Plaintiffs' claim of tortious interference with commercial relations is, therefore, dismissed.

d. Breach of Contract

As is the case with all of their claims, in their breach of contract claim, plaintiffs do not specify which plaintiffs had contractual relationships with which defendants, generally alleging that the

> defendants conduct and the unlawful acts in restraint of trade have caused the breach [*65] of their respective contracts with plaintiffs, and, Defendants have breached their contractual duties to each plaintiff separately and apart from their anti-competitive conduct. Defendants also engaged in the following additional actions that further breached its covenants of good faith and fair dealing. Defendants' bad faith actions contributed substantially to the demise of the plaintiffs, and caused each of the plaintiffs' substantial financial loss. The contracts themselves are unconscionable, against public policy, and predatory.

Complaint at 26-27, P98. Indeed the only allegations that support a breach of contract claim which specifically identify a breach by a particular defendant of a contract with a specific plaintiff are against defendants Westgate and Star Funding. Plaintiffs allege that

> Westgate Financial confiscated Plaintiff John Michael's client inventory and sold it to a salvage company, never gave plaintiffs credit for payments made, refused to give advance funding, breached their contract, and caused a loss in excess of Two Million Dollars. Defendants misappropriated Plaintiffs' inventory and charged unlawfully high interest rates causing serious financial [*66] loss to John Michael's.

Complaint at 13, P35.

> Plaintiffs further allege that they were coerced and forced under duress to use the factor Star Funding, and then Star Funding immediately breached their contract based upon Rosenthal & Rosenthal's request not to go forward with its funding to Gabbey, all of this occurred after Star Funding and Rosenthal & Rosenthal met with defendants and agreed to force plaintiffs out of business.

Complaint at 14, P38.

[HN30] In order to state a claim for breach of contract, plaintiffs must allege: (1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of the contract provisions by the defendants; and (4) damages resulting from the breach. See *Terwilliger v. Terwilliger, 206 F.3d 240, 246 (2d Cir. 2000).* As plaintiffs have only alleged contracts with defendants Westgate and Star Funding, plaintiffs breach of contract claim against all other defendants are dismissed. Plaintiffs claims against these remaining defendants are also dismissed for failing to allege adequate performance of the contract by the plaintiffs as well as damages resulting from the breach.

III. Conclusion

[*67] Defendants' motions to dismiss plaintiffs' claims under *Section 1 of the Sherman Act* are granted. Defendants' motions to dismiss plaintiffs' claims under *Section 2 of the Sherman Act* are denied. Defendants' motions to dismiss plaintiffs' claims under the *Clayton Act* are granted. Defendants' motions to dismiss plaintiffs' price-fixing and group boycott claims under the *Donnelly Act* are granted. Defendant's motion to dismiss

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

plaintiffs' monopolization claims under the *Donnelly Act* are denied. Defendants' motions to dismiss all of plaintiffs' claims of trade libel, injurious falsehood, tortious interference with commercial relations and breach of contract are granted. Defendants' motion to dismiss plaintiffs' defamation, libel and slander claims is granted in part and denied in part. All of plaintiffs' defamation, libel and slander claims are dismissed except for plaintiffs' slander claim regarding the alleged December 5, 2000 telephone call.

Dated: New York, New York

December 10, 2004

SO ORDERED:

GEORGE B. DANIELS

United States District Judge [*68]

8

LEXSEE 1990 US DIST LEXIS 18739

**METRO VIDEO DIST., INC., ET. ALS., Plaintiffs v. VESTRON VIDEO, INC., ET. ALS., Defendants**

**Civil No. 89-0640(PG)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO**

*1990 U.S. Dist. LEXIS 18739; 1990-1 Trade Cas. (CCH) P68,986*

**February 8, 1990, Decided
February 8, 1990, Filed**

**JUDGES:** [*1] Juan M. Perez-Gimenez, Chief United States District Judge.

**OPINION BY:** PEREZ-GIMENEZ

**OPINION**

*OPINION AND ORDER*

Plaintiffs Metro Video Dist., Inc., Metro Video Dist. of Puerto Rico, Inc., M. Video Dist. Inc., Metro Video Dist. of Minnesota, Inc., and their majority stockholder and president Arthur Morowitz (collectively, "Metro"), commenced this action in May of 1989 against defendants Vestron Video and Vestron Video, Inc. (collectively, "Vestron"). Metro sued under provisions of the Clayton Act [1] invoking this Court's federal question jurisdiction, [2] with reliance also placed on the authority we derive from the doctrine of pendent jurisdiction. The complaint alleged, in essence, that Vestron's decision to discontinue extending credit to Metro in 1988 violated several federal antitrust laws as well as a number of the laws of Puerto Rico.

    1  *15 U.S.C. §§ 15, 22*, as amended by the Robinson-Patman Act.

    2  *28 U.S.C. § 1331.*

Defendants have moved this Court for an order granting partial summary judgment as to the antitrust claims [*2] made in the first, second, third and fourth causes of action of the complaint, pursuant to *Fed. R. Civ. P. 56*, and for a transfer of the remaining counts to the District of Connecticut on the grounds that the transfer would best serve the convenience of the parties, the witnesses, and the interests of justice, pursuant to *28*

*U.S.C. § 1404*. For reasons we expound below, defendants' motion is granted in all respects.

THE STANDARD FOR SUMMARY JUDGMENT

We will grant summary judgment if the pleadings and other submissions "show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly submitted motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1985)*. We note in passing that our First Circuit has specifically rejected special summary judgment treatment in antitrust cases, holding that the particular circumstances involved are what control. *Texaco v. Medina, 834 F.2d 242, 247 (1st Cir. 1987)*, [*3] *White v. Hearst Corp., 669 F.2d 14, 17 (1st Cir. 1982).*

Viewing the record, as we must, in the light most favorable to the non-moving party, and indulging all inferences favorable to that party, *Oliver v. Digital Equipment Corp., 846 F.2d 103, 105 (1st Cir 1988)*, we turn to the facts.

FACTS COMMON TO ALL CAUSES OF ACTION

Defendant Vestron is engaged in the business of the manufacture and distribution of motion picture video cassettes and is "engaged in commerce" within the meaning of the antitrust laws of the United States. Plaintiff Metro is a wholesale distributor of video cassettes in the continental United States and Puerto Rico. Vestron distributed its products nationwide through a network of approximately 23 independent wholesale distributors. Metro had been one of those distributors since 1982.

Case 1:07-cv-00556-JJF-LPS    Document 31-5    Filed 12/17/2007    Page 3 of 18

Page 2

1990 U.S. Dist. LEXIS 18739, *; 1990-1 Trade Cas. (CCH) P68,986

Two seemingly insignificant facts must be noted at the outset, for they acquired unexpected relevance as the plot developed. The first, to be mentioned only briefly, pertains to Vestron's particular system of sale incentives. Prior to January 1988, Vestron offered its distributors a series of advertising credits, allowances, incentives, and [*4] rebates for unsold and returned merchandise upon the submission of claims. Starting in 1988, however, Vestron implemented the so called "Advantage Program," which provided for a full scale revision of all sale credits and incentives available along its distribution chain, along with a new system of sales quotas and directives and an array of penalties for the dealer's failure to comply with them.

Secondly, we must mention that Mr. Morowitz had played an instrumental role in the organization and furtherance of the National Video Software Manufacturers Credit Association ("NVSMCA"). The NVSMCA's purpose was to protect dealers from abusive practices and unfair methods of competition and to provide a means of exchange of historical credit information. See Exh. D to the McGovern Aff., Art II, Part 1, Bylaws of the NVSCMA. From 1986 to 1988 Mr. Morowitz was President of the NVSCMA and had also been a member of its Board of Directors since its inception in 1981. The association sought to facilitate the exchange of video dealers' historical credit information, and its bylaws explicitly prohibited its members from agreeing to take any action with respect to a customer or from exchanging [*5] any confidential information about a customer. See Exh. D to McGovern Aff., Art III, Part 1.

To no one's surprise, resolution of Vestron's motion hinges on facts pertaining to the economic relationship that existed between the parties which we now proceed to describe briefly. Defendants contend, and plaintiffs do not dispute, that Metro has had a history of past-due payments to Vestron. To illustrate, Vestron points to the fact that in March of 1988 about $ 1.2 million of Metro's outstanding balance of approximately $ 3 million was more than thirty days overdue. See Par. 7 of the Aff. of Michael McGovern. Vestron's National Credit Manager, Jeff Hamilton, visited Metro's office and discussed the situation with Metro's president and co-plaintiff Arthur Morowitz. Upon review of some financial records, Mr. Hamilton concluded that Metro might be having severe financial difficulties. See McGovern Aff. Pp. 4-8. To further evaluate Metro's financial situation, Vestron's Vice President of Credit Operations, Michael McGovern, met with Arthur Morowitz in June of 1988. He requested that Metro provide him with audited financial statements for the past several years. Mr. Morowitz gave [*6] Mr. McGovern Metro's audited financial statements for the years ending on June 30, 1986, and June 30, 1987, and unaudited financials for the nine-month period ending on

April 2, 1988. The June 30, 1987, audited financial statement reported a net loss of $ 3,676,339.00 and disclosed that Metro's liabilities exceeded its assets at the time by $ 4,641,673.00. The unaudited financial statements for the nine-month period ending April 2, 1988, showed Metro's liabilities continued to exceed its assets by more than $ 3,300,000.00. As defendants viewed things, those statements revealed that Metro posed a serious credit risk to Vestron. See McGovern Aff. Pp. 9-11.
[3]

> 3    As further evidence of Metro's insolvency, Vestron points to an involuntary bankruptcy petition filed in the United States Bankruptcy Court for the District of New Jersey on August 25, 1989, against co-plaintiff Metro Video Distributors, Inc. by three of plaintiffs' creditors. See In re Metro Video Distributors, Inc., Case No. 89-06734 (Bankr. D.N.J. Aug. 25, 1989).

[*7] While not contesting the truthfulness of the above stated facts, Metro concentrates its fire on a different front. First, plaintiffs submit that Vestron had knowledge of Metro's uncertain financial situation since as early as August of 1987, more or less the time around which the two of them began doing business with each other. See Par. 18 of the Aff. of Arthur Morowitz. Secondly, it is contended that Vestron had repeatedly assured Metro that, notwithstanding Metro's financial problems, it would continue to sell to Metro on standard credit terms if Metro paid off its past due balance and remained current, a condition which, working in conjunction with Vestron, [4] Metro was able to comply with at no less than two periods in time: by year end of 1987 and by August of 1988 (the month on which Metro's credit was terminated by Vestron). See Morowitz Aff. Pp. 19-22. [5] Moreover, in the midst of its precarious financial situation, Metro points to an "upward trend" which is presumably evidenced by its financial statements. To illustrate, Metro submits that its deficiency in assets was reduced from $ 3,020,257.00 in 1987 to $ 1,887,310.00 in nine months of operations in 1988. Additionally, [*8] from a loss of operations of $ 3,676,339.00 in 1987, it alleges that it was able to develop a positive net income from operations of $ 1,132,947.00 in that nine month period, with an increase in working capital of $ 1,243,378.00.

> 4    Mr. Morowitz's affidavit concedes, however, that from time to time Vestron required and obtained from Metro various forms of security in order to continue dealing with them on standard credit terms. See Par 19 of Morowitz Aff. and Par. 4 of McGovern Aff..

1990 U.S. Dist. LEXIS 18739, *; 1990-1 Trade Cas. (CCH) P68,986

5   Mr. McGovern's affidavit concedes this fact, at least as it pertains to Metro's account's current status as of December 1987. See Par. 6 of McGovern Aff..

In August of 1988 Vestron announced that it would refuse to extend any further credit to Metro but would continue to deal with it on a cash basis only. The cash-basis-only treatment required Metro to pay cash in advance for all future orders. As explained more fully below, this action by Vestron allegedly placed Metro at a disadvantage with respect to its competitors [*9] in the business of video cassette distribution specially in the wake of the newly implemented Advantage Program. More important to the business at hand, it prompted the legal action which occupies our attention today.

There being no genuine issue as to any of the above presented material facts, we examine the law.

DISCUSSION

A

In the broad panoply of federal antitrust laws, the Clayton Act as amended by the Robinson-Patman Act, protects competitors who engaged themselves in interstate commerce. See *15 U.S.C. § 13(a)*. [6] In this spirit, it forbids sellers to "discriminate in price between different purchasers of commodities," where such discrimination tends to substantially "lessen competition or . . . to injure, destroy or prevent competition with any person" who receives the benefits of such discrimination. See Section 2(a) of the Robinson-Patman Act and *Monahan's Marine, Inc. v. Boston Whaler, Inc., 866 F.2d 525, 528 (1st Cir. 1989)*.

6   To place the Clayton Act's role in perspective, we note that other legislation, notably the Sherman Antitrust Act *15 U.S.C. § 1*, is intended to protect competition, not competitors. See *Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962)*, *Monahan's Marine, Inc. v. Boston Whaler, Inc., 866 F.2d 525, 528 (1st Cir. 1989)*.

[*10] Plaintiffs attempt to bring their cause within the narrow confines of Section 2(a). [7] For this they allege that Vestron's sales to Metro from August of 1988 to December of that same year on a cash basis only, while sales to Metro's competitors during the same period of time were made on standard credit terms, constituted price discriminations which had the effect of substantially lessening competition or of injuring, destroying, or preventing competition, all in violation of the Robinson-Patman Act. The adverse effect of Vestron's decision to terminate Metro's credit was multiplied by the "Advantage Program" that had been recently implemented. This was so, the thesis runs, in view of the fact that since

Metro had to fund all its purchases by paying cash in advance, it was limited in the amount of product it could purchase for resale. As a result thereof, Metro found it difficult to meet quotas imposed by Vestron pursuant to its "Advantage Program," which in turn caused it to lose rebates and other concessions. In addition, Vestron's treatment of Metro's account as one not in good standing caused Metro to lose advertising credits and returns, allowances, incentives, and rebates, all [*11] of which placed Metro at a competitive disadvantage in its business. Vestron, in response, argues that its decision to discontinue extending credit to Vestron was based on legitimate business reasons, as case law requires.

7   Section 2(a) of the Robinson-Patman Act, *15 U.S.C. § 13(a)*.

In evaluating Metro's position we must be mindful that credit decisions, by their very nature, will have discriminatory effects, since they require sellers to distinguish between dealers who are good credit risks and those who are not. This being so, and taking into account the fact that the legislative purpose behind Section 2(a) has been described as an effort to insure that purchasers from a single seller would not be injured by the seller's discriminatory pricing policies, *Pierce v. Commercial Warehouse, 876 F.2d 86 (11th Cir. 1989)*, we must consequently conclude that under § 2(a) the most that can be asked from a manufacturer is that he apply the same standard of credit worthiness to all distributors who compete [*12] for his products. In order to prove this, courts have consistently ruled that a showing that a legitimate business justification underlies a particular credit decision entitles a seller to a presumption of regularity in his dealings with all of his distributors.

In *Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 796 (4th Cir. 1989)*, the Fourth Circuit outlined the proper approach to be followed when considering discrimination claims in decisions involving the extension of credit. After observing that no court had found sufficient facts for Robinson-Patman liability based on a single credit decision perhaps due to the fact that credit extension decisions are quite customer specific and that many other different factors guide credit determinations, *Thomas J. Kline, 878 F.2d at 797*, the Circuit Court relied on the words of the district court in *Carlo C. Gerardi Corp. v. Miller Brewing Co., 502 F.Supp. 637, 647 (D.N.J. 1980)*:

In other words, a manufacturer is free to extend different terms to competing purchasers so long as it makes its decisions in a non-discriminatory manner, i.e. the same standards of credit worthiness [*13] must be extended to all applicants for credit who are in competition with each other. A showing such as the one made by [plaintiff] can,

Case 1:07-cv-00556-JJF-LPS     Document 31-5     Filed 12/17/2007     Page 5 of 18

Page 4
1990 U.S. Dist. LEXIS 18739, *; 1990-1 Trade Cas. (CCH) P68,986

therefore, be rebutted by an affirmative showing that the different terms resulted from legitimate business factors.

Along with the majority of the other circuits which have considered the issue, [8] then, the Fourth Circuit did not hesitate to hold that when legitimate business reasons for the extension or denial of credit are advanced, a Clayton Act, Section 2(a) cause of action is effectively barred. Cf. also *Mozart v. Mercedes-Benz of North America, Inc., 833 F.2d 1342, 1348-1351 (9th Cir. 1987)*.

> 8    The Sixth Circuit, confronted with an analogous claim of price discrimination in a seller's decision not to permit one of its distributors to participate in credit programs made available to the majority of its dealers, ruled in no unclear terms that "*Section [13(a)]* is not violated when credit decisions are based upon legitimate business reasons," *Bouldis v. Suzuki Motor Corp., 711 F.2d 1319, 1325 (6th Cir. 1983)*. The Tenth Circuit, when faced with a parallel scenario, went a step beyond in holding that decisions involving the extension of credit "could not, as a matter of law, be the basis for a claim under *15 U.S.C. § 13(a)*." *Craig v. Sun Oil Company of Pennsylvania, 515 F.2d 221, 224 (10th Cir. 1975)*. Its holding was based on the fact that too many factors, prominent among which were the borrower's financial strength and business experience, go into the determination of the terms of credit, securities and guarantees required, and other devices typically considered by creditors in extending or denying credit. *515 F.2d at 224*.

[*14]    In the instant case, legitimate business reasons for Vestron's denial of credit to Metro abound. As noted above, Metro had a history of late payments. We need not recount here the financial hardships encountered by Metro during the years 1987 and 1988, as nothing is to be gained from such an ordeal. It suffices to say that Vestron's characterization of Metro as a substantial "credit risk" is, in our view of things, a fair statement of the point, to say the least. Even Metro's allegations in its own defense depict a corporation in a constant struggle to get out of the red. The fact that Vestron had been lenient, cooperative, and supportive in its prior dealings with Metro can in no way now serve to hold it liable once such treatment is no longer offered. Other courts, notably the Fourth and Sixth Circuits in their Thomas J. Kline and Bouldis decisions, have found histories of late payments and credit problems, as well as instances of negative net worth to constitute sufficient justification to bar a claim under Section 2(a). We therefore hold, without serious pause, that no cause of action is stated in the case at bar under Section 2(a) of the Robinson-Patman Act. Under [*15] the circumstances of this case, Vestron's

management could have opted not to continue dealing with Metro under their established credit terms, but it certainly cannot be disputed that a decision to stop extending credit clearly had a legitimate foundation.

The arguments advanced by Metro in support of its position do not warrant a contrary result. Metro first contends that the fact that no court to date has found a seller's decision not to extend credit to its customers to violate Section 2(a) does not mean that a discrimination in credit may never result in a Section 2(a) (price discrimination) violation. To defend their contention plaintiffs argue that credit terms are in fact an integral part of the price, finding support for their contention in some language quoted by the Supreme Court in *Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 645 (1980)* (wherein we are advised that the extension or denial of credit is an indirect method of lowering or raising prices). Additionally, plaintiffs point to the opinions in *Robbins Flooring, Inc. v. Federal Floors, Inc., 445 F.Supp. 4 (E.D. Pa., 1977)* and *Craig v. Sun Oil Company, supra,* [*16] wherein the possibility was recognized that "in an extreme situation there might be a violation of the (Robinson-Patman) Act by reason of the magnitude or nature of the discrimination in the extension of credit." *515 F.2d at 224*.

However cleverly it might have been presented, the argument simply will not wash. The statement in Catalano, which we of course do not contend, was nevertheless advanced in the context of the price-fixing prohibition of the Sherman Antitrust Act and is therefore extraneous to the analysis that applies to Robinson-Patman violations. We explain briefly. *Section 1* of the Sherman Act has been interpreted to make horizontal agreements (or conspiracies) to fix prices unlawful per se. See *Catalano, 446 U.S. at 647*. The Court in Catalano was concerned with the Court of Appeals decision holding that a horizontal agreement to fix or eliminate short-term trade credit does not necessarily contravene the antitrust laws. It was in reversing this holding of the Circuit Court that the Supreme Court characterized credit terms as an integral part of a price. Clearly, an agreement to fix or eliminate credit terms across the board [*17] has to be regarded as a conspiracy to fix prices, thus falling squarely within the traditional antitrust rule of per se illegality of price fixing embodied in the Sherman Act. It does not follow from this, however, that on a one on one relationship between a seller and a dealer a decision to deny credit must be considered as an instance of price discrimination. As noted above, the proper analysis in this context, taking into account the great number of factors that go into credit determinations, is to require sellers to prove the existence of legitimate business reasons underlying the differential treatment in credit. Once this

Case 1:07-cv-00556-JJF-LPS    Document 31-5    Filed 12/17/2007    Page 6 of 18

Page 5

1990 U.S. Dist. LEXIS 18739, *; 1990-1 Trade Cas. (CCH) P68,986

feat is accomplished, our inquiry into the facts, in the absence of extreme circumstances, must stop.

As for the Tenth Circuit's holding in Craig, and to the extent that it left open the possibility of the existence of a discrimination in credit of such a magnitude as to constitute a Section 2(a) violation, we observe that it is a position that we do not quarrel with. This fact notwithstanding, however, we are of the opinion that no factual scenario even remotely resembling such an extreme discriminatory conduct is present here. We have already discussed [*18] how Vestron's decision found ample justification in the record from the business point of view. Accordingly, we discard this contention without further discourse.

In essaying their final defense of their Section 2(a) claim, plaintiffs first lay out two facts upon which they hope to build an argument. First, they submit that in order to make out a price discrimination case they must establish the existence of competitors who were favored with credit while Metro was not. Then, they explain that they have no access to evidence that would prove this since all of this evidence is in the hands of Vestron. Hence, the argument goes, summary judgment would be improper at this nascent stage of the proceedings without affording Metro the benefit of the discovery that would reveal facts basic to their causes of action. Were we to accept this contention, however, we would in fact be opening the door for future plaintiffs to file totally unsupported claims and expect to uncover the basis for their complaint during the course of discovery. As noted above, the case law provides a mechanism that plaintiffs had available to establish their Section 2(a) claim which took into account the difficulty Metro [*19] believes it is confronted with: if they could have demonstrated an absence of legitimate business reasons in Vestron's decision to stop extending credit to them, then they would have been entitled to summary judgment in their favor without further inquiry into the relationship between Vestron and the rest of its distributors. Clearly, Metro has access to all evidence pertinent to its relationship with Vestron. Defendants' affirmative showing relative to the existence of a business justification for their denial of credit to Metro entitles them to a presumption of regularity in their dealings with the rest of their distributors and to summary judgment, as to the Section 2(a) claim, on their behalf.

B

Plaintiffs' second cause of action is contained in its entirety in paragraph 24 of their complaint. We quote it verbatim for two reasons: one, because of its brevity and, two, because we can find no better way of showing that, contrary to Metro's assertion, its second cause of action really alleges nothing more than the first.

Paragraph 24 of plaintiffs' complaint reads as follows:

By failing to extend credit to Metro, rebates and other concessions, which would otherwise be available [*20] to Metro, were denied to it but not to Metro's competitors. Due to Vestron's actions in making such concessions and rebates functionally unavailable to Metro, the price which Metro effectively paid to Vestron for these same commodities was higher than the price paid by Metro's competitors, thus placing Metro at a competitive disadvantage.

The next paragraph alleges, as in cause of action number 1, that such a conduct violates Section 2(a) of the Robinson-Patman Act. Plaintiffs' effort, in its motion in opposition to summary judgment, to differentiate one cause of action from the other appears to us to incur in the critical error of attempting to elicit liability from both the cause as well as the effects. That is to say, Metro asserts that Vestron's denial of credit to Metro gives rise to a cause of action under Section 2(a) and that the effects of such a denial also give rise to an independent right of action under the same section of the law. With this, of course, we cannot agree. Both causes of action being one and the same, with respect to cause of action number two defendants are also entitled to judgment as a matter of law.

C

In its third cause of action Metro alleges violations [*21] to Sections 2(d) and 2(e) of the Clayton Act, as amended by the Robinson-Patman Act.

Section 2(d) makes it unlawful for a seller engaged in interstate commerce to grant advertising or other sales or promotional allowances to one "customer" who resells the seller's "products or commodities" unless the allowances are "available on proportionally equal terms to all other customers competing in the distribution of such products or commodities." *F.T.C. v. Fred Meyer, Inc., 390 U.S. 341, 343 (1967)*. Section 2(e) prohibits a seller from discriminating "in favor of one purchaser . . . of a commodity bought for resale . . . by . . . furnishing . . . any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms." *F.T.C. v. Simplicity Pattern Co., 360 U.S. 55, 65 (1958)*.

Metro alleges that Vestron's treatment of "Metro's account as one not in good standing" constitutes a violation of these sections of the law since, in so doing, "Vestron made certain advertising credits, incentives, and rebates functionally unavailable [*22] to Metro, while at the same time making those credits available to Metro's competitors." [9] Vestron, in turn, contends that, in

the final analysis, Metro's allegation amounts to a claim that as a result of Vestron's credit decision Metro was unable to make sufficient purchases to qualify for the benefits in controversy. This being so, defendants urge us to dismiss said cause of action on the ground that Sections 2(d) and (e) do not apply to discriminatory practices in the extension of credit but to those occurring in connection with the resale of the product. In their opposition, plaintiffs iterate and reiterate that their claim is "not based on Vestron's failure to extend credit but rather, . . . on Vestron's failure to make [sales incentives] functionally available to Metro by treating Metro's account as 'one not in good standing.'" [10] With slight modifications, it is with defendants' reasoning that we agree.

