## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| JEOFFREY L. BURTCH, CHAPTER 7 TRUSTEE, FACTORY 2-U STORES, INC., et al., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:07-cv-00556-*** |
| MILBERG FACTORS, INC., CAPITAL FACTORS, INC., THE CIT GROUP/COMMERICAL SERVICES, INC., GMAC COMMERCIAL FINANCE LLC, HSBC BUSINESS CREDIT (USA) INC., ROSENTHAL AND ROSENTHAL, INC., STERLING FACTORS CORPORATION, WELL FARGO CENTURY, INC., | ) ) ) ) ) ) ) ) ) ) | **DECLARATION OF STUART M. BROWN IN SUPPORT OF MOTION TO DISMISS OF DEFENDANTS GMAC COMMERCIAL FINANCE LLC, STERLING FACTORS CORPORATION and WELLS FARGO CENTURY, INC.** |
| Defendants. | ) ) | |

STUART M. BROWN, declares under penalty of perjury and says:

I am a member of the Bar of this Court and of the firm of Edwards Angell Palmer & Dodge LLP, attorneys for defendants, GMAC Commercial Finance LLC, Sterling Factors Corporation and Wells Fargo Century, Inc. I am fully familiar with the facts and circumstances in this action. I make this declaration in support of the aforementioned defendants' motion to dismiss the Complaint in the within action for failing to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), and because it is time-barred.

Annexed hereto in support of the motion, are the following exhibits:

| EXHIBIT | DESCRIPTION |
|---|---|
| "A" | Complaint dated September 17, 2007 |

932171.1

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| "B" | Excerpts from Factory 2-U Stores, Inc. ("Factory 2-U") amended 10-K filing for the fiscal year ended February 1, 2003, filed with the SEC on August 4, 2003 |
| "C" | Excerpts from Factory 2-U 10-Q filing for the fiscal quarter ended August 2, 2003, filed with the SEC on September 16, 2003 |
| "D" | Excerpts from Factory 2-U 10-K filing for the fiscal year ended February 1, 2003, filed with the SEC on May 2, 2003 |

I declare under penalty of perjury that the forgoing is true and correct.

Executed:     December 17, 2007
              Wilmington, Delaware


_____
                    STUART M. BROWN

932171.1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 17, a copy of the attached was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following counsel of record:

Robert W. Pedigo, Esquire
Shelley A. Kinsella, Esquire
Cooch & Taylor

Jeffrey R. Waxman, Esquire
Cozen & O'Connor

David J. Baldwin, Esquire
Potter Anderson & Corroon LLP

David Kyle Sheppard, Esquire
Michael D. DeBaecke, Esquire
Blank Rome LLP

Stephen B. Brauerman, Esquire
The Bayard Firm

Monte Terrell Squire, Equire
Young, Conaway, Stargatt & Taylor LLP

In addition, the undersigned forwarded a copy of same in the manner indicated below to:

### BY HAND

Robert W. Pedigo, Esquire
Shelley A. Kinsella, Esquire
Cooch & Taylor
824 Market Street, Suite 1000
Wilmington, DE 19801

Jeffrey R. Waxman, Esquire
Cozen & O'Connor
1201 N. Market Street, Suite 1400
Wilmington, DE 19801

David J. Baldwin, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street, Hercules Plaza
Wilmington, DE 19801

David Kyle Sheppard, Esquire
Michael D. DeBaecke, Esquire
Blank Rome LLP
1201 N. Market Street, Suite 800
Wilmington, DE 19801

Stephen B. Brauerman, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

Monte Terrell Squire, Esquire
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

*/s/ Denise Seastone Kraft*
Denise Seastone Kraft (#2778)
Edwards Angell Palmer & Dodge LLP
Wilmington, DE 19801
(302) 777-7770
dkraft@eapdlaw.com

EXHIBIT "B"

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
FORM 10-K/A
ANNUAL REPORT PURSUANT TO SECTION 13 or 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934
For fiscal year ended February 1, 2003


Commission File number 1-10089
FACTORY 2-U STORES, INC.
(Exact Name of Registrant as Specified in its Charter)


Delaware                                       51-0299573
--------                                       ----------
(State or Other Jurisdiction of      (I.R.S. Employer Identification Number)
Incorporation or Organization)


4000 Ruffin Road
San Diego, California                          92123
---------------------                          -----
(Address of Principal Offices)                 (Zip Code)


Registrant's Telephone Number, Including Area Code: (858) 627-1800
                                                    -----------------


Securities registered pursuant to Section 12(b) of the Act:

Title of each class              Name of each exchange on which registered
-------------------              ------------------------------------------
None                                              None

Securities registered pursuant to Section 12(g) of the Act:

Common Stock, $0.01 par value
(Title of Class)

Indicate by check mark whether the Registrant: (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
Registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days.
                          YES {X} NO { }

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K is not contained herein, and will not be contained, to the
best of Registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K { X }

Indicate by check mark whether the Registrant is an accelerated filer (as
defined in Exchange Act Rule 12b-2).
                          YES {X} NO { }

At August 2, 2002, the aggregate market value of the voting and non-voting
common equity of the Registrant held by non-affiliates was approximately
$98,953,051.

At April 25, 2003, the Registrant had outstanding 15,992,953 shares of Common
Stock, $0.01 par value per share.

PART I

Item 1.   Business                                                              3
Item 2.   Properties                                                            13
Item 3.   Legal Proceedings                                                     14
Item 4.   Submission of Matters to a Vote of Security Holders                   15

PART II

Item 5.   Market for Registrant's Common Equity and Related Stockholder
            Matters                                                             15
Item 6.   Selected Financial Data                                               17
Item 7.   Management's  Discussion and Analysis of Financial Condition and
            Results of Operations                                               19
Item 7A.  Quantitative and Qualitative Disclosures About Market Risk            30
Item 8.   Financial Statements and Supplementary Data                           31
Item 9.   Changes in and Disagreements with Accountants on Accounting and
            Financial Disclosure                                                31

PART III

Item 10.  Directors and Executive Officers of the Registrant                    32
Item 11.  Executive Compensation                                                34
Item 12.  Security Ownership of Certain Beneficial Owners and Management        44
Item 13.  Certain Relationships and Related Transactions                        46
Item 14.  Controls and Procedures                                               47

PART IV

Item 15.  Exhibits, Financial Statement Schedules and Reports on Form 8-K       48

2

As a result of our financial results over the past two fiscal years, bankruptcy filings by a number of well-known retail chains during calendar year 2002 and the general weak economic environment, shortly after the Christmas selling season we experienced a tightening of credit extended to us by our vendors and the credit community for merchandise purchases. The initial impact of this credit tightening was a disruption of product flow to our stores in January, February and to a lesser extent March of 2003. This credit environment required us, in many cases, to meet accelerated payment terms in order to re-establish a consistent flow of product and assure a level of inventory for Spring 2003 business. The acceleration of payment terms, in turn, adversely affected our liquidity and, to some extent, further weakened our existing credit standing.

In an effort to improve our liquidity position, obtain more reasonable credit terms and provide for a consistent flow of merchandise to our stores, we initiated a series of financing transactions, in addition to taking steps to accelerate the recognition of tax loss carry-back benefits. On March 6, 2003, we completed the private offering of approximately 2.5 million shares of our common stock for aggregate proceeds of approximately $5.7 million, net of placement fees. In addition, during March 2003, we received an $8.2 million federal tax refund as a result of utilizing tax loss carry-back benefits. On April 10, 2003, we completed a $7.5 million debt financing transaction consisting of a $6.5 million junior term note secured primarily by inventory and accounts receivable and a $1.0 million term note secured primarily by equipment and other assets.

In April 2003, we have experienced an improved flow of merchandise product to our stores, a loosening of credit terms from the credit community and improved liquidity as a result of our capital raising efforts. To a large extent, our ability to obtain merchandise in the future on credit terms consistent with those that we have received historically will depend upon our ability to improve future operating results as measured by comparable store sales growth and operating margins.

Operating Strategy

At Factory 2-U, our goal is to become the nation's premier "Extreme Value Retailer" - providing the lowest price in the marketplace by using our aggressive, unique buying techniques. More specifically, we seek to be the leading off price casual apparel, domestic goods and houseware retailer to families with more than the average number of children and whose household income is approximately $35,000 in the markets we serve.

