**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JEOFFREY L. BURTCH, CHAPTER 7 TRUSTEE, FACTORY 2-U STORES, INC., et al., <br><br> Plaintiff, <br><br> v. <br><br> MILBERG FACTORS, INC., CAPITAL FACTORS, INC., THE CIT GROUP/COMMERCIAL SERVICES, INC., GMAC COMMERCIAL FINANCE LLC, HSBC BUSINESS CREDIT (USA) INC., ROSENTHAL AND ROSENTHAL, INC., STERLING FACTORS CORPORATION, WELL FARGO CENTURY INC., <br><br> Defendants. | Civil Action No. 07-556 (JJF) |

**PLAINTIFF'S CONSOLIDATED BRIEF IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS**

Robert W. Pedigo, Esq. (ID# 4047)
Shelley A. Kinsella, Esq. (ID #4023)
COOCH & TAYLOR, P.A.
824 Market Street, 10th Floor
Wilmington, DE 19801
Phone: (302)-984-3832
Fax: (302)-652-5379

and

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, PA 19103
Phone: (215)-320-6200
Fax: (215)-981-0082

Dated: February 29, 2008

**TABLE OF CONTENTS**

PAGE

TABLE OF CONTENTS........................................................................................i - ii

TABLE OF AUTHORITIES...............................................................................iii - v

I. INTRODUCTION............................................................................................1 - 3

II. NATURE AND STAGE OF PROCEEDINGS...............................................3

III. SUMMARY OF ARGUMENT....................................................................3-4

IV. STATEMENT OF FACTS ...........................................................................5-9

    A. The Factoring Business............................................................................5-6

    B. The Defendants' Control of the Factoring Industry...................................6

    C. Relevant Market........................................................................................7

    D. Antitrust Standing and Antitrust Injury....................................................7

    E. Defendants' Antitrust Conspiracy...........................................................7-9

    F. Defendants' Fraudulent Concealment.......................................................9

V. LEGAL STANDARD ..................................................................................9-10

VI. ARGUMENT.............................................................................................10-36

    A. The Defendants' Conspiracy to Share and to Act Upon Information Regarding Future Credit Terms is Illegal Under the Sherman Act...............................................10-14

    B. <u>Twombly</u> Does Not Require Dismissal of Factory 2-U's Complaint.............14-18

        1. The holding in <u>Twombly</u> does not alter the standard for a motion to dismiss...........................................................................................14-15

        2. Factory 2-U's allegations easily satisfy its pleading burden.............15-17

      3. There is no comparison between the allegations in <u>Twombly</u>
         and Factory 2-U's allegations ....................................................17-18

  C. Fixing Credit Terms is a Per Se violation of Section 1............................18-19

  D. Factory 2-U Adequately Alleges a Per Se Illegal Group Boycott....................19-29

      1. Factory 2-U's allegations permit an inference of an agreement to boycott that
         constitutes a per se antitrust violation ....................................19-23

      2. Boycotts targeted at customers are not exempt from the per se rule........23-25

      3. The factors' conspiracy makes economic sense..................................26-28

      4. Factory 2-U has alleged antitrust injury....................................28-29

  E. The Complaint Adequately Defines the Relevant Market ..........................29-31

  F. Factory 2-U Adequately Alleges a Claim Under the New York Donnelly Act......31-32

  G. Factory 2-U Timely Filed its Complaint Because it Sued Defendants Within Four
    Years From the Date on Which Damages Were Inflicted..............................32-33

  H. Factory 2-U Sufficiently Pled Fraudulent Concealment ...........................33-36

VII. CONCLUSION ................................................................................36

VIII. CERTIFICATE OF SERVICE..............................................................37

## TABLE OF AUTHORITIES

*CASES*                                                                            *PAGE*

AD/SAT v. Associated Press, 181 F.3d 216 (2d Cir. 1999) ................................ 31

Bailey v. Glover, 88 U.S. 342 (1874) ......................................................... 33

Baker v. F.& F. Inv., 420 F.2d 1191 (7th Cir. 1970) ..................................... 34

Bell Atl. Corp. v. Twombly, ___ U.S ___, 127 S. Ct. 1955 (2007) ................... *passim*

Bethlehem Steel Corp. v. Fischbach and Moore, Inc., 641 F. Supp. 271 (E.D. Pa 1986) ...33, 34

Binderup v. Pathe Exchange, Inc., 263 U.S. 291 (1923) ............................ *passim*

Brunson Commc'ns, Inc. v. Arbitron, Inc., 239 F. Supp. 2d 550 (E.D. Pa. 2002) ........ 20

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977) ..................... 28

Capital Imaging Assocs. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 544
(2d Cir. 1993) ............................................................................... 21

Catalano Inc. v. Target Sales Inc., 446 U.S. 643 (1980) ........................... 4, 13, 19

Cement Mfrs.' Protective Ass'n v. U.S., 268 U.S. 588 (1925) ...................... *passim*

Chow v. The Union Central Life Ins. Co., 457 F. Supp. 1303 (E.D.N.Y 1978) ........ 32

Continental-Wirt Elecs. Corp. v. Lancaster Glass Corp., 459 F.2d 768 (3d. Cir 1972) ... 32

DeFilippo v. Ford Motor Co., 516 F.2d 1313 (3d Cir. 1975) ................. 4, 14, 19, 24

Dresses for Less, Inc. v. CIT Group/Commercial Servs., Inc., No. 01 Civ. 2669 (WHP), 2002 U.S. Dist.
LEXIS 18338 (S.D.N.Y Sept. 30, 2002) ............................................... *passim*

F.T.C. v. Superior Court Trial Lawyers' Ass'n, 493 U.S. 411 (1990) ............ 10, 21, 25

Harrison Aire, Inc. v. Aerostar Int'l, Inc., 423 F.3d 374 (3d Cir. 2005) ............. 29

Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738 (1976) ........................... 17

In re Aspartame Litig., 2007 U.S. Dist. LEXIS 16995 (E.D. Pa. Jan. 19, 2007) ...... 34, 35

In re Intel Corp. Microprocessor Antitrust Litig., 496 F. Supp. 2d 404 (D. Del. 2007) ... 15, 28

In re Lower Lake Erie Iron Core Litig., 998 F.2d 1144 (3d Cir. 1993) ................. 33

In re OSB Antitrust Litig., 2007 U.S. Dist. LEXIS 56573 (E.D. Pa. August 3, 2007) ...... 17

In re Rockefeller Ctr. Props. Sec. Litig., 184 F.3d 280 (3d Cir. 1999) ................36

Kasada, Inc., v. Access Capital Inc., No. 01 Civ. 8893 (GBD), 2004 U.S. Dist. LEXIS 25257 (S.D.N.Y. Dec. 10, 2004) ................................................13, 22

Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211 (1951) ................25

King & King Enters. v. Champlin Petroleum Co., 657 F.2d 1147 (10th Cir. 1981) ................33

Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997) ................34

Larry V. Muko, Inc. v. Sw. Pa. Bldg. & Constr., 670 F.2d 421 (3d Cir.), cert. denied, 459 U.S. 916 (1982) ................24

Leegin Creative Leather Prods., Inc. v. PSKS, Inc., ___ U.S. ___, 127 S. Ct. 2705 (2007) ......19, 22

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ................26

Michelman v. Clark-Schwebel Fiber Glass Co., 534 F.2d 1036 (2d Cir. 1976) ................10, 12, 22

Morton's Market v. Gustafson's Dairy, Inc., 198 F.3d 823 (11th Cir. 1999) ................35

Nat'l Soc'y of Prof'l Eng'rs v. U.S., 435 U.S. 679 (1978) ................10

N. Pac. R.R. Co. v. U.S., 356 U.S. 1 (1958) ................18

Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284 (1985) ........passim

NYNEX Corp. v. Discon, Inc., 525 U.S. 128 (1998) ................19

Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173 (3d Cir. 1988) ................20

Phillips v. County of Allegheny, ___ F.3d ___, 2008 U.S. App. LEXIS 2513 (3d Cir. Feb. 5, 2008) ................passim

Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430 (3d Cir. 1997) ................26,30

Schuylkill Energy Res. Inc., v. PP&L Co., 113 F.3d 405 (3d Cir. 1997) ................28

St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531 (1978) ................25

Texaco, Inc. v. Dagher, 547 U.S. 1 (2006) ................18

Todd v. Exxon Corp., 275 F.3d 191 (2d Cir. 2001) ................29,30

Tunica Web Adver. v. Tunica Casino Operators Ass'n, Inc., 496 F.3d 403 (5th Cir. 2007) ................24, 25

U.S. v. Container Corp. of Am., 393 U.S. 333 (1969) ................29

U.S. v. Fed'n of Physicians and Dentists, Inc., 63 F. Supp. 2d 475 (D. Del. 1999) ................18

U.S. v. Socony-Vacuum Oil Co., 310 U.S. 150 (1940)..................................18, 19

U.S. v. Trenton Potteries, 273 U.S. 392 (1927) ..........................................19

U.S. v. U.S. Gypsum Co., 438 U.S. 422 (1978)..........................................29

Venture Tech., Inc. v. Nat'l Fuel Gas Co., 685 F.2d 41 (2d Cir. 1980)...................21

Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321 (1971)...................32

## *STATUTES*

N.Y. Gen. Bus. L. § 340.................................................................31

15 U.S.C. §1.........................................................................3, 10

15 U.S.C. §15(a).......................................................................28

15 U.S.C. §15(b).......................................................................32

## *RULES*

Fed. R. Civ. P. 12(b)(6)..............................................................3, 10

## *INTERNET SOURCES*

The Big Apple, "Does Macy's Tell Gimbel's?" http://www.barrypopik.com, Oct. 7, 2004...................................................................................1

CIT, "What is Factoring?"http://www.citcommercialfinance.com
.....................................................................................31

## *MISCELLANEOUS*

Journal, November 11-14, 1850, Thoreau, H. D..........................................3

U.S. Dep't of Justice, Antitrust Guidelines for Collaborations Among Competitors, (2000)
.....................................................................................2, 14

U.S. Dep't of Justice and the Federal Trade Comm'n, Horizontal Merger Guidelines § 2.1 (1997)
.....................................................................................27, 30

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| JEOFFREY L. BURTCH, CHAPTER 7 TRUSTEE, FACTORY 2-U STORES, INC., et al., | ) ) ) ) |  |
| Plaintiff, | ) ) ) |  |
| v. | ) ) | Civil Action No. 07-556  (JJF) |
| MILBERG FACTORS, INC., CAPITAL FACTORS, INC., THE CIT GROUP/COMMERCIAL SERVICES, INC., GMAC COMMERCIAL FINANCE LLC, HSBC BUSINESS CREDIT (USA) INC., ROSENTHAL AND ROSENTHAL, INC., STERLING FACTORS CORPORATION, WELL FARGO CENTURY INC., | ) ) ) ) ) ) ) ) ) | **BRIEF IN OPPOSITION TO MOTIONS TO DISMISS** |
| Defendants. | ) ) ) |  |

**PLAINTIFF'S CONSOLIDATED BRIEF IN OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS**

### I.    Introduction

"Does Macy's Tell Gimbel's?" was once a popular slogan, particularly in the 1930s.[1]  The implication of the slogan was that one business will not reveal to its competitors commercially sensitive information about its own business affairs.  Yet that is exactly what the Defendants do not deny doing, but contend that they were permitted to do without running afoul of the antitrust laws.  It just is not so.  The purpose of the antitrust laws is to promote pro-competitive behavior among market participants and punish those who are responsible for anti-competitive results.  Sharing private, confidential business information with a competitor concerning the price terms upon which a business is dealing with a customer is unlikely to be pro-competitive.  Rather, as the U. S. Department of Justice and the Federal Trade Commission have said:

---

[1]  The Big Apple, "Does Macy's Tell Gimbel's?": http://www.barrypopik.com, Oct. 7, 2004.

> The sharing of information related to a market in which … the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, … , or other competitively sensitive variables … Other things being equal, the sharing of information relating to price, output, costs or strategic planning is more likely to raise competitive concerns than the sharing of information relating to less competitively sensitive variables. Similarly, other things being equal, the sharing of information on current operating and future business plans are more likely to raise concerns than the sharing of historical information. Finally, other things being equal, the sharing of individual company data is more likely to raise [antitrust] concerns than the sharing of aggregated data that does not permit recipients to identify individual firm data.

U.S. Dep't of Justice, <u>Antitrust Guidelines for Collaborations Among Competitors</u>, at 15-16 (2000) ("D.O.J. <u>Guidelines</u>")

This case involves the undisputed sharing among competitors in the same relevant market of price and other commercially sensitive information concerning one party: Factory 2-U. It does not, as the Motions to Dismiss argue, rely upon allegations of parallel conduct; nor does it involve the sharing of data concerning the creditworthiness of Factory 2-U. Rather, it involves the sharing of information concerning the present and future business plans of competitors as to how they will deal with Factory 2-U with regard to credit for purchases from garment manufacturers. Again, as noted by the Department of Justice in its guidelines, "[c]ompetitor collaborations also may facilitate explicit or tacit collusion through facilitating practices such as the exchange or disclosure of competitively sensitive information." <u>Id.</u> at 6. Further, "[t]he mere coordination of decision on price, output, customers, territories, and the like is not integration, and cost savings without integration is not a basis for avoiding *per se* condemnation." <u>Id.</u> at 8.

The Complaint in this case contains allegations of at least 27 specific instances in which the various Defendants exchanged competitively sensitive information concerning the terms under which they were or would be dealing with the credit of Factory 2-U. <u>See</u> Compl. ¶ 35. As the D.O.J. <u>Guidelines</u> state, the sharing of such information is strong evidence of collusion. This is so particularly where, as here, it is alleged that following the discussions alleged in Paragraph 35, "the Defendants declined and limited credit to Factory 2-U at approximately the same time." <u>See</u> Compl. ¶ 37. Defendants argue that the evidence is merely circumstantial. As Thoreau wrote, however, "[s]ome circumstantial evidence is

very strong, as when you find a trout in the milk."[2]  Just as the trout in the milk indicates that the milk has been adulterated, the allegation that the Defendants declined and limited credit to Factory 2-U at approximately the same time is strong evidence of collusion in light of their acknowledged prior discussions concerning the terms under which credit would or would not be extended to Factory 2-U.[3] The Defendants had an agreement; they acted upon that agreement; and Factory 2-U and competitors in the relevant product market were injured.  No more is needed to establish a violation of Section 1.

## II.     Nature and Stage of the Proceedings

This litigation concerns a conspiracy among the defendants to engage in a per se illegal group boycott and per se illegal price fixing scheme in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The instant matter comes before the Court on Defendants' motions to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## III.     Summary of Argument

Contrary to Defendants' arguments, Plaintiff – the Chapter 7 Trustee for Factory 2-U (hereinafter "Factory 2-U") – easily satisfies his pleading burden by alleging a set of facts that, taken as true, lead to the inevitable conclusion that Defendants engaged in a conspiracy to fix prices and to boycott Factory 2-U in violation of the Sherman Act.  As alleged in detail in the Complaint, the defendants engaged in a series of at least twenty-seven (27) conspiratorial conversations during which they exchanged not just historical information regarding Factory 2-U's creditworthiness, but also information regarding the future terms and conditions on which credit would be extended to Factory 2-U, if at all.  The type of information-sharing alleged has been recognized as anticompetitive and violative of the antitrust laws for over eighty years. See Cement Mfrs.' Protective Ass'n v. U.S., 268 U.S. 588, 599-600 (1925) (reversing grant of injunction because government failed to charge or prove that Defendants entered an agreement regarding "the persons to whom or conditions under which credit should be extended").

---

[2]  Journal, November 11-14, 1850, Thoreau, H. D.

