**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
             :

JEOFFREY L. BURTCH, CHAPTER 7     :   Civil Action No. 1:07-cv-00556-JJF-LPS
TRUSTEE, FACTORY 2-U STORES, INC., *et* :
*al.*,                :
             :
        Plaintiff,     :
             :
        v.         :
             :
MILBERG FACTORS, INC., CAPITAL     :
FACTORS, INC., THE CIT         :
GROUP/COMMERCIAL SERVICES, INC.,   :
GMAC COMMERCIAL FINANCE LLC,    :
HSBC BUSINESS CREDIT (USA) INC.,    :
ROSENTHAL AND ROSENTHAL, INC.,    :
STERLING FACTORS CORPORATION,    :
WELL FARGO CENTURY INC.,      :
             :
       Defendants.   :
             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
### THE CIT GROUP/COMMERCIAL SERVICES, INC.'S
### MOTION TO DISMISS THE COMPLAINT

                BLANK ROME LLP
                Chase Manhattan Centre
                1201 Market Street, Suite 800
                Wilmington, DE 19801
                (302) 425-6400

                and

                PAUL, WEISS, RIFKIND, WHARTON &
                GARRISON LLP
                1285 Avenue of the Americas
                New York, NY 10019-6064
                (212) 373-3000

Dated: April 2, 2008

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES......................................................................................................ii

SUMMARY OF ARGUMENT..................................................................................................1

ARGUMENT.............................................................................................................................2

I.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE SHARING CREDIT
       INFORMATION DOES NOT VIOLATE THE SHERMAN ACT...................................2

II.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF'S
       FORMULAIC AND CONCLUSORY ALLEGATIONS OF AN ILLEGAL
       AGREEMENT ARE NOT SUFFICIENT.........................................................................6

       A.     The Complaint Fails to Satisfy the Pleading Standard Required to Avoid
              Dismissal Under Twombly........................................................................................7

       B.     The Alleged Agreement Makes No Economic Sense..........................................10

III.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS
       FAILED TO STATE A PRICE FIXING CLAIM ..........................................................13

IV.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS
       NOT ALLEGED ANY ANTITRUST INJURY .............................................................14

V.     THE COMPLAINT IS BARRED BY THE STATUTE OF LIMITATIONS..................16

CONCLUSION........................................................................................................................19

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bell* v. *Twombly,*
 127 S. Ct. 1955 (2007) ................................................................................................ 7, 8, 9

*Binderup* v. *Pathe Exchange,*
 263 U.S. 291 (1923) .......................................................................................................... 11

*Building Materials Corp. of America* v. *Rotter,*
 __ F. Supp. 2d __ , 2008 WL 442135 (E.D. Pa. Feb. 15, 2008) ...................................... 15, 16

*Catalano* v. *Target Sales, Inc.,*
 446 U.S. 643 (1980) .......................................................................................................... 13

*Cement Mfrs. Protective Ass'n* v. *United States,*
 268 U.S. 588 (1925) ...................................................................................................... 2, 3, 5

*Davis* v. *Grusemeyer,*
 996 F.2d 617 (3d Cir. 1993) ............................................................................................. 17

*De Filippo* v. *Ford Motor Co.,*
 516 F.2d 1313 (3d Cir. 1975) ........................................................................................... 12

*Dresses for Less, Inc.* v. *CIT Group/Commercial Services, Inc.,*
 No. 01 CIV. 2669 (WHP), 2002 WL 31164482 (S.D.N.Y. Sept. 30, 2002) .............. 10, 13, 14

*In re Factory 2-U Stores,*
 Case No. 04-10111 (PJW), Bankr. D. Del. ....................................................................... 11

*Fed. Trade Comm'n* v. *Superior Court Trial Lawyers Ass'n,*
 493 U.S. 411 (1990) .......................................................................................................... 12

*Garshman* v. *Universal Resources Holding, Inc.,*
 824 F.2d 223 (3d Cir. 1987) ............................................................................................... 9

*Granite Partners, L.P.* v. *Bear, Stearns & Co. Inc.,*
 17 F. Supp. 2d 275 (S.D.N.Y. 1998) ................................................................................. 15

*Higgins* v. *NYSE,*
 755 F. Supp. 113 (S.D.N.Y. 1991) .................................................................................... 17

*Kasada* v. *Access Capital, Inc.,*
 No. 01 Civ. 8893 (GBD), 2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004) ...................... *passim*

*Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.,*
   340 U.S. 211 (1951) .......................................................................................................... 12

*In re Lower Lake Erie Iron Ore Antitrust Litig.,*
   998 F.2d 1144 (3d Cir. 1993) ........................................................................................... 17

*Mathias* v. *Daily News, L.P.,*
   152 F. Supp. 2d 465 (S.D.N.Y. 2001) .............................................................................. 15

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.,*
   475 U.S. 574 (1986) .......................................................................................................... 10

*Metro Video Dist., Inc.* v. *Vestron Video, Inc.,*
   Civ. No. 89-0640 PG, 1990 WL 58463 (D.P.R. Feb. 8, 1990) ............................................ 3, 5

*Michelman* v. *Clark-Schwebel Fiber Glass Corp.,*
   534 F.2d 1036 (2d Cir. 1976) ...................................................................................... *passim*

*Phillips* v. *County of Allegheny*
   515 F.3d 224 (3d Cir. 2008) ............................................................................................ 7, 8

*Queen City, Inc.* v. *Dominio's Pizza, Inc.,*
   124 F.3d 430 (3d Cir. 1997) ............................................................................................. 16

*St. Paul Fire & Marine Ins. Co.* v. *Barry,* 438 U.S. 531 (1978) ................................................... 12

*Supermarket of Marlington* v. *Meadow Gold Dairies,*
   71 F.3d 119 (4th Cir. 1995) .............................................................................................. 17

*U.S. Horticultural Supply, Inc.* v. *The Scotts Co.,*
   No. 04-5182, 2006 WL 1531407 (E.D. Pa. June 1, 2006) ................................................... 10

*Zenith Radio Corp.* v. *Hazeltine Research, Inc.,*
   401 U.S. 321 (1971) .......................................................................................................... 17

*Zoslaw* v. *MCA Distrib. Corp.,*
   693 F.2d 870 (9th Cir. 1982) ............................................................................................ 2, 3

## RULES

Fed. R. Civ. P. 8 ............................................................................................................................ 9

Fed. R. Civ. P. 12(b)(6) ................................................................................................................ 1

## OTHER AUTHORITIES

U.S. Department of Justice, *Antitrust Guidelines for Collaborations Among Competitors* (2000) ("DOJ Guidelines")...............................................................................................4, 5

VI AREEDA & HOVENKAMP, *Antitrust Law* ¶ 1423b (2003) .....................................................2, 9

Defendant The CIT Group/Commercial Services, Inc. ("CIT") respectfully submits this reply memorandum of law in further support of its motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## SUMMARY OF ARGUMENT

Plaintiff's opposition suffers from the same misunderstanding of the law as his pleading: sharing credit information, which is all that the Complaint alleges, is not an antitrust violation. Only an agreement by rival creditors, promising to make the exact same credit decisions, could violate the Sherman Act. Plaintiff has pled no facts to show such an agreement, and alleging that defendants exchanged credit information is not a shortcut or shorthand for stating such a claim.

That has been the law for more than 80 years. Despite the recent application of that law to the dismissal of a nearly identical claim in *Kasada* v. *Access Capital, Inc.*, No. 01 Civ. 8893 (GBD), 2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004), plaintiff argues that he has found a loophole. Information about "future" credit decisions, plaintiff contends, cannot be exchanged. There is no law or logic to support that. The very case plaintiff cites (*Michelman*) involved competitors sharing information about the future. That they then made similar credit decisions did not show, or even imply, that the competitors had unlawfully colluded.

So too here. The Complaint does not allege -- and plaintiff's brief does not identify -- a single fact to show that the defendant factors agreed to act in unison. That they each, independently, reached the same judgment about Factory 2-U's lack of creditworthiness following the exchange of information makes complete sense -- and is completely lawful.

Plaintiff gamely tries to come up with a theory as to why factors *might* conspire to collectively withhold credit and destroy their own customer base. He imagines that this would make it easier to collect from "guarantors." Like everything about plaintiff's claim, this hypothesis is far-

1

fetched and has no factual footing in the Complaint: there is no guarantor for CIT to collect from. Plaintiff does not even allege one.

This is an antitrust case in name only. The Complaint contains none of the facts necessary to establish the basic elements of a Sherman Act Section 1 claim -- collusion and harm to competition. Rather, it complains that defendants allegedly did what was natural, lawful and pro-competitive: they declined to extend further credit to one debt-strapped and soon to be defunct business. For that, plaintiff can claim no relief under the Sherman Act. The Complaint should be dismissed.

## ARGUMENT

### I.

### THE COMPLAINT SHOULD BE DISMISSED BECAUSE SHARING CREDIT INFORMATION DOES NOT VIOLATE THE SHERMAN ACT

In the face of the unbroken line of authority -- from the Supreme Court down to the circuit and district courts -- holding that the exchange of credit information among competitors "is clearly lawful," VI AREEDA & HOVENKAMP, *Antitrust Law* ¶ 1423b (2003), plaintiff has conjured up an exception that does not exist. Plaintiff contends that while sharing credit histories is lawful, it is illegal to share information about "future" credit decisions -- *e.g.*, the amount of credit extended and willingness to increase credit extensions. (Opp. 16.) This purported distinction is not supported by the case law.

On the contrary, the exchange of information "concerning the credit-worthiness of customers has long been held not to violate the Sherman Act," regardless of the nature of the credit information. *See Michelman* v. *Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1048 (2d Cir. 1976); *Cement Mfrs. Protective Ass'n* v. *United States*, 268 U.S. 588, 600 (1925); *Zoslaw* v. *MCA*

2

*Distrib. Corp.*, 693 F.2d 870, 886 (9th Cir. 1982); *Metro Video Dist., Inc.* v. *Vestron Video, Inc.*, Civ. No. 89-0640 PG, 1990 WL 58463, at *9 (D.P.R. Feb. 8, 1990). Whether the exchange is about a creditor's past indebtedness, or a rival lender's future credit limits, the information is pro-competitive because it can be used by each creditor "for self protection purposes." *See Zoslaw*, 693 F.2d at 886. Whether backward or forward-looking, information sharing promotes informed, self-interested and independent credit judgments by the participating creditors, not irrational, collective and collusive credit decisions. "[T]he dissemination to competitors of information concerning the credit-worthiness of customers" serves the "legitimate function" of aiding "sellers in gaining information necessary *to protect themselves* against fraudulent or insolvent customers." *Michelman*, 534 F.2d at 1048 (emphasis added); *see Cement Mfrs.*, 268 U.S. at 604.

There is no caselaw or scholarship that holds otherwise. Plaintiff relies primarily on *Cement Mfrs.* and *Michelman* (Opp. 10-13), but neither case distinguishes between historical and so-called "future" credit information. Plaintiff simply makes the facile argument that since those cases only involved the exchange of historical information, it must be that sharing "future" information would have been found unlawful. The cases do not say or even hint at that. In fact, Michelman *did* involve the sharing of confidential information about future credit actions and the Second Circuit found that there was no violation of the antitrust laws.

In *Michelman*, the plaintiff was a manufacturer of fiber glass fabrics. It accused three of its suppliers (Clark, Burlington and J.P. Stevens) of conspiring to drive it out of business by, *inter alia*, restricting sales on credit and inducing the plaintiff's factor to terminate financing of its receivables. 534 F.2d at 1038. The plaintiff was a "thinly financed company" with net losses and negative working capital, creating "increasing concern among its suppliers about payment." *Id*. at 1040. Two of those rival suppliers (Clark and Burlington) shared information about plaintiff's

3

creditworthiness. They also spoke in detail about both their current *and future* credit decisions and

strategies:

- Clark gave Burlington advance notice that it was "thinking of submitting its disputes with [the plaintiff] to arbitration" -- a prospective event that "could be the final blow [to plaintiff's] thin financial structure."

- After the arbitration was commenced, Clark periodically briefed Burlington about the case and about the progress of prospective settlement negotiations.

- Based on Clark's revelations about the arbitration, Burlington requested a personal guarantee from the plaintiff's majority shareholder.

- Clark then told Burlington that it "was no longer accepting orders" from the plaintiff -- *i.e.*, it "cut-off" plaintiff's credit.

- Looking ahead, Clark informed Burlington that if the arbitration did not settle, it "will insist on immediate payment, which may very well bankrupt the account." Burlington reacted that "this matter should be taken into consideration in any further extension of credit on our part."

- Clark notified Burlington when the plaintiff defaulted on payments, which prompted Burlington to hold all shipments to the plaintiff.

*Id.* at 1047-48 n.16.

Much of this sounds like the allegations here: *e.g.*, that credit lines had been

"cut," orders were being "decline[d]" or put "on hold," and a particular factor was "getting

surcharges." (Cmplt. ¶¶ 35(g), (q,y) and (n).) In *Michelman*, the Second Circuit found that such

conversations were "merely exchanges of credit information" and, therefore, were within the

"permissible boundaries" of the antitrust laws. 534 F.2d at 1048, 1048 n. 15. Clark's forecasts

about where it was headed in the future with the arbitration, and about its prospective cut-off of

credit to the plaintiff, would "naturally tend to make others wary about extending credit" to the

plaintiff. *Id.* at 1041. But that is precisely what is permitted and protected by the antitrust law.[1]

---

[1]   Plaintiff also cites to the U.S. Department of Justice, *Antitrust Guidelines for Collaborations Among Competitors* (2000) ("DOJ Guidelines") to support his argument that the sharing of future credit

That is the animating principle of the case law -- and exactly what plaintiff's pleading and opposition fail to comprehend: "it is not a violation of Section 1" for creditors to exchange and act on creditworthiness information, "provided that any action taken in reliance upon it is the result of each firm's independent judgment, and not of agreement." *Id.* at 1048. The exchange of information is not suspect or illegal. The subsequent denial of credit is not suspect or illegal. Only an agreement dictating how each creditor must use the information -- *i.e.*, an abdication of each creditor's independent decision-making ability in favor of collusive credit decisions -- would be a violation of law. *Id.; Metro Video*, 1990 WL 58463, at *9.

This rule explains why plaintiff's discussion of *Cement Mfrs.* is so wrong. Plaintiff asserts that the "crucial characteristic" of the information exchange in *Cement Mfrs.* that "rendered it benign was its purely historical nature." (Opp. 11.) The Supreme Court said nothing of the kind. It drew no line between historical and "future" credit information. Rather, the decision turned on the government's failure to prove that there was an agreement with respect to the use of the credit information. *See Cement Mfrs.*, 268 U.S. at 599-600. The crucial characteristic was that "any consequences" flowing from the information exchanges "would naturally ensue *from the exercise of the individual judgment* of manufacturers in determining, on the basis of available information,

---

information is anti-competitive. The DOJ Guidelines do not specifically address the sharing of credit information. These guidelines, however, which address certain types of competitor collaborations not alleged here, "recognize that the sharing of information among competitors may be procompetitive and is often reasonably necessary to achieve the procompetitive benefits of certain collaborations...." *Id.* at 15. The DOJ Guidelines go on to say that "a competitor collaboration may enable participants to offer goods and service that are cheaper . . ." *Id.* at 6. This is precisely the benefit highlighted by the Second Circuit in *Michelman* when it upheld the exchange of credit information: the "dissemination to competitors of information concerning the credit-worthiness of customers" serves the "legitimate function" of aiding "sellers in gaining information necessary to protect themselves against fraudulent or insolvent customers." 534 F.2d at 1048. Protecting against fraudulent or insolvent customers makes credit cheaper for everyone.

whether to extend credit or require cash or security from any given customer." *Id.* at 600 (emphasis added).

Again, the decisive distinction is not between past and future credit information, but between individual and collusive credit judgments. In this case, no facts have been alleged to show that any of the factors -- much less, all eight of the defendants -- entered into an agreement to jettison their individual judgments and make collective credit decisions. The Complaint does not allege any facts about any credit judgment made by any factor, other than the allegedly parallel denial of credit to Factory 2-U. As a matter of law, that does not state a claim.

As in *Michelman*, it may be true that CIT and the other defendant factors "based their future course of action" on the shared credit information (Cmplt. ¶ 37), but the Complaint contains no factual allegations to suggest that those credit decisions were anything other than independent (and sensible) business judgments based on each factor's individualized assessment of Factory 2-U's creditworthiness. The pleading and plaintiff's opposition thus ignore the law, including *Kasada, Inc.* v. *Access Capital, Inc.*, No. 01 Civ. 8893 (GBD), 2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004), which dismissed a Section 1 claim based on virtually the identical claim -- *i.e.*, the exchange of credit information among factors allegedly resulting in a parallel denial of credit. As there, the Complaint here fails to state a claim and should be dismissed.

## II.

## THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF'S FORMULAIC AND CONCLUSORY ALLEGATIONS OF AN ILLEGAL AGREEMENT ARE NOT SUFFICIENT

Since sharing credit information and making parallel credit decisions are not sufficient grounds for alleging an antitrust conspiracy, other facts must be alleged to avoid dismissal.

6

As the Supreme Court held in *Bell* v. *Twombly*, 127 S. Ct. 1955 (2007), to defeat a motion to dismiss a Sherman Act Section 1 claim, the plaintiff must allege "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." 127 S. Ct. at 1965.

No such facts are alleged here. All that is alleged is that some of the defendants shared credit information about Factory 2-U, some of the defendants then continued extending credit while others curtailed or cut their credit, and eventually all of the defendants ceased providing credit to this bankrupt business. (Cmplt. ¶¶ 35, 37.) As discussed above and in the moving briefs, those facts are not enough to state a claim. And not a single additional fact is alleged to show that it is "plausible" that the purported parallel conduct was the product of a conspiracy. *Twombly*, 127 S. Ct. at 1971. The Complaint merely recites the "labels and conclusions" of an agreement or boycott or conspiracy. That is just what the Supreme Court held is *not* sufficient to make out a "showing that the pleader is entitled to relief." *Id.* at 1964 (citations omitted).

## A.     The Complaint Fails to Satisfy the Pleading Standard
## Required to Avoid Dismissal Under Twombly

Plaintiff struggles to diminish the significance of *Twombly*, but the case he cites (*Phillips* v. *County of Allegheny*, 515 F.3d. 224 (3d Cir. Feb. 2008)) actually reconfirms the test for evaluating the sufficiency of Section 1 claims: the complaint must contain a factual "showing" making it "plausible that such [parallel] conduct was the product of a conspiracy." *Phillips*, 515 F.3d at 230. The issue in *Phillips* was how that test applies "[o]utside the § 1 antitrust context." *Id.* at 234. Though obviously irrelevant here, the court "decline[d] at this point to read *Twombly* so narrowly as to limit its holding on plausibility to the antitrust context." *Id.*

7

Plaintiff rests on the platitude that, under *Twombly*, all he must do is make a "'showing'" of "'some factual allegation in the complaint'" to survive a motion to dismiss. (Opp. 14-15 (citing *Phillips*, 515 F.3d at 231-232).) But plaintiff fails to address the particular "factual allegation" required by *Twombly* to state a Section 1 claim based on alleged parallel conduct.

The Supreme Court held that "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Twombly*, 127 S. Ct. at 1966. Thus, plaintiff's insistence that he is not just alleging parallel conduct because he is also claiming a conspiracy does him no good. (Opp. 16-17.) Those are labels, not facts. As in *Twombly*, the Complaint here "does not set forth a single fact in a context that suggests an agreement" and "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway" -- *e.g.*, deny or limit credit to a troubled company heading into bankruptcy. *Id.* at 1968-69, 1970. Not even plaintiff contends that the alleged credit denials were irrational, money-losing decisions which can only be explained by an eight-party agreement. There is no factual basis from which to infer that defendants did anything other than make independent credit decisions about a company on the brink of financial failure.[2]

Plaintiff attempts to distinguish the Complaint here from the pleading in *Twombly*, which he describes as "bare-bones" and "conclusory." (Opp. 17-18.) But the fact that this Complaint has more words than the *Twombly* complaint does not make it better. The only additional "factual detail" that this Complaint provides are the alleged conversations in which the credit

---

[2]    Plaintiff's opposition describes the alleged conspiracy in two different ways, but in neither scenario do plaintiff's allegations suffice to state an antitrust claim. On the one hand, in an effort to avoid the obvious problem that the Complaint, on its face, shows that factors were acting differently toward Factory 2-U while exchanging credit information (Cmplt. ¶ 35, CIT Mem. 5), plaintiff now claims that the exchanges of credit information alleged in the Complaint were not agreements to conspire, but that an agreement to boycott Factory 2-U was entered into only sometime after the discussions took place. (Opp. 20 n.9.) On the other hand, at other points in the opposition, plaintiff takes the position that agreements took place prior to the first alleged communications on February 27, 2002. (Opp. 33 n. 16.)

information was exchanged. (*See* Cmplt. ¶¶ 35(a) – (aa).) As established before, there is nothing illegal about those conversations, and "no boycott conspiracy is inferable from the circulation of credit information." AREEDA & HOVENKAMP ¶ 1423b (2003). Plaintiff could set out 100 paragraphs describing such information sharing, and the Complaint would still be deficient. It would still be missing the critical allegation that was missing in *Twombly*: facts sufficient to show that an agreement was made to do something with the information that would not have been done in the absence of any agreement. 127 S. Ct. at 1968-69, 1971.[3]

Plaintiff argues that the "content and detail of the conversations permits [sic] the Court to infer that the defendant factors' nearly simultaneous decision" to deny or limit credit to Factory 2-U was "not mere coincidence, but instead the result of an illegal conspiracy in restraint of trade." (Opp. 20 n. 9.) Again, plaintiff fails to grasp the law. Of course, the alleged denial of credit following the exchange of gloomy credit information as to a retailer in poor financial straits was not a coincidence. It makes sense that each lender would deny credit – and to do so *independently*, without any agreement or conspiracy. As the Supreme Court stated in *Twombly*, "if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing." 127 S. Ct. at 1971.

---

[3]  *See Twombly*, 127 S. Ct. at 1971 n.10 (stating that because "the pleadings mentioned no specific time, place or person involved in the alleged conspiracies" they would not have satisfied the notice required by F.R.C.P. 8); *Garshman* v. *Universal Resources Holding, Inc.*, 824 F.2d 223, 230 (3d Cir. 1987) ("The allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act"); *Kasada,* 2004 WL 2903776, at \*6 (same).

9

**B.** **The Alleged Agreement Makes No Economic Sense**

Plaintiff has no coherent response to the argument that the alleged credit boycott makes no economic sense. As we previously demonstrated, no agreement or conspiracy can be inferred here because the purported purpose of defendants' alleged boycott, to drive the customers of their clients out of business and reduce demand for their services, would be economically self-destructive. (CIT Mem. 18-19.) Plaintiff theorizes that conspiring to drive a customer into insolvency "allows the factors who have extended credit to such retailers a better prospect of recovering fully by collecting from guarantors." (Opp. 27.) That itself is nonsensical and only underscores why the Complaint should be dismissed.[4]

Plaintiff's theory is that in order to collect its debts, CIT would prefer to collude with its rival creditors to drive a borrower into certain bankruptcy, rather than to encourage its rivals to keep the borrower solvent so that CIT can get paid back. The prize for hastening this financial ruin, and ensuring that Factory 2-U will not be able to repay CIT, is "collecting from guarantors." (Opp. 27.) Even if this economic suicide theory were credible, the critical fact is not alleged -- *i.e.*, that there is a "guarantor" from whom CIT can collect. None is alleged because none exists.[5]

In any event, it makes no sense that the defendant factors would seek to drive their customer out of business only to be mired in bankruptcy proceedings for years before they *might* recover the funds owed by Factory 2-U. The bankruptcy proceedings here commenced over four

---

[4]   Dismissal is "warranted when the alleged conspiracy was illogical" or "made no economic sense." *U.S. Horticultural Supply, Inc.* v. *The Scotts Co.*, No. 04-5182, 2006 WL 1531407, at *5 (E.D. Pa. June 1, 2006); *see also Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 593 (1986) ("[C]ourts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct.").

[5]   *Dresses for Less, Inc.* v. *CIT Group/Commercial Services, Inc.*, No. 01 CIV. 2669 (WHP), 2002 WL 31164482, at *8 (S.D.N.Y. Sept. 30, 2002) is distinguishable because in that case the principals of the plaintiff garment manufacturer were alleged to personally guarantee several of the debts to defendant CIT.

years ago (Cmplt. ¶ 20), and there have been more than 800 preference actions filed.[6] (*See* Trustee's Motion Seeking Entry of an Order Setting Pre-Trial Deadlines in Pending Adversary Proceedings, dated February 5, 2008, filed in *In re Factory 2-U Stores,* Case No. 04-10111 (PJW), Bankr. D. Del., D.I. 101 at ¶ 3.)

The economic irrationality of plaintiff's claim is further highlighted by his argument that defendants' conduct amounts to a *per se* violation of the Sherman Act. (Opp. 23-25.) The cases he cites involved boycotts that restrained competition and provided a tangible benefit to the defendants. Here, plaintiff's allegations do not fit into that mold, demonstrating both that defendants' conduct is not *per se* illegal, and that plaintiff's claim makes no sense.

That plaintiff needs to reach back to the silent film era to find an irrelevant case about the strong-arm tactics of the original movie moguls, illustrates that he has no law to sustain the Complaint. *See Binderup* v. *Pathe Exchange,* 263 U.S. 291 (1923). The conspiracy alleged in *Binderup* was not based on parallel conduct readily explainable by independent decision-making, but a cabal of movie producers and distributors who got together and agreed to destroy a profitable theatre owner in Nebraska who rejected their demands to "share his patronage" with them. *Id.* at 303. The defendants, who "controlled the distribution of all films in the United States," allegedly retaliated by conspiring to refuse to furnish the plaintiff with any movies. *Id.*

That conspiracy allegation was not merely plausible. It was the *only* explanation for the alleged conduct: the defendants' extortion threat would not work unless all the defendants acted

---

[6]  Plaintiff also argues that the alleged boycott makes sense because "it allowed the factors to stabilize prices at a higher level (along with each factor's market share) than if competition between the factors been [*sic*] truly existed." (Opp. 27.) This is simply a repetition of plaintiff's conclusory claim that the defendant factors engaged in a price-fixing conspiracy. Plaintiff still fails to allege any facts to support this naked assertion -- including how the alleged conspiracy resulted in stabilized prices or the level of the prices affected -- and does nothing to contest defendants' argument that the alleged conspiracy makes no economic sense.

11

in unison by agreeing to withhold all their movies from the plaintiffs. Conversely, there was no

reason why any one of the defendants would, on its own, decline to distribute movies to the plaintiff.

Here, by contrast, declining to extend credit to a delinquent borrower does not require -- and thus

does not imply -- an agreement with any other lenders.[7]

    The Complaint here contains no allegation that the factors were not vigorously

competing for business or that competition among the factors was reduced. To the contrary, the

conduct that is alleged makes perfect pro-competitive sense: defendant factors were making

independent (and different) decisions about whether credit would be extended and the terms of that

credit if extended to a company on the brink of bankruptcy. (Cmplt. ¶ 35.) The conspiracy that is

alleged therefore is not economically plausible and no *per se* boycott has been pled.

---

[7]  *De Filippo* v. *Ford Motor Co.,* 516 F.2d 1313 (3d Cir. 1975), also is not applicable. *De Filippo* involved allegations that Ford and certain of its dealers conspired to prevent another dealer from acquiring a dealership on special terms. *Id.* at 1315-16. The court found that the allegations did *not* constitute a group boycott, and there was no *per se* unreasonable restraint of trade because the plaintiff was "deprived simply of the benefits of a contract offered to them at special terms." *Id.* at 1320. Even if the court had found concerted action among the defendants to exclude the dealership from the market, which it did not, such a conspiracy to boycott makes economic sense because the dealers were acting to disadvantage another competing dealer.

  The other cases relied upon by plaintiff are similarly distinguishable. *See also Fed. Trade Comm'n* v. *Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 422-23, 426 (1990) (finding allegations that "[p]rior to the boycott [the] lawyers were in competition with one another" and the "agreement was implemented by a concerted refusal to serve an important customer" with the "undenied objective" to obtain "economic advantage for those who agreed to participate" were sufficient to state a boycott claim); *St. Paul Fire & Marine Ins. Co.* v. *Barry,* 438 U.S. 531, 544 (1978) (finding a boycott where insurer "induced its competitors to refuse to deal" with its customers "solely for the purpose of forcing physicians and hospitals to accede to substantial curtailment of the coverage previously available"); *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 212, 214 (1951) (finding liquor companies' agreement to only sell to wholesalers who would resell at prices fixed by the companies to be a boycott).

**III.**

## THE COMPLAINT SHOULD BE DISMISSED BECAUSE
## PLAINTIFF HAS FAILED TO STATE A PRICE FIXING CLAIM

Plaintiff's failure to plead any specific facts in support of his "price fixing" claim cannot be excused by a lack of first-hand knowledge: Factory 2-U knew full well the prices and terms of the credit that were extended by the various factor defendants. Yet the Complaint lacks any showing that defendants acted uniformly to fix the price or terms of credit, or that Factory 2-U (or anyone else) paid the same price for credit to all of the defendants during the relevant time period. Nowhere does the Complaint provide the terms of the alleged agreement to price fix, including for example, the prices charged, the credit terms, and whether the defendants charged the same amount to Factory 2-U or others. Plaintiff's conclusory assertion of price fixing does not state a claim. *See Kasada*, 2004 WL 2903776, at *6-7; *Dresses for Less*, 2002 WL 31164482, at *10 (dismissing claim for price fixing).

Plaintiff's opposition never addresses these pleading deficiencies. He argues only that *Catalano* v. *Target Sales, Inc.*, 446 U.S. 643 (1980), supports his claim that the alleged agreement to deny credit to Factory 2-U constitutes price fixing. (Opp. 19.) If anything, *Catalano* further demonstrates why plaintiff has failed to allege a price fixing claim.

In *Catalano*, competing beer wholesalers agreed among themselves to fix the credit terms on which they would sell their product (beer) to retailers. 446 U.S. at 643. Specifically, the wholesalers made an agreement that they would all require their retailer customers to pay in advance or upon delivery, and to discontinue the practice of accepting late payments without interest. *Id.* at 644-45. Since extending such interest-free credit was "equivalent to giving a discount" off the

13

purchase price, conspiring to terminate that practice constituted "an agreement to eliminate discounts" -- *i.e.*, fixing the price of beer. *Id.* at 648.

There is no comparable allegation in this case. The defendants are not accused of agreeing with each other on marketwide credit terms, like the agreement in *Catalano* to cease offering interest-free late payment terms. Here, the defendants allegedly declined to extend credit to one particular business. For that very reason, the courts in both *Kasada* and *Dresses for Less* held that *Catalano* does not support a price fixing claim on these facts: the defendants "specifically denied credit to the plaintiffs alone and not to all of their customers." *Kasada*, 2004 WL 2903776, at *7; *Dresses for Less*, 2002 WL 31164482, at *10. As in those two cases, the Complaint does "not state how the denial of credit to specific garment [retailers] affected market prices." *Kasada*, 2004 WL 2903776, at *7. The price fixing claim should be dismissed.

