IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| JEOFFREY L. BURTCH, CHAPTER 7 TRUSTEE, FACTORY 2-U STORES, INC., et al., | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 1:07-cv-00556-JJF-LPS |
| MILBERG FACTORS, INC., CAPITAL FACTORS, INC., THE CIT GROUP/COMMERCIAL SERVICES, INC., GMAC COMMERCIAL FINANCE LLC, HSBC BUSINESS CREDIT (USA) INC., ROSENTHAL AND ROSENTHAL, INC., STERLING FACTORS CORPORATION, WELL FARGO CENTURY, INC., | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**COMPENDIUM OF UNREPORTED CASES CITED IN REPLY BRIEF OF
DEFENDANTS GMAC COMMERCIAL FINANCE LLC, STERLING FACTORS
CORPORATION AND WELLS FARGO CENTURY, INC.
IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS**

EDWARDS ANGELL PALMER & DODGE LLP
Stuart M. Brown (#4050)
Denise Seastone Kraft (#2778)
Mark D. Olivere (#4291)
919 N. Market Street, Suite 1500
Wilmington, DE 19801
Tel: (302) 777-7770
smbrown@eapdlaw.com
dkraft@eapdlaw.com
molivere@eapdlaw.com

Counsel for Defendants GMAC Commercial
Finance LLC, Sterling Factors Corporation,
and Wells Fargo Century, Inc.

OF COUNSEL:
Daniel Wallen
Bernard Beitel
Lloyd M. Green
OTTERBOURG, STEINDLER
HOUSTON & ROSEN, P.C.
230 Park Avenue
New York, New York 10169
Tel: (212) 661-9100

Dated:  April 2, 2008

# INDEX

**Cases**                                                                                                  **Tab**

Bldg. Materials Corp. of Am. v. Rotter,
    2008 U.S. Dist. LEXIS 11917 (E.D. Pa. Feb. 15, 2008) ........................................................... 1

IDT Corp. v. Building Owners & Managers Assn. Intl.,
    2005 U.S. Dist. LEXIS 33208 (D. N.J. Dec. 14, 2005)........................................................... 2

In re Ditech Communs. Corp. Secs. Litig.,
    2007 U.S. Dist. LEXIS 78411 (N.D. Cal. Oct. 11, 2007) ........................................................ 3

Int'l Norcent Tech. v. Koninklijke Philips Elecs.,
    2007 U.S. Dist. LEXIS 89946 (C.D. Cal. Oct 29. 2007)........................................................... 4

Kasada, Inc. v. Access Capital, Inc.,
    2004 U.S. Dist. LEXIS 25257 (S.D.N.Y. Dec. 10, 2004) ........................................................ 5

Kendall v. Visa U.S.A., Inc.,
    2008 U.S. App. LEXIS 5032 (9th Cir. Mar. 7, 2008) ............................................................... 6

Korea Kumho Petrochemical v. Flexsys Am. LP,
    2007 U.S. Dist. LEXIS 61373 (N.D. Cal. Aug. 4, 2007) ......................................................... 7

Metro Video Dist. v. Vestron Video, Inc.,
    1990 U.S. Dist. LEXIS 18739 (D. P.R. Feb. 8, 1990)............................................................... 8

# Tab 1

1 of 1 DOCUMENT

**BUILDING MATERIALS CORPORATION OF AMERICA, et al., Plaintiffs, v. MARTIN J. ROTTER, et al., Defendants.**

CIVIL ACTION No: 06-1490

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2008 U.S. Dist. LEXIS 11917*

February 15, 2008, Decided
February 19, 2008, Filed

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, including a roofing materials manufacturer, sued defendants, including an inventor, for breach of contract, trademark infringement, and tort claims. Defendants filed counterclaims alleging, inter alia, violations of *15 U.S.C.S. §§ 1 and 2* of the Sherman Act and tort claims. Plaintiffs moved to dismiss the antitrust counterclaims and certain tort counterclaims.

**OVERVIEW:** Defendants claimed that the inventor had developed attic ventilation products that required the use of non-woven mesh. Defendants alleged that plaintiffs had entered into exclusive contracts with the only United States suppliers of non-woven mesh. The court found that defendants failed to state a claim under *15 U.S.C.S. § 1* that plaintiffs' agreement with one of the suppliers illegally restrained trade, as defendants failed to adequately define a relevant product market. Defendants claimed that the relevant product market was asphalt shingle roof ridge vents, but there was no explanation why asphalt shingle roof ridge vents were distinct from the market for roof ridge vents in general or other roofing products; the market was defined without reference to the rule of reasonable interchangeability and the cross-elasticity of demand. Defendants' failure to define a relevant product market also precluded their monopolization, attempted monopolization, and monopoly leveraging counterclaims under *15 U.S.C.S. § 2*. The court declined to dismiss the state law tort counterclaims.

**OUTCOME:** Plaintiffs' motion to dismiss was granted as to defendants' antitrust counterclaims and was denied without prejudice as to the tort counterclaim.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] In reviewing a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN2] According to *Fed. R. Civ. P. 12(b)(6)*, a court must grant a motion to dismiss if the plaintiff fails to state a claim upon which relief can be granted. In deciding a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, a court must accept as true the well-pleaded allegations of the complaint and draw all reasonable inferences in the plaintiff's favor. However, it is not bound to accept as true a legal conclusion couched as a factual allegation. While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Antitrust & Trade Law > Sherman Act > Coverage > General Overview*

[HN3] See *15 U.S.C.S. § 1.*

*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > Sherman Act*
*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Vertical Restraints > Nonprice Restraints*
*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Vertical Restraints > Price Fixing*
[HN4] Ordinarily, whether particular concerted action violates *15 U.S.C.S. § 1* of the Sherman Act is determined through case-by-case application of the so-called rule of reason. Courts should apply the rule of reason in cases involving vertical non-price restraints. All vertical price restraints are to be judged according to the rule of reason.

*Antitrust & Trade Law > Sherman Act > Claims*
[HN5] To establish a violation of *15 U.S.C.S. § 1* of the Sherman Act, a plaintiff must prove: (1) concerted action by the defendant; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action.

*Antitrust & Trade Law > Market Definition > Product Market*
*Antitrust & Trade Law > Market Definition > Relevant Market*
*Antitrust & Trade Law > Sherman Act > Claims*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN6] A party asserting a violation of *15 U.S.C.S. § 1* of the Sherman Act always has the burden of defining the relevant product market. The relevant product market is defined as those commodities reasonably interchangeable by consumers for the same purposes. The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. Reasonable interchangeability of use implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively. In assessing reasonable interchangeability, a court should consider price, use, and qualities. The products in a relevant product market should be characterized by a cross-elasticity of demand; in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market.

*Antitrust & Trade Law > Market Definition > Product Market*
*Antitrust & Trade Law > Market Definition > Relevant Market*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN7] While it is true that in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers, there is no per se prohibition against dismissal of antitrust claims for failure to plead a relevant market under *Fed. R. Civ. P. 12(b)(6)*. Where the plaintiff fails to define its proposed relevant market with reference to the rule of cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in the plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted. Hence, if a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand, a court may grant a *Rule 12(b)(6)* motion.

*Antitrust & Trade Law > Sherman Act > Coverage > Monopolization Offenses*
[HN8] See *15 U.S.C.S. § 2.*

*Antitrust & Trade Law > Monopolization > Actual Monopolization > Claims*
[HN9] In order to prevail upon a theory of monopoly leveraging, a plaintiff must prove threatened or actual monopoly in the leveraged market, not mere competitive advantage.

*Antitrust & Trade Law > Monopolization > Actual Monopolization > Claims*
*Antitrust & Trade Law > Sherman Act > Claims*
*Antitrust & Trade Law > Sherman Act > Coverage > Monopolization Offenses*
[HN10] To prevail on a claim under *15 U.S.C.S. § 2* of the Sherman Act, a party alleging monopolization must prove: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from the growth or development as a consequence of a superior product, business acumen, or historic accident.

*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > Claims*

*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > Sherman Act*
[HN11] Under *15 U.S.C.S. § 2*, a party alleging attempted monopolization must prove that its opponent: (1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power.

*Antitrust & Trade Law > Market Definition > Product Market*
*Antitrust & Trade Law > Market Definition > Relevant Market*
*Antitrust & Trade Law > Sherman Act > Claims*
*Antitrust & Trade Law > Sherman Act > Coverage > Monopolization Offenses*
[HN12] In order to determine whether there is a monopoly or a dangerous probability of monopolization under *15 U.S.C.S. § 2* of the Sherman Act, as is also necessary in *15 U.S.C.S. § 1*, a court must examine the relevant product market. Both *15 U.S.C.S. §§ 1* and *2* of the Sherman Act define the relevant product market by examining the rule of reasonable interchangeability of use and the cross-elasticity of demand.

**COUNSEL:**    [*1] For BUILDING MATERIALS CORPORATION OF AMERICA doing business as GAF MATERIALS CORPORATION, BUILDING MATERIALS INVESTMENT CORPORATION, Plaintiffs: GLENN P. CALLAHAN, LEAD ATTORNEY, THERESE M. KELLEY, KEELEY & CALLAHAN P.C., CAPE MAY, NJ; PAUL T. QUALEY, KENYON & KENYON, NEW YORK, NY.

For MARTIN J. ROTTER, VENTCO, INC., MONGOOSE PRODUCTS, INC., Defendants: ROBERT J. REGER, LEAD ATTORNEY, JASON S. GARBER, REGER RIZZO KAVULICH & DARNALL LLP, PHILADELPHIA, PA; ANTHONY S. VOLPE, RANDOLPH J. HUIS, VOLPE AND KOENIG, P.C., PHILADELPHIA, PA.

For MARTIN J. ROTTER, VENTCO, INC., MONGOOSE PRODUCTS, INC., Counter Claimants: ROBERT J. REGER, LEAD ATTORNEY, JASON S. GARBER, REGER RIZZO KAVULICH & DARNALL LLP, PHILADELPHIA, PA.

For BUILDING MATERIALS CORPORATION OF AMERICA, BUILDING MATERIALS INVESTMENT CORPORATION, Counter Defendants: GLENN P. CALLAHAN, LEAD ATTORNEY, THERESE M. KELLEY, KEELEY & CALLAHAN P.C., CAPE MAY, NJ; PAUL T. QUALEY, LEAD ATTORNEY, KENYON & KENYON, NEW YORK, NY.

**JUDGES:** ANITA B. BRODY, J.

**OPINION BY:** ANITA B. BRODY

**OPINION**

**MEMORANDUM AND ORDER**

Plaintiffs Building Materials Corporation of America, d/b/a GAF Materials Corporation ("GAFMC") and Building Materials Investment Corporation ("BMIC") [the aforementioned [*2] plaintiffs will be collectively referred to as "GAFMC"] brought this action against Martin J. Rotter, Ventco, Inc. ("Ventco") and Mongoose Products, Inc. ("Mongoose") [the aforementioned defendants will be collectively referred to as "Rotter"]. GAFMC's alleges that Rotter engaged in: (1) two counts of breach of contract; (2) common law trademark infringement; (3) false designation of origin in violation of *15 U.S.C. § 1125(a)*; (4) trademark dilution; (5) false and misleading advertising; (6) product disparagement; (7) unfair competition; and (8) constructive trust disgorgement. Rotter raises the following counterclaims against GAFMC: (1) four antitrust counts in violation of *15 U.S.C. §§ 1* and *2*; (2) false advertising in violation of *15 U.S.C. § 1125(a)*; (3) unfair competition; (4) tortious interference with prospective business advantage; (5) three counts of breach of contract; (6) fraud; (7) breach of the covenant of good faith and fair dealing; (8) unjust enrichment; (9) civil conspiracy; and (10) fraud and misrepresentation. Jurisdiction is proper under *28 U.S.C. §§ 1331* and *1367*.

Currently before me is GAFMC's motion to dismiss the following counterclaims: (1) the four antitrust [*3] counts, which allege violations of *15 U.S.C. §§ 1* and *2*; (2) unfair competition; (3) tortious interference with prospective business advantage; (4) civil conspiracy; (5) fraud; and (6) fraud and misrepresentation. For the reasons stated below, I grant GAFMC's motion to dismiss Rotter's counterclaims alleging violations of the *15 U.S.C. §§ 1* and *2*. I do not permit Rotter leave to amend his counterclaims in order to re-plead the antitrust violations. [1] Additionally, I deny GAFMC's motion to dismiss the state law claims.

> 1  I do not grant Rotter the chance to re-plead the antitrust violations because I already gave him this opportunity. In my June 26, 2007 Order (Doc. # 35), I gave Rotter the right to file an amended counterclaim. When Rotter filed his amended counterclaim, he was already on notice that he may not have properly stated the relevant product market because GAFMC had already filed a motion to dismiss Rotter's original coun-

terclaims (Doc. # 15), in which it asserted that he had failed to allege a relevant product market.

## I. BACKGROUND [2]

2 [HN1] In reviewing a motion to dismiss pursuant to 12(b)(6), "all allegations in the complaint and all reasonable inferences that can be drawn therefrom [*4] must be accepted as true and viewed in the light most favorable to the nonmoving party." *Sturm v. Clark, 835 F.2d 1009, 1011 (3d Cir. 1987).* Because this is a motion to dismiss directed to defendants' counterclaims, I state the facts in the light most favorable to the defendants.

Plaintiff GAFMC is the dominant manufacturer and marketer of commercial and residential roofing products and accessories. Defendant Martin J. Rotter is the named inventor of the Cobra Ridge Vent, an attic ventilation product. In 1992, GAFMC and Rotter entered into a Patent and Know-How Agreement. In the agreement, GAFMC agreed to pay Rotter royalties for ten years on products sold by GAFMC employing the Cobra Technology. In exchange, Rotter granted GAFMC exclusive license to the existing patents related to the Cobra Technology and to any inventions related to the Cobra technology that Rotter developed during the period in which he received royalties. Under the agreement, GAFMC owed Rotter a duty to use its best efforts to develop, market and sell products utilizing the technology. However, GAFMC refused to perform this obligation.

The Patent and Know-How Agreement terminated in July 2002 and on September 5, [*5] 2002, Rotter received the final royalty payment from GAFMC. In August 2004, more than two years after termination of the Patent and Know-How Agreement, Rotter began work on a different ridge vent for asphalt roofs. The patent applications for this ridge vent were initially filed on January 31, 2005. These patent applications described the asphalt roof ridge vent product that Rotter planned to market as the Mongoose Ridge Vent. In 2005, Rotter began selling the Mongoose Ridge Vent. Both the Cobra Ridge Vent and the Mongoose Ridge Vent require, as an essential component of manufacture, the use non-woven mesh.

Rotter claims that GAFMC breached its contract with him by failing to use its best efforts to develop, market, and sell products using the Cobra Technology. Additionally, Rotter alleges that GAFMC engaged in several other violations of the law, many of which are the result of the reliance by both Cobra and Mongoose on the use of non-woven mesh in their manufacture. Rotter alleges that in 2005, there were only four United States suppliers of non-woven mesh: Loren Products ("Loren"), Glit/Microtron ("Glit"), Americo, and Washington International Non-Wovens, LLC ("WIN"). However, Loren [*6] and Glit were both owned by the same corporate parent, KATY Industries ("KATY").

In 2005, GAFMC had contracts with KATY and Americo to supply non-woven mesh. GAFMC's contract with Americo was for an exclusive supply of non-woven mesh that prevented Americo from selling it to other roofing companies. In 2005, Rotter had a contract to purchase non-woven mesh from WIN. In August 2005, KATY announced that it had purchased WIN.

Rotter alleges that GAFMC engaged in contract talks with KATY in which an agreement was reached that KATY would exclusively provide non-woven mesh to GAFMC, as long as GAFMC guaranteed a yearly amount of business. Rotter claims that GAFMC had no need for this exclusive contract and that GAFMC entered the exclusive agreement with the intent to harm Mongoose. As a result of these contract talks, Rotter alleges that in August/September of 2005, KATY stopped selling non-woven mesh to Rotter for use in the Mongoose product. Due to GAFMC's exclusive contracts with Americo and KATY, the only U.S. suppliers of non-woven mesh, Rotter was forced to purchase non-woven mesh from overseas.

## II. LEGAL STANDARD

[HN2] According to *Fed. R. Civ. P. Rule 12(b)(6)*, a court must grant a motion [*7] to dismiss if the plaintiff fails "to state a claim upon which relief can be granted." In deciding a motion to dismiss pursuant to *Fed. R. Civ. P. Rule 12(b)(6)*, the court must accept as true the well-pleaded allegations of the complaint and draw all reasonable inferences in the plaintiff's favor. *Brown v. Card Serv. Ctr., 464 F.3d 450, 452 (3d Cir. 2006).* However, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986).* "While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007)* (internal quotations omitted).

## III. DISCUSSION

### A. Sherman Act - Section 1

*Section 1* of the Sherman Act states that [HN3] "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce among the several States, or with foreign nations,

is declared to be illegal." *15 U.S.C. § 1*. Rotter [*8] alleges that GAFMC's agreement with KATY to exclusively supply non-woven mesh for use in asphalt ridge products to GAFMC illegally restrained trade in violation of *Section 1*.

[HN4] "Ordinarily, whether particular concerted action violates *§ 1* of the Sherman Act is determined through case-by-case application of the so-called rule of reason." *Bus. Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 108 S. Ct. 1515, 99 L. Ed. 2d 808 (1988)*. In *Bus. Electronics*, the United States Supreme Court held that courts should apply the rule of reason in cases involving vertical non-price restraints,. *485 U.S. at 724*. Additionally, in 2007, the United States Supreme Court held that all "[v]ertical price restraints are to be judged according to the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 127 S. Ct. 2705, 2725, 168 L. Ed. 2d 623 (2007)*. In this case, both parties agree that their dispute involves a non-price related vertical agreement between GAFMC and KATY. Therefore, the rule of reason is the appropriate standard to use in determining whether GAFMC has illegally restrained trade.

[HN5] To establish a violation of *15 U.S.C. § 1*, Rotter must prove: (1) concerted action by GAFMC; (2) that produced anti-competitive effects within [*9] the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that Rotter was injured as a proximate result of the concerted action. *Queen City Pizza, Inc. v. Domino's Pizza, Inc. 124 F.3d 430, 442 (3d Cir. 1997)*. Rather than analyze each factor necessary to establish a *Section 1* violation, I will focus my attention on the second prong of this test that requires a plaintiff, in its claim, to allege a relevant product market.

[HN6] The party asserting a violation of *Section 1* always has the burden of defining the relevant product market. *Id. at 436*. "The relevant product market is defined as those 'commodities reasonably interchangeable by consumers for the same purposes.'" *Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1992)* (quoting *United States v. E.I. Du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S. Ct. 994, 100 L. Ed. 1264 (1956)*. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Queen City, 124 F.3d at 436* (quoting *Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962))*. Reasonable interchangeability of use "implies that one product [*10] is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively." *Id. at 437* (quoting *Allen-Myland, Inc. v. Int'l Bus. Machines Corp., 33 F.3d 194, 206 (3d Cir. 1994)*. In assessing reasonable interchangeability, a court should con-

sider price, use, and qualities. *Tunis Bros., 952 F.2d at 722*. "The products in a relevant product market [should] be characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Id.*

[HN7] While "[i]t is true that in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers," there is no " *per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under *Fed.R.Civ.P. 12(b)(6)*." *Queen City, 124 F.3d at 436*. According to the Third Circuit:

> Where the plaintiff fails to define its proposed relevant market with reference to the rule of cross-elasticity of demand, or alleges a proposed relevant market that clearly does [*11] not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

*Id.* Hence, "if a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand, . . . a court may grant a *Rule 12(b)(6)* motion." *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., 812 F. Supp. 387, 391 (S.D.N.Y. 1993)* (cited by *Queen City, 124 F.3d at 437*).

In *Fresh Made, Inc. v. Lifeway Foods, Inc.*, the court granted the defendant's motion to dismiss the antitrust claims because the plaintiff did "not ground its allegations regarding product market with reference to the rule of reasonable interchangeability of use or cross-elasticity of demand. *2002 U.S. Dist. LEXIS 15098, 2002 WL 31246922, *5 (E.D. Pa. 2002); Accord Brotech Corp. v. White Eagle Int'l Techs. Group, Inc., 2003 U.S. Dist. LEXIS 21073, 2003 WL 22797730, *5* (dismissing an antitrust counterclaim because it "failed to define the relevant product market with reference to the rule of reasonable interchangeability of use or cross-elasticity of demand."). The [*12] plaintiff in *Fresh Made* identified the relevant product market as specialty Russian foods, including kefir (a yogurt type drink). *Id.* However, the plaintiff did "not allege facts establishing that the market for specialty Russian dairy products, such as kefir, [was] distinct from the market for yogurt, other drinkable yogurt products, or from other dairy products in general." *Id.* Additionally, there were "no allegations relating to the price of and/or the demand for kefir and other spe-

cialty Russian dairy products relative to products in the larger dairy market as a whole." *Id.* Furthermore, the plaintiff did not clarify "what relationship kefir [had] to other specialty Russian dairy products or why they [were] appropriately in the same product market." *Id.* The court dismissed the antitrust claim because the plaintiff failed to state whether there were any reasonably interchangeable alternatives for its products and did not explain why kefir and other specialty Russian dairy products formed an appropriate relevant market. *2003 U.S. Dist. LEXIS 21073, at *5-6.*

In this case, Rotter alleges that the relevant product market is asphalt shingle roof ridge vents. However, in neither his counterclaims nor his brief [*13] in response to the motion to dismiss, does Rotter provide any factual basis nor analysis to support his bare assertion that the relevant market is asphalt shingle roof ridge vents. All that Rotter says in his counterclaim is that "[t]here is a relevant market for asphalt shingle roof ridge vent products . . . ." Amended Counterclaims, para. 103. Rotter does not explain why asphalt shingle roof ridge vents are distinct from the market for shingle roof ridge vents, roof ridge vents in general or any other roofing products. Rotter makes no reference to the price of and/or demand for asphalt shingle roof ridge vents relative to the roofing products industry as a whole. Rotter defines the relevant product market without reference to the rule of reasonable interchangeability and the cross-elasticity of demand.

This Court is not required to accept Rotter's definition of the relevant product market because it is "a legal conclusion couched as a factual allegation" that is unsupported by Rotter's filings. *See Papasan, 478 U.S. at 286.* There is no need to examine the other factors in the rule of reason test because Rotter's counterclaim fails to state a relevant product market for antitrust purposes. [*14] As a result of Rotter's failure to support his definition of the relevant product market, I grant GAFMC's motion to dismiss the counterclaim alleging violation of *15 U.S.C. § 1*

### B. Sherman Act - *Section 2*

*Section 2* of the Sherman Act states that [HN8] "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations shall be deemed guilty of a felony." *15 U.S.C. § 2.* Rotter alleges three counts of violation of *Section 2.* He claims that GAFMC: (1) maintained a monopoly over the asphalt shingle roof ridge vent market; (2) attempted to maintain a monopoly over the asphalt shingle roof ridge vent market; and (3) leveraged its monopoly power in the

asphalt shingle roof ridge vent market to foreclose competition in the separate market for roofing materials. [3]

> 3   As to the leveraging claim, according to the Third Circuit, [HN9] "in order to prevail upon a theory of monopoly leveraging, a plaintiff must prove threatened or actual monopoly in the leveraged market," not mere "competitive advantage." *Fineman v. Armstrong World Indus., 980 F.2d 171, 206 (3d Cir. 1992).* [*15] Rotter's claim of monopoly leveraging is based solely upon his statement that GAFMC "used its monopoly power in the market for asphalt shingle roof ridge vents to foreclose competition in the separate market for roofing materials." This pleading is insufficient to establish a claim for monopoly leveraging. Hence, Rotter's monopoly leveraging claim fails because there is no proof of a threatened or actual monopoly in the leveraged market and Rotter has failed to allege a relevant product market.

[HN10] To prevail on a claim under *Section 2* of the Sherman Act, the party alleging monopolization must prove: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from the growth or development as a consequence of a superior product, business acumen, or historic accident. *Queen City, 124 F.3d at 437.* Additionally, [HN11] under *Section 2,* a party alleging attempted monopolization must prove that its opponent: (1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power. *Id. at 442.*

[HN12] In order to determine whether there is a monopoly [*16] or a dangerous probability of monopolization, as is also necessary in *Section 1,* a court must examine the relevant product market. *Id. at 437* and *442.* Both *Section 1* and *Section 2* of the Sherman Act define the relevant product market by examining the rule of reasonable interchangeability of use and the cross-elasticity of demand. *Id. at 442 n. 18.* As explained earlier in this opinion, Rotter fails to allege a relevant product market under *Section 1.* For the same reasons, Rotter has not alleged a relevant product market under *Section 2* of the Sherman Act. Therefore, I grant GAFMC's motion to dismiss all three counts of violations of *15 U.S.C. § 2.*

### C. State Law Claims

GAFMC seeks to dismiss several of Rotter's counterclaims that rely on state law. At this time, I deny GAFMC's motion to dismiss the state law claims of unfair competition, [4] tortious interference with prospective

business advantage, civil conspiracy, fraud, and fraud and misrepresentation.

4   As to the unfair competition claim, according to the Third Circuit, "[a] claim of unfair competition under Pennsylvania law requires proof that the defendant has "passed off" the goods of one manufacturer or vendor as those of another, [*17] thus creating confusion between his own goods, and those of the rival." *Scanvec Amiable Ltd. v. Chang, 80 Fed.Appx. 171, 180 (3d Cir. 2003)* (citing to *Penn. State Univ. v. Univ. Orthopedics, Ltd., 706 A.2d 863, 870-71 (Pa. Super. Ct. 1998)* ("The gist of the action lies in the deception practiced in 'passing off' the goods of one for that of another.") In recent years, the Pennsylvania Court of Common Pleas has begun to define unfair competition according to its definition in the *Restatement (Third) Unfair Competition § 1* (1995). *See e.g. Babiarz v. Bell Atlantic-Pennsylvania, Inc., 2001 Phila. Ct. Com. Pl. LEXIS 94, 2001 WL 1808554, at *9 (Pa. Com. Pl. July 10, 2001); Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Med. Serv., Inc.,* 1995 WL 842000, at *1-2 (Pa. Com. Pl. Oct. 18, 1995). Under the Restatement (Third), "[o]ne who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless . . . the harm results from . . . other acts or practices of the actor determined to be actionable as an unfair method of competition." According to Comment G of the Restatement (Third), "[a]s a general matter, if the means of competition are otherwise [*18] tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition." Hence, tortious interference may form the basis of a claim for unfair competition. *Id Security Sys. Canada, Inc. v. Checkpoint Sys., Inc., 249 F. Supp. 2d 622, 688 (E.D. Pa. 2003).* Several judges in the Eastern District of Pennsylvania have applied the Restatement (Third) definition of unfair competition when faced with a Pennsylvania state law unfair competition claim. *See, e.g., Synthes (USA) v. Globus Med., Inc., 2005 U.S. Dist. LEXIS 19962, 2007 WL 2043184, at *9 (E.D. Pa. Sept. 14, 2005); Id Security, 249 F. Supp. 2d at 688; Air Products and Chemicals, Inc. V. Inter-Chemical, LTD, et al.,* 2003 WL 22917491, at *12 (E.D. Pa. Dec. 2, 2003); *Fresh Made, 2002 U.S. Dist. LEXIS 15098, 2002 WL 31246922, at *9.* To date, however, no appellate court in Pennsylvania has applied the Restatement (Third) to the common law tort of unfair competition. Therefore, I deny the motion to dismiss Rotter's claim of unfair competition without prejudice to be reasserted at a later stage in litigation with the hope that, in the near future, Pennsylvania courts will provide more guidance on this issue.

## ORDER

**AND NOW**, this 15th day of February, 2008, [*19] it is **ORDERED** that Plaintiffs' Motion to Dismiss (Doc. # 46) is:

. **GRANTED** as to the antitrust claims (Counts I-IV).

. **DENIED** without prejudice to be reasserted at a later stage in litigation as to the claims of unfair competition (Count VI), tortious interference with prospective business advantage (Count VII), civil conspiracy (Count XIV), and fraud and misrepresentation (Count XV)

. **DENIED** with prejudice as to the claim of fraud.

s/ Anita B. Brody

ANITA B. BRODY, J.

# Tab 2

1 of 1 DOCUMENT



Cited
As of: Apr 02, 2008

### IDT CORPORATION, WINSTAR COMMUNICATIONS, L.L.C., and WINSTAR OF NEW JERSEY, L.L.C., Plaintiffs, v. BUILDING OWNERS AND MANAGERS ASSOCIATION INTERNATIONAL, BUILDING OWNERS AND MANAGERS ASSOCIATION OF NEW JERSEY, TRIZEC PROPERTIES, INC., TRIZECHAHN NEWPORT, L.L.C., and TRIZEC REALTY, INC., Defendants.

### Civil Action No. 03-4113 (JAG)

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

### *2005 U.S. Dist. LEXIS 33208; 2006-1 Trade Cas. (CCH) P75,151*

### December 14, 2005, Decided
### December 15, 2005, Filed

**NOTICE:** [*1] NOT FOR PUBLICATION

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff telecommunications company sued defendants, building associations, building owner-managers, and a real estate investment trust, for violations of 15 U.S.C.S. § 1 et seq., inter alia, based on the alleged use defendants' collective control of the commercial real estate market to deny the company access to their tenants and, when granted, to condition building access by the company on exclusionary and anticompetitive terms and conditions.

**OVERVIEW:** The company claimed that defendants conspired to fix the rental price of building access for the provision of telecommunications services to commercial office building tenants. The company asserted that these horizontal price-fixing agreements severely restrained and diminished competition in the relevant market. The problem with the company's antitrust allegations was that defendants did not compete in the market for provision of telecommunications services. Even if the court assumed the truth of the company's allegation that defendants conspired to impose discriminatory prices upon the company for building access, in order for the court to find that the company had alleged sufficiently a restraint on competition in the telecommunications services market, the court would have to assume further that, through

this discriminatory pricing in the building access market, defendants aimed to restrain competition in the market for provision of telecommunications services--a market in which defendants did not compete. Thus, the company's market definitions were insufficient to state a valid claim for anticompetitive market power. This was fatal to the company's claims.

**OUTCOME:** Defendants' motion to dismiss was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] On a motion to dismiss for failure to state a claim, pursuant to *Fed. R. Civ. P. 12(b)(6)*, the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail.

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN2] While a court will accept well-pled allegations as true for the purposes of a motion dismiss, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. The pleader is required to set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist. It is not proper for a court to assume that the plaintiff can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.

*Antitrust & Trade Law > Clayton Act > Claims*
*Antitrust & Trade Law > Private Actions > Standing > Clayton Act*
[HN3] The burden of a plaintiff in a private antitrust action to demonstrate that it has antitrust standing arises from § 4 of the Clayton Act, *15 U.S.C.S. § 15*, which provides that any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may bring suit under the antitrust laws in the district courts for treble damages.

*Antitrust & Trade Law > Private Actions > Standing*
[HN4] The focus of antitrust standing is different from constitutional standing. In the constitutional context, standing is concerned with whether a party has sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy and, among other things, requires a plaintiff to show that it has suffered an "injury in fact." While harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact the doctrine of antitrust standing requires the court to make a further determination as to whether the plaintiff is a proper party to bring a private antitrust action.

*Antitrust & Trade Law > Clayton Act > Claims*
*Antitrust & Trade Law > Private Actions > Standing > Clayton Act*
[HN5] The mere fact that the claim is literally encompassed by the Clayton Act does not end the standing inquiry. A court must consider, along with a number of other factors, the nature of the plaintiff's alleged injury in order to determine whether it is of the type that the antitrust statute was intended to forestall.

*Antitrust & Trade Law > Private Actions > Injuries & Remedies*

[HN6] In defining antitrust injury, the United States Supreme Court has explained that conduct in violation of the antitrust laws may have three effects, often interwoven: In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.

*Antitrust & Trade Law > Private Actions > Injuries & Remedies*
[HN7] It is well established that an antitrust injury reflects an activity's anticompetitive effect on the competitive market. A plaintiff's personal grievance cannot be deemed an antitrust injury unless the activity has a wider impact on the competitive market.

*Antitrust & Trade Law > Private Actions > Injuries & Remedies*
*Antitrust & Trade Law > Private Actions > Standing > Requirements*
[HN8] The Third Circuit Court of Appeals has interpreted certain precedent to require a plaintiff to satisfy the antitrust injury requirement and also be the appropriate "person" to bring suit under the standing requirements. Antitrust injury is a threshold inquiry to be satisfied before the matter may proceed.

*Antitrust & Trade Law > Private Actions > Standing > Requirements*
[HN9] The Third Circuit Court of has Appeals has enumerated the factors to be considered in an antitrust standing analysis: (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Antitrust & Trade Law > Private Actions > Injuries & Remedies > Clayton Act*
[HN10] A § 4 of the Clayton Act, *15 U.S.C.S. § 15*, plaintiff need not prove an actual lessening of competi-

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

tion in order to recover. Competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened.

***Antitrust & Trade Law > Private Actions > Injuries & Remedies > Sherman Act***
[HN11] To establish a § 1 of the Sherman Act violation for unreasonable restraint of trade, a plaintiff must prove (1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason***
[HN12] For antitrust violations not within the per se category of invalidity, courts employ a rule of reason test.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > Sherman Act***
[HN13] Under a rule of reason analysis, a valid claim must allege facts which, if true, are sufficient to establish the four elements of the § 1 of the Sherman Act analysis. In order to establish the second element, that the defendants' actions have produced anticompetitive effects within the relevant product and geographic markets, the plaintiff must allege that particular, actual anticompetitive effects occurred within these markets, such as price increases or output reduction. Because such proof is often impossible to make due to the difficulty of isolating the market effects of challenged conduct, courts typically allow proof of the defendant's market power instead. Market power is the ability to raise prices above those that would prevail in a competitive market. As with actual anticompetitive effects, market power must be shown in the relevant product and geographic markets.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > Sherman Act***
[HN14] To state a valid claim under the rule of reason analysis under § 1 of the Sherman Act approach, a plaintiff must, inter alia, define the relevant product and geographic markets in which market power is alleged. The proper definition of the market is a "necessary predicate" to an examination of the competition that may be affected. A plaintiff may also define a sub-market as the area in which market power may be found. The boundaries of such a sub-market may be determined by examining such practical indicia as industry or public recogni-

tion of the sub-market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason***
[HN15] Although most restraints are analyzed under the traditional "rule of reason," there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable. Such practices are deemed to be "illegal per se." The per se rule of illegality, however, is based in large part on economic predictions that certain types of activity will more often than not unreasonably restrain competition.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > Boycotts***
[HN16] In certain instances, concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as per se violations of § 1 of the Sherman Act. Generally, the per se approach to boycotts is applied in cases where there are joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle. The United States Court of Appeals for the Third Circuit has echoed that narrow construction of the per se rule for boycotts.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason***
[HN17] As a general matter, the United States Supreme Court has been cautious in extending the per se approach to claims that fall outside certain previously enumerated categories of liability. Thus, claims not within established categories of antitrust liability are more appropriately analyzed under the rule of reason where courts can balance the effect of the alleged anticompetitive activity against its competitive purposes within the relevant product and geographic markets.

***Communications Law > Federal Acts > Communications Act > General Overview***
[HN18] The Communications Act of 1934, in particular *47 U.S.C.S. §§ 201(b), 202(a)*, makes it unlawful for any "common carrier" of telecommunications services to discriminate in prices or practices.

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

*Communications Law > Federal Acts > Communications Act > General Overview*
[HN19] See *47 U.S.C.S. § 201(b).*

*Communications Law > Federal Acts > Communications Act > General Overview*
[HN20] See *47 U.S.C.S. § 202(a).*

*Communications Law > Federal Acts > Communications Act > General Overview*
[HN21] The text of the Communications Act of 1934, specifically *47 U.S.C.S. § 153(44)*, defines and describes "common carrier" as an entity that is "engaged in providing telecommunications services." To determine whether an entity is a "common carrier," courts should examine: (1) whether the carrier "undertakes to carry for all people indifferently"; and (2) whether the system is such that customers transmit intelligence of their own design and choosing.

*Communications Law > Resale of Services*
[HN22] Resale is an activity wherein one entity subscribes to the communications services and facilities of another entity and then reoffers communications service and facilities to the public for profit.

*Communications Law > Federal Acts > Communications Act > General Overview*
[HN23] The Communications Act of 1934's prohibition against unjust or unreasonable practices expressly applies to "any common carrier."

**COUNSEL:** For IDT CORPORATION, Plaintiff: DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ; JOSEPH A. BOYLE, KELLEY DRYE & WARREN LLP, PARSIPPANY, NJ.

For WINSTAR COMMUNICATIONS, L.L.C., WINSTAR OF NEW JERSEY, L.L.C., Plaintiffs: DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ; JOSEPH A. BOYLE, PAUL L. KATTAS, KELLEY DRYE & WARREN LLP, PARSIPPANY, NJ.

For CARRAMERICA REALTY CORP., CARRAMERICA DEVELOPMENT, INC., Defendants: CLIFFORD BRIAN KORNBREK, GREENBAUM, ROWE, SMITH & DAVIS, ROSELAND, NJ.

For TRIZEC PROPERTIES, INC., TRIZECHAHN NEWPORT, L.L.C., TRIZEC REALTY, INC., Defendants: ARTHUR S. GOLDSTEIN, WOLFF & SAMSON, PC, WEST ORANGE, NJ; KEVIN N. AINSWORTH, MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO PC, NEW YORK, NY.

For CB RICHARD ELLIS, INC., Defendant: WILLIAM J. O'SHAUGHNESSY, MCCARTER & ENGLISH, ESQS., NEWARK, NJ.

For HINES CORPORATE PROPERTIES, L.L.C., HINES INTEREST, L.P., Defendants: GARY M. BUTTER, BAKER & BOTTS, L.L.P, New York, NY.

For SHORENSTEIN, L.L.C., Defendant: MICHAEL S. WATERS, MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP, NEWARK, NJ.

**JUDGES:** JOSEPH A. GREENAWAY, JR., U.S.D.J.

**OPINION BY:** JOSEPH A. GREENAWAY, JR.

**OPINION**

   [*2]  **GREENAWAY, JR., U.S.D.J.**

   This matter comes before the Court on the reinstated motion of Defendants Trizec Properties, Inc., TrizecHahn Newport, L.L.C., and Trizec Realty, Inc. (collectively "Trizec") [1] to dismiss the Complaint, pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure.* For the reasons set forth below, Defendants' motion is granted; the Complaint is dismissed without prejudice as to Counts 1, 2, 4, and 5, and dismissed with prejudice as to Count 3.

   > 1   Defendants CarrAmerica Realty Corp., CarrAmerica Development, Inc., Trammel Crow Company, CB Richard Ellis, Inc., Hines Corporate Properties, L.L.C., and Hines Interest, L.P. originally joined in Trizec's motion to dismiss. Subsequently, these parties were terminated from the litigation.

**BACKGROUND**

   Plaintiff IDT Corporation, and its wholly-owned subsidiaries Winstar Communications, L.L.C., and Winstar of New Jersey, L.L.C. (collectively "Winstar"), provide telecommunications services [*3] to residential and business customers, as well as other telecommunications carriers, throughout the United States. (Complaint ("Compl."), at PP13-14.)

   Winstar's Complaint names two categories of defendants: trade associations Building Owners and Managers

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

Association International ("BOMA") and Building Owners and Managers Association of New Jersey ("BOMA-NJ"), and building owner-managers ("Building Defendants"), including Trizec.

Defendant BOMA is a non-profit trade association for the commercial real estate industry that provides advice, research, and legal and legislative advocacy for its members. BOMA's members own and manage roughly eighty percent of the commercial office space in the United States. (Compl. P3.) Defendant BOMA-NJ is a separate non-profit corporation that provides research, advisory, and advocacy services related to the New Jersey commercial real estate market. (BOMA Br. at 5.)

Defendant Trizec owns, manages or provides real estate services for commercial real estate properties throughout the United States. (Building Defs.' Br. in Supp. of Mot. to Dismiss ("Building Defs.' Br.") at 3.) Trizec Properties, Inc. is a real estate investment trust ("REIT") that owns [*4] and leases commercial real estate properties and is a member of BOMA. (Compl. P20.) TrizecHahn Newport, L.L.C. and Trizec Realty, Inc. are subsidiaries of Trizec Properties, Inc. (Compl. PP21-22.)

Parties like Winstar are relatively new. With the passage of the Telecommunications Act of 1996 ("the Act"), Congress enacted provisions designed to promote competition in the local telecommunications markets, which traditionally had been served by one incumbent local exchange carrier ("ILEC"). [2] (Compl. P36) (citing 47 U.S.C. § 151 et seq.). Pursuant to the Act, competitive local telecommunications providers like Winstar (also known as competitive local exchange carriers or "CLECs") began to enter local markets and offer the ILECs' customers a choice in telecommunications services. (Compl. P36.)

> 2 The parties use several different acronyms in their briefs: ILEC (incumbent local exchange carrier, such as Verizon); CLEC (competitive local exchange carrier, such as Winstar); MTE (multiple tenant environment, i.e., an office building accommodating both ILECs and CLECs); REIT (real estate investment trust); RBOC (regional bell operating company, such as Verizon or other ILECs that historically served local telecommunications markets before the 1996 amendments to the Communications Act opened such markets to competition from CLECs). (Compl. P36.)

[*5] Since the passage of the Act, the Federal Communications Commission ("FCC") has continued to monitor the development of competition in the market for the provision of telecommunications services. (BOMA Br. at 9.) In 2000, the FCC adopted a measure

prohibiting telecommunications carriers from entering into contracts that restrict owners and managers of commercial buildings from granting access to competing carriers. (BOMA Br. at 9.) Without access to the building rooftops and to the internal ducts and conduits of these buildings, companies like Winstar cannot deliver telecommunications services to tenants in those buildings. (Compl. P3.) At the same time, however, the FCC declined to adopt a rule prohibiting owners and managers from entering into contracts with various telecommunications providers that may contain different terms and fees for building access. (BOMA Br. at 9.)

Winstar alleges that, beginning in 1997 and continuing through the present, the Building Defendants, through and with their trade associations (BOMA and BOMA-NJ), have used their "collective control of the commercial real estate market to deny Winstar access to their tenants and, when granted, to condition building [*6] access by Winstar on exclusionary and anticompetitive terms and conditions, including price." (Compl. P3.) Winstar claims that, as a result of Defendants' conduct, it has been:

> unable to serve many customers that have requested service, has been impeded in its entry into the telecommunications market, and has been harmed in its ability to compete with Verizon and other ILECs. Competition in the commercial telecommunications market has accordingly been eliminated or restrained, injuring Winstar in its business and harming commercial office building tenants by limiting their choices in communications services.

(Compl. P7.) On August 29, 2003, Winstar filed a five-count complaint, [3] seeking relief for: (1) violations of § 1 of the Sherman Act, 15 U.S.C. § 1 (2004), based on allegations of horizontal price fixing, concerted refusals to deal (group boycott), and conspiracy to impose discriminatory prices in violation of the rule of reason; (2) violation of the New Jersey Antitrust Act, N.J. STAT. ANN. §§ 56:9-1 to 56:9-18 (1970); (3) violation of §§ 201(b) and 202(a) of the 1934 Communications Act, as amended, 47 U.S.C. §§ 201 [*7] (b) and (202)(a); (4) tortious interference with prospective business relations; and (5) breach of duty of good faith and fair dealing. (Compl. PP50-89.) On April 12, 2004, both BOMA and the Building Defendants filed the instant motions to dismiss the complaint, pursuant to FED. R. CIV. P. 12(b)(6).

> 3 Counts 3 and 5 are against the Building Defendants only.

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

On April 23, 2004, Winstar filed a complaint in the District Court for the Southern District of New York ("New York"), naming as defendants several building owners and managers, together with their trade association, BOMA-NY, and alleging that the defendants conspired in violation of § 1 of the Sherman Act to disadvantage Winstar in favor of ILECs. (Defs.' Joint Supplemental Mem. of Law in Supp. of Their Mot. to Dismiss, dated Feb. 4, 2005 ("Defs.' Mem."), at 3); Winstar Communications, LLC v. Equity Office Properties Inc., No. 04-3139 (S.D.N.Y. Jan. 24, 2005) (order granting motion to dismiss, at 1) [hereinafter [*8] "J. Wood's order"]. The defendants in the New York action also filed a motion to dismiss.

On December 1, 2004, Judge Wood conducted oral argument regarding the motion to dismiss in the New York action. On December 21, 2004, oral argument was held before this Court regarding Defendants' Motions to Dismiss in the instant action. On January 24, 2005, the New York action was dismissed with prejudice, on the ground that Winstar did not have standing to bring the suit under the antitrust laws. (J. Wood's order at 3.)

In light of the dismissal of the New York action, Trizec, with other defendants, submitted a Joint Supplemental Memorandum of Law in Support of Their Motions to Dismiss. Trizec argued that Winstar's antitrust claims in this action are "substantially identical" to those dismissed by Judge Wood in the New York action, and that Winstar lacks standing to raise Sherman Act claims before this Court. More specifically, Trizec asserts that, as in the New York action, Winstar's Complaint is likewise deficient here because "Winstar has alleged no more than harm to *itself* and to *its* business, and not harm to competition." (Defs.' Mem. at 2.) Thus, Trizek seeks dismissal of the [*9] Complaint, or alternatively, a stay of all proceedings pending resolution of Winstar's appeal to the Second Circuit Court of Appeals. (Defs.' Mem. at 2.)

Winstar argues in opposition that Defendants' Motion to Dismiss, and alternative plea for a stay, should be denied because Judge Wood's opinion is irrelevant and not dispositive. (Pls.' Supplemental Mem. of Points and Authorities on Antitrust Injury, dated Feb. 22, 2005 ("Pls.' Mem."), at 2.) Winstar contends that: (1) the actions do not present substantially identical antitrust claims, as the instant action includes a group boycott claim in addition to price fixing; (2) "Judge Wood's opinion is mistaken and poorly reasoned"; (3) Judge Wood's opinion is not binding precedent and has no collateral estoppel effect; and (4) Judge Wood did not permit Winstar an opportunity to amend its complaint to cure the antitrust injury pleading deficiencies. (Pls.' Mem. at 2-6.)

On June 30, 2005, Trizec and Plaintiffs stipulated to the withdrawal without prejudice of Trizec's motion to dismiss, subject to the condition that Trizec could reinstate the motion at any time, to be then decided by this Court upon the record as it existed as of June 28, 2005. On [*10] October 20, 2005, Trizec filed a request that the motion to dismiss be reinstated.

**STANDARD OF REVIEW**

[HN1] On a motion to dismiss for failure to state a claim, pursuant to *FED. R. CIV. P. 12(b)(6)*, the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. See *Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994)*. A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. See *In re Warfarin Sodium, 214 F.3d 395, 397-98 (3d Cir. 2000)*. The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. See *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*; *Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000)*.

[HN2] While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported [*11] conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. See *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)*. "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" *Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993)* (quoting 5A CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357). It is not proper for a court to "assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*.

**DISCUSSION**

In its Complaint, Winstar makes no specific statements about any Trizec entity, beyond naming Trizec as a defendant. The Complaint includes Trizec when referring either to all defendants, or to the building owner-manager defendants (hereinafter, "Defendants").

**A. Standing -- Counts 1 & 2 -- Federal and State Antitrust Claims**

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

[*12] As a preliminary matter, this Court must determine whether Winstar has standing to sue under the antitrust laws, which are, along with the alleged Communications Act violations, the basis for this Court's subject matter jurisdiction over this action. Trizec, largely relying on Judge Wood's dismissal of the New York action for lack of antitrust standing, argues that Winstar lacks standing to raise its antitrust claims because it has failed to allege antitrust injury. (Defs.' Mem. at 1.) More specifically, Trizec asserts that Plaintiffs cannot establish antitrust standing because "just as in [the] New York [action], Winstar has alleged no more than harm to *itself* and to *its* business, and not harm to competition; thus, here just as in New York, Winstar's antitrust complaint should be dismissed for failure to state a claim." (Defs.' Mem. at 2.)

Winstar disagrees in several respects. First, Winstar counters that Defendants' reliance on the New York action is misplaced because this action is not similar to the New York action. (Pls.' Mem. at 3.) For example, Winstar argues that, unlike the New York action, this case involves a per se group boycott claim in addition to [*13] a per se price fixing claim, whereas the New York action raised only price fixing claims. (Pls.' Mem. at 3.) Therefore, Winstar disputes Defendants' contention that the instant action presents antitrust claims that are "'substantially identical'" to those raised in the New York action. (Pls.' Mem. at 2) (quoting Defs.' Mem. at 1, 3). Winstar contends that it "has suffered antitrust injury for purposes of its group boycott claim without regard to Judge Wood's ruling on standing with respect to price fixing." (Pls.' Mem. at 3.) Winstar further maintains that Judge Wood's ruling is not controlling because it is "mistaken and poorly reasoned" in its conclusion that Winstar has only alleged injury to itself, and not harm to competition in the marketplace. (Pls.' Mem. at 3-5.) Finally, Winstar asserts that Judge Wood's ruling is not binding precedent upon this Court, and that Judge Wood erred by declining Winstar's express request for an opportunity to amend its complaint. (Pls.' Mem. at 5-7.)

### 1. Applicable Law

[HN3] The burden of a plaintiff in a private antitrust action to demonstrate that it has antitrust standing arises from *Section 4* of the Clayton Act, which provides that [*14] "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may bring suit under the antitrust laws in the district courts for treble damages. See *15 U.S.C. § 15 (1982).*

It is an understatement to state that, "in many ways the standing question is the most difficult issue in [a] case." *Arroyo-Melecio v. Puerto Rican Am. Ins. Co., 398 F.3d 56, 72 (1st Cir. 2005).* To begin with, the term

"standing" has "caused confusion when used in the antitrust context as opposed to the constitutional sense." *Alberta Gas Chem. Ltd. v. E.I. Du Pont De Nemours and Co., 826 F.2d 1235, 1239 (3d Cir. 1987).*[HN4] The focus of antitrust standing is different from constitutional standing. In the constitutional context, standing is concerned with whether "a party has sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy" and, among other things, requires a plaintiff to show that it has suffered an "injury in fact." See *Sierra Club v. Morton, 405 U.S. 727, 731, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972).* While "harm to the antitrust plaintiff is sufficient to satisfy [*15] the constitutional standing requirement of injury in fact . . . [the doctrine of antitrust standing requires] the court [to] make a further determination [as to] whether the plaintiff is a proper party to bring a private antitrust action." *Alberta, 826 F.2d at 1239* (quoting *Associated Gen. Contractors, 459 U.S. at 535 n.31*).

In *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983),* widely regarded as the leading case on antitrust standing, the Supreme Court observed that [HN5] "the mere fact that the claim is literally encompassed by the Clayton Act does not end the [standing] inquiry." *Id. at 537.* A court must consider, along with a number of other factors, "the nature of the plaintiff's alleged injury" in order to determine whether it is "of the type that the antitrust statute was intended to forestall." *Id. at 538, 540.*

[HN6] In defining antitrust injury, the Supreme Court has explained that:

> Conduct in violation of the antitrust laws may have three effects, often interwoven: In some respects the conduct may reduce competition, in other [*16] respects it may increase competition, and in still other respects effects may be realized as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.

*Id. at 543-44.*

The Third Circuit Court of Appeals echoed this notion in *Eichorn v. AT&T Corp., 248 F.3d 131 (3d Cir. 2001),* where it stated that [HN7] "it is well established that an antitrust injury reflects an activity's anticompetitive effect on the competitive market." *Eichorn, 248 F.3d at 140* (citing *Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344, 110 S. Ct. 1884, 109 L. Ed. 2d 333*

*(1990))*. A plaintiff's personal grievance cannot be deemed an antitrust injury "unless the activity has a wider impact on the competitive market." Id. (citing *City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 266-67 (3d Cir. 1998))*.

[HN8] The Third Circuit Court of Appeals has interpreted Brunswick and Associated Gen. Contractors to require a plaintiff to satisfy the antitrust injury requirement and also be the appropriate "person" to bring suit under the standing requirements. [*17] Antitrust injury is a threshold inquiry to be satisfied before the matter may proceed. See *Alberta, 826 F.2d at 1240* (stating that "once antitrust injury has been demonstrated by a causal relationship between the harm and the challenged aspect of the alleged violation, standing analysis is employed to search for the most effective plaintiff from among those who have suffered loss"). In *Angelico v. Lehigh Valley Hospital, Inc., 184 F.3d 268, 274 (3d Cir. 1998)*, [HN9] the Third Circuit Court of Appeals enumerated the factors to be considered in an antitrust standing analysis:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex [*18] apportionment of damages.

*Id. at 274* (citations omitted).

### 2. Analysis

For the purposes of the instant motions, this Court assumes the truth of Winstar's factual allegations, although this Court does not accept as true any conclusory or legal assertions. See *Morse, 132 F.3d at 906*. For the reasons set forth below, this Court concludes that Winstar has established standing to bring suit under the antitrust laws.

Generally, Winstar claims that as a result of the unlawful conspiracy and agreements among Defendants to deny or restrict building access, it is being anticompetitively forced out of the market for the provision of telecommunications services. (Compl. P7.) Winstar also alleges that commercial office building tenants have been

harmed because their choice of telecommunications carriers has been limited. (Compl. P7.) Thus, Winstar alleges that "competition in the commercial telecommunications market has accordingly been eliminated or restrained." (Compl. P7.)

Specifically, Winstar claims that Defendants have conspired "to fix the rental price of building access for the provision of telecommunications services to commercial [*19] office building tenants." (Compl. P51.) Winstar asserts that these horizontal price-fixing agreements "have severely restrained and diminished competition in the relevant market." (Compl. P51.) Winstar also contends that Defendants have conspired not to deal with Winstar "by denying it access to the buildings they own or manage" - a horizontal agreement that constitutes an unlawful group boycott. (Compl. PP58, 63.) Finally, Winstar argues that Defendants have conspired to impose discriminatory prices, terms, and conditions on Winstar's building access, thereby "substantially restraining and impeding competition in the relevant market." (Compl. P64.)

The threshold issue in the Angelico analysis is one of antitrust injury. Trizec argues solely that Winstar has failed to establish standing because it has not articulated antitrust injury. [4] (Defs.' Mem. at 1-2.) This Court disagrees: Winstar has alleged an injury "of the type for which the antitrust laws were intended to provide redress." *Angelico, 184 F.3d at 274*. Assuming the truth of Winstar's allegations that Defendants have combined in a horizontal agreement to disadvantage Winstar intentionally and impede its [*20] competition in the market, as this Court must at the motion to dismiss stage, this Court finds that Winstar has sufficiently alleged, for standing purposes, that Defendants' purported agreement has a market-wide impact on the competitive market. *Eichorn, 248 F.3d at 140* (citing *West Penn Power Co., 147 F.3d at 266-67*).

> 4  In their joint supplemental memorandum, Defendants argue that Winstar lacks standing because it has not alleged a cognizable antitrust injury. (Defs.' Mem. at 4.) Defendants do not argue that Winstar has failed to establish any other factor of antitrust standing.

Mindful of Angelico's admonition not to confuse the issue of anticompetitive market effect with the antitrust injury requirement of the standing inquiry, *Angelico, 184 F.3d at 275 n.2*, but also noting Eichorn's requirement that "antitrust injury reflect[] an activity's anticompetitive effect on the competitive market," *Eichorn, 248 F.3d at 140*, it appears to this [*21] Court that Winstar has alleged, at a minimum, that Defendants conspired to restrict or deny access to Winstar, as part of a larger campaign against other similarly-situated CLECs, and that

Case 1:07-cv-00556-JJF-LPS    Document 55-3    Filed 04/02/2008    Page 10 of 16

Page 9

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

this conduct resulted in a wide impact on the competitive telecommunications market. (Compl. PP2-7, 37, 41, 47-48.) Thus, this Court concludes that Winstar has standing to sue under the antitrust laws. [5]

> 5    In the New York action, Judge Wood concluded that Winstar had merely alleged harm to itself as an individual competitor, and had not "alleged how Defendants' conduct has reduced competition among telecommunication services providers." (J. Wood's order at 8.) Judge Wood's decision is governed by a Second Circuit case, *Balaklaw v. Lovell, 14 F.3d 793 (2d Cir. 1994)*. In Balaklaw, the court concluded that the plaintiff anesthesiologist who competed for an exclusive contract, and lost it to another anesthesiology group, had not suffered an antitrust injury sufficient to confer standing upon him. *Balaklaw, 14 F.3d at 802*. The court noted that, since the market for anesthesiology services for hospitals was multi-state, if not national, the plaintiff had not provided any evidence to suggest that he was excluded from or substantially limited in the broader market for employment, and thus, had failed to demonstrate antitrust injury. *Id. at 799*. The court also relied in part on the lack of impact of the alleged unlawful restraint on the consumer, regardless of whether there had been an impact on the plaintiff competitor. *Id. at 798* (noting that "from the consumers' point of view, nothing about the market has changed"). Judge Wood was persuaded further by the notion that this type of exclusive contract actually might foster competition, rather than restrain it, in that the competing anesthesiology groups would have strong incentives to offer competitive and improved care and prices in order to obtain exclusive contracts. *Id. at 799*. Judge Wood's decision emphasizes the Balaklaw court's observation that Dr. Balaklaw had "only established harm as an individual competitor." (J. Wood's order at 9 n.8) (citing *Balaklaw, 14 F.3d at 797*). While Balaklaw may be persuasive, it is not binding in this Circuit.

[*22]   Furthermore, the Supreme Court has stated that [HN10] "a *§ 4* plaintiff need not 'prove an actual lessening of competition in order to recover. Competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened.'" *Blue Shield of Virginia v. McCready, 457 U.S. 465, 482, 102 S. Ct. 2540, 73 L. Ed. 2d 149 (1982)*. To the extent that Winstar is claiming that Defendants have conspired to drive it (and other CLECs) from the market, thereby resulting in a future reduction in competition, this Court finds that Winstar has alleged successfully antitrust injury sufficient to obtain standing. Al-

though Winstar is not a direct competitor of Defendants, it appears that its alleged injury is sufficiently related to the injury Defendants allegedly sought to inflict on the market such that this Court may conclude that Winstar's alleged injury "flows from that which makes Defendants' acts unlawful" within the meaning of Brunswick. See *McCready, 457 U.S. at 483-84*.

Finally, this Court considers persuasive the notion that, assuming Defendants indeed have conspired to restrain trade in a manner in which the antitrust laws are designed to prevent, [*23] denying standing to Winstar might be "'likely to leave a significant antitrust violation undetected or unremedied.'" *Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp., 951 F.2d 1158, 1164 (9th Cir. 1991)*. Winstar has alleged that it, along with other CLECs, is the specific target of Defendants' alleged anticompetitive conspiracy to disadvantage it within the market. (Compl. PP2-7, 37, 41, 47-48.) Thus, Winstar has established that, if an anticompetitive practice does in fact exist, Winstar is the most direct victim. Based on Winstar's allegations, this Court cannot speculate that there exists a more appropriate antitrust plaintiff in this context who is "better poised to vindicate the public interest in antitrust enforcement." *Yellow Pages, 951 F.2d at 1163*. Winstar has established sufficient antitrust injury to give it antitrust standing.

**B. Failure to State a Claim**

**1. Counts 1 & 2 -- Federal and State Antitrust Claims** [6]

> 6    Winstar admits in its Complaint that "the New Jersey Antitrust Act parallels the Sherman Act and is to 'be construed in harmony with judicial rulings' under the Sherman Act." (Compl., at P69 (citing *N.J. STAT. ANN. § 56:9-18*).) Thus, Winstar's federal and state antitrust claims shall be treated together and dismissed on the same grounds.

[*24]   [HN11] "To establish a *section 1* violation for unreasonable restraint of trade, a plaintiff must prove (1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action." *Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997)*. Winstar has alleged three distinct violations of *§ 1* of the Sherman Act: (1) a discriminatory pricing scheme in violation of the rule of reason; (2) a per se price fixing violation; and (3) a per se group boycott. (Compl. PP51-67.)

**a. Rule of Reason Violation (Price Discrimination)**

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

Winstar claims that "Defendants have colluded, conspired and agreed, among themselves and with Verizon and other ILECs, to impose discriminatory and less favorable prices, terms and conditions on Winstar's access to their commercial properties than those applied to Verizon and other ILECs." (Compl. P64.)[HN12]  For antitrust violations not within the per se category of invalidity, courts employ a rule of reason test. [7] *Eichorn, 248 F.3d at 138.* [*25]  This Court finds that Winstar has failed to allege a rule of reason violation adequately.

> 7  "Under the per se test, agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality are found to be antitrust violations. . . Under [the rule of reason] test, plaintiffs have the burden of establishing that, under all the circumstances, the challenged acts are unreasonably restrictive of competitive conditions in the relevant market." *Eichorn, 248 F.3d at 138.*

[HN13]  Under a rule of reason analysis, a valid claim must allege facts which, if true, are sufficient to establish the four elements of the § 1 analysis. In order to establish the second element, that the Defendants' actions produced anticompetitive effects within the relevant product and geographic markets, the plaintiff must allege that particular, actual anticompetitive effects occurred within these markets, such as price increases or output reduction. [*26]  See *F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61, 106 S. Ct. 2009, 90 L. Ed. 2d 445 (1986).* Because "such proof is often impossible to make . . . due to the difficulty of isolating the market effects of challenged conduct . . ., courts typically allow proof of the defendant's 'market power' instead. Market power [is] the ability to raise prices above those that would prevail in a competitive market." *United States v. Brown Univ., 5 F.3d 658, 668 (3d Cir. 1993)* (internal citations omitted). As with actual anticompetitive effects, market power must be shown in the relevant product and geographic markets.

Here, Winstar has not alleged sufficiently that Trizec's conduct has been "unreasonably restrictive of competitive conditions" to state a § 1 claim under either the actual competitive effects or market power approaches. Actual anticompetitive effects are typically measured by price increase or output reduction, but Winstar has not alleged that these effects occurred in the market for provision of telecommunications services. Winstar does allege that Defendants increased the price of building access for Winstar, (Compl. P37), but to the extent that Winstar is asserting [*27]  that the increased prices in building access are evidence of actual anticompetitive effects, this effort fails for two reasons.

First, Winstar claims a restraint on competition in the telecommunications services market, but has not alleged an increase in the price of telecommunications services that could evidence actual anticompetitive effects in that market.

Second, and more importantly, Winstar is claiming that a restraint of trade has occurred in the market for the provision of telecommunications services, not in the market for building access. (Compl. P7) (emphasis added). Therefore, even if there has been a market-wide rise in price for building access, this Court cannot infer reasonably that price increases in building access have resulted in price increases for telecommunications services, evidencing actual anticompetitive effects.

Winstar also fails to state a claim for anticompetitive effects using the market power approach. [HN14]  To state a valid claim under this approach, Winstar must, *inter alia,* define the relevant product and geographic markets in which market power is alleged. "The proper definition of the market is a 'necessary predicate' to an examination [*28]  of the competition that may be affected." *Brown Shoe Co. v. United States, 370 U.S. 294, 335, 82 S. Ct. 1502, 8 L. Ed 2d 510 (1962).* A plaintiff may also define a sub-market as the area in which market power may be found. "The boundaries of such a sub-market may be determined by examining such practical indicia as industry or public recognition of the sub-market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id. at 325.*

Winstar alleges that the relevant product market is "the provision of telecommunications services to tenants in commercial office buildings." (Compl. P28.) Winstar alleges that the relevant geographic market is "the United States and includes sub-markets, such as the State of New Jersey, because access for telecommunications purposes to commercial office buildings in one city or location is not a good substitute for access to commercial office buildings in other cities or locations." (Compl. P28) (emphasis added). Winstar's market definitions suffer from several fatal defects.

First, to the extent that [*29]  Winstar defines the geographic market as the entire United States, it has not alleged facts sufficient for a conclusion that Defendants have market power over the national market for provision of telecommunications services. Second, to the extent that Winstar defines the relevant geographic market as "including sub-markets," this is simply too undefined to state a claim of anticompetitive power in a specific sub-market. Third, to the extent that Winstar defines the relevant geographic market as the sub-market of the

Case 1:07-cv-00556-JJF-LPS    Document 55-3    Filed 04/02/2008    Page 12 of 16

Page 11
2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

State of New Jersey, Winstar has not stated sufficient facts to support this sub-market definition.

Lastly, Winstar's market definition incorporates two different kinds of markets: "provision of telecommunications services" and "access for telecommunications purposes to commercial office buildings." (Compl. P28.) Winstar justifies its claim of market power in the sub-market of the State of New Jersey by connecting the two: "landlords enjoy locational market power in the sale of building access." (Compl. P30.) This, however, is the wrong market power: it is not power in the relevant product market, defined by Winstar as the provision of telecommunications services. (Compl. [*30] P28.) Winstar does not explain how power in the market for building access produces power in the market for telecommunications services, nor does it allege facts sufficient to support such an argument, had it made it.

Defendants do not compete in the market for provision of telecommunications services. Even if this Court assumes the truth of Winstar's allegation that Defendants have conspired to impose discriminatory prices upon Winstar for building access, in order for the Court to find that Winstar has alleged sufficiently a restraint on competition in the telecommunications services market, the Court would have to assume further that, through this discriminatory pricing in the building access market, Defendants aimed to restrain competition in the market for provision of telecommunications services -- a market in which Defendants do not compete.

Winstar has not alleged sufficient facts to permit this Court to find that a restraint in the market for building access has resulted in a restraint in the product market for telecommunications services. This Court is not required, nor would it be "proper to assume that [Winstar] can prove facts that it has not alleged or that Defendants [*31] have violated the antitrust laws in ways that have not been alleged." *Associated Gen. Contractors, 459 U.S. at 526.*

For all the reasons cited, Winstar's market definitions are insufficient to state a valid claim for anticompetitive market power. As dictated by the Supreme Court, "in a case of this magnitude, a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id. at 528 n.17.*

Because Winstar has failed to allege sufficient facts concerning the anticompetitive effects of Defendants' conduct in the relevant product and geographic markets in which Winstar alleges that trade has been restrained, under either the actual anticompetitive effects or market power approaches, this Court cannot conclude that Winstar has stated a claim for a rule of reason violation.

Thus, Winstar's rule of reason price discrimination claim will be dismissed.

### b. Price Fixing

Winstar alleges in Counts 1 and 2 that Defendants "have colluded, conspired and agreed . . . to fix the rental price of building access for the provision of telecommunications services to commercial [*32] office building tenants. This horizontal conspiracy . . . constitutes a per se violation of *Section 1* of the Sherman Act." (Compl. PP51, 54.)

[HN15] Although most restraints are analyzed under the traditional "rule of reason," *Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49, 97 S. Ct. 2549, 53 L. Ed. 2d 568 (1977)*, "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable." *N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958).* Such practices are deemed to be "illegal per se." *Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 692, 98 S. Ct. 1355, 55 L. Ed. 2d 637 (1978).* The per se rule of illegality, however, is "based in large part on economic predictions that certain types of activity will more often than not unreasonably restrain competition." *Brown Univ., 5 F.3d at 670;* see also *Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 344, 102 S. Ct. 2466, 73 L. Ed. 2d 48 (1982)* ("Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption [*33] that the restraint is unreasonable"); *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 289, 105 S. Ct. 2613, 86 L. Ed. 2d 202 (1985)* ("The per se approach permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive"); *NCAA v. Bd. of Regents of the Univ. of Oklahoma, 468 U.S. 85, 103-04, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984)* ("Per se rules are invoked when the surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct"). For the following reasons, this Court determines that Winstar's claim of price fixing, as currently alleged, should not be subject to the per se rule of illegality, and rather, should be subject to a rule of reason analysis.

Winstar's price fixing claim centers upon action allegedly taken by BOMA and BOMA-NJ to encourage their members "to offer uniform and less favorable terms to Winstar than to Verizon or other ILECs." (Compl. P52.) Winstar refers to model agreements, "best practices," and other related materials distributed to BOMA's members by their trade association. (Compl. P52.) Defendants [*34] argue, however, that "BOMA's develop-

Case 1:07-cv-00556-JJF-LPS    Document 55-3    Filed 04/02/2008    Page 13 of 16

Page 12

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

ment of model agreements and 'best practices' for building access was a lawful trade association activity that was specifically encouraged by the FCC." (BOMA Br. at 17.)

This Court cannot conclude with confidence that the price fixing conspiracy alleged in this case presents an unreasonable restraint on competition in the telecommunications service market such that it should be conclusively presumed per se illegal, and that further examination of the facts and circumstances would be unjustified. First, it is only very recently that Congress and the FCC have begun to scrutinize the issue of competition in the local telecommunications markets, and the issues arising out of the passage of the Telecommunications Act of 1996 are still being addressed. (BOMA Br. at 6.) In addition, the courts have not yet begun to publish consistent pronouncements on the issue. [8] Because this is not the type of circumstance where this Court can easily ascertain the great likelihood of anticompetitive effects, see *California Dental Ass'n v. FTC, 526 U.S. 756, 770, 119 S. Ct. 1604, 143 L. Ed. 2d 935 (1999)*, this Court holds that, as currently alleged, Winstar's claim of price fixing [*35] should not be analyzed under the per se rule, but rather under the full rule of reason. Because of Winstar's failure to state a claim for anticompetitive effects, delineated above (failing to specify particular adverse effects on competition in particular markets), Winstar's price fixing claim, analyzed under the rule of reason, also must fail. Therefore, this Court will dismiss Winstar's claim of price fixing.

8   Notably, the Third Circuit has stated that:

> . . . concerted action does not exist every time a trade association member speaks or acts. Instead, in assessing whether a trade association (or any other group of competitors) has taken concerted action, a court must examine all the facts and circumstances to determine whether the action taken was the result of some agreement, tacit or otherwise, among members of the association.

*Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1007-08 (3d Cir. 1994).*

## C. Group Boycott

In Counts 1 and 2, Winstar claims that [*36] "Defendants have colluded, conspired and agreed not to deal with Winstar by denying it access to the buildings they own or manage," constituting "per se unlawful group boycotts in violation of *Section 1* of the Sherman Act." (Compl. PP58, 63.)

[HN16] In certain instances, concerted refusals to deal or group boycotts are "so likely to restrict competition without any offsetting efficiency gains that they should be condemned as per se violations of *§ 1* of the Sherman Act." *Northwest Wholesale, 472 U.S. at 290.* Generally, the per se approach to boycotts is applied in cases where there are "joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'" *Id. at 294* (quoting L. SULLIVAN, LAW OF ANTITRUST 261-62 (1977)). The Third Circuit has echoed that narrow construction of the per se rule for boycotts. See *Eichorn, 248 F.3d at 143* (citing *Northwest Wholesale, 472 U.S. at 289-90* (per se rule confined to limited types of anti-competitive practices); *Larry Muko, Inc. v. Southwestern Pa. Bldg. and Const. Trades Council, 670 F.2d 421, 429* [*37] *(3d Cir.)* ("Generally the application of the per se rule has been limited to those 'classic' boycotts in which a group of business competitors seek to benefit economically by excluding other competitors from the marketplace"), cert. denied, *459 U.S. 916, 103 S. Ct. 229, 74 L. Ed. 2d 182 (1982)).*

[HN17] As a general matter, "the Supreme Court has been cautious in extending the per se approach to claims that fall outside certain previously enumerated categories of liability." *Eichorn, 248 F.3d at 143* (citations omitted). Thus, "claims not within established categories of antitrust liability are more appropriately analyzed under the rule of reason where courts can balance the effect of the alleged anticompetitive activity against its competitive purposes within the relevant product and geographic markets." Id.

Based on the judicial reluctance to analyze boycott claims under the per se rule, as well as upon this Court's review of the Complaint, it appears that the circumstances of the alleged boycott in this case do not fall within the narrow scenario detailed by the Court in *Northwest Wholesale.* In this case, Winstar alleges that the Building Defendants conspired with each [*38] other and BOMA to engage in a group boycott of Winstar. (Compl. PP58, 63.) However, Winstar is not a competitor of either BOMA or the Building Defendants. Winstar is in competition with other CLECs, Verizon, and other ILECs. This case does not fall within the Northwest Wholesale per se rule, which applies only to boycotts by competitors against competitors. [9] Therefore, this Court holds that, as currently alleged, Winstar's group boycott claim should not be analyzed under the per se rule, but rather under the full rule of reason.

9  Winstar specifically alleges that:

> Through and with BOMA, the Owner-Manager Defendants, together with other coconspirator real estate owners and managers not parties to this action, have entered into exclusive arrangements for building access pursuant to which they receive equity and/or revenue-sharing compensation from their preferred telecommunications provider. In light of these exclusivity provisions, Defendants' [sic] have refused to execute building access arrangements with Winstar for certain of their commercial properties.

(Compl. P58.) Winstar has not implicated Verizon or other ILECs in the concerted refusal to deal beyond alleging that Defendants have chosen Verizon and other ILECs to be their exclusive "preferred providers." (Compl. P58, 61.) Winstar also has not alleged or intimated that Verizon or other ILECs are at all involved in the conspiracy to boycott Winstar.

[*39] Because of Winstar's failure to state a claim for anticompetitive effects, Winstar's group boycott claim, analyzed under the rule of reason, must also fail. Therefore, this Court will dismiss Winstar's group boycott claim.

Because this Court has determined that Winstar has failed to state a claim upon which relief may be granted for violations of *section 1* of the Sherman Act, this Court dismisses Counts 1 and 2 of the Complaint, without prejudice, allowing Winstar to re-plead to address its present deficiencies.

**2. Count 3 -- The Communications Act of 1934, as amended**

Winstar asserts this claim against the Building Defendants only. [10] This claim arises from the Communications Act of 1934 ("the Act"). See *47 U.S.C. §§ 201(b)* and *202(a)*. [HN18] The Act makes it unlawful for any "common carrier" of telecommunications services to discriminate in prices or practices. See *47 U.S.C. §§ 201(b)* [11] and *202(a)*. [12]

10   Of the Building Defendants, Trizec is the only remaining defendant.

11   [HN19] *Section 201(b)* declares that, for "common carriers," "all charges, practices, classi-

fications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." *47 U.S.C. § 201(b)*.

[*40]

12   *Section 202(a)* [HN20] makes it unlawful for any "common carrier":

> to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

*47 U.S.C. § 202(a)*.

Winstar alleges that the Building Defendants are "common carriers" subject to the Act because the Building Defendants have entered into arrangements with "preferred" telecommunications carriers wherein the carriers were given exclusive access to the properties in exchange for the Building Defendants' equity interests in the carriers or revenue-sharing with the carriers. (Compl. P73.) Winstar claims that, based upon the revenue-sharing agreements between the Building Defendants and the "preferred carriers," the [*41] Building Defendants are de facto "common carriers" of telecommunications services. (Compl. P74.) Winstar then claims that these exclusive agreements deny access to Winstar, and amount to discriminatory practices and pricing proscribed by the Act. (Compl. P77.)

The Building Defendants argue that this claim cannot survive because *§§ 201 and 202* only apply to "common carriers," which they are not. (Building Defs.' Br. at 38-46.) This Court agrees. Because Winstar has not alleged facts to support the theory that the Building Defendants are "common carriers" of telecommunications services, this Count is dismissed with prejudice.

[HN21] The text of the Act defines and describes "common carrier" as an entity that is "engaged in providing telecommunications services." *47 U.S.C. § 153(44)*. To determine whether an entity is a "common carrier,"

see *FCC v. Midwest Video Corp., 440 U.S. 689, 700-01, 99 S. Ct. 1435, 59 L. Ed. 2d 692 (1979)*, courts should examine: (1) whether the carrier "undertakes to carry for all people indifferently," see *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC, 525 F.2d 630, 641, 173 U.S. App. D.C. 413 (D.C. Cir. 1976)* (internal quotation marks and citation omitted); and (2) [*42] whether the system is such that customers transmit intelligence of their own design and choosing, see *Nat'l Ass'n of Regulatory Util. Comm'rs, 533 F.2d 601, 609, 174 U.S. App. D.C. 374.* The Building Defendants are not "engaged in providing telecommunications services," *47 U.S.C. § 153(44)*, nor do the factual allegations support the finding that the Building Defendants satisfy the first prong of the test articulated above.

Winstar claims that the Building Defendants should be deemed "common carriers" because they are resellers of telecommunications services who are subject to "common carrier" duties under the Act. According to Winstar, "common carrier duties apply to any entity that: (1) independently or jointly through a resale or joint service provider arrangement, (Pls.' Br. in Opp'n to the Building Defs.' Mot. to Dismiss ("Pls.' Opp'n") at 36 (citations omitted)); (2) offers 'transmission, between or among points specified by the user, of information of the user's choosing.'" (Pls.' Opp'n at 36) (quoting *47 U.S.C. § 153(43)*).

Defendants argue that Winstar's characterization of them as "resellers" that are subject to §§ 201(b) and 202(a) of [*43] the Act as "common carriers" is flawed, and thus, must fail. (Building Defs.' Br. at 44.) This Court agrees.

[HN22] Resale is "an activity wherein one entity subscribes to the communications services and facilities of another entity and then reoffers communications service and facilities to the public . . . for profit." *Resale and Shared Use Order, 60 F.C.C.2d 261, 261 P17 (1976)*. The Third Circuit Court of Appeals described the resale market as follows:

> Resellers . . . subscribe to AT&T programs which provide large discounts for high volume purchases of AT&T telecommunications services. The resellers then sell the services to individual businesses that do not generate sufficient volume to qualify individually for the high-volume discounts. Thus, by providing the services to these end-users, resellers make a profit while end-users receive access to the AT&T network at a significantly lower cost than if they purchased services from AT&T directly . . . in the resale business, only the reseller is a customer of

AT&T; the end-users are customers of the reseller and not AT&T.

*AT&T v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1423 (3d Cir. 1994). [*44]*

The Building Defendants are not customers of the telecommunications providers, i.e., they do not purchase the telecommunications services from the providers. (Building Defs.' Br. at 23.) The end-users of the telecommunications services, the tenants, are direct customers of the telecommunications providers, not the Building Defendants. Winstar has not alleged facts to show that the Building Defendants act as the sort of intermediaries or intermediate providers of telecommunications services intended to be captured by the term "resellers" that are subject to "common carrier" duties under the Communications Act. Thus, its attempt to seek relief against the Building Defendants under this theory must fail.

Finally, Winstar attempts to argue that it has pled adequately a claim for relief under the Communications Act "regardless of whether the Defendants are common carriers," because Winstar claims that "Defendants violated *Sections 202(a)* and *201(b)* of the Act, which prohibit discrimination and unreasonable practices 'in connection with' telecommunications services." (Pls.' Opp'n at 47.) This basis for relief also fails.

In asserting this theory of relief, Winstar appears to have overlooked [*45] the fact that [HN23] the Act's prohibition against unjust or unreasonable practices expressly applies to "any common carrier." See *47 U.S.C. § 202(a)*. Indeed, the Act states: "It shall be unlawful for any common carrier to make any unjust or unreasonable determination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service." *47 U.S.C. § 202(a)* (emphasis added). Furthermore, *Section 201* expressly provides that the chapter applies to "common carriers." *47 U.S.C. §§ 201(a)* and *(b)*. In fact, the relevant subchapter of the statute containing both §§ 201 and 202 is entitled "Common Carriers," and the relevant part is entitled "Common Carrier Regulation." Winstar cannot seek relief under §§ 201 and 202 against parties who are not common carriers.

Winstar has not alleged facts to support its assertion that the Building Defendants are "common carriers," subject to liability under the Communications Act. Thus, Count 3 is dismissed with prejudice.

### 3. Counts 4 & 5 - State Common Law Claims

Count 4 asserts tortious interference with prospective [*46] business relations on the part of all Defen-

Case 1:07-cv-00556-JJF-LPS     Document 55-3     Filed 04/02/2008     Page 16 of 16

Page 15

2005 U.S. Dist. LEXIS 33208, *; 2006-1 Trade Cas. (CCH) P75,151

dants, and Count 5 asserts breach of the duty of good faith and fair dealing on the part of the Building Defendants. These are claims under state law.

Based upon this Court's dismissal of all other counts of the Complaint, this Court declines to exercise supplemental jurisdiction over these state law claims, pursuant to *28 U.S.C. § 1367.* This Court dismisses these claims without prejudice because this Court cannot conclude that Winstar's amendment of its antitrust claims would be futile. Thus, if Winstar successfully re-pleads its Sherman Act claims, satisfying federal question jurisdiction under *28 U.S.C. § 1331*, this Court may exercise supplemental jurisdiction over any state or common law claims under *28 U.S.C. § 1367.*

## CONCLUSION

For the reasons set forth above, Trizec's motion to dismiss is granted. Accordingly, Counts 1, 2, 4, and 5 are dismissed without prejudice and Count 3 is dismissed with prejudice. Winstar, if it so chooses, may file an amended complaint within forty-five (45) days of the entry of this Court's order.

Dated: December 14, 2005

[*47] JOSEPH A. GREENAWAY, JR., U.S.D.J.

## ORDER

**GREENAWAY, JR., U.S.D.J.**

This matter having come before the Court on the re-instated motion of Defendants Trizec Properties, Inc., TrizecHahn Newport, L.L.C., and Trizec Realty, Inc. (collectively "Trizec") to dismiss the Complaint, pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, and Trizec's appeal of Magistrate Judge Haneke's discovery order dated May 10, 2005; and it appearing that resolution of the motion to dismiss renders the appeal moot; and it appearing that this Court reviewed the parties' submissions, and heard oral argument on the motion to dismiss; and for the reasons set forth in the accompanying Opinion, and good cause appearing,

IT IS on this 14th day of December, 2005,

ORDERED that Defendants' motion to dismiss (Docket Entry no. 47) is GRANTED, and Counts 1, 2, 4, and 5 of the Complaint are hereby DISMISSED without prejudice, and Count 3 of the Complaint is hereby DISMISSED with prejudice; and it is further

ORDERED that Defendants' Appeal of Magistrate Judge Haneke's Order dated May 10, 2005 (Docket Entry no. 91) is dismissed as moot; and it [*48] is further

ORDERED that a copy of this Order be served on the parties within seven (7) days of the entry of this Order.

JOSEPH A. GREENAWAY, JR., U.S.D.J.

# Tab 3

1 of 4 DOCUMENTS



Analysis
As of: Apr 02, 2008

**In re DITECH COMMUNICATIONS CORP. SECURITIES LITIGATION; This Document Relates To: ALL ACTIONS.**

No. C 05-02406 JSW

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2007 U.S. Dist. LEXIS 78411; Fed. Sec. L. Rep. (CCH) P94,450*

**October 11, 2007, Decided
October 11, 2007, Filed**

**PRIOR HISTORY:** *In re Ditech Communs. Corp. Secs. Litig., 2007 U.S. Dist. LEXIS 26547 (N.D. Cal., Mar. 22, 2007)*

**COUNSEL:** [*1] For Richard Jaffe, Individually And On Behalf Of All Others Similarly Situated, Plaintiff: Elizabeth Pei Lin, Karen T. Rogers, LEAD ATTORNEYS, Jeff S. Westerman, Sabrina S. Kim, Milberg Weiss LLP, Los Angeles, CA.

For Young Kim, Plaintiff: Christopher T. Heffelfinger, LEAD ATTORNEY, Berman DeValerio Pease & Tabacco, P.C., San Francisco, CA; Karen T. Rogers, LEAD ATTORNEY, Milberg Weiss LLP, Los Angeles, CA.

For Casey Group, Plaintiff: Elizabeth Pei Lin, Karen T. Rogers, LEAD ATTORNEYS, Sabrina S. Kim, Milberg Weiss LLP, Los Angeles, CA.

For Ditech Communications Corp, Timothy K. Montgomery, William J. Tamblyn, Defendants: Jeffrey Michael Kahan, William S. Freeman, Cooley Godward Kronish LLP, Palo Alto, CA.

For Casey Group, Movant: Elizabeth Pei Lin, Karen T. Rogers, LEAD ATTORNEYS, Milberg Weiss LLP, Los Angeles, CA.

**JUDGES:** JEFFREY S. WHITE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JEFFREY S. WHITE

**OPINION**

**ORDER GRANTING MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH PREJUDICE**

Now before the Court is the motion to dismiss the Third Amended Class Action Complaint ("TCAC" or "Complaint") filed by defendants Ditech Communications Corporation, which subsequently changed its name to Ditech Networks, Inc., ("Ditech"), Timothy [*2] K. Montgomery ("Montgomery"), and William J. Tamblyn ("Tamblyn") (collectively "Defendants"). Defendants move to dismiss asserting that lead plaintiffs Jack Casey, Tonio Dahmen, George Innocenti, Shengli Duan and Norbert P. Czub (collectively "Plaintiffs") fail to meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). Defendants further assert that allowing amendments to the Complaint would be futile and request that the Court dismiss this action with prejudice. Having carefully reviewed the parties' papers, considered their arguments and relevant legal authority, and having had the benefit of oral argument, the Court hereby GRANTS Defendants' motion to dismiss without leave to amend.

**FACTUAL BACKGROUND**

On August 10, 2006, the Court granted Defendants' motion to dismiss Plaintiffs' Amended Class Action Complaint ("ACAC") and dismissed Plaintiffs' claims brought under *Sections 10(b)* and *20(a)* of the Securities

Exchange Act of 1934, *15 U.S.C. §§ 78j(b)* and *78t(a)*, and the rules and regulations promulgated thereunder, with leave to amend. The Court held that Plaintiffs failed to sufficiently allege materially false or misleading statements made [*3] by Defendants and that Plaintiffs failed to sufficiently allege scienter. In an attempt to address these pleading deficiencies, Plaintiffs filed a Second Amended Class Action Complaint ("SCAC"). On March 22, 2007, the Court found the allegations in the SCAC deficient as well. The Court gave Plaintiffs one last opportunity to amend. Plaintiffs filed a TCAC. Defendants now move to dismiss Plaintiffs' TCAC.

The allegations from the Plaintiffs' prior complaints are extensively detailed in the Court's orders dated August 10, 2006 and March 22, 2007 regarding Defendants' previous motions to dismiss and need not be reiterated here. Accordingly, the Court will focus on the allegations added in the TCAC and determine whether, based on such additional allegations, Plaintiffs sufficiently allege any materially false or misleading statements and scienter.

**Voice Quality Assurance Orders**

Plaintiffs allege that on August 24, 2004, Defendants represented that they secured two orders totaling over five million dollars for Voice Quality Assurance ("VQA") from new customers in Asia. (TCAC, PP 4(a), 31-32.) Plaintiffs allege that the orders were not actually "secured" because (1) "Ditech knew that it could [*4] not timely comply with the numerous government regulations and requirement concerning international trade, and that its non-compliance precluded shipping its products to China; (2) "the purported 'orders' were invalidated shortly after defendants' announcement, when the company from whom Ditech purportedly 'secured' the 'orders' was bought out by another company and/or reorganized, resulting in the expiration of the original company's 'letter of credit' -- a prerequisite to the consummation of Ditech's international orders;" and (3) after the letter of credit expired, "Ditech knew that the purported customer in Asia treated its relationship with Ditech as a mere opportunity to 'evaluate' Ditech's VQA technology as a potential alternative to its normal supplier, Tellabs." (*Id.,* P 4(a).)

As support for such allegations in its SCAC, Plaintiffs relied on information they obtained from a Confidential Witness 1, who worked at Ditech as a stockroom supervisor from prior to the Class Period until early 2005. Confidential Witness 1's responsibilities at Ditech included "reviewing import/export regulations and documentation used by Ditech." (SCAC, P 23(a).) More specifically, he "was involved [*5] in reviewing the international shipping documentation that Ditech had prepared and/or needed to ship VQA products to China."

(*Id.*) According to Confidential Witness 1, Ditech's shipping procedures and documentation were outdated. (*Id.,* P 37.) Ditech, thus, was unable to comply with international shipping regulations for shipping to China and could not ship the VQA orders. (*Id.*) Several weeks before alleged misrepresentations were made on August 24, 2004, Confidential Witness 1 found the following problems with the shipping documents he reviewed: (1) the "commodity classification" determined by government regulations, and needed to clear customs, did not match the product being shipped; (2) the documents did not contain the then-current government regulations; (3) China was wrongfully listed as an "embargoed country"; and (4) some of the documentation was dated 2002. (*Id.*) In mid-August 2004, Confidential Witness 1 advised Tamblyn of the deficiencies he observed on the forms and that such deficiencies would have to be corrected before the VQA product could be shipped to China. (*Id.*) According to Confidential Witness 1, Tamblyn did not take any action on this issue for several weeks. [*6] (*Id.*)

Plaintiffs further alleged that Ditech announced on November 3, 2004, that these orders had not yet shipped, but "maintained that this was merely a 'delay' and that they still expected the orders to ship." (*Id.,* PP 5, 38, 39.) Defendants further announced on that day that the delay was due to management changes within the largest of the two new customers from China, but that the customer had reconfirmed the new shipping schedule and that Ditech was "taking steps to ensure smooth delivery of these orders in the second half of this fiscal year." (*Id.,* P 39.)

The statements made on November 3 were false, according to Plaintiffs, because of the problems with Ditech's shipping documents and because one of the two new Chinese customers was "bought out by another company and/or reorganized shortly after the August 24 announcement, resulting in the expiration of the first company's 'letter of credit' - a prerequisite for the acceptance of international orders in China." (*Id.,* P 40.) Plaintiffs' alleged that when this Chinese company was "bought out by another company and/or reorganized," its VQA order was effectively cancelled. (*Id.,* P 43.) According to Confidential Witness 1, at several [*7] quarterly meetings he attended, along with Montgomery and Tamblyn, it was revealed that the letter of credit from the first company expired when the company was bought out and/or reorganized, and that Ditech was never able to secure a letter of credit from the second company. (*Id.,* P 44.) Plaintiffs further alleged based on information obtained from Witness I that an unspecified "manager who dealt directly with the inventory that was purportedly intended for China" attended meetings every three months, which Tamblyn and Montgomery also attended, at which information about the Chinese company "fold-

ing" was released. (*Id.*) The same unspecified manager "often" made statements to the effect that the inventory to China "is not going to ship" and "we will find out why at the next meeting." (*Id.,* P 44.)

Confidential Witness 1 further reported that a consultant, Jim Smalts, who was the manager of the Customer Service Group during the Class Period, "cautioned throughout the second half of 2004 that the order would not ship to China" and stated to Confidential Witness 1 that he "did not see shipments to China happening anytime soon." (*Id.,* P 45.) According to Confidential Witness several other [*8] unspecified managers, including one who received direction from an officer who reported to Montgomery or Tamblyn during the Class period, confirmed internally that the VQA orders "were not going to ship" during the Class Period. (*Id.*) In their TCAC, Plaintiffs named one of these managers as Denis Martin, the Senior Director of Manufacturing Operations, who reported directly to Ditech's Chief Operation Officer. (TCAC, P 49.)

In their TCAC, Plaintiffs also add allegations from another source, Confidential Witness 7, who worked as a Product Verification Engineer for Ditech beginning shortly after the start of the Class Period. (TCAC, P 23(g).) Confidential Witness 7 saw boxes, supposedly bound for China, piled up in a warehouse in Mountain View long into 2005. (*Id.,* P 39.) Confidential Witness 7 learned from conversations with Ditech's Sales Engineer Sateesh Hiremagular, that during the "relevant period," Hiremagular made presentations to one of the customers in China during which he hoped to obtain orders for Ditech's VQA orders. (*Id.,* P 43.) Tellabs was also seeking to get this company's business, and Ditech and Tellabs competed for sales of VQA products from this company well into [*9] 2005. (*Id.*)

Finally, Plaintiffs added allegations regarding the requirements of doing business internationally. Plaintiffs allege that several bodies of law impact the ability of companies located within the United States to do business with companies in China, including Export Administration Regulations ("EAR"). (*Id.,* P 38.) Complying with EAR is a forbidding task. EAR contains a twenty-nine part "steps overview." (*Id.*) Ditech had to navigate these export procedures in connection with past orders and thus is aware that compliance efforts can take months and that there is no guarantee that a company will be able to ship internationally. (*Id.*) For prior orders, Ditech's compliance with export regulations was handled by outside consulting organizations, such as PricewaterhouseCoopers. For the orders to the new Asian customers, Defendants assigned this task to Confidential Witness 1 weeks before the August 24, 2004 announcement. (*Id.*)

**Nextel-Sprint Merger**

On a conference call on February 17, 2005, Montgomery stated: "The Nextel-Sprint merger is actually, we think, quite good for us in that the key strategic people on the technical side are actually going to be the Nextel players, and this [*10] is what we've seen publicly announced. So we think that's positive, but we also have an account team calling on Sprint directly in Kansas City, which we're hopeful the 2 points lead to the right end." (*Id.,* P 56; *see also* P 4(b).) Plaintiffs alleged in their SCAC that this representation was false and misleading when made because the merger posed a serious threat to Ditech and Defendants "were aware that their business would be materially impacted at least two months before they finally disclosed this fact to the public." (SCAC, P 50.) To support their allegation of falsity, Plaintiffs relied on information obtained by confidential witnesses who worked at companies that installed Nextel orders of Ditech's echo cancellation equipment. Plaintiffs pointed to emails from these third-party companies dated in mid-March and early April 2005 showing that the Nextel orders of Ditech's echo cancellation equipment referred to them had dropped significantly. (*Id.,* P 51.)

Confidential witnesses 2 through 6 are current and former employees of Scope Networks, a company that installed approximately half of Nextel's orders of Ditech's echo cancellation equipment. (*Id.,* PP 23(b)-(e), 55.) Confidential [*11] Witness 2 was employed by Scope Networks as a project technician from early 2005 until after the Class Period. (*Id.,* P 23(b).) Confidential Witness 3 was a field technician with Scope Networks throughout the Class Period. (*Id.,* P 23(c).) Confidential Witness 4 worked for Scope Networks as a project manager for several years, including through out the Class Period. (*Id.,* P 23(d).) Confidential Witness 5 worked as a field technician for Scope Networks throughout the Class Period. (*Id.,* P 23(e).) Throughout the Class Period, Confidential Witness 6 worked as an installation supervisor for Pride Communications, "a company that performed installation work for Nextel that included installation of Ditech echo cancellation devices." (*Id.,* P 23(0.) All of these confidential witnesses installed Ditech equipment for Nextel. (*Id.,* PP 23(b)-(f).)

Plaintiffs alleged that according to Confidential Witnesses 2 through 5, the number of Ditech installations for Nextel "declined dramatically following the announcement of the Nextel-Sprint merger," and according to Confidential Witnesses 3 and 4, the installations "ultimately 'dropped off completely' as a result of the merger." (*Id.,* P 56.) According to [*12] Confidential Witnesses 3, "it was common knowledge at Scope that once Nextel merged with Sprint, 'everything would stop for at least a year,' until the newly merged Sprint-Nextel was 'reorganized.'" (*Id.*) Confidential Witness 6 con-

Page 4

2007 U.S. Dist. LEXIS 78411, *; Fed. Sec. L. Rep. (CCH) P94,450

firmed that Pride Communications' installations of Ditech equipment for Nextel similarly declined after the announcement of the merger. (*Id.*, P 60.)

On May 26, 2005, the "truth" about the Nextel-Sprint merger was revealed when Ditech announced that orders from Nextel dropped almost 60% as a result of the merger. (*Id.*, PP 6, 51.)

In their TCAC, Plaintiffs include the following additional allegations: According to Confidential Witness 7, sometime during the Class Period, Montgomery stated at a company meeting that the merger could go in either one of two ways for Ditech, one way being that the merged entity might not order any additional product from Ditech. (TCAC, P 62.)

**Scienter Allegations**

As in their two prior complaints, Plaintiffs' additional allegations relating to scienter in the TCAC focus solely on stock sales by insiders. (TCAC, PP 85-92.) With the exception of some additional argument as to what meaning should be attributed to such stock sales and whether [*13] Defendants' unexercised options were appropriated valued, the SCAC does not provide any more information regarding the amount and timing of stock sales by Montgomery or Tamblyn, or any other insider, during the Class Period.

**ANALYSIS**

Plaintiffs allege that throughout the Class Period Defendants publicly made misrepresentations concerning VQA orders and the Sprint-Nextel merger between August 24, 2004 and May 26, 2005 (the "Class Period")) [1] *Section 10(b)* of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." *15 U.S.C. § 78j(b)*.

    1   The Court has not yet certified a class and refers to the time period involved as the "Class Period" for ease of reference.

*Rule 10b-5* makes it unlawful for any person to use interstate commerce:

    (a) To employ any device, scheme, or artifice to defraud;

    (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements [*14] made, in light of the circum-

stances under which they were made, not misleading, or;

    (c) To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*17 C.F.R. § 240.10b-5.*

To plead a claim under *section 10(b)* and *Rule 10b-5*, a plaintiff must allege (1) a misrepresentation or omission, (2) of material fact, (3) made with scienter, (4) on which the plaintiff justifiably relied, (5) that proximately caused the alleged loss. *Binder v. Gillespie, 184 F.3d 1059, 1063 (9th Cir. 1999)*. Additionally, as in all actions alleging fraud, a plaintiff must state with particularity the circumstances constituting fraud. *Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (9th Cir. 1999); Fed. R. Civ. P. 9(b)*.

Plaintiffs also claim that individual defendants are liable pursuant to *Section 20(a)* of the Securities Exchange Act, which provides for derivative liability for those who control others found to be primarily liable under the provisions of that act. *See In re Ramp Networks, Inc. Sec. Lit, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002)*. Where a plaintiff asserts a *Section 20(a)* claim based [*15] on an underlying violation of *section 10(b)*, the pleading requirements for both violations are the same. *Id.*

**A. Applicable Pleading Standards: Private Securities Litigation Reform Act.**

In order to limit the number of frivolous private securities lawsuits, Congress enacted the PSLRA in December of 1995, and created heightened pleading standards for such lawsuits. *15 U.S.C. § 78u-4(b)*. The PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1)(B)*. Furthermore, the PSLRA requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)*.

The heightened standard set by the PSLRA was intended to put an end to securities fraud lawsuits that plead "fraud by hindsight." *In re Silicon Graphics, Inc. Sec. Lit., 183 F.3d 970, 988 (9th Cir. 1999)*. "The PSLRA significantly altered pleading requirements in [*16] private securities fraud litigation by requiring that

a complaint plead with particularity both falsity *and scienter."* *In re Vantive Corp. Sec. Lit., 283 F.3d 1079, 1084 (9th Cir. 2002)* (citing *Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001))* (emphasis added). "Thus the complaint must allege that the defendant made false or misleading statements either intentionally or with deliberate recklessness or, if the challenged representation is a forward looking statement, with 'actual knowledge . . . that the statement was false or misleading.'" *Id. at 1085* (citing *15 U.S.C. § 78u-5(c)(1)(B)(1)*). This is often accomplished "by pointing to inconsistent contemporaneous statements or information (such as internal reports) made by or available to the defendants." *Yourish v. California Amplifier, 191 F.3d 983, 993 (9th Cir. 1999)* (quoting *In re GlenFed Sec. Lit., 42 F.3d 1541, 1549 (9th Cir. 1991) (en banc)); see also id. at 994* (discussing insufficiency of plaintiffs' allegations with regard to the not disclosure of confidential non-public information).

Under the PSLRA, a complaint still is construed in the light most favorable to the non-moving party and all material allegations in the complaint [*17] are taken to be true. *Silicon Graphics, 183 F.3d at 983.* To determine whether a plaintiff has pled a strong inference of scienter, however, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002).* The Court "should consider all the allegations in their entirety, together with any reasonable inferences therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter." *Id.* "Conclusory allegations of law and unwarranted inferences, however, are insufficient to defeat a motion to dismiss." *In re Northpoint Communications Group, Inc. Sec. Lit. (Northpoint II), 221 F. Supp. 2d 1090, 1094 (N.D. Cal. 2002).*

Finally, the Court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when the authenticity of those documents is not questioned, and other matters for which the Court can take judicial notice. *Northpoint II, 221 F. Supp. 2d at 1094; see also Silicon Graphics, 183 F.3d at 986.*

## B. Request for Judicial Notice.

Defendants [*18] request that the Court take judicial notice of Ditech's press releases, SEC filings, and transcripts of Ditech's conference calls, all of which are referenced in the Complaint, are publicly filed documents, or are otherwise the proper subject of judicial notice. Plaintiffs do not dispute the accuracy of the documents attached to the request, and the requested documents are the types of documents of which this Court properly may take judicial notice. *See, e.g., In re*

*Calpine Corp. Sec. Lit., 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003)* (court "may properly take judicial notice of SEC filings and documents expressly referenced" in a complaint"); *see also Plevy v. Haggerty, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998).* Accordingly, the Court GRANTS Defendants' request.

## C. Plaintiffs Fail To Plead Sufficient Facts to Demonstrate Falsity.

The PSLRA requires that Plaintiffs allege with the requisite particularity each statement alleged to be false or misleading, the reason or reasons why the statement was false or misleading, and if those allegations are made on information and belief, all facts on which that belief is formed. *See 15 U.S.C. § 78u-4(b)(1)(B); see also Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1134 (9th Cir. 2004).* [*19] Plaintiffs allege that Defendants made two types of alleged false misrepresentations regarding: (1) Defendants' VQA orders and (2) the Nextel-Sprint merger. Plaintiffs fail to meet this standard with respect to either type of alleged misrepresentation.

### 1. VQA Orders.

Plaintiffs allege that Defendants misrepresented that Ditech had received two orders worth over five million dollars from two new customers in Asia. (TCAC, P 4(a).) In a press release issued on August 24, 2004, Ditech announced it had "secured orders to deploy its [VQA] solutions with two new customers in Asia .... totaling in excess of five million dollars." (*Id.*, P 31.) On a conference call later that day, Montgomery stated: "Although we don't know yet precisely where Q2 VQA revenues will be, given our Q4 revenues and orders in excess of $ 5 million already in Q2, you can see the beginning of a trend line that gives us real confidence in our VQA business." (*Id.*, P 32.) On November 3, 2004, Ditech announced that these orders had not yet shipped, but "maintained that this was merely a 'delay' and that they still expected the orders to ship." [*20] (*Id.*, PP 4, 40, 41.) Defendants further announced on that day that the delay was due to management changes within the largest of the two new customers from China, but that the customer had reconfirmed the new shipping schedule and that Ditech was "taking steps to ensure smooth delivery of these orders in the second half of this fiscal year." (*Id.*, P 41.)

Plaintiffs allege that the orders were not actually "secured" either because Ditech was seriously deficient in numerous shipping requirements which would prevent any shipments to China or because the shortly after the orders were announced, one of the Asian customers was bought out by another company and/or reorganized, resulting in the expiration of the original company's 'letter

of credit"-- a prerequisite for acceptance of international orders in China." (TCAC, P 4(a).) Plaintiffs further alleged that after the letter of credit expired, one of the Asian customers treated its relationship with Ditech as a mere opportunity to "evaluate" Ditech's VQA technology as a potential alternative to its normal supplier, Tellabs. (*Id.*)

In Plaintiffs' SCAC, Plaintiffs' sole support for their position that Defendants' statements regarding the VQA [*21] orders were false when made was information they obtained from Confidential Witness 1. The Court found the information provided by Confidential Witness 1 alleged in the SCAC was insufficient to demonstrate a basis for believing Defendants' statements regarding the VQA orders were false when made. Confidential Witness 1 said he noticed several problems with the shipping documents several weeks before the statements were made on August 24, 2004 and that in mid-August of that he year he advised Tamblyn of the deficiencies and of their need to correct them before the VQA product could be shipped to China. (SCAC, P 37.) According to Confidential Witness 1, Tamblyn waited several weeks to take any action on this issue. (*Id.*) Plaintiffs failed to allege any facts which would demonstrate the alleged deficiencies would be difficult or time consuming to fix. Nor did Plaintiffs allege what action Tamblyn did take or, more importantly, what additional actions would have been necessary to correct the deficiencies before the VQA product could be shipped internationally.

The limited additional facts Plaintiff allege in their TCAC do not alter the Court's analysis. Plaintiffs allege that Ditech had [*22] to comply with the EAR, a complicated regulatory scheme, in order to ship products to China and that, generally, compliance efforts can take months. However, Plaintiffs do not allege any specific facts to support an inference that the deficiencies alleged by Plaintiffs would take months to correct.

Moreover, as the Court noted in its order finding the allegations in the SCAC insufficient, the alleged misrepresentations Plaintiffs point to merely state that VQA orders were secured, not that the orders were promised to be shipped by a certain date or that the orders were time sensitive. Notably, Ditech did announce that it shipped $ 0.5 million of VQA product to a customer in China before January 31, 2005. (RJN, Ex. J.) Plaintiffs do not contend that Ditech did not actually ship this product. Considering that Ditech actually did ship VQA product to Asia after the announcements of the two orders were made, Plaintiffs do not allege facts to demonstrate that when Ditech announced the two orders it knew that it would not be able to ship product to Asia based on its non-compliance with export shipping regulations.

The Court also found Plaintiff's allegations in the SCAC regarding the alleged [*23] expiration of the letter of credit similarly deficient. Plaintiffs alleged that Confidential Witness 1 learned at quarterly meetings attended by Montgomery and Tamblyn that the letter of credit from the first company expired when the company was bought out and/or reorganized and that Ditech was never able to secure a letter of credit from the second company. (*Id.,* PP 43-45.) However, Plaintiffs did not allege when this information was conveyed to Montgomery and Tamblyn, who conveyed it, or the substance of what was allegedly conveyed. Although Plaintiffs alleged that, according to Confidential Witness 1, managers stated that the VQA orders were not going to ship, Plaintiffs failed to allege who the managers were, how or when they obtained such knowledge, or exactly what they knew. (*Id.,* PP 44-45.) For example, it is not clear whether they said the VQA products would not ship on a particular date or that they would never be shipped. Therefore, the Court found that Plaintiffs allegations were insufficient to support a belief that, when the alleged statements were made, Defendants knew that the letter of credit from the original customer had expired and that Ditech knew it could not receive [*24] a new one from the new or reorganized company.

Plaintiffs did not cure these deficiencies in their TCAC. Despite having notice of the Court's concerns, Plaintiffs did not allege any additional information regarding when the quarterly meetings were held or what information was conveyed at each meeting. Besides identifying one of the managers who made comments that the VQA orders were not going ship, Plaintiffs did not allege any additional facts regarding what information this, or any other managers, knew or what their statements meant in terms of timing.

In their TCAC, Plaintiffs allege that the information regarding the obstacles to shipping were obtained by Ditech managers "contemporaneously with the relevant events" because such information was disclosed to Confidential Witness 1 during the Class Period. (TCAC, P 52.) However, the alleged false statements regarding the VQA orders were made in August and November 2004 and the Class Period continued until May 26, 2005. (TCAC, P 24.) Therefore, such allegation fails to provide any information indicating that Ditech knew about obstacles to shipping, let alone knowledge that such alleged obstacles were insurmountable, before the alleged [*25] misrepresentations were made.

Nor do Plaintiffs' additional allegations regarding Ditech's efforts to win VQA orders from a customer in Asia provide any more support for Plaintiffs' contentions that the statements made in August and November 2004 were false when made. Plaintiffs' allegations are vague as to when these alleged efforts began, alleging only that

2007 U.S. Dist. LEXIS 78411, *; Fed. Sec. L. Rep. (CCH) P94,450

such efforts continued "well into 2005." (TCAC, P 43.) Moreover, it is not clear from Plaintiff's allegations whether Ditech was attempting to obtain new orders or whether Ditech was attempting to keep one of the two orders announced in August 2004. [3] Accordingly, the Court concludes that Plaintiffs fail to sufficiently allege falsity with respect to the alleged misrepresentations as to the VQA orders. *See 15 U.S.C. § 78u-4(b)(1)(B).*

> 2  In their opposition brief, Plaintiffs assert additional allegations from Confidential Witness 8 that they would plead if given leave to amend yet another time. Even if the Court were to consider giving Plaintiff a fourth opportunity to allege their claims sufficiently, the allegations described in Plaintiffs' opposition brief would not assist Plaintiff. According to Plaintiffs, Confidential Witness [*26] 8 began working at some unspecified date in November 2004. Thus, it is not clear whether Confidential Witness 8 began working at Ditech, let alone obtained sufficient information to be knowledgeable regarding the orders in Asia, *before* November 18, 2004, when the last alleged misrepresentation regarding the VQA orders was made. With respect to the Nextel-Sprint merger, Confidential Witness 8 contends that Defendants Tamblyn and Montgomery knew by the March 2005 that revenues from Nextel substantially declined and that the merging entity placed a capital expenditure freeze on all new hardware until the company worked out its strategy for the future. Similar to the allegations from Confidential Witnesses 2 through 6, discussed below, such allegations fail to show that Defendants knew, as of February 17, 2005 when the alleged misrepresentation was made, that the merger would be detrimental for Ditech or that any such revenue declines would be permanent.

## 2. Nextel-Sprint Merger.

Plaintiffs contend that Defendants' positive statements regarding proposed merger between Sprint and Nextel made in mid-February 2005 were false and misleading. In their SCAC, to support their contention that Defendants [*27] knew, when the statements were made, that they were false, Plaintiffs relied on statements from confidential witnesses who worked at companies that installed Nextel's orders of Ditech's echo cancellation equipment. In rejecting such allegations as sufficient to demonstrate falsity, the Court noted that at most, the allegations provide anecdotal information that the third-party witnesses observed that the numbers of orders declined starting in March 2005, or perhaps when the merger was announced in December 2004. Plaintiffs failed not allege any facts to support a belief that such

declines observed by the confidential witnesses were permanent, or more significantly, that Defendants *knew as of mid-February* that it would lose Nextel's business as a result of the merger. Plaintiffs failed to allege any material non-public information known by Defendants at the time the statement was made which would have rendered it false. Again, Plaintiffs did not cure these pleading deficiencies in their TCAC.

Plaintiffs additional allegation that, according to Confidential Witness 7, during a company meeting held "about the time of the merger announcement," Montgomery stated that the merger could go [*28] in either "one of two ways," with one of those ways being that the merged entity might not order any additional product from Ditech, does not assist Plaintiffs. Notably, the alleged misrepresentation did not state without hesitation that the merger was going to be good for Ditech. Rather, it is clear from the context of the entire paragraph Plaintiffs quote that Montgomery expressed that he was hopeful, but not certain, that the merger would be good for Ditech. Montgomery's statement was as follows:

> The Nextel-Sprint merger is actually, we think, quite good for us in that the key strategic people on the technical side are actually going to be the Nextel players, and this is what we've seen publicly announced. So we think that's positive, but we also have an account team calling on Sprint directly in Kansas City, which we're hopeful the 2 points lead to the right end.

(TCAC., P 56) Stating that the merger could go one of two ways for Ditech does not contradict the above statement or indicate that it was false. Accordingly, the Court concludes that Plaintiffs fail to sufficiently allege falsity with respect to the alleged misrepresentations as to the Nextel-Sprint merger. *See 15 U.S.C. § 78u-4(b)(1)(B).*

## D.  [*29] Plaintiffs fail to Plead Sufficient Facts to Demonstrate Scienter.

The PSLRA also requires a plaintiff to allege particular facts giving rise to a strong inference that "the defendant made false or misleading statements either intentionally or with deliberate recklessness." *Vantive, 283 F.3d at 1085; 15 U.S.C. § 78u-4(b)(2).* Where the pleadings are not sufficiently particularized or where, even taken as a whole, they do not raise a strong inference of scienter, dismissal pursuant to *Rule 12(b)(6)* is proper. *Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1038 (9th Cir. 2002).* Moreover, to determine whether a plaintiff has pled a strong inference of scienter, "the

2007 U.S. Dist. LEXIS 78411, *; Fed. Sec. L. Rep. (CCH) P94,450

court must consider all reasonable inferences to be drawn from the allegations including inferences unfavorable to the plaintiffs." *Gompper, 298 F.3d at 897.*

In addition to the alleged misrepresentations, Plaintiffs relied on Montgomery's and Tamblyn's stock sales to support their scienter allegations. In the Court's orders dismissing Plaintiffs' prior complaints, the Court found that the relatively low percentage of stocks sold by Montgomery and Tamblyn during the Class Period were not suspicious enough to raise a strong inference [*30] of scienter. Additionally, given that Montgomery sold more stocks during the four months preceding the Class Period, his sales during the Class Period were not dramatically out of line with prior trading practices. The Court also noted that the absence of allegations that the remaining corporate insiders sold a large portion of their Ditech stocks further defeated any inference of scienter. Plaintiff has not alleged *any* additional facts regarding stock sales by Montgomery, Tamblyn, or other insiders, or any other facts to support an inference of scienter.

The only additional allegation in their -CAC regarding stocks is a brief allegation, based on information and belief, that Defendants' unexercised options were improperly "spring loaded" and/or tainted through improper backdating. Plaintiffs do not allege any facts to support this allegation regarding spring loading or backdating generally, or more importantly, with respect to the Montgomery's or Tamblyn's options at issue in this action. Moreover, as Defendants argue, even if Plaintiffs did allege sufficient facts to support such accusations, spring loading or backdating could affect the ultimate value of such options, but would not [*31] eliminate the options. Thus, the such options would still be considered

in determining what percentage of Defendants' holdings were sold during the Class Period. Accordingly, the Court finds that Plaintiffs' allegations fail to raise a strong inference of scienter.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss with prejudice.

**IT IS SO ORDERED.**

Dated: October 11, 2007

JEFFREY S. WHITE

UNITED STATES DISTRICT JUDGE

## JUDGMENT

Pursuant to the Order granting Defendants' motion to dismiss entered today, this action is DISMISSED WITH PREJUDICE. Pursuant to *Section 21D(c)(1)* of the Securities Exchange Act of 1934, *15 U.S.C. § 78u-4(c)(1)* and N.D. Civil Local Rule 58-1, the Court finds that during the course of the litigation, the parties and their respective counsel at all times complied with the requirements of *Federal Rule of Civil Procedure 11.*

The Clerk is directed to close the file.

**IT IS SO ORDERED AND ADJUDGED.**

Dated: October 11, 2007

JEFFREY S. WHITE

UNITED STATES DISTRICT JUDGE

# Tab 4

1 of 1 DOCUMENT

**INTERNATIONAL NORCENT TECHNOLOGY, a California corporation, Plaintiff, vs. KONINKLIJKE PHILIPS ELECTRONICS N.V., a Netherlands corporation; and PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, a Delaware corporation, Defendants.**

**CASE NO. CV 07-00043 MMM (SSx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*2007 U.S. Dist. LEXIS 89946*

**October 29, 2007, Decided
October 29, 2007, Filed**

**COUNSEL:** [*1] For International Norcent Technology, a California corporation, Plaintiff: Bruce G Chapman, LEAD ATTORNEY, Connolly Bove Lodge and Hutz, Los Angeles, CA; Joseph James Mellema, LEAD ATTORNEY, Connolly Bove Lodge and Hutz, Los Angeles, CA; Minda R Schechter, LEAD ATTORNEY, Connolly Bove Lodge and Hutz, Los Angeles, CA.

For Koninklijke Philips Electronics NV, a Netherlands corporation, Philips Electronics North America Corporation, a Delaware corporation, Defendants: A Stephen Hut, Jr., LEAD ATTORNEY, A Douglas Melamed, LEAD ATTORNEY, Ryan Patrick Phair, LEAD ATTORNEY, Wilmer Cutler Pickering Hale and Dorr, LLP, Washington, DC; Danielle Y Conley, LEAD ATTORNEY, Samuel Broderick-Sokol, LEAD ATTORNEY, Wilmer Cutler Pickering Hale and Dorr, Washington, DC; Michael W Fitzgerald, LEAD ATTORNEY, Robert L Corbin, LEAD ATTORNEY, Corbin & Fitzgerald, Los Angeles, CA.

**JUDGES:** Margaret M. Morrow, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Margaret M. Morrow

**OPINION**

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

Plaintiff International Norcent Technology ("Norcent") filed this antitrust action against its competitors, defendants Koninklijke Philips Electronics N.V. ("Philips NV") and Philips Electronics North American Corpo-

ration ("Philips [*2] NA"), on January 3, 2007. Norcent alleges that Philips joined with nine other producers of DVD players (collectively the "Group of 10") to develop a technical standard for DVDs ("the DVD standard"). The standard was written to ensure that each member of the Group of 10 owned a patent or patents that met the DVD standard. Various members of the Group of 10, including Philips NV, have allegedly pooled their patents and formed patent licensing entities that exact royalties and licenses from competitors outside the Group of 10. Norcent contends that the Group of 10 has also implemented a DVD specification/logo licensing program that charges fees for specifications and logos that are essential for competitors to compete effectively in the market for DVD players. On April 24, 2007, the court granted defendants' motion to dismiss the complaint. Norcent filed its First Amended Complaint on May 1, 2007. On August 3, 2007, the court granted defendants' motion to dismiss the first amended complaint. On August 20, 2007, Norcent filed a Second Amended Complaint, alleging claims under *Section 1 of the Sherman Act*, the California Cartwright Act, and *California Business & Professions Code § 17200*. [*3] On September 4, 2007, defendants moved to dismiss the Second Amended Complaint.

**I. FACTUAL BACKGROUND**

**A. Facts Common To The First Amended Complaint**

Norcent, Philips NV, and Philips NA were previously competitors in the interstate sale of DVD players; they remain competitors in the interstate sale of other consumer electronics. Norcent alleges that the relevant geographic market is the United States, the geographic

Case 1:07-cv-00556-JJF-LPS    Document 55-5    Filed 04/02/2008    Page 3 of 18

Page 2
2007 U.S. Dist. LEXIS 89946, *

submarket is California, and the product market is DVD players. [1] Philips NV and its competitors purportedly developed DVD technology and obtained patents relating to that technology. The technologies developed were not exclusive, as alternative technologies such as the Multi-Media Compact Disc system and Super Density Disc system existed. [2]

> 1  Second Amended Complaint, PP 6-8.
> 2  *Id.*, P 9-11.

At some point, Philips NV joined with nine other competitors to develop a DVD standard. These competitors are Hitachi Ltd., Matsushita Electric Industrial Co., Ltd., Mitsubishi Electric Corporation, Pioneer Electronics Corporation, Sony Corporation, Time Warner, Inc., Toshiba Corporation, Victor Company of Japan, Ltd. ("JVC"), and Thomson Multimedia S.A. [3] Norcent alleges that the Group of [*4] 10 intentionally excluded other interested parties from participating in development of the DVD standard. [4]

> 3  *Id.*, P 12.
> 4  *Id.*, P 13.

The standard the Group of 10 developed purportedly ensures that each owns a patent(s) that covers an essential component of video disc players "substantially meeting the DVD standard." [5] Norcent contends that the technologies for which the Group of 10 owns patents are not essential for interoperability. [6] It also alleges that the Group of 10 has refused to include in the DVD standard alternative technologies for which its members do not own patents. [7]

> 5  *Id.*, P 12.
> 6  *Id.*, P 14. Interoperability is "the ability of one manufacturer's product to interface with other manufacturers' products." *Rambus, Inc. v. Infineon Technologies AG, 330 F. Supp. 2d 679, 696 (E.D. Va. 2004)* (citing Mark A. Lemley, *Standardizing Government Standard-Setting Policy for Electronic Commerce, 14 BERKELEY TECH. L.J. 745, 746 (1999)).* Standard setting is a common method of achieving interoperability. See *Rambus, 330 F. Supp.2d at 696;* see also Lemley, *Standardizing Government Standard-Setting Policy, supra,* at 746-47 (discussing alternative methods of ensuring interoperability in electronic [*5] commerce).
> 7  Second Amended Complaint, P 15.

Norcent asserts that, "at least initially," the Group of 10 collectively held more than a 90 percent share of the market for video disc players of all types. [8] Norcent asserts that the Group of 10 "actively combated alternative disc formats" such as Divx and, through their activities,

ensured that "no significant content was available to consumers in alternative disc formats." [9] Once content providers committed to using DVD standard compliant discs, Norcent contends, "consumers were coerced to buy only video disc players that substantially conform to the DVD standard in order to play such discs." [10] This, in turn, precluded competitors "from selling competitive video disc players that do not substantially conform to the DVD standard"; to compete in the market and submarket, they were forced to pay royalties to members of the Group of 10. [11]

> 8  *Id.*, P 20.
> 9  *Id.*, P 22, 25.
> 10  *Id.*, P 25.
> 11  *Id.*, 26.

Norcent also alleges that the Group of 10 used its "power" in the relevant market and submarket, as well as "collective action," to establish the "DVD" name and logo owned by the Group of 10 "so that consumers will only purchase DVD players that use the [*6] 'DVD' name and logo." [12] Indeed, it asserts, the name "DVD" has become "virtually generic" for any compact video disc. [13] Norcent contends that the Group of 10 "acts collectively" to prevent competitors from selling DVD players that use the "DVD" name and logo if those players do not conform to the DVD standard. [14]

> 12  *Id.*, P 27.
> 13  *Id.*
> 14  *Id.*

"By virtue of their ownership of patents essential to the DVD standard," for which there are purportedly no commercially viable competitive products, the Group of 10 allegedly "has the ability to reduce output by excluding competitors outside the Group of 10," as well as "the ability to raise consumer prices by increasing the costs to competitors outside the Group of 10." [15] For this reason, Norcent contends, the Group of 10 collectively has market power in the relevant market and submarket. [16]

> 15  *Id.*, P 30.
> 16  *Id.*

Norcent also asserts that members of the Group of 10 have entered into cross-licensing agreements with one another. [17] Philips NV, Sony, and Pioneer have purportedly pooled their patents to (1) exact royalties from competitors outside the Group of 10; (2) exact "grant back" licensing rights; [18] and (3) gain a competitive advantage in the [*7] market and submarket. [19] The three companies sought U.S. Department of Justice review of their patent pooling, but allegedly failed to disclose to the Department that they had combined with other competitors to develop a DVD standard "[for the] purpose of making

Philips N.V., Sony and Pioneer patents essential to the DVD standard." [20]

> 17  *Id.*, P 31.
> 18  "A grantback is an arrangement pursuant to which a licensee agrees to extend to the licensor of intellectual property the right to use the licensee's improvements to the licensed technology. Grantbacks can have procompetitive effects, especially if they are nonexclusive. . . . A nonexclusive grantback [i.e., one that permits licensing to the licensor as well as others] allows the licensee to practice its technology and license it to others. Such a grantback provision may be necessary to ensure that the licensor is not prevented from effectively competing because it is denied access to improvements developed with the aid of its own technology." (Motion to Dismiss the Original Complaint at 19 n. 16 (quoting IP Guidelines for the Licensing of Intellectual Property § 5.6, at 30 (1995)).
> 19  Second Amended Complaint, P 32.
> 20  *Id.*, P 33.

The Group [*8] of 10 eventually formed three patent licensing entities, each of which holds patents essential to the manufacture and/or sale of DVD players. These are: (1) the "3C" pool, comprising patents owned by Philips NV, Sony, and Pioneer; (2) the "6C" pool, comprising patents owned by Toshiba, Time Warner, Matsushita, Hitachi, Mitsubishi Electric, and JVC; and (3) Thomson. The licensing entities allegedly continue to operate today. [21]

> 21  *Id.*, P 34.

In addition, the Group of 10 has implemented and owns a DVD specification/logo licensing program, known as the DVD Format/Logo Licensing Corporation ("DFLLC"). Norcent alleges that, to compete effectively in the market and submarket, competitors must pay fees to this corporation for specifications and logos. [22]

> 22  *Id.*, P 35.

Norcent asserts that defendants have gained a significant unfair competitive advantage as a result of the DVD standard, their patent holdings, and their specification/logo licensing program. It contends that this competitive advantage has harmed competition and consumers by, for example, increasing the cost of DVD players purchased from suppliers who must pay royalties. [23]

> 23  *Id.*, P 36.

Philips NA, acting for Philips NV and the 3C [*9] patent pool, has purportedly demanded that Norcent pay

license fees or buy from licensed manufacturers whose costs are high because of the royalties they pay to the Group of 10. [24] It has also allegedly taken steps to stop Norcent's (and other competitors') customers from purchasing DVD players for which no license fees have been paid. [25] The 6C patent pool, too, has purportedly demanded that Norcent and other competitors outside the Group of 10 pay license fees. [26]

> 24  *Id.*, P 38.
> 25  *Id.*
> 26  *Id.*, P 39.

Norcent asserts that it and other companies cannot reasonably compete in the market and submarket without paying additional costs to the Group of 10, and that it has been driven out of the market and submarket as a result. [27] It reports that "other large competitors" such as Haier and Shinco have been or are being driven out of the market and submarket, and that the top twenty Chinese DVD manufacturers will withdraw from the market and submarket by 2008 "because of their inability to profitably compete due to the anticompetitive conduct of the Group of 10." [28] Purportedly, the exclusion of Norcent and these other competitors has "significantly constrained and will continue to constrain output" [*10] in the market and submarket. [29]

> 27  *Id.*, PP 40-41.
> 28  *Id.*, P 42.
> 29  *Id.*

Additionally, because the Group of 10 demands royalties and/or otherwise enforces its members' patents, "prices to consumers in the relevant market and submarket are [purportedly] higher tha[n] they would have been and would be in a competitive environment." [30] Norcent alleges that the Group of 10's "unfair competitive advantage" have caused prices for DVD players to "plateau at supra-competitive levels such that consumers have been and are being forced to pay supra-competitive prices." [31] It seeks treble damages, attorneys' fees and costs, injunctive relief, restitution, and disgorgement of profits. [32]

> 30  *Id.*, P 43.
> 31  *Id.*, P 44.
> 32  *Id.* at 16 (prayer for relief).

## B. Facts Newly Alleged In The Second Amended Complaint

Because it has dismissed Norcent's two prior complaints, the court considers, in deciding this motion, whether Norcent's second amended complaint pleads new facts that "nudge[ its] claims across the line from conceivable to plausible." *Bell Atlantic Corp. v.*

*Twombly, 550 U.S.___, 127 S.Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007).*

Among the new allegations found in the second amended complaint are the dates on which actions previously [*11] alleged occurred. Norcent asserts, for example, that Philips N.V. combined with Sony and Pioneer "beginning in the mid- to late-1990s and continuing into the present to pool patents purportedly essential to the DVD standard. . . ." [33] It also alleges that the 3C patent pool began to demand that it pay license fees or buy from licensed manufacturers "in the summer of 2003." [34] Finally, Norcent contends that it was "driven out" of the relevant market and submarket in 2005. [35]

> 33  *Id.*, 32.
> 34  *Id.*, P 38.
> 35  *Id.*, P 41.

Norcent has also added substantive allegations. These include specifics regarding the Group of 10's standard setting meetings. Norcent contends that executives of each member the Group of 10 were present at meetings held in Tokyo, Japan, between September and December 1995. [36] It asserts that "additional meetings have been held in subsequent years in locations including Japan [and that these] continu[e] [ ]to the present." [37] Norcent alleges that "the definition of the DVD standard was one of a series of steps in furtherance of an on-going combination whose purpose and effect has been to provide Philips and the Group of 10 with an unfair competitive advantage in the relevant market [*12] and submarket." [38] It also asserts that the Group of 10 acted collectively through an unincorporated partnership previously known as the "DVD Consortium" and later as the "DVD Forum." [39]

> 36  *Id.*, P 17. Norcent asserts that among the executives present were Jan Oosterveld and Henk Bodt of Philips, Sony's Norio Ohga, and Toshiba's Tazio Nishimuro. (*Id.*, P 18.)
> 37  *Id.*, 17.
> 38  *Id.*, P 12. Norcent deleted an allegation that the Group of 10 has "continued acts in furtherance of this unlawful scheme." (Compare *id.*, P 16 with First Amended Complaint, P 16.) Norcent's new allegation may simply be a restatement of the deleted allegation, as both assert the existence of an unlawful combination or scheme, and allude to unspecified steps or acts taken in furtherance of the combination.
> 39  *Id.*, P 19. Norcent notes that "the Group of 10 were, and continue to be, among the largest consumer electronics companies in the world . . . ." (*Id.*, P 20.) This allegation supports Norcent's assertion that the Group of 10 accounts for more

than ninety percent of the market for video disc players. (*Id.*)

In 2000, the Group of 10 purportedly formed the DFLLC, a Japanese corporation that is jointly owned by its members. [40] [*13] Norcent asserts that, from the time of its creation to the present, the Group of 10 has used the DFFLC to "oversee[ ] the DVD markets, grant[ ] licenses, collect[ ] royalties and monitor[ ] compliance with the DVD standard." [41] In addition to defining the DVD standard, Norcent alleges that "the Group of 10 agreed to produce only compact video disc players compliant with the DVD standard and agreed not to produce competing compact video disc players that were not compliant with the DVD Standard." [42] It asserts that, acting through the DFLLC, the Group of 10 has "threatened licensees who attempt to manufacture alternative compact video discs that are not compliant with the DVD standard." [43] Specifically, it alleges that the DFLLC "threatened to terminate the licenses of licensees that manufacture alternative compact video discs that do not comply with the DVD standard" by publishing "a general announcement over the internet." [44] Finally, Norcent contends that the production of DVD discs is "a capital intensive undertaking, requiring equipment for laser beam recording, development of a master, replication of the master, electroforming, stamping, molding of substrates and spin coating," [*14] [45]

> 40  *Id.*, P 19.
> 41  *Id.*
> 42  *Id.*, P 21.
> 43  *Id.*, P 28.
> 44  *Id.* Relatedly, Norcent repeats an allegation, raised in the previous complaint, that "only products that comply with the DVD standard exist or can exist in the relevant market and submarket." *Id.*, P 29; First Amended Complaint, P 20.
> 45  Second Amended Complaint, P 23. Norcent has made a number of other minor changes from the first amended complaint, which appear simply to reorganize earlier allegations. The allegations in paragraph 18 of the first amended complaint now appear in four separate paragraphs. (*See id.*, 22, 24-26; First Amended Complaint, P 18.) Although the wording is slightly different, these paragraphs allege that the Group of 10: (1) actively combated alternative disc formats (Second Amended Complaint, P 22); (2) used its combined market power to compel content providers to invest in and commit to using discs that complied with the DVD standard (*id.*, P 24);(3) ensured that no content was available in alternative disc formats, thereby coercing consumers to buy DVD standard compliant video disc players (*id.*, P 25); and (4) precluded competitors from selling

competitive compact video disc players that did not substantially conform [*15] to the DVD standard, forcing all competitors to pay royalties to the Group of 10 to compete in the relevant market (*id.*, P 26.)

## II. DISCUSSION

### A. Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).* In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002); Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n. 19 (9th Cir.1990).* If a document is incorporated by reference in a complaint, but is not physically attached, a court may consider the document so long as it is central to plaintiffs claim and no party questions its authenticity. See *Marder v. Lopez, 450 F.3d 445, 448 (9th Cir. 2006)* ("A court may consider evidence on which the complaint 'necessarily relies' if: (1) [*16] the complaint refers to the document; (2) the document is central to the plaintiffs claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion"); *In re Silicon Graphics Inc. Securities Litigation, 183 F.3d 970, 986 (9th Cir. 1999)* ("[the incorporation by reference doctrine] permits a district court to consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiffs] pleading,'" quoting *Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994)*).

The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mutual Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996); Mier v. Owens, 57 F.3d 747, 750 (9th Cir. 1995).* It need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Twombly, 127 S.Ct. at 1965* ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of [*17] his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief

above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)).

This is particularly true in the context of antitrust claims, because "'the costs of modem federal antitrust litigation and the increasing caseload of the federal courts counsels against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint.'" *Id. at 1967* (quoting *Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984)* (alteration deleted)); see also *Cascade Health Solutions v. PeaceHealth, 502 F.3d 895, 2007 WL 2473229, * 14 (9th Cir. 2007)* (noting the potential burden of antitrust trials, and "declin[ing] to adopt a rule that might encourage more antitrust litigation than is reasonably necessary to ferret out anticompetitive practices").

### B. The Sherman Act Claim

Section 1 of the Sherman Act declares [*18] that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations," is illegal. *15 U.S.C. § 1.* Because even beneficial business contracts and combinations restrain trade to some degree, § 1 has been interpreted to prohibit only those contracts or combinations that are "unreasonably restrictive of competitive conditions." *Standard Oil Co. v. United States, 221 U.S. 1, 58, 31 S. Ct. 502, 55 L. Ed. 619 (1911);* see also *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc., 407 F.3d 1027, 1033 (9th Cir. 2005)* ("Section 1 is intended to prohibit actions that *unreasonably* restrain competition" (emphasis added)). To prevail on a claim under § 1 of the Sherman Act, plaintiff must prove: (1) that there was a contract, combination, or conspiracy; (2) that unreasonably restrained competition; and (3) that affected interstate or foreign commerce. See, e.g., *Tanaka v. University of Southern California, 252 F.3d 1059, 1062 (9th Cir. 2001).*

Activity that allegedly violates § 1 is evaluated under either a per se or "rule of reason" standard. [46] See *Paladin Assocs., Inc. v. Montana Power Co., 328 F.3d 1145, 1154 (9th Cir. 2003).* [*19] Whichever standard is used, the court must assess the effect of the challenged conduct on competition. See *NCAA v. Board of Regents, 468 U.S. 85, 104, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984)* ("[W]hether the ultimate finding is the product of a presumption or of actual market analysis, the essential inquiry remains the same -- whether or not the challenged restraint enhances competition" (footnote omitted)).

> 46 A plaintiff may also attempt to establish that challenged conduct "unreasonably restrained competition" by "proof of a 'naked restraint,'

where an adverse effect on price or output is obvious." *Carter v. Variflex, Inc., 101 F. Supp. 2d 1261, 1266 (C.D. Cal. 2000)*; see also 1 ABA Section of Antitrust Law, ANTITRUST LAW DEVELOPMENTS 62-63 (5th ed. 2002) ("ANTITRUST LAW DEVS.") ("In quick look cases where 'an observer with even rudimentary understanding of economics could conclude that the arrangements in question have an anticompetitive effect on customers and markets,' courts do not require the plaintiff to establish every aspect of anticompetitive effect before the burden shifts to the defendant to prove the restraint's offsetting procompetitive effects," quoting *California Dental Ass'n v. FTC, 526 U.S. 756, 770, 119 S. Ct. 1604, 143 L. Ed. 2d 935 (1999)* [*20] (footnotes omitted)). "The quick look analysis . . . is the exception, not the rule." *Carter, 101 F. Supp. 2d at 1266*. Neither party has suggested that the court employ the "quick look" approach to analyze the allegedly anticompetitive conduct at issue here.

The per se standard applies only to "conduct that is manifestly anticompetitive, that is, conduct 'that would always or almost always tend to restrict competition and decrease output.' *Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 723, 108 S. Ct. 1515, 99 L. Ed. 2d 808 (1988)* (citations and internal quotations omitted). In contrast, "the rule of reason is to be applied 'where the economic impact of the challenged practice is not obvious.'" *Jack Russell Terrier Network of Cal., 407 F.3d at 1033 n. 13* (quoting *Harkins Amusement Enters., Inc. v. Gen. Cinema Corp., 850 F.2d 477, 486 (9th Cir. 1988)*, and *Dimidowich v. Bell Howell, 803 F.2d 1473, 1480 (9th Cir. 1986))*. Rule of reason review is the presumptive form of analysis in § 1 cases. See, e.g., *Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49, 97 S. Ct. 2549, 53 L. Ed. 2d 568 (1977)* ("Since the early years of this century a judicial gloss on this statutory language has established the 'rule of reason' as the prevailing [*21] standard of analysis"). "The rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects." *Paladin Assocs., Inc., 328 F.3d at 1156*.

The parties have agreed that the "rule of reason" standard governs evaluation of the adequacy of Norcent's allegations of anticompetitive conduct. To prevail on an antitrust claim under the "rule of reason" standard, a plaintiff must prove three elements: "(1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually injures competition." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Assn, 884 F.2d 504, 507 (9th Cir. 1989)* (quot-

ing *Oltz v. St. Peter's Community Hosp., 861 F.2d 1440, 1445 (9th Cir. 1988))*. If the plaintiff establishes these elements, then the fact finder "must weigh the anticompetitive effects and the procompetitive effects or business justifications advanced for the challenged restraint to determine whether it is unreasonable." *Les Shockley, 884 F.2d at 507* (citing *Oltz, 861 F.2d at 1445*). In making this examination, the fact finder considers "all of the circumstances surrounding [*22] the restraint." *Les Shockley, 884 F.2d at 508*.

## 1. Unreasonable Restraint of Trade

As noted, only conduct that unreasonably restrains trade violates § 1 of the Sherman Act. See, e.g., *Northwest Whole Stationers, Inc. v. Stationery & Printing Co., 472 U.S. 284, 289, 105 S. Ct. 2613, 86 L. Ed. 2d 202 (1985)* ("[E]very commercial agreement restrains trade. Whether this action violates § 1 of the Sherman Act depends on whether it is adjudged an *unreasonable* restraint" (emphasis original)). As a result, Norcent must allege and prove not just that defendants have restrained trade, but that they have done so unreasonably to prevail on their § 1 claim. See *Rickards v. Canine Eye Registration Foundation, 783 F.2d 1329, 1333 (9th Cir. 1986)* (to establish a § 1 violation under the rule of reason, plaintiff "must establish that [defendant's] action unreasonably restrained trade"). The reasonableness of a defendant's conduct is typically determined on "a case-by-case" basis, and requires that "'the fact finder weigh[ ] all of the circumstances of the case.'" *Oltz, 861 F.2d at 1445* (quoting *Continental T.V., 433 U.S. at 50*). The analysis is generally undertaken by the fact finder after the § 1 plaintiff establishes an agreement [*23] among two or more business entities (2) through which the entities intend to harm competition and (3) which actually harms competition. *Les Shockley, 884 F.2d at 507*. As a general matter, § 1's prohibitions have been held to "encompass a wide variety of anticompetitive practices, including horizontal and vertical price fixing, horizontal and vertical restraints on such non-price factors as territories and customers, tying agreements, exclusive dealing agreements, and, finally, anticompetitive boycotts or concerted refusals to deal." *Amarel v. Connell, 102 F.3d 1494, 1521 (9th Cir. 1996)* (citations omitted).

Defendants argue that, despite Norcent's further amendments, the second amended complaint "uses antitrust jargon [and] alleges nothing specific other than commonplace and lawful business practices that ultimately led to innovation, successful product promotion, and marketplace success. [47] Defendants successfully advanced a nearly identical argument in their motion to dismiss Norcent's first amended complaint. [48] In both of its orders dismissing Norcent's prior complaints, the court found that Norcent had failed to allege facts plausi-

2007 U.S. Dist. LEXIS 89946, *

bly suggesting that an anti-trust violation had [*24] occurred. Despite newly alleged facts, the court concludes that Norcent's most recent pleading does not cure the deficiency.

> 47 Defendants' Memorandum in Support of Motion to Dismiss Plaintiff's Second Amended Complaint ("Def's Mem.") at 2.
> 48 See August 3, 2007 Order at 10-11 ("Defendants argue that Norcent's § 1 claim must be dismissed because the complaint 'describes nothing more than ordinary[,] . . . procompetitive invention and promotion of a new product, dressed up in the jargon of antitrust,'" citing Defendants' Motion at 10:16-18).

In its April 24 order, the court noted that Norcent alleged only that defendants had collaborated with other competitors to create a DVD standard that had, as a result of their promotional efforts, become *de rigueur* in the industry. [49] Citing *Consolidated Metal Prods, Inc. v. American Petroleum Inst., 846 F.2d 284 (5th Cir. 1988)*, the court observed that "promotion" of an industry standard is not an actionable restraint of trade unless it amounts to coercion or encompasses other anticompetitive conduct. [50]

> 49 April 24, 2007 Order at 22.
> 50 *Id.* at 23.

Plaintiff in *Consolidated Metal* sued several competitors and the American Petroleum Institute ("API"), [*25] a standard-setting organization, alleging that API's refusal to certify plaintiff's product, a sucker rod, constituted an unreasonable restraint of trade. Plaintiff alleged, among other things, that "[b]ecause of widespread acceptance of and reliance on the API standards as a measure of quality and fitness for use, certification by the API through the licensing of its monogram is essential for manufacturers of sucker rods and related equipment to compete effectively in the marketplace." *Id. at 295 n. 41.* The appellate court affirmed the entry of summary judgment in API's favor, concluding that no reasonable jury could find that the API's actions constituted an unreasonable restraint on trade. Although it acknowledged that API certification was "very important to buyer acceptance of sucker rods" (*id. at 295*), the court determined that plaintiff had failed to show an unreasonable restraint of trade because it had not adduced evidence that "its customers were coerced by API or otherwise constrained to buy only monogrammed products" (*id. at 296*). API's influence, the court reasoned, stemmed principally from its success in evaluating products, and not from coercion or anticompetitive animus. [*26] *Id. at 296-97.* [51]

51 In its opposition and again at oral argument, Norcent attempted to reargue an issue previously decided by the court, i.e., whether the standard setting in which defendants engaged, without more, could constitute an unreasonable restraint of trade. Norcent sought to distinguish *API*, arguing that the standard there at issue was akin to a Good Housekeeping "seal of approval," and thus different from the standard being challenged in this case, which incorporates elements of patented technology owned by defendants and requires that companies wishing to manufacture standard-compliant video disc players pay royalties to standard-setting patent holders. The court is not persuaded. The available case law does not indicate that, by itself, setting such a standard constitutes an antitrust violation. In *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S. Ct. 365, 5 L. Ed. 2d 358 (1961)*, the Supreme Court held that Radiant Burners had stated a Sherman Act claim by alleging that the American Gas Association ("AGA"), which tested gas burners and affixed a "seal of approval" to those that passed the tests, refused to approve Radiant's burners, and thereafter conspired with certain of its [*27] members to ensure that they would not provide gas for the burners. See *id. at 658.* In *Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 108 S. Ct. 1931, 100 L. Ed. 2d 497 (1988)*, the Court held that competitors in the electrical conduit industry violated the antitrust laws by packing the annual membership meeting of a private standard-setting organization whose standards were routinely adopted into law by state and local governments, and causing those present to vote to disapprove another company's product. See *id. at 507* ("Nor can the Association's Code be characterized as merely an exercise of the power of persuasion, for it involves the exercise of market power"); see also *id. at 497* ("Petitioner conceded that it had conspired with the other steel interests to exclude respondent's product from the Code and that it had a pecuniary interest to do so"). Similarly in *American Society of Mechanical Engineers v. Hydrolevel, 456 U.S. 556, 102 S. Ct. 1935, 72 L. Ed. 2d 330 (1982)*, the Court held that an industry-wide standard-setting organization violated the antitrust laws by allowing one competitor in the industry to interpret its code to the detriment of another. See *id. at 572.*

In each of these cases, the Court found an antitrust violation [*28] because an established industry-wide standard-setting process was abused or manipulated. In each, there was an allegation

that an industry-wide standard-setting organization had been coopted by one or more members of the industry in an anti-competitive way. Norcent does not allege that the Group of 10 abused an industry-wide standard-setting process. Rather, it argues that members of the Group of 10 came together to create a standard and successfully promoted it. None of the cases on which Norcent relies holds, or even intimates, that such behavior is prohibited. Rather, as the court found in its prior orders, private action of this type does not give rise to a Sherman Act claim absent proof of coercion.

The final case Norcent cited at argument was *Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297 (3d Cir. 2007)*. There, the Third Circuit held that a patent holder's intentionally false promise to license its technology on fair, reasonable and non-discriminatory terms, on which a standard-determining organization's ("SDO") relied in including the technology in an industry-wide standard, constituted "actionable antitrust conduct." See *id. at 314* ("Deception in a consensus-driven private standard-setting [*29] environment harms the competitive process by obscuring the costs of including proprietary technology in a standard and increasing the likelihood that patent rights will confer monopoly power on the patent holder"). Like the other decisions cited by Norcent, *Qualcomm* is inapposite. Although the case also involves the licensing of patents on technology included in an industry-wide standard, Norcent has not alleged that any member of the Group of 10 misrepresented its willingness to license its patents. Nor has it alleged that the patented technology was included in an industry-wide standard. In sum, Norcent has advanced no argument that causes the court to change its view that there was nothing inherently anti-competitive about the standard-setting activity in which the Group of 10 engaged.

Because Norcent's original complaint did not allege that competitors could not produce DVD players that did not meet the standard, but only that they could not "advertise or promote such DVD players "as standard-complaint," the court found *Consolidated Metal* analogous and granted defendants' motion to dismiss. [52] To the extent, therefore, that Norcent once again asserts that setting and enforcing [*30] an industry standard, standing alone, is conduct that is sufficiently anti-competitive to support a § 1 claim, the court finds the argument unavailing. [53]

52 *Id.* at 23-24.

53 Norcent's new allegations and dates regarding the standard setting meetings in Tokyo may add specificity, but do not support the inference that the Group of 10 entered into an illegal agreement. To transform facially legitimate standard-setting and licensing into an antitrust violation, Norcent must allege facts indicating that the purpose of the activity was to restrain trade. See *In re Graphics Processing Units Antitrust Litigation, No. C 06-07417 WHA, 2007 U.S. Dist. LEXIS 76601, 2007 WL 2875686, * 12 (N.D. Cal. Sept. 27, 2007)* (concluding that, even though plaintiff provided a detailed account of two companies' parallel pricing behavior and frequent meetings, "[p]laintiffs ha[d] not pleaded that defendants ever met and agreed to fix prices; they plead at most that defendants had the opportunity to do so because they attended many of the same meetings").

In its first amended complaint, Norcent alleged that the Group of 10 "combined to use its market power to gain acceptance of products meeting the DVD standard and to compel content providers [*31] to invest in and to commit to using discs that complied with the DVD standard." [54] Purportedly, its members also "actively combated alternative disc formats, such as Divx." [55] As a result of these activities, Norcent asserted, "no significant content was available to consumers in alternative disc formats," [56] and "consumers were coerced to buy only video disc players that substantially conform to the DVD standard in order to play such discs." [57] This market reality, Norcent contended, had created a situation in which competitors were "precluded from selling competitive video disc players that do not substantially conform to the DVD standard, [and] . . . [were required to] pay royalties to members of the Group of 10 in order to compete in the relevant market and submarket." [58]

54  First Amended Complaint, ¶ 18.
55  *Id.*
56  *Id.*
57  *Id.*
58  *Id.*

Although Norcent added allegations that the Group of 10 "combined," "coerced" content providers, and "actively combated" alternative technologies to its first amended complaint, the court found that the amendments did not "nudge[ ] [its] claims across the line from conceivable to plausible." *Twombly, 127 S. Ct. at 1974.* [59] Specifically, the court held that the addition of "magic words" was  [*32] not alone sufficient to state a claim under *§ 1* of the Sherman Act. [60] See *Twombly, 127 S.Ct. at 1965* ("a formulaic recitation of the elements of a cause of action will not do"); *DM Research, Inc. v. Coll.*

2007 U.S. Dist. LEXIS 89946, *

*of Am. Pathologists, 170 F.3d 53, 56 (1st Cir. 1999)* ("terms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation -- for example, identifying a written agreement or even a basis for inferring a tacit agreement -- but a court is not required to accept such terms as a sufficient basis for a complaint," citing *Inter-state Circuit v. United States, 306 U.S. 208, 221-25, 59 S. Ct. 467, 83 L. Ed. 610 (1939)); Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 736 (9th Cir. 1987)* ("The pleader may not evade [antitrust] requirements by merely alleging a bare legal conclusion" (citations omitted)); *Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1110 (7th Cir. 1984)* ("invocation of antitrust terms of art does not confer immunity from a motion to dismiss; to the contrary, these conclusory statements must be accompanied by supporting factual allegations").

59    "August 3, 2007 Order at 12.
60    *Id.* at 12-13. As with all pleadings subject to [*33] *Rule 8,* plaintiffs presenting antitrust claims "do not have to plead any magic words." *Weath-erby v. RCA Corp., Nos. 85-CV-1615, 85-CV-1613, 85-CV-1614, 1986 U.S. Dist. LEXIS 25649, 1986 WL 21336, *3 (N.D.N.Y. May 9, 1986)*; see also *Bogosian v. Gulf Oil Corp., 561 F.2d 434, 445 (3d Cir. 1977)* (vacating the district court's grant of summary judgment where plaintiff's complaint, though failing to include the words conspiracy, combination, or contract, "fairly read as a whole allege[d] a 'combination,' and . . . such an allegation combined with a statement of the specific course of conduct alleged to be unlawful clearly state[d] a claim"); *Foam Supplies, Inc. v. Dow Chem. Co., No. 4:05CV 1772 CDP, 2006 U.S. Dist. LEXIS 53497, 2006 WL 2225392, *4 (E.D. Mo. Aug. 2, 2006)* ("Instead of searching for magic words or phrases, a court must deter-mine whether the complaint alleges sufficient facts"); *Am. Medicorp, Inc. v. Humana, Inc., 445 F. Supp. 573, 587 (E.D. Pa. 1977)* (rejecting de-fendant's argument that plaintiff had not alleged the "magic words" of "contract, combination, or conspiracy in restraint of trade[,]" or "monopolize or attempt to monopolize[,]" because the com-plaint "fairly read as a whole" alleged such activi-ties).

Applying this standard, [*34] the court held that Norcent's first amended complaint -- which alleged that the Group of 10 "combined" to use its collective share of the video disc player market to gain acceptance of the DVD standard and "to compel content providers to invest in and to commit to using discs that complied with the DVD standard [61] -- was too vague and conclusory to state

a cognizable § 1 claim. [62] See *Les Shockley, 884 F.2d at 507.*

61    First Amended Complaint, P 18.
62    See August 3, 2007 Order at 14 ("Norcent not only does not allege a sufficiently plausible factual basis for this conclusory allegation; it al-leges *no* factual basis for a claim that members of the Group of 10 engaged in a *common* unlawful scheme -- i.e., a conspiracy or combination. See *Twombly, 127 S.Ct. at 1970 n. 10* (affirming the dismissal of § 1 conspiracy allegations that "men-tioned no specific time, place, or person involved in the alleged conspiracies"); *Floors-N-More, Inc. v. Freight Liquidators, 142 F. Supp. 204 496, 501 (S.D.N.Y. 2001)* ("plaintiff must do more than allege the existence of a conspiracy -- it must allege some facts in support of the claim").

In reaching this conclusion, the court relied, in large part, on the fact [*35] that Norcent did not allege any facts regarding the alleged compulsion and coercion -- for example, *who* coerced *whom, when* the coercion took place, *how* the coercion was effected, and *what* com-prised the conspiracy. [63] It is true that whether a restraint is unreasonable cannot generally be determined without "thorough examination into all of the circumstances sur-rounding the restraint." *Les Shockley, 884 F.2d at 507;* see also *Cascade Cabinet, 710 F.2d at 1373* ("Rule of reason analysis calls for a 'thorough investigation of the industry at issue and a balancing of the arrangement's positive and negative effects on competition," citing *Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1050 (9th Cir. 1983)).* Before a factfinder can con-duct such an inquiry, however, Norcent must first allege the existence of a restraint of trade cognizable under *§ 1.* See *Columbia River People's Utility Dist. v. Portland General Elec. Co., 217 F.3d 1187, 1190 (9th Cir. 2000)* ("Because CRPUD has not sufficiently alleged a restraint of trade or commerce, we hold the § 1 claim must fail as a matter of law"). The question is thus whether the new allegations in Norcent's second amended complaint pro-vide [*36] the requisite factual specificity to support its conclusions of combination and coercion.

63    August 3, 2007 Order at 15 (citing *Twombly, 127 S. Ct. at 1970 n. 10; Associated Gen., 459 U.S. at 528 n. 17, 103 S. Ct. 897,74 L. Ed. 2d 723; Les Shockley, 884 F.2d at 507; Rutman Wine, 829 F.2d at 736;* see, e.g., *Petrochem Insu-lation, Inc. v. Northern Cal. & N. Nev. Pipe Trades Council, No. C-90-3628 FEL, 1992 U.S. Dist. LEXIS 4564, 1992 WL 131162, *6 (N.D. Cal. Mar. 19, 1992)* (dismissing a complaint that "fail[ed] to state with whom the supposed agree-ment was made; what its terms were; . . . or [to]

state what acts any defendant undertook in furtherance of it"); compare *Western Duplicating, Inc. v. Riso Kagaku Corp., No. Civ. S98-208 FCD GGH, 2000 U.S. Dist. LEXIS 17398, 2000 WL 1780288, *6 (E.D. Cal. Nov. 21, 2000)* ("Western also alleges that Riso and its dealers conspired at the October 1994 Dealer Advisory Council Meeting to eliminate competition from `supply pirates' such as Western. Pursuant to that conspiracy, Riso dealers allegedly agreed to use service threats to coerce customers to use Riso inks and masters and to spread fear, uncertainty and doubt in the minds of consumers to prevent them from purchasing non-Riso inks and masters. Western's allegations concerning the    [*37] agreements entered into at the Dealer Advisory Council Meeting are sufficient to allege the existence of a conspiracy to restrain trade" (citation omitted)).

Norcent's most recent pleading alleges that "the Group of 10 agreed to produce only compact video disc players compliant with the standard." [64] Norcent does not explain, either in its complaint or its opposition, how or why this newly alleged agreement constitutes an unreasonable restraint on trade in the relevant market. Norcent does not allege that the Group of 10 took action to prevent other companies from producing or selling non-DVD video players, and it is not obvious why an agreement by a group of companies (even a dominant or influential group) to restrict production to one technology would unreasonably restrain trade in that technology. [65] The central question in determining whether a restraint on trade is unreasonable "is whether the relevant agreement likely harms competition . . . [compared to] what likely would prevail in the absence of the relevant agreement." Federal Trade Commission & United States Department of Justice, Antitrust Guidelines for Collaboration Among Competitors, § 3.3; see also *Paladin Assocs., Inc., 328 F.3d at 1155* [*38] (noting that the Guidelines "provid[e] guidance on evaluating 'collaboration among competitors under antitrust law'"). Norcent does not allege that any member of the Group of 10 would have pursued alternative technologies in the absence of the purported agreement nor does it plead in what manner the agreement harmed competition in the DVD market. Without some further explanation as to why it constitutes an unreasonable restraint on trade, the agreement, even if properly pled, would not suffice to support Norcent's § 1 claim.

64   Second Amended Complaint, P 17.
65   This is especially true because, as noted, the relevant market identified by Norcent is the market for DVD players. It is not clear how the Group of 10's purported decision to sell nothing

but DVD players could have restrained other producers from participating in the DVD market. While the decision to focus only on DVD technology might conceivably have had an impact on the market for *competing* technologies, or the market for all video disc players, that is not the relevant market Norcent has alleged in its complaint.

Additionally, Norcent's allegations regarding the agreement are not supported by sufficient factual context. As    [*39] with the magic words "coerce," "combine," and "conspiracy," a mere allegation that parties entered into an agreement to restrain trade does not suffice to state a § 1 claim. See *Twombly, 127 S. Ct. at 1966* (a naked assertion of conspiracy in a § 1 complaint "gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of `entitlement to relief"). Norcent has not alleged any facts supporting its claim that the Group of 10 agreed not to sell video disc players that did not comply with the DVD standard. It has not alleged when the purported agreement was made. [66] Nor has it stated who made the decision, how it was made or what the parameters of the agreement were. [67] See *Twombly, 127 S. Ct. at 1971 n. 10.*

> 66   Norcent alleges that the Group of 10 met in Tokyo in 1995, and that there have been subsequent meetings. (Second Amended Complaint, P 17.) It does not specifically assert that the alleged agreement was made at these meetings, however.
> 67   Norcent identifies a handful of executives who met to set the DVD standard. (See *id.*, P 18.) It does not specifically allege that these executives agreed not    [*40] to sell non-DVD video disc players, however.

Furthermore, as defendants note, Norcent has not alleged any parallel conduct by the Group of 10 that would give rise to an inference the agreement was made. [68] Norcent does not allege that none of the members of the Group of 10 ever manufactured a competing video disc player. [69] In this respect, it has provided less specificity than the plaintiffs in *Twombly.* There, the issue was whether specific factual allegations of parallel conduct by two telecommunications carriers, combined with an allegation of conspiracy, sufficed to state a Sherman Act claim. The Court held that they did not. See *Twombly, 127 S. Ct. at 1966* ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"). [70] If a conclusory allegation of agreement is not sufficient even when supported by facts demonstrating parallel conduct, such an

2007 U.S. Dist. LEXIS 89946, *

allegation cannot be sufficient here, where no parallel conduct or any other factual context is alleged. [71]

68  Norcent alleges that "Philips has previously embraced the fact that such an agreement actually exists, saying: [*41] 'As the Complaint . . . states, in 1996, Philips and a number of other companies that developed DVD technology published a set of technical standards to promote the manufacture and sale of compatible DVD players and discs.'" (Pl.'s Opp. at 3 (quoting Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss Complaint, filed March 5, 2007 at 1).) This does not constitute an admission that defendants agreed not to manufacture non-DVD video disc players. Rather, it is entirely consistent with defendants' contention that any agreement among the Group of 10 was an agreement to set and promote standards, and not an agreement to restrict competition.

69  See Def.'s Mem. at 5. Proof that members of the Group of 10 never sold non-DVD video players would be the most obvious type of parallel conduct related to the alleged agreement. As noted, parallel conduct may arise from legitimate and legal business decisionmaking. See *Twombly, 127 S. Ct. at 1964* ("Even 'conscious parallelism,' a common reaction of 'firms in a concentrated market [that] recogniz[e] their [*42] shared economic interests and their interdependence with respect to price and output decisions' is 'not in itself unlawful,'" quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993)*).

70  The Court stated that before allegations of parallel conduct would support a § 1 claim, they had to "be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly, 127 S. Ct. at 1966.* This is necessary in order to avoid commencing litigation over "merely parallel conduct that could just as well be independent action." *Id.*

71  Norcent raises the novel argument that the application of *Twombly's* factual context requirement would preclude actions against conspirators who "are good at planning and keeping secrets." (See Pl.'s Opp. at 2.) The Supreme Court has clearly held, however, that a plaintiff must meet the "plausibility" threshold, no matter how well the defendants concealed their actions. The Court has made the decision, as a matter of policy, that it is better to require a factual basis before allowing costly litigation to proceed than it is

to permit plaintiffs to commence [*43] discovery without stating facts supporting their claims. See *Twombly, 127 S. Ct. at 1966-67* ("it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery . . . but quite another to forget that proceeding to antitrust discovery can be expensive"). Justice Stevens' dissent highlights this as a point of disagreement. See *id. at 1976* ("Under the relaxed pleading standards of the Federal Rules, the idea was not to keep litigants out of court but rather to keep them in. The merits of a claim would be sorted out during a flexible pretrial process and, as appropriate through the crucible of trial" (Stevens, J., dissenting)). In the face of clear guidance from the Supreme Court, Norcent cannot escape *Twombly's* requirements by arguing that they were prevent some meritorious cases from advancing.

Given the lack of specific factual context supporting Norcent's conclusory allegation that the Group of 10 agreed to produce only compact video disc players that complied with the standard, the allegation fails to "nudge" Norcent's claim from conceivable to plausible. [72] See *Twombly, 127 S.Ct. at 1965* ("stating a [§ 1] claim requires a complaint with enough factual [*44] matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement"). Consequently, the addition of an allegation that the Group of 10 agreed not to manufacture disc players that did not comply with the DVD standard does not alone persuade the court that the antitrust violation claimed is more than just "conceivable." See *id. at 1974.* [73]

72  Norcent appears to ignore *Twombly* in its opposition. It claims that "standing alone, the agreement not to offer product variations could itself constitute an unreasonable restraint of trade." (See Plaintiff's Opposition to Defendants' Motion to Dismiss Second Amended Complaint ("Pl.'s Opp.") at 6.) Under *Twombly,* this is true only if Norcent provides factual context that makes it plausible such an agreement was actually made. See *Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)* ("we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible "plausibility [*45] standard," which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible"*(emphasis

original)); see also *TON Servs. v. Qwest Corp.,* *493 F.3d 1225, 1236 (10th Cir. 2007)* ("In *Bell Atlantic,* the Supreme Court articulated a new 'plausibility' standard under which a complaint must include 'enough facts to state a claim to relief that is plausible on its face,'" citing *Twombly, 127 S.Ct. at 1974*); *Brown v. Kerkhoff, 504 F. Supp. 2d 464, 522 (S.D. Iowa 2007)* (reviewing the Second and Tenth Circuit's interpretations of *Twombly* and anticipating that the Eighth Circuit would hold that "[t]he merits of the claim need not be such that the plaintiff plausibly succeeds; the claim must merely be supported with enough factual fodder that the claim can plausibly be proven. This standard may require a plaintiff to place allegations 'in a context that raises a suggestion of unlawful conduct, such that the plaintiff's allegations hurdle the line 'between the factually neutral and the factually suggestive,'" citing *Twombly, 127 S.Ct. at 1966* & n. 5).

73   Norcent suggested at oral argument that the court [*46] had misinterpreted the significance of this new allegation. It asserted that it had not shifted the focus of its allegations from coercion to agreement. Rather, it contended, the agreement it had pled constituted contextual evidence of coercion. The alleged agreement does not demonstrate coercion any more than the allegations contained in Norcent's prior complaints. Stated differently, the agreement not to produce nonstandard compliant video disc players, without more, is not inherently coercive because it does not, on its face, bind anyone outside the Group of 10.

Norcent has also added an allegation that the Group of 10 "threatened licensees who attempt to manufacture alternative compact video discs that are not compliant with the DVD standards.[74] Like the allegation regarding an agreement not to manufacture non-compliant disc players, the allegation regarding threats is conclusory. Norcent provides some factual context for the claim, alleging that the threat was communicated "by way of a general announcement over the internet.[75] It does not offer any specifics regarding the announcement, however, i.e., it does not state when the announcement was made, who made it, or what its [*47] content was. See *Twombly, 127 S.Ct. at 1970 n. 10* (references to "specific time, place or person" are important elements in providing notice to defendant).

74   Second Amended Complaint, P 28.
75   *Id.*

The nature of the threat is important. A patent holder may refuse to license a non-conforming product if it chooses without running afoul of the Sherman Act. See *Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1363 (Fed. Cir. 1999)* ("the antitrust laws do not negate the patentee's right to exclude others from patent property"); *Carter, 101 F. Supp. 2d at 1265* ("Generally, courts have held that a patentee may 'grant licenses to make, use or vend, restricted in point of space or time, or with any other restriction upon the exercise of the granted privilege' without violating the antitrust laws," citing *Ethyl Gas. Corp. v. United States, 309 U.S. 436, 60 S. Ct. 618, 84 L. Ed. 852, 1940 Dec. Comm'r Pat. 758 (1940))*. If the DFLLC has insisted that licensees use the DVD logo only for products that comply with the DVD standard, there is nothing inherently anti-competitive about this practice. If, on the other hand, Norcent alleges that the DFLLC has threatened to revoke the license of a licensee who produces *any* non-conforming disc player, whether or not [*48] it bears the DVD logo, this might give rise to an inference of anti-competitive behavior. See *Compton v. Metal Products, Inc., 453 F.2d 38, 44-45 (4th Cir. 1971)* ("in exclusively licensing his patents, the patentee himself could neither require non-competition beyond the term of the patents nor as to items not covered by the patents"); *McCullough v. Kammerer Corp., 166 F.2d 759, 763 (9th Cir. 1948)* (holding that a license conditioned on the licensee using only the patented product is anti-competitive because "[t]here is no merit to the contention . . . that because the patentee may refrain from making or using competing devices, unpatented or patented, he may bind his licensee so to refrain"); cf *United States v. Paramount Pictures, Inc., 334 U.S. 131, 159, 68 S. Ct. 915, 92 L. Ed. 1260 (1948)* ("we hold to be illegal [ ] a refusal to license one or more copyrights unless another copyright is accepted"); *United States v. Westinghouse Elec. Corp., 648 F.2d 642, 647 (9th Cir. 1981)* ("Of course a patent holder may run afoul of the antitrust laws . . . [by] refus[ing] to grant licenses except on condition that royalties be paid on unpatented products," citing *Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 135, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969))*. [*49]

The court cannot determine which, if either, of these scenarios is what occurred, however, because Norcent alleges the threat in a conclusory, non-specific manner. Without any information as to who was threatened, who made the threat, what the content of the threat was, and whether any licenses were revoked, the court and defendants must speculate as to whether the fact of the threat raises a plausible antitrust claim. It is precisely this type of speculative allegation that *Twombly* holds is insufficient. See *Twombly, 127 S.Ct. at 1965* ("Factual allegations must be enough to raise a right to relief above the speculative level," citing 5 Charles Alan Wright & Arthur Miller, FEDERAL PRACTICE AND PROCEDURE § 1216).[76]

76   At the hearing, Norcent raised an new argument regarding the illegality of the Group of 10's licensing scheme. It asserted that members of the Group of 10 favored other members because they did not charge each other royalties. This amounts to an argument that patent pools are inherently anti-competitive. Such an argument is at odds with well-established law. See *U.S. Philips Corp. v. International Trade Com'n, 424 F.3d 1179, 1193 (Fed. Cir. 2005)* (holding that packaged [*50] licensing has pro-competitive purposes and is not per se violative of the Sherman Act); see also *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 20, 99 S. Ct. 1551, 60 L. Ed. 2d 1 (1979)* ("The blanket license, as we see it, is not a 'naked restrain[t]' of trade with no purpose except stifling of competition," quoting *White Motor Co. v. United States, 372 U.S. 253, 263, 83 S. Ct. 696, 9 L. Ed. 2d 738 (1963))*. The fact that members of the Group of 10 do not charge each other royalties is permissible. As defendants noted at oral argument, the patent pools at issue here resemble barter agreements in which patent holders trade the use of licenses to each other in lieu of paying royalties. The fact that there are three pools does not change this analysis. Each member of the Group of 10 is permitted to trade the use of its license in return for the right to use another member's license, and in this manner take advantage of the benefits of its research and development activities.

It is fundamental to *Rule 8* notice pleading that a complaint be sufficiently specific to allow the defendant to prepare a response. See *Twombly, 127 S.Ct. at 1970 n. 10* (comparing the complaint's conclusory allegations with the model Form 9 for negligence, [*51] and finding that "[a] defendant wishing to prepare an answer in the simple fact pattern laid out in Form 9 [to the Federal Rules of Civil Procedure] would know what to answer; a defendant seeking to respond to plaintiffs' conclusory allegations . . . would have little idea where to begin"); see also *McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 2007 WL 2683705, *2 (Fed. Cir. 2007)* ("It logically follows that a patentee need only plead facts sufficient to place the alleged infringer on notice as to what he must defend"). Even though Norcent has alleged that the threat was communicated via a "general announcement" over the internet, without further specificity, defendants will be unable to identify the announcement to which Norcent refers, who made the announcement, what its content was, and who it threatened without more specific allegations.

The court's conclusion is bolstered by Norcent's puzzling statement in its opposition that the "[c]omplaint does not refer to any documents and no . . . documents are central to Norcent's claim." [77] Website content is "documentary" for the purposes of the incorporation by reference doctrine. See *Murawksi v. Pataki,    F.Supp.2d   , 2007 U.S. Dist. LEXIS 72749, 2007 WL 2781054, *8 (S.D.N.Y. Sept. 26, 2007)* [*52] (considering a website on which plaintiff relied in his complaint); *Knievel v. ESPN, Inc., 223 F.Supp.2d 1173, 1176 (D. Mont. 2002)* (holding that the court could consider the entire contents of a website because it was mentioned in the complaint, portions were attached as exhibits, and no party questioned the authenticity of the CD-Rom reflecting its content).

77   Pl.'s Opp. at 8. Norcent made this claim in response to defendants' citation of two web postings that might constitute the "announcement" alleged in the complaint. One of the postings is an answer to a frequently asked question on the DFLLC's website, which states that "[t]he use of the DVD Format for products that do not conform to the Specifications is a violation of the DVD Format/Logo License. Such violation may lead to termination of the License." (Def.'s Mem. at 6-7 n. 5, citing http://www.dvdfllc.co.jp/faq.html).) The other reference defendants proffer is a portion of the publicly available DVD Format/Logo, which provides that the use of the DVD logo except in connection with authentic DVD players is a material breach of the agreement. (*Id.* at 7 n. 5, citing http://www.dvdfllc.co.jp/pdf/LicenseAgreement Draft.pdf). In [*53] both of these references, the Group of 10 threatens only to revoke the license of a licensee who uses the DVD logo on non-conforming products. As noted, there is nothing improper about such a practice.

The web announcement that purportedly included the threat to licensees cannot be both the specific factual hook that allows Norcent to state a claim and yet be so general that it is not a specific document referenced in its complaint. Norcent neither admits nor denies that the two websites proffered by defendants are the "announcement" to which it refers in the complaint. On the present state of the record, the court must conclude *either* that defendants have proffered the website postings to which Norcent referred in the complaint, and Norcent does not challenge their authenticity, *or* that Norcent's reference to a "general announcement" constituting a threat is not sufficiently specific to state a claim for violation of *§ 1* of the Sherman Act, as defendants are unable to identify the announcement and respond.

Thus, neither Norcent's allegation that the Group of 10 entered into an agreement not to manufacture non-compliant DVDs or its allegation that the Group of 10 "threatened" licensees [*54] who attempted to market non-conforming disc players satisfies *Twombly's* "plausibility" requirement. The balance of Norcent's arguments in opposition to defendants' motion merely reargues points that have previously been decided against it. Norcent asserts, for example, that "the mere adoption of a standard by a decisive number of industry participants is often all that is needed to ensure that competing standards will fail in the marketplace." [78] The court has already held, however, that setting an industry standard, without more, does not constitute an actionable restraint of trade "unless it amounts to coercion or encompasses other anticompetitive conduct." [79] Norcent also argues that the Group of 10 conspired to ensure "that no other technology could be successful in the market." [80] As the court has previously found, in the absence of a further allegation of anti-competitive conduct, the fact that the DVD standard has undercut the commercial success of other technologies will not support an antitrust claim.

78  Pl.'s Opp. at 4.
79  See August 3, 2007 Order at 23.
80  Pl.'s Opp. at 5.

At bottom, Norcent wishes to assert that "(1) setting a DVD standard to give every member of the Group of [*55] 10 patent coverage over that standard; (2) compelling the industry to commit to the DVD standard; and (3) enforcing patents covering the DVD standard to injure competition and consumers" constitutes an antitrust violation. [81] The court has previously concluded that setting standards and ensuring that licenses comply with those standards, while creating a successful brand, does not suffice to state a § 1 claim. Absent factual context indicating that the Group of 10's standard setting and licensing activities were other than legal, Norcent's allegations that defendants improperly "compelled" the industry to commit to the standard, and "injured competition" by enforcing their patents do not alter this result. The additional details Norcent offers regarding the manner in which the standard was set, and its conclusory allegations of improper conduct, are simply not enough to "nudge [the] claims across the line from conceivable to plausible." *Twombly, 127 S.Ct. at 1974.* Consequently, the court grants defendants' motion to dismiss the second amended complaint.

81  *Id. at 1.*

**2. Injury To Competition**

In its August 3, 2007 Order, the court held that Norcent's allegations of supra-competetive consumer [*56] prices adequately alleged injury to competition. [82] Defendants ask the court to reconsider this ruling in light of Norcent's allegations that the Group of 10 engaged in anti-competitive behavior by entering into an agreement not to produce non-compliant video disc players, and threatening licensees who manufacture non-conforming products. [83] They assert that such conduct might injure competition in non-DVD formats, but not in the relevant market for DVD players. [84]

82  See August 3, 2007 Order at 20-21.
83  Def.'s Mem. at 10.
84  *Id.*

In its earlier order, the court noted Norcent's allegation that defendants' actions had caused prices to plateau at supra-competitive levels. Although it found that Norcent had not adequately alleged that the Group of 10 had unreasonably restrained trade, the court reasoned that, were Norcent able ultimately to allege that the Group of 10's standard-setting and licensing constituted such a restraint, and that the standard-setting and licensing affected prices in the market for DVD players, the fact that prices had reached and remained at supra-competitive levels would constitute cognizable injury to competition. [85] In its most recent complaint, Norcent has attempted [*57] to demonstrate that the Group of 10's standard-setting and licensing activities are anti-competitive by alleging that they were accompanied by an agreement not to manufacture or market video disc players that did not comply with the DVD standard, and threats to licensees who attempted to market non-compliant disc players. The court has concluded that, viewed in combination with Norcent's allegations regarding standard-setting and licensing, these facts either do not plead a unreasonable restraint of trade or lack adequate factual context. The court agrees with defendants, however, that to the extent these allegations are intended to detail defendants' purportedly anti-competitive behavior, they demonstrate that the injury to competition alleged is not causally linked to the illegal conduct.

85  The court stated:

"Norcent alleges that prices in the market have plateaued at supra-competitive levels because members of the Group of 10 exercise an unfair competitive advantage by demanding royalties and otherwise enforcing their patents. It asserts that they are able to demand royalties not simply because they own patents, but also because

2007 U.S. Dist. LEXIS 89946, *

the Group of 10 has combined to set an industry standard [*58] for DVDs that ensures competitors must license the patents to compete effectively in the market and submarket. Whether or not such conduct is actionable under § 1 of the Sherman Act is a different question, which is addressed *supra*. There is no doubt, however, that the averments sufficiently state a causal link between defendants' alleged conduct -- conduct that, as currently alleged, does not constitute an unreasonable restraint of trade -- and the alleged supra-competitive prices being paid by consumers. Consequently, the court concludes that Norcent has adequately pleaded injury to competition." (August 3, 2007 Order at 21-22.)

The antitrust laws exist to protect competition. See *Gough v. Rossmoor Corp., 585 F.2d 381, 386 (9th Cir. 1978)* ("the antitrust laws . . . were enacted for 'the protection of Competition, not Competitors,'" quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977))*. For this reason, a plaintiff must allege injury not only to itself, but to competition "within a field of commerce in which the claimant is engaged (i.e., 'antitrust injury')." *McGlinchy v. Shell Chemical Co., 845 F.2d 802, 811 (9th Cir. 1988)*; see also *Gough, 585 F.2d at 386* [*59] ("The conduct must have an adverse impact on the competitive conditions in general as they exist within the field of commerce in which the plaintiff is engaged").

To allege injury to competition, a plaintiff "may not merely recite the bare legal conclusion that competition has been restrained unreasonably." *Les Shockley, 884 F.2d at 508*. "[A]t a minimum," it must "sketch the outline of the antitrust violation with allegations of supporting factual detail." *Id. at 508*; see also *Rutman Wine, 829 F.2d at 736* ("The pleader may not evade [antitrust] requirements by merely alleging a bare legal conclusion; if the facts 'do not at least outline or adumbrate' a violation of the Sherman Act, the plaintiffs 'will get nowhere merely by dressing them up in the language of antitrust'" (citation omitted)).

There is no doubt that supra-competitive prices to consumers are a cognizable form of antitrust injury. See *American Ad Mgmt., Inc. v. GTE Corp., 92 F.3d 781, 791 (9th Cir. 1996)* ("it is difficult to imag[ine] a more

typical example of anti-competitive effect than higher prices"); *Rebel Oil v. Atlantic Richfield Co., 51 F.3d 1421, 1433 (9th Cir. 1995)* ("Consumer welfare is maximized when . . . [*60] consumers are assured competitive price and quality. Accordingly, an act is deemed *anticompetitive* under the Sherman Act only when it harms both allocative efficiency *and* raises the prices of good above competitive levels or diminishes their quality" (emphasis original)). To prove cognizable injury to competition, however, Norcent must allege facts demonstrating that there is a causal connection between the alleged anti-competitive actions of the Group of 10 and the alleged supra-competitive prices. Since Norcent now asserts that the Group of 10's anti-competitive behavior is its agreement not to manufacture non-compliant video disc players and its members' threats to licensees who attempt to manufacture such products, it is clear there is no causal connection between the purportedly illegal acts and the alleged injury.

This is in contrast to the causal link that theoretically could exist between defendants' standard-setting and licensing activities and the purportedly supra-competitive prices in the DVD market. Because the court previously found that those activities alone did not constitute an unreasonable restraint of trade, Norcent presented new allegations of an agreement not [*61] to manufacture non-compliant video disc players and purported threats to licensees. It alleged no facts, however, that would support a finding that these activities caused, or could cause, supra-competitive pricing in the DVD market. [86] Nor is the link between the two readily apparent.

[86] As noted, Norcent asserted at the hearing that it had not "shifted focus" by including these new allegations. To the extent the allegations are intended to provide support for Norcent's coercion claim, they are insufficient for the reasons stated earlier. Consequently, it is appropriate to examine whether Norcent has alleged that the purported agreement and threats are causally linked to the injury to competition it asserts.

The court's observation in its August 3, 2007 Order that Norcent had adequately alleged injury to competition was based on the complaint as then pleaded. Stated differently, it was based on the fact that Norcent at that point alleged that the Group of 10's standard-setting and licensing activities constituted an unreasonable restraint of trade. Had Norcent been able to add allegations demonstrating that, the court would have concluded that the present complaint adequately alleged [*62] injury to competition. Because it has not, however, and because it now alleges different illegal acts, the causal connection between the hypothetical restraint of trade and the injury to competition has been broken. Thus, Norcent's most

recent complaint not only fails to allege an unreasonable restraint of trade, but also to allege cognizable injury to competition in the relevant market caused by such a restraint.

## C. Leave To Amend

Norcent has requested leave to amend in the event the court finds that the second amended complaint does not allege sufficient factual detail to state a claim. "'Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment.'" *Intri-Plex Techs., Inc. v. Crest Group, Inc., 499 F.3d 1048, 2007 WL 2410170, *6 (9th Cir. 2007)* (quoting *In re Daou Sys., Inc., 411 F.3d 1006, 1013 (9th Cir. 2005))*. Leave to amend need not be granted where further amendment would "constitute[ ] an exercise in futility," however. *Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir. 1989)*. When a party has already been given leave to amend its complaint, the district court [*63] may exercise its discretion more broadly to find that further amendment would be futile. See, e.g., *Simon v. Value Behavioral Health, Inc., 208 F.3d 1073, 1084 (9th Cir. 2000)* ("The district court's discretion [in granting or denying leave to amend] 'is particularly broad' when the plaintiff previously has been granted leave to amend," quoting *Griggs v. Pace Amer. Group, Inc., 170 F.3d 877, 879 (9th Cir. 1999))*, as amended, *234 F.3d 428*; *Ascon Properties, 866 F.2d at 1160* ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint," citing *DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 n.3 (9th Cir. 1987)* and *Mir v. Fosburg, 646 F.2d 342, 347 (9th Cir. 1980))*; see also *Richardson Constr. v. Clark County Sch. Dist., 223 Fed. Appx. 731, 733 (9th Cir. Mar. 5, 2007)* (Unpub. Disp.) (affirming the dismissal with prejudice of a third amended complaint because plaintiff had had three opportunities to cure the infirmity); *Mejia v. Stolarski, 175 Fed. Appx. 137, 138 (9th Cir. Apr. 7, 2006)* (Unpub. Disp.) ("Because Mejia could not save his complaint through further amendment, the district court did not abuse its discretion [*64] in dismissing his complaint without leave to amend").

Norcent has been granted two opportunities to amend its complaint to allege something more than a conclusory violation of the Sherman Act. This is the third time the court has evaluated the sufficiency of the allegations and found them wanting. The fact that Norcent has failed, in three attempts, to state a plausible antitrust claim supports the conclusion that further amendment would be futile. See *Government Computer Sales Inc. v. Dell Marketing, 199 Fed. Appx. 636, 639 (9th Cir. Aug. 28, 2006)* (Unpub. Disp.) (noting that "an additional opportunity to amend would be futile because GCS ha[d]

not alleged any additional facts or circumstances that give rise to a claim" after two opportunities).

Norcent has had access to all information relevant to its claim since the date it filed its original complaint. Despite the incremental addition of allegations, the second amended complaint alleges essentially the same claim pled in the original complaint; as a result, it suffers from the same infirmities. See *LRL Properties v. Portage Metro Housing Authority, 55 F.3d 1097, 1104 (6th Cir. 1995)* ("'Denial of [leave to amend] is not an abuse [*65] of discretion where [t]he infirmities of the original complaint are not dissipated by the amended complaint'" (internal quotation marks omitted)). Norcent has had three chances, and has failed to allege anything more than a legal standard-setting and licensing program. Consequently, the court concludes that it would be futile to allow leave to amend. [87]

> 87 Noting that Norcent's second amended complaint alleges that the DFLLC was formed in 2000, defendants contend that it is now clear on the face of the complaint that Norcent's § 1 claim is barred by the Sherman Act's four year statute of limitations. (See Def.'s Mem. at 12.) Defendants concede that Norcent alleges "an ongoing combination" and meetings "continuing into the present." They argue, however, that the real injury alleged is the Group of 10's initial standard-setting activity, and that there is no reason to believe that the "continuing collaborations were material to the exclusion of alternative[ technologies] that is the gravamen of the [second amended complaint]." (Def.'s Mem. at 13.) "A cause of action in antitrust accrues each time a plaintiff is injured by an act of the defendant and the statute of limitations runs from [*66] the commission of the act." *Pace Industries, Inc. v. Three Phoenix Co., 813 F.2d 234, 237 (9th Cir. 1987)* (citing *Zenith Radio Corp., 401 U.S. at 338, 91 S. Ct. 795, 28 L.Ed. 2d 77)*. "Even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act." *Id.* (citing *Steiner v. 20th Century-Fox Film Corporation, 232 F.2d 190, 195 (9th Cir. 1956))*. Although Norcent has failed to allege sufficiently *any* illegal conduct by defendants, to the extent it asserts that the Group of 10 is violating the antitrust laws by implementing its licensing regime, it pleads ongoing acts that contribute to ongoing sales at purportedly supra-competitive prices. See *Klehr v. A.O. Smith Corp., 521 U.S. 179, 189, 117 S. Ct. 1984, 138 L. Ed. 2d 373 (1997)* ("in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a

2007 U.S. Dist. LEXIS 89946, *

series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' e.g., each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiffs knowledge of the alleged illegality at much earlier times'" (citations omitted)). [*67] The court thus disagrees that Norcent's new allegations make clear that its § 1 claim is barred by the statute of limitations. Because the complaint alleges that overt acts have continued through the present, the complaint pleads ongoing injury. Because Norcent has failed adequately to allege that defen-

dants have unreasonably restrained trade, however, the court need not finally decide this issue.

## III. CONCLUSION

For the reasons stated, the court grants defendants' motion to dismiss the second amended complaint with prejudice.

DATED: October 29, 2007

s/ Margaret M. Morrow

MARGARET M. MORROW

UNITED STATES DISTRICT JUDGE

# Tab 5

1 of 1 DOCUMENT



Positive
As of: Apr 02, 2008

**KASADA, INC., JOHN MICHAELS, INC., GABBEY DESIGN GROUP, INC.
GARMENT MAKERS, INC., THEORDORE SADAKA, KAREN SADAKA AND
GLADYS SADAKA, Plaintiffs, -against- ACCESS CAPITAL, INC., WESTGATE
FINANCIAL CORP., FINOVA CAPITAL, INC., UCC ASSET MANAGEMENT
CORP., STAR FUNDING, INC., OMNI COMMERCIAL, L.L.C., COMMERCIAL
SERVICES, INC., d/b/a C.I.T. GROUP, ROSENTHAL & ROSENTHAL, MILES
M. STUCHIN and RICHARD I. SIMON, Defendants.**

**01 Civ. 8893 (GBD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2004 U.S. Dist. LEXIS 25257; 2005-1 Trade Cas. (CCH) P74,693*

**December 10, 2004, Decided
December 14, 2004, Filed**

**DISPOSITION:** [*1] Defendants' motions to dismiss
granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, commercial
credit "factors," filed motions to dismiss claims by plain-
tiff garment manufacturers alleging price fixing and mo-
nopoly claims under the Sherman Act, *15 U.S.C.S. §§ 1
and 2*, the Clayton Act, *15 U.S.C.S. § 4*, and the Don-
nelly Act, *N.Y. Gen. Bus. Law § 340*, and pendent com-
mon law claims.

**OVERVIEW:** The manufacturers argued, inter alia, that
the factors' denial of credit constituted a group boycott
and that the factors controlled the price and interest rates
for factoring which constituted illegal price-fixing under
*15 U.S.C.S. § 1* of the Sherman Act. The district court
rejected the manufacturers' group boycott claim under
the Sherman Act, as there was no allegation that a par-
ticular manufacturer, once denied credit, was subse-
quently refused by each of the other factors. Likewise,
the district court dismissed the manufacturers' price fix-
ing claim, as the manufacturers made no allegation that
the price, terms, conditions, interest rates, or any other
aspect of the factors' factoring services were fixed. How-

ever, the court found that the manufacturers had stated a
claim against the factors under *15 U.S.C.S. § 2* of the
Sherman Act, alleging that the factors acted with specific
intent to archive or maintain monopoly power in the fac-
toring market by merging with competitors and unlaw-
fully utilizing the resulting economic leverage to fix
piece goods prices and to drive out of business garment
manufacturers that potentially enhanced the factors'
overall credit risk exposure.

**OUTCOME:** Defendants' motions to dismiss plaintiffs'
price fixing and group boycott claims and their Clayton
Act claim were granted. Defendants' motions to dismiss
plaintiffs' monopolization claims under the Sherman Act
and the Donnelly Act were denied, and dismissal of the
pendent common law claims was granted in part and
denied in part.

**LexisNexis(R) Headnotes**

***Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Failures to State Claims***
[HN1] *Fed. R. Civ. P. 12(b)(6)* allows a party to move to
dismiss a complaint where the complaint fails to state a
claim upon which relief can be granted. *Fed. R. Civ. P.*

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

*12(b)(6)*. In reviewing a motion to dismiss, the court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party. A motion to dismiss will only be granted if the plaintiff can prove no set of facts in support of its claim that would entitle it to relief.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings > General Overview***
[HN2] In considering a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview***
***Criminal Law & Procedure > Accusatory Instruments > Informations***
[HN3] Although no heightened pleading requirements apply in antitrust cases, a plaintiff must do more than cite relevant antitrust language to state a claim for relief. A plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated those laws are insufficient. Furthermore, it is not proper to assume that the plaintiff can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been set forth in the complaint. The complaint must set forth enough information to suggest that relief would be based on some recognized legal theory. In practice, a complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.

***Antitrust & Trade Law > Sherman Act > General Overview***
***International Law > Authority to Regulate > Anticompetitive Activities***
[HN4] *15 U.S.C.S. § 1* of the Sherman Act prohibits every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > Boycotts***

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Restraints > Price Fixing***
***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Restraints > Sherman Act***
[HN5] The blanket prohibition against any restraint of trade under the Sherman Act, *15 U.S.C.S. § 1*, has been delineated into two separate doctrines. The first doctrine finds certain conduct illegal per se. In construing and applying the Sherman Act's ban against contracts, conspiracies, and combinations in restraint of trade, certain agreements or practices are so plainly anticompetitive, and so often lack any redeeming virtue, that they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases. Examples of per se illegal conduct include horizontal restraints, i.e. agreements between competitors at the same level of market structure, like agreements to fix prices and group boycotts. Conduct that does not fall within the per se rule is subject to the rule of reason analysis. Under the rule of reason, the anticompetitive consequences of a challenged practice are weighed against the business justifications upon which it is predicated and its putative procompetitive impact, and a judgment with respect to its reasonableness is made. For example, allegations of agreements between entities at different market levels that restrain trade i.e., vertical agreements, are analyzed under the rule of reason.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > Boycotts***
***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview***
[HN6] Courts have found that group boycotts, because of their anti-competitive nature, are unreasonable per se and therefore always illegal.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Restraints > Price Fixing***
***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview***
***Criminal Law & Procedure > Accusatory Instruments > Informations***
[HN7] Although "information exchange" has been found to be an example of a facilitating practice that a court could use to help support an inference of a price-fixing agreement, the exchange of information between business firms concerning the credit-worthiness of customers has long been held not to violate the Sherman Act. Furthermore, the dissemination to competitors of information concerning the credit-worthiness of customers aids

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

sellers in gaining information necessary to protect themselves against fraudulent or insolvent customers. Lastly, the United States Court of Appeals for the Second Circuit has held that it is not a violation of *15 U.S.C.S. § 1* to exchange such information, provided that any action taken in reliance upon it is the result of each firm's independent judgment, and not of agreement.

*Antitrust & Trade Law > Private Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN8] A bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal.

*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview*
[HN9] Credit terms must be characterized as an inseparable part of price. An agreement to terminate the practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional per se rule against price fixing.

*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*
[HN10] In alleging a violation of *15 U.S.C.S. § 1* of the Sherman Act, under the rule of reason, a plaintiff bears the burden of showing that the challenged action has an actual adverse effect on competition as a whole in the relevant market. It is not sufficient for plaintiffs merely to show that they have suffered injury due to the alleged agreement; they must also demonstrate an actual adverse effect on competition market-wide. The injury to a relevant market requirement assures that the Sherman Act protected competition as a whole in the relevant market, and not the individual competitors within that market.

*Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview*
[HN11] A plaintiff that fails to plead an actual injury to competition may nonetheless show antitrust injury by showing that the defendant possesses "market power" sufficient to inhibit competition on a market-wide basis. Market power is defined as the power to raise prices sig-

nificantly above the competitive level without losing all of one's business.

*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > Sherman Act*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
[HN12] *15 U.S.C.S. § 2* of the Sherman Act provides that every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize, any part of the trade or commerce among the several states shall have committed an illegal act. In order to state a claim of conspiracy to monopolize under *§ 2*, a plaintiff must allege (1) a concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize. Intent alone is not sufficient, however; the defendant's power in the relevant market must be established, to establish whether the defendant is a monopolist or is threatening to become one. Furthermore, a short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules. Lastly, in antitrust cases in particular, the United States Supreme Court has stated that dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.

*Antitrust & Trade Law > Sherman Act > General Overview*
[HN13] *15 U.S.C.S. § 1* and *2* of the Sherman Act require proof of conspiracies which are reciprocally distinguishable from and independent of each other, although the objects of the conspiracies may partially overlap.

*Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > General Overview*
[HN14] Although the allegation of market share is not the same as one alleging monopoly power, the existence of monopoly power may be inferred from a predominant share of the market. The higher the market share, the stronger the inference of monopoly power.

*Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview*
*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > General Overview*
[HN15] Market share is not enough to allege a violation of *15 U.S.C.S. § 2* because monopoly power is not unlawful per se. Plaintiffs must allege an anticompetitive

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

effect harmful to competition or antitrust injury. An "antitrust injury" is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violations or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations would likely cause.

*Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview*
[HN16] To state an antitrust injury, a plaintiff must demonstrate that the defendants' conduct has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice. To this end, the antitrust laws were enacted for the protection of competition, not competitors.

*Antitrust & Trade Law > Market Definition > Product Market*
*Business & Corporate Law > Distributorships & Franchises > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN17] A complaint under the Sherman Act, *15 U.S.C.S. § 2*, must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed. However, because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market. To survive a *Fed. R. Civ. P. 12(b)(6)* motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes-- analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible. Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way.

*Antitrust & Trade Law > Joint Ventures, Mergers & Acquisitions > Clayton Act*
*Business & Corporate Law > Mergers & Acquisitions > Antitrust > Horizontal Mergers*
*Business & Corporate Law > Mergers & Acquisitions > Antitrust > Market Definition*
[HN18] Section 7 of the Clayton Act, *15 U.S.C.S. § 18*, forbids mergers in any line of commerce where the effect

may be substantially to lessen competition or tend to create a monopoly. The section proscribes many mergers between competitors in a market, it also bars certain acquisitions of a market competitor by a noncompetitor, such as a merger by an entrant who threatens to dominate the market or otherwise upset market conditions to the detriment of competition. Suspect also is the acquisition by a company not competing in the market but so situated as to be a potential competitor and likely to exercise substantial influence on market behavior. Entry through merger by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate § 7 because the entry eliminates a potential competitor exercising present influence on the market.

*Antitrust & Trade Law > Clayton Act > General Overview*
[HN19] See *15 U.S.C.S. § 18*.

*Antitrust & Trade Law > Monopolization > General Overview*
[HN20] See *N.Y. Gen. Bus. Law § 340(1)*.

*Antitrust & Trade Law > Monopolization > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*
[HN21] The Donnelly Act, *N.Y. Gen. Bus. Law § 340*, was patterned after the Sherman Act, *15 U.S.C.S. § 2*, and has been narrowly construed to encompass only those causes of action falling within the Sherman Act.

*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN22] Under New York law, a mere conspiracy to commit a tort is never of itself a cause of action. An independent tort must form the basis of a claim of civil conspiracy. A defendant may be held liable in tort for conspiracy to do an unlawful thing, or to do a lawful thing in an unlawful manner. The purpose of civil conspiracy is to establish joint liability by co-participants in a particular tortious conduct.

*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > Elements*

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

[HN23] A successful claim for civil conspiracy requires a plaintiff to show the primary tort plus the following four elements: (1) a corrupt agreement between two or more persons; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) the resulting damage or injury.

*Torts > Business Torts > Slander of Title > General Overview*
*Torts > Business Torts > Trade Libel > General Overview*
[HN24] The tort of trade libel or injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment. The utterance or furnishing of false and misleading information may be actionable if done maliciously or with the intention to harm another, or so recklessly and without regard to its consequences, that a reasonably prudent person should anticipate that damage to another will naturally follow.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Special Damages*
*Civil Procedure > Remedies > Damages > Special Damages*
*Torts > Business Torts > Trade Libel > Elements*
[HN25] The elements of a claim of injurious falsehood or trade libel are: (i) falsity of the alleged statements; (ii) publication to a third person; (iii) malice; and (iv) special damages. The requirement of pleading and proving special damages is applied strictly. Thus, a motion to dismiss a claim of injurious falsehood may be granted for failure to allege special damages with the requisite specificity. Under New York law, a plaintiff's special damages claim must be fully and accurately stated.

*Civil Procedure > Remedies > Damages > General Overview*
*Torts > Intentional Torts > Defamation > Defamation Per Se*
*Torts > Intentional Torts > Defamation > Remedies > General Overview*
[HN26] Under New York law, the elements of a defamation cause of action are: (i) a defamatory statement of fact concerning the plaintiff, (ii) publication to a third party by the defendant, (iii) falsity of the defamatory statement, (iv) some degree of fault, and (v) special damages or per se actionability (defamatory on its face). As a general rule, a statement is defamatory per se if it tends

to disparage a person in the way of his office, profession or trade. If a statement is defamatory per se, injury is assumed and the statement is actionable without proof of special damages. Special damages are those which flow directly from the injury to a plaintiff's reputation caused by the defamation and which involve the loss of something having economic or pecuniary value. Lastly, a plaintiff in a libel action must identify a plausible defamatory meaning of the challenged statement or publication. If the statement is susceptible of only one meaning, it becomes the court's responsibility to determine, as a matter of law, whether that one meaning is defamatory. On the other hand, if the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it becomes the trier of fact's responsibility to determine in what sense the words were used and understood.

*Real Property Law > Deeds > Enforceability*
*Torts > Intentional Torts > Defamation > Defamation Per Se*
*Torts > Intentional Torts > Defamation > Elements > Slander*
[HN27] Under New York law, there are four elements necessary to establish a prima facie case of slander: (1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff. The fourth element is presumed when the defamatory statement takes the form of slander per se.

*Torts > Intentional Torts > Defamation > Defamation Per Se*
[HN28] Defamation per se consists of statements (i) charging the plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that the plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman. The second type of defamation per se is limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities. Thus, charges against a clergyman of drunkenness and other moral misconduct affect his fitness for the performance of the duties of his profession, although the same charges against a business man or tradesman do not so affect him.

*Contracts Law > Breach > General Overview*
*Torts > Business Torts > Commercial Interference > Business Relationships > Elements*

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

*Torts > Business Torts > Commercial Interference > Contracts > Elements*

[HN29] In order to state a claim for tortious interference with contractual relations under New York law, a plaintiff must allege (1) the existence of a valid contract between itself and a third party for a specific term; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of its breach; and (4) damages. The standard for demonstrating tortious interference with business relations is somewhat more stringent. A plaintiff must allege that the defendant interfered with business or economic relations between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by dishonest, unfair, or improper means. Indeed, the defendant must interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.

*Contracts Law > Breach > Causes of Action > General Overview*

[HN30] In order to state a claim for breach of contract, plaintiffs must allege: (1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of the contract provisions by the defendants; and (4) damages resulting from the breach.

**COUNSEL:** For Kasada, Inc., John Michaels, Inc., Gabbey Design Group, Inc., Garment Makers, Inc., Theodore Sadaka, Karen Sadaka, Gladys Sadaka, Plaintiffs: Laura M. Dilimetin, Dilimatin & Dilimetin, New York, NY.

For Access Capital, Inc., Miles M. Stuchin, Defendants: Clifford M. Solomon, Solomom & Tanenbaum, P.C., White Plains, NY.

For UCC Asset Management Corp., Star Funding, Inc., Defendants: Joseph J. Macchiarola, Ruskin, Moscou, Evans & Faltischek, P.C., Uniondale, NY.

For Omni Commercial, L.L.C., Defendant: Liviu Vogel, Salon, Marrow, Dyckman & Newman, L.L.P., New York, NY.

For Omni Commercial, L.L.C., Counter Claimant: Liviu Vogel, Salon Marrow Dyckman & Newman LLP, New York, NY.

For Omni Commercial, L.L.C., Cross Claimant: Liviu Vogel, Salon, Marrow, Dyckman & Newman, L.L.P., New York, NY.

For Access Capital, Inc., Miles M. Stuchin, Counter Claimants: Clifford M. Solomon, Solomom & Tanenbaum, P.C., White Plains, NY.

For UCC Asset Management Corp., Star Funding, Inc., Counter Claimants: Joseph J. Macchiarola, Ruskin, Moscou, Evans & Faltischek, P.C., Uniondale, NY.

For Kasada, [*2] Inc., John Michaels, Inc., Gabbey Design Group, Inc., Garment Makers, Inc., Theodore Sadaka, Karen Sadaka, Gladys Sadaka, Counter Defendants: Laura M. Dilimetin, Dilimatin & Dilimetin, New York, NY.

**JUDGES:** GEORGE B. DANIELS, United States District Judge.

**OPINION BY:** GEORGE B. DANIELS

**OPINION**

MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, DISTRICT JUDGE:

Plaintiffs bring suit alleging price fixing and monopoly claims in violation of the *Sherman Act §§ 1, 2*, the *Clayton Act § 4*, the *New York State Donnelly Act*, and pendant common law claims. Defendants filed motions to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. For the reasons below, defendants' motions to dismiss are granted in part and denied in part.

I. Background

Plaintiffs are garment manufacturers, their principals and related entities who bring suit against various credit institutions alleging price fixing and monopoly in violation of federal and state antitrust statutes and state common law. Plaintiffs Kasada, Inc., John Michaels, Inc., Gabbey Design Group, Inc. and Garment Makers, Inc. are corporations engaged in the business of domestic garment manufacturing. Complaint at 2-3, PP4-7. Plaintiff Theodore [*3] Sadaka is the principal officer of plaintiffs Garment Makers, Inc. and John Michaels, Inc.. Plaintiff Karen Sadaka is a principal officer of plaintiff Kasada, Inc. Plaintiff Gladys Sadaka is a principal officer of plaintiff Gabbey Design Group, Inc. Id. at 3, P8.

Plaintiffs' allegations revolve around the business of factoring, a form of commercial finance by which credit institutions provide financing to clients in exchange for the right to collect the client's accounts receivable. These credit institutions, commonly referred to as factors, advance up to 80% of the worth of a garment manufacturers' invoices in exchange for fees and interest. Complaint at 8, P20. The factor also assumes the risk of collecting

Case 1:07-cv-00556-JJF-LPS    Document 55-6    Filed 04/02/2008    Page 8 of 23

Page 7

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

the client garment manufacturers' accounts receivable. Id. A factor assumes that credit risk, however, only after it has checked whether its client garment manufacturer is selling to a creditworthy purchaser. The garment manufacturer, in turn, uses that credit to purchase raw materials to produce their product. Id.

Plaintiffs allege that the defendants mutually agreed to stop credit-checking plaintiff garment manufacturers, denied them credit and/or withdrew their [*4] funding. The refusal by a factor to credit check a garment manufacturer results in "the garment manufacturer [being] unable to obtain virtually any fabric or other raw materials on credit." Id. at 10, P24. Specifically, plaintiffs allege that Westgate Financial Corp. and Finova Capital, Inc. allegedly discontinued their funding of plaintiff John Michaels, Inc. Id. at 4, P11. Finova Capital, Inc. also allegedly denied credit to John Michaels, Inc. Id. at 5, P12. Defendants Rosenthal & Rosenthal ("Rosenthal") and Star Funding, Inc. are alleged to have withdrawn funding from plaintiff Gabbey Design, Group, Inc. Id. at 3, 5, 6 PP6, 13, 16. Defendant Omni Commercial denied credit and refused to release monies to plaintiff Garment Makers, Inc. and caused defendant C.I.T. to deny credit to Garment Makers, Inc. as well. Id. at 3, 5, PP7, 14. The plaintiffs also allege that defendant Access Capital "published false accusations against plaintiffs, which caused plaintiffs to be group boycotted by defendants." Id. at 3, P7. Plaintiffs further claim that "Access Capital designed and orchestrated the group boycott of plaintiffs and caused defendants to deny credit . [*5] . . and caused plaintiffs to cease operations." Id. at 4, P10. Individual defendants Miles M. Stuchin and Richard I. Simon are alleged to be the presidents of Access Capital, Inc. and Westgate Financial Corp., respectively. Id. at 6, P17. Each are alleged to have "conspired with other defendants to conduct a group boycott against plaintiffs." Id. at 6-7 PP17-18.

Plaintiffs assert that defendants' actions precluded them from receiving the credit they needed to purchase fabric or other raw materials. This, in turn, caused some of them to lose money and "to cease operations." Complaint at 2-4, PP4-10. [1] Without specifically identifying which defendants were involved and which plaintiffs were affected, plaintiffs allege that the "factoring defendants, engaged in boycotting certain plaintiffs, denied credit to certain plaintiffs, fixed costs and interest rates, published letters to plaintiffs' customers, and agreed with other factors to fund certain manufacturers and to deny funding to other manufacturers, and to drive them out of business." Id. at 11, P25. Plaintiffs claim that the defendants communicated with each other, shared credit information, and agreed to make [*6] credit decisions together. Complaint at 12, P30. These communications allegedly occurred during meetings of the Uptown Credit

Group and the Thursday Group. [2] Plaintiffs maintain that these groups "allowed defendants to conduct their secret meetings and made many of their collective credit decisions at these meetings and during telephone calls and other contacts." Id. at 12, P28. Plaintiffs argue that the defendants' denial of credit constitutes a group boycott in violation of *Section 1 of the Sherman Act.* In addition, plaintiffs allege that the defendants "controlled the price and interest rates for factoring" constituting illegal price-fixing in violation of *Section 1* of the Sherman Act. Id. at 18, P57. Plaintiffs also claim that defendants' actions constitute illegal price-fixing in the "piece goods" market, arguing that the "piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors." [3] Id. at 8, P20.

> 1 Without specifically identifying which manufacturers, plaintiffs allege that "numerous garment manufacturers have been driven out of business." Plaintiffs' complaint, however, is devoid of any allegation that any of the plaintiffs have gone out of business. To the contrary, plaintiffs complaint alleges that each corporate plaintiff "was and still is a domestic Corporation duly organized and licensed to do business within the State of New York." Complaint at 2-3, PP4-7.

[*7]

> 2 Uptown Credit Group and the Thursday Group are not parties to this litigation.
> 3 The piece goods market is the market for raw materials such as fabric, buttons, trim and other accessories.

Plaintiffs also claim that the defendants violated *Section 2 of the Sherman Act* by engaging "in an unlawful combination and conspiracy to unreasonably restrain and monopolize interstate commerce." Complaint at 12, P30. Plaintiffs allege that the defendants acted as "one," in that defendants "black listed certain customers and weeded out those that they targeted to drive out of business." Id. at 11, P27 (internal quotations omitted). Plaintiffs assert that through these actions, the defendants "have engaged in predatory and anti-competitive conduct, with a specific intent to monopolize, and have achieved monopoly power." Id. at 17, P53. This conspiracy to monopolize allegedly occurred in two markets: the factoring market for domestic garment manufacturers and the piece goods market. Plaintiffs claim that the defendants "factor 90% of the factored piece goods vendors in the United States." [*8] Id. at 10, P24. Plaintiffs also allege that all the defendants are members of the Uptown Credit Group and the Thursday Group, which plaintiffs maintain are designed "to maintain a monopoly over the industry, and they collectively agreed unlawfully to deny plaintiffs credit." Id. at 9, P22. Plaintiffs allege that "col-

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

lectively, defendants involved in these two groups control over 85% of [the] factoring market for garment manufacturing and virtually all of the piece goods manufacturing segment of that market." Id. [4]

> 4  Plaintiffs also assert claims under the *Clayton Act § 4*, the *Donnelly Act of the State of New York*, as well as the following common law claims: trade libel, defamation, injurious falsehood, interference with commercial relations, and breach of contract.

Defendants submitted motions to dismiss plaintiffs' claims, arguing that the plaintiffs failed to allege a violation of *Section 1 of the Sherman Act*. Specifically, defendants argue that plaintiffs failed to make sufficient allegations [*9] to establish that: the defendants entered into an agreement to boycott; the defendants engaged in price-fixing; and the defendants caused plaintiffs to suffer an antitrust injury rather than an injury specific to plaintiffs. Defendants also maintain that plaintiffs have failed to sufficiently allege a violation of *Section 2 of the Sherman Act*, arguing that plaintiffs' complaint fails to allege: a conspiracy by defendants to monopolize the market; an abuse of power by defendants; an antitrust injury; and a relevant market. [5] Defendants further argue that plaintiffs have failed to state a claim under the *Section 4 of the Clayton Act*, the Donnelly Act, or other state laws.

> 5  Defendants C.I.T. Group and Rosenthal & Rosenthal submitted a brief in support of their motion to dismiss. Their arguments to dismiss plaintiff's federal claims were adopted by Westgate Financial Corp., Richard I. Simon, and Omni Commercial. In lieu of filing a motion, defendants Star Funding, Inc. and UCC Asset Management submitted a letter dated March 12, 2002 stating that "counsel for plaintiff and [these defendants] have agreed that to the extent that portion of the decision of the Court regarding the federal claims (and the *Donnelly Act* claim) applies to all Moving Defendants, it shall also be deemed to apply to Star and UCC." Similarly, defendants Access Capital, Inc. and Miles M. Stuchin, in a letter dated February 7, 2002, informed the Court that "in lieu of filing a formal motion to dismiss the plaintiffs' complaint, [defendants] submit this letter to join and adopt the legal arguments made by counsel for [Finova], [C.I.T.], [Rosenthal & Rosenthal], [Omni], [Westgate], and [Simon] in connection with their respective motions to dismiss."

[*10] II. Discussion

[HN1] *Federal Rule of Civil Procedure 12(b)(6)* allows a party to move to dismiss a complaint where the complaint "fail[s] . . . to state a claim upon which relief can be granted[.]" *FED. R. CIV. P. 12(b)(6)*. In reviewing a motion to dismiss, this Court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party. See *Patel v. Searles, 305 F.3d 130, 134-35 (2d Cir. 2002)*. A motion to dismiss will only be granted if the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. See *Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1494 (2d Cir. 1992)*. [HN2] In considering a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, a district court must limit itself to facts stated in the complaint or documents attached to the complaint as exhibits or incorporated in the complaint by reference. *Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991)*; see also *Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998)*(in evaluating motions to dismiss, a court must limit its review to the allegations contained within [*11] the four corner's of the complaint).

[HN3] Although no heightened pleading requirements apply in antitrust cases, *Todd v. Exxon Corporation, 275 F.3d 191, 198 (2d Cir. 2001)*, a plaintiff must do more than cite relevant antitrust language to state a claim for relief. See *TV Communications Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1024 (10th Cir. 1992)*. "A plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated those laws are insufficient." Id. (citing *Klebanow v. New York Produce Exchange, 344 F.2d 294, 299 (2d Cir. 1965)*). Furthermore, "it is not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been" set forth in the complaint. *George Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 139 (2d Cir. 1998)*. The complaint must set forth enough information to suggest that relief would be based on some recognized legal theory. *Fort Wayne Telsat v. Entertainment and Sports Programming Network, 753 F.Supp 109, 111 (S.D.N.Y. 1990)*. [*12] "In practice, a complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Id. (quoting *District of Columbia v. Air Florida, Inc., 243 U.S. App. D.C. 1, 750 F.2d 1077, 1081-82 (D.C. Cir. 1984)*).

A. Section 1 of the Sherman Act

[HN4] *Section 1 of the Sherman Act* prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." *15 U.S.C. §*

*1*. [HN5] This blanket prohibition against any restraint of trade has been delineated into two separate doctrines. The first doctrine finds certain conduct illegal *per se*.

> In construing and applying the *Sherman Act*'s ban against contracts, conspiracies, and combinations in restraint of trade, the Court has held that certain agreements or practices are so plainly anticompetitive, and so often lack any redeeming virtue, that they are conclusively presumed illegal without further examination under the rule of reason generally applied in *Sherman Act* cases.

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 7-8, 99 S. Ct. 1551, 1556, 60 L. Ed. 2d 1 (1979)* [*13] (internal quotations and citations omitted). Examples of *per se* illegal conduct include horizontal restraints, i.e. agreements between competitors at the same level of market structure, like agreements to fix prices and group boycotts. See *Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212, 79 S. Ct. 705, 3 L. Ed. 2d 741 (1959)*(finding group boycotts unreasonable *per se*); *United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S. Ct. 811, 84 L. Ed. 1129 (1940)*(finding price fixing unreasonable *per se*); *Michelman v. Clark-Schwebel Fiber Glass Corporation, 534 F.2d 1036, 1043 (2d Cir. 1976)*(finding that a group boycott, because of its inherently anti-competitive nature, is unreasonable *per se* and thus always illegal).

Conduct that does not fall within the *per se* rule is subject to the rule of reason analysis. Under the rule of reason, the anticompetitive consequences of a challenged practice are weighed against the business justifications upon which it is predicated and its putative procompetitive impact, and a judgment with respect to its reasonableness is made. See KAYE SCHOLER, KAYE SCHOLER'S ANTITRUST [*14] DESKBOOK, 6 (3d ed. 2002). For example, allegations of agreements between entities at different market levels that restrain trade i.e., vertical agreements, are analyzed under the rule of reason. *Electronics Communications Corp. v. Toshiba America Consumer Prods. Inc., 129 F.3d 240, 243 (2d Cir. 1997)*("Absent price-fixing between a supplier and distributor, vertical restraints are generally subject to 'rule of reason' analysis.") Id.

a. *Per se* Illegal Conduct: Group Boycott and Price Fixing

Plaintiffs allege that the defendants violated *Section 1 of the Sherman Act* "by engaging in an unlawful group boycott and a concomitant price-fixing conspiracy" in which the defendants collectively refused to credit check

certain garment manufacturers. Complaint at 18, P56. Plaintiffs further claim that defendants colluded to fix the price and interest rates for factoring as well as the price of the piece goods purchased by the garment manufacturers.

Defendants argue that plaintiffs' complaint alleges no facts to support a finding that an agreement or conspiracy to boycott existed and that plaintiffs' complaint "alleges only the naked conclusion that the defendants [*15] conspired and agreed. No specific agreement is alleged with any factual particularity -- no dates, no details, no places, no participants, no purpose, no decisions, no terms, no actions." Defendant C.I.T.'s Memorandum of Law in Support of Its Motions to Dismiss the Complaint ("C.I.T. Brief") at 7. Defendants also argue that the plaintiffs have failed to state a claim to establish price fixing in either the factoring market or the piece goods market.

i. Group Boycott

[HN6] Courts have found that group boycotts, because of their anti-competitive nature, are unreasonable *per se* and therefore always illegal. See *Klor's, Inc., 359 U.S. at 212*; *Michelman v. Clark-Schwebel Fiber Glass Corporation, 534 F.2d at 1043*. Plaintiffs allege that the defendants conspired to conduct a group boycott against plaintiffs by denying them credit.

> Defendants routinely communicated with each other, had access to each others' databases and credit information, consulted with each other regarding credit decision, shared confidential information, and agreed together when making credit decisions concerning garment manufacturers.

Complaint at 12, P30. Plaintiffs, [*16] however, fail to provide sufficient factual allegations to support this claim. There is no allegation that a particular plaintiff, once refused to be credit checked by one factor, was subsequently refused by each of the other factors. Compare *Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., 2002 U.S. Dist. LEXIS 18338, 2002 WL 31164482, *9 (S.D.N.Y. 2002)*(in finding that plaintiff stated a claim for group boycott, the Court found that "the gravamen of plaintiff's amended complaint is that C.I.T. and the other factors agreed that once C.I.T. refused to credit check a manufacturer, the other factors would refuse to check that manufacturer's credit as well"). Id. There is no allegation that a particular garment manufacturer applied for and was refused to be credit checked by all of the defendants.

Conversely, there is no allegation that a particular factor refused to credit check all of the plaintiffs. Plaintiffs' complaint specifically alleges that specific defendants denied credit to specific plaintiffs, withheld from a specific plaintiff credit or refused to release to a specific plaintiff monies allegedly owed. Complaint at 3-7, PP6-18. Plaintiffs [*17] allege that "after a group meeting of defendants," defendants Westgate Financial Corp. and Finova Capital, Inc. refused to continue funding plaintiff John Michaels and that Finova Capital, Inc. denied credit to John Michaels, Inc. Id. at 4, 5 PP11-12. "After a group meeting of defendants," defendants Rosenthal & Rosenthal and Star Funding, Inc. are alleged to have withdrawn funding to plaintiff Gabbey Design. Id. at 3, 5, 6 PP6, 13, 16. "After a group meeting of defendants," defendant Omni Corp. is alleged to have refused to release monies to plaintiff Garment Makers, Inc. Id. at 3, P7. "After a group meeting of defendants," defendant Omni Commercial is alleged to have denied credit to plaintiff Garment Makers, Inc. and caused defendant C.I.T. to deny credit to Garment Makers, Inc. There is, furthermore, no allegation that the plaintiffs are one organization, belong to the same association, or that they possess any contractual relationship. Lastly, plaintiffs allegation that defendants "used subjective criteria and denied credit based upon malice, ill will, a personal dislike of management, rumors with no bearing on the customer's creditworthiness, or simply due to negligence" [*18] belies their argument that a collective decision not to credit check certain plaintiffs was because of a conspiracy to boycott. Complaint at 10, P24. Rather, this allegation supports a finding that credit-checking decision were made independently by each factor based on subjective criteria.

Plaintiffs' also argue that the defendants "engaged in group meetings" to share "credit information" and "had access to each other's databases and credit information." Complaint at 11-12, PP27, 28, 30. [HN7] Although "information exchange" has been found to be an example of a facilitating practice that a court could use to help support an inference of a price-fixing agreement, [6] the exchange of information between business firms concerning the credit-worthiness of customers has long been held not to violate the *Sherman Act*." *Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1048 (2d Cir. 1976)*; see also *Cement Mfrs. Protective Asso. v. United States, 268 U.S. 588, 604, 69 L. Ed. 1104, 45 S. Ct. 586, 591 (1925)*. [7] Furthermore, "the dissemination to competitors of information concerning the credit-worthiness of customers aids sellers in gaining information necessary to protect [*19] themselves against fraudulent or insolvent customers." *Michelman, 534 F.2d at 1048*. Lastly, the Second Circuit has held that "it is not a violation of *Section 1* to exchange such information, provided that any action taken in reliance upon it is the result of each firm's independent judgment, and not of agreement." Id.

> 6    See *Todd v. Exxon Corporation, 275 F.3d 191, 198 (2d Cir. 2001)*.
> 7    Although the Supreme Court has found that the exchange of information itself, as opposed to merely using the information exchanged as evidence upon which to infer a price-fixing agreement, violates *Section 1 of the Sherman Act* under a Rule of Reason analysis, plaintiffs in the present case have made no such argument and therefore, this type of violation will not be entertained by the Court.

In the absence of factual allegations to support their claim, plaintiffs' claim of group boycott is dismissed. See *Fort Wayne Telsat v. Entertainment and Sports Programming Network, 753 F. Supp. at 115* [*20] (finding that local subscription company had to do more than merely allege existence of a conspiracy; company was required to prove factual basis for the allegation); see also *Garshman v. Universal Resources Holding Inc., 824 F.2d 223, 230 (3d Cir. 1987)*("The allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the *Sherman Act*." Id.); *Heart Disease Research Foundation v. General Motors Corp., 463 F.2d 98, 100 (2d Cir. 1972)*[HN8] ("a bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal"). Id.

### ii. Price Fixing

Plaintiffs' claim of price fixing is equally conclusory. Plaintiffs allege that the defendants "have dominated the factoring market for domestic garment manufacturers for many years [and] used their control over [the] market to fix conditions," specifically by controlling "the price and interest rates for factoring." Id. at 18, PP56-57. Plaintiffs allege that by colluding and agreeing to drive their own clients out of business, [*21] the defendant factors have "enhanced their overall competitive position and [reduced] [their] collective credit risk exposure." Id. at 18, P57. Defendants argue that "plaintiffs do not allege, even in conclusory fashion, that defendants fixed the price of the product they provide: factoring and financial serves. There is no allegation that the price, terms, conditions, interest rates or any other aspect of defendants' factoring services were fixed." C.I.T. Brief at 11.

Similar to plaintiffs' arguments in *Dresses for Less, Inc. 2002 U.S. Dist. LEXIS 18338, 2002 WL 31164482*, plaintiffs' in the present case argue that the factor's denial of credit is analogous to the facts of *Catalano v. Target*

Case 1:07-cv-00556-JJF-LPS    Document 55-6    Filed 04/02/2008    Page 12 of 23

Page 11

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

*Sales, Inc. 446 U.S. 643, 100 S. Ct. 1925, 64 L. Ed. 2d 580 (1980)*. In Catalano, competing beer wholesalers agreed to fix the credit terms on which they would sell beer to retailers. Specifically, the wholesalers agreed to require that the retailers pay in advance or upon delivery, and to discontinue the practice of accepting late payments without interest. *Id. at 644-45*. The Court held that [HN9] "credit terms must be characterized as an inseparable part of price. [*22] An agreement to terminate the practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional *per se* rule against price fixing." *Id. at 648*. Unlike *Catalano*, however, the present complaint alleges that the defendants specifically denied credit to the plaintiffs alone and not to all of their customers. Most importantly, there is no allegation that the defendants conspired or agreed to fix the price or terms of credit. Plaintiffs' price fixing argument hinges on the allegation that by not extending credit to the plaintiffs, the defendants "minimized their risks and costs of doing business" thereby controlling the price and interest rates for factoring. Complaint at 18, P57. Plaintiffs, however, do not state how the denial of credit to specific garment manufacturers affected market prices. *Dresses for Less, Inc. 2002 U.S. Dist. LEXIS 18338, 2002 WL 31164482 at *10*. Plaintiffs claims of price fixing in the factoring industry are completely conclusory, unsupported by factual allegations and are, therefore, dismissed.

Furthermore, plaintiffs appear to allege that defendants have also fixed the prices in the [*23] piece goods market. Plaintiffs argue that "when defendants conspire to withdraw funding, they are actually fixing the prices of the goods." Plaintiffs' Brief at 18. Plaintiffs apparent argument is that piece goods cost more to the plaintiffs as a result of defendants denial of credit. This allegation is insufficient to find that the defendants conspired or agreed to fix prices in the piece goods market. Plaintiffs claim that defendants fixed prices in the piece goods market, therefore, is also dismissed.

b. The Rule of Reason

[HN10] In alleging a violation of *Section 1 of the Sherman Act* under the rule of reason, a plaintiff bears the burden of showing that the challenged action has an actual adverse effect on competition as a whole in the relevant market. *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc., 996 F.2d 537, 543 (2d Cir. 1993)*. It is not sufficient for plaintiffs merely to show that they have suffered injury due to the alleged agreement; they must also demonstrate "an actual adverse effect on competition market-wide." *Electronics Communications Corp., v. Toshiba, 129 F.3d at 244*. "The injury to a relevant market requirement [*24] assures that the *Sherman Act* protected competition as a whole in the relevant market, and not the individual

competitors within that market." *Dresses for Less, Inc. 2002 U.S. Dist. LEXIS 18338, 2002 WL 31164482 *7 (S.D.N.Y. 2002)*(internal quotations omitted).

In support of their rule of reason claim, plaintiffs allege that

> each of the agreements entered into among the defendants was an agreement in restraint of trade in violation of *15 U.S.C. § 1*, intending to achieve anti competitive effects. Each agreement violates the *Sherman Act* under the Rule of Reason because its pro-competitive effects are outweighed by its anti-competitive effects.

Complaint at 19, P65. Plaintiffs also claim that "as a result of defendants' conduct, plaintiffs have been damaged in an amount to be determined at trial in excess of $ 40,000,000.00 for which defendants are jointly liable." Id. at 19, P66. Plaintiffs also allege that the

> piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors. The domestic garment manufacturing market is adversely affected by the antitrust violations through [*25] the resulting increase in piece goods prices and the elimination of garment manufacturers from the marketplace.

Id. at 8, P20.

These allegations are insufficient to establish a violation under the rule of reason. Plaintiffs make no allegations from which the Court could infer that defendants' alleged actions had "any anticompetitive effect beyond the injury to plaintiffs." See *Granite Partners, L.P v. Bear, Stearns & Co., Inc. 17 F. Supp.2d 275, 297-98 (S.D.N.Y. 1998)*. As discussed *supra*, plaintiffs have not articulated with any particularity the effect of the defendants' alleged actions on the piece goods market. Alleging that the price they paid for piece goods increased as a result of their concomitant inability to receive credit to purchase those goods falls short of alleging an anticompetitive effect beyond personal injury to the plaintiffs. Furthermore, the allegation that client competition among the factors was reduced is conclusory and unsubstantiated. Lastly, plaintiffs' allegation of an anticompetitive effect on the domestic garment manufacturing marker is also conclusory. Plaintiffs claim that garment manufacturers were eliminated from [*26] the market-

Case 1:07-cv-00556-JJF-LPS    Document 55-6    Filed 04/02/2008    Page 13 of 23

Page 12

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

place. However, they do not allege what garment manufacturers, other than themselves, were affected by defendants' alleged actions. Indeed, plaintiffs' claims center on their injury alone and not on a broader injury to competition generally. Plaintiffs, therefore, have also failed to allege the requisite antitrust injury to competition resulting from defendants' actions.

[HN11] A plaintiff that fails to plead an actual injury to competition may nonetheless show antitrust injury by showing that the defendant possesses "market power" sufficient to inhibit competition on a market-wide basis. *Dresses for Less, 2002 U.S. Dist. LEXIS 18338, 2002 WL 31164482 at *7 (S.D.N.Y. 2002).* Market power is defined as the power to raise prices significantly above the competitive level without losing all of one's business. See id.; see also *CDC Techs., Inc. v. IDEXX Lab., Inc., 186 F.3d 74, 81 (2d Cir. 1999)*(internal citations and quotations omitted). Plaintiffs do not allege with any specificity that defendants possess market power in the factoring market. Plaintiffs, furthermore, do not allege that the defendants sought to raise the price for credit market-wide in a manner that affected competition. Plaintiffs' [*27] Second Cause of Action alleging a violation under the Rule of Reason is therefore dismissed.

B. Section 2 of the Sherman Act

Plaintiffs claim that the defendants have conspired to monopolize both the factoring market for domestic piece goods vendors and the factoring market for domestic garment manufacturers. [8] They allege that the defendants "engaged in an unlawful combination and conspiracy to unreasonably restrain and monopolize interstate commerce." Complaint at 12, P30. Plaintiffs assert that the "defendants acted as 'one'" and that they "black listed certain customers and weeded out those that they targeted to drive out of business." Id. at 11, P27. Defendant C.I.T. argues that plaintiffs' complaint fails to allege a conspiracy to monopolize, an abuse of monopoly power, an antitrust injury or a relevant market. [9] Defendant Rosenthal similarly argues that plaintiffs have failed to allege an antitrust injury, an abuse of monopoly power or a relevant market. [10]

8    Although plaintiffs did not specify in their complaint that their third cause of action constituted a conspiracy to monopolize claim as opposed to a monopolization claim, in their Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Complaint ("Plaintiffs' Brief"), plaintiffs argue that their complaint alleges a conspiracy to monopolize. See Plaintiffs' Brief at 20.

[*28]

9    C.I.T. also asserts that they should not even be a defendant in this matter as they are not alleged to have had a factoring contract with the plaintiffs and were not a party to any of the alleged tortious conduct that C.I.T. claims is the gravamen of plaintiffs' complaint. C.I.T. argues that they are "named as a defendant solely because of [their] alleged market share and because [they] attended, along with other factors, weekly meetings of two industry credit groups. That is not enough to state a claim under any law, including the antitrust laws." C.I.T. Brief at 1.

10    Rosenthal likewise argues that "CIT was added to the Complaint simply to permit a *Section 2* claim to be asserted." Rosenthal Brief at 13.

[HN12] *Section 2 of the Sherman Act* provides that "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize, any part of the trade or commerce among the several States" shall have committed an illegal act. *15 U.S.C. § 2.* In order to state a claim of conspiracy to monopolize under *Section 2,* [*29] a plaintiff must allege (1) a concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize. *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc., 129 F.3d 240, 246 (2d Cir. 1997).* "Intent alone is not sufficient, however; the defendant's power in the relevant market must be established, to establish whether the defendant is a monopolist or is threatening to become one." Id. Furthermore, "a short plain statement of a claim for relied which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules." *George C. Frey Ready-Mixed Concrete, inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 554 (2d Cir. 1977).* Lastly, "in antitrust cases in particular, the Supreme Court has stated that dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *George Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 139 (2d Cir. 1998)*(internal quotations and citations omitted).

Plaintiffs' complaint presents colorable claims of a conspiracy to monopolize under *Section* [*30] *2.* The gravamen of plaintiffs' *Section 2* claims, and indeed of all of plaintiffs' federal claims, is that the defendants conspired to selectively choose which garment manufacturers would receive credit and which would not. This choice, in effect, ultimately decided which manufacturers went out of business and which ones did not. Complaint at 20, P68. Whether through the defendants' alleged membership in both the Uptown Credit Group and the Thursday Group, or through other unspecified meetings, plaintiffs maintain that the defendants "shared all credit

Case 1:07-cv-00556-JJF-LPS     Document 55-6     Filed 04/02/2008     Page 14 of 23

Page 13

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

information and in effect merged the companies." Id. at 11, P27. It is at these meetings and "during telephone calls and other contacts" that the alleged concerted action took place. Id. at 12, P28.

Similar to their arguments to dismiss plaintiffs' *Section 1* claims, defendants contend that the plaintiffs have failed to specify the conspiracy claims with any particularity, citing several cases where antitrust conspiracy actions were dismissed for failing to allege any supporting facts. See *Telectronics Proprietary, Ltd., v. Medtronic, Inc., 687 F.Supp 832, 839 (S.D.N.Y. 1988)*(quoting *Heart Disease Research Foundation v. General Motors Corp., 463 F.2d 98, 100 (2d Cir. 1972)).* [*31] [11] Unlike their *Section 1* claim, however, plaintiffs have alleged facts sufficient to support a preliminary finding of concerted action among the defendants. [12]

> 11   Unlike the plaintiff in *Telectronics*, who did not name the others who allegedly conspired with the defendants, plaintiffs in the instant case have alleged that all the defendants conspired with each other to monopolize the factoring markets for garment manufacturers and for piece goods vendors.
> 12   [HN13] *Sections 1* and *2* of the *Sherman Act* require proof of conspiracies which are reciprocally distinguishable from and independent of each other, although the objects of the conspiracies may partially overlap. See *American Tobacco Co. v. United States, 328 U.S. 781, 788, 66 S. Ct. 1125, 1129, 90 L. Ed. 1575 (1946).*

Plaintiffs, furthermore, allege several overt acts in furtherance of the alleged conspiracy. Plaintiffs claim that the defendants

> deliberately created a monopoly by merging their interests, eliminating competition, [*32] and working to together control the business, by agreeing and deciding to give Plaintiffs credit or not, setting the prices, controlling every credit decision relative to factored sales, issuing substantially the same unconscionable contract, and having the ability to drive manufacturers out of business, including plaintiffs.

Complaint at 13, P33. Plaintiffs further allege that the defendants

> have the power to drive manufacturers out of business by their agreements together to control the market and in turn control the garment manufacturers by

choosing which manufacturers they would withhold payments to and deny credit to, fixing costs of goods at artificially high prices, and charging exorbitant fees.

Complaint at 9, P21. These allegations are sufficient to allege overt acts in furtherance of the conspiracy.

Plaintiffs have also specifically alleged the defendants' intent to monopolize. Plaintiffs claim that the defendants "engaged in the acts and practice alleged herein with the specific intent to achieve or maintain monopoly power in the two affected markets." Complaint at 20, P69. Plaintiffs further allege that the defendants' merging of interests gave [*33] the defendants "a dominant share in the factored domestic manufacturing market" and in the piece goods market, as well as "the power to drive manufacturers out of business by their agreements together to control the market and in turn control the garment manufacturers." Id. at 9, P21. This alleged monopoly power came from the defendants' ability to "control 85% of factoring market for garment manufacturing" and "90% of the factored piece goods vendors in the United States." Id. at 9, 10 PP22, 24. [HN14] Although the allegation of market share is not the same as one alleging monopoly power, the existence of monopoly power may be inferred from a predominant share of the market. See *United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S. Ct. 1698, 1703-04, 16 L. Ed. 2d 778 (1966).* The higher the market share, the stronger the inference of monopoly power. See *Broadway Delivery Corp. v. United Parcel Serv. of America, Inc., 651 F.2d 122, 129 (2d Cir. 1981).*

Defendants further argue that plaintiffs' fail to allege an anticompetitive effect harmful to competition or antitrust injury. [HN15] "Market share is not enough to allege a violation of *Section 2* because [*34] monopoly power is not unlawful *per se.*" Defendant C.I.T. Brief at 14 (internal quotations and citations omitted). An "antitrust injury" is an

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violations or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations ... would likely cause.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977);* see also

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

*Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial, Inc., 919 F.2d 1517, 1522 (11th Cir. 1990)*(finding that a "monopolist's refusal to deal becomes actionable under the antitrust laws only where the refusal is designed to have an anticompetitive effect, whether to gain greater market share, to drive up prices, or to obtain some other illegal goal").[HN16] To state an antitrust injury, a plaintiff must demonstrate that defendants' conduct "has had an actual adverse effect on competition as a whole in the relevant market; to [*35] prove it has been harmed as an individual competitor will not suffice." *Capital Imaging, 996 F.2d at 543*; see also *Brunswick Corp., 429 U.S. at 488* ("The antitrust laws ... were enacted for 'the protection of competition, not competitors.'")(quoting *Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962))*. Plaintiffs, however, have proffered sufficient allegations displaying harm to competition and antitrust injury. Plaintiffs allege that

> defendants have violated Section 2 of the Sherman Act, *15 U.S.C. § 2*, because they have acted with specific intent to archive (sic) or maintain monopoly power in the factoring market for domestic piece goods and garment manufacturers by merging with competitors and unlawfully utilizing its resulting economic leverage to fix piece goods prices and to drive out of business garment manufacturers that potentially enhance defendants' overall credit risk exposure.

Complaint at 20, P70. Plaintiffs also maintain that the defendants'

> actions have harmed consumers in that the manufacturer has to charge higher prices and the manufacturers [*36] that were forced out of business prevented consumers from having the freedom to choose from quality merchandise suppliers since there is a limited product.

Complaint at 16, P49. These allegations are sufficient to allege both the anticompetitive effect of, as well as the antitrust injury resulting from, defendants' actions.

Lastly, defendants argue that the plaintiffs have failed to adequately allege a relevant market. [HN17] "A complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." *Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co., 2001 U.S. Dist. LEXIS 18831, 2001 WL 1468168 (S.D.N.Y. 2001)*. However, because market definition is a deeply fact-intensive inquiry,

courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corporation, 275 F.3d 191, 199 (2d Cir. 2001)*. "To survive a *Rule 12(b)(6)* motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes - analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible. [*37] " *Id. at 199* (internal citations omitted). "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." Id.

Plaintiffs allege that the "relevant market is the factoring market for domestic garment manufacturers." Complaint at 8, P20. Plaintiffs further claim that factors are distinguishable from banks and other credit institutions in that factors are willing to grant credit without the borrower having to put up collateral outside of the borrower's invoices and incoming accounts receivable. Id. Plaintiffs also claim that the "piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors. The domestic garment manufacturing market is adversely affected by the antitrust violations through the resulting increase in piece goods prices and the elimination of garment manufacturers from the marketplace. [*38] " Id. Defendants' motions to dismiss plaintiffs' *Section 2* claims are denied.

## C. Clayton Act

Plaintiffs also assert claims under *Sections 4* and *7* of the Clayton Act. Complaint at 1, P1. [13] Plaintiffs make the same allegation they did under their *Section 1* and *Section 2* claims alleging that the

> defendants violated the *Clayton Act* because it has acted with specific intent to achieve or maintain its monopoly power in the factoring market for domestic piece goods and garment manufacturers by merging with competitors and unlawfully utilizing its resulting economic leverage to fix piece goods prices and to drive out of business garment manufacturers to enhance defendants' overall credit risk exposure.

Complaint at 21, P76.

Case 1:07-cv-00556-JJF-LPS    Document 55-6    Filed 04/02/2008    Page 16 of 23

Page 15

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

13    The Fourth Cause of Action of plaintiffs' complaint does not specify which section of the *Clayton Act* was violated. In paragraph 1 of their complaint, plaintiffs allege a violation of *Section 4. Section 4*, however, does not provide a substantive claim for relief but rather enables plaintiffs who have been injured under the antitrust laws to sue for damages. See *Floors-N-More, Inc. v. Freight Liquidators, 142 F. Supp.2d 496, 499-500 (S.D.N.Y. 2001)*; see also *Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*. In contrast, plaintiffs argue in their Memorandum of Law in Opposition to Defendants' Motion to Dismiss that they have adequately alleged a claim under *Section 7 of the Clayton Act*. Plaintiffs do not reference any other section of the *Clayton Act*. The Court, therefore, will construe plaintiffs' *Clayton Act* claim as one being under *Section 4* and *Section 7* of that act.

[*39] The Supreme Court summarized the purpose of *Section 7* of the Clayton Act in *United States v. Falstaff Brewing Corp., 410 U.S. 526, 531-32, 35 L. Ed. 2d 475, 93 S. Ct. 1096, 1099- 1100, (1973)*: [HN18] *Section 7 of the Clayton Act* forbids mergers in any line of commerce where the effect may be substantially to lessen competition or tend to create a monopoly. [14] The section proscribes many mergers between competitors in a market, *United States v. Continental Can Co., 378 U.S. 441 (84 S. Ct. 1738, 12 L. Ed. 2d 953) (1964)*; *Brown Shoe Co. v. United States, 370 U.S. 294 (82 S. Ct. 1502, 8 L. Ed. 2d 510) (1962)*; it also bars certain acquisitions of a market competitor by a noncompetitor, such as a merger by an entrant who threatens to dominate the market or otherwise upset market conditions to the detriment of competition, *FTC v. Procter & Gamble Co., 386 U.S. 568, 578- 580 , 18 L. Ed. 2d 303, 87 S. Ct. 1224 (1967)*. Suspect also is the acquisition by a company not competing in the market but so situated as to be a potential competitor and likely to exercise substantial influence on market behavior. Entry through merger [*40] by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate *§ 7* because the entry eliminates a potential competitor exercising present influence on the market. *Id., at 580-581 (87 S. Ct. at 1231-1232)*; *United States v. Penn-Olin Chemical Co., 378 U.S. 158, 173-174 (84 S. Ct. 1710-1718, 12 L. Ed. 2d 775) (1964)*.

14    *Section 7 of the Clayton Act* provides that[HN19]

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

*15 U.S.C. § 18.*

[*41] None of the preceding situations exist in the present case. Plaintiffs allegations of a 'merger' are conclusory and unsupported by any factual allegations. Plaintiffs do not allege the existence of either a merger agreement or an acquisition agreement to support its *Section 7* claim. Plaintiffs' *Section 7* claim, therefore, is dismissed.

D. Donnelly Act

Plaintiffs also assert claims under the *Donnelly Act of the State of New York*. Specifically, plaintiffs allege that the defendants

entered into agreements with other factoring companies to engage in group boycotts where they refused to approve credits for New York based garment manufacturers, unlawfully fixed piece goods prices for those manufacturers, drove them out of business, and enabled the factors to maintain supra-competitive pricing structures and stable market shares, among other anti-competitive effects.

Complaint at 22, P79. Plaintiffs further assert that the unlawful reduction of the number of garment manufacturers competing in the market has resulted in artificially maintained and non-competitive levels of prices for factoring services throughout New York and has enabled the factors to stabilize [*42] their respective market

Case 1:07-cv-00556-JJF-LPS    Document 55-6    Filed 04/02/2008    Page 17 of 23

Page 16

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

shares in a way that could not have been achieved or maintained had the factors operated in a genuinely competitive environment.

Complaint at 22, P80. Defendants move to dismiss plaintiffs' *Donnelly Act* claims on the same grounds that it moved to dismiss the *Sherman Act* claims.

The Donnelly Act, *N.Y. Gen. Bus. Law § 340*, states that [HN20] "every contract, agreement, arrangement or combination whereby a monopoly ... is or may be established or maintained, or whereby competition ... may be restrained" is illegal. *N.Y. Gen. Bus. Law § 340(1)*. [HN21] The Donnelly Act was patterned after the *Sherman Act* and has been narrowly construed to encompass only those causes of action falling within the *Sherman Act*. See *State v. Mobil Oil Corp., 38 N.Y.2d 460, 381 N.Y.S.2d 426, 427, 344 N.E.2d 357 (1976)*; accord *Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton, 997 F. Supp. 340 (E.D.N.Y.1998)* (finding *Donnelly Act* is modeled after the *Sherman Antitrust Act* and is generally interpreted in accordance with federal precedent); see also *Anheuser-Busch, Inc. v. Abrams, 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 820, 520 N.E.2d 535 (1988)* [*43] (*Donnelly Act* was modeled on the *Sherman Act* and is to be construed in accord with it). Accordingly, defendants' motion to dismiss plaintiffs' *Donnelly Act* claims is granted in part and denied in part. Plaintiffs'*Donnelly Act* claims of price-fixing and group boycott are therefore dismissed.

E. State Law Claims

In addition to plaintiffs' federal and state antitrust claims, plaintiffs also allege the following pendant state law claims: trade libel; defamation, libel and slander; injurious falsehood; interference with commercial relations; and breach of contract. Each of these claims, with the exception of plaintiffs' breach of contract claim, have been alleged as conspiracies to commit the alleged tortious acts. In presenting their claims in this manner, plaintiffs allege that all of the defendants are liable for the tortious conduct. Specifically, plaintiffs' Sixth, Seventh, Eighth and Ninth Causes of Action claim that all of the defendants "engaged in an unlawful combination and conspiracy" to commit trade libel; defamation, libel and slander; injurious falsehood; and interference with commercial relations.

[HN22] Under New York law, however, "a mere conspiracy to commit a [tort] [*44] is never of itself a cause of action." *Alexander & Alexander v. Fritzen, 68 N.Y.2d 968, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986)* (citations omitted). An independent tort must form the basis of a claim of civil conspiracy. See *Demalco v.*

*Feltner, 588 F. Supp. 1277, 1278 (S.D.N.Y.1984)*; *Smukler v. 12 Lofts Realty, 156 A.D.2d 161, 548 N.Y.S.2d 437, 439 (1st Dep't 1989)*, app. den., *76 N.Y.2d 701, 557 N.Y.S.2d 878, 557 N.E.2d 114 (1990)*. "[A] defendant may be held liable in tort for conspiracy to do an unlawful thing, or to do a lawful thing in an unlawful manner." *Arlinghaus v. Ritenour, 622 F.2d 629, 639 (2d Cir.1980)*(internal citations omitted); see *Banque Nationale de Paris v. Prudential Sec., Inc., 1997 U.S. Dist. LEXIS 15998, 1997 WL 639257, at *3 (S.D.N.Y. Oct. 16, 1997)*. The purpose of civil conspiracy is to "establish[] joint liability by co-participants in a particular tortious conduct." *Sackman v. Liggett Group, Inc., 965 F. Supp. 391, 395 (E.D.N.Y.1997)*. [HN23] A successful claim for civil conspiracy requires a plaintiff to show the primary tort plus the following four elements: "'([1]) a corrupt [*45] agreement between two or more persons[;] ([2]) an overt act in furtherance of the agreement[;] ([3]) the parties' intentional participation in the furtherance of a plan or purpose[;] and ([4]) the resulting damage or injury.'" *Andre Emmerich Gallery, Inc. v. Segre, 1997 U.S. Dist. LEXIS 16899, 1997 WL 672009, at *10 (S.D.N.Y. Oct. 29, 1997)* (quoting *Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1267 (S.D.N.Y.1991)*).

Plaintiffs provide no factual support for their conclusory allegations of a conspiracy to commit any of these torts. Plaintiffs claims of a conspiracy to commit these torts, therefore, is dismissed as to all plaintiffs. Furthermore, as will be seen, plaintiffs have also failed to allege facts sufficient to support their claims of the underlying torts.

a. Trade Libel and Injurious Falsehood

Plaintiffs Sixth and Eighth Causes of Action allege independent trade libel and injurious falsehood claims against all the defendants. In support of their trade libel claim, plaintiffs allege that the

defendants have engaged in an unlawful combination and conspiracy to cause the publication of untruths disparaging plaintiffs, such as [*46] plaintiffs' actions are fraudulent, their products and services are of inferior quality, they misappropriated inventories and are poor risks. Such publications being accompanied by an intent to cause competitive injury, personal hostility, and bad faith. These untruths were published maliciously and without reasonable or probable cause to believe in the truth thereof. These publications of injurious falsehoods constituted, and continue to constitute, the tort of trade libel for

Case 1:07-cv-00556-JJF-LPS     Document 55-6     Filed 04/02/2008     Page 18 of 23

Page 17

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

which defendants are jointly and severally liable.

Complaint at 23, P87.

Similarly, in support of their injurious falsehood claim, plaintiffs restate many of the same conclusory allegations in their trade libel claim. Plaintiffs maintain that the

> defendants have engaged in an unlawful combination and conspiracy to cause the publication of untruths disparaging plaintiffs, such publication being accompanied by an intent to cause competitive injury, personal hostility, and bad faith. These untruths were published maliciously and without reasonable or probable cause to believe in the truth thereof. These publications of injurious falsehoods such as plaintiffs committed fraud, stole money, fraudulently [*47] conveyed assets, misrepresented themselves, and lied to their customers, and switched receivables constitute the tort of injurious falsehood. Defendants made these statements and published these statements knowing they were false and knowing and intending to cause harm to plaintiffs. These statements in fact caused harm to plaintiffs' in that plaintiffs' customers stopped doing business with plaintiffs and other factors withdrew funding from plaintiffs and factors refuse to factor plaintiffs.

Complaint at 25, P92.

These conclusory allegations are insufficient to support plaintiffs' claim of trade libel or injurious falsehood. The allegations fail to identify which specific defendants committed these torts. Furthermore, the allegations fail to identify the false statements made by any defendant. However, in their Seventh Cause of Action for defamation, slander and libel, plaintiffs make allegations from which the Court may infer false statements in support of their trade libel and injurious falsehood claims. Plaintiffs allege that Miles M. Stuchin "defamed and slandered Plaintiffs by writing and publishing false and libelous letters, including a letter dated November 3, 2000, and [*48] telephone calls, mainly during October 2000 and through and including December 2000, and oral communications to Plaintiffs' clients and to the industry." Complaint at 6, P17. Stuchin and defendant Access Capital, of which he is president, are alleged to have

defamed[,] libeled and slandered plaintiffs in that on many dates during the time between October 2000 and February 2001, defendant and his employees including Vincent Grillo called and wrote plaintiffs' customers and others in the industry stating that plaintiffs "committed fraud," "stole money," "fraudulently conveyed assets," "misrepresented themselves" and "lied" to their customers, and "switched receivables.

Complaint at 6, P17. Lastly, plaintiffs maintain that in a letter dated January 16, 2001, defendants Richard I. Simon and Westgate Financial, of which he is allegedly president, "accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey." Complaint at 7, 15, PP18, 43. These statements were published to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others. Id. at 15, P43. [*49] [15]

> 15 Plaintiffs have not pled their trade libel or injurious falsehood claim against all defendants with any specificity. The only defendants identified as having made false statements are Miles M. Stuchin, Access Capital, Richard I. Simon and Westgate Financial. The Court will therefore treat plaintiffs' claims of trade libel and injurious falsehood as against those defendants only. If indeed plaintiffs intended to allege these claims against all of the defendants, those claims are dismissed as conclusory and unsupported by specific allegations of published false statements.

Although pled separately, the torts of trade libel and injurious falsehood require the same allegations to be pled. The distinction between the two is slight; courts having articulated that statements disparaging another's product were called "trade libel," another's business "injurious falsehood," and another's title "slander of title." *Payrolls & Tabulating, Inc. v. Sperry Rand Corp., 22 A.D.2d 595, 257 N.Y.S.2d 884, 887 [*50] (1st Dep't 1965).* [HN24] "The tort of trade libel or injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment." *Waste Distillation, 136 A.D.2d 633, 634, 523 N.Y.S.2d 875 (2nd Dep't 1988)*; see also *Global Merch., Inc. v. Lombard & Co., 234 A.D.2d 98, 99, 650 N.Y.S.2d 724 (1st Dep't 1996)* ("trade libel ... requires 'knowing publication of false matter derogatory to the plaintiff's

Case 1:07-cv-00556-JJF-LPS    Document 55-6    Filed 04/02/2008    Page 19 of 23

Page 18
2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

business."') (quoting *Waste Distillation, 136 A.D.2d at 634, 523 N.Y.S.2d 875*). "The utterance or furnishing of false and misleading information may be actionable if done maliciously or with the intention to harm another, or so recklessly and without regard to its consequences, that a reasonably prudent person should anticipate that damage to another will naturally follow." *Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co., 7 A.D.2d 441, 444, 184 N.Y.S.2d 58, 61 (App. Div. 1st Dep't 1959).*

[HN25] The elements of a claim of injurious false-hood or trade libel are: [*51] (i) falsity of the alleged statements; (ii) publication to a third person; (iii) malice; and (iv) special damages. See *Drug Research Corp. v. Curtis Publishing Co., 7 N.Y.2d 435, 440, 199 N.Y.S.2d 33, 37, 166 N.E.2d 319 (1960)*; see also *Computech Int'l, Inc. v. Compaq Computer Corp., 2002 U.S. Dist. LEXIS 20307, No. 02 Civ. 2628, 2002 WL 31398933, at *5 (S.D.N.Y. Oct. 24, 2002).* The requirement of pleading and proving special damages is applied strictly. See *id.WL at *6.* Thus, a motion to dismiss a claim of injuri-ous falsehood may be granted for failure to allege special damages with the requisite specificity. See *id.*; see also *Drug Research Corp., 7 N.Y.2d at 440-41, 199 N.Y.S.2d at 37-38, 166 N.E.2d 319.*

Plaintiffs' claims of trade libel and injurious false-hood, like their defamation, slander and libel claims, are premised on two letters dated November 3, 2000 and January 16, 2001 as well as telephone calls made during October 2000 and through and including December 2000. Plaintiffs complaint, however, does not allege with particularity to whom the November 3, 2000 letter was written. [16] Plaintiffs' claim regarding the November 3, 2000 letter, therefore, [*52] is dismissed. Furthermore, all of plaintiffs' trade libel and injurious falsehood claims against all defendants must be dismissed because plain-tiffs failed to allege special damages with sufficient par-ticularity. Under New York law, plaintiffs' special dam-ages claim, premised on their loss of business, must be "fully and accurately stated." *Drug Research Corp. v. Curtis Pub. Co., 7 N.Y.2d 435, 440-41, 199 N.Y.S.2d 33, 37-38, 166 N.E.2d 319 (N.Y. 1960)*(finding that special damages were not adequately alleged where the damage claim was a round figure [$ 5,000,000] with no attempt at itemization); see also *Rall v. Hellman, 284 A.D.2d 113, 114, 726 N.Y.S.2d 629, 632 (App. Div. 1st Dep't 2001)*(finding that complaint was deficient because it failed to identify special damages with sufficient particu-larity). Plaintiffs allege damages "in an amount to be determined at trial but not less than $ 40,000,000.00." Complaint at 23, 26, PP87, 93. This allegation is insuffi-cient under New York law and cannot survive defen-dants' motion to dismiss.

16   Plaintiffs do, however, allege that "on De-cember 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plain-tiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance" Complaint at 15, P42. Plaintiffs also allege the third person to whom Westgate published false statements: "on or about January 16, 2001 Defen-dants, including Westgate Financial Corp., ac-cused Gabbey Design of theft and fraud and cre-ated allegations of false, untrue, and malicious charges against Gabbey. Defendants published these statements to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others." Complaint at 15, P43.

[*53] b. Defamation, Libel, Slander

In their Seventh Cause of Action, plaintiffs assert claims of defamation, libel and slander. Premised on the same set of allegations as their trade libel and injurious falsehood claims, plaintiffs' defamation, libel and slander claim is based on false statements allegedly made by defendants Stuchin, Access Capital, Simon and Westgate Financial in two letters dated November 3, 2000 and January 16, 2001, as well as oral statements made on the telephone from October 2000 through and including Feb-ruary 2001. Complaint at 6, 13, 14, 24, PP17, 36, 37, 89. As with plaintiffs trade libel and injurious falsehood claims, plaintiffs' claim regarding the November 3, 2000 letter fails to specify to whom the letter was published and is, therefore, dismissed.

Although defendants Westgate, Simon, Access and Stuchin argue that plaintiffs claim must be dismissed for failing to specify to whom all of the alleged defamatory statements were made, plaintiffs' complaint does allege that "on December 5, 2000, Defendant Stuchin tele-phoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance. [*54] " Complaint at 15, P42. Plaintiffs further assert

> that on or about January 16, 2001 De-fendants, including Westgate Financial Corp., accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey. Defendants published these statements to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others.

Complaint at 15, P43. [17]

Case 1:07-cv-00556-JJF-LPS    Document 55-6    Filed 04/02/2008    Page 20 of 23

Page 19
2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

17   Additionally, plaintiffs maintain that Omni Corp. "slandered plaintiffs to many in the industry." Complaint at 3, P7. Although plaintiffs allege that Omni Corp. and not named defendant Omni Commercial, LLP slandered the plaintiffs, assuming *arguendo* that the plaintiffs allegation is directed towards defendant Omni Commercial, plaintiffs' claim would still be dismissed for failure to state a claim. Plaintiffs do not allege a specific defamatory statement; to whom these statements were made; nor any special damages to support their claim.

[HN26] Under New York law, [*55] the elements of a defamation cause of action are: (i) a defamatory statement of fact concerning the plaintiff, (ii) publication to a third party by the defendant, (iii) falsity of the defamatory statement, (iv) some degree of fault, and (v) special damages or per se actionability (defamatory on its face). See *Dillon v. City of New York, 261 A.D.2d 34, 37, 704 N.Y.S.2d 1- 38,* (App. Div. 1st Dep't 1999); *Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 176 (2d Cir.2000).* As a general rule, a statement is defamatory per se if it "tends to disparage a person in the way of his office, profession or trade." *Celle, 209 F.3d at 179* (emphasis in original); see also *Aronson v.. Wiersma, 65 N.Y.2d 592, 594, 493 N.Y.S.2d 1006, 1008, 483 N.E.2d 1138 (1985).* If a statement is defamatory *per se,* injury is assumed and the statement is actionable without proof of special damages. Special damages are those which flow directly from the injury to a plaintiff's reputation caused by the defamation and which involve the loss of something having economic or pecuniary value. See *Celle, 209 F.3d at 179* (citing [*56] *Matherson v. Marchello, 100 A.D.2d 233, 235, 473 N.Y.S.2d 998, 1000 (App. Div.2d Dep't 1984)).* Lastly, "a plaintiff in a libel action must identify a plausible defamatory meaning of the challenged statement or publication." *Celle 209 F.3d at 178.* If the statement is susceptible of only one meaning, it becomes the court's responsibility to determine, as a matter of law, whether that one meaning is defamatory. On the other hand, if the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it becomes the trier of fact's responsibility to determine in what sense the words were used and understood. See id.

Although plaintiffs allege that all of the defendants committed defamation, plaintiffs' complaint only supports claims against defendants Stuchin, Access Capital, Simon and Westgate Financial. Stuchin and Access Capital are alleged to be responsible for the November 3, 2000 letter as well as the oral communications between October 2000 and February 2001. Defendants Simon and Westgate are alleged to be responsible for the January

16, 2001 letter. As plaintiffs' complaint does not refer to any other communications, [*57] plaintiffs claims against all other defendants are dismissed.

Plaintiffs' claims against defendants Stuchin and Access Capital regarding the November 3, 2000 letter are dismissed for failing to allege with specificity the exact words contained in the November 3, 2000 letter that plaintiffs' claim are libelous. Plaintiffs' insufficient pleading of the allegedly defamatory statement goes hand in hand with their failure to identify a plausible defamatory meaning for that statement. Plaintiffs further fail to allege to whom that letter was published. Lastly, plaintiffs fail to allege special damages or that the defamatory words contained in the letter should be considered by the Court as defamatory *per se.* See *Church of Scientology Int'l v. Eli Lilly & Co., 778 F.Supp 661, 668 (S.D.N.Y. 1991)*(dismissing claim that failed "to provide both the context and the precise language of" the alleged statements).

Plaintiffs allegations concerning the January 16, 2001 letter allegedly written by defendants Simon and Westgate Financial suffer from the same deficiencies as their claims regarding the November 3, 2000 letter. Plaintiffs fail to articulate the libelous statement [*58] made in that letter and also fail to allege either special damages or that the libelous statement reaches *per se* liability. Although plaintiffs allege to whom that letter was sent, that allegation alone is insufficient to support plaintiffs' claims. Plaintiffs' libel claim regarding the January 16, 2001 letter is therefore dismissed.

Plaintiffs claims regarding telephone calls and other oral communications that occurred between October 2000 and February 2001 against Stuchin and Access Capital are dismissed except for one slander allegation: "on December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance." Complaint at 15, P42. [HN27] Under New York law, there are four elements necessary to establish a *prima facie* case of slander: (1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff. The fourth element is presumed when the defamatory statement takes the form of slander *per se. Weldy v. Piedmont Airlines, 985 F.2d 57, 61-62 (2d Cir. 1993)* [*59] (citations omitted). [HN28] Defamation *per se* "consist[s] of statements (i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman v. Gelstein, 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992).* The second type of defamation *per se* is "limited to defamation of a kind incompatible with the proper

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities". *Id.* Thus, "charges against a clergyman of drunkenness and other moral misconduct affect his fitness for the performance of the duties of his profession, although the same charges against a business man or tradesman do not so affect him". *Id. at 436, 590 N.Y.S.2d 857, 605 N.E.2d 344* (citations omitted). For the purposes of this motion, therefore, plaintiff has adequately pled a *prima facie* case of slander. Defendants' motion to dismiss plaintiffs' [*60] claim of slander based on this telephone call is denied.

c. Interference with Commercial Relations

In their Ninth Cause of Action, plaintiffs also allege a claim of interference with commercial relations. Plaintiffs maintain that the

> defendants have induced Plaintiffs' clients to refrain from purchasing from Plaintiffs by publishing disparaging and false statements about the products and services of Plaintiff, such publications being accompanied by an intent to cause competitive injury, personal hostility, bad faith, knowing the matter was false, by creating the impression and belief that to work with plaintiffs would jeopardize such customers' continued status, and by Defendants having purposely induced or otherwise caused third persons not to enter into or continue business relations with Plaintiffs.

Complaint at 13, P34. These allegations are insufficient to state a claim of tortious interference with business relations against all of the defendants. The only allegations which specify direct conduct by particular defendants are actions by defendants Access Capital and Stuchin against plaintiff John Michaels. Plaintiffs allege that Access Capital and Stuchin "interfered [*61] with an unrelated lawsuit plaintiffs were involved in, illegally diverted and opened plaintiffs' personal and business mail." Complaint at 6, P17. Plaintiffs assert that

> on or about and after October 27, 2000, Defendant Access intentionally and illegally diverted, opened and withheld Plaintiffs' mail, made illegal financial threats and demands upon Plaintiff John Michaels' accounts causing many of John Michael's accounts to withhold payments

and caused John Michaels to be unable to operate its business.

Complaint at 14, P40. Plaintiffs maintain that

> defendants' actions constitute interference of John Michaels' and other plaintiffs' contractual relationships with its customer accounts, and disrupted the normal operation of John Michaels' and plaintiffs' business, causing a great loss of booked orders plus future sales. Defendants acted intentionally with the knowledge that their actions would cause John Michaels' accounts to stop payments for shipments received and that the factors would refuse to do business with plaintiffs, and that plaintiffs' customers would refuse to do business with plaintiffs.

Complaint at 15, P41.

[HN29] In order to state a claim for tortious [*62] interference with contractual relations under New York law, a plaintiff must allege "(1) the existence of a valid contract between itself and a third party for a specific term; (2) defendant's knowledge of that contract; (3) defendant's intentional procuring of its breach; and (4) damages." *150 East 58th St. Partners, L.P. v. Wilkhahn Wilkening & Hahn GmbH & Co., 1998 U.S. Dist. LEXIS 1701, No. 97 CIV. 4262(SHS), 1998 WL 65992, at *1 (S.D.N.Y. Feb. 17, 1998)* (quoting *Riddell Sports Inc. v. Brooks, 872 F. Supp. 73, 77 (S.D.N.Y.1995)*); see *Jews for Jesus, Inc. v. Jewish Community Relations Council of N.Y., Inc., 968 F.2d 286, 292 (2d Cir.1992)*; *Union Carbide Corp. v. Montell N.V., 944 F. Supp. 1119, 1136 (S.D.N.Y.1996)*; *Foster v. Churchill, 87 N.Y.2d 744, 749-50, 665 N.E.2d 153, 156, 642 N.Y.S.2d 583, 586 (1996)*.

The standard for demonstrating tortious interference with business relations "is somewhat more stringent." *Campo v. 1st Nationwide Bank, 857 F. Supp. 264, 273 (E.D.N.Y.1994)*; see *International Minerals and Resources, Inc. v. Pappas, 761 F. Supp. 1068, 1075 (S.D.N.Y.1991)*. A plaintiff [*63] must allege that defendants interfered with business or economic relations between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by dishonest, unfair, or improper means. See *PPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266, 269 (2d Cir.1987)*; *Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F. Supp. 477, 482 (S.D.N.Y.)*, cert. denied, *522 U.S. 908, 118 S. Ct. 265, 139 L. Ed. 2d 191 (1997)*; *Houbigant, Inc. v. ACB Mercantile, 914 F. Supp. 964, 995 (S.D.N.Y.1995)*; *Campo, 857 F. Supp. at 273*. Indeed, the defendant "must

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." *Fonar Corp., 957 F. Supp. at 482.*

Defendants Access and Stuchin argue that plaintiffs fail under both standards. First, defendants argue that plaintiffs fail to allege that they were "actually and wrongfully prevented from entering into or continuing in a specific business relationship." *Solar Travel Corp. v. Nachtomi, 2001 U.S. Dist. LEXIS 7549, 2001 WL 641151 (S.D.N.Y. 2001);* [*64] *Korn v. Princz, 226 A.D.2d 278, 641 N.Y.S.2d 283 (1st Dep't 1996).* Defendants further contend that plaintiffs have not alleged that a contract would have been entered into but for the alleged actions of Access and Stuchin. See, e.g., *Bankers Trust Co. v. Bernstein, 169 A.D.2d 400, 563 N.Y.S. 2d 821 (1st Dep't 1991).*

Plaintiffs' claims against defendants Stuchin and Access Capital must be dismissed. Plaintiffs do not allege with any specificity the contracts it claims were breached or the business relations it claims were prevented from going forward as a result of either Stuchin's or Access Capital's actions. Plaintiffs also fail to identify the third parties that plaintiffs had either a contractual or prospective business relationships with. Plaintiffs' claim of tortious interference with commercial relations is, therefore, dismissed.

d. Breach of Contract

As is the case with all of their claims, in their breach of contract claim, plaintiffs do not specify which plaintiffs had contractual relationships with which defendants, generally alleging that the

> defendants conduct and the unlawful acts in restraint of trade have caused the breach [*65] of their respective contracts with plaintiffs, and, Defendants have breached their contractual duties to each plaintiff separately and apart from their anti-competitive conduct. Defendants also engaged in the following additional actions that further breached its covenants of good faith and fair dealing. Defendants' bad faith actions contributed substantially to the demise of the plaintiffs, and caused each of the plaintiffs' substantial financial loss. The contracts themselves are unconscionable, against public policy, and predatory.

Complaint at 26-27, P98. Indeed the only allegations that support a breach of contract claim which specifically identify a breach by a particular defendant of a contract with a specific plaintiff are against defendants Westgate and Star Funding. Plaintiffs allege that

> Westgate Financial confiscated Plaintiff John Michael's client inventory and sold it to a salvage company, never gave plaintiffs credit for payments made, refused to give advance funding, breached their contract, and caused a loss in excess of Two Million Dollars. Defendants misappropriated Plaintiffs' inventory and charged unlawfully high interest rates causing serious financial [*66] loss to John Michael's.

Complaint at 13, P35.

> Plaintiffs further allege that they were coerced and forced under duress to use the factor Star Funding, and then Star Funding immediately breached their contract based upon Rosenthal & Rosenthal's request not to go forward with its funding to Gabbey, all of this occurred after Star Funding and Rosenthal & Rosenthal met with defendants and agreed to force plaintiffs out of business.

Complaint at 14, P38.

[HN30] In order to state a claim for breach of contract, plaintiffs must allege: (1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of the contract provisions by the defendants; and (4) damages resulting from the breach. See *Terwilliger v. Terwilliger, 206 F.3d 240, 246 (2d Cir. 2000).* As plaintiffs have only alleged contracts with defendants Westgate and Star Funding, plaintiffs breach of contract claim against all other defendants are dismissed. Plaintiffs claims against these remaining defendants are also dismissed for failing to allege adequate performance of the contract by the plaintiffs as well as damages resulting from the breach.

III. Conclusion

[*67] Defendants' motions to dismiss plaintiffs' claims under *Section 1 of the Sherman Act* are granted. Defendants' motions to dismiss plaintiffs' claims under *Section 2 of the Sherman Act* are denied. Defendants' motions to dismiss plaintiffs' claims under the *Clayton Act* are granted. Defendants' motions to dismiss plaintiffs' price-fixing and group boycott claims under the *Donnelly Act* are granted. Defendant's motion to dismiss

2004 U.S. Dist. LEXIS 25257, *; 2005-1 Trade Cas. (CCH) P74,693

plaintiffs' monopolization claims under the *Donnelly Act* are denied. Defendants' motions to dismiss all of plaintiffs' claims of trade libel, injurious falsehood, tortious interference with commercial relations and breach of contract are granted. Defendants' motion to dismiss plaintiffs' defamation, libel and slander claims is granted in part and denied in part. All of plaintiffs' defamation, libel and slander claims are dismissed except for plain-

tiffs' slander claim regarding the alleged December 5, 2000 telephone call.

Dated: New York, New York

December 10, 2004

SO ORDERED:

GEORGE B. DANIELS

United States District Judge [*68]

# Tab 6

1 of 1 DOCUMENT


Analysis
As of: Apr 02, 2008

**SHERI L. KENDALL, doing business as Bala Hair Salon, James Maser, and Maiz Holding Co., Plaintiffs-Appellants, v. VISA U.S.A., INC., Mastercard International, Inc., Bank of America, N.A., Wells Fargo Bank, N.A., and U.S. Bank, N.A., Defendants-Appellees.**

**No. 05-16549**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*2008 U.S. App. LEXIS 5032*

**June 11, 2007, Argued and Submitted, San Francisco, California
March 7, 2008, Filed**

**PRIOR HISTORY:** [*1]
Appeal from the United States District Court for the Northern District of California. D.C. No. CV-04-04276-JSW. Jeffrey S. White, District Judge, Presiding.
*Kendall v. Visa U.S.A., Inc., 2005 U.S. Dist. LEXIS 21450 (N.D. Cal., July 25, 2005)*

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant merchants sought review of an order from the United States District Court for the Northern District of California dismissing under *Fed. R. Civ. P. 12(b)(6)* without leave to amend appellants' first amended complaint against appellees, banks and credit card consortia, for alleged antitrust violations under *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*, and under *§ 16* of the Clayton Act, *15 U.S.C.S. § 26*.

**OVERVIEW:** Appellants, who offered customers the convenience of paying with a credit card, alleged that appellees conspired with each other to set the fees charged to merchants, such as appellants, for payment of credit card sales. Appellants contended that appellees' action in setting the amount of the merchant discount fee and interchange fee constituted violations of *15 U.S.C.S. §§ 1* and *26* because appellees conspired to set the amounts charged. The court agreed with the district court that appellants' amended complaint, like their original complaint, failed to meet the pleading requirements set forth by the U.S. Supreme Court in Bell Atlantic because of the failure to allege specific facts of such conspiracy. As to the banks, appellants failed to plead any evidentiary facts beyond parallel conduct to prove their allegations of a conspiracy. Appellants' claim against the consortium was barred by the "indirect purchaser" rule because they had no contractual relationship with the consortia and they were not charged the interchange fee directly. The court agreed that amendment would be futile because appellants failed to state what additional facts they would plead if given leave to amend.

**OUTCOME:** The court affirmed the judgment.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] The appellate court reviews the dismissal of a complaint under *Fed. R. Civ. P. 12(b)(6)* de novo.

*Antitrust & Trade Law > Sherman Act > Coverage > General Overview*
[HN2] *Section 1* of the Sherman Act, *15 U.S.C.S. § 1*, prohibits every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations.

*Antitrust & Trade Law > Sherman Act > Claims*
*Civil Procedure > Pleading & Practice > Pleadings >*
*Complaints > Requirements*
[HN3] In Bell Atlantic, the United States Supreme Court clarified what a plaintiff must plead to state a claim under *15 U.S.C.S. § 1*: A plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level. In applying these general standards to a *15 U.S.C.S. § 1* claim, the Supreme Court held that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. An allegation of parallel conduct and a bare assertion of conspiracy will not suffice. This is because discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case.

*Antitrust & Trade Law > Sherman Act > Claims*
*Civil Procedure > Pleading & Practice > Pleadings >*
*Complaints > Requirements*
[HN4] At least for the purposes of adequate pleading in antitrust cases, the United States Supreme Court in Bell Atlantic specifically abrogated the usual "notice pleading" rule found in *Fed. R. Civ. P. 8(a)(2)* and Conley, which requires only a short and plain statement of the claim showing that the pleader is entitled to relief, to give the defendant fair notice of what the claim is and the grounds upon which it rests.

*Antitrust & Trade Law > Sherman Act > Claims*
*Civil Procedure > Pleading & Practice > Pleadings >*
*Complaints > Requirements*
[HN5] Terms like "conspiracy," or even "agreement," are borderline: they might well be sufficient in conjunction with a more specific allegation--for example, identifying a written agreement or even a basis for inferring a tacit agreement--but a court is not required to accept such terms as a sufficient basis for a complaint under *15 U.S.C.S. § 1*. In Bell Atlantic, the United States Supreme Court also suggested that to allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a specific time, place, or person involved in the alleged conspiracies to give a defendant seeking to re-

spond to allegations of a conspiracy an idea of where to begin. A bare allegation of a conspiracy is almost impossible to defend against, particularly where the defendants are large institutions with hundreds of employees entering into contracts and agreements daily.

*Antitrust & Trade Law > Sherman Act > Claims*
*Civil Procedure > Pleading & Practice > Pleadings >*
*Complaints > Requirements*
[HN6] To state a claim under *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*, claimants must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition.

*Antitrust & Trade Law > Sherman Act > Claims*
*Civil Procedure > Pleading & Practice > Pleadings >*
*Complaints > Requirements*
[HN7] Merely charging, adopting, or following the interchange fees set by a consortium is insufficient as a matter of law to constitute a violation of *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*. In Kline, the United States Court of Appeals for the Ninth Circuit held that membership in an association does not render an association's members automatically liable for antitrust violations committed by the association. Even participation on the association's board of directors is not enough by itself. A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a *15 U.S.C.S. § 1* claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a *15 U.S.C.S. § 1* complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief.

*Antitrust & Trade Law > Private Actions > Purchasers*
*> Indirect Purchasers*
[HN8] In Illinois Brick, the United States Supreme Court held "indirect purchasers" may not recover antitrust damages. The Supreme Court held that permitting suits by indirect third parties essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge from direct pur-

chasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness. Courts are not permitted to determine what portion of an illegal overcharge was "passed on" and what part was absorbed by the middlemen because such an analysis would involve all the evidentiary and economic complexities that Illinois Brick clearly forbade.

*Antitrust & Trade Law > Sherman Act > Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN9] Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws. An antitrust complaint must cross the threshold not only between conclusory and factual but also between the factually neutral and the factually suggestive.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN10] The district court is not required to accept as true conclusory allegations of law or legal conclusions couched as factual allegations in considering the sufficiency of a complaint.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN11] Whether issue preclusion applies is a legal question that the appellate court reviews de novo.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN12] Issue preclusion prevents a party from relitigating an issue decided in a previous action if four requirements are met: (1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom collateral estoppel is asserted in the present action was a party or in privity with a party in the previous action. The burden is on the party seeking to rely upon issue preclusion to prove each of the elements have been met.

*Antitrust & Trade Law > Private Actions > Injuries & Remedies > Clayton Act*
*Antitrust & Trade Law > Private Actions > Injuries & Remedies > Sherman Act*
*Antitrust & Trade Law > Sherman Act > Remedies > General Overview*
[HN13] Section 16 of the Clayton Act, *15 U.S.C.S. § 26*, provides that any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief against threatened loss or damage by a violation of the antitrust laws. *15 U.S.C.S. § 26* does not furnish an independent cause of action. Rather, it allows the court to fashion relief upon a showing of a separate violation of the antitrust laws. Where a plaintiff fails to state a claim under *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*, the claim under *15 U.S.C.S. § 26*, predicated upon a violation *15 U.S.C.S. § 1*, is barred.

*Antitrust & Trade Law > Sherman Act > Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN14] Normally, the United States Court of Appeals for the Ninth Circuit would agree that when the United States Supreme Court alters the pleading requirements for a cause of action, such as it did in Bell Atlantic, plaintiffs should be allowed leave to amend their complaint to meet the new standard. However, dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment.

**COUNSEL:** Richard J. Archer, Archer & Hanson, Occidental, California and James A. Kopcke, Golden Kopcke, San Francisco, California, for the appellants.

Marie L. Fiala, Heller Ehrman, San Francisco, California; Robert Vizas, Arnold & Porter, LLP, San Francisco, California; Jay N. Fastow, Debra J. Pearlstein, Gianluca Morello, Weil, Gotshal & Manges, LLP, New York, New York; Keila D. Ravelo, Wesley R. Powell, Hunton & Williams, New York, New York; Eileen Ridley, Foley & Lardner, LLP, San Francisco, California; Maurice J. McSweeney, Michael Luedner, Foley & Lardner, Milwaukee, Wisconsin; Daniel M. Wall, Joshua N. Holian, Latham & Watkins, San Francisco, California; and Sonya D. Winner, Tara M. Steeley, Covington & Burling, San Francisco, California.

**JUDGES:** Before: Michael Daly Hawkins, A. Wallace Tashima, and Carlos T. Bea, Circuit Judges.

2008 U.S. App. LEXIS 5032, *

**OPINION BY:** Carlos T. Bea

**OPINION**

BEA, Circuit Judge:

This case concerns the pleading requirements to state a claim for antitrust violations under *Section 1* of the Sherman Act following the Supreme Court's recent pronouncement [*2] in *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-66, 167 L. Ed. 2d 929 (May 21, 2007)*.

Appellants are a group of businesses who offer their customers the convenience of paying with a credit card, at a cost to the business. Appellees are composed of two groups: (1) MasterCard and Visa (referred to as "Consortiums") and (2) Bank of America, N.A.; Wells Fargo Bank, N.A.; and U.S. Bank, N.A. (referred to as "Banks"). [1]

> 1    The district court also dismissed allegations against defendant, Citi-Group, under Federal *Rule 12(f)*. Appellants do not appeal this ruling.

Appellants sued appellees under *Section 1* of the Sherman Act, *15 U.S.C. § 1*, and *Section 16* of the Clayton Act, *15 U.S.C. § 26*, for antitrust violations, alleging appellees conspired with each other to set the fees charged to merchants, such as appellants, for payment of credit card sales. The district court dismissed appellants' First Amended Complaint without leave to amend for failure to state a claim upon which relief can be granted pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. We hold that Appellants' First Amended Complaint failed to plead evidentiary facts sufficient to establish a conspiracy, and we affirm.

I. A Typical Credit Card [*3] Transaction

To understand this case, it is helpful to begin with an example of a credit card transaction: [2] A customer purchases dinner for $ 100 from a merchant using his Visa credit card. The merchant accepts the credit card from the customer, then electronically presents the card's data to the merchant's bank (the "acquiring bank"), or sometimes to a third party processing firm, for verification and processing. The acquiring bank presents the data to Visa, which in turn contacts the bank that issued the credit card to the customer (the "issuing bank") to check the customer's bank account or credit line. The issuing bank then tells Visa to authorize or decline the transaction, and Visa relays this message to the acquiring bank, which notifies the merchant. Thanks to modern computers, this all typically happens while the customer finishes his coffee.

2    Our hypothetical is taken from the declaration of William Sheedy, Executive Vice President of Visa, and from Visa's brief. No contrary evidence appears in the record.

If the transaction was authorized, the merchant eventually delivers the credit card slip to the acquiring bank and asks the sum be credited to the merchant's bank account. [*4] If this had been a personal check from the customer, the acquiring bank might put a hold on the check until the customer's bank had paid it. The acquiring bank might also charge a fee for this service. Because this is a Visa receipt, and Visa's credit is good, the acquiring bank credits the merchant's account before the customer pays his Visa bill at the end of the month.

The acquiring bank, however, will not credit the merchant's account the full $ 100. Instead, the acquiring bank will deduct a "merchant discount fee" of around three percent. Thus, the acquiring bank will credit the merchant's account only $ 97, keeping $ 3 as a fee. This merchant discount fee is negotiable. The acquiring bank might not charge this fee if the merchant leaves a large amount of money in its account which the bank can lend out.

The acquiring bank then delivers the credit card receipt to the issuing bank, via Visa. The issuing bank pays the acquiring bank the original amount minus a fee of around two percent, or $ 98, because the issuing bank knows that when it presents the $ 100 receipt to Visa, Visa will deduct a $ 2 fee as well. The difference between the credit card receipt, $ 100, and the amount the [*5] issuing bank pays the acquiring bank, $ 98, is known as the "interchange fee" or "interchange reimbursement fee." The issuing bank makes nothing in its transaction with Visa, but profits, in part, by being one of the owners of Visa through an association. [3]

> 3    The district court found the issuing bank keeps the interchange fee instead of Visa, but makes no mention of how the Consortiums make a profit. Either version of the transaction (either Visa keeps the interchange fee or the issuing bank keeps the interchange fee) results in the same analysis of this case.

At the end of the transaction, the customer and his family are fed, for which he pays $ 100 to the issuing bank, plus any late fees and interest. The merchant receives $ 97 for the dinner, for which it charged the customer $ 100. The acquiring bank receives $ 98 from the issuing bank, credits the merchant's account $ 97, and keeps $ 1 as a merchant discount fee. The issuing bank receives $ 98 from Visa, but gives all $ 98 to the acquiring bank. The issuing bank gets only a portion of Visa's $ 2 profit as one of the many owners of Visa through an

2008 U.S. App. LEXIS 5032, *

association but, most importantly, keeps any late fees and interest the customer must [*6] pay if the customer does not pay his account on time, in full, according to his contract with the issuing bank. Visa receives $ 100 from the customer, pays the issuing bank $ 98, and keeps $ 2 as an interchange fee. The difference between what the two banks keep represents the difference between the greater risk the issuing bank and Visa have that the consumer will not pay compared to the lesser risk the acquiring bank has that the issuing bank will not pay.

In this case, appellants allege the appellees' actions in setting the amount of the merchant discount fee and interchange fee constitute violations of *Section 1* of the Sherman Act, *15 U.S.C. § 1*, and *Section 16* of the Clayton Act, *15 U.S.C. § 26*, because appellees conspired to set the amounts charged. The district court dismissed appellants' original complaint with leave to amend for, *inter alia*, failure to allege specific facts of such conspiracy. The district court then allowed appellants to conduct discovery so they would have the facts they needed to plead an antitrust violation in their amended complaint. Appellants deposed Steven Jonas for MasterCard and William Sheedy for Visa. They then used the facts learned in those depositions [*7] to form the allegations in their First Amended Complaint. [4] The district court then granted appellees' motions to dismiss the First Amended Complaint, without leave to amend, for failure to state a claim upon which relief can be granted pursuant to *Federal Rule of Civil Procedure 12(b)(6)*.

> 4  Appellants did not depose any representatives of the Banks, nor do they contend on appeal they needed further discovery to plead their case.

II. *Section 1* of the Sherman Act

[HN1] We review the dismissal of a complaint under *Rule 12(b)(6) de novo. Les Shockley Racing Inc. v. Nat'l Hot Rod Ass'n, 884 F.2d 504, 507 (9th Cir. 1989)*.

[HN2] *Section 1* of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." *15 U.S.C. § 1.* [HN3] The Supreme Court recently clarified what a plaintiff must plead to state a claim under *§ 1*:

> [A] plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, *see Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)* [*8] (on a motion to dismiss, courts "are not

bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level. . . . In applying these general standards to a *§ 1* claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. . . . [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.

*Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-66, 167 L. Ed. 2d 929 (May 21, 2007).* [5] This is because discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case. *Id. at 1966-67.*

> 5  [HN4] At least for the purposes of adequate pleading in antitrust cases, the Court specifically abrogated the usual "notice pleading" rule, found in *Federal Rule of Civil Procedure 8(a)(2)* [*9] and *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic, 127 S. Ct. at 1964, 1968.*

[HN5] "[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation--for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court is not required to accept such terms as a sufficient basis for a complaint." *Id. at 1966* (quoting *DM Research, Inc. v. College of Am. Pathologists, 170 F.3d 53, 56 (1st Cir. 1999)*). The Court also suggested that to allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a "specific time, place, or person involved in the alleged conspiracies" to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin. *Id. at 1970 n.10.* A bare allegation of a conspiracy is almost impossible to defend against, particularly where the defendants are large institutions with hundreds of [*10] employees entering into contracts and agreements daily.

[HN6] To state a claim under *Section 1* of the Sherman Act, *15 U.S.C. § 1*, claimants must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition. *Les Shockley Racing Inc. v. Nat'l Hot Rod Ass'n, 884 F.2d 504, 507 (9th Cir. 1989); see also Bell Atlantic, 127 S. Ct. at 1964-66.*

In *Bell Atlantic*, the Supreme Court found allegations that the defendant telephone companies "have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another" insufficient because no evidentiary facts were pleaded which could prove the conspiracy. *Id. at 1963.* "Although in form a few stray statements speak directly of agreement, on fair reading [*11] these are merely legal conclusions resting on the prior allegations." *Id. at 1970* (footnote omitted). Here, appellants pleaded only ultimate facts, such as conspiracy, and legal conclusions. They failed to plead the necessary evidentiary facts to support those conclusions.

A. Allegations Against the Banks

Appellants allege that: (1) each Bank defendant "participates in the management of and has a proprietary interest in" the Consortiums; (2) the Banks charge appellants "the amount of the interchange rate fixed by the Consortiums as the merchant discount fee"; (2) the Banks adopt the interchange fees set by the Consortiums; (3) the acquiring banks "knowingly, intentionally and actively participated in an individual capacity with the Consortiums in charging the fixed minimum merchant discount fees"; and (4) there is an agreement among all financial institutions to charge a minimum merchant discount fee set by the Consortiums.

Appellants do not allege any facts to support their theory that the Banks conspired or agreed with each other or with the Consortiums to restrain trade. Although appellants allege the Banks "knowingly, intentionally and actively participated in an individual capacity [*12] in the alleged scheme" to fix the interchange fee or the merchant discount fee, this allegation is nothing more than a conclusory statement. There are no facts alleged to support such a conclusion. *See id. at 1970.* Even after the depositions taken, the complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?

Regarding the allegation that the Banks conspired to fix the interchange fee, [HN7] merely charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of *Section 1* of the Sherman Act. *Id. at 1964-66; see also Kline v. Coldwell Banker & Co., 508 F.2d 226 (9th Cir. 1974).* In *Kline*, we held that membership in an association does not render an association's members automatically liable for antitrust violations committed by the association. *Kline, 508 F.2d at 232.* Even participation on the association's board of directors is not enough by itself.

> A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a *§ 1* claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's [*13] commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a *§ 1* complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief."

*Bell Atlantic, 127 S. Ct. at 1966* (citation omitted).

Appellants failed to plead any evidentiary facts beyond parallel conduct to prove their allegation of a conspiracy. Accordingly, the district court correctly dismissed the complaint against the Banks.

B. Allegations Against the Consortiums

[HN8] The Supreme Court in *Illinois Brick v. Illinois, 431 U.S. 720, 736, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977),* held "indirect purchasers" may not recover antitrust damages. The Court held that permitting suits by indirect third parties:

> essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages [*14] suits and seriously undermine their effectiveness.

2008 U.S. App. LEXIS 5032, *

*Illinois Brick, 431 U.S. at 737.*

In *Illinois Brick*, an antitrust treble-damages action was brought by the State of Illinois and local government entities alleging that concrete block manufacturers had engaged in a price-fixing conspiracy. *Id. at 726-27.* The government entities had contracted with general contractors who in turn hired masonry sub-contractors, who bought the concrete blocks for installation in government projects. *Id. at 735.* The Supreme Court held that only a direct purchaser of the concrete blocks (the masonry sub-contractor who purchased the concrete blocks) is a party "injured in his business or property" entitled to sue under *Section 1* of the Sherman Act, not another party in the chain of manufacture or distribution. *Id. at 729, 735-37.*

Courts are not permitted to determine "what portion of [an] illegal overcharge was 'passed on' . . . and what part was absorbed by the middlemen" because such an analysis would "involve all the evidentiary and economic complexities that *Illinois Brick* clearly forbade." *Royal Printing Co. v. Kimberly-Clark Corp ., 621 F.2d 323, 327 (9th Cir. 1980).*

Appellants allege that the Consortiums [*15] set both the merchant discount fee and the interchange fee. Appellants allege that by setting the interchange fee that the Consortiums charge the issuing bank, the Consortiums establish a minimum amount for the merchant discount fee. Appellants have no contractual relationship with the Consortiums directly, nor are they charged the interchange fee directly. In *Illinois Brick*, the State's contractors who bought the brick to be installed were the middlemen. Here, the acquiring and issuing banks are the middlemen. Thus, with respect to the interchange fee, appellants run squarely into the *Illinois Brick* wall. *Illinois Brick, 431 U.S. at 746.*

Appellants also allege the Consortiums indirectly establish the minimum merchant discount fee the Banks charge Merchants. Appellants allege that because the interchange fee is one of the cost factors an acquiring bank considers when determining the merchant discount fee, the interchange fee effectively sets a floor for each bank's merchant discount fee. In this sense, the Consortiums indirectly establish the merchant discount fee, much as the cost of eggs sets a floor for the price of an omelette on a menu. Just like the restauranteur, the banks charge [*16] the merchant a higher price than their cost of business to make a profit. This behavior suggests a rational business decision, not a conspiracy. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 102 (2d Cir. 2005)* ("Economics demands that the [merchant] discount fee [for credit card transactions] be greater than the interchange fee the acquiring institution must pay to the card-issuing institution."). [HN9] Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws. *Bell Atlantic, 127 S. Ct. at 1964-66 & n.5* (explaining that an antitrust complaint must cross the threshold not only between "conclusory and factual" but also between "the factually neutral and the factually suggestive"). Further, this allegation is barred by *Illinois Brick* to the extent that the Consortiums do not directly set the merchant discount fee; the acquiring bank sets that fee.

In an attempt to circumvent *Illinois Brick*, appellants also allege the Consortiums directly conspired with the Banks to set the merchant discount fee. Appellants contend they are entitled [*17] to sue the Consortiums as co-conspirators under the exception to *Illinois Brick* found in *Arizona v. Shamrock Foods Co., 729 F.2d 1208, 1213-14 (9th Cir. 1984).* Appellants, however, simply allege the Consortiums are coconspirators, without providing any facts to support such an allegation, despite having deposed executives from both MasterCard and Visa. Here again, the district court was not required to accept appellants' conclusion that the Consortiums were co-conspirators of the Banks without any evidentiary facts alleged to support such conclusion. *See Bell Atlantic, 127 S. Ct. at 1964-66* (holding [HN10] the district court is not required to accept as true conclusory allegations of law or legal conclusions couched as factual allegations); *see also Kansas v. Utilicorp United, Inc., 497 U.S. 199, 216, 110 S. Ct. 2807, 111 L. Ed. 2d 169 (1990)* (holding the exception to *Illinois Brick* did not apply even where the direct purchaser almost certainly passed on the entire cost of an alleged overcharge to the indirect purchaser because no facts were alleged to support the allegation of conspiracy).

Importantly, appellants do not allege any facts showing the Consortiums have any direct control over the merchant discount fee the acquiring [*18] bank chooses to charge, or not charge, the merchant. In fact, appellants have expressly excluded from the putative class of plaintiffs "those merchants who negotiate merchant discounts directly with VISA and/or MASTERCARD or receive payments directly from them."

Appellants also attempt to rely upon *Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1145-46 (9th Cir. 2003)*, in which we held that indirect purchasers can sue for damages if there is no "realistic possibility that the direct purchaser will sue" over the antitrust violation. But appellants failed to allege any facts establishing that there is no realistic possibility the Banks will not sue the Consortiums.

Appellants' allegations that the Consortiums charge different interchange fees for different types of mer-

chants also fail to state a violation for *Section 1* of the Sherman Act because appellants do not allege they compete with these other unidentified merchants, or that their trade was in any way injured by such practices. *See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 763-64, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984).*

C. Issue Preclusion

To cure the deficiencies in their failure to plead the necessary evidentiary facts, appellants attempt to [*19] assert issue preclusion to rely upon the factual findings in *United States v. Visa U.S.A., Inc., 344 F.3d 229 (2d Cir. 2003).* [HN11] Whether issue preclusion applies is a legal question we review *de novo. See Frank v. United Airlines, Inc., 216 F.3d 845, 849-50 (9th Cir. 2000).*

[HN12] Issue preclusion prevents a party from relitigating an issue decided in a previous action if four requirements are met: "(1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom collateral estoppel is asserted in the present action was a party or in privity with a party in the previous action." *United States Internal Revenue Serv. v. Palmer (In re Palmer), 207 F.3d 566, 568 (9th Cir. 2000).* The burden is on the party seeking to rely upon issue preclusion to prove each of the elements have been met. Here, appellants have not shown any of the elements of issue preclusion have been met. The Second Circuit's decision in *Visa* involved exclusivity rules which barred member banks from issuing American Express or Discover cards; any discussion [*20] of interchange fees or merchant fees in that opinion was provided as background only and was irrelevant to the issue actually decided in that litigation. *See 344 F.3d at 235, 237.* [6]

> 6   In fact, the attorneys representing appellants here also sued these same defendants in *Reyn's Pasta Bella, LLC v. Visa, USA, Inc., 442 F.3d 741 (9th Cir. 2006).* We rejected the argument that issue preclusion applied because, as is the case here, the appellants failed to allege the required facts.

III. *Section 16* of the Clayton Act

[HN13] *Section 16* of the Clayton Act provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . ." *15 U.S.C. § 26. Section 16* does not furnish an independent cause of action. Rather, it allows the court to fashion relief upon a showing of a separate violation of the antitrust laws. *See, e.g., Catlin v. Washington Energy*

*Co., 791 F.2d 1343, 1350 (9th Cir. 1986).* Because appellants failed to state a claim under *Section 1* of the Sherman Act, their claim under *Section 16* of the Clayton Act, predicated upon a violation *Section 1* of the Sherman Act, [*21] is barred. *Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 109, 107 S. Ct. 484, 93 L. Ed. 2d 427 (1986)* (threatened antitrust injury is a prerequisite to equitable relief).

The district court properly dismissed appellants' complaint under the pleading standards recently reinforced in *Bell Atlantic* and the indirect purchaser rule in *Illinois Brick.* Accordingly, we affirm.

IV. Leave to Amend the Complaint

Finally, plaintiffs seek leave to file a Second Amended Complaint, although they fail to state how they would amend the Complaint if given leave. [HN14] Normally, we would agree that when the Supreme Court alters the pleading requirements for a cause of action, such as it did in *Bell Atlantic*, plaintiffs should be allowed leave to amend their complaint to meet the new standard. In this particular case, however, we think such leave would be futile. Dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment. *Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003)* (per curiam).

The district court in this case was particularly prescient in its original order granting the Bank Defendants' motion to dismiss with leave to amend. The district court dismissed appellants' [*22] original complaint with leave to amend and allowed appellants to conduct discovery so they would have the facts they needed to adequately to plead an antitrust violation in their First Amended Complaint.

In its original dismissal order, the district court relied upon the pleading standards set forth in *Papasan v. Allain, 478 U.S. at 286* (holding courts are not required to accept as true conclusory allegations of law or legal conclusions couched as factual allegations). This is the very same standard and reasoning that the Supreme Court relied upon in *Bell Atlantic* in articulating the pleading standards for antitrust complaints. Accordingly, appellants had already been put on notice once before of the same defects that led to the dismissal of their First Amended Complaint.

Appellants were already granted leave to amend once and were given an opportunity to conduct discovery to discover the facts needed to plead their causes of action, yet their First Amended Complaint contained the same defects as their original Complaint. Appellants fail to state what additional facts they would plead if given leave to amend, or what additional discovery they would

2008 U.S. App. LEXIS 5032, *

conduct to discover such facts. Accordingly, [*23] amendment would be futile.

**AFFIRMED.**

7

7  All other pending motions are denied.

# Tab 7

1 of 2 DOCUMENTS



Cited
As of: Apr 02, 2008

**KOREA KUMHO PETROCHEMICAL, Plaintiff, v. FLEXSYS AMERICA LP, Defendant.**

**No. C07-01057 MJJ**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2007 U.S. Dist. LEXIS 61373; 2007-2 Trade Cas. (CCH) P75,885*

**August 4, 2007, Decided**
**August 13, 2007, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant moved to dismiss a revised first amended complaint alleging (1) conspiracy to restrain trade under § 1 of the Sherman Act (SA), (2) conspiracy to monopolize under § 2 of the SA, (3) attempted monopolization under § 2, (4) violation of the Cartwright Act, *Cal. Bus. & Prof. Code § 16720 et seq.*, (5) unfair business practices, *Cal. Bus. & Prof. Code § 17200*, and *(6)* intentional interference with prospective economic advantage.

**OVERVIEW:** Plaintiff was a corporation organized and existing under the laws of the Republic of Korea, with its principal place of business in Seoul. Plaintiff manufactured and sold chemicals, including a rubber chemical that plaintiff made at a South Korea plant. Plaintiff alleged that defendants conspired together to restrain trade, foreclose markets, allocate customers, reduce supply, and monopolize trade in the United States (US) market for the rubber chemical. The court concluded that plaintiff's SA claims did not satisfy the antitrust injury requirement. When analyzing whether plaintiff adequately alleged antitrust injury, the court had to read the complaint from the perspective that plaintiff could only assert claims on behalf of itself, not on behalf of a joint venture. The allegations of anti-competitive behavior specifically directed at plaintiff were conclusory in nature. None of these allegations spoke to the existence or nature of any antitrust injury actually suffered by plaintiff (e.g., decreased sales, profits, or market share resulting from conduct that vio-

lated the SA). Plaintiff's failure to plead a cognizable antitrust injury required dismissal of the state law claims.

**OUTCOME:** The court granted defendant's motion to dismiss and dismissed with leave to amend plaintiff's revised first amended complaint in its entirety.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN1] *Fed. R. Civ. P. 12(b)(1)* authorizes a party to move to dismiss a claim for lack of subject matter jurisdiction. Federal courts are courts of limited jurisdiction; thus, a court presumes lack of jurisdiction, and the party seeking to invoke the court's jurisdiction bears the burden of proving that subject matter jurisdiction exists.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN2] A party challenging a court's jurisdiction under *Fed. R. Civ. P. 12(b)(1)* may do so by raising either a facial attack or a factual attack. A facial attack is one where the challenger asserts that the allegations contained in a complaint are insufficient on their face to in-

2007 U.S. Dist. LEXIS 61373, *; 2007-2 Trade Cas. (CCH) P75,885

voke federal jurisdiction. In evaluating a facial attack to jurisdiction, the court must accept the factual allegations in plaintiff's complaint as true. For a factual attack, in contrast, the court may consider extrinsic evidence. Further, the court does not have to assume the truthfulness of the allegations, and may resolve any factual disputes. Thus, once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or evidence properly before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Federal Questions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN3] In the Ninth Circuit, jurisdictional dismissals in cases premised on federal-question jurisdiction are exceptional, and must satisfy the Bell requirements. The Bell standard provides that jurisdictional dismissals are warranted where the alleged claim under the Constitution or federal statute clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such a claim is wholly insubstantial and frivolous.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN4] A jurisdictional finding of genuinely disputed facts is inappropriate when the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action. The jurisdictional issue and the substantive issues are intertwined where a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN5] A motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)* tests the legal sufficiency of a claim.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN6] Because the focus of a *Fed. R. Civ. P. 12(b)(6)* motion is on the legal sufficiency, rather than the sub-

stantive merits of a claim, a court ordinarily limits its review to the face of the complaint.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN7] In considering a *Fed. R. Civ. P. 12(b)(6)* motion, a court accepts a plaintiff's material allegations in the complaint as true and construes them in the light most favorable to the plaintiff. Generally, dismissal is proper only when the plaintiff has failed to assert a cognizable legal theory or failed to allege sufficient facts under a cognizable legal theory. In pleading sufficient facts, however, a plaintiff must suggest his or her right to relief is more than merely conceivable, but plausible on its face.

*Antitrust & Trade Law > General Overview*
*Civil Procedure > Justiciability > Standing > General Overview*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN8] In antitrust actions brought in the Ninth Circuit, the facts demonstrating standing must be clearly alleged in the complaint.

*Antitrust & Trade Law > Sherman Act > Claims*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN9] In order to recover under the Sherman Act, a plaintiff is required to establish causal antitrust injury. To assert antitrust injury, a plaintiff must show an injury to themselves resulting from the illegal conduct.

*Antitrust & Trade Law > Sherman Act > Claims*
[HN10] To establish antitrust injury, it is not sufficient to allege that conspirators merely "targeted" a plaintiff or otherwise intended to harm or schemed against it.

*Antitrust & Trade Law > International Application of U.S. Law > Foreign Trade Antitrust Improvements Act*
*International Law > Authority to Regulate > Anticompetitive Activities*
[HN11] Although the FTAIA excludes import trade and import commerce from its limitations on subject matter jurisdiction, the trade and commerce that is scrutinized for purposes of this analysis is the conduct of a defendant. The dispositive inquiry is whether the conduct of defendants, not plaintiffs, involves "import trade and commerce."

2007 U.S. Dist. LEXIS 61373, *; 2007-2 Trade Cas. (CCH) P75,885

*Antitrust & Trade Law > Sherman Act > Claims*
*Antitrust & Trade Law > State Civil Action*
[HN12] Cartwright Act, *Cal. Bus. & Prof. Code § 16720 et seq.*, claims raise basically the same issues as do Sherman Act claims. California state courts follow federal cases in deciding claims under the Cartwright Act.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN13] A required element of a claim for tortious interference with prospective economic advantage is proof that wrongful conduct caused injury to a plaintiff.

**COUNSEL:** [*1] For Korea Kumho Petrochemical Co Ltd, Plaintiff: Helen Ha Yan Cho, LEAD ATTORNEY, Jeffrey Andrew Richmond, LEAD ATTORNEY, Bethany Lynn Marvin, Heller Ehrman LLP, Los Angeles, CA; Robert G. Badal, LEAD ATTORNEY, Heller Ehrman White & MacAuliffe LLP, Los Angeles, CA; Robert J. Hanna, LEAD ATTORNEY, Tucker Ellis & West, Cleveland, OH; William H. Forman, LEAD ATTORNEY, Heller Ehrman, Los Angeles, CA.

For Flexsys America LP, Defendant: Amanda M. Leffler, LEAD ATTORNEY, John C. Fairweather, LEAD ATTORNEY, Lisa S. DelGrosso, LEAD ATTORNEY, Brouse McDowell, Akron, OH; Andrew Zachary Edelstein, LEAD ATTORNEY, Daniel Glenn Swanson, LEAD ATTORNEY, Gibson, Dunn & Crutcher LLP, Los Angeles, CA; Carolyn E. Miller, LEAD ATTORNEY, Neil A. Benchell, LEAD ATTORNEY, Katten Muchin Rosenman, Chicago, IL; D. Jarrett Arp, LEAD ATTORNEY, Gibson Dunn & Crutcher, Washington, DC; David C. Minc, LEAD ATTORNEY, Flexsys America, Akron, OH; Eric C Cohen, LEAD ATTORNEY, Katten Muchin Rosenman LLP, Chicago, IL; J. Warren Rissier, LEAD ATTORNEY, Michael Adler, LEAD ATTORNEY, Wyatt Evan Bloomfield, Gibson Dunn & Crutcher, Los Angeles, CA; Adam Joseph Di Vincenzo, Gibson, Dunn & Crutcher, Washington, DC.

For Akzo Nobel [*2] Chemicals International B.V., Defendant: Andrew Zachary Edelstein, LEAD ATTORNEY, Daniel Glenn Swanson, LEAD ATTORNEY, Gibson, Dunn & Crutcher LLP, Los Angeles, CA; D. Jarrett Arp, LEAD ATTORNEY, Gibson Dunn & Crutcher, Washington, DC; Matthew E. Liebson, LEAD ATTORNEY, Thompson Hine LLP, Cleveland, OH; Robert F. Ware, LEAD ATTORNEY, Thompson Hine, Cleveland, OH; Wyatt Evan Bloomfield, Gibson, Dunn & Crutcher, Los Angeles, CA.

For Akzo Nobel Chemicals, Inc., Defendant: Andrew Zachary Edelstein, LEAD ATTORNEY, Gibson, Dunn & Crutcher LLP, Los Angeles, CA; D. Jarrett Arp, LEAD ATTORNEY, Gibson Dunn & Crutcher, Washington, DC; Matthew E. Liebson, LEAD ATTORNEY, Thompson Hine LLP, Cleveland, OH; Robert F. Ware, LEAD ATTORNEY, Thompson Hine, Cleveland, OH; Wyatt Evan Bloomfield, Gibson, Dunn & Crutcher, Los Angeles, CA.

For Flexsys NV, Defendant: Amanda M. Leffler, LEAD ATTORNEY, John C. Fairweather, LEAD ATTORNEY, Lisa S. DelGrosso, LEAD ATTORNEY, Brouse McDowell, Akron, OH; Andrew Zachary Edelstein, LEAD ATTORNEY, Gibson, Dunn & Crutcher LLP, Los Angeles, CA; Carolyn E. Miller, LEAD ATTORNEY, Neil A. Benchell, LEAD ATTORNEY, Katten Muchin Rosenman, Chicago, IL; D. Jarrett Arp, LEAD ATTORNEY, [*3] Gibson Dunn & Crutcher, Washington, DC; David C. Minc, LEAD ATTORNEY, Flexsys America, Akron, OH; Eric C Cohen, LEAD ATTORNEY, Katten Muchin Rosenman LLP, Chicago, IL; Wyatt Evan Bloomfield, Gibson, Dunn & Crutcher, Los Angeles, CA.

**JUDGES:** MARTIN J. JENKINS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MARTIN J. JENKINS

**OPINION**

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

**INTRODUCTION**

Before the Court is Defendants' Motion To Dismiss With Prejudice Plaintiff's Revised First Amended Complaint. (Docket No. 3.)

For the following reasons, the Court **GRANTS** Defendants' Motion and **DISMISSES WITH LEAVE TO AMEND** Plaintiff's Revised First Amended Complaint ("RFAC") in its entirety.

**FACTUAL BACKGROUND**

Plaintiff Korea Kumho Petrochemical Company ("KKPC" or "Plaintiff") is a corporation organized and existing under the laws of the Republic of Korea, with its prinicipal place of business in Seoul. (RFAC P 2.) Plaintiff manufactures and sells chemicals, including 6PPD, a rubber chemical that Plaintiff makes at is Yeosu City, South Korea plant. (RFAC PP 2, 14-15, 17.) In this litigation, Plaintiff alleges that Defendants Flexsys America L.P., Flexsys N.V., Akzo Nobel Chemical Int'l B.V., and

Case 1:07-cv-00556-JJF-LPS    Document 55-8    Filed 04/02/2008    Page 5 of 8

Page 4

2007 U.S. Dist. LEXIS 61373, *; 2007-2 Trade Cas. (CCH) P75,885

Akzo Nobel Chemicals, Inc. (collectively "Defendants") [*4] conspired together to restrain trade, foreclose markets, allocate customers, reduce supply, and monopolize trade in the United States market for 6PPD.

Plaintiff originally filed its Complaint in this action on April 26, 2006 in the Central District of California. On July 12, 2006, the Central District of California transferred the case to the Northern District of Ohio. Plaintiff filed a First Amended Complaint on August 8, 2006, and a Revised First Amended Complaint (the current operative pleading) on October 16, 2006. On February 16, 2007, the Judicial Panel on Multidistrict Litigation ("JPML") transferred the litigation to this Court as part of ongoing MDL proceedings.

Defendants now bring a motion to dismiss each of the six causes of action in the RFAC: (1) conspiracy to restrain trade under *Section 1 of the Sherman Act*; (2) conspiracy to monopolize under Section 2 of the Sherman Act, (3) attempted monopolization under *Section 2 of the Sherman Act*, (4) violation of the Cartwright Act (*Cal. Bus. & Prof. Code §§ 16720 et seq.*), (5) unfair business practices (*Cal. Bus. & Prof. Code § 17200*), and (6) intentional interference with prospective economic advantage. Defendants raise facial [*5] attacks on subject matter jurisdiction under *Rule 12(b)(1)*, and also challenge the legal sufficiency of Plaintiff's claims under *Rule 12(b)(6)*.

**LEGAL STANDARD**

**A. Rule 12(b)(1)**

*Rule 12(b)(1)* [HN1] authorizes a party to move to dismiss a claim for lack of subject matter jurisdiction. Federal courts are courts of limited jurisdiction; thus, the Court presumes lack of jurisdiction, and the party seeking to invoke the court's jurisdiction bears the burden of proving that subject matter jurisdiction exists. *See Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994).* [HN2] A party challenging the court's jurisdiction under *Rule 12(b)(1)* may do so by raising either a facial attack or a factual attack. *See White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000).*

A facial attack is one where "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004).* In evaluating a facial attack to jurisdiction, the Court must accept the factual allegations in plaintiff's complaint as true. *See Miranda v. Reno, 238 F.3d 1156, 1157 n. 1 (9th Cir. 2001).* For a factual attack, in contrast, [*6] the Court may consider extrinsic evidence. *See Roberts v. Corrothers, 812 F.2d 1173, 1177 (9th*

*Cir.1987).* Further, the court does not have to assume the truthfulness of the allegations, and may resolve any factual disputes. *See White, 227 F.3d at 1242.* Thus, "[o]nce the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or evidence properly before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch., 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).*

[HN3] In the Ninth Circuit, "[j]urisdictional dismissals in cases premised on federal-question jurisdiction are exceptional, and must satisfy the requirements specific in *Bell v. Hood, 327 U.S. 678, 66 S. Ct. 773, 90 L. Ed. 939* [] (1946)." *Sun Valley Gas., Inc. v. Ernst Enters., 711 F.2d 138, 140 (9th Cir. 1983); see Safe Air for Everyone, 373 F.3d at 1039.* The *Bell* standard provides that jurisdictional dismissals are warranted "where the alleged claim under the [C]onstitution or federal statute clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where [*7] such a claim is wholly insubstantial and frivolous." *327 U.S. at 682-83.* Additionally, the Ninth Circuit has admonished that [HN4] a "[j]urisdictional finding of genuinely disputed facts is inappropriate when 'the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits' of an action." *Sun Valley, 711 F.2d at 139.* The jurisdictional issue and the substantive issues are intertwined where "a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." *Safe Air for Everyone, 373 F.3d at 1039 (quoting Sun Valley, 711 F.2d at 139).*

**B. Rule 12(b)(6)**

[HN5] A motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)* tests the legal sufficiency of a claim. *Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).* [HN6] Because the focus of a *Rule 12(b)(6)* motion is on the legal sufficiency, rather than the substantive merits of a claim, the Court ordinarily limits its review to the face of the complaint. *See Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002).* [HN7] In considering a *Rule 12(b)(6)* motion, [*8] the Court accepts the plaintiff's material allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Shwarz v. United States, 234 F.3d 428, 435 (9th Cir. 2000).* Generally, dismissal is proper only when the plaintiff has failed to assert a cognizable legal theory or failed to allege sufficient facts under a cognizable legal theory. *See Smile-Care Dental Group v. Delta Dental Plan of Cal., Inc., 88 F.3d 780, 782 (9th Cir. 1996); Balistreri v. Pacifica Po-*

2007 U.S. Dist. LEXIS 61373, *; 2007-2 Trade Cas. (CCH) P75,885

*lice Dep't, 901 F.2d 696, 699 (9th Cir. 1988); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir. 1984).* In pleading sufficient facts, however, a plaintiff must suggest his or her right to relief is more than merely conceivable, but plausible on its face. *See Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007).*

## ANALYSIS

### A. Plaintiff's Sherman Act Claims Do Not Satisfy The Antitrust Injury Requirement.

The Court first examines whether Plaintiff's Sherman Act claims satisfy the antitrust injury requirement. After a careful review of Plaintiff's allegations, the Court concludes that Plaintiff has not adequately alleged that it suffered antitrust injury. [1]

> 1   Contrary to Plaintiff's [*9] contention, it is appropriate to vet a plaintiff's ability to establish antitrust injury at the pleading stage, given that a plaintiff's ability to establish antitrust injury depends less on the plaintiffs' proof than on its underlying theory of injury, and antitrust injury is necessary, but not sufficient, for antitrust standing. *Cf., e.g., George Haug Co. v. Rolls Royce Motor Cars, 148 F.3d 136, 139-40 (2d Cir. 1998)* (affirming dismissal of antitrust complaint for failure to adequately plead antitrust injury); *Schuylkill Energy Resources v. Pennsylvania Power & Light Co., 113 F.3d 405, 413-14 (3d Cir. 1997)* (same); *G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 766-67 (2d Cir. 1995)* (same). [HN8] In antitrust actions brought in this circuit, "the facts demonstrating standing must be clearly alleged in the complaint." *Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).*

[HN9] In order to recover under the Sherman Act, a plaintiff is required to establish causal antitrust injury. To assert antitrust injury, a plaintiff "must show an injury to them[selves] resulting from the illegal conduct." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); see also American Ad Mgmt, Inc. v. General Tel. Co. of Cal., 190 F.3d 1051, 1056 (9th Cir. 1999)* [*10] (plaintiff must "allege some credible injury caused by the unlawful conduct"); *Eichman v. Fotomat Corp., 880 F.2d 149, 163 (9th Cir. 1989)* (plaintiff must establish "injury to himself as a result of the alleged anti-trust violation").

### 1. Plaintiff Does Not Allege Facts Permitting It To Assert Antitrust Claims On Behalf Of The KMI Joint Venture.

As an initial matter, Defendants contend that Plaintiff has not alleged facts that would permit it to assert antitrust claims on behalf of the Kumho-Monsanto, Inc. ("KMI") joint venture. Plaintiff did not respond to this point in its opposition papers, but conceded at oral argument that it is not asserting claims on KMI's behalf. Accordingly, when analyzing whether Plaintiff has adequately alleged antitrust injury, this Court must read the RFAC from the perspective that Plaintiff can only assert claims on behalf of itself, not on behalf of the KMI joint venture. [2]

> 2   The RFAC identifies KMI as a "50-50 owned joint venture in South Korea" originally formed by Plaintiff and Monsanto. (RFAC P 19.) Plaintiff does not have a legal right to bring antitrust claims on KMI's behalf only by virtue of being a shareholder. *See Solinger v. A & M Records, Inc., 718 F.2d 298, 299 (9th Cir. 1983);* [*11] *Florida Seed Co., Inc. v. Monsanto Co., 105 F.3d 1372, 1376 (11th Cir. 1997).* The only other allegation in the RFAC regarding Plaintiff's legal relationship to KMI is a parenthetical comment that Plaintiff is a "successor to KMI." (RFAC P 19.) But a general allegation that Plaintiff is a "successor" to KMI, without more, does not establish that Plaintiff may assert antitrust claims that once belonged to KMI. An express assignment, which Plaintiff has not alleged, is required for the transfer of U.S. antitrust claims. *See Sullivan v. National Football League, 34 F3d. 1091, 1106 (1st Cir. 1994); Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 437-440 (3d. Cir. 1993); Arden Architectural Specialities, Inc. v. Washington Mills Electro Minerals Corp., 1998 U.S. Dist. LEXIS 23084 (W.D.N.Y. July 7, 1998). .]").*

### 2. Plaintiff Does Not Allege Facts That, If True, Would Establish That It Suffered Antitrust Injury.

Read through that lens, Plaintiff's allegations are insufficient to establish that it (i.e., KKPC) suffered antitrust injury. The allegations of anti-competitive behavior specifically directed at KKPC, primarily found at paragraph 18 of the RFAC, are conclusory [*12] in nature. In paragraph 18, Plaintiff contends that Defendants:

> . "conspir[ed] to foreclose KKPC from the 6PPD market";
>
> . "sought to impede KKPC's ability to compete in the market for 6PPD";
>
> . "targeted KKPC for adverse and predatory treatment",

2007 U.S. Dist. LEXIS 61373, *; 2007-2 Trade Cas. (CCH) P75,885

. "agreed to refuse to deal with KKPC"

. "sought to impede KKPC's entry into the U.S. 6PPD market", and

. "sought... to constrain [Plaintiff's] growth by a variety of methods, including exerting control over the essential resource of 4-ADPA [and] intimidating KKPC from entering into the United States 6PPD market."

(RFAC P 18.) Similar conclusory allegations, with no additional supporting factual allegations, are repeated at paragraphs 27, 33, 44, 51, 58 of the RFAC. [3]

> 3    It is not sufficient to allege, in conclusory fashion, the ultimate legal conclusion that Plaintiff "has suffered and will continue to suffer antitrust injury" (RFAC PP 46, 53, 63) without accompanying factual allegations that make clear the antitrust injury theory that Plaintiffs seek to advance. *See, e.g., Carell v. The Shubert Org., Inc., 104 F. Supp. 2d 236, 266 (S.D.N.Y. 2000); Volmar Distrib., Inc. v. The New York Post Co., Inc., 825 F. Supp. 1153, 1160 (S.D.N.Y. 1993).*

None of these [*13] allegations speak to the existence or nature of any antitrust injury actually suffered by Plaintiff. The allegations identify the purpose and goals of the alleged conspiracy, and indicate that Plaintiff was a target of the conspiracy. Absent, however, is any adequate allegation of facts that would establish that Plaintiff suffered some sort of cognizable injury (e.g., decreased sales, profits or market share resulting from conduct that violates the Sherman Act). [HN10] To establish antitrust injury, it is not sufficient to allege that the conspirators merely "targeted" Plaintiff or otherwise intended to harm or schemed against it. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 225, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993); Smilecare Dental Group v. Delta Dental Plan of Cal., Inc., 88 F.3d 780, 783 (9th Cir. 1996).*

The only detailed factual allegations in the RFAC regarding the conspiracy's anticompetitive conduct describe activity directed not at Plaintiff, but at the KMI joint venture. (RFAC PP 33-36.) These detailed allegations do not identify how KKPC itself suffered any antitrust injury from the conspirator's actions directed at the KMI joint venture. The allegations do not even specify a cognizable [*14] antitrust injury suffered by the KMI joint venture. To the contrary, the RFAC indicates that the various threats and demands directed at KMI were ineffectual such that KMI "turned to alternative supplies

of 4-ADPA" and "continued to competitively produce 6PPD using this alternative source of supply." (RFAC P 36.) [4]

> 4    At oral argument, Plaintiff cited *United Phosphorus, Ltd. v. Angus Chemical Co., 1994 U.S. Dist. LEXIS 14786, 1994 WL 577246 (N.D.Ill. Oct. 18, 1994)* in support of its contention that its generalized allegations of antitrust injury are sufficient to survive a motion to dismiss. The Court finds *United Phosphorus* to be distinguishable. In *United Phosphorus,* unlike here, the plaintiff alleged specific lost business and financial losses which constituted antitrust injury. *Id.* at 12.

The only other allegations of injury suffered by KKPC concern patent-related communications directed at Plaintiff's customers, found at paragraphs 37-40 of the RFAC. But these alleged pre-litigation communications are protected conduct under the *Noerr-Pennington* immunity doctrine, and therefore are insufficient to create antitrust liability on their own. *See Sosa v. DirecTV, Inc., 437 F.3d 923, 937 (9th Cir. 2006); Globetrotter Software, Inc. v. Elan Computer Group, Inc., 362 F.3d 1367, 1376 (Fed. Cir. 2004).* [*15] Plaintiff concedes that it is not asserting these litigation-related communications as an independent basis for antitrust liability, and is not asserting that the "sham" exception to *Noerr-Pennington* immunity applies. In fact, Plaintiff intentionally deleted such "sham" allegations originally found in its original complaint. (April 26, 2006 Complaint at PP 47-51, 70, 72.) [5]

> 5    At oral argument, Plaintiff asserted that the patent-related conduct it alleges is analogous to the activity considered outside *Noerr-Pennington* immunity in *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240 (9th Cir. 1982).* The Court finds this argument unconvincing. The *Clipper Exxpress* decision preceded the Supreme Court's decision in *Professional Real Estate Investors, Inc. V. Columbia Pictures Indus., Inc., 508 U.S. 49, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993) ("PREI"),* which requires Plaintiff to meet the "sham" exception to *Noerr-Pennington* immunity to use patent-related communications such as those alleged her as a basis for antitrust injury.

Because Plaintiff has not adequately allege antitrust injury in connection with any of its Sherman Act claims, the Court will dismiss Plaintiff's first, second, and third causes [*16] of action. [6]

> 6    Because Plaintiff has failed to allege antitrust injury, Plaintiff's Sherman Act allegations also

Case 1:07-cv-00556-JJF-LPS    Document 55-8    Filed 04/02/2008    Page 8 of 8

Page 7

2007 U.S. Dist. LEXIS 61373, *; 2007-2 Trade Cas. (CCH) P75,885

fail to satisfy the FTAIA. The Court disagrees with Plaintiff's contention that the FTAIA does not apply to its allegations. [HN11] Although the FTAIA excludes import trade and import commerce from its limitations on subject matter jurisdiction, the trade and commerce that is scrutinized for purposes of this analysis is the conduct *of the defendant.* "The dispositive inquiry is whether the conduct of defendants, not plaintiffs, involves 'import trade and commerce." *Turicentro, S.A. v. Am. Airlines Inc., 303 F.3d 293, 303 (3d Cir. 2002); see also Carpet Group Int'l v. Oriental Rug Imp. Ass'n, 227 F.3d 62, 70 (3d Cir. 2000).* Here, the relevant alleged conduct by the defendants reflects no involvement in import trade or commerce - rather, it simply reflects restrains on foreign trade. Plaintiff's allegations, at best, attempt to establish that Defendants' conduct had some effect *on Plaintiff's* ability to import 6PPD into the United States. This is not enough to categorize defendant's conduct as "involvement" in import trade or commerce to remove it ambit of the FTAIA. *Cf. Carpet Group, 227 F.3d at 72;* [*17] *Turicentro, 303 F.3d at 304.*

**B. Plaintiff's State Law Claims Must Be Dismissed.**

**1. Plaintiff's Cartwright Act Claim Must Be Dismissed.**

Plaintiff's failure to plead a cognizable antitrust injury requires dismissal of the fourth cause of action under California's Cartwright Act as well. *See McGlinchy v. Shell Chem Co., 845 F.2d 802, 811 n.4 (9th Cir. 1988)* ("We have recognized that [HN12] Cartwright Act claims raise basically the same issues as do Sherman Act claims. California state courts follow federal cases in deciding claims under the Cartwright Act.") (citations omitted). Plaintiff advances no argument as to how the Cartwright Act claim can survive in the absence of cognizable antitrust injury.

**2. Plaintiff's *Section 17200* Claim Must Be Dismissed.**

Plaintiff's failure to plead a cognizable antitrust injury also requires dismissal of Plaintiff's *Section 17200* claim as well. Plaintiff has identified no alleged unlaw-

fulness beyond Defendants' alleged antitrust violations. Plaintiff has also not satisfied the "injury in fact" requirement under *Section 17200.*

**3. Plaintiff's Tortious Interference With Prospective Economic Advantage Claim Must Be Dismissed.**

Plaintiff's failure to plead a cognizable [*18] antitrust injury requires dismissal of Plaintiff's tortious interference claim as well. [HN13] A required element of the claim is proof that wrongful conduct caused injury to the plaintiff. *See Della Penna v. Toyota Motor Sales, U.S.A., 11 Cal. 4th 376, 392-93, 45 Cal. Rptr. 2d 436, 902 P.2d 740 (1995).*

**C. Leave To Amend Is Appropriate.**

Although the Court finds that Plaintiff's RFAC does not contain any allegations that adequately state a cognizable federal or state claim, the Court also finds that granting Plaintiff leave to amend is appropriate. Plaintiff represents that it has adduced additional facts from discovery in this matter that it can plead in support of its allegations. Although Plaintiff's allegations are presently too conclusory and general to satisfy antitrust pleading requirements, the Court is unable to conclude that further amendment would be futile. Moreover, because this litigation is still in its early stages, there is no real prejudice to Defendants by permitting Plaintiffs an opportunity to amend their complaint to attempt to state a cognizable claim.

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendant's Motion and **DISMISSES WITH LEAVE TO AMEND** Plaintiff's Revised First Amended Complaint in its [*19] entirety. Plaintiff shall file a Second Amended Complaint, if any, within twenty (20) days of entry of this order.

**IT IS SO ORDERED.**

Dated: 8/4/2007

MARTIN J. JENKINS

UNITED STATES DISTRICT JUDGE

# Tab 8

1 of 1 DOCUMENT

**METRO VIDEO DIST., INC., ET. ALS., Plaintiffs v. VESTRON VIDEO, INC., ET. ALS., Defendants**

**Civil No. 89-0640(PG)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO**

*1990 U.S. Dist. LEXIS 18739; 1990-1 Trade Cas. (CCH) P68,986*

**February 8, 1990, Decided**
**February 8, 1990, Filed**

**JUDGES:** [*1] Juan M. Perez-Gimenez, Chief United States District Judge.

**OPINION BY:** PEREZ-GIMENEZ

**OPINION**

*OPINION AND ORDER*

Plaintiffs Metro Video Dist., Inc., Metro Video Dist. of Puerto Rico, Inc., M. Video Dist. Inc., Metro Video Dist. of Minnesota, Inc., and their majority stockholder and president Arthur Morowitz (collectively, "Metro"), commenced this action in May of 1989 against defendants Vestron Video and Vestron Video, Inc. (collectively, "Vestron"). Metro sued under provisions of the Clayton Act [1] invoking this Court's federal question jurisdiction, [2] with reliance also placed on the authority we derive from the doctrine of pendent jurisdiction. The complaint alleged, in essence, that Vestron's decision to discontinue extending credit to Metro in 1988 violated several federal antitrust laws as well as a number of the laws of Puerto Rico.

> 1   *15 U.S.C. §§ 15, 22*, as amended by the Robinson-Patman Act.
> 2   *28 U.S.C. § 1331*.

Defendants have moved this Court for an order granting partial summary judgment as to the antitrust claims [*2] made in the first, second, third and fourth causes of action of the complaint, pursuant to *Fed. R. Civ. P. 56*, and for a transfer of the remaining counts to the District of Connecticut on the grounds that the transfer would best serve the convenience of the parties, the witnesses, and the interests of justice, pursuant to *28 U.S.C. § 1404*. For reasons we expound below, defendants' motion is granted in all respects.

THE STANDARD FOR SUMMARY JUDGMENT

We will grant summary judgment if the pleadings and other submissions "show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly submitted motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1985)*. We note in passing that our First Circuit has specifically rejected special summary judgment treatment in antitrust cases, holding that the particular circumstances involved are what control. *Texaco v. Medina, 834 F.2d 242, 247 (1st Cir. 1987)*, [*3] *White v. Hearst Corp., 669 F.2d 14, 17 (1st Cir. 1982)*.

Viewing the record, as we must, in the light most favorable to the non-moving party, and indulging all inferences favorable to that party, *Oliver v. Digital Equipment Corp., 846 F.2d 103, 105 (1st Cir 1988)*, we turn to the facts.

FACTS COMMON TO ALL CAUSES OF ACTION

Defendant Vestron is engaged in the business of the manufacture and distribution of motion picture video cassettes and is "engaged in commerce" within the meaning of the antitrust laws of the United States. Plaintiff Metro is a wholesale distributor of video cassettes in the continental United States and Puerto Rico. Vestron distributed its products nationwide through a network of approximately 23 independent wholesale distributors. Metro had been one of those distributors since 1982.

Two seemingly insignificant facts must be noted at the outset, for they acquired unexpected relevance as the

1990 U.S. Dist. LEXIS 18739, *; 1990-1 Trade Cas. (CCH) P68,986

plot developed. The first, to be mentioned only briefly, pertains to Vestron's particular system of sale incentives. Prior to January 1988, Vestron offered its distributors a series of advertising credits, allowances, incentives, and [*4] rebates for unsold and returned merchandise upon the submission of claims. Starting in 1988, however, Vestron implemented the so called "Advantage Program," which provided for a full scale revision of all sale credits and incentives available along its distribution chain, along with a new system of sales quotas and directives and an array of penalties for the dealer's failure to comply with them.

Secondly, we must mention that Mr. Morowitz had played an instrumental role in the organization and furtherance of the National Video Software Manufacturers Credit Association ("NVSMCA"). The NVSMCA's purpose was to protect dealers from abusive practices and unfair methods of competition and to provide a means of exchange of historical credit information. See Exh. D to the McGovern Aff., Art II, Part 1, Bylaws of the NVSCMA. From 1986 to 1988 Mr. Morowitz was President of the NVSCMA and had also been a member of its Board of Directors since its inception in 1981. The association sought to facilitate the exchange of video dealers' historical credit information, and its bylaws explicitly prohibited its members from agreeing to take any action with respect to a customer or from exchanging [*5] any confidential information about a customer. See Exh. D to McGovern Aff., Art III, Part 1.

To no one's surprise, resolution of Vestron's motion hinges on facts pertaining to the economic relationship that existed between the parties which we now proceed to describe briefly. Defendants contend, and plaintiffs do not dispute, that Metro has had a history of past-due payments to Vestron. To illustrate, Vestron points to the fact that in March of 1988 about $ 1.2 million of Metro's outstanding balance of approximately $ 3 million was more than thirty days overdue. See Par. 7 of the Aff. of Michael McGovern. Vestron's National Credit Manager, Jeff Hamilton, visited Metro's office and discussed the situation with Metro's president and co-plaintiff Arthur Morowitz. Upon review of some financial records, Mr. Hamilton concluded that Metro might be having severe financial difficulties. See McGovern Aff. Pp. 4-8. To further evaluate Metro's financial situation, Vestron's Vice President of Credit Operations, Michael McGovern, met with Arthur Morowitz in June of 1988. He requested that Metro provide him with audited financial statements for the past several years. Mr. Morowitz gave [*6] Mr. McGovern Metro's audited financial statements for the years ending on June 30, 1986, and June 30, 1987, and unaudited financials for the nine-month period ending on April 2, 1988. The June 30, 1987, audited financial statement reported a net loss of $ 3,676,339.00 and dis-

closed that Metro's liabilities exceeded its assets at the time by $ 4,641,673.00. The unaudited financial statements for the nine-month period ending April 2, 1988, showed Metro's liabilities continued to exceed its assets by more than $ 3,300,000.00. As defendants viewed things, those statements revealed that Metro posed a serious credit risk to Vestron. See McGovern Aff. Pp. 9-11.

3    As further evidence of Metro's insolvency, Vestron points to an involuntary bankruptcy petition filed in the United States Bankruptcy Court for the District of New Jersey on August 25, 1989, against co-plaintiff Metro Video Distributors, Inc. by three of plaintiffs' creditors. See In re Metro Video Distributors, Inc., Case No. 89-06734 (Bankr. D.N.J. Aug. 25, 1989).

[*7]    While not contesting the truthfulness of the above stated facts, Metro concentrates its fire on a different front. First, plaintiffs submit that Vestron had knowledge of Metro's uncertain financial situation since as early as August of 1987, more or less the time around which the two of them began doing business with each other. See Par. 18 of the Aff. of Arthur Morowitz. Secondly, it is contended that Vestron had repeatedly assured Metro that, notwithstanding Metro's financial problems, it would continue to sell to Metro on standard credit terms if Metro paid off its past due balance and remained current, a condition which, working in conjunction with Vestron, [4] Metro was able to comply with at no less than two periods in time: by year end of 1987 and by August of 1988 (the month on which Metro's credit was terminated by Vestron). See Morowitz Aff. Pp. 19-22. [5] Moreover, in the midst of its precarious financial situation, Metro points to an "upward trend" which is presumably evidenced by its financial statements. To illustrate, Metro submits that its deficiency in assets was reduced from $ 3,020,257.00 in 1987 to $ 1,887,310.00 in nine months of operations in 1988. Additionally, [*8]    from a loss of operations of $ 3,676,339.00 in 1987, it alleges that it was able to develop a positive net income from operations of $ 1,132,947.00 in that nine month period, with an increase in working capital of $ 1,243,378.00.

4    Mr. Morowitz's affidavit concedes, however, that from time to time Vestron required and obtained from Metro various forms of security in order to continue dealing with them on standard credit terms. See Par 19 of Morowitz Aff. and Par. 4 of McGovern Aff..

5    Mr. McGovern's affidavit concedes this fact, at least as it pertains to Metro's account's current status as of December 1987. See Par. 6 of McGovern Aff..

1990 U.S. Dist. LEXIS 18739, *; 1990-1 Trade Cas. (CCH) P68,986

In August of 1988 Vestron announced that it would refuse to extend any further credit to Metro but would continue to deal with it on a cash basis only. The cash-basis-only treatment required Metro to pay cash in advance for all future orders. As explained more fully below, this action by Vestron allegedly placed Metro at a disadvantage with respect to its competitors [*9] in the business of video cassette distribution specially in the wake of the newly implemented Advantage Program. More important to the business at hand, it prompted the legal action which occupies our attention today.

There being no genuine issue as to any of the above presented material facts, we examine the law.

DISCUSSION

A

In the broad panoply of federal antitrust laws, the Clayton Act as amended by the Robinson-Patman Act, protects competitors who engaged themselves in interstate commerce. See *15 U.S.C. § 13(a)*. [6] In this spirit, it forbids sellers to "discriminate in price between different purchasers of commodities," where such discrimination tends to substantially "lessen competition or . . . to injure, destroy or prevent competition with any person" who receives the benefits of such discrimination. See Section 2(a) of the Robinson-Patman Act and *Monahan's Marine, Inc. v. Boston Whaler, Inc., 866 F.2d 525, 528 (1st Cir. 1989)*.

> 6 To place the Clayton Act's role in perspective, we note that other legislation, notably the Sherman Antitrust Act *15 U.S.C. § 1*, is intended to protect competition, not competitors. See *Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962), Monahan's Marine, Inc. v. Boston Whaler, Inc., 866 F.2d 525, 528 (1st Cir. 1989)*.

[*10] Plaintiffs attempt to bring their cause within the narrow confines of Section 2(a). [7] For this they allege that Vestron's sales to Metro from August of 1988 to December of that same year on a cash basis only, while sales to Metro's competitors during the same period of time were made on standard credit terms, constituted price discriminations which had the effect of substantially lessening competition or of injuring, destroying, or preventing competition, all in violation of the Robinson-Patman Act. The adverse effect of Vestron's decision to terminate Metro's credit was multiplied by the "Advantage Program" that had been recently implemented. This was so, the thesis runs, in view of the fact that since Metro had to fund all its purchases by paying cash in advance, it was limited in the amount of product it could purchase for resale. As a result thereof, Metro found it difficult to meet quotas imposed by Vestron pursuant to

its "Advantage Program," which in turn caused it to lose rebates and other concessions. In addition, Vestron's treatment of Metro's account as one not in good standing caused Metro to lose advertising credits and returns, allowances, incentives, and rebates, all [*11] of which placed Metro at a competitive disadvantage in its business. Vestron, in response, argues that its decision to discontinue extending credit to Vestron was based on legitimate business reasons, as case law requires.

> 7 Section 2(a) of the Robinson-Patman Act, *15 U.S.C. § 13(a)*.

In evaluating Metro's position we must be mindful that credit decisions, by their very nature, will have discriminatory effects, since they require sellers to distinguish between dealers who are good credit risks and those who are not. This being so, and taking into account the fact that the legislative purpose behind Section 2(a) has been described as an effort to insure that purchasers from a single seller would not be injured by the seller's discriminatory pricing policies, *Pierce v. Commercial Warehouse, 876 F.2d 86 (11th Cir. 1989)*, we must consequently conclude that under § 2(a) the most that can be asked from a manufacturer is that he apply the same standard of credit worthiness to all distributors who compete [*12] for his products. In order to prove this, courts have consistently ruled that a showing that a legitimate business justification underlies a particular credit decision entitles a seller to a presumption of regularity in his dealings with all of his distributors.

In *Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 796 (4th Cir. 1989)*, the Fourth Circuit outlined the proper approach to be followed when considering discrimination claims in decisions involving the extension of credit. After observing that no court had found sufficient facts for Robinson-Patman liability based on a single credit extension decision perhaps due to the fact that credit extension decisions are quite customer specific and that many other different factors guide credit determinations, *Thomas J. Kline, 878 F.2d at 797*, the Circuit Court relied on the words of the district court in *Carlo C. Gerardi Corp. v. Miller Brewing Co., 502 F.Supp. 637, 647 (D.N.J. 1980)*:

In other words, a manufacturer is free to extend different terms to competing purchasers so long as it makes its decisions in a non-discriminatory manner, i.e. the same standards of credit worthiness [*13] must be extended to all applicants for credit who are in competition with each other. A showing such as the one made by [plaintiff] can, therefore, be rebutted by an affirmative showing that the different terms resulted from legitimate business factors.

Along with the majority of the other circuits which have considered the issue, [8] then, the Fourth Circuit did not hesitate to hold that when legitimate business reasons for the extension or denial of credit are advanced, a Clayton Act, Section 2(a) cause of action is effectively barred. Cf. also *Mozart v. Mercedes-Benz of North America, Inc., 833 F.2d 1342, 1348-1351 (9th Cir. 1987)*.

> 8    The Sixth Circuit, confronted with an analogous claim of price discrimination in a seller's decision not to permit one of its distributors to participate in credit programs made available to the majority of its dealers, ruled in no unclear terms that "*Section [13(a)]* is not violated when credit decisions are based upon legitimate business reasons," *Bouldis v. Suzuki Motor Corp., 711 F.2d 1319, 1325 (6th Cir. 1983)*. The Tenth Circuit, when faced with a parallel scenario, went a step beyond in holding that decisions involving the extension of credit "could not, as a matter of law, be the basis for a claim under *15 U.S.C. § 13(a)*." *Craig v. Sun Oil Company of Pennsylvania, 515 F.2d 221, 224 (10th Cir. 1975)*. Its holding was based on the fact that too many factors, prominent among which were the borrower's financial strength and business experience, go into the determination of the terms of credit, securities and guarantees required, and other devices typically considered by creditors in extending or denying credit. *515 F.2d at 224*.

[*14]  In the instant case, legitimate business reasons for Vestron's denial of credit to Metro abound. As noted above, Metro had a history of late payments. We need not recount here the financial hardships encountered by Metro during the years 1987 and 1988, as nothing is to be gained from such an ordeal. It suffices to say that Vestron's characterization of Metro as a substantial "credit risk" is, in our view of things, a fair statement of the point, to say the least. Even Metro's allegations in its own defense depict a corporation in a constant struggle to get out of the red. The fact that Vestron had been lenient, cooperative, and supportive in its prior dealings with Metro can in no way now serve to hold it liable once such treatment is no longer offered. Other courts, notably the Fourth and Sixth Circuits in their Thomas J. Kline and Bouldis decisions, have found histories of late payments and credit problems, as well as instances of negative net worth to constitute sufficient justification to bar a claim under Section 2(a). We therefore hold, without serious pause, that no cause of action is stated in the case at bar under Section 2(a) of the Robinson-Patman Act. Under [*15]  the circumstances of this case, Vestron's management could have opted not to continue dealing with Metro under their established credit terms, but it

certainly cannot be disputed that a decision to stop extending credit clearly had a legitimate foundation.

The arguments advanced by Metro in support of its position do not warrant a contrary result. Metro first contends that the fact that no court to date has found a seller's decision not to extend credit to its customers to violate Section 2(a) does not mean that a discrimination in credit may never result in a Section 2(a) (price discrimination) violation. To defend their contention plaintiffs argue that credit terms are in fact an integral part of the price, finding support for their contention in some language quoted by the Supreme Court in *Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 645 (1980)* (wherein we are advised that the extension or denial of credit is an indirect method of lowering or raising prices). Additionally, plaintiffs point to the opinions in *Robbins Flooring, Inc. v. Federal Floors, Inc., 445 F.Supp. 4* (E.D. Pa., 1977) and *Craig v. Sun Oil Company, supra,* [*16] wherein the possibility was recognized that "in an extreme situation there might be a violation of the (Robinson-Patman) Act by reason of the magnitude or nature of the discrimination in the extension of credit." *515 F.2d at 224*.

However cleverly it might have been presented, the argument simply will not wash. The statement in Catalano, which we of course do not contend, was nevertheless advanced in the context of the price-fixing prohibition of the Sherman Antitrust Act and is therefore extraneous to the analysis that applies to Robinson-Patman violations. We explain briefly. *Section 1* of the Sherman Act has been interpreted to make horizontal agreements (or conspiracies) to fix prices unlawful per se. See *Catalano, 446 U.S. at 647*. The Court in Catalano was concerned with the Court of Appeals decision holding that a horizontal agreement to fix or eliminate short-term trade credit does not necessarily contravene the antitrust laws. It was in reversing this holding of the Circuit Court that the Supreme Court characterized credit terms as an integral part of a price. Clearly, an agreement to fix or eliminate credit terms across the board [*17] has to be regarded as a conspiracy to fix prices, thus falling squarely within the traditional antitrust rule of per se illegality of price fixing embodied in the Sherman Act. It does not follow from this, however, that on a one on one relationship between a seller and a dealer a decision to deny credit must be considered as an instance of price discrimination. As noted above, the proper analysis in this context, taking into account the great number of factors that go into credit determinations, is to require sellers to prove the existence of legitimate business reasons underlying the differential treatment in credit. Once this feat is accomplished, our inquiry into the facts, in the absence of extreme circumstances, must stop.

As for the Tenth Circuit's holding in Craig, and to the extent that it left open the possibility of the existence of a discrimination in credit of such a magnitude as to constitute a Section 2(a) violation, we observe that it is a position that we do not quarrel with. This fact notwithstanding, however, we are of the opinion that no factual scenario even remotely resembling such an extreme discriminatory conduct is present here. We have already discussed [*18] how Vestron's decision found ample justification in the record from the business point of view. Accordingly, we discard this contention without further discourse.

In essaying their final defense of their Section 2(a) claim, plaintiffs first lay out two facts upon which they hope to build an argument. First, they submit that in order to make out a price discrimination case they must establish the existence of competitors who were favored with credit while Metro was not. Then, they explain that they have no access to evidence that would prove this since all of this evidence is in the hands of Vestron. Hence, the argument goes, summary judgment would be improper at this nascent stage of the proceedings without affording Metro the benefit of the discovery that would reveal facts basic to their causes of action. Were we to accept this contention, however, we would in fact be opening the door for future plaintiffs to file totally unsupported claims and expect to uncover the basis for their complaint during the course of discovery. As noted above, the case law provides a mechanism that plaintiffs had available to establish their Section 2(a) claim which took into account the difficulty Metro [*19] believes it is confronted with: if they could have demonstrated an absence of legitimate business reasons in Vestron's decision to stop extending credit to them, then they would have been entitled to summary judgment in their favor without further inquiry into the relationship between Vestron and the rest of its distributors. Clearly, Metro has access to all evidence pertinent to its relationship with Vestron. Defendants' affirmative showing relative to the existence of a business justification for their denial of credit to Metro entitles them to a presumption of regularity in their dealings with the rest of their distributors and to summary judgment, as to the Section 2(a) claim, on their behalf.

B

Plaintiffs' second cause of action is contained in its entirety in paragraph 24 of their complaint. We quote it verbatim for two reasons: one, because of its brevity and, two, because we can find no better way of showing that, contrary to Metro's assertion, its second cause of action really alleges nothing more than the first.

Paragraph 24 of plaintiffs' complaint reads as follows:

By failing to extend credit to Metro, rebates and other concessions, which would otherwise be available [*20] to Metro, were denied to it but not to Metro's competitors. Due to Vestron's actions in making such concessions and rebates functionally unavailable to Metro, the price which Metro effectively paid to Vestron for these same commodities was higher than the price paid by Metro's competitors, thus placing Metro at a competitive disadvantage.

The next paragraph alleges, as in cause of action number 1, that such a conduct violates Section 2(a) of the Robinson-Patman Act. Plaintiffs' effort, in its motion in opposition to summary judgment, to differentiate one cause of action from the other appears to us to incur in the critical error of attempting to elicit liability from both the cause as well as the effects. That is to say, Metro asserts that Vestron's denial of credit to Metro gives rise to a cause of action under Section 2(a) and that the effects of such a denial also give rise to an independent right of action under the same section of the law. With this, of course, we cannot agree. Both causes of action being one and the same, with respect to cause of action number two defendants are also entitled to judgment as a matter of law.

C

In its third cause of action Metro alleges violations [*21] to Sections 2(d) and 2(e) of the Clayton Act, as amended by the Robinson-Patman Act.

Section 2(d) makes it unlawful for a seller engaged in interstate commerce to grant advertising or other sales or promotional allowances to one "customer" who resells the seller's "products or commodities" unless the allowances are "available on proportionally equal terms to all other customers competing in the distribution of such products or commodities." *F.T.C. v. Fred Meyer, Inc., 390 U.S. 341, 343 (1967).* Section 2(e) prohibits a seller from discriminating "in favor of one purchaser . . . of a commodity bought for resale . . . by . . . furnishing . . . any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms." *F.T.C. v. Simplicity Pattern Co., 360 U.S. 55, 65 (1958).*

Metro alleges that Vestron's treatment of "Metro's account as one not in good standing" constitutes a violation of these sections of the law since, in so doing, "Vestron made certain advertising credits, incentives, and rebates functionally unavailable [*22] to Metro, while at the same time making those credits available to Metro's competitors." [9] Vestron, in turn, contends that, in the final analysis, Metro's allegation amounts to a claim that as a result of Vestron's credit decision Metro was unable to make sufficient purchases to qualify for the

1990 U.S. Dist. LEXIS 18739, *; 1990-1 Trade Cas. (CCH) P68,986

benefits in controversy. This being so, defendants urge us to dismiss said cause of action on the ground that Sections 2(d) and (e) do not apply to discriminatory practices in the extension of credit but to those occurring in connection with the resale of the product. In their opposition, plaintiffs iterate and reiterate that their claim is "not based on Vestron's failure to extend credit but rather, . . . on Vestron's failure to make [sales incentives] functionally available to Metro by treating Metro's account as 'one not in good standing.'" [10] With slight modifications, it is with defendants' reasoning that we agree.

    9  See Par. 27 of Metro's Complaint.
   10  See page 23 of Metro's Opposition.

Try as they may, plaintiffs [*23] cannot seriously dispute the fact that Vestron's treatment of Metro's account as one "not in good standing" and its decision to deny credit to them are so closely interrelated as to constitute one and the same action. In fact, the "not in good standing" treatment was the only direct result of Vestron's conclusion that Metro constituted a "serious credit risk" and that therefore credit could no longer continue to be extended to them. Perhaps it is easier to visualize our point if we consider the following: if Vestron decided to re-extend credit to Metro, Metro's account would cease to be one "not in good standing." Consequently, we must once again reject Metro's attempt to attribute different effects to each of the two actions. In our opinion, then, Metro's third cause of action is also based on Vestron's decision to stop extending credit to them. Discriminatory practices in the extension of credit being beyond the scope of either Section 2(d) or 2(e), *Bouldis v. U.S. Suzuki Motor Corp., 711 F.2d 1319 (6th Cir. 1983), Craig v. Sun Oil Co. of Pa., 515 F.2d 221 (10th Cir. 1975), L. & L. Oil Co. Inc. v. Murphy Oil Corp., 674 F.2d 1113, n.7 (5th Cir. 1982),* [*24] plaintiffs' cause of action number three must also be dismissed.

Our holding fully effectuates the legislative motives behind the enactment of §§ 2(d) and (e). Prior to the enactment of the Robinson-Patman amendments to the Clayton Act § 2 applied only to direct price discriminations and sellers were circumventing these prohibitions by offering special sales allowances and promotional services to their favored customers. See *Murphy Oil Corp., 674 F.2d at 1118.* Sections 2(d) and (e) were thus intended to prohibit price discriminations disguised in the form of promotional services provided to customers on a discriminatory basis. *Purdy Mobile Home, Inc. v. Champion Home Builders Co., 594 F.2d 1313 (9th Cir. 1979).* In this case it has not been disputed that Metro was still eligible to obtain all advertising credits, incentives and rebates available to the rest of Vestron's customers. Cf. *Bouldis, 711 F.2d at 1327.* Metro's objection

is only that their obtention was difficulted by the fact that they no longer enjoyed credit in their business relationship with Vestron. But, decisions involving credit cannot be the basis for a claim [*25] under §§ 2(d) and (e) since the statute's clear language states that these sections apply not to the original sale of the product but to the distributor's resale, *Bouldis, 711 F.2d at 1328.* Consequently, as to the §§ 2(d) and (e) claims, too, defendants are entitled to judgment as a matter of law.

    D

In their fourth cause of action, plaintiffs allege that Vestron, through its membership in the NVSMCA, unlawfully combined or conspired with other video manufacturers to discuss confidential information regarding the distributors' credit histories with the purpose of providing each manufacturer with "the same information so that they all acted accordingly." As a result of their conduct, Metro allegedly lost its good name and credit standing in the industry and also lost valuable distribution rights from other manufacturers. Such acts, the complaint alleges, constitute violations to *Section 1* of the Sherman Antitrust Act and Section 5 of the Federal Trade Commission Act ("FTCA").

Metro has since conceded that, as contended by defendants, Section 5 of the Federal Trade Commission Act does not provide a right of action to private litigants. See *Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 268 (1940).* [*26] Consequently, we dismiss the FTCA violation claim without further probe and concentrate our analysis on the alleged violation to the Sherman Antitrust Act.

*Section 1* of the Sherman Antitrust Act prohibits "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce." In *Standard Oil Company of New Jersey v. United States, 221 U.S. 1 (1911),* the Supreme Court explained that such open-ended language was only intended to forbid unreasonable restraints on trade. Certain restraints on trade, however, are considered to be so inherently damaging to competition that they have been held to be per se violations of *Section 1* of the Sherman Act. For the most part, Sherman Act violations are to be scrutinized through the application of the "Rule of Reason" test, which requires courts to determine "by the light of reason, guided by the principles of law and the duty to apply and enforce the public policy embodied in the statute" whether any particular act or contract constitutes a Sherman Act violation. *Standard Oil Company, 221 U.S. at 63-64.*

Against this backdrop plaintiffs build the following argument. [*27] First, they recall that the Supreme Court has held that exchanges of price information among competitors, although not a per se violation,

*United States v. Citizens & Southern National Bank, 422 U.S. 86, 113 (1975)*, could nonetheless constitute a Sherman Act violation depending on the "structure of the industry" and "the nature of the information exchanged." *United States v. United States Gypsum Co., 438 U.S. 422, fn.16 (1977)*. Then, they once again resort to the Court's statement in Catalano whereby it affirms that credit terms form an integral price of the overall price paid for a product. *Catalano, 446 U.S. at 645.* Finally, while accepting that in *Cement Manufacturers Protective Association v. United States, 268 U.S. 588 (1925)* the Supreme Court stated that an exchange of credit information among competitors was not an unlawful restraint on commerce when procured to prevent fraud, Metro contends that a dictum contained in footnote 22 in Gypsum (in which the Court stated that the holding of Cement merely "highlightened a narrow limitation on the application of the general rule that [a [*28] showing of] either purpose or effect [to restrain competition] will support [Sherman Act] liability") warrants a conclusion to the effect that exchanges of credit information among competitors may be illegal if the information exchanged goes beyond the narrow limitation of that needed to prevent fraud.

At least two assumptions are fundamentally wrong in plaintiffs' reasoning. We comment briefly only as to one of them, since once it is rejected Metro's argument collapses on the force of its own weight. Plaintiffs' blind reliance on the Supreme Court's statement in Catalano is once again wholly misplaced, and we refer the reader to our previous discussion explaining the reasons why. [11] Here, it suffices to say that under the federal antitrust laws decisions involving credit have always required and produced totally different analyses from those involving prices. This is why decisions regarding agreements pertaining to prices and exchanges of price information have consistently been held to violate the Sherman Act, see *American Column & Lumber Co. v. United States, 257 U.S. 377 (1921), United States v. American Linseed Oil Co., 262 U.S. 371 (1923)*, [*29] *United States v. Container Corp., 393 U.S. 333 (1968)*, while at the same time it has long been held that the exchange of information between competitors regarding the credit worthiness of customers does not violate any provision of the federal antitrust laws. *Cement Manufacturers Protective Association v. United States, 268 U.S. 588 (1925)*. See also *Zoslaw v. MCA Dist. Corp., 693 F.2d 870, 886 (9th Cir. 1982)*, cert. denied, *460 U.S. 1085 (1983), Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1048 (2d Cir. 1975)*, cert. denied, *429 U.S. 885 (1976), Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc., 497 F.2d 203, 209 (9th Cir. 1973)*, cert. denied, *419 U.S. 999 (1974)*. In Cement Manufacturers, the Supreme Court specifically stated that "distribution of information as to credit and responsibility of buyers un-

doubtedly prevents fraud and cuts down to some degree commercial transactions which would otherwise be induced by fraud," so it cannot be declared to be an unlawful restraint of trade "even [*30] though such information be gathered and disseminated by those who are engaged in the trade or business principally concerned." *268 U.S. at 604.* As long as the exchange of credit information is not accompanied by any agreements relating to the extension of credit, such as an agreement to deny credit to one or more of the competitors' customers, no violation of the antitrust laws has occurred. *Zoslaw, 693 F.2d at 886.* Decisions holding price agreements to be unlawful, on the other hand, generally do so on the ground that they result in the stabilization of prices and therefore have an anticompetitive effect. *United States v. Container Corp., 393 U.S. 333 (1968)*.

> 11 Part A of this Opinion. We also note in passing that it is our opinion that the second flaw in plaintiffs' reasoning is that their interpretation of the Gypsum footnote is also out of context. We do not elaborate on this point, however, as it is not necessary to support our decision in this case.

[*31] Looking at the facts of this case we see that no Sherman Act violation is present here. The record shows that the NVSMCA purpose and dealings were concentrated on the exchange of the dealers' historical credit information and this presents no problems under the federal antitrust laws. In relation to Metro, the Morowitz affidavit only states how to his understanding erroneous information regarding Metro's financial condition was discussed at NVSMCA's meetings. This fact may or may not have prejudiced Metro's commercial venture (a point over which we express no opinion), but it certainly does not constitute a violation of § 1 of the Sherman Antitrust Act. The Morowitz affidavit also states that the fact that such information may have been exchanged raises the strong inference that other information, particularly information concerning pricing, had been exchanged. See pp. 6-10 of Morowitz Aff.. Once again, that is a statement with which we cannot agree. The balance of his objection relates to defects in the association bylaws which do not amount to violations of the antitrust laws. Finally, in page 13 of its memorandum of law in support of its opposition to Vestron's motion for summary [*32] judgment, Metro alleges that "meetings and group discussions have occurred in which concerted action appears to have been agreed to." This statement, which constitutes mere speculation on their part, is clearly insufficient to defeat a properly submitted motion for summary judgment. *Brennan v. Hendrigan, 888 F.2d 189 (1st Cir. 1989)*. From the record before us we can only conclude that no information regarding prices was exchanged, and that no agreements concern-

ing price fixing were ever reached. Accordingly, plaintiffs' fourth cause of action must also be dismissed.

E

Defendants have moved to transfer this action to the District of Connecticut under *28 U.S.C. § 1404 (a).* That section provides:

For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Thus, three are the considerations that we must entertain in order to answer Vestron's request for a transfer on forum non-conveniens grounds. In the instant case, all three argue in favor conferring their request. Our explanation follows.

The convenience of the parties and [*33] witnesses is clearly served by transferring this action to Connecticut. Vestron's executive offices are located in Stamford, Connecticut. As alleged in the complaint, Metro is incorporated in New York and has its main offices in Hasbrouck Heights, New Jersey, with only a branch office -- whose personnel is not involved in the events which are central to this litigation -- in Puerto Rico. We recall that this action revolves around Vestron's decision to stop extending credit to Metro, and those decisions are clearly taken at the top executive positions within the corporations. All documentary evidence located in the parties' main offices would thus have to be shuffled back and forth were the trial to be held in Puerto Rico, all this at a great inconvenience to both parties. What is more, plaintiff Arthur Morowitz himself, whose submissions up to this point have been instrumental for the consideration of this case, resides in the Northeastern coast of the United States. As for the witnesses from both parties, Vestron has named eight potential witnesses whose testimony they consider to be essential for their defense who reside in either the state of Connecticut, New Jersey or New York [*34] City. [12] Vestron has also named a number former or present Metro employees with whom Vestron's sales and credit personnel dealt with in connection with this matter whose testimony maybe necessary and who reside in the continental United States. [13] The interests of justice, we affirm without hesitation, would be ill served were we to require the parties to submit themselves to such a constant reshuffling of persons and documents in order to conduct this litigation.

12  See McGovern Aff., Par. 24.

13  See McGovern Aff., Par. 25 and Reuben Aff. Par. 6. The list of witnesses who live in Puerto Rico submitted by Metro, see Morowitz Aff., Par. 33, does not strike as a list of witnesses whose testimony might be particularly important for the establishment of their case (i.e., twelve of the sixteen are sales representatives who may testify as to the prejudicial effects of Vestron's termination and discriminatory practices).

The requirement that the transfer be ordered to a district or division where the [*35] action might have been brought, of course, relates to the existence of venue in that particular district for the action in controversy. In antitrust actions, venue is governed by Section 12 of the Clayton Act, *15 U.S.C. § 22,* which states:

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business . . .

*Section 22* was enacted to enlarge the venue provisions of *15 U.S.C. § 15* so that parties injured by violations of the antitrust laws could more easily seek redress in the courts. Whether a corporation is an inhabitant, is found, or transacts sufficient business within a district to establish venue therein is considered a practical question devoid of technicalities. The Supreme Court has stated that the test of venue must be understood to be whether the corporation in fact and in the ordinary and usual sense engages in business of any substantial character in the state where venue is alleged to lie. *United States v. Scophony Corp., 333 U.S. 795, 807 (1948).*

Whether or not venue properly lies in [*36] Puerto Rico is a question whose answer is of little consequence in our quest. Under the circumstances of this case, the reasons that would substantiate an affirmative determination in this respect would also argue in favor of the propriety of venue in the District of Connecticut (and in every other state where the defendants have also engaged in business operations of any substantial character). Clearly, Vestron carries on substantial business operations in Connecticut, the state where its main offices are located. It being far more convenient for the parties, witnesses, and the interest of justice, and venue also being proper in the District of Connecticut, defendants' motion for transfer finds full compliance with the governing statute, *28 U.S.C. § 1404 (a).* This action will continue in the Constitution state.

*WHEREFORE,* in view of the foregoing, defendants' motion for summary judgment as to plaintiffs' first through fourth causes of action and for transfer of this action to the District of Connecticut is hereby *GRANTED.* The Clerk of the Court shall enter judgment *DISMISSING* plaintiffs' causes of action one through four with prejudice and it is hereby further *ORDERED* [*37] that the remaining five causes of action in the in-

1990 U.S. Dist. LEXIS 18739, *; 1990-1 Trade Cas. (CCH) P68,986

stant suit be *TRANSFERRED* to the District of Connecti-
cut for their just consideration.

*IT IS SO ORDERED.*

## CERTIFICATE OF SERVICE

I, Denise Seastone Kraft, hereby certify that on April 2, 2008, the **Compendium of Unreported Cases Cited in Reply Brief of Defendants GMAC Commercial Finance LLC, Sterling Factors Corporation and Wells Fargo Century, Inc. in Further Support of Their Motion to Dismiss** was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to counsel of record and the document is available for viewing and downloading from CM/ECF.

_/s/ Denise Seastone Kraft_
Denise Seastone Kraft (No. 2778)