## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JEOFFREY L. BURTCH, CHAPTER 7           :
TRUSTEE, FACTORY 2-U STORES,            :
INC., et al.,                           :
                                        :
          Plaintiff,          :
                                        :
                                        :
          v.                  :    Civ. No. 07-556-JJF-LPS
                                        :
MILBERG FACTORS, INC.,                  :
CAPITAL FACTORS, INC.,                  :
THE CIT GROUP/COMMERCIAL                :
SERVICES, INC.,                         :
GMAC COMMERCIAL FINANCE LLC,            :
HSBC BUSINESS CREDIT (USA) INC.,        :
ROSENTHAL AND ROSENTHAL, INC.,          :
STERLING FACTORS CORPORATION,           :
WELLS FARGO CENTURY, INC.               :
                                        :
          Defendants.         :

## REPORT AND RECOMMENDATION REGARDING
## MOTION TO DISMISS THE COMPLAINT

      This is an antitrust case.  Plaintiff seeks damages for an alleged price-fixing conspiracy

and group boycott to deny credit to a chain of retail stores in violation of Section 1 of the

Sherman Act and the New York State Donnelly Act, N.Y. Gen. Bus. L. § 340.  (D.I. 1 ¶ 1)

Presently pending before me are six motions to dismiss the Complaint on the grounds that

Plaintiff has failed to state a claim on which relief may be granted and that his claims are time-

barred.  The motions were filed by Defendants CIT Group/Commercial Services, Inc. ("CIT")

(D.I. 26); GMAC Commercial Finance LLC ("GMAC"), Sterling Factors Corporation

("Sterling"), and Wells Fargo Century, Inc. ("Century") (D.I. 29); Rosenthal & Rosenthal, Inc.

("Rosenthal") (D.I. 33); Milberg Factors, Inc. ("Milberg") (D.I. 35); HSBC Business Credit

(USA) Inc. ("HSBC") (D.I. 37); and Capital Factors, Inc. ("Capital") (D.I. 38). For the reasons

explained below, I recommend that Defendants' motions be granted and Plaintiff's claims be

dismissed.

## BACKGROUND[1]

The Parties

Plaintiff Jeoffrey L. Burtch ("Plaintiff" or "Burtch") is the Chapter 7 Trustee for Factory

2-U Stores, Inc., F/A/K/A General Textiles, Inc., F/A/K/A General Textiles, F/A/K/A Family

Bargain Corporation, F/A/K/A Family Bargain Center (collectively "Factory 2-U"). (D.I. 1 at 1)

Factory 2-U is a discount clothing retailer, currently in Chapter 7 bankruptcy proceedings. At

one time, Factory 2-U operated more than 200 stores in ten states. *Id.* ¶ 2. It is a Delaware

corporation with its principal place of business in San Diego. *Id.* ¶ 20.

The eight defendants (collectively "Defendants") are corporations engaged in the business

of "factoring," as described below. Milberg, CIT, GMAC, and HSBC are Delaware corporations.

*Id.* ¶¶ 22, 24-26. Capital is a Florida corporation. *Id.* ¶ 23. Rosenthal, Sterling, and Century are

New York corporations. *Id.* ¶¶ 27-29. All of the Defendants have principal places of business in

New York. *Id.* ¶¶ 22-29.

---

[1]As required, I accept all allegations of the Complaint as true and take them in the light
most favorable to Burtch. *See Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007).

The Factoring Industry

Factoring is a form of commercial finance that propels the garment industry, by facilitating transactions between garment manufacturers and garment retailers.[2] *Id.* ¶ 3. A factor is a lender that purchases a client's (in this context, a garment manufacturer's) accounts receivable at a discount, and then assumes the risk of collecting the accounts receivable from the client's customer (the garment retailer). *Id.* ¶¶ 3-5. According to the Complaint, a factor provides credit in two ways: pursuant to a written contract with its factored client, and through an oral "customer credit" agreement with the client's customer. *Id.* ¶ 3. The factor effectively serves as its client's credit department, reviewing the creditworthiness of the client-manufacturer's retailer-customers, extending credit to approved retailers, and purchasing the client's accounts receivables "on a full, partial, or non-recourse basis." *Id.*

Factors assume the risk of collecting the accounts receivable only for those accounts receivable that are generated by sales to retailers that the factor approves (or "credit checks," in industry parlance). *Id.* ¶ 5. Thus, when a factor refuses to "credit check" a client's retailer-customer, any sale by the client to that retailer-customer (should the client elect to proceed with the sale) is considered "client's risk." *Id.* The Complaint alleges that a manufacturer typically cannot afford the risk of a sale that was deemed unacceptable to its factor, so "the factor's 'credit check' decision usually determines whether a sale is made." *Id.* It states, furthermore, that factors typically include in their contracts "a boilerplate provision that the factor has discretion to refuse to 'credit check' a garment retailer for any reason at all," so a factor may decline to

---

[2]The Complaint alleges that "about 80% of garment manufacturers relied on factors for their credit needs." (D.I. 1 ¶ 12)

3

purchase accounts receivable for a garment retailer for reasons other than the retailer's

creditworthiness. *Id.* ¶ 6. Factors also determine the rate of discount at which they will purchase

receivables from their clients and set the payment terms and conditions required of their clients'

retailer-customers. *Id.* ¶ 8.

Defendants' History Of "Cartel-Like" Behavior

Defendants are eight of the top ten factors in the U.S., based on factoring volume. *Id.*

¶¶ 11-12. Defendant CIT alone is alleged to have "factored approximately $16 billion for the

domestic garment manufacturing industry, or at least 33% of the market." *Id.* ¶ 12. The

economic power of Defendants is "magnified by the fact that . . . many of the smaller factors ran

their receivable purchases through one or more of the Defendants." *Id.* ¶ 15. Thus, according to

the Complaint, retailers who were declined credit by Defendants were unable to turn "to any of

the smaller factors for recourse because those smaller factors were essentially controlled by the

Defendants." *Id.* Between them, Defendants provided factoring services to 305 of the garment

manufacturers who supplied Factory 2-U stores with garments for re-sale to the public. *Id.* ¶¶ 7,

13-14.[3]

Plaintiff alleges that the industry's largest factors, "including many of the Defendants,"

routinely shared confidential information about their manufacturer-clients and these clients'

retailer-customers, "and then reached illegal agreements regarding the terms and conditions of

---

[3]The complete breakdown, in descending order, is: (1) CIT factored 169 manufacturers who sold garments to Factory 2-U, (2) GMAC 48, (3) Rosenthal 37, (4) Capital 24, (5) Milberg 16, and (6) Sterling 11. (D.I. 1 ¶ 13) The Complaint does not allege how many manufacturers were factored by defendants HSBC and Century.