9   See Par. 27 of Metro's Complaint.

10   See page 23 of Metro's Opposition.

Try as they may, plaintiffs [*23] cannot seriously dispute the fact that Vestron's treatment of Metro's account as one "not in good standing" and its decision to deny credit to them are so closely interrelated as to constitute one and the same action. In fact, the "not in good standing" treatment was the only direct result of Vestron's conclusion that Metro constituted a "serious credit risk" and that therefore credit could no longer continue to be extended to them. Perhaps it is easier to visualize our point if we consider the following: if Vestron decided to re-extend credit to Metro, Metro's account would cease to be one "not in good standing." Consequently, we must once again reject Metro's attempt to attribute different effects to each of the two actions. In our opinion, then, Metro's third cause of action is also based on Vestron's decision to stop extending credit to them. Discriminatory practices in the extension of credit being beyond the scope of either Section 2(d) or 2(e), *Bouldis v. U.S. Suzuki Motor Corp., 711 F.2d 1319 (6th Cir. 1983), Craig v. Sun Oil Co. of Pa., 515 F.2d 221 (10th Cir. 1975), L. & L. Oil Co. Inc. v. Murphy Oil Corp., 674 F.2d 1113, n.7 (5th Cir. 1982),* [*24] plaintiffs' cause of action number three must also be dismissed.

Our holding fully effectuates the legislative motives behind the enactment of §§ 2(d) and (e). Prior to the enactment of the Robinson-Patman amendments to the Clayton Act § 2 applied only to direct price discriminations and sellers were circumventing these prohibitions by offering special sales allowances and promotional services to their favored customers. See *Murphy Oil Corp., 674 F.2d at 1118.* Sections 2(d) and (e) were thus intended to prohibit price discriminations disguised in the form of promotional services provided to customers on a discriminatory basis. *Purdy Mobile Home, Inc. v. Champion Home Builders Co., 594 F.2d 1313 (9th Cir.*

*1979).* In this case it has not been disputed that Metro was still eligible to obtain all advertising credits, incentives and rebates available to the rest of Vestron's customers. Cf. *Bouldis, 711 F.2d at 1327.* Metro's objection is only that their obtention was difficulted by the fact that they no longer enjoyed credit in their business relationship with Vestron. But, decisions involving credit cannot be the basis for a claim [*25] under §§ 2(d) and (e) since the statute's clear language states that these sections apply not to the original sale of the product but to the distributor's resale, *Bouldis, 711 F.2d at 1328.* Consequently, as to the §§ 2(d) and (e) claims, too, defendants are entitled to judgment as a matter of law.

D

In their fourth cause of action, plaintiffs allege that Vestron, through its membership in the NVSMCA, unlawfully combined or conspired with other video manufacturers to discuss confidential information regarding the distributors' credit histories with the purpose of providing each manufacturer with "the same information so that they all acted accordingly." As a result of their conduct, Metro allegedly lost its good name and credit standing in the industry and also lost valuable distribution rights from other manufacturers. Such acts, the complaint alleges, constitute violations to *Section 1* of the Sherman Antitrust Act and Section 5 of the Federal Trade Commission Act ("FTCA").

Metro has since conceded that, as contended by defendants, Section 5 of the Federal Trade Commission Act does not provide a right of action to private litigants. See *Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 268 (1940).* [*26] Consequently, we dismiss the FTCA violation claim without further probe and concentrate our analysis on the alleged violation to the Sherman Antitrust Act.

*Section 1* of the Sherman Antitrust Act prohibits "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce." In *Standard Oil Company of New Jersey v. United States, 221 U.S. 1 (1911),* the Supreme Court explained that such open-ended language was only intended to forbid unreasonable restraints on trade. Certain restraints on trade, however, are considered to be so inherently damaging to competition that they have been held to be per se violations of *Section 1* of the Sherman Act. For the most part, Sherman Act violations are to be scrutinized through the application of the "Rule of Reason" test, which requires courts to determine "by the light of reason, guided by the principles of law and the duty to apply and enforce the public policy embodied in the statute" whether any particular act or contract constitutes a Sherman Act violation. *Standard Oil Company, 221 U.S. at 63-64.*

1990 U.S. Dist. LEXIS 18739, *; 1990-1 Trade Cas. (CCH) P68,986

Against this backdrop plaintiffs build the following argument. [*27] First, they recall that the Supreme Court has held that exchanges of price information among competitors, although not a per se violation, *United States v. Citizens & Southern National Bank, 422 U.S. 86, 113 (1975),* could nonetheless constitute a Sherman Act violation depending on the "structure of the industry" and "the nature of the information exchanged." *United States v. United States Gypsum Co., 438 U.S. 422, fn.16 (1977).* Then, they once again resort to the Court's statement in Catalano whereby it affirms that credit terms form an integral price of the overall price paid for a product. *Catalano, 446 U.S. at 645.* Finally, while accepting that in *Cement Manufacturers Protective Association v. United States, 268 U.S. 588 (1925)* the Supreme Court stated that an exchange of credit information among competitors was not an unlawful restraint on commerce when procured to prevent fraud, Metro contends that a dictum contained in footnote 22 in Gypsum (in which the Court stated that the holding of Cement merely "highlightened a narrow limitation on the application of the general rule that [a [*28] showing of] either purpose or effect [to restrain competition] will support [Sherman Act] liability") warrants a conclusion to the effect that exchanges of credit information among competitors may be illegal if the information exchanged goes beyond the narrow limitation of that needed to prevent fraud.

At least two assumptions are fundamentally wrong in plaintiffs' reasoning. We comment briefly only as to one of them, since once it is rejected Metro's argument collapses on the force of its own weight. Plaintiffs' blind reliance on the Supreme Court's statement in Catalano is once again wholly misplaced, and we refer the reader to our previous discussion explaining the reasons why. [11] Here, it suffices to say that under the federal antitrust laws decisions involving credit have always required and produced totally different analyses from those involving prices. This is why decisions regarding agreements pertaining to prices and exchanges of price information have consistently been held to violate the Sherman Act, see *American Column & Lumber Co. v. United States, 257 U.S. 377 (1921), United States v. American Linseed Oil Co., 262 U.S. 371 (1923),* [*29] *United States v. Container Corp., 393 U.S. 333 (1968),* while at the same time it has long been held that the exchange of information between competitors regarding the credit worthiness of customers does not violate any provision of the federal antitrust laws. *Cement Manufacturers Protective Association v. United States, 268 U.S. 588 (1925).* See also *Zoslaw v. MCA Dist. Corp., 693 F.2d 870, 886 (9th Cir. 1982),* cert. denied, *460 U.S. 1085 (1983), Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1048 (2d Cir. 1975),* cert. denied, *429 U.S. 885 (1976), Treasure Valley Potato Bargaining Association v. Ore-Ida*

*Foods, Inc., 497 F.2d 203, 209 (9th Cir. 1973),* cert. denied, *419 U.S. 999 (1974).* In Cement Manufacturers, the Supreme Court specifically stated that "distribution of information as to credit and responsibility of buyers undoubtedly prevents fraud and cuts down to some degree commercial transactions which would otherwise be induced by fraud," so it cannot be declared to be an unlawful restraint of trade "even [*30] though such information be gathered and disseminated by those who are engaged in the trade or business principally concerned." *268 U.S. at 604.* As long as the exchange of credit information is not accompanied by any agreements relating to the extension of credit, such as an agreement to deny credit to one or more of the competitors' customers, no violation of the antitrust laws has occurred. *Zoslaw, 693 F.2d at 886.* Decisions holding price agreements to be unlawful, on the other hand, generally do so on the ground that they result in the stabilization of prices and therefore have an anticompetitive effect. *United States v. Container Corp., 393 U.S. 333 (1968).*

> 11 Part A of this Opinion. We also note in passing that it is our opinion that the second flaw in plaintiffs' reasoning is that their interpretation of the Gypsum footnote is also out of context. We do not elaborate on this point, however, as it is not necessary to support our decision in this case.

[*31] Looking at the facts of this case we see that no Sherman Act violation is present here. The record shows that the NVSMCA purpose and dealings were concentrated on the exchange of the dealers' historical credit information and this presents no problems under the federal antitrust laws. In relation to Metro, the Morowitz affidavit only states how his understanding erroneous information regarding Metro's financial condition was discussed at NVSMCA's meetings. This fact may or may not have prejudiced Metro's commercial venture (a point over which we express no opinion), but it certainly does not constitute a violation of § 1 of the Sherman Antitrust Act. The Morowitz affidavit also states that the fact that such information may have been exchanged raises the strong inference that other information, particularly information concerning pricing, had been exchanged. See pp. 6-10 of Morowitz Aff.. Once again, that is a statement with which we cannot agree. The balance of his objection relates to defects in the association bylaws which do not amount to violations of the antitrust laws. Finally, in page 13 of its memorandum of law in support [*32] of its opposition to Vestron's motion for summary judgment, Metro alleges that "meetings and group discussions have occurred in which concerted action appears to have been agreed to." This statement, which constitutes mere speculation on their part, is clearly insufficient to defeat a properly submitted motion for summary judgment. *Brennan v. Hendrigan,*

Case 1:07-cv-00556-JJF-LPS    Document 31-5    Filed 12/17/2007    Page 9 of 18

Page 8

1990 U.S. Dist. LEXIS 18739, *; 1990-1 Trade Cas. (CCH) P68,986

*888 F.2d 189 (1st Cir. 1989)*. From the record before us we can only conclude that no information regarding prices was exchanged, and that no agreements concerning price fixing were ever reached. Accordingly, plaintiffs' fourth cause of action must also be dismissed.

### E

Defendants have moved to transfer this action to the District of Connecticut under *28 U.S.C. § 1404 (a)*. That section provides:

For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Thus, three are the considerations that we must entertain in order to answer Vestron's request for a transfer on forum non-conveniens grounds. In the instant case, all three argue in favor conferring their request. Our explanation follows.

The convenience of the parties and [*33] witnesses is clearly served by transferring this action to Connecticut. Vestron's executive offices are located in Stamford, Connecticut. As alleged in the complaint, Metro is incorporated in New York and has its main offices in Hasbrouck Heights, New Jersey, with only a branch office -- whose personnel is not involved in the events which are central to this litigation -- in Puerto Rico. We recall that this action revolves around Vestron's decision to stop extending credit to Metro, and those decisions are clearly taken at the top executive positions within the corporations. All documentary evidence located in the parties' main offices would thus have to be shuffled back and forth were the trial to be held in Puerto Rico, all this at a great inconvenience to both parties. What is more, plaintiff Arthur Morowitz himself, whose submissions up to this point have been instrumental for the consideration of this case, resides in the Northeastern coast of the United States. As for the witnesses from both parties, Vestron has named eight potential witnesses whose testimony they consider to be essential for their defense who reside in either the state of Connecticut, New Jersey or New York [*34] City. [12] Vestron has also named a number former or present Metro employees with whom Vestron's sales and credit personnel dealt with in connection with this matter whose testimony maybe necessary and who reside in the continental United States. [13] The interests of justice, we affirm without hesitation, would be ill served were we to require the parties to submit themselves to such a constant reshuffling of persons and documents in order to conduct this litigation.

12  See McGovern Aff., Par. 24.

13  See McGovern Aff., Par. 25 and Reuben Aff. Par. 6. The list of witnesses who live in Puerto Rico submitted by Metro, see Morowitz Aff., Par. 33, does not strike as a list of witnesses whose testimony might be particularly important for the establishment of their case (i.e., twelve of the sixteen are sales representatives who may testify as to the prejudicial effects of Vestron's termination and discriminatory practices).

The requirement that the transfer be ordered to a district or division where the [*35] action might have been brought, of course, relates to the existence of venue in that particular district for the action in controversy. In antitrust actions, venue is governed by Section 12 of the Clayton Act, *15 U.S.C. § 22*, which states:

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business

. . .

*Section 22* was enacted to enlarge the venue provisions of *15 U.S.C. § 15* so that parties injured by violations of the antitrust laws could more easily seek redress in the courts. Whether a corporation is an inhabitant, is found, or transacts sufficient business within a district to establish venue therein is considered a practical question devoid of technicalities. The Supreme Court has stated that the test of venue must be understood to be whether the corporation in fact and in the ordinary and usual sense engages in business of any substantial character in the state where venue is alleged to lie. *United States v. Scophony Corp., 333 U.S. 795, 807 (1948)*.

Whether or not venue properly lies in [*36] Puerto Rico is a question whose answer is of little consequence in our quest. Under the circumstances of this case, the reasons that would substantiate an affirmative determination in this respect would also argue in favor of the propriety of venue in the District of Connecticut (and in every other state where the defendants have also engaged in business operations of any substantial character). Clearly, Vestron carries on substantial business operations in Connecticut, the state where its main offices are located. It being far more convenient for the parties, witnesses, and the interest of justice, and venue also being proper in the District of Connecticut, defendants' motion for transfer finds full compliance with the governing statute, *28 U.S.C. § 1404 (a)*. This action will continue in the Constitution state.

*WHEREFORE,* in view of the foregoing, defendants' motion for summary judgment as to plaintiffs' first through fourth causes of action and for transfer of this action to the District of Connecticut is hereby

1990 U.S. Dist. LEXIS 18739, *; 1990-1 Trade Cas. (CCH) P68,986

*GRANTED.* The Clerk of the Court shall enter judgment *DISMISSING* plaintiffs' causes of action one through four with prejudice and it is hereby further *ORDERED* [*37] that the remaining five causes of action in the in-stant suit be *TRANSFERRED* to the District of Connecti-cut for their just consideration.

   *IT IS SO ORDERED.*

9

LEXSEE 2007 US DIST LEXIS 82118

**TRANS WORLD TECHNOLOGIES, INC., Plaintiff, v. RAYTHEON COMPANY
and LOCKHEED MARTIN CORPORATION, Defendants.**

**Civil No. 06-5012(RMB), [Docket No. 43 and 51]**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2007 U.S. Dist. LEXIS 82118*

**November 1, 2007, Decided
November 1, 2007, Filed**

**NOTICE:**   NOT FOR PUBLICATION

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, defense contractors, jointly moved to dismiss plaintiff software company's claims of misappropriation, promissory estoppel, and antitrust conspiracy under *§ 1* of the Sherman Act, *15 U.S.C.S. § 1.*

**OVERVIEW:** The company worked on the development of software for the U.S. Navy. The company was asked to begin sharing with fellow members of the design team certain of its trade secrets, ideas, and confidential proprietary information. The contractors entered into confidentiality agreements with the company. The company alleged that the contractors later used this information to the detriment of the company. The company alleged in detail how the contractors worked together to prevent the company to bid on work for the Navy. The court held that because conspiracies were often proven by circumstantial evidence, the complaint had sufficient facts (taken as true) to suggest that an illegal agreement was made between the contractors. The court next turned to the contractors' argument that the company had failed to plead an antitrust injury. While the company had clearly pled sufficient facts to show injury to itself, there was nothing in the complaint to plausibly support injury to the competition, other than conclusory allegations. For example, the complaint did not describe the marketplace, other than itself, or even suggest the presence of other actual competitors.

**OUTCOME:** The contractors' motion to dismiss was granted as to the Sherman Act antitrust conspiracy claim and denied in all other respects.

LexisNexis(R) Headnotes

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] A *Fed. R. Civ. P. 12(b)(6)* motion to dismiss for failure to state a claim upon which relief may be granted must be denied if the plaintiff's factual allegations are enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true, (even if doubtful in fact). Moreover, while a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. A district court must accept any and all reasonable inferences derived from those facts. Further, the court must view all allegations in the complaint in the light most favorable to the plaintiff.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN2] In deciding a motion to dismiss, a court should look to the face of the complaint and decide whether, taking all of the allegations of fact as true and construing them in a light most favorable to the nonmovant, plaintiff has alleged enough facts to state a claim for relief that is plausible on its face. Only the allegations in the complaint, matters of public record, orders, and exhibits attached to the complaint matter, are taken into consideration.

*Antitrust & Trade Law > Sherman Act > Coverage > General Overview*
[HN3] See *15 U.S.C.S. § 1.*


*Antitrust & Trade Law > Sherman Act > Claims*
[HN4] In order to state a claim under *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*, a party must allege: (1) concerted action by the defendants; (2) that produces anticompetitive effects within the relevant product and geographic markets; (3) that the concerted action is illegal; and (4) that the plaintiff is injured as a proximate result of the concerted action.


*Antitrust & Trade Law > Sherman Act > Claims*
[HN5] To prove the existence of a conspiracy, there must be a unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme. In a *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*, claim, the complaint must have enough factual matter (taken as true) to suggest that an agreement has been made. There must be enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.


*Antitrust & Trade Law > Sherman Act > Claims*
[HN6] A complaint brought pursuant to *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*, need not allege that the parties to an agreement have identical motives. As long as the complaint alleges that the alleged co-conspirators have a plausible reason to participate in the conspiracy, the complaint is sufficient. It is also sufficient if the complaint alleges that the defendant, regardless of its own motive, merely acquiesces in an agreement knowing that it would have anti-competitive effects.


*Antitrust & Trade Law > Sherman Act > Coverage > General Overview*
[HN7] The United States Supreme Court has held that notwithstanding the plain language of the statute, the Sherman Act's prohibition of "every" agreement in "restraint of trade" prohibits only agreements that unreasonably restrain trade.


*Antitrust & Trade Law > Sherman Act > Coverage > General Overview*
[HN8] An agreement that restrains or harms a competitor does not fall within the Sherman Act's prohibition. The unlawful agreement must harm competition. Thus, an allegation that a company is harmed does not automatically show injury to competition.


*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN9] A plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Under *Twombly*, a plaintiff must do more than make general, conclusory allegations.


*Antitrust & Trade Law > Sherman Act > Claims*
[HN10] Under *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*, restraints that produce insignificant, de minimis, or insubstantial restrictions of competition are not unlawful. A bare allegation will not suffice.


*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
[HN11] To request leave to amend a complaint, the plaintiff must submit a draft amended complaint to the court so that it can determine whether amendment would be futile. Indeed, a failure to submit a draft amended complaint is fatal to a request for leave to amend.


*Torts > Business Torts > Unfair Business Practices > Elements*
*Trade Secrets Law > Factors > Novelty*
*Trade Secrets Law > Misappropriation Actions > Elements > Confidentiality*
*Trade Secrets Law > Misappropriation Actions > Elements > Use*
[HN12] In order to state a claim for misappropriation, a plaintiff must allege that (1) the idea is novel; (2) it is made in confidence to the defendant; (3) it is adopted and made use of by the defendant in connection with his own activities.


*Contracts Law > Consideration > Promissory Estoppel*
[HN13] In order to state a claim for promissory estoppel, a plaintiff must allege: (1) a clear and definite promise by the promisor; (2) the promise must be made with the expectation that the promisee will rely thereon; (3) the promisee must in fact reasonably rely on the promise; and (4) detriment of a definite and substantial nature must be incurred in reliance on the promise.

**COUNSEL:** [*1] Chad A. Rutkowski, Esquire, Woodcock Washburn, LLP, Philadelphia, Pennsylvania, Attorney for Plaintiff.

John B. Kearney, Esquire, Rosemary Bates Walsh, Esquire, Ballard, Spahr, Andrews & Ingersoll, LLP, Voorhees, New Jersey, Attorneys for Defendant Raytheon Company.

William J. Heller, Esquire, Scott S. Christie, Esquire, McCarter & English, LLP, Newark, New Jersey, Attorneys for Defendant Lockheed Martin Corporation.

**JUDGES:** Renee Marie Bumb, United States District Judge.

**OPINION BY:** Renee Marie Bumb

**OPINION**

**BUMB,** United States District Judge:

*INTRODUCTION*

This matter comes before the Court upon the Defendants Raytheon Company's ("Raytheon") and Lockheed Martin Corporation's ("Lockheed") (collectively the "Defendants") joint motion to dismiss the following Counts of the Second Amended Complaint: Count XII (Misappropriation of Idea); Count XIV (Misappropriation of Confidential and Proprietary Information); Count XV (Promissory Estoppel); and Count XVI (Sherman Act, § 1). Plaintiff Transworld Technologies, Inc. ("TWT") has opposed the motion. For the reasons set forth below, the Defendants' motion to dismiss will be granted in part and denied in part.

*FACTS* [1]

> 1  Because this is a Motion to Dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, [*2] the facts as pled in TWT's Second Amended Complaint are taken as true. *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)*. For ease, the Second Amended Complaint is referred to as the Complaint.

Plaintiff Transworld Technologies, Inc. ("TWT") is a small, high-technology company with expertise and experience in designing and developing sophisticated software, primarily for defense and naval engineering applications. Over the past fifteen years, TWT has been predominantly a United States Navy defense contractor. TWT developed a damage control automation system designed primarily for use on naval vessels. TWT alleges that its unique approach to damage control results in a reduction of the magnitude of secondary damage caused by fire, flooding, stability problems, hull stress, nuclear warfare, biological warfare, and chemical warfare. Compl. at PP 2, 12-16.

The U.S. Navy is developing a major program called the DDG-1000. *Id.* at PP 3, 18. The DDG-1000 program is aimed at developing new and revolutionary military ships. *Id.* at P 1. It is anticipated that the new technologies developed for and implemented during the DDG-1000 program will be used on a range of future ship classes. *Id.* at PP 17-20.

Part [*3] of the new technology being developed for the DDG-1000 program is Damage Decision Assessment ("Damage Assessment" or "DA") software. This software is intended to assist ship personnel in dealing with fires, explosions, flood conditions, and other hazards facing naval vessels. *Id.* at PP 3-4, 22.

TWT worked on the development of the Damage Assessment component of the DDG-1000 program from October 1998 to September 2005, as a subcontractor, first, to Defendant Raytheon (in the first two phases of the project, "Phases I and II") and then, to Northrup Grumman Ship systems ("Northrup Grumman") (for the third phase of the project, "Phase III"). *Id.* at P 20.

Towards the end of Phase III, TWT was asked to begin sharing with fellow members of the DDG-1000 design team certain of its trade secrets, ideas, and confidential proprietary information. *Id.* at PP 31-34. TWT agreed, subject to certain express acknowledgments that the sharing of this information was beyond the scope of its contract for Phase III, that all rights in the information remained with TWT, that TWT controlled use of the information, and that access to the information by others would be restricted. *Id.* TWT was not paid by Northrup [*4] Grumman for this preliminary information-sharing. *Id.* at P 34. TWT's information was placed on a secure computer system known as the Vault, or Team Center, designed specifically so that contractors could share sensitive proprietary information with each other without sacrificing the confidential nature of their information. *Id.* at PP 27-30.

In the spring and summer of 2005, the Navy announced that it was reorganizing the DDG-1000 program for Phase IV and that the prime contractor to whom TWT had been reporting on Phase III, Northrup Grumman, was being replaced by defendant Raytheon Company ("Raytheon"). *Id.* at PP 36-37.

The Navy directed that the Damage Assessment component of the project be subject to open and competitive bidding. *Id.* at PP 48, 57, 178. Raytheon allegedly represented to TWT that the Damage Assessment component would be, in fact, subject to fair and open competition and that Lockheed would handle the competition as its procurement agent. *Id.* at P 39.

Defendants Raytheon and Lockheed launched negotiations with TWT regarding TWT's participation in

Phase IV and held several meetings over several months discussing TWT's ideas for the Damage Assessment. *Id.* at PP 39-47, 51-52. [*5] Both Defendants Raytheon and Lockheed entered into confidentiality agreements with TWT covering this time period, in which both expressly agreed to honor the proprietary nature of the information being imparted by TWT and to refrain from using such information for their own purposes. *Id.* at PP 23, 35, 42-43. As a result of these promises, TWT shared with Defendants Raytheon and Lockheed many of its valuable trade secrets, ideas, and other confidential proprietary information. *Id.* at PP 40-43, 45-46.

In reliance on representations, Plaintiff TWT invested large amounts of time and money so that it could meet its obligations if it was awarded the Phase IV work, "including the hiring of additional personnel, the acquisition/lease and fitting out of new/expanded work space and facilities, and the purchase of mandated equipment and software." TWT alleges it incurred hundreds of thousands of dollars in costs. *Id.* at P 53.

TWT alleges that, contrary to the Defendants' representations to TWT, there never was any "fair and open competition" for Phase IV Damage Assessment work. *Id.* at P 55. Instead, Defendants Raytheon and Lockheed conspired to take TWT's valuable information for themselves. They [*6] then used this information to get work from the Navy that they otherwise would not have been able to get because they had lacked the expertise TWT had.

Specifically, TWT alleges that even though the Navy directed Raytheon to make the DA component of the contract subject to open and competitive bidding, Raytheon, "[s]o as to lessen the risk of a bid protest from Lockheed," awarded the DA component (and another unrelated portion, the ECS) to Lockheed, "informing Lockheed of the Navy's directive that the work was to be competitively bid." *Id.* at P 180. Defendant Lockheed, in turn, "[s]o as to lessen the risk of scrutiny from the Navy ... bid the Phase IV Engineering Control System ("ECS") portion [only]." *Id.* at P 181. Both Defendants, having allegedly and unlawfully misappropriated TWT's trade secrets, confidential and proprietary information, were able to represent their expertise in DA software to the Navy and justify Lockheed's retention of the DA software component without competitive bidding. *Id.* at PP 186-187.

TWT alleges that the Defendants' conduct has resulted in them not being able to compete for the Damage Assessment. *Id.* at PP 69, 71, 199. TWT's inability to compete on the DDG-1000 [*7] project has essentially put it out of business. *Id.* at P 199. TWT further alleges that it will be at a severe disadvantage in competing in the future because the Defendants have "falsely bol-

ster[ed] their reputation for technical competence and proficiency through use of TWT's trade secrets..." *Id.* at P 196. Moreover, TWT alleges that the Defendants' conduct has allowed them to exclude all competitors from competing for the Damage Assessment work because they have convinced the Navy that they possess the proper technical expertise for such work when, in fact, they only possess such expertise because they stole it from TWT. *Id.* at PP 194-197.