The major element of our operating strategy is to provide value to customers on national and discount brand apparel and houseware merchandise. We emphasize providing value to our customers by selling merchandise offered by national discount chains at savings of generally 20 to 50% below their prices. We buy excess in-season inventory of recognized brands at bargain prices and pass along the savings to our customers. We believe we are positioned to help families dress, decorate their homes and entertain their children at a great value.

Buying and Distribution

We purchase merchandise from domestic manufacturers, jobbers, importers and other vendors. Historically, our payment terms have typically been net 30 days. While we continually add new vendors, we have maintained stable and good business relationships with certain established vendors. However, we do not maintain any long term or exclusive purchase commitments or agreements with any vendors. We believe that there is a substantial number of additional sources of supply of first quality, national and discount brand merchandise that will meet our inventory needs.

Unlike traditional department stores and discount retailers (that primarily purchase merchandise in advance of the selling season, for example, back-to-school is purchased by March), we purchase approximately 80% of our merchandise in-season (i.e., during the selling season). These in-season purchases generally represent closeouts of vendors' excess inventories remaining after the traditional wholesale selling season and are often created by other retailers' order cancellations. We believe that in-season buying practices are well suited to our customers, who tend to make purchases on an as-needed basis during the season. For years, our customers have substantiated this pattern, which has helped shape the way Factory 2-U does business.

SIGNATURES

Pursuant to the  requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934,  the Company has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.


FACTORY 2-U STORES, INC.


By: /s/William R. Fields
    --------------------
    William R. Fields
    Chairman of the Board

Dated: August 4, 2003

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of this Company and in the capacities and on the date indicated.

| Signature | Title | Date |
| --------- | ----- | ---- |
| /s/William R. Fields<br>-----------------------<br>William R. Fields | Chief Executive Officer<br>and Chairman of the Board<br>(Principal Executive Officer) | August 4, 2003 |
| /s/Douglas C. Felderman<br>-----------------------<br>Douglas C. Felderman | Executive Vice President,<br>Chief Financial Officer<br>(Principal Financial and Accounting<br>Officer) | August 4, 2003 |
| /s/Ronald Rashkow<br>-----------------------<br>Ronald Rashkow | Lead Director | August 4, 2003 |
| -----------------------<br>Willem de Vogel | Director | August 4, 2003 |
| /s/ Peter V. Handal<br>-----------------------<br>Peter V. Handal | Director | August 4, 2003 |
| /s/Wm. Robert Wright II<br>-----------------------<br>Wm. Robert Wright II | Director | August 4, 2003 |

CERTIFICATION

I, William R. Fields, certify that:

1.     I have reviewed this annual report on Form 10- K/A of Factory 2-U Stores, Inc. (the "Registrant").

2.     Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report.

3.     Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material aspects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this annual report.

4.     The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the Registrant and we have:

    (a)     designed such disclosure controls and procedures to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b)     evaluated the effectiveness of the Registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

    (c)     presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.     The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the Registrant's auditors and the audit committee of Registrant's board of directors (or persons performing the equivalent function):

    (a)     all significant deficiencies in the design or operation of internal controls which could adversely affect the Registrant's ability to record, process, summarize and report financial data and have identified for the Registrant's auditors any material weaknesses in internal controls; and

    (b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal controls; and

6.     The Registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: August 4, 2003              /s/ William R. Fields
                                   --------------------
                                   Name:  William R. Fields
                                   Title: Chief Executive Officer

53

CERTIFICATION

I, Douglas C. Felderman, certify that:

1.    I have reviewed this annual report on Form 10- K/A of Factory 2-U Stores, Inc. (the "Registrant").

2.    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report.

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material aspects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this annual report.

4.    The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the Registrant and we have:

    (a)    designed such disclosure controls and procedures to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b)    evaluated the effectiveness of the Registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

    (c)    presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.    The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the Registrant's auditors and the audit committee of Registrant's board of directors (or persons performing the equivalent function):

    (a)    all significant deficiencies in the design or operation of internal controls which could adversely affect the Registrant's ability to record, process, summarize and report financial data and have identified for the Registrant's auditors any material weaknesses in internal controls; and

    (b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal controls; and

6.    The Registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: August 4, 2003

/s/ Douglas C. Felderman
------------------------
Name:  Douglas C. Felderman
Title: Executive Vice President,
      Chief Financial Officer

FACTORY 2-U STORES, INC.
Statements of Operations
(in thousands, except per share data)

| | Fiscal Year Ended | | |
|---|---|---|---|
| | February 1, 2003 | February 2, 2002 | February 3, 2001* |
| Net sales | $535,270 | $580,460 | $555,670 |
| Cost of sales | 372,885 | 385,390 | 358,393 |
| Gross profit | 162,385 | 195,070 | 197,277 |
| Selling and administrative expenses (exclusive of non-cash stock-based compensation expense shown below) | 196,435 | 188,272 | 154,379 |
| Pre-opening expenses | 1,086 | 3,086 | 5,371 |
| Amortization of intangibles | - | 1,682 | 2,092 |
| Restructuring charge | 9,914 | 18,360 | - |
| Condemnation award | - | - | (1,240) |
| Stock-based compensation expense | - | 456 | 4,807 |
| Operating income (loss) | (45,050) | (16,786) | 31,868 |
| Interest expense, net | 1,611 | 960 | 1,546 |
| Income (loss) before income taxes | (46,661) | (17,746) | 30,322 |
| Income taxes (benefit) | (18,152) | (6,850) | 9,058 |
| Net income (loss) | $(28,509) | $(10,896) | $ 21,264 |
| | | | |
| Net income (loss) per share | | | |
| Basic | $ (2.20) | $ (0.85) | $ 1.69 |
| Diluted | $ (2.20) | $ (0.85) | $ 1.63 |
| Weighted average common shares outstanding | | | |
| Basic | 12,957 | 12,807 | 12,589 |
| Diluted | 12,957 | 12,807 | 13,066 |

* 53-week fiscal year.

The accompanying notes are an integral part of these financial statements.

F-5

**EXHIBIT "C"**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
FORM 10-Q

( X )    QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended August 2, 2003
--------------

OR

(   )    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1932

For the transition period from...............to................

Commission File Number: 1-10089

FACTORY 2-U STORES, INC.
(Exact name of registrant as specified in its charter)

Delaware                                         51-0299573
--------                                         ----------
(State or other jurisdiction of                  (I.R.S. Employer
incorporation or organization)                   Identification No.)


4000 Ruffin Road, San Diego, CA                  92123-1866
-------------------------------                  ----------
(Address of principal executive office)          (Zip Code)

(858) 627-1800
(Registrant's telephone number, including area code)


Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months (or for such shorter period that the registrant was
required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days.
        (X) YES ( ) NO

The number of shares  outstanding of the  registrant's  common stock, as of
September 10, 2003 was 18,046,132 shares.

FACTORY 2-U STORES, INC.

FORM 10-Q FOR THE QUARTERLY PERIOD ENDED AUGUST 2, 2003

INDEX

PART I.   FINANCIAL INFORMATION

Item 1.   Financial Statements

          Balance Sheets as of August 2, 2003 (Unaudited), August 3, 2002
          (Unaudited) and February 1, 2003 ..................................F-1

          Statements of Operations (Unaudited) for the 13 and  26 weeks ended
          August 2, 2003 and August 3, 2002 ...............................F-3

          Statements of Cash Flows (Unaudited) for the 26 weeks ended
          August 2, 2003 and August 3, 2002 ...............................F-4

          Notes to Financial Statements (Unaudited) ........................F-5

Item 2.   Management's Discussion and Analysis of Financial Condition and
          Results of Operations ............................................3

Item 3.   Quantitative and Qualitative Disclosures About Market Risk.........11
Item 4.   Controls and Procedures ...........................................12


PART II. OTHER INFORMATION

Item 1.   Legal Proceedings................................................. 13
Item 2.   Changes in Securities and Use of Proceeds.........................13
Item 3.   Defaults Upon Senior Securities...................................13
Item 4.   Submission of Matters to a Vote of Security Holders...............13
Item 5.   Other Information ................................................13
Item 6.   Exhibits and Reports on Form 8-K .................................14
Signatures    .............................................................15

2

Interest expense, net was $1.6 million for the 26 weeks ended August 2, 2003 compared to $568,000 for the 26 weeks ended August 3, 2002, an increase of $1.0 million or 176.2%. The increase in interest expense from the same period last year was primarily due to increased borrowings and higher interest rates.