[3]  On a motion to dismiss, the Court is required to accept as true the allegations of the Complaint that those discussions took place.  Bell Atl. Corp. v. Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1965 (2007)

Similarly, Twombly fails to shield Defendants' anticompetitive activity from judicial scrutiny. As recently explained by the Third Circuit, Twombly did nothing to alter the deference with which the Court must view the Complaint on a motion to dismiss. See Phillips v. County of Allegheny, ___ F.3d ___, 2008 U.S. App. LEXIS 2513 at *11-*14 (3d Cir. Feb. 5, 2008). To the contrary, Twombly simply highlighted the fact that a plaintiff may not meet its pleading burden through conclusory statements and the recitation of the elements of a cause of action alone. See id. Even the most superficial comparison of Plaintiff's allegations in the instant suit with the bare-bones, conclusory allegations of an antitrust violation by the Twombly plaintiffs reveals that Factory 2-U has alleged exactly the type of factual detail that was missing in Twombly and that suffices to defeat a motion to dismiss. Indeed, Factory 2-U has alleged a classic antitrust conspiracy by the defendants – an agreement to fix the price of credit and to boycott a putative customer, which have been recognized as per se violations of the Sherman Act. See Catalano Inc. v. Target Sales Inc., 446 U.S. 643, 648 (1980) (stating "credit terms must be characterized as an inseparable part of price") and De Filippo v. Ford Motor Co., 516 F.2d 1313, 1318 (3d Cir. 1975) (citing Binderup v. Pathe Exchange, Inc., 263 U.S. 291, 303-04 (1923), which involved a horizontal conspiracy to refuse to deal with a putative customer, as an example of a classic, per se illegal group boycott). The alleged conspiracy allowed the defendants to minimize their risk and to set credit prices at an artificially high level by agreeing to restrict competition in the relevant market.

In short, Plaintiff has alleged a detailed set of facts indicating that the defendants engaged in a classic cartel, one result of which was to drive Factory 2-U out of business. This is just the type of conduct that the antitrust laws were designed to prevent. Defendants' motions to dismiss should be denied.

## IV.    Statement of Facts

On September 17, 2007, Plaintiff, Chapter 7 Trustee for Factory 2-U, filed a Complaint against eight Defendants[4] seeking treble damages for price fixing and an illegal group boycott to deny credit in violation of Section 1 of the Sherman Act, together with a related claim for unlawful restraint of trade under the New York Donnelly Act. Compl. ¶ 1.

A. *The Factoring Business*

Defendants are engaged in the business of factoring. Factors are lenders who play a major role in financing purchase and sale transactions between garment manufacturers and garment retailers, such as Factory 2-U. Factors extend credit to garment manufacturers in two distinct ways: (1) through written "factoring" agreements with clients (i.e. garment manufacturers), and (2) through oral "customer credit" agreements and relationships with their clients' customers (i.e. garment retailers). Factors function, in effect, as many garment manufacturers' credit departments by reviewing the creditworthiness of the retailers to whom those manufacturers sell, by extending credit to manufacturers' sales to particular retailers, and by purchasing manufacturers' receivables on a full, partial, or non-recourse basis. Compl. ¶ 3.

When a factor purchases a client's accounts receivable, it assumes the risk of collecting the accounts receivable. The factor assumes that risk only as to those sales to customers that the factor approves (or "credit checks", in the parlance of the industry). When a factor refuses to "credit check" a client's customer, the factor declines to approve orders placed by the customer with the factor's client. Any sale by the client to that customer becomes a "client's risk" sale if the client elects to go forward with the transaction. Since a garment manufacturer usually cannot afford to risk sales that are not acceptable to a factor, the factor's "credit check" decision usually determines whether a sale is made. Compl ¶ 5.

---

[4] Defendants are Milberg Factors, Inc., Capital Factors, Inc., The CIT Group/Commercial Services, Inc., GMAC Commercial Finance LLP, HSBC Business Credit (USA) Inc., Rosenthal & Rosenthal, Inc., Sterling Factors Corporation., and Wells Fargo Century Inc.

Although factors advertise that they will assume their clients' credit risk, factors almost always include in their factoring agreements a boilerplate provision stating that the factor has discretion to refuse to "credit check" a garment retailer for any reason at all. This allows the factors to refuse to "credit check" a garment retailer <u>for reasons that have nothing to do with the retailer's creditworthiness</u>. Compl. ¶ 6. If a factor's "credit check" decision is adverse to the garment retailer, not only is the garment manufacturer unable to sell its materials to the garment retailer due to its inability to quickly convert accounts receivable into cash, but the garment retailer is left with insufficient inventory to sell to its customers. Compl. ¶ 7.

Additionally, factors determine the terms and conditions on which they will deal with particular retailers and manufacturers. The terms and conditions include: the discount rate at which factors will purchase receivables from manufacturers owed by retailers; payment terms required of retailers; and whether purchases by particular retailers from particular manufacturers will be financed at all. Small to medium-sized garment manufacturers and retailers often lack access to other forms of financing, making factor financing essential to their ability to remain profitable, viable businesses. Because a factor's credit decision determines whether a sale is made between a garment retailer and garment manufacturer, the factors exert significant control over the garment industry. Compl. ¶ 8.

    B.  *The Defendants' Control of the Factoring Industry*

The eight Defendants were in the top ten list of factors based on estimates of their annual factoring volume in 2002-2003. Compl. ¶ 11. Furthermore, about 80% of garment manufacturers relied on factors for their credit needs. Compl. ¶ 12. During the time period relevant to the Complaint, 305 of Factory 2-U's garment manufacturers were factored by the Defendants. Therefore, the impact of Defendants' refusal to extend credit to Factory 2-U and decline garment manufacturers' Factory 2-U orders was financially devastating to Factory 2-U and contributed materially to its bankruptcy and ultimate business failure. Compl. ¶¶ 12-13. Factory 2-U could not even go to any of the smaller factors for credit because those smaller factors were essentially controlled by the Defendants. Compl. ¶ 15.

C  *Relevant Market*

The relevant product market is the provision of "factoring services" in the domestic garment industry to include retailers, wholesalers, and manufacturers  Factoring services include a complete financial package that consists of: (1) credit extension; (2) accounts receivable purchasing and collection; and (3) financing. The relevant geographic market is the United States  Compl. ¶¶ 30-31.

D.  *Antitrust Standing and Antitrust Injury*

Factory 2-U has standing to bring the claims because it has suffered an injury that is causally related to Defendants' illegal anti-competitive activity.  Specifically, Defendants' violations of the antitrust laws have directly and proximately injured Factory 2-U in its business and property in an amount that will be proved at trial  Additionally, Defendants' unlawful conduct increased Factory 2-U's credit costs and deprived it of adequate inventory with which to conduct business.  As a result, Factory 2-U's profits were reduced, its losses were substantially increased, and its business was damaged so as to materially contribute to its ultimate bankruptcy and business failure  Compl. ¶ 32.

Furthermore, Defendants' unlawful conduct has generally harmed competition because their violations of the antitrust laws lessened competition.  Defendants possessed market power sufficient to inhibit competition on a market-wide basis because they were in the top ten list of factors based on their factoring volume in 2002-2003.  Through illegal concerted activity, Defendants sought to: (1) minimize their risks and costs of doing business with garment manufacturers and their customers; (2) maintain and stabilize pricing structures for factoring services; and (3) stabilize their respective market shares, all of which they could not accomplish if they operated in a legal competitive manner.  Additionally, because of their control of the smaller factors, Defendants, through collusion, effectively dominated and controlled the factoring market and dictated terms to their clients and customers  Compl. ¶ 33

E.  *Defendants' Antitrust Conspiracy*

Historically, the largest factors in the domestic garment industry have engaged in cartel-like behavior  These factors, including many of the Defendants, regularly and unlawfully shared highly confidential information regarding the terms and conditions of credit to be extended  Compl. ¶ 34.  In the

past, the unlawful information exchanges and agreements occurred at highly-secretive weekly meetings of formal groups such as the Uptown Credit Group, Inc. and the Thursday Garment Group, and through less formal means of communication. When legal challenges exposed the activities of the formal groups, the factors continued their collusive behavior through informal communication methods, such as telephone calls. Compl. ¶ 34.

Beginning at least as early as 2002, Defendants discussed and unlawfully agreed with each other on how they would do business with Factory 2-U and its garment manufacturers. The Complaint alleges in specific detail <u>twenty-seven (27) conspiratorial communications</u> among the Defendants spanning over a year-and-a-half regarding: (1) whether credit would be extended to Factory 2-U in the future; (2) the terms and amount in which credit would be extended; and (3) whether surcharges would be imposed on garment manufacturers as a condition of financing Factory 2-U's purchases from those manufacturers. Compl. ¶¶ 35-36, 38. The Complaint details the participants in each conspiratorial communication, the date of the communication, and the specific credit terms that were discussed. The conspiratorial communications concerned not only the current credit status of Factory 2-U, but also the factor's future plans regarding credit terms to be applied to Factory 2-U. Compl. ¶ 35a – aa.

Through their unlawful discussions and communications, <u>the Defendants agreed upon the basis on which they would do business with Factory 2-U and its manufacturers</u>. Those illegal agreements included, without limitation: (1) agreements on whether credit would be extended by Defendants to Factory 2-U for its purchases from garment manufacturers; (2) agreements on the amount of credit that would be extended by Defendants to Factory 2-U for its purchases from garment manufacturers; (3) agreements on the terms on which credit would be extended by Defendants to Factory 2-U for its purchases from garment manufacturers, including without limitation time to pay (e.g., net 60, net 30, net 15, or other terms), the date on which time to pay would commence (e.g., from receipt of goods or date of invoice), and whether a security deposit would be required from Factory 2-U; and (4) agreements on whether surcharges would be imposed by Defendants on garment manufacturers as a condition of financing Factory 2-U's purchases from those manufacturers. Compl. ¶ 38.

Based on these agreements, <u>the Defendants took concerted action that harmed Factory 2-U's ability to conduct business</u>. Specifically, the Defendants declined and limited credit to Factory 2-U at approximately the same time. The Defendants based their future course of action on their previous unlawful communications and discussions. As a result of Defendants taking adverse concerted action, Factory 2-U filed for bankruptcy in January 2004. Compl. ¶¶ 37, 44, 47, 50

### F. *Defendants' Fraudulent Concealment*

The Trustee did not discover the Defendants' unlawful conduct until April/May 2007 while reviewing documents reflecting Milberg Factors' contacts and agreements with its competitors that Milberg Factors produced in response to discovery requests in bankruptcy proceedings. Neither the Trustee nor Factory 2-U could have discovered the unlawful conduct earlier because the documents were the internal and confidential documents of Milberg Factors to which the Plaintiff had no access.[5] Compl. ¶ 39. Furthermore, since the conspiratorial communications among the competing Defendants were conducted secretly by telephone so as to leave no written record, the Defendants fraudulently concealed their unlawful conduct from Factory 2-U. Compl. ¶ 19

### V.    **Legal Standard**

In reviewing a motion to dismiss, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." <u>Phillips</u>, 2008 U.S. App. LEXIS 2513 at *17. When evaluated this way, in order to survive, the complaint must merely contain a "showing that the pleader is entitled to relief," meaning that "there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation." <u>Id.</u> at *20-*21. Phrased somewhat

---

[5] Mr. Sabony of Milberg Factors had frequent and regular telephone contacts with Factory 2-U executives, including its controller, in which Mr. Sabony asked or discussed with the Factory 2-U representatives what other factors were doing with regard to Factory 2-U orders. <u>Mr. Sabony concealed from Factory 2-U, however, that the competing factors were discussing and agreeing upon what their actions would be with regard to Factory 2-U orders</u>. Compl. ¶ 42 (emphasis added). Milberg Factors also never informed Factory 2-U that it was in contact with other factors or requesting the names of credit "references" from Factory 2-U. Indeed, information on Factory 2-U's credit standing was readily available from a credit reporting agency through reports to which Defendants subscribed, making direct contact with competing factors for so-called "references" unnecessary. Compl. ¶ 41.

differently, the complaint will pass muster under Fed. R. Civ. P. 12(b)(6) if it makes "a sufficient showing of enough factual matter (taken as true)" to suggest the required elements of" Plaintiff's claims. Id. at *21.

## VI.    Argument

Section 1 of the Sherman Act, 15 U.S.C. §1 provides in pertinent part:

> Every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal ....

Because not every agreement among competitors is illegal, the United States Supreme Court has used two types of analyses to determine the lawfulness of an agreement among competitors:  the Per Se Rule and the Rule of Reason.  See Nat'l Soc'y of Prof'l Eng'rs v. U.S., 435 U.S. 679, 692 (1978).  Those agreements that are per se unlawful are those that are so likely to harm competition and to have no significant pro-competitive benefits that they do not warrant the time and expense required for a particularized inquiry into their effects.  See F.T.C. v. Superior Court Trial Lawyers' Ass'n, 493 U.S. 411, 432-36 (1990).  Agreements that are not per se illegal are analyzed under the Rule of Reason to determine their overall competitive effect by studying the facts "peculiar to the business, the history of the restraint and the reasons why it was imposed".  Nat'l. Soc'y, supra.

### A.  The Defendants' Conspiracy to Share and to Act Upon Information Regarding Future Credit Terms is Illegal Under the Sherman Act.

Both CIT and the GMAC Defendants rely heavily on Cement Mfrs.' and Michelman v. Clark-Schwebel Fiber Glass Co., 534 F.2d 1036 (2d Cir. 1976) for the proposition that the exchange of so-called "credit information" between and among presumptive competitors is pro-competitive and legal.  See Mem. of Law in Support of Deft. the CIT Group/Commercial Services, Inc's Motion to Dismiss ("CIT Mem.") at 10; Opening Br. of Defts. GMAC Commercial Finance, LLC, Sterling Factors Corp. and Wells Fargo Century, Inc. in Support of their Motion to Dismiss ("GMAC Defts.' Mem.") at 4. Defendants' characterization of their discussions as the sharing of "credit information" is hardly dispositive of the issue.  Instead, as both Cement Mfrs.' and Michelman recognize, the nature of the information and the

context in which it is exchanged are critical.  Specifically, while the sharing of <u>historical</u> information (<u>e.g.</u>, regarding a debtor's past record of payment) may legally be exchanged, information regarding the <u>future</u> terms and conditions of credit or to whom credit will be extended may not be exchanged consistent with the Sherman Act.

As further explained below, Factory 2-U has alleged the dates of, content of, and participants in a series of conversations between the defendant factors relating to the future terms on which credit would be offered to Factory 2-U.  <u>See</u> Compl. ¶ 35.  These conspiratorial conversations ultimately resulted in an agreement between the defendants, to cut off or severely limit Factory 2-U's credit at approximately the same time.  <u>See id.</u> ¶ 37.  Defendants' attempt to use the "credit information" label as a shield for their anticompetitive conspiracy is a transparent ruse, and should be rejected.

In <u>Cement Mfrs.'</u>, after a complete record had been developed at a hearing on a permanent injunction, the Supreme Court described the information that had been shared as follows:

> <u>Members of the association render monthly reports of all accounts of customers two months or more overdue</u>, give the name and address of the delinquent debtor, the amount of the overdue account and ledger balance, accounts in hands of attorneys for collection, and any explanation, or for example of any account that was treated by the debtors as offset of a balance due for bags, or as otherwise disputed. . . . <u>There were never any comments concerning names appearing on the list of delinquent debtors.</u>"

268 U.S. at 599-600 (emphasis added).  As the Supreme Court recognized, the crucial characteristic of the information shared among the <u>Cement Mfrs.'</u> defendants that rendered it benign was its purely historical nature.[6]  In overturning the grant of a preliminary injunction on the basis of the exchange of what it termed "information concerning credits," the Supreme Court explicitly relied on the fact that "[t]he Government neither charged nor proved that there was any agreement with respect to the use of this information, or with respect to the persons to whom or conditions under which credit should be extended."  <u>Id.</u> at 599-600.  The Court's holding illustrates that if the Government had charged and

---

[6]  The historical nature of the information shared in <u>Cement Mfrs.'</u> is further highlighted by the fact that the Supreme Court pointed out that the information shared by the defendants, so far as it was relevant to the credit extended to particular customers, related to "<u>closed</u> specific job contracts"; <u>i.e.</u> contracts for work <u>previously performed</u>.  263 U.S. at 604 (emphasis added).

proven that the Defendants agreed to share potential <u>future</u> terms to particular customers, the Court would have affirmed the lower court's finding of a Sherman Act violation and grant of an injunction.