## IV.

### THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS NOT ALLEGED ANY ANTITRUST INJURY

Plaintiff does not dispute that he is required to allege an injury flowing from harm to competition in a relevant market, not merely a loss to Factory 2-U. (Opp. 28.) He fails, however, to identify any such factual allegations in the Complaint that satisfy that pleading requirement. Plaintiff just repeats the conclusory allegation that defendants' alleged conduct has "lessened competition generally." (Opp. 28.)

No garment industry business other than Factory 2-U is alleged to have been hurt by the alleged exchange of information among defendants, let alone driven out of business. Likewise, there is no allegation that the grievance in the Complaint -- that Factory 2-U was denied credit --

14

arises from any marketwide absence of competition among the factors. Even if it were true that defendant factors had agreed to cut off credit to Factory 2-U, it is plaintiff's own theory that such a conspiracy arose from Factory 2-U's inability to pay its debts, not from an absence of competition among the factors to win the business of customers who do pay their debts.

The one paragraph in the Complaint that plaintiff cites in his opposition (Cmplt. ¶ 32) does not solve this problem. That paragraph makes the sweeping legal conclusion that the defendants "possessed market power sufficient to inhibit competition on a market-wide basis," but it does not allege facts to show that this supposed "market power" actually was used to harm competition. (Opp. 28.) Courts regularly dismiss on the pleadings cases failing to allege injury to the competition, other than conclusory allegations. *See Building Materials Corp. of America* v. *Rotter*, __ F. Supp. 2d __ , 2008 WL 442135, at *3-5 (E.D. Pa. Feb. 15, 2008); *Kasada,* 2004 WL 2903776, at *8 (granting motion to dismiss Section 1 claim and finding that plaintiffs did not allege antitrust injury because "plaintiffs' claims center on their injury alone and not on a broader injury to competition generally"); *Mathias* v. *Daily News, L.P.,* 152 F. Supp. 2d 465, 479 (S.D.N.Y. 2001) ([P]rivate antitrust plaintiffs must allege harm to competition in the market rather than primarily harm to themselves.").

Because plaintiff has not alleged any facts in the Complaint to show harm to competition in a relevant market, the Complaint should be dismissed. *See, e.g.*, *Granite Partners, L.P.* v. *Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 297-98 (S.D.N.Y. 1998) (dismissing complaint containing only conclusory allegation that "nationwide competition and trade were injured . . . in relevant market under the Sherman Act").[8]

---

[8]   Further plaintiff has also failed to allege an antitrust injury by failing to allege a relevant market in which competition has been harmed. Contrary to plaintiff's assertions, the Third Circuit has held that "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable

**V.**

## THE COMPLAINT IS BARRED BY THE STATUTE OF LIMITATIONS

The four-year statute of limitations periods of both the Sherman Act and the Donnelly Act bar plaintiff's claims as a matter of law because those claims -- which were asserted on September 17, 2007 -- are based on acts that are alleged to have occurred prior to September 17, 2003.

Plaintiff argues that, because the alleged conspiracy "*continued* after September 17, 2003," and because damages "remained speculative" until Factory 2-U declared bankruptcy on January 13, 2007, the cause of action did not begin to accrue until January 13, 2007. (Opp. 33 (emphasis added).) But plaintiff's own Complaint does not support that position. According to the Complaint, all of the unlawful "information exchanges and agreements" among the defendants took place "at least as early as 2002," and continued up to September 17, 2003. (Cmplt. ¶ 35; *see also* Cmplt.¶¶ 9, 37-38, 56.) The Complaint alleges no facts to suggest that any unlawful discussions or agreements took place after September 17, 2003.

Nor does plaintiff cite to any authority that would support the conclusion that Factory 2-U's alleged damages only materialized and became ascertainable on the date that it sought bankruptcy protection.[9] Rather, according to the Complaint, damages would have been incurred at

---

interchangeability and cross-elasticity of demand...the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City, Inc.* v. *Dominio's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (affirming grant of motion to dismiss for failure to allege relevant market); *Building Materials Corp.*, 2008 WL 442135, at *5 (granting motion to dismiss Section 1 counterclaim because the court "is not required to accept [defendant's] definition of the relevant product market because it is a legal conclusion couched as a factual allegation that is unsupported by [defendant's] filings" (internal citations omitted)). Plaintiff does not deny that it must allege cross-elasticity of demand, and yet plaintiff fails to refute CIT and the other defendants' argument that by alleging that "about 80% of garment manufacturers relied on factors for their credit needs," (Cmplt. ¶ 12), plaintiff essentially concedes that the other 20% relied on other sources of credit that are interchangeable with factoring. (CIT Mem. 24-25.)

[9] Indeed, as set forth above, plaintiff has not even alleged damage that would support his antitrust claim because he has not alleged any marketwide harm to competition. *See* Section IV, *supra*.

16

the time Factory 2-U's "credit costs" were increased and it was "deprived of adequate inventory". (*See, e.g.*, Cmplt. ¶¶ 10, 32, 37, 45, 48, 52.) Any damages could have been calculated at that time. *See, e.g., Higgins* v. *NYSE*, 755 F. Supp. 113, 116 (S.D.N.Y. 1991) (concluding that under *Zenith Radio Corp.* v. *Hazeltine Research, Inc.,* 401 U.S. 321 (1971), plaintiff's alleged antitrust damages were not "so speculative" that he could not have sued in a timely manner and that "[m]ere uncertainty as to the precise amount of damages" was insufficient to toll the statute of limitations).

Nor does the Complaint adequately allege facts that would support plaintiff's argument that defendants' "fraudulent concealment" tolled the statute of limitations. *See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1178-79 (3d Cir. 1993) (finding of fraudulent concealment rests on proof of (1) affirmative acts of concealment, which (2) misled plaintiff, and that (3) plaintiff exercised due diligence to discover the alleged wrongdoing). Plaintiff has not pled any of these elements with the required particularity. *See Davis* v. *Grusemeyer*, 996 F.2d 617, 624 n.13 (3d Cir. 1993). Plaintiff acknowledges in his brief that he cannot demonstrate any "affirmative act of concealment" by defendants. His attempt to avoid this requirement by alleging that the alleged conspiratorial communications were "conducted secretly," and that because of this the conspiracy was "self-concealing," fails as a matter of law. *See, e.g., Supermarket of Marlington* v. *Meadow Gold Dairies*, 71 F.3d 119, 123 (4th Cir. 1995) (holding that in the context of alleged price-fixing in the case that the application of the "self-concealing" doctrine would be "improper").

Further, plaintiff's argument that the *Kasada* case did not place Factory 2-U on notice of the factual bases for its claims, and the suggestion that to so hold would create an "affirmative duty to investigate every single antitrust violation that Defendants were committing during the tolling period" (Opp. 35), is nonsensical: the *Kasada* case involved facts virtually identical to those

17

here -- *i.e.,* the exchange of credit information among factors allegedly resulting in a parallel denial of credit. *Kasada,* 2004 WL 2903776, at *2. And, of course, Factory 2-U would have been on notice of its claims because it would have been aware of any reductions in credit offered by defendants. For these reasons, and those set forth in our opening brief, plaintiff cannot prevail on his fraudulent concealment defense as a matter of law. His antitrust claims are barred by the statute of limitations.

## CONCLUSION

For the reasons stated herein and in its initial memorandum of law, CIT

respectfully requests that the Court grant its motion to dismiss the Complaint with prejudice.

Dated:   April 2, 2008

BLANK ROME LLP

By: /s/ Christine Azar
    Michael DeBaecke (ID No. 3186)
    Christine Azar (ID No. 4170)

Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington, DE 19801
Debaecke@BlankRome.com
(302) 425-6400

and

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

Robert A. Atkins
Daniel H. Levi
Robin D. Fineman

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for Defendant The CIT
Group/Commercial Services Inc.*

19

# UNREPORTED CASES

**1**

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 442135 (E.D.Pa.)
**(Cite as: --- F.Supp.2d ----)**

Page 1

Building Materials Corp. of America v. Rotter
E.D.Pa.,2008.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
BUILDING MATERIALS CORPORATION OF
AMERICA, et al., Plaintiffs,
v.
Martin J. ROTTER, et al., Defendants.
**Civil Action No. 06-1490.**

Feb. 15, 2008.

**Background:** Dominant manufacturer and marketer
of commercial and residential roofing products and
accessories brought action against inventor and his
corporations alleging breach of contract, common
law trademark infringement, false designation of
origin under Lanham Act, trademark dilution, false
and misleading advertising, product disparagement,
unfair competition, and constructive trust disgorge-
ment. Defendants counterclaimed alleging violation
of federal antitrust law, false advertising under Lan-
ham Act, unfair competition, tortious interference
with prospective business advantage, breach of con-
tract, fraud, breach of covenant of good faith and
fair dealing, unjust enrichment, civil conspiracy,
and fraud and misrepresentation. Plaintiff brought
motion for to dismiss defendants' counterclaims.

**Holdings:** The District Court, Anita B. Brody, J.,
held that:
(1) rule of reason was appropriate standard to use
on antitrust claims;
(2) defendants did not adequately allege relevant
product market on claim of illegal restraint of trade;
and
(3) defendants did not adequately allege relevant
product market on monopoly leveraging claim.

Motion granted in part and denied in part.

**[1] Antitrust and Trade Regulation 29T ⟲⟳592**

29T Antitrust and Trade Regulation

29TVI Antitrust Regulation in General
29TVI(E) Particular Industries or Businesses
29Tk592 k. Manufacturers. Most Cited
Cases
Rule of reason was appropriate standard to use in
determining whether dominant manufacturer and
marketer of commercial and residential roofing
products and accessories had illegally restrained
trade in violation of Sherman Act, where dispute in-
volved non-price related vertical agreement
between manufacturer and component manufac-
turer. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[2] Antitrust and Trade Regulation 29T ⟲⟳535**

29T Antitrust and Trade Regulation
29TVI Antitrust Regulation in General
29TVI(A) In General
29Tk532 Judicially Created Tests of Leg-
ality
29Tk535 k. Rule of Reason. Most
Cited Cases

**Antitrust and Trade Regulation 29T ⟲⟳537**

29T Antitrust and Trade Regulation
29TVI Antitrust Regulation in General
29TVI(B) Cartels, Combinations, Contracts,
and Conspiracies in General
29Tk537 k. In General. Most Cited Cases
Ordinarily, whether particular concerted action il-
legally restrains trade in violation of the Sherman
Act is determined through case-by-case application
of the so-called rule of reason. Sherman Act, § 1,
15 U.S.C.A. § 1.

**[3] Antitrust and Trade Regulation 29T ⟲⟳592**

29T Antitrust and Trade Regulation
29TVI Antitrust Regulation in General
29TVI(E) Particular Industries or Businesses
29Tk592 k. Manufacturers. Most Cited
Cases
Product manufacturer had to explain why asphalt
shingle roof ridge vents were distinct from market

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for shingle roof ridge vents, roof ridge vents in general, or any other roofing products, and make reference to price of and/or demand for asphalt shingle roof ridge vents relative to roofing products industry as whole, and define relevant product market with reference to rule of reasonable interchangeability and cross-elasticity of demand, to support definition of relevant product market as asphalt shingle roof ridge vents, on claim of illegal restraint of trade under Sherman Act against dominant manufacturer and marketer of commercial and residential roofing products and accessories. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[4] Antitrust and Trade Regulation 29T ☜976**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk973 Evidence
                29Tk976 k. Presumptions and Burden of Proof. Most Cited Cases
The party asserting a violation of illegal restraint of trade provision of the Sherman Act always has the burden of defining the relevant product market. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[5] Antitrust and Trade Regulation 29T ☜557**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(C) Market Power; Market Share
            29Tk555 Relevant Market
                29Tk557 k. Product Market. Most Cited Cases
On a claim of illegal restraint of trade under the Sherman Act, the relevant product market is defined as those commodities reasonably interchangeable by consumers for the same purposes. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[6] Antitrust and Trade Regnlation 29T ☜557**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General

            29TVI(C) Market Power; Market Share
                29Tk555 Relevant Market
                    29Tk557 k. Product Market. Most Cited Cases
On a claim of illegal restraint of trade under the Sherman Act, the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[7] Antitrust and Trade Regulation 29T ☜557**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(C) Market Power; Market Share
            29Tk555 Relevant Market
                29Tk557 k. Product Market. Most Cited Cases
On a claim of illegal restraint of trade under the Sherman Act, when determining the outer boundaries of a product market, reasonable interchangeability of use implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[8] Antitrust and Trade Regulation 29T ☜557**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(C) Market Power; Market Share
            29Tk555 Relevant Market
                29Tk557 k. Product Market. Most Cited Cases
On a claim of illegal restraint of trade under the Sherman Act, when assessing reasonable interchangeability of use, a court should consider price, use, and qualities; the products in a relevant product market should be characterized by a cross-elasticity of demand where the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market. Sherman Act, § 1, 15 U.S.C.A. § 1.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2008 WL 442135 (E.D.Pa.)
**(Cite as: --- F.Supp.2d ----)**

**[9] Antitrust and Trade Regulation 29T ⚬⟳ 972(3)**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk972 Pleading
            29Tk972(2) Complaint
               29Tk972(3) k. In General. Most
Cited Cases
While a proper market definition can be determined in most cases only after a factual inquiry into the commercial realities faced by consumers, there is no per se prohibition against dismissal of a claim of illegal restraint of trade under the Sherman Act for failure to plead a relevant market. Sherman Act, § 1, 15 U.S.C.A. § 1; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[10] Antitrust and Trade Regulation 29T ⚬⟳ 620**

29T Antitrust and Trade Regulation
   29TVII Monopolization
      29TVII(A) In General
         29Tk619 Elements in General
            29Tk620 k. In General. Most Cited
Cases
In order to prevail upon a theory of monopoly leveraging, a plaintiff must prove threatened or actual monopoly in the leveraged market, not mere competitive advantage.

**[11] Antitrust and Trade Regulation 29T ⚬⟳ 687**

29T Antitrust and Trade Regulation
   29TVII Monopolization
      29TVII(E) Particular Industries or Busi- nesses
         29Tk687 k. Manufacturers. Most Cited
Cases
Product manufacturer did not state claim of monopoly leveraging on allegation that dominant manufacturer and marketer of commercial and residential roofing products and accessories "used its monopoly power in the market for asphalt shingle roof ridge vents to foreclose competition in the separate market for roofing materials." Sherman Act, § 2, 15 U.S.C.A. § 2.

**[12] Antitrust and Trade Regulation 29T ⚬⟳ 687**

29T Antitrust and Trade Regulation
   29TVII Monopolization
      29TVII(E) Particular Industries or Busi- nesses
         29Tk687 k. Manufacturers. Most Cited
Cases
Product manufacturer had to explain why asphalt shingle roof ridge vents were distinct from market for shingle roof ridge vents, roof ridge vents in general, or any other roofing products, and make reference to price of and/or demand for asphalt shingle roof ridge vents relative to roofing products industry as whole, and define relevant product market with reference to rule of reasonable interchangeability and cross-elasticity of demand, to support definition of relevant product market as asphalt shingle roof ridge vents, on monopolization claim under Sherman Act against dominant manufacturer and marketer of commercial and residential roofing products and accessories. Sherman Act, § 2, 15 U.S.C.A. § 2.

**[13] Antitrust and Trade Regulation 29T ⚬⟳ 620**

29T Antitrust and Trade Regulation
   29TVII Monopolization
      29TVII(A) In General
         29Tk619 Elements in General
            29Tk620 k. In General. Most Cited
Cases
To prevail on a monopolization claim under the Sherman Act, the party alleging monopolization must prove: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from the growth or development as a consequence

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
Page 4
--- F.Supp.2d ----, 2008 WL 442135 (E.D.Pa.)
**(Cite as: --- F.Supp.2d ----)**

of a superior product, business acumen, or historic accident. Sherman Act, § 2, 15 U.S.C.A. § 2.

**[14] Antitrust and Trade Regulation 29T ☞ 713**

29T Antitrust and Trade Regulation
  29TVIII Attempts to Monopolize
    29TVIII(A) In General
      29Tk712 Elements in General
        29Tk713 k. In General. Most Cited Cases

**Antitrust and Trade Regulation 29T ☞714**

29T Antitrust and Trade Regulation
  29TVIII Attempts to Monopolize
    29TVIII(A) In General
      29Tk712 Elements in General
        29Tk714 k. Chance of Success in the Relevant Market. Most Cited Cases

**Antitrust and Trade Regulation 29T ☞715**

29T Antitrust and Trade Regulation
  29TVIII Attempts to Monopolize
    29TVIII(A) In General
      29Tk712 Elements in General
        29Tk715 k. Intent. Most Cited Cases
A party alleging attempted monopolization under the Sherman Act must prove that its opponent: (1) engaged in predatory or anti-competitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power. Sherman Act, § 2, 15 U.S.C.A. § 2.

**[15] Antitrust and Trade Regulation 29T ☞41**

29T Antitrust and Trade Regulation
  29TII Unfair Competition
    29TII(A) In General
      29Tk40 Passing Off or Palming Off
        29Tk41 k. In General. Most Cited Cases
A claim of unfair competition under Pennsylvania law requires proof that the defendant has "passed off" the goods of one manufacturer or vendor as

those of another, thus creating confusion between his own goods, and those of the rival. Restatement (Third) Unfair Competition § 1.

**[16] Antitrust and Trade Regulation 29T ☞50**

29T Antitrust and Trade Regulation
  29TII Unfair Competition
    29TII(A) In General
      29Tk49 Practices Involving Particular Relationships
        29Tk50 k. In General. Most Cited Cases
In Pennsylvania, tortious interference may form the basis of a claim for unfair competition. Restatement (Third) Unfair Competition § 1.

Glenn P. Callahan, Therese M. Keeley, Keeley & Callahan, PC, Cape May, NJ, Paul T. Qualey, Kenyon & Kenyon, New York City, for Plaintiffs.
Robert J. Reger, Jason S. Garber, Reger Rizzo Kavulich & Darnall LLP, Anthony S. Volpe, Randolph J. Huis, Volpe & Koenig PC, Philadelphia, PA, for Defendants.

### *MEMORANDUM AND ORDER*

ANITA B. BRODY, District Judge.
**\*1** Plaintiffs Building Materials Corporation of America, d/b/a GAF Materials Corporation ("GAFMC") and Building Materials Investment Corporation ("BMIC") [the aforementioned plaintiffs will be collectively referred to as "GAFMC"] brought this action against Martin J. Rotter, Ventco, Inc. ("Ventco") a nd Mongoose Products, Inc. ("Mongoose") [the aforementioned defendants will be collectively referred to as "Rotter"]. GAFMC's alleges that Rotter engaged in: (1) two counts of breach of contract; (2) common law trademark infringement; (3) false designation of origin in violation of 15 U.S.C. § 1125(a); (4) trademark dilution; (5) false and misleading advertising; (6) product disparagement; (7) unfair competition; and (8) constructive trust disgorgement. Rotter raises the following counterclaims against GAFMC: (1) four antitrust counts in violation of 15

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

U.S.C. §§ 1 and 2; (2) false advertising in violation of 15 U.S.C. § 1125(a); (3) unfair competition; (4) tortious interference with prospective business advantage; (5) three counts of breach of contract; (6) fraud; (7) breach of the covenant of good faith and fair dealing; (8) unjust enrichment; (9) civil conspiracy; and (10) fraud and misrepresentation. Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367.

Currently before me is GAFMC's motion to dismiss the following counterclaims: (1) the four antitrust counts, which allege violations of 15 U.S.C. §§ 1 and 2; (2) unfair competition; (3) tortious interference with prospective business advantage; (4) civil conspiracy; (5) fraud; and (6) fraud and misrepresentation. For the reasons stated below, I grant GAFMC's motion to dismiss Rotter's counterclaims alleging violations of the 15 U.S.C. §§ 1 and 2. I do not permit Rotter leave to amend his counterclaims in order to re-plead the antitrust violations.FN1 Additionally, I deny GAFMC's motion to dismiss the state law claims.

**I. BACKGROUND**FN2

Plaintiff GAFMC is the dominant manufacturer and marketer of commercial and residential roofing products and accessories. Defendant Martin J. Rotter is the named inventor of the Cobra Ridge Vent, an attic ventilation product. In 1992, GAFMC and Rotter entered into a Patent and Know-How Agreement. In the agreement, GAFMC agreed to pay Rotter royalties for ten years on products sold by GAFMC employing the Cobra Technology. In exchange, Rotter granted GAFMC exclusive license to the existing patents related to the Cobra Technology and to any inventions related to the Cobra technology that Rotter developed during the period in which he received royalties. Under the agreement, GAFMC owed Rotter a duty to use its best efforts to develop, market and sell products utilizing the technology. However, GAFMC refused to perform this obligation.

The Patent and Know-How Agreement terminated in July 2002 and on September 5, 2002, Rotter received the final royalty payment from GAFMC. In August 2004, more than two years after termination of the Patent and Know-How Agreement, Rotter began work on a different ridge vent for asphalt roofs. The patent applications for this ridge vent were initially filed on January 31, 2005. These patent applications described the asphalt roof ridge vent product that Rotter planned to market as the Mongoose Ridge Vent. In 2005, Rotter began selling the Mongoose Ridge Vent. Both the Cobra Ridge Vent and the Mongoose Ridge Vent require, as an essential component of manufacture, the use non-woven mesh.

**\*2** Rotter claims that GAFMC breached its contract with him by failing to use its best efforts to develop, market, and sell products using the Cobra Technology. Additionally, Rotter alleges that GAFMC engaged in several other violations of the law, many of which are the result of the reliance by both Cobra and Mongoose on the use of non-woven mesh in their manufacture. Rotter alleges that in 2005, there were only four United States suppliers of non-woven mesh: Loren Products ("Loren"), Glit/Microtron ("Glit"), Americo, and Washington International Non-Wovens, LLC ("WIN"). However, Loren and Glit were both owned by the same corporate parent, KATY Industries ("KATY").

In 2005, GAFMC had contracts with KATY and Americo to supply non-woven mesh. GAFMC's contract with Americo was for an exclusive supply of non-woven mesh that prevented Americo from selling it to other roofing companies. In 2005, Rotter had a contract to purchase non-woven mesh from WIN. In August 2005, KATY announced that it had purchased WIN.

Rotter alleges that GAFMC engaged in contract talks with KATY in which an agreement was reached that KATY would exclusively provide non-woven mesh to GAFMC, as long as GAFMC guaranteed a yearly amount of business. Rotter claims

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 8 of 104

Page 100 of 104

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 442135 (E.D.Pa.)
(Cite as: --- F.Supp.2d ----)

Page 6

that GFAMC had no need for this exclusive contract and that GFAMC entered the exclusive agreement with the intent to harm Mongoose. As a result of these contract talks, Rotter alleges that in August/September of 2005, KATY stopped selling non-woven mesh to Rotter for use in the Mongoose product. Due to GAFMC's exclusive contracts with Americo and KATY, the only U.S. suppliers of non-woven mesh, Rotter was forced to purchase non-woven mesh from overseas.

## II. LEGAL STANDARD

According to Fed.R.Civ.P. Rule 12(b)(6), a court must grant a motion to dismiss if the plaintiff fails "to state a claim upon which relief can be granted."In deciding a motion to dismiss pursuant to Fed.R.Civ.P. Rule 12(b)(6), the court must accept as true the well-pleaded allegations of the complaint and draw all reasonable inferences in the plaintiff's favor. *Brown v. Card Serv. Ctr.,* 464 F.3d 450, 452 (3d Cir.2006). However, it is "not bound to accept as true a legal conclusion couched as a factual allegation."*Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)."While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."*Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007) (internal quotations omitted).

## III. DISCUSSION

### A. Sherman Act-Section 1

[1]Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce among the several States, or with foreign nations, is declared to be illegal."15 U.S.C. § 1. Rotter alleges that GAFMC's agreement with KATY to

exclusively supply non-woven mesh for use in asphalt ridge products to GAFMC illegally restrained trade in violation of Section 1.

*3 [2]"Ordinarily, whether particular concerted action violates § 1 of the Sherman Act is determined through case-by-case application of the so-called rule of reason."*Bus. Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). In *Bus. Electronics,* the United States Supreme Court held that courts should apply the rule of reason in cases involving vertical non-price restraints. 485 U.S. at 724, 108 S.Ct. 1515.Additionally, in 2007, the United States Supreme Court held that all "[v]ertical price restraints are to be judged according to the rule of reason."*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* ---U.S. ----, ----, 127 S.Ct. 2705, 2725, 168 L.Ed.2d 623 (2007). In this case, both parties agree that their dispute involves a non-price related vertical agreement between GAFMC and KATY. Therefore, the rule of reason is the appropriate standard to use in determining whether GAFMC has illegally restrained trade.

[3] To establish a violation of 15 U.S.C. § 1, Rotter must prove: (1) concerted action by GAFMC; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that Rotter was injured as a proximate result of the concerted action. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.* 124 F.3d 430, 442 (3d Cir.1997). Rather than analyze each factor necessary to establish a Section 1 violation, I will focus my attention on the second prong of this test that requires a plaintiff, in its claim, to allege a relevant product market.

[4][5][6][7][8] The party asserting a violation of Section 1 always has the burden of defining the relevant product market. *Id.* at 436."The relevant product market is defined as those 'commodities reasonably interchangeable by consumers for the same purposes.'"*Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715, 722 (3d Cir.1991) (quoting *United States v. E.I. du Pont de Nemours & Co.,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956))."The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."*Queen City,* 124 F.3d at 436 (quoting *Brown Shoe Co. v. U.S.,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Reasonable interchangeability of use "implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively."*Id.* at 437 (quoting *Allen-Myland, Inc. v. Int'l Bus. Machines Corp.,* 33 F.3d 194, 206 (3d Cir.1994)). In assessing reasonable interchangeability, a court should consider price, use, and qualities. *Tunis Bros.,* 952 F.2d at 722."The products in a relevant product market [should] be characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market."*Id.*

[9] While "[i]t is true that in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers," there is no *"per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under Fed.R.Civ.P. 12(b)(6)."*Queen City,* 124 F.3d at 436.According to the Third Circuit:

\*4 Where the plaintiff fails to define its proposed relevant market with reference to the rule of cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

*Id.* Hence, "if a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand, ... a court may grant a Rule 12(b) (6) motion."*Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ.,* 812 F.Supp. 387, 391 (S.D.N.Y.1993) (cited by *Queen City,* 124 F.3d at 437).

In *Fresh Made, Inc. v. Lifeway Foods, Inc.,* the court granted the defendant's motion to dismiss the antitrust claims because the plaintiff did "not ground its allegations regarding product market with reference to the rule of reasonable interchangeability and cross-elasticity of demand."2002 WL 31246922, \*5 (E.D.Pa.2002); *Accord Brotech Corp. v. White Eagle Int'l Techs. Group, Inc.,* 2003 WL 22797730, \*5 (E.D.Pa. Nov. 18, 2003) (dismissing an antitrust counterclaim because it "failed to define the relevant product market with reference to the rule of reasonable interchangeability of use or cross-elasticity of demand."). The plaintiff in *Fresh Made* identified the relevant product market as specialty Russian foods, including kefir (a yogurt type drink).*Id.* However, the plaintiff did "not allege facts establishing that the market for specialty Russian dairy products, such as kefir, [was] distinct from the market for yogurt, other drinkable yogurt products, or from other dairy products in general."*Id.* Additionally, there were "no allegations relating to the price of and/or the demand for kefir and other specialty Russian dairy products relative to products in the larger dairy market as a whole."*Id.* Furthermore, the plaintiff did not clarify "what relationship kefir [had] to other specialty Russian dairy products or why they [were] appropriately in the same product market."*Id.* The court dismissed the antitrust claim because the plaintiff failed to state whether there were any reasonably interchangeable alternatives for its products and did not explain why kefir and other specialty Russian dairy products formed an appropriate relevant market. *Id.* at \*5-6.

In this case, Rotter alleges that the relevant product market is asphalt shingle roof ridge vents. However, in neither his counterclaims nor his brief in response to the motion to dismiss, does Rotter provide any factual basis nor analysis to support his bare assertion that the relevant market is asphalt

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

shingle roof ridge vents. All that Rotter says in his counterclaim is that "[t]here is a relevant market for asphalt shingle roof ridge vent products ...." Amended Counterclaims, para. 103. Rotter does not explain why asphalt shingle roof ridge vents are distinct from the market for shingle roof ridge vents, roof ridge vents in general or any other roofing products. Rotter makes no reference to the price of and/or demand for asphalt shingle roof ridge vents relative to the roofing products industry as a whole. Rotter defines the relevant product market without reference to the rule of reasonable interchangeability and the cross-elasticity of demand.

*5 This Court is not required to accept Rotter's definition of the relevant product market because it is "a legal conclusion couched as a factual allegation" that is unsupported by Rotter's filings. *See Papasan,* 478 U.S. at 286, 106 S.Ct. 2932.There is no need to examine the other factors in the rule of reason test because Rotter's counterclaim fails to state a relevant product market for antitrust purposes. As a result of Rotter's failure to support his definition of the relevant product market, I grant GAFMC's motion to dismiss the counterclaim alleging violation of 15 U.S.C. § 1

## *B. Sherman Act-Section 2*

[10][11][12]Section 2 of the Sherman Act states that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations shall be deemed guilty of a felony."15 U.S.C. § 2 . Rotter alleges three counts of violation of Section 2. He claims that GAFMC: (1) maintained a monopoly over the asphalt shingle roof ridge vent market; (2) attempted to maintain a monopoly over the asphalt shingle roof ridge vent market; and (3) leveraged its monopoly power in the asphalt shingle roof ridge vent market to foreclose competition in the separate market for roofing materials.[FN3]

[13][14] To prevail on a claim under Section 2 of the Sherman Act, the party alleging monopolization must prove: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from the growth or development as a consequence of a superior product, business acumen, or historic accident. *Queen City,* 124 F.3d at 437.Additionally, under Section 2, a party alleging attempted monopolization must prove that its opponent: (1) engaged in predatory or anti-competitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power. *Id.* at 442.

In order to determine whether there is a monopoly or a dangerous probability of monopolization, as is also necessary in Section 1, a court must examine the relevant product market. *Id.* at 437 and 442.Both Section 1 and Section 2 of the Sherman Act define the relevant product market by examining the rule of reasonable interchangeability of use and the cross-elasticity of demand. *Id.* at 442 n. 18.As explained earlier in this opinion, Rotter fails to allege a relevant product market under Section 1. For the same reasons, Rotter has not alleged a relevant product market under Section 2 of the Sherman Act. Therefore, I grant GAFMC's motion to dismiss all three counts of violations of 15 U.S.C. § 2.

## *C. State Law Claims*

[15][16] GAFMC seeks to dismiss several of Rotter's counterclaims that rely on state law. At this time, I deny GAFMC's motion to dismiss the state law claims of unfair competition,[FN4] to rtious interference with prospective business advantage, civil conspiracy, fraud, and fraud and misrepresentation.

## *ORDER*

*6 AND NOW, this *15th* day of February, 2008, it is **ORDERED** that Plaintiffs' Motion to Dismiss (Doc. # 46) is:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

• **GRANTED** as to the antitrust claims (Counts I-IV).