credit to be extended." *Id.* ¶ 34. These illegal information exchanges and agreements allegedly

occurred at "highly-secretive weekly meetings of formal groups such as the Uptown Credit

Group, Inc. and the Thursday Garment Group, and through less formal means of

communication." *Id.* Later, "when legal challenges exposed the activities of the formal groups,

the factors continued their collusive behavior" informally, including over the telephone. *Id.*


Defendants Share Credit Information Relating To Factory 2-U

The Complaint contains no factual allegation as to whether any of the Defendants

participated in a formal group to share information, nor whether Factory 2-U was discussed at

any formal meeting. Instead, Plaintiff alleges generally that "at least as early as 2002, the

Defendants discussed and unlawfully agreed with each other on how they would do business with

Factory 2-U and its garment manufacturers." *Id.* ¶ 35. The Complaint then sets forth 27

instances of alleged "conspiratorial communications" among varying pairs of Defendants, though

it further alleges that Defendants' discussions and agreements began before and continued after

the dates of these contacts. *Id.* ("[T]he precise scope and duration of the Factory 2-U discussions

and agreements are at present unknown to the Trustee . . . [but] they include, at a minimum, the

discussions and agreements specifically alleged herein.").

As set forth in detail at paragraph 35 of the Complaint, the 27 contacts between different

pairs of Defendants spanned a twenty-month period from February 27, 2002 to September 17,

2003. (The entirety of the twenty-seven specific contacts are reproduced in the Appendix.) In

terms of substance, the topics discussed between the factors were: (i) the amount of credit

Factory 2-U had sought and/or been approved for and/or how that amount of credit changed over

time; (ii) the disclosure that a factor declined a Factory 2-U request for credit and/or when a

credit line had expired or would expire; (iii) the disclosure that Factory 2-U's orders were being

held; and (iv) the payment terms or other requirements being imposed by the factor on Factory 2-

U (e.g., that a credit line must be paid down to be renewed, the requirement of a security deposit,

and/or imposition of surcharges).  None of the contacts described in paragraph 35 contain a

specific allegation of an agreement being formed or even discussed.

 The Complaint also alleges that Maurice Sabony of Defendant Milberg additionally

received calls from unnamed "competing factors."  *Id.* ¶ 36.  The purpose of these calls was to

learn about "Milberg's dealings with Factory 2-U and its manufacturers, including but not limited

to Milberg's willingness to extend credit to Factory 2-U, Milberg's credit limits on Factory 2-U

orders, and Milberg's payment terms to Factory 2-U."  *Id.*  The Complaint does not indicate

whether any of the alleged calls to Sabony about Milberg's policy with respect to Factory 2-U

came from any of Milberg's co-defendants, nor does it set forth any allegations as to the dates of

the calls or Milberg's responses to the competing factors' inquiries.


<u>Defendants Allegedly Agree On Their Collective Actions Toward Factory 2-U</u>

 Plaintiff alleges that "[t]hrough their unlawful discussions and communications,"

Defendants agreed on the basis on which they would collectively do business with Factory 2-U

and its supplying manufacturers.  *Id.* ¶ 38.  The substance of their agreements allegedly included:

(1) <u>whether credit would be extended</u> to Factory 2-U for purchase from Defendants'

manufacturer clients; (2) the <u>amount of credit that would be extended</u> for purchase; (3) "the <u>terms</u>

<u>on which credit would be extended</u> . . . including without limitation [,] time to pay . . ., the date

6

on which the time to pay would commence (e.g., from receipt of goods or date of invoice), and whether a security deposit would be required from Factory 2-U;" and (4) whether Defendants would impose surcharges on their garment manufacturer clients as a condition of financing purchases by Factory 2-U. *Id.* (emphasis added).

### Milberg Allegedly Conceals Defendants' Discussions From Factory 2-U

The Complaint further alleges that on an unspecified date Maurice Sabony of Milberg was in frequent contact by telephone with Factory 2-U executives, during which he "asked about or discussed . . . what other factors were doing with regard to Factory 2-U orders," but "concealed from Factory 2-U" that the Defendants were in the process of "discussing and agreeing upon what their actions would be with regard to Factory 2-U orders." *Id.* ¶ 42.

### Defendants Allegedly Take "Concerted Action" With Regard To Factory 2-U

The Complaint alleges that "[a]fter their unlawful discussions and communications, the Defendants took concerted action which harmed Factory 2-U's ability to conduct business. Specifically, the Defendants declined and limited credit to Factory 2-U at approximately the same time." *Id.* ¶ 37.

### Factory 2-U Files For Bankruptcy

On January 13, 2004, Factory 2-U filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101, et seq., in the United States Bankruptcy Court for the District of Delaware. *Id.* ¶¶ 20, 37. The action was converted to a bankruptcy case under

7

Chapter 7 of the Code on January 27, 2005. *Id.* ¶ 20. On January 27, 2005, Jeoffrey L. Burtch was appointed as interim trustee and is now serving as Trustee of the Estate pursuant to Section 702(d) of the Bankruptcy Code. *Id.*

Plaintiff Discovers Factors' Alleged Conspiracy

In April or May 2007, Plaintiff discovered Defendants' "unlawful conduct" upon reviewing documents reflecting Milberg's contacts with rival factors. *Id.* ¶ 39. These documents were produced to Plaintiff by Milberg in response to discovery requests relating to the bankruptcy. *Id.* ¶ 39. The Complaint alleges that although "Milberg misdescribed its contacts with its competitors as credit 'references,'" Milberg neither requested the names of credit references from Factory 2-U nor informed Factory 2-U that it was in contact with other factors. *Id.* ¶ 41. Information pertaining to Factory 2-U's credit history was readily available through credit reports to which the Defendants subscribed. *Id.* Plaintiff alleges that neither he nor Factory 2-U could have discovered the Defendants' alleged conspiracy earlier, because they did not have access to the "internal and confidential documents of Milberg" describing the contacts and because the "conspiratorial communications among the competing factors were conducted secretly by telephone so as to leave no written record." *Id.* ¶ 40.

Procedural Background

Plaintiff filed this action on September 17, 2007. (D.I. 1) Initially, the case was assigned to the "judicial vacancy" left by the elevation of the Honorable Kent A. Jordan to the United States Court of Appeals for the Third Circuit and referred to me for all pretrial proceedings.