### APPLICABLE STANDARD

[HN1] A *Rule 12(b)(6)* motion to dismiss for failure to state a claim upon which relief may be granted must be denied if the plaintiff's factual allegations are "enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true, (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929, (2007)*(internal citations omitted). Moreover,

> [w]hile a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, ... a plaintiff's [*8] obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Id. at 1965* (internal citations omitted).

A district court must accept any and all reasonable inferences derived from those facts. *Unger v. Nat'l Residents Matching Program, 928 F.2d 1392, 1394-95 (3d Cir. 1991); Glenside West Corp. v. Exxon Co., U.S.A., 761 F. Supp. 1100, 1107 (D.N.J. 1991); Gutman v. Howard Sav. Bank, 748 F. Supp. 254, 260 (D.N.J. 1990).* Further, the court must view all allegations in the complaint in the light most favorable to the plaintiff. *See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).*

Therefore, [HN2] in deciding a motion to dismiss, a court should look to the face of the complaint and decide whether, taking all of the allegations of fact as true and construing them in a light most favorable to the non-movant, plaintiff has alleged "enough facts to state a claim for relief that is plausible on its face." *Twombly, 127 S. Ct. at 1974.* Only the allegations in the complaint, [*9] matters of public record, orders, and exhibits attached to the complaint matter, are taken into consideration. *Chester County Intermediate Unit v. Pennsylvania Blue Shield, 896 F.2d 808, 812 (3d Cir. 1990).*

### DISCUSSION

### A. *Count XVI*

Defendants have moved to dismiss Count XVI (the Sherman Act antitrust conspiracy count) on the grounds that TWT fails to state a claim. Specifically, Defendants contend that: (1) TWT's conspiracy theory makes no economic sense; (2) TWT fails to adequately allege a conspiracy; and (3) TWT has no antitrust standing because it fails to allege harm to competition.

Section 1 of the Sherman Act, *15 U.S.C. § 1*, provides:

> [HN3] [e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states...is declared to be illegal.

*15 U.S.C. § 1*. The parties are in agreement that [HN4] in order to state a claim under *section 1*, a party must allege: (1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action. *Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997)*.

The [*10] Court turns first to the Defendants' contention that TWT has failed to plead a conspiracy sufficiently. [HN5] To prove the existence of a conspiracy, there must be a "'unity of purpose or a common design and understanding or a meeting of minds'" or "'a conscious commitment to a common scheme.'" *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984)* (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 111 (3d Cir. 1980))*. In a section 1 claim, the complaint must have "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly, 127 S. Ct. at 1965*. There must be enough facts "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*

[HN6] The complaint need not allege that the parties to an agreement had identical motives. *Spectators' Community Network v. Colonial Country Club, 253 F.3d 215, 220 (5th Cir. 2001)* ("Antitrust law has never required identical motives among conspirators and even reluctant participants have been held liable for conspiracy"). As long as the complaint alleges that the alleged co-conspirators had a plausible reason to participate in the conspiracy, the complaint is sufficient. *Rochez Bros. v. North Am. Salt Co., F. Supp. 2d, 1994 U.S. Dist. LEXIS 19421 (W.D.Pa. 1994)*. [*11] It is also sufficient if the complaint alleges that the defendant, regardless of its own motive, merely acquiesced in an agreement knowing that it would have anti-competitive effects. *United States v. Paramount Pictures, 334 U.S. 131, 161, 68 S. Ct. 915, 92 L. Ed. 1260 (1948); Virginia Vermiculite, Ltd. V. W. R. Grace & Co., 156 F.3d 535, 541 (4th Cir. 1998)*.

The Court disagrees with the Defendants' argument that the Complaint, with all reasonable inferences drawn in favor of TWT, fails to adequately allege that Raytheon and Lockheed conspired with each other. TWT alleges in detail how Lockheed and Raytheon worked together to prevent TWT to bid on the Phase IV work. In paragraphs 39 and 60, for example, TWT alleges various facts to support its allegation that Raytheon and Lockheed conspired to foreclose TWT from bidding on the Damage Assessment component of the Phase IV project. At paragraph 39 of the Complaint, TWT alleges that "Raytheon assured TWT that it would closely monitor Lockheed [Raytheon's procurement agent] to assure fair and open competition." Compl. at P 39. TWT alleges that it provided proprietary, confidential and trade secret materials [*12] to both Raytheon and Lockheed, both of which assured TWT that the Damage Assessment component was being competitively bid. Despite these assurances, TWT alleges, Raytheon awarded the Damage Assessment, as well as the ECS, components of the contract to Lockheed without subjecting them to competitive bidding. Defendants acted together "in furtherance of their plan to restrain competition and increase their profits." *Id.* at P 48. As further part of their plan to restrain competition, TWT alleges that the Defendants, motivated to avoid bid protests, engaged in a "joint and cooperative effort to misuse TWT confidential, proprietary and trade secret information." *Id.* at P 68. The Defendants allegedly used this information to their financial benefit, and the detriment of TWT.

Because conspiracies are often proven by circumstantial evidence, the Complaint has sufficient facts (taken as true) to suggest that an illegal agreement was made between Raytheon and Lockheed. There are clearly enough facts to raise a reasonable expectation that discovery will reveal an illegal agreement. Accordingly, TWT sufficiently alleges a conspiracy. *Cf. Twombly, 127 S. Ct. at 1971*.

Defendants also argue that the [*13] conspiracy TWT alleges makes no economic sense and should be dismissed under the rationale of *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. In *Matsushita*, the Court found that economic plausibility was a factor to consider in the summary judgment context, particularly in light of the high cost of litigation. *Id.* at 596 ("the absence of any plausible motive to engage in the conduct

Case 1:07-cv-00556-JJF-LPS    Document 31-5    Filed 12/17/2007    Page 17 of 18

Page 6
2007 U.S. Dist. LEXIS 82118, *

charged is highly relevant to whether a 'genuine issue for trial' exists"). This case, however, is not at the summary judgment stage. Moreover, even if this Court were to follow the few courts that have applied the *Matsushita* reasoning at the motion to dismiss stage, the Complaint alleges sufficient facts to suggest that the conspiracy makes economic sense, particularly in the long-run. *See* Compl. at PP 179, 180, 182, 184, 196.

The Court next turns to Defendants' argument that TWT has failed to plead an antitrust injury, to wit, concerted action that produced anti-competitive effects within the relevant market. [HN7] The Supreme Court has held that notwithstanding the plain language of the statute, the Sherman Act's prohibition of "every" agreement in "restraint of trade" prohibits [*14] only agreements that *unreasonably* restrain trade. *Standard Oil Co. Of New Jersey v. United States, 221 U.S. 1, 59-62, 31 S. Ct. 502, 55 L. Ed. 619 (1911).* [HN8] An agreement that restrains or harms a competitor does not fall within the Sherman Act's prohibition. The unlawful agreement must harm competition. *Spectrum Sports v. McQuillan, 506 U.S. 447, 458, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993); Atlantic Richfield Co. V. USA Petroleum Co., 495 U.S. 328, 338, 110 S. Ct. 1884, 109 L. Ed. 2d 333 (1990).* Thus, an allegation that a company was harmed "does not automatically show injury to competition." *Nynex Corp. V. Discon, Inc., 525 U.S. 128, 139, 119 S. Ct. 493, 142 L. Ed. 2d 510 (1998); see also Indeck Energy Service v. Consumers Energy Co., 250 F.3d 972, 977 (6th Cir. 2001)* (district court properly dismissed claim where alleged harm suffered by plaintiffs "was in the company's capacity as a competitor in the marketplace, not as a defender of marketplace confusion"); *McGlinchy v. Shell Chemical Co., 845 F.2d 802, 812 (9th Cir. 1988)* ("elimination of a single competitor, without more, does not prove anticompetitive effect").

TWT argues that it does allege injury to competition at paragraph 188 of its Second Amended Complaint. Specifically, TWT's Second Amended Complaint alleges that the Defendants' conduct has had the "anticompetitive [*15] effects of excluding competition, artificially increasing prices, decreasing the quality of products and/or reducing innovation in the relevant markets." Compl. at P 188. These allegations, however, are really nothing more than the ill-fated "labels and conclusions" buried by the Supreme Court in *Twombly*. *Twombly, 127 S. Ct. at 1964-65* [HN9] ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do")(internal citations omitted). Under *Twombly*, a plaintiff must do more than make general, conclusory allegations.

While TWT has clearly pled sufficient facts to show injury to itself, there is nothing in the Complaint to plau-

sibly support injury to the competition, other than conclusory allegations. For example, the Complaint does not describe the marketplace, other than itself, or even suggest the presence of other actual competitors. Indeed, TWT characterizes itself as "unique." *See* Compl. PPs 14-15. Nor does the Complaint sufficiently allege that the restraint has had or is likely to have a substantial anticompetitive effect. This failure is fatal [*16] to the Complaint because [HN10] restraints that produce insignificant, *de minimis,* or insubstantial restrictions of competition are not unlawful. *United States v. Topco Associates, 405 U.S. 596, 606, 92 S. Ct. 1126, 31 L. Ed. 2d 515 (1972); Tunis Brothers Co. V. Ford Motor Co., 952 F.2d 715, 728 (3d Cir. 1991).* There simply are not enough facts to *plausibly* support injury to competition. A bare allegation will not suffice. Otherwise, if alleging injury to a competitor were enough to infer or imply injury to competition, then pleading a section 1 violation "would be a sure thing." *Cf. Twombly, 127 S. Ct. at 1971* ("if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing").

In so holding, this Court is not applying a "heightened" pleading standard under *Federal rule of Civil Procedure 9,* as Defendants urge. Rather, this Court finds that because TWT has only conclusorily alleged injury to competition, it has failed to state a claim for relief that is plausible on its face.

In addition, the Court will not grant Plaintiff's informal request to amend the Complaint because Plaintiff has failed [*17] to properly request leave to amend the Complaint:

> [HN11] to request leave to amend a complaint, the plaintiff must submit a draft amended complaint to the court so that it can determine whether amendment would be futile. Indeed, we have held that a failure to submit a draft amended complaint is fatal to a request for leave to amend.

*Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007); see also Ranke v. Sanofi-Synthelabo Inc., 436 F.3d 197, 206 (3d Cir. 2006)* (finding that court did not abuse its discretion in not granting request for leave to amend presented as part of opposition brief because such leave was not properly requested). This Court will, however, consider a properly filed motion. [2]

2    Pursuant to *Local Rule 7.1(f)*, Plaintiff must attach a copy of the proposed amended pleading to its motion.

For the above reasons, Count XVI of the Second Complaint is dismissed.

**B. *Count XII***

Defendants Raytheon and Lockheed argue that Plaintiff TWT has failed to allege novelty, an essential element of a claim for misappropriation.[HN12] In order to state a claim for misappropriation, a plaintiff must allege that (1) the idea was novel; (2) it was made in confidence to the  [*18] defendant; (3) it was adopted and made use of by the defendant in connection with his own activities. *Baer v. Chase, 392 F.3d 609, 627 (3d Cir. 2004)* (citing *Flemming v. Ronson Corp., 107 N.J. Super, 311, 258 A.2d 153 (Law Div. 1969)*.

The Court finds that TWT has pled each of these elements. The fact that the Complaint does not employ the term "novel" is not fatal to the Count. TWT clearly alleges that its approach to damage control is "unique." Compl. at PP 14-15. TWT further sets forth in the Complaint that it has developed "'unique' and proprietary methods and systems for controlling...shipboard damage." *Id.* at P 5.

The complaint also alleges that "TWT agreed to communicate these ideas *in confidence* to defendants Raytheon and Lockheed with an expectation that Raytheon and/or Lockheed would compensate TWT in the event they found the ideas useful and wished to actually used them." *Id.* at P 150 (emphasis added).

Finally, TWT's Complaint alleges in detail that TWT made certain of its ideas available to fellow participants in the DDG-1000 program only with the assurance that use of the information would be restricted. *Id.* at PP 27-34.

Accordingly, TWT has sufficiently pled a claim of misappropriation of  [*19] idea. Defendants' motion is denied as to this claim.

**C. *COUNT XIV***

Defendants' motion to dismiss Count XIV - Misappropriation of Confidential and Proprietary Information - is also denied. Defendants argue that TWT has failed to plead the existence of a confidential relationship between it and Defendant Raytheon and/or Defendant Lockheed. Although a confidential relationship is not presumed in the business context, TWT has clearly pled and detailed such relationship. TWT alleges that it entered into a Pro-

prietary Information Nondisclosure Agreement with Defendant Raytheon, *id.* at P 23, and with Defendant Lockheed. *Id.* at PP 42, 45; *see supra.* Accordingly, Defendants' motion as to this claim is denied.

**D. *COUNT XV***

Defendants Raytheon and Lockheed also argue that TWT has failed to state a claim for promissory estoppel. The Court disagrees.

[HN13] In order to state a claim for promissory estoppel, the plaintiff must allege:

> (1) a clear and definite promise by the promisor;
>
> (2) the promise must be made with the expectation that the promisee will rely thereon;
>
> (3) the promisee must in fact reasonably rely on the promise; and
>
> (4) detriment of a definite and substantial nature must be incurred in reliance  [*20] on the promise.

*Great Am. Ins. Cos. v. Subranni (In re Tri-State Armored Servs.), 366 B.R. 326, 2007 U.S. Dist. LEXIS 29794 at *41 (D.N.J. April 23, 2007)*.

The Complaint clearly alleges that the Defendants promised and reassured TWT that there would be open and competitive bidding of the Damage Assessment component of the contract. In reliance on their promises, which TWT alleges were false, TWT alleges that it invested large amounts of time and money to support its anticipated work on the Phase IV portion of the project. Accordingly, Defendants' motion is denied as to this claim.

**CONCLUSION**

For the above reasons, Defendants Raytheon's and Lockheed's motion to dismiss is granted as to Count XVI and denied as to Counts XII, XIV, and XV. An accompanying Order shall issue.

Dated: *November 1, 2007*

s/ Renee Marie Bumb

Renee Marie Bumb

United States District Judge

10

LEXSEE 2007 US DIST LEXIS 87941



Analysis
As of: Dec 13, 2007

**JOANN TREDENNICK, Plaintiff, v. Thomas BONE, MICHAEL J. MARTIN, TIM
ZUBER, ADAM CUPERSMITH, KEN PICCIANO, KIM WICK and DOUG VIDA,
trading and doing business as KMPG LLP; and EMANUEL B. HUDOCK, Defen-
dants.**

**Civil Action No. 07-0735**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA**

*2007 U.S. Dist. LEXIS 87941*

**November 29, 2007, Decided
November 29, 2007, Filed**

**PRIOR HISTORY:** *Tredennick v. Bone, 2007 U.S.
Dist. LEXIS 87940 (W.D. Pa., Nov. 29, 2007)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, the majority
shareholder of a corporation, filed suit against defen-
dants, the corporation's tax manager and seven members
of an outside accounting firm, alleging breach of con-
tract, negligence, fraud, and negligent misrepresentation
claims arising from tax advice provided by the members
in connection with the corporation's sale. Defendants
filed motions to dismiss the complaint pursuant to *Fed.
R. Civ. P. 12(b)(6).*

**OVERVIEW:** The corporation hired the firm to provide
tax advice and recommendations relating to its sale. The
shareholder contended that defendants failed to advise
her of the adverse tax consequences arising from the
members' recommendations and that she was harmed
because she received a lower price for her stock and her
tax liability was increased. The court found that her
breach of contract claim failed because she was not a
party to the contract between the corporation and the
firm, she was not an intended beneficiary of the contract,
and the contract specifically stated that no third party
could rely on any advice or recommendations made by
the members or the firm. The shareholder's professional
negligence claim failed because she was not in privity

with the members and they did not owe any duty of care
to her. The shareholder failed to meet *Fed. R. Civ. P.
9(b)* heightened pleading requirements with regard to her
fraud claims. She did not allege facts showing a depar-
ture from reasonable accounting practices or identify
which defendants provided allegedly inaccurate or in-
complete information. Her negligent misrepresentation
claim did not rise above the level of speculation.

**OUTCOME:** The court granted defendants' dismissal
motions. It denied, as moot, the shareholder's motion for
leave to file certificates of merit as required by Pa. R.
Civ. P. 1042.3. Supplemental dismissal motions filed by
defendants were also denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Motion Prac-
tice > Content & Form*
*Civil Procedure > Summary Judgment > General Over-
view*
*Evidence > Judicial Notice > General Overview*
[HN1] To survive a motion to dismiss pursuant to *Fed.
R. Civ. P. 12(b)(6)*, a complaint need not contain detailed
factual allegations. However, the grounds for entitlement
to relief require more than labels and conclusions, and a

2007 U.S. Dist. LEXIS 87941, *

formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact). To evaluate a motion to dismiss, a court may consider the allegations contained in the complaint, exhibits attached to or incorporated by reference into the complaint, matters of public record, and records of which the court may take judicial notice. Any matters incorporated by reference or integral to the claim also may properly be regarded by the court without converting the motion to dismiss to one for summary judgment. Accordingly, on a motion to dismiss, the court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document because otherwise a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relies.

*Contracts Law > Third Parties > Beneficiaries > Types > Intended Beneficiaries*
[HN2] In considering who may be considered a third party beneficiary of the performance of a contract, unless otherwise agreed to between a promisor and a promisee, a beneficiary of a promise is an intended beneficiary if the recognition of a right to performance in the beneficiary is appropriate to effectuate the intentions of the parties and either: (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. The Supreme Court of Pennsylvania has recognized that a party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself. Several courts have recognized that plaintiffs cannot be third party beneficiaries where a contract specifically states that it is not intended to create third party beneficiaries at all.

*Contracts Law > Third Parties > Beneficiaries > Defenses*
*Contracts Law > Third Parties > Beneficiaries > Types > Intended Beneficiaries*
[HN3] Where the parties to a contract explicitly provide that no third parties can rely on the tax advice provided pursuant to the contract, a plaintiff cannot successfully claim to be a third party beneficiary to that contract.

*Torts > Malpractice & Professional Liability > General Overview*

[HN4] In Pennsylvania, an action for professional negligence cannot be maintained unless there is privity of contract between the parties. Further, the Supreme Court of Pennsylvania has made clear that a specific undertaking to perform a specific service for a plaintiff is required to maintain a malpractice action based on negligence.

*Torts > Malpractice & Professional Liability > General Overview*
[HN5] Where a plaintiff fails to establish that the defendants engaged in any specific undertaking to perform any specific service for her, as required to maintain a claim for professional negligence in Pennsylvania, no exception to the privity requirement is warranted.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > Elements*
[HN6] A pleading setting forth fraud as the basis of recovery of damages must, with particularity, allege all the essential elements of actionable fraud. *Fed. R. Civ. P. 9(b)*. In order to satisfy the pleading requirements of R. 9(b), a party must, at a minimum, state the time, place and content of the false misrepresentation, the fact misrepresented, and what was obtained or given up as a consequence of the fraud. Even where a plaintiff's allegations of fraud are based on information and belief, supporting facts on which this belief is founded must be set forth in the complaint. In the context of claims against accountants, where allegations of fraud fail to disclose the manner in which a defendant knowingly departed from reasonable accounting practices, R. 9(b) is not satisfied. Also, where a case involves multiple defendants, the complaint should inform each defendant of the nature of his alleged participation in the fraud. A complaint that "lumps" together numerous defendants does not provide sufficient notice of which defendants allegedly made the misrepresentations.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > Elements*
[HN7] Where a plaintiff does not identify any accounting principle or auditing standard which was violated, and the plaintiff simply states that financial statements were inaccurate or incomplete and that the defendants collectively knew this, this does not satisfy the requirements of *Fed. R. Civ. P. 9(b)*.

2007 U.S. Dist. LEXIS 87941, *

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Judicial Officers > Judges > Discretion*
[HN8] A court may sua sponte dismiss a count against a defendant that did not file a *Fed. R. Civ. P. 12(b)(6)* motion to dismiss where another defendant's motion has raised defects that apply equally to all claims.

*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > Elements*
[HN9] Privity is not required to state a claim for negligent misrepresentation.

*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > Elements*
[HN10] A claim for negligent misrepresentation requires a plaintiff to prove: 1) a misrepresentation of material fact; 2) made under circumstances in which the misrepresenter ought to have known its falsity; 3) with the intent to induce another to act on it; and 4) which results in injury to a party acting in justifiable reliance on the misrepresentation. Moreover, like any action in negligence, the plaintiff must prove that the defendants owe her a duty of care.

*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > Elements*
[HN11] The Supreme Court of Pennsylvania has officially adopted the *Restatement (Second) of Torts § 552* (1977), which sets forth the elements of a cause of action for negligent misrepresentation. It provides, in § 522(1), that one who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. Section 522(2) provides that except as stated in *§ 552(3)*, the liability stated in *§ 552(1)* is limited to loss suffered: (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply it. The Pennsylvania Supreme Court has adopted *§ 552* as the law in Pennsylvania in cases where information is negligently supplied by one in the business of supplying information and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information.

*Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement*
*Contracts Law > Third Parties > Beneficiaries > Types > Intended Beneficiaries*
*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > Elements*
[HN12] Where an operative contract specifically excludes reliance by any third party, a third party plaintiff cannot establish that it is foreseeable that she would use or rely upon information promulgated pursuant to the contract. Nor can such a plaintiff establish under the *Restatement (Second) of Torts § 552* (1977) that she is part of any limited group of persons for whose benefit and guidance the information was intended to be supplied, for purposes of establishing a negligent misrepresentation claim.

**COUNSEL:** [*1] For JOANN TREDENNICK, Plaintiff: Andrew L. Noble, Ronald L. Hicks, Jr., LEAD ATTORNEYS, Meyer, Unkovic & Scott, Pittsburgh, PA.

For THOMAS BONE, MICHAEL J. MARTIN, TIM ZUBER, ADAM CUPERSMITH, KEN PICCIANO, KIM WICK, DOUG VIDA, trading and doing business as KPMG LLP., Defendants: John E. Caruso, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA.

For EMANUEL B. HUDOCK, Defendant: Deborah A. Little, Buchanan Ingersoll, Pittsburgh, PA.

**JUDGES:** Gary L. Lancaster, District Judge.

**OPINION BY:** Gary L. Lancaster

**OPINION**

MEMORANDUM ORDER

    Gary L. Lancaster,

    District Judge.

    November 29, 2007

    This is an action in professional malpractice pled as breach of contract, negligence, fraud and negligent misrepresentation. Plaintiff, JoAnn Tredennick, alleges that defendants, Thomas Bone, Michael Martin, Tim Zuber, Adam Cupersmith, Ken Picciano, Kim Wick and Doug Vida, trading and doing business as KPMG LLP, ("KPMG defendants") and defendant, Emanuel B. Hudock, ("defendant Hudock") failed to disclose certain tax information to her resulting in significant tax liability and other losses. Plaintiff seeks monetary relief, including punitive damages.

2007 U.S. Dist. LEXIS 87941, *

Defendants have filed motions to dismiss pursuant to *Fed.R.Civ.P. 12(b)(6)* on various grounds. [*2] Defendants have also filed supplemental motions to dismiss for failure to file a certificate of merit pursuant to *Pa.R.Civ.P. 1042.3*. In the alternative, the KPMG defendants argue that if the amended complaint survives dismissal, the court should compel the parties to arbitrate these claims. For the reasons set forth below, the amended complaint will be dismissed in its entirety.

## I. BACKGROUND

Set forth below are the facts viewed in the light most favorable to plaintiff.

This case arises out of certain tax recommendations relating to the sale of Resco Products, Inc. ("Resco"). Plaintiff, as the majority shareholder, controlled approximately 92% of Resco's capital stock. Plaintiff also served as the chair of Resco's Board of Directors and was a member of Resco's Audit Committee. Prior to the sale of the company, Resco entered into a contract with KPMG for tax advice and recommendations relating to the sale. KPMG is in the business of providing professional accounting services, including tax advice and auditing. The KPMG defendants were the specific representatives of KPMG who performed services and provided tax advice to Resco. Defendant Hudock was employed by Resco and served as its Corporate [*3] Tax Manager.

In early 2005, defendants prepared a confidential offering memorandum which Resco could distribute to potential buyers. In this memorandum, certain tax deductions relating to the sale of Resco's stock were estimated to be worth approximately $ 20 million. Also, at or about the same time, defendants advised Resco to pay certain liabilities on or after March 16, 2005. By paying these liabilities on or after March 16, 2005, Resco's shareholders could not deduct these payments; rather, the buyer of Resco could deduct these payments and realize a tax benefit if the purchase was completed in 2005. Resco was acquired in September of 2005 and the tax benefits of these payments accrued to the buyer of Resco, rather than to plaintiff and the remaining shareholders of Resco. At the time of the closing of the sale of the company and based on the advice of defendants, Resco made additional payments of accrued bonuses and deferred compensation. These payments were also deductible by the buyer and not the shareholders of Resco. Plaintiff also contends that information in the confidential memorandum was inaccurate and/or incomplete because it did not include additional deductions available [*4] to a buyer of Resco. As a result, plaintiff contends that she received a lesser price for her stock.

According to plaintiff, defendants failed to advise her of the adverse tax consequences to shareholders associated with the above referenced payments Resco made in 2005 and 2006. Due to the timing of the above referenced payments and the accrual of the tax benefits to the buyer of Resco rather than to her as a shareholder, plaintiff contends that she incurred over $ 900,000 in state and federal tax liability.

## II. STANDARD OF REVIEW

[HN1] To survive a motion to dismiss pursuant to *Fed.R.Civ.P. 12(b)(6)*, a complaint need not contain detailed factual allegations. However, as the Supreme Court recently stated, the grounds for entitlement to relief "require [] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly, U.S. , 127 S.Ct. 1955, 1964-1965, 167 L. Ed. 2d 929 (2007)* (internal quotations and citations omitted). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id. at 1965* [*5] (citations omitted); see also, *Victaulic Co. v. Tieman, 499 F.3d 227, 234 (3d Cir. 2007)*.