We recorded an income tax benefit of $5.0 million for the 26 weeks ended August 2, 2003 compared to $6.0 million for the 26 weeks ended August 3, 2002. The decrease in income tax benefit was the result of decreased pre-tax loss compared to the same period a year ago.

For the 26 weeks ended August 2, 2003, the net loss was $8.1 million as compared to $9.0 million for the 26 weeks ended August 3, 2002. The decrease in net loss was a result of factors cited above.

Liquidity and Capital Resources

General

We finance our operations through credit provided by vendors and other suppliers, amounts borrowed under our $50.0 million revolving credit facility, internally generated cash flow, and other financing resources. Credit terms provided by vendors and other suppliers are generally net 30 days. Amounts that may be borrowed under the revolving credit facility are based on a percentage of eligible inventory and accounts receivable, as defined.

Since February 1, 2003, we have completed a series of financing transactions designed to add liquidity and strengthen our financial position. On March 6, 2003, we completed the private offering of 2,515,379 shares of our common stock for net proceeds of approximately $5.7 million, after deducting the placement fees and other offering expenses. On April 10, 2003, we completed a $7.5 million debt financing transaction, which consists of a $6.5 million junior term note secured primarily by inventory and accounts receivable and a $1.0 million term note secured primarily by equipment and other assets. In addition, we received a federal tax refund of $8.2 million in March 2003. On August 20, 2003, we sold 2,450,000 shares of common stock at $5.00 per share to accredited investors and received approximately $11.6 million in net proceeds, after deducting the placement fees and other expenses.

Since the completion of our private equity offering and debt financing transaction, and receipt of the federal tax refund, the vendor and credit community have begun to provide support and extend credit terms for merchandise shipments. Based on the current credit support being provided by our vendors and the credit community, we expect to receive merchandise receipts on credit terms necessary to meet our desired inventory levels. While we have experienced an improvement in support from the credit community, any further improvement in credit will be contingent upon improved operating results and liquidity. Provided we do not experience comparable store sales declines and a tightening of credit from our vendors and/or the credit community in the future, we believe our $50.0 million revolving credit facility and internal cash flow should provide sufficient funds to finance our operations and capital expenditures, pay our debt obligations, and complete the closing of stores and distribution centers included in our fiscal 2002 restructuring and fiscal 2001 restructuring efforts over the next twelve months.

9

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the
Registrant has duly caused this report to be signed on its behalf by the
undersigned thereunto duly authorized.

FACTORY 2-U STORES, INC.

Date: September 16, 2003

By:    /s/Douglas C. Felderman
       --------------------------------------------------
       Name:  Douglas C. Felderman
       Title: Executive Vice President and Chief Financial Officer
              (duly authorized officer and principal financial officer)

15

Exhibit 31.1

CERTIFICATION

I, William R. Fields, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Factory 2-U Stores, Inc. (the "Registrant").

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report.

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Registrant and have:

    (a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)  disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.   The Registrant's other certifying officer and I have disclosed, based on
     our most recent evaluation of internal control over financial reporting, to
     the Registrant's auditors and the audit committee of Registrant's board of
     directors (or persons performing the equivalent functions):

     (a)  all significant deficiencies and material weaknesses in the design or
          operation of internal control over financial reporting which are
          reasonably likely to adversely affect the Registrant's ability
          to record, process, summarize and report financial information; and

     (b)  any fraud, whether or not material, that involves management or other
          employees who have a significant role in the Registrant's internal
          control over financial reporting.


Date:     September 16, 2003              /s/ William R. Fields
                                          ----------------------
                                          Name:  William R. Fields
                                          Title: Chief Executive Officer

Exhibit 31.2

CERTIFICATION

I, Douglas C. Felderman, certify that:

1.   I have reviewed this quarterly report on Form 10-Q of Factory 2-U Stores,
     Inc. (the "Registrant").

2.   Based on my knowledge, this report does not contain any untrue statement of
     a material fact or omit to state a material fact necessary to make the
     statements made, in light of the circumstances under which such statements
     were made, not misleading with respect to the period covered by this
     report.

3.   Based on my knowledge, the financial statements, and other financial
     information included in this report, fairly present in all material
     respects the financial condition, results of operations and cash flows of
     the Registrant as of, and for, the periods presented in this report.

4.   The Registrant's other certifying officer and I are responsible for
     establishing and maintaining disclosure controls and procedures (as defined
     in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Registrant and have:

     (a)   designed such disclosure controls and procedures, or caused such
           disclosure controls and procedures to be designed under our
           supervision, to ensure that material information relating to the
           Registrant, including its consolidated subsidiaries, is made known
           to us by others within those entities, particularly during the period
           in which this report is being prepared;

     (b)   evaluated the effectiveness of the Registrant's disclosure controls
           and procedures and presented in this report our conclusions about the
           effectiveness of the disclosure controls and procedures, as of the
           end of the period covered by this report based on such evaluation; and

     (c)   disclosed in this report any change in the Registrant's internal
           control over financial reporting that occurred during the
           registrant's most recent fiscal quarter (the Registrant's fourth
           fiscal quarter in the case of an annual report) that has
           materially affected, or is reasonably likely to materially affect,
           the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of Registrant's board of directors (or persons performing the equivalent functions):

    (a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

    (b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.


Date:    September 16, 2003          /s/ Douglas C. Felderman
                                     -------------------------
                                     Name:  Douglas C. Felderman
                                     Title: Executive Vice President and
                                            Chief Financial Officer

**EXHIBIT "D"**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 or 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934
For fiscal year ended February 1, 2003

Commission File number 0-16309

FACTORY 2-U STORES, INC.
----------------------------
(Exact Name of Registrant as Specified in its Charter)

| Delaware | 51-0299573 |
|----------|------------|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification Number) |

| 4000 Ruffin Road San Diego, California | 92123 |
|----------------------------------------|-------|
| (Address of Principal Offices) | (Zip Code) |

Registrant's Telephone Number, Including Area Code: (858) 627-1800

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---------------------|-------------------------------------------|
| Common Stock, $0.01 par value | None |

Securities registered pursuant to Section 12(g) of the Act:

Common Stock, $0.01 par value
(Title of Class)

Indicate by check mark whether the Registrant: (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
Registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days.
YES {X} NO { }

Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained,
to the best of Registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K {X}

Indicate by check mark whether the Registrant is an accelerated filer (as
defined in Exchange Act Rule 12b-2).
YES {X} NO { }

At April 25, 2003, the aggregate market value of the voting stock of the
Registrant held by non-affiliates was approximately $55,427,082.

At April 25, 2003, the Registrant had outstanding 15,992,953 shares of
Common Stock, $0.01 par value per share.

PART I

Item 1.   Business                                                        3

Item 2.   Properties                                                      11
Item 3.   Legal Proceedings                                               13
Item 4.   Submission of Matters to a Vote of Security Holders             13


PART II

Item 5.   Market for Registrant's Common Equity and Related Stockholder
          Matters                                                         14
Item 6.   Selected Financial Data                                         16
Item 7.   Management's Discussion and Analysis of Financial Condition and
          Results of Operations                                           18
Item 7A.  Quantitative and Qualitative Disclosures About Market Risk      28
Item 8.   Financial Statements and Supplementary Data                     29
Item 9.   Changes in and Disagreements with Accountants on Accounting
          and Financial Disclosure                                        29


PART III

Item 10.  Directors and Executive Officers of the Registrant             30
Item 11.  Executive Compensation                                         32
Item 12.  Security Ownership of Certain Beneficial Owners and Management  40
Item 13.  Certain Relationships and Related Transactions                 42
Item 14.  Controls and Procedures                                        43


PART IV

Item 15.  Exhibits, Financial Statement Schedules and Reports on Form 8-K  44

2

We define our fiscal year by the calendar year in which most of our business activity occurs (the fiscal year ended February 1, 2003 is referred to as fiscal 2002).

OPERATIONS

Recent Developments

As in fiscal 2001, we experienced a continuation of declining sales volume in fiscal 2002 with a decrease of 7.7% in comparable store sales for the year. The decline in comparable store sales was the result of lower transaction counts and lower purchase size. We believe there were a number of factors that contributed to the lower sales in fiscal 2002: (1) general economic malaise on the part of the consumer, partly exacerbated by the September 11 terrorists attacks and the threat of war in Iraq, (2) extreme price competition within the retail industry, which made it more difficult to maintain our price advantage, (3) higher fuel and utility costs, particularly in the state of California where more than half of our stores are located, (4) the pronounced effects of the September 11 terrorists attacks on our 17 stores located near the Mexican border, and (5) the deployment of United States armed forces overseas and the related negative impacts on our 42 stores located near military bases.