Similarly, <u>Michelman</u>, which involved an appeal after a full trial and a complete record (and which relied entirely on <u>Cement Mfrs.'</u>), limits its approval of the exchange of "credit information" to the type of historical data approved by the Supreme Court. The plaintiff in <u>Michelman</u> attempted to prove an antitrust conspiracy between two defendants primarily on the basis of seven telephone conversations between the president or vice-president of one defendant (Clark-Schwebel) and an official in the credit department of the other defendant (Burlington). <u>See Michelman</u>, 534 F.2d at 1048 n.16. The seven conversations at issue involved: (1) characterization of the plaintiff as a difficult account and a description of past collection problems (one conversation); (2) discussion of Clark-Schwebel's arbitration petition against the plaintiff and settlement negotiations related thereto (four conversations); (3) bringing Burlington up to date on the status of the dispute between Clark-Schwebel and the plaintiff (one conversation); and (4) stating that Clark-Schwebel had defaulted on its payment obligation (one conversation). <u>See id.</u> The court held that the information exchange between the defendants did not constitute an antitrust violation, given that the primary content of the telephone calls was historical information summarizing the progress of the arbitration dispute and was thus not sufficient to support an inference of a conspiracy to cut off goods and credit to the plaintiff. <u>See id.</u> at 1048-49.

In contrast to both <u>Cement Mfrs.'</u> and <u>Michelman</u>, Factory 2-U has alleged that the defendant factors exchanged information regarding not just Factory 2-U's creditworthiness, but also: (1) whether, in the future, credit would be extended to Factory 2-U at all; (2) if so, on what terms and in what amount credit would be offered; and (3) whether surcharges would be imposed on Factory 2-U in the future. <u>See Compl.</u> ¶ 36. Indeed, Factory 2-U has provided detailed allegations, including the content of, date of, and participants in twenty-seven separate conspiratorial conversations between the defendant factors. <u>See id.</u> ¶ 35. Factory 2-U has alleged, with specificity, that these conversations related to <u>future</u> credit terms. For instance, in Paragraph 35(u) of its Complaint, Factory 2-U alleges that:

> On June 5, 2003, Mr. Sabony again telephoned Mr. Turkish at Sterling Factors. They discussed Sterling Factor's credit limit with regard to Factory 2-U, Sterling Factor's willingness to increase Factory 2-U's credit limit, whether Sterling Factors or the manufacturers bore the risk of nonpayment, and payment terms required by Sterling Factors from Factory 2-U

Thus, rather than merely exchanging information regarding Factory 2-U's previous payment record or summarizing previous negotiations with Factory 2-U, the defendants shared information regarding potential future terms of credit to be extended to Factory 2-U, and further discussed whether credit would be extended to Factory 2-U at all. Factory 2-U further alleges that the defendants utilized the information they exchanged by agreeing to cut off or severely limit Factory 2-U's credit at approximately the same time, driving Factory 2-U out of business. Id. ¶ 37.

In other words, Factory 2-U has alleged the precise information that the Supreme Court found lacking in Cement Mfrs.': an "agreement with respect to the use of [credit] information, or with respect to the persons to whom or conditions under which credit should be extended." See Cement Mfrs.', 263 U.S. at 599-600. Factory 2-U's allegations, which must be taken as true at this stage of the litigation, are not about mere conversations concerning past credit history. Instead, the Defendants' conduct as alleged is a quintessential conspiracy to fix prices and engage in a group boycott, as explained in more detail infra. Nothing in Supreme Court – or any other – precedent even purports to approve discussions among competitors regarding the future terms on which credit will be offered to particular individuals or corporations. Indeed, the Supreme Court has indicated that such conversations are illegal under the Sherman Act. See Cement Mfrs.', 263 U.S. at 599-600. An agreement to fix credit terms constitutes price fixing that is illegal per se under Section 1 of the Sherman Act. Catalano, 446 U.S. at 648 (stating "credit terms must be characterized as an inseparable part of price")[7]

Condoning Defendants' conduct based on their self-serving characterization of their conspiracy as the mere exchange of "credit information" would ignore that the "sharing of information relating to price … current operating and future business plans" are precisely the types of collusive actions that the

---

[7] Compare Kasada, Inc., v. Access Capital Inc., No. 01 Civ. 8893 (GBD), 2004 U.S. Dist. LEXIS 25257 at *18 n.7 (S.D.N.Y. Dec. 10, 2004), relied upon by Defendants: "the exchange of information itself … violates Section 1 of the Sherman Act under a Rule of Reason analysis."

antitrust laws were designed to prevent. See D.O.J. Guidelines at 15-16. In fact, the type of conspiracy alleged by Factory 2-U has previously been held per se illegal. See, e.g., De Filippo, 516 F.2d at 1318 (citing Binderup, 263 U.S. at 303-04, which involved a horizontal conspiracy to refuse to deal with a putative customer, as an example of a classic, per se illegal group boycott). Therefore, the defendants' motions to dismiss should be denied.

B.  *Twombly Does Not Require Dismissal of Factory 2-U's Complaint*

Defendants also argue that any actions of the individual Defendants constituted parallel conduct approved by the Supreme Court in Twombly, 1271 S. Ct. 1955 (2007). Defendants, however, misconstrue the import of the Supreme Court's Twombly holding, the gravamen of the allegations in the Complaint, and, crucially, the vast gulf that separates the plaintiffs' allegations in Twombly from Factory 2-U's allegations here.

1.  *The holding in Twombly does not alter the standard for a motion to dismiss.*

As recently explained by the Third Circuit, Twombly did not alter Fed. R. Civ. P. 8's standard for the pleading of a valid complaint, which requires only that the plaintiff provide "'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests,' and ... does not require 'detailed factual allegations.'" Phillips, 2008 U.S. App. LEXIS 2513 at *11 (quoting Twombly, 127 S. Ct. at 1964, in turn quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)) Nor did Twombly change the requirement that a court, in considering a motion to dismiss, must take all the facts alleged as true, "and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Id. (citing Twombly, 127 S. Ct. at 1964-65, 1969 n.8).

Instead, the Third Circuit viewed the effect of Twombly as twofold. First, a complaint attacked by a Rule 12(b)(6) motion cannot merely recite the elements of a cause of action or provide labels or conclusions; some type of "showing" is required for the complaint to survive. Id. at *11-*12. In the view of the Third Circuit, that "showing" amounts to "some factual allegation in the complaint," such that the plaintiff provides both notice of its claim and the grounds upon which the claim rests. Id. at *14.

Second, the Third Circuit explained that <u>Twombly</u> rejected a "hyper-literal" understanding of <u>Conley's</u> "no set of facts language," such that a complaint could survive a motion to dismiss where it alleged, like the <u>Twombly</u> complaint, "a wholly conclusory statement of the claim."[8] <u>Twombly</u>, 127 S. Ct. at 1968. Instead, the complaint must set forth allegations sufficient to convince the court that its claim is "plausible." <u>Phillips</u>, 2008 U.S. App. LEXIS 2513 at *19-*20; <u>In re Intel Corp. Microprocessor Antitrust Litig.</u>, 496 F. Supp. 2d 404, 407 (D. Del. 2007) ("Heightened fact pleading is not required, but enough facts must be alleged to state a claim for relief that is plausible on its face."). In the Third Circuit's view, <u>Twombly's</u> contribution can be reduced to a simple proposition: "Rule 8(a)(2) has it right." <u>Id.</u> at *20. The complaint must contain a "showing that the pleader is entitled to relief," meaning that "there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation." <u>Id.</u> at *20-*21. Viewed in this light, Factory 2-U's complaint clearly satisfies the pleading standard by "making a sufficient showing of enough factual matter (taken as true)" to suggest the required elements of" Factory 2-U's claims. <u>Id.</u> at *21.

### 2. *Factory 2-U's allegations easily satisfy its pleading burden.*

Factory 2-U sets forth in detail including the specific dates, names of the participants, and topics of conversation, twenty seven (27) conspiratorial communications between the defendant factors, which took place between February 27, 2002 and September 17, 2003. In these conversations, as alleged, the defendants exchanged not merely innocuous, historical "credit information" regarding Factory 2-U, but instead shared information regarding the <u>future</u> terms on which credit would be extended to Factory 2-U, specifically: (1) whether credit would be extended; (2) the amount of credit that would be extended; (3) the terms on which credit would be extended; and (4) whether surcharges would be imposed. By way of illustration, the conspiratorial communications between the defendants alleged in the Complaint include:

---

[8]  The impact of this aspect of <u>Twombly</u> is muted in this jurisdiction, however, as the Third Circuit previously rejected the hyper-literal interpretation of <u>Conley</u> in a series of decisions. See <u>Phillips</u>, 2008 U.S. App. LEXIS at *16 (collecting cases). See also <u>In re Intel Corp.</u>, 496 F. Supp. 2d at 408 n.2 ("This Court understands <u>Twombly</u> to primarily be a discussion aimed at bringing the standard of dismissal back to its roots by undoing the literal reading of <u>Conley v. Gibson</u>.").

On October 15, 2002, a representative from Rosenthal & Rosenthal contacted George Dazet at HSBC and was told that Factory 2-U's credit line was $1.5 million through December 31, 2002, which was a $1 million cut from September 2002. The Rosenthal representative was also told that GMAC was holding $3.2 million in Factory 2-U orders.

Compl. ¶ 35(g) (i.e., discussion of current and future credit terms, including specific amount of credit extended relative to Factory 2-U's previous credit line);

[O]n March 13, 2003, Mr. Sabony telephoned Orlando Morales of Rosenthal and Rosenthal, a competing factor, and discussed with him the amount of orders that Rosenthal and Rosenthal had    approved for Factory 2-U, as well as the payment terms that Rosenthal and Rosenthal was requiring of Factory 2-U. Mr. Sabony and Mr. Morales also discussed whether Rosenthal and Rosenthal was requiring security deposits from Factory 2-U, and Mr. Morales told Mr. Sabony about the security deposit policy of CIT, another competing factor, with regard to Factory 2-U.

Compl. ¶ 35(m) (i.e., discussion of current and future credit terms);

On or about April 9, 2003, Frank DeRita, Senior Vice President and Credit Manager at Milberg Factors, who was Mr. Sabony's superior, telephoned Steve Turkish, a credit manager at Sterling Factors, a competing factor. Mr. DeRita and Mr. Turkish discussed the credit limit that Sterling Factors was maintaining on orders by Factory 2-U, the payment terms that Sterling Factors was requiring from Factory 2-U, and the fact that Sterling Factors was getting surcharges from manufacturers on all approved orders from Factory 2-U.

Compl. ¶ 35(n) (i.e., discussion of current and future credit terms and surcharges); and

On June 5, 2003, Mr. Sabony again telephoned Mr. Turkish at Sterling Factors. They discussed Sterling Factor's credit limit with regard to Factory 2-U, Sterling Factor's willingness to increase Factory 2-U's credit limit, whether Sterling Factors or the manufacturers bore the risk of nonpayment, and payment terms required by Sterling Factors from Factory 2-U.

Compl. ¶ 35(u) (i.e., discussion of current and future credit terms and market risk).

The content of the conversations between the defendant factors is highly suggestive of a conspiracy, especially in light of the fact – as also alleged in the Complaint – that "[a]fter their unlawful discussions and communications, the Defendants took concerted action which harmed Factory 2-U's ability to conduct business. Specifically, the Defendants declined and limited credit to Factory 2-U at approximately the same time." Compl. ¶ 37. Due to the nature of the market, as explained in more detail infra, Section VI(D)(3), the factors are both highly risk averse and eager to keep the price of credit as high as possible. After their inappropriate series of conspiratorial conversations, the defendants agreed to cut

off, or severely limit, Factory 2-U's credit, knowing that this concerted scheme would drive Factory 2-U out of business, and thus put the factors in the best position to recover any credit previously extended from Factory 2-U's guarantors (i.e., would limit the factors' risk), while simultaneously fixing the price of credit at an artificially high level.

These allegations plainly put the defendants on notice of the claims against them, and are more than sufficient to make "a sufficient showing of enough factual matter (taken as true) to suggest the required elements of" Factory 2-U's claims. Phillips, 2008 U.S. App. LEXIS at *21. See, e.g., Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 746-747 (1976) (explaining that "in antitrust cases, when the 'proof is largely in the hands of the alleged conspirators' dismissal prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly") (internal citation omitted); In re OSB Antitrust Litig., 2007 U.S. Dist. LEXIS 56573 (E.D. Pa. August 3, 2007) (allegations that defendants regularly communicated with each other, that their failure to compete was anomalous in the absence of an agreement, that the market conditions facilitated potential agreement, and that defendants engaged in parallel conduct "strongly suggested" antitrust conspiracy).

### 3. There is no comparison between the allegations in Twombly and Factory 2-U's allegations.

In stark contrast, the plaintiffs in Twombly failed to allege even a single fact from which an agreement between the defendants could be inferred. Instead, the Twombly plaintiffs simply quoted verbatim the elements of a Section 1 Sherman Act claim:

> Beginning at least as early as February 6, 1996, and continuing to the present [April 14, 2003], the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services parkets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another in violation of Section 1 of the Sherman Act.

Twombly Compl. (attached hereto as Exhibit A) ¶ 64.

This bare-bones allegation, which amounts to nothing more than a conclusory statement on the part of the Twombly plaintiffs that an antitrust conspiracy had occurred, is not even remotely analogous

to the level of factual detail provided by Factory 2-U. As the Third Circuit has stated, if the Supreme Court refused to dismiss the <u>Twombly</u> complaint, it would have affirmed that <u>Conley</u> must be taken literally and that a valid and well pleaded complaint may "consist simply of giving the names of the plaintiff and the defendant, and asking for judgment." <u>Phillips</u>, 2008 U.S. App. LEXIS at *16 (internal quotation marks and citations omitted). The Court did not do so, however, and instead dismissed the plainly deficient complaint in <u>Twombly.</u> Factory 2-U, which is entitled at this stage to have all factual allegations taken as true, to the benefit of every reasonable inference, and to an analysis of the complaint in the most favorable possible light, <u>see id.</u> at *17, has more than satisfied its pleading burden. Contrary to the factor defendants' claims, Factory 2-U has not merely alleged parallel conduct, but instead has set forth a detailed factual context from which the Court may infer a conspiracy to fix prices and engage in a group boycott. <u>See U.S. v. Fed'n of Physicians and Dentists, Inc.,</u> 63 F. Supp. 2d 475, 478 (D. Del. 1999). Accordingly, Defendants' Motion to Dismiss should be denied.

### C. *Fixing Credit Terms is a Per Se violation of Section 1*

The Supreme Court has held that "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation . . . - an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing . . . ." <u>N. Pac. R.R. Co. v. U.S.</u>, 356 U.S. 1, 5 (1958). As stated in <u>U.S. v. Socony-Vacuum Oil Co.</u>, price-fixing is a <u>per se</u> violation because price is the "central nervous system of the economy." 310 U.S. 150, 226, n. 59 (1940). The Supreme Court recently reaffirmed that "price fixing agreements between two or more competitors, otherwise known as horizontal price fixing agreements, fall into the category of arrangements that are <u>per se</u> unlawful." <u>Texaco, Inc. v. Dagher</u>, 547 U.S. 1, 7 (2006).

18

It is no excuse that the prices that are fixed are themselves reasonable. See U.S. v. Trenton Potteries, 273 U.S. 392, 397-398 (1927). The Supreme Court in Socony-Vacuum also held that a violation can occur even though there was no direct agreement on the actual prices to be maintained. The Court made it clear that:

> Under the Sherman Act a combination formed for the purpose and with the effect of raising, repressing, fixing, pegging or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se.

310 U.S. at 223.

Furthermore, the Supreme Court has held that an agreement among competitors to fix credit terms constitutes price fixing that is illegal *per se* under Section 1 of the Sherman Act. Catalano, 446 U.S. at 648 (stating "credit terms must be characterized as an inseparable part of price").