• **DENIED** without prejudice to be reasserted at a later stage in litigation as to the claims of unfair competition (Count VI), tortious interference with prospective business advantage (Count VII), civil conspiracy (Count XIV), and fraud and misrepresentation (Count XV)

• **DENIED** with prejudice as to the claim of fraud.

> FN1. I do not grant Rotter the chance to replead the antitrust violations because I already gave him this opportunity. In my June 26, 2007 Order (Doc. # 35), I gave Rotter the right to file an amended counterclaim. When Rotter filed his amended counterclaim, he was already on notice that he may not have properly stated the relevant product market because GAFMC had already filed a motion to dismiss Rotter's original counterclaims (Doc. # 15), in which it asserted that he had failed to allege a relevant product market.

> FN2. In reviewing a motion to dismiss pursuant to 12(b)(6), "all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party."*Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). Because this is a motion to dismiss directed to defendants' counterclaims, I state the facts in the light most favorable to the defendants.

> FN3. As to the leveraging claim, according to the Third Circuit, "in order to prevail upon a theory of monopoly leveraging, a plaintiff must prove threatened or actual monopoly in the leveraged market," not mere "competitive advantage." *Fineman v.*

*Armstrong World Indus., Inc.,* 980 F.2d 171, 206 (3d Cir.1992). Rotter's claim of monopoly leveraging is based solely upon his statement that GAFMC "used its monopoly power in the market for asphalt shingle roof ridge vents to foreclose competition in the separate market for roofing materials."This pleading is insufficient to establish a claim for monopoly leveraging. Hence, Rotter's monopoly leveraging claim fails because there is no proof of a threatened or actual monopoly in the leveraged market and Rotter has failed to allege a relevant product market.

> FN4. As to the unfair competition claim, according to the Third Circuit, "[a] claim of unfair competition under Pennsylvania law requires proof that the defendant has 'passed off' the goods of one manufacturer or vendor as those of another, thus creating confusion between his own goods, and those of the rival."*Scanvec Amiable Ltd. v. Chang,* 80 Fed.Appx. 171, 180 (3d Cir.2003) (citing to *Penn. State Univ. v. Univ. Orthopedics, Ltd.,* 706 A.2d 863, 870-71 (Pa.Super.Ct.1998)) ("The gist of the action lies in the deception practiced in 'passing off' the goods of one for that of another.") In recent years, the Pennsylvania Court of Common Pleas has begun to define unfair competition according to its definition in the Restatement (Third) Unfair Competition § 1 (1995).*See e.g. Babiarz v. Bell Atl.-Pa., Inc.,* 2001 WL 1808554, at *9 (Pa.Com.Pl. July 10, 2001); *Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Med. Serv., Inc.,* 1995 WL 842000, at *1-2 (Pa.Com.Pl. Oct. 18, 1995). Under the Restatement (Third), "[o]ne who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless ... the harm results from ... other

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 442135 (E.D.Pa.)
**(Cite as: --- F.Supp.2d ----)**

acts or practices of the actor determined to be actionable as an unfair method of competition."According to Comment G of the Restatement (Third), "[a]s a general matter, if the means of competition are otherwise tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition."Hence, tortious interference may form the basis of a claim for unfair competition. *ID Security Sys. Canada, I nc. v . Checkpoint Sys., Inc.,* 249 F.Supp.2d 622, 688 (E.D.Pa.2003). Several judges in the Eastern District of Pennsylvania have applied the Restatement (Third) definition of unfair competition when faced with a Pennsylvania state law unfair competition claim. *See, e.g., Synthes (USA) v. Globus Med., Inc.,* 2005 WL 2233441, at *9 (E.D.Pa. Sept. 14, 2005); *Id Security,* 249 F.Supp.2d at 688;*Air Products and Chemicals, Inc. v. Inter-Chemical, Ltd.,* 2003 WL 22917491, at *12 (E.D.Pa. Dec. 2, 2003); *Fresh Made,* 2002 WL 31246922, at *9. To date, however, no appellate court in Pennsylvania has applied the Restatement (Third) to the common law tort of unfair competition. Therefore, I deny the motion to dismiss Rotter's claim of unfair competition without prejudice to be reasserted at a later stage in litigation with the hope that, in the near future, Pennsylvania courts will provide more guidance on this issue.

E.D.Pa.,2008.

Building Materials Corp. of America v. Rotter
--- F.Supp.2d ----, 2008 WL 442135 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**2**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
(Cite as: Not Reported in F.Supp.2d)

Page 1

**C**
Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc.
S.D.N.Y.,2002.

United States District Court, S.D. New York.
DRESSES FOR LESS, INC., DFL Management Inc., the DFL Apparel Group, an unincorporated association, Allison Che' Fashions, Inc., Bicci Studio Ltd., Garden City Dresses for Less, Donald Weiner and Barbara Weiner, individually and derivatively as a shareholder of Stella N. Bishop Fashion Corp., and I.S.B. Fashions Corp., Plaintiffs,
v.
CIT GROUP/COMMERCIAL SERVICES, INC. and THE UPTOWN CREDIT GROUP, INC., Defendants.
**No. 01 CIV. 2669(WHP).**

Sept. 30, 2002.

Garment manufacturers and related entities or their principles brought action against domestic factor for garment industry, alleging price-fixing and monopoly claims under the Sherman Act and New York law Donnelly Act and common law contract claims. Defendant moved to dismiss. The District Court, Pauley, J., held that: (1) allegations supported group boycott claims; (2) manufacturers failed to state price-fixing claim against factor; (3) issues of fact regarding relevant product market could not be resolved at motion to dismiss; (4) allegations supported monopoly claims; (5) allegations supported good faith and fair dealing contract claims against factor; and (6) lack of contractual privity precluded certain good faith and fair dealing contract claims.

Motion granted in part and denied in part.

West Headnotes

**[1] Antitrust and Trade Regulation 29T** 972(3)

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk972 Pleading
                29Tk972(2) Complaint
                    29Tk972(3) k. In General. Most Cited Cases
    (Formerly 265k28(6.2))
Allegations that domestic factor for garment industry and other factors collectively decided whether to deny credit to a particular manufacturer, and that the factors met biweekly and acted unanimously toward garment manufacturer, supported manufacturers' group boycott Sherman Act and New York law Donnelly Act restraint-of-trade claims against domestic factor, although factor claimed that manufacturers' theory lacked economic rationality. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.; McKinney's General Business Law § 340.

**[2] Antitrust and Trade Regulation 29T** 963(3)

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk963 Injury to Business or Property
                    29Tk963(3) k. Particular Cases. Most Cited Cases
    (Formerly 265k28(1.4))
Allegations that domestic factor for garment industry agreed with other factors that once domestic factor agreed to refuse to credit check a garment manufacturer other actors would also refuse to check the manufacturer's credit and that factor could cripple garment manufacturer through control of piece goods sellers' purchases supported existence of antitrust injury under Clayton Act, as re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
(Cite as: Not Reported in F.Supp.2d)

quired for manufacturer's group boycott Sherman Act and New York law Donnelly Act restraint of claims suit against domestic factor. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.; Clayton Act, 15 U.S.C.A. § 15(a); ; McKinney's General Business Law § 340.

**[3] Antitrust and Trade Regulation 29T ☞ 972(3)**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk972 Pleading
            29Tk972(2) Complaint
               29Tk972(3) k. In General. Most Cited Cases
   (Formerly 265k28(6.2))
Garment manufacturers failed to state Sherman Act or New York law Donnelly Act price-fixing claim against domestic factor for garment industry; although manufacturers alleged conspiracy that was a product of a horizontal agreement, manufacturers alleged that domestic factor and co-conspirators singled out certain manufacturers in denying credit, and manufacturers failed to state how market-wide denial of credit to specific companies affected market prices and to allege that factors discussed any prices or terms for factoring services. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.; ; McKinney's General Business Law § 340.

**[4] Antitrust and Trade Regulation 29T ☞ 972(3)**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk972 Pleading
            29Tk972(2) Complaint
               29Tk972(3) k. In General. Most Cited Cases
   (Formerly 265k28(6.2))
Issue of whether garment manufacturer alleged rel-

evant product market could not be resolved at motion to dismiss phase, on manufacturers' Sherman Act and New York law Donnelly Act antitrust monopoly claims against domestic factor, because of factual dispute as to market definition of factoring in domestic garment manufacturing industry and whether factoring was distinguishable from other forms of credit financing. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2; ; McKinney's General Business Law § 340.

**[5] Antitrust and Trade Regulation 29T ☞ 670**

29T Antitrust and Trade Regulation
   29TVII Monopolization
      29TVII(E) Particular Industries or Busi- nesses
         29Tk670 k. In General. Most Cited Cases
   (Formerly 265k12(1.3))
Allegations that domestic factor increased its market share of domestic piece goods manufacturing to 90% through acquisition of competitors, giving it a "near stranglehold on garment manufacturers" because of its practice of making unilateral decisions equivalent to "blacklisting a manufacturer among factors" supported market power element of manufacturers' Sherman Act and New York law Donnelly Act claims that domestic factor abused monopoly power. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[6] Antitrust and Trade Regulation 29T ☞ 972(3)**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk972 Pleading
            29Tk972(2) Complaint
               29Tk972(3) k. In General. Most Cited Cases
   (Formerly 265k28(6.3))
Allegations that, through domestic factor's control of the piece goods market for garment industry, domestic factor influenced other factors to deny credit

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
**(Cite as: Not Reported in F.Supp.2d)**

checks, and therefore financing, to garment manufacturers that could have been financed under normal market conditions, and thus discouraged other factors from participation in factoring for garment industry, supported manufacturers' claims against domestic factor under anti-monopoly provisions of Sherman Act and New York law Donnelly Act. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[7] Antitrust and Trade Regulation 29T ☜ 963(3)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk963 Injury to Business or Prop- erty
                    29Tk963(3) k. Particular Cases.
Most Cited Cases
    (Formerly 265k28(1.4))
Injuries underlying derivative antitrust claims, by related entities of manufacturer and principles of garment manufacturer against domestic factor for garment industry, were not the sort of injury at which antitrust laws were directed, and thus principles lacked standing, although manufacturer had standing to bring Sherman Act price-fixing and monopoly claims. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

**[8] Antitrust and Trade Regulation 29T ☜ 972(3)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk972 Pleading
                29Tk972(2) Complaint
                    29Tk972(3) k. In General. Most Cited Cases
    (Formerly 265k28(6.2))
Shareholder's allegations regarding other shareholders' refusal to consent to initiate Sherman Act price-fixing and monopoly claims against domestic factor in garment industry supported shareholder's claim that it would have been futile to secure initiation of claims with company boards, rather than as derivative shareholder claims; as to one corporation, shareholder who brought suit claimed that other 50% shareholder refused to consent, and as to other corporation, shareholder alleged that any dissenting shareholder could block corporate action and other shareholders refused to consent. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.; Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.

**[9] Antitrust and Trade Regulation 29T ☜ 963(3)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk963 Injury to Business or Prop- erty
                    29Tk963(3) k. Particular Cases.
Most Cited Cases
    (Formerly 265k28(1.6))
Garment manufacturers' organization lacked standing to bring Sherman Act anti-monopoly and price-fixing claims, seeking money damages, against domestic factor for garment industry; fact and extent of injury required individualized proof by each company affected by the alleged anticompetitive behavior. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

**[10] Factors 167 ☜51**

167 Factors
    167k48 Rights, Powers, and Liabilities as to Third Persons
        167k51 k. Contracts in General. Most Cited Cases
Allegations that domestic factor for garment industry deliberately inflated garment manufacturers'

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
**(Cite as: Not Reported in F.Supp.2d)**

debt by authorizing piece goods vendors to ship un-ordered merchandise to manufacturers supported manufacturers' New York law good faith and fair dealing contract claims against factor.

**[11] Factors 167 ☞51**

167 Factors
  167k48 Rights, Powers, and Liabilities as to Third Persons
    167k51 k. Contracts in General. Most Cited Cases
Lack of contractual privity between domestic factor for garment industry and association of garment manufacturers precluded any good faith and fair dealing contract claims by association against factor.

**[12] Federal Civil Procedure 170A ☞1831**

170A Federal Civil Procedure
  170AXI Dismissal
    170AXI(B) Involuntary Dismissal
      170AXI(B)5 Proceedings
        170Ak1827 Determination
          170Ak1831 k. Fact Issues. Most Cited Cases
Issue of whether domestic factor for garment in-dustry breached fiduciary duty to principal of man-ufacturer could not be resolved at motion to dismiss phase because of factual dispute as to whether fidu-ciary relationship existed between parties. Restate-ment (Second) of Torts § 874.

Alexander H. Schmidt, Esq., Wolf Haldenstein Adler Freeman & Herz LLP, New York, for Plaintiffs.
Robert A. Atkins, Esq., Paul, Weiss, Rifkind, Wharton & Garrison, New York, for Defendant CIT Group/Commercial Services, Inc.
Bernard Beitel, Esq., Otterbourg, Steindler, Hous-ton & Rosen, P.C. , New York, for Defendant CIT Group/Commercial Services, Inc.
Harlan M. Lazarus, Esq., Larazus & Lazarus, P.C., New York, for Defendant The Uptown Credit Group, Inc.

*MEMORANDUM AND ORDER*

PAULEY, District J.
*1 Plaintiffs are garment manufacturers and related entities or their principals. Defendant CIT Group/ Commercial Services, Inc. ("CIT") is the largest domestic factor for the garment industry.

Plaintiffs assert that CIT and its predecessors con-spired with other factoring companies to deny cred-it to certain garment manufacturers. Plaintiffs claim that the factors illegally boycotted their businesses and unlawfully fixed prices in violation of the Sher-man Antitrust Act, 15U.S.C. § 1 ("Section 1"). Plaintiffs further allege that CIT, by merging with or acquiring its competitors, obtained monopoly power in the garment factoring industry, in viola-tion of the Sherman Antitrust Act, 15U.S.C. § 2 ("Section 2"). Plaintiffs also assert common law claims for breach of contractual good faith and fair dealing and breach of fiduciary duty.

Defendants move to dismiss the amended complaint pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. For the following reasons, defendants' motion is granted in part and denied in part.

*Background*

Factoring is a business relationship in which com-panies known as "factors" purchase at a discount other businesses' rights to collect accounts receiv-able. The discount usually ranges from approxim-ately 0.5 to 0.9 percent of the accounts. The factor then collects the accounts receivable. (Am.Compl.¶¶ 38-39.)

Without the ability to quickly convert accounts re-ceivable into cash through factoring, a factor's cli-ents could be exposed to a liquidity crunch that would threaten their businesses. When a factor pur-chases an account receivable, it assumes the risk of collecting the receivable. (Am.Compl.¶ 39.) However, a factor assumes that credit risk only after it has checked whether its customer is selling to a creditworthy purchaser. (Am.Compl.¶¶ 39, 42.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 18 of Page 72 of 104

Not Reported in F.Supp.2d                                                                        Page 5
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
(Cite as: Not Reported in F.Supp.2d)

Moreover, factors like CIT may refuse to credit check a client's purchaser for any reason, even if that customer is creditworthy. (Am.Compl.¶ 41.) Because a manufacturer usually cannot afford to risk sales that are not acceptable to the factor, the factor's credit check decision often determines whether a sale is made. (Am. Compl ¶ 39.)

In the garment industry, a factor's clients may include the "piece goods" vendors that manufacture raw materials such as fabric, buttons, trim and other accessories, or garment manufacturers who purchase materials from piece good vendors. (Am. Compl. ¶ 41; Transcript from Oral Argument dated Nov. 16, 2001 ("Tr."), at 3.) Thus, when a factor's clients include both a piece goods vendor and a garment manufacturer who purchases from the piece goods vendor, the factor faces credit checking a purchaser who is also its own client. (Am.Compl. ¶ 41.)

Accepting the allegations in the amended compliant as true, the facts are as follows. Plaintiffs Allison Che' Fashions, Inc., Bicci Studio Ltd. ("Bicci"), and I.S.B. Fashions Corp. ("ISB"), Stella N. Bishop Fashion Corp. ("Stella Bishop") are defunct clothing manufacturers. (Am.Compl.¶¶ 12-15.) They grossed sales of $30,206,570, 48,492,233, and 53,800,273 for the fiscal years ending June 1998, 1999, and 2000 respectively. (Am.Compl.¶ 16.) Each manufacturer used CIT, or its predecessor Congress Talcott Corporation ("Congress"), as their factor for some period between 1996 and 2000. (Am.Com pl.¶¶ 12-15, 24.) Dresses For Less, Inc. ("Dresses For Less") is a garment manufacturer that was denied credit by CIT. (Am.Compl.¶ 18, 245) (collectively, Bicci Studio, ISB, Stella Bishop, and Dresses for Less are referred to as the "DFL Apparel companies"). Dresses For Less guaranteed some of the DFL Apparel companies' debts to CIT. (Am.Compl.¶ 18.)

*2 Plaintiff DFL Management Inc. operated the DFL Apparel companies. (Am.Compl.¶ 10.) Plaintiff DFL Apparel Group is an unincorporated business association comprised of the DFL Apparel

companies, and previously included other manufacturers who are not parties to this litigation. (Am.Compl.¶ 11.) Plaintiffs Donald and Barbara Weiner are principals of the DFL Apparel companies and their related entities and also personally guaranteed several of the DFL Apparel companies' debts to CIT. The Weiners have lost approximately $2,600,000 in personal assets as a result of defaults. (Am.Compl.17.) Barbara Weiner owns fifty percent of ISB and forty-five percent of Stella Bishop. (Am.Compl.¶¶ 14-15.)

Plaintiff Garden City Dresses For Less ("GC Dresses For Less") leased property to DFL Apparel companies and lost more than $750,000 in annual rental income as a consequence of their defaults. (Am.Compl.¶ 19.)

CIT emerged as a dominant domestic factor after merging with its former competitors Congress and Heller Financial, Inc. in 1999 and 2000 respectively. (Am.Compl.¶ 28.) Those acquisitions caused CIT's market share in the factored retail garment industry to grow from nineteen to forty-one percent and its share of piece goods factoring to rise from fifty to ninety percent. (Am.Compl. ¶¶ 27, 60.) CIT factored approximately $26 billion of the entire domestic garment manufacturing industry. (Am.Compl.¶ 26.) CIT's largest competitor factors twenty-two percent of the market. (Am.Compl.¶ 26.)

Plaintiffs allege that CIT and several other factors formed an illegal cartel in 1924 and to this day operate as the single entity, currently known as defendant Uptown Credit Group, Inc. ("UCG"). (Am.Compl.¶¶ 25, 44.) Factors comprising the UCG include GMAC Commercial Credit LLC ("GMAC"), HSBC Business Credit (USA) Inc. ("HSBC"), the Receivable Capital Management Division of Sun Trust Banks, Inc. ("SunTrust"), Rosenthal & Rosenthal, Inc. ("Rosenthal"), Capital Factors, Inc. ("Capital"), Finova Capital Corp. ("Finova") and Sterling Factors Corp. ("Sterling") (Am.Compl.¶¶ 30-37.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
(Cite as: Not Reported in F.Supp.2d)

The UCG members account for approximately 80 to 85 percent of domestic garment manufacturer factoring. (Am.Compl.¶ 37.) Through acquisitions made between 1999 and 2001, including Finova, GMAC became the second largest factor in the industry with $14 billion in receivables purchased annually or twenty-two percent of the garment manufacturer factoring industry. (Am.Compl.¶ 30.) Finova previously factored $800 million, or 1.2 percent of the domestic garment manufacturing market. (Am.Compl.¶ 35.)

HSBC factors approximately $7 billion in annual receivables, or eleven percent of the industry. (Am.Compl.¶ 31.) Rosenthal controls 2.4 percent of the domestic garment manufacturing market with $1.5 billion in annual receivables. (Am.Compl.¶ 33.) Capital factors $800 million, or 1.2 percent, of the domestic garment manufacturing industry. (Am.Compl.¶ 34.) In recent years, Sterling also captured $800 million, or 1.2 percent, of the domestic garment manufacturer factoring industry. (Am. Compl. ¶ 36 .)

*3 Plaintiffs allege that the other factors have agreed with CIT that they will not credit check customers that CIT has refused to credit check even though they contracted to assume those customers' credit risks in factoring agreements. (Am.Compl.¶¶ 42, 54.) Plaintiffs also contend that CIT has refused to credit check customers due to its dislike of management or other reasons that are not related to their customers' creditworthiness. (Am. Compl. ¶ 41 .)

Once CIT refuses to credit check a sale from a piece goods vendor to a garment manufacturer, it stops checking every proposed sale to that manufacturer by any piece goods vendor. (Am.Comp.¶¶ 43, 49.) A manufacturer's inability to make credit purchases from a piece goods vendor will increase its costs, inhibit cash flow, and can within weeks disable the manufacturer's ability to fill existing orders from retailers. (Am.Compl.¶¶ 44, 53, 61.) Moreover, because CIT controls ninety percent of domestically factored piece goods vendors, other

factors quickly realize that a manufacturer who is not being credit checked by CIT cannot obtain enough credit to purchase the materials it requires. (Am.Compl.¶¶ 43, 61, 62.) Realizing that economic urgency, the other factors will quickly follow CIT's lead and refuse to check credit. (Am.Compl.¶¶ 61, 62, 63.) In addition, through its dominance in the garment manufacturing market via control over the piece goods vendors, CIT can also discourage garment manufacturers from purchasing from specific piece goods vendors. (Am.Compl.¶ 63.)

Plaintiffs allege that over the past two decades, CIT and its fellow factors conducted two highly secretive meetings every week. (Am.Compl.¶ 44.) The first meeting, known as the "Uptown meeting" is conducted every Wednesday by conspiring factors' account officers; the second, known as the "credit manager's meeting," is conducted every Thursday by the factors' credit managers. (Am.Comp.¶ 46.) At those meetings, the factors share not only publicly available information about their clients' creditworthiness, but also highly confidential information about their clients, including whether and why they have stopped credit checking a particular client. (Am.Compl.¶¶ 48, 51.) Thus, the factors' collective decision not to credit check a certain manufacturer assures that none of them will incur a credit risk for a customer who might be creditworthy but potentially faces insolvency due to one factor's decision to deny further credit for any reason. (Am.Compl.¶ 50.)

Beginning in February 1997, Kenwin Shops Incorporated ("Kcnwin"), a company controlled by Donald Weiner, was defending a civil action by the Bank of Louisiana ("BOL") in the Eastern District of Louisiana. See *In re: Bank of Louisiana / Kenwin Shoes Inc.,* No. 97 Civ. 1193(MDL), 1998 Lexis 11680, at *2 (E.D.La. July 27, 1998). That action resulted from Kenwin's failure to make payments to BOL in accord with their regular course of dealing. *Bank of Louisiana,* 1998 Lexis 11680, at *3. "Kenwin was collecting and holding money paid by customers of Kenwin that was due to BOL under

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 20 of Page 74 of 104

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
(Cite as: Not Reported in F.Supp.2d)

the Contract Agreement between them."*Bank of Louisiana,* 1998 Lexis 11680, at *3. In the course of that litigation, D & A Funding Corporation, another company controlled by Donald Weiner, asserted that it had priority to the monies owed to BOL.

*4 Both parties filed motions for injunctive relief. In support of an application for a continuance on the motions, counsel for Kenwin represented that the claimed funds were sequestered precluding any harm to BOL. *Bank of Louisiana,* 1998 Lexis 11680, at *3. After several months, the parties entered set-tlement discussions with the aid of the court to resolve their motions for injunctive relief. The parties stipulated that each would post a bond and there-after voluntarily dismiss the motions. *Bank of Louisiana,* 1998 Lexis 11680, at *6. In October 1997, Kenwin filed for Chapter 11 bankruptcy without informing BOL. *Bank of Louisiana,* 1998 Lexis 11680, at *6. On November 3, 1997, Kenwin offered a draft bond to BOL, but eleven days later, Kenwin's counsel informed BOL that it would not file it. *Bank of Louisiana,* 1998 Lexis 11680, at *7. At that time, the court first learned of Kenwin's bankruptcy petition. *Bank of Louisiana,* 1998 Lexis 11680, at *8.

The court conducted a hearing regarding Weiner's apparent "material misrepresentations and omissions" regarding the sequestered funds and the timing of Kenwin's bankruptcy. *Bank of Louisiana,* 1998 Lexis 11680, at *9. On July 27, 1998, the court sanctioned Donald Weiner after finding his testimony to be "disingenuous, obviously evasive and obfuscatory" and his memory to be "transparently convenient." *Bank of Louisiana,* 1998 Lexis 11680, at *9.

The *Bank of Louisiana* decision, however, had no adverse impact on the creditworthiness of the DFL Apparel companies. (Am.Compl.¶ 57.) By late 1998, the DFL Apparel companies were generating net sales of approximately $10 million per month. (Am.Compl.¶ 56.) As of September 1998, DFL Apparel companies had never been denied credit. (Am.Compl.¶ 56.) Nevertheless, CIT ceased ap-

proving credit to each DFL Apparel company shortly after the issuance of the *Bank of Louisiana* opinion and advised its co-conspirator factors of its decision. (Am.Compl.¶ 57.) Each of the co-conspirator factors stopped credit checking DFL Apparel companies the next day. (Am.Compl.¶ 57.) Although CIT eventually continued to extend cred-it, the DFL Apparel companies suffered millions of dollars in lost sales in the interim. (Am. Compl. ¶ 57 .)

In addition to colluding with the other factors, plaintiffs further allege that CIT engaged in bad faith conduct throughout their relationship that damaged the manufacturing plaintiffs. Plaintiffs contend that starting in 1996, Donald Weiner ad-vised CIT and numerous piece goods vendors orally and in writing that, as a condition to the guaranties of Donald Weiner, Barbara Weiner and Dresses for Less, no DFL Apparel company purchase order should be honored unless it bore his signature. (Am.Compl.¶ 69.) Despite expressly acknow-ledging that requirement in writing, CIT approved millions of dollars of sales to the DFL Apparel companies by CIT's factored piece goods vendors that were not supported by signed purchase orders. (Am.Compl.¶ 69.) As a result, the DFL Apparel companies suffered millions of dollars in losses and incurred millions in debt to CIT. (Am.Compl.¶ 69.)

*5 Moreover, although CIT had separate factoring agreements with each DFL Apparel company, CIT treated them as if they were one company by penal-izing every member when one company was delin-quent on its payments. Thus, a DFL Apparel com-pany with no credit or payment problems might nevertheless have its credit reduced or refused. (Am.Compl.¶ 70.) By treating the DFL Apparel Group as a single entity instead of several compan-ies, CIT applied one "collective credit limit" to the entire group. Thus, if the group limit had been ex-ceeded, CIT directed all DFL Apparel members to reduce their sales volumes and denied credit for piece goods purchases by DFL Apparel companies with remaining credit under their individual factor-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ing agreements. (Am.Compl.¶ 71.)

At some time in 2000, CIT orchestrated a boycott where the factors ceased authorizing piece goods vendors to sell goods to Dresses For Less and DFL Apparel companies. (Am.Compl.¶ 73.) Between September 30, 2000 and January 31, 2001, the DFL Apparel companies went out of business. (Am.Compl.¶ 73.)

Plaintiffs also assert that before those failures, CIT compelled certain DFL Apparel companies to accept substantial "overadvances of credit" that bore higher interest charges than normal advances. (Am Compl. ¶ 72.) Normally, a DFL Apparel company could obtain credit advances of up to 80 to 90 percent of the sales that it assigned to CIT. However, CIT had the discretion to extend overadvances for as much as 95 to 100 percent of assigned sales. (Am.Compl.¶ 72.) CIT regularly refused to approve credit for piece goods purchases by solvent DFL Apparel companies unless a fiscally unstable DFL company accepted an overadvance with a higher than normal interest rate and then applied the extra funds to debts it owed to piece goods vendors factored by CIT. (Am.Compl. ¶ 72.) As a result, the weaker DFL company could not purchase the piece goods and would face losing millions in sales or borrowing more at increased interest charges. (Am.Compl.¶ 72.)

Lastly, plaintiffs allege that CIT prolonged the failure of the DFL Apparel companies for several months in order to extract additional interest. (Am.Compl.¶ 75.) In June 2000, Donald Weiner discovered that CIT had approved several piece goods vendors' sales to DFL Apparel companies without first obtaining purchase orders signed by him. Concerned about his and other guarantors' exposure arising from the DFL Apparel companies' debts to CIT, Donald Weiner advised CIT that he was closing the DFL Apparel companies. (Am.Compl.¶ 75.) At that time, the DFL Apparel companies' inventories and accounts receivable exceeded their debts by 50 percent. (Am.Compl.¶ 75.) After receiving CIT's assurances that it would con-

tinue to finance and support the DFL Apparel companies, Weiner continued the businesses. (Am.Compl.¶ 75.) As a result, CIT received interest payments throughout 2000. Nevertheless, CIT stopped checking the DFL Apparel companies' credit causing them to fail. (Am.Compl.¶ 76.)

## Discussion

### I. Motion to Dismiss Standards

\*6 On a motion to dismiss pursuant to Rule 12(b)(6), a court typically must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). A court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995).

There are no heightened pleading requirements for antitrust cases. *Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir.2001). Further, dismissals of antitrust cases "prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly."*Todd,* 275 F.3d at 198 (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)). However, it is improper " 'to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." ' *Todd,* 275 F.3d at 198 (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

### II. Section One Violations

Plaintiffs allege that CIT conspired with other factors to boycott credit checks of plaintiff compan-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 22 of Page 76 of 104

Not Reported in F.Supp.2d                                                                                      Page 9
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
(Cite as: Not Reported in F.Supp.2d)

ies in violation of Section One, and that their boy-cott resulted in the price fixing of piece goods also in violation of Section One. (Am.Compl.¶¶ 80, 86, 87.)

Section One prohibits all combinations and conspir-acies that unreasonably restrain trade among the states. 15 U.S.C. § 1. To establish a Section One vi-olation, a plaintiff must produce evidence sufficient to show: "(1) a combination or some form of con-certed action between at least two legally distinct economic entities; and (2) such combination or con-duct constituted an unreasonable restraint of trade either *per se* or under the rule of reason."*Virgin At-lantic Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 273 (2d Cir.2001); *see also Tops Mkts., Inc., v. Quality Mkts. ., Inc.,* 142 F.3d 90, 96 (2d Cir.1998).

*Per se* illegal conduct is that which is so egregious as to constitute a violation of law without the ne-cessity of showing an effect on competition.*NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 133-34, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); *Bogan,* 166 F.3d at 513. Among conduct falling within the *per se* rule are price fixing, territorial market division and certain group boycotts involving concerted re-fusals to deal. *NYNEX Corp.,* 525 U.S. at 133;*Cap-ital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.,* 996 F.2d 537, 542-43 (2d Cir.1993). Only conduct that is "manifestly anticompetitive" is des-ignated as per se illegal. Most cases do not fall within the *per se* category. *Bogan,* 166 F.3d at 514;*see also CDC Techs., Inc. v. IDEXX Laborat-ories, Inc.,* 186 F.3d 74, 79 (2d Cir.1999) (only a "handful" of practices are per se illegal); *National Camp Assoc., Inc. v. Am. Camping Assoc., Inc.,* No. 99 Civ. 11853(DLC), 2000 WL 1844764, at *5 (S.D.N.Y. Dec.15, 2000) (noting Supreme Court's refusal to extend the class of agreements to which a per se analysis applies).