8

(D.I. 3)  The case was then assigned to Judge Joseph J. Farnan, Jr., who, on February 14, 2008, referred it to me for all pretrial matters up to and including the pretrial conference.  (D.I. 45, 46)

The Complaint asserts four claims arising from alleged violations of the Sherman Act, 15 U.S.C. § 1, and New York's Donnelly Act, N.Y. Gen. Bus. L. § 340.  Plaintiff alleges the defendants violated the Sherman Act by: 1) agreeing to "fix, maintain, and stabilize Factory 2-U's terms and amounts of credit," constituting a *per se* illegal price-fixing agreement; 2) agreeing "to boycott Factory 2-U from the garment retailer business," a *per se* illegal boycott; and 3) reaching agreements that are unlawful under the rule of reason.  (D.I. 1 ¶¶ 19, 44, 47, 49-52) Plaintiff further alleges that Defendants' unlawful agreements "restrained trade in the market for the provision of factoring services in the garment industry" in violation of New York's Donnelly Act.  *Id.* ¶ 54.

CIT moved to dismiss on December 14, 2007.  (D.I. 26)  GMAC, Sterling, and Century jointly moved to dismiss on December 17, 2007.  (D.I. 29)  Rosenthal separately moved to dismiss, also on December 17, 2007.  (D.I. 33)  On December 18, 2007, Milberg and HSBC moved to dismiss, including by seeking to join in the previously-filed motions to dismiss. (D.I. 35, 37)  On December 20, 2007, Capital moved to dismiss for the reasons set forth in earlier motions.  (D.I. 38)  Briefing was completed on April 9, 2008.  (D.I. 62, 63)[4]  I held a hearing on all pending motions on October 20, 2008.  *See* Transcript ("Tr.") (D.I. 69).

---

[4]Plaintiff's Motion for Leave to File a Surreply Brief (D.I. 62) is hereby granted.

## LEGAL STANDARDS

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted). Thus, the Court may grant such a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted).

However, "[t]o survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007)). While heightened fact pleading is not required, "enough facts to state a claim to relief that is plausible on its face" must be alleged. *Twombly*, 127 S. Ct. at 1974. At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Technology Charter School Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted). "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 127 S. Ct. at 1966 (internal quotation marks omitted).

The Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

In reviewing a motion to dismiss, "[c]ourts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1195 (3d Cir. 1993). Certain additional materials may also be considered without converting a motion to dismiss into a motion for summary judgment (which generally cannot be ruled upon without providing a plaintiff a reasonable opportunity for discovery). For instance, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document . . . ." *Pension Benefit*, 998 F.2d at 1196 (internal citations omitted); *see also* 5B C. Wright & A. Miller, Federal Practice and Procedure § 1357 (2007) ("The court is not limited to the four corners of the complaint, however. Numerous cases . . . have allowed consideration of matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; these items may be considered by the district judge without converting the motion into one for summary judgment.").

11

## DISCUSSION

I.   Plaintiff's Section 1 Sherman Act Claims

Plaintiff's first three counts are brought under Section 1 of the Sherman Act, which

makes illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in

restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

Depending on the nature of the alleged violation, a court must apply one of two standards for

evaluating whether a practice restrains trade in violation of Section 1: the *per se* rule or the rule

of reason. *See Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 127 S. Ct. 2705, 2710

(2007).

The *per se* rule governs the narrow category of restraints that "have such predictable and

pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they

are deemed unlawful *per se.*" *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997). The Supreme Court

has held that restraints covered by the *per se* rule include "price-fixing agreements between two

or more competitors, otherwise known as horizontal price-fixing agreements," *Texaco Inc. v.*

*Dagher,* 547 U.S. 1, 5 (2006), as well as horizontal agreements among direct competitors to

boycott a third party, *see NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 135 (1998). Plaintiff's

Count I alleges a *per se* illegal price-fixing scheme and Count II alleges a *per se* illegal group

boycott.

The rule of reason applies to any restraint of trade that is not subject to analysis under the

*per se* rule. Rule-of-reason analysis requires a court to "decide whether the questioned practice

imposes an unreasonable restraint on competition, taking into account a variety of factors,

including specific information about the relevant business, its condition before and after the

restraint was imposed, and the restraint's history, nature, and effect." *Khan*, 522 U.S. at 10. The Third Circuit has "laid down four steps of proof that a plaintiff must present" in order to set forth a rule-of-reason claim: "(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and conduct pursuant to the contract or conspiracy were illegal; and (4) that the plaintiffs were injured as the proximate result of that conspiracy." *In re Baby Food Antitrust Litigation*, 166 F.3d 112, 118 (3d Cir. 1999). Plaintiff's Count III alleges that Defendants' conduct is unlawful under rule-of-reason analysis.

An essential element of all three of Plaintiff's Section 1 claims is that there was an unlawful agreement, or conspiracy, among the Defendants. In order to survive a motion to dismiss, a Section 1 claim must adequately allege the existence of an unlawful agreement in restraint of trade, regardless of whether the unlawful conduct is to be measured by the *per se* rule or the rule of reason. *See Leegin*, 127 S. Ct. at 2708. Therefore, I will focus my analysis on the sufficiency of the Complaint's allegations of an unlawful agreement.

II.     *Twombly* Sets Out Section 1 Pleading Requirements

The analysis required to dispose of Defendants' motions to dismiss is aided substantially by the Supreme Court's recent decision in *Bell Atlantic v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964 (2007), in which the Court expressly addressed "what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act." *Id.*; *see also id.* (stating Court was considering "the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct"). In particular, *Twombly* examines whether a Section 1 Sherman Act claim can survive

13

a motion to dismiss based on allegations that the defendants "engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action." *Id.* at 1961. The Court held that such a claim must be dismissed.

The plaintiffs in *Twombly* were representatives of a putative class of subscribers to local telephone and/or high speed internet service, who alleged that the incumbent local exchange carriers (ILECs) unlawfully agreed to limit competition in violation of Section 1. *Id.* at 1961-62. Plaintiffs alleged two types of anti-competitive conduct. First, they alleged that the ILECs "engaged in parallel conduct" to inhibit the growth of competitive local exchange carriers (CLECs), who could have entered each of the ILECs' geographic markets to compete with each ILEC. *Id.* at 1962. Second, the plaintiffs alleged that the ILECs agreed that they would refrain from competing against one another in each other's traditional geographic markets. *Id.*

After the district court dismissed the complaint, the Court of Appeals for the Second Circuit reversed. *See id.* at 1963. The Supreme Court reversed the Court of Appeals and dismissed the complaint. *See id.* In doing so, the Supreme Court held that stating a Section 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 1965. There must be "plausible grounds to infer an agreement;" that is, "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 1959.

The Court explained that allegations of parallel conduct are not "suggestive enough to render a § 1 conspiracy plausible." *Id.* at 1965.