To evaluate a motion to dismiss, the court may consider the allegations contained in the complaint, exhibits attached to or incorporated by reference into the complaint, matters of public record and records of which the court may take judicial notice. See *Tellabs, Inc. v. Makor Issues & Rts., Ltd., U.S. , 127 S.Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007)*; *Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)*. Any "matters incorporated by reference or integral to the claim" also may properly be regarded by the court without converting the motion to dismiss to one for summary judgment. *Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006)* (citing 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004)). Accordingly, on a motion to dismiss, the court may consider an "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document" since " [o]therwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach [*6] a dispositive document on which it relied." *Pension Benefit, 998 F.2d at 1196* (citation omitted).

It is according to this standard that the court has reviewed defendants' motions to dismiss. The court has reviewed the pleadings of record and the briefs filed in support and opposition thereto. The court has also considered the undisputed written contract between Resco and KPMG, even though it was not attached to plaintiff's

2007 U.S. Dist. LEXIS 87941, *

amended complaint. The court is not persuaded that plaintiff's allegations, even taken as true, raise a right to relief above the speculative level.

## III. DISCUSSION

### A. Breach of Contract Claim Against KPMG Defendants

Count I of the amended complaint asserts a breach of contract claim against the KPMG defendants. In their motion to dismiss, the KPMG defendants assert that plaintiff did not have a contract for tax services with them or with KPMG and was not an intended third party beneficiary of the contract between Resco and KPMG. Further, the contract for tax services between Resco and KPMG specifically provided that any advice or recommendations "may not be relied upon by any third party."

Plaintiff concedes that the operative contract is between Resco and KPMG but contends [*7] that she is a third party beneficiary of that contract. The parties assume that Pennsylvania law applies. The court agrees, and finds that the breach of contract claim fails because the contract expressly disclaims any intention of KPMG or Resco for plaintiff to be a third party beneficiary of their agreement.

[HN2] In considering who may be considered a third party beneficiary of the performance of a contract, the *Restatement (Second) of Contracts § 302* provides:

> (1) **Unless otherwise agreed between promisor and promisee,** a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intentions of the parties and either
>
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Scarpitti v. Weborg,* 530 Pa. 366, 609 A.2d 147, 150 (Pa. 1992) quoting *Restatement (Second) of Contracts § 302(1)* (1979) (emphasis added). In Scarpitti, the Pennsylvania Supreme Court recognized that a party becomes a third party beneficiary "only where both parties to the contract [*8] express an intention to benefit the third party in the contract itself." *Id.* at 149-150.

Further, several courts have recognized that plaintiffs cannot be third party beneficiaries where a contract specifically states that it is not intended to create third party beneficiaries at all. See, e.g., *Banknorth, N.A. v. BJ's Wholesale Club, Inc.,* 442 F.Supp.2d 206, 210-211 (M.D. Pa. 2006); *Villanova. Ltd v. Convergys,* No. 01-1213, 2001 U.S. Dist. LEXIS 11647, 2001 WL 868662, at **1-2 (E.D. Pa. April 24, 2001).

In this case, Paragraph 8 (a) regarding "Reliance and Disclosure" of the "Standard Terms and Conditions Tax Services" agreement between KPMG and Resco provides:

> "[C]lient acknowledges and agrees that any advice, recommendations, information or work product provided to Client by KPMG in connection with this Engagement is for the confidential use of the Client, [and] **may not be relied upon by any third party ... "** (emphasis added).

This contract for tax services excludes any reliance upon the advice, recommendations, or information KPMG provided to Resco. This provision expressly disclaims any intention of Resco or KPMG for plaintiff to be a third party beneficiary to their agreement. Plaintiff here has failed to offer [*9] any circumstances in this case to warrant third party beneficiary status.

Because [HN3] the parties to the contract explicitly provided that no third parties could rely on the tax advice KPMG provided to Resco, plaintiff cannot successfully claim to be a third party beneficiary. Accordingly, plaintiff's claim for breach of contract in Count I against the KPMG defendants is dismissed. [1]

> 1   The court also notes that Paragraph 12 of the contract expressly provides that "[N]o action, regardless of form, arising out of or relating to this engagement, may be brought by either party more than one year after the cause of action has accrued." In an action for breach of contract, the statute of limitations begins to run from the time of the breach. *Romeo & Sons, Inc. v. P.C. Yezbak & Son. Inc.,* 539 Pa. 390, 652 A.2d 830, 832 (Pa. 1995)(citations omitted). According to plaintiff, defendants breached the contract by failing to disclose the tax consequences of certain payments made in February or March of 2005 and 2006. Plaintiff filed the instant action in May of 2007, more than a year after defendants purportedly should have disclosed this information. Additionally, although the discovery rule may be applied to breach [*10] of contract actions where the injured party is unable, despite the exercise of due diligence, to know of an injury or its cause, plaintiff alleges that she first learned of the ad-

2007 U.S. Dist. LEXIS 87941, *

verse tax consequences in February or March 2006. Even assuming the discovery rule applies here, plaintiff filed the instant action outside the one year limitations provision of the contract, of which she claims to be a third party beneficiary. Although the court does not dismiss Count I on this basis, plaintiff's breach of contract claim appears from the face of the amended complaint to be time-barred.

B. Negligence Claim Against All Defendants

Count II of the amended complaint asserts a negligence claim against all defendants. The KPMG defendants contend that this claim fails as a matter of law because plaintiff was not in privity with the KPMG defendants. Defendant Hudock likewise moves to dismiss Count II for lack of privity.

At a status conference in this case, plaintiff's counsel characterized this action as an "accountant malpractice case." [2] However, plaintiff contends that privity is not required under the facts here, relying principally upon a Pennsylvania Court of Common Pleas case, *Reilly v. Ernst & Young, LLP, 66 Pa. D&C 4th 252 (Ct. Com. Pl. Butler County 2003).* [*11] Plaintiff further contends that as majority shareholder, she was an intended beneficiary of the accounting information provided by the defendants. Plaintiff's arguments, however, fail to persuade the court to abandon the strict privity requirement necessary to maintain a professional negligence claim in Pennsylvania.

> 2 Despite this admission, plaintiff's counsel failed to file a certificate of merit as required by *Pa.R.Civ.P. 1042.3.* Federal courts sitting in diversity must apply this substantive state law to malpractice claims brought in federal court. See e.g., *Chamberlain v. Giampapa, 210 F.3d 154 (3d Cir. 2000); Velazquez v. UPMC Bedford Memorial Hosp., 328 F.Supp.2d 549 (W.D. Pa. 2004).* After the court raised this issue at the status conference, defendants filed supplemental motions to dismiss for failure to comply with this requirement [Doc. Nos. 39 and 43]. Plaintiff also subsequently filed a motion for leave to file certificates of merit [Doc. No. 41], more than six months after filing the initial complaint. Although failing to meet this substantive requirement may provide a basis for dismissal, we dismiss the professional negligence claim on the merits. Thus, plaintiff's motion [*12] for leave to file certificates of merit [Doc. No. 41] is denied as moot. Defendants' supplemental motions to dismiss on this ground [Doc. Nos. 39 and 43] are also denied as moot.

[HN4] In Pennsylvania, it is well-settled that an action for professional negligence cannot be maintained unless there is privity of contract between the parties. See *Landell v. Lybrand, 264 Pa. 406, 107 A. 783 (Pa. 1919)*(where plaintiff-shareholder claimed that certain financial statements were incomplete and misleading, the Pennsylvania Supreme Court held that, as a matter of law, the plaintiff failed to state a claim against the accountants because privity of contract did not exist); *Guy v. Liederbach, 501 Pa. 47, 459 A.2d 744 (Pa. 1983)* (recognizing important policies requiring privity); *PNC Bank, Kentucky, Inc. v. Housing Mortgage Corp., 899 F.Supp. 1399, 1406 (W.D. Pa. 1994); Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates, 39 F.Supp.2d 517, 523 (M.D. Pa. 1999)*("The Pennsylvania Supreme Court requires privity between a plaintiff and a defendant-accountant to maintain a professional negligence action."); *Pell v. Weinstein, 759 F.Supp. 1107, 1119-1120 (M.D. Pa. 1991).*

Further, the Pennsylvania Supreme Court has [*13] made clear that a specific undertaking to perform a specific service **for a plaintiff** is required to maintain a malpractice action based on negligence. *Guy, 459 A. 2d at 750* (emphasis added).

Here, plaintiff concedes that the contract for tax services and recommendations was between Resco and KPMG. Plaintiff had no contract with any of the defendants for tax advice. [HN5] Plaintiff has failed to establish that defendants engaged in any specific undertaking to perform any specific service for her as required to maintain a claim for professional negligence in Pennsylvania. Accordingly, based upon the facts set forth in the amended complaint, no exception to the privity requirement is warranted here. Because plaintiff is not in privity with defendants as required by Pennsylvania, Count II against all defendants is dismissed.

C. Fraud Claim Against All Defendants

Count III asserts a claim for fraud against all defendants. The amended complaint alleges that the accounting information provided by defendants was inaccurate or incomplete, that the defendants knew this, and that plaintiff justifiably relied on this information. The KPMG defendants maintain that the amended complaint fails to state the [*14] alleged fraud with sufficient particularity as required by *Fed.R.Civ.P. 9 (b).* Even if pled adequately, the KPMG defendants argue that plaintiff cannot state a claim for fraud. The court agrees.

[HN6] A pleading setting forth fraud as the basis of recovery of damages must, with particularity, allege all the essential elements of actionable fraud. See *Fed.R.Civ.P. 9(b).* In order to satisfy the pleading requirements of *Rule 9 (b),* "a party must at a minimum,

'state the time, place and content of the false misrepresentation, the fact misrepresented and what was obtained or given up as a consequence of the fraud.'" *DuSesoi v. United Refining Co., 540 F.Supp. 1260, 1272 (W.D. Pa. 1982)* (citation omitted). Even where a plaintiff's allegations of fraud are based on information and belief, supporting facts on which this belief is founded must be set forth in the complaint. *Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985)*(citations omitted).

In the context of claims against accountants, where allegations of fraud fail to disclose the manner in which a defendant knowingly departed from reasonable accounting practices, *Rule 9(b)* is not satisfied. See *Christidis v. First Pennsylvania Mortgage Trust, 717 F.2d 96 (3d Cir. 1983)* [*15] (affirming dismissal of fraud claim against an accounting firm for failure to identify the particular accounting practices allegedly violated). Also, where, as here, a case involves multiple defendants, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Silverstein v. Percudani, 422 F.Supp.2d 468, 472-473 (M.D. Pa. 2006)* (citations omitted). A complaint that "lumps" together numerous defendants does not provide sufficient notice of which defendants allegedly made the misrepresentations. *Id. at 473.*

Here, the amended complaint fails to satisfy the requirements of *Rule 9(b)* given the complete absence of any disclosure of the manner in which, in performing their analysis and providing tax advice, any of the defendants knowingly departed from reasonable accounting practices. Plaintiff alleges "upon information and belief" that the accounting information provided by defendants was inaccurate and omitted the impact of the timing of various payments. Any purported inaccuracy or omission could be fraudulent only if the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices. [*16] What those practices are and how they were departed from is nowhere set forth in plaintiff's amended complaint.

Plaintiff also fails to elucidate which defendants provided the inaccurate or incomplete information. The only allegation relating to the alleged participation of defendant Hudock in the purported fraud is that he presented certain accounting information to the audit committee. Again, the complaint is silent as to how his presentation deviated from reasonable accounting practices. The remaining allegations in Count III improperly "lump" defendants together and fail to provide sufficient notice to all defendants regarding the fraud allegations.

In sum, [HN7] plaintiff here does not identify any accounting principle or auditing standard which was violated. Rather, plaintiff simply states that the financial statements were inaccurate or incomplete and that defen-

dants collectively knew this. This does not satisfy the requirements of *Rule 9 (b)*. Plaintiff's allegations of fraud are of insufficient particularity to raise her right to relief above the speculative level. Accordingly, Count III is dismissed against all defendants. [3]

> 3   Although defendant Hudock did not move to dismiss Count [*17] III of the amended complaint on this ground, [HN8] the court may *sua sponte* dismiss Count III against a defendant that did not file a motion to dismiss because another defendant's motion raised defects that applied equally to all claims. See, e.g., *Washington Petroleum & Supply Co. v. Girard Bank, 629 F.Supp. 1224, 1230 (M.D. Pa. 1983)*. Plaintiff responded to the KPMG defendants' motion to dismiss Count III for failure to plead fraud with particularity as required by *Fed.R.Civ.P. 9(b)*. The defects raised by the KPMG defendants apply equally to the fraud claims against defendant Hudock. Moreover, defendant Hudock raised similar issues in his motion to dismiss the original complaint which was terminated upon plaintiff's filing of the amended complaint. The amended complaint suffers from similar infirmities.

**D. Negligent Misrepresentation Claim Against All Defendants**

In Count IV, plaintiff alternatively asserts a claim for negligent misrepresentation. The KPMG defendants contend that this claim also fails for lack of privity. They further argue that plaintiff has not alleged the essential elements of such a claim. Plaintiff contends that privity is not required to maintain a claim for negligent [*18] misrepresentation. While the court agrees with plaintiff that [HN9] privity is not required to state a claim for negligent misrepresentation, the allegations of the amended complaint fail to raise the right to relief for such a claim above the speculative level.

[HN10] A claim for negligent misrepresentation requires plaintiff to prove: 1) a misrepresentation of material fact; 2) made under circumstances in which the misrepresenter ought to have known its falsity; 3) with the intent to induce another to act on it; and 4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Bortz v. Noon, 556 Pa. 489, 729 A.2d 555, 561 (Pa. 1999)*. Moreover, like any action in negligence, plaintiff must prove that defendants owe her a duty of care. *Bair v. Purcell, 500 F.Supp.2d 468, 488 (M.D. Pa. 2007)*.

In *Bilt-Rite Contractors, Inc. v. The Architectural Studio, 581 Pa. 454, 866 A.2d 270, 287 (Pa. 2005)*, [HN11] the Pennsylvania Supreme Court officially

adopted the *Restatement (2d) Torts, § 552* (1977), which sets forth the elements of a cause of action for negligent misrepresentation. *Section 552 of the Restatement* provides in relevant part:

> (1) One who, in the course of his business, profession or employment, [*19] or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> > (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply it.

*Restatement (Second) of Torts § 552* (1977); quoted in *Bilt-Rite Contractors, 866 A.2d at 287.*

The Pennsylvania Supreme Court adopted "*Section 552* as the law in Pennsylvania in cases where information is negligently supplied by one in the business of supplying information . . . and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information." *Bilt-Rite Contractors, 866 A.2d at 287.*

Here, because plaintiff's contractual theories of recovery are flawed, she alternatively attempts to recover [*20] in tort. As outlined above, however, because the [HN12] operative contract between Resco and KPMG specifically excludes reliance upon the accounting information by any third party, plaintiff cannot establish that it was foreseeable that she would use or rely upon it. Nor can plaintiff establish under *Section 552* that she is part of any limited group of persons for whose benefit and guidance the information was intended to be supplied. Rather, the information was intended for Resco, the corporate entity, to rely on in connection with the sale of the company, not for the shareholders to determine their individual tax liability. Plaintiff's allegations in Count IV for negligent misrepresentation against all defendants fail to raise any right to relief above the speculative level and should be dismissed. [4]

> 4    See infra n. 3. Defendant Hudock did not move to dismiss on this ground, however, plaintiff addressed these issues in response to the KPMG defendant's motion to dismiss.

IV. CONCLUSION

All claims are dismissed for failure to state a claim upon which relief can be granted. Accordingly, the court need not address the KPMG defendant's alternative argument that the parties are bound to arbitrate [*21] this dispute. The appropriate order follows.

ORDER

Therefore, this 29th day of November, 2007, IT IS HEREBY ORDERED that the KPMG defendant's motion to dismiss [Doc. No. 23] is GRANTED. Defendant Hudock's motion to dismiss [Doc. No. 20] is GRANTED. Defendants' supplemental motions to dismiss [Doc. Nos. 39 and 43] are DENIED as moot. Plaintiff's motion for leave to file certificates of merit [Doc. No. 41] is DENIED as moot.

BY THE COURT:

/s/ Gary L. Lancaster

Gary L. Lancaster

11

LEXSEE 2007 US DIST LEXIS 83883



Analysis
As of: Dec 13, 2007

**FRED and MICHANA WESTERFIELD, et al., Plaintiffs, v. THE QUIZNO'S FRANCHISE COMPANY, LLC, et al., Defendants.**

**Case No. 06-C-1210**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF WISCONSIN**

*2007 U.S. Dist. LEXIS 83883*

**November 5, 2007, Decided
November 5, 2007, Filed**

**PRIOR HISTORY:** *Westerfield v. Quizno's Franchise Co., LLC, 2007 U.S. Dist. LEXIS 25968 (E.D. Wis., Apr. 6, 2007)*

**COUNSEL:** [*1] For Fred N Westerfield, Michana A Westerfield, Quizwiz LLC, Allan G Loeffler, ALJL Loeffler Enterprises Inc, Annie S Gelvoria, Corona Ventures LLC, Jay Schleis, German Creek Subs Inc, Becky Manske, Warren Manske, Qubs Inc, Rick Ten Pas, Tenpas Enterprises LLC, Dan J Schwagel, Murelly-Rae's LLC, Donald Maul, American Edge II Inc, William C Harris, Jr, Anthony M Harris, Harris & Harris LLC, Linda M Knutson, LWL Inc, Nasir Hanif, H&N LLC, John F Schodron, Dawn L Schodron, Schodron Enterprises LLC, Plaintiffs: Joseph S Goode, LEAD ATTORNEY, Mark M Leitner, LEAD ATTORNEY, Kravit Hovel & Krawczyk SC, Milwaukee, WI; Justin M Klein, Marks & Klein LLP, Red Bank, NJ.

For The Quizno's Franchise Company LLC, Quizno's Franchising LLC, Quizno's Franchising II LLC, The Quizno's Master LLC, QFA Royalties LLC, QZ Finance LLC, QIP Holder LLC, TQSC LLC, Richard E Schaden, Richard F Schaden, Cervantes Capital LLC, Defendants: Charles P Graupner, LEAD ATTORNEY, Erin K Dickinson, Jacob E Miota, Michael Best & Friedrich LLP, Milwaukee, WI; Fredric A Cohen, LEAD ATTORNEY, Cheng Cohen LLC, Chicago, IL.

For Darin Tweten, Eric M Tweten, Defendants: John R Shull, Jr, Terwilliger Wakeen Piehler & Conway SC, Wausau, [*2] WI.

For Stuart Brown, Eric Brown, Defendants: Michael J Happe, Ryberg & Happe SC, Eau Claire, WI.

**JUDGES:** William C. Griesbach, United States District Judge.

**OPINION BY:** William C. Griesbach

**OPINION**

**MEMORANDUM AND ORDER**

Quizno's is the trade name for chain of fast-food restaurants known for their toasted submarine sandwiches. On November 20, 2006, twelve Wisconsin Quizno's franchisees brought this class action against The Quizno's Franchise Company LLC and related entities, two of its officers (hereinafter collectively Quizno's), and four of its Wisconsin Area Directors. Plaintiffs allege that Quizno's engaged in an illegal business scheme in which it "fraudulently induced plaintiffs and the Class to purchase franchises and thereafter exploited their control and economic power in order to extract exorbitant and unjustifiable payments from their franchisees." (Compl. P1.) The fifty-six-page, one-hundred-ninety-one-paragraph, complaint asserts claims against the defendants for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), the Sherman Act, the Wisconsin Anti-Trust Act, the Wisconsin Fair Dealership Law, the Wisconsin Deceptive Trade Practices Act, and common law claims for fraud and breach [*3] of con-

tract. Plaintiffs seek certification as a class action, preliminary and permanent injunctive relief, and statutory, compensatory and punitive damages. Federal jurisdiction is predicated on *28 U.S.C. §§ 1331* and *1367*.

Referring to their current relationship with their franchisor, plaintiffs state that for them, "Quizno's advertising slogan "Get Toasted" had taken on a new and unhappy meaning." (Br. In Opp. at 1.) Quiznos, on the other hand, has responded to plaintiffs' lawsuit with the legal equivalent of another fast food restaurant's advertizing slogan: "Where's the beef?" It has filed a motion to dismiss for failure to state a claim pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*. Arguing that each of the plaintiffs' claims "is conclusively gutted by the explicit disclosures each plaintiff received, the express terms of the Franchise Agreement, and each plaintiff's acknowledgment of the risk associated with his business and disclaimer of the very sort of purported representations alleged in the complaint," Quiznos urges that the complaint be dismissed.

Having considered fully the arguments of counsel, I conclude that claims of fraud on which plaintiffs' civil [*4] RICO claims rest are fatally undermined by the exhaustive disclosures and specific disclaimers and non-reliance clauses set forth in the franchise agreements they signed. I also conclude that the complaint fails to state a claim under the Sherman Act and its Wisconsin equivalent. With plaintiffs' federal claims gone, I then dismiss the remaining state law claims without prejudice to allow plaintiffs to pursue them in state court under whose law they arise.

## A. *Rule 12(b)(6)* Motion To Dismiss Standard

A motion to dismiss under *Rule 12(b)(6)* challenges the sufficiency of the complaint to state a claim upon which relief may be granted. *See Fed. R. Civ. P. 12(b)(6)*. In ruling on a motion to dismiss under *Rule 12(b)(6)*, a court views all of the facts alleged in the complaint, as well as any inferences reasonably drawn from them, in the light most favorable to the plaintiff. *Mosley v. Klincar, 947 F.2d 1338, 1339 (7th Cir. 1991)*. In general, "[t]he federal rules require ... only that the complaint state a claim, not that it plead the facts that if true would establish (subject to any defenses) that the claim was valid." *Higgs v. Carver, 286 F.3d 437, 439 (7th Cir. 2002)*. All that need be specified [*5] is the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer. *Beanstalk Group, Inc. v. AM General Corp., 283 F.3d 856, 863 (7th Cir.2002)*. As the appellate courts have consistently reminded us, plaintiffs "don't have to file long complaints, don't have to plead facts, don't have to plead legal theories." *Kirksey v. R.J. Reynolds Tobacco Co., 168 F.3d 1039, 1041 (7th Cir.1999)*.

A critical exception to this general rule of notice pleading exists for claims of fraud and other claims sounding in fraud. *Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502, 507 (7th Cir. 2007)*. *Rule 9(b) of the Federal Rules of Civil Procedure* provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This heightened pleading requirement is a response to the "great harm to the reputation of a business firm or other enterprise a fraud claim can do." *Id. (citing Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 627 (7th Cir.1999)*. A complaint alleging fraud must provide "the who, what, when, where, and how." *Id. (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990))*.

In [*6] addition to this explicit heightened pleading standard in cases of fraud, the Supreme Court has recently explained that in the anti-trust context, Rule 8(a)'s general requirement for a "plain statement" of the claim means "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)*. Noting the high cost of discovery in anti-trust litigation, the Court held that in this area a complaint must set forth sufficient facts to show plausible grounds exist for believing a violation has occurred. To survive a *Rule 12(b)(6)* motion to dismiss, a plaintiff claiming an anti-trust violation must allege "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* And in *Jennings v. Auto Meter Products, Inc., 495 F.3d 466, 473 (7th Cir. 2007)*, the Seventh Circuit applied the same pleading standard to a civil RICO claim.

Finally, also critical to the motion filed in this case is the rule that "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." [*7] *Wright v. Associated Ins. Companies, Inc., 29 F.3d 1244, 1248 (7th Cir. 1994)*. "[T]o the extent that the terms of an attached contract conflict with the allegations of the complaint, the contract controls. *Centers v. Centennial Mortg., Inc., 398 F.3d 930, 933 (7th Cir. 2005); see also Rosenblum v. Travelbyus.com Ltd., 299 F.3d 657, 661 (7th Cir.2002)* ("The court is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material.").

With these principles in mind, I proceed to consideration of plaintiffs' federal claims.

## B. Fraud In The Inducement and Civil RICO Claims

Plaintiffs assert a claim of fraud in the inducement and two claims under RICO predicated on allegations of mail and/or wire fraud. Plaintiffs allege that the defendants first conducted the affairs of the Quiznos franchise system, an "association in fact" enterprise, so as to "fraudulently and deceptively induce them to purchase Quiznos franchises by intentionally misrepresenting the true nature of the contractual relationship as well as the financial prospects for the franchise [*8] and the likelihood of success." (Compl. P 2.) Although some of the plaintiffs allege that Quiznos, through its Area Directors, made certain oral misrepresentations concerning such matters as the future profitability of the franchises, the fraudulent inducement RICO claim is primarily based on what plaintiffs claim they were not told. All of the plaintiffs claim that Quiznos fraudulently withheld information it was required to disclose. For example, each of the plaintiffs claims that the defendants failed to disclose "the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers." (Comp. PP 115(d), 117(c), 119(e), 121(b), 123(e), 125(b), 127(b), 129(d), 131(b), 133(b), 135(c), 137(c)).

As a second RICO violation, plaintiffs claim that once they became franchisees, the Quiznos defendants "exploited their control and economic power in order to extract exorbitant and unjustifiable payments from their franchisees." (Compl. P 1.) Under the terms of the franchise agreements, plaintiffs were required to purchase products, services and materials from suppliers that were either affiliated [*9] with or approved by Quiznos. Plaintiffs allege that they were overcharged for the products, services and materials they were required to purchase in order to operate their restaurants and that Quiznos profited from the excess payments either directly when the supplier was one of its affiliated companies, or indirectly in the form of "kickbacks" from its approved suppliers. Plaintiffs allege that both schemes -- the scheme to fraudulently induce individuals to purchase franchises, and the scheme to fraudulently extract from franchisees exorbitant payments for essential goods and services, were carried out through the use of the United States mail and interstate wire facilities -- thus making them actionable under RICO as a violation of *18 U.S.C. § 1962(c)*.