In response to declining sales and operating losses over the last two fiscal years, we have taken steps designed to improve our future operating performance. To that end, on February 6, 2002, we announced a restructuring plan (fiscal 2001 restructuring) for the purpose of improving future operating results, which principally consisted of closing 28 unprofitable stores, realignment of our field organization and workforce reductions. We recorded a $21.2 million pre-tax charge in fiscal 2001 related to this restructuring effort.

Beginning in November 2002, we also made a number of changes to our senior management team. In November 2002, we announced the appointment of William R. Fields to the position of Chairman and Chief Executive Officer, succeeding Michael Searles, our former Chairman and Chief Executive Officer. During fiscal 2002, we also appointed Edward Wong to the new position of Executive Vice President, Supply Chain and Information Technology, Melvin Redman to the position of Executive Vice President, Store Operations and Distribution and Larry Kelley to the position of Executive Vice President, Merchandising and Marketing. In a continuing effort to improve operating results, on December 6, 2002, we announced additional restructuring initiatives, which included the closure of another 23 under-performing stores, consolidation of our distribution center network, and reorganization of our corporate overhead structure (fiscal 2002 restructuring). In connection with this fiscal 2002 restructuring, we recorded a $14.4 million pre-tax charge. In addition, we announced efforts to liquidate our slow-moving and aged inventory chain-wide. We incurred a pre-tax charge of $16.1 million related to clearing slow-moving inventory and an inventory valuation allowance.

As a result of our financial results over the past two fiscal years, bankruptcy filings by a number of well-known retail chains during calendar year 2002 and the general weak economic environment, shortly after the Christmas selling season we experienced a tightening of credit extended to us by our vendors and the credit community for merchandise purchases. The initial impact of this credit tightening was a disruption of product flow to our stores in January, February and to a lesser extent March of 2003. This credit environment required us, in many cases, to meet accelerated payment terms in order to re-establish a consistent flow of product and assure a level of inventory for Spring 2003 business. The acceleration of payment terms, in turn, adversely affected our liquidity and, to some extent, further weakened our existing credit standing.

In an effort to improve our liquidity position, obtain more reasonable credit terms and provide for a consistent flow of merchandise to our stores, we initiated a series of financing transactions, in addition to taking steps to accelerate the recognition of tax loss carry-back benefits. On March 6, 2003, we completed the private offering of approximately 2.5 million shares of our common stock for aggregate proceeds of approximately $5.7 million, net of placement fees. In addition, during March 2003, we received an $8.2 million federal tax refund as a result of utilizing tax loss carry-back benefits. On April 10, 2003, we completed a $7.5 million debt financing transaction consisting of a $6.5 million junior term note secured primarily by inventory and accounts receivable and a $1.0 million term note secured primarily by equipment and other assets. We also anticipate completing a sale/leaseback transaction covering

4

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

FACTORY 2-U STORES, INC.

By: /s/ William R. Fields
    ----------------------
    William R. Fields
    Chairman of the Board

Dated: May 2, 2003

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of this Company and in the capacities and on the date indicated.

| Signature | Title | Date |
| --- | --- | --- |
| /s/ William R. Fields<br>--------------------------<br>William R. Fields | Chief Executive Officer and Chairman of the Board (Principal Executive Officer) | May 2, 2003 |
| /s/ Douglas C. Felderman<br>--------------------------<br>Douglas C. Felderman | Executive Vice President, Chief Financial Officer (Principal Financial and Accounting Officer) | May 2, 2003 |
| /s/ Ronald Rashkow<br>--------------------------<br>Ronald Rashkow | Lead Director | May 2, 2003 |
| /s/ Willem de Vogel<br>--------------------------<br>Willem de Vogel | Director | May 2, 2003 |
| /s/ Peter V. Handal<br>--------------------------<br>Peter V. Handal | Director | May 2, 2003 |
| /s/ Wm. Robert Wright II<br>--------------------------<br>Wm. Robert Wright II | Director | May 2, 2003 |

48

CERTIFICATION

I, William R. Fields, certify that:

1.    I have reviewed this annual report on Form 10-K of Factory 2-U Stores, Inc. (the "Registrant").

2.    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report.

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material aspects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this annual report.

4.    The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the Registrant and we have:

(a)    designed such disclosure controls and procedures to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b)    evaluated the effectiveness of the Registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

(c)    presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.    The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the Registrant's auditors and the audit committee of Registrant's board of directors (or persons performing the equivalent function):

(a)    all significant deficiencies in the design or operation of internal controls which could adversely affect the Registrant's ability to record, process, summarize and report financial data and have identified for the Registrant's auditors any material weaknesses in internal controls; and

(b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal controls; and

6.    The Registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date:    May 2, 2003                        /s/ William R. Field
                                            ----------------------
                                            Name:  William R. Fields
                                            Title: Chief Executive Officer

49

CERTIFICATION

I, Douglas C. Felderman, certify that:

1.  I have reviewed this annual report on Form 10-K of Factory 2-U Stores, Inc. (the "Registrant").

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report.

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material aspects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this annual report.

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the Registrant and we have:

    (a)  designed such disclosure controls and procedures to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b)  evaluated the effectiveness of the Registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

    (c)  presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the Registrant's auditors and the audit committee of Registrant's board of directors (or persons performing the equivalent function):

    (a)  all significant deficiencies in the design or operation of internal controls which could adversely affect the Registrant's ability to record, process, summarize and report financial data and have identified for the Registrant's auditors any material weaknesses in internal controls; and

    (b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal controls; and

6.  The Registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.


Date:   May 2, 2003                      /s/ Douglas  C. Felderman
                                         --------------------------
                                         Name:  Douglas C. Felderman
                                         Title: Executive Vice President,
                                                Chief Financial Officer


50

**EXHIBIT "A"**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JEOFFREY L. BURTCH, CHAPTER 7 TRUSTEE, FACTORY 2-U STORES, INC., et al., <br><br>                    Plaintiff, <br><br> v. <br><br> MILBERG FACTORS, INC., CAPITAL FACTORS, INC.  THE CIT GROUP/COMMERCIAL SERVICES, INC., GMAC COMMERCIAL FINANCE LLC, HSBC BUSINESS CREDIT (USA) INC., ROSENTHAL AND ROSENTHAL, INC., STERLING FACTORS CORPORATION, WELL FARGO CENTURY INC., <br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

Jeoffrey L. Burtch, Chapter 7 Trustee (the "Trustee"), for Factory 2-U Stores, Inc.,

A/K/A Factory 2-U, F/A/K/A General Textiles, Inc., F/A/K/A General Textiles, F/A/K/A Family

Bargain Corporation, F/A/K/A Family Bargain Center (collectively "Factory 2-U"), as and for

his Complaint, states as follows:

**Introduction**

1.      This is a complaint seeking damages for an illegal group boycott to deny credit

and price fixing in violation of Section 1 of the Sherman Act, together with a related claim for

unlawful restraint of trade under the New York State Donnelly Act, N.Y. Gen. Bus. L. § 340.

2.      Factory 2-U Stores, Inc. ("Factory 2-U"), prior to its closure and pending

liquidation in bankruptcy, was a major discount clothing retailer, operating more than 200 stores

in ten states.

**A. The Factoring Business**

3.      Defendants are engaged in the business of "factoring."  Factors are lenders who

play a major role in financing purchase and sale transactions between garment manufacturers[1]

and garment retailers, such as Factory 2-U.  Factors extend credit to garment industry businesses

in two distinct ways: (1) through written "factoring" agreements with clients (i.e. garment

manufacturers), and (2) through oral "customer credit" agreements and relationships with their

clients' customers (i.e. garment retailers). Factors function, in effect, as many garment

manufacturers' credit departments by reviewing the creditworthiness of the retailers to whom

those manufacturers sell, by extending credit for manufacturers' sales to particular retailers, and

by purchasing manufacturers' receivables on a full, partial, or non-recourse basis.  The factors

collect the money from retailers through collection calls on past due or over limit accounts.

Factors receive and clear checks from retailers, and apply the receipts.

4.      A "factoring agreement" is one by which a factor provides financing to a client by

purchasing the client's accounts receivable at a small discount, usually between 0.5% and 0.9%

of the face amount of the receivables.  The factor and the client may agree that the factor will

make advances to the client, at normal commercial interest rates, in amounts up to 70% to 90%

---

[1] In this Complaint, all references to garment manufacturers shall include garment wholesalers.