D. *Factory 2-U Adequately Alleges a Per Se Illegal Group Boycott*

1. *Factory 2-U's allegations permit an inference of an agreement to boycott that constitutes a per se antitrust violation.*

For over eighty years, the courts have recognized that the effects of a group boycott on competition are so pernicious that group boycotts are rightfully considered per se violations of the Sherman Act. While labeling a refusal to deal as a "group boycott" does not in and of itself render an activity a per se antitrust violation, the Third Circuit has repeatedly made clear that "a concerted activity constitutes a 'group boycott' and is considered per se 'in restraint of trade' when 'there (is) a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both.'" De Filippo, 516 F.2d at 1318. The agreement to boycott must be "horizontal," that is, the agreement must involve an agreement between firms that ordinarily compete with one another. See NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135 (1998). In general, "[t]o justify a per se prohibition a restraint must have manifestly anticompetitive effects and lack any redeeming virtue." Leegin Creative Leather Prods., Inc. v. PSKS, Inc., ___ U.S. ___, 127 S. Ct. 2705, 2713 (2007) (internal quotation marks and citations omitted). More specifically, per se violative group boycotts: (1) frequently "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete"; (2) involve boycotting

firms that possess a dominant position in the relevant market; and (3) are generally not justified by procompetitive counterarguments. See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 294 (1985).

As alleged, the factors' boycott of Factory 2-U meets these standards. Factory 2-U alleges that eight of the top ten factors in the market, who thus controlled an overwhelming portion of the overall factoring market, conspired together to boycott Factory 2-U in an effort to ruin Factory 2-U and drive it out of business. See Compl. ¶¶ 11-13, 15, 37-38. Factory 2-U further alleges that the boycott deprived it of access to a supply (credit), without which it was unable to continue operations. See id. ¶¶ 14, 48. Factory 2-U sets forth in detail the defendants' year-and-a-half long[9] series of discussions regarding not just Factory 2-U's creditworthiness, but also: (1) whether, in the future, credit would be extended to Factory 2-U at all; (2) if so, on what terms and in what amount credit would be offered; and (3) whether surcharges would be imposed on Factory 2-U in the future. See id. ¶ 36.[10]

---

[9] Defendant CIT argues that that the period of time during which the factors are alleged to have discussed Factory 2-U is "typically not found to be parallel conduct for purposes of inferring concerted action." CIT Mem. at 15 n.3. CIT, evidently, misunderstands Factory 2-U's allegations. The conspiratorial agreement between the factors was implemented after September 17, 2003 (the date of the last factor-to-factor conversation alleged in the Complaint), when the defendants either denied or limited credit to Factory 2-U at approximately the same time. The year-and-a-half long series of conversations between the factors is evidence of the conspiracy, in that the information being shared was inappropriate insofar as it related to contemplated future terms, rates, and conditions of credit to be offered to Factory 2-U. The content and detail of the conversations permits the Court to infer that the defendant factors' nearly simultaneous decision to revoke or severely limit Factory 2-U's credit was not mere coincidence, but instead the result of an illegal conspiracy in restraint of trade.

[10] The GMAC Defendants' reliance on Brunson Commc'ns, Inc. v. Arbitron, Inc., 239 F. Supp. 2d 550, 561 (E.D. Pa. 2002), see GMAC Defts.' Mem. at 19, is thus woefully misplaced. In that case, the plaintiff merely inserted the phrase "group boycott" into a laundry list of conclusory allegations set forth in the complaint. See id. at 559 (quoting ¶¶ 43, 45, 48-50 of the plaintiff's complaint). In the instant case, Factory 2-U has alleged, in detail, a series of conversations between the defendants exchanging inappropriate information regarding credit terms, conditions, and surcharges, that resulted in a conspiracy to boycott Factory 2-U. Compare Brunson, 239 F. Supp. 2d at 561 (relying on Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988) for the proposition that a Section 1 claim should be dismissed where Plaintiff fails to allege any "meetings...communications...or other means by which the conspiracy came about") with Compl. ¶ 35 (alleging the contents of, dates of, and participants involved in a series of twenty seven separate conspiratorial communications).

Defendants' actions in engaging in a year-and-a-half-long campaign to illicitly share information regarding not just Factory 2-U's credit history, but also potential future terms on which credit would be offered to Factory 2-U is not justified by any procompetitive rationale. Indeed, the Supreme Court has previously indicated that the sharing and use of such information to reach an agreement regarding "the persons to whom or conditions under which credit should be extended" violates the Sherman Act. See Cement Mfrs.', 268 U S at 599-600 (reversing grant of injunction because government failed to charge or prove such an agreement).[11] The defendants all ostensibly competed with each other in the market to offer credit to garment retailers such as Factory 2-U. Their ongoing discussions regarding what future terms would be offered to Factory 2-U and finally their agreement to, at approximately the same time, either deny credit entirely or to limit credit extended to Factory 2-U, is classic cartel-like behavior. Such agreements in no way serve to enhance competition and are precisely the type of agreements that the Sherman Act targets. See, e.g., Binderup, 263 U.S. at 312 ("It is difficult to imagine how interstate trade could be more effectively restrained than by" an agreement between film distributors to refuse to deal with a motion picture exhibitor); Dresses for Less, Inc. v. CIT Group/Commercial Servs., Inc., No. 01 Civ. 2669 (WHP), 2002 U.S. Dist. LEXIS 18338 at *21-*23 (S.D.N.Y. Sept. 30, 2002) (denying motions to dismiss where plaintiffs alleged that several factors "collectively decided whether to deny credit to a particular manufacturer.") See also Superior Court Trial Lawyers, 493 U.S. at 422-23 (finding a group boycott per se illegal where a group of criminal defense attorneys conspired to refuse to accept further appointments to represent indigent defendants unless the attorneys were paid at a higher rate).

In short, Factory 2-U has alleged a classic group boycott that is per se unlawful under the Sherman Act. The agreement between the defendant factors was horizontal – the factors ostensibly compete with each other in providing credit to the garment industry. The agreement cut off Factory 2-U's

---

[11]    The detailed information Factory 2-U alleges the defendant factors actually exchanged and the defendants' subsequent agreement to deny or limit Factory 2-U's credit undermines the defendants' reliance on cases in which the plaintiff alleged the mere opportunity to conspire. See CIT Mem. at 14 (citing Capital Imaging Assocs. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 544-45 (2d Cir. 1993) and Venture Tech., Inc. v. Nat'l Fuel Gas Co., 685 F.2d 41, 45 (2d Cir. 1980) (for the proposition that the opportunity to conspire is insufficient to infer an illegal agreement)

access to a necessary supply – credit – forcing Factory 2-U out of business. The defendant factors possess a dominant share of the relevant market. Finally, no procompetitive justification for the agreement exists. See Nw. Wholesale, 472 U.S. at 294. In other words, the alleged agreements between the factors "have manifestly anticompetitive effects and lack any redeeming virtue." Leegin, 127 S. Ct. at 2713.

Defendants' heavy reliance on Kasada, 2004 U.S. Dist. LEXIS 25257 is misplaced. In Kasada, the court dismissed plaintiffs' group boycott claim because: (1) the plaintiffs failed to allege that any one garment manufacturer applied for and was denied credit by all the defendants; (2) the plaintiffs failed to allege that any one factor refused credit to all the plaintiffs; (3) the plaintiffs were not one organization nor in privity of contract; and (4) the plaintiffs' allegations regarding the sharing of credit information failed to rise to the level of a violation of the Sherman Act; and (5) the allegations were insufficient to permit an inference that more than parallel conduct was at issue. See id. At *15-*19.

Here, however, the sole plaintiff, Factory 2-U has alleged in detail a series of discussions between the defendant factors culminating in a decision to deny or limit credit to Factory 2-U, rendering the first, second, and third bases of the Kasada court's decision inapposite. Moreover, Factory 2-U has alleged that the defendants went further than merely sharing information regarding creditworthiness, and instead shared information related to and conspired regarding the companies to which credit would be extended and the terms on which credit would be extended. See Cement Mfrs.', 268 U.S. at 599-600 (reversing grant of injunction where government failed to charge or prove "that there was any agreement with respect to the use of [credit] information, or with respect to the persons to whom or conditions under which credit should be extended."). Contrary to the situation in Kasada, the Cement Mfrs.' decision supports Factory 2-U's position in the instant case, as Factory 2-U has alleged precisely those facts that were missing in Cement Mfrs.'[12] Finally, Factory 2-U alleges that, after sharing information regarding

---

[12] For this reason, Michelman, 534 F.2d 1036 is inapposite. Michelman, following Cement Mfrs.', held that the exchange of historical information regarding the creditworthiness of customers was not a Sherman Act violation. Id. at 1048. This limitation on the scope of Michelman's holding is clear from the actual content of the alleged conversations at issue in Michelman, which were limited to one

prospective future credit terms, the factors agreed to deny or limit Factory 2-U's credit and subsequently did so at approximately the same time. Such allegations are sufficient to permit an inference of conspiratorial, rather than merely parallel, conduct. See Dresses for Less, 2002 U.S. Dist. LEXIS 18338 at *21-*23. Accordingly, the defendants' motions to dismiss should be denied.

      2   _Boycotts targeted at customers are not exempt from the per se rule._

Both CIT and the GMAC defendants attempt to bolster their motion to dismiss by advancing the disingenuous claim that per se illegal boycotts "are only those which 'disadvantage competitors.'" GMAC Defts' Mem. at 21 (emphasis in original; citation omitted); CIT's Mem. at 19 (emphasis in original; citation omitted). As authority for that sweeping proposition, CIT and the GMAC Defendants cite Nw. Wholesale. However, the Nw. Wholesale Court did not state even in dicta, let alone hold, that per se illegal boycotts are limited to situations in which the boycott is designed to "disadvantage competitors." To the contrary, the Court noted that "[c]ases to which this Court has applied the per se approach have generally involved joint efforts by a firm or firms to disadvantage competitors. . ." Nw. Wholesale, 472 U.S. at 294 (emphasis added). More importantly, a motivation to disadvantage competitors was listed as but one of the four characteristics often shared by group boycotts. See id. After describing each characteristic it held relevant to an analysis of whether the per se rule applies, including the motivation to disadvantage competitors, the Court explicitly stated that "a concerted refusal to deal need not necessarily possess all of these traits to merit per se treatment. . ." Id. at 295 (emphasis added). Defendants' cherry-picking of the phrase "disadvantage competitors" from Nw. Wholesale is completely

---

creditor's statements to another that Clark-Schwebel was a "difficult and contentious" client that was being held to cash terms, and that same creditor's subsequent description of the status of its arbitration petition against Clark-Schwebel. See id. at 1048 n.16. Nothing in Michelman remotely indicates any alteration in the Supreme Court's suggestion that an agreement regarding the "use of [credit] information, or with respect to the persons to whom or conditions under which credit should be extended" violates the Sherman Act. See Cement Mfrs.', 268 U.S. at 599-600.

misleading; far from implying that such a motivation is the <u>sine qua non</u> of boycotts that merit <u>per se</u> treatment, the Court was at pains to make the opposite point.[13]

The fallacy of Defendants' attempt to limit the class of boycotts that warrant <u>per se</u> treatment to those that disadvantage competitors is easily illustrated by precedent. Precisely the same disingenuous interpretation of <u>Nw. Wholesale</u> was recently argued to the Fifth Circuit by a group of antitrust defendants. The court emphatically rejected the defendants' argument, holding that "[n]othing in <u>Northwest Wholesale Stationers</u> or the Supreme Court's later cases, however, establishes a bright-line rule limiting the application of the <u>per se</u> rule to cases in which the victim is a competitor of at least one of the conspirators, and <u>no such rule is justified</u> under the Court's precedent." <u>Tunica Web Adver. v. Tunica Casino Operators Ass'n, Inc.</u>, 496 F.3d 403, 413 (5th Cir. 2007) (emphasis added).

Further, in the course of setting forth its rule on the type of refusals to deal that rise to the level of <u>per se</u> group boycotts, the Third Circuit reviewed existing Supreme Court precedent. <u>See</u> <u>De Filippo</u>, 516 F.2d at 1318. One of the cases relied on by <u>De Filippo</u> was <u>Binderup</u>, a case in which, as the Third Circuit described it, "a national organization of motion picture film <u>distributors</u>, deciding not to sell to <u>an exhibitor</u>, put an end to his participation in that business." <u>De Filippo</u>, 516 F.2d at 1318 (internal quotation marks and citation omitted; emphasis added). Plainly, <u>Binderup</u> did not involve a conspiracy to harm a competitor; instead, as in the instant case, the gravamen of the complaint was that the defendants conspired to harm one of their putative customers. Indeed, the facts in <u>Binderup</u>, in which the Supreme

---

[13] The Defendants also rely on <u>Larry V. Muko, Inc. v. Sw. Pa. Bldg. & Constr.</u>, 670 F.2d 421, 429 (3d Cir.), <u>cert. denied</u>, 459 U.S. 916 (1982), for the proposition that application of the <u>per se</u> rule is limited to boycotts targeting competitors. <u>See</u> CIT Mem. at 19; GMAC Defts.' Mem at 21-22. In fact, the GMAC Defendants, apparently finding the duty of candor to this Court a bit blasé, go so far as to misquote <u>Muko</u> by omitting the word "Generally" (which begins the sentence quoted by the GMAC defendants) while capitalizing "the" to make it appear as if they provided a complete quotation. <u>Compare</u> GMAC Defts.' Mem. at 22 ("The application of the per se rule has been limited to those 'classic' boycotts....") <u>with</u> <u>Muko</u>, 670 F.2d at 429 ("<u>Generally</u>, the application of the per se rule has been limited to those 'classic' boycotts...."). While certain dicta in <u>Muko</u>, taken out of context, superficially appear to support the defendants' position, in reality <u>Muko</u> supports Factory 2-U's position. The case the <u>Muko</u> court relied upon for the proposition that the Third Circuit generally attempts to limit the <u>per se</u> rule to "classic" boycotts was <u>De Filippo</u>. <u>See</u> <u>Muko</u>, 670 F.2d at 430. As explained in detail <u>infra</u>, <u>De Filippo</u> considered a horizontal agreement between film distributors to boycott a motion picture exhibitor (<u>i.e.</u>, a boycott targeting a customer) to be one of the "classic" boycotts covered by the <u>per se</u> rule. <u>See</u> <u>De Filippo</u>, 516 F.2d at 1318 (citing <u>Binderup</u>, 263 U.S. at 303-04).

---

24

Court reversed the lower courts' dismissal of the plaintiff's complaint, are highly analogous to the facts that Factory 2-U has alleged.