*7 Conduct that does not fall within the *per se* rule is subject to the rule of reason analysis. Application of this doctrine requires a plaintiff to prove not mere injury to plaintiff as a competitor but antitrust

injury, i.e., actual damage to competition within the relevant market. *Capital Imaging,* 996 F.2d at 542-43. The injury to a relevant market requirement assures that the Sherman Act protects competition as a whole in the relevant market, and "not the indi-vidual competitors within that market, so that a plaintiff may succeed only when the loss he asserts derives from activities that have a 'competition-reducing' ' effect. *Tops Mkts., Inc.,* 142 F.3d at 96 (citing *Atl. Richfield Co. v. USA Pet-roleum Co.,* 495 U.S. 328, 342-44, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)).

A plaintiff that fails to plead an actual injury to competition may nonetheless show antitrust injury by showing that the defendant possesses "market power" sufficient to inhibit competition on a mar-ket-wide basis. Such power is defined as the power to "raise prices significantly above the competitive level without losing all of one's business."*CDC Technologies,* 186 F.3d at 81 (quoting *Capital Ima-ging,* 996 F.2d at 546);*see also Primetime 24 Joint Venture v. Nat. Broad. Co., Inc.,* 219 F.3d 92, 103-04 (2d Cir.2000).

### III. *Group Boycott*

Plaintiffs allege group boycott conduct as *per se* and rule of reason violations. (Am.Comp.¶¶ 80, 86); *see AD/SAT v. Associated Press,* 181 F.3d 216, 232 (2d Cir.1999) (Section 1 group boycotting claim may be alleged as either a *per se* or rule of reason violation); *accord Bogan v. Hodgkins,* 166 F.3d 509, 514 (2d Cir.1999).FN1 CIT contends that plaintiffs have not adequately pleaded a boycotting claim because the amended complaint fails to allege facts to support an inference of an agreement among the factors or that plaintiffs suffered an anti-trust injury.

> FN1. Although defendants have not argued that the alleged conspiracy cannot be con-sidered illegal *per se,* plaintiffs contended at oral argument that any boycott of credit is *per se* illegal. (Tr. at 13.) However, this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 23 of Page 77 of 104

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
(Cite as: Not Reported in F.Supp.2d)

Court notes that not all horizontal group boycotts are *per se* illegal. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 294, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985); *Bogan,* 166 F.3d at 514. "The scope of the *per se* rule against group boycotts is a recognized source of confusion in antitrust law."*Bogan,* 166 F.3d at 514 (citation omitted). Moreover, the agreement alleged here does not reflect "the classic model of a group boycott-that is, a 'concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level.' ' *Bogan,* 166 F.3d at 514 (citing *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1178 (D.C.Cir.1978)); *see also Capital Imaging,* 996 F.2d 537, 542 (2d Cir.1993) ("Conduct considered illegal *per se* is invoked only in a limited class of cases, where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are conclusively presumed illegal without further examination.").

1. *Existence of an Agreement*

CIT asserts that plaintiffs' conclusory allegations regarding a boycotting agreement among the several factors to cut off plaintiffs' credit are inadequate as a matter of law. (CIT's Mem. in Supp. at 6-7.) CIT further contends that inferring such an agreement would be nonsensical because it contradicts CIT's economic interests. (CIT's Mem. in Supp. at 9.)

"The plaintiff must do more than allege the existence of a conspiracy-it must allege some facts in support of the claim."*Floors-N-More, Inc. v. Freight Liquidators,* 142 F.Supp.2d 496, 501 (S.D.N.Y.2001); *see also Heart Disease Research Found. v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972) ("[A] bare bones statement of con-

spiracy or of injury under the antitrust laws without any supporting facts permits dismissal."); *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 687 F.Supp. 832, 837 (S.D.N.Y.1988) (dismissing complaint which alleged that the defendants "conspired and contracted with [each other] ... to restrain trade").

*8 [1] Here, plaintiffs allege that CIT and the other factors collectively decided whether to deny credit to a particular manufacturer. Plaintiffs contend that the factors' agreement regarding credit checks is evidenced by the factors' biweekly meetings and by the factors' unanimity in refusing to check the DFL Apparel companies' credit between September 2000 and January 2001. (Pls.' Mem. in Opp. at 5.)

Viewing the amended complaint liberally, plaintiffs have alleged sufficient facts to assert that the conspiring factors' conduct was not simply parallel but was the product of collusion. *See Todd,* 275 F.3d at 198 (citations omitted) (finding that an inference of a horizontal price-fixing agreement could be drawn in the absence of direct "smoking gun" evidence "when such interdependent conduct is accompanied by circumstantial evidence and plus factors such as defendants' use of facilitating practices. Information exchange is an example of a facilitating practice that can help support an inference of a price fixing agreement").

CIT further argues that the existence of an agreement among the factors cannot be inferred because plaintiffs' theory lacks any economic rationality. (CIT's Mem. in Supp. at 8.) Without great detail, plaintiffs allege that defendants' conspiracy sought to minimize their costs, stabilize prices, preserve market shares, and maintain monopoly power. (Am.Compl.¶ 47.) While, CIT acknowledges that refusing to check a purchaser can limit its own exposure, it argues that encouraging other factors also to deny credit to the DFL Apparel companies would only hasten their insolvencies preventing their continued payments to CIT. (CIT's Mem. in Supp. at 8.) Thus, CIT maintains that it lacks any incentive to collude with the other factors because the alleged

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 24 of Page 78 of 104

Not Reported in F.Supp.2d                                                        Page 11
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
(Cite as: Not Reported in F.Supp.2d)

conspiracy hurts its economic interests. (CIT's Mem. in Supp. at 8.)

Even if the scheme alleged was economically implausible, a conspiracy may nevertheless be proven "by strong direct or strong circumstantial evidence, [although] the implausibility of a scheme will reduce the range of inferences that may permissibly be drawn from ambiguous evidence."*Apex Oil Co. v. DiMauro,* 822 F.2d 246, 253 (2d Cir.1987) (citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Moreover, plaintiffs have proposed a reasonable economic motive for the conspiracy. Plaintiffs contend that by "weeding out" creditworthy albeit financially weaker companies, at the "slightest inkling" of their insolvency, CIT assured that it would recover fully by collecting from the guarantors. (Pls.' Mem. in Opp. at 7.) Plaintiffs further allege that the agreement to reduce credit risk stabilizes prices and the competing factors' market shares. (Am.Compl.¶ 64.) Whether any of these motives can be established and are served by the alleged conspiracy are factual questions.

### 2. *Antitrust Injury*

Section 4 of the Clayton Act provides that "any person who shall be injured ... by reason of anything forbidden in the antitrust laws may sue."15 U.S.C. § 15(a). Despite this broad language, plaintiffs must nevertheless demonstrate that they have suffered an "antitrust injury," and that they are otherwise proper plaintiffs to bring the action at issue. *Todd,* 275 F.3d at 213 ("An antitrust plaintiff must not only allege cognizable harm to [it]self, but an adverse effect on competition market wide.") (citing *Elecs. Communications Corp. v. Toshiba Am. Consumer Prods., Inc.,* 129 F.3d 240, 242 (2d Cir.1997)); *see also Volvo No. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55, 66 (2d Cir.1988).

*9 An "antitrust injury" is an

injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violations or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations ... would likely cause.

*Brunswick Corp. v. Pueblo B owl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *see also Intellective v. Massachusetts Mut. Life Ins. Co.,* 190 F.Supp.2d 600, 609 (S.D.N.Y.2002).

To state an antitrust injury, a plaintiff must demonstrate that defendants' conduct "has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice."*Capital Imaging,* 996 F.2d at 543;*see also Brunswick Corp.,* 429 U.S. at 488 ("The antitrust laws ... were enacted for 'the protection of competition, not competitors." ') (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Even when a *per se* violation of the antitrust laws occurs, a plaintiff is still required to demonstrate antitrust injury as an element of a successful claim. *See Atlantic Richfield Co.,* 495 U.S. at 341-45 (1990) ("[I]nsofar as the *per se* rule permits the prohibition of efficient practices in the name of simplicity, the need for the antitrust injury requirement is underscored."). As the Supreme Court explained, the antitrust injury requirement:
ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs .... The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.

*Atl. Richfield Co.,* 495 U.S. at 345.

[2] CIT argues that the amended complaint lacks any factual allegations of anticompetitive behavior

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS   Document 53-2   Filed 04/02/2008   Page 25 of Page 79 of 104

Not Reported in F.Supp.2d                                                                    Page 12
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
(Cite as: Not Reported in F.Supp.2d)

to support its "vague and conclusory" claims of "horizontal and vertical anticompetitive impacts." (CIT's Mem. in Supp. at 12.) However, the gravamen of plaintiffs' amended complaint is that CIT and the other factors agreed that once CIT refused to credit check a manufacturer, the other factors would refuse to check that manufacturer's credit as well. By participating in the alleged conspiracy, CIT's co-conspirators protected their own market shares. (Am.Compl.¶ 47.) Moreover, if a co-conspirator abandoned the conspiracy and financed a garment manufacturer that CIT refused to credit check, CIT could nevertheless cripple that garment manufacturer through its alleged control of the piece goods vendors' purchases. (Am.Compl.¶ 63.) Thus, plaintiffs contend that CIT forged an agreement with its competitors that restricted the supply of factoring to garment manufacturers. That allegation sufficiently pleads injury to the garment manufacturing market. *Primetime 24 Joint Venture,* 219 F.3d at 102 (plaintiff "clearly alleged injury" to competition where it pleading that competitors had eliminated "potential price competition," restricted output, and diminished the quality of service to customers).

## IV. *Price Fixing*

*10 CIT argues that plaintiffs' claim of price fixing is inadequate because it lacks any allegation that the factors ever discussed, much less agreed on, any prices or terms for their factoring services. (CIT's Mem. in Supp. at 11.) Plaintiffs respond that the conduct alleged in their boycotting claim resulted in illegal price-fixing *per se.*(Pls.' Mem. in Opp. at 11.)

A horizontal price fixing conspiracy is a *per se* unreasonable restraint of trade. *See United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 ("Under the Sherman Act, a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se.*").

[3] While the alleged conspiracy in this case was the product of a horizontal agreement, it was not a price fixing agreement. Plaintiffs argue that the factors' denial of credit is analogous to the facts of *Catalano v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980). In *Catalano,* beer wholesalers agreed not to extend credit to any retailers and to sell their product only when they received payment in advance or on delivery. *Catalano,* 446 U.S. at 644. The Court held that

[i]t is virtually self-evident that extending interest-free credit for a period of time is equivalent to giving a discount equal to the value of the use of the purchase price for that period of time. Thus, credit terms must be characterized as an inseparable part of price. An agreement to terminate the practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional *per se* rule against price fixing.

*Catalano,* 446 U.S. at 648. However, unlike *Catalano,* plaintiffs do not allege that CIT and its co-conspirators terminated the practice of providing credits to their customers. Instead, plaintiffs claim that defendants singled out the DFL Apparel companies in denying their credit.

Moreover, the amended complaint states that the factors entered the agreement to assure that "none of conspiring factors [would] incur a credit risk for a customer that appears to be worthy of credit but whose ability to remain in business is [threatened] by a competing factor's decision to deny credit."(Am Compl. ¶ 54.) From that allegation, plaintiffs add in conclusory fashion that the denial of credit also served to stabilize the factors' prices due to the uniform reduction of credit risk. However, at no time do they state how the market-wide denial of credit to specific companies affected market prices. In addition, as noted by CIT, there is no allegation that the factors ever discussed "any prices or terms for their factoring services-*e.g.,* interest rates, payment terms, credit limits or any aspects of the 'price' of the services."(CIT's Mem. in Supp. at 11.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 26 of Page 80 of 104

Not Reported in F.Supp.2d                                                                        Page 13
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
(Cite as: Not Reported in F.Supp.2d)

Plaintiffs' amended complaint fails to allege facts to state a claim for price fixing. Accordingly, plaintiffs' price fixing claim is dismissed.

### V. *Monopolization*

*11 Section 2 of the Sherman Act prohibits persons from combining or conspiring to monopolize trade or commerce among the several States ...." 15 U.S.C. § 2; *see also AD/SAT,* 181 F.3d at 232. To state a claim under Section 2, a plaintiff must plead two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."*United States v. Grinnell Corp.,* 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Monopoly power is defined "as the power to control prices in the relevant market or to exclude competitors."*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596, n. 20, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). CIT argues that plaintiffs have failed to allege a relevant product market or that CIT abused its monopoly power.[FN2]

> FN2. CIT also alleged that plaintiffs Section 2 claims should be dismissed because they failed to allege an antitrust injury. As discussed above, plaintiffs have sufficiently pleaded an antitrust injury at this stage.

#### 1. *Relevant Market*

"A complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed."*Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.,* No. 00 Civ. 5663(MBM), 2001 WL 1468168 (S.D.N.Y. Nov.19, 2001) (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 29, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984)). Because market definition is a deeply fact-intensive inquiry, courts hesitate to

grant motions to dismiss for failure to plead a relevant product market. *Todd,* 275 F.3d at 199;*see also Hayden Publ'g Co. v. Cox Broad. Corp.,* 730 F.2d 64, 70 n. 8 (2d Cir.1984) ("The conclusion that genuine issues of material fact preclude a finding as to [the] relevant market as a matter of law is not unexpected. It frequently has been observed that 'a pronouncement as to market definition is not one of law, but of fact ....' ').

"To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes-analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible."*Todd,* 275 F.3d at 199 (internal citations omitted); *accord Hack v. President & Fellows of Yale Coll.,* 237 F.3d 81, 86 (2d Cir.2000); *see also Yellow Page Solutions,* 2001 WL 1468168, at *12. "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way ."*Todd,* 275 F.3d at 199.

[4] Here, the relevant markets alleged are factoring in the domestic garment manufacturing industry and factoring in the domestic piece goods industry. (Am.Compl.¶ 65.) Moreover, plaintiffs distinguish factoring from other forms of credit financing on the ground that factors "bear any and all losses stemming from [their] customers' insolvency or other financial inability to pay for goods that are sold and shipped by the client."(Am.Compl.¶ 39.) Whether that market definition is appropriate for plaintiffs' antitrust claim is a fact-intensive inquiry that cannot be resolved at this juncture.

#### 2. *Abuse of Monopoly Power*

*12 Possession of monopoly power does not violate Section 2 of the Sherman Act. Plaintiffs must

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS   Document 53-2   Filed 04/02/2008   Page 27 of 74 81 of 104

Not Reported in F.Supp.2d                                                                    Page 14
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
(Cite as: Not Reported in F.Supp.2d)

demonstrate that defendants abused their market power in either its acquisition or maintenance. *Berkey Photo Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 275 (2d Cir.1979) ("defendant must refrain from conduct directed at smothering competition."); *see also Olympia Equip. Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 376-77 (7th Cit.1986) (Posner, J.). A Section 2 monopolization claim requires an allegation that defendants willfully acquired or maintained monopoly power, "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."*Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *see also Am. Academic Suppliers, Inc. v. Beckley-Cardy, Inc.,* 922 F.2d 1319, 1322 (7th Cir.1999) (citing *United States v. Aluminum Co. of Am.,* 148 F.2d 416 (2d Cir.1945)) (monopolization by improper methods usually involves repelling or intimidating new entrants into a market through predatory pricing). To demonstrate attempted monopolization, plaintiffs must prove that defendant engaged in predatory or anticompetitive conduct with a specific intent to monopolize and a dangerous possibility of achieving monopoly power.*Spectrum Sports v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). Anticompetitive conduct is "the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor."*Covad Comms. Co. v. BellSouth Corp.,* No. 01-16064, 2002 WL 1777009 (11th Cir. Aug.2, 2002). Both monopolization and attempted monopolization claims require anticompetitive behavior by the defendant. *Invamed Inc. v. Barr Labs., Inc.,* 22 F.Supp.2d 210, 218 (S.D.N.Y.1998).

[5] CIT contends that plaintiffs allege no abuse of market power because their one allegation, "that [CIT] decided to stop credit checking the manufacturing plaintiffs," was not anticompetitive conduct. (CIT's Mem. in Supp. at 17.) However, CIT construes plaintiffs' claim too narrowly.

Plaintiffs assert that CIT increased its market share of domestic piece goods manufacturing to 90 percent through the acquisition of several competitors, giving it a "near stranglehold on garment manufacturers" because its unilateral decisions equate to "blacklisting a manufacturer among factors." (Pls.' Mem. in Supp. at 15-16.) Thus, plaintiffs adequately plead CIT's market power in the piece goods factoring market. *Moore U.S.A., Inc. v. Standard Register Co.,* 139 F.Supp.2d 348, 364 (W.D.N.Y.2001) (alleging market share that SRC alleges in this action: 65 percent) (citing *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 924 (9th Cir.1980)).

[6] Plaintiffs further contend that CIT engaged in anticompetitive behavior through its aggressive mergers. However, "the mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality."IV Phillip E. Areeda et al., *Antitrust Law* ¶ 901a (1998) (hereinafter "Areeda"); *see also* Irving Scher, *Antitrust Adviser* § 3.61 at 3-167 (4th ed.2001) (horizontal mergers are much more likely to be procompetitive than anticompetitive.)."Competing firms typically merge for reasons entirely unrelated to effects on marketwide output or price-for example, to achieve economies of scale or integration, to put inefficiently run assets into the hands of superior management, to resolve management succession for an individually owned enterprise, or for tax or other reasons."Areeda ¶ 9 01a. Plaintiffs also assert that CIT's alleged illegal boycotts constitute anticompetitive behavior to plead a monopolization claim.

*13 As stated above, plaintiffs allege that through its control of the piece goods market, CIT influenced other factors to deny credit checks, and therefore financing, to garment manufacturers that could have been financed under normal market conditions. Thus, CIT, through its control of piece goods factoring, discouraged other factors from their participation in factoring for the garment industry. *See, e.g., United States v. Socony-Vacuum*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 28 of Page 82 of 104

Not Reported in F.Supp.2d                                                                        Page 15
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
(Cite as: Not Reported in F.Supp.2d)

*Oil Co.,* 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (Sections 1 and 2 "overlap" in the sense that a monopoly under section 2 is a "species of restraint" under section 1.). That contention sufficiently alleges anticompetitive conduct to support plaintiffs' Section 2 claim. Accordingly, CIT's motion to dismiss plaintiffs' Section 2 monopolization claim is denied.

## VI. *Standing*

### 1. *Antitrust Claims*

CIT moves to dismiss plaintiffs Donald and Barabra Weiner, Dresses for Less, Inc., Garden City Dresses for Less, Inc., and DFL Management for lack of standing because their injuries are "merely derivative" and do not constitute an antitrust injury. (CIT's Mem. in Supp. at 19.) As stated above, an antitrust plaintiff's injury must be the kind of injury at which the antitrust laws were directed. *Brunswick Corp.,* 429 U.S. at 489. Thus, "[m]erely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing."*G.K.A. Beverage Corp. v.. Honickman,* 55 F.3d 762, 766 (2d Cir.1994) (citing *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,* 830 F.2d 1374, 1378 (7th Cir.1987))."It follows naturally that a party in a business relationship with an entity that failed as a result of an antitrust violation has not suffered the antitrust injury necessary for antitrust standing."*G.K.A. Beverage Corp.,* 55 F.3d at 766-67 (8th Cir.1992) (denying antitrust standing where sole shareholder's injury stemmed from failure of corporation)); *accord Lovett v. Gen. Motors Corp.,* 975 F.2d 518, 520 (8th Cir.1992) (dismissing car dealership owner's antitrust claims because he was not the target of anticompetitive conduct but rather suffered a consequential injury). This prerequisite necessitates that the injured party be a participant in the same market as the alleged malefactors. *Automated Salvage Transport, Inc. v. Wheelabrator Env't Sys., Inc.,* 155 F.3d 59, 78 (2d

Cir.1998) (quoting *Bhan v. NME Hosps., Inc.,* 772 F.2d 1467, 1470 (9th Cir.1985); *see also Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 989 (9th Cir.2000) ("Antitrust injury requires that the 'injured party be a participant in the same market as the alleged malefactors." '); *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 539, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (denying antitrust standing to party that was "neither a consumer nor a competitor in the market in which trade was restrained").

**\*14** [7] The DFL Apparel companies participate in the factoring market as consumers and therefore, their injury is a direct consequence of the alleged antitrust violations. However, the injuries suffered by Donald and Barbara Weiner, Garden City Dresses for Less, Inc., and DFL Management as a result of the alleged antitrust violations are entirely derivative of the direct antitrust injury suffered by the DFL Apparel companies. Accordingly, CIT's motion to dismiss the antitrust claims asserted by Donald and Barabra Weiner, Dresses for Less, Inc., Garden City Dresses for Less, Inc., and DFL Management for lack of standing is granted.

### 2. *Shareholder Derivative Claims*

[8] CIT contends that Barbara Weiner's derivative shareholder claims asserted on behalf of ISB and Stella Bishop should be dismissed because she has failed to allege the reason that she did not secure initiation of those claims with the boards of those companies. (CIT's Mem. in Supp. at 19.)

The amended complaint states that Barbara Weiner owns a 50 percent stake in ISB and a 45 percent of Stella Bishop. (Am.Compl.¶¶ 20, 22.) Plaintiffs allege that ISB's other 50 percent shareholder refused to consent to this lawsuit, and that Stella Bishop's other 45 percent FN3 shareholder "would plainly never consent [to this action]" because he and the Weiners are involved in several bitter lawsuits. (Am.Compl.¶ 23.) In addition, Stella Bishop's other

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS   Document 53-2   Filed 04/02/2008   Page 29 of Page 83 of 104

Not Reported in F.Supp.2d                                                                          Page 16
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
(Cite as: Not Reported in F.Supp.2d)

45 percent shareholder owns companies that are currently being factored by CIT. (Am.Compl.¶ 24.)

> FN3. The remaining 10 percent of Stella Bishop is owned by a third shareholder. Any dissenting shareholder of Stella Bishop could block a corporate action because its by-laws require unanimous shareholder consent for corporate actions. (Am.Compl.¶ 22.)

When a shareholder brings a derivative lawsuit, her complaint must set forth either the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort. *See*Fed. R. Civ. Proc. 23.1; Business Corporation Law § 626(c)."[W]here the directors and controlling shareholders are antagonistic, adversely interested, or involved in the transaction attracted, a demand on them is presumptively futile and need not be made. *Cathedral Estates v. Taft Realty Corp.,* 228 F.2d 85, 88 (2d Cir.1955); *see also Galef v. Alexander,* 615 F.2d 51 (2d Cir.1980); *General Elec. Co. v. Bucyrus-Erie Co.,* 563 F.Supp. 970, 974 (S.D.N.Y.1983).

The amended complaint's allegations regarding ISB's other shareholder's refusal to consent and the animosity between Stella Bishop's major shareholders sufficiently plead that demand would be futile. Accordingly, CIT's motion to dismiss the shareholder derivative claims is denied.

### 3. *DFL Apparel Group*

[9] CIT asserts that the DFL Apparel Group has no standing to sue on behalf of the companies it represents. An association may assert the rights of its members under the doctrine of associational standing. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343-45, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *accord Irish Lesbian and Gay Org. v. Guiliani,* 143 F.3d 638, 649 (2d Cir.1998). To bring suit on behalf of its membership, the organization must demonstrate that "(a) its members

would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."*Hunt,* 432 U.S at 343;*see Rent Stabilization Ass'n v. Dinkins,* 5 F.3d 591, 596 (2d Cir.1993) (applying *Hunt* test).

*15 An organization lacks standing to sue for money damages on behalf of its members if the damages "are not common to the entire membership, nor shared by all in equal degree," so that "the fact and extent of injury require[s] individualized proof."*Warth v. Seldin,* 422 U.S. 490, 515-16, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *accord Sun City Taxpayers' Ass'n v. Citizens Utils. Co.,* 45 F.3d 58, 61 (2d Cir.1995).

DFL Apparel fails the third prong of the *Hunt* test. Recovery in this case would require individualized proof by each of the companies affected by CIT's alleged anticompetitive behavior. Accordingly, CIT's motion to dismiss DFL Apparel as a plaintiff is granted.

### VII. *State Law Claims*

### 1. *Donnelly Act Claims*

CIT moves to dismiss plaintiffs' Donnelly Act claims on the same grounds that it moved to dismiss the Sherman Act claims. The Donnelly Act, N.Y. Gen. Bus. Law § 340, prescribes that "[e]very contract, agreement, arrangement or combination whereby a monopoly ... is or may be established or maintained, or whereby competition ... may be restrained" is illegal. N.Y. Gen. Bus. Law § 340(1)."The Act was closely patterned after the Sherman Act and has been narrowly construed to encompass only those causes of action falling within the Sherman Act."*Yankees Entertainment and Sports Network, LLC v. Cablevision Systems Corp.,* No. 02 Civ. 3242(DAB), 2002 WL 31010490, at *14 (S.D.N.Y. Sept.4, 2002) (citing *State v. Mobil*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 30 of Page 84 of 104

Not Reported in F.Supp.2d                                                                 Page 17
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
(Cite as: Not Reported in F.Supp.2d)

*Oil Corp.,* 38 N.Y.2d 460, 381 N.Y.S.2d 426, 427, 344 N.E.2d 357 (1976)); *accord Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton,* 997 F.Supp. 340 (E.D.N.Y.1998) (finding Donnelly Act is modeled after the Sherman Antitrust Act and is generally interpreted in accordance with federal precedent); *Anheuser-Busch, Inc. v. Abrams,* 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 820, 520 N.E.2d 535 (1988) (Donnelly Act was modeled on the Sherman Act and is to be construed in accord with it). Thus, CIT's motion to dismiss the Donnelly Act claims is granted in part and denied in part in accord with this Court's rulings set forth above.

## 2. *Contractual Good Faith and Fair Dealing*

Plaintiffs contend that CIT breached its duty of good faith when it deliberately inflated the DFL Apparel companies' debts by authorizing piece goods vendors to ship unordered merchandise to those companies. (Am.Compl.¶ 69.) Plaintiffs further contend that CIT breached its duty of good faith when it refused to credit check one DFL Apparel company because a separate DFL Apparel company was in arrears (Am.Compl.¶ 70); enforced a combined credit limit for the DFL Apparel companies instead of a separate limit for each company (Am.Compl.¶ 7 1); coerced the DFL Apparel companies to accept excessive advances on its credit bearing higher interest charges and fees (Am.Compl.¶ 72); orchestrated the group boycotts that cut off the DFL Apparel companies' credit (Am.Compl.¶ 73); and induced the DFL Apparel companies to stay in business after June 2000 by falsely promising that it would continue to finance the companies (Am.Compl.¶¶ 74-75).

**\*16** Under New York law, every contract contains an implied covenant of good faith and fair dealing. *Gelder Med. Group v. Webber,* 41 N.Y.2d 680, 684, 394 N.Y.S.2d 867, 363 N.E.2d 573 (1977); *see also*Restatement (Second) of Contracts § 205 comment a (1981) ("Good faith performance or enforcement of a contract emphasizes faithfulness to

an agreed common purpose and consistency with the justified expectations of the other party ....").

[10] With respect to plaintiffs' claim regarding the precondition of Donald Weiner's signature on purchase orders, factual issues exist including whether Weiner and CIT had a guarantee agreement giving rise to an obligation of good faith dealing and whether his signature was a condition of that agreement. At this stage, however, plaintiffs have sufficiently alleged breach of good faith dealing with respect to the unauthorized shipments approved by CIT. Accordingly, CIT's motion to dismiss the good faith and fair dealing claims of the amended complaint is denied.

[11] With respect to the remainder of the good faith claims, however, those allegations concern CIT's extension or refusal of credit to DFL Apparel companies. The factoring agreements ran between CIT and a piece goods vendor. Thus, the lack of contractual privity between CIT and the DFL Apparel companies precludes any good faith claim. In addition, plaintiffs further concede that CIT's agreements with the piece goods vendors permitted them to refuse credit checks for any reason or no reason at all. Thus, plaintiffs cannot claim that CIT failed to perform those contracts in good faith.

## 3. *Breach of Fiduciary Duty*

[12] Plaintiffs argue that CIT breached a fiduciary duty when it advised Donald Weiner that it would continue to extend him credit and failed to do so. (Pls. Mem. in Opp. at 23.) To state a claim for aiding and abetting a breach of fiduciary duty under New York law, plaintiffs must allege (1) a breach by a fiduciary of obligations to another, and (2) that the defendant knowingly induced or participated in the breach. *Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000). The existence of a fiduciary duty is often "a fact-specific inquiry reserved for a jury."*Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Securities Corp.,* No. 00 Civ. 8688(WHP), 2002 WL 362794, **\*9**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 18
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828
**(Cite as: Not Reported in F.Supp.2d)**

(S.D.N.Y. Mar.6, 2002). Under New York Law, " 'a fiduciary relationship exists from the assumption of control and responsibility, and is founded upon trust reposed by one party in integrity and fidelity of another .'' *Deleu v. S caife,* 775 F.Supp. 712, 715 (S.D.N.Y.1991) (quoting *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.,* 601 F.Supp. 770, 772 (S.D.N.Y.1985)); *see also* Restatement (Second) of Torts § 874 cmt. a (1977) (fiduciary relationship exists "when one [party] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation"). Moreover, fiduciary relationships can arise when a party "trusts or relies on another or where confidence is based on prior business dealings." *Olshansky v. Sutton,* No. 00 Civ. 3539(LAP), 2001 WL 99857, at *5 (S.D.N.Y. Feb.6, 2001). Claims alleging the existence of a fiduciary duty are usually not subject to dismissal in a 12(b)(6) motion. *Olshansky,* 2001 WL 99857, at *5.

*17 Given the factually intensive nature of a fiduciary duty inquiry, CIT's opposition to plaintiffs' fiduciary claim is better addressed on summary judgment. Accordingly, CIT's motion to dismiss the breach of fiduciary duty claim is denied.

VIII. *Uptown Credit Group's Motion To Dismiss*

In the amended complaint's first, second and fourth causes of action, plaintiffs allege that UCG violated Section 1 of the Sherman act and the Donnelly Act by participating in the agreement to deny credit to the DFL Apparel companies.

In addition to joining CIT's 12(b) motions, UCG moves to dismiss those causes of action on the ground that plaintiffs have not sufficiently alleged facts that tie UCG to the factoring conspiracy. (UCG's Mem. in Supp. at 5-6.) Plaintiffs allege that CIT combined with its co-conspirators to act as a cartel under the auspices of the UCG. (Am.Compl.¶¶ 4-5.) Through the UCG, the conspirators assured that the DFL Apparel companies

would not be extended credit on purchases from piece goods vendors. (Am.Compl.¶ 48.) Those allegations adequately allege that UCG participated in the antitrust violations. *See* 15 U.S.C. § 1 (liable persons may include associations); *Hydrolevel Corp. v. Am. Soc. of Mech. Eng'rs, Inc.,* 635 F.2d 118, 126 (2d Cir.1980) ("It is difficult to see how a trade association should be treated any differently than a business competitor, especially when it is the association's standing and influence that makes the conspiracy effective and possible. In a variety of contexts, [associations] are obligated to take suitable precautions to avoid antitrust violations."); *Vandervelde v. Put & Call Brokers & Dealers Ass'n,* 344 F.Supp. 118, *155 (S.D.N.Y.1972) (an association found liable "as an independent legal entity"). Accordingly, UCG's motion to dismiss the amended complaint is denied.