> . . . [L]awful parallel conduct fails to bespeak an unlawful agreement. It makes sense to say, therefore, that <u>an allegation of parallel conduct and a bare assertion of conspiracy will not suffice</u>. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point

does not supply facts adequate to show illegality.  Hence, <u>when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.</u>

*Id.* at 1966 (emphasis added); *see also id.* (describing "need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement").

The Court found that the plaintiffs' claim of conspiracy did not suggest a preceding agreement, and, thus, "c[ame] up short." *Id.* at 1960, 1970.  Other than "a few stray statements speak[ing] directly of agreement," which were "merely legal conclusions resting on the prior allegations," the "plaintiffs rest[ed] their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs." *Id.*  The complaint was insufficiently detailed as to the alleged unlawful agreement: "the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies," and "furnishe[d] no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place." *Id.* at 1970 n.10.

Since "the nub of the complaint" was the ILECs' alleged parallel conduct with respect to the CLECs, the adequacy of plaintiffs' claim "turn[ed] on the suggestions raised by this conduct when viewed in light of common economic experience." *Id.* at 1970-71.  Those economic realities established that it was equally likely that the ILECs were acting independently and in their economic self-interest as that they, instead, were unlawfully colluding and coordinating their actions.  With respect to the plaintiffs' theory that the ILECs thwarted new CLECs, the Court stressed that "nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance." *Id.* at 1971.  The same was true with respect to the plaintiffs' alternate theory that

15

the ILECs colluded to stay out of one another's traditional markets: "here we have an obvious alternative explanation . . . a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing." *Id.* at 1972.

The Court thus concluded:

> [T]here is no reason to infer that the [defendant] companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.

*Id.* at 1971. In sum, "the complaint warranted dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible." *Id.* at 1973 n.14.

Three points from *Twombly* are directly relevant to the pending motions. First, a Section 1 claim may not be predicated solely on allegations that defendants in a particular industry engaged in parallel conduct adverse to a plaintiff. *See, e.g., id.* at 1965-66. Second, conclusory assertions of an unlawful agreement are insufficient; the complaint must set forth specific factual allegations creating a "context" at least "suggest[ive]" of a conspiracy that preceded the defendants' parallel conduct. *See, e.g., id.* at 1966. Third, where the defendants' alleged conduct may just as likely be the result of wholly lawful independent reactions to common economic stimuli as the result of an unlawful agreement, the plaintiff has failed to state a claim. *See, e.g., id.*

With these points in mind, I turn to the allegations in Plaintiff's Complaint.

III.     Plaintiff's Allegations Closely Resemble Those Dismissed In *Twombly*

All three of Plaintiff's Section 1 claims – *per se* unlawful price-fixing, *per se* unlawful

group boycott, and an anticompetitive agreement violating the rule of reason – are based on a

concoction of three ingredients: (1) allegations of parallel conduct among Defendants in that, at

approximately the same time, each worsened the terms on which it would provide factoring

services to Factory 2-U or chose no longer to provide such services; (2) allegations describing at

least 27 conversations during which Defendants shared information about Factory 2-U's

creditworthiness and Defendants' individual plans regarding the provision of factoring services

to Factory 2-U in the future; and (3) allegations of an unlawful agreement as to the terms on

which Defendants would do business with Factory 2-U in the future.

The question before me is whether these allegations together adequately allege a

conspiracy in violation of Section 1 or whether, instead, Plaintiff's allegations fail to provide

"enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal

agreement." *Twombly*, 127 S. Ct. at 1965.  I conclude that, at best, Plaintiff has alleged a

situation in which it is just as likely that the Defendants were independently responding to the

reality of Factory 2-U's deteriorating economic condition as it is that they were acting pursuant to

an unlawful agreement.  In this circumstance, *Twombly* compels me to recommend that the Court

dismiss Plaintiff's Section 1 claims.

A.    Allegations of Parallel Conduct

I assume, *arguendo*, that the Complaint alleges parallel conduct by the Defendants

directed toward Factory 2-U.[5]  Specifically, the parallel conduct the Defendants engaged in was

"declining or limiting Factory 2-U's credit at approximately the same time." (D.I. 1 ¶ 44; *see*

*also id.* ¶¶ 37, 47; Tr. at 63.)  Generally, the terms on which Factory 2-U could obtain the credit it

needed to operate as a garment retailer – which required the purchase of garments from the

Defendants' garment manufacturer-clients – deteriorated, making it difficult and, eventually,

impossible for Factory 2-U to continue operations.

Assuming, then, that the parallel conduct of declining or limiting the extension of credit

to Factory 2-U was "anticompetitive conduct," the "crucial question" is whether it "stem[med]

from independent decision or from an agreement." *Twombly*, 127 S. Ct. at 1964.

> While a showing of parallel business behavior is admissible circumstantial
> evidence from which the fact finder may infer agreement, it falls short of
> conclusively establish[ing] agreement or . . . . itself constituting a Sherman Act
> offense.  Even conscious parallelism, a common reaction of firms in a

---

[5]However, there appears to be significant merit to Defendants' contention that the
Complaint fails even to allege parallel conduct. Defendants point out that at no point does the
Complaint identify a date on which all of the Defendants were acting in precisely the same
manner towards Factory 2-U. (D.I. 27 at 15)  To allege that some Defendants declined to extend
any credit, while other Defendants merely limited the credit they extended, may be viewed as an
allegation of differential treatment and, therefore, non-parallel conduct. This reading of the
Complaint is bolstered by specific allegations that, as late as September 2003, two Defendants
were contemplating increasing Factory 2-U's credit limit. *See* D.I. 1 ¶ 35(u) (describing June
2003 discussion between Defendants Milberg and Sterling regarding Sterling's "willingness to
increase Factory 2-U's credit limit"); D.I. 1 ¶ 35(y) (describing September 2003 discussion
between Defendants Milberg and GMAC concerning "GMAC's possible increase of Factory 2-
U's credit limit").  The Complaint further fails to identify the prices Factory 2-U was being
charged by each Defendant and how those prices worsened over time. I need not decide whether
the Complaint sufficiently alleges parallel conduct because, for the reasons described in the text,
even a sufficient allegation of parallel conduct does not, in the circumstances presented here,
state a Section 1 violation.

18

> concentrated market that recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful.

*Id.* (internal quotation marks and citations omitted). "[N]either parallel conduct nor conscious parallelism, taken alone, raise the necessary implication of conspiracy." *Id.* at 1968 n.7. The Plaintiff's allegations of parallel conduct, therefore, may "get[] the complaint close to stating a claim, but without some further factual enhancements it stops short of the line between possibility and plausibility of entitle[ment] to relief." *Id.* at 1966 (internal quotation marks omitted).