The problem with plaintiffs' claims of fraud, however, is that they are fatally undermined by the express disclosures, disclaimers and non-reliance clauses contained in both the Uniform Franchise Offering Circular (UFOC) that each plaintiff received and the Franchise Agreement that each plaintiff signed. [1] Regarding the scheme to fraudulently induce plaintiffs to buy the franchises, for example, the complaint alleges that several plaintiffs [*10] relied on oral representations by Area

Directors as to the average profit they could expect or the expenses they would incur. (Compl. PP 119, 129, 135.) But the UFOC each plaintiff received before entering into the agreement expressly stated:

> OTHER THAN THE ABOVE INFORMATION, WE DO NOT FURNISH OR AUTHORIZE OUR SALESPERSONS TO FURNISH ANY ORAL OR WRITTEN INFORMATION CONCERNING THE ACTUAL OR POTENTIAL SALES, INCOME OR PROFITS OF A QUIZNO'S RESTAURANT.

(Ex. B at 53-54) (capitalization in original). Even as to figures that were provided by Quiznos in writing, the UFOC warned:

> YOUR ACTUAL FINANCIAL RESULTS ARE LIKELY TO DIFFER FROM THE FIGURES PRESENTED. THE AVERAGE GROSS SALES FIGURES PRESENTED ABOVE REPRESENT SALES BEFORE DEDUCTIONS FOR CONTINUING ADVERTISING AND ROYALTY FEES PAYABLE TO THE FRANCHISOR AND ALL OTHER OPERATING EXPENSES. SEE ITEMS 6 AND 7 OF THIS OFFERING CIRCULAR FOR A PARTIAL LIST OF EXPENSES YOU WILL INCUR.
>
> THE SALES FIGURES ABOVE ARE AVERAGES OF HISTORICAL DATA OF SPECIFIC FRANCHISES. THEY SHOULD NOT BE CONSIDERED AS POTENTIAL SALES THAT MAY BE REALIZED BY YOU. WE DO NOT REPRESENT THAT YOU CAN EXPECT TO ACHIEVE THESE SALES LEVELS. ACTUAL RESULTS VARY FROM RESTAURANT TO RESTAURANT, [*11] AND WE CANNOT ESTIMATE THE RESULTS OF ANY PARTICULAR FRANCHISE.
>
> SUBSTANTIATION OF THE ABOVE AVERAGES IS AVAILABLE TO YOU AT OUR OFFICES IF YOU REQUEST, PROVIDED IT DOES NOT REQUIRE THE DISCLOSURE OF THE IDENTITY OF ANY RESTAURANT OWNER.

*(Id.)*

> 1  Quiznos initially submitted only representative samples of the UFOCs and franchise agreements that each of the plaintiffs received and signed. In response to Plaintiffs' suggestion that the court should deny its motion unless copies of the actual UFOC received by each plaintiff, as well as the Franchise Agreement each plaintiff signed, were submitted, Quiznos supplemented the record with the actual UFOC's the individual plaintiffs received and the Franchise Agreements they signed. The Court agrees that the relevant provisions are substantially identical and will refer only to the copies initially submitted.

In addition to the disclaimers in the UFOC, the Franchise Agreement each plaintiff signed contained an integration provision that read:

> This Agreement contains the entire agreement between the parties and supercedes any and all prior agreements concerning its subject matter. Franchisee agrees and understands that Franchisor shall not be liable [*12] or obligated for any oral representations or commitments made prior to the execution of this Agreement or for claims of negligent or fraudulent misrepresentation, and that no modifications of this Agreement shall be effective except those in writing and signed by both parties. Franchisor does not authorize and will not be bound by any representation of any nature other than those expressed in this Agreement. Franchisee further acknowledges and agrees that no representations have been made to it by Franchisor or its affiliates regarding projected sales volumes, market potential, revenues, profits fo Franchisee's Restaurant or operational assistance other than as stated in this Agreement or in any disclosure document provided by the Franchisor or its representatives. ...

(Ex. A. § 23.2.) At the end of the Franchise Agreement, just over the parties' signatures, the following acknowledgments appeared:

> 23.12  **Acknowledgment.** BEFORE SIGNING THIS AGREEMENT, FRANCHISEE SHOULD READ IT CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL.

> FRANCHISEE ACKNOWLEDGES THAT:

> **(A) THE SUCCESS OF THIS BUSINESS VENTURE INVOLVES SUBSTANTIAL RISKS AND DEPENDS UPON FRANCHISEE'S ABILITY AS AN INDEPENDENT BUSINESS PERSON [*13] AND ITS ACTIVE PARTICIPATION IN THE DAILY AFFAIRS OF THE BUSINESS, AND**

> **(B) NO ASSURANCE OR WARRANTY, EXPRESS OR IMPLIED, HAS BEEN GIVEN AS TO THE POTENTIAL SUCCESS OF SUCH BUSINESS VENTURE OR THE EARNINGS LIKELY TO BE ACHIEVED, AND**

> **(C) NO STATEMENT, REPRESENTATION, OR OTHER ACT, EVENT, OR COMMUNICATION, EXCEPT AS SET FORTH IN THIS DOCUMENT AND ANY OFFERING CIRCULAR SUPPLIED TO FRANCHISEE, IS BINDING ON THE FRANCHISEE IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.**

(Ex. A. § 23.12) (capitalization in original). Finally, at the time each franchisee signed the Franchise Agreement, they were asked to sign a "Disclosure Acknowledgment Statement," in which they again acknowledged that:

> **1. The Franchisee recognizes and understands that business risks, which exist in connection with the purchase of any business, make the success or failure of the franchise subject to many variables, including, among other things, the skills and abilities of the Franchisee, the hours worked by the Franchisee, competition, interest rates, the economy, inflation, Restaurant location, operation costs, lease terms and costs and the market place. The Franchisee hereby acknowledges its awareness of and willingness [*14] to undertake these business risks.**

> **2. The Franchisee acknowledges receipt of the Franchisor's Uniform Franchise Offering Circular and Exhibits (collectively, the "UFOC"). The Franchisee acknowledges that it has had the opportunity to personally and carefully review these documents. Furthermore, the Franchisee has been advised to seek**

2007 U.S. Dist. LEXIS 83883, *

professional assistance, to have professionals review the documents and to consult with other franchisees regarding the risks associated with the purchase of the franchise.

3. The Franchisee agrees and states that the decision to enter into this business risk is in no manner predicated upon any oral representations, assurances, warranties, guarantees or promises made by the Franchisor or any of its officers, employees or agents (including any franchise broker) as to the likelihood of success of the franchise. Except as contained in the Franchisors' UFOC, the Franchisee acknowledges that it has not received any information from the Franchisor or any of its officers, employees or agents (including any franchise broker) concerning actual, average, projected or forecasted franchise sales, profits or earnings. If the Franchisee believes that is has received any [*15] information concerning actual, average, projected or forecasted franchise sales, profits or earnings other than those contained in the UFOC, please describe these in the space provided below or write "None."

(Ex.A, Disclosure Acknowledgement Statement) In the space provided, each plaintiff wrote "None."

In the face of these clear and unambiguous disclaimers and non-reliance clauses, plaintiffs cannot plausibly claim that they reasonably relied on oral statements concerning likely profits and expenses in deciding whether to invest in a Quiznos franchise. "[I]t is simply unreasonable to continue to rely on representations after stating in writing that you are not so relying." *Hardee's of Maumelle, Ark., Inc. v. Hardee's Food Sys., Inc., 31 F.3d 573, 576 (7th Cir. 1994); see also Rissman v. Rissman, 213 F.3d 381, 384 (7th Cir. 2000)* (holding that a written non-reliance clause precludes any claim of deceit by prior representations in security transaction); *Associates In Adolescent Psychiatry, S.C. v. Home Life Insurance Co., 941 F.2d 561, 571 (7th Cir.1991)* ("Documents that unambiguously cover a point control over remembered (or misremembered, or invented) oral statements."). In the absence [*16] of such reliance, no fraud can be shown. Accordingly, to the extent plaintiffs' alleged scheme to defraud rests on oral representations made by Area Directors, it must fail.

Plaintiffs face a similar problem with respect to their allegations of fraudulent omission. The general rule is that absent a duty to disclose, one cannot be liable in fraud for a failure to disclose. *See Higginbotham v. Baxter Intern., Inc., 495 F.3d 753, 760 (7th Cir. 2007)* ("Silence is not 'fraud' without a duty to disclose."). Plaintiffs argue that under Wisconsin law, Quiznos clearly had such a duty under the circumstances alleged. [2] Citing *Ollerman v. O'Rourke Co., Inc., 94 Wis. 2d 17, 288*

*N.W.2d 95 (Wis. 1980)*, plaintiffs note that Wisconsin has recognized a duty to disclose on the part of a seller in a real estate transaction for more than thirty years. (Br. In Opp. at 28.) In *Ollerman*, the Wisconsin Supreme Court held that "a subdivider-vendor of a residential lot has a duty to a 'non-commercial' purchaser to disclose facts which are known to the vendor, which are material to the transaction, and which are not readily discernible to the purchaser." *288 N.W.2d at 107.* More recently, in *Kaloti Enterprises, Inc. v. Kellogg Sales Co., 2005 WI 111, 283 Wis. 2d 555, 699 N.W.2d 205 (Wis. 2005)*, [*17] the Court extended the rule to business transactions in general, stating:

> we conclude that a party to a business transaction has a duty to disclose a fact where: (1) the fact is material to the transaction; (2) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact.

*699 N.W.2d at 213.* Even apart from the *Ollerman* exception, Wisconsin also recognizes the rule that a duty to disclose may arise where a seller has told a half-truth or has made an ambiguous statement if the seller's intent is to create a false impression and he does so. *Ollerman, 288 N.W.2d at 102.* [3] Liability under federal law for the crimes of mail and wire fraud also extends to fraudulent omissions. *See United States. v. Morris, 80 F.3d 1151, 1160-61 (7th Cir. 1996); Emery v. American Gen. Fin., Inc., 71 F.3d 1343, 1346 (7th Cir.1995).*

2    Although the franchise agreements provide [*18] that any dispute between them is to be governed by Colorado law, the parties agree that Colorado law does not differ meaningfully from that of Wisconsin and have both cited Wisconsin law in support of their respective arguments. Following their lead, I will apply Wisconsin law to those issues governed by state law. *See Kochert v. Adagen Medical Intern., Inc., 491 F.3d 674, 677 (7th Cir. 2007)* ("Where the parties have not identified a conflict in state law, we will generally apply the law of the forum state.").

3    This is also the position of the Restatement:

2007 U.S. Dist. LEXIS 83883, *

§ 551 Liability For Nondisclosure.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

\*\*\*

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading;

*RESTATEMENT (SECOND) OF TORTS § 551.*

Plaintiffs argue that one or both of these exceptions to the rule of *caveat emptor* is applicable here. They argue that the very nature of the transaction required that Quiznos disclose such items as the true cost of advertising, the number of Quiznos franchises that had closed, and [\*19] the substantial "markups and kickbacks" that add to the cost of food and services the franchisee was required to purchase for Quizno affiliates or approved suppliers. Plaintiffs also allege that Quiznos provided partial information that required further disclosure so as to avoid misleading them. For example, they allege that Quiznos provided marketing materials specifying food costs and other percentages calculated on an incomplete set of data, while withholding actual revenue figures based on more complete data. (Compl. P 119(f).) Under these circumstances, plaintiffs allege that Quiznos' failure to fully disclose all of the costs they would incur constitutes fraud.

Leaving aside plaintiffs' pejorative and vague references to "substantial kickbacks and markups," however, a review of the UFOC and Franchise Agreement reveals that Quiznos did disclose to plaintiffs the charges they would be required to pay as Quiznos franchisees. Item 8 of the UFOC, for example, states:

We and our affiliates have the right to receive payments from suppliers on account of their dealings with you and other Franchisees and to use the amounts we receive without restriction (unless we or our affiliates agree [\*20] otherwise with the supplier) for any purpose we or our affiliates deem appropriate. We and our affiliates negotiate purchase arrangements with suppliers for the benefit of Franchisees, which often include volume discounts.

Some suppliers pay us and/or our affiliates fees for products purchased through these negotiated agreements, and willingness to pay us and/or our affiliates may be a condition of our approval.

(Br. In Supp., Ex. B. at 26.) The UFOC also advised prospective franchisees of estimated initial food and other costs, and informed them that franchisees "must participate in any promotion campaigns and advertising and other programs the we periodically establish or approve." (Ex. B at 22, 36.)

The Franchise Agreement likewise provided that the franchisee must "purchase all equipment, products, services, supplies, and materials required for the operation of the Restaurant from manufacturers, suppliers, or distributors designated by Franchisor." The Agreement further stated that the designated supplier may be a single supplier, or it may be Quiznos or its affiliates, and advised that,

Franchisor and its affiliates may receive payments from suppliers on account of such suppliers' [\*21] dealings with Franchisee and other franchisees and may use all amounts so received without restriction and for any purpose Franchisor and its affiliates deem appropriate.

(Ex. A § 13.4.) If Quiznos in fact imposed additional charges on its franchisees or charged them a higher percentage for such items as advertising or promotional costs than it promised, it may be liable for breach of contract. But in the face of these disclosures, plaintiffs' claim that the defendants induced them to purchase their franchises by fraudulently concealing such information cannot stand. A party cannot reasonably rely on allegedly fraudulent statements directly contradicted by the terms of a subsequently executed contract. *See Amplicon Inc. v. Marshfield Clinic, 786 F.Supp. 1469, 1478 (W.D.Wis.1992).*

This is not to say that Quiznos disclosed the exact cost of the essential goods its franchisees would be required to purchase. But how could it? The price of goods and services is constantly changing. More importantly, Quiznos made clear it was not disclosing actual costs or the profits plaintiffs could expect. Quiznos explicitly cautioned plaintiffs that it was furnishing no information as to "actual or potential [\*22] sales, earnings or profits." (Ex. B at 53.) And as to the average gross sales figures it presented, Quiznos told prospective franchisees that the figures did not reflect "deductions for continuing

advertising and royalty fees payable to the franchisor and all other operating expenses." (*Id.*) As to deductions for those expenses and a partial list of other expenses they would incur, plaintiffs were directed to other items in the UFOC. They were also advised "to seek professional assistance, to have professionals review the documents and to consult with other franchisees regarding the risks associated with the purchase of the franchise." (Ex.A, Disclosure Acknowledgement Statement.) Finally, the UFOC plaintiffs received includes a list of Quiznos franchises with operating restaurants as of December 31, 2002, and a list of a list of franchisees and Area Directors who had left the system or not communicated. Both lists include addresses and telephone numbers. Thus, to the extent Quiznos did not provide specific cost figures, it was clear to prospective franchisees that they lacked that information. It was also clear how they could obtain further information if they needed it.

This is a [*23] far cry from the situation in *Ollerman* and *Kaloti Enterprises*. In *Ollerman*, the seller failed to disclose to the buyer the existence of an underground well, and in *Kaloti Enterprises* a food producer failed to disclose to one of its secondary suppliers prior to a new purchase agreement that it was changing its marketing strategy and would be making direct sales to the supplier's customers for a lower price. In both cases, the buyer had no knowledge of the crucial fact, i.e. the underground well or the change in marketing strategy, that rendered the transaction disadvantageous to the buyer. But not only was the buyer in those cases unaware of crucial information, he had no reason to suspect that such facts may exist. In other words, he was unaware that he was unaware. Here, by contrast, the plaintiffs knew that they would be charged for the essential goods and services needed to operate the franchise and they also knew they did not have exact costs for those goods and services. They went forward with the transaction knowing that they did not have that information. This is not fraud. As the Wisconsin Supreme Court remarked in *Kaloti Enterprises*, "parties to a business transaction must [*24] "use their faculties and exercise ordinary business sense, and not [] call on the law to stand *in loco parentis* to protect them in their ordinary dealings with other business people." *Kaloti Enterprises, 699 N.W.2d at 213* (quoting *Ollerman, 288 N.W.2d at 101*).

## C. Unconscionability

In response to Quiznos' contention that their claims of fraud are effectively gutted by the explicit disclosures, disclaimers and non-reliance clauses contained in the UFOC and Franchise Agreements, plaintiffs argue that the court should ignore the terms of the Franchise Agreement because the Franchise Agreement is unconscionable and therefore unenforceable. They contend that

the Franchise Agreement was offered on a take-it-or-leave-it basis and not only "give[s] the defendants *carte blanche* to exploit the franchisees at will (for example, by authorizing Quiznos to place a new store right down the block from an existing franchise, or by requiring franchisees to buy items they need only from Quiznos-owned or -approved suppliers at what turn out to be grossly inflated prices)," but also "purports to eviscerate the franchisees' ability to seek, let alone obtain, any meaningful redress for harm they suffer at Quiznos' [*25] hands." (Br. In Opp. at 7-8.) While Plaintiffs do not seek a determination at this time that the franchise agreements are unconscionable, they contend that the issue is sufficiently raised to render premature Quiznos' contract-based arguments in support of their motion for summary judgment.

Under Wisconsin law, an entire contract or a provision of a contract is invalid if it is unconscionable. *Wis. Auto Title Loans, Inc. v. Jones, 2006 WI 53, 290 Wis.2d 514, 714 N.W.2d 155, 164 (2006).* "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Discount Fabric House of Racine, Inc. v. Wisconsin Tel. Co., 117 Wis. 2d 587, 345 N.W.2d 417, 424 (Wis. 1984).* In order to be declared invalid as unconscionable, a contract or provision thereof must be both procedurally and substantively unconscionable. *Jones, 714 N.W.2d at 164.* Procedural unconscionability, called "bargaining naughtiness" by Professor Leff, *see* Leff, Arthrur, *Unconscionability and the Code-The Emperor's New Clause,* 115 U. Pa. L.Rev. 485, 487 (1967), requires consideration of the factors that bear on the formation [*26] of the contract, including the age, education, intelligence, business acumen and experience of the party challenging the contract; the relative bargaining power of the parties; who drafted the contract; whether the terms were explained to the weaker party; whether alterations in the printed terms would have been permitted by the drafting party; and whether there were alternative providers of the subject matter of the contract. *Jones, 714 N.W.2d at 166 (citing Discount Fabric House of Racine, Inc. v. Wisconsin Tel. Co., 117 Wis.2d 587, 602, 345 N.W.2d 417 425 (1984)).* Substantive unconscionability, on the other hand, pertains to "the contract terms themselves, and requires a determination whether they are commercially reasonable." *Discount Fabric House, 345 N.W.2d at 425; see also Deminsky v. Arlington Plastics Mach., 2003 WI 15, 259 Wis.2d 587, 657 N.W.2d 411, 422 (2003).* As the Wisconsin Court of Appeals recently explained,

No single, precise definition of substantive unconscionability can be articulated. Substantive unconscionability refers to

whether the terms of a contract are unreasonably favorable to the more powerful party. The analysis of substantive unconscionability requires looking at [*27] the contract terms and determining whether the terms are "commercially reasonable," that is, whether the terms lie outside the limits of what is reasonable or acceptable. The issue of unconscionability is considered "in the light of the general commercial background and the commercial needs."

*Coady v. Cross Country Bank,* 729 N.W.2d 732, 742, 2007 WI App 26 (Ct. App. 2007) (quoting *Jones,* 714 N.W.2d at 166)).

In order for a court to declare a contract unconscionable, it must find "a mixture of both procedural and substantive unconscionability." *Jones,* 714 N.W.2d at 165. The analysis is made on "a case-by-case basis. The more substantive unconscionability present, the less procedural unconscionability is required, and vice versa." *Id.* The court must then "weigh all the elements of unconscionability and may conclude unconscionability exists because of the combined quantum of procedural and substantive unconscionability." *Id.* Given the imprecision of the concept and the myriad of factors that bear on the determination of unconscionability, many of which are unique to each individual franchisee, plaintiffs argue that the issue should be postponed until a complete record is established. [4]

> 4  Of [*28] course, plaintiffs' argument for individual consideration of the circumstances surrounding the formation of the contract for each franchise also undermines their contention that not only are their individual claims properly joined, but that the case should be certified as a class action. But that is a different issue to be considered later.

Quiznos, on the other hand, argues that plaintiffs' claim that the Franchise Agreement is unconscionable is "completely baseless" and urges the Court to reject plaintiffs' argument to the contrary. (Reply Br. at 2-3.) It notes that there is no suggestion that plaintiffs were somehow forced to become Quiznos franchisees, since there are plenty of other franchise opportunities available. Moreover, the precedent plaintiffs cite in support of their contention that the Franchise Agreement is unconscionable, Quiznos observes, involves unsuspecting consumers who signed standard form contracts for common, if not essential, goods or services. This case, by contrast, involves individuals with the means and business acumen to pur-

chase and operate a restaurant. Because they have failed to allege facts that would support the suggestion that plaintiffs are individuals [*29] "having limited financial means and unequal bargaining power," Quiznos contends that there is no basis upon which the Court could find procedural unconscionability. (Reply at 4.)

As to substantive unconscionability, Quiznos contends that many of the provisions that plaintiffs claim are unconscionable apply to both parties and thus cannot be considered one-sided. By way of example, Quiznos notes that the one-year limitations period applies to its claims as well as those of the plaintiffs. The same is true of the waiver of jury trial, the requirement that claims be brought on an individual basis, and the agreement to have disputes determined in a Colorado forum applying Colorado law. Quiznos also notes that provisions such as those barring class actions and punitive damages, waiving jury trial and placing a one-year limitation on claims have been found enforceable by other courts and are hardly "so one-sided as to shock the conscience." (Reply at 6.)

I conclude that plaintiffs' assertion that certain provisions of the contract they signed are unconscionable does not preclude consideration of Quiznos' contractual defenses, at least those that clearly apply and do not even arguably offend [*30] public policy. "[C]ontract law is grounded on the principle of freedom of contract, which protects the justifiable expectations of parties to an agreement, free from governmental interference." *Jones,* 714 N.W.2d at 163. The rule is well-established in Wisconsin, as in all states, that courts may not rewrite a clear and unambiguous contract, or use the mechanism of construction to review an unambiguous contract to relieve a party from any disadvantageous terms to which the party has agreed. *Algrem v. Nowlan,* 37 Wis. 2d 70, 154 N.W.2d 217, 221 (1967). While the rule that unconscionable contracts or contract provisions are unenforceable is an exception to the general principle of freedom of contract, this does not mean that an evidentiary hearing is required in any case in which there is a bare allegation that a contract on which a claim or defense is based is unconscionable. Otherwise, unconscionability would become the primary dilatory defense in contract litigation. Calamari and Perillo, *The Law of Contracts* § 9.39, at 371 (4th ed. 1998). Such a rule would unreasonably increase the cost of doing business by creating uncertainty and adding to the litigation expenses in an economy that [*31] many already regard as over-burdened by the costs of litigation.

Here, plaintiffs offer nothing, not even allegations, that would support a finding of procedural unconscionability. The very facts alleged in the complaint belie the suggestion that they are unsophisticated or vulnerable individuals of whom advantage is easily taken. The

plaintiffs are purchasers and owners of businesses which they undertook to operate and have operated, some for more than six years. All appear to have formed corporations or limited liability companies to operate their businesses. (Compl. PP 9-33.) As Judge Posner remarked in a similar setting, "[t]he Sigels are not vulnerable consumers or helpless workers. They are business people who bought a franchise (actually two, though the other isn't in issue in this case) in another state as an investment to be managed by local managers. They were not forced to swallow unpalatable terms. They have rightly declined even to argue unconscionability." *Original Great American Chocolate Chip Cookie Co. v. River Valley, Ltd., 970 F.2d 273, 281 (7th Cir. 1992)*.

Similarly, Judge Clevert rejected a challenge to an arbitration clause in an automobile finance agreement with [*32] Nissan Motor Acceptance Corporation (NMAC), stating:

> Here, Johnson has not demonstrated that she had no meaningful choice. While NMAC or the dealer may have more bargaining power and economic strength, the alternative sources of supply may or may not have been plentiful. However, based on the record, it is difficult to believe that Johnson was forced to buy this particular used car at this particular dealership using this particular financing. She purchased a used Chevrolet Tahoe from a Nissan dealership in the Milwaukee metropolitan area. Like any car purchaser, she could have walked out and taken her business elsewhere, both for the car and for the financing. She could have gone to a Chevrolet dealer, a car dealer affiliated with companies other than NMAC, or any independent used car lot. She could have obtained financing from a bank, a credit union, or a friend. She even could have saved in advance and purchased a car at a later time using less, or no, financing at all. In sum, she had numerous options and was not over a barrel in accepting NMAC's contract.

*Battle v. Nissan Motor Acceptance Corp., 2006 U.S. Dist. LEXIS 37916, 2007 WL 1095681, *6 (E.D.Wis. March 9, 2006)*. The same is true here. A court does not [*33] need to conduct an evidentiary hearing to recognize that there are numerous franchising and other investment opportunities available in this state. Plaintiffs cannot plausibly claim that they had no other choice.

It is also clear from the UFOC and the Franchise Agreement that plaintiffs were not prevented from carefully considering the Agreement before signing it or obtaining outside advice. Each franchisee expressly acknowledged that "it has had the opportunity to personally and carefully review" the UFOC and Franchise Agreement, and that it had been "advised to seek professional assistance, to have professionals review the documents and to consult with other franchisees regarding the risks associated with the purchase of the franchise." (Ex. A. Disclosure Acknowlegment Statement.). Each was also advised in the body of the Agreement that "BEFORE SIGNING THIS AGREEMENT, FRANCHISEE SHOULD READ IT CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL ...." (Ex. A. § 23.12.) This is not the advice of a party engaged in "bargaining naughtiness." Under these circumstances, plaintiffs' unsupported assertion of procedural unconscionability rings hollow.