2

of the face amount of the receivables, which advances are repaid when the factor collects the receivable from the garment retailer.

5.      When a factor purchases a client's accounts receivable, it assumes the risk of collecting the accounts receivable. The factor assumes that risk only as to those sales to customers that the factor approves (or "credit checks", in the parlance of the industry). When a factor refuses to "credit check" a client's customer, the factor declines to approve orders placed by the customer with the factor's client. Any sale by the client to that customer becomes a "client's risk" sale if the client elects to go forward with the transaction. Since a garment manufacturer usually cannot afford to risk sales that are not acceptable to a factor, the factor's "credit check" decision usually determines whether a sale is made.

6.      Although factors advertise that they will assume their clients' credit risk, upon information and belief, factors almost always include in their factoring agreements a boilerplate provision stating that the factor has discretion to refuse to "credit check" a garment retailer for any reason at all. This allows the factors to refuse to "credit check" a garment retailer for reasons that have nothing to do with the retailer's creditworthiness.

7.      Factors compete with each other to provide financing to garment manufacturers. This financing enables garment retailers such as Factory 2-U, to purchase the inventory that they sell to their customers. If a factor's "credit check" decision is adverse to the garment retailer, not only is the garment manufacturer unable to sell its materials to the garment retailer due to its inability to quickly convert accounts receivable into cash, but the garment retailer is left with insufficient inventory to sell to its customers.

8.      Factors determine the terms and conditions on which they will deal with particular retailers and manufacturers, including the discount rate at which factors will purchase

3

receivables from manufacturers owed by retailers, payment terms required of retailers, and indeed, whether purchases by particular retailers from particular manufacturers will be financed at all. Because small to medium-sized garment manufacturers and retailers often lack access to other forms of financing, factor financing is essential to their ability to remain profitable, viable businesses. Because a factor's credit decision determines whether a sale is made between a garment retailer and a garment manufacturer, the factors exert significant control over the garment industry.

9.    Defendants are all factors that ostensibly competed with each other to provide credit to Factory 2-U, and financing for Factory 2-U's purchase of inventory from several garment manufacturers. In fact, they regularly discussed and agreed among themselves as to the terms and conditions on which they would finance Factory 2-U's purchases, the discount rate at which they would purchase Factory 2-U's receivables from Factory 2-U's garment manufacturers, or whether they would extend credit to Factory 2-U at all. These discussions and agreements constituted a conspiracy in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and agreements in restraint of trade under the New York State Donnelly Act, N.Y. Gen. Bus. L. § 340.

10.    As a result of Defendants' unlawful activities, Factory 2-U's access to credit was rendered more costly, was restricted, and sometimes was cut off altogether. Defendants' unlawful conduct increased Factory 2-U's credit costs, reduced its sales and profitability, and contributed materially to its bankruptcy and ultimate business failure.

4

**B. The Defendants' Control of the Factoring Industry**

11.    According to <u>The Commercial Factor</u>, Summer 2003 Edition, the eight

Defendants were in the top ten list of factors based on estimates of their annual factoring volume

in 2002-2003:

> (a)    CIT Group was ranked as the number one factor based on its annual
> factoring volume of $20 billion.
>
> (b)    GMAC was ranked as the number two factor based on its annual factoring
> volume of $10 billion.
>
> (c)    Wells Fargo Century Inc. was ranked as the number four factor based on
> its annual factoring volume of $5 billion.
>
> (d)    HSBC Business Credit was ranked as the number five factor based on its
> annual factoring volume of $4-5 billion.
>
> (e)    Capital Factors was ranked as the number six factor based on its annual
> factoring volume of $3 billion.
>
> (f)    Milberg Factors was ranked as the number eight factor based on its
> annual factoring volume of $2.5 billion.
>
> (g)    Rosenthal & Rosenthal was ranked as the number nine factor based on its
> annual factoring volume of $2.5 billion.
>
> (h)    Sterling Factors was ranked as the number ten factor based on its annual
> factoring volume of $750 million.

12.    Furthermore, upon information and belief, about 80% of garment manufacturers

relied on factors for their credit needs. In recent years, at least one factor, Defendant CIT, has

factored approximately $16 billion for the domestic garment manufacturing industry, or at least

5

33% of the market. Because the Defendants comprised eight out of the top ten factors and most of the garment manufacturers relied on them for credit and financing, they exerted significant control over the garment industry.

13.     During the time period relevant to this Complaint, 305 of Factory 2-U's garment manufacturers were factored by the Defendants with the breakdown as follows:

        (a)     CIT – 169 manufacturers

        (b)     GMAC – 48 manufacturers

        (c)     Milberg Factors – 16 manufacturers

        (d)     Rosenthal & Rosenthal – 37 manufacturers

        (e)     Sterling Factors – 11 manufacturers

        (f)     Capital Factors – 24 manufacturers

14.     Because hundreds of Factory 2-U's garment manufacturers were factored by the Defendants, the impact of the Defendants' refusal to extend credit to Factory 2-U and decline garment manufacturers' Factory 2-U orders was financially devastating to Factory 2-U. Specifically, the Defendants' concerted activity caused a reduction of Factory 2-U's inventory, increased Factory 2-U's credit costs, reduced its sales and profitability, and contributed materially to its bankruptcy and ultimate business failure.

15.     The economic power which the Defendants exerted within the garment industry is magnified by the fact that many of the smaller factors refactored through the Defendants. This means that many of the smaller factors ran their receivable purchases through one or more of the Defendants. Thus, when the Defendants decreased or refused to extend credit to Factory 2-U, Factory 2-U could not go to any of the smaller factors for recourse because those smaller factors were essentially controlled by the Defendants.

6

**Jurisdiction and Venue**

16.    This Court has original subject matter jurisdiction over this action pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

17.    This Court has supplemental jurisdiction over the New York State Donnelly Act claim pursuant to 28 U.S.C. § 1367.

18.    Defendants reside and transact business within this District and are therefore, subject to personal jurisdiction in this District.  Venue is proper in the District of Delaware pursuant to 15 U.S.C. §§ 15 and 22 as a district in which Defendants reside, are found, and/or transact business; and 28 U.S.C. § 1391(b) and (c) as a district in which Defendants reside because they are subject to personal jurisdiction in this District. Service may be effected in this district pursuant to 15 U.S.C. § 22 as a district in which Defendants are found.

19.    The Trustee and Defendants are involved in interstate trade and commerce, and the conduct of Defendants complained of herein occurred in and had a substantial adverse effect on interstate trade and commerce.  In the conduct of their business, Defendants directly or indirectly used the means and instrumentalities of interstate trade and commerce in furtherance of the acts complained of herein.

**Parties**

20.    Plaintiff is the Chapter 7 Trustee for Factory 2-U, which is a clothing retailer currently in Chapter 7 bankruptcy proceedings.  On January 13, 2004, Factory 2-U Stores filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended, in the United States Bankruptcy Court for the District of Delaware. The bankruptcy case converted to a case under Chapter 7 on January 27, 2005.  Jeoffrey L. Burtch was appointed as interim trustee on January 27, 2005 pursuant to Section 701, and is serving as

7

Trustee of this Estate pursuant to Section 702(d) of the Bankruptcy Code.   Factory 2-U Stores Inc. is a Delaware corporation whose principal office was located in San Diego, California.

21.     The defendant factors are Milberg Factors, Inc., Capital Factors, Inc., The CIT Group/Commercial Services, Inc., GMAC Commercial Finance LLC, HSBC Business Credit (USA) Inc., Rosenthal and Rosenthal, Inc.,  Sterling Factors Corporation, and Wells Fargo Century Inc. (collectively the "Defendants").

22.     Defendant Milberg Factors Inc. ("Milberg") is:

      (a)     a corporation of the state of Delaware;

      (b)     with its principal place of business located in New York, NY;

      (c)     with a mailing address at 99 Park Avenue, New York, NY 10016; and

      (d)     United States Corporation Company is the registered agent with a mailing address at 2711 Centerville Road Suite 400, Wilmington, DE 19808.