In <u>Binderup</u>, the plaintiff alleged that a film board of trade had been formed in order to attempt to control prices. However, his film exhibition business became so successful that he was able to choose which distributors with which to deal, undermining the stated purpose of the film board. The plaintiff further alleged that distributors within and without the film board then conspired to refuse to do business with him "to ruin the business, credit, and reputation of the exhibitor; that, in furtherance of the combination and conspiracy, the distributors have ever since refused to deal with him..." <u>Binderup</u>, 263 U.S. at 303-04. The Supreme Court, reversing the dismissal of the exhibitor's complaint, held that "[i]t is difficult to imagine how interstate trade could be more effectively restrained than by suppressing it and that, in effect, so far as the exhibitor is concerned, is what the distributors in combination are charged with doing and intending to do." <u>Id.</u> at 312. The gravamen of Factory 2-U's allegations is identical. Factory 2-U alleges that the defendant factors agreed to deny or limit credit to Factory 2-U, thus suppressing interstate trade and harming competition. The fact that the target of the boycott was a putative customer of the factors is of no moment; such boycotts have repeatedly been found to be <u>per se</u> unlawful, and the Supreme Court has never purported to limit application of the <u>per se</u> rule to boycotts targeting competitors. <u>See, e.g.</u>, <u>Superior Court Trial Lawyers</u>, 493 U.S. at 422-23 (attorneys' boycott of representing indigent defendants held <u>per se</u> unlawful); <u>St. Paul Fire & Marine Ins. Co. v. Barry</u>, 438 U.S. 531, 543 (1978) ("the boycotters and the ultimate target need not be in a competitive relationship with each other"); <u>Kiefer-Stewart Co. v. Seagram & Sons</u>, 340 U.S. 211, 214 (1951) ("the Sherman Act makes it an offense for [businessmen] to agree among themselves to stop selling to particular customers"); <u>Binderup</u>, 263 U.S. at 303-04 (reversing dismissal of complaint alleging conspiracy among film distributors to boycott a particular customer); <u>Tunica</u>, 496 F.3d at 413 (rejecting limitation of <u>per se</u> rule to boycotts targeting competitors).[14]

---

[14] Even were the Court to hold that Factory 2-U has not alleged adequately a group boycott constituting a <u>per se</u> violation of the Sherman Act, its allegations are more than sufficient to state a group boycott

3   *The factors' conspiracy makes economic sense.*

Defendants claim that no agreement to boycott Factory 2-U can be inferred because any such agreement is economically implausible.  *See* CIT Mem. at 18-19; GMAC Defts.' Mem. at 22-23; see generally Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (whether conduct is consistent with defendants' own self-interest is a factor as to whether there is an inference of a conspiracy).[15]  Defendants' claim of implausibility is meritless.

As alleged in the Complaint, the defendant factors conspired and agreed to deny or limit credit to Factory 2-U.  Given the nature of the industry and their overall control of the market, the conspiring factors knew that their decision would drive Factory 2-U out of business in relatively short order.  In fact, Factory 2-U was forced to declare bankruptcy in early 2004, shortly after the conspiring factors denied or limited its credit.  Defendants, in their opening briefs, claim that this scenario makes no economic sense, because a factor's forcing its customers to leave the market ultimately reduces demand and thus lowers prices.  See CIT Mem. at 18; GMAC Defts.' Mem. at 22.

In reality, however, two economic considerations illustrate why the alleged conspiracy makes perfect economic sense to the factors.  First, the group boycott was designed, as described in the Complaint, to facilitate a price fix on the part of the factors.  Absent the conspiracy to deny or limit credit to Factory 2-U, each individual factor has its own price/cost trade-offs that would have dictated the specific terms offered to Factory 2-U.  These very trade-offs, coupled with each individual factor's tolerance for risk, should drive competition in the factoring market.  The conspiracy to refuse to supply

---

claim under the rule of reason, for the reasons already stated.  Specifically, Factory 2-U alleges (1) concerted action by the defendant factors; (2) anticompetitive effects within the factoring market in the United States; (3) the existence of a conspiracy in restraint of trade prohibited by the Sherman Act; and (4) injury to Factory 2-U as a proximate result of the defendants' conspiracy.  See Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997).

[15]  Factory 2-U notes that the economic plausibility of an alleged conspiracy is not a necessary element of a Section 1 claim; certain seemingly implausible conspiracies may nonetheless survive a motion to dismiss.  See, e.g., Dresses for Less, 2002 U.S. Dist. LEXIS 18338 at *23.  Furthermore, as the Supreme Court in Twombly stated, "...of course, a well pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." 127 S. Ct. at 1965.  Regardless, the conspiracy alleged by Factory 2-U makes ample economic sense, as explained infra.

credit to Factory 2-U may have eliminated one potential retail outlet for the factors' garment-manufacturing client, but it allowed the factors to stabilize prices at a higher level (along with each factor's market share) than if competition between the factors been truly existed. See, e.g., Dresses for Less, 2002 U.S. Dist. LEXIS at *23-*24 (holding that a motive to "stabilize prices and the competing factors' market shares" was economically plausible and denying motion to dismiss per se group boycott claim).

Price fixers typically lose some quantity of customers when they endeavor to set their prices at the desired monopoly level; however, they ultimately realize more profit through implementing the price fix and capturing the price differential between the competitive price and the price the cartel is able to charge through implementation of its conspiracy. See, e.g., U.S. Dep't of Justice and the Federal Trade Comm'n, Horizontal Merger Guidelines § 2.1 (1997) ("D.O.J. Merger Guidelines"). In other words, the simple supply-and-demand rubric set forth by the defendants in their memoranda of law obscures the actual, more complicated economic story. It is certainly plausible, if not likely, that the factors would want to conspire in order to achieve the stability in price and market share their conspiracy facilitated.

The second factor illustrating the economic plausibility of the alleged conspiracy is the factors' incentive to drive firms from the market at the first sign of potential insolvency. The factors, because they operate at such small margins, are necessarily risk averse. Their effort to "cull the herd" of garment retailers perceived to be weaker (albeit still creditworthy) allows the factors who have extended credit to such retailers a better prospect of recovering fully by collecting from the guarantors. In essence, the factors conspire and agree that, although a given company (in this case, Factory 2-U) is otherwise creditworthy, it is better in the long run for the factors to agree to decline credit to that company to avoid the risk of great difficulty recovering the money already loaned. Indeed, this very motive has previously been found to support the plausibility of an identical conspiracy. See Dresses for Less, 2002 U.S. Dist. LEXIS at *23-*24 (holding that a conspiracy to "weed[] out creditworthy albeit financially weaker companies" to ensure a higher probability of full collection from guarantors was economically plausible). In the case of In re Intel Corp., this Court said it would apply "what the Second Circuit has coined the

'flexible plausibility standard ....'" 496 F. Supp. 2d at 407 n.2. Defendants' motions to dismiss should be denied; the conspiracy between the factors meets the standard.

### 4. *Factory 2-U has alleged antitrust injury.*

Plaintiff's right to sue for treble damages under the Sherman Act is based upon Section 4 of the Clayton Act, which provides for suits by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. §15(a). An "antitrust injury" is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). To state an antitrust injury, a plaintiff must demonstrate that the defendants' conduct has had an adverse effect on competition as a whole in the relevant market. See id. At 488. Furthermore, the "injury [must be] of the type the antitrust laws were intended to protect." Id. at 489.

The Third Circuit has recognized that the existence of an antitrust injury is not typically resolved through a motion to dismiss. See Schuylkill Energy Res. Inc., v. PP&L Co., 113 F.3d 405, 413 (3d Cir 1997). Factory 2-U's allegations are more than sufficient to set forth a claim of antitrust injury at this stage of the case. Factory 2-U first alleges that the relevant market is the provision of "factoring services" in the United States, where "factoring services" is understood to constitute "a complete financial package that consists of: (1) credit extension; (2) accounts receivable purchasing and collection; and (3) financing." Compl. ¶¶ 30-31. Factory 2-U further alleges:

> Defendants' violations of the antitrust laws have directly and proximately lessened competition generally. Defendants were in the top ten list of factors based on their annual factoring volume in 2002-2003 and thus, possessed market power sufficient to inhibit competition on a market-wide basis. Through illegal concerted activity, these dominant factors sought to: (1) minimize their risks and costs of doing business with garment manufacturers and their customers; (2) maintain and stabilize pricing structures for factoring services; and (3) stabilize their respective market shares, all of which they could not accomplish if they operated in a legal, competitive manner. Additionally, because of their control of the smaller factors, Defendants, through collusion, effectively dominated and controlled the factoring market and dictated terms to their clients and customers.

Compl. ¶ 32. The Defendants' efforts to fix prices and stabilize their shares of the market, which is further detailed in the Complaint as already discussed above, is precisely the type of conduct at which the

antitrust laws are directed. The factors' efforts to stifle competition in the factoring market in order to maintain prices at a higher level than would otherwise be possible and to restrict the availability of factoring services throughout the United States is a classic example of conduct that harms competition generally. Accordingly, Factory 2-U's allegations more than suffice to state antitrust injury. <u>See, e.g.,</u> <u>Binderup</u>, 263 U.S. at 312 ("a necessary corollary" of a conspiracy to refuse to deal with a particular customer is the restraint of interstate trade and commerce in violation of the Sherman Act); <u>Harrison Aire, Inc. v. Aerostar Int'l, Inc.</u>, 423 F.3d 374, 385 (3d Cir. 2005) (injury consisting of "high consumer prices resulting from allegedly monopolistic behavior [] is the type the antitrust laws are designed to redress."); <u>Dresses for Less</u>, 2002 U.S. Dist. LEXIS 18338 at *27 (allegation that "CIT forged an agreement with its competitors that restricted the supply of factoring" sufficient to state antitrust injury).

   E. *The Complaint Adequately Defines the Relevant Market*

   In Count II of the Complaint, Plaintiff alleges, in the alternative, that Defendants' conspiracy constitutes a violation of Section 1 of the Sherman Act under the Rule of Reason. Defendants argue that the Rule of Reason claim should be dismissed because Plaintiff failed to adequately define the relevant market. <u>See</u> GMAC Defts' Mem. at 25-27. Defendants' claim is meritless.

   In the case of <u>U.S. v. Container Corp. of Am.</u>, 393 U.S. 333, 334 (1969), the Supreme Court held that an information exchange itself could constitute a Section 1 violation, upholding the sufficiency of a complaint charging "an exchange of price information but no agreement to adhere to a price schedule." In <u>U.S. v. U.S. Gypsum Co.</u>, 438 U.S. 422, 441, n. 16 (1978), the Court set out the basic framework for a Rule of Reason inquiry covering such an exchange: "A number of factors including most prominently the structure of the industry involved and the nature of the information exchanged are generally considered in divining the pro-competitive or anti-competitive facts of this type of interseller communications." As one court has held, "An important factor to analyze in a <u>Gypsum</u> data exchange case is the market power of the defendants. One traditional way to demonstrate market power is by defining the relevant product market and showing defendants percentage share of that market." <u>Todd v. Exxon Corp.</u>, 275 F.3d 191, 199 (2d Cir. 2001).

In the present case, Plaintiff has alleged that the relevant product market consists of "factoring services" in the U. S. garment industry. The Defendants are eight of the top ten factors in that industry. Compl. ¶ 12. Although the Defendants challenge the market definition as being under-inclusive, "[b]ecause market definition is a deeply fact intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." Id. at 199-200. See also Queen City Pizza, 124 F.3d at 436 (explaining that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers.") As one circuit court has noted, "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt to a plausible explanation as to why the market should be limited in a particular way." Todd, 275 F.3d at 200 (footnote omitted). That is not the case here.

In this case, the relevant product market is defined as "The provision of 'factoring services' in the domestic garment industry to include retailers, wholesalers and manufacturers. Factoring services include a complete financial package which consists of: (1) credit extension; (2) accounts receivable purchasing and collection; and (3) financing." Compl. ¶ 30. As discussed above, the Defendants challenge the relevant market contending that it is under-inclusive because it does not include other forms of financing. The Department of Justice's merger guidelines address the issue of market definition:

> Market is defined as a product or a group of products at a geographic area in which it is produced or sold such that a hypothetical profit-maximizing firm, not subject to price regulation, there was the only present or future producer or seller of those products in that area likely would impose at least a "small but significant and non-transitory" increase in price, assuming terms of sale of all other products are held constant

D.O.J. Merger Guidelines, § 1.0 (1997). The Guidelines then go on to define what is a relevant market: "A relevant market is a group of products in a geographic area that is no bigger than necessary to satisfy this test." Id.

The market generally must be "composed of products that have reasonable interchangeability for the purposes for which they are produced - - price, use and qualities considered." AD/SAT v. Associated

Press, 181 F.3d 216, 227 (2d Cir. 1999). The court in AD/SAT went on to say that "[i]n economists' terms, two products or services are reasonably interchangeable if there is sufficient cross-elasticity of demand. Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product." Id. In the present case, there is no such interchangeability available.

As alleged in the Complaint and as discussed above, the relevant market is the market for "factoring services." It is not defined as a market for all potential sources of credit as the Defendants apparently would like it to be. Factoring is a different type of animal than merely lending money. The CIT Defendant, on it website, has a list of frequently asked questions. The first question is "What is factoring?" Their answer to that question is the following:

> Factoring is a complete financial package that combines credit protection, accounts receivable, bookkeeping, collection services and advances against your receivables. The factor purchases your accounts receivable and collects the money from your customers. If a customer is financially unable to pay its debts, the factor assumes responsibility for credit loss.

http://www.citcommercialfinance.com   It is respectfully submitted that no bank or other lending institution provides those types of services and, therefore, those institutions are legitimately excluded from the relevant market definition in this case. Defendants offer no evidence that other products are interdependent with this product. The Complaint, moreover, alleges that "about 80% of garment manufacturers relied upon factors for their credit needs." Compl. ¶ 12. The Complaint finally alleges that "305 of Factory 2-U's garment manufacturers were factored by the Defendants." Compl. ¶ 13. Under those circumstances, it is submitted that the market definition is not under-inclusive as contended by Defendants. Rather, it is just the right size.

F.  *Factory 2-U Adequately Alleges a Claim Under the New York Donnelly Act.*

Count IV of the Complaint alleges a claim under the New York Donnelly Act. Compl. ¶¶ 54-57; N.Y. Gen. Bus. L. § 340. Because the Donnelly Act is patterned after the Sherman Act, it "is governed by the same standards developed under the federal antitrust acts." Chow v. The Union Central Life Ins.

Co., 457 F. Supp. 1303, 1308 (E.D.N.Y. 1978).  Accordingly, for the reasons set forth in Sections VI(A) –

VI(E) above,  Defendants' Motions to Dismiss should be denied.

      G.   *Factory 2-U Timely Filed its Complaint Because it Sued Defendants Within Four*
            *Years From the Date on Which Damages Were Inflicted.*

      Section 4B of the Clayton Act provides that a private damages action arising under the antitrust

laws must be commenced within four years from the date the cause of action accrued.  15 U.S.C. §15b.

Although the statute of limitations generally begins to run when a defendant commits an action that

injures a plaintiff's business, if there is a continuing conspiracy to violate the antitrust laws, then a cause

of action accrues to the plaintiff each time he is injured by the defendant's act.  Continental-Wirt Elecs.

Corp. v. Lancaster Glass Corp., 459 F.2d 768, 770 (3d. Cir. 1972).   The Supreme Court, however, has

recognized that damages caused by particular antitrust violations may remain speculative for some time

after the injury.   Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 339 (1971).  In such

circumstances, the Court has held that "the cause of action for future damages, if they ever occur, will

accrue only on the date they are suffered; thereafter the plaintiff must sue to recover them at any time

within four years from the date they were inflicted."  Id.

      In Continental-Wirt, the Third Circuit applied the principles set forth in Zenith.   In that case, a

cathode ray tube manufacturer sued cathode ray bulb manufacturers alleging that the bulb manufacturers

entered into a price fixing conspiracy which undermined the ray tube manufacturer's competitive

position.   459 F.2d at 769.  The defendant filed a motion for summary judgment, arguing that the

plaintiff's action was time barred since it was filed more than four years after the cause of action accrued.

Id.  Relying on Zenith, the court stated that "[the plaintiff] could hardly calculate . . . that portion of its

damages relating to the value of the business when it remained speculative until a sufficient time for

reasonable attempts to sell the business had expired or the sale of the business had been made."  Id.  The

Court held that "it was only at the time of resale, when the damages were actually suffered that . . . the

statute of limitations began to run."  Id.   Accordingly, the court vacated the district court's grant of

summary judgment in favor of the defendants and remanded the case to the district court for further consideration in light of Zenith. Id. at 770.

Here, the damages caused to Plaintiff by Defendants' antitrust violations remained speculative until Plaintiff declared bankruptcy on January 13, 2004. Because January 13, 2004 was the date that Plaintiff suffered damages as a result of Defendants' conspiratorial conduct, the statute of limitations did not run until January 2008. At this early stage in the litigation, it would be purely speculative to surmise any other date on which Factory 2-U suffered damages as a result of Defendants' conspiratorial conduct. Since Plaintiff filed its Complaint on September 17, 2007, and the limitations period did not run until January 2008, Plaintiff's Complaint is clearly timely.[16]

### H. *Factory 2-U Sufficiently Pled Fraudulent Concealment.*

As discussed supra Section VI(G), Plaintiff timely filed its Complaint. Furthermore, because Plaintiff sufficiently pled fraudulent concealment, it tolled the statute of limitations. Generally, there are three elements that must be alleged to establish fraudulent concealment: (1) an affirmative act of concealment; (2) which misleads or relaxes the plaintiff's inquiry, who (3) exercised due diligence in investigating his cause of action. In re Lower Lake Erie Iron Core Litig., 998 F.2d 1144, 1178-79 (3d Cir. 1993).