### Conclusion

For the reasons set forth above, CIT's motion to dismiss the first cause of action is granted with respect to plaintiffs' price fixing claim and denied with respect to the boycotting claim. CIT's motions to dismiss the second, third, fourth, fifth, and sixth causes of action are denied. UCG's motion to dismiss is also denied.

SO ORDERED:

S.D.N.Y.,2002.
Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc.
Not Reported in F.Supp.2d, 2002 WL 31164482 (S.D.N.Y.), 2002-2 Trade Cases P 73,828

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**3**

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: Not Reported in F.Supp.2d)

## C

Kasada, Inc. v. Access Capital, Inc.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
KASADA, INC., John Michaels, Inc., Gabbey
Design Group, Inc., Garment Makers, Inc., Theor-
dore Sadaka, Karen Sadaka and Gladys Sadaka,
Plaintiffs,
v.
ACCESS CAPITAL, INC., Westgate Financial
Corp., Finova Capital, Inc., UCC Asset Manage-
ment Corp., Star Funding, Inc., Omni Commerical,
L.L.C., Commercial Services, Inc., d/b/a C.I.T.
Group, Rosenthal & Rosenthal, Miles M. Stuchin
and Richard I. Simon, Defendants.
**No. 01 Civ. 8893(GBD).**

Dec. 14, 2004.

### *MEMORANDUM DECISION AND ORDER*

DANIELS, J.
**\*1** Plaintiffs bring suit alleging price fixing and
monopoly claims in violation of the Sherman Act
§§ 1, 2, the Clayton Act § 4, the New York State
Donnelly Act, and pendent common law claims.
Defendants filed motions to dismiss pursuant to
Federal Rule of Civil Procedure 12(b)(6). For the
reasons below, defendants' motions to dismiss are
granted in part and denied in part.

### I. *Background*

Plaintiffs are garment manufacturers, their prin-
cipals and related entities who bring suit against
various credit institutions alleging price fixing and
monopoly in violation of federal and state antitrust
statutes and state common law. Plaintiffs Kasada,
Inc., John Michaels, Inc., Gabbey Design Group,
Inc. and Garment Makers, Inc. are corporations en-
gaged in the business of domestic garment manu-
facturing. Complaint at 2-3, ¶¶ 4-7. Plaintiff

Theodore Sadaka is the principal officer of
plaintiffs Garment Makers, Inc. and John Michaels,
Inc.. Plaintiff Karen Sadaka is a principal officer of
plaintiff Kasada, Inc. Plaintiff Gladys Sadaka is a
principal officer of plaintiff Gabbey Design Group,
Inc. *Id.* at 3, ¶ 8.

Plaintiffs' allegations revolve around the business
of factoring, a form of commercial finance by
which credit institutions provide financing to cli-
ents in exchange for the right to collect the client's
accounts receivable. These credit institutions, com-
monly referred to as factors, advance up to 80% of
the worth of a garment manufacturers' invoices in
exchange for fees and interest. Complaint at 8, ¶ 20.
The factor also assumes the risk of collecting the
client garment manufacturers' accounts receivable.
*Id.* A factor assumes that credit risk, however, only
after it has checked whether its client garment man-
ufacturer is selling to a creditworthy purchaser. The
garment manufacturer, in turn, uses that credit to
purchase raw materials to produce their product.*Id.*

Plaintiffs allege that the defendants mutually agreed
to stop credit-checking plaintiff garment manufac-
turers, denied them credit and/or withdrew their
funding. The refusal by a factor to credit check a
garment manufacturer results in "the garment man-
ufacturer [being] unable to obtain virtually any fab-
ric or other raw materials on credit."*Id.* at 10, ¶
24.Specifically, plaintiffs allege that Westgate Fin-
ancial Corp. and Finova Capital, Inc. allegedly dis-
continued their funding of plaintiff John Michaels,
Inc. *Id.* at 4, ¶ 11.Finova Capital, Inc. also allegedly
denied credit to John Michaels, Inc. *Id.* at 5, ¶
12.Defendants   Rosenthal   &   Rosenthal
("Rosenthal") and Star Funding, Inc. are alleged to
have withdrawn funding from plaintiff Gabbey
Design, Group, Inc. *Id.* at 3, 5, 6 ¶¶ 6, 13,
16.Defendant Omni Commercial denied credit and
refused to release monies to plaintiff Garment
Makers, Inc. and caused defendant C.I.T. to deny
credit to Garment Makers, Inc. as well. *Id.* at 3, 5, ¶
¶ 7, 14.The plaintiffs also allege that defendant Ac-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cess Capital "published false accusations against plaintiffs, which caused plaintiffs to be group boycotted by defendants."*Id.* at 3, ¶ 7. Plaintiffs further claim that "Access Capital designed and orchestrated the group boycott of plaintiffs and caused defendants to deny credit ... and caused plaintiffs to cease operations."*Id.* at 4, ¶ 10.Individual defendants Miles M. Stuchin and Richard I. Simon are alleged to be the presidents of Access Capital, Inc. and Westgate Financial Corp., respectively. *Id.* at 6, ¶ 17.Each are alleged to have "conspired with other defendants to conduct a group boycott against plaintiffs."*Id.* at 6-7 ¶¶ 17-18.

**\*2** Plaintiffs assert that defendants' actions precluded them from receiving the credit they needed to purchase fabric or other raw materials. This, in turn, caused some of them to lose money and "to cease operations." Complaint at 2-4, ¶¶ 4-10.[FN1]Without specifically identifying which defendants were involved and which plaintiffs were affected, plaintiffs allege that the "factoring defendants, engaged in boycotting certain plaintiffs, denied credit to certain plaintiffs, fixed costs and interest rates, published letters to plaintiffs' customers, and agreed with other factors to fund certain manufacturers and to deny funding to other manufacturers, and to drive them out of business."*Id.* at 11, ¶ 25.Plaintiffs claim that the defendants communicated with each other, shared credit information, and agreed to make credit decisions together. Complaint at 12, ¶ 30. These communications allegedly occurred during meetings of the Uptown Credit Group and the Thursday Group.[FN2]Plaintiffs maintain that these groups "allowed defendants to conduct their secret meetings and made many of their collective credit decisions at these meetings and during telephone calls and other contacts."*Id.* at 12, ¶ 2 8.Plaintiffs argue that the defendants' denial of credit constitutes a group boycott in violation of Section 1 of the Sherman Act. In addition, plaintiffs allege that the defendants "controlled the price and interest rates for factoring" constituting illegal price-fixing in violation of Section 1 of the Sherman Act. *Id.* at 18, ¶

57.Plaintiffs also claim that defendants' actions constitute illegal price-fixing in the "piece goods" market, arguing that the "piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors."[FN3]*Id.* at 8, ¶ 20.

> FN1. Without specifically identifying which manufacturers, plaintiffs allege that "numerous garment manufacturers have been driven out of business."Plaintiffs' complaint, however, is devoid of any allegation that any of the plaintiffs have gone out of business. To the contrary, plaintiffs complaint alleges that each corporate plaintiff "was and still is a domestic Corporation duly organized and licensed to do business within the State of New York."Complaint at 2-3, ¶¶ 4-7.

> FN2. Uptown Credit Group and the Thursday Group are not parties to this litigation.

> FN3. The piece goods market is the market for raw materials such as fabric, buttons, trim and other accessories.

Plaintiffs also claim that the defendants violated Section 2 of the Sherman Act by engaging "in an unlawful combination and conspiracy to unreasonably restrain and monopolize interstate commerce."Complaint at 12, ¶ 30. Plaintiffs allege that the defendants acted as "one," in that defendants "black listed certain customers and weeded out those that they targeted to drive out of business."*Id.* at 11, ¶ 27 (internal quotations omitted). Plaintiffs assert that through these actions, the defendants "have engaged in predatory and anti-competitive conduct, with a specific intent to monopolize, and have achieved monopoly power."*Id.* at 17, ¶ 53.This conspiracy to monopolize allegedly occurred in two markets: the factoring market for domestic garment manufacturers and the piece goods market. Plaintiffs claim that the defendants "factor 90% of the factored piece goods vendors in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: Not Reported in F.Supp.2d)

United States."*Id.* at 10, ¶ 24.Plaintiffs also allege that all the defendants are members of the Uptown Credit Group and the Thursday Group, which plaintiffs maintain are designed "to maintain a monopoly over the industry, and they collectively agreed unlawfully to deny plaintiffs credit."*Id.* at 9, ¶ 22.Plaintiffs allege that "[c]ollectively, defendants involved in these two groups control over 85% of [the] factoring market for garment manufacturing and virtually all of the piece goods manufacturing segment of that market."*Id.*<sup>FN4</sup>

> FN4. Plaintiffs also assert claims under the Clayton Act § 4, the Donnelly Act of the State of New York, as well as the following common law claims: trade libel, defamation, injurious falsehood, interference with commercial relations, and breach of contract.

*3 Defendants submitted motions to dismiss plaintiffs' claims, arguing that the plaintiffs failed to allege a violation of Section 1 of the Sherman Act. Specifically, defendants argue that plaintiffs failed to make sufficient allegations to establish that: the defendants entered into an agreement to boycott; the defendants engaged in price-fixing; and the defendants caused plaintiffs to suffer an antitrust injury rather than an injury specific to plaintiffs. Defendants also maintain that plaintiffs have failed to sufficiently allege a violation of Section 2 of the Sherman Act, arguing that plaintiffs' complaint fails to allege: a conspiracy by defendants to monopolize the market; an abuse of power by defendants; an antitrust injury; and a relevant market.<sup>FN5</sup>Defendants further argue that plaintiffs have failed to state a claim under the Section 4 of the Clayton Act, the Donnelly Act, or other state laws.

> FN5. Defendants C.I.T. Group and Rosenthal & Rosenthal submitted a brief in support of their motion to dismiss. Their arguments to dismiss plaintiff's federal claims were adopted by Westgate Financial Corp., Richard I. Simon, and Omni Com-

mercial. In lieu of filing a motion, defendants Star Funding, Inc. and UCC Asset Management submitted a letter dated March 12, 2002 stating that "counsel for plaintiff and [these defendants] have agreed that to the extent that portion of the decision of the Court regarding the federal claims (and the Donnelly Act claim) applies to all Moving Defendants, it shall also be deemed to apply to Star and UCC."Similarly, defendants Access Capital, Inc. and Miles M. Stuchin, in a letter dated February 7, 2002, informed the Court that "[i]n lieu of filing a formal motion to dismiss the plaintiffs' complaint, [defendants] submit this letter to join and adopt the legal arguments made by counsel for [Finova], [C.I.T.], [Rosenthal & Rosenthal], [Omni], [Westgate], and [Simon] in connection with their respective motions to dismiss."

## II. *Discussion*

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint where the complaint "fail[s] ... to state a claim upon which relief can be granted[.]"FED. R. CIV. P. 12(b)(6). In reviewing a motion to dismiss, this Court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party. *SeePatel v. Searles,* 305 F.3d 130, 134-35 (2d Cir.2002). A motion to dismiss will only be granted if the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *SeeCitibank, N.A. v. K-H Corp.,* 968 F.2d 1489, 1494 (2d Cir.1992). In considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference. *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991); *seealsoPani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 71 (2d Cir.1998)(in evaluating motions to dismiss, a court must limit its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS   Document 53-2   Filed 04/02/2008   Page 36 of 7Page 5 of 104

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: Not Reported in F.Supp.2d)

Page 4

review to the allegations contained within the four corner's of the complaint).

Although no heightened pleading requirements apply in antitrust cases, *Todd v. Exxon Corporation,* 275 F.3d 191, 198 (2d Cir.2001), a plaintiff must do more than cite relevant antitrust language to state a claim for relief. *SeeTV Communications Network, Inc. v. Turner Network Television, Inc.,* 964 F.2d 1022, 1024 (10th Cir.1992)."A plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated those laws are insufficient."*Id.* (citing *Klebanow v. new York Produce Exch.,* 344 F.2d 294, 299 (2d Cir.1965)). Furthermore, "[i]t is not ... proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been" set forth in the complaint. *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F .3d 136, 139 (2d Cir.1998). The complaint must set forth enough information to suggest that relief would be based on some recognized legal theory. *Fort Wayne Telsat v. Entertainment and Sports Programming Network,* 753 F.Supp 109, 111 (S.D.N.Y.1990)."In practice, a complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."*Id.* (quoting *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1081-82 (D.C.Cir.1984)).

### A. *Section I of the Sherman Act*

**\*4** Section 1 of the Sherman Act prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."15 U.S.C. § 1. This blanket prohibition against any restraint of trade has been delineated into two separate doctrines. The first doctrine finds certain conduct illegal *per se* .

In construing and applying the Sherman Act's ban against contracts, conspiracies, and combinations in restraint of trade, the Court has held that certain

agreements or practices are so plainly anticompetitive, and so often lack any redeeming virtue, that they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases.

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 7-8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979)(internal quotations and citations omitted). Examples of *per se* illegal conduct include horizontal restraints, i.e. agreements between competitors at the same level of market structure, like agreements to fix prices and group boycotts. *See,Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 3 59 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)(finding group boycotts unreasonable *per se* ); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)(finding price fixing unreasonable *per se* ); *Michelman v. Clark-Schwebel Fiber Glass Corporation,* 534 F.2d 1036, 1043 (2d Cir.1976)(finding that a group boycott, because of its inherently anticompetitive nature, is unreasonable *per se* and thus always illegal).

Conduct that does not fall within the *per se* rule is subject to the rule of reason analysis. Under the rule of reason, the anticompetitive consequences of a challenged practice are weighed against the business justifications upon which it is predicated and its putative procompetitive impact, and a judgment with respect to its reasonableness is made. *See*KAYE SCHOLER, KAYE SCHOLER'S ANTITRUST DESKBOOK, 6 (3d ed.2002). For example, allegations of agreements between entities at different market levels that restrain trade i.e., vertical agreements, are analyzed under the rule of reason. *Electronics Communications Corp. v. Toshiba America Consumer Prods. Inc.,* 129 F.3d 240, 243 (2d Cir.1997)("Absent price-fixing between a supplier and distributor, vertical restraints are generally subject to 'rule of reason' analysis.") *Id.*

a. Per se *Illegal Conduct: Group Boycott and Price*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 37 of 7 Page 6 of 104

Not Reported in F.Supp.2d                                                                  Page 5
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
**(Cite as: Not Reported in F.Supp.2d)**

*Fixing*

Plaintiffs allege that the defendants violated Section 1 of the Sherman Act "by engaging in an unlawful group boycott and a concomitant price-fixing conspiracy" in which the defendants collectively refused to credit check certain garment manufacturers. Complaint at 18, ¶ 56. Plaintiffs further claim that defendants colluded to fix the price and interest rates for factoring as well as the price of the piece goods purchased by the garment manufacturers.

**\*5** Defendants argue that plaintiffs' complaint alleges no facts to support a finding that an agreement or conspiracy to boycott existed and that plaintiffs' complaint "alleges only the naked conclusion that the defendants conspired and agreed. No specific agreement is alleged with any factual particularity-no dates, no details, no places, no participants, no purpose, no decisions, no terms, no actions."Defendant C.I.T.'s Memorandum of Law in Support of Its Motions to Dismiss the Complaint ("C.I.T.Brief") at 7. Defendants also argue that the plaintiffs have failed to state a claim to establish price fixing in either the factoring market or the piece goods market.

i. *Group Boycott*

Courts have found that group boycotts, because of their anti-competitive nature, are unreasonable *per se* and therefore always illegal. *SeeKlor's, Inc.,* 359 U.S. at 212;*Michelman v. Clark-Schwebel Fiber Glass Corporation,* 534 F.2d at 1043. Plaintiffs allege that the defendants conspired to conduct a group boycott against plaintiffs by denying them credit.
Defendants routinely communicated with each other, had access to each others' databases and credit information, consulted with each other regarding credit decision, shared confidential information, and agreed together when making credit decisions concerning garment manufacturers.

Complaint at 12, ¶ 3 0. Plaintiffs, however, fail to

provide sufficient factual allegations to support this claim. There is no allegation that a particular plaintiff, once refused to be credit checked by one factor, was subsequently refused by each of the other factors. *CompareDresses for Less, Inc. v. CIT Group/Commercial Services, Inc. and The Uptown Credit Group, Inc.,* 2002 WL 31164482, \* 9 (S.D.N.Y.2002)(in finding that plaintiff stated a claim for group boycott, the Court found that "the gravamen of plaintiff's amended complaint is that C.I.T. and the other factors agreed that once C.I.T. refused to credit check a manufacturer, the other factors would refuse to check that manufacturer's credit as well").*Id.* There is no allegation that a particular garment manufacturer applied for and was refused to be credit checked by all of the defendants.

Conversely, there is no allegation that a particular factor refused to credit check all of the plaintiffs. Plaintiffs' complaint specifically alleges that specific defendants denied credit to specific plaintiffs, withheld from a specific plaintiff credit or refused to release to a specific plaintiff monies allegedly owed. Complaint at 3-7, ¶¶ 6-18. Plaintiffs allege that "after a group meeting of defendants," defendants Westgate Financial Corp. and Finova Capital, Inc. refused to continue funding plaintiff John Michaels and that Finova Capital, Inc. denied credit to John Michaels, Inc. *Id.* at 4, 5 ¶¶ 11-12."[A]fter a group meeting of defendants," defendants Rosenthal & Rosenthal and Star Funding, Inc. are alleged to have withdrawn funding to plaintiff Gabbey Design. *Id.* at 3, 5, 6 ¶¶ 6, 13, 16."[A]fter a group meeting of defendants," defendant Omni Corp. is alleged to have refused to release monies to plaintiff Garment Makers, Inc. *Id.* at 3, ¶ 7."[A]fter a group meeting of defendants," defendant Omni Commercial is alleged to have denied credit to plaintiff Garment Makers, Inc. and caused defendant C.I.T. to deny credit to Garment Makers, Inc. There is, furthermore, no allegation that the plaintiffs are one organization, belong to the same association, or that they possess any contractual relationship. Lastly, plaintiffs allegation that defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 38 of 104

Page 7 of 104

Not Reported in F.Supp.2d                                                                                            Page 6
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
**(Cite as: Not Reported in F.Supp.2d)**

ants "used subjective criteria and denied credit based upon malice, ill will, a personal dislike of management, rumors with no bearing on the customer's creditworthiness, or simply due to negligence" belies their argument that a collective decision not to credit check certain plaintiffs was because of a conspiracy to boycott. Complaint at 10, ¶ 24. Rather, this allegation supports a finding that credit-checking decision were made independently by each factor based on subjective criteria.

\*6 Plaintiffs' also argue that the defendants "engaged in group meetings" to share "credit information" and "had access to each other's databases and credit information."Complaint at 11-12, ¶¶ 27, 28, 30. Although "information exchange" has been found to be an example of a facilitating practice that a court could use to help support an inference of a price-fixing agreement, FN6 the exchange of information between business firms concerning the credit-worthiness of customers has long been held not to violate the Sherman Act." *Michelman v. Clark-Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1048 (2d Cir.1976); *seealsoCement Mfrs. Protective Ass'n v. United States,* 268 U.S. 588, 604, 45 S.Ct. 586, 591 (1925).FN7 Furthermore, "the dissemination to competitors of information concerning the credit-worthiness of customers aids sellers in gaining information necessary to protect themselves against fraudulent or insolvent customers."*Michelman,* 534 F.2d at 1048. Lastly, the Second Circuit has held that "it is not a violation of Section 1 to exchange such information, provided that any action taken in reliance upon it is the result of each firm's independent judgment, and not of agreement ."*Id.*

> FN6.*SeeTodd v. Exxon Corporation,* 275 F.3d 191, 198 (2d Cir.2001).

> FN7. Although the Supreme Court has found that the exchange of information itself, as opposed to merely using the information exchanged as evidence upon which to infer a price-fixing agreement, violates Section 1 of the Sherman Act under

a Rule of Reason analysis, plaintiffs in the present case have made no such argument and therefore, this type of violation will not be entertained by the Court.

In the absence of factual allegations to support their claim, plaintiffs claim of group boycott is dismissed. *SeeFort Wayne Telsat v. Entertainment and Sports Programming Network,* 753 F.Supp. at 115 (finding that local subscription company had to do more than merely allege existence of a conspiracy; company was required to prove factual basis for the allegation); *seealsoGarshman v. Universal Resources Holding Inc.,* 824 F.2d 223, 230 (3d Cir.1987)("The allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act."*Id.*);*Heart Disease Research Foundation v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972)("a bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal").*Id.*

### ii. *Price Fixing*

Plaintiffs' claim of price fixing is equally conclusory. Plaintiffs allege that the defendants "have dominated the factoring market for domestic garment manufacturers for many years [and] used their control over [the] market to fix conditions," specifically by controlling "the price and interest rates for factoring."*Id.* at 18, ¶¶ 56-57.Plaintiffs allege that by colluding and agreeing to drive their own clients out of business, the defendant factors have "enhance[d] their overall competitive position and [reduced] [their] collective credit risk exposure."*Id.* at 18, ¶ 57.Defendants argue that "[p]laintiffs do not allege, even in conclusory fashion, that defendants fixed the price of the product they provide: factoring and financial serves. There is no allegation that the price, terms, conditions, interest rates or any other aspect of defendants' factoring services were fixed."C.I.T. Brief at 11.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 39 of 7Page 8 of 104

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: Not Reported in F.Supp.2d)

Page 7

\*7 Similar to plaintiffs' arguments in *Dresses for Less, Inc.* 2002 WL 31164482, plaintiffs' in the present case argue that the factor's denial of credit is analogous to the facts of *Catalano v. Target Sales, Inc.* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980). In *Catalano,* competing beer wholesalers agreed to fix the credit terms on which they would sell beer to retailers. Specifically, the wholesalers agreed to require that the retailers pay in advance or upon delivery, and to discontinue the practice of accepting late payments without interest. *Id.* at 644-45.The Court held that "credit terms must be characterized as an inseparable part of price. An agreement to terminate the practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional *per se* rule against price fixing."*Id.* at 648.Unlike *Catalano,* however, the present complaint alleges that the defendants specifically denied credit to the plaintiffs alone and not to all of their customers. Most importantly, there is no allegation that the defendants conspired or agreed to fix the price or terms of credit. Plaintiffs' price fixing argument hinges on the allegation that by not extending credit to the plaintiffs, the defendants "minimized their risks and costs of doing business" thereby controlling the price and interest rates for factoring. Complaint at 18, ¶ 57. Plaintiffs, however, do not state how the denial of credit to specific garment manufacturers affected market prices.*Dresses for Less, Inc.* 2002 WL 31164482 at \*10. Plaintiffs claims of price fixing in the factoring industry are completely conclusory, unsupported by factual allegations and are, therefore, dismissed.

Furthermore, plaintiffs appear to allege that defendants have also fixed the prices in the piece goods market. Plaintiffs argue that "when defendants conspire to withdraw funding, they are actually fixing the prices of the goods."Plaintiffs' Brief at 18. Plaintiffs apparent argument is that piece goods cost more to the plaintiffs as a result of defendants denial of credit. This allegation is insufficient to find that the defendants conspired or agreed to fix

prices in the piece goods market. Plaintiffs claim that defendants fixed prices in the piece goods market, therefore, is also dismissed.

b. *The Rule of Reason*

In alleging a violation of Section 1 of the Sherman Act under the rule of reason, a plaintiff bears the burden of showing that the challenged action has an actual adverse effect on competition as a whole in the relevant market.*Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.,* 996 F.2d 537, 543 (2d Cir.1993). It is not sufficient for plaintiffs merely to show that they have suffered injury due to the alleged agreement; they must also demonstrate "an actual adverse effect on competition market-wide."*Electronics Communications Corp., v. Toshiba,* 129 F.3d at 244. "The injury to a relevant market requirement assures that the Sherman Act protected competition as a whole in the relevant market, and not the individual competitors within that market."*Dresses for Less, Inc.* 2002 WL 31164482 \*7(S.D.N.Y.2002)(internal quotations omitted).

\*8 In support of their rule of reason claim, plaintiffs allege that

[e]ach of the agreements entered into among the defendants was an agreement in restraint of trade in violation of 15 U.S.C. § 1, intending to achieve anti competitive effects. Each agreement violates the Sherman Act under the Rule of Reason because its pro-competitive effects are outweighed by its anti-competitive effects.

Complaint at 19, ¶ 65. Plaintiffs also claim that "[a]s a result of defendants' conduct, plaintiffs have been damaged in an amount to be determined at trial in excess of $40,000,000.00 for which defendants are jointly liable."*Id.* at 19, ¶ 66.Plaintiffs also allege that thepiece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors. The domestic garment manufacturing market is adversely affected by the antitrust violations

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS   Document 53-2   Filed 04/02/2008   Page 40 of 7 Page 9 of 104

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: Not Reported in F.Supp.2d)

Page 8

through the resulting increase in piece goods prices and the elimination of garment manufacturers from the marketplace.

*Id.* at 8, ¶ 20.

These allegations are insufficient to establish a violation under the rule of reason. Plaintiffs make no allegations from which the Court could infer that defendants' alleged actions had "any anticompetitive effect beyond the injury to plaintiffs."*SeeGranite Partners. L.P v . B ear, S tearns & Co., I nc.* 17 F.Supp.2d 275, 297-98 (S.D.N.Y.1998). As discussed *supra,* plaintiffs have not articulated with any particularity the effect of the defendants' alleged actions on the piece goods market. Alleging that the price they paid for piece goods increased as a result of their concomitant inability to receive credit to purchase those goods falls short of alleging an anticompetitive effect beyond personal injury to the plaintiffs. Furthermore, the allegation that client competition among the factors was reduced is conclusory and unsubstantiated. Lastly, plaintiffs' allegation of an anticompetitive effect on the domestic garment manufacturing marker is also conclusory. Plaintiffs claim that garment manufacturers were eliminated from the marketplace. However, they do not allege what garment manufacturers, other than themselves, were affected by defendants' alleged actions. Indeed, plaintiffs' claims center on their injury alone and not on a broader injury to competition generally. Plaintiffs, therefore, have also failed to allege the requisite antitrust injury to competition resulting from defendants' actions.

A plaintiff that fails to plead an actual injury to competition may nonetheless show antitrust injury by showing that the defendant possesses "market power" sufficient to inhibit competition on a market-wide basis.*Dresses for Less,* 2002 WL 31164482 at * 7 (S.D.N.Y.2002). Market power is defined as the power to raise prices significantly above the competitive level without losing all of one's business. *Seeid.;seealsoCDC Technologies,* 186 F.3d 74, 81 (2d Cir.1999)(internal citations and

quotations omitted). Plaintiffs do not allege with any specificity that defendants possess market power in the factoring market. Plaintiffs, furthermore, do not allege that the defendants sought to raise the price for credit market-wide in a manner that affected competition. Plaintiffs' Second Cause of Action alleging a violation under the Rule of Reason is therefore dismissed.

### B. *Section 2 of the Sherman Act*

**\*9** Plaintiffs claim that the defendants have conspired to monopolize both the factoring market for domestic piece goods vendors and the factoring market for domestic garment manufacturers.FN8They allege that the defendants "engaged in an unlawful combination and conspiracy to unreasonably restrain and monopolize interstate commerce."Complaint at 12, ¶ 30. Plaintiffs assert that the "[d]efendants acted as "one" and that they "black listed certain customers and weeded out those that they targeted to drive out of business."*Id.* at 11, ¶ 2 7.Defendant C.I.T. argues that plaintiffs' complaint fails to allege a conspiracy to monopolize, an abuse of monopoly power, an antitrust injury or a relevant market.FN9Defendant Rosenthal similarly argues that plaintiffs have failed to allege an antitrust injury, an abuse of monopoly power or a relevant market.FN10

> FN8. Although plaintiffs did not specify in their complaint that their third cause of action constituted a conspiracy to monopolize claim as opposed to a monopolization claim, in their Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Complaint ("Plaintiffs' Brief"), plaintiffs argue that their complaint alleges a conspiracy to monopolize. *See* Plaintiffs' Brief at 20.

> FN9. C.I.T. also asserts that they should not even be a defendant in this matter as they are not alleged to have had a factoring contract with the plaintiffs and were not a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 41 of 104    Page 10 of 104

Not Reported in F.Supp.2d                                                                              Page 9
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: Not Reported in F.Supp.2d)

party to any of the alleged tortious conduct that C.I.T. claims is the gravamen of plaintiffs' complaint. C.I.T. argues that they are "named as a defendant solely because of [their] alleged market share and because [they] attended, along with other factors, weekly meetings of two industry credit groups. That is not enough to state a claim under any law, including the antitrust laws."C.I.T. Brief at 1.

FN10. Rosenthal likewise argues that "CIT was added to the Complaint simply to permit a Section 2 claim to be asserted."Rosenthal Brief at 13.

Section 2 of the Sherman Act provides that "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize, any part of the trade or commerce among the several States" shall have committed an illegal act. 15 U.S.C. § 2. In order to state a claim of conspiracy to monopolize under Section 2, a plaintiff must allege (1) a concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize. *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.,* 129 F.3d 240, 246 (2d Cir.1997)."Intent alone is not sufficient, however; the defendant's power in the relevant market must be established, to establish whether the defendant is a monopolist or is threatening to become one."*Id.* Furthermore, "a short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules."*George C. Frey Ready-Mixed Concrete, inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 554 (2d Cir.1977). Lastly, "[i]n antitrust cases in particular, the Supreme Court has stated that dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly."*George Ha ug Co. v . R olls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998)(internal quotations and citations omit- ted).

Plaintiffs' complaint presents colorable claims of a conspiracy to monopolize under Section 2. The gravamen of plaintiffs' Section 2 claims, and indeed of all of plaintiffs' federal claims, is that the defendants conspired to selectively choose which garment manufacturers would receive credit and which would not. This choice, in effect, ultimately decided which manufacturers went out of business and which ones did not. Complaint at 20, ¶ 68. Whether through the defendants' alleged membership in both the Uptown Credit Group and the Thursday Group, or through other unspecified meetings, plaintiffs maintain that the defendants "shared all credit information and in effect merged the companies."*Id.* at 11, ¶ 27.It is at these meetings and "during telephone calls and other contacts" that the alleged concerted action took place. *Id.* at 12, ¶ 28.

*10 Similar to their arguments to dismiss plaintiffs' Section 1 claims, defendants contend that the plaintiffs have failed to specify the conspiracy claims with any particularity, citing several cases where antitrust conspiracy actions were dismissed for failing to allege any supporting facts. See*Telectronics Proprietary. Ltd., v. Medtronic, Inc.,* 687 F.Supp 832, 839 (S.D.N.Y.1988)(quoting *Heart Disease Research Foundation v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972)).[FN11] Unlike their Section 1 claim, however, plaintiffs have alleged facts sufficient to support a preliminary finding of concerted action among the defendants.FN12

FN11. Unlike the plaintiff in *Telectronics,* who did not name the others who allegedly conspired with the defendants, plaintiffs in the instant case have alleged that all the defendants conspired with each other to monopolize the factoring markets for garment manufacturers and for piece goods vendors.