### B. Shared Credit Information

Given *Twombly's* directive that "allegations of parallel conduct . . . must be placed in a context that raises a suggestion of a preceding agreement," *id.* at 1966, Plaintiff relies on the 27 alleged instances of Defendants sharing information with one another about the terms on which they would do business with Factory 2-U as "factual enhancements" providing a context for their eventual conspiracy. The law is clear that the type of information-sharing that is alleged does not violate antitrust laws. As the Second Circuit has explained:

> The exchange of information between business firms concerning the credit-worthiness of customers has long been held not to violate the Sherman Act. . . . [T]he dissemination to competitors of information concerning the credit-worthiness of customers aids sellers in gaining information necessary to protect themselves against fraudulent or insolvent customers. Given the legitimate function of such data, it is not a violation of § 1 to exchange such information, provided that any action taken in reliance upon it is the result of each firm's independent judgment, and not of agreement.

*Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1048 (2d. Cir. 1976) (internal citations omitted); *see also Cement Mfrs. Protective Ass'n v. United States*, 268 U.S. 588, 604

(1925) (association members' exchange of credit information did not violate Section 1 where government "neither charged nor proved that there was any agreement with respect to the persons to whom or conditions under which credit should be extended"); *Kasada, Inc. v. Access Capital, Inc.*, 2004 WL 2903776, at *6 (S.D.N.Y. Dec. 14, 2004) (holding allegation that factors for garment industry "engaged in group meetings to share credit information and had access to each other's databases and credit information" did not violate Sherman Act) (internal quotation marks and citation omitted).

Plaintiff maintains that the contacts described in ¶ 35 of the Complaint are unlawful because "while the sharing of historical information (e.g., regarding a debtor's past record of payment) may legally be exchanged, information regarding the future terms and conditions of credit or to whom credit will be extended may not be exchanged consistent with the Sherman Act." (D.I. 50 at 11) Plaintiff's distinction is not supported by the case law. For example, in *Michelman*, 534 F.2d at 1048 n.16, the Second Circuit found that an antitrust plaintiff's allegations regarding sharing of forward-looking credit information failed to support his claim of a Section 1 conspiracy to restrain trade. There the plaintiff, a converter of fiberglass fabrics into draperies, sought to rely on a series of telephone calls between two of its suppliers, each of whom was a defendant in the action. One defendant, Clark-Schwebel, told another, Burlington, that it was "thinking of submitting its disputes with [the plaintiff] to arbitration;" if the contemplated arbitration did not settle, Clark-Schwebel would "insist on immediate payment, which may very well bankrupt" the plaintiff. *See id.* This disclosure from a competitor-supplier prompted Burlington to note in an internal memorandum that "this matter should be taken into consideration in any further extension of credit on our part." *Id.* In finding that the calls between

Clark-Schwebel and Burlington were within "permissible boundaries," the Second Circuit made

no distinction between "historical" and "forward-looking" information-sharing. *Id.* at 1048.

Plaintiff cites *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975), in which the Supreme

Court struck down a minimum-fee schedule for legal services as a price-fixing conspiracy in

violation of Section 1. In explaining how it found that the bar in Virginia had established "a

fixed, rigid price floor," the Court observed that "[t]he price information disseminated [among

attorneys] did not concern past standards, but rather minimum fees to be charged in future

transactions, and those minimum rates were increased over time." *Id.* at 781 (internal citation

omitted). Yet this statement does not support the distinction Plaintiff seeks to draw between

forward- and backward-looking information. This is because the violation the Supreme Court

identified in *Goldfarb* did not turn on the fact that the information was forward-looking instead

of backward-looking; rather, the problem was that the substance of the "information" shared was

an <u>agreement</u> as to what prices to charge in the future. In this sense, an agreement to do anything

can only be "forward-looking." The antitrust violation arises from the existence of the <u>agreement</u>

to coordinate prices (or to boycott a customer), not from the forward-looking character of the

agreement. The violation in *Goldfarb* was the setting of minimum fees that all attorneys had to

charge (or face the disciplinary wrath of the state bar). This price-fixing scheme, to be effective,

necessarily operated on <u>future</u> prices, but it does not at all follow that merely sharing forward-

looking credit information is itself unlawful.[6]

---

[6]Likewise unhelpful to Plaintiff is *United States v. Container Corp. of America,* 393 U.S. 333 (1969), a case he cited for the proposition that sharing future credit information is unlawful even without a showing of conspiracy, *see* Tr. at 57-58. In *Container Corp.*, the Court held that defendants' exchange of price information established a price-fixing conspiracy where there was direct evidence of an agreement to share information, further evidence that the information

It is true that information-sharing can serve as "a facilitating practice that can help support an inference of [an unlawful Section 1] agreement." *Todd v. Exxon Corp*, 275 F.3d 191, 198 (2d Cir. 2001). Here, however, when one breaks down the specific allegations in paragraph 35 of the Complaint, they do not significantly support such an inference. The 27 contacts occurred over a 20-month period (February 27, 2002 through September 17, 2003), but contacts are alleged to have been made during only 11 of the 20 months, and in only four of these months did more than two contacts take place. Each of the 27 discussions was initiated by either Defendant Rosenthal (D.I. 1 ¶ 35(a)-(j)) or Defendant Milberg (D.I. 1 ¶ 35(k)-(aa)); the other six factors simply responded to their queries.[7] Yet Rosenthal and Milberg were hardly the largest factors, together being responsible for factoring just 53 of the 305 garment-manufacturers which dealt with Factory 2-U. *See supra* n.3. Although the substance of the information exchange was wide-ranging – including discussions of the amount of credit Factory 2-U had sought from a factor and/or been approved for and/or how that amount of credit changed over time, the expiration date of credit extended, whether Factory 2-U's orders were being held, and the payment terms being imposed by the factor[8] – there is no allegation that Rosenthal or Milberg

---

exchange had "the effect of keeping prices within a fairly narrow ambit," and where the unique nature of the corrugated container industry made it so that "[t]he exchange of price data tends toward price uniformity" throughout the industry. 393 U.S. at 336-37. The same are not alleged – at least not in a non-conclusory manner – here.

[7]Although the Complaint alleges "[n]ot only did [Milberg] contact various factors, but competing factors also telephoned [Milberg] to discuss . . . Milberg's dealings with Factory 2-U" (D.I. 1 ¶ 36), it does not clarify whether these "competing factors" are any of the other Defendants, nor set forth the dates of the telephone calls.