On the issue of substantive unconscionability, [*34] plaintiffs point to the provision of the Franchise Agreement under which Quiznos is alleged to have directly or indirectly extracted exorbitant payments from its franchisees for the services, goods and materials essential to their businesses. They also claim that provisions intended to limit their means of redress are unconscionable. These include a prohibition on suing individual officers, agents or affiliates of Quiznos, a truncated (one-year) statute of limitations of any and all claims, a bar on punitive or exemplary damage claims, waiver of the right to a jury trial, prohibition of class actions and consolidation of claims or cases, and a forum selection and choice of law clause requiring cases to be brought in Colorado and decided under Colorado law. Citing cases such as *Jones*, plaintiffs argue that some or all of these provisions may be substantively unconscionable.

But in *Jones*, the Court struck down a one-sided arbitration provision in a short-term loan agreement which allowed the lender to enforce its rights in the circuit court but required the borrower to submit any counterclaims to arbitration. *696 N.W.2d at 220*. Only one of the cases plaintiffs cite involves a franchise [*35] agreement. In *Bolter v. Superior Court, 87 Cal. App. 4th 900, 104 Cal. Rptr. 2d 888 (2001)*, the Court struck down an arbitration clause in a franchise agreement that required the California franchisees to arbitrate their claims against the franchisee in Utah. All of the other cases upon which plaintiffs rely, however, involve consumer credit card or purchase agreements. *See Coady v. Cross Country Bank, Inc., 2007 WI App 26, 729 N.W.2d 732 (Wis. 2007)* (holding arbitration clause in credit card agreement unconscionable); *Powertel v. Bexley, 743 So.2d 570 (Fla. App. 1999)* (holding arbitration clause added to contract for cellular telephone service unconscionable); *Kinkel v.*

*Cingular Wireless LLC, 223 Ill. 2d 1, 857 N.E.2d 250, 306 Ill. Dec. 157 (Ill. 2006)* (holding the class action waiver provision of cellular telephone service contract unconscionable); *Lozado v. Dale Baker Oldsmobile, Inc., 91 F. Supp. 2d 1087 (W.D. Mich. 2000)* (holding arbitration provision of automobile installment sales agreement unconscionable); and *Wong v. T-Mobile USA, 2006 U.S. Dist. LEXIS 49444, 2006 WL 2042512 (E.D. Mich. July 20, 2006)* (holding class action waiver in cellular telephone service agreement unconscionable).

Nothing in *Jones* or any of the other cases cited by plaintiffs offer any support for their contention [*36] that I should ignore the clear and unequivocal disclaimers, disclosures and non-reliance clauses set forth in the UFOC they received and the Franchise Agreement they signed. On the basis of those disclaimers, disclosures and non-reliance clauses, I conclude that plaintiffs' claim of fraud cannot stand. And without a tenable claim of fraud, plaintiffs' RICO claims fall for failure to state a claim. *See Matter of VMS Ltd. Partnership Securities Litigation, 803 F.Supp. 179, 192 (N.D.Ill. 1992)* ("In the court's view, plaintiffs' RICO claims, as well as the related mail and wire fraud claims, are inadequate as a matter of law. Plaintiffs have failed to allege specific facts sufficient to overcome the exhaustive disclosures and warnings contained in the private placement memoranda and the subscription agreements that plaintiffs signed."). Accordingly, defendants' motion to dismiss will be granted as to plaintiffs' RICO claims and their claim of fraud in the inducement.

## D. Sherman Act Claim

Plaintiffs have also asserted a claim under *Section 1 of the Sherman Act* and the Wisconsin Antitrust Act. [5] To state a claim for relief under *Section 1*, a plaintiff must allege either that a contract, combination, [*37] or conspiracy resulted in a per se violation of the Sherman Act or that it unreasonably restrained competition in a relevant market. *See Denny's Marina, Inc. v. Renfro Prods., Inc., 8 F.3d 1217, 1220 (7th Cir. 1993); Banks v. National Collegiate Athletic Ass'n, 977 F.2d 1081, 1088 (7th Cir. 1992); Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr., 684 F.2d 1346, 1352 (7th Cir. 1982).* Here, plaintiffs claim that Quiznos orchestrates tying arrangements that are either illegal per se, or otherwise unreasonably restrain competition. (Compl. P 155.)

5   The Wisconsin Antitrust Act provides that, "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal." *Wis. Stat. § 133.03.* This language is nearly identical to that of *Section 1 of the Sherman Act,* which states, "every contract, combination in the form of trust or otherwise,

conspiracy, in restraint of trade or commerce . . . is declared to be illegal." *15 U.S.C. § 1.* Therefore, although the Court's analysis will focus on plaintiffs' claim under the Sherman Act, plaintiffs' claim under the Wisconsin Antitrust Act will be dismissed for the same reasons. *See Conley Publ'g Group v. Journal Commc'ns, 2003 WI 119, P 17, 265 Wis. 2d 128, P 17, 665 N.W.2d 879, P 17,* [*38] *overruled on other grounds by Olstad v. Microsoft Corp., 2005 WI 121, 284 Wis. 2d 224, 700 N.W.2d 139.*

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" *Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 462, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992)* (quoting *Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958)).* For a tying arrangement to be actionable, the defendant must enjoy substantial market power in the tying product. *Hardy v. City Optical Inc., 39 F.3d 765, 767 (7th Cir. 1994)* (citing *Will v. Comprehensive Accounting Corp., 776 F.2d 665, 670-74 (7th Cir. 1985)).* As the Seventh Circuit has explained,

> [e]stablishing the necessary combination in a tying case requires exceeding subtlety, because the substantive theory of tying law depends on coercion to take two products as a package. The joint sale of two products is a "tie" only if the seller exploits its control of the tying product "to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred [*39] to purchase elsewhere on different terms."

*Will v. Comprehensive Accounting Corp., 776 F.2d 665, 669 (7th Cir. 1985)* (quoting *Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 12, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984)); see also Digital Equip. v. Uniq Digital Technologies, 73 F.3d 756, 761 (7th Cir. 1996)* ("Unless the seller has market power, ... the practice is of no antitrust concern."). Plaintiffs claim that Quiznos illegally ties the sale of their franchises (the tying product) to the subsequent sale of the "Essential Goods" required to operate the franchises, (the tied product). (Compl. PP 143-56.) Plaintiffs allege that because Quiznos enjoys substantial market power in the "Quick Service Toasted Sandwich Restaurant Franchise" market, the tying arrangement under which its franchisees must purchase Essential Goods from its affiliates or approved suppliers is unlawful.

Relying on the Third Circuit's decision in *Queen City Pizza v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997)*, Quiznos argues that plaintiffs' antitrust claims fail because the complaint fails to allege "a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." (Br. In Supp. at 20.) [*40] In *Queen City Pizza*, the Third Circuit affirmed the district court's *Rule 12(b)(6)* dismissal of the plaintiff's Sherman Act claims for failure to plead a valid relevant market. The court noted that "in most cases proper market definition can be determined only after a factual inquiry into the commercial realities face by consumers." *124 F.3d at 436. Queen City Pizza* held, however, that "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Id.* Quiznos contends that plaintiffs' complaint has the same defect.

As an initial matter, plaintiffs argue in response that Quiznos' argument is a premature request for summary judgment. Citing *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*, plaintiffs contend that at the pleading stage a court can dismiss a claim only if "it appears beyond doubt that the plaintiff can prove no set of facts in support [*41] of his claim." (Br. In Opp. at 42 (*quoting Conley, 355 U.S. at 45-46*.)) Noting that questions relating to the existence of and boundaries to a relevant market in antitrust cases are for the trier of fact and that much of the economic evidence in such cases is in the hands of the defendant, plaintiffs argue that "dismissal prior to giving plaintiff ample opportunity for discovery should be granted very sparingly." (*Id. at 42-43 (quoting Hospital Bldg. Co. v. Trustees of Rex Hospital, 425 U.S. 738, 746, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976)*.) But as noted above, *Twombly*, which explicitly repudiated the *Conley* formula for assessing the sufficiency of a claim, requires, especially for antitrust claims, that a complaint set forth sufficient facts to show plausible grounds exist for believing a violation has occurred. *127 S. Ct. at 1968*. Quiznos' argument goes directly to whether plaintiffs' complaint meets this standard. For absent some suggestion that Quiznos exercised substantial market power in a relevant product market, plaintiffs antitrust claim should not be permitted to continue into "its inevitably costly and protracted discovery phase." *Asahi Glass Co. v. Pentech Pharmaceuticals, Inc., 289 F.Supp.2d 986, 995 (N.D.Ill.2003)* [*42] (Posner, J., sitting by designation). In light of *Twombly*, I do not find Quiznos' argument premature.

The relevant product market, for purposes of antitrust law, includes all "products that have reasonable interchangeability for the purposes for which they are produced -- price, use, and qualities considered." *United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404, 76 S. Ct. 994, 100 L. Ed. 1264 (1956)*. Products are considered reasonably interchangeable if consumers treat them as "acceptable substitutes." *PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2nd Cir. 2002)*. "[T]he relevant market consists of all of the products that the Defendants' customers view as substitutes to those supplied by the Defendants." *Id. (quoting FTC v. Cardinal Health, Inc., 12 F.Supp.2d 34, 46 (D.D.C.1998))*. A key consideration in determining the relevant market is cross-elasticity of demand. "Cross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers. More technically, it measures the responsiveness of the demand for one product to changes in the price of a different product." *Queen City Pizza, 124 F.3d at 438, n 6 (quoting E. Thomas Sullivan and Jeffrey L. Harrison, Understanding [*43] Antitrust and its Economic Implications 217 (1994))*.

In the area of franchises such as Quiznos, the relevant product market would include equivalent investment opportunities. As one commentator has explained,

> From the perspective of sound analysis and consistency with the fundamental legal principle, it is patent that-at the minimum-a franchisor market power assessment requires reference to all alternatives available to the potential consumer in a broad line of business endeavors. In many cases this will extend to the market for franchises of all types or the employment of capital. For market power to exist there must be something that shows that, pre-contract, the seller had the power to force a potential franchisee to purchase something that would not have occurred in a competitive market-a requirement drawn directly from *Jefferson Parish*.

Alan Silberman, *The Myths of Franchise "Market Power", 65 Antitrust L.J. 181, 206 (1996)*. Considered in this light, plaintiffs' assertion that the "Quick Service Toasted Sandwich Restaurant Franchise" market constitutes the relevant product market in which to assess Quiznos' market power is patently absurd. It may well be that Quiznos holds substantial [*44] market power for those investors who wish to purchase a fast food franchise that sells toasted submarine sandwiches. But that's like saying that the seller of any franchise known for a particular product has market power over investors who

are already determined to sell such a product. That cannot be the test. The mere fact that a particular franchise is known for a unique product and way of doing business does not show market power over investors. *Will v. Comprehensive Accounting Corp.*, 776 F.2d at 672-73; *see also Tominaga v. Shepherd*, 682 F. Supp. 1489, 1494 *(C.D. Calif. 1988)* (stating that in assessing tying claim against combination chicken/pizza franchise "[p]ossible relevant markets include take out pizza franchises, fast food franchises or restaurant franchises in general"). Product identification or branding is at the very core of franchising. The crucial question is whether Quiznos was in a position to coerce investors not otherwise determined to do so to purchase its franchise.

Leaving aside the question of whether a franchise can be a tying product, *see Will*, 776 F.2d at 671 ("'franchises' (the tying product here) are just names and methods of doing business, not 'products' [*45] and some courts have held that as a matter of law there cannot be a tie-in between a name and a product, ....), there is no suggestion in the complaint that Quiznos' enjoyed any pre-contract market power over plaintiffs and other potential investors. Indeed, plaintiffs claim they purchased the franchises not because of Quiznos' overwhelming market power but because of its fraudulent inducements. A seller with overwhelming market power does not need to resort to fraud to induce buyers to purchase his product.

It is true that after plaintiffs became Quiznos franchisees, Quiznos was able to exercise substantial power over them. It was able to determine the suppliers from whom plaintiffs were required to purchase the products and services needed to operate the franchises. The gist of plaintiffs' complaint is that Quiznos exercised this authority so as to extract exorbitant payments from them. But this was due to the contractual provisions of the Franchise Agreement each of the plaintiffs signed, not Quiznos' market power. This is not the kind of harm the Sherman Act was intended to prevent. As *Queen City Pizza* observed,

> Plaintiffs need not have become Domino's franchisees. If the contractual [*46] restrictions in section 12.2 of the general franchise agreement were viewed as overly burdensome or risky at the time they were proposed, plaintiffs could have purchased a different form of restaurant, or made some alternative investment. They chose not to do so. Unlike the plaintiffs in *Kodak*, plaintiffs here must purchase products from Domino's Pizza not because of Domino's market power over a unique product, but because they are

> bound by contract to do so. If Domino's Pizza, Inc. acted unreasonably when, under the franchise agreement, it restricted plaintiffs' ability to purchase supplies from other sources, plaintiffs' remedy, if any, is in contract, not under the antitrust laws.

*124 F.3d at 441* (footnote omitted).

The same analysis applies here. Plaintiffs need not have become Quiznos franchisees. As one scholar has noted, "[t]here are literally thousands of franchise opportunities available to prospective investors, and federal law operates to ensure that prospective investors are given information about the likely costs and revenues of a particular franchise opportunity in order to help them make an informed choice." George A. Hay, *Is the Glass Half-Empty or Half-Full?: Reflections* [*47] *on the Kodak Case, 62 Antitrust L.J. 177, 188 (1993).* Having chosen to become Quiznos franchisees, plaintiffs are bound by the terms of the franchise agreements they signed. If Quiznos has breached its agreement with them by charging them exorbitant prices for the goods and services needed to operate their franchises, their remedy lies in contract, not under the antitrust laws. Accordingly, I conclude that plaintiffs' antitrust claims should be dismissed.

### E. Remaining State Law Claims

Having disposed of plaintiffs federal claims and those state claims inextricably intertwined with them, the question arises as to what action should be taken with respect to plaintiffs' remaining state law claims. "[T]he general rule is that, when all federal-law claims are dismissed before trial, the pendent claims should be left to the state courts." *Wright v. Associated Ins. Cos., Inc., 29 F.3d 1244, 1251 (7th Cir.1994).* The rule is "designed to minimize the occasions for federal judges to opine on matters of state law." *Van Harken v. City of Chicago, 103 F.3d 1346, 1354 (7th Cir. 1997).* Of course, if an obvious interpretation of state law eliminates a plaintiff's state claim, "the federal judge should [*48] put the plaintiff out of his misery then and there, rather than burdening the state courts with a frivolous case." *Id.* That is not the case here, however, with respect to the claims that remain. The outcome of plaintiffs' breach of contract claims and their claims under Wisconsin's Fair Dealership Law and Deceptive Trade Practices Act are not obvious and may be more appropriately considered by Wisconsin's state courts. Accordingly, while those claims are also dismissed, the dismissal is without prejudice.

**IT IS THEREFORE ORDERED** that the defendants' motion to dismiss is granted. Plaintiffs' first and

2007 U.S. Dist. LEXIS 83883, *

second (civil RICO), third and fourth (federal and state antitrust), and sixth (fraud in the inducement) claims for relief are dismissed with prejudice. The remaining state law claims are dismissed for lack of jurisdiction without prejudice.

Dated this 5th day of November, 2007.

/s William C. Griesbach

William C. Griesbach

United States District Judge

12

LEXSEE



Caution
As of: Dec 14, 2007

**YELLOW PAGE SOLUTIONS, INC.; LAUREL LEONE, d/b/a LEONE
ADVERTISING; MARTINEZ & ASSOCIATES, INC. d/b/a ADS NATIONWIDE;
NATIONAL YELLOW PAGE SERVICE, INC.; LARRY H. KISTENMACHER
d/b/a KEY YELLOW PAGE CONSULTING; TOM A. THOMPSON and DONNA
M. THOMPSON, d/b/a A M NATIONAL ADVERTISING; NATIONAL
TELEPHONE DIRECTORY MARKETING SERVICE, a Partnership; and
PHOENIX YELLOW PAGE GROUP, INC., Plaintiffs, -against- BELL ATLANTIC
YELLOW PAGES COMPANY, BELLSOUTH ADVERTISING & PUBLISHING
CORPORATION, SBC DIRECTORY OPERATIONS, INC., U.S. WEST DEX,
INC., GTE DIRECTORIES CORP., and THE YELLOW PAGES PUBLISHERS
ASSOCIATION, INC., Defendants.**

**00 Civ. 5663 (MBM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2001 U.S. Dist. LEXIS 18831; 2002-1 Trade Cas. (CCH) P73,556*

**November 14, 2001, Decided
November 19, 2001, Filed**

**DISPOSITION:**     [*1] Defendants' motions to dismiss
for lack of personal jurisdiction and failure to state a
claim granted, and amended complaint dismissed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, companies that
sold advertising in phone directories, sued defendants,
publishers of the directories and a trade association, al-
leging antitrust violations under the Robinson-Patman
Act, *§§ 1* and *2* of the Sherman Act, and state antitrust
laws. The defendants moved to dismiss the complaint.

**OVERVIEW:** Several defendants moved to dismiss the
action pursuant to *Fed. R. Civ. P. 12(b)(2)* and *12(b)(3)*
for lack of personal jurisdiction and improper venue. All
of the publishers moved to dismiss the amended com-
plaint pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to
state a claim. The court concluded that the companies
had failed to establish prima facie facts that supported
personal jurisdiction over the moving defendants under
New York law. Moreover, having failed to satisfy the

"transacting business" test under the long-arm statute, the
companies had also failed to satisfy the venue provision
of the Clayton Act, and therefore could not rely on the
Act's nationwide service of process provision. The court
declined to consider transferring venue, as it was unclear
how or where the companies might wish to proceed
against the moving defendants. The court also concluded
that taking the allegations of the amended complaint as
true, it did not appear that there was any set of facts the
companies could prove in support of their complaint that
would entitle them to relief under the antitrust laws.

**OUTCOME:** The motions to dismiss were granted and
the amended complaint was dismissed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction
& In Rem Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Motions to Dismiss*

2001 U.S. Dist. LEXIS 18831, *; 2002-1 Trade Cas. (CCH) P73,556

[HN1] Because a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(2)* based on lack of personal jurisdiction is inherently a matter requiring the resolution of factual issues outside of the pleadings all pertinent documentation submitted by the parties may be considered in deciding the motion. Therefore, the facts are drawn from the amended complaint, affidavits, and documentary exhibits submitted by both parties, and are construed in the light most favorable to the nonmoving party.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN2] For the purposes of a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, only the facts alleged in the amended complaint may be considered, and such facts are to be accepted as true.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN3] Jurisdiction is a threshold matter, and must precede a determination on the merits.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Evidence > Inferences & Presumptions > General Overview*
[HN4] On a *Fed. R. Civ. P. 12(b)(2)* motion, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant. Prior to the holding of an evidentiary hearing, the plaintiff need only make a prima facie showing that jurisdiction exists. Where there has been discovery on the issue of jurisdiction, the plaintiff's prima facie showing must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. The plaintiff cannot rely merely on conclusory statements or allegations; rather, the prima facie showing must be "factually supported."

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
*Civil Procedure > Pleading & Practice > Service of Process > General Overview*
[HN5] In a case arising under federal law which does not provide for service of process, personal jurisdiction is based on the law of the forum state.

*Antitrust & Trade Law > Clayton Act > Jurisdiction & Venue*
*Civil Procedure > Jurisdiction > General Overview*
*Civil Procedure > Venue > General Overview*
[HN6] Although § 12 of the Clayton Act does provide for nationwide service of process for suits under the antitrust laws, *15 U.S.C.S. § 22*, satisfaction of the venue provision of the Act is a prerequisite to extraterritorial service of process. The applicable test for venue under the Act -- whether the moving defendants transact business in this district -- has been held to be co-extensive with the "transacting business prong" of New York's long-arm statute. If this test is not met, plaintiffs may rely on the other provisions of New York law to establish jurisdiction and on the general venue statute for venue. Thus, New York law determines the issue of personal jurisdiction. If the exercise of personal jurisdiction is found to be proper under state law, the court must then decide whether such exercise is consistent with due process.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Doing Business*
[HN7] *N.Y. C.P.L.R. § 301*, as construed by the New York courts, subjects a foreign corporation to personal jurisdiction in New York if the defendant is engaged in such a continuous and systematic course of doing business here as to warrant a finding of its presence in this jurisdiction. The defendant must be present in New York not occasionally or casually, but with a fair measure of permanence and continuity.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN8] Under *N.Y. C.P.L.R. § 301*, the traditional indicia of "doing business" include: 1) the existence of an office in New York; 2) the solicitation of business in the state; 3) the presence of bank accounts and other property in the state; and 4) the presence of employees of the foreign defendant in the state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN9] A foreign supplier of goods or services for whom an independent agency solicits orders from New York purchasers is not present in New York and may not be sued here, however substantial in amount the resulting orders.

2001 U.S. Dist. LEXIS 18831, *; 2002-1 Trade Cas. (CCH) P73,556

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN10] "Mere solicitation" of business or "mere sales" in New York do not constitute a corporate presence in New York for purposes of personal jurisdiction.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > Statutory Sources*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Long-Arm Jurisdiction*
[HN11] *N.Y. C.P.L.R. § 302(a)(1)* permits a court to exercise jurisdiction over an out-of-state defendant who transacts any business within the state or contracts anywhere to provide goods or services in the state where the cause of action arises out of that business activity.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN12] To "transact business" in New York, a nondomiciliary must purposely avail itself of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws. Courts will consider the "totality of the circumstances" to determine whether a party transacts business in New York; common factors include, but are not limited to: 1) the existence of an ongoing contractual relationship with a New York corporation; 2) whether the contract was negotiated or executed in New York and whether the defendant visited New York regarding the contractual relationship; 3) the choice-of-law clause in the contract; and 4) whether the contract requires supervision by the corporation in the forum state. All factors are relevant, and no one factor is dispositive.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN13] Phone calls and mailings must serve to project a defendant into New York to assert jurisdiction on that basis.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN14] *N.Y. C.P.L.R. § 302* jurisdiction requires a "substantial relationship" between the in-state contacts and the cause of action sued upon.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN15] *N.Y. C.P.L.R. § 302(a)(2)* confers jurisdiction over a defendant who commits a tortious act within the state. Antitrust violations are tortious acts for jurisdictional purposes. Under *§ 302(a)(2)* a defendant's physical presence in New York is a prerequisite to jurisdiction.

*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN16] Under New York law, conspiracy, per se is not a tort. The damage for which recovery may be had in a civil action is not the conspiracy itself, but the injury to plaintiff produced by specific overt acts.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > General Overview*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN17] It is well-established that the acts of a coconspirator may be attributed to a defendant for the purpose of obtaining personal jurisdiction over the defendant. However, it is also settled that the bland assertion of conspiracy is insufficient to establish jurisdiction for the purposes of *N.Y. C.P.L.R. § 302(a)(2)*. Instead, plaintiffs must make a prima facie case of conspiracy and allege specific facts warranting the inference that the defendants were members of the conspiracy. Plaintiffs then must come forward with some definite evidentiary facts to connect the defendant with transactions occurring in New York.

*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN18] A prima facie case of conspiracy can be based on either direct or circumstantial evidence.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN19] *N.Y. C.P.L.R. § 302(a)(3)* provides for jurisdiction over a defendant who committed a tortious act outside New York that caused injury in New York. Courts determining whether there is injury in New York must generally apply a situs-of-injury test, which asks them to locate the original event which caused the injury. The

2001 U.S. Dist. LEXIS 18831, *; 2002-1 Trade Cas. (CCH) P73,556

original event as to a commercial tort is typically the loss of business, which occurs where the customers are located.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN20] *N.Y. C.P.L.R. § 302(a)(3)* is not satisfied by remote or consequential injuries which occur in New York only because the plaintiff is domiciled, incorporated or doing business in the state.

*Antitrust & Trade Law > Robinson-Patman Act > Claims*
*Antitrust & Trade Law > Robinson-Patman Act > Coverage > General Overview*
[HN21] The Robinson-Patman Act makes it unlawful to discriminate in price between different purchasers of commodities of like grade and quality. *15 U.S.C.S. § 13(a)*.The term "commodities" refers to goods, not services.

*Antitrust & Trade Law > Sherman Act > Claims*
[HN22] In order to prevail on a monopolization claim under the Sherman Act, plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. That is, an antitrust plaintiff must prove more than harm to its own business or the loss of a competitor. Rather, it must prove harm to competition as a whole in the relevant market.

*Antitrust & Trade Law > Market Definition > Relevant Market*
*Antitrust & Trade Law > Sherman Act > General Overview*
[HN23] Even if plaintiffs have alleged antitrust injury, a complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed.

*Antitrust & Trade Law > Sherman Act > General Overview*
[HN24] A complaint in an antitrust case must allege a basis for finding that the product alleged to have been monopolized is in some way unique, that it is a market unto itself.

*Antitrust & Trade Law > Sherman Act > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN25] Where a complaint fails to allege facts regarding substitute products, or to allege other pertinent facts relating to cross-elasticity of demand a court may grant a *Fed. R. Civ. P. 12(b)(6)* motion.

*Antitrust & Trade Law > Sherman Act > General Overview*
[HN26] The Sherman Act does not convert all harsh commercial actions into antitrust violations.