23.     Defendant Capital Factors, Inc (a/k/a Capital Business Credit, LLC) ("Capital") is:

      (a)     a corporation of the state of Florida;

      (b)     with its principal place of business located in New York, NY;

      (c)     with a mailing address at 1700 Broadway, New York, NY; and

      (d)     Corporation Service Company is the registered agent with a mailing address at 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

24.     Defendant, The CIT Group/Commercial Services, Inc. ("CIT") is:

      (a)     a corporation of the state of Delaware;

      (b)     with its principal place of business located in New York, New York;

(c)     with a mailing address at 1211 Avenue of the Americas, New York, N.Y.

10036 and

(d)     The Corporation Trust Company is the Registered Agent for The CIT

Group /Commercial Services, Inc. with a mailing address at Corporation Trust

Center, 1209 Orange Street, Wilmington, DE 19801.

25.     Defendant GMAC Commercial Finance LLC ("GMAC") is:

(a)     a limited liability company of the state of Delaware;

(b)     with its principal place of business located in New York;

(c)     with a mailing address at 1290 Avenue of the Americas - 3rd Floor

New York, NY 10104; and

(d)     The Corporation Trust Company is the registered agent with a mailing

address at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

26.     Defendant HSBC Business Credit (USA) Inc. ("HSBC") is:

(a)     a corporation of the state of Delaware;

(b)     with its principal place of business located in New York, NY;

(c)     with a mailing address at 452 Fifth Avenue, 14th Floor, New York, NY

10018; and

(d)     The Corporation Trust Company is the registered agent with a mailing

address at 1209 Orange Street, Wilmington, DE 19801.

27.     Defendant Rosenthal & Rosenthal Inc. ("Rosenthal") is:

(a)     a corporation of the state of New York;

(b)     with its principal place of business located in New York, NY;

(c)     with a mailing address at 1370 Broadway, New York, NY 10018;

9

(d) Rosenthal, Inc. is the parent company of Rosenthal & Rosenthal Inc.; and

(e) The Corporation Trust Company is the registered agent of Rosenthal, Inc. with a mailing address of 1209 Orange Street, Wilmington, DE 19801.

28. Defendant Sterling Factors Corporation ("Sterling") is:

(a) a corporation of the state of New York;

(b) with its principal place of business located in New York, NY;

(c) with a mailing address at 500 7th Avenue 10th Floor, New York, NY 10018;

(d) Sterling Bancorporation, LLC is the parent company of Sterling Factors Corporation; and

(e) The Wilmington Trust Special Services is the registered agent of Sterling Bancorporation LLC with a mailing address of 1105 N. Market Street, Suite 1300, Wilmington, DE 19801.

29. Defendant Wells Fargo Century Inc. ("Wells Fargo") is:

(a) a corporation of the state of New York;

(b) with its principal place of business located in New York, New York;

(c) with a mailing address at 119 West 40th Street, New York, NY 10018;

(d) Wells Fargo & Company is the parent company of Wells Fargo Century Inc.; and

(e) Corporation Trust Company is the registered agent of Wells Fargo & Company with a mailing address of Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

**Relevant Market**

30.    The relevant product market is the provision of "factoring services" in the
domestic garment industry to include retailers, wholesalers, and manufacturers. Factoring
services include a complete financial package that consists of: (1) credit extension; (2) accounts
receivable purchasing and collection; and (3) financing.

31.    The relevant geographic market is the United States.

**Antitrust Standing/Antitrust Injury**

32.    Factory 2-U has standing to bring the claims because it has suffered an injury that
is causally related to the Defendants' illegal anti-competitive activity.   Specifically, Defendants'
violations of the antitrust laws have directly and proximately injured Factory 2-U in its business
and property and damaged it in an amount which will be proved at trial. The unlawful conduct
alleged herein increased Factory 2-U's credit costs and deprived it of adequate inventory with
which to conduct business.  As a result, Factory 2-U's profits were reduced, its losses were
substantially increased, and its business was damaged so as to materially contribute to its
ultimate bankruptcy and business failure.

33.    Defendants' violations of the antitrust laws have directly and proximately
lessened competition generally. Defendants were in the top ten list of factors based on their
annual factoring volume in 2002-2003 and thus, possessed market power sufficient to inhibit
competition on a market-wide basis.   Through illegal concerted activity, these dominant factors
sought to: (1) minimize their risks and costs of doing business with garment manufacturers and
their customers; (2) maintain and stabilize pricing structures for factoring services; and (3)
stabilize their respective market shares, all of which they could not accomplish if they operated
in a legal, competitive manner.  Additionally, because of their control of the smaller factors,

11

Defendants, through collusion, effectively dominated and controlled the factoring market and dictated terms to their clients and customers.

### Facts

34.     For years, prior to the filing of this Complaint, the largest factors in the domestic garment industry have engaged in cartel-like behavior. These factors, including many of the Defendants, regularly and unlawfully shared highly confidential information relating to factored customers and clients, and then reached illegal agreements regarding the terms and conditions of credit to be extended. The unlawful information exchanges and agreements occurred at highly-secretive weekly meetings of formal groups such as the Uptown Credit Group, Inc. and the Thursday Garment Group, and through less formal means of communication. Upon information and belief, when legal challenges exposed the activities of the formal groups, the factors continued their collusive behavior through informal communication methods, such as telephone calls.

35.     Consistent with the longstanding industry culture, beginning at least as early as 2002, the Defendants discussed and unlawfully agreed with each other on how they would do business with Factory 2-U and its garment manufacturers. The precise scope and duration of the Factory 2-U discussions and agreements are at present unknown to the Trustee, but they include, at a minimum, the discussions and agreements specifically alleged herein. Upon information and belief, these discussions and agreements began before the dates specifically alleged and continued after the dates specifically alleged. The conspiratorial communications among Defendants, include, but are not limited to the following:

> (a)     On February 27, 2002, a credit representative from Rosenthal & Rosenthal contacted "Hattie" from Wells Fargo, a competing factor, and was told

that Factory 2-U's $2 million credit line expired in February 2002 and that

$282 thousand in Factory 2-U orders were being held as of March 2002.

(b)      On June 13, 2002, a credit representative of Rosenthal & Rosenthal

contacted George Dazet at HSBC, a competing factor, and was told that Factory

2-U's $4 million credit line was due on June 30, 2002, that a $2

million credit line was approved for June and July 2002, and that $3 million

in Factory 2-U orders were being held.

(c)      On June 20, 2002, a credit representative from Rosenthal & Rosenthal

contacted "Efrin" at Capital, a competing factor, and was told that Capital had

approved $1 million on Factory 2-U's orders but were holding $1.5 million in

Factory 2-U orders.

(d)      On July 10, 2002, a credit representative from Rosenthal & Rosenthal

once again contacted George Dazet from HSBC and was told that Factory 2-U's

credit line clearance was submitted for $4 million, but was cut down to

$2.5 million.  The representative was also told that HSBC was holding $2.1

million in Factory 2-U orders and that Factory 2-U had to "pay down to get the

line free."

(e)      On August 30, 2002, a credit representative from Rosenthal & Rosenthal

contacted Steve Turkish and/or "Amy" at Sterling Factors and was informed that

$1 million was being held on Factory 2-U orders.

(f)      Also, on August 30, 2002, a credit representative from Rosenthal &

Rosenthal  once again contacted George Dazet at HSBC and was told that

13

Factory 2-U's $2.5 million line expired in September and that $3.7 million in December 2002 Factory 2-U orders were being held.

(g)    On October 15, 2002, a representative from Rosenthal & Rosenthal contacted George Dazet at HSBC and was told that Factory 2-U's credit line was $1.5 million through December 31, 2002, which was a $1 million cut from September 2002. The Rosenthal representative was also told that GMAC was holding $3.2 million in Factory 2-U orders.

(h)    On December 18, 2002, a representative from Rosenthal & Rosenthal contacted George Dazet at HSBC and was told that Factory 2-U's credit line had decreased from $5 million to $1.5 million. The Rosenthal representative was also told that HSBC was holding $460 thousand in Factory 2-U orders.

(i)    Also, on December 18, 2002, a representative from Rosenthal & Rosenthal contacted "Efrin" from Capital and was told that Factory 2-U's $1.5 million credit line was being pulled and that $1 million of Factory 2-U orders were being held.

(j)    Also, on December 18, 2002, a representative from Rosenthal & Rosenthal contacted a representative at Sterling Factors and was told that Sterling was holding Factory 2-U orders.

(k)    On March 13, 2003, Maurice Sabony, a vice president of Milberg, telephoned Roy Gringhaus of Wells Fargo, a competing factor, and discussed with Mr. Gringhaus the fact that Century was "continuing to decline all orders" that Factory 2-U was attempting to place with manufacturers. Mr. Gringhaus also

14

told Mr. Sabony that another competing factor, Capital, was also not approving orders by Factory 2-U.