If an antitrust conspiracy is self-concealing, then " ... it would be anomalous to require a plaintiff to allege affirmative acts by defendants to conceal the conspiracy because such acts would be unnecessary and therefore never performed." Bethlehem Steel Corp. v. Fischbach and Moore, Inc., 641 F. Supp. 271, 274 (E.D. Pa. 1986); see also Bailey v. Glover, 88 U.S. 342, 349 (1874) (holding that "by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which is designed to prevent fraud the means by which it is made successful and secure"); King & King Enters. v. Champlin Petroleum Co., 657 F.2d 1147, 1154 (10th Cir. 1981) (holding in the antitrust context that "where acts

---

[16] Furthermore, the Complaint states that upon information and belief, discussions and agreements began before February 27, 2002, and continued after September 17, 2003. Compl. ¶ 35 (emphasis added).

causing injury are fraudulently concealed from the injured party or where fraud furnishing the basis of an action is of such a nature as to conceal itself, a statute of limitation is tolled until the injured party discovers, or with due diligence could have discovered, the injury"); Baker v. F.& F. Inv., 420 F.2d 1191, 1199 (7th Cir 1970) (stating "where, as in the case of many conspiracies in violation of the antitrust laws, the wrong is self-concealing, little need be added in order to justify tolling the statute"); In re Aspartame Litig., 2007 U.S. Dist. LEXIS 16995 at *18 (E.D. Pa. Jan. 19, 2007) (stating that the majority of courts examining price-fixing conspiracies have deemed such conspiracies self-concealing and to require affirmative acts in this context would "permit sophisticated defrauders to successfully conceal the details of their fraud and escape liability").

Here, Defendants' antitrust conspiracy was self-concealing, thereby eliminating any need for Plaintiff to prove affirmative acts of concealment. The Complaint states that Defendants fraudulently concealed their unlawful conduct from Factory 2-U because the conspiratorial communications among the competing factors were conducted secretly so as to leave no written record. See Compl. ¶ 40. Secrecy was a necessary element to the success of Defendants' conspiracy. It would be nonsensical for Plaintiff to have to prove that Defendants performed affirmative acts of concealment when the nature of the underlying antitrust conspiracy concealed itself.

Additionally, to successfully plead fraudulent concealment, a plaintiff must "show that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." Klehr v. A.O. Smith Corp., 521 U.S. 179, 195 (1997). District Courts within the Third Circuit have noted that a complaint should generally not be dismissed for lack of due diligence:

> Issues of diligence and constructive notice, which are inherently factual should not be decided on a motion to dismiss … a complaint may be dismissed for lack of diligence only when the pleadings and public disclosures show beyond doubt that plaintiff can prove no facts to support the claim.

In re Aspartame Litig., 2007 U.S. Dist. LEXIS 16995 at * 21 (citing Bethlehem Steel Corp. v. Fischbach and Moore, Inc., 641 F. Supp. 271, 273 (E.D. Pa 1986)).

Here, Plaintiff alleged in the Complaint that it did not discover Defendants' unlawful conduct until April/May 2007 while reviewing documents reflecting Milberg Factor's contacts and agreements with its competitors that Milberg Factors produced in response to discovery requests in bankruptcy proceedings. Compl. ¶ 39. Furthermore, Plaintiff alleges that "neither the Trustee nor Factory 2-U could have discovered the unlawful conduct earlier because the documents were the internal and confidential documents of Milberg to which the Plaintiff had no access." Id. (emphasis added). The allegations in the Complaint clearly state that Plaintiff could not have reasonably known about the antitrust conspiracy in the exercise of due diligence because it did not have access to Milberg Factor's confidential documents. Id. Because "[p]laintiffs bear the burden only to show that the cause of action would not have been revealed even in the exercise of diligence, not that affirmative investigative steps were taken to identify the conspiracy", Defendants' due diligence argument completely lacks merit. In re Aspartame Litig., 2007 U.S. Dist. LEXIS 16995 at *22.

Additionally, Defendants argue that the Complaint does not set forth allegations establishing that Plaintiff was unaware about the factual basis of its claims during the requested tolling period. The Complaint, however, specifically states that the Trustee did not discover Defendants' antitrust conspiracy until April/May 2007. Compl. ¶ 39. This statement clearly stands for the proposition that the Trustee did not know about the antitrust conspiracy before April/May 2007.

Finally, Defendants' argument that Plaintiff was placed on notice about the factual basis for its claims due to the Dresses for Less and Kasada cases is equally unavailing. Plaintiff has no affirmative duty to investigate every single antitrust violation that Defendants were committing during the tolling period. See Morton's Market v. Gustafson's Dairy, Inc., 198 F.3d 823, 834 (11th Cir. 1999) (holding that one sort of antitrust violation by a defendant "does not trigger a duty for potential plaintiffs to investigate all wrongs the defendant might be committing").[17] In the motion to dismiss context, the Court

---

[17] Defendants assert in their Briefs that Plaintiff was aware of the factors exchanging credit information on Factory 2-U. This statement is true in the sense that Factory 2-U was aware that information on its payment history and credit standing were readily available from the public domain via a credit reporting agency. See Compl. ¶ 41. Plaintiff, was unaware, however, that the competing factors were secretly

must accept the well pleaded fact that the Trustee was not aware of the factual basis for his claims until April/May 2007.[18]

## VII.    Conclusion

WHEREFORE, Plaintiff respectfully requests that this Court deny Defendants' Motions to Dismiss and order all Defendants to answer Plaintiff's Complaint within twenty (20) days.

Respectfully submitted,

_Joseph D. Mancano_                                     _Shelley A. Kinsella_
OF COUNSEL                                               Robert W. Pedigo, Esq. (ID# 4047)
Joseph D. Mancano, Esq.                                 Shelley A. Kinsella, Esq. (ID #4023)
Anthony J. Basinski, Esq.                               COOCH & TAYLOR, P.A.
Bryan S. Neft, Esq.                                     824 Market Street, 10th Floor
J. Peter Shindel, Jr., Esq.                             Wilmington, DE 19801
Divya Wallace, Esq.                                     Phone: (302)-984-3832
PIETRAGALLO GORDON ALFANO BOSICK &                      Fax: (302)-652-5379
RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, PA 19103
Phone: (215)-320-6200
Fax: (215)-981-0082

Attorneys for Plaintiff, Jeoffrey L. Burtch, Chapter    Attorneys for Plaintiff, Jeoffrey L. Burtch, Chapter
7 Trustee                                               7 Trustee

Dated: February 29, 2008

---

discussing and agreeing upon what their future course of action would be with respect to Factory 2-U orders. See Compl. ¶¶ 39, 42.

[18] Defendants also suggest that the Court take judicial notice of certain Factory 2-U Bankruptcy Court filings and Securities and Exchange Commission ("SEC") filings. See CIT Mem. at 6-7 (quoting Decl. of Norman G. Plotkin); GMAC Defts.' Mem. at 5-7 (citing SEC and Bankruptcy Court filings). It is doubtful that the Court may consider Bankruptcy Court filings without converting the motion to dismiss into a motion for summary judgment. See In re Rockefeller Ctr. Props. Sec. Litig., 184 F.3d 280, 292-94 (3d Cir. 1999) (Nygaard, J. concurring in part and dissenting in part) (analyzing which documents the District Court should have considered with the pleadings and concluding that filings with the Bankruptcy Court for the Southern District of New York should not have been considered). Regardless, the Bankruptcy Court and SEC filings referenced in Defendants' motions to dismiss, even if considered by the Court, provide no support for the defendant factors' position. As alleged in the Complaint, Factory 2-U was unaware of Defendants' conspiratorial scheme until April/May 2007. See Compl. ¶¶ 39-40. All of the filings in question were made well before that time, when the conspiracy was fraudulently concealed from Factory 2-U. Thus, no statement in the Bankruptcy Court and SEC filings should be considered remotely exculpatory of Defendants.

# EXHIBIT A

Westlaw.

2003 WL 25629874 (S.D.N.Y.)    Page 1

(Cite as: 2003 WL 25629874)

For Opinion See 313 F.Supp.2d 174

United States District Court, S.D. New York.
William TWOMBLY and Lawrence Marcus, individually and on behalf of all others
similarly situated, Plaintiffs,
v.
BELL ATLANTIC CORPORATION, Bellsouth Corporation, Qwest Communications
International, Inc., Sbc Communications, Inc., and Verizon Communications, Inc.,
Defendants.
No. 02 CIV. 10220 (GEL).
April 14, 2003.

Jury Trial Demanded

Consolidated Amended Class Action Complaint
Milberg Weiss Bershad Hynes & Lerach LLP, J. Douglas Richards (JDR-6038), Michael
M. Buchman (MB-1172), Michael R. Reese (MR-3183), One Pennsylvania Plaza, New
York, New York 10119-0165, Telephone: (212) 594-5300, Facsimile: (212)
868-1229.Schiffrin & Barroway, LLP, Richard S. Schiffrin, Joseph H. Meltzer,
Edward W. Ciolko, Three Bala Plaza East, Suite 400, Bala Cynwyd, Pennsylvania
19004, Telephone: (610) 667-7706, Facsimile: (610) 667-7056, Attorneys for
Plaintiffs, William Twombly and Lawrence Marcus.
Plaintiffs, by and through their undersigned attorneys, for their Amended Class
Action Complaint allege the claims set forth herein. Plaintiffs' claims as to
themselves and their own actions, as set forth in ¶¶ 9 and 10 are based upon their
own knowledge. All other allegations are based upon information and belief
pursuant to the investigation of counsel.

I.

*NATURE OF THE ACTION*

1. This lawsuit is brought as a class action on behalf of all individuals and
entities who purchased local telephone and/or high speed internet services in the
continental United States (excluding Alaska and Hawaii) from at least as early as
February 8, 1996 and continuing to present (the "Class Period").

2. The Telecommunications Act of 1996, 47 U.S.C. §§ 151 to 614 (the "Act") was
designed to promote competition for local telephone services by opening the
markets to effective competition. The purpose, intent and requirements of the Act
are to create competition without delay in the local telephone services markets so

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 25629874 (S.D.N.Y.)

(Cite as: 2003 WL 25629874)

that the public's local telephone bills and charges will be reduced as soon as possible by virtue of such competition.

3. Local telephone services include traditional dial tone primarily used to make or receive voice, fax, or analog modem calls from a residence or business and exchange access services which allow long distance carriers to use their local exchange facilities to originate and terminate long distance calls to end users. Local telephone services also include, but is not limited to, custom calling services such as Caller ID, Call Waiting, Voice Mail and other advanced services. High speed internet services include circuits that connect customers to the internet at speeds in excess of 56K such as, but not limited to, T1 lines, asynchronous transfer mode circuits, frame relay circuits, ISDN, and digital subscriber lines ("DSL"). The rates concerning certain features or services are either not subject to tariff filing requirements and/or are not subject to any meaningful review.

4. Plaintiffs allege that Defendants entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another.

5. As a direct and proximate result of Defendants' unlawful contract, combination or conspiracy, Plaintiffs and members of the Class allege that Defendants have hindered the development of the local telephone and/or high speed internet services markets. Plaintiffs and members of the Class further allege that they have been and continue to be denied the benefits of free and unrestrained competition for local telephone and/or high speed internet services. Plaintiffs and members of the Class have, therefore, been forced to pay supracompetitive prices for such services causing them to sustain injury to their business or property.

II

*JURISDICTION AND VENUE*

6. Plaintiffs bring this class action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15 and 26, to recover treble damages and injunctive relief as well as reasonable attorneys' fees and costs with respect to injuries arising from violations by Defendants of the federal antitrust laws, including Section 1 of the Sherman Act. 15 U.S.C. § 1.

7. The Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The Court has supplemental jurisdiction over the state antitrust law claims pursuant to 28 U.S.C. § 1367.

8. Venue in this district is proper pursuant to 28 U.S.C. §1391(b)(2) because a part of the events or omissions giving rise to the claims occurred in this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: 2003 WL 25629874)

district, and pursuant to 28 U.S.C. §1391(b)(3) and 15 U.S.C. §§15 and 22 because Defendants Bell Atlantic and Verizon have maintained or maintain a principal place of business within this district.

III.

*PARTIES*

9. Plaintiff William Twombly is a resident of Bethel, Connecticut. At times relevant herein, William Twombly was a resident of New York, New York and purchased local telephone and/or high speed internet services from Defendants Bell Atlantic Corporation or Verizon Communications, Inc.

10. Plaintiff Lawrence Marcus is a resident of Maple Glen, Pennsylvania. At times relevant herein, Lawrence Marcus purchased local telephone and/or high speed internet services from Defendants Bell Atlantic Corporation or Verizon Communications, Inc.

11. Defendant Bell Atlantic Corporation is a Delaware corporation with its principal place of business at 1095 Avenue of Americas, New York, New York. Bell Atlantic Corporation is a telecommunications company with principal operating subsidiaries (together with the parent company "Bell Atlantic") that provide local telephone and/or high speed internet services to subscribers in Connecticut, Delaware, Maryland, Massachusetts, Maine, New Hampshire, New York, New Jersey, Pennsylvania, Rhode Island, Vermont, Virginia, West Virginia and the District of Columbia.

12. Defendant BellSouth Corporation is a Delaware corporation with its principal place of business at 1155 Peachtree Street, N.E., Atlanta, Georgia. BellSouth Corporation, is a telecommunications company that, through its wholly owned subsidiaries including but not limited to Bell South Telecommunications, Inc. (together with the parent company "BellSouth"), provides local telephone and/or high speed internet services to millions of subscribers in Alabama, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina and Tennessee ("BellSouth").

13. Defendant Qwest Communications International, Inc., is a Delaware corporation with its principal place of business at 1801 California Street, Denver, Colorado. Qwest Communications International, Inc., is a telecommunications company that, through its wholly-owned subsidiaries including but not limited to Qwest Corporation, Inc (together with the parent company "Qwest"), provides local telephone and/or high speed internet services in fourteen states, including Arizona, Colorado, Idaho, Iowa, Minnesota, Montana, Nebraska, New Mexico, North Dakota, Oregon, South Dakota, Utah, Washington, and Wyoming ("Qwest").

14. Defendant SBC Communications, Inc., is a Delaware corporation with its principal place of business at 175 East Houston, San Antonio, Texas. SBC Communications, Inc., is a telecommunications company that, through its operating subsidiaries including but not limited to SBC Ameritech, SBC Nevada Bell, SBC

© 2008 Thomson/West. No Claim to Orig. U.S. Govt Works.

(Cite as: 2003 WL 25629874)

Pacific Bell, SBC SNET and SBC Southwestern Bell (together with the parent company "SBC"), provides local telephone and/or high speed internet services to subscribers in Arkansas, California, Connecticut, Florida, Illinois, Indiana, Kansas, Michigan, Missouri, Nevada, Ohio, Oklahoma, Texas and Wisconsin.

15. Defendant Verizon Communications, Inc. ("Verizon") is a Delaware corporation with its principal place of business at 1095 Avenue of Americas, New York, New York. GTE Corporation ("GTE") merged with and became a wholly-owned subsidiary of Bell Atlantic. Bell Atlantic now does business as Verizon Communications, Inc.

IV.

*CO-CONSPIRATORS*

16. Various other persons, firms, corporations and associations, not named in this Complaint, have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.

V.