FN12.Sections 1 and 2 of the Sherman Act require proof of conspiracies which are reciprocally distinguishable from and inde-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 10
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: Not Reported in F.Supp.2d)

pendent of each other, although the objects of the conspiracies may partially overlap. *SeeAmerican Tobacco Co. v. United States,* 328 U.S. 781, 788, 66 S.Ct. 1125, 1129, 90 L.Ed. 1575 (1946).

Plaintiffs, furthermore, allege several overt acts in furtherance of the alleged conspiracy. Plaintiffs claim that the defendants deliberately created a monopoly by merging their interests, eliminating competition, and working to together control the business, by agreeing and deciding to give Plaintiffs credit or not, setting the prices, controlling every credit decision relative to factored sales, issuing substantially the same unconscionable contract, and having the ability to drive manufacturers out of business, including plaintiffs.

Complaint at 13, ¶ 33. Plaintiffs further allege that the defendantshave the power to drive manufacturers out of business by their agreements together to control the market and in turn control the garment manufacturers by choosing which manufacturers they would withhold payments to and deny credit to, fixing costs of goods at artificially high prices, and charging exorbitant fees.

Complaint at 9, ¶ 21. These allegations are sufficient to allege overt acts in furtherance of the conspiracy.

Plaintiffs have also specifically alleged the defendants' intent to monopolize. Plaintiffs claim that the defendants "engaged in the acts and practice alleged herein with the specific intent to achieve or maintain monopoly power in the two affected markets."Complaint at 20, ¶ 69. Plaintiffs further allege that the defendants' merging of interests gave the defendants "a dominant share in the factored domestic manufacturing market" and in the piece goods market, as well as "the power to drive manufacturers out of business by their agreements together to control the market and in turn control the garment manufacturers."*Id.* at 9, ¶ 2 1.This alleged monopoly power came from the defendants' ability

to "control 85% of factoring market for garment manufacturing" and "90% of the factored piece goods vendors in the United States."*Id.* at 9, 10 ¶¶ 22, 24.Although the allegation of market share is not the same as one alleging monopoly power, the existence of monopoly power may be inferred from a predominant share of the market. *SeeUnited States v. Grinnel Cop.,* 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966). The higher the market share, the stronger the inference of monopoly power. *SeeBroadway Delivery Corp. v. United P arcel S erv. of America, Inc.,* 6 51 F.2d 122, 129 (2d Cir.1981).

**\*11** Defendants further argue that plaintiffs' fail to allege an anticompetitive effect harmful to competition or antitrust injury. "Market share is not enough to allege a violation of Section 2 because monopoly power is not unlawful *per se.*"Defendant C.l.T. Brief at 14 (internal quotations and citations omitted). An "antitrust injury" is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violations or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations ... would likely cause.

*Brunswick Corp. v. Pueblo B owl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *seealsoMr. Furniture Warehouse, Inc. v. Barclays American/Commerical Inc.,* 919 F.2d 1517, 1522 (11th Cir.1990)(finding that a "monopolist's refusal to deal becomes actionable under the antitrust laws only where the refusal is designed to have an anticompetitive effect, whether to gain greater market share, to drive up prices, or to obtain some other illegal goal"). To state an antitrust injury, a plaintiff must demonstrate that defendants' conduct "has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice."*Capital Imaging,* 996 F.2d at 543;*seealsoBrunswick Corp.,* 429 U.S. at 488 ("The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 43 of Page 12 of 104

Not Reported in F.Supp.2d                                                    Page 11
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: Not Reported in F.Supp.2d)

antitrust laws ... were enacted for 'the protection of competition, not competitors ." ')(quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Plaintiffs, however, have proffered sufficient allegations displaying harm to competition and antitrust injury. Plaintiffs allege that[d]efendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, because they have acted with specific intent to archive (sic) or maintain monopoly power in the factoring market for domestic piece goods and garment manufacturers by merging with competitors and unlawfully utilizing its resulting economic leverage to fix piece goods prices and to drive out of business garment manufacturers that potentially enhance defendants' overall credit risk exposure.

Complaint at 20, ¶ 70. Plaintiffs also maintain that the defendants'actions have harmed consumers in that the manufacturer has to charge higher prices and the manufacturers that were forced out of business prevented consumers from having the freedom to choose from quality merchandise suppliers since there is a limited product.

Complaint at 16, ¶ 49. These allegations are sufficient to allege both the anticompetitive effect of, as well as the antitrust injury resulting from, defendants' actions.

Lastly, defendants argue that the plaintiffs have failed to adequately allege a relevant market. "A complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed."*Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.,* 2001 WL 1468168 (S.D.N.Y.2001). However, because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corporation,* 275 F.3d 191, 199 (2d Cir.2001)."To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes-analysis of the interchangeability of use or the cross-elasticity

of demand, and it must be plausible."*Id.* at 199 (internal citations omitted)."Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way."*Id.*

\*12 Plaintiffs allege that the "relevant market is the factoring market for domestic garment manufacturers."Complaint at 8, ¶ 20. Plaintiffs further claim that factors are distinguishable from banks and other credit institutions in that factors are willing to grant credit without the borrower having to put up collateral outside of the borrower's invoices and incoming accounts receivable. *Id.* Plaintiffs also claim that the "piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors. The domestic garment manufacturing market is adversely affected by the antitrust violations through the resulting increase in piece goods prices and the elimination of garment manufacturers from the marketplace."*Id.* Defendants' motions to dismiss plaintiffs' Section 2 claims are denied.

### C. *Clayton Act*

Plaintiffs also assert claims under Sections 4 and 7 of the Clayton Act. Complaint at 1, ¶ 1.[FN13] Plaintiffs make the same allegation they did under their Section 1 and Section 2 claims alleging that the

> FN13. The Fourth Cause of Action of plaintiffs' complaint does not specify which section of the Clayton Act was violated. In paragraph 1 of their complaint, plaintiffs allege a violation of Section 4. Section 4, however, does not provide a substantive claim for relief but rather enables plaintiffs who have been injured under the antitrust laws to sue for damages.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 12
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
**(Cite as: Not Reported in F.Supp.2d)**

*SeeFloors-N-More, Inc. v. Freight Liquidators,* 142 F.Supp.2d 496, 499-500 (S.D.N.Y.2001); *seealsoAssociated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). In contrast, plaintiffs argue in their Memorandum of Law in Opposition to Defendants' Motion to Dismiss that they have adequately alleged a claim under Section 7 of the Clayton Act. Plaintiffs do not reference any other section of the Clayton Act. The Court, therefore, will construe plaintiffs' Clayton Act claim as one being under Section 4 and Section 7 of that act.

[d]efendants violated the Clayton Act because it has acted with specific intent to achieve or maintain its monopoly power in the factoring market for domestic piece goods and garment manufacturers by merging with competitors and unlawfully utilizing its resulting economic leverage to fix piece goods prices and to drive out of business garment manufacturers to enhance defendants' overall credit risk exposure.

Complaint at 21, ¶ 76.

The Supreme Court summarized the purpose of Section 7 of the Clayton Act in *United States v. Falstaff Brewing Corp.,* 410 U.S. 526, 531-32, 93 S.Ct. 1096, 1099-1100, 35 L.Ed.2d 475 (1973): Section 7 of the Clayton Act forbids mergers in any line of commerce where the effect may be substantially to lessen competition or tend to create a monopoly.[FN14]The section proscribes many mergers between competitors in a market, *United States v. Continental Can Co.,* 378 U.S. 441 (84 S.Ct. 1738, 12 L.Ed.2d 953) (1964); *Brown Shoe Co. v. United States,* 370 U.S. 294 (82 S.Ct. 1502, 8 L.Ed.2d 510) (1962); it also bars certain acquisitions of a market competitor by a noncompetitor, such as a merger by an entrant who threatens to dominate the market or otherwise upset market conditions to the detriment of competition, *FTC v. Procter & Gamble Co.,* 386 U.S. 568, 578-580 (87

S.Ct. 1224, 1230-1231, 18 L .Ed.2d 303) (1967). Suspect also is the acquisition by a company not competing in the market but so situated as to be a potential competitor and likely to exercise substantial influence on market behavior. Entry through merger by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate § 7 because the entry eliminates a potential competitor exercising present influence on the market. *Id.,* at 580-581 (87 S.Ct. at 1231-1232);*United States v. Penn-Olin Chemical Co.,* 378 U.S. 158, 173-174 (84 S.Ct. 1710-1718, 12 L.Ed.2d 775) (1964).

FN14. Section 7 of the Clayton Act provides that

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. 15 U.S.C. § 18.

**\*13** None of the preceding situations exist in the present case. Plaintiffs allegations of a 'merger' are conclusory and unsupported by any factual allegations. Plaintiffs do not allege the existence of either a merger agreement or an acquisition agreement to support its Section 7 claim. Plaintiffs' Section 7 claim, therefore, is dismissed.

### D. *Donnelly Act*

Plaintiffs also assert claims under the Donnelly Act of the State of New York. Specifically, plaintiffs allege that the defendants entered into agreements with other factoring companies to engage in group boycotts where they re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 45 of Page 14 of 104

Not Reported in F.Supp.2d                                                                    Page 13
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: Not Reported in F.Supp.2d)

fused to approve credits for New York based garment manufacturers, unlawfully fixed piece goods prices for those manufacturers, drove them out of business, and enabled the factors to maintain supracompetitive pricing structures and stable market shares, among other anticompetitive effects.

Complaint at 22, ¶ 79. Plaintiffs further assert that[t]he unlawful reduction of the number of garment manufacturers competing in the market has resulted in artificially maintained and noncompetitive levels of prices for factoring services throughout New York and has enabled the factors to stabilize their respective market shares in a way that could not have been achieved or maintained had the factors operated in a genuinely competitive environment.

Complaint at 22, ¶ 80. Defendants move to dismiss plaintiffs' Donnelly Act claims on the same grounds that it moved to dismiss the Sherman Act claims.

The Donnelly Act, N.Y. Gen. Bus. Law § 340, states that "[e]very contract, agreement, arrangement or combination whereby a monopoly ... is or may be established or maintained, or whereby competition ... may be restrained" is illegal. N.Y. Gen. Bus. Law § 340(1). The Donnelly Act was patterned after the Sherman Act and has been narrowly construed to encompass only those causes of action falling within the Sherman Act. *SeeState v . Mob il Oil Corp.,* 38 N.Y .2d 460, 381 N.Y.S.2d 426, 427, 344 N.E.2d 357 (1976); *accordGreat Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton,* 997 F.Supp. 340 (E.D.N.Y.1998) (finding Donnelly Act is modeled after the Sherman Antitrust Act and is generally interpreted in accordance with federal precedent); *seealsoAnheuser-Busch, Inc. v. Abrams,* 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 820, 520 N.E.2d 535 (1988) (Donnelly Act was modeled on the Sherman Act and is to be construed in accord with it). Accordingly, defendants' motion to dismiss plaintiffs' Donnelly Act claims is granted in part and denied in part. Plaintiffs' Donnelly Act claims of price-fixing and group boycott are therefore dismissed.

## E. *State Law Claims*

In addition to plaintiffs' federal and state antitrust claims, plaintiffs also allege the following pendant state law claims: trade libel; defamation, libel and slander; injurious falsehood; interference with commercial relations; and breach of contract. Each of these claims, with the exception of plaintiffs' breach of contract claim, have been alleged as conspiracies to commit the alleged tortious acts. In presenting their claims in this manner, plaintiffs allege that all of the defendants are liable for the tortious conduct. Specifically, plaintiffs' Sixth, Seventh, Eighth and Ninth Causes of Action claim that all of the defendants "engaged in an unlawful combination and conspiracy" to commit trade libel; defamation, libel and slander; injurious falsehood; and interference with commercial relations.

**\*14** Under New York law, however, "a mere conspiracy to commit a [tort] is never of itself a cause of action."*Alexander & Alexander v. Fritzen,* 68 N.Y.2d 968, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986) (citations omitted). An independent tort must form the basis of a claim of civil conspiracy. *SeeDemalco v. Feltner,* 588 F.Supp. 1277, 1278 (S.D.N.Y.1984); *Smukler v. 12 Lofts Realty,* 156 A.D.2d 161, 548 N.Y.S.2d 437, 439 (1st Dep't 1989), app. den., 76 N.Y.2d 701, 557 N.Y.S.2d 878, 557 N.E.2d 114 (1990)."[A] defendant may be held liable in tort for conspiracy to do an unlawful thing, or to do a lawful thing in an unlawful manner."*Arlinghaus v. Ritenour,* 622 F.2d 629, 639 (2d Cir.1980)(internal citations omitted); *seeBanque Nationale de Paris v. PrudentialSec., Inc.,* 1997 WL 639257, at *3 (S.D.N.Y. Oct. 16, 1997). The purpose of civil conspiracy is to "establish[ ] joint liability by co-participants in a particular tortious conduct."*Sackman v. Liggett Group, Inc.,* 965 F.Supp. 391, 395 (E.D.N.Y.1997). A successful claim for civil conspiracy requires a plaintiff to show the primary tort plus the following four elements: " '( [1] ) a corrupt agreement between two or more persons [;] ( [2] ) an overt act in furtherance of the agreement[;] ( [3] ) the parties' inten-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 46 of Page 15 of 104

Not Reported in F.Supp.2d                                                                    Page 14
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: Not Reported in F.Supp.2d)

tional participation in the furtherance of a plan or purpose [;] and ( [4] ) the resulting damage or injury." ' *Andre Emmerich Gallery, Inc. v. Segre,* 1997 WL 672009, at \*10 (S.D.N.Y. Oct. 29, 1997) (quoting *Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260, 1267 (S.D.N.Y.1991)).

Plaintiffs provide no factual support for their conclusory allegations of a conspiracy to commit any of these torts. Plaintiffs claims of a conspiracy to commit these torts, therefore, is dismissed as to all plaintiffs. Furthermore, as will be seen, plaintiffs have also failed to allege facts sufficient to support their claims of the underlying torts.

a. *Trade Libel and Injurious Falsehood*

Plaintiffs Sixth and Eighth Causes of Action allege independent trade libel and injurious falsehood claims against all the defendants. In support of their trade libel claim, plaintiffs allege that the

[d]efendants have engaged in an unlawful combination and conspiracy to cause the publication of untruths disparaging plaintiffs, such as plaintiffs' actions are fraudulent, their products and services are of inferior quality, they misappropriated inventories and are poor risks. Such publications being accompanied by an intent to cause competitive injury, personal hostility, and bad faith. These untruths were published maliciously and without reasonable or probable cause to believe in the truth thereof. These publications of injurious falsehoods constituted, and continue to constitute, the tort of trade libel for which defendants are jointly and severally liable.

Complaint at 23, ¶ 87.

Similarly, in support of their injurious falsehood claim, plaintiffs restate many of the same conclusory allegations in their trade libel claim. Plaintiffs maintain that the

\*15 [d]efendants have engaged in an unlawful combination and conspiracy to cause the publication of untruths disparaging plaintiffs, such publication be-

ing accompanied by an intent to cause competitive injury, personal hostility, and bad faith. These untruths were published maliciously and without reasonable or probable cause to believe in the truth thereof. These publications of injurious falsehoods such as plaintiffs committed fraud, stole money, fraudulently conveyed assets, misrepresented themselves, and lied to their customers, and switched receivables constitute the tort of injurious falsehood. Defendants made these statements and published these statements knowing they were false and knowing and intending to cause harm to plaintiffs. These statements in fact caused harm to plaintiffs' in that plaintiffs' customers stopped doing business with plaintiffs and other factors withdrew funding from plaintiffs and factors refuse to factor plaintiffs.

Complaint at 25, ¶ 92.

These conclusory allegations are insufficient to support plaintiffs' claim of trade libel or injurious falsehood. The allegations fail to identify which specific defendants committed these torts. Furthermore, the allegations fail to identify the false statements made by any defendant. However, in their Seventh Cause of Action for defamation, slander and libel, plaintiffs make allegations from which the Court may infer false statements in support of their trade libel and injurious falsehood claims. Plaintiffs allege that Miles M. Stuchin "defamed and slandered Plaintiffs by writing and publishing false and libelous letters, including a letter dated November 3, 2000, and telephone calls, mainly during October 2000 and through and including December 2000, and oral communications to Plaintiffs' clients and to the industry."Complaint at 6, ¶ 17. Stuchin and defendant Access Capital, of which he is president, are alleged to have

defamed[,] libeled and slandered plaintiffs in that on many dates during the time between October 2000 and February 2001, defendant and his employees including Vincent Grillo called and wrote plaintiffs' customers and others in the industry stating that plaintiffs "committed fraud," "stole

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 47 of Page 16 of 104

Not Reported in F.Supp.2d                                                                    Page 15
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: Not Reported in F.Supp.2d)

money," "fraudulently conveyed assets," "misrepresented themselves" and "lied" to their customers, and "switched receivables.

Complaint at 6, ¶ 17. Lastly, plaintiffs maintain that in a letter dated January 16, 2001, defendants Richard I. Simon and Westgate Financial, of which he is allegedly president, "accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey."Complaint at 7, 15, ¶¶ 18, 43. These statements were published to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others. *Id.* at 15, ¶ 43.[FN15]

> FN15. Plaintiffs have not pled their trade libel or injurious falsehood claim against all defendants with any specificity. The only defendants identified as having made false statements are Miles M. Stuchin, Access Capital, Richard I. Simon and Westgate Financial. The Court will therefore treat plaintiffs' claims of trade libel and injurious falsehood as against those defendants only. If indeed plaintiffs intended to allege these claims against all of the defendants, those claims are dismissed as conclusory and unsupported by specific allegations of published false statements.

Although pled separately, the torts of trade libel and injurious falsehood require the same allegations to be pled. The distinction between the two is slight; courts having articulated that statements disparaging another's product were called "trade libel," another's business "injurious falsehood," and another's title "slander of title." *P ayrolls & Tab u-lating, Inc. v. Sperry Rand Corp.,* 22 A.D.2d 595, 257 N.Y.S.2d 884, 887 (1st Dep't 1965)."The tort of trade libel or injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment."*Waste Distillation,* 136 A.D.2d 633,

634, 523 N.Y.S.2d 875 (2nd Dep't 1988); *seealsoGlobal Merch., Inc. v. Lombard & Co.,* 234 A.D.2d 98, 99, 650 N.Y.S.2d 724 (1st Dep't 1996) ("trade libel ... requires 'knowing publication of false matter derogatory to the plaintiff's business." ') (quoting *Waste Distillation,* 136 A.D.2d at 634, 523 N.Y.S.2d 875). "The utterance or furnishing of false and misleading information may be actionable if done maliciously or with the intention to harm another, or so recklessly and without regard to its consequences, that a reasonably prudent person should anticipate that damage to another will naturally follow." *Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co.,* 7 A.D.2d 441, 444, 184 N.Y.S.2d 58, 61 (App. Div. 1st Dep't 1959).

*16 The elements of a claim of injurious falsehood or trade libel are: (i) falsity of the alleged statements; (ii) publication to a third person; (iii) malice; and (iv) special damages. *SeeDrug Research Corp. v. Curtis Publishing Co.,* 7 N.Y.2d 435, 440, 199 N.Y.S.2d 33, 37, 166 N.E.2d 319 (1960); *seealsoComputech Int'l, Inc. v. Compaq Computer Corp.,* No. 02 Civ. 2628, 2002 WL 31398933, at *5 (S.D.N.Y.Oct.24, 2002). The requirement of pleading and proving special damages is applied strictly. *Seeid.* at *6. Thus, a motion to dismiss a claim of injurious falsehood may be granted for failure to allege special damages with the requisite specificity. *Seeid.;seealsoDrug Research Corp.,* 7 N.Y.2d at 440-41, 199 N.Y.S.2d at 37-38, 166 N.E.2d 319.

Plaintiffs' claims of trade libel and injurious falsehood, like their defamation, slander and libel claims, are premised on two letters dated November 3, 2000 and January 16, 2001 as well as telephone calls made during October 2000 and through and including December 2000. Plaintiffs complaint, however, does not allege with particularity to whom the November 3, 2000 letter was written.FN16Plaintiffs' claim regarding the November 3, 2000 letter, therefore, is dismissed. Furthermore, all of plaintiffs' trade libel and injurious falsehood claims against all defendants must be dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 48 of Page 17 of 104

Not Reported in F.Supp.2d
Page 16
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: Not Reported in F.Supp.2d)

missed because plaintiffs failed to allege special damages with sufficient particularity. Under New York law, plaintiffs' special damages claim, premised on their loss of business, must be "fully and accurately stated." *Drug Research Corp. v. Curtis Pub. Co.,* 7, N.Y.2d 435, 440-41, 199 N.Y.S.2d 33, 37-38, 166 N.E.2d 319 (N.Y.1960)(finding that special damages were not adequately alleged where the damage claim was a round figure [$5,000,000] with no attempt at itemization); *seealsoRall v . Hellman,* 2 84 A.D.2d 113, 114, 726 N.Y.S.2d 629, 632 (App. Div. 1st Dep't 2001)(finding that complaint was deficient because it failed to identify special damages with sufficient particularity). Plaintiffs allege damages "in an amount to be determined at trial but not less than $40,000,000.00."Complaint at 23, 26, ¶¶ 87, 93. This allegation is insufficient under New York law and cannot survive defendants' motion to dismiss.

> FN16. Plaintiffs do, however, allege that "[o]n December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance" Complaint at 15, ¶ 42. Plaintiffs also allege the third person to whom Westgate published false statements: "on or about January 16, 2001 Defendants, including Westgate Financial Corp., accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey. Defendants published these statements to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others."Complaint at 15, ¶ 43.

### b. *Defamation, Libel, Slander*

In their Seventh Cause of Action, plaintiffs assert claims of defamation, libel and slander. Premised on the same set of allegations as their trade libel and injurious falsehood claims, plaintiffs' defama-

tion, libel and slander claim is based on false statements allegedly made by defendants Stuchin, Access Capital, Simon and Westgate Financial in two letters dated November 3, 2000 and January 16, 2001, as well as oral statements made on the telephone from October 2000 through and including February 2001. Complaint at 6, 13, 14, 24, ¶¶ 17, 36, 37, 89. As with plaintiffs trade libel and injurious falsehood claims, plaintiffs' claim regarding the November 3, 2000 letter fails to specify to whom the letter was published and is, therefore, dis- missed.

**\*17** Although defendants Westgate, Simon, Access and Stuchin argue that plaintiffs claim must be dismissed for failing to specify to whom all of the alleged defamatory statements were made, plaintiffs' complaint does allege that "[o]n December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance."Complaint at 15, ¶ 42. Plaintiffs further assert

[t]hat on or about January 16, 2001 Defendants, including Westgate Financial Corp., accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey. Defendants published these statements to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others.

Complaint at 15, ¶ 43.[FN17]

> FN17. Additionally, plaintiffs maintain that Omni Corp. "slandered plaintiffs to many in the industry."Complaint at 3, ¶ 7. Although plaintiffs allege that Omni Corp. and not named defendant Omni Commercial, LLP slandered the plaintiffs, assuming *arguendo* that the plaintiffs allegation is directed towards defendant Omni Commercial, plaintiffs' claim would still be dismissed for failure to state a claim. Plaintiffs do not allege a specific defamatory statement; to whom these statements

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 49 of Page 18 of 104

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
**(Cite as: Not Reported in F.Supp.2d)**

Page 17

were made; nor any special damages to support their claim.

Under New York law, the elements of a defamation cause of action are: (i) a defamatory statement of fact concerning the plaintiff, (ii) publication to a third party by the defendant, (iii) falsity of the defamatory statement, (iv) some degree of fault, and (v) special damages or per se actionability (defamatory on its face).*See Dillon v. City of New York,* 261 A.D.2d 34, 37-38, 704 N.Y.S.2d 1, 5 (App. Div. 1st Dep't 1999); *Celle v. Filipino Reporter Enters. Inc.,* 209 F.3d 163, 176 (2d Cir.2000). As a general rule, a statement is defamatory per se if it "tends to disparage a person in the way of his office, profession or trade."*Celle,* 209 F.3d at 179 (emphasis in original); *seealsoAronson v. Wiersma,* 65 N.Y.2d 592, 594, 493 N.Y.S.2d 1006, 1008, 483 N.E.2d 1138 (1985). If a statement is defamatory *per se,* injury is assumed and the statement is actionable without proof of special damages. Special damages are those which flow directly from the injury to a plaintiff's reputation caused by the defamation and which involve the loss of something having economic or pecuniary value. *SeeCelle,* 209 F.3d at 179 (citing *Matherson v. Marchello,* 100 A.D.2d 233, 235, 473 N.Y.S.2d 998, 1000 (App. Div.2d Dep't 1984)). Lastly, "a plaintiff in a libel action must identify a plausible defamatory meaning of the challenged statement or publication."*Celle* 209 F.3d at 178. If the statement is susceptible of only one meaning, it becomes the court's responsibility to determine, as a matter of law, whether that one meaning is defamatory. On the other hand, if the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it becomes the trier of fact's responsibility to determine in what sense the words were used and understood. *Seeid.*

Although plaintiffs allege that all of the defendants committed defamation, plaintiffs' complaint only supports claims against defendants Stuchin, Access Capital, Simon and Westgate Financial. Stuchin and Access Capital are alleged to be responsible for the

November 3, 2000 letter as well as the oral communications between October 2000 and February 2001. Defendants Simon and Westgate are alleged to be responsible for the January 16, 2001 letter. As plaintiffs' complaint does not refer to any other communications, plaintiffs claims against all other defendants are dismissed.

**\*18** Plaintiffs' claims against defendants Stuchin and Access Capital regarding the November 3, 2000 letter are dismissed for failing to allege with specificity the exact words contained in the November 3, 2000 letter that plaintiffs' claim are libelous. Plaintiffs' insufficient pleading of the allegedly defamatory statement goes hand in hand with their failure to identify a plausible defamatory meaning for that statement. Plaintiffs further fail to allege to whom that letter was published. Lastly, plaintiffs fail to allege special damages or that the defamatory words contained in the letter should be considered by the Court as defamatory *per se.SeeChurch of Scientology Int'l v. Eli Lilly & Co.,* 778 F.Supp 661, 668 (S.D.N.Y.1991)(dismissing claim that failed "to provide both the context and the precise language of" the alleged statements).

Plaintiffs allegations concerning the January 16, 2001 letter allegedly written by defendants Simon and Westgate Financial suffer from the same deficiencies as their claims regarding the November 3, 2000 letter. Plaintiffs fail to articulate the libelous statement made in that letter and also fail to allege either special damages or that the libelous statement reaches *per se* liability. Although plaintiffs allege to whom that letter was sent, that allegation alone is insufficient to support plaintiffs' claims. Plaintiffs' libel claim regarding the January 16, 2001 letter is therefore dismissed.

Plaintiffs claims regarding telephone calls and other oral communications that occurred between October 2000 and February 2001 against Stuchin and Access Capital are dismissed except for one slander allegation: "[o]n December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: Not Reported in F.Supp.2d)

stealing money, and switching invoices in a fraudulent conveyance."Complaint at 15, ¶ 42. Under New York law, there are four elements necessary to establish a *prima facie* case of slander: (1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff. The fourth element is presumed when the defamatory statement takes the form of slander *per se.Weldy v. Piermont Airlines, Inc.,* 985 F.2d 57, 61-62 (2d Cir.1993) (citations omitted). Defamation *per se*"consist[s] of statements (i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman."*Liberman v. Gelstein,* 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992). The second type of defamation *per se* is "limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities".*Id.* Thus, "charges against a clergyman of drunkenness and other moral misconduct affect his fitness for the performance of the duties of his profession, although the same charges against a business man or tradesman do not so affect him".*Id.* at 436, 590 N.Y.S.2d 857, 605 N.E.2d 344 (citations omitted). For the purposes of this motion, therefore, plaintiff has adequately pled a *prima facie* case of slander. Defendants' motion to dismiss plaintiffs' claim of slander based on this telephone call is denied.

### c. *Interference with Commercial Relations*

*19 In their Ninth Cause of Action, plaintiffs also allege a claim of interference with commercial relations. Plaintiffs maintain that the

[d]efendants have induced Plaintiffs' clients to refrain from purchasing from Plaintiffs by publishing disparaging and false statements about the products and services of Plaintiff, such publications being accompanied by an intent to cause competitive injury, personal hostility, bad faith, knowing the matter was false, by creating the impression and belief that to work with plaintiffs would jeopardize such customers' continued status, and by Defendants having purposely induced or otherwise caused third persons not to enter into or continue business relations with Plaintiffs.

Complaint at 13, ¶ 34. These allegations are insufficient to state a claim of tortious interference with business relations against all of the defendants. The only allegations which specify direct conduct by particular defendants are actions by defendants Access Capital and Stuchin against plaintiff John Michaels. Plaintiffs allege that Access Capital and Stuchin "interfered with an unrelated lawsuit plaintiffs were involved in, illegally diverted and opened plaintiffs' personal and business mail."Complaint at 6, ¶ 17. Plaintiffs assert thaton or about and after October 27, 2000, Defendant Access intentionally and illegally diverted, opened and withheld Plaintiffs' mail, made illegal financial threats and demands upon Plaintiff John Michaels' accounts causing many of John Michael's accounts to withhold payments and caused John Michaels to be unable to operate its business.

Complaint at 14, ¶ 40. Plaintiffs maintain that[d]efendants' actions constitute interference of John Michaels' and other plaintiffs' contractual relationships with its customer accounts, and disrupted the normal operation of John Michaels' and plaintiffs' business, causing a great loss of booked orders plus future sales. Defendants acted intentionally with the knowledge that their actions would cause John Michaels' accounts to stop payments for shipments received and that the factors would refuse to do business with plaintiffs, and that plaintiffs' customers would refuse to do business with plaintiffs.

Complaint at 15, ¶ 41.

In order to state a claim for tortious interference with contractual relations under New York law, a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS   Document 53-2   Filed 04/02/2008   Page 51 of Page 20 of 104

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: Not Reported in F.Supp.2d)

Page 19

plaintiff must allege "(1) the existence of a valid contract between itself and a third party for a specific term; (2) defendant's knowledge of that contract; (3) defendant's intentional procuring of its breach; and (4) damages."*150 East 58th St. Partners, L.P. v. Wilkhahn Wilkening & Hahn GmbH & Co., No. 97 CIV. 4262(SHS), 1998 WL 65992, at *1 (S.D.N.Y.Feb.17, 1998) (quoting Riddell Sports Inc. v. Brooks, 872 F.Supp. 73, 77 (S.D.N.Y.1995)); seeJews for Jesus, Inc. v. Jewish Community Relations Council of N.Y., Inc., 968 F.2d 286, 292 (2d Cir.1992); Union Carbide Corp. v. Montell N.V., 944 F.Supp. 1119, 1136 (S.D.N.Y.1996); Foster v. Churchill, 87 N.Y.2d 744, 749-50, 665 N.E.2d 153, 156, 642 N.Y.S.2d 583, 586 (1996).