[8]The information shared among the Defendants appears to be broader than what "was readily available from a credit reporting agency through reports to which Defendants subscribed," contrary to the Complaint's general allegations. (D.I. 1 ¶ 41)

22

passed on what they learned to each of the other factors through other identified discussions.[9]

Thus, nothing about the contacts alleged gives rise to an inference that one factor's disclosure of

credit information to a second factor influenced the terms on which the second factor

subsequently did business with Factory 2-U.

In short, the contacts alleged in paragraph 35 do not constitute "tacit invitations . . . to

join in a coordinated credit policy toward" Factory 2-U. *Michelman,* 534 F.2d at 1048-49.  Nor

do they create "a context that raises a suggestion of [an] agreement" having actually been formed

among the eight Defendants prior to their parallel conduct of reducing or eliminating credit

extended to Factory 2-U. *Twombly*, 127 S. Ct. at 1966.


C.     Conclusory Allegations Of Conspiracy

The final ingredient common to each of the Plaintiff's Section 1 claims is his general

allegation that the Defendants' conduct was the result of an unlawful agreement.  The Complaint

asserts, repeatedly, that the Defendant factors' parallel conduct of declining or limiting the

amount of credit available to Factory 2-U was the result of a conspiracy among them.

---

[9]For example, the Complaint states that between February 27, 2002 and December 18, 2002, Rosenthal learned that Century, HSBC, Capital, Sterling, and GMAC were all holding orders and/or pulling or reducing credit lines to Factory 2-U.  (D.I. 1 ¶ 35(a)-(j))  But when a Milberg representative telephoned a Rosenthal representative on March 13, 2003, the two discussed "the amount of orders" that Rosenthal had approved for Factory 2-U and the "payment terms" Rosenthal was requiring; there is no indication they discussed whether Rosenthal had arranged to hold Factory 2-U's orders or pull or reduce its credit line. *Id.* ¶ 35(m).

A typical assertion is that Defendants:

> regularly discussed and agreed among themselves as to the terms and conditions
> on which they would finance Factory 2-U's purchases, the discount rate at which
> they would purchase Factory 2-U's receivables from Factory 2-U's garment
> manufacturers, or whether they would extend credit to Factory 2-U at all.  These
> discussions and agreements constituted a conspiracy in violation of Section 1 of
> the Sherman Antitrust Act.

(D.I. 1 ¶ 9)  But there is no specification of what the "terms and conditions" of financing were, or

the discount rate at which the Defendants purchased Factory 2-U's receivables, or even whether

Defendants agreed to extend credit to Factory 2-U at all.

The deficiency can be illustrated in another manner.  After chronicling the 27 telephone

contacts among inconstant pairs of the Defendants, the Complaint asserts in conclusory fashion

that "[a]fter their unlawful discussions and communications" the factors "took concerted action

which harmed Factory 2-U's ability to conduct business." *Id.* ¶ 37.  Rather than describe the

"concerted action" Defendants took, however, the Complaint merely identifies four general types

of agreements reached by some unspecified number of the Defendants:

(a)     Agreements on whether credit would be extended by Defendants to
        Factory 2-U for its purchases from garment manufacturers;

(b)     Agreements on the amount of credit that would be extended by
        Defendants to Factory 2-U for its purchases from garment
        manufacturers;

(c)     Agreements on the terms on which credit would be extended by
        Defendants to Factory 2-U for its purchases from garment
        manufacturers, including without limitation time to pay (e.g., net
        60, net 30, net 15, or other terms), the date on which the time to
        pay would commence (e.g., from receipt of goods or date of
        invoice), and whether a security deposit would be required from
        Factory 2-U; and

(d)     Agreements on whether surcharges would be imposed by
        Defendants on garment manufacturers as a condition of financing

24

Factory 2-U's purchases from those manufacturers.

*Id.* ¶ 38.

How many of the Defendants reached how many of these agreements?  Which Defendants were they?  When was the agreement reached?  What was the substance of the agreement?  Would credit be extended or not, in what amount, on what terms, and with what surcharges?  On all of these points the Complaint is silent.  Because the Complaint offers only vague allegations of unspecified agreements made under four general categories and implemented at an unspecified time, I do not infer from them that a Section 1 conspiracy existed among Defendants.  The Complaint does not set out enough factual matter to suggest that the alleged agreements were actually reached.

The Plaintiff does not deny that Factory 2-U, as the borrower, would have known the answers to the types of questions I listed above; moreover, he, as Factory 2-U's trustee, has access to this information as well.  *See* Tr. at 27, 66, 83-84.  Yet Plaintiff chose to omit such detail from his Complaint.[10]  Although Plaintiff insists that such detail is not necessary at this stage of the proceedings, in light of *Twombly*'s directive that a Section 1 claim must provide "some setting . . . pointing toward a meeting of the minds," 127 S. Ct. at 1966, I disagree.  The absence of any kind of factual enhancement in the Complaint makes for an essentially "naked

---

[10]In the current procedural posture, I do not conclude that the pricing and other data omitted from the Complaint would contradict Plaintiff's claims, but it is fair to consider Plaintiff's access to these specifics when contemplating whether, consistent with *Twombly*, the Plaintiff's allegations are sufficiently non-speculative to justify imposition of the burdens of antitrust discovery.  *See* 127 S. Ct. at 1965 (requiring "plausible grounds to infer an agreement" and "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement"); *id.* at 1967 (cautioning district courts not to "forget that proceeding to antitrust discovery can be expensive").

assertion of conspiracy" that, like the parallel conduct allegation, "gets the [C]omplaint close to

stating a claim, but . . . stops short of the line between possibility and plausibility of entitlement

to relief." *Id.* (internal citation omitted).

D.     Independent Action By The Factors At Least As
       Likely As An Unlawful Agreement Among Them

Having examined the Complaint's allegations of parallel conduct, allegations of

information-sharing, and allegations of unlawful agreement, it is necessary to determine whether,

when taken together, these allegations meet *Twombly*'s standards for stating a Section 1 claim. I

conclude that they do not.