*Antitrust & Trade Law > Sherman Act > Jurisdiction*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN27] Just as conclusory allegations of concerted action are insufficient to support a conspiracy theory of jurisdiction, so too are they insufficient to state a Sherman Act *§ 2* claim. Although the Federal Rules permit statement of ultimate facts, a bare bones statement of conspiracy under the antitrust laws without any supporting facts permits dismissal.

*Antitrust & Trade Law > Industry Regulation > Professional Associations & Higher Education > Professional Associations*
*Antitrust & Trade Law > Sherman Act > General Overview*
[HN28] A conspiracy will not be inferred from participation in a trade association.

*Antitrust & Trade Law > Sherman Act > General Overview*
[HN29] Even where pricing practices or other policies are generally alleged to be uniform, this uniformity does not permit an inference of a conspiracy where the conduct is in each party's individual self-interest.

*Antitrust & Trade Law > Sherman Act > General Overview*
[HN30] To state a tying claim, there must be two separate products for which there is consumer demand, and the sale of one must be conditioned on the purchase of the other.

2001 U.S. Dist. LEXIS 18831, *; 2002-1 Trade Cas. (CCH) P73,556

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > General Overview*

[HN31] When federal claims are dismissed at an early stage of litigation, it is proper to decline to exercise supplemental jurisdiction.

**COUNSEL:** CARL E. PERSON, ESQ., New York, NY, for Plaintiffs.

ALAN COHEN, ESQ., ANDREW J. FRACKMAN, ESQ., ROBERT M. STERN, ESQ., O'Melveny & Myers LLP, New York, NY, for Bell Atlantic Yellow Pages Company and GTE Directories Corp., Defendants.

IAN T. SIMMONS, ESQ., WILLIAM J. STUCKWISCH, ESQ., Washington, D.C., for Bell Atlantic Yellow Pages Company and GTE Directories Corp., Defendants.

ALLEN KEZSBOM, ESQ., ALLANA F. STARK, ESQ., Fried Frank Harris Shriver & Jacobson, New York, NY, for BellSouth Advertising & Publishing Company, Defendant.

DAVID A. BARRETT, ESQ., EVAN GLASSMAN, ESQ., Boies Schiller & Flexner LLP, New York, NY, for U.S. West Dex, Inc. and SBC Directory Operations, Inc., Defendants.

KENT A. GARDINER, ESQ., BRIDGET E. CALHOUN, ESQ., Cromwell & Moring LLP, Washington, D.C., for SBC Directory Operations, Inc., Defendant.

MARK A. CONLEY, ESQ., CHARLES STERN, ESQ., Katten Muchin & Zavis, Los Angeles, CA, for Yellow Pages Publishers Association, Inc., Defendant.

**JUDGES:** Michael B. Mukasey, U.S. District Judge.

**OPINION BY:** Michael B. Mukasey

**OPINION**

OPINION AND ORDER

MICHAEL B. MUKASEY, U.S.D.J.

Plaintiffs are eight companies that sell advertising in Yellow Pages directories. They sue eight publishers of Yellow Pages directories ("Pubcos") and a trade association, alleging antitrust violations under the Robinson-Patman Act, *Sections 1* and *2* of the Sherman Act, and state antitrust laws. Plaintiffs further allege a variety of common-law claims, including unlawful interference with contracts and advantageous economic relationships,

breach of contract, breach of the implied covenant of good faith and fair dealing, defamation and trade libel, and unfair competition. Certain defendants move to dismiss the action pursuant to *Fed. R. Civ. P. 12(b)(2)* and *12(b)(3)* for lack of personal jurisdiction and improper venue. All of the defendant Pubcos move to dismiss the amended complaint pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim. For the reasons set forth below, defendants' motions to dismiss are granted.

I.

[HN1] Because a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(2)* based on lack of personal jurisdiction is "inherently a matter requiring the resolution of factual issues outside of the pleadings [*3] . . . all pertinent documentation submitted by the parties must be considered in deciding the motion." *Pilates, Inc. v. Pilates Inst., Inc., 891 F. Supp. 175, 178 n.2 (S.D.N.Y. 1995).* Therefore, the following facts are drawn from the amended complaint, affidavits, and documentary exhibits submitted by both parties, and on this motion are construed in the light most favorable to plaintiffs. *CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986).* [HN2] For the purposes of the motion to dismiss pursuant to *Rule 12(b)(6),* only the facts alleged in the amended complaint may be considered, and such facts are to be accepted as true.

Defendant Pubcos publish printed telephone directories, including Yellow Pages, for cities within their respective geographic regions of the country. (Am. Compl. PP 13-17) Bell Atlantic Yellow Pages Company ("Verizon") [1] is a Delaware corporation with its principal place of business in Massachusetts; it operates in various states in the northeastern United States, including New York. (*Id.* P 13) BellSouth Advertising and Publishing Corporation ("BAPCO") is a Georgia corporation with its principal place of business in Georgia; [*4] it operates in the southeastern United States. (*Id.* P 14; Frew Aff. P 3) Southwestern Bell Yellow Pages, Inc. ("SWBYP"), Pacific Bell Directory ("PBD"), Ameritech Publishing, Inc. ("API") and SNET Information Services, Inc. ("SNET") (collectively the "SBC Publishing Companies") [2] are respectively a Missouri, California, Delaware, and Connecticut corporation with their principal places of business in Missouri, California, Delaware, and Connecticut, respectively. (Fobbs Decl. PP 10-13) SWBYP operates in the southern-midwestern and southwestern United States; PBD operates in California and Nevada; API operates in the northern-midwestern United States; SNET operates in Connecticut. (*Id.*) Qwest Dex, Inc. ("Qwest") [3] is a Colorado corporation with its principal place of business in Colorado; it operates in the midwestern and western United States. (Am. Compl. P 16; Houston Decl. P 2) GTE Directories Corp. ("GTE") is a Delaware cor-

poration with its principal place of business in Texas; it operates in various states throughout the United States. (Am. Compl. P 17) The Yellow Pages Publishers Association, Inc. (the "YPPA") is a Delaware corporation with its principal place of business [*5] in Colorado. (*Id.* P 20)

> 1    Recently, Bell Atlantic changed its name to Verizon.

> 2    The four companies that comprise the SBC Publishing Companies have been substituted for defendant SBC Directory Operations, Inc. in this action by stipulation and order.

> 3    U.S. West Dex, Inc., changed its name to Qwest Dex, Inc.

Plaintiffs are five Certified Marketing Representatives ("CMRs") and three other companies that have sold Yellow Pages advertising either directly on behalf of a Pubco or on behalf of a CMR. [4] (*Id.* PP 6-12A) A CMR is an advertising organization or other person that is certified by the YPPA to sell advertising in Yellow Pages directories. (*Id.* PP 21, 33B) The YPPA is a non-profit trade association comprised of 99 Yellow Pages publishers and 186 CMRs that was created by the Pubcos to facilitate and set standards for the placement of Yellow Pages advertising. (*Id.* PP 20, 21, 84) None of the plaintiffs are located in New York. (*Id.* PP 6-12A)

> 4    Plaintiffs Yellow Page Solutions, Inc.; Laurel Leone; Martinex & Associates, Inc.; National Yellow Page Service, Inc.; and Tom and Donna Thompson are the CMR plaintiffs. Phoenix Yellow Page Group, Inc. is not a CMR, but to some extent makes claims as a CMR due to its purchase of DRC Advertising, Inc., a former CMR.

[*6]    The advertising that the Pubcos sell in their Yellow Pages directories is either national or local, as defined by non-binding guidelines of the YPPA. (*Id.* PP 79, 80) Each Pubco has its own internal sales force to solicit local advertisers within the cities for which it publishes directories. (*Id.* P 74) National advertisers are solicited by CMRs, who then contact a Pubco to submit the advertising order. The CMR acts as an intermediary between the Pubco and the national advertiser, allowing these larger advertisers to place ads for their local outlets in multiple directories without having to deal with each individual publisher. (*Id.* PP 75, 81)

The Pubcos sell national advertising to the CMRs at a reduced rate, the discount representing the CMRs' sales commission. (*Id.* P 75) CMRs do not receive a commission for selling local advertising; commissions on local advertising are available only to a Pubco's internal sales

force and allegedly to any Pubco that places local advertising in another Pubco's directory pursuant to cross-selling agreements between the Pubcos. (*Id.* PP 75, 77) The non-CMR plaintiffs earn their compensation either by sharing in a CMR's commission, [*7] or by working out a fee arrangement with their client-advertisers for local advertising placed directly with a Pubco. (*Id.* P 76)

Plaintiffs allege that defendants have a monopoly in the market for Yellow Pages publishing and for the advertising published therein for their respective regions, with competing publishers collectively accounting for less than 10% of the market share for Yellow Pages advertising. (*Id.* PP 34E-F; 67-69) Plaintiffs assert that defendants have engaged in discriminatory practices and have conspired through the YPPA to restrain trade and to further monopolize the industry. (*Id.* PP 52, 84-86)

Plaintiffs' first claim alleges that defendants have engaged in price discrimination, offering favored CMRs and the internal sales forces of the Pubcos greater discounts on advertising than those offered to plaintiff CMRs. The commission level is based on a CMR's sales history with a Pubco, thereby discouraging a CMR from placing advertising in competing directories regardless of its clients' best interests. (*Id.* PP 29, 30, 38)

Claim two alleges conspiracy and attempt to monopolize, and monopolization with use of predatory pricing and practices. In addition [*8] to defendants' pricing practices, plaintiffs focus on defendants' manipulation of the definition of "local" and "national" advertising in order to convert national advertisers into uncompensated local advertisers, for whose business the only commission payment goes to in-house sales staff or other Pubcos. Plaintiffs also complain about a host of other allegedly predatory business practices and terms and conditions of doing business. (*Id.* PP 60, 78, 89A-MM)

The third claim alleges a conspiracy to fix prices and restrain trade, based on the allegation that defendants have conspired to sell plaintiffs local advertising at full list price, without discount, and to redefine national advertising as local advertising. Plaintiffs assert that the collective refusal to sell local advertising at a discount amounts to a group boycott and concerted refusal to deal. (*Id.* PP 98-100)

Plaintiffs' remaining claims allege an array of state and common law violations.

Plaintiffs allege that the result of these practices is that they are losing their clients to the favored CMRs and the Pubcos, and that non-favored CMRs, and competing publishers of Yellow Pages, are being driven out of business. [*9] (*Id. passim*)

II.

2001 U.S. Dist. LEXIS 18831, *; 2002-1 Trade Cas. (CCH) P73,556

[HN3] Jurisdiction is a threshold matter, and must precede a determination on the merits. *Rationis Enter., Inc. v. AEP/Borden Indus., 261 F.3d 264, 267-68 (2d Cir. 2001).* I therefore first consider the motion by BAPCO, the SBC Publishing Companies, and Qwest to dismiss for lack of personal jurisdiction.

[HN4] On a *Rule 12(b)(2)* motion, "the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996).* Prior to the holding of an evidentiary hearing, the plaintiff need only make a prima facie showing that jurisdiction exists. *CutCo, 806 F.2d at 365.* Where, as here, there has been discovery on the issue of jurisdiction, the plaintiff's prima facie showing must include "an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d. Cir. 1990).* The plaintiff cannot rely merely on conclusory statements or allegations, *see Barrett v. United States, 646 F. Supp. 1345, 1350 (S.D.N.Y. 1986)* [*10] (citing *Newmark v. Abeel, 102 F. Supp. 993, 994 (S.D.N.Y. 1952)* (Weinfeld, J.)); rather, the prima facie showing must be "factually supported." *Ball, 902 F.2d at 197.*

[HN5] In a case arising under federal law which does not provide for service of process, personal jurisdiction is based on the law of the forum state. *See Omni Capital Int'l v. Rudolf Wolff & Co., 484 U.S. 97, 108, 98 L. Ed. 2d 415, 108 S. Ct. 404 (1987).* [HN6] Although *section 12* of the Clayton Act does provide for nationwide service of process for suits under the antitrust laws, *15 U.S.C. § 22 (1994)*, satisfaction of the venue provision of the Act is a prerequisite to extraterritorial service of process. [5] *See Goldlawr, Inc. v. Heiman, 288 F.2d 579, 581 (2d Cir. 1961), rev'd on other grounds, 369 U.S. 463, 8 L. Ed. 2d 39, 82 S. Ct. 913 (1962); Grosser v. Commodity Exchange, Inc., 639 F. Supp. 1293, 1312 (S.D.N.Y. 1986), aff'd 859 F.2d 148 (2d Cir. 1988); GTE New Media Serv. Inc. v. BellSouth Corp., 339 U.S. App. D.C. 332, 199 F.3d 1343, 1351 (D.C. Cir. 2000)* (following *Goldlawr*). The applicable test [*11] for venue under the Act -- whether the moving defendants transact business in this district -- has been held to be co-extensive with the "transacting business prong" of New York's long-arm statute. *Grosser, 639 F. Supp. at 1313.* If this test is not met, plaintiffs may rely on the other provisions of New York law to establish jurisdiction and on the general venue statute for venue. Thus, New York law determines the issue of personal jurisdiction. If the exercise of personal jurisdiction is found to be proper under state law, the court must then decide whether such exercise is consistent with due process. *Bensusan Restaurant Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997).*

5   This connection between personal jurisdiction and venue in antitrust cases explains why four of the moving defendants here, BAPCO and the SBC Publishing Companies, frame their motion as an attack on both jurisdiction and venue. Defendant Qwest, although it makes the same arguments, frames its motion in terms of jurisdiction alone. Personal jurisdiction and venue are necessarily considered together here.

[*12]   In this case, plaintiffs argue that this court has jurisdiction pursuant to *N.Y. C.P.L.R. § 301 (McKinney 2000)* and New York's Long Arm Statute, *N.Y. C.P.L.R. § 302 (McKinney 2000).*

## A. C.P.L.R. § 301

[HN7] *Section 301*, as construed by the New York courts, subjects a foreign corporation to personal jurisdiction in New York if the defendant is "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *McGowan v. Smith, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321 (1981); see also Landoil Res. Corp. v. Alexander & Alexander Servs. Inc., 918 F.2d 1039, 1043 (2d Cir. 1991),* and cases cited therein. The defendant "must be present in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.'" *Landoil, 918 F.2d at 1043* (quoting *Tauza v. Susquehanna Coal Corp., 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917)).*

[HN8] The traditional indicia of "doing business" here include: 1) the existence of an office in New York; 2) the solicitation of business in the state; 3) the presence of bank accounts and other [*13] property in the state; and 4) the presence of employees of the foreign defendant in the state. *See Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985).* None of these traditional indicia are present for the moving defendants. Rather, the moving defendants do business only in their respective regional territories, where they publish and distribute directories intended only for their local communities. They solicit only local advertisers, and the advertising in these directories is for businesses having local contacts. Although Qwest is licensed to do business in New York and has appointed an agent for service of process, that is not sufficient to subject it to personal jurisdiction absent a showing that it is actually doing business in the state. *See Bellepointe, Inc. v. Kohl's Department Stores, Inc., 975 F. Supp. 562, 564 (S.D.N.Y. 1997)* (citing *Beja v. Jahangiri, 453 F.2d 959, 962 (2d Cir. 1972)); Consolidated Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1293 (11th Cir. 2000)* (collecting cases). [6]

2001 U.S. Dist. LEXIS 18831, *; 2002-1 Trade Cas. (CCH) P73,556

6   Qwest obtained the license only to preserve and protect its trademark. Since its receipt of that license, Qwest's revenues from New York have been insufficient to require Qwest to pay taxes on that revenue. (Houston Decl. PP 6, 21-22)

[*14]  Plaintiffs first attempt to base § 301 jurisdiction on defendants' contacts with non-plaintiff CMRs in New York, particularly TMP Worldwide, Inc. ("TMP"), allegedly one of the favored CMRs. (Am. Compl. P 2A) Although the Pubcos do accept advertising from these CMRs and derive revenues from New York advertising, it cannot be said that the moving defendants solicit advertising in New York, either directly or indirectly through the CMRs.

First, to the extent that a New York advertiser advertises in defendants' directories, such advertising was solicited by a CMR, which is an unaffiliated intermediary. [HN9] "[A] foreign supplier of goods or services for whom an independent agency solicits orders from New York purchasers is not present in New York and may not be sued here, however substantial in amount the resulting orders." *Laufer v. Ostrow, 55 N.Y.2d 305, 311, 449 N.Y.S.2d 456, 459, 434 N.E.2d 692 (1982).*

Second, as to the Pubcos' relationship with the CMRs themselves, it should first be noted that "the mere existence of a business relationship with entities within the forum state is insufficient to establish presence." *Insurance Co. of Penn. v. Centaur Ins. Co., 590 F. Supp. 1187, 1189 (S.D.N.Y. 1984).* Moreover, in this relationship, it is the CMRs that initiate contact with the Pubcos in order to place advertising in local directories. I thus agree with the District of New Jersey Court that found "it is the CMRs which draw [the Pubcos] into the state, rather than any purposeful injection by [the Pubcos] of their presence." *Database Am., Inc. v. BellSouth Adver. & Publ'g Corp., 825 F. Supp. 1195, 1210 (D.N.J. 1993).*

Even were I to find that the moving defendants did solicit business from New York [HN10] CMRs, "mere solicitation" of business or "mere sales" in New York do not constitute a corporate presence in New York. *Roberts-Gordon, LLC v. Superior Radiant Products, Ltd., 85 F. Supp. 2d 202, 209 (W.D.N.Y. 2000); Roper Starch Worldwide, Inc. v. Reymer & Assocs., Inc., 2 F. Supp. 2d 470, 473 (S.D.N.Y. 1998)* (citing *Landoil, 918 F.2d at 1043*). This is particularly true here, where the amount of revenue derived from New York is less than one percent of annual revenues (Frew Supp. Aff. P 2; Fobbs Decl. P 26; Houston Decl. P 10), far less than the substantial solicitation required. *See, e.g., Beacon Enter., Inc. v. Menzies, 715 F.2d 757, 763 (2d Cir. 1983);* [*16] *Stark Carpet Corp. v. M-Geough Robinson, Inc., 481 F. Supp. 499, 505 (S.D.N.Y. 1980); New England Laminates Co.*

*v. Murphy, 79 Misc. 2d 1025, 362 N.Y.S.2d 730, 733 (Sup. Ct. Nassau County 1974).* Although plaintiffs try to bolster their argument by pointing to the Pubcos' sporadic trips to visit New York CMRs, the occasional sale of directories in New York, and payments made to various New York vendors in the ordinary course of business (Pl. Mem. *passim*), these are not sufficient to confer § 301 jurisdiction. *See* cases cited herein; *see also Aquascutum of London, Inc. v. S.S. Am. Champion, 426 F.2d 205, 211-12 (2d Cir. 1970); Holness v. Maritime Overseas Corp., 251 A.D.2d 220, 222-23, 676 N.Y.S.2d 540, 543 (1st Dep't 1998).*

Plaintiffs next rely on alleged cross-selling agreements between the moving Pubcos and Verizon as a basis for general jurisdiction. (Pl. Mem. at 2) Plaintiffs claim that, pursuant to these reciprocal agreements, the moving Pubcos regularly purchase and resell advertising in Verizon's New York directories and receive revenue from New York advertising that Verizon places in the moving defendants' [*17] directories. However, as to all but one of the moving defendants, the facts proffered by plaintiffs themselves directly refute the existence of any such agreements. The sworn depositions of the moving defendants taken by plaintiffs clearly establish that none of the moving defendants, with the sole exception of one of the SBC Publishing Companies, defendant SNET, has such an agreement with Verizon. (Frew Dep. at 26, 33, 35, 36; Gibbons Dep. at 10, 11; Plucker Dep. at 14) Although plaintiffs inexplicably continue to hypothesize the existence of such agreements, "affidavits based on personal knowledge are to be credited over contradictory allegations based merely on information or belief, and facts adduced in opposition to jurisdictional allegations are considered more reliable than mere contentions offered in support of jurisdiction." *Barrett, 646 F. Supp. at 1350.* Plaintiffs have failed to meet their burden here.

As the argument applies to SNET, it is also insufficient to confer jurisdiction. The "Out of Area Agreement" in issue is nothing more than a way for SNET to help its local Connecticut customers, who do not qualify for national representation by a CMR, to [*18] place advertising with Verizon. (Gibbons Decl. P 6) This service, rendered in Connecticut, does not bring SNET into New York for jurisdictional purposes. As to the advertising Verizon places in SNET directories, this is directly analogous to the result of the CMR contacts addressed above, and is insufficient to confer jurisdiction.

## B. C.P.L.R. § 302(a)(1)

Plaintiffs argue also that defendants are subject to personal jurisdiction under § 302(a)(1) of New York's Long Arm Statute. [HN11] That section permits a court to exercise jurisdiction over an out-of-state defendant who "transacts any business within the state or contracts

anywhere to provide goods or services in the state" where the cause of action arises out of that business activity. *C.P.L.R. § 302(a)(1)*.

Plaintiffs assert that the cross-selling agreements with Verizon are contracts by the moving Pubcos to provide advertising services in New York. (Pl. Mem. P 4) However, as I have noted above, this argument applies only to SNET and, as noted, SNET provides its service in Connecticut, not in New York. I thus turn to whether defendants "transact business" in New York.

[HN12] To "transact business" in New York, a non-domiciliary must "purposely [*19] avail[] itself of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *McKee Elec. Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34, 229 N.E.2d 604 (1967)* (quoting *Hanson v. Denckla, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958)).* Courts will consider the "totality of the circumstances" to determine whether a party transacts business in New York; common factors include, but are not limited to: 1) the existence of an ongoing contractual relationship with a New York corporation; 2) whether the contract was negotiated or executed in New York and whether the defendant visited New York regarding the contractual relationship; 3) the choice-of-law clause in the contract; and 4) whether the contract requires supervision by the corporation in the forum state. *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29-30 (2d Cir. 1996).* All factors are relevant, and no one factor is dispositive. *Id.*

Plaintiffs base their argument in support of jurisdiction primarily on defendants' relationship with CMRs in New York. However, as Judge [*20] Parker has previously determined, these dealings do not constitute transacting business in New York under the meaning of *§ 302(a)(1). See National Tel. Directory Consultants, Inc. v. BellSouth Adver. & Publ'g Corp., 25 F. Supp. 2d 192 (S.D.N.Y. 1998)* [hereinafter *NTDC*]. The contracts between the moving Pubcos and the CMRs were not drafted in New York, were not negotiated or executed in New York, are explicitly not governed by New York law, and require no supervision in New York. (Frew Aff. PP 18-23; Fobbs Decl. PP 27-28; Houston Decl. PP 20)

Although the contract does generate sporadic contacts between the Pubcos and the New York CMRs by mail, telephone, or otherwise, the Pubcos do not thereby "'project' themselves into New York local commerce in order to 'purposely avail' themselves of the benefits of doing business in New York." *NTDC,* 25 F. Supp. 2d at 196; *see also Roper Starch, 2 F. Supp. 2d at 474* (holding that [HN13] phone calls and mailings must serve to project a defendant into New York to assert jurisdiction on that basis); *Premier Lending Services, Inc. v. J.L.J.*

*Assocs., 924 F. Supp. 13, 16 (S.D.N.Y. 1996)* [*21] (same); *Wilhelmshaven Acquisition Corp. v. Asher, 810 F. Supp. 108, 112 (S.D.N.Y. 1993)* (same). Rather, such contacts "further the CMRs' efforts to place advertising in [the Pubcos' regional directories];" they are thus incidental to a service that is only provided elsewhere. *NTDC,* 25 F. Supp. 2d at 197. The Second Circuit has held that a defendant cannot be sued in New York based solely on incidental contacts associated with performing a service for a New York client where the client solicits the service and the service is performed outside New York. *Mayes v. Leipziger, 674 F.2d 178, 185 (2d Cir. 1982).* In such a relationship, there is "no activity in New York in which defendant sought to participate." *Id.; see also Continental Field Serv. Corp. v. ITEC Int'l Inc., 894 F. Supp. 151, 154 (S.D.N.Y. 1995)* (declining jurisdiction where defendant had no physical presence in New York and the contract was negotiated and performed in Venezuela).

Moreover, [HN14] *§ 302* jurisdiction requires a "substantial relationship" between the in-state contacts and the cause of action sued upon. *Beacon Enter., Inc., 715 F.2d at 764* [*22] (citing *McGowan, 52 N.Y.2d at 272, 437 N.Y.S.2d at 645*). To the extent that plaintiffs' claims arise out of the Pubcos' business decisions and practices in connection with their contracts with plaintiff and non-plaintiff CMRs, the claims implicate conduct that took place in the Pubcos' respective regions -- not in New York.