(l)     Also on March 13, 2003, Mr. Sabony telephoned George Dazet of HSBC, a competing factor, and discussed with him the fact that HSBC was declining orders that Factory 2-U was attempting to place with manufacturers.

(m)     Also on March 13, 2003, Mr. Sabony telephoned Orlando Morales of Rosenthal and Rosenthal, a competing factor, and discussed with him the amount of orders that Rosenthal and Rosenthal had approved for Factory 2-U, as well as the payment terms that Rosenthal and Rosenthal was requiring of Factory 2-U. Mr. Sabony and Mr. Morales also discussed whether Rosenthal and Rosenthal was requiring security deposits from Factory 2-U, and Mr. Morales told Mr. Sabony about the security deposit policy of CIT, another competing factor, with regard to Factory 2-U.

(n)     On or about April 9, 2003, Frank DeRita, Senior Vice President and Credit Manager at Milberg, who was Mr. Sabony's superior, telephoned Steve Turkish, a credit manager at Sterling Factors, a competing factor. Mr. DeRita and Mr. Turkish discussed the credit limit that Sterling was maintaining on orders by Factory 2-U, the payment terms that Sterling was requiring from Factory 2-U, and the fact that Sterling was getting surcharges[2] from manufacturers on all approved orders from Factory 2-U.

(o)     On April 21, 2003, Mr. Sabony telephoned Bill French at Capital Factors, a competing factor. Mr. Sabony discussed with Mr. French the fact that Capital

---

[2] A surcharge is an increase over the normal percentage of a garment manufacturer's receivable that a factor would ordinarily be paid.

Factors was approving only small orders from Factory 2-U for good clients, and was trying to resist "opening up" Factory 2-U's account for significant amounts of credit.

(p)    On April 23, 2003, Mr. Sabony again telephoned Mr. Morales at Rosenthal and Rosenthal. They discussed the amount of credit that Rosenthal was approving on orders by Factory 2-U, the payment terms that Rosenthal was requiring of Factory 2-U, and the fact that Rosenthal was "doing surcharges" with Factory 2-U's manufacturers.

(q)    Also on April 23, 2003, Mr. Sabony again telephoned Mr. Gringhaus at Wells Fargo, who told Mr. Sabony that Wells Fargo was continuing to decline all Factory 2-U orders.

(r)    Also on April 23, 2003, Mr. Sabony again telephoned Mr. Dazet at HSBC, who told Mr. Sabony that HSBC was continuing to decline all Factory 2-U orders.

(s)    Also on April 23, 2003, Mr. Sabony telephoned Bill Rose of GMAC, a competitor. Mr. Rose and Mr. Sabony discussed the amount of credit that GMAC was approving on orders by Factory 2-U, the payment terms that GMAC was requiring of Factory 2-U (including the fact that GMAC was insisting on "strict terms"), and GMAC's policy with regard to surcharges to Factory 2-U's manufacturers.

(t)    Also on April 23, 2003, a Milberg representative contacted a representative of CIT. They discussed the amount of credit that CIT was approving on orders from Factory 2-U, including a line of credit that Factory 2-U had established, the fact that CIT was imposing surcharges on all manufacturers

16

whose orders from Factory 2-U CIT was financing, payment terms required by CIT from Factory 2-U and the fact that Sterling, another competing factor, was approving Factory 2-U orders up to a specified limit.

(u)     On June 5, 2003, Mr. Sabony again telephoned Mr. Turkish at Sterling. They discussed Sterling's credit limit with regard to Factory 2-U, Sterling's willingness to increase Factory 2-U's credit limit, whether Sterling or the manufacturers bore the risk of nonpayment, and payment terms required by Sterling from Factory 2-U.

(v)     On July 22, 2003, Mr. Sabony again telephoned Mr. Frank at Capital Factors. They discussed the payment terms required of Factory 2-U by Capital, and the fact that Capital was declining orders from Factory 2-U except for small orders that were accepted as accommodations for Capital's best clients.

(w)     On July 28, 2003, Mr. DeRita again telephoned Mr. Turkish at Sterling. They discussed Sterling's intention to keep Factory 2-U's available credit limited to a specified amount.

(x)     On September 15, 2003, Mr. Sabony again telephoned Mr. Turkish at Sterling, who told Mr. Sabony that Sterling was approving orders up to a specified limit.

(y)     Also on September 15, 2003, Mr. Sabony again telephoned Mr. Rose at GMAC. Mr. Rose discussed with Mr. Sabony GMAC's payment terms to Factory 2-U, GMAC's placement of $1 million of Factory 2-U orders on hold, GMAC's withholding of approval for those orders, GMAC's credit limit to

17

Factory 2-U, and GMAC's possible increase of Factory 2-U's credit limit depending on Factory 2-U's financial plan.

(z)    Also on September 15, 2003, Mr. Sabony telephoned Steve Batkowsky of Rosenthal and Rosenthal, who told Mr. Sabony that Rosenthal and Rosenthal was still not approving Factory 2-U orders.

(aa)    On September 17, 2003, Mr. DeRita telephoned R. Louie of CIT.  Mr. DeRita and Mr. Louie discussed the credit limit applied to Factory 2-U orders by CIT, and the future expiration date of that credit limit.

36.    Not only did Mr. Sabony contact various factors, but competing factors also telephoned Mr. Sabony to discuss with him Milberg's dealings with Factory 2-U and its manufacturers, including but not limited to Milberg's willingness to extend credit to Factory 2-U, Milberg's credit limits on Factory 2-U orders, and Milberg's payment terms to Factory 2-U.

37.    After their unlawful discussions and communications, the Defendants took concerted action which harmed Factory 2-U's ability to conduct business.  Specifically, the Defendants declined and limited credit to Factory 2-U at approximately the same time.  The Defendants based their future course of action on their previous unlawful communications and discussions.  As a result of the Defendants taking adverse concerted action, Factory 2-U filed for bankruptcy in January 2004.

38.    Through their unlawful discussions and communications, the Defendants agreed upon the basis on which they would do business with Factory 2-U and its manufacturers.  Those illegal agreements included, without limitation:

(a)    Agreements on whether credit would be extended by Defendants to Factory 2-U for its purchases from garment manufacturers;

18

(b)    Agreements on the amount of credit that would be extended by
        Defendants to Factory 2-U for its purchases from garment
        manufacturers;

(c)    Agreements on the terms on which credit would be extended by
        Defendants to Factory 2-U for its purchases from garment
        manufacturers, including without limitation time to pay (e.g., net 60, net
        30, net 15, or other terms), the date on which the time to pay would
        commence (e.g., from receipt of goods or date of invoice), and whether
        a security deposit would be required from Factory 2-U; and

(d)    Agreements on whether surcharges would be imposed by Defendants on
        garment manufacturers as a condition of financing Factory 2-U's
        purchases from those manufacturers.

39.    The Trustee did not discover the Defendants' unlawful conduct until April/May
2007 while reviewing documents reflecting Milberg's contacts and agreements with its
competitors that Milberg produced in response to discovery requests in bankruptcy proceedings.
Neither the Trustee nor Factory 2-U could have discovered the unlawful conduct earlier because
the documents were the internal and confidential documents of Milberg to which the Plaintiff
had no access.

40.    The Defendants fraudulently concealed their unlawful conduct from Factory 2-U.
The conspiratorial communications among the competing factors were conducted secretly by
telephone so as to leave no written record.

41.    Milberg misdescribed its contacts with its competitors as credit "references," but
it never informed Factory 2-U that it was in contact with other factors or requested the names of

19

credit "references" from Factory 2-U. Moreover, information on Factory 2-U's payment history and credit standing was readily available from a credit reporting agency through reports to which Defendants subscribed, making direct contact with competing factors for so-called "references" unnecessary.

42.    Mr. Sabony had frequent and regular telephone contacts with Factory 2-U executives, including its controller, in which Mr. Sabony asked about or discussed with the Factory 2-U representatives what other factors were doing with regard to Factory 2-U orders. Mr. Sabony concealed from Factory 2-U, however, the fact that the competing factors were discussing and agreeing upon what their actions would be with regard to Factory 2-U orders.

### Causes of Action

### Count I – Violation of 15 U.S.C. § 1 (Price-Fixing Conspiracy)

43.    The Trustee repeats and realleges the allegations in paragraphs 1-42 above with the same force and effect as if fully set forth herein.