*BACKGROUND*

A. *The Bell Operating System and Divestiture*

17. During the early part of its approximately 120-year history, the telephone industry experienced varying periods of competition, monopolization and regulation. By 1934, the Bell System, consisting of Bell Operating Companies, along with American Telephone and Telegraph Company ("AT&T"), owned 80 percent of all the local telephone lines and services in the United States and owned a monopoly long-distance network. The Bell Operating Companies were wholly-owned subsidiaries of AT&T.

18. In 1934, the Communications Act of 1934 was adopted. That act severed regulation of the telephone industry from the Interstate Commerce Commission and provided for the creation of the Federal Communications Commission ("FCC") to regulate interstate telephone, telegraph and radio companies. Interstate and international telephone services fell under the aegis of the FCC, and intrastate telephone services became regulated under the auspices of respective state commissions. Once a telephone communications service crossed a state line, it fell under the jurisdiction of the FCC.

19. In 1974, the United States filed a lawsuit against AT&T alleging that it had monopolized and conspired to restrain trade in the manufacture, distribution, sale and installation of telephones, telephone apparatus equipment and materials and supplies in violation of §§ 1,2, and 3 of the Sherman Act, 15 U.S.C. §§ 1, 2, and 3. The basic theory of the government's case, as explained by the District Court, was that AT&T had unlawfully used its control of local exchange facilities to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

suppress competition in related markets, such as the markets for long distance services, which are dependent upon access to the local exchange to originate and terminate calls. *United States v. AT&T*, 524 F. Supp. 1336, 1352 (D.D.C. 1981).

20. In 1982, the United States and AT&T agreed to settle the case through the entry of a consent decree. In 1982, United States District Court Judge Harold H. Greene signed the Modified Final Judgment, settling the antitrust suit against AT&T. The Modified Final Judgment was based on divestiture; AT&T was required to divest itself of its twenty-two Bell Operating Companies ("BOCs"). The BOCs provided the means by which local telephone service was furnished. Bell customers gained access to the network for both local and long distance telecommunications services through the BOCs. The Modified Final Judgment, however, imposed certain business restrictions on the newly divested BOCs. Specifically, the BOCs were prohibited from providing interLATA services (which are long distance services involving calls that terminated outside the "local access and transport area" in which they originate, as defined in the Modified Final Judgment), or any non-telecommunications services, and from manufacturing telecommunications equipment. In addition, the Modified Final Judgment required the BOCs to provide all interexchange carriers (*i.e.*, long distance providers) with exchange access that was equal in type, quality and price to the access provided to AT&T. *United States v. AT&T*, 552 F. Supp. 131, 227 (D.D.C. 1982), *aff'd sub nom., Maryland v. United States*, 460 U.S. 1001, 103 S. Ct. 1240, 75 L.Ed.2d 472 (1983).

21. On January 1, 1984, divestiture of the Bell System by AT&T took effect. AT&T divested the seven Regional Bell Operating Companies ("RBOCs") and exited the local telephone business. The RBOCs were barred from providing long distance services. The seven RBOCs became known as the Baby Bells and included: Ameritech; SBC Communications; Pacific Telesis; Bell South; US West; Bell Atlantic; and NYNEX. SBC became the parent corporation of Southwestern Bell, and Pacific Telesis became the parent corporation of Pacific Bell and Nevada Bell. SBC and Pacific Telesis merged in early 1997. NYNEX and Bell Atlantic merged in mid-1997 and became known as Bell Atlantic Corporation. Bell Atlantic later merged with GTE Corporation and is now doing business as Verizon Communications, Inc.

22. Local telephone companies such as the Bell Operating Companies are commonly referred to as local exchange carriers ("LECs") and provide business and residential customers with local telephone and/or high speed internet services.

23. In addition to the Bell Operating Companies, there are hundreds of other local exchange carriers operating in the United States. These local exchange carriers generally offer the same services as the Bell Operating Companies. Although GTE was not one of the original Bell Operating Companies, prior to merging with Bell Atlantic it acquired local telephone systems in 28 states and was one of the largest local phone companies in the nation in terms of telephone lines. Local exchange carriers historically operated in their local franchise areas free of competition, pursuant to exclusive franchises granted by state regulatory authorities.

24. A consent decree also was entered against GTE in 1984. *United States v. GTE Corp.*, 1985-1 Trade Cas. (CCH) § 66.355 (D.D.C. 1984) ("GTE Consent Decree"). The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: 2003 WL 25629874)

GTE Consent Decree was prompted by GTE's acquisition of one of the largest long-distance companies in the United States, and was based upon the same concerns underlying the AT&T consent decree with the United States. Under the GTE Consent Decree, operating companies (*i.e.*, the local exchange providers) were prohibited from providing long distance services, but GTE Corporation itself was permitted to provide long distance services through other subsidiaries. GTE was required to maintain total separation between its long distance operations and the GTE operating companies, so that those companies could not use their position as exclusive local telephone service providers within their franchised areas to lessen competition in long distance services.

### B. *The Telecommunications Act of 1996*

25. On February 8, 1996, the Telecommunications Act of 1996 became law when it was signed by President Clinton. Pub. L. No. 104, 110 Stat. 56. The Act amends the Communications Act of 1934. (See 47 U.S.C. § 609, Historical and Statutory Notes.) The Act changed the landscape of federal and state telecommunications regulatory policies and the telecommunications industry.

26. The Act adopts a pro-competitive framework for the telecommunications industry in the United States. It opens the markets for both local telephone and long-distance services to effective competition.

27. Because of their prior unique existence as government granted monopolies and the benefits that they enjoyed as government granted monopolies, the Act requires that the LECs, including Defendants, must provide potential competitors access and connections to their lines and equipment on just, reasonable and non-discriminatory terms.

28. The Act also requires the incumbent local exchange companies ("ILEC") to provide competitors with the same quality of service that the incumbent local exchange carriers provide to themselves or their own customers. The Act specifically defines an ILEC as follows: "With respect to an area, the local exchange carrier that on February 8,1996, provided telephone exchange service in such area." 47 U.S.C. § 251. The seven original RBOCs, GTE and Defendants herein are ILECs.

29. With respect to long-distance service, the Act establishes a detailed mechanism for the RBOCs to compete for the first time in the long distance business. Unlike the RBOCs, GTE was allowed to expand into long-distance telephone service as soon as the Act became law on February 8, 1996.

30. Pursuant to the Act, before the respective RBOCs can offer long-distance telephone service, they must, *inter alia,* satisfy a 14-point checklist of requirements and demonstrate that there is competition in their respective local markets. It is up to the FCC in coordination with the Department of Justice and various state public utilities commissions to decide, upon request by an RBOC, when the RBOC has met the requirements.

31. Section 251 of the Act (47 U.S.C. § 251) imposes certain obligations on ILECs

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: 2003 WL 25629874)

designed to permit new entrants to use some or all of the ILECs' networks to offer local-exchange services.

32. Section 251 of the Act requires an ILEC to: (1) allow a competitor to interconnect with its network so that the competitor can provide calls to and from that network; (2) sell to competitors access to components of its network, called network elements, on an unbundled or individual basis; and (3) sell its retail telephone services to competitors at wholesale prices. All of these requirements of an ILEC are to be provided by the ILEC "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." *Id.* Section 251 imposes specific obligations on telecommunications carriers designed to promote competition in local exchange markets across the country. Federal Register/Vol. 61, No. 169, August 29, 1996, at 45476.

33. The Act directed the FCC to establish regulations to implement § 251's requirements within six months of its enactment. On August 8, 1996, the FCC released its Report and Order ("Report and Order"),

34. The Report and Order promulgated "national rules and regulations implementing the statutory requirements of the Act intended to encourage the development of competition in local exchange and exchange access markets." Federal Register/Vol. 61. No. 169, August 29, 1996 at 45476.

35. GTE and the RBOCs appealed the Report and Order to the 8th Circuit, and on October 15, 1996, the 8th Circuit stayed the Report and Order, including its pricing rules and regulations, pending a decision on the merits. *Iowa Utils. Bd. v. FCC*, 109 F.3d 418 (8th Cir. 1996). The group defending the Report and Order included, among others, the FCC and the U.S. Department of Justice.

36. On July 18, 1997, the U.S. Court of Appeals for the Eighth Circuit filed its Opinion in the *Iowa Utilities Board v. FCC* case. *Iowa Utils. Bd. v. FCC*, 120 F.3d 753 (8th Cir. 1997). The Court vacated certain provisions of the FCC's Report and Order and upheld the remainder. Specifically, the Court stated: "We decline the petitioners' request to vacate the FCC's entire First Report and Order and limit our rejection of FCC rules only to those that we have specifically overturned in this opinion." *Id.* at 819. In a footnote, the Court stated: "In total we vacate the following provisions: 47 C.F.R. §§51.303 51.305(a)(4) 51.311(c)-f 51.317 (vacated only to the extent this rule establishes a presumption that a network element must be unbundled if it is technically feasible to do so) 51.405 51.501-51.515 (inclusive except for 51.515 (b) 51.601-51.611 (inclusive) 51.701-51.717 (inclusive except for 51.701 51.703 51.709 (b) 51.7119a0910 51.7159d0 and 51.717 but only as they apply to CMRS providers) 51.809 First Report and Order ¶¶ 101-103 121-128 180. We also vacate the proxy range for line ports used in the delivery of basic residential and business exchange services established in the FCC's Order on Reconsideration dated September 27 1996." *Id.*

C. *The RBOCs' Market Allocation and Refusal to Compete*

37. The 1996 Telecommunications Act authorized RBOCs to offer local telephone and/or high speed internet services in each other's territories, yet they have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 25629874 (S.D.N.Y.)                                          Page 8

(Cite as: 2003 WL 25629874)

stayed almost completely out of one another's markets. Indeed,"[t]he major
telephone companies have not sought to provide local telephone service outside of
their home territories." Consumer Federation of America, *Lessons From 1996
Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer
Disaster,* February 2001, p. 2. "Major incumbent service providers have failed to
attack markets within their industry ... [m]ajor incumbent service providers have
failed to use their facilities to attack cross markets." *Id.* at 20.

38. "It was hoped that the large incumbent local monopoly companies (RBOCs) might
attack their neighbors' service areas, as they are the best situated to do so. But
such competition has not happened. The incumbent local exchange carriers (RBOCs)
have simply not tried to enter each other's service territories in any significant
way." Consumer Federation of America, *Lessons From 1996 Telecommunications Act:
Deregulation Before Meaningful Competition Spells Consumer Disaster,* February
2001, p. 13.

39. Although the RBOCs contend that CLECs are hurting them by leasing network
components at below-cost rates, the RBOCs have refrained from engaging in
meaningful head-to-head competition in each other's markets. For example, "[i]n
New York, SBC served a grand total of six residential lines at the end of 2001."
Joan Campion, *Competition Is Vital For Phone Customers,* Chicago Tribune, Nov. 11,
2002, Commentary pg. 20.

40. The failure of the RBOCs to compete with one another would be anomalous in the
absence of an agreement among the RBOCs not to compete with one another in view of
the fact that in significant respects, the territories that they service are
non-contiguous. As reflected in Exhibit A hereto, SBC serves most of the State of
Connecticut even though Verizon rather than SBC serves the surrounding states. SBC
serves California and Nevada, even though Qwest serves the other surrounding
states. Similarly, there are many relatively small areas within the States of
California, Texas, Illinois, Michigan, Ohio, Wisconsin, Indiana and other states
that are served by Verizon, even though SBC serves all surrounding territories, as
illustrated in Exhibit B hereto.[FN1] The failure of the RBOCs that serve the
surrounding territories to make significant attempts to compete in the surrounded
territories is strongly suggestive of conspiracy, since the service of such
surrounded territories presents the RBOC serving surrounding territories with an
especially attractive business opportunity that such RBOCs have not meaningfully
pursued.

        FN1. On information and belief, all or substantially all of the small areas
        served by Verizon that are surrounded by territories served by other RBOCs,
        as illustrated in Exhibit B hereto, were acquired by Verizon not as the
        result of competition by it with other RBOCs since the time of enactment of
        the Telecommunications Act, but rather through acquisition of territories
        served by Verizon's corporate predecessors-in-interest who served those
        areas prior to that time.

41. In competing for business in Connecticut, Verizon's predominance in the
surrounding states would have provided it with substantial competitive advantages.

                © 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: 2003 WL 25629874)

In competing for business in California and Nevada, Qwest's predominance in surrounding states would have given it substantial competitive advantages. In competing for the business in the many smaller territories that Verizon serves that are surrounded by territories served by other RBOCs, the dominance of those other RBOCs in surrounding areas would have given them substantial competitive advantages. Nevertheless, Verizon has not sought to compete in a meaningful manner with SBC in Connecticut, Qwest has not sought to compete meaningfully with SBC in California and Nevada, and the RBOCs that serve the areas surrounding the smaller areas served by Verizon, as illustrated on Exhibit B hereto, have not sought to compete meaningfully with Verizon in those smaller areas. In the absence of an agreement not to compete, it is especially unlikely that there would have been no efforts by surrounding and dominant RBOCs to compete in such surrounded territories.

42. On October 31, 2002, Richard Notebaert the former Chief Executive Officer of Ameritech, who sold the company to Defendant SBC in 1999 and who currently serves as the Chief Executive Officer of Defendant Qwest, was quoted in a *Chicago Tribune* article as saying it would be fundamentally wrong to compete in the SBC/Ameritech territory, adding "it might be a good way to turn a quick dollar but that doesn't make it right." Jon Van, *Ameritech Customers Off Limits: Notebaert,* Chicago Tribune, Oct. 31, 2002 Business, pg. 1.

43. The pronouncement that Qwest would forgo lucrative opportunities in its sister monopoly markets and in its principal line of business came as Qwest announced a Third Quarter loss of $214 million and 13% fall in revenue.

44. On November 8, 2002, in response to Notebaert's remarks, the Illinois Coalition For Competitive Telecom called Notebaert's statement "evidence of potential collusion among regional Bell phone monopolies to not compete against one another and kill off potential competitors in local phone service." *Illinois CLECS Assail Notebaert,* State Telephone Regulation Report, Comment, Vol. 20, No. 22. According to the article, "[t]he CLEC group said Notebaert indicated that the Bells' strategy was to divide the country into local phone 'fiefdoms,' not to compete against each other, and to devote their collective efforts to 'eliminating would-be competitors in local service.' " *Id.*

45. On December 18, 2002, United States Representatives John Conyers, Jr. of Michigan and Zoe Lofgren of California sent a letter to United States Attorney General John Ashcroft requesting that the U.S. Department of Justice, Antitrust Division investigate whether the RBOCs are violating the antitrust laws by carving up their market territories and deliberately refraining from competing with one another. Jon Van, *Lawmakers Seek Probe of Bells; Do Firms Agree Not To Compete,* Chicago Tribune, Dec. 19,2002, Business, pg. 2; James S. Granelli, *Federal Probe of Baby Bells Urged; Comments By Chairman Of Qwest Raise Questions About The Competitive Zeal Of The Regional Phone Companies,* Los Angeles Times, Dec. 19,2002, Business, Part 3, Pg. 3.; *Conyers Asks Justice Dept. To Investigate Bells On Anticompetitive Practices,* Communications Daily, Dec. 20, 2002, Today's News. Representatives Conyers and Lofgren questioned the extent to which the RBOCs' "very apparent non-competition policy in each others' markets is coordinated." Letter to The Honorable John D. Ashcroft dated December 18, 2002, p. 2.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 25629874 (S.D.N.Y.)                                                          Page 10

(Cite as: 2003 WL 25629874)

46. The RBOCs do indeed communicate amongst themselves through a myriad of organizations, including but not limited to the United States Telecom Association, the TeleMessaging Industry Association, the Alliance for Telecommunications Industry Solutions, Telecordia, Alliance for Public Technology, the Telecommunications Industry Association and the Progress and Freedom Foundation.