**\*20** The standard for demonstrating tortious interference with business relations "is somewhat more stringent." Campo v. 1st Nationwide Bank, 857 F.Supp. 264, 273 (E.D.N.Y.1994); seeInternational Minerals and Resources, Inc. v. Pappas, 761 F.Supp. 1068, 1075 (S.D.N.Y.1991). A plaintiff must allege that defendants interfered with business or economic relations between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by dishonest, unfair, or improper means. SeePPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266, 269 (2d Cir.1987); Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F.Supp. 477, 482 (S.D.N.Y.), cert. denied, 522 U.S. 908, 118 S.Ct. 265, 139 L.Ed.2d 191 (1997); Houbigant, Inc. v. ACB Mercantile, 914 F.Supp. 964, 995 (S.D.N.Y.1995); Campo, 857 F.Supp. at 273. Indeed, the defendant "must interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff."Fonar Corp., 957 F.Supp. at 482.

Defendants Access and Stuchin argue that plaintiffs fail under both standards. First, defendants argue that plaintiffs fail to allege that they were "actually and wrongfully prevented from entering into or continuing in a specific business relationship."Solar Travel Corp. v. Bachtomi, 2001 WL 641151 (S.D.N.Y.2001); Korn v. Princz, 226 A.D.2d 278, 641 N.Y.S.2d 283 (1st Dep't 1996). Defendants further contend that plaintiffs have not alleged that a contract would have been entered into but for the alleged actions of Access and Stuchin. See,e.g.,Bankers Trust Co. v. Bernstein, 169 A.D.2d 400, 563 N.Y.S.2d 821 (1st Dep't 1991).

Plaintiffs' claims against defendants Stuchin and Access Capital must be dismissed. Plaintiffs do not allege with any specificity the contracts it claims were breached or the business relations it claims were prevented from going forward as a result of either Stuchin's or Access Capital's actions. Plaintiffs also fail to identify the third parties that plaintiffs had either a contractual or prospective business relationships with. Plaintiffs' claim of tortious interference with commercial relations is, therefore, dismissed.

### d. Breach of Contract

As is the case with all of their claims, in their breach of contract claim, plaintiffs do not specify which plaintiffs had contractual relationships with which defendants, generally alleging that the [d]efendants conduct and the unlawful acts in restraint of trade have caused the breach of their respective contracts with plaintiffs, and, Defendants have breached their contractual duties to each plaintiff separately and apart from their anticompetitive conduct. Defendants also engaged in the following additional actions that further breached its covenants of good faith and fair dealing. Defendants' bad faith actions contributed substantially to the demise of the plaintiffs, and caused each of the plaintiffs' substantial financial loss. The contracts themselves are unconscionable, against public policy, and predatory.

**\*21** Complaint at 26-27, ¶ 98. Indeed the only allegations that support a breach of contract claim which specifically identify a breach by a particular

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 20
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: Not Reported in F.Supp.2d)

defendant of a contract with a specific plaintiff are against defendants Westgate and Star Funding. Plaintiffs allege thatWestgate Financial confiscated Plaintiff John Michael's client inventory and sold it to a salvage company, never gave plaintiffs credit for payments made, refused to give advance funding, breached their contract, and caused a loss in excess of Two Million Dollars. Defendants misappropriated Plaintiffs' inventory and charged unlawfully high interest rates causing serious financial loss to John Michael's.

Complaint at 13, ¶ 35. Plaintiffs further allege that theywere coerced and forced under duress to use the factor Star Funding, and then Star Funding immediately breached their contract based upon Rosenthal & Rosenthal's request not to go forward with its funding to Gabbey, all of this occurred after Star Funding and Rosenthal & Rosenthal met with defendants and agreed to force plaintiffs out of business.

Complaint at 14, ¶ 38.

In order to state a claim for breach of contract, plaintiffs must allege: (1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of the contract provisions by the defendants; and (4) damages resulting from the breach. See*Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir.2000). As plaintiffs have only alleged contracts with defendants Westgate and Star Funding, plaintiffs breach of contract claim against all other defendants are dismissed. Plaintiffs claims against these remaining defendants are also dismissed for failing to allege adequate performance of the contract by the plaintiffs as well as damages resulting from the breach.

### III. *Conclusion*

Defendants' motions to dismiss plaintiffs' claims under Section 1 of the Sherman Act are granted. Defendants' motions to dismiss plaintiffs' claims under Section 2 of the Sherman Act are denied. De-

fendants' motions to dismiss plaintiffs' claims under the Clayton Act are granted. Defendants' motions to dismiss plaintiffs' price-fixing and group boycott claims under the Donnelly Act are granted. Defendant's motion to dismiss plaintiffs' monopolization claims under the Donnelly Act are denied. Defendants' motions to dismiss all of plaintiffs' claims of trade libel, injurious falsehood, tortious interference with commercial relations and breach of contract are granted. Defendants' motion to dismiss plaintiffs' defamation, libel and slander claims is granted in part and denied in part. All of plaintiffs' defamation, libel and slander claims are dismissed except for plaintiffs' slander claim regarding the alleged December 5, 2000 telephone call.

S.D.N.Y.,2004.
Kasada, Inc. v. Access Capital, Inc.
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**4**

## Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 58463 (D.Puerto Rico), 1990-1 Trade Cases P 68,986
**(Cite as: Not Reported in F.Supp.)**

## C

Metro Video, Inc. v. Vestron Video, Inc.
D.Puerto Rico,1990.

United States District Court, D. Puerto Rico.
METRO VIDEO DIST., INC., et als.
v.
VESTRON VIDEO, INC., et als.
**CIV. No. 89-0640 PG.**

Feb. 8, 1990.

#### Opinion and Order

PEREZ-GIMENEZ, Chief Judge.
**\*1** Plaintiffs Metro Video Dist., Inc., Metro Video Dist. of Puerto Rico, Inc., M. Video Dist. Inc., Metro Video Dist. of Minnesota, Inc., and their majority stockholder and president Arthur Morowitz (collectively, "Metro"), commenced this action in May of 1989 against defendants Vestron Video and Vestron Video, Inc. (collectively, "Vestron"). Metro sued under provisions of the Clayton Act FN1 invoking this Court's federal question jurisdiction, FN2 with reliance also placed on the authority we derive from the doctrine of pendent jurisdiction. The complaint alleged, in essence, that Vestron's decision to discontinue extending credit to Metro in 1988 violated several federal antitrust laws as well as a number of the laws of Puerto Rico.

Defendants have moved this Court for an order granting partial summary judgment as to the antitrust claims made in the first, second, third and fourth causes of action of the complaint, pursuant to Fed.R.Civ.P. 56, and for a transfer of the remaining counts to the District of Connecticut on the grounds that the transfer would best serve the convenience of the parties, the witnesses, and the interests of justice, pursuant to 28 U.S.C. § 1404. For reasons we expound below, defendants' motion is granted in all respects.

#### The Standard for Summary Judgment

We will grant summary judgment if the pleadings and other submissions "show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly submitted motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1985). We note in passing that our First Circuit has specifically rejected special summary judgment treatment in antitrust cases, holding that the particular circumstances involved are what control. *Texaco v. Medina,* 834 F.2d 242, 247 (1st Cir.1987), *White v. Hearst Corp.,* 669 F.2d 14, 17 (1st Cir.1982).

Viewing the record, as we must, in the light most favorable to the non-moving party, and indulging all inferences favorable to that party, *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988), we turn to the facts.

#### Facts Common to All Causes of Action

Defendant Vestron is engaged in the business of the manufacture and distribution of motion picture video cassettes and is "engaged in commerce" within the meaning of the antitrust laws of the United States. Plaintiff Metro is a wholesale distributor of video cassettes in the continental United States and Puerto Rico. Vestron distributed its products nationwide through a network of approximately 23 independent wholesale distributors. Metro had been one of those distributors since 1982.

Two seemingly insignificant facts must be noted at the outset, for they acquired unexpected relevance as the plot developed. The first, to be mentioned only briefly, pertains to Vestron's particular system of sale incentives. Prior to January 1988, Vestron offered its distributors a series of advertising cred-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS   Document 53-2   Filed 04/02/2008   Page 55 of Page 24 of 104

Not Reported in F.Supp.                                                                                      Page 2
Not Reported in F.Supp., 1990 WL 58463 (D.Puerto Rico), 1990-1 Trade Cases P 68,986
(Cite as: Not Reported in F.Supp.)

its, allowances, incentives, and rebates for unsold
and returned merchandise upon the submission of
claims. Starting in 1988, however, Vestron imple-
mented the so called "Advantage Program," which
provided for a full scale revision of all sale credits
and incentives available along its distribution chain,
along with a new system of sales quotas and direct-
ives and an array of penalties for the dealer's failure
to comply with them.

\*2 Secondly, we must mention that Mr. Morowitz
had played an instrumental role in the organization
and furtherance of the National Video Software
Manufacturers Credit Association ("NVSMCA").
The NVSMCA's purpose was to protect dealers
from abusive practices and unfair methods of com-
petition and to provide a means of exchange of his-
torical credit information. See Exh. D to the
McGovern Aff., Art II, Part 1, *Bylaws of the
NVSCMA.* From 1986 to 1988 Mr. Morowitz was
President of the NVSCMA and had also been a
member of its Board of Directors since its inception
in 1981. The association sought to facilitate the ex-
change of video dealers' historical credit informa-
tion, and its bylaws explicitly prohibited its mem-
bers from agreeing to take any action with respect
to a customer or from exchanging any confidential
information about a customer. See Exh. D to
McGovern Aff., Art III, Part 1.

To no one's surprise, resolution of Vestron's motion
hinges on facts pertaining to the economic relation-
ship that existed between the parties which we now
proceed to describe briefly. Defendants contend,
and plaintiffs do not dispute, that Metro has had a
history of past-due payments to Vestron. To illus-
trate, Vestron points to the fact that in March of
1988 about $1.2 million of Metro's outstanding bal-
ance of approximately $3 million was more than
thirty days overdue. *See* Par. 7 of the Aff. of Mi-
chael McGovern. Vestron's National Credit Man-
ager, Jeff Hamilton, visited Metro's office and dis-
cussed the situation with Metro's president and co-
plaintiff Arthur Morowitz. Upon review of some
financial records, Mr. Hamilton concluded that

Metro might be having severe financial difficulties.
See McGovern Aff. Pp. 4-8. To further evaluate
Metro's financial situation, Vestron's Vice President
of Credit Operations, Michael McGovern, met with
Arthur Morowitz in June of 1988. He requested that
Metro provide him with audited financial state-
ments for the past several years. Mr. Morowitz
gave Mr. McGovern Metro's audited financial state-
ments for the years ending in June 30, 1986, and
June 30, 1987, and unaudited financials for the
nine-month period ending on April 2, 1988. The
June 30, 1987, audited financial statement reported
a net loss of $3,676,339.00 and disclosed that
Metro's liabilities exceeded its assets at the time by
$4,641,673.00. The unaudited financial statements
for the nine-month period ending April 2, 1988,
showed Metro's liabilities continued to exceed its
assets by more than $3,300,000.00. As defendants
viewed things, those statements revealed that Metro
posed a serious credit risk to Vestron. *See* McGov-
ern Aff. Pp. 9-11.FN3

While not contesting the truthfulness of the above
stated facts, Metro concentrates its fire on a differ-
ent front. First, plaintiffs submit that Vestron had
knowledge of Metro's uncertain financial situation
since as early as August of 1987, more or less the
time around which the two of them began doing
business with each other. See Par. 18 of the Aff. of
Arthur Morowitz. Secondly, it is contended that
Vestron had repeatedly assured Metro that, notwith-
standing Metro's financial problems, it would con-
tinue to sell to Metro on standard credit terms if
Metro paid off its past due balance and remained
current, a condition which, working in conjunction
with Vestron,FN4 Metro was able to comply with
at no less than two periods in time: by year end of
1987 and by August of 1988 (the month on which
Metro's credit was terminated by Vestron). See
Morowitz Aff. Pp. 19-22.FN5 Moreover, in the
midst of its precarious financial situation, Metro
points to an "upward trend" which is presumably
evidenced by its financial statements. To illustrate,
Metro submits that its deficiency in assets was re-
duced from $3,020,257.00 in 1987 to $1,887,310.00

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in nine months of operations in 1988. Additionally, from a loss of operations of $3,676,339.00 in 1987, it alleges that it was able to develop a positive net income from operations of $1,132,947.00 in that nine month period, with an increase in working capital of $1,243,378.00.

**\*3** In August of 1988 Vestron announced that it would refuse to extend any further credit to Metro but would continue to deal with it on a cash basis only. The cash-basis-only treatment required Metro to pay cash in advance for all future orders. As explained more fully below, this action by Vestron allegedly placed Metro at a disadvantage with respect to its competitors in the business of video cassette distribution specially in the wake of the newly implemented Advantage Program. More important to the business at hand, it prompted the legal action which occupies our attention today.

There being no genuine issue as to any of the above presented material facts, we examine the law.

*Discussion*

A

In the broad panoply of federal antitrust laws, the Clayton Act, as amended by the Robinson-Patman Act, protects competitors who engage themselves in interstate commerce. See 15 U.S.C. § 13(a).[FN6] In this spirit, it forbids sellers to "discriminate in price between different purchasers of commodities," where such discrimination tends to substantially "lessen competition or ... to injure, destroy or prevent competition with any person" who receives the benefits of such discrimination. See Section 2(a) of the Robinson-Patman Act and *Monahan's Marine, Inc. v. Boston Whaler, Inc.*[1989-1 TRADE CASES ¶ 68,422], 866 F.2d 525, 528 (1st Cir.1989).

Plaintiffs attempt to bring their cause within the narrow confines of Section 2(a).[FN7] For this they allege that Vestron's sales to Metro from August of 1988 to December of that same year on a cash basis

only, while sales to Metro's competitors during the same period of time were made on standard credit terms, constituted price discriminations which had the effect of substantially lessening competition or of injuring, destroying, or preventing competition, all in violation of the Robinson-Patman Act. The adverse effect of Vestron's decision to terminate Metro's credit was multiplied by the "Advantage Program" that had been recently implemented. This was so, the thesis runs, in view of the fact that since Metro had to fund all its purchases by paying cash in advance, it was limited in the amount of product it could purchase for resale. As a result thereof, Metro found it difficult to meet quotas imposed by Vestron pursuant to its "Advantage Program," which in turn caused it to lose rebates and other concessions. In addition, Vestron's treatment of Metro's account as one not in good standing caused Metro to lose advertising credits and returns, allowances, incentives, and rebates, all of which placed Metro at a competitive disadvantage in its business. Vestron, in response, argues that its decision to discontinue extending credit to Vestron [Metro] was based on legitimate business reasons, as case law requires.

In evaluating Metro's position we must be mindful that credit decisions, by their very nature, will have discriminatory effects, since they require sellers to distinguish between dealers who are good credit risks and those who are not. This being so, and taking into account the fact that the legislative purpose behind Section 2(a) has been described as an effort to insure that purchasers from a single seller would not be injured by the seller's discriminatory pricing policies, *Pierce v. Commercial Warehouse* [1989-1 TRADE CASES ¶ 68,638], 876 F.2d 86 (11th Cir.1989), we must consequently conclude that under § 2(a) the most that can be asked from a manufacturer is that he apply the same standard of credit worthiness to all distributors who compete for his products. In order to prove this, courts have consistently ruled that a showing that a legitimate business justification underlies a particular credit decision entitles a seller to a presumption of regularity in his

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dealings with all of his distributors.

**\*4** In *Thomas J. Kline, Inc. v. Lorillard, Inc.*[1989-1 TRADE CASES ¶ 68,650], 878 F.2d 791, 796 (4th Cir.1989), the Fourth Circuit outlined the proper approach to be followed when considering discrimination claims in decisions involving the extension of credit. After observing that no court had found sufficient facts for Robinson-Patman liability based on a single credit decision perhaps due to the fact that credit extension decisions are quite customer specific and that many other different factors guide credit determinations, *Thomas J. Kline,* 878 F.2d at 797, the Circuit Court relied on the words of the district court in *Carlo C. Gelardi Corp. v. Miller Brewing Co.*[1980-81 TRADE CASES ¶ 63,745], 502 F.Supp. 637, 647 (D.N.J.1980):

In other words, a manufacturer is free to extend different terms to competing purchasers so long as it makes its decisions in a non-discriminatory manner, i.e. the same standards of credit worthiness must be extended to all applicants for credit who are in competition with each other. A showing such as the one made by [plaintiff] can, therefore, be rebutted by an affirmative showing that the different terms resulted from legitimate business factors.

Along with the majority of the other circuits which have considered the issue, [FN8] then, the Fourth Circuit did not hesitate to hold that when legitimate business reasons for the extension or denial of credit are advanced, a Clayton Act, Section 2(a) cause of action is effectively barred. *Cf.* also *Mozart v. Mercedes-Benz of North America, Inc.*[1987-2 TRADE CASES ¶ 67,789], 833 F.2d 1342, 1348-1351 (9th Cir.1987).

In the instant case, legitimate business reasons for Vestron's denial of credit to Metro abound. As noted above, Metro had a history of late payments. We need not recount here the financial hardships encountered by Metro during the years 1987 and 1988, as nothing is to be gained from such an ordeal. It suffices to say that Vestron's characteriza-

tion of Metro as a substantial "credit risk" is, in our view of things, a fair statement of the point, to say the least. Even Metro's allegations in its own defense depict a corporation in a constant struggle to get out of the red. The fact that Vestron had been lenient, cooperative, and supportive in its prior dealings with Metro can in no way now serve to hold it liable once such treatment is no longer offered. Other courts, notably the Fourth and Sixth Circuits in their *Thomas J. Kline* and *Bouldis* decisions, have found histories of late payments and credit problems, as well as instances of negative net worth to constitute sufficient justification to bar a claim under Section 2(a). We therefore hold, without serious pause, that no cause of action is stated in the case at bar *under Section 2(a) of the Robinson-Patman Act.* Under the circumstances of this case, Vestron's management could have opted not to continue dealing with Metro under their established credit terms, but it certainly cannot be disputed that a decision to stop extending credit clearly had a legitimate foundation.

**\*5** The arguments advanced by Metro in support of its position do not warrant a contrary result. Metro first contends that the fact that no court to date has found a seller's decision not to extend credit to its customers to violate Section 2(a) does not mean that a discrimination in credit may never result in a Section 2(a) (price discrimination) violation. To defend their contention plaintiffs argue that credit terms are in fact an integral part of the price, finding support for their contention in some language quoted by the Supreme Court in *Catalano, Inc. v. Target Sales, Inc.*[1980-2 TRADE CASES ¶ 63,352], 446 U.S. 643, 645 (1980) (wherein we are advised that the extension or denial of credit is an indirect method of lowering or raising prices). Additionally, plaintiffs point to the opinions in *Robbins Flooring, Inc. v. Federal Floors, Inc.*[1978-2 TRADE CASES ¶ 62,259], 445 F.Supp. 4 (E.D.Pa., 1977) and *Craig v. Sun Oil Company, supra,* wherein the possibility was recognized that "in an extreme situation there might be a violation of the (Robinson-Patman) Act by reason of the magnitude

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 58 of Page 27 of 104

Not Reported in F.Supp.                                                                          Page 5
Not Reported in F.Supp., 1990 WL 58463 (D.Puerto Rico), 1990-1 Trade Cases P 68,986
(Cite as: Not Reported in F.Supp.)

or nature of the discrimination in the extension of credit." 515 F.2d at 224.

However cleverly it might have been presented, the argument simply will not wash. The statement in *Catalano,* which we of course do not contend, was nevertheless advanced in the context of the price-fixing prohibition of the Sherman Antitrust Act and is therefore extraneous to the analysis that applies to Robinson-Patman violations. We explain briefly. Section 1 of the Sherman Act has been interpreted to make horizontal agreements (or conspiracies) to fix prices unlawful *per se.* See *Catalano,* 446 U.S. at 647. The Court in *Catalano* was concerned with the Court of Appeals decision holding that a horizontal agreement to fix or eliminate short-term trade credit does not necessarily contravene the antitrust laws. It was in reversing this holding of the Circuit Court that the Supreme Court characterized credit terms as an integral part of a price. Clearly, an agreement to fix or eliminate credit terms across the board has to be regarded as conspiracy to fix prices, thus falling squarely within the traditional antitrust rule of *per se* illegality of price fixing embodied in the Sherman Act. It does not follow from this, however, that on a one on one relationship between a seller and a dealer a decision to deny credit must be considered as an instance of price discrimination. As noted above, the proper analysis in this context, taking into account the great number of factors that go into credit determinations, is to require sellers to prove the existence of legitimate business reasons underlying the differential treatment in credit. Once this feat is accomplished, our inquiry into the facts, in the absence of extreme circumstances, must stop.

As for the Tenth Circuit's holding in *Craig,* and to the extent that it left open the possibility of the existence of a discrimination in credit of such a magnitude as to constitute a Section 2(a) violation, we observe that it is a position that we do not quarrel with. This fact notwithstanding, however, we are of the opinion that no factual scenario even remotely resembling such an extreme discriminatory conduct

is present here. We have already discussed how Vestron's decision found ample justification in the record from the business point of view. Accordingly, we discard this contention without further discourse.

*6 In essaying their final defense of their Section 2(a) claim, plaintiffs first lay out two facts upon which they hope to build an argument. First, they submit that in order to make out a price discrimination case they must establish the existence of competitors who were favored with credit while Metro was not. Then, they explain that they have no access to evidence that would prove this since all of this evidence is in the hands of Vestron. Hence, the argument goes, summary judgment would be improper at this nascent stage of the proceedings without affording Metro the benefit of the discovery that would reveal facts basic to their causes of action. Were we to accept this contention, however, we would in fact be opening the door for future plaintiffs to file totally unsupported claims and expect to uncover the basis for their complaint during the course of discovery. As noted above, the case law provides a mechanism that plaintiffs had available to establish their Section 2(a) claim which took into account the difficulty Metro believes it is confronted with: if they could have demonstrated an absence of legitimate business reasons in Vestron's decision to stop extending credit to them, then they would have been entitled to summary judgment in their favor without further inquiry into the relationship between Vestron and the rest of its distributors. Clearly, Metro has access to all evidence pertinent to its relationship with Vestron. Defendants' affirmative showing relative to the existence of a business justification for their denial of credit to Metro entitles them to a presumption of regularity in their dealings with the rest of their distributors and to summary judgment, as to the Section 2(a) claim, on their behalf.

B

Plaintiff's second cause of action is contained in its entirety in paragraph 24 of their complaint. We

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 58463 (D.Puerto Rico), 1990-1 Trade Cases P 68,986
(Cite as: Not Reported in F.Supp.)

quote it *verbatim* for two reasons: one, because of its brevity and, two, because we can find no better way of showing that, contrary to Metro's assertion, its second cause of action really alleges nothing more than the first.

Paragraph 24 of plaintiffs' complaint reads as follows:

By failing to extend credit to Metro, rebates and other concessions, which would otherwise be available to Metro, were denied to it but not to Metro's competitors. Due to Vestron's actions in making such concessions and rebates functionally unavailable to Metro, the price which Metro effectively paid to Vestron for these same commodities was higher than the price paid by Metro's competitors, thus placing Metro at a competitive disadvantage.

The next paragraph alleges, as in cause of action number 1, that such a conduct violates Section 2(a) of the Robinson-Patman Act. Plaintiffs' effort, in its motion in opposition to summary judgment, to differentiate one cause of action from the other appears to us to incur in the critical error of attempting to elicit liability from both the cause as well as the effects. That is to say, Metro asserts that Vestron's denial of credit to Metro gives rise to a cause of action under Section 2(a) and that the effects of such a denial also give rise to an independent right of action under the same section of the law. With this, of course, we cannot agree. Both causes of action being one and the same, with respect to cause of action number two defendants are also entitled to judgment as a matter of law.

C

\*7 In its third cause of action Metro alleges violations to Sections 2(d) and 2(e) of the Clayton Act, as amended by the Robinson-Patman Act.

Section 2(d) makes it unlawful for a seller engaged in interstate commerce to grant advertising or other sales or promotional allowances to one "customer" who resells the seller's "products or commodities"

unless the allowances are "available on proportionally equal terms to all other customers competing in the distribution of such products or commodities." *F.T.C. v. Fred Meyer, Inc.*[1968 TRADE CASES ¶ 72,383], 390 U.S. 341, 343 (1967). Section 2(e) prohibits a seller from discriminating "in favor of one purchaser ... of a commodity bought for resale ... by ... furnishing ... any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms." *F.T.C. v. Simplicity Pattern Co.*[1959 TRADE CASES ¶ 69,361], 360 U.S. 55, 65 (1958).

Metro alleges that Vestron's treatment of "Metro's account as one not in good standing" constitutes a violation of these sections of the law since, in so doing, "Vestron made certain advertising credits, incentives, and rebates functionally unavailable to Metro, while at the same time making those credits available to Metro's competitors.[FN9]" Vestron, in turn, contends that, in the final analysis, Metro's allegation amounts to a claim that as a result of Vestron's credit decision Metro was unable to make sufficient purchases to qualify for the benefits in controversy. This being so, defendants urge us to dismiss said cause of action on the ground that Sections 2(d) and (e) do not apply to discriminatory practices in the extension of credit but to those occurring in connection with the resale of the product. In their opposition, plaintiffs iterate and reiterate that their claim is "not based on Vestron's failure to extend credit but rather, ... on Vestron's failure to make [sales incentives] functionally available to Metro by treating Metro's account as 'one not in good standing.[FN10]' " With slight modifications, it is with defendants' reasoning that we agree.

Try as they may, plaintiffs cannot seriously dispute the fact that Vestron's treatment of Metro's account as one "not in good standing" a nd its decision to deny credit to them are so closely interrelated as to constitute one and the same action. In fact, the "not in good standing" treatment was the only direct res-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 60 of Page 29 of 104

Not Reported in F.Supp.                                                                                    Page 7
Not Reported in F.Supp., 1990 WL 58463 (D.Puerto Rico), 1990-1 Trade Cases P 68,986
(Cite as: Not Reported in F.Supp.)

ult of Vestron's conclusion that Metro constituted a "serious credit risk" and that therefore credit could no longer continue to be extended to them. Perhaps it is easier to visualize our point if we consider the following: if Vestron decided to re-extend credit to Metro, Metro's account would cease to be one "not in good standing." Consequently, we must once again reject Metro's attempt to attribute different effects to each of the two actions. In our opinion, then, Metro's third cause of action is also based on Vestron's decision to stop extending credit to them. Discriminatory practices in the extension of credit being beyond the scope of either Section 2(d) or 2(e), *Bouldis v. U.S. Suzuki Motor Corp.*[1983-1 TRADE CASES ¶ 65,465], 711 F.2d 1319 (6th Cir.1983), *Craig v. Sun Oil Co. of Pa.*[1975-1 TRADE CASES ¶ 60,290], 515 F.2d 221 (10th Cir.1975), *L. & L. Oil Co. Inc. v. Murphy Oil Corp.*[1982-2 TRADE CASES ¶ 64,725], 674 F.2d 1113, n. 7 (5th Cir.1982), plaintiffs' cause of action number three must also be dismissed.

**\*8** Our holding fully effectuates the legislative motives behind the enactment of §§ 2(d) and (e). Prior to the enactment of the Robinson-Patman amendments to the Clayton Act § 2 applied only to direct price discriminations and sellers were circumventing these prohibitions by offering special sales allowances and promotional services to their favored customers. See *Murphy Oil Corp.,* 674 F.2d at 1118. Sections 2(d) and (e) were thus intended to prohibit price discriminations disguised in the form of promotional services provided to customers on a discriminatory basis. *Purdy Mobile Home, Inc. v. Champion Home Builders Co.*[1979-1 TRADE CASES ¶ 62,620], 549 F.2d 1313 (9th Cir.1979). In this case it has not been disputed that Metro was still eligible to obtain all advertising credits, incentives and rebates available to the rest of Vestron's customers. *Cf. B ouldis,* 7 11 F.2d at 1327. Metro's objection is only that their obtention was difficulted by the fact that they no longer enjoyed credit in their business relationship with Vestron. But, decisions involving credit cannot be the basis for a claim under §§ 2(d) and (e) since the statute's clear

language states that these sections apply not to the original sale of the product but to the distributor's resale, *Bouldis,* 711 F.2d at 1328. Consequently, as to the §§ 2(d) and (e) claims, too, defendants are entitled to judgment as a matter of law.

D

In their fourth cause of action, plaintiffs allege that Vestron, through its membership in the NVSMCA, unlawfully combined or conspired with other video manufacturers to discuss confidential information regarding the distributors' credit histories with the purpose of providing each manufacturer with "the same information so that they all acted accordingly." As a result of their conduct, Metro allegedly lost its good name and credit standing in the industry and also lost valuable distribution rights from other manufacturers. Such acts, the complaint alleges, constitute violations to Section 1 of the Sherman Antitrust Act and Section 5 of the Federal Trade Commission Aet ("FTCA").

Metro has since conceded that, as contended by defendants, Section 5 of the Federal Trade Commission Act does not provide a right of action to private litigants. See *Amalgamated Utility Workers v. Consolidated Edison Co.,* 309 U.S. 261, 268 (1940). Consequently, we dismiss the FTCA violation claim without further probe and concentrate our analysis on the alleged violation to the Sherman Antitrust Act.

Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce." In *Standard Oil Company of New Jersey v. United States,* 221 U.S. 1 (1911), the Supreme Court explained that such open-ended language was only intended to forbid unreasonable restraints on trade. Certain restraints on trade, however, are considered to be so inherently damaging to competition that they have been held to be *per se* violations of Section 1 of the Sherman Act. For the most part, Sherman Act violations are to be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 61 of 104

scrutinized through the application of the "Rule of Reason" test, which requires courts to determine "by the light of reason, guided by the principles of law and the duty to apply and enforce the public policy embodied in the statute" whether any particular act or contract constitutes a Sherman Act violation. *Standard Oil Company,* 221 U.S. at 63-74.

\*9 Against this backdrop plaintiffs build the following argument. First, they recall that the Supreme Court has held that exchanges of price information among competitors, although not a *per se* violation, *United States v. Citizens & Southern National Bank* [1975-1 TRADE CASES ¶ 60,360], 422 U.S. 86, 113 (1975), could nonetheless constitute a Sherman Act violation depending on the "structure of the industry" and "the nature of the information exchanged." *United States v. United States Gypsum Co.*[1978-1 TRADE CASES ¶ 62,103], 438 U.S. 422, fn. 16 (1977). Then, they once again resort to the Court's statement in *Catalano* whereby it affirms that credit terms form an integral price of the overall price paid for a product. *Catalano,* 446 U.S. at 645. Finally, while accepting that in *Cement Manufacturers Protective Association v. United States,* 268 U.S. 588 (1925) the Supreme Court stated that an exchange of credit information among competitors was not an unlawful restraint on commerce when procured to prevent fraud, Metro contends that a dictum contained in footnote 22 in *Gypsum* (in which the Court stated that the holding of *Cement* merely "highlightened a narrow limitation on the application of the general rule that [a showing of] either purpose or effect [to restrain competition] will support [Sherman Act] liability") warrants a conclusion to the effect that exchanges of credit information among competitors may be illegal if the information exchanged goes beyond the narrow limitation of that needed to prevent fraud.