At best, the Plaintiff has alleged that the Defendants might have reached an agreement to

limit or decline credit to Factory 2-U and then acted on that agreement by doing just that, at

approximately the same time as one another. However, there is no factual detail in the

Complaint that makes it any more likely that the Defendants' parallel conduct was the result of

an unlawful agreement than, instead, the result of independent, rational, and wholly lawful

decisions by each Defendant to limit its exposure to Factory 2-U's deteriorating financial

condition. That is, it is at least equally likely that Defendants' actions were uncoordinated,

rational responses to the common "stimulus" of Factory 2-U's declining solvency.[11]

---

[11]That Factory 2-U was suffering from significant financial problems during the time of
the alleged conspiracy is not disputed in the Complaint. Furthermore, in documents filed in the
bankruptcy action – which the Court may consider, as they provide information relevant to
evaluating whether the allegations in the Complaint are plausible or, instead, there is "an obvious
alternative explanation," *Twombly*, 127 S. Ct. at 1972; *see also id.* at 1972 n.13 (noting that
district court "was entitled to take notice of the full contents of the published [newspaper] articles
referenced in the complaint") – Factory 2-U's Chief Executive Officer Norman Plotkin stated
that the company had experienced a "sustained period of sub-par operating performance despite

In such a situation, *Twombly* directs dismissal of the Complaint.  Given the "ambiguity" of parallel conduct amongst competitors, "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market," allegations that point equally both to lawful and unlawful behavior are inadequate to state a violation of Section 1 of the Sherman Act.  127 S. Ct. at 1964. "[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 1966 (emphasis added); *see also id.* at 1971 ("[W]hile the plaintiff may believe the defendants conspired . . . , the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy.") (internal quotation marks omitted).

Whether the Defendants acted independently, though in parallel, or whether, instead, they reached an agreement to act in parallel, is the very delineation between conduct that is entirely lawful and that which is so unlawful as to potentially require payment of treble damages to the victim.  That *Twombly* reached, and resolved, the question of how to handle a Section 1 claim that straddles this line is, in the instant case, dispositive.  Even if I were to conclude that Plaintiff's vague allegations of unspecified, lawful parallel conduct, its further allegations of lawful information-sharing, and its conclusory allegations of conspiracy together combined to make the two scenarios equally likely to be borne out by discovery, I cannot conclude that they combine to create "some setting suggesting the agreement necessary to make out a § 1 claim"

---

two rounds of out-of-court store closures during fiscal 2002 and fiscal 2003, and . . . declining sales volume in both fiscal 2001 and 2002." (D.I. 27 at 6 (citing *In re Factory 2-U Stores*, Case No. 04-10111 (Bkcy. D. Del.), D.I. 5 ¶¶ 7, 13); internal quotation marks omitted)

that would lift the claim out of "neutral territory" and into the realm of plausibility. *Id.* at 1966.

E.     Plaintiff's Section 1 Claims Should Be Dismissed

I conclude that the Complaint fails to meet *Twombly*'s standards for alleging an unlawful anti-competitive agreement in violation of Section 1 of the Sherman Act. Because a sufficient allegation of such an agreement is an essential element of Plaintiff's price-fixing, group boycott, and rule of reason claims, its absence must result in the dismissal of each of these three claims. Accordingly, I recommend that Counts I, II, and III of the Complaint be dismissed.[12]

IV.     Plaintiff's New York Law Claim

New York's "Donnelly Act was patterned after the Sherman Act and has been narrowly construed to encompass only those causes of action falling within the Sherman Act." *Kasada*, 2004 WL 2903776, at *13; *see also Chow v. Union Central Life Insurance Co.*, 457 F. Supp. 1303, 1308 (E.D.N.Y. 1978). Thus, I recommend that Plaintiff's Donnelly Act claims also be dismissed.

---

[12]It is not necessary to reach the multiple additional grounds the Defendants have offered for dismissing the Sherman Act claims. These include the failure to allege antitrust injury and expiration of the applicable statute of limitations.

28

## RECOMMENDED DISPOSITION

For the reasons set forth above, I recommend that Defendants' motions to dismiss (D.I. 26, 29, 33, 35, 37 and 38) be GRANTED and that the Complaint be DISMISSED.

Furthermore, Plaintiff's Motion for Leave to File a Surreply Brief in opposition to the motions to dismiss (D.I. 62) is GRANTED, Plaintiff's Motion to Vacate the Scheduling Order (D.I. 70) is DENIED AS MOOT, and Certain Defendants' Motion to Strike Plaintiff's Reply Brief in Support of His Motion to Vacate (D.I. 73) is DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within ten (10) days after being served with a copy of this Report and Recommendation.  Fed. R. Civ. P. 72(b).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir.1987); *Sincavage v. Barnhart*, 171 Fed. Appx. 924, 925 n.1 (3d Cir. 2006).

Dated: March 30, 2009

_____
The Honorable Leonard P. Stark
UNITED STATES MAGISTRATE JUDGE

29

## APPENDIX

Paragraph 35 of Plaintiff's Complaint alleges as follows:

35.      Consistent with the longstanding industry culture, beginning at least as early as 2002, the Defendants discussed and unlawfully agreed with each other on how they would do business with Factory 2-U and its garment manufacturers. The precise scope and duration of the Factory 2-U discussions and agreements are at present unknown to the Trustee, but they include, at a minimum, the discussions and agreements specifically alleged herein. Upon information and belief, these discussions and agreements began before the dates specifically alleged and continued after the dates specifically alleged. The conspiratorial communications among Defendants, include, but are not limited to the following:

(a)      On February 27, 2002, a credit representative from Rosenthal & Rosenthal contacted "Hattie" from Wells Fargo, a competing factor, and was told that Factory 2-U's $2 million credit line expired in February 2002 and that $282 thousand in Factory 2-U orders were being held as of March 2002.

(b)      On June 13,2002, a credit representative of Rosenthal & Rosenthal contacted George Dazet at HSBC, a competing factor, and was told that Factory 2-U's $4 million credit line was due on June 30, 2002, that a $2 million credit line was approved for June and July 2002, and that $3 million in Factory 2-U orders were being held.

(c)      On June 20, 2002, a credit representative from Rosenthal & Rosenthal contacted "Efrin" at Capital, a competing factor, and was told that Capital had approved $1 million on Factory 2-U's orders but were holding $1.5 million in Factory 2-U orders.

(d)      On July 10, 2002, a credit representative from Rosenthal & Rosenthal once again contacted George Dazet from HSBC and was told that Factory 2-U's credit line clearance was submitted for $4 million, but was cut down to $2.5 million.  The representative was also told that HSBC was holding $2.1 million in Factory 2-U orders and that Factory 2-U had to "pay down to get the line free."

(e)      On August 30,2002, a credit representative from Rosenthal & Rosenthal contacted Steve Turkish and or "Amy" at Sterling Factors and was informed that $1 million was being held on Factory 2-U orders.

(f)     Also, on August 30,2002, a credit representative from Rosenthal &
        Rosenthal once again contacted George Dazet at HSBC and was
        told that Factory 2-U's $2.5 million line expired in September and
        that $3.7 million in December 2002 Factory 2-U orders were being
        held.

(g)     On October 15, 2002, a representative from Rosenthal & Rosenthal
        contacted George Dazet at HSBC and was told that Factory 2-U's
        credit line was $1.5 million through December 31, 2002, which
        was a $1 million cut from September 2002. The Rosenthal
        representative was also told that GMAC was holding $3.2 million
        in Factory 2-U orders.

(h)     On December 18, 2002, a representative from Rosenthal &
        Rosenthal contacted George Dazet at HSBC and was told that
        Factory 2-U's credit line had decreased from $5 million to $1.5
        million.  The Rosenthal representative was also told that HSBC
        was holding $460 thousand in Factory 2-U orders.

(i)     Also, on December 18, 2002, a representative from Rosenthal &
        Rosenthal contacted "Efrin" from Capital and was told that Factory
        2-U's $1.5 million credit line was being pulled and that $1 million
        of Factory 2-U orders were being held.

(j)     Also, on December 18, 2002, a representative from Rosenthal &
        Rosenthal contacted a representative at Sterling Factors and was
        told that Sterling was holding Factory 2-U orders.

(k)     On March 13, 2003, Maurice Sabony, a vice president of Milberg,
        telephoned Roy Gringhaus of Wells Fargo, a competing factor, and
        discussed with Mr. Gringhaus the fact that Century was
        "continuing to decline all orders" that Factory 2-U was attempting
        to place with manufacturers. Mr. Gringhaus also told Mr. Sabony
        that another competing factor, Capital, was also not approving
        orders by Factory 2-U.

(l)     Also on March 13, 2003, Mr. Sabony telephoned George Dazet of
        HSBC, a competing factor, and discussed with him the fact that
        HSBC was declining orders that Factory 2-U was attempting to
        place with manufacturers.

31

(m)   Also on March 13, 2003, Mr. Sabony telephoned Orlando Morales of Rosenthal and Rosenthal, a competing factor, and discussed with him the amount of orders that Rosenthal and Rosenthal had approved for Factory 2-U, as well as the payment terms that Rosenthal and Rosenthal was requiring of Factory 2-U.  Mr. Sabony and Mr. Morales also discussed whether Rosenthal and Rosenthal was requiring security deposits from Factory 2-U, and Mr. Morales told Mr. Sabony about the security deposit policy of CIT, another competing factor, with regard to Factory 2-U.

(n)   On or about April 9, 2003, Frank DeRita, Senior Vice President and Credit Manager at Milberg, who was Mr. Sabony's superior, telephoned Steve Turkish, a credit manager at Sterling Factors, a competing factor. Mr. DeRita and Mr. Turkish discussed the credit limit that Sterling was maintaining on orders by Factory 2-U, the payment terms that Sterling was requiring from Factory 2-U, and the fact that Sterling was getting surcharges from manufacturers on all approved orders from Factory 2-U.

(o)   On April 21, 2003, Mr. Sabony telephoned Bill French at Capital Factors, a competing factor. Mr. Sabony discussed with Mr. French the fact that Capital Factors was approving only small orders from Factory 2-U for good clients, and was trying to resist "opening up" Factory 2-U's account for significant amounts of credit.

(p)   On April 23, 2003, Mr. Sabony again telephoned Mr. Morales at Rosenthal and Rosenthal.  They discussed the amount of credit that Rosenthal was approving on orders by Factory 2-U, the payment terms that Rosenthal was requiring of Factory 2-U, and the fact that Rosenthal was "doing surcharges" with Factory 2-U's manufacturers.

(q)   Also on April 23, 2003, Mr. Sabony again telephoned Mr. Gringhaus at Wells Fargo, who told Mr. Sabony that Wells Fargo was continuing to decline all Factory 2-U orders.

(r)   Also on April 23, 2003, Mr. Sabony again telephoned Mr. Dazet at HSBC, who told Mr. Sabony that HSBC was continuing to decline all Factory 2-U orders.

32

(s)     Also on April 23, 2003, Mr. Sabony telephoned Bill Rose of
        GMAC, a competitor. Mr. Rose and Mr. Sabony discussed the
        amount of credit that GMAC was approving on orders by Factory
        2-U, the payment terms that GMAC was requiring of Factory 2-U
        (including the fact that GMAC was insisting on "strict terms"), and
        GMAC's policy with regard to surcharges to Factory 2-U's
        manufacturers.

(t)     Also on April 23, 2003, a Milberg representative contacted a
        representative of CIT. They discussed the amount of credit that
        CIT was approving on orders from Factory 2-U, including a line of
        credit that Factory 2-U had established, the fact that CIT was
        imposing surcharges on all manufacturers whose orders from
        Factory 2-U CIT was financing, payment terms required by CIT
        from Factory 2-U and the fact that Sterling, another competing
        factor, was approving Factory 2-U orders up to a specified limit.

(u)     On June 5, 2003, Mr. Sabony again telephoned Mr. Turkish at
        Sterling. They discussed Sterling's credit limit with regard to
        Factory 2-U, Sterling's willingness to increase Factory 2-U's credit
        limit, whether Sterling or the manufacturers bore the risk of
        nonpayment, and payment terms required by Sterling from Factory
        2-U.

(v)     On July 22, 2003, Mr. Sabony again telephoned Mr. Frank at
        Capital Factors. They discussed the payment terms required of
        Factory 2-U by Capital, and the fact that Capital was declining
        orders from Factory 2-U except for small orders that were accepted
        as accommodations for Capital's best clients.

(w)     On July 28, 2003, Mr. DeRita again telephoned Mr. Turkish at
        Sterling. They discussed Sterling's intention to keep Factory 2-U's
        available credit limited to a specified amount.

(x)     On September 15, 2003, Mr. Sabony again telephoned Mr. Turkish
        at Sterling, who told Mr. Sabony that Sterling was approving orders
        up to a specified limit.

(y)     Also on September 15, 2003, Mr. Sabony again telephoned Mr.
        Rose at GMAC.  Mr. Rose discussed with Mr. Sabony GMAC's
        payment terms to Factory 2-U, GMAC's placement of $1 million of
        Factory 2-U orders on hold, GMAC's withholding of approval for
        those orders, GMAC's credit limit to Factory 2-U, and GMAC's
        possible increase of Factory 2-U's credit limit depending on
        Factory 2-U's financial plan.

(z)     Also on September 15, 2003, Mr. Sabony telephoned Steve
        Batkowsky of Rosenthal and Rosenthal, who told Mr. Sabony that
        Rosenthal and Rosenthal was still not approving Factory 2-U
        orders.

(aa)    On September 17, 2003, Mr. DeRita telephoned R. Louie of CIT.
        Mr. DeRita and Mr. Louie discussed the credit limit applied to
        Factory 2-U orders by CIT, and the future expiration date of that
        credit limit.