Plaintiffs cite meetings with a favored CMR, TMP, in New York, but plaintiffs adduce no facts to show that these meetings had anything to do with the subject matter of this lawsuit. Plaintiffs offer no more than speculation as to what was discussed at these meetings, and therefore have failed to support *§ 302(a)(1)* jurisdiction. *See Pyramyd Stone Int'l Corp. v. Crosman Corp., 1997 U.S. Dist. LEXIS 1610,* No. 95 Civ. 6665, 1997 WL 66778, at *10 (S.D.N.Y. Feb. 18, 1997). Further, once again, the discovery record built by plaintiffs often directly refutes the sinister purpose plaintiffs would attach to these meetings. The moving defendants visited CMRs nationwide to discuss such issues as changes in the ordering-processing system, or generally to discuss ways to increase business. (Frew Dep. at 22-23; Gibbons Dep. at 8, 10; Plucker Dep. at 6-7, 24-25) These [*23] visits were not targeted at "favored" CMRs in New York. Indeed, when specifically asked, defendant Qwest refuted the notion that any special deals had been offered to TMP in New York, and some of the defendants, Qwest included, have done no business with TMP in New York during the period for which plaintiffs made their jurisdictional inquiry. (Plucker Dep. at 14-15; Plucker Decl. P 6; Gibbons Decl. P 4) Thus, the "record is devoid of evidence that defendants' alleged activities in New York gave rise

to the causes of action for which long-arm jurisdiction is sought." *Storch v. Vigneau, 162 A.D.2d 241, 242, 556 N.Y.S.2d 342, 342* (1st Dep't 1990). Defendants' other unrelated visits to New York, the occasional sale of a directory in New York, and business payments made to New York vendors similarly lack the requisite "articulable nexus" upon which to base jurisdiction. *McGowan, 52 N.Y.2d at 272, 437 N.Y.S.2d at 645.*

### C. C.P.L.R. § 302(a)(2)

Plaintiffs further rely on [HN15] *§ 302(a)(2)* of New York's Long Arm Statute, which confers jurisdiction over a defendant who "commits a tortious act within the state." *C.P.L.R. § 302(a)(2).* Antitrust violations are tortious [*24] acts for jurisdictional purposes. *See Fashion Two Twenty, Inc. v. Steinberg, 339 F. Supp. 836, 841 (E.D.N.Y. 1970); Albert Levine Assocs. v. Bertoni & Cotti, 314 F. Supp. 169, 171 (S.D.N.Y. 1970).* Under *§ 302(a)(2)* a defendant's physical presence in New York is a prerequisite to jurisdiction. *See Bensusan, 126 F.3d at 29* (citing *Feathers v. McLucas, 15 N.Y.2d 443, 458, 261 N.Y.S.2d 8 (1965).* Plaintiffs rely on the moving defendants' conspiracy with Verizon and TMP in New York to monopolize, fix prices, and restrain trade, and on the moving defendants' visits to TMP in New York, allegedly in furtherance of that conspiracy. (Pl. Mem. at 18) This argument fails for three reasons. First, as noted above, plaintiffs have failed to show that these meetings involved any such conspiracy. Absent a specific showing that these meetings served an unlawful end, plaintiffs' conclusory allegations are "totally insufficient to create tortious activity in New York." *Lehigh Valley Indus., Inc. v. Birenbaum, 527 F.2d 87, 93 (2d Cir. 1975).*

Second, plaintiffs cannot rely on conspiracy alone to assert jurisdiction. "[HN16] Under [*25] New York law, conspiracy, per se is not a tort . . . . The damage for which recovery may be had in a civil action is not the conspiracy itself, but the injury to plaintiff produced by specific overt acts." *Grove Press, Inc. v. Angleton, 649 F.2d 121, 123 (2d Cir. 1981).* Plaintiffs have failed to allege specifically any tortious act performed by the moving defendants while in New York.

Finally, to the extent that plaintiffs' papers could be construed to assert a conspiracy theory of jurisdiction based on the alleged in-state activities of Verizon, plaintiffs have failed make a prima facie factual showing of a conspiracy. "[HN17] It is well-established that the acts of a co-conspirator may be attributed to a defendant for the purpose of obtaining personal jurisdiction over the defendant." *Singer v. Bell, 585 F. Supp. 300, 302 (S.D.N.Y. 1984)* (Weinfeld., J.) (citations omitted). However, it is also settled that "the bland assertion of conspiracy . . . is insufficient to establish jurisdiction for the purposes of *§ 302(a)(2)*." *Lehigh Valley Indus. Inc., 527 F.2d 87, 93-*

*94.* Instead, plaintiffs must make a "prima facie case of conspiracy and [*26] allege specific facts warranting the inference that the defendants were members of the conspiracy." *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 26 F. Supp. 2d 593, 601 (S.D.N.Y. 1998)* (citations omitted); *see also Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991).* Plaintiffs then must "come forward with some definite evidentiary facts to connect the defendant with transactions occurring in New York." *Singer, 585 F. Supp. 300, 303* (citations omitted); *see also Levisohn, Lerner, Berger & Langsam v. Medical Taping Sys., Inc., 10 F. Supp. 2d 334, 342 (S.D.N.Y. 1998).*

Plaintiffs have failed to meet their burden. Although [HN18] a prima facie case of conspiracy can be based on either direct or circumstantial evidence, *see Singer, 585 F. Supp. at 303,* plaintiffs aver no facts to support the inference that the moving defendants were part of any conspiracy, let alone that any tortious acts were committed in New York on their behalf, *see Pyramyd Stone Int'l Corp., 1997 U.S. Dist. LEXIS 1610, 1997 WL 66778,* at *11; *see also Chrysler Capital Corp., 778 F. Supp. at 1268.* [*27] Plaintiffs would apparently have the court infer a conspiracy from defendants' participation in YPPA, a trade association, and from various business practices of the Pubcos, only some of which constitute parallel conduct and all of which are in the defendants' individual self-interest. But far more is required to lay a sufficient factual foundation for an antitrust conspiracy. *See, e.g., AD/SAT, A Division of Skylight, Inc. v. Associated Press, Newspaper Assoc. of Am., 181 F.3d 216, 234-35 (2d Cir. 1999); Apex Oil Co. v. DiMaurio, 822 F.2d 246, 254 (2d Cir. 1987); Levitch v. Columbia Broadcasting System, 495 F. Supp. 649, 674-75 (S.D.N.Y. 1980), aff'd, 697 F.2d 495 (2d Cir. 1983)* (per curiam). Throughout their complaint and papers, plaintiffs offer nothing more, other than conclusory allegations of a corrupt agreement between the Pubcos and the favored CMRs to violate the antitrust laws. "Mere speculation and conjecture" by the plaintiffs, however, cannot provide a substitute for the averment of jurisdictional facts. *Singer, 585 F. Supp. at 303.*

### D. C.P.L.R. § 302(a)(3)

Finally, plaintiffs would [*28] rely also on [HN19] *§ 302(a)(3),* which provides for jurisdiction over a defendant who committed a tortious act outside New York that caused injury in *New York. C.P.L.R. § 302(a)(3).* "Courts determining whether there is injury in New York must generally apply a situs-of-injury test, which asks them to locate the original event which caused the injury." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 791 (2d Cir. 1999)* (citations omitted). The original event as to a commercial tort is

Case 1:07-cv-00556-JJF-LPS    Document 31-7    Filed 12/17/2007    Page 12 of 15

Page 11

2001 U.S. Dist. LEXIS 18831, *; 2002-1 Trade Cas. (CCH) P73,556

typically the loss of business, which occurs where the customers are located. *American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp., 439 F.2d 428 (2d Cir. 1971); Sales Arm, Inc. v. Automobile Club of S. Cal., 402 F. Supp. 763, 766 (S.D.N.Y. 1975).* Plaintiffs assert that defendants are "causing injury to property of the disfavored CMRs within New York State, and the plaintiff CMRs which purchase from Verizon as to the Verizon yellow-page directories in the SDNY and elsewhere in New York." (Pl. Mem. at 19). However, absent sufficient allegations of a conspiracy with Verizon, *see* discussion *supra pp. 19-21*, it is not possible [*29] to connect the moving defendants' activities with any loss of business from Verizon. Plaintiffs do not specifically allege that they, or the disfavored CMRs in New York, have lost business from any client-advertisers in New York as a direct result of the moving defendants' activities. Finally, the mere presence of "disfavored CMRs within New York State," none of whom are parties to this action, does not qualify as injury in New York. *See Mareno v. Rowe, 910 F.2d 1043, 1046 (2d Cir. 1990)* ("An injury . . . does not occur within the state simply because the plaintiff is a resident."); *American Eutectic, 439 F.2d at 433* ("[HN20] *Section 302(a)(3)* is not satisfied by remote or consequential injuries which occur in New York only because the plaintiff is domiciled, incorporated or doing business in the state."); *Barricade Books v. Langberg, 2000 U.S. Dist. LEXIS 18279,* No. 95 CIV. 8906, 2000 WL 1863764, at *4 (S.D.N.Y. Dec. 19, 2000) ("New York courts have made one helpful principle clear: the situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff." (citations omitted)).

[*30] Plaintiffs have thus failed to establish prima facie facts that support personal jurisdiction over the moving defendants under New York law. Moreover, having failed to satisfy the "transacting business" test under the Long-Arm Statute, plaintiffs have also failed to satisfy the venue provision of the Clayton Act, and therefore cannot rely on the Act's nationwide service of process provision. I decline to consider transferring venue, as it is unclear how or where plaintiffs might wish to proceed against the moving defendants. The amended complaint is thus dismissed as to defendants BAPCO, the SBC Publishing Companies, and Qwest.

III.

The remaining Pubcos, Verizon and GTE, move to dismiss the complaint pursuant to *Rule 12(b)(6)* for failure to state a claim. Taking the allegations of the amended complaint as true, it does not appear that there is any set of facts plaintiffs could prove in support of their complaint that would entitle them to relief under the

antitrust laws. *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* [7]

> 7   Having failed to state a claim under the antitrust laws, plaintiffs have also failed to aver the commission of a tort, thus providing an additional ground for declining jurisdiction under *C.P.L.R. § 302(a)(2)* and *(a)(3)*.

[*31] A. The Robinson-Patman Act Claim

[HN21] The Robinson-Patman Act makes it "unlawful to discriminate in price between different purchasers of commodities of like grade and quality . . . ." *15 U.S.C. § 13(a).* Plaintiffs base their claim on the different level of commissions on the sale of advertising offered to plaintiff CMRs as compared to favored CMRs and the Pubcos' internal sales forces. But as a matter of law, the Robinson-Patman Act does not apply to these allegations. The term "commodities" refers to goods, not services. *See National Tire Wholesale, Inc. v. Washington Post Co., 441 F. Supp. 81, 84 (D.D.C. 1977), aff'd without opinion, 595 F.2d 888 (D.C. Cir. 1979).* The Second Circuit thus has held that newspaper advertising is not a commodity within the meaning of the Act. *Ambook Enter. v. Time Inc., 612 F.2d 604, 610 (1979).* Contrary to plaintiffs' suggestion, this is not an open question, at least in this Circuit. Nor is advertising "a product . . . because [the directory] occupies a physical space and is physically distributed to the users." (Am. Comp. P 37) Rather, "the printed paper is merely a tangible [*32] vehicle for the conveyance of . . . ideas. It is only incidental to the dominant intangible nature of the transaction." *National Tire Wholesale, 441 F. Supp. at 85* (citations omitted). Plaintiffs' attempts to distinguish Yellow Pages advertising are unpersuasive; rather, like newspaper advertising, it is outside the scope of the Act.

The Robinson-Patman Act claim also fails for two other reasons. First, the commission transactions at issue here are not "sales" with the meaning of the Act. *See, e.g., Metro Communications Co. v. Ameritech Mobile Communications, Inc., 984 F.2d 739, 745-46 (6th Cir. 1993); Kem-Tech, Inc. v. Mobil Corp., 1985 U.S. Dist. LEXIS 15079,* No. 84-1421, 1985 WL 3011, at *4 (E.D. Pa. Oct. 9, 1985) (collecting cases); *Martin Ice Cream Co. v. Chipwich, Inc., 554 F. Supp. 933, 944 (S.D.N.Y. 1983).* CMRs do not buy advertising space from the Pubcos for resale to its clients. Rather, they act as intermediaries, verifying available space and placing orders on behalf of advertisers; they do not hold an inventory of space. (Am. Compl. PP 75) Based on the foregoing, several other courts have already held that the transactions between [*33] the Pubcos and those selling advertising on their behalf are not "sales." *See American Ad Mgmt., Inc. v. GTE Corp., 92 F.3d 781, 785 (9th Cir. 1996); Ad-*

Case 1:07-cv-00556-JJF-LPS    Document 31-7    Filed 12/17/2007    Page 13 of 15

Page 12

2001 U.S. Dist. LEXIS 18831, *; 2002-1 Trade Cas. (CCH) P73,556

*Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp., 849 F.2d 1336, 1345-48 (11th Cir. 1987).* Second, to the extent that plaintiffs' claim is premised on alleged differences between their commissions and the commissions paid to the Pubco's own internal sales force, the Robinson-Patman Act does not apply to discrimination based on intra-enterprise transfers. *See, e.g., City of Mount Pleasant v. Associated Elec. Coop., Inc., 838 F.2d 268, 278-79 (8th Cir. 1988).* For all of the above reasons, plaintiffs' Robinson-Patman Act claim is dismissed.

### B. Sherman Act § 2 Claim

Plaintiffs also fail to state a claim for monopolization, attempted monopolization, or conspiracy to monopolize under *section 2* of the Sherman Act. Specifically, plaintiffs fail to allege antitrust injury, fail to adequately define the relevant market or plead market power, and fail to properly plead a conspiracy.

[HN22] In order to prevail on a monopolization claim, "plaintiffs must prove antitrust injury, which [*34] is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977).* That is, an antitrust plaintiff must prove more than harm to its own business or the loss of a competitor. Rather, it must prove harm to competition as a whole in the relevant market. *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., 996 F.2d 537, 543 (2d Cir. 1993).* The crux of plaintiffs' complaint is that they are being harmed by the Pubcos' refusal to grant them the same levels of discount on advertising or the same terms as those granted to in-house sales representatives or other CMRs who have a history of selling more advertising than plaintiffs. Plaintiffs complain of having to "lower their markups on resale . . . in order to offer yellow-page advertising to customers at the same price as the favored CMRs and in-house sales departments." (Pl. Opp. at 2) This alleged injury is not antitrust injury.

First, to the extent that plaintiffs are complaining about defendants' pricing conduct as competitors [*35] to the Pubcos' internal sales forces, there is no antitrust injury absent an allegation that defendants' pricing is predatory -- that is, below an appropriate level of defendants' costs. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222-24, 125 L. Ed. 2d 168, 113 S. Ct. 2578 (1993); Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 337-39, 109 L. Ed. 2d 333, 110 S. Ct. 1884 (1990).* Plaintiffs have made no such allegation. Non-predatory pricing furthers competition, and thus is not actionable under the antitrust laws. *See Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1061 (8th Cir. 2000)* ("The decisions of the

Supreme Court . . . illustrate the general rule that above cost discounting is not anticompetitive.")

Second, to the extent that plaintiffs are complaining about being disfavored intermediaries between the Pubcos and advertisers, their injury can be likened to that of a non-preferred distributor who is harmed by a supplier's decision to sell its product directly or to give other distributors better terms. In *Cancall PCS v. Omnipoint Corp.*, Judge Schwartz recently dismissed claims [*36] based on just this sort of injury. *2000 U.S. Dist. LEXIS 2830,* No. 99 Civ. 3395, 2000 WL 272309 (Mar. 10 2000). The Court held that these allegations "fail to allege harm to competition in a manner that the antitrust laws were meant to guard against." *2000 U.S. Dist. LEXIS 2830* at *20, 2000 WL 272309 at *6; see also Re-Alco Indus., Inc. v. National Center for Health Educ., Inc., 812 F. Supp. 387, 392 (S.D.N.Y. 1993)* (holding that even an exclusive distributorship agreement causing harm to another distributor is not, standing alone, sufficient to show antitrust injury).

The *Cancall* Court explained that such grievances did not constitute harm to competition because plaintiffs made "no allegation that consumers in general were charged higher prices" by the defendant or the other distributors. *Cancall, 2000 U.S. Dist. LEXIS 2830,* at *17, 2000 WL 272309, at *6. Plaintiffs similarly do not allege market-wide harm to competition in the provision of advertising services. They fail to allege specifically that the consumer-advertisers are being charged more because of defendants' conduct, or that advertisers cannot turn to another of the 186 CMRs or to the Pubcos themselves for advantageous terms and prices. Neither plaintiffs' conclusory allegation [*37] that competition has been destroyed in this market, nor their vague allegation of harm to competition in the market for Yellow Pages publishing can cure this defect. Absent sufficient allegations of antitrust injuries, plaintiffs lack standing to bring their antitrust claims.

[HN23] Even if plaintiffs had alleged antitrust injury, a complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 29, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984).* Because the relevant market includes all products reasonably interchangeable, determining that market requires consideration of cross-elasticity of demand -- that is, which products can effectively substitute for the product allegedly being monopolized. *See United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 100 L. Ed. 1264, 76 S. Ct. 994 (1956).* Plaintiffs assert simply that the relevant market is the market for Yellow Pages directories and Yellow Pages advertising included therein. However, [HN24] a complaint in an antitrust case must allege a basis for finding that the product al-

2001 U.S. Dist. LEXIS 18831, *; 2002-1 Trade Cas. (CCH) P73,556

leged to have been [*38] monopolized is in some way unique, that it is a market unto itself. Plaintiffs must explain why the market they allege is in fact the relevant, economically significant market. Here, plaintiffs do not show why other forms of advertising, such as television, radio, or other print media, are not reasonably interchangeable with Yellow Pages advertising. [HN25] Where a complaint fails to allege facts regarding substitute products, or to allege other pertinent facts relating to cross-elasticity of demand, as the complaint here fails to do, a court may grant a *Rule 12(b)(6)* motion. *See Re-Alco Indus. Inc., 812 F. Supp. at 391; E&G Gabriel v. Gabriel Bros., Inc., 1994 U.S. Dist. LEXIS 9455*, No. 93 Civ. 894, 1994 WL 369147, at *3 (S.D.N.Y. July 13, 1994) ("Plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal.").

A related defect in plaintiffs' monopolization and attempted monopolization claim is that, absent adequate market definition, it is impossible for the court to determine if the defendants possess "monopoly power in the relevant market" or "a dangerous possibility of achieving monopoly power. [*39]   " *United States v. Grinnell Corp., 384 U.S. 563, 570, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966); Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 122 L. Ed. 2d 247, 113 S. Ct. 884 (1993)*. This is compounded by plaintiffs' lack of allegations regarding specific market characteristics, such as barriers to entry, in its purported market. *See International Distrib. Ctrs. v. Walsh Trucking Co., 812 F.2d 786, 791-92 (2d Cir. 1987); Smith & Johnson, Inc. v. Hedaya, 1996 U.S. Dist. LEXIS 19023*, No. 96 Civ. 5821, 1996 WL 737194, at *7 (S.D.N.Y. Dec. 26, 1996). Plaintiffs' reliance on the entry barriers to providing local telephone service is insufficient; plaintiffs have not shown that defendants' affiliation with the telephone companies endows them with monopoly power in the Yellow Pages advertising market.

Further, these defects in market allegations make it difficult for a court to assess whether the challenged practices are exclusionary conduct in violation of the Sherman Act. Absent a showing that these practices are part of an effort to maintain monopoly power in the relevant market, each defendant is free to decide unilaterally with whom to deal [*40]  and on what terms and conditions. *See, e.g., United States v. Colgate & Co., 250 U.S. 300, 307, 63 L. Ed. 992, 39 S. Ct. 465 (1919); Goldwasser v. Ameritech Corp., 222 F.3d 390, 397 (7th Cir. 2000)* ("Even a monopolist is entitled to compete . . . . Part of competing like everyone else is the ability to make decisions about whom and on what terms one will deal."); *see also Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1354 (Fed. Cir. 1999)* ("[HN26] The

Sherman Act does not convert all harsh commercial actions into antitrust violations.").

Finally, plaintiffs fail to properly plead a conspiracy to monopolize. [HN27] Just as conclusory allegations of concerted action are insufficient to support a conspiracy theory of jurisdiction, so too are they insufficient to state a Sherman Act *§ 2* claim. "Although the Federal Rules permit statement of ultimate facts, a bare bones statement of conspiracy . . . under the antitrust laws without any supporting facts permits dismissal." *Fort Wayne Telsat v. Entertainment & Sports Programming Network, 753 F. Supp. 109, 113 (S.D.N.Y. 1990)* (quoting *Heart Disease Research Foundation v. General Motors Corp., 463 F.2d 98, 100 (2d Cir. 1972)*; [*41]  *see also Furlong v. Long Island College Hosp., 710 F.2d 922, 927 (2d Cir. 1983)* ("We think that *Conley* permits a pleader to enjoy all favorable inferences from facts that have been pleaded, and does not permit conclusory statements to substitute for minimally sufficient factual allegations."); *John's Insulation, Inc. v. Siska Constr. Co., 774 F. Supp. 156, 163 (S.D.N.Y. 1991)* ("Conclusory allegations which merely recite the litany of antitrust will not suffice."). As noted in the discussion of jurisdiction, *see supra p. 21*, [HN28] a conspiracy will not be inferred from participation in a trade association. Nor can it be inferred from the non-uniform conduct that necessitates a 75-page complaint where plaintiffs plead "individually" in a "plaintiff-defendant specific" format. (*See* Am. Compl. at 14 n.1) Plaintiffs' charge of conspiracy is thus not factually based nor intuitively apparent. Accordingly, plaintiffs' Sherman Act *§ 2* claims are dismissed.

## C. Sherman Act *§ 1* Claim

Plaintiffs' Sherman Act *§ 1* claim is also without merit. Not surprisingly, it suffers from some of the same pleading deficiencies as plaintiffs' other claims. First, as [*42]  noted above, plaintiffs have failed to allege antitrust injury, and thus have failed to satisfy a prerequisite for recovery under the antitrust laws. Second, the amended complaint is devoid of factual support for the existence of any *§ 1* "contract, combination . . . or conspiracy in restraint of trade." *15 U.S.C. § 1*.

Once again, plaintiffs do not allege when or where any unlawful agreement was made, or by whom, or why the parties would enter this agreement. Furthermore, the court is left to speculate as to its specific terms. For example, although plaintiffs allege a conspiracy to fix prices, they do not allege that the Pubcos charge the same rates for advertising or even that they have adopted the same discount commission structure. [HN29] Even where pricing practices or other policies are generally alleged to be uniform, this uniformity does not permit an inference of a conspiracy where the conduct is in each party's individual self-interest. Plaintiffs do not allege, as

Case 1:07-cv-00556-JJF-LPS    Document 31-7    Filed 12/17/2007    Page 15 of 15

Page 14

2001 U.S. Dist. LEXIS 18831, *; 2002-1 Trade Cas. (CCH) P73,556

they must, that this is anything other than independent, parallel conduct meant to maximize each party's own revenues. *See Levitch, 495 F. Supp. at 673-75; see also AD/SAT, A Division of Skylight, Inc., 181 F.3d at 235 (2d Cir. 1999); [*43] Apex Oil Co., 822 F.2d at 254 (2d Cir. 1987).* There is a similar lack of particulars surrounding the alleged concerted refusal to sell plaintiffs local advertising at a discount. That each Pubco chose to adhere to guidelines set by the YPPA as to the definition of local advertising, and decided to handle "local" accounts internally, is insufficient to state a *§ 1* claim. *See, e.g., Consol. Metal Prods., Inc. v. Am. Petroleum Inst., 846 F.2d 284, 292-94 (5th Cir. 1988)* (citing *Maple Flooring Mfrs. Ass'n v. United States, 268 U.S. 563, 582-87, 69 L. Ed. 1093, 45 S. Ct. 578 (1925)).*

Finally, although there is no specific mention of a tying claim in the amended complaint, plaintiffs assert an unlawful tying arrangement in their motion papers based on the allegation that defendants have tied current prices for advertising to last year's volume of purchases. (Pl. Opp. at 26) Apart from the question of whether or not the complaint gives notice of such a claim, the claim is deficient as a matter of law. [HN30] To state a tying claim, there must be two separate products for which there is consumer demand, and the sale of one must be conditioned on [*44] the purchase of the other. *See Jefferson Parish, 466 U.S. at 12, 21-22; Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 462, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992).* Plaintiffs' claim is not based on such a relationship between two separate products as that concept is understood in tying jurisprudence, nor is there any allegation that a CMR is required to have purchased advertising or any other product in order to be able to purchase advertising from defendants.

Plaintiffs' claims will be dismissed without further leave to replead. I told plaintiffs that their amended complaint would be *the* complaint upon which I would address a motion to dismiss. The letter that defendants sent to plaintiffs under court order put plaintiffs on notice of the deficiencies in their original complaint. Plaintiffs have failed to correct these deficiencies in their amended complaint, and thus dismissal without leave to replead is proper. *See Rock TV Entm't, Inc. v. Time Warner, Inc., 1998 U.S. Dist. LEXIS 799, No. 97 CIV. 0161, 1998 WL 37498, at *4 (S.D.N.Y. Jan. 30, 1998)* (citing *Posner v.*

*Coopers & Lybrand, 92 F.R.D. 765 (S.D.N.Y. 1981), [*45] aff'd, 697 F.2d 296 (2d Cir. 1982)).*

D. State and Common Law Claims

Because I have dismissed all of plaintiffs' federal claims on defendants' motion to dismiss, I decline to exercise supplemental jurisdiction over the state and common law claims. They are dismissed. *See 28 U.S.C. § 1367(c)(3) (1994); Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 102-03 (2d Cir. 1998)* (holding that when [HN31] federal claims are dismissed at an early stage of litigation, it is proper to decline to exercise supplemental jurisdiction); *Purgess v. Sharrock, 33 F.3d 134, 138 (2d Cir. 1994)* (stating that if federal claims are dismissed before trial, state claims should be dismissed as well).

E. The YPPA

Although the YPPA did not move to dismiss the complaint, the only role it is alleged to have played was to facilitate the unlawful activities of the defendant publishing companies. Because I have found that plaintiffs fail to allege unlawful conduct by those defendants, there can be no unlawful facilitation by the YPPA, and thus no basis for its continued presence in this lawsuit. Indeed, in their papers, both plaintiffs and [*46] defendants have tacitly acknowledged that the outcome of this motion determines the status of all defendants. Therefore, the amended complaint is dismissed as to all defendants, including the YPPA.

* * *

For the reasons set forth above, defendants' motions to dismiss for lack of personal jurisdiction and failure to state a claim are granted, and the amended complaint is dismissed.

SO ORDERED:

Dated: New York, New York

November 14, 2001

Michael B. Mukasey,

U.S. District Judge