44.    The Defendants conspired and agreed among themselves to fix, maintain, and stabilize Factory 2-U's terms and amount of credit, which is a *per se* illegal price-fixing agreement in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Specifically, the Defendants had numerous discussions in which they agreed on the amount of credit that would be extended to Factory 2-U, the terms on which credit would be extended to Factory 2-U, whether the Defendants would impose surcharges on garment manufacturers as a condition of financing Factory 2-U's purchases from those manufacturers, and whether security would be required from Factory 2-U. Based on these agreements, the Defendants acted in concert by declining or limiting Factory 2-U's credit at approximately the same time.

20

45.     Factory 2-U was injured as a proximate result of the conspiracy in that the Defendants' unlawful conduct increased Factory 2-U's credit costs and deprived it of adequate inventory with which to conduct business. As a result, Factory 2-U's profits were reduced, its losses substantially increased, and its business was damaged as to materially contribute to its ultimate bankruptcy and business failure.

WHEREFORE, the Trustee demands judgment in its favor and against all Defendants, jointly and severally, in an amount to be determined at trial trebled, plus costs of suit, attorneys' fees and interest, and other and further relief as the Court deems just and proper.

### Count II – Violation of 15 U.S.C. § 1 (Boycott)

46.     The Trustee repeats and realleges the allegations in paragraphs 1-45 above with the same force and effect as if fully set forth herein.

47.     The Defendants conspired and agreed among themselves to boycott Factory 2-U from the garment retailer business, which is a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Specifically, the Defendants had numerous discussions in which they agreed on the amount of credit that would be extended to Factory 2-U, the terms on which credit would be extended to Factory 2-U, whether the Defendants would impose surcharges on garment manufacturers as a condition of financing Factory 2 U's purchases from those manufacturers, and whether security would be required from Factory 2 U. Because the Defendants acted in concert when limiting or refusing to extend credit to Factory 2-U, the Defendants boycotted Factory 2-U from the garment retailer business.

48.     Factory 2-U was injured as a proximate result of the boycott in that the Defendants' unlawful conduct increased Factory 2-U's credit costs and deprived it of adequate inventory with which to conduct business. As a result, Factory 2-U's profits were reduced, its

21

losses substantially increased, and its business was damaged as to materially contribute to its ultimate bankruptcy and business failure.

WHEREFORE, the Trustee demands judgment in its favor and against all Defendants, jointly and severally, in an amount to be determined at trial trebled, plus costs of suit, attorneys' fees and interest, and other and further relief as the Court deems just and proper.

### Count III – Violation of 15 U.S.C. § 1 (Rule of Reason Claim)

49.     The Trustee repeats and realleges the allegations in paragraphs 1-48 above with the same force and effect as if fully set forth herein.

50.     The Defendants conspired and agreed among themselves to fix, maintain, and stabilize Factory 2-U's terms and amount of credit, and exchanged other competitive information with regard to Factory 2-U.   Specifically, the Defendants had numerous discussions in which they agreed on the amount of credit that would be extended to Factory 2-U, the terms on which credit would be extended to Factory 2-U, whether the Defendants would impose surcharges on garment manufacturers as a condition of financing Factory 2-U's purchases from those manufacturers, and whether security would be required from Factory 2-U.  Based on these agreements, the Defendants acted in concert by declining or limiting Factory 2-U's credit at approximately the same time.

51.     The Defendants' conspiracy produced adverse and anticompetitive effects within the relevant product and geographic markets because the Defendants possessed "market power" sufficient to inhibit competition on a market-wide basis.  Through illegal concerted activity, Defendants sought to: (1) minimize their risks and costs of doing business with garment manufacturers and their customers; (2) maintain and stabilize pricing structures for factoring services; and (3) stabilize their respective market shares, all of which they could not accomplish

22

if they operated in a legal, competitive manner. Additionally, because of their control of the smaller factors, Defendants, through collusion, effectively dominated and controlled the factoring market and dictated terms to their clients and customers. Defendants' agreements were not designed to, nor had the effect of, increasing economic efficiency or rendering the relevant market more competitive.

52.     Factory 2-U was injured as a proximate result of the conspiracy in that the Defendants' unlawful conduct increased Factory 2-U's credit costs and deprived it of adequate inventory with which to conduct business. As a result, Factory 2-U's profits were reduced, its losses substantially increased, and its business was damaged as to materially contribute to its ultimate bankruptcy and business failure.

WHEREFORE, the Trustee demands judgment in its favor and against all Defendants, jointly and severally, in an amount to be determined at trial trebled, plus costs of suit, attorneys' fees and interest, and other and further relief as the Court deems just and proper.

### Count IV – Violation of the New York Donnelly Act (N.Y. Gen. Bus. L. § 340)

53.     The Trustee repeats and realleges the allegations in paragraphs 1-52 with the same force and effect as if fully set forth herein.

54.     The Defendants have restrained trade in the market for the provision of factoring services in the garment industry in the United States in violation of the law of the State of New York.

55.     The Defendants conspired and agreed among each other to fix, maintain, and stabilize Factory 2-U's terms and amount of credit, which constitutes unlawful restraint of trade in violation of N.Y. Gen. Bus. L. § 340. Specifically, the Defendants had numerous discussions in which they agreed on the amount of credit that would be extended to Factory 2-U, the terms

23

on which credit would be extended to Factory 2-U, whether the Defendants would impose

surcharges on garment manufacturers as a condition of financing Factory 2-U's purchases from

those manufacturers, and whether security would be required from Factory 2-U. Based on these

agreements, the Defendants acted in concert by declining or limiting Factory 2-U's credit at

approximately the same time.

56. Each of the Defendants' unlawful information exchanges and agreements entered

into was a combination in restraint of trade in violation of the Donnelly Act. Each such unlawful

agreement violates the Donnelly Act *per se*, or violates the Donnelly Act, because its pro-

competitive effects, if any, are outweighed by its anticompetitive effects. Specifically, the

Defendants' conspiracy produced adverse and anticompetitive effects within the relevant product

and geographic markets because the Defendants possessed "market power" sufficient to inhibit

competition on a market-wide basis. Through illegal concerted activity, Defendants sought to:

(1) minimize their risks and costs of doing business with garment manufacturers and their

customers; (2) maintain and stabilize pricing structures for factoring services; and (3) stabilize

their respective market shares, all of which they could not accomplish if they operated in a legal,

competitive manner. Additionally, because of their control of the smaller factors, Defendants,

through collusion, effectively dominated and controlled the factoring market and dictated terms

to their clients and customers. Defendants' agreements were not designed to, nor had the effect

of, increasing economic efficiency or rendering the relevant market more competitive.

57. Factory 2-U was injured as a proximate result of the conspiracy in that the

Defendants' unlawful conduct increased Factory 2-U's credit costs and deprived it of adequate

inventory with which to conduct business. As a result, Factory 2-U's profits were reduced, its

24

losses substantially increased, and its business was damaged as to materially contribute to its ultimate bankruptcy and business failure.

WHEREFORE, the Trustee demands judgment in its favor and against all Defendants, jointly, and severally, in an amount to be determined at trial trebled, plus costs of suit, attorneys' fees and interest, and other and further relief as the Court deems just and proper.

### Jury Demand:

The Trustee demands trial by jury in this action.

Respectfully submitted,

GRT DE
3911

| | |
|---|---|
| OF COUNSEL<br>Joseph D. Mancano, Esq.<br>Anthony J. Basinski, Esq.<br>Bryan S. Neft, Esq.<br>Divya Wallace, Esq.<br>PIETRAGALLO BOSICK & GORDON LLP<br>1255 Drummers Lane, Suite 105<br>Wayne, PA 19087<br>Phone: (610)-293-2222<br>Fax: (610)-293-2225<br><br>Attorneys for Plaintiff, Jeoffrey L. Burtch,<br>Chapter 7 Trustee<br><br>Dated: September 17, 2007 | /s/ Robert W. Pedigo<br>Robert W. Pedigo, Esq.<br>ID#: 4047<br>COOCH & TAYLOR, P.A.<br>824 Market Street, 10th Floor<br>Wilmington, DE 19801<br>Phone: (302)-984-3832<br>Fax: (302)-652-5379<br><br>Attorneys for Plaintiff, Jeoffrey L. Burtch,<br>Chapter 7 Trustee<br><br>Dated: September 17, 2007 |

26