47. Defendants have engaged in parallel conduct in order to prevent competition in their respective local telephone and/or high speed internet services markets. "They have refused to open their markets by dragging their feet in allowing competitors to interconnect, refusing to negotiate in good faith, litigating every nook and cranny of the law, and avoiding head-to-head competition like the plague." Consumer Federation of America, *Lessons From 1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer Disaster,* February 2001, p. 1. Defendants also have engaged and continue to engage in unanimity of action by committing one or more of the following wrongful acts in furtherance of a common anticompetitive objective to prevent competition from Competitive Local Exchange Carriers ("CLECS") in their respective local telephone and/or high speed internet services markets:

(a) Defendants have failed to provide the same quality of service to competitors that Defendants provided to their own retail customers;

(b) Defendants have failed to provide access to their operational support systems ("OSS"), including on-line customer service records ("CSRs"), on a nondiscriminatory basis that places competitors at parity. Moreover, competitors do not have access to unbundled elements on the same basis on which Defendants accessed the same elements;

(c) Defendants' competitors have experienced undue delays in the provisioning of unbundled elements. Such delays are discriminatory and preclude competitors from offering service as attractive to customers as Defendants' services and on a basis that places competitors at parity with a respective Defendant;

(d) Defendants have billed customers of competitors who are converted from Defendants' retail service. As a result of Defendants' practices, customers of competitors are double-billed. Defendants' practices have severely impacted competitors' relationships with customers;

(e) Defendants have failed to provide interconnection between the network and those of competitors that is equal in quality to the interconnection that each provided itself;

(f) Defendants have refused to sell to competitors, on just, reasonable, and non-discriminatory terms, access to components of the network on an unbundled or individual basis;

(g) Defendants have refused to sell to competitors local telephone and/or high speed internet services at wholesale prices that are just, reasonable and nondiscriminatory, thereby preventing Defendants' competitors from being able to competitively resell the services to Plaintiffs and members of the Class;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 25629874 (S.D.N.Y.)

(Cite as: 2003 WL 25629874)

(h) Defendants have refused to allow competitors to connect to essential facilities, consisting of, but not limited to, local telephone lines, equipment, transmission and central switching stations (central office) and "local loop" on just, reasonable and non-discriminatory terms;

(i) Defendants have used discriminatory and error filled methods to bill local telephone service competitors in order to discourage competition by making it virtually impossible for competitors to audit the bills they received from Defendants;

(j) Defendants have imposed slow and inaccurate manual order processing causing competitors to devote significant time, effort and expense to identify and rectify problems to ensure that orders were ultimately processed correctly;

(k) Defendants have used monopoly power in their respective wholesale local telephone and/or high speed internet services market in order to gain or maintain a competitive advantage in the retail market for the provision of local telephone and/or high speed internet services; and

(1) Defendants have used their respective monopoly power and exclusive control over essential facilities consisting of, but not limited to, local telephone lines, equipment, transmission and central switching stations (central office) and "local loop" to negotiate agreements on unfair terms with competitors who were seeking access to their respective local telephone networks. Each Defendant, possessing the exclusive and sole source of entry into its own local telephone and/or high speed interest services market, was in a superior bargaining position to competitors and potential competitors and used that superior bargaining position to dictate unfair terms upon competitors.

48. The structure of the market for local telephone services is such as to make a market allocation agreement feasible, in that the four defendants, taken together, account for as much as ninety percent or more of the markets for local telephone services within the 48 contiguous states. Elaborate communications thus would not have been necessary in order to enable Defendants to agree to allocate territories and to refrain from competing with one another. A successful conspiracy among the Defendants to allocate territories would not require such frequent communications as to make prompt detection likely.

49. If one of the Defendants had broken ranks and commenced competition in another's territory the others would quickly have discovered that fact. The likely immediacy of such discovery makes a territorial allocation agreement among the Defendants more feasible, more readily enforceable, and more probable. In this respect as well, the structure of the market was conducive to an agreement among the Defendants to allocate territories to one another.

50. Had any one of the Defendants not sought to prevent CLECs (other than the other Defendants) from competing effectively within that Defendant's allocated territory in the ways described above, the resulting greater competitive inroads into that Defendant's territory would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: 2003 WL 25629874)

the absence of such conduct. In addition, the greater success of any CLEC that
made substantial competitive inroads into one Defendant's territory would have
enhanced the likelihood that such a CLEC might present a competitive threat in
other Defendants' territories as well. In these respects as well as others,
Defendants had compelling common motivations to include in their unlawful
horizontal agreement an agreement that each of them would engage in a course of
concerted conduct calculated to prevent effective competition from CLECs in each
of the allocated territories.

51. In the absence of any meaningful competition between the RBOCs in one
another's markets and in light of the parallel course of conduct that each engaged
in to prevent competition from CLECs within their respective local telephone
and/or high speed internet services markets and the other facts and market
circumstances alleged above, Plaintiffs allege upon information and belief that
Defendants have entered into a contract, combination or conspiracy to prevent
competitive entry in their respective local telephone and/or high speed internet
services markets and have agreed not to compete with one another and otherwise
allocated customers and markets to one another.

VI.

*INTERSTATE TRADE AND COMMERCE*

52. At times relevant herein, Defendants and/or their subsidiaries provided local
and regional telephone and/or high speed internet services across state lines, and
regularly and frequently solicited customers and sent bills and received payments
via the mail throughout the United States. The marketing, sale and provision of
local telephone and/or high speed internet services regularly occurs in and
substantially affects interstate trade and commerce.

VII.

*CLASS ACTION ALLEGATIONS*

53. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil
Procedure on behalf of the following class:
All persons or entities who reside or resided in the continental United States
(excluding Alaska and Hawaii) and are or were subscribers of local telephone
and/or high speed internet services (the "Class") from February 8, 1996 to present
(the "Class Period"). Excluded from the Class are the Defendants and any parent,
subsidiary, corporate affiliate, officer, director or employee of a Defendant and
any judge or magistrate judge assigned to entertain any portion of this case.

54. The members of the Class are so numerous and geographically dispersed that
joinder of all members is impracticable. The exact number and identity of Class
members is unknown to Plaintiffs but can readily be ascertained from books and
records maintained by Defendants or their agents. Upon information and belief,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 25629874 (S.D.N.Y.)                                          Page 13

(Cite as: 2003 WL 25629874)

there are millions of local telephone and/or high speed internet services subscribers in the United States who are within the defined Class.

55. There are questions of law or fact common to the Class members concerning:

(a) whether Defendants and their co-conspirators engaged in a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and otherwise allocating customers and markets to one another;

(b) the duration and extent of the contract, combination or conspiracy alleged herein;

(c) whether the Defendants were participants in the contract, combination or conspiracy alleged herein;

(d) whether the alleged contract, combination or conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

(e) whether the alleged contract, combination or conspiracy caused injury and damage to Plaintiffs and members of the Class and the appropriate measure of damages;

(f) whether a Defendant's conduct violated state antitrust laws;

(g) whether Plaintiffs and members of the Class are entitled to injunctive and other equitable relief; and

(h) whether Defendants and their co-conspirators fraudulently concealed the conspiracy alleged herein.

56. The claims of Plaintiffs are typical of the claims of each of the members of the Class. Plaintiffs and members of the Class purchased local telephone and/or high speed internet services from a Defendant or a competitor of a Defendant in the continental United States.

57. Plaintiffs will fairly and adequately protect the interests of the Class. There is no conflict of interest between Plaintiffs and other members of the Class and Plaintiffs are represented by experienced class action counsel.

58. Defendants have acted in an unlawful manner on grounds generally applicable to all members of the Class.

59. The questions of law or of fact common to the claims of the Class predominate over any questions affecting only individual class members, so that the certification of this case as a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

60. For these reasons, the proposed Class may be certified under Fed. R. Civ. P. 23

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: 2003 WL 25629874)

VIII.

*FRAUDULENT CONCEALMENT*

61. Plaintiffs and members of the Class had no knowledge of the contract,
combination or conspiracy or any facts alleged herein which might have led to the
discovery thereof until shortly before the filing of this Complaint. Plaintiffs
and members of the Class could not have discovered the contract, combination or
conspiracy at an earlier date by the exercise of due diligence because of the
affirmative, deceptive practices and techniques of secrecy employed by Defendants.
Through these acts of secrecy and deception, which included affirmative acts to
hide their wrongdoing, Defendants actively misled Plaintiffs and the Class about
the existence and terms of their contract, combination or conspiracy to prevent
competitive entry in their respective local telephone and/or high speed internet
services markets by, among other things, agreeing not to compete with one another
and to stifle attempts by others to compete with them and otherwise allocating
customers and markets to one another.

*COUNT I*

*Violation of Sherman Act § 1 - 15 U.S.C. § 1*

62. Plaintiffs repeat and reallege the allegations contained in paragraphs 1
through 61 as if fully set forth herein.

63. Defendants and their co-conspirators have engaged in a horizontal contract,
combination or conspiracy in unreasonable restraint of trade in violation of
Section 1 of the Sherman Act. 15 U.S.C. § 1.

64. Beginning at least as early as February 6, 1996, and continuing to the
present, the exact dates being unknown to Plaintiffs, Defendants and their
co-conspirators engaged in a contract, combination or conspiracy to prevent
competitive entry in their respective local telephone and/or high speed internet
services markets by, among other things, agreeing not to compete with one another
and to stifle attempts by others to compete with them and otherwise allocating
customers and markets to one another in violation of Section 1 of the Sherman Act.
15 U.S.C. § 1.

65. The contract, combination or conspiracy has had and will continue to have the
following effects:

(a) competition in the local telephone and/or high speed internet services market
has been unlawfully restrained, suppressed or eliminated;

(b). Plaintiffs and members of the Class have been denied the benefits of free,
open and unrestricted competition in the local telephone and/or high speed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

internet services markets; and

(c) the price of local telephone and/or high speed internet services in the United States have been fixed, raised, maintained or stabilized at artificially high and non-competitive levels.

66. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered injury to their business or property and have paid supracompetitive prices for local telephone and/or high speed internet services.

67. If not permanently enjoined, the unlawful contract, combination or conspiracy will continue and cause irreparable harm to Plaintiffs and members of the Class who have no adequate remedy at law.

*COUNT II*

*Violation of State Antitrust Laws*

68. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

69. As described above, Defendants have engaged in a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another in violation of the following state antitrust laws.

70. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Arizona Revised Stat. § § 44-1401, *et seq.*

71. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of , and Cal. Bus. & Prof. Code §§ 17200.

72. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of violation of D.C. Code Ann. §§ 28-45031, *et seq.*

73. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Fla. Stat. §§ 501. Part II, *et seq.*

74. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Iowa Code §§ 553.4 *et seq*

75. Defendants have unlawfully entered into a contract, combination or conspiracy

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: 2003 WL 25629874)

in unreasonable restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, et seq.

76. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of La. Rev. Stat. § § 51:137, et seq.

77. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Me. Rev. Stat. Ann. 10, § 1101, et seq.

78. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Mass. Ann. Laws ch. 93, et seq.

79. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Mich.Comp.Laws Ann. §§ 445.771, et seq.

80. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Minn. Stat. §§ 325 D.52, et seq.

81. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Miss. Code Ann. § § 75-21-1, et seq.

82. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A., et seq.

83. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1 et seq.

84. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1 et seq.

85. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of New York General Business Law §§ 340, et seq. And § 349 et. seq.

86. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, et seq.

87. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, et seq.

88. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of S.D. Codified Laws Ann. § 37-1,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: 2003 WL 25629874)

*et seq.*

89. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*

90. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Vt. Stat. Ann. 9, § 2453, *et seq.*

91. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of W.Va. Code §§ 47-18-1, *et seq.*

92. Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Wis. Stat. § 133.01, *et seq.*

93. Plaintiffs and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Count. Their injury consists of paying higher prices for local telephone and/or high speed internet services than they would have paid in the absence of the violations alleged herein. This injury is of the type the antitrust laws of the above States and the District of Columbia were designed to prevent and flows from that which makes Defendants' conduct unlawful.

## COUNT III

### *Unjust Enrichment*

94. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 93 as if fully set forth herein.

95. Defendants have benefitted from their unlawful acts through the overpayments from Plaintiffs and other Class members and the increased profits resulting from such overpayments. It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments, which were conferred by Plaintiffs and the other class members and retained by Defendants.

96. Plaintiffs and members of the Class are entitled to the establishment of a constructive trust consisting of the benefit to Defendants of such overpayments, from which Plaintiffs and the other Class members may make claims on a pro-rata basis for restitution.

### *PRAYER FOR RELIEF*

WHEREFORE, Plaintiffs and members of the Class pray that the Court enter judgment in their favor as follows:

A. Declaring this action to be a proper class action and certifying Plaintiffs as the representative of the Class pursuant to Rule 23 of the Federal Rules of Civil

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: 2003 WL 25629874)

Procedure;

B. Declaring that Defendants violated and are in violation of the Sherman Act § 1 and the various state antitrust statutes alleged herein;

C. Awarding threefold the damages sustained by Plaintiffs and members of the Class as a result Defendants' violations;

D. Ordering injunctive relief preventing and restraining Defendants and all persons acting on their behalf from engaging in the unlawful acts alleged herein;

F. Awarding Plaintiffs and members of the Class the costs, expenses, and reasonable attorneys' fees and experts' fees for bringing and prosecuting this action; and

G. Awarding Plaintiffs and members of the Class such other and further relief as the Court may deem just and proper.

*JURY DEMAND*

Pursuant to Rule 38(h) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: April 11, 2003

New York, New York

MILBERG WEISS BERSHAD HYNES

& LERACH LLP

By: <<signature>>

J. Douglas Richards (JDR-6038)

Michael M. Buchman (MB-1172)

Michael R. Reese (MR-3183)

One Pennsylvania Plaza

New York, New York 10119-0165

Telephone: (212) 594-5300

Facsimile: (212) 868-1229

SCHIFFRIN & BARROWAY, LLP

Richard S. Schiffrin

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 25629874 (S.D.N.Y.)

(Cite as: 2003 WL 25629874)


Joseph H. Meltzer

Edward W. Ciolko

Three Bala Plaza East

Suite 400

Bala Cynwyd, Pennsylvania 19004

Telephone: (610) 667-7706

Facsimile: (610) 667-7056

Attorneys for Plaintiffs,

William Twombly and Lawrence Marcus

William TWOMBLY and Lawrence Marcus, individually and on behalf of all others
similarly situated, Plaintiffs, v. BELL ATLANTIC CORPORATION, Bellsouth
Corporation, Qwest Communications International, Inc., Sbc Communications, Inc.,
and Verizon Communications, Inc., Defendants.
2003 WL 25629874 (S.D.N.Y.)

END OF DOCUMENT


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

<table>
<tr><td>
JEOFFREY L. BURTCH, CHAPTER 7<br>
TRUSTEE, FACTORY 2-U STORES,<br>
INC., et al.,<br><br>
       Plaintiff,<br><br>
v.<br><br>
MILBERG FACTORS, INC.,<br>
CAPITAL FACTORS, INC., THE CIT<br>
GROUP/COMMERCIAL SERVICES, INC.,<br>
GMAC COMMERCIAL FINANCE LLC,<br>
HSBC BUSINESS CREDIT (USA) INC.,<br>
ROSENTHAL AND ROSENTHAL, INC.,<br>
STERLING FACTORS CORPORATION,<br>
WELL FARGO CENTURY INC.,<br><br>
       Defendants.
</td>
<td>
)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)
</td>
<td>
Civil Action No. 07-556  (JJF)
</td></tr>
</table>

## PROPOSED ORDER

      AND NOW this _____ day of _____ 2008, it is hereby ORDERED

that Defendants' Motions to Dismiss are DENIED.  Defendants are ORDERED to answer

Plaintiff's Complaint within twenty (20) days.

                                     _____

## VIII. <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of Plaintiff's Consolidated Brief in Opposition to the

Motions to Dismiss has been served on all counsel of record via the Court's ECF System

<u>/s/ Shelley A. Kinsella</u>
Robert W. Pedigo, Esq. (ID# 4047)
Shelley A. Kinsella, Esq. (ID #4023)
COOCH & TAYLOR, P.A.
824 Market Street, 10th Floor
Wilmington, DE 19801
Phone: (302)-984-3832
Fax: (302)-652-5379

Dated: February 29, 2008