At least two assumptions are fundamentally wrong in plaintiffs' reasoning. We comment briefly only as to one of them, since once it is rejected Metro's argument collapses on the force of its own weight. Plaintiffs' blind reliance on the Supreme Court's

statement in *Catalano* is once again wholly misplaced, and we refer the reader to our previous discussion explaining the reasons why.[FN11] Here, it suffices to say that under the federal antitrust laws decisions involving credit have always required and produced totally different analyses from those involving prices. This is why decisions regarding agreements pertaining to prices and exchanges of price information have consistently been held to violate the Sherman Act, see *American Column & Lumber Co. v. United States,* 257 U.S. 377 (1921), *United States v. American Linseed Oil Co.,* 262 U.S. 371 (1923), *United States v. Container Corp.*[1969 TRADE CASES ¶ 72,675], 393 U.S. 333 (1968), while at the same time it has long been held that the exchange of information between competitors regarding the credit worthiness of customers does not violate any provision of the federal antitrust laws. *Cement Manufacturers Protective Association v. United States,* 268 U.S. 588 (1925). See also *Zoslaw v. MCA Dist. Corp.*[1982-83 TRADE CASES ¶ 65,078], 693 F.2d 870, 886 (9th Cir.1982), cert. denied, 460 U.S. 1085 (1983), *Michelman v. Clark-Schwebel Fiber Glass Corp.*[1976-1 TRADE CASES ¶ 60,843], 534 F.2d 1036, 1048 (2d Cir.1975), cert. denied, 429 U.S. 885 (1976), *Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc.*[1974-1 TRADE CASES ¶ 75,017], 497 F.2d 203, 209 (9th Cir.1973), cert. denied, 419 U.S. 999 (1974). In *Cement Manufacturers,* the Supreme Court specifically stated that "[d]istribution of information as to credit and responsibility of buyers undoubtedly prevents fraud and cuts down to some degree commercial transactions which would otherwise be induced by fraud," so it cannot be declared to be an unlawful restraint of trade "even though such information be gathered and disseminated by those who are engaged in the trade or business principally concerned." 268 U.S. at 604. As long as the exchange of credit information is not accompanied by any agreements relating to the extension of credit, such as an agreement to deny credit to one or more of the competitors' customers, no violation of the antitrust laws has occurred. *Zoslaw,* 693 F.2d at 886. De-

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 62 of Page 31 of 104

Not Reported in F.Supp.                                                                                   Page 9
Not Reported in F.Supp., 1990 WL 58463 (D.Puerto Rico), 1990-1 Trade Cases P 68,986
(Cite as: Not Reported in F.Supp.)

cisions holding price agreements to be unlawful, on the other hand, generally do so on the ground that they result in the stabilization of prices and therefore have an anticompetitive effect. *United States v. Container Corp.* [1969 TRADE CASES ¶ 72,675], 393 U.S. 333 (1968).

**\*10** Looking at the facts of this case we see that no Sherman Act violation is present here. The record shows that the NVSMCA purpose and dealings were concentrated on the exchange of the dealers' historical credit information and this presents no problems under the federal antitrust laws. In relation to Metro, the Morowitz affidavit only states how to his understanding erroneous information regarding Metro's financial condition was discussed at NVSMCA's meetings. This fact may or may not have prejudiced Metro's commercial venture (a point over which we express no opinion), but it certainly does not constitute a violation of § 1 of the Sherman Antitrust Act. The Morowitz affidavit also states that the fact that such information may have been exchanged raises the strong inference that other information, particularly information concerning pricing, had been exehanged. See pp. 6-10 of Morowitz Aff. Once again, that is a statement with which we cannot agree. The balance of his objection relates to defects in the association bylaws which do not amount to violations of the antitrust laws. Finally, in page 13 of its memorandum of law in support of its opposition to Vestron's motion for summary judgment, Metro alleges that "meeting and group discussions have occurred in which concerted action appears to have been agreed to." This statement, which constitutes mere speculation on their part, is clearly insufficient to defeat a properly submitted motion for summary judgment. *Brennan v. Hendrigan,* 888 F.2d 189 (1st Cir.1989). From the record before us we can only conclude that no information regarding prices was exchanged, and that no agreements concerning price fixing were ever reached. Accordingly, plaintiffs' fourth cause of action must also be dismissed.

E

Defendants have moved to transfer this action to the District of Connecticut under 28 U.S.C. § 1404(a). That section provides:

For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Thus, three are the considerations that we must entertain in order to answer Vestron's request for a transfer on *forum non-conveniens grounds.* In the instant case, all three argue in favor [of] conferring their request. Our explanation follows.

The convenience of the parties and witnesses is clearly served by transferring this action to Connecticut. Vestron's executive offices are located in Stamford, Connecticut. As alleged in the complaint, Metro is incorporated in New York and has its main offices in Hasbrouck Heights, New Jersey, with only a branch office-whose personnel is not involved in the events which are central to this litigation-in Puerto Rico. We recall that this action revolves around Vestron's decision to stop extending credit to Metro, and those decisions are clearly taken at the top executive positions within the corporations. All documentary evidence located in the parties' main offices would thus have to be shuffled back and forth were the trial to be held in Puerto Rico, all this at a great inconvenience to both parties. What is more, plaintiff Arthur Morowitz himself, whose submissions up to this point have been instrumental for the consideration of this case, resides in the Northeastern coast of the United States. As for the witnesses from both parties, Vestron has named eight potential witnesses whose testimony they consider to be essential for their defense who reside in either the State of Connecticut, New Jersey or New York City.[FN12] Vestron has also named a number [of] former or present Metro employees with whom Vestron's sales and credit personnel dealt with in connection with this matter whose testimony may be necessary and who reside in the continental United States.[FN13] The interests of justice, we affirm without hesitation, would be ill

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00556-JJF-LPS    Document 53-2    Filed 04/02/2008    Page 63 of Page 32 of 104

Not Reported in F.Supp.                                                                                Page 10
Not Reported in F.Supp., 1990 WL 58463 (D.Puerto Rico), 1990-1 Trade Cases P 68,986
(Cite as: Not Reported in F.Supp.)

served were we to require the parties to submit themselves to such a constant reshuffling of persons and documents in order to conduct this litigation.

**\*11** The requirement that the transfer be ordered to a district or division where the action might have been brought, of course, relates to the existence of venue in that particular district for the action in controversy. In antitrust actions, venue is governed by Section 12 of the Clayton Act, 15 U.S.C. § 22, which states:

Any suit, action, or proceeding under the anti-trust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business ...

Section 22 was enacted to enlarge the venue provisions of 15 U.S.C. § 15 so that parties injured by violations of the antitrust laws could more easily seek redress in the courts. Whether a corporation is an inhabitant, is found, or transacts sufficient business within a district to establish venue therein is considered a practical question devoid of technicalities. The Supreme Court has stated that the test of venue must be understood to be whether the corporation in fact and in the ordinary and usual sense engages in business of any substantial character in the state where venue is alleged to lie. *United States v. Scophony Corp.*[1948-1949 TRADE CASES ¶ 62,238], 333 U.S. 795, 807 (1948).

Whether or not venue properly lies in Puerto Rico is a question whose answer is of little consequence in our quest. Under the circumstances of this case, the reasons that would substantiate an affirmative determination in this respect would also argue in favor of the propriety of venue in the District of Connecticut (and in every other state where the defendants have also engaged in business operations of any substantial character). Clearly, Vestron carries on substantial business operations in Connecticut, the state where its main offices are located. It being far more convenient for the parties, witnesses, and the interest of justice, and venue also being proper

in the District of Connecticut, defendants' motion for transfer finds full compliance with the governing statute, 28 U.S.C. § 1404(a). This action will continue in the Constitution state.

Wherefore, in view of the foregoing, defendants' motion for summary judgment as to plaintiffs' first through fourth causes of action and for transfer of this action to the District of Connecticut is hereby Granted. The Clerk of the Court shall enter judgment Dismissing plaintiffs' causes of action one through four with prejudice and it is hereby further Ordered that the remaining five causes of action in the instant suit be Transferred to the District of Connecticut for their just consideration.

It Is So Ordered.

> FN1. 15 U.S.C. §§ 15, 22, as amended by the Robinson-Patman Act.

> FN2. 28 U.S.C. § 1331.

> FN3. As further evidence of Metro's insolvency, Vestron points to an involuntary bankruptcy petition filed in the United States Bankruptcy Court for the District of New Jersey on August 25, 1989, against co-plaintiff Metro Video Distributors, Inc. by three of plaintiffs' creditors. See *In re Metro Video Distributors, Inc.,* Case No. 89-06734 (Bankr.D.N.J. Aug. 25, 1989).

> FN4. Mr. Morowitz's affidavit concedes, however, that from time to time Vestron required and obtained from Metro various forms of security in order to continue dealing with them on standard credit terms. See Par. 19 of Morowitz Aff. and Par. 4 of McGovern Aff..

> FN5. Mr. McGovern's affidavit concedes this fact, at least as it pertains to Metro's account's current status as of December 1987. See Par. 6 of McGovern Aff..

> FN6. To place the Clayton Act's role in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 11
Not Reported in F.Supp., 1990 WL 58463 (D.Puerto Rico), 1990-1 Trade Cases P 68,986
(Cite as: Not Reported in F.Supp.)

perspective, we note that other legislation, notably the Sherman Antitrust Act 15U.S.C. § 1, is intended to protect competition, not competitors. See *Brown Shoe Co. v. United States,* [1962 TRADE CASES ¶ 70,366], 370 U.S. 294, 320 (1962), *Monahan's Marine, Inc. v. Boston Whaler, Inc.*[1989-1 TRADE CASES ¶ 68,422], 866 F.2d 525, 528 (1st Cir.1989).

FN7. Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a).

FN8. The Sixth Circuit, confronted with an analogous claim of price discrimination in a seller's decision not to permit one of its distributors to participate in credit programs made available to the majority of its dealers, ruled in no unclear terms that "Section [13(a) ] is not violated when credit decisions are based upon legitimate business reasons,"*Bouldis v. Suzuki Motor Corp.*[1983-1 TRADE CASES ¶ 65,465], 711 F.2d 1319, 1325 (6th Cir.1983). The Tenth Circuit, when faced with a parallel scenario, went a step beyond in holding that decisions involving the extension of credit "could not, as a matter of law, be the basis for a claim under 15 U.S.C. § 13(a)." *Craig v. Sun Oil Company of Pennsylvania* [1975-1 TRADE CASES ¶ 60,290], 515 F.2d 221, 224 (10th Cir.1975). Its holding was based on the fact that too many factors, prominent among which were the borrower's financial strength and business experience, go into the determination of the terms of credit, securities and guarantees required, and other devices typically considered by creditors in extending or denying credit. 515 F.2d at 224.

FN9. See Par. 27 of Metro's Complaint.

FN10. See page 23 of Metro's Opposition.

FN11. Part A of this Opinion. We also note

in passing that it is our opinion that the second flaw in plaintiffs' reasoning is that their interpretation of the *Gypsum* footnote is also out of context. We do not elaborate on this point, however, as it is not necessary to support our decision in this case.

FN12. See McGovern Aff., Par. 24.

FN13. See McGovern Aff., Par. 25 and Reuben Aff. Par. 6. The list of witnesses who live in Puerto Rico submitted by Metro, see Morowitz Aff., Par. 33, does not strike as a list of witnesses whose testimony might be particularly important for the establishment of their case (*i.e.,* twelve of the sixteen are sales representatives who may testify as to the prejudicial effects of Vestron's termination and discriminatory practices).

D.Puerto Rico,1990.

Metro Video, Inc. v. Vestron Video, Inc.

Not Reported in F.Supp., 1990 WL 58463 (D.Puerto Rico), 1990-1 Trade Cases P 68,986

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**5**

# Westlaw.

Slip Copy
Slip Copy, 2006 WL 1531407 (E.D.Pa.), 2006-1 Trade Cases P 75,303
**(Cite as: Slip Copy)**

Page 1

## H

U.S. Horticultural Supply, Inc. v. The Scotts Co.
E.D.Pa.,2006.

United States District Court,E.D. Pennsylvania.
U.S. HORTICULTURAL SUPPLY, INC., Plaintiff,
v.
THE SCOTTS COMPANY, et al., Defendants.
**Civil Action No. 04-5182.**

June 1, 2006.

Joseph J. Hamill, Timothy C. Russell, Spector
Gadon & Rosen PC, Philadelphia, PA, for Plaintiff.
Peter B. Gronvall, Hunton & Williams LLP, Wash-
ington, DC, Thomas G. Slater, Jr., Hunton & Willi-
ams, Richmond, VA, Amy S. Kline, Saul Ewing
LLP, Philadelphia, PA, for Defendant.

### MEMORANDUM AND ORDER

McLAUGHLIN, J.

**\*1** The plaintiff has alleged that the Scotts Com-
pany ("Scotts") conspired with Griffin Greenhouse
Supplies, Inc. ("Griffin") to restrain trade in the
mid-Atlantic and/or New England market for horti-
cultural products and Scotts brand horticultural
products in violation of Section 1 of the Sherman
Act. Scotts has moved to dismiss the plaintiff's
complaint pursuant to Federal Rule of Civil Procedure
12(b)(6) for failure to state a claim. The Court
will deny Scotts' motion.

### I. *Procedural History*

The plaintiff originally sued Scotts on February 7,
2003 and brought an attempted monopolization
claim against Scotts pursuant to Section 2 of the
Sherman Act. The plaintiff also made allegations of
promissory estoppel and breach of contract. Scotts
moved to dismiss the Sherman Act claim and the
promissory estoppel claims. The plaintiff then with-
drew the promissory estoppel claims and after some
discovery, agreed to withdraw the Section 2 claim

as well. On July 20, 2005, the Court granted Scotts'
motion for summary judgment with respect to the
breach of contract claim.

On September 29, 2004, while the plaintiff was still
litigating the Section 2 claim, the Court denied the
plaintiff's motion for leave to amend to add a claim
under Section 1 of the Sherman Act. Following that
decision, the plaintiff filed this complaint on
November 5, 2004 against Scotts and Griffin.
Scotts filed a motion to dismiss on December 2,
2004 and oral arguments were held on March 18,
2005. At the oral arguments, a representation was
made that the plaintiff settled with Griffin, so only
Scotts remains as a defendant.

### II. *Factual Background*[FN1]

> FN1. When considering a motion to dis-
> miss under Fed.R.Civ.P. 12(b)(6), a court
> accepts all facts and allegations listed in
> the complaint as true and construes them in
> the light most favorable to the
> plaintiff.*H.J., Inc. v. Nw. Bell Tel. Co.,* 492
> U.S. 229, 249 (1989); *Rocks v. City of
> Philadelphia,* 868 F.2d 644, 645 (3d
> Cir.1989)."[A] complaint should not be
> dismissed for failure to state a claim unless
> it appears beyond doubt that the plaintiff
> can prove no set of facts in support of his
> claim which would entitle him to
> relief."*Conley v. Gibson,* 355 U.S. 41,
> 45-46 (1957).

In support of its Section 1 claim, the plaintiff, a
former distributor of horticultural products in the
mid-Atlantic region, alleges that Scotts, a supplier
of horticultural products, conspired with another
one of its distributors, Griffin, to restrain trade in
the mid-Atlantic and New England market for hor-
ticultural products and Scotts brand horticultural
products. The plaintiff alleges that the objects of
the conspiracy were: (i) to eliminate the plaintiff as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a competitor to Griffin by preventing the plaintiff from entering the New England market and driving the plaintiff out of the mid-Atlantic market; (ii) to prevent the plaintiff from selling horticultural products from other manufacturers that competed with Scotts; (iii) to prevent the plaintiff from selling Scotts' products at lower prices than Scotts desired; and (iv) to raise the prices of Scotts branded products.

To accomplish the objects of the conspiracy, the plaintiff claims that Scotts and Griffin agreed that: (i) Scotts would assist Griffin in entering the mid-Atlantic market; (ii) Scotts would hinder the plaintiff from entering the New England market to compete with Griffin; (iii) Scotts would impose unreasonable credit terms and other costs on the plaintiff so that the plaintiff could not survive as a competitor to Griffin; and (iv) after the plaintiff had been eliminated as a competitor, Griffin would increase the prices it charged for Scotts branded products to supra-competitive levels.

*2 The result of this alleged conspiracy was that the plaintiff did go out of business and Griffin was able to purchase the plaintiff's assets at distressed levels. As a result of the plaintiff's demise, inter-brand competition with Scotts' products was reduced and Griffin raised the prices of Scotts brand products to supra-competitive levels.

III. *Legal Analysis*

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."15 U.S.C. § 1. Courts have long recognized that Section 1 only prohibits unreasonable restraints of trade. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 723 (1988).

Generally, to establish a Section 1 violation, a plaintiff must prove: "(1) concerted activity by the defendants; (2) that produced anti-competitive ef-

fects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action."*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F .3d 430, 442 (3d Cir.1997); *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715, 722 (3d Cir.1991). When a conspiracy to commit a per se violation of Section 1 is alleged though, a plaintiff need only prove a conspiracy existed that was the proximate cause of the plaintiff's injuries. *In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 356 (3d Cir.2004).

Scotts has argued that the complaint should be dismissed because it does not plead facts that are sufficiently specific to support a conspiracy and that the facts it does allege are consistent with unilateral action. Additionally, Scotts argues that even if the complaint properly alleges a conspiracy, it does not allege a per se violation and the plaintiff has not properly alleged an anti-competitive effect or a relevant product or geographic market. Although the Court has reservations about whether the plaintiff will be able to prove its claims, at this stage in the proceedings, the Court concludes that the plaintiff had pled facts which, if true, could establish a vertical agreement to fix prices that is illegal per se under Section 1.

A. *Concerted Action*

Generally, Section 1 claims are held to the pleading standard laid out in Federal Rule of Civil Procedure 8(a) which requires a short and plain statement of the claim. *Lum v. Bank of Am.,* 361 F.3d 217, 228 (3d Cir.2004). Courts " 'should be extremely liberal in construing antitrust complaints.' " *Id. (quoting Knuth v. Erie-Crawford Dairy Coop. Ass'n.,* 395 F.2d 420, 423 (3d Cir.1968)). However, a general allegation of conspiracy, without more is not sufficient. Although detail is not necessary, a plaintiff "must plead the facts constituting the conspiracy, its object and accomplishment." *Black & Yates, Inc. v. Mahogany Ass'n, Inc.,* 129 F.2d 227, 231 (3d Cir.1941).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*3** Albeit in a slightly different context than this instant case, the United States Court of Appeals for the Third Circuit dealt with the question of whether allegations of concerted action in a Section 1 case were sufficient to survive a motion to dismiss in *Fuentes v.. South Hills Cardiology,* 946 F.2d 196 (3d Cir.1991). The plaintiff in *Fuentes* alleged that doctors, who were in competition with the plaintiff, conspired with a hospital to terminate the plaintiff's staff privileges. In sum, the relevant allegations in the complaint stated that: (i) competing doctors requested that the hospital deny the plaintiff staff privileges; (ii) in direct response to this request, the hospital did deny the plaintiff staff privileges; (iii) the denial of staff privileges would not have occurred but for the request by competing doctors; (iv) the defendants' conduct constituted an illegal group boycott under Section 1; and (v) the denial of staff privileges at the hospital deprived the plaintiff of the ability to provide health care services in competition with the defendants. *Fuentes,* 946 F.2d at 201.

After referencing the standard from *Black & Yates,* the Court of Appeals held that the plaintiff's "allegations identifying the conspiracy's participants, purpose and motive are sufficient to survive a motion to dismiss."*Id.* at 202.This was so even though the plaintiff had not identified any meetings or phone calls at which the conspiracy was carried out. *Id.*

In this case, although the complaint lacks detail about how the alleged conspiracy was formed, it is sufficiently specific to survive a motion to dismiss.

First, the complaint identifies Scotts and Griffin as the participants in the conspiracy and alleges that its purpose was to drive the plaintiff out of the mid-Atlantic market, replace it with Griffin, raise the prices of Scotts branded products and reduce interbrand competition with Scotts branded products. The ultimate motive of Scotts and Griffin is easily inferred as a desire to increase profits. (Compl.¶¶ 1, 18).

Additionally, the complaint goes into some detail as to how Scotts and Griffin accomplished and carried out their agreement. The complaint alleges that the conspiracy was formed in about 1998. Initially, Griffin obtained Scotts' permission to distribute Scotts branded products in the mid-Atlantic market and in about 1998 Griffin entered that market. Scotts facilitated Griffin's entry by shipping products directly to certain high-volume, high-profit buyers thereby saving Griffin storage and distribution costs. At the same time that Scotts was assisting Griffin's entry into the mid-Atlantic market, it is alleged that Scotts denied the plaintiff the ability to compete with Griffin in the New England market and imposed onerous credit restrictions on the plaintiff. In 2002, Scotts ceased doing business with the plaintiff, after repeated promises that the plaintiff's distribution agreement would be renewed and following discussions between the plaintiff and Scotts regarding the plaintiff's distribution of certain non-Scotts brand products. This left the plaintiff without adequate supply arrangements for horticultural products and drove the plaintiff out of business. Griffin was then able to purchase the plaintiff's assets at a low price. Following this, Griffin raised the prices it charged for Scotts brand products to supra-competitive levels. (Compl.¶¶ 1-2, 17-42).

**\*4** Scotts relies on *Zimmerman v. PepsiCo., Inc.,* 836 F.2d 173 (3d Cir.1988), a case decided prior to *Fuentes,* to support its argument that the plaintiff's allegations of a Section 1 conspiracy are not sufficiently particularized to withstand a motion to dismiss. At issue in *PepsiCo* was whether the plaintiff had alleged facts sufficient to support a claim that the defendants committed a per se Section 1 violation by forming a horizontal conspiracy. Although the Soft Drink Act governed the plaintiff's allegations, the United States Court of Appeals for the Third Circuit considered in detail the question of whether the plaintiff had pleaded a per se violation of the Sherman Act based on a horizontal conspiracy that would exempt the case from the requirements of the Soft Drink Act. However, the Court of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Appeals concluded that because of the Soft Drink Act, the plaintiff had a much higher pleading burden than that in a typical antitrust case. *PepsiCo,* 836 F.2d at 181.

The complaint alleged that PepsiCo, two licensed bottlers and other unnamed co-conspirators agreed to reduce competition between bottlers and resellers by prohibiting sales between resellers. Specifically, the complaint alleged that the defendants and their co-conspirators would refuse to sell to and would otherwise penalize resellers who bought PepsiCo products from or sold PepsiCo products to other resellers. The defendants and their co-conspirators would track such sales by a coding identification system. *Id.* at 180.

The Court of Appeals concluded that the complaint did not state a horizontal conspiracy claim which would exempt it from the Soft Drink Act. In reaching that conclusion, the Court of Appeals found that: (1) the complaint did not properly identify the co-conspirators and did not allege any agreement that was attributable solely to bottlers, without the involvement of PepsiCo; and (2) there were no allegations of any communications between the defendant bottlers or other means by which any alleged agreement came about. *Id.* at 181.

Even disregarding the fact that a higher pleading burden was imposed on the plaintiff in *PepsiCo* as a result of the Soft Drink Act, the plaintiff's complaint in this case is distinguishable from the complaint in that case.

First, in this case, the plaintiff's complaint identifies the participants by name and makes an allegation of an agreement which, if true, would constitute the vertical agreement which forms the basis of the plaintiff's Section 1 claim. The complaint in *PepsiCo,* which alleged a horizontal agreement, failed to allege an agreement solely among competing bottlers.

Second, although the plaintiff's complaint makes only bare-bones allegations of specific communica-

tions between Scotts and Griffin,[FN2] the lack of such allegations alone does not require dismissal. See *Fuentes,* 946 F.2d at 202. Additionally, the plaintiff's complaint does go into detail about the means employed to carry out the alleged agreement. Thus, dismissal is not required under *PepsiCo.*

> FN2. Besides the general allegation that Scotts and Griffin conspired, the only allegation of a specific communication between Scotts and Griffin is an allegation in paragraph 18 of the complaint which states that Griffin sought and obtained Scotts' permission to enter the mid-Atlantic market.

**\*5** Lack of specificity aside, Scotts has also argued that the plaintiff's Section 1 claim must be dismissed because the complaint does not allege facts which are inconsistent with unilateral action. In *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986), the Supreme Court held that in the context of a summary judgment motion, "a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently."*Matsushita,* 475 U.S. at 588 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764 (1984)). Although *Matsushita* did not deal with a motion to dismiss, its reasoning has been applied in this context. See *Brunson Commc'ns Inc. v. Arbitron, Inc.,* 239 F.Supp.2d 550, 563-564 n. 5 (E.D.Pa.2002) (citing cases). The Court of Appeals in *PepsiCo* also found *Matsushita* relevant in the context of a motion to dismiss, but did not directly apply its reasoning.*PepsiCo,* 836 F.2d at 181-82.

Cases that have applied *Matsushita* in the context of a motion to dismiss have not required a plaintiff to put forth evidence that tends to exclude the possibility that the defendants acted independently, but instead look to the facts alleged in the complaint to see if they support an inference of an agreement. For example, in *Brunson,* the district court applied *Matsushita* and dismissed the complaint because the allegations were "not sufficient to support an in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ference that defendants acted conspiratorially."*Brunson,* 239 F.Supp.2d at 563-64. Similarly, the cases cited by *Brunson* to support the application of *Matsushita* found that dismissal was warranted when the alleged conspiracy was illogical, made no economic sense, or when the facts, viewed in the light most favorable to the plaintiff, did not support an antitrust claim. See *DM Research, Inc. v. College of Am. Pathologists,* 2 F.Supp.2d 226, 229-230 (D .R.I.1998) (aff'd170 F.3d 53);*United Magazine Co. v. Murdoch Magazines Distrib. Inc.,* 146 F.Supp.2d 385, 401-02 (S.D.N.Y.2001); *Cancall PCS, LLC v. Omnipoint Corp.,* No. 99-3395, 2000 U.S. Dist. LEXIS 2830 at *23 n. 4 (S.D.N.Y Mar. 6, 2000). These decisions are consistent with *Fuentes* which held that a complaint should not be dismissed even though there was a competing inference of unilateral action. *Fuentes,* 946 F.2d at 202.

The Court does not have to decide whether *Matsushita* is applicable here, because even applying *Matsushita* to the plaintiff's complaint, the Court concludes that the complaint states a plausible claim for a conspiracy.

The parties do not dispute that Scotts would have been justified under the antitrust laws if Scotts had unilaterally decided to choose Griffin over the plaintiff as a distributor for its products in the mid-Atlantic region and the most likely inference to be drawn from the plaintiff's allegations is that Scotts did just that. Any subsequent price increase or refusal to sell competing products by Griffin is likely due to an independent decision by Griffin.

*6 That said, the complaint alleges that all of the actions taken by Scotts were done to carry out a joint plan with Griffin to drive the plaintiff out of the market, reduce competition with competing brands and raise prices. Although at some point the plaintiff will need to put forth evidence, beyond bare allegations, that tends to exclude unilateral conduct, at this stage, the Court cannot rule out the possibility that Scotts may not have decided to stop doing business with the plaintiff unilaterally unless

it had some assurances that another distributor would be in a position to take over for the plaintiff, charge higher prices and reduce competition from other brands. Thus, dismissal is not appropriate at this stage even applying *Matsushita.*See *Fuentes* 946 F.2d at 202.

### B. *Per Se Violation*

The next issue is whether the alleged conspiracy constitutes a per se violation of the Sherman Act. If the plaintiff has alleged a conspiracy to commit a per se violation of Section 1, the plaintiff only has to plead facts which, if true, could show that Scotts was the proximate cause of the plaintiff's injuries. *In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 356 (3d Cir.2004). Otherwise the plaintiff must proceed under the rule of reason and also plead facts which, if true, could demonstrate an anti-competitive effect within the relevant product and geographical markets. *See Tunis Bros. Co ., Inc. v. Ford Motor Co.,* 952 F.2d 715, 722 (3d Cir.1991).

In *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717 (1988), the Supreme Court addressed the question of when a vertical agreement results in a per se violation of Section 1. *Business Electronics* involved a situation where Sharp terminated one of its dealers, Business Electronics, because of price cutting and pursuant to an agreement with another dealer. *Bus. Elecs.,* 485 U.S. at 722. The Supreme Court agreed with the United States Court of Appeals for the Fifth Circuit which held that for a vertical agreement between a manufacturer and a dealer to terminate a second dealer to be illegal per se, the non-terminated dealer must "expressly or impliedly agree to set its prices at some level, though not a specific one."*Id.* at 722, 726 (internal quotations omitted).

In this case, the plaintiff has alleged facts, which if proven, could establish a per se violation of the Sherman Act under *Business Electronics.*The complaint alleges that Scotts and a dealer, Griffin, conspired to eliminate another dealer, the plaintiff, be-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cause of the plaintiff's price cutting and sales of non-Scotts branded products. It is alleged that part of the conspiracy was an agreement between Scotts and Griffin that Griffin would raise prices to supra-competitive levels once the plaintiff had been eliminated. Once the plaintiff was no longer in business, it is alleged that Griffin did indeed raise prices for Scotts branded products and/or other horticultural products to supra-competitive levels.[FN3](Compl.¶¶ 1-2, 18, 42).

> FN3. Scotts has argued that depositions in a related case undermine the plaintiff's allegation of price-fixing. At this stage though, the Court will not look beyond the complaint to discovery taken in a related case.

*7 Scotts has not argued that the plaintiff failed to plead facts which, if true, could demonstrate that the alleged conspiracy was the proximate cause of the plaintiff's injuries. Thus, the plaintiff has stated a claim under Section 1. See In *re Flat Glass Antitrust Litigation*, 3 85 F.3d 350, 356 (3d Cir.2004). Because the plaintiff has pled a per se violation of the Sherman Act, at this stage, the Court need not consider Scotts' arguments that the plaintiff has not adequately pled an anticompetitive effect in a relevant product or geographical market.

IV. *Conclusion*

Since Scotts terminated its distribution agreement with the plaintiff in late 2002, there have been a number of lawsuits between the plaintiff and Scotts in both this Court and in other fora. Prior to this case, the plaintiff filed a Section 2 claim against Scotts that the plaintiff agreed to dismiss after insufficient evidence was found during discovery to support its allegations. However, despite the fact that there has been extensive litigation of related claims, this instant claim was filed as a new case and the defendants filed a motion to dismiss for failure to state a claim. Although the Court has some serious reservations as to the merits of the

plaintiff's claims, at this point, the Court cannot conclude that it is beyond doubt that the plaintiff will be able to prove a violation of Section 1 and thus Scotts' motion to dismiss must be denied.

An appropriate Order follows.

*ORDER*

AND NOW, this 1st day of June, 2006, upon consideration of the motion to dismiss filed by the Scotts Company (Docket No. 5), the plaintiff's opposition and Scotts' reply, as well as arguments presented at a hearing held on March 18, 2005, IT IS HEREBY ORDERED that Scotts' motion to dismiss is DENIED for the reasons set forth in a memorandum of this date.

The Court will hold a telephone conference with counsel on Monday, June 26, 2006 at 11:00 a.m. to discuss the scheduling of this case. Counsel for the plaintiff shall initiate the call. Judge McLaughlin's chambers telephone number is 267-299-7600. Prior to the telephone conference the parties shall attempt to reach an agreement regarding a schedule for discovery and dispositive motions.

E.D.Pa.,2006.
U.S. Horticultural Supply, Inc. v. The Scotts Co.
Slip Copy, 2006 WL 1531407 (E.D.Pa.), 2006-1 Trade Cases P 75,